Volume 4

Pages 461 — 739

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | NO. CR 14-102-CRB |
| ) | |
| IAN FURMINGER and EDMOND ROBLES, ) | |
| ) | San Francisco, California |
| Defendants. ) | Thursday |
| ) | November 13, 2014 |
| _____ ) | 9:05 a.m. |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:           MELINDA HAAG
                         United States Attorney
                         450 Golden Gate Avenue
                         San Francisco, California  94102
                  BY:    JOHN HENRY HEMANN
                         RODNEY C. VILLAZOR
                         Assistant United States Attorneys


For Defendant Ian Furminger:
                         LAW OFFICES OF BRIAN H. GETZ
                         201 California Street
                         Suite 450
                         San Francisco, California  94111
                  BY:    BRIAN H. GETZ, ESQ.
                         JOHN PAUL PASSAGLIA, ESQ.


Reported by:             BELLE BALL, CSR 8785, CRR, RDR
                         KATHERINE SULLIVAN, CSR 5812, CRR, RMR
                         Official Reporters, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**

**For Defendant Edmond Robles:**
                          **LAW OFFICES OF TERESA CAFFESE**
                          **1000 Brannan Street**
                          **Suite 400**
                          **San Francisco, California  94103**
                **BY:  TERESA CAFFESE, ESQ.**
                          **HEATHER KELLY, ESQ.**


**Also Present:**
                          **Defendant Ian Furminger**
                          **Defendant Edmond Robles**
                          **Special Agent Melissa Patrick**
                          **Special Agent Sandra Flores**
                          **Dalida Vartanian**
                          **Stephen Janick**
                          **Alycee Lane**
                          **Erik Guzman, Esq.**
                          **Ines Swaney, Spanish-Language**
                                **Interpreter**

PROCEEDINGS

```
 1   NOVEMBER 13, 2014                              9:05 A.M.

 2                      P R O C E E D I N G S

 3          THE COURT:   Okay.  Let the record show all parties

 4   are present.

 5      Bring in the jury, and we'll start.

 6      (Jury enters at 9:06 a.m.)

 7          THE COURT:   Let the record reflect all jurors are

 8   present.

 9      Thank you so much for being so prompt.  Traffic was

10   terrible.

11      (Laughter)

12          THE COURT:   It was terrible.  So I really do

13   appreciate the fact that you obviously made an effort to get

14   here on time.

15      So let's proceed.  Call your next witness.

16          MR. VILLAZOR:   Thank you, Your Honor.  The government

17   calls Jerome DeFilippo.

18          THE CLERK:   Will the witness please come forward.

19      Good morning.

20          THE WITNESS:   Good morning.

21          THE CLERK:   Please remain standing.  Raise your right

22   hand.

23

24

25
```

1              **JEROME DEFILIPPO, PLAINTIFF WITNESS, SWORN**

2              **THE WITNESS:**  I do.

3              **THE CLERK:**  Please be seated.

4       Make sure you always speak into the mic.

5              **THE WITNESS:**  Okay.

6              **THE CLERK:**  Please state your full name.  Spell your

7    last name for the record.

8              **THE WITNESS:**  Jerome DeFilippo, D-e-F-i-l-i-p-p-o.

9                         **DIRECT EXAMINATION**

10   **BY MR. VILLAZOR:**

11   **Q.**   Good morning.

12   **A.**   Good morning.

13   **Q.**   Could you please introduce yourself to the jury and tell

14   them who you work for.

15   **A.**   I'm Captain Jerry DeFilippo, San Francisco Police

16   Department.

17   **Q.**   Captain DeFilippo, do you work within a particular

18   department within the police?

19   **A.**   I work in the Staff Services Unit.

20   **Q.**   Would you generally describe what the Staff Services Unit

21   does.

22   **A.**   In staff services I have personnel; backgrounds; payroll;

23   medical liaison; ADA coordinator; department physician; the

24   fleet unit; and permits unit.

25   **Q.**   And, Captain DeFilippo, how long have you been a police

1  officer with the San Francisco Police Department?

2  **A.**    A little over 25 years.

3  **Q.**    By the way, where are you working, at what location?

4  **A.**    The Hall of Justice, 850 Bryant.

5  **Q.**    Captain DeFilippo, I would like to briefly talk about your

6  background.

7      So you graduated from the academy about 25 years ago?

8  **A.**    Correct.

9  **Q.**    Did you start off as a patrolman?

10  **A.**    Yes.

11  **Q.**    Can you explain to the members of the jury where you were

12  stationed as a patrolman.

13  **A.**    I did my field training at Northern Station, my probation

14  at Mission Station.  I transferred to the Tenderloin Task

15  Force, which is now called Tenderloin Police Station.  I was

16  there until '96, when I got promoted to sergeant.

17      I went to Southern, Northern, back to Southern, all within

18  one year.  And then transferred back to the Tenderloin in

19  mid-'97.

20  **Q.**    And after you were at that last station, as a sergeant,

21  were you promoted again?

22  **A.**    I was.

23  **Q.**    Where were you pro- -- what were you promoted to, and

24  where?

25  **A.**    2006, to the rank of inspector.  And then went to the

1  investigations bureau.

2  **Q.**    What is the investigations bureau?

3  **A.**    That's where you have your specific units at that time.

4  It's different now.  I worked in the burglary unit, robbery

5  unit, and generally work unit.

6  **Q.**    Were you promoted after that?

7  **A.**    I was.

8  **Q.**    What were you promoted to, and where?

9  **A.**    In 2008 promoted to lieutenant.  And I went to Ingleside

10  Police Station in early 2008.

11        In October 2008 I was transferred to narcotics division.

12  Lieutenant there.  Day watch lieutenant.

13        In 2011 -- I'm sorry.  In 2009 I was transferred to

14  Taraval Station with -- we had a new chief who redesigned our

15  investigations bureau.  Every police station, at that point,

16  had an investigations unit.  So I went to Taraval Station and

17  ran the investigations unit there.

18  **Q.**    Did you move onto the internal affairs?

19  **A.**    I did.

20  **Q.**    Was that on the administrative side or criminal side?

21  **A.**    Criminal side.

22  **Q.**    Did you move on from IA?

23  **A.**    I did.

24  **Q.**    Where did you go?

25  **A.**    The tactical unit.  I was the day watch SWAT commander.

1   **Q.**   Just explain to the jury what the tactical unit is.

2   **A.**   It's the SWAT team.

3   **Q.**   After that you were then promoted to captain?

4   **A.**   I was.

5   **Q.**   In your present position?

6   **A.**   Correct.

7   **Q.**   You mentioned when you were lieutenant you worked in the

8   narcotics division?

9   **A.**   I did.

10  **Q.**   That was October 2008 to about November 2009?

11  **A.**   Yes.

12  **Q.**   Can you explain what the narcotics division is.

13  **A.**   Well, again, it was part of the Investigations Bureau.

14       We are broken down -- we still have a narcotics division.

15  So it basically investigates all narcotic or high-end,

16  mid-level to high-end narcotic trafficking and investigations.

17  **Q.**   Captain DeFilippo, I would like to show you what's been

18  marked as Government Exhibit 1.  Let me know when you have it

19  on your screen.

20       Do you recognize that?

21  **A.**   Not here yet.

22  **Q.**   Sorry.

23  **A.**   Oath of Office.

24  **Q.**   The Oath of Office?

25  **A.**   Yes.

1  **Q.**   What's the Oath of Office?

2  **A.**   When you pass the academy or every rank when you get

3  promoted you take the Oath of Office.

4  **Q.**   And is this what you took, this Oath of Office, when you

5  first became a San Francisco Police Department officer?

6  **A.**   I don't remember verbatim, but I believe it is.

7              **MR. VILLAZOR:**   Your Honor, at this time the

8  government moves Exhibit 1 into evidence.

9              **THE COURT:**   Admitted.

10     (Trial Exhibit 1 received in evidence.)

11     (Document displayed.)

12  **BY MR. VILLAZOR:**

13  **Q.**   Captain DeFilippo, you said you took this oath every time

14  you got promoted?

15  **A.**   Correct.

16  **Q.**   So when you became a sergeant, a lieutenant, and captain

17  you took that oath each time?

18  **A.**   Yes.

19  **Q.**   And is there also a tradition of taking that oath within

20  the San Francisco Police Department in other situations?

21  **A.**   There is.

22  **Q.**   Can you explain to the jury when you take that oath.

23  **A.**   Uhm, when the police academy graduates their classes, it's

24  a public forum.  The chief will ask any law enforcement

25  officers who would like to reaffirm their oath, if they can

1  stand and also take the oath with the graduating class.

2  Q.   Did you recently take the oath with the graduating class?

3  A.   I did.

4  Q.   Was there any particular reason you were with that

5  graduating class?

6  A.   My son graduated from the academy.

7  Q.   Did you take your oath then?

8  A.   I did.

9  Q.   Captain DeFilippo, in your 25 years of experience and your

10  time taking these oaths on numerous occasions, can you explain

11  to the jury what it means to you to take this oath.

12  A.   Sure.

13       It's really a commitment to a way of live.  You know, to

14  myself, to the community.  You know, uphold the laws of the

15  state of California, the Constitution.  Just really set your

16  moral and ethical compass in a direction, and follow that path.

17  Q.   Thank you, Captain.

18       I'd like to show you now what's been marked as Government

19  Exhibit 2.  Let me know when you have it up on your screen.

20  A.   Okay.  I have it.

21  Q.   Do you see that?

22  A.   I do.

23  Q.   What was Government Exhibit 2?

24  A.   The police department's Informant Management Manual.

25  Q.   Is there a particular, I guess, year down at the bottom

1   level?

2   **A.**   Yeah.  It's department manual 15, 2 of '98, was when it

3   was issued.

4   **Q.**   Was this the manual in effect at the time you were at the

5   narcotics division?

6   **A.**   Yes, it was.

7          **THE COURT:**  Admitted.

8       (Trial Exhibit 2 received in evidence.)

9          **MR. VILLAZOR:**  Thank you, Your Honor.

10      May we publish it to the jury, Your Honor?

11          **THE COURT:**  Yes.

12      (Document displayed.)

13  **BY MR. VILLAZOR:**

14  **Q.**   Captain DeFilippo, I'm going to ask Ms. Lane to turn to

15  page 4 of the exhibit.  Not page 4 of the manual, but page 4 of

16  the exhibit.  Do you see that?

17  **A.**   Barely.

18          **MR. VILLAZOR:**  I'll ask Ms. Lane to blow up the

19  "Purpose," part I, to the jury.

20  **BY MR. VILLAZOR:**

21  **Q.**   Captain DeFilippo, ask you read that part of -- the

22  Purpose of the manual.  Is the font big enough?

23  **A.**   I think so.

24  **Q.**   I have a paper copy.

25  **A.**   Actually, I have one also.

DELFILIPPO - DIRECT / VILLAZOR

1    Q.   You have a copy okay?

2    A.   Might be better.

3    Q.   How's that?  It's a little too big.

4    A.   This might be a little better if I just read.

5    Q.   Okay.

6    A.   (As read:)

7                    "The purpose of this manual is to

8              provide guidelines for the establishment,

9              use, and management of confidential

10             informants or/and or sources.  The San

11             Francisco Police Department recognizes that

12             informants are an effective tool for law

13             enforcement.  Members are encouraged to

14             develop criminal intelligence information

15             through the recruitment and proper

16             management of informants.  All members

17             should look upon each contact with

18             witnesses, suspects, victims and citizens

19             as potential sources of information.

20             However, members are reminded that not

21             every person is suitable as a potential

22             informant.  The Department's ultimate

23             responsibility to the community and that

24             need -- that need, must be balanced against

25             the need to gather intelligence -- or

```
 1              criminal information, intelligence

 2              information.  Members who obtain criminal

 3              intelligence information are responsible

 4              for bringing that information to the

 5              attention of the investigative unit best

 6              equipped to use the information."

 7   Q.   Thank you.

 8        Next, I would like to turn to part II, the Definitions.

 9   Part A, 1 and 2.  And I'll read that to you, Captain DeFilippo.

10   Let me know if I've read that accurately.

11              "Definitions the following terms and

12              their meanings are significant to informant

13              source management:

14              "1.  Source.  A person who provides law

15              enforcement with information with no

16              expectation of compensation (e.g. citizen

17              informant.)

18              "2.  Informant.  A person who provides

19              information as above, but who may be

20              motivated by a variety of expectations."

21        Did I read that correctly, Captain?

22   A.   You did.

23   Q.   I'm going to turn to page 5 of the exhibit, part B.  Types

24   of Informants.

25        (Document displayed.)
```

1  Q.  Do you see where I am, Captain DeFilippo?

2  A.  I think so.

3  Q.  Can you read the two types of information listed in part 1

4  and part 2.

5  A.  "Untested Informants"?

6  Q.  Yes, please.

7  A.  (As read:)

8          "Untested informants are usually people

9       who are willing to provide information to

10      law enforcement personnel in exchange for

11      some kind of considerations (e.g. money, or

12      consideration from District Attorney's

13      Office on a pending case).

14          "2.  Tested informants are usually

15      criminals or other people who have criminal

16      associates who have an established track

17      record of reliability with law enforcement

18      personnel.  Tested informants are usually

19      motivated by monetary compensation."

20  Q.  Thank you, Captain.

21      If we could turn now, to page 6 of the exhibit, part C.

22  And, captain, I'll read that to you.  Let me know if I've read

23  it correctly.

24      (Document displayed.)

25  Q.  "Classification of informants.  Part 1."

1   **A.**    Okay.

2   **Q.**    (As read:)

3        "Classification of informants.

4              "1.  Active informants are individuals

5              who physically participate in the purchase

6              of narcotics or contraband, and/or who are

7              physically present while introducing

8              undercover police officers to criminals, as

9              part of a Department-supervised, proactive,

10             covert investigation.

11             "A.  The use of restricted use

12             informants as active informants is

13             forbidden unless there are exigent

14             circumstances.  Members must obtain the

15             approval of his or her officer in charge

16             before using a restricted use informant

17             actively in a criminal investigation."

18       Did I read that correctly?

19  **A.**    Yes.

20  **Q.**    And is "restricted use informant" defined in the prior

21  section?

22  **A.**    I believe it is, yes.

23  **Q.**    Captain, could we turn to page 7 of the exhibit, part III,

24  Policy.

25       Do you see where we are?

1   **A.**   Yes.

2          **MR. VILLAZOR:**  If we could highlight part A of the

3   policy.

4        (Document displayed.)

5   **BY MR. VILLAZOR:**

6   **Q.**   And, Captain DeFilippo, could you read that into the

7   record, part A.

8   **A.**   Sure.  (As read:)

9          "A.  This informant policy demands consistency in

10       the use and management of confidential sources and

11       informants.  Common sense and prudent management

12       dictate that the below-listed general policies be

13       adhered to in order to protect the informant and the

14       integrity of the individual officer handling the

15       informant, the Investigations Bureau and the San

16       Francisco Police Department.

17          "*Members are forbidden from departing from these*

18       *guidelines and may be subject to appropriate*

19       *discipline if they do so.*"

20   **Q.**   Captain DeFilippo, I'm going to go down to part C.  And

21   I'll read that to you.  (As read:)

22              "Officer/informant contacts will be of

23          a strictly professional nature.  Extrinsic

24          social or business contacts (excluding

25          citizen informants) are expressly

1          prohibited.  This Department policy

2          precludes contacts with informants and/or

3          their families outside the scope of

4          official business because it is important

5          that members remain unbiased while

6          conducting a criminal investigation.  To

7          accomplish that goal, should a member be

8          contacted by a family member and/or a close

9          family friend who wishes to provide the

10         member with information regarding criminal

11         conduct, the member shall refer the

12         individual to another member of the

13         Department to conduct the follow-up

14         investigation."

15     Did I read that correctly, Captain?

16  A.   Yes.

17  Q.   If we go down to part E and F.  If you could read that to

18  the jury once we've blown up E and F, please.

19     Can you read that to the jury.

20  A.   Sure.  (As read:)

21          "E.  *Unless there are exigent*

22          *circumstances, informant managers are*

23          *prohibited from physically contacting the*

24          *informants alone.  On all physical*

25          *informant contacts, at least two offices*

```
 1              must be present.
 2                   "F.  Productive contacts with
 3              informants, if significant, will be
 4              documented on a Source Debriefing Form or
 5              on an Informant Contact/Payment form.
 6              Nonproductive contacts will be reported in
 7              the member's journal, notebook, or on the
 8              Informant Contact/Payment form."
```

**Q.**   Captain DeFilippo, I want to focus on E, real quick.

It says they're prohibited from physically contacting informants alone?

**A.**   Yes.

**Q.**   Can you explain to the jury what's the rationale behind that.

**A.**   There's always a danger of the informant saying an officer was inappropriate in transactions with them.  It's best to have a witness with you when you're contacting informants.

**Q.**   If you would turn to page 8 of the next page, part G.  And I'll read that to you.

(Document displayed.)

**Q.**   (As read:)

```
                   "G.  The source/informant name will
              never be used in an Establishment Report
              (memorandum), Source Debriefing Report, or
              on the Informant Contact/Payment form.
```

1          *Only* a source/informant number may be used.

2          Names of informants and other identifying

3          information (e.g., Informant Identification

4          Record, rap sheet, CII), will be maintained

5          in the master file by the Commanding

6          Officer of the Investigations Bureau or

7          Narcotics Division, whichever is

8          applicable.  The informant's working file

9          will contain the Establishment Report,

10         Source Debriefing Report and the

11         Contact/Payment record.  The working file

12         documents will identify the informant by

13         her/his informant number only."

14    Did I read that correctly?

15 **A.**   Yes.

16 **Q.**   And, very quickly, the third line from the top says:

17    "Only a source/informant number may be used."

18    Do you see that?

19 **A.**   Yes.

20 **Q.**   Captain DeFilippo, what's a source/informant number?

21 **A.**   Every informant is given a number for tracking purposes.

22    That way it keeps the identity of the informant

23 confidential.  It keeps the informant safe.  And the officer

24 works with that number as who they're working with.  That's how

25 they're identified in all the documents except in master file.

1  Q.   Is there any rhyme or reason to the number?

2  A.   Yes, there is.

3  Q.   Can you explain to the jury what that rhyme or reason is.

4  A.   The number is given for the year and then the sequential

5  person or source being signed up.

6       For instance, we're in 2014.  So the first number will be

7  one-four for 2014.  There will be a dash.  And the first

8  informant signed up would be zero-one.  So it will be 14-01.

9  Next will be 14-02.  And so on.

10  Q.  And then on the sixth line it mentions that a master file

11  will be with the Commanding Officer of the Investigations

12  Bureau or Narcotics Division, whichever is applicable.

13      Do you see where I read that?

14  A.  Yes.

15  Q.  Narcotics Division, is that where were you working in

16  2008-2009?

17  A.  I was.

18          **MR. VILLAZOR:**  If we could highlight H.  H.1.  H.1.

19  **BY MR. VILLAZOR:**

20  Q.  Captain, I think it's your turn.  If you would mind

21  reading that to the jury.

22  A.  (As read:)

23              "H.  All informants *actively* involved

24              in criminal investigations, regardless of

25              their type of classification, shall be

DEFILIPPO - DIRECT / VILLAZOR

```
 1                     advised at the onset that:
 2                          "1.  They shall not violate criminal
 3                     law in furtherance of gathering
 4                     information, and/or providing services
 5                     while assisting the San Francisco Police
 6                     Department.  Any evidence of such a
 7                     violation will be reported to the
 8                     appropriate law enforcement agency and may
 9                     hinder further use of this individual as an
10                     informant."
11  Q.   If we could go down to number 5 of H.
12  A.   (As read:)
13                          "5.  All informants actively involved
14                     in the purchase of narcotics or other
15                     contraband shall be searched completely
16                     (strip searched) for narcotics, money, or
17                     other contraband before and after making
18                     any controlled purchase.  The searching
19                     officer shall be of the same sex as the
20                     informant."
21  Q.   Captain DeFilippo, have you ever engaged in a controlled
22  purchase under these circumstances?
23  A.   I have.
24  Q.   Can you just explain what number 5 means in layman's
25  terms.
```

**A.**   If you have an informant who has given information about,
say, a drug dealer, and they can make the buy for you, you take
the person into a location.  You'll strip search the person,
make sure there's no drugs, money, or anything else on their
person, check their clothes.

You provide them with the buy money.  They go and make the
purchase.  They come back and give you what they bought.

They are strip searched again, make sure they didn't steal
any from what they bought.  And then you write the report.

**Q.**   Thank you, Captain.

If we could turn to part I now. (As read:)

              "I.  Informants shall sign and date a
              Cooperating Individual Agreement form
              acknowledging that he or she has read and
              agrees to comply with the above conditions.
              The informant's signature shall be
              witnessed by two officers who shall sign
              the agreement form as a witness.  Should an
              informant refuse to sign the agreement
              form, members shall verbally admonish the
              informant, verbatim, and the
              Cooperating" -- next page, top paragraph --
              "the Cooperating Individual Agreement will
              be completed through audio taping.  The
              following statement shall be entered on the

```
 1                Cooperating Agreement form, dated, and

 2                signed by the informant manager and a

 3                witnessing officer:

 4                     "On [date] C.R.I.#," blank, "was

 5                advised of and agreed to the conditions set

 6                forth on this form.  C.R.I.#," blank,

 7                "refused to sign the Cooperating Individual

 8                form; however, the informant was verbally

 9                admonished and his/her agreement was

10                tape-recorded."
```

11      Did I read that correctly?

12  **A.**   You did.

13  **Q.**   Captain, if you would now turn to part J and read that to

14  the jury.

15  **A.**   (As read:)

```
16                     "All interactions with the informant,

17                including his/her development,

18                establishment, and use should be carried

19                out with the highest regard for

20                confidentiality.  When the informant is

21                brought into a police facility, it should

22                be done in a manner to attract minimal

23                attention both upon entering and leaving

24                the facility.  While the informant is in

25                the police facility his/her activity shall
```

1              be monitored by the informant manager or

2              his/her designee.  Documents and reports

3              concerning the identity of the informant

4              and his/her informant status should be kept

5              secure.  Members should arrange to meet

6              their informants as much as possible at

7              neutral locations so as not to

8              unnecessarily disclose their informant

9              status to adverse parties."

10  **Q.**  Captain, it says "minimal attention."  Could you elaborate

11  a little more on what minimal attention is.

12  **A.**  You wouldn't want to bring somebody through the front

13  door.  Usually, if you had to bring an informant to a station

14  or your detail, you try to use side entrances, back doors.  You

15  try to do it off hours.

16     So when the public or other, you know, potential criminals

17  don't recognize the person, because you don't want to put your

18  CI in danger.

19            **MR. VILLAZOR:**  If we could turn to page 10 of this

20  exhibit, part IV, Procedures.  Just that first paragraph.

21     (Document displayed.)

22  **BY MR. VILLAZOR**

23  **Q.**  (As read:)

24     "IV.  Procedures.

25              "Criteria have been established, which

DEFILIPPO - DIRECT / VILLAZOR                    484

1                    must be strictly adhered to when developing

2                    and establishing source/informants to be

3                    used by the Police Department."

4        Did I read that correctly?

5    A.   Yes.

6    Q.   And on the accompanying part IV, does this set forth the

7    procedures that are supposed to be followed in terms of signing

8    up a confidential informant?

9    A.   They are.

10   Q.   I'm going to skip over to part B on page 11 of the

11   exhibit.

12       (Document displayed.)

13   Q.   Part B, Detention and arrest of informants.

14       Do you see where I am?

15   A.   Yes.

16   Q.   And if you could go to part -- actually, part 2.  Can you

17   read that to the jury.

18   A.   (As read:)

19                   "Members who have been arrested as

20                   potential informants for criminal offenses

21                   (other than felony warrant) who are seeking

22                   to release an arrestee (potential

23                   informant) before the booking process,

24                   shall, either at the station or detail, or

25                   at CJ9" -- which is county jail -- "obtain

```
 1                the approval of their immediate supervisor

 2                and the Officer-in-Charge or designee of

 3                the members's unit/station.  It is

 4                permitted for the member to obtain verbal

 5                permission from his/her supervisor and the

 6                Officer-in-Charge or designee by telephone

 7                before the release of the individual.

 8                Arrestees who have outstanding felony

 9                warrants for their arrest shall be booked.

10                The decision to release an arrestee with

11                outstanding warrants for misdemeanor or

12                infraction violations will be at the

13                discretion of the member with the approval

14                of his/her immediate supervisor and

15                Officer-in-Charge."
```

**Q.**  Let my stop you right there.

     "With the approval of his/her immediate supervisor."
Immediate supervisor, so, let's say, any given patrol person,
their immediate supervisor is typically who?

**A.**  Would be a sergeant.

**Q.**  Within the particular office that they work?

**A.**  Correct.

**Q.**  Or station that they work in?

**A.**  Station or detail, yes.

**Q.**  And officer-in-charge, where is the officer-in-charge?

 1    **A.**    That -- potentially at a station would probably be the

 2    platoon commander, which is the rank of lieutenant.

 3    **Q.**    So the approval would have to be at the particular station

 4    where the patrol person is designated?

 5    **A.**    Yes, if I read this right.

 6    **Q.**    Okay.

 7    **A.**    His or her commanding officer.

 8    **Q.**    The chain of command?

 9    **A.**    Chain of command, yes.

10    **Q.**    And, Captain, I want to flip over to page 14 of the

11    exhibit, part D, Establishment.  Part 1.

12         (Document displayed.)

13    **Q.**    And I'll read that into the record.  Let me know if I've

14    read it right.

15                     "D.  Establishment.

16                     "1.  The officer initiating

17              establishment shall first have the approval

18              of his/her immediate supervisor and the

19              officer in charge or his/her designee.  The

20              member will contact the appropriate

21              Investigative Bureau or Narcotics

22              Division" -- again, that's where you

23              worked?

24    **A.**    Correct.

25    **Q.**    (As read:)

```
 1                     "To ascertain whether the informant has
 2               a current informant manager and/or an
 3               existing informant file.  If the members
 4               are unable to ascertain the name of the
 5               potential informant's manager or they are
 6               unsure if the potential informant has been
 7               established as an informant, the member
 8               shall complete an informant file and
 9               forward the file to the appropriate
10               bureau/division (Narcotics or
11               Investigative).  It will be the
12               responsibility of the Commanding Officer or
13               designee of the Narcotics Division or
14               Investigative Bureau to monitor the
15               informant file for duplication."
16         Did I read that correctly?
17   A.    Yes.
18   Q.    If you can skip down to part 4 of D.  Can you read that to
19   the jury, Captain.
20   A.    (As read:)
21                     "If the potential informant does not
22               have an established informant file, the
23               member will adhere to the following
24               procedure."
25   Q.    If you turn to the next page, and look at parts A, B, and
```

DEPHLIPPO - DIRECT / VILLAZOR

```
 1   C.

 2        (Document displayed.)

 3   A.   Okay.  (As read:)

 4               "A.  The member will introduce the

 5               potential informant to his or her immediate

 6               supervisor once to allow the supervisor to

 7               make an independent evaluation as to the

 8               suitability of the individual.

 9               "B.  Once approved, the initiating

10               member shall prepare two separate files, a

11               master file and a working file.  The master

12               file will contain pertinent information

13               regarding the identity of the informant,

14               and the working file will contain documents

15               concerning the investigation in which the

16               informant has provided information.

17               "C.  Upon completing the master and the

18               working file, the member will forward the

19               files to his or her immediate supervisor

20               and the Officer-in-Charge or designee of

21               the member's respective unit, division, or

22               station for approval.  Once files are

23               approved the files will be forwarded to the

24               commanding officer of the Investigations

25               Bureau or Narcotics Division, whichever
```

```
 1              applies, and the informant will be issued

 2              an informant number.  The informant number

 3              will be used to identify the informant in

 4              any future written communication."

 5   Q.    Thank you, Captain.

 6        Now, I want to talk about part C a bit more.  During your

 7   time in the narcotics division can you just explain to the jury

 8   how that actually worked.

 9   A.    Sure.

10        The files will come out to the narcotics division for

11   narcotic informants.  Review them to see if they're suitable,

12   met the criteria.  Not on parole or probation, federal

13   probation.  The violence, check their rap sheets.

14        If everything met the criteria, I give it to the

15   commanding officer, who was the captain of narcotics at the

16   time.  He would look it over, approve it.  At which time I

17   would enter the number -- or give a number, assign a number for

18   the informant and then advise the officers of the number.

19   Q.    Captain DeFilippo, I'm going to show you what's been

20   marked as Government Exhibit 50.  Five-zero.  Let me know when

21   you have it on your screen.

22   A.    It's up.

23   Q.    Do you recognize that?

24           MR. VILLAZOR:  If you could show, I guess, the "To"

25   and "From."  Actually the whole front, the stamp.
```

1  **BY MR. VILLAZOR:**

2  **Q.**    Do you recognize what Government Exhibit 50 is?

3  **A.**    I do.

4  **Q.**    What is that?

5  **A.**    It's a memo to establish a CA.

6          **MR. VILLAZOR:**  Your Honor, I would move Government

7  Exhibit 50 into evidence.

8          **THE COURT:**  Admitted.

9      (Trial Exhibit 50 received in evidence.)

10     (Document displayed.)

11 **BY MR. VILLAZOR:**

12 **Q.**    And, Captain DeFilippo, who is the "To" listed here?

13 **A.**    To is Captain Stephen Tacchini, who is the commanding

14 officer of Mission Station.

15 **Q.**    Who's it from?

16 **A.**    Officer Edmond Robles.

17 **Q.**    The date?

18 **A.**    Friday, February 20, 2009.

19 **Q.**    And the subject?

20 **A.**    Informant Initiation.

21 **Q.**    And to the right do you see there's, I guess, some stamps

22 there?

23 **A.**    Yes.

24 **Q.**    Could you explain to the jury what that is.

25 **A.**    When a memo is submitted it goes through the chain of

1    command.  It gets approval.

2        Every time it gets approved by a supervisor or a

3    commanding officer, it gets stamped.  They either "yes,"

4    approved, or "no."

5    **Q.**   Do you see your actual name and stamp over there?

6    **A.**   I do.

7    **Q.**   This was something you approved during the time you were

8    at narcotics division?

9    **A.**   I did.

10   **Q.**   Was this part of that part C we just talked about in the

11   informant manual?

12   **A.**   Correct.

13   **Q.**   You didn't actually meet the informant, did you?

14   **A.**   Did not.

15   **Q.**   Is that not part of the protocol?

16   **A.**   No.  I would not have met an outside unit's informant.

17          **MR. VILLAZOR:**  If we could now show the first

18   paragraph of the part.

19       (Document displayed.)

20   **BY MR. VILLAZOR:**

21   **Q.**   Captain, can you read that to the members of the jury.

22   **A.**   (As read:)

23       "On 2/20/2009 CI# 09-08 was interviewed by Officer

24       Vargas star 979 and myself.  The CI wants to give the

25       San Francisco Police Department information about

1          suspected narcotic dealers and suspects who are

2          illegally selling guns in San Francisco.  After the

3          CI was debriefed, it was found that the information

4          given to us by the CI was accurate.  The information

5          will be helpful to members of the department to solve

6          future criminal cases."

7                    **MR. VILLAZOR:**  Your Honor, at this time I would like

8     to read a stipulation in by the parties.

9                    **THE COURT:**  Yes.

10                   **MR. VILLAZOR:**  (As read:)

11                        "Under the section SFPD Informant

12                   Policy No. 6, Cesar Hernandez was signed as

13                   an SFPD informant on February 20, 2009.

14                   SFPD assigned him informant identification

15                   number 09-08."

16         Thank you, Your Honor.

17                   **THE COURT:**  Thank you.

18    **BY MR. VILLAZOR:**

19    **Q.**   Captain DeFilippo I'm going to show you now Government

20    Exhibit 51.

21         (Document displayed.)

22    **Q.**   Do you see that?

23    **A.**   I do.

24    **Q.**   And what is that?

25    **A.**   That is the Cooperating Individual Agreement.

1              **MR. VILLAZOR:**  Your Honor, can we move that into

2    evidence?

3              **THE COURT:**  Yes.  51 admitted.

4         (Trial Exhibit 51 received in evidence.)

5         (Document displayed.)

6    **BY MR. VILLAZOR:**

7    **Q.**   Captain DeFilippo, if we could read paragraph 1 to the

8    jury.

9    **A.**   (As read:)

10                  "They shall not violate criminal law in

11               furtherance of gathering information or

12               providing services that may -- that any

13               evidence of such a violation will be

14               reported to the appropriate law enforcement

15               agency."

16   **Q.**   And paragraph 5?

17   **A.**   (As read:)

18                  "Informants actively involved in the

19               purchase of narcotics or other contraband

20               shall be searched completely (strip

21               searched) prior to making the purchase.

22               The searching officer shall be of the same

23               sex as the informant."

24   **Q.**   Captain DeFilippo, is this essentially verbatim from what

25   was a part in the informant manual?

 1  **A.**    It is.

 2  **Q.**    Now I'm going to show you Government Exhibit 70.  Let me

 3  know when you see it.

 4  **A.**    Yes.

 5  **Q.**    Do you recognize that?

 6  **A.**    I can barely --

 7  **Q.**    Sorry?

 8  **A.**    Could you blow it up.

 9         This one I don't.

10  **Q.**    Okay.  We'll move on then.

11              **THE COURT:**  I'm sorry, what --

12              **MR. VILLAZOR:**   That was Government Exhibit 70, Your

13  Honor.

14         We'll move on.  The parties have a stipulation.  We can

15  talk about it later.

16         If we could go back to Government Exhibit 2.  Go to page

17  22 of the exhibit.  Part G, paragraph 1.

18         (Document displayed.)

19  **BY MR. VILLAZOR:**

20  **Q.**    Could you read that to the jury.

21  **A.**    Find it.

22  **Q.**    It's page 19 of the informant manual.

23  **A.**    Commanding officer responsibilities?

24  **Q.**    Yes.  Could you read part 1?

25  **A.**    Sure.  (As read:)

```
 1                    "The commanding officer of the

 2               Investigations Bureau and the commanding

 3               officer of the Narcotics Division will each

 4               maintain an informant code book.  The

 5               Investigations informant number will be

 6               prefaced with the letter 'I,' and Narcotics

 7               Division informant number will be prefaced

 8               with the letter 'N.'  The informant code

 9               book will contain the following information

10               (example attached):"
```

11  **Q.**    Captain, this code book, is this what you were talking

12  about with the assignment of numbers?

13  **A.**    Correct.

14  **Q.**    Can you explain to the jury how that works.

15  **A.**    Again, as I explained before, it's like an old ledger

16  book.  Lines across it.  The first line would be -- you know,

17  up at the top of the page is the year.

18       This year would be 2014.  So then first one would be

19  14-01.  It would have the name of the officer handling the

20  informant.  I think -- it's been a long time since I've seen it

21  but I believe it's the date of initiation.  There's several

22  columns.  It goes across to date of deactivation.

23       So it's just a ledger tracking each informant.

24  **Q.**    Is there a corresponding name with the particular number?

25  **A.**    The names aren't in there.  The names are only in the

```
 1  master file of the informant.  But the officer who's signed

 2  them up, that officer's name is in the book.

 3  Q.   Lastly, Captain, if we could turn to page 23 of the

 4  exhibit, page 20 of the informant manual, part I, Payments to

 5  Informants.

 6       Could you read that to the members of the jury.

 7  A.   Okay.  (As read:)

 8            "Documentation of payment to informants

 9            is critical, and all payments shall be

10            recorded on the appropriate receipt form

11            (SFPD 312 form).  All payments to

12            informants shall be witnessed by another

13            member.  Any person who is to receive

14            payments shall be established as an

15            informant as outlined in this manual.  This

16            includes informants who are not -- who are

17            information only informants.  The amount of

18            payment shall be" commen- --

19       Excuse me.

20  Q.   "Commensurate."

21  A.   (As read:)

22            "... commensurate with the value of

23            services and/or information provided, and

24            shall be based on the following factors:

25            "a.  The level of the targeted
```

1               individual, organization or operation.

2                    "b.   In narcotic-related cases, the

3               amount of actual or potential seizure of

4               contraband.   NOTE:   Because payments based

5               on seized evidence are not universally

6               accepted in the courts, the investigator

7               shall not promise the informant any

8               specific amount of remuneration based on

9               evidence seized.

10                   "c.   The significance of the

11              contribution made by the informant in the

12              investigation.

13                   "d.   Whether or not the informant

14              testified in court."

15         And:

16                   "e.   The level of jeopardy into which

17              he or she has been placed."

18   Q.   Captain DeFilippo, is there a designated source of money

19   that any particular SFPD officer is supposed to go to, to give

20   an informant money?

21   A.   Yes.

22   Q.   Where is that source?

23   A.   Narcotics Division has funds for informants, contingency

24   funds for that, just this.

25   Q.   Is that the only source where police officers are supposed

1  to be getting money?

2  **A.**    I believe the Investigations Bureau, at the time, also had

3  funds for investigations with informants.

4  **Q.**    Are those the only two sources?

5  **A.**    Correct.

6  **Q.**    Should they be getting money from any seizures?

7  **A.**    No.

8  **Q.**    Should they be getting anything beyond money?

9  **A.**    They should not.

10           **MR. VILLAZOR:**  Just a moment, Your Honor.

11  **BY MR. VILLAZOR:**

12  **Q.**    Captain DeFilippo, any money that is seized during

13  seizures, what are they supposed to do with that?

14  **A.**    It gets booked.

15  **Q.**    "Booked."  What does that mean?

16  **A.**    It's evidence.  So, like any other piece of evidence, the

17  police report is written.  It's listed in the police report.

18  It goes through the procedure of booking, documenting, and sent

19  to the property clerk.

20           **MR. VILLAZOR:**  Thank you, Captain.  I have no further

21  questions.

22           **THE COURT:**  Is that true of narcotics, as well?

23           **THE WITNESS:**  Narcotics, they get booked also, but

24  it's a different process.  That gets booked in a special block

25  container, and it goes out to the lab for testing.

DEFILIPPO - CROSS / GETZ

```
1              THE COURT:  Would that be all narcotics that were

2    seized?

3              THE WITNESS:  Yes.

4              THE COURT:  Thank you.

5         Cross.  Yes.

6                        CROSS EXAMINATION

7    BY MR. GETZ:

8    Q.   Good morning.

9    A.   Good morning.

10   Q.   What did you mean when you said being a police officer is

11   a way of life?

12   A.   Well, you kind of set your moral compass, do the right

13   thing, and hopefully follow it.

14   Q.   It's more than just a 9:00 to 5:00 job; isn't it?

15   A.   It is.

16   Q.   It really is around the clock, because at all times you

17   bear in mind this is what you stand for.  Do you agree?

18   A.   I do.

19   Q.   In fact, police officers are authorized to carry their

20   guns while off duty; are they not?

21   A.   They are.

22   Q.   Do you agree with me that police officers are encouraged,

23   even when they're off duty, to serve the public by being

24   observant, by watching what's going on around them, and by

25   protecting the citizens?
```

1    **A.**    Yes.

2    **Q.**    Do you agree with me that being a police officer is not

3    just a profession and not just work, but it also becomes

4    somewhat social in that you enjoy the brotherhood of your

5    fellow officers?

6    **A.**    Yeah.  Yes.

7    **Q.**    I'm just asking you whether you noticed that police

8    officers tend to socialize more than, say, insurance salesmen

9    or lawyers or any other group you can name.

10         They're a group; wouldn't you say?

11   **A.**    Yeah.  But I have no reference to any other groups, so I

12   wouldn't know.

13   **Q.**    All right.  Do you agree that being a police officer means

14   there's a certain amount of loyalty that you have to your

15   brother officers?

16   **A.**    I'm not sure what you mean by that.

17   **Q.**    Loyalty in the sense that you're all in this together and

18   that you're all working toward a common goal and a common

19   purpose as police officers?

20   **A.**    I'm not sure where you're going, but we're all here to do

21   the right thing.

22   **Q.**    All right.  I guess, you were talking about the oath

23   someone takes to be a police officer.  And one of the things it

24   refers to is defending against enemies.  Do you remember that?

25   **A.**    Foreign and domestic.

DEFILIPPO - CROSS / GETZ

1   **Q.**   Who are the enemies?

2   **A.**   That's a good question.

3   **Q.**   It could be anyone; right?

4   **A.**   Could be.

5   **Q.**   It could be a brother officer theoretically; couldn't it?

6   **A.**   Could be.

7   **Q.**   Okay.  I'd like to ask you a couple of questions about the

8   Informant Management Manual.  And in terms of who can be an

9   informant, I'd like to start with that.

10       An informant could be somebody with no police background;

11  correct?

12  **A.**   Correct.

13  **Q.**   An informant could be somebody who's been arrested before;

14  correct?

15  **A.**   Could be, yes.

16  **Q.**   An informant could be somebody who's under 18,

17  theoretically?

18  **A.**   It would be a restricted use, but it's possible.

19  **Q.**   It could be somebody who's over 18 and is on state parole;

20  correct?

21  **A.**   Could be.

22  **Q.**   It could be somebody who's on federal parole?

23  **A.**   Could be.

24  **Q.**   It could be somebody who just got out of prison?

25  **A.**   Pretty much anybody could be a source.

1  Q.   An informant could be anybody.  There isn't anyone in your

2  manual who is expressly excluded from being an informant.  Do

3  you agree with that?

4  A.   I mean, any -- depends on the circumstances.  You can use

5  information from almost anybody.

6  Q.   Sure.  Now, you were talking, a little bit, about policy.

7  And the policy section of the manual is essentially the general

8  guideline that officers are to follow, correct?

9  A.   Yes.

10  Q.   But as to each policy, the officer has to exercise

11  individual judgment and determination, correct?

12  A.   I would say so.

13  Q.   So, for example, one thing you read into the record when

14  you were -- we were talking about policy -- it's on page 7, I

15  believe, of your book there.  If you want to look at the policy

16  section III.

17  A.   Sure.

18  Q.   But one of the things you were talking about was that the

19  officer informant contacts should be of a strictly professional

20  nature.

21       It doesn't really give a definition of what "professional

22  nature" is, correct?

23  A.   I don't think there's a definition of what that is, no.

24  Q.   No.  But we've already established, and you established

25  five minutes ago when you testified, that the profession of

 1    being a police officer is all-encompassing, correct?

 2    **A.**    I believe so.

 3    **Q.**    Twenty-four hours a day, right?

 4    **A.**    Could be.

 5    **Q.**    You were proud when your son swore the oath to become a

 6    police officer; were you not?

 7    **A.**    I was.

 8    **Q.**    And is it fair to say that, no doubt, one of the reasons

 9    why he wanted to become a police officer is because of his

10    great love and respect for you and what you do; correct?

11    **A.**    I like to think so.

12    **Q.**    So in this book here, you know, the manual talks about the

13    exercise of professional judgment.  That would include

14    everything in a person's life, not just the one shift where the

15    person is on duty as a police officer.  Do you agree with that?

16    **A.**    I would.

17    **Q.**    Okay.  The policy section that you are looking at -- I'm

18    looking at III, subsection C, if you need to refresh your

19    recollection.

20         It talks about extrinsic social and business contacts

21    being expressly prohibited, correct?

22    **A.**    Where was that again?

23    **Q.**    It was III, subsection C, on page 7.  It's page 4 of your

24    manual.  Talks about extrinsic social and business contacts

25    being prohibited.  Do you remember that?

1   **A.**    Yes.

2   **Q.**    But nowhere in the manual does it say what extrinsic

3   social or business contacts are; correct?

4   **A.**    I don't think it's broken down, no.

5   **Q.**    Okay.  And the -- it goes on to say that the department

6   policy precludes contact with informants outside the scope of

7   official business; correct?

8   **A.**    I believe so.

9   **Q.**    All right.  But nowhere in the manual does it say what

10  official business is; correct?

11  **A.**    Well, I wouldn't go to a barbecue with an informant.

12  **Q.**    Right.  But you might do something that's way beyond the

13  scope of the shift that you were just finishing; correct?

14  **A.**    I'm not sure what you mean.

15  **Q.**    Well, there's no definition, there's no limit on what is

16  official business when you're a police officer.  Do you agree

17  with that?

18  **A.**    No.

19  **Q.**    You don't agree that 24 hours a day you're capable of

20  being a police officer?  I thought we already went through

21  that.

22  **A.**    Capable.  But, I mean, I'm taking my business home.  I'm

23  not really sure where we're going here.

24  **Q.**    Okay.  Well, let me try another question on you --

25  **A.**    Okay.

1   Q.   -- and see if I can do a better job.

2        Let's go down to III, subsection E.  Talks about exigent

3   circumstances being needed before you can meet one-on-one with

4   an informant; correct?

5   A.   Yes.

6   Q.   But nowhere does it say what exigent circumstances are in

7   that context; correct?

8   A.   It doesn't.

9   Q.   All right.  Now, the manual makes numerous references to

10  protecting the identity of the informant and trying to make

11  sure that the informant's identity is not disclosed to people,

12  because that might endanger the informant's safety.

13       Do you agree with that?

14  A.   I do.

15  Q.   In fact, the manual is so precise on that regard there's

16  even a section in which officers are warned not to tell the

17  name of the informant to the prosecutors; right?

18  A.   Correct.

19  Q.   So, just to put this in context, the police officers --

20  I'm speaking generally now.

21       The police officers gather evidence.  And when it comes

22  time to go to court they give the evidence to the prosecutors,

23  who are assigned the duty of coming to court and prosecuting

24  these people who are being charged; correct?

25  A.   Yes.

1    **Q.**    Yet the police officers who are providing this raw

2    evidence and material have a duty to make sure that even the

3    prosecutor doesn't know the name of the informant; correct?

4    **A.**    Well, there are steps in place where that can be given to

5    the prosecutor.  And it would be an in camera hearing with the

6    Judge to determine whether or not the person named will be able

7    to testify.

8        So, yes, there are steps in place that you can disclose

9    who it is.

10   **Q.**    I'm going to get to that in a moment, but I'm trying to do

11   it step by step.  You and I know all this stuff, but I'm trying

12   to do it in a chronological way.

13       I'm asking you, first of all, whether there's a duty that

14   the police officers not tell the prosecutors, at least

15   initially, who the informant is; correct?

16   **A.**    There's a duty to keep that information confidential for

17   the safety of the informant, yes.

18   **Q.**    You say "confidential."  I'm being precise here.  I'm

19   saying the duty of confidentiality means that, generally

20   speaking, the police officer doesn't even tell the prosecutor

21   the name of the informant; right?

22   **A.**    In many cases that's true.

23   **Q.**    Okay.  So there can be a situation where -- and it's

24   usually the defense lawyer asks the Judge to make the police

25   say who the informant is.  And then there's a procedure to

 1  still protect the name of the informant, which you called "in

 2  camera"; correct?

 3  **A.**   Yes.

 4  **Q.**   And that's the procedure where, away from the eyes of

 5  anyone who might see and the ears of anyone who might listen,

 6  the police officer who knows the name of the informant goes in

 7  the back, to the Judge's robing room, and says to the Judge

 8  what the information is about the informant, in an attempt to

 9  keep it from becoming publicly known; correct?

10          **MR. VILLAZOR:**   Your Honor, I'm going to object.

11  That's complex, compound.

12          **THE COURT:**   Well, just to take the mystery out of

13  this, because it sounds like something is being done in the

14  back room.

15      (Laughter)

16          **THE COURT:**   It's not actually done in the back room.

17  It's frequently done in court.

18      But Counsel is quite right, the public and other people

19  may be excluded from that session if there is the disclosure of

20  confidential information initially.

21      I would also say, ladies and gentlemen of the jury, that

22  while that process excludes the public it does not exclude the

23  court reporter.  And so what is told to the Judge during that

24  process is recorded by the court reporter.  It's placed in a

25  transcript.  The transcript is sealed.  That means it's not

DEFILIPPO - CROSS / GETZ

1  disclosed to the public.  And it may possibly not be disclosed

2  to the defense depending on the outcome of the hearing.  And

3  it's part of the record.

4      So, eventually, depending on what occurs with respect to

5  the case, it may be disclosed at least to a panel of judges

6  later on who are reviewing anything that happened in the

7  District Court.

8      So that's the process.  It's not a mystery.  It's been

9  done for many, many years.  It's a well-recognized manner in

10 which confidential information is disclosed and is dealt with.

11     Thank you.

12     Go ahead, Mr. Getz.

13          **MR. GETZ:**  Thank you.

14 **BY MR. GETZ:**

15 **Q.**  You mentioned that -- and you relied upon subsection E of

16 the policy when you were talking about this -- unless there are

17 exigent circumstances there should be two officers present when

18 the informant is met somewhere.

19     Do you remember that testimony?

20 **A.**  Yes.

21 **Q.**  Do you agree with me that the fact of the second officer

22 being present doesn't decrease but, instead, increases the

23 chance that the informant could be revealed?

24 **A.**  I would say no.

25 **Q.**  When the informant is out in the field somewhere and is

1   approached by two plainclothes officers, instead of one, that

2   does not increase the chance that someone is going to notice

3   that?

4   **A.**   I would say if you're meeting with an informant it's

5   usually not a chance meeting.  You're setting that up away from

6   public eyes.  So I would say no.

7   **Q.**   All right.  Let's -- let's talk about what happens when

8   the informant is brought to a police facility.  And I just want

9   to briefly touch upon this.

10       If you need to refresh your recollection, this is

11   subsection J of the manual.  Page 6 on the manual, page 9 of

12   the exhibit.

13       Do you remember we were talking about bringing the

14   informant to the facility?

15   **A.**   Yes.

16   **Q.**   You talked about how this should be done in a manner to

17   attract minimal attention.  Remember?

18   **A.**   Yes.

19   **Q.**   That could include actually meeting the informant outside

20   the facility instead of within the confines of the building?

21   Do you agree with that?

22   **A.**   Yes.

23   **Q.**   Okay.  The last couple of questions I have for you have to

24   do with page 25 of the exhibit, the Cooperating Individual

25   Agreement.

 1        Can you get that in front of you in case you need to

 2   refresh your recollection.

 3   **A.**   Page number, by chance?

 4   **Q.**   I think it's 25 at the bottom.

 5            **THE COURT:**  You're talking about the individual

 6   agreement, the cooperation agreement?

 7            **MR. GETZ:**  Yes, the Cooperating Individual Agreement.

 8   **BY MR. GETZ:**

 9   **Q.**   Do you have that handy?

10   **A.**   Yes.

11   **Q.**   Okay.  So just to be clear about what the meaning of these

12   rules are, the first rule is that the informant shall not

13   violate any criminal law.

14        Do you agree with that?  That's the first rule?

15   **A.**   Yes.

16   **Q.**   As a practical matter, that rule applies to everybody in

17   the State of California.  Do you agree?

18   **A.**   I do.

19   **Q.**   Number 2 refers to the fact that they have no official

20   status as employees of the San Francisco Police Department;

21   correct?

22   **A.**   Yes.

23   **Q.**   However, they do have official status as an informant;

24   right?

25   **A.**   Well, they're an informant.  We don't pay -- they're not

1    on the books per se.  But I guess so.

2    **Q.**    Because once somebody signs the Cooperating Individual

3    Agreement they are officially an informant, and they have that

4    status compared to all the other people who haven't signed.

5         Am I right?

6    **A.**    Well, anybody can be an informant.  A citizen can give

7    information.  So is everybody an informant?  Does everybody

8    have an official status as a source?  I don't know.

9    **Q.**    My precise question is:  There are informants, such as the

10   one you just mentioned, who might give information, but there

11   is a category of people who have signed the Cooperating

12   Individual Agreement.  And once they sign, they have that

13   status.  Yes?

14   **A.**    As a signed informant they are, yes.

15   **Q.**    Going down to number 4, when they sign this Cooperating

16   Individual Agreement, they are told here, in number 4, that

17   there are no promises of leniency regarding the disposition of

18   any criminal case they might have; correct?

19   **A.**    Yes.

20   **Q.**    Generally speaking, while the informant knows there are no

21   promises of leniency or immunity from prosecution, that is

22   exactly what the informant wants.  Do you agree?

23   **A.**    Well, they can be motivated by many different things.  You

24   know, easy on a case they got.  Money in their pocket.  I can't

25   get in the mind of every informant.

DEFILIPPO - CROSS / GETZ

 1  **Q.**    Right.  But you've been doing this a long time, and you

 2  are in narcotics.  And I'm asking you whether, generally

 3  speaking, informants are trying to work off their case and get

 4  a benefit for their cooperation.  Yes?

 5  **A.**    I remember a lot, back then, just wanted cash.

 6  **Q.**    All right.  And what else did they want besides cash?

 7  **A.**    Nothing that I know of.

 8  **Q.**    No?  When an informant is working off an informant's beef,

 9  they are hoping for leniency on their case; correct?

10  **A.**    If we assume the informant just became an informant

11  because they got arrested on something else, that's true.

12  **Q.**    And what percentage of the informants, in your experience,

13  who sign the cooperating individual agreement are hoping to

14  work off their beef?  What percentage?  5?  20?  50?  A

15  hundred?  What would you say?

16  **A.**    I have no idea.

17  **Q.**    You have no idea.

18        How many informants have you worked with?

19  **A.**    I've never signed up an informant.

20  **Q.**    Pardon?

21  **A.**    I've never signed up an informant.

22  **Q.**    You never signed one up?

23  **A.**    Never.

24  **Q.**    All right.  Last, but not least, it is the responsibility

25  of the informant to stay in contact with his or her informant

DEFILIPPO - CROSS / CAFFESE

1  manager.  Right?

2  **A.**    Yep.

3  **Q.**    And the informant manager is the police officer who's

4  handling that informant, correct?

5  **A.**    Yes.

6  **Q.**    And we have this rule because the San Francisco Police

7  Department sponsors a connection, a relationship, communication

8  between the informant and the police officer; correct?

9  **A.**    There should be communication, yes.

10 **Q.**    There has to be in order for the thing to work; right?

11 **A.**    Correct.

12         **MR. GETZ:**    Okay.  Thank you.

13         **THE COURT:**    Ms. Caffese, any questions?

14         **MS. CAFFESE:**    Yes.

15                    **CROSS EXAMINATION**

16 BY MS. CAFFESE:

17 **Q.**    Good morning, Captain.

18 **A.**    Good morning.

19 **Q.**    Captain, I notice on the people's exhibit -- excuse me,

20 the government's Exhibit here, 2, that the manual is dated

21 February of 1998.  Is that correct?

22 **A.**    It is.

23 **Q.**    And am I correct that it has not been updated for over ten

24 years?

25 **A.**    It was --

1   Q.   Go ahead.

2   A.   -- updated, I think, last year.

3   Q.   Right.

4   A.   So it's been quite a while.

5   Q.   So, as of the time period in which Officer Robles was

6   working in Mission Station, the end of 2008, 2009, this manual

7   had not been updated; is that a fair statement?

8   A.   It is.

9   Q.   All right.  And I also note, sir, that on page 2 of the

10  government's exhibit there's some acknowledgments.  Do you

11  notice that there, sir?

12  A.   Yes.

13  Q.   And there are a number of officers that have contributed

14  to this manual.

15  A.   There are.

16  Q.   And Lieutenant Michael Puccinelli was one of the

17  contributors; correct?

18  A.   He was.

19  Q.   And you know him --

20  A.   Very well.

21  Q.   -- is that right?

22  A.   Yes.

23  Q.   And you respect him --

24  A.   I do.

25  Q.   -- is that fair?

1  A.    Yes.

2  Q.    All right.  Now, you, sir, were not a contributor to this

3  manual back in February of 2008; is that correct?

4  A.    I was not.

5  Q.    Is it fair to say it's my understanding you were not a

6  contributor to the more current manual that was updated after

7  2009?

8  A.    Correct.

9  Q.    All right.  Now, what training, if you know, did

10  Mr. Robles, Officer Robles, receive when he was assigned to

11  plainclothes at the Mission Station in December of 2008?

12         MR. VILLAZOR:  Objection.  Foundation.

13         THE COURT:  Well, the question is -- I'm going to

14  allow the question because he can answer.  He's either aware of

15  it or not aware of it.

16         THE WITNESS:  I don't know his training.

17  BY MS. CAFFESE:

18  Q.    All right.  And do you know whether or not this exhibit

19  that we've been referring to, the manual, Exhibit 2, was ever

20  actually given to Officer Robles when he went to Mission

21  Station the end of 2008, sir?

22  A.    I don't know.

23  Q.    All right.  Now, my understanding is that you have never

24  signed up an informant, correct?

25  A.    Correct.

DEFILIPPO - CROSS / CALFEE

```
 1  Q.   And am I correct that you have, therefore, never used an
 2  informant yourself, sir?
 3  A.   I work with officers who have, but I've never had one.
 4  Q.   All right.  Fair enough.
 5       So is it fair enough to say that there are a lot of
 6  practical considerations that go into using an informant on the
 7  streets?
 8  A.   I'm not sure what you mean.
 9  Q.   You don't understand my question?
10  A.   No.
11  Q.   All right.  There are a lot of rules in here?
12  A.   Correct.
13  Q.   I'm saying Exhibit 2 here; right?
14  A.   Yes.
15  Q.   There's, you know, the books.  And then there's what
16  happens on the streets.  The real world, as we say sometimes.
17  Is that right?
18  A.   You've got to follow the rules.  I'm not sure -- so you've
19  got to do it right.
20  Q.   Fair enough.  You've never actually used an informant
21  yourself, personally?
22  A.   I have not.
23  Q.   Correct.  So you don't have any personal firsthand
24  experience of what it's like in the real world to use an
25  informant.  True statement?
```

1   **A.**   True statement.

2   **Q.**   Now, would you say, as a captain, that there are often

3   violations that police officers make as it relates to the

4   administrative rules in the department?  Fair enough to say?

5   **A.**   Yes.

6   **Q.**   And when a rule, such as a rule that is in the manual

7   here, is broken that, perhaps, is a violation of an

8   administrative rule; is that right?

9   **A.**   Yes.

10  **Q.**   It's not a federal crime though; correct?

11  **A.**   No.

12  **Q.**   Okay.

13           **MR. VILLAZOR:**   Objection.  Foundation.

14           **THE COURT:**   Well, I'm going to allow it.  Go ahead.

15  **BY MS. CAFFESE:**

16  **Q.**   Now, sir, I would like to just go through a few items in

17  the manual that you spoke of, sir.

18  **A.**   Sure.

19  **Q.**   Now, and the purpose of the manual here on page 1, is it

20  fair to say that the use of informants is highly encouraged?

21  **A.**   At times it's necessary.  I don't know if it's encouraged.

22  But at times it's necessary.

23  **Q.**   Fair to say that it's necessary -- if you want to use that

24  word as opposed to encourage -- because it's a tool that law

25  enforcement, particularly undercover cops, use to try to catch

DEFILIPPO - CROSS / CAPELLE

```
 1  bigger fish, bigger crimes; is that right?
 2  A.   Any officer.  Not just undercover.  But, yeah, you try to
 3  find the big guy, if you will.
 4  Q.   It's a tool that officers use to abate crime in our
 5  communities; is that right?
 6  A.   Yes.
 7  Q.   And some of these informants, obviously, the reason why
 8  they have valuable information is because they, too, live lives
 9  of crime.  Is that right?
10  A.   I would say so, yes.
11  Q.   What better way to know what crime is being committed than
12  to go to the source; is that right?
13  A.   Yes.
14  Q.   Now, I noticed that there were a lot of different
15  definitions here that counsel went over, but there was no
16  definition of a confidential informant in the manual.
17       Is that true, sir?
18  A.   I never noticed.  I would have to say all informants
19  should be kept confidential.
20  Q.   Do you know why -- if you don't it's okay, but I'm just
21  curious -- why isn't there a definition of a confidential
22  informant in the manual?
23  A.   I believe the manual itself addresses the confidentiality
24  of the informant, of any informant.
25  Q.   Yes, sir.  There are, however, types of informants listed
```

1  in the manual, on page 2 here, that are defined, correct?

2  **A.**   Yes.

3  **Q.**   Yes.  And I won't go over all of them again because it's

4  here in the exhibit that's been introduced into evidence.  But

5  they are several that are defined.  And confidential informant

6  is not one that is defined.  True statement?

7  **A.**   Correct.

8  **Q.**   All right.  Is there any reason why -- I should ask,

9  what's the difference between types of informants and, on page

10  3, classifications of informants?

11  **A.**   I didn't write the manual so I'm not a hundred percent

12  certain.

13  **Q.**   Fair.  Excuse me.  Fair enough.  Thank you, sir.

14      Now, I want to go to page 3 again, in number 5 there.  And

15  I know that in this manual it says that you're not supposed to

16  use people with, like, criminal convictions to do buy/busts,

17  for example.  Is that true?

18  **A.**   Say that again, please.

19  **Q.**   Correct me if I'm wrong.  It's my understanding that

20  you're not supposed to use people with criminal convictions to

21  do, like, buy/bust operations?

22  **A.**   Sure you can.

23  **Q.**   You can.  Okay.  Excuse me.  I misunderstood you then.

24      The informants give information for a variety of reasons;

25  is that right?

1   **A.**   I believe so, yes.

2   **Q.**   And sometimes it's for a financial motivation; is that

3   right.

4   **A.**   I believe so.

5   **Q.**   Sometimes they want protection from -- have you ever

6   heard, for example, of an informant coming in to a police

7   station and wanting protection from the police?

8   **A.**   I have not.

9   **Q.**   You have not.  Okay.  Fair enough.

10      Now, I do want to skip over to page 5.  Before, actually,

11   I get to some specific questions on that page there, sir, my

12   understanding -- and correct me if I'm wrong -- if a police

13   officer arrests somebody that they believe may have valuable

14   information, they can release that person; is that right?

15   **A.**   Under certain circumstances, yes.

16   **Q.**   Okay.  So what would the circumstances be, if you know,

17   sir?

18   **A.**   I can refer back to the manual.  But you have to have

19   approval from your supervisor and officer-in-charge.  It

20   couldn't be a felony warrant.  I can't recall the rest.  I

21   believe that's the gist of it.

22   **Q.**   All right.  You couldn't -- like, for example, if somebody

23   had an outstanding felony warrant you couldn't just let them

24   go; is that right?  Because, obviously, they were wanted by the

25   authorities, and you need to book them and go through the

1  process; right?

2  **A.**    Correct.

3  **Q.**    But, for example, if somebody is arrested because, let's

4  say, they are in a place where there are narcotics found, and

5  the police want to find out what that person knows about,

6  perhaps, another investigation, it's okay to talk to that

7  person and find out if they know anything about other narcotics

8  investigations that might be going on; is that right?  There's

9  nothing wrong with that?

10  **A.**    No.  You should be interviewing or speaking with anybody

11  you stop/detain; find out if there's a crime being committed.

12  **Q.**    And it would be okay for the police officers to release

13  that person, that they had detained or arrested, for the

14  purposes of doing investigation in another case; fair enough?

15  **A.**    Sure.  But there's steps you have to take.

16  **Q.**    A lot of this, would you agree, is dependent on an

17  officer's discretion?

18  **A.**    Yes.

19  **Q.**    It's not a perfect science; fair enough?

20  **A.**    Fair enough.

21  **Q.**    And you have to make decisions as a police officer based

22  on your training and experience over the course of your career.

23  Is that fair enough to say?

24  **A.**    Yes.

25  **Q.**    Now -- all right.

DEFILIPPO - CROSS / CAFFESE

```
 1         Now, I do have some specific questions about people's

 2   Exhibit 50 and 51 here.  You saw those before, sir.  Let me

 3   just -- I know.

 4              THE COURT:  Which one are you referring to?

 5              MS. CAFFESE:  Let me refer, first, to 50, Exhibit 50.

 6   I believe that's been introduced into evidence.

 7   BY MS. CAFFESE:

 8   Q.  And I'll refresh your recollection here, sir.

 9         50 is the memorandum that was written by Edmond Robles,

10   star number 1467 --

11              THE COURT:  Maybe we can put it on the screen.

12              MS. CAFFESE:  Excuse me.  Can you do that?

13              THE COURT:  Well, somebody can.  There.

14              MS. CAFFESE:  Thank you.  Excuse me.

15         (Document displayed.)

16              THE COURT:  There we go.

17   BY MS. CAFFESE:

18   Q.  I'll give you a copy too.  Does that work better?

19   A.  Either/or.

20   Q.  Now, this is a memorandum that's kept in the CI file;

21   right?

22   A.  Yes.

23   Q.  And it's supposed to be kept in the CI file; is that

24   right?

25   A.  Yes.
```

DEFILIPPO - CROSS / CAPPESE

```
 1   Q.   And if my memory serves me right you were in narcotics at
 2   the time that Ed was at Mission; is that right?
 3   A.   I believe so.
 4   Q.   So that document should have been both in his file and
 5   your file; is that right?
 6   A.   Yes.
 7   Q.   And that was done; is that right?
 8   A.   As far as I know, yes.
 9   Q.   Okay.  And I notice here, obviously it's been established,
10   but you approved this; is that correct?
11   A.   Correct.
12   Q.   And you were a lieutenant at the time; is that right?
13   A.   Correct.
14   Q.   Okay.  And this was a proper SFPD document that was
15   executed by Officer Robles, as it relates to CI 09-08; is that
16   right?
17   A.   Yes.
18   Q.   Nothing wrong with this; correct?
19   A.   No.
20   Q.   Proper police procedure; correct?
21   A.   Yes.
22   Q.   Now, Exhibit 51.  Do you want a copy?  You have it up
23   there.
24   A.   It's up here.
25   Q.   Okay.  Probably remember it there.
```

1          Now, this is, again, the Cooperating Individual Agreement;

2    right?

3    **A.**    Yes.

4    **Q.**    And it has a signature of the informant here; right?

5    **A.**    It does.

6    **Q.**    And it has a signature -- do you know whose signature that

7    is?

8    **A.**    The informant?

9    **Q.**    No, no.  Excuse me, the officer, the witness officer.

10   **A.**    I can't make out those signatures.

11   **Q.**    Okay.  But this is also a proper document relating to

12   CI -- the same CI, if I'm not -- actually, his number is not on

13   here.  But your understanding it's the same CI?

14   **A.**    I believe it all came out in a packet to narcotics.

15   **Q.**    All right.

16   **A.**    It's all proper.

17   **Q.**    Part of this document indicates that the informant is not

18   supposed to commit any crimes; is that right?

19   **A.**    It is.

20   **Q.**    All right.  Now, would you agree that it's difficult, as a

21   practical matter, to know whether or not your informant is

22   continuing to commit crimes?

23   **A.**    You can't be with your informant 24 hours a day, so.

24   **Q.**    Okay.  And it wouldn't be surprising, I would imagine,

25   over your years of experience, to find out that informs do

1    sometimes continue to commit crimes?

2    **A.**    Sometimes it's a way of life for them.

3    **Q.**    Now, I just -- I don't know how familiar you are with

4    Mission Station back in '08-'09, but I do have a few questions

5    for you there.  Okay?

6    **A.**    I know the general way it operated.  I didn't work there.

7    **Q.**    Had you ever been to Mission Station in '08-'09, sir, if

8    you remember?

9    **A.**    I don't recall.

10   **Q.**    If I were to ask you if you knew how the file cabinets

11   were maintained at Mission Station at the time would you be

12   able to answer that question?

13   **A.**    No.

14   **Q.**    Do you know, do you know whether or not different officers

15   work with the same CIs?

16   **A.**    I have no idea it.  I don't know.

17   **Q.**    Did you want to give it a try there, or not?  It's okay.

18   **A.**    Well, a CI doesn't belong to an individual officer.  Any

19   officer can use it.  Just follow the rules.  You got to check

20   to see if they're already signed up.  So I don't know if

21   they're being used by other officers or not.

22   **Q.**    Would you know this and would you agree that it would not

23   be unusual for different officers to use the same CI or

24   informant?

25   **A.**    It's possible.

DEFILIPPO - CROSS / CALPESE

```
 1  Q.   And, incidentally, as we go over these different
 2  classifications, I mean, just because an informant or somebody
 3  gives you a tip about crime that might be happening doesn't
 4  mean they get paid for it; is that right?
 5  A.   Correct.
 6  Q.   Right.  I mean, some do, if they get signed up; right?
 7  A.   Yes.
 8  Q.   Okay.  But, certainly, an officer isn't required to go to
 9  the source funds and pay somebody who claims they're an
10  informant every time they tell 'em there's a crime that's about
11  to occur.  True statement?
12  A.   Yes.
13  Q.   Okay.  Incidentally, is the designated source for the
14  money in the manual here, sir?
15  A.   I'm sorry?
16  Q.   The designated source of where the money comes from to pay
17  the CIs in the manual we've been talking about here.
18  A.   I'm not sure.  The funds were at -- for narcotics
19  informants were at Narcotics.  And for investigations was at
20  the Investigations Bureau.  I'm not sure it's outlined in here
21  or not.
22  Q.   Right.  You don't know whether or not there's a
23  description of how these funds are used, or where they're kept
24  as contained in this exhibit here we've been talking about?
25  A.   I don't recall reading it in there.
```

1        **MS. CAFFESE:**  Okay.  I think I'm done.  Thank you,

2   sir.

3        **THE WITNESS:**  Thank you.

4        **THE COURT:**  Any redirect?

5        **MR. VILLAZOR:**  A few questions, Your Honor.

6        **THE COURT:**  Okay.

7                    **REDIRECT EXAMINATION**

8   BY MR. VILLAZOR:

9   **Q.**   Captain DeFilippo, you testified on cross-examination that

10  you know one of the -- the authors of the informant manual?

11  **A.**   Yes.

12  **Q.**   And who is that?

13  **A.**   Mike Puccinelli.

14  **Q.**   So you knew him well?

15  **A.**   Fairly well, yes.

16  **Q.**   Is he a police officer with real-world experience?

17  **A.**   Yes.

18  **Q.**   Captain DeFilippo, during your time at Narcotics Division

19  that was when again?

20  **A.**   Late '08 to late '09.

21  **Q.**   Do you recall, ballpark, of how many informants were

22  signed during your time there?

23  **A.**   Guessing the area of maybe 40.

24  **Q.**   Forty?

25  **A.**   Roughly.  Not certain.

1   **Q.**   Do you know how many police officers were signing up, give

2   or take, those 40 or so informants?

3   **A.**   Without looking at the ledger, I wouldn't know.

4           **MR. VILLAZOR:**  Actually look to -- go to Exhibit 2

5   again, page 7.  If we could highlight part III, Policy, number

6   A.

7       (Document displayed.)

8   **BY MR. VILLAZOR:**

9   **Q.**   Could you read the first sentence again, to the jury.

10  It's page 4 of the actual manual.

11  **A.**   On policy?

12  **Q.**   Part III, part A.  Can you read that first sentence?

13  **A.**   (As read:)

14              "This informant policy demands

15              consistency in the use and management of

16              confidential sources and informants."

17  **BY MR. VILLAZOR:**

18  **Q.**   And could you read the second sentence.

19  **A.**   (As read:)

20              "Common sense and prudent management

21              dictate that the below-listed general

22              policies be adhered to in order to protect

23              the informant and the integrity of the

24              individual officer handling the informant,

25              the Investigations Bureau, and the San

1           Francisco Police Department."

2 **Q.**   Captain DeFilippo, we had talked about payments to

3 informants?

4 **A.**   Yes.

5 **Q.**   Does it say anywhere here where or what kind of payments

6 should be made to the informants, what form of currency?

7 **A.**   I don't think so.

8 **Q.**   Is that an example of where you just use common sense in

9 applying that?

10 **A.**   I believe so.  Anytime they're paid it goes on the form.

11 That's supposed to be the cash gotten from the contingency fund

12 from Narcotics Bureau.

13 **Q.**   And Mr. Getz asked you whether or not social contacts were

14 expressly defined in the informant manual; remember that?

15 **A.**   I do.

16 **Q.**   Is this another example of where common sense applies?

17 **A.**   I would say so.

18           **MR. VILLAZOR:**  No further questions.

19           **THE COURT:**  Anything further?

20           **MR. GETZ:**  No, thank you.

21           **MS. CAFFESE:**  No, Your Honor.

22           **THE COURT:**  Okay.  Thank you very much, Captain.

23           **THE WITNESS:**  Thank you.

24           **THE COURT:**  Ladies and gentlemen, we're going to take

25 a recess now.  We will be in recess until 20 to 11:00.

PROCEEDINGS

1   Remember the admonition given to you.  Don't discuss the case,

2   allow anyone to discuss it with you, form or express any

3   opinion.

4        You can leave your binders right in your chair.  Take your

5   notes with you.

6        (Jury out at 10:23 a.m.)

7             **THE COURT:**  Okay.  Let the record reflect the jury

8   has retired.

9        I guess the issue, I assume that Mr. Hernandez is the next

10  witness; is that right?

11            **MR. HEMANN:**  Yes, Your Honor.

12            **THE COURT:**  The question is whether he can be

13  cross-examined on the domestic violence charge?

14            **MR. HEMANN:**  Yes, Your Honor.

15            **THE COURT:**  And I've read the government's submission

16  in that regard.  Any further argument?

17            **MS. CAFFESE:**  Yes, Judge, excuse me.

18       I think the issue is whether or not Mr. Hernandez has a

19  felony conviction.  And that's the issue, I think, we're

20  debating, if I'm correct here.

21            **THE COURT:**  Well, that's part of it.

22            **MS. CAFFESE:**  Part of it.

23            **THE COURT:**  That's not the whole thing.

24            **MS. CAFFESE:**  If I can address that, if I may?

25            **THE COURT:**  Sorry?

```
 1              MS. CAFFESE:  If I can address that first, Your

 2    Honor.

 3              THE COURT:  Sure.  I haven't seen the rap sheet.

 4              MS. CAFFESE:  Can I give it to you?

 5              THE COURT:  Sure.  Why don't you have it marked as an

 6    exhibit but not admitted in evidence.

 7         Well, I don't want to spend a lot of time on this.  It

 8    seems to me that he was convicted of a misdemeanor.  He

 9    ostensibly violated a condition of his probation, or whatever

10    they call it.  Parole.  I don't know.

11         He didn't go to prison.  He went to county jail.  So I

12    would assume that he would be put on probation as a condition

13    of -- once released.  Isn't that correct?

14              MS. CAFFESE:  May I, Judge?  If I could, I think,

15    this might clarify.

16              THE COURT:  Yes, go ahead.

17              MS. CAFFESE:  In 1993, according to his rap sheet, he

18    was convicted of a misdemeanor 273.5, which can be charged

19    either as a misdemeanor or felony.  Excuse me.  He pled guilty.

20    He received three years court probation, nineteen days county

21    jail.

22              THE COURT:  Yeah.

23              MS. CAFFESE:  In 1996 -- and the Court can look at

24    the court numbers.  They are different court numbers.

25              THE COURT:  He committed some other offense.
```

1        **MS. CAFFESE:**  Of 273.5 as a felony.

2        **THE COURT:**  I don't know that.  Where do you see

3  that?

4        **MS. CAFFESE:**  I think I highlighted it there, Judge.

5  He received two years state prison suspended, three years

6  probation.

7     And then in 1998 he picked up another felony --

8        **THE COURT:**  Okay.  Wait, wait.  Count One.  I'm

9  sorry.  Count One I'm now looking at, I guess, 16912701, what

10  you've highlighted.  It's 11351 of the Health and Safety Code.

11  It was a narcotics conviction.  And it says, "Disposition:

12  convicted. Convicted felony.  Sentence:  Two years prison."

13        **MS. CAFFESE:**  Judge, the reason why he was given two

14  years prison is because of instead of being sentenced to

15  imposition of sentence suspended on the felony domestic

16  violence, the Court had imposed those two years but suspended

17  it.  Meaning --

18        **THE COURT:**  Well, how do I know that?  How do I

19  know -- how do I know he wasn't sentenced on the narcotics

20  violation?

21        **MS. CAFFESE:**  Because he was on probation for the

22  felony --

23        **THE COURT:**  A lot of people are.  How do --

24        **MS. CAFFESE:**  You're absolutely right.  But it seems

25  to me he was probably given concurrent time.

PROCEEDINGS

```
1        The real issue, Judge, is whether or not he has a
2   conviction for --
3            THE COURT:  No.  Actually, the real issue, to tell
4   you the truth, is whether or not its probative value, with
5   respect to his truth-telling abilities, is appropriate for
6   impeachment.  That's, in the Court's view, the real issue.
7        And it's not.  Domestic violence conviction does not go to
8   a person's truth-telling abilities or credibility in that
9   sense.
10       So to the extent that your argument prevails as to whether
11  it's a felony -- and I think it's a questionable issue -- I
12  would exclude it, in any event, because it's not -- number one,
13  it's remote.  And, number two, it doesn't go to his truth
14  telling -- doesn't go to credibility.  So to the extent the
15  Court has discretion in that regard, I exclude it.
16           MS. CAFFESE:  The government has indicated that it
17  was intending to ask Mr. Hernandez about his domestic violence
18  conviction --
19           THE COURT:  They're not going to ask it in light of
20  this ruling.
21           MS. CAFFESE:  Well, Judge --
22           THE COURT:  If they do, Ms. Caffese, if they do
23  you're free to go after it.
24           MS. CAFFESE:  Thank you.
25           THE COURT:  You're not free to raise it.
```

PROCEEDINGS

```
 1              MR. HEMANN:  Thank you, Your Honor.

 2              THE COURT:  Okay.

 3              MS. CAFFESE:  I think there is an issue of a limiting

 4    instruction.  I don't know whether the Court wants to take that

 5    up now.

 6              THE COURT:  Limiting as to what?

 7              MS. CAFFESE:  There will be some evidence, I believe,

 8    with other officers this afternoon that --

 9              THE COURT:  I'll deal with it later.

10              MS. CAFFESE:  Thank you.

11              MR. HEMANN:  Thank you, Your Honor.

12         (Recess taken from 10:29 to 10:42 a.m.)

13         (The following proceedings were held outside of the

14     presence of the Jury)

15              THE CLERK:  Remain seated.  All rise.

16         (The following proceedings were held in the presence of

17     the Jury)

18              THE COURT:  Please be seated.

19         Let the Record reflect all parties present; the jury is

20    present.

21         Please call your next witness.

22              MR. HEMANN:  Your Honor, the United States calls

23    Cesar Hernandez.

24              THE CLERK:  Will the witness please come forward and

25    take the witness stand.
```

```
 1              CESAR HERNANDEZ, PLAINTIFFS' WITNESS, SWORN

 2              THE CLERK:  Please be seated.  Make sure you always

 3   speak into the mic.

 4              THE WITNESS:  Okay.

 5              THE CLERK:  Please state your full name; spell your

 6   last name for the Record.

 7              THE WITNESS:  My name is Cesar Hernandez.

 8                        DIRECT EXAMINATION

 9   BY MR. HEMANN:

10   Q    Can you spell your last name, please?

11   A    De Leon Hernandez.

12   Q    Can you please spell your last name?  Spell it.

13   A    H-E-R-N-A-N-D-E-Z.

14              MR. HEMANN:  Your Honor, as you can tell,

15   Mr. Hernandez speaks with a very pronounced Spanish accent.  We

16   have a standby interpreter who is in the courtroom in case he

17   needs assistance in answering any questions or providing any

18   answers.

19         The interpreter's in the front row in the gallery.  We can

20   have her stay there or we can ask her to sit up next to

21   Mr. Hernandez.

22              THE COURT:  Yeah, why don't you come forward and at

23   least have a seat.

24              MR. HEMANN:  Can I get this chair over here,

25   Your Honor, and bring it (Indicating)?
```

1          **THE COURT:**  Sure.

2          **MR. HEMANN:**  Thank you.

3          **THE CLERK:**  Good morning.

4          **THE INTERPRETER:**  Good morning.

5          **THE CLERK:**  Please raise your right hand.

6       (Interpreter placed under oath)

7          **THE INTERPRETER:**  My name is Ines Swaney.  I-N-E-S

8    SE-W-A-N-E-Y.  I'm a California state- and federally-certified

9    Spanish court interpreter.

10         **THE COURT:**  So, how do you want to proceed?  We can

11   proceed in English, and if it appears that the witness either,

12   one, doesn't understand a question, or we don't understand his

13   response, use the interpreter.

14      How do you want to proceed?  I'll leave it up to you.

15         **MR. HEMANN:**  We would like to proceed that way,

16   Your Honor.  And wait until there's an instance in which

17   Mr. Hernandez either doesn't understand the question or has

18   difficulty articulating the answer, and then allow him to

19   consult with the interpreter.

20         **THE COURT:**  Okay.  Mr. Hernandez, do you understand

21   that if you don't understand a question, you should not answer

22   the question, and you should indicate that you need the

23   interpreter to assist?

24      Do you understand that?

25         **THE WITNESS:**  Yeah, I understand that, sir.

1          THE COURT:  Okay.

2          MR. HEMANN:  And in the meanwhile Ms. Swaney can just

3   have a seat, and we'll request her presence as needed.

4          THE COURT:  Go ahead.

5          MR. HEMANN:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7   BY MR. HEMANN:

8   Q    Mr. Hernandez, good morning.

9   A    Good morning, sir.

10  Q    And just to be clear, when you're answering questions,

11  please speak slowly --

12  A    Okay.

13  Q    -- and carefully so that the court reporter can understand

14  what you are saying.  Okay?

15  A    Okay, sir.

16  Q    Mr. Hernandez, do you know Ed Robles?

17  A    Yes, sir.

18  Q    Do you know Ian Furminger?

19  A    Yes, sir.

20  Q    Do you know an individual by the name of Rey Vargas?

21  A    Yes, sir.

22  Q    How do you know these three people?

23  A    They are police officers in the Valencia, the Police

24  Station Mission, 17th and Valencia.

25  Q    The police station in the Mission?

1  **A**    Yes.

2  **Q**    And did you have some sort of relationship with these

3  three individuals?

4  **A**    Well, I worked with Mr. Robles and with Mr. Vargas.

5  **Q**    And the relationship that you had with Mr. Robles and

6  Mr. Vargas was what?

7  **A**    An informant.

8  **Q**    An informant?

9         **MR. GETZ:**  Based on the answer I just heard, I'm

10  asking for the limiting instruction.  He said he had a

11  relationship with Mr. Vargas and Mr. Robles.

12         **THE COURT:**  I understand that, but the question is --

13  I don't know what the evidence is.  If the -- if there --

14  testimony that it only relates to -- to Mr. Robles, as an

15  example, of course, I'll give a limiting instruction.

16     But I don't know what theory the government has in

17  introducing whatever they're going to introduce.  I have to

18  listen to it.  Whether it would behalf legally applicable to

19  your client; it may not be.

20         **MR. GETZ:**  Thank you.

21         **THE COURT:**  I just don't know.  I don't know what it

22  is.

23     So, ladies and gentlemen, let me just explain the process

24  for a moment.

25     Testimony is going to be forthcoming involving some

```
 1  incidences or incident.  The testimony may or may not apply to

 2  both of the Defendants.  I don't know yet.

 3      And, what Mr. Getz is requesting is that the testimony, if

 4  it relates only -- that is, if it can only be considered by you

 5  as it relates to Mr. Robles, it should be limited to that.

 6  But, we don't know what the testimony is yet.  I'm sitting

 7  here, just like you.  And so I'm going to wait and see how it

 8  comes in and what it is.

 9      It may be that after the testimony is elicited in full,

10  that I would give a limiting instruction.  Sometimes I do it

11  before; sometimes I do it in the middle.  Sometimes I do it at

12  the end.  Because, it's -- it's difficult to look at the

13  picture in advance and say, "Oh, you know, that's just as to

14  one or two the other."  So just keep an open ear, open mind,

15  listen very carefully what the witness says.

16      And I'll probably revisit this subject as the testimony

17  proceeds.

18      Okay.

19          MR. HEMANN:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21  BY MR. HEMANN:

22  Q    Do you see Mr. Robles here in the courtroom,

23  Mr. Hernandez?

24  A    Yes, sir.

25  Q    Where is he sitting?
```

```
 1   A     In the corner, in that table (Indicating).

 2             MR. HEMANN:  Your Honor?

 3             THE COURT:  Let the Record indicate he has identified

 4   the Defendant, Edmond Robles.

 5   BY MR. HEMANN:

 6   Q     And do you see Mr. Furminger sitting here in the

 7   courtroom?

 8   A     Yes, sir.

 9   Q     And where is he sitting?

10   A     Right there (Indicating), next to the -- right there

11   (Indicating).

12   Q     Next to the gentleman with the beard?

13   A     Yes, yes.

14             THE COURT:  Okay let the Record reflect he has

15   identified the Defendant, Ian Furminger.

16   BY MR. HEMANN:

17   Q     You said earlier that you were an informant.  Do you

18   remember that?

19   A     Yes, sir.

20   Q     What do you mean when you say that you were an informant?

21   A     I'm -- give you tips, the guys who sell drugs.

22   Q     Who did you give tips to?

23   A     First I go to Mr. Robles and then Mr. Vargas.

24   Q     And you gave tips to them about what?

25   A     Drug dealers.
```

1    **Q**    Drug dealers?

2    **A**    Yeah.

3    **Q**    And in what part of San Francisco?

4    **A**    Mission.  Um, in San Francisco, we go like, um, most of

5    the time in the Mission area but we goes -- we go to Oakland

6    one time, we go to North Beach one time.  All the areas of

7    San Francisco.

8    **Q**    And did you know drug dealers in San Francisco?

9    **A**    Yeah.

10   **Q**    Who did you first become an informant for?

11   **A**    Mr. Robles.

12   **Q**    And do you remember how it was that you first met

13   Mr. Robles?

14   **A**    Yes, sir.

15   **Q**    Can you tell the jury when the first time you ever saw

16   Mr. Robles was?

17   **A**    I live in the hotel in -- between 17 and 16 and Mission.

18   A few hotels over there; I live in one.

19        And one morning, somebody knock my door (Indicating), so I

20   was sleeping, was in the morning.

21   **Q**    Can I stop you for a moment, Mr. Hernandez?

22   **A**    Yes.

23   **Q**    What kind of a hotel was it?

24   **A**    It's -- the cheaper hotel in San Francisco, it's a

25   bathroom in the hall.  Kind of --

HERNANDEZ - DIRECT EXAMINATION / HEMANN

```
1   Q    There is a bathroom in the hall?

2   A    Yeah.  There's --

3   Q    How large was the room?

4   A    Like right here, (Indicating), small, very small room.

5   Only the bed, maybe this, to right there (Indicating).  Very

6   small rooms.

7           MR. HEMANN:  Your Honor, the witness is indicating

8   about the distance between at the end of the jury box and the

9   door back to chambers.

10          THE WITNESS:  Yeah, that door right here, the bed

11  right there (Indicating) and that's it.  Very small.

12          MR. HEMANN:  And between the witness box and the

13  wall.

14          THE WITNESS:  Yeah.

15          THE COURT:  So noted.  So noted.

16  BY MR. HEMANN:

17  Q    So it's a small room?

18  A    It's very small room, yes.

19  Q    And you said there was a knock on the door one morning?

20  A    Yeah, in the morning, so I was sleeping.  So I wake up and

21  say, "Who is this?"

22       And they say, say something like "Manager" or whatever.

23  Q    "Manager"?

24  A    That is what I understand them say, "Manager."  So I was

25  in underwear, I always sleep in underwear, and I open the door
```

 1  and I see only the face (Indicating), to see what did they

 2  want, the manager.  But -- was the officer, with another

 3  officer.  Was two.

 4  **Q**    Okay, so there were two officers.  Were they in the

 5  hallway?

 6  **A**    Yes.

 7  **Q**    Okay.  When you opened the door --

 8  **A**    I'm just looking, (Inaudible) show my face (Indicating).

 9  **Q**    Okay.  And you peeked out?

10  **A**    And he pushed the door (Indicating).

11  **Q**    Who pushed the door?

12  **A**    Mr. Robles.

13  **Q**    And did the officers then come into the room?

14  **A**    Yes.

15  **Q**    Okay.

16  **A**    They come to the room, and I say, "What is the problem?"

17       And he asked me if I can show some kind of ID.  And I have

18  only the City College ID.

19       I got with it me, I don't know if you want to see

20  (Indicating), college ID.

21  **Q**    When he came into the room, did he just stand there and

22  say "May I please see some ID," or do something with you?

23  **A**    He just pushed me aside.  And I say, "What do you..."

24       I don't remember exactly what happened, just like asked me

25  for ID.  And I said, "What is the problem?"

```
 1        And then he asked me if I was in prison.  I told him yes,
 2   I was in prison and I do parole, but now I'm not probation, I'm
 3   not parole, I'm --
 4   Q    Okay.  So at the time he came into your room, you were no
 5   longer on probation or parole.
 6   A    No, sir.
 7   Q    Did you tell Mr. Robles that?
 8   A    I told him that and then he called on the radio.
 9   Q    He called what on the radio?
10   A    My name, check every -- I don't know.  I don't know how
11   they work but they have -- ask what my name and my birthday and
12   everything.
13   Q    After he did that, what was the next thing what happened?
14   A    They start break my room apart.
15   Q    When you say breaking your room apart, what do you mean?
16   A    Search for everything.
17   Q    Okay.
18        (Reporter interruption)
19            THE WITNESS:  Excuse me, ma'am.
20        They break everything apart.  And at one point they find a
21   little bag (Indicating), I don't know where, on the -- between
22   the carpet, the carpet and the wall, an open bag, empty bag,
23   nothing in there.
24   BY MR. HEMANN:
25   Q    And when you're indicating, you're indicating with your
```

 1   fingers --

 2   **A**    Yeah, little bag, little one (Indicating).

 3   **Q**    About an inch?  One inch?

 4   **A**    Yeah, like this much (Indicating).  But just opened in

 5   half (Indicating).

 6   **Q**    Okay.

 7   **A**    And, and they say I'm in trouble.  This is -- I don't

 8   know, I don't remember, but they put handcuffs on me for that.

 9   **Q**    Let me ask you this.  Do you remember the little bag?

10   **A**    Yes.

11   **Q**    Did you recognize these type of little bags?

12   **A**    Yes.

13   **Q**    How did you recognize them?

14   **A**    Most of the people use them for put a drug inside.

15   **Q**    Okay.  Putting drugs inside the bag?

16   **A**    Yeah, most of the guys use for that, yeah.  A little bag.

17   I think everybody use for that.  I don't think why else we can

18   use it.

19   **Q**    That's the only use for those little bags, isn't it?

20   **A**    At that time, yes, everybody use that for -- but that's

21   what, until I leave, it's only people that use drugs, it's

22   cheap hotel.

23   **Q**    Was that your little bag?

24   **A**    Yes -- it's mine?

25   **Q**    Your bag?

1   **A**   No, it's not mine.

2   **Q**   So, Mr. Robles, he showed you the bag, and what did he say

3   to you?

4   **A**   I don't remember exactly what he said but he put handcuffs

5   on me, and he said, "You're under..."  How he said I'm under

6   arrest for that.

7        But next he called a police officer on the radio, and come

8   a van, police van.  He take me downstairs.  With the handcuffs.

9   And take me to the police station.  A police in uniform, a

10  lady.

11  **Q**   A lady police officer?

12  **A**   Yes.

13  **Q**   And she drove you to you the police station?

14  **A**   17, one block.

15  **Q**   So, very close.

16  **A**   Yeah, very close.

17  **Q**   When you got to the police station, what happened at the

18  police station?

19  **A**   When I came to the police station the lady put me in the

20  police station, you come this way, from the parking lot

21  (Indicating), and this -- that's something like the chair

22  (Indicating), but they have a pole so they put the handcuffs on

23  there.

24  **Q**   Okay.  So it was like a bench?

25  **A**   Yes, like a bench.

1  **Q**    You say there is a hole.  What was the hole for?

2  **A**    No.  The pole.

3  **Q**    Oh, pole.  Okay.

4  **A**    Yeah, put the handcuffs in there.

5  **Q**    Okay.

6  **A**    Yes, something like that.  I don't know.  They put the

7  handcuffs over there (Indicating).

8  **Q**    So you were handcuffed to a bench.

9  **A**    Yeah.

10 **Q**    Okay.

11 **A**    Yeah, something like that.  And I meet with the officer,

12 Mr. Rey Vargas.

13 **Q**    What was Mr. Vargas wearing when you got there that day?

14 **A**    He wear police uniform but not -- not the police uniform,

15 just one -- just one -- (Indicating)

16 **Q**    Like a one-piece uniform?

17 **A**    Yeah, with the star (Indicating), in the -- in the

18 uniform.

19 **Q**    Like, embroidered into --

20 **A**    Yes, yes.  Like the deputies use in jail.  Like, yes.

21 **Q**    Okay.  What was Mr. Vargas -- how did you come to meet

22 Mr. Vargas that day?

23 **A**    I don't know.  I come over there, and she start touching

24 me, like, a little racy, like, "Oh you come back, you swimming,

25 right, you come back from Mexico."

1    I be like, "No I never been Mexico before in my life."

2    He's like, "You come back, remember, I arrest you last

3  month, and I put you in jail and then I pull you, so you come

4  back, swimming..."

5  Q    Slow down, slow down.

6  A    All right.  And not the kind -- so, I don't know what he's

7  talking about.  He say he arrest me on a bicycle one month

8  before, in -- there's a Burger King on 30 and Mission between

9  Valencia.  Yeah.

10  Q    And was that true?

11  A    No, sir.  No.  I never seen that guys in my life.

12  Q    So did Mr. Vargas do anything with you after you were

13  handcuffed there?

14  A    Yeah, he put me -- fingers, printings (Indicating).

15  Q    He did your fingerprints?

16  A    Yes, sir.

17  Q    Okay.  Now on that occasion, after he took your

18  fingerprints, did you speak in addition -- speak with

19  Mr. Robles again, that day?

20  A    After that, like, I don't know.  Thirty minutes, ten

21  minutes, 20, I don't remember.  They took me to the little

22  office inside the police station.  Inside.

23  Q    So there is a small office in the police station?

24  A    There's a little small office (Indicating), have one desk

25  over there, another desk (Indicating).  And cabinets.  Very

1   small.  And a TV.

2   **Q**    Was it about the same size as that hotel room you were

3   staying at?

4   **A**    No, maybe -- oh, yeah, maybe, maybe, maybe a little bit,

5   little bit.  Because a big desk over there, one desk, I don't

6   remember exactly but there's a desk, cabinets and a TV.  And,

7   and this side (Indicating) there is a lot of boxes, backpacks

8   and everything.

9   **Q**    And that the first time you had ever been in that room?

10  **A**    The first time I been in that room.

11  **Q**    Did you ever go in that room again, after that?

12  **A**    Yes.  A lot of times.

13  **Q**    How many times?

14  **A**    You know what?  I been in that police station before, when

15  I go to jail.  The first time, in '98.  I was -- in '99 I be in

16  that, I think so, yes.

17  **Q**    Okay.  So that was maybe the second time you were in that

18  room.

19  **A**    Yes.

20  **Q**    Okay.  After that, did you go in that room many times?

21  **A**    Yeah, a lot of times.

22  **Q**    Okay.  So, who brought you into that little room, that

23  first day?

24  **A**    I don't remember it was Mr. Robles or Mr. Vargas, but it

25  was one of them.

1  Q    Okay.  And then when you went into the room, did you speak

2  with Mr. Robles and Mr. Vargas?

3  A    Yes, sir.  Mr. Robles.

4  Q    You've got to let me finish everything I say, and then you

5  go.  Okay?

6  A    Okay, sir.

7  Q    All right.  When you went into the room, did you speak

8  with somebody?

9  A    Yes, sir.

10  Q    Who did you speak with?

11  A    Mr. Robles.

12  Q    Okay.  And what did Mr. Robles tell you?

13  A    He told me I'm in trouble for that evidence.  He got it in

14  another big bag at that moment.  The little bag, he put in

15  another big bag.  He's like, "You see that, you're in trouble."

16       And, before that I do courts and everything, so I know I'm

17  not in trouble.  I know this, nothing.  This is, like, no case.

18  So, I be comfortable.  I don't -- I don't care, you know,

19  whatever he say.

20       And he is like, "Okay.  This is what we are going to do.

21  You call somebody, and ask for drugs..." I mean, "You call

22  somebody, you're free to go."

23       And I say "What I have to call, what do I have to..."

24       And he say, "You know, you call somebody, I let you go."

25       We had that argument for maybe ten, twenty minutes, and I

1    say...

2    **Q**    You said what?

3    **A**    I said, "No.  I don't know.  I don't know what you're

4    talking about."  And, that kind of -- that kind of things.

5    **Q**    Okay.  So you told him you didn't know what he was talking

6    about.

7    **A**    Yes.

8    **Q**    But, did you know what he was talking about?

9    **A**    Yeah.

10   **Q**    What was he talking about?

11   **A**    He want I call somebody, ask for drugs, and then -- in the

12   past, I heard when somebody a snitch like that, they give you a

13   marked bill, they give you a bill to buy.  They call them

14   "marked bill."

15           **MS. CAFFESE:**  Excuse me, Judge.  I'm going to object

16   to that, as hearsay.

17           **THE COURT:**  Sustained.

18   BY MR. HEMANN:

19   **Q**    So, you said that he was asking you to be an informant.  A

20   snitch.

21   **A**    Yeah.  Call somebody and turn in, turn in.  And then I go

22   free.

23   **Q**    Okay.

24   **A**    But, but -- yeah.

25   **Q**    Did you agree to do that on that occasion?

1   **A**    No.

2   **Q**    Why not?

3   **A**    Because at that moment, no, they don't have nothing on me.

4   That's nothing.  I'm -- I don't want to cooperate with police

5   in the first thing.

6   **Q**    Okay.

7   **A**    And I know they don't have nothing on me, so -- I let him

8   talk.

9   **Q**    Okay.  So about how long did you talk to him?

10  **A**    He told me:  This is what we are going to do.  He told me,

11  because I said "No, whatever you want, put me in jail, put me

12  in jail, no problem."

13         So at one point he is like, okay, he forget my life, he

14  like:  "Okay.  This is what are we going do.  I'll let you go,

15  I'll give you my number, I'll expect for you call, looking for

16  somebody..." because I told him I don't know nobody.  He said,

17  "Looking for somebody, and give me a call."

18  **Q**    Did you notice anything about the phone number?

19  **A**    Yeah, he give me one phone number with another area.

20  **Q**    With another area?

21  **A**    Yeah.  Was no 415.

22  **Q**    It was not a -- the phone number was not a 415.

23  **A**    No.  I remember that.

24  **Q**    So he gave you his phone number; he let you go.

25  **A**    Yes.  He told me, "Call me."

1      And I be like, "Okay, whatever.  I'm leaving."

2  **Q**   So you left?

3  **A**   I left, yeah.

4  **Q**   Did you just walk right out the front door of Mission

5  Station?

6  **A**   Yes.

7  **Q**   Okay.

8  **A**   I come back to my room, and my room was -- shoo --

9  **Q**   You said "shoo."  What does that mean?

10  **A**   Like, we been -- like, a big problem.  My room is like,

11  like I have a war inside that room.  It's like my clothes

12  everywhere, yeah.  Yeah, like, I don't know.

13  **Q**   Okay.  After that, did you stay in the same room for a

14  while?

15  **A**   Yeah.  I stay in the same room because I know they don't

16  have nothing on me, no problems, so, it's no big deal.  Empty

17  bag.

18  **Q**   Did you see Mr. Robles again in that room?

19  **A**   Yes, sir.

20  **Q**   About how long after?

21  **A**   I can say no more that a week.

22  **Q**   Okay.

23  **A**   I really don't remember how many days, but it was a short

24  time.  See, the first day, after I come back to the hotel, the

25  next day, I start to be like, cool, you know.  I clean that

1  room very good, I don't want to -- in case they come back.  I

2  looking, maybe somebody forget something in the past, so I

3  clean everything good.

4       So I feel more and more safety.  And I say, "Okay, I don't

5  have nothing now, it's just clean."

6  **Q**   So, did Mr. Robles come back?

7  **A**   Yes.  One day, again in the morning, I was sleeping.  In

8  the morning like 8:00 or 9:00, I don't remember.

9       At that time they knocked on the door very bad, bap, bap,

10  bap, and then try to open the door.  And I wake up and I see

11  somebody -- because the window have a fire escape.

12  **Q**   Okay, so you heard a bang on the door, and you looked at

13  the window.  And what did you see in the window?

14  **A**   Somebody in the window.  They have a fire escape

15  (Indicating).  But my door they tried to open, and I said

16  what -- you know, so I jumped from the bed and I opened the

17  thing.

18       At that moment, I see they come back with a lot of

19  officers.

20  **Q**   Okay.

21  **A**   Four or five officers.

22  **Q**   Okay.  And, did they come -- did you let them into the

23  room?

24  **A**   So when I opened that thing, they come inside my room.

25  **Q**   And what happened when they came into your room?

1  **A**    They start search everything.

2  **Q**    What were you wearing?

3  **A**    Underwear, I only sleep in the underwear every time.

4  **Q**    Okay.

5  **A**    And they say put the pants on, Mr. Robles told me, "Put

6  your pants on."  So I put on my pants.

7       And that morning I feel like a little angry, like, why

8  they do that to me, so I told him, "Why you do that to me?  I'm

9  not probation no more."

10      And he like, "Why you don't call me?  Why you don't call

11 me?  Dude."

12      And at one point I be like, "Why you do that to me," you

13 know.  So he pushed me on the bed (Indicating) and he told me,

14 he told me, like, if I want to go to jail or something like

15 that.  And I told him, "Why?  I don't have nothing."

16      And he say, "I can -- I can find something -- anything I

17 want on you."

18      (Reporter interruption)

19          **THE WITNESS:**  "I can find something, anything on

20 you."  And they mention a gun.  And I be like, "I don't have

21 nothing."

22      And he's like, "Well, it's your word, it's your word

23 against all these police officers" (Indicating).

24 **BY MR. HEMANN:**

25 **Q**    And when he's saying this to you, where are you?  Where's

1   your body?

2   **A**    I'm in the bed, and he grab me in my -- in my -- chin?

3   Chin? (Indicating)

4   **Q**    Chin?

5   **A**    And knee was in my chest (Indicating).  In the bed.

6   **Q**    His knee?

7   **A**    Yes.

8   **Q**    Was on your chest?

9   **A**    Yes.

10  **Q**    And where was his hand?

11  **A**    On my chin, in the bed, he was laying down with me

12  (Indicating).

13  **Q**    Do you remember what he said to you?

14  **A**    He said, "Look, motherfucker, I can find anything on you,

15  even a gun or pistol," something like that.

16       And I be like, "I don't have nothing.  You can search.  I

17  don't have nothing."

18       And he say, "Well, it's going to be your word against all

19  these officers'" (Indicating).  And --

20  **Q**    What did you -- how did you respond to that?

21  **A**    They can do anything they want, so I think I'm quiet, I

22  don't say nothing.  They start searching everything.  And he

23  gave me that number again.  And he say, "I expect you call me.

24  I want to come back."  And he goes, "Next time I come back, I

25  take you with me."

```
 1   Q    "Next time I come back," what did he say?

 2   A    "You come with me."

 3   Q    Okay.

 4   A    "You charged with something."

 5   Q    And, he gave you a little piece of paper?

 6   A    Another phone -- yeah, phone number.

 7   Q    With that same number on it?

 8   A    I think this was -- I don't remember.  But at one point

 9   they gave me phone number, same as Mr. (Unintelligible) but the

10   other number was changed, the last number, 43 and the other one

11   was 42, what I remember.  Something like that.  I don't

12   remember.  I don't remember.

13   Q    Okay.  So, that occasion, the second time Mr. Robles came

14   to your room, was Mr. Furminger with him on that occasion?

15   A    I don't remember.  No, I don't think so, no.

16   Q    Was Mr. Vargas with him on that occasion?

17   A    I don't remember.  I remember a couple of guys there, I

18   meet later.  I don't think so.

19   Q    So you remember a couple of guys who were there, because

20   you saw them later?

21   A    Yes.

22   Q    Okay.

23   A    That day was -- everything so fast, and there's a lot of

24   police officers.  It's like -- I don't know.

25   Q    But you don't remember Mr. Vargas there.
```

 1  **A**     No.  I don't remember Mr. Vargas there.

 2  **Q**     So, did they then leave you in your room?

 3  **A**     Yeah.

 4  **Q**     Did they leave you in your room?

 5  **A**     Yes, sir.  They leave me in my room.  Gave me another --

 6  gave me the phone number, and tell me, "I'll -- you call, you

 7  call me or I come back for you."

 8  **Q**     Okay.  Now, when they left, did you think, "Maybe I should

 9  call Mr. Robles"?

10  **A**     I live in the Mission area, and every time that I go -- I

11  live in that area, every time I go somewhere, I meet this guy.

12  I meet Mr. Robles.  And that moment, they always with

13  Mr. Vargas.  And they told me, like (Whispering), "Call me,

14  call me."

15  **Q**     Okay.  You need to explain that a little more.  You say

16  you live in the same apartment as before.

17  **A**     Hotel.

18  **Q**     Hotel?

19  **A**     Yeah.

20  **Q**     On Mission between 16 and 17?

21  **A**     Yeah.

22  **Q**     Okay.

23  **A**     They are every day over there.

24  **Q**     And when you say "over there," do you mean in the area?

25  **A**     In the area, yes.

1  Q    Okay.  And after they left the apartment that day, in the

2  days and weeks afterward, would you go outside in the

3  neighborhood?

4  A    Yes, I have to.  I need to look for money for pay my -- my

5  room.  My -- you know.

6  Q    And did you see Mr. Robles?

7  A    Yeah.  In the mornings.  Most of the times in the

8  mornings.

9  Q    And did you see on those occasions Mr. Vargas with him?

10 A    Yes.  Most of the time.

11 Q    And, did Mr. Robles make some sort of eye contact with

12 you?

13 A    Yes.

14 Q    And did he make some sort of gesture toward you?

15 A    Yeah, "Call me" (Indicating).

16 Q    And when you say "Call me," you are doing, like, your

17 fingers by your ears (Indicating)?

18 A    Yeah, yes.

19 Q    And about -- go ahead.

20 A    And I'm -- I'm scared, because I'm illegal, you know, and

21 I have plenty of records, and I don't know what to do.  I can't

22 call police because they are police.  I don't know what I can

23 do.

24 Q    So eventually, did you decide to -- were you concerned

25 about them coming back in your room?

1   **A**    Yeah.

2   **Q**    Did you do anything to --

3   **A**    Every day that I go to store, every day I go out, I come

4   back to the hotel, and I have to search my entire room, make

5   sure there's nothing plant over there, or -- what's -- no good.

6   What, every day I'm thinking, what time they're going to throw

7   away my door (Indicating).  I have a scared in that days.

8         So, one day I call him.

9   **Q**    So one day you called him.  Why did you call him?

10  **A**    I think if I call him for -- give him somebody, then he

11  let me alone.

12  **Q**    Now, when you say "Maybe I call him and give him

13  somebody..."

14  **A**    Yeah.

15  **Q**    Explain to the jury what you mean by "call him and give

16  him somebody."

17  **A**    Somebody that's dealing drugs.  I want to, want to tell

18  him I know somebody, and give that information about him, and

19  he come arrest him.  And probably he -- he leave me alone.

20  Because he tell me, "Call somebody."  So every time I call

21  somebody the deal is like, okay.

22  **Q**    And at that point in time, did you just want to be left

23  alone?

24  **A**    Yes.  Yes.

25  **Q**    Okay.  So, eventually you decided to call somebody?  Or,

1   to call Mr. Robles about somebody.

2   **A**    Yes.

3   **Q**    And who did you call him about?

4   **A**    I call, one of the guys that I know on the street.

5   **Q**    Okay.

6   **A**    Because at that time I'm a middleman, and, and he always

7   is in the area, so, I do little, a couple business, you know,

8   for -- so I wanted him go away.

9   **Q**    So he was a competitor?

10  **A**    Yes.  I want him --

11  **Q**    Do you know what I mean when I say "competitor"?

12  **A**    No, sir.

13            **MR. HEMANN:**  Could we ask the translator --

14            **THE INTERPRETER:**  (Inaudible)

15            **THE WITNESS:**  Oh, yes, compete, yes.

16  BY MR. HEMANN:

17  **Q**    So you know what I say when I say "competitor"?

18  **A**    Yes.

19  **Q**    So this guy you were calling Mr. Robles about was a

20  competitor?

21  **A**    He was my customer before, and then he find a better

22  connection and go away and start to tell my other friends,

23  "Hey, I know somebody with better price."

24  **Q**    You said a couple of minutes ago that you were a

25  middleman.  Do you remember that?

1   **A**    Yes.

2   **Q**    Can you explain what that means in the drug business?

3   **A**    Yeah.  When somebody call me, like he want to buy an ounce

4   of cocaine and I tell him it's $700, but I know somebody on

5   sale for 500, so they -- we go with him, they give me the

6   money, we buy.

7          That buyer think it's 700, but the cost is 500 so I make

8   $200, just the middleman.  Just, take it here and give it to

9   him (Indicating).  It's that kind of business.

10  **Q**    And that's what you are basically doing --

11  **A**    Yes.

12  **Q**    To support yourself for a job, then.

13  **A**    Yes, sir.  Yes.  I do that with Carlos Guerrero, the guy

14  that I turn in.

15  **Q**    This is the guy you were going to turn in.

16  **A**    Yes.  This is the guy, do that kind of business.

17  **Q**    And had you been in Mr. Guerrero's house?

18  **A**    Yes, sir.

19          **MR. HEMANN:**  Could we please display Exhibit 267,

20  which is in evidence.

21          (Document displayed)

22  **BY MR. HEMANN:**

23  **Q**    Is that Mr. Guerrero's house?

24  **A**    I believe it was that house, but at that time it was a

25  pink.

1        **MR. HEMANN:**  And, Your Honor, this is Tab 1 in the

2  jury's binders.

3        **THE COURT:**  Okay.  Ladies and gentlemen, you have a

4  picture, Tab 1.  You can take a look at it.  Or you can look at

5  it on the screen.

6        **THE WITNESS:**  At that time it was a pink color.

7  BY MR. HEMANN:

8  **Q**    At the time that you called Mr. Robles, and that you knew

9  it was Mr. Guerrero's house, it was a pink house, not a yellow

10 house?

11 **A**    Not a yellow house.  Pink.

12 **Q**    But this is the house (Indicating)?

13 **A**    Yes.  I think it is.

14 **Q**    Okay.  Had you been in Mr. Guerrero's house before?

15 **A**    Yes.  A lot of times.

16 **Q**    And on what occasion had you been -- what occasions had

17 you been in his house?

18 **A**    I use him for -- what is the reason to go to his house?

19 **Q**    Yes.  What's the reason?

20 **A**    Okay.  The friends in Redwood City --

21       (Reporter interruption)

22       **THE COURT:**  Speak slowly.

23       **THE WITNESS:**  My friends in Redwood City, they buy a

24 kilo, cocaine.  Guerrero buy, like, four or five ounces.  But

25 it's good stuff.  They come from the brick.  So, I teaching him

1    how cut it.  Make more.

2    **BY MR. HEMANN:**

3    **Q**    You were teaching Mr. Guerrero how to cut it up to make

4    more cocaine?

5    **A**    Yes.  And I go to his house, or we -- four ounce, we make

6    five ounce.  And I make more money.

7    **Q**    So, at around the time that you called Mr. Robles for the

8    first time, --

9    **A**    I --

10    **Q**    -- had you recently been in --

11    **A**    One night before.

12    **Q**    Let me finish the whole question, okay?

13    **A**    Okay.

14    **Q**    Had you recently been in Mr. Guerrero's house?

15    **A**    Yes, sir.

16    **Q**    When?

17    **A**    Night before.

18    **Q**    Okay.  So, you called Mr. Robles.  Did you call

19    Mr. Vargas?

20    **A**    No.

21    **Q**    Did you call Mr. Furminger?

22    **A**    No.

23    **Q**    All right.  You called Mr. Robles.

24    **A**    I called Mr. Robles.

25    **Q**    And what did you tell Mr. Robles?

1   **A**      I tell Mr. Robles: okay, we going make one, one deal.  And

2   I'm free, and he let me alone?

3        He says, "Yeah, yeah, good.  Just give me somebody, and

4   it's okay."  So, he say, "Come to the police station."  And, I

5   go to the police station, and we talking about him.

6   **Q**      When you went to the police station, did you go back in

7   that same little room that you just described?

8   **A**      Yes, same little room.

9   **Q**      Who was in that room when you went in there?  Do you

10  remember?

11  **A**      Mr. Robles, and -- I talk to him first and then he call

12  another, another officers, plainclothes.

13  **Q**      So you talked to him alone, first?

14  **A**      Yeah, the first thing, yeah.

15  **Q**      What did you tell him about Mr. Guerrero and

16  Mr. Guerrero's house?

17  **A**      I tell them I know somebody, they have crystal meth, they

18  have marijuana and cocaine.

19  **Q**      Did you tell them what other things Mr. Guerrero had in

20  his house?

21  **A**      I tell him he have money and gold, like, things.  You

22  know, like -- but, at that moment I don't know him.  So I

23  thought he looking for drugs.  We talking about more drugs.

24  **Q**      When you say "I don't know him," who's "him"?

25  **A**      Mr. Robles.

1  Q    So, you don't know him well at that point.

2  A    No.

3  Q    So, you were just telling him about drugs.

4  A    Yeah.

5  Q    Okay.  So you told him about the drugs.  Did you describe

6  the inside of the house to him?

7  A    I write him a map.

8  Q    You drew a map?

9  A    Yeah.  Drew a map.

10 Q    And did you show him where Mr. Guerrero's room was in that

11 house?

12 A    Yes, yes.

13 Q    Okay.

14 A    And I make a call.  I call him and say, "What are you

15 doing?"

16      And he say, "I'm sleeping."

17      I say, "Okay, call me when you wake up."

18 Q    Okay.  So, we just need to be careful.  You made a call.

19 And who did you call?

20 A    Carlos.  I call him "*El Pareja*."

21 Q    You called him "*El Pareja*"?

22 A    *Pareja*, yeah.

23 Q    Did Mr. Robles ask you to make that phone call?

24 A    Yes, make sure he's over there.

25 Q    You're calling from your phone?

 1   **A**    I think so, yes.  I have to, yes, my phone.

 2   **Q**    And what do you say to Mr. Guerrero?

 3   **A**    "What are you doing?"

 4        He say, "I'm sleeping."

 5        So I tell him, "Hey, when you wake up, give me a call."

 6        He say, "Okay."

 7   **Q**    Okay.

 8   **A**    But, before that, we drive around the house (Indicating).

 9   **Q**    Who's "we"?

10   **A**    Me and Mr. Robles.

11   **Q**    All right.  You drove over to this house on 22nd and --

12   **A**    Yeah, and somebody else, but I don't remember who else.

13   **Q**    Another police officer?

14   **A**    Yes.  I was in the back.

15   **Q**    And, did you identify the house for Mr. Robles?

16   **A**    Yes.  I'm -- point the house (Indicating).

17   **Q**    At some point, then, did you leave Mr. Robles's company?

18   **A**    Yeah.  They -- they tell me walk away somewhere, I don't

19   remember.  Van Ness, or I don't know -- one -- couple blocks

20   from the house, they tell me.

21   **Q**    They dropped you off.

22   **A**    Yes.

23        (Reporter interruption)

24            **MR. HEMANN:**  Van Ness.

25

1  **BY MR. HEMANN:**

2  **Q**    After they dropped you off, did you --

3  **A**    I think we do a buy.  I really don't remember if I make

4  call only or ask for something.  I don't remember.

5  **Q**    Okay.  Did you go over to the area of the house with

6  Mr. Robles?

7  **A**    Yeah.  I point to him the house.

8  **Q**    Okay.  And then after that, did they drop you off?

9  **A**    Yes.

10  **Q**    Okay.  After they dropped you off that day, did you hear,

11  after that, anything more from Mr. Robles about Mr. Guerrero

12  and his house?

13  **A**    A few hours later -- I don't remember if I call him or he

14  call me to see what happened.  And, he was like, very good,

15  "Can I talk to you?  Can I see you?"

16      And I say, "Yes."

17  **Q**    Where were you when you had this --

18  **A**    In the Mission.  I don't remember.  Maybe, probably the

19  20th and Mission, because he asked me where I am.  And he told

20  me if I can meet with him.  I say "Okay."

21      I see him in the little alley between Valencia and

22  Mission.

23  **Q**    Okay.  Did you arrange to meet with him there?

24  **A**    Yes.  I want to talk to him, and tell if everything is

25  already, if I'm good, I can go, and everything's like --

1  Q    What time of day was this?

2  A    What time?

3  Q    Morning, afternoon, evening.

4  A    Afternoon, 2:00 or 3:00.  I don't remember.  Afternoon.

5  Q    Afternoon.

6  A    Yeah, I don't remember what time, sir.  Five years ago,

7  more than that.

8  Q    Okay.  Did you then meet up with him or arrange a place to

9  meet?

10  A    Yes.

11  Q    Okay.  Where was that?

12  A    I believe it was in between 19 and 20 and San Carlos, I

13  think.  One of the alleys over there.

14  Q    Who got there first?

15  A    Me.

16  Q    Where did you go when you got there?

17  A    Because I'm around the corner.  So, when he come, he come

18  in the blue car.  He was in the passenger, and the other police

19  officer drive (Indicating).  The same police -- I think it was

20  the same police that come with him the first time to my room.

21  Q    Okay.

22  A    So, he gone from the car.

23  Q    And where were you sitting?

24  A    It's, like, the *Pareja* house, the steps, I sit on the

25  steps but another house, another house.

1   Q    So there's another house near the station with long steps.

2   A    Yeah.  I sit on the last one.  First I be standing up in

3   the sidewalk.  When I see they come, I walking there.  So

4   Mr. Robles jump from the car and walk to me.

5   Q    Did the car stay there at the bottom, or keep going?

6   A    It keep going a little bit.  I don't know.  They stick --

7   I can't see.

8   Q    And Mr. Robles came up the stairs to sit with you?

9   A    Yeah, he walked to me.

10  Q    Okay.  And, did he sit down next to you?

11  A    Yes.

12  Q    Okay.  And what did he tell you?

13  A    I don't know.  He put the hand in my back like he know me,

14  he was my friend, like, "Yeah, dude, very good" (Indicating),

15  that kind of thing (Indicating thumbs up).

16  Q    Can you describe what his mood was like?

17  A    Like he was my friend.  Like when you see your friend,

18  like, "How you doing, brother?"  You have a game and you guys

19  win, "Very good, we do good," and that kind of stuff.

20       And --

21  Q    And then what did he say?

22  A    I don't know.  He say he -- he got good case, everything

23  is good.  We had to do this more, and all that kind of stuff.

24       And I say, "No, I don't want to do -- what I make or what

25  I'm going to make with this," like, like -- I want to explain

1    to him that I do that because I wanted he to go away.

2         So in one moment he pulled out money (Indicating), out of

3    his pocket.  A big double, like folded money (Indicating).

4    Q    Like a roll of money?

5    A    Yeah.

6    Q    Okay.  And how big, would you say?

7    A    Like this (Indicating).

8    Q    Okay.

9    A    Was five, ten, twenties, yes.

10   Q    Okay.

11   A    That kind of money, had that before.  Like that.  Most of

12   the dope dealers don't use a wallet.  They use a roll.

13   Q    They use what?

14   A    A roll.

15   Q    A roll of money?

16   A    Yeah.

17   Q    And what were the denominations?

18   A    Twenties, tens.  I see -- at that time I'm thinking, and

19   I'm still thinking it was Carlos' money.

20   Q    Okay?

21   A    Because I see that money.  He always dealing, he dealing

22   20's, he deal in eight balls, he deal in crack, deal in weed.

23   He's selling all day.  All day, money, money, money.

24   Q    Okay.  So, Mr. Robles pulled out a roll of money.  What

25   did he do with it?

1  **A**    Yeah, because I tell him, he say, "We have to do this one
2  more time, another thing."
3       And I say, "No, I don't want to do that, I'm..."
4       And, and he, "Yeah, yeah, you have to call, we can make
5  money, this."  And he gave me -- I think, a hundred dollars.
6  **Q**    Okay.
7  **A**    Hundred dollars.  So I grabbed that hundred dollars.  In
8  that moment, I'm happy, more comfortable.  You know, I talking
9  more to him, he give me money.  At the time, I'm -- I don't
10 have that stress no more (Indicating).
11      So I tell him, "Look how much you give me, and look how
12 much you make."
13      And he, like, "Oh, you bastard motherfucker..."  Sorry.
14 Can I -- sorry.
15 **Q**    If it was -- if it was --
16 **A**    I'm sorry.
17 **Q**    If it was said, if those words were said at the time, you
18 can say it.
19 **A**    Yeah.
20 **Q**    I don't want you just saying it for no reason.  Okay?
21      So, is that what he said at the time?
22 **A**    Yes.  When he come to the hotel, he said very worse.
23 **Q**    When he came to your hotel, he said worse?
24 **A**    Yeah.  I mean, bad words, I mean a lot.
25 **Q**    But on this occasion, when you said, "Wait a minute, can I

1   have some more," what did he say?

2   **A**     No, I don't say "Can I have more."

3   **Q**     What did you say?

4   **A**     I tell him, "Look (Unintelligible) and look what you

5   have."

6        And he like, "Oh, you bastard motherfucker."  He gave me,

7   I guess, 100 more or 150 more.

8   **Q**     Okay.

9   **A**     I walk away with 250.  I count the money.

10  **Q**     So when you walked away from him later on, you had $250?

11  **A**     Yes (Indicating).

12  **Q**     You kind of like flipped your -- did he kind of flip the

13  money to you like that (Indicating)?

14  **A**     Yes, I -- I was seated right here, and he was standing up

15  right here (Indicating).

16  **Q**     Okay.

17  **A**     He gave me the money.  At one point I stand up.  And when

18  I stand up he have -- like, something like this (Indicating),

19  like this paper was the paper, drop in my -- (Indicating).

20  **Q**     Okay.  So, stop for a minute.

21       Okay.  After he gave you the money and it was time to

22  leave, you both stand up?

23  **A**     He already stand up.

24  **Q**     Okay.

25  **A**     All the time.

 1   Q    And then you stand up?

 2   A    Yes.

 3   Q    And what were you wearing?

 4   A    I wearing a jacket, with a big bag in the front

 5   (Indicating).

 6   Q    Like a pocket?

 7   A    Yes.

 8   Q    A big one?

 9   A    Not a big jacket, like that jacket (Indicating), but with

10   a thing in the front (Indicating).

11   Q    Okay.  And when you stand up, what did he do?

12   A    He put something in there.

13   Q    What did he put in?

14   A    He don't tell me nothing.  He just put in the -- I don't

15   ask him.

16   Q    What did it look like?

17   A    Like this (Indicating).

18   Q    Okay.

19        MR. HEMANN:  So, the witness is holding up a crumpled

20   napkin.

21        THE WITNESS:  Paper.  So then, he walking to the car.

22   BY MR. HEMANN:

23   Q    And how did you leave it with him?

24   A    I think that the other officer go back.  And he jump in

25   the car.  So I wait for they leave, so then I'm start walking.

1   The same direction.  We are -- that way (Indicating).

2   **Q**    Toward what street?

3   **A**    Like 21 to 20.  I start walking that way.  So I put the

4   thing, open it, and it was like glass.  You know when you broke

5   a glass (Indicating), look like that.  And then I find out it's

6   crystal meth.

7   **Q**    How did you know it was crystal meth?

8   **A**    I know it's crystal meth.

9   **Q**    How do you know it's crystal meth?

10  **A**    How I know?  Just -- hard to explain.  I know it's crystal

11  meth.

12  **Q**    You are a drug dealer, right?

13  **A**    Yes, I'm a drug dealer.  I know.

14  **Q**    Okay.

15  **A**    You can put baby powder here and you can put cocaine here,

16  and I don't have to try (Indicating).  I see in that, okay,

17  that's cocaine, and that's powder.

18  **Q**    Okay.

19  **A**    Baby powder.  So I know, it was crystal.

20  **Q**    You knew this was crystal meth.

21  **A**    Yes, sir.

22  **Q**    What did you do when you found -- how big was the piece,

23  by the way?

24  **A**    Like this (Indicating).

25  **Q**    Maybe two inches?

1   A    Yeah.  They come -- you know when you broke a glass they

2   come in piece -- they come in piece like that.

3   Q    So it looked like a piece of glass about two inches long?

4   A    Yes.  And then another one, a little bit, yeah.

5   Q    So what did you think when you found a -- crystal meth?

6   A    I thought, when's the police going to come at that moment

7   and arrest me?  And I think this is the time that they put

8   something on me.

9   Q    You thought it was a setup?

10  A    Yeah, I want to throw it away, but -- he talked too nice

11  to me so I'm be like -- I don't know, you know, I'm a

12  businessman so I'm -- I had that.  And what I do is walk it

13  straight to the 16 and Mission and start dealing with that.

14  Q    When you say you start dealing with it, you mean you sold

15  it?

16  A    Yeah.

17  Q    Do you remember who you sold it to?

18  A    The first time -- I almost sell everything -- let me find

19  out what -- a man, look like a woman.

20  Q    Okay.

21  A    With the -- everything, yeah.  He -- he almost buy

22  everything to me.

23  Q    And did you sell it to a few other people as well?

24  A    Yeah.  I sell to one guy, 19th.  A couple guys, very fast.

25  Q    How much money do you think you made off the crystal meth

1    that you sold?

2    **A**    I think I had to make more, but I don't put on the scales,

3    I just -- I see somebody, and I offer it.  And if they say yes

4    I just cut it from that (Indicating), and give it to him.

5         I make like, maybe 200.  Or 150.  I don't remember; hard

6    to say.  But I can make more if I put it on the scale, because

7    that sale is expensive.

8         (Reporter interruption)

9    **BY MR. HEMANN:**

10   **Q**    What year was this, Mr. Hernandez?

11   **A**    Oh, like 2009, I think.

12   **Q**    When did you first become involved in being a drug dealer?

13        When did you first become involved with illegal drugs?

14   **A**    Dealing with drugs?  Oh, my God.  This is --

15   **Q**    How old were you?

16   **A**    In the eighties, I had, like eight years old, nine years

17   old.

18   **Q**    And where were you born?

19   **A**    Mexico.

20   **Q**    Where were you born?

21   **A**    Michoacán, Mexico.

22   **Q**    And were you an eight-year-old in Mexico when you first

23   started with illegal drugs?

24   **A**    Marijuana.

25   **Q**    And what kind of things did you do with marijuana?

1    **A**    When I'm born, I'm born in Michoacán.

2    **Q**    You need to say that -- that's the city that you were born

3    in?

4    **A**    Yes.  Apatzingan.

5    **Q**    Can you spell that for the court reporter?

6    **A**    Can I read --

7             **THE INTERPRETER:**  I'll put it in a note and write it

8    down.

9             **MR. HEMANN:**  Okay.

10            **THE WITNESS:**  I have to wait?

11   **BY MR. HEMANN:**

12   **Q**    No.  Go ahead.

13   **A**    And --

14   **Q**    So, you're eight years old?

15   **A**    Yeah.  My father go to jail at that time for -- he

16   transportation drugs from Michoacán to Reynosa, Texas.  One of

17   the times he had (Unintelligible) in the road, so he go to

18   jail.  So we are very poor.

19        My mother was close from somebody else to give us food.

20   And, you know, when you put iron, I don't know how they calling

21   that, they do that.  Yeah, they washing and -- and do that

22   (Indicating) for give it to us, food.

23        But, we had six kids, my mama.  And, she don't have no

24   money.  So, she don't have time to put attention on us, so I go

25   to the streets when I'm like six years old.  I be everywhere.

1    And I start hanging out with the -- I don't have no school.  I

2    start hanging out with adults.

3    **Q**    Uh-huh.

4    **A**    So, I don't remember how this come out, but one day they

5    told me if I want to go to process, when they harvest, when

6    they harvest the marijuana, they bring it to the lemon factory.

7    And they start make the -- the bricks.

8         One of my jobs to put the tape, we tape it (Indicating),

9    tape, tape, tape.  But, I was talking about like 500 bricks, a

10   lot.  (Indicating).  They have everything right here

11   (Indicating).  So they start make the bricks and my job is to

12   tape it, tape it, give it to somebody else.  Somebody else put

13   it, something.

14        At that time the peoples thinking if they use a grease,

15   dirty grease, that dogs can't smell that.  I don't know, but

16   somebody put grease.  Sometimes I did, and then somebody else.

17   **Q**    So that was marijuana.

18   **A**    We killed the thing, yeah.  I was like eight years old.

19        (Reporter interruption)

20         **THE WITNESS:**  You know, the big truck, the cement,

21   the head, the head and then they put the box (Indicating), they

22   put for -- that kind of grease.

23   **BY MR. HEMANN:**

24   **Q**    Engine grease.

25   **A**    Yeah.  Dirty grease.  And coffee.

1   Q    What's that?

2   A    And we mix it with coffee.

3   Q    So, that was when first started working with marijuana?

4   A    Yeah.

5   Q    And then did you start working other illegal drugs?

6   A    Yes, then I like -- that was not my job.  I do sometimes.

7   Because I don't know how to tell my mama I have the money.  How

8   come I -- "Look, Mama, I find this bill on the street."  And

9   she don't believe me and she think stole it, I don't know what

10  she thinking.  But --

11  Q    Slow down.

12  A    Okay.  So, it's hard to me, give it to my mama, money.

13  Q    Okay.

14  A    And, so I don't do that.  I have a lot of -- I have eight

15  years old, so whatever money they gave me, I thought it's a

16  lot.  I buy everything, a lot of things.  I put it in a hole

17  back at my house.

18  Q    Buried it in the backyard?

19  A    Yeah.  And, and, and I spent anything (Indicating), but

20  it's hard to me, buy things, my mama.

21  Q    Okay.  So you know some marijuana dealers, right?

22  A    Yes.

23  Q    Did you also meet some cocaine dealers?

24  A    After that, one time that I working with somebody he told

25  me it's better money, I can make -- because when you do that

1    marijuana, it's very hard job.  It's good money, but you have

2    to work.  You have to work.  I have a lot of pokes in my

3    fingers, and it's tiring.

4         So one of the guy told me it's a better way to make money,

5    and I can make money in a couple of hours.  And, but that was

6    for cocaine.

7    **Q**    Okay.  What was your job with cocaine?

8    **A**    They -- I talked to somebody.  I don't remember the names.

9    One person.

10        I meet with somebody and they told me how that thing, we

11   had to go in the middle of the night to outside the city.  And,

12   we go to the little hill, and wait.  Sometimes we wait one

13   hour, sometimes we wait two hours, sometimes they don't come.

14   Airplanes come in (Indicating), you don't see nothing, you only

15   heard the name -- the motor.

16        At one point they turned the lights, light (Indicating),

17   and whatever, whenever they go down, and they go up

18   (Indicating), they say "Ready," so we have to form the line

19   because they dropping the cocaine.  So we had to go and we make

20   money.  Each, each brick that we find it, we make money.

21   **Q**    So, you and some other kids?

22   **A**    Uh, I think I was the only kid.  There was another kid,

23   but more of the guys, you know, like 18, 20.  I was down, the

24   little one (Indicating).  I grew up -- yeah, there was a lot of

25   other kids, like 12, yes.

1  Q    So you go out and find the cocaine, and then bring it back

2  to the dealers?

3  A    Yeah.  We put one thing right here (Indicating), to, like

4  a little bag.

5  Q    Like a bag strapped on your head?

6  A    Yes.  And go to the back, so we go looking for the thing,

7  and then we put it back (Indicating).  But it was like 80

8  kilos, 60 kilos, but we are like 12, 13 people, so I find like

9  two or three.

10       The better is the last one, because when it's left like

11 four kilos, they double the offer.  Whatever they pay you.  If

12 they pay $200 for find one kilo, they double, "Okay, $500.  We

13 still missing four."

14 Q    You have to go look harder.

15 A    Yeah, because --

16          MS. CAFFESE:  Excuse me, but I think at this point we

17 get the idea.  I'm going to object to a narrative.

18          THE COURT:  Sustained.

19          MS. CAFFESE:  Thank you.

20 BY MR. HEMANN:

21 Q    At some point in time, did you also become involved in

22 heroin?

23 A    Yes.

24 Q    And were you working for a heroin dealer as a child in

25 Mexico?

1  **A**    No, they bring me here.  I do sometimes over there, but he

2  going to next state, Guerrero, like a couple -- I go to

3  Guerrero, Acapulco, we go.  Another town.  And he buy, and we

4  bring into Michoacán.

5  **Q**    So, at some point, did you come into the United States?

6  **A**    Yes.

7  **Q**    And, briefly, how did you get into the United States?

8  **A**    I have -- because I have only adult friends (Indicating),

9  so I had this, this friend mine, that he came to the United

10 States.  At that time I don't know where he come.  And he told

11 me I go with my brother -- his brother, he dealing in heroin

12 here in the United States.

13 **Q**    Okay.

14 **A**    He's selling grams.  And he told me he going to here, and

15 I tell him, "Okay, tell your brother I want to go."  I was

16 probably 13 years old.

17 **Q**    So, about -- when you were about 13 years old, you --

18 **A**    Yeah, 12 years old.  I tell him, "Tell your brother I want

19 to go and sell it."

20      And he like, "Okay, I tell him."

21      So he come here.  And in a few months, three months, two

22 months, I don't remember, that his mother come to my house, and

23 tell my mother that guy want to talk to me.

24 **Q**    Okay.  So, after you met this guy, did this guy arrange

25 for you to come to the United States?

1  **A**    Yeah.  I talk to this guy -- he say, "My brother tell me

2  you want to come to -- you know what are we doing?"

3       I say, "Yeah, I know what you do."

4  **Q**    Stop for a minute.

5       And what did they do?  Heroin dealers?

6  **A**    Yes.

7  **Q**    So did you come to United States to work with heroin

8  dealers?

9  **A**    Yes.

10 **Q**    And did you eventually make your way to San Francisco with

11 these heroin dealers?

12 **A**    Yes.

13 **Q**    And did you become employed by these heroin dealers in

14 San Francisco?

15 **A**    Yeah, he -- he was mad, because I -- I don't tell him how

16 I --

17 **Q**    You didn't tell him how old you were?

18 **A**    No.

19 **Q**    How old were you?

20 **A**    Like, 13.

21 **Q**    Okay.  And, but did he get over being mad, and put you to

22 work?

23 **A**    Yeah, he -- yeah, he -- he find me a way because I can't

24 live in the streets.  So that my first job was answer the

25 phone.

1  Q    You said you can't be on the streets; too young?

2  A    Yeah, too young.

3  Q    So he put you to work in San Francisco?

4  A    Yes.

5  Q    As -- doing what?

6  A    Between 19 and 20 and -- that was my first house, when the

7  peoples call, they give me -- I don't know no English at that

8  time, zero.  So they write for me, three words:  "Who is it,"

9  "What do you want," and "Where are you?"

10       (Reporter interruption)

11          THE WITNESS:  Yeah.  And then he when he told me who

12  is this, they give me the name, and I write the name on the

13  paper.

14  BY MR. HEMANN:

15  Q    Like a code.

16  A    Yes.  And then I say, once they give me their name, "What

17  do you want," and then, okay.

18       (Reporter interruption)

19  BY MR. HEMANN:

20  Q    So, then, you're working for this guy.  How long did you

21  work for him?

22  A    We do that for maybe three years.

23  Q    Okay.  At some point in time, did you get arrested?

24  A    Yes.

25  Q    And how did you come to be arrested?  Was that the first

1   time you have been arrested?

2   **A**    Yes.

3   **Q**    Okay.

4   **A**    I can't go outside because my -- my only job was that, on

5   the phone.  And make a lot -- they sell a lot of heroin.  They

6   sell quarter grams, grams and halves.

7        So one of my job, they put it in the plastic, and then put

8   inside the balloon.  But I talk about 200 every day, that was

9   my job.  Do that, do that, put it in the fire, make the

10  balloon.  Make a lot of money.

11  **Q**    So, how did you come to be arrested?

12  **A**    One day, the guys are working outside, they go to --

13  drinking.  So they come drunk one night, like 2:00, 3:00 in the

14  morning.  And I was a young guy.  I be addicted, like any kid,

15  to play games.

16  **Q**    Video games?

17  **A**    Nintendo.  And then, new game, killing ducks, quack,

18  quack, you kill duck with a pistol (Indicating).  I want that

19  so bad.  So these guys told me, was 3:00 in the morning, the

20  guy told me, I come here, say somebody want two grams or three

21  grams, something like that, and he say, "You know what?  I feel

22  very bad.  You go see him."  My first sale.  He tell me "You go

23  see him, I'll take you to the mall to buy the game."

24       I say, "Okay."  So I go see the guy, and these guys were

25  the officers.  And --

1   Q    So you got busted.

2   A    Yes.

3   Q    Did you get sent to Juvenile Hall?

4   A    They sent me to 850 Bryant.  And I told the Judge, I have

5   20 years.  Because I feel like an adult.  So he said, "How old

6   are you?"

7        And I said, "Twenty."

8        And he say, "You are not 20."  So they have sent me to

9   juvie, yeah.

10  Q    So how long were you in the juvenile facilities, both

11  Juvenile Hall here and then the camp facility?  How long?

12  A    Total?

13  Q    Total.

14  A    Like 11 months, 12 months.

15  Q    When you got out --

16  A    I go to -- they send me to transition house.

17  Q    Transition house?

18  A    Fourteenth and Guerrero.

19  Q    What did you do when you got to the transition house?

20  A    I run from them.  I'm free, so I walk away.

21  Q    Did you go back to being a drug dealer?

22  A    Yes.

23       (Reporter interruption)

24  BY MR. HEMANN:

25  Q    Did you go back to the same guy?

1    **A**    Yes.

2    **Q**    Okay.

3    **A**    He live one block away.

4    **Q**    Okay.

5    **A**    From the transition house.

6    **Q**    And did you continue then selling drugs?

7    **A**    In that moment, was very easy for me.  They opened my eyes

8    in the juvie.  They -- I mean, my English was better.  I feel

9    comfortable, what I do.  So, at that moment, I start make deals

10   on the street.

11   **Q**    So you went in kind of a mediocre drug dealer, and you

12   came out a good drug dealer.

13   **A**    Yes.  I can talk to the adults, the junkies.  I can talk

14   to everybody.  I don't know --

15   **Q**    Slow down.

16   **A**    I'm better.  They open my mind.  You know, when I come

17   here I always in the room, play games.  When I go to juvie, I

18   meet all the kind of people, so --

19   **Q**    After you got out of juvie, did you continue selling

20   heroin?

21   **A**    Heroin.

22   **Q**    In the Mission?

23   **A**    Yes, sir.

24   **Q**    Okay.  And did you do that until you got arrested again?

25   **A**    My boss got arrested.  Yes, yes.  But, before I have

1    arrest, I changed boss.  He went to jail.  Federal prison.

2    **Q**    So you changed to a different boss?

3    **A**    Yes.  And this is a bigger boss.  Now he bring the heroin

4    for me.  My first boss, he buy it here.  He buy like five

5    pieces.  But my new boss, he bring the thing from Mexico to

6    here.

7    **Q**    Okay.  And so you worked for two bosses.  And then, did

8    you get arrested again?

9    **A**    Yes.  And I go to prison.

10   **Q**    And that time, you went to prison.

11   **A**    Yes, sir.

12   **Q**    And you went to prison for selling what kind of drug?

13   **A**    Heroin.

14   **Q**    And what prison did you go to?

15   **A**    San Quentin.

16   **Q**    And how much time did you do in San Quentin?

17   **A**    I go for my number -- they give you a number, so, when you

18   go to San Quentin, like the reception out there, you come over

19   there, they give you a number, and then they sent you to

20   another prison to do your time, or you stay there.  It depends.

21        But I go only for my -- for my -- for my number.  Because

22   I already spent like 12 months in 850 Bryant, talking about

23   that case.  So, when they send -- when they give me the --

24   sentence, when the Judge told me I got to do two years, they

25   count the time I already do in the county.  So I go for four

1  months, four or five -- I don't remember, four months, I think.

2  Q    When you got out of San Quentin, do you remember what year

3  that was?

4  A    When I came from San Quentin?

5  Q    Uh-huh.

6  A    I went to my wife house and my daughter.  When I go to

7  jail she had three months pregnant, like three or four months.

8  Q    What year did you get out of San Quentin?

9  A    I believe it was '99, sir.

10  Q    After you got out of San Quentin, did you go back to

11  selling drugs on the street in the Mission?

12  A    When I came home from San Quentin I have one friend, at

13  that time he is big guy in Fresno, but he dealing with crystal

14  meth.  And he told me if I want to do that, you know.  I don't

15  want to deal in crystal meth.  So he recommend somebody else.

16  Q    So did you go to work for somebody selling drugs?

17  A    Yes.

18  Q    What kind of drugs?

19  A    Cocaine and heroin.

20  Q    And is this the first time you start dealing with cocaine?

21  A    Yeah.  It was the first time.

22  Q    Now, over the next several years after that, did you start

23  dealing in larger amounts of cocaine?

24      (Reporter interruption)

25

1    **BY MR. HEMANN:**

2    **Q**    After the next several years, in the next several years

3    after that, did you start dealing in larger amounts of cocaine?

4    **A**    Yeah, one-kilo operation, like one month later, one month

5    or two months.

6    **Q**    And what amounts -- what sizes of cocaine did you begin to

7    deal with, sort of, between 1999 and 2002?  How did it grow

8    over that --

9    **A**    How many kilos did I sell?  Oh, a lot.

10   **Q**    Okay.  Hundreds?

11   **A**    Hundreds.  Yeah, my boss bring me, like, three kilos every

12   week, four kilos every week.  So put four years together -- and

13   heroin.

14   **Q**    And did you start making a lot of money?

15   **A**    We start make a lot of money.

16   **Q**    And did you start using cocaine?

17   **A**    Yes.

18   **Q**    Did you start using a lot of cocaine?

19   **A**    In 2002.

20   **Q**    Okay.  Tell the jury, did you become addicted to cocaine?

21   **A**    Well, the thing is we make -- at that point, I don't -- I

22   don't work it.  I have three guys work for me.

23        So, what -- what I do is only, one of my job is go to the

24   bars and meet people, offer this, "This is my -- this is my

25   stuff (Indicating), you want to call me, this is my price."

1   Bring new customers.

2       So, but, was a lot of -- a lot of money.  So it's party

3   for me every day.  Every day.  Every day.

4   **Q**    It was a party for you every day?

5   **A**    Yeah.  Drinking every day, have a party.  Do whatever I

6   want.  You know, make a lot of money.  So, sometimes you

7   looking for more.  And, I had the stuff (Indicating).  So I be

8   tired, I use it.

9   **Q**    So when you started using it, did you start using it too

10  much?

11  **A**    Yeah, that thing beat me.  Because I had the kilos with

12  me, so, what I do, I try to be a little -- impress my friends

13  or whatever.  And we have a party at my house, I bring a kilo

14  and I put it over there, I make a B, open it, and "Okay, let's

15  go."  And then I'm continuing (Indicating), from the kilo.

16      At one point, I'm -- just put my fingers inside, and smash

17  it in my nose (Indicating).  And that thing beat me.

18  **Q**    Beat you?

19  **A**    Yeah, beat me.  So my boss start like, my boss, he only

20  move like 80, 60 kilos.  But he work for somebody.  Plus he

21  have a lot of friends, that move a lot of things.  And he like

22  me.

23      Everywhere he go, I go with him.  So I know a lot of

24  people.  People don't like that.  That I be like --

25  **Q**    So the bosses didn't like that you were using all this

 1  cocaine?

 2  **A**    Well, thing is when I use cocaine I do cocaine for maybe

 3  three days in the room, I turn my phones off, I don't answer

 4  the door.  I disappear because I -- I deal in drugs already.

 5      And my bosses, they stop the business, they say, "Oh,

 6  Cesar go to jail.  What happened with him?"  They don't know

 7  what happened.  So they stop, from -- from Santa Ana,

 8  California to here or wherever, they work everywhere, they stop

 9  because they don't know what happened with me.

10  **Q**    So the whole system stopped when you --

11  **A**    Yeah.

12  **Q**    So, did you get fired, basically?

13  **A**    Yeah.  They kicked me out.

14  **Q**    And did you move to another place?

15  **A**    Yeah, because I don't make no money here.  And yeah, I

16  move to Atlanta.

17  **Q**    Atlanta?

18  **A**    Yes.

19  **Q**    And did you get a job in Atlanta?

20  **A**    Yeah.  I work in the movie theater and I work in -- Stevi

21  B's Pizza Buffet.

22  **Q**    That's a buffet.  That's the name of the place?

23  **A**    Yeah, Stevi B.  And I cleaned the movie theater.  I start

24  at 11:00 that night until 6:00, and then I work pizzas, I

25  think, 9:00 to 2:00.

1  **Q**    Did you also get a job for a drug dealer?

2  **A**    One day I -- one day I go to the place from my country,

3  food from my state, from my -- lamb, we call it *birra de chivo*,

4  stewed lamb.  And when I come out from there I find one of the

5  guys.  This guy is a brother to the guy they recommend to me

6  with my third boss.  I know him from here.  And from Michoacán.

7  **Q**    Was he a crystal meth dealer?

8  **A**    Yes.  I see, he told me, "What are you doing here?  You

9  know, blah, blah, blah," and we start talking.  And then he

10 told me they living in Seattle, Washington, but they bring

11 crystal meth.

12 **Q**    And did you get a job guarding crystal meth for this guy?

13 **A**    I have my wife pregnant, and she told -- I mean my

14 girlfriend pregnant over there.  And she (sic) told me, "Hey,

15 dude, look.  We have to come back but we have a lot of pounds

16 of crystal meth in that trailer.  Do you want to move over

17 there?  You don't pay rent, you don't pay bills, and just watch

18 it."

19        Okay, so I be like --

20 **Q**    So he gave you free rent to watch the crystal meth?

21 **A**    Yeah, but working --

22        (Reporter interruption)

23        **THE WITNESS:**  But I'm working when I'm over there.

24 My girlfriend worked with me at the pizza place.

25 **Q**    Basically that was just for -- you were protecting his

1    crystal meth in exchange for free rent?

2    **A**    Something like that.

3    **Q**    At some point in time did you move back to San Francisco?

4    **A**    I moved to Gatlinburg, and then Kansas -- Memphis, and

5    then moved to Kansas.  And one day my boss called me.  Rafael.

6    **Q**    Boss from San Francisco?

7    **A**    Yeah.

8    **Q**    Mr. Valencia.

9    **A**    Yeah.  And he told me what I do, and everything, and I say

10   I'm working.  I work in construction at that time.  Framing.

11   **Q**    Construction?

12   **A**    Yeah we build houses in Kansas.  And, he say, "So, you

13   clean?"  And I clean at that time.

14   **Q**    He asked you if you're clean.

15   **A**    Yes.

16   **Q**    Meaning no more coke.

17   **A**    Probably, yes, but no, like, before, like three or four

18   days, no, like.

19   **Q**    Okay.  And did he ask you if you would come back to

20   San Francisco?

21   **A**    He tell another Cuban, and the Cuban send me money to come

22   here.

23   **Q**    And did you come back to San Francisco and go back to work

24   for Mr. Valencia?

25   **A**    Yes.

1    Q     And did he want you to start dealing cocaine again?

2    A     Yes.

3    Q     How long did that last?

4    A     We do, like, like, four deals.  And then, I did again.

5    Q     You started using too much again?

6    A     No.  Just one time.  But the guy, the guy when I was that

7    day, he jealous of me.  So he told me -- the phone is ringing.

8    He asks me, "Why don't you answer the phone?"

9          I say, "Because it's my boss, and he want to meet me, and

10   I'm high right now.  I don't want to meet him."

11         And then I went to the bathroom, and the boss called

12   again, and he answered: "Oh, he's in the bathroom, doing

13   cocaine."

14         Then he -- "Look, motherfucker, I hear you high right now.

15   I want to meet you at the house right now."  Because he pay my

16   rent, he buy my car.

17         So next day, I owe him $5,000 and he say, "Forget about

18   the $5,000, keep it.  But I don't want to make deals no more

19   with you."

20   Q     Okay.  So you stopped being a cocaine dealer for

21   Mr. Valencia?

22   A     Yeah, 2007.

23   Q     Is that when you became a middleman again?

24   A     Yeah, because they tell the other guys like me, "Don't

25   give nothing to Cesar.  Only, he come with the customer, sell

1  to him."

2  Q    So you weren't trusted to hold large amounts of drugs

3  anymore.

4  A    No.  He say he don't trust me even if I want to buy an

5  ounce with cash in the hand.  I have to have somebody with me.

6  My boss, he -- he act like he like me, he's my family, like he

7  tried to protect me from myself.

8  Q    So after you became a middleman again -- what year was

9  that, 2007, 2008?

10  A    Yeah, 2007.

11  Q    Okay.  Did you do that for a while?

12  A    Yeah, until I find the guys (Indicating).  2008.

13  Q    You said until you find these guys, and you gestured

14  towards Mr. Robles.

15  A    Yes.  I'm going to stop a little bit, when they let me go,

16  I start working in a restaurant, Porticos over there, Beale and

17  Second -- Beale and Market.

18  Q    We'll get to that in a minute.

19  A    Okay.

20  Q    So where were you living in 2007, 2008?

21  A    I living in the -- Third Street.

22  Q    Third Street?

23  A    Third Street and Bayshore, somewhere over there.

24  Q    In a motel?

25  A    A room.  Somebody rent me a room over there.

1  Q    Okay.  And how did you eventually end up in that little

2  hotel on Mission Street between --

3  A    I work in the -- in the -- in the Porticos restaurant, so

4  I move to between 16 and 17 and Mission.  It's a little

5  building, apartments.  They have rooms at the top, on the

6  second floor, they rent rooms (Indicating).

7       So I know somebody that -- somebody that was janitor in my

8  job, he's a janitor in the building.  He told me, "Do you want

9  to move in with me?"

10      And I say, "Yeah, I want to move with you."  So I move

11  with him over there.

12      When I go to Sixth and Mission I see a couple of business

13  to do so -- um, I move over there.  And then I move to the

14  hotel room, because the guy that rent my room, he fight with

15  another guy.  So they kick him -- they say, "You have to

16  leave."  Both, two.

17  Q    So you were living over, then, on Mission Street.  When --

18  A    Eighteen and 17, yes.

19  Q    When you met Mr. Robles.  Yes?

20  A    Yes.

21  Q    And then after the -- the deal at Mr. Guerrero's house on

22  22nd and Harrison, did you start working for Mr. Robles as an

23  informant?

24  A    Yes.

25  Q    And as you were working for him as an informant, did you

 1   spend time talking to him?

 2   **A**      Yes.

 3   **Q**      And in -- in cars?

 4   **A**      Well, I do the first deal with him.  The first deal.  And

 5   at that time this deal was only for --

 6   **Q**      We'll talk about that in a minute.  Okay?  Answer the

 7   question, okay?

 8   **A**      All right.

 9   **Q**      After you started working for him, over the next six

10   months or so, how many times did you talk to Mr. Robles?

11   **A**      We talk a lot.

12   **Q**      A lot?

13   **A**      Yeah.

14   **Q**      Did you talk to him in the Mission Street Station?

15   **A**      Where?

16   **Q**      Did you talk to him in the Mission Street police station?

17   **A**      Yes.  Most of times.

18   **Q**      Did you talk to him in cars sometimes?

19   **A**      Yes.

20   **Q**      Did you talk to him on the phone sometimes?

21   **A**      Yes.

22   **Q**      Okay.

23   **A**      In the phone, not too much because, when talk on the

24   phone, I don't understand.  I have to see the face.  My English

25   is no good.  But if I see you when I talk, I can understand

1   more.

2   Q    And did you communicate with Mr. Robles in Spanish or

3   English?

4   A    English.

5   Q    And over the times that you talked to him, did you tell

6   him about your history, your life?

7   A    Probably, yes.

8   Q    Did you tell him about being a cocaine dealer?

9   A    Yes, I tell him -- sometimes they call me for show me a

10  picture.  Somebody.  And, I say, "Oh, yeah, I know that guy

11  from '99, 2000, he deal," that kind of things.

12  Q    Did you tell Mr. Robles and then Mr. Vargas that there

13  were times in which you dealt in large amounts of cocaine?

14  A    Yes.

15  Q    Did Mr. Robles ever cause you to be prosecuted for

16  anything?  Did he ever charge you with anything?

17  A    No.

18          MS. CAFFESE:  Well, excuse me; I'm going to make a

19  motion to strike, and objection.  Lack of foundation.

20          THE COURT:  Overruled.

21  BY MR. HEMANN:

22  Q    Did Mr. Robles ever tell you you had to plead guilty for

23  any of those past crimes that you had committed, all of the

24  drug dealing?

25          MS. CAFFESE:  Objection.  That's an improper

1   question.  Past drug dealing that he committed?  Overbroad.

2               **THE COURT:**  Overruled.

3   **BY MR. HEMANN:**

4   **Q**    Did Mr. Robles ever tell you that you had to plead guilty

5   for all those past drug deals that you had done?

6   **A**    No.

7   **Q**    After that first time that Mr. Robles brought you to

8   Mission Station, did he ever arrest you again?

9   **A**    No.

10  **Q**    Did he ever arrest you for dealing kilos of cocaine?

11  **A**    No.

12  **Q**    In fact, did you talk to Mr. Robles about going out on the

13  street and selling drugs?

14  **A**    He tell me, if I want to sell drugs -- later.  Not that

15  day, but later, he told me, "You want to sell drugs, you can do

16  that."

17  **Q**    How did that come up?

18  **A**    That was like no one time, a lot of time, he say, "Dude,

19  why don't you dealing drugs?  Everybody know you here, you

20  don't have no trouble do that."  He say all I can't do is

21  killing somebody.

22  **Q**    Say that again?

23  **A**    Kill somebody.

24  **Q**    He said all you couldn't do is kill somebody?

25  **A**    No, no.  I can do whatever I want, but no kill nobody.  If

1  I kill somebody, he can't help.  He don't want to help me.

2  **Q**    What if you got arrested dealing drugs?  What did he say?

3  **A**    He say nobody going to arrest me for dealing drugs.

4  **Q**    Did he tell you what you should do if you got arrested

5  selling drugs?

6  **A**    He told me nobody going to arrest me because everybody

7  know me.  And yeah, everybody know me in the police station,

8  but he say, "Somebody arrest you from another station, you

9  don't say nothing, just go -- when you come to the police

10  station tell the guys call me."

11       I say, "Okay."

12          **MR. HEMANN:**  Your Honor, this would probably be a

13  pretty good breaking spot if it's --

14          **THE COURT:**  Okay, ladies and gentlemen, we are going

15  to take our recess.

16       Remember the admonition given to you:  Don't discuss the

17  case, allow anyone to discuss it with you, form or express any

18  opinion.

19       We will resume at 1:00.  You can leave your binders on

20  your seats.  Take your books with you.

21       (Jury excused)

22       (The following proceedings were held outside of the

23   presence of the Jury)

24          **THE COURT:**  Okay, let the Record reflect the jurors

25  have left.

```
 1        Mr. Hemann, let's return with Mr. Getz's concerns about a
 2   limiting instruction.  I mean, where are we going?  Is it --
 3   what's your view as to that?
 4            MR. HEMANN:  What I believe -- should we allow
 5   Mr. Hernandez to step out?
 6            THE COURT:  He can; I don't care.  Doesn't make any
 7   difference.
 8            MR. HEMANN:  I believe that Mr. Hernandez will
 9   testify that he was in and out of Mission Station, and he spoke
10   --
11            THE COURT:  Okay, all right.
12            MR. HEMANN:  -- in Mr. Furminger's presence.
13            THE COURT:  Okay.
14            MR. HEMANN:  But I think we'll -- if afterwards, a
15   limiting instruction is needed -- I've been trying to be good
16   about was Furminger here, was Vargas there, was he not.  And
17   I'll continue to do that.
18            THE COURT:  All right.  Well, let's see where it
19   goes.  But -- you know, I may give some limiting --
20            MR. HEMANN:  I don't have a strong objection to a
21   limiting instruction if the Court believes it's appropriate.
22            THE COURT:  I don't believe it's appropriate right
23   now.  I think it might be appropriate once you complete your
24   examination, and I have some way to judge as to what, if
25   anything, it would be germane to Mr. Furminger.  I just don't
```

1    know at this point.

2        So far, there's nothing there.  So, obviously, I would

3    limit the testimony to Mr. Robles if this was all there is.

4        Now, if what's going to be is that he saw, you know,

5    Sergeant Furminger here, there, or so forth, which depends on

6    the context, depends on where he was and so forth and so on.

7             **MR. HEMANN:**  There will be a bit.  It is limited as

8    to this witness as to Mr. Furminger, but --

9             **THE COURT:**  Let see where it is.  And at the end, I

10   can give some appropriate limiting instruction.  I think

11   Mr. Getz is entitled to a limiting instruction.  That's my

12   point, and -- because all of this, without more -- and I guess

13   that's the key phrase, "without more" -- would be just as to

14   Mr. Robles.

15            **MR. HEMANN:**  Yes, Your Honor.

16            **THE COURT:**  Okay.  Ms. Caffese.

17            **MS. CAFFESE:**  Thank Your Honor.

18            **THE COURT:**  Yes.

19            **MS. CAFFESE:**  I would like to revisit the earlier

20   matter we discussed before Mr. Hernandez's testimony.  But I

21   would ask that he not be present.

22            **THE COURT:**  Sure.  Okay.  Mr. Hernandez, you can be

23   excused.  And if you will -- the government agent will take

24   you.

25        (Mr. Hernandez leaves the courtroom)

PROCEEDINGS

1            **MS. CAFFESE:**  Thank you, Counsel.  Thank you,

2  Your Honor.

3            **THE COURT:**  Yeah, sure.

4            **MS. CAFFESE:**  Judge, I would ask that I be permitted

5  to cross-examine Mr. Hernandez on his domestic violence

6  contacts.  And the reason for that --

7            **THE COURT:**  Let me get the rule.

8            **MS. CAFFESE:**  And if I may state the reason?

9            **THE COURT:**  Well, wait, wait.

10     Here's my question:  Isn't the admission of the conviction

11  subject to 403?

12            **MR. HEMANN:**  It certainly is.

13            **THE COURT:**  Fine.  Okay, well, that's the basis of my

14  ruling.  I think the -- the probative effect is very limited,

15  and the prejudicial effect is great.  So under 403, I'm

16  excluding it.

17            **MS. CAFFESE:**  I think -- I've kind of addressed the

18  issue a different way.  If I may --

19            **THE COURT:**  Well, you have to address it -- you may

20  address it any way you want to.  But my suggestion is you'd

21  better address it my way, because that is the basis of my

22  ruling.

23            **MS. CAFFESE:**  I understand, I understand.  But --

24            **THE COURT:**  You know, domestic violence --

25            **MS. CAFFESE:**  He's --

PROCEEDINGS

1      **THE COURT:**  Ms. Caffese, domestic violence is a -- is

2  a very explosive issue with respect to jurors, with respect to

3  the public in general.  And it doesn't go necessarily to truth

4  telling; it goes to the person's character.  And it has a great

5  deal of prejudicial effect.

6      Now, that's not to say that no convictions for domestic

7  violence wouldn't be relevant.  They may be.  I wouldn't

8  exclude all of them.

9      However, in this case, given the timing, given the age of

10  the conviction, given what the nature of the case is, given

11  what the Court views as its marginal relevance, if any, I'm

12  excluding it under 403.

13      **MS. CAFFESE:**  However, Judge --

14      **THE COURT:**  Yeah.

15      **MS. CAFFESE:**  He put his character for peacefulness

16  in issue when he stated, "I'm a peaceful man."  And he

17  testified to that on direct examination.  That is misleading

18  the jury.

19      And I believe that Mr. Robles has a right to attack his,

20  quote, character for peacefulness, and his credibility, because

21  clearly this man's credibility is at the crux of the cross

22  examination.

23      **THE COURT:**  Of course, of course, credibility is --

24  is significant.  I'm not saying it's insignificant.

25      What's your response?  I didn't hear him say, "I'm a

1  peaceful man."

2          **MR. HEMANN:**  I didn't -- I confess I didn't hear it

3  either.  And I don't -- I mean, I would like to just add to the

4  litany of reasons it should not come in.

5      He was 17 years old, when it occurred.  We know absolutely

6  no facts about -- there's a -- an enormous spectrum of conduct

7  that falls under 273.5.  I don't know anything about it.  It

8  was a long time ago.

9      I think that -- I promise the Court that neither

10  Mr. Villazor nor I will argue for one nanosecond that he was

11  peaceful, if that's even what he said, which I don't remember.

12          **THE COURT:**  Okay.  I'm excluding it, under 403.

13          **MS. CAFFESE:**  Thank you.

14          **MR. HEMANN:**  Thank you, Your Honor.

15      (Recess taken from 12:00 to 1:02 p.m.)

16          **THE COURT:**  Please be seated.

17      Okay.  Let the record reflect all jurors are present.  The

18  parties are present.  You may proceed.

19      You may have a seat.

20          **THE WITNESS:**  Thank you, sir.

21  **BY MR. HEMANN:**

22  **Q.**  Mr. Hernandez, can you put the microphone back in front of

23  your face.

24  **A.**  Yes.

25  **Q.**  You remember you're still under oath --

1  **A.**    Yes, sir.

2  **Q.**    -- from earlier?

3  **A.**    Yes, sir.

4  **Q.**    So let's go back to what we talked about at Mr. Guerrero's

5  house at 22nd and Harrison.   Remember we talked about that?

6  **A.**    Yes, sir.

7  **Q.**    And afterwards you testified Mr. Robles showed you the

8  ball of cash from the house, correct?   The ball of cash with

9  the 5s and the 20s, when you were sitting on the steps.

10 **A.**    Yes.

11 **Q.**    Okay.

12 **A.**    Oh, the money?

13 **Q.**    The money.

14 **A.**    Yes.

15 **Q.**    Yes.

16 **A.**    The money.

17 **Q.**    You walked away from that.   And as you were walking away

18 from that meeting with Mr. Robles, when he gave you the cash

19 and the crystal meth, did you intend to do more work with the

20 San Francisco police officers?

21 **A.**    He called me a couple, like, times and told me we did good

22 and we had to do again.   And I have a couple -- I think I talk

23 to him -- I talk to him after that again.

24       I do the first thing because I want him go away.

25 **Q.**    You wanted him to go away?

1    A.    Yeah, on the first day.

2          Then when he gave me money, he gave me the crystal meth,

3    and when I talked to him I think was -- he was one of my kind,

4    like me.

5    Q.    He was one of your kind?

6    A.    Yeah.  Only thing is he had a badge and pistol.  He was my

7    people.  Criminal like me.  Like the guys always hang out, you

8    know.  He was the same.  The only difference he had pistol and

9    badge.  And I don't have no problems to do things later.

10   Q.    So did you change your mind about doing more deals with

11   Mr. Robles?

12   A.    Yes.

13   Q.    Did you then sign up to be a confidential informant with

14   Mr. Robles?

15   A.    Yes.

16   Q.    Okay.

17         **MR. HEMANN:**  Could you please display Exhibit 51.

18         (Document displayed.)

19   **BY MR. HEMANN:**

20   Q.    Do you see this document, Mr. Hernandez?

21   A.    Yes.

22   Q.    Is that your signature down -- it says "Cesar HDZ."  That

23   your signature?

24   A.    Yes, sir.  Yes, it's my E and my R, yes.

25   Q.    Is this a document that you signed at the request of

1   Mr. Robles?

2   **A.**   If my sign is over there, yes.  This form, yes.

3   **Q.**   After you did that first deal at Mr. Guerrero's house did

4   you do more deals like that, more -- more cases like that

5   with --

6   **A.**   Robles.

7   **Q.**   -- Mr. Robles?

8   **A.**   Yes.

9   **Q.**   I want you to describe for the jury how the cases

10  generally worked, what the plan was, okay.

11       So, and I want you to start with what was the -- what was

12  the first thing that would usually happen when you would do one

13  of these deals with Mr. Robles?

14  **A.**   Well, I'm -- when I meet somebody that sell drugs or

15  somebody introduce me somebody -- because I know a lot of

16  peoples.  But I tried to find a house.  This is rule number

17  one.  Mr. Robles tell me always had the house.

18  **Q.**   Find the house.  And why was that?

19  **A.**   Where did they live.

20  **Q.**   Okay.

21  **A.**   And then we do a buy.

22  **Q.**   Why was rule number one find the house?

23  **A.**   They say going to be more money if we go to the house.

24  **Q.**   Okay.

25  **A.**   But I know the guy, we make a buy.

1    Q.   How would you make the buy?  Where would you get the money

2    to make the buy?

3    A.   They gave me money to buy.  Like, one 20, two 20s.  20

4    half gram cocaine.

5    Q.   Say that again.

6    A.   Twenty dollars like half gram.

7    Q.   Half gram of cocaine?

8    A.   Yeah, something like that.  Maybe little bit less, about

9    $20.

10   Q.   You call it a 20?

11   A.   Yeah.  We don't say, Give me a half gram.  We say, I want

12   20.  Two 20s.

13   Q.   Okay.  You said they would give me money?

14   A.   I mean him.

15   Q.   At some point --

16   A.   I said they because then the officer --

17           MS. CAFFESE:  Excuse me.  Objection.  It is vague as

18   to time.

19           THE COURT:  Can you lay a foundation?

20           MR. HEMANN:  Certainly.

21           THE COURT:  Thank you.

22       Objection sustained.

23   BY MR. HEMANN:

24   Q.   After 22nd and Harrison, was another officer, other than

25   Mr. Vargas -- or Mr. Robles also involved?

1   **A.**    Yes.

2   **Q.**    Who was that other officer?

3   **A.**    Mr. Vargas.

4   **Q.**    And did you have an understanding, after the incident at

5   22nd and Harrison, what the relationship between Mr. Vargas and

6   Mr. Robles was?

7   **A.**    Yes, after that.  Not before.  After.

8   **Q.**    Okay.

9   **A.**    I meet Mr. Vargas because he always ride with Mr. Robles.

10  **Q.**    In the same car?

11  **A.**    In the same car.

12  **Q.**    Okay.  So you said they would give you money to make buys?

13  **A.**    Yes.

14  **Q.**    Okay.

15  **A.**    In the beginning, Mr. Robles.

16  **Q.**    And then --

17  **A.**    I only speak with Mr. Robles in the beginning, before he

18  went away to ride motorcycles.

19  **Q.**    Before he went away to ride motorcycles?

20  **A.**    Yes.  I dealing only with him, but Vargas was around.

21  **Q.**    Vargas was around?

22  **A.**    Yes.  But I never deal with him.  I deal with Mr. Robles.

23  **Q.**    Okay.  So when you would make the buy, after you

24  identified the house you would make a buy?

25  **A.**    Yes.

1   **Q.**   And you would get some money for that; correct?

2   **A.**   Yes.

3   **Q.**   Where would that money come from?

4   **A.**   I don't know.  They give it to me.  And I sign a paper.

5   Maybe -- I don't know -- later I find out they have some kind

6   of money because they working in the narcotics unit.  So what I

7   understand later they have some kinds of money.

8              **MS. CAFFESE:**  Judge, excuse me.  Objection.  Hearsay.

9              **THE COURT:**  Overruled.

10  **BY MR. HEMANN:**

11  **Q.**   So your understanding is the narcotics unit had some

12  money?

13  **A.**   Give it to the officers.  I don't know.

14  **Q.**   Okay.  So you said you had to sign a paper when you got

15  the money to do the buys, correct?

16  **A.**   Yes.

17  **Q.**   Was it like an official San Francisco Police Department

18  paper?

19  **A.**   Yes.  Not all the time.  Sometimes.

20  **Q.**   Okay.  Once you get money to go do buys, what would you

21  do?

22  **A.**   I go to buy.  And then I come back and I give the drugs.

23  Then they give me like $30, $40.  But I don't care about money.

24  The money -- the good thing is when they hit the house after

25  that.

1   Q.    Okay.  So you got a little bit of money at the beginning?

2   A.    For to do the buy.  And I sign papers for that.

3   Q.    That was, like, official?

4   A.    Yes.

5   Q.    Okay.  So then would you provide the officers, Mr. Robles,

6   and then later Mr. Vargas, with information about the house?

7   A.    Yes, sir.

8   Q.    And it would be the kind of information that you described

9   earlier that you provided about the inside --

10  A.    Yes, everything --

11  Q.    Let me finish, okay.  I want you to answer, but let me

12  finish first.

13  A.    Okay.

14  Q.    Would it be the same kind of information about what the

15  inside of the house looked like?

16  A.    Everything I know, I tell them.  I tell the truth.

17  Q.    Give the jury some examples of the things that you needed

18  to tell them about the inside of the house.

19  A.    Yes.

20  Q.    Some examples.  What kind of things?

21  A.    Like what is the drugs.  Like what apartment, what is the

22  room he sleep.  It's a building.  They ask me what is the

23  number of the apartment.  If I know where they put the drugs.

24  Things like that.  And how much money they -- how much money I

25  think they have, and how much drugs.  All kinds of drugs.  That

 1  kind of things.

 2       That happened one day before they hit any house.  They

 3  wait one day.

 4  Q.   So would you provide that information, and then shortly

 5  thereafter --

 6  A.   Yeah.  Actually, I point the house too.

 7  Q.   You would show them what the house was?

 8  A.   Yeah.  Sometimes -- most of the times I tell them what is

 9  the house.  We going to do the buy one day before they hit that

10  place, yeah.

11  Q.   Then you said they would hit the place?

12  A.   When they go to the house, arrest the guy.

13  Q.   Would you meet with them after they hit the house?

14  A.   Yes.  Then I just wait for next day.  They call me.  They

15  do in the mornings.  They working most of the time in the

16  mornings.  That happened in the mornings.

17       So when they hit the house they call me -- he call me and

18  I go meet him.  And then when the good money come, the $80.

19  Q.   And where would you usually meet them?

20  A.   The police station, sir.  Valencia.

21  Q.   Would you recognize the Mission Police Station, what it

22  looks like?

23  A.   Yes.

24  Q.   Okay.

25            MR. HEMANN:  Could you please show the witness what's

1    been marked for exhibit --

2              THE WITNESS:  17th and Valencia.

3              MR. HEMANN:  17th and Valencia, just for the witness,

4    please.

5    BY MR. HEMANN:

6    Q.    Could you look at the picture which has been marked as

7    Exhibit 3.

8          Do you see it up there on the screen?

9    A.    No.  Oh, yes.

10   Q.    There?

11   A.    Yes.  This is the front -- the front door.  In the

12   beginning I always come from the back door.

13   Q.    Okay.  We'll talk about that in a moment.  That's the

14   front door of Mission Station?

15   A.    Yes.

16              MR. HEMANN:  Your Honor, the government moves Exhibit

17   3 into evidence.

18              THE COURT:  Admitted.

19         (Trial Exhibit 3 received in evidence.)

20   BY MR. HEMANN:

21   Q.    Now, you said there were two doors you would go in; right?

22   A.    Yeah.  That door you go to elevator.

23   Q.    Slow down just a little bit.

24   A.    Okay.

25   Q.    You indicated the front door you go in there's an

 1  elevator.

 2  **A.**    Before I come in the back door.

 3  **Q.**    There was also a back door to Mission Station?

 4  **A.**    Yes.

 5  **Q.**    Did you sometimes go in both doors?

 6  **A.**    Later I'm use that -- the -- in the beginning I have a lot

 7  of scare, a lot of scared come to the police station.  Afraid

 8  somebody see me.  Come inside to the police station, I look

 9  everywhere.  Don't want nobody see me.

10  **Q.**    And later did you become more comfortable?

11  **A.**    Not more comfortable.  But, I don't know, just put my

12  hoodie, go in the front door, run.

13  **Q.**    When you went into the police station is there a place

14  that you would usually go in the police station?

15  **A.**    Yeah, only that police station every time.

16  **Q.**    Was there a place inside that police station that you

17  would usually go?

18  **A.**    Yes.  Same room.

19  **Q.**    That same little room that you went on that first day?

20  **A.**    Yes.  Yes.

21  **Q.**    Okay.  And you said, okay, they would call you after they

22  hit the house?

23  **A.**    Yes.

24  **Q.**    And would you talk to them about it in that little room?

25  **A.**    Yeah.  We talking about the -- not exactly what did they

 1  do, but they told me what happened, you know.  And I go for

 2  more money.  And the guys, they tell me, okay, this is your

 3  part.

 4  **Q.**    Now, when you met in that small room?

 5  **A.**    Yeah.

 6  **Q.**    Can you tell the jury who was present?  Who was there?

 7  **A.**    Mr. Robles.  Mr. Vargas most of the times.  Sometimes

 8  Mr. Sergeant.

 9              **MS. CAFFESE:**  Could we get a date in terms of --

10              **THE WITNESS:**  Not all the time.  Couple times he was

11  standing up over there.

12  **BY MR. HEMANN:**

13  **Q.**    And when "he was standing up over there" what do you mean?

14  **A.**    Listen what we do.

15        Sometimes they do something like -- I don't know.  He was

16  over there in the little room.  And sometimes they stand up,

17  like, watching us.  Not all the times.  Probably, I say, like,

18  four times, six times.  Not all the time.

19  **Q.**    And was -- Mr. Furminger, Sergeant, did you know -- at the

20  time did you know his name to be Furminger?

21  **A.**    No, sir.

22  **Q.**    How did you refer to him?

23  **A.**    Sergeant.

24  **Q.**    And that's the individual that you earlier --

25  **A.**    Yeah.

1   **Q.**   Let me finish the question, okay.

2   **A.**   Okay.

3   **Q.**   And the person you knew as Sergeant, was that the person

4   you earlier identified as Mr. Furminger?

5   **A.**   Yes.  Because Mr. Robles and Vargas call him the sergeant.

6   They never called him by name.  So I called him Sergeant.  This

7   is why.

8   **Q.**   Did you discuss receiving cash from the houses in front of

9   Sergeant Furminger?

10  **A.**   Yes.

11  **Q.**   When you began --

12  **A.**   We discussed to rob peoples one time.

13  **Q.**   What's that?  Say that again please.

14  **A.**   We have one discussion about rob -- rob one guy, and he

15  was there.

16  **Q.**   Okay.  We'll talk about that in a moment, okay.

17       When you first began discussing this scheme with

18  Mr Robles --

19  **A.**   Yeah.

20  **Q.**   -- did you have an agreement with him about the amount

21  that you would get from the house?

22  **A.**   Well, after -- after we hit the first place and, I think,

23  we do another thing, I tell them I wanted 30 percent, something

24  like that.  30 percent in drugs.  30 percent in money.

25  **Q.**   Okay.

**A.**    They say yes.  But they never did.  They hit places they

say, oh, we don't got no too much money so give you

(unintelligible).

**Q.**    That say that last part again.

**A.**    I been with the guys before they hit the place, so I know

what did they have most of the time.

**Q.**    So how much would you usually get; do you know?

**A.**    Hundred, 80, 60.

**Q.**    You said you had been in the house before?

**A.**    Yeah.

**Q.**    So did you --

**A.**    Oh, how much they have?

**Q.**    Yeah.

**A.**    I don't know.  They always had the roll of the bills

(indicating).

**Q.**    And you indicated about, maybe, three or four inches of

fingers?

**A.**    Yeah like that (indicating).  Dealing drugs.  Dealing 20s.

Cocaine.  Dealing all day.  I don't know.

**Q.**    So was there a lot of cash at these houses?

**A.**    When I do the buys and then put the money, I see.

**Q.**    You saw the amount of money that the drug dealers had?

**A.**    Yeah, most of the times.  And what kind of drugs they

have.

**Q.**    Did you ever have an argument with Mr. Robles about how

1  much money you were getting in Mission Station?

2  **A.**    One day, I think, we had little argument because he always

3  show up with $40, $60.  One day we have argument and he's like

4  he got a little attitude --

5  **Q.**   Say that again.  He had what?

6  **A.**    Attitude.

7  **Q.**   Attitude?

8  **A.**    Look motherfucker, the money is not only for you.  You're

9  not the only one.  I have to split the money with bosses, my

10  boss.  But very bad, was look, motherfucker.  And then I be

11  like okay.

12  **Q.**   Were you a little scared?

13  **A.**    Yes.

14           **MR. GETZ:**  May I make a request?  I would ask that

15  the Court instruct the jury that the testimony "I have to split

16  the money with my boss" is not offered for the truth of the

17  matter that Furminger was to get the money, but only that it

18  was said.

19           **THE COURT:**  Well, I think -- first, let me look at

20  the testimony.

21      (Pause)

22           **THE COURT:**  What's your response to that?

23           **MR. HEMANN:**  His statement is not hearsay under Rule

24  801(d)(2)(E).  It's a co-conspirator statement.  It's not

25  hearsay.

1           **THE COURT:**  Well, I think that's a correct statement

2   of the law.  The question is whether there is sufficient

3   evidence of a conspiracy -- which there isn't at this point --

4   that it be binding upon the co-conspirators in terms of

5   furtherance of the conspiracy.

6           I think I can take care of it this way, but let me talk to

7   the jury.  And then if you have some concerns you can raise

8   them.

9           Ladies and gentlemen, a statement -- the witness has

10  testified as to a conversation he had with Mr. Robles.

11          Is that correct?

12          All right.  In which this witness has said Mr. Robles said

13  a certain thing about splitting money.

14          Now, number one is that's a statement -- it's testimony of

15  a witness about a statement purportedly made by Mr. Robles.

16  And you will be the judge as to whether or not you believe this

17  witness when he says that's what was said, okay.  So everything

18  I say about that statement is in the context of the fact that

19  it is this witness's testimony which you are free to accept and

20  free not to accept based upon your determination as to

21  credibility.

22          Next, if you were to find that it was a -- that this

23  witness is credible on that subject, and accurately reported

24  that statement, you then have to determine whether or not it

25  has any impact on, quote, on Mr. Furminger, as an example,

1    because his counsel has acknowledged that, I think, Sergeant

2    Furminger was a boss or a supervisor of Mr. Robles.  So I think

3    that's not in contention.

4         As to that statement, however, there are two things that

5    one would say:  It is evidence, if accepted as true, as a

6    statement made by Mr. Robles.  That is to say it's a statement

7    which would constitute an admission or at least a statement of

8    the defendant.  And you can consider it as -- as evidence

9    against Mr. Robles.  It doesn't go just to the state of mind.

10   It isn't hearsay, an exception to the hearsay rule.

11        As to Sergeant Furminger, we are not at a point, yet, in

12   the proceedings where we could say whether or not it would be

13   admissible as to him.  And that's -- so I want you to just keep

14   that in mind.  I will, at a later time, address that subject.

15   But now it's clearly admissible as to Mr. Robles.  It may or

16   may not be admissible as to Sergeant Furminger.

17        And, obviously, I can discuss it further with you,

18   Mr. Getz, outside the presence of the jury, if you wish.  But I

19   think that that leaves it where it ought to be at this point in

20   the proceeding.

21             **MR. GETZ:**  Yes.  The Court has accurately addressed

22   my concern.  And when the state of the record is more developed

23   we can revisit it.

24             **THE COURT:**  Thank you.

25             **MR. GETZ:**  Thank you.

```
 1           THE COURT:  Thank you Mr, Getz.

 2       You know, I never know how clear those statements are from

 3  me.

 4       (Laughter)

 5           THE COURT:  But we'll all do the best we can.  Okay.

 6  Thank you.

 7       Go ahead.

 8           MR. HEMANN:  Thank you, Your Honor.

 9  BY MR. HEMANN:

10  Q.   Mr. Hernandez, you described, sort of, the way these --

11  these deals generally went, right?

12  A.   Yes, sir.

13  Q.   About how many of these kinds of deals did you do with

14  Mr. Robles?

15  A.   How many deals I do with him?

16  Q.   How many deals did you do with him?

17  A.   Not too much.  Not too many.

18  Q.   How many do you think?

19  A.   Five, six.  I don't remember.

20  Q.   And other than the first --

21  A.   Well, we do another ones but was not my -- they ask me

22  about, You know this guy?  Say, You know where he live?  I say

23  yes.  I don't pick it up.  They show me.

24       But the one I tell them, not too many, no.  Few ones.

25  Q.   Of the five or six --
```

 1  **A.**    Probably, probably something like that.  I don't remember

 2  exactly.

 3  **Q.**    Of that number, did you not do the first one with

 4  Mr. Vargas, correct?

 5  **A.**    Yes.

 6  **Q.**    Did you do the other ones with Mr. Vargas?

 7              **MS. CAFFESE:**  Objection.  Leading.

 8              **THE COURT:**  Objection sustained.

 9         Would you re-ask the question.

10  **BY MR. HEMANN:**

11  **Q.**    The first one that you talked about, 22nd and Harrison?

12  **A.**    Yes.

13  **Q.**    Was Mr. Vargas present for that?

14  **A.**    When I tell them or when they go to the house?

15  **Q.**    When you told them.

16  **A.**    I don't remember.  I don't think so, no.  It was another

17  officer, but for that moment I don't know.

18  **Q.**    For the other deals in which Mr. Robles was involved --

19  **A.**    Yes.

20  **Q.**    -- was Mr. Vargas also involved?

21  **A.**    Yes.

22  **Q.**    At some point in time did Mr. Robles leave the Mission

23  Station narcotics group?

24  **A.**    Yes.  He told me he go to mortgage cycle unit at 850

25  Bryant.

1  Q.    Motorcycle unit at 850 Bryant?

2  A.    Yeah.  Ride motorcycles.  I don't know how they call it

3  that, but he told me 850 Bryant.

4  Q.    And when Mr. Robles told you he was leaving to go to the

5  motorcycle group did you discuss it with him?

6  A.    He told me?

7  Q.    Yeah.

8  A.    Yes.  And then I'm staying Mr. Vargas.

9  Q.    And did you ask Mr. Robles why he was leaving to go to the

10 motorcycle group?

11 A.    He told me he rode motorcycle.  Well, I tell him, say, you

12 not working narcotics no more?  He told me no, it's what I

13 want, I always want to be in the motorcycle.

14       And then I tell him, like, oh, you're not going to make no

15 more money.  And he like, you know what, there is more money

16 there because I'm going to stop a lot of motherfuckers, illegal

17 motherfuckers.

18           MR. GETZ:  I didn't hear that.

19           THE COURT:  I couldn't hear the statement so I

20 don't --

21           MR. HEMANN:  I'll ask him to repeat it slowly.

22 BY MR. HEMANN:

23 Q.    When you asked him -- when you said you're not going to

24 make any more money there --

25 A.    Yeah.

1   **Q.**   Let me finish.

2   **A.**   Okay.

3   **Q.**   When you said you're not going to make anymore money there

4   how did he respond to you?  And say it slowly.

5   **A.**   He respond something like, no, dude, I'm going to make

6   more money because you know how many illegal motherfuckers I'm

7   going to stop with no driver's license.  I be like -- that's

8   it.

9   **Q.**   Okay.

10  **A.**   He said he want to work only patrol.  Patrol and stop.  I

11  don't know.  I don't know what he had to do, but that the

12  answer he give to me.  I say he not going to make no more money

13  narcotics.  And he say he make more.

14  **Q.**   After Mr. Robles left did you continue to do these kind of

15  deals, that you described earlier, with Mr. Vargas?

16  **A.**   Yeah.  In that moment I have more -- I talking more with

17  Vargas.  I never been his friend, but Vargas is kind of more

18  personal.  I don't think you can trust in him, but it's more --

19  yeah, you can trust.  He's more friendly.  I don't -- I don't

20  know how explain this.  But way different than Mr. Robles.

21  **Q.**   I have a simple question, which is, after Mr. Robles left

22  to go to motorcycles did you do some more of these deals with

23  Mr. Vargas?

24  **A.**   Yes, sir.  Yes, sir.

25  **Q.**   About how many?

1  **A.**   Well, with Mr. Vargas because -- we had a lot.  Maybe 12.

2  **Q.**   Okay.

3  **A.**   Maybe more than that.

4  **Q.**   Okay.  How many more do you think?  Give me an estimate.

5  **A.**   No more than 15.  No less than 10.

6  **Q.**   Okay.

7  **A.**   Something like that.

8  **Q.**   All right.

9  **A.**   Well, we do a lot -- he ask me a lot of times about

10  people's -- I'm talking about the one that got turned in.

11  **Q.**   Let's go back in time now, okay, back to when you were

12  working with both Mr. Robles and Mr. Vargas before Mr. Robles

13  left.  Okay?

14  **A.**   Okay.

15  **Q.**   Did you ever work much with marijuana as a drug dealer?

16  **A.**   Only when I was a kid.  But in United States I never

17  dealing with marijuana.

18  **Q.**   Okay.  Were you ever involved in selling marijuana in the

19  Mission?

20  **A.**   I never involved in selling marijuana, but couple friends

21  deal in marijuana so.

22  **Q.**   So what?

23  **A.**   Well, I never deal, but I know where is marijuana.

24  **Q.**   So you know people who sold marijuana?

25  **A.**   Yeah, I know some, couple people sell marijuana.

HERNANDEZ - DIRECT - HEMANN

1  **Q.**  Was there an occasion in which Mr. Robles asked you to

2  help him sell some marijuana?

3  **A.**  Uhm, he don't ask me to sell.  He told me he have a friend

4  that have a good-quality marijuana.

5  **Q.**  Okay.  So stop for a moment.

6  **A.**  Okay.

7  **Q.**  Was there a time that you noticed, with Mr. Robles, some

8  marijuana?

9  **A.**  Repeat.

10 **Q.**  Was there a time when you were with Mr. Robles when you

11 noticed some marijuana?

12          **MS. CAFFESE:**  Objection.  Vague as to time.

13          **THE COURT:**  Overruled.

14 **BY MR. HEMANN:**

15 **Q.**  Was there a time that you were with Mr. Robles --

16 **A.**  Yes.

17 **Q.**  -- that you noticed some marijuana?

18 **A.**  Oh, yes, yes.

19 **Q.**  Okay.

20 **A.**  I go in the car.  And I smell marijuana in the car, yes.

21 **Q.**  Okay.

22 **A.**  No was like --

23 **Q.**  Hold on a minute.  I am going to ask you a question.  All

24 right?

25 **A.**  Okay.

1    Q.   So what were you doing on that day?

2    A.   I don't remember what I do that day but they call me like

3    always.  I always -- sometimes I call them and asking if I have

4    money for burrito, $20, $40.  Sometimes they call me show me a

5    picture.  Maybe I have something for them.  But I don't

6    remember why they call me that day.

7    Q.   When you say --

8    A.   Are we talking about the day they have the garbage bag in

9    the back?

10   Q.   I'm asking, do you remember a day when they called you

11   when there was some marijuana?

12   A.   I don't remember the date.

13   Q.   Not the date.  Do you remember that that happened?

14   A.   Yes.

15   Q.   Where were you?

16   A.   Somewhere from the Mission.

17   Q.   How did you come into contact with Mr. Robles?

18   A.   Every time he call me on the phone.  And I tell him where

19   I am, and he pick me up.

20   Q.   On that day did he come and pick you up?

21   A.   Yes, sir.

22   Q.   And was he in a car?

23   A.   Yes.  He was in the car, driving the car with Mr. Vargas.

24   Q.   And was Mr. Vargas in the passenger seat?

25   A.   Yes.  Like most the time most -- I think every time Vargas

1   was there.

2   **Q.**   Okay.

3   **A.**   Most of the times or every time.

4   **Q.**   Did they drive up near you?

5   **A.**   Yes.  Every time that they stop -- I wait.  They comes.

6   Make eye contacts.  So they park, like, half block or close to

7   where I am.  And then I open the back door, and I'm laying down

8   in the back, back of the -- when I go meet him I try to have a

9   hoodie.

10  **Q.**   Were you wearing a hoodie?

11  **A.**   Yeah.  Most of the time, yes.  So when they stop I open

12  the back door, I jump in the car.  And I'm sunken laying down

13  in the back of the seat.

14  **Q.**   Why were you laying down in the back of the seat?

15  **A.**   I don't want nobody see me I'm riding with the police

16  officers.

17  **Q.**   And on that day did you notice anything unusual in the

18  car?

19  **A.**   Was a garbage bag.

20  **Q.**   Where was the garbage bag?

21  **A.**   In the driver back in the floor.

22  **Q.**   Behind the --

23  **A.**   Yes, in the floor.

24  **Q.**   Okay.  And was it a -- just a garbage bag?  How was the

25  garbage bag situated in the car?

 1   **A.**    Looked like something inside.  I never asked what it is,

 2   and they never told me.

 3   **Q.**    Did you notice anything about how the car smelled?

 4   **A.**    It smelled to marijuana.

 5         Well, that was in my nose.  I jump in the car and that was

 6   in my nose.

 7   **Q.**    The bag was in your nose?

 8   **A.**    Yeah.

 9   **Q.**    And did you smell a certain smell coming out of the bag?

10   **A.**    Yeah.

11   **Q.**    What was that smell?

12   **A.**    Strong marijuana.  At that time it wasn't dispenser

13   everybody talking about that.  What good marijuana.  Not like

14   Mexican marijuana.  Mexican marijuana is different smell.

15   **Q.**    It was a potent, strong smell?

16   **A.**    Yes.

17   **Q.**    What did you do after you hopped in the car and smelled

18   the marijuana?

19   **A.**    What I do?

20   **Q.**    Yeah.

21   **A.**    Nothing.  I don't ask nothing.  I just still laying down.

22   I don't asking them.  He don't tell me nothing.

23   **Q.**    Were you able to notice what the shape of the things in

24   the plastic bag was?

25   **A.**    At that moment I think it was marijuana.  And I'm still

1    thinking it's marijuana.  I don't know.

2           **MS. CAFFESE:**  Excuse me.  Objection.  Motion to

3    strike as hearsay, speculation -- excuse me, speculation.

4           **THE COURT:**  Well, it's nonresponsive.  So it will be

5    stricken.

6       Go ahead.

7    **BY MR. HEMANN:**

8    **Q.**   Were you able to notice the shape of the -- what the

9    things in the plastic bag looked like, the shape of them?

10   **A.**   (Indicating.)

11      Like -- well, I don't put too much attention in that.  But

12   when I was young I'm dealing with marijuana and I have a

13   friends dealing with marijuana so I know it's marijuana.

14   **Q.**   I'm asking if you noticed it that day, what the shape of

15   the plastic bag was.

16   **A.**   What big?

17   **Q.**   Yeah.

18   **A.**   (Indicating.)

19      Maybe like this, that high (indicating).  I don't know

20   something like that.  Plus -- because it's -- it's a tie

21   (indicating).  Big tie, big bag.  You know the big garbage bag

22   where this is tied.

23      I don't know.  About this (indicating) -- I don't pay

24   attention to that.

25   **Q.**   Okay.  After you got out of the car and noticed the

1  marijuana smell did you go somewhere with Mr. Robles and

2  Mr. Vargas?

3  **A.**    Well, we went to the police station.  And that day we

4  don't park in the police station.

5      We park -- in the 17 and Valencia, across the street, the

6  taqueria, in the back is a funeral home.

7  **Q.**    Funeral home?

8  **A.**    Yeah, a little alley.  We park over there.

9  **Q.**    When you usually drove over there with them did you park

10 in the police station --

11 **A.**    Yeah, we park in the police station --

12 **Q.**    Let me ask it again.  The court reporter is typing it, so

13 she has to finish my whole question before you talk.

14 **A.**    Okay.

15 **Q.**    Okay.  When you would drive over there, usually, did you

16 park in the police station parking lot?

17 **A.**    Yes.

18 **Q.**    Was it different that day?  You parked in a different

19 space?

20 **A.**    Yes.  Sometimes not exactly in the police station, on the

21 other side, but near to the police station.  That day we go to

22 the little alley.  I don't know why.

23 **Q.**    After you parked there, did you go into the police station

24 with --

25 **A.**    Yes, we go to the police station, inside.

1  **Q.**   At some point after that did you speak with Mr. Robles

2  about marijuana?

3  **A.**   Yes.  He told me he have a friend.

4  **Q.**   What did Mr. Robles tell you about marijuana?

5  **A.**   He say he have a friend that he have a few pounds, the

6  good quality purple marijuana.  They asked me if I know

7  somebody we can sell it cheaper.

8  **Q.**   How did he describe it, good quality?

9  **A.**   Good quality purple.

10  **Q.**   Purple?

11  **A.**   Purple, yeah.

12  **Q.**   When he said "purple marijuana" did you know what he was

13  talking about?

14  **A.**   Yeah.

15  **Q.**   What was he talking about?

16  **A.**   The new quality that's in the Mission that moment, good

17  marijuana.  I only know about that marijuana and the Mexican

18  marijuana.

19  **Q.**   So you knew the difference between that marijuana and

20  Mexican marijuana?

21  **A.**   And peoples dealing only that kind.  My understanding now

22  is a thousand different, but back in that time I only know that

23  two, purple marijuana and Mexican marijuana.  There's two kinds

24  in the streets.

25  **Q.**   Did Mr. Robles ask you to do anything in particular with

1  regard to that marijuana that he was talking about?

2  **A.**   Yeah.  He told me if I know somebody that we can sell it.

3  **Q.**   Okay.

4  **A.**   He say he know somebody.  He don't say he got it.  He say

5  one of my friends have a good marijuana.  And he say you can

6  help.

7      But I never dealing with marijuana in the United States so

8  I'm not interest.

9  **Q.**   He asked you if you knew anybody that could help sell it?

10 **A.**   Yes.

11 **Q.**   Did he mention anybody in particular?

12 **A.**   No.

13 **Q.**   Did you -- how did you respond to that?

14 **A.**   Well, I tell there's no money over there.  And he say,

15 well, it's cheap.  He told me some number like 1800.

16 **Q.**   1800 for what?

17 **A.**   I believe for a pound.

18 **Q.**   Okay.

19 **A.**   And the street was like 25.

20 **Q.**   So did you go back and forth with him in conversation for

21 a while?

22 **A.**   No.  Just that time.

23 **Q.**   Now, on that day did you talk back and forth with him

24 about selling this marijuana?

25 **A.**   Yes.  He -- he tried to convince me to looking for

1  customers.  But I'm not interested in marijuana, my whole life,

2  in marijuana.

3  **Q.**  Did you tell him you were not interested?

4  **A.**  He don't tell me much.  He was like, there is money, help

5  me go looking for customers.

6  **Q.**  Did you then go -- did you ever go look for somebody to

7  sell some marijuana?

8  **A.**  No.

9          **MR. HEMANN:**  And, Your Honor --

10          **THE WITNESS:**  Somebody -- okay.

11          **MR. HEMANN:**  This is not offered for the truth, Your

12  Honor.

13  **BY MR. HEMANN:**

14  **Q.**  Afterwards did you go out on the street and hear people

15  talking about marijuana?

16  **A.**  Some kinds of peoples ask me -- telling me about they have

17  somebody that have good quality cheaper marijuana.  I mean good

18  quality but cheaper price.  Not cheap marijuana.  Cheaper

19  price.

20  **Q.**  What price did you hear mentioned?

21  **A.**  They told me 2,000 at that moment.

22  **Q.**  And that was near in time with the incident with

23  Mr. Robles?

24  **A.**  Yes.

25  **Q.**  When?

1  **A.**    Like one day, or two.  I already heard that day and next

2  day.  After that nobody say nothing.

3  **Q.**    And was that unusual to hear people talking about that?

4  **A.**    Yes, yes.

5  **Q.**    Mr. Hernandez, do you know somebody by the name of Sergio

6  Sanchez?

7  **A.**    Sergio Sanchez, I don't know Sergio Sanchez.  I know

8  somebody Sergio in the Mission.  I know a lot of Sergio.  But I

9  think Sergio the one --

10 **Q.**    Do you know a person in the Mission, who worked in the

11 Mission, named Sergio?

12 **A.**    I know one Sergio that work in 20 and Mission by stealing

13 things from peoples.

14 **Q.**    Okay.  You have to talk about that in a little bit more

15 detail, okay.

16 **A.**    Okay.

17 **Q.**    You said he worked where in the Mission?

18 **A.**    I know this Sergio for long time.  He always -- he always

19 is in the 20 and Mission.

20      He buy computers.  If anybody have something to sell they

21 go over there.  They have no receipt and he buy.  Electronics,

22 computers, phones.  IPhones.  Anything.  He -- he is there

23 forever.  Buy stolen things.

24 **Q.**    Buys stolen things?

25 **A.**    Yes.

```
 1              MR. HEMANN:  Ms. Lane, could you please put up
 2   Exhibit 277 -- which is in evidence, Your Honor -- and page 7.
 3        (Document displayed.)
 4   BY MR. HEMANN:
 5   Q.   Do you see this picture on the screen, Mr. Hernandez?
 6   A.   Yes.
 7   Q.   And is that the corner on which Sergio worked?
 8   A.   Yes.  He always be over there in that corner.  Always.
 9   Q.   And how did you know that he was in the business of buying
10   and selling stolen things?
11   A.   I know him for little -- before.
12   Q.   So you had talked to him about it?
13   A.   I know him.  We never discuss his business, but I know
14   what he do.  I know.
15   Q.   How do you know?  You have to explain.  How do you know?
16   A.   Uhm, I dealing in the street.  In the Mission we know
17   everybody.  I know the guys that sell fake I.D.s.  I know the
18   guys that different kinds of drugs.
19        I walk that area all the time.  I know him.  I've known,
20   like hundred percent sure, that he do that.  I know him.  And
21   he know me.
22   Q.   Was there a day that you went over near that corner with
23   Mr. Robles and Mr. Vargas?
24   A.   No.  We don't go to that corner.
25   Q.   Did you see Mr. Sergio at another corner?
```

1   **A.**    Yes.

2   **Q.**    Where did you see him?

3   **A.**    In that same street, 20 -- that same street, but in the

4   Van Ness, two blocks.

5   **Q.**    So two blocks from this corner you saw Mr. Sergio?

6   **A.**    Yes.

7   **Q.**    Okay.  And what were you doing with Mr. Robles and

8   Mr. Vargas that day?

9   **A.**    That day I believe I call him for I need -- if they have

10  money for the burrito.  And they told me no.  They show me one

11  picture.  They show me one picture that day.  So I go in the

12  car, and asking them for money.

13  **Q.**    Let me stop you.  You said this a couple of times, that

14  they show you a picture?

15  **A.**    Sometimes.

16  **Q.**    Can you --

17  **A.**    (Unintelligible.)

18  **Q.**    Let me.  Okay?

19  **A.**    Okay.

20  **Q.**    When they showed you a picture, what were they showing you

21  a picture for?

22  **A.**    If I know that guy.

23  **Q.**    And then after that you asked them for money?

24  **A.**    Yes.

25  **Q.**    Okay.  And that's what you were doing that day?

1   **A.**    Yes.  At the back of the car.

2   **Q.**    In the back of their car?

3   **A.**    Yes.

4   **Q.**    And when you asked them for money, what did they do?

5   **A.**    He say he don't have no cash.  And then he tell Vargas he

6   got cash.  And he say he don't got no cash.  Too early.  9:00,

7   maybe a little bit more.  And then they say, okay, I'm going to

8   call.  At that moment I don't pay attention who they call.  So

9   he call somebody.

10  **Q.**    And tell me, you're in the car; right?

11  **A.**    Yeah.  I'm in the back of the car.

12  **Q.**    Who's sitting where in the car?

13  **A.**    Robles and Vargas.

14  **Q.**    In the front seat?

15  **A.**    In the front seat.

16  **Q.**    Where were you?

17  **A.**    In the backseat.

18  **Q.**    Sitting behind --

19  **A.**    Covered with my hoodie.  And I look a little bit between

20  that.

21  **Q.**    Who were you sitting behind?  Which one were you behind?

22  **A.**    Both.  I'm laying down.  My feets is behind Vargas, and my

23  head is behind him.

24  **Q.**    Behind?

25  **A.**    Robles.

1  **Q.**    You said you had a hoodie on?

2  **A.**    Whatever side I come.  I'm behind, laying down in the

3  backseat.  But sometimes I'm looking with my hoodie, looking in

4  the mirror, or both.

5  **Q.**    So when you found out they didn't have any cash what did

6  you do?

7  **A.**    I say -- Robles told me don't worry, we going to have cash

8  in a minute.  He make a call.

9  **Q.**    Okay.  So did you guys go somewhere and get cash?

10  **A.**    Yeah.  Yes.  At one point they looking, they tell Vargas,

11  you don't see him?  And then say, yeah, yeah, Sergio's over

12  there.  And that moment I know him.  I say no, no, no.  Wait.

13  I know Sergio.  And he turned the car back.  And he walking.

14  Because I think guy's walking to the car.

15  **Q.**    So you drive up?

16  **A.**    Yeah.

17  **Q.**    Were you able to see Sergio over the top of the window?

18  **A.**    We talking and talking, and I see the side.

19  **Q.**    And what did you say?

20  **A.**    I know that guy.

21  **Q.**    So who was driving?

22  **A.**    Mr. Robles.

23  **Q.**    What did Mr. Robles do?

24  **A.**    A U turn.

25  **Q.**    A U turn?

1   **A.**   Yes, a U turn.

2        And maybe he jump in the car.  I say, wait, wait, wait.  I

3   think Sergio's walking to the car.  Maybe like I do.  Every

4   time I see his car I jump in.  I don't know.

5        At some point I'm -- only Vargas stay in the car.  And one

6   point I'm looking, looking back.  And I see him talk to him,

7   talking.

8   **Q.**   When Mr. Robles got out of the car did he have anything

9   with him?

10  **A.**   No.

11  **Q.**   At some point did Mr. Robles come back to the car?

12  **A.**   He have a manila envelope, a little one.

13  **Q.**   A manila envelope?

14  **A.**   The little just one you send letters.

15  **Q.**   Okay.

16  **A.**   And give it to Vargas, and throw away the page like

17  something.

18  **Q.**   To Mr. Vargas?

19  **A.**   Yeah.  And then Vargas open it and give me $60, I think,

20  from that envelope.  60 or $80.  I don't remember, sir.  I

21  really don't remember.  It was like 60 or $80.

22  **Q.**   Okay.  After you drove --

23  **A.**   And asking him I know that guy.  His name is Sergio.  And

24  he say, oh, he's good guy.

25  **Q.**   Who said that?

1  **A.**    Mr. Robles.  And that guy is not too bad.  He buy stolen

2  things.  He's very good guy.

3  **Q.**    And that's what Mr. Robles said?

4  **A.**    Yes, sir.

5  **Q.**    Did Mr. Robles ever mention to you, when you were working

6  with him, a person by the name of Manny?

7  **A.**    Yes.

8  **Q.**    And where was Mr. Robles when he mentioned the person

9  named Manny?

10 **A.**    They come into the police station like always I go to

11 police station lot of times.

12     We always meet in the little room inside.  But that day

13 I'm coming the front door.

14 **Q.**    The front door, the picture we looked at earlier?

15 **A.**    Yeah, you show me.  I come from that door.  There's the

16 elevator and that door to come to the office.  But this side

17 is -- there's one door, big doors like that ones.  But this was

18 like a conference room.  Large chairs inside.  Big room like

19 half of this.

20 **Q.**    It was a big room and --

21 **A.**    Like half of this (indicating).  Half, yes.

22 **Q.**    And was there a big table in the middle?

23 **A.**    Yeah.  One table in the side and chairs.  And they say

24 come on, come on.  So I go over there.

25 **Q.**    And who said come in, come in?

1   **A.**   Robles.

2   **Q.**   Was anybody else in the room?

3   **A.**   Vargas.  Sorry, Vargas.

4        And we talking about something.  And then they start

5   telling me about Manny.  I know that guy.  It's not my friends.

6   **Q.**   Good.

7   **A.**   Okay.

8   **Q.**   So he was talking about Manny.  And what was the other

9   name?

10  **A.**   His wife's girlfriend.

11  **Q.**   And what was her name?

12  **A.**   Another lady, Gricelda.

13  **Q.**   Gricelda?

14  **A.**   Gricelda.

15  **Q.**   And did you know who these people were?

16  **A.**   These guys is not my friends, but I know the guys.  They

17  have some kind of level.

18  **Q.**   When you say they have some kind of level, what do you

19  mean?

20  **A.**   They move, they move drugs.  It's not like dealing in the

21  street with junk.  No.

22  **Q.**   Kind of high-level drug dealers?

23  **A.**   Yes.

24  **Q.**   What kind of drugs?

25  **A.**   My understanding -- when I know the guys --

```
 1              MS. CAFFESE:  I'm going to object.  Unless he's

 2   speaking from personal knowledge, Judge, objection.

 3              THE COURT:  Sustained.

 4   BY MR. HEMANN:

 5   Q.   Do you know what kind of drugs Manny and Gricelda were

 6   moving?

 7   A.   When -- in the beginning they move heroin.  But then I --

 8   I don't know that his business.  I know that deal drugs.  I

 9   know them.

10   Q.   So what did Mr. Robles ask you about Manny?

11   A.   In that moment I tell him a little bit about my life in

12   the past.  So he know I have friends like him.  And he say,

13   see, you have to give me friends like Manny because we can make

14   a lot of money.  And then you know how much money I make on

15   this guy?

16        And all the -- he's happy, excited talk to me about these

17   guys.  Like you walk in the street and find money, you happy.

18   That's this guy.  I want you have to give to me people like

19   Manny so that way we can make a lot of money.

20        He say, You know how much money I make on that?  I say,

21   How much?  And he say, A lot.  A lot.  He always say that.

22   Q.   Let me step back for a moment.  You walked into the room?

23   A.   Yeah.

24   Q.   And how did this conversation start?  Did he tell you

25   about something?
```

1    **A.**    They tell me if I know them.  They asked me.  And they

2    used to ask me about these guys, way they look and everything.

3    And I know them.  I know who's dealing, you know, who's the

4    guys.  So I tell, yeah, I know them.  Yeah, we arrested.

5    **Q.**    Stop you.

6         So he told you that they had arrested Manny?

7    **A.**    They don't give me details.  Most of the conversation was

8    he wanted people like him.

9    **Q.**    People like Manny?

10   **A.**    Like Manny.  He say, Your friends in Redwood City, I want

11   that guy.  I want that kind of money.  I want that kind of

12   thing.

13   **Q.**    So what did you say?

14   **A.**    I don't remember.  Nothing.  I just like no -- I never

15   turn my friends.

16   **Q.**    You never turned in your friends?

17   **A.**    My friends, no.

18        People I meet in the street.  Little dope dealers, like

19   *El Pareja*.  This is normal for this guy.  I know him.

20        I never turn my people from my country, the guys working

21   there in 2000, from my town in Mexico, Michoacan.

22        I turn people that I know here, here in the United States.

23   Never my friends.

24        And Manny is one of my country, is one that come from my

25   city.

1  Q.   So when Mr. Robles said to you, "I want you to give me

2  somebody like Manny," did you understand what he was talking

3  about?

4  A.   Yeah.  He talking about high-quality drug dealers.  Only

5  give to him people like deal in 20s, 40s.  I think the only big

6  one was *El Pareja*.  And then we made one case with the D.A. but

7  that I got working.  But that was later.

8  Q.   And the day that you met Mr. Robles in that conference

9  room --

10  A.   Yeah.

11  Q.   -- can you describe what his mood was, what his demeanor

12  was.

13  A.   Happy.

14  Q.   How do you know that?

15  A.   I know him at that time.  I'm talking with him more.  I

16  know when he's mad, when he's happy.

17       He was happy.  He was like, I want people like him.  And

18  he told me.  "I make a lot of money, a lot of money.  Know how

19  much money I make?  I make a lot."

20       At one point -- at one point Mr. Vargas --

21  Q.   Was Mr. Vargas in the room --

22  A.   Yes.

23  Q.   -- during this conversation with Mr. Robles?

24  A.   Yes.  Both were there.

25  Q.   Okay.  Was Mr. Furminger present during this discussion?

1   **A.**   No, sir.

2   **Q.**   Do you recall an incident --

3   **A.**   Mr. Furminger is the sergeant; right?

4   **Q.**   The sergeant.  I'm sorry.  Was the sergeant present?

5   **A.**   No.

6          **MR. GETZ:**  I would like the record to reflect the

7   witness asked if Mr. Furminger was the sergeant.

8          **MR. HEMANN:**  I think that's what he said.

9          **THE COURT:**  I think that's what he said.

10  **BY MR. HEMANN:**

11  **Q.**   And just to be clear, you knew somebody at Mission Station

12  who was the sergeant, correct?

13  **A.**   Yes.

14  **Q.**   Is that the man sitting in the courtroom here?

15  **A.**   Yes.  They call him Sergeant all the time.  They don't

16  call him Furminger.  They never say Furminger.  They say

17  Sergeant.  Sergeant.

18  **Q.**   Do you remember an incident involving an individual by the

19  name of Duanes?

20  **A.**   Carlos Duanes, yes.

21  **Q.**   Did he have a nickname?

22  **A.**   El Moreno.

23  **Q.**   El Moreno?

24  **A.**   Yeah.

25  **Q.**   And how do you know who Carlos Duanes or El Moreno is?

1   **A.**    I meet him in jail before I go to prison.  He always talk

2   to me.  Because I come to jail when -- my case was so big, my

3   case was 200 pieces of heroin and one million bail.

4   **Q.**    This is the time you went to San Quentin?

5   **A.**    Yes.

6   **Q.**    And you meant Mr. Duanes in San Quentin?

7   **A.**    Yes.  He know my case.  I tell him about my case and my

8   paperwork and everything.  So he knows I know peoples.  He tell

9   me when you get out from prison we can work.  And I be like,

10  all right.

11  **Q.**    Did you stay in touch with Mr. Duanes after you got out of

12  prison?

13  **A.**    Yes.  When I leave from prison, my wife tell me a person

14  called few days ago and left this number for you.  Because I

15  gave him my beeper number.

16  **Q.**    That's back in the early 2000s; right?

17  **A.**    Yes, 1999.

18  **Q.**    Did Mr. Duanes come up again in -- with Mr. Robles and

19  Mr. Vargas?

20  **A.**    Yes.  In that 2000 -- when I meet, yes.

21  **Q.**    In 2009?

22  **A.**    Yes, something.

23  **Q.**    How did Mr. Duanes come up during that time?

24  **A.**    One day I tell him about him.

25  **Q.**    You told who about who?

1  **A.**    Mr. Robles.

2  **Q.**    About?

3  **A.**    Carlos Duanes.

4  **Q.**    What did you tell Mr. Robles --

5  **A.**    I tell --

6  **Q.**    Slow down just a little bit.  It's okay.

7       What did you tell Mr. Robles about Mr. Duanes?

8  **A.**    I tell him dealing a lot of heroin in the Tenderloin.

9  **Q.**    In the Tenderloin?

10 **A.**    Yes.

11 **Q.**    Why did you tell Mr. Robles about Mr. Duanes.

12 **A.**    Give a tip.

13 **Q.**    Pardon me?

14 **A.**    I give a tip to him.

15 **Q.**    You gave a tip to Mr. Robles?

16 **A.**    Yeah.  That day that we talking I'm -- I'm hundred percent

17 sure was that day was Mr. Jake -- another -- I give the names?

18 Was another police officer name Jake.  And Ricky Guerrero.  I

19 believe that was that day over there.  So we start talking

20 about Carlos Duanes.

21      And then Mr. Jake was interest in the name.  Oh, who is

22 the -- he come to the conversation that we have.

23 **Q.**    And were you sitting in that little room at Mission

24 Station?

25 **A.**    Yeah, that little room.  And they talk -- I talk to them,

Belle Ball and Katherine Sullivan
Official Reporters -  U.S. District Court
(415) 373-2529

1    but the guys was over there.

2         And they say, oh, we know that guy.  We always want to

3    catch this.  And they start talking about background on him.

4    And I say, yeah, I talk to him.

5         And they tell me one story.  They hit one house when the

6    lady there.  They told me, oh, we hit this house one day

7    looking for a kilo, but we never find it.  And I say, you know

8    what?  That was my wife.  They hit my house.  I was in Atlanta.

9    Q.   That was several years before?

10   A.   Yes.  They told me they looking for him.

11   Q.   Did you discuss with Mr. Robles doing something --

12   A.   Yes.

13   Q.   -- with Mr. Duanes?

14   A.   Yes.

15   Q.   What did you talk about with Mr. Robles doing with

16   Mr. Duanes?  What was the plan?

17   A.   I told him he move a lot of heroin.

18   Q.   Okay.  And did you and Mr. Robles and Mr. Vargas come up

19   with a plan to hit Mr. Duanes?

20   A.   When they talked these guys and tell who these guys are

21   they very interest.  They say they have money and everything.

22   Q.   Okay.

23   A.   They digging holes.

24   Q.   They're digging holes?

25   A.   Him, Carlos Duanes.  He don't put the money in the bank.

 1  He don't put the money in the house.  In the park he make

 2  holes, and he put the money in the holes.

 3  **Q.**   In what park?

 4  **A.**   One of the Avenues.  Golden Gate Park in the Avenues.  We

 5  go over there.

 6  **Q.**   Okay.  So did you and Mr. Robles come up with a plan --

 7  **A.**   Yeah.

 8  **Q.**   -- to do something with Mr. Duanes?

 9  **A.**   Yes, to buy.

10  **Q.**   What was the plan?

11  **A.**   Told me buy some pieces of heroin.

12  **Q.**   Pieces of heroin?

13  **A.**   I say piece.  I don't say ounce because the ounce come

14  28 grams.  The heroin is different.  When somebody want an

15  ounce we don't call it that.  We call them piece.  25 grams.

16  **Q.**   So the unit of measuring heroin is a piece, which is 25

17  ounces?

18  **A.**   Yeah.  You say I want --

19  **Q.**   25 grams.

20          **THE COURT:**  I think it's 25 grams.

21  **BY MR. HEMANN:**

22  **Q.**   25 grams, yes.

23  **A.**   Yeah, but the ounce is 28.

24  **Q.**   So the plan was to get some pieces from Mr. Duanes?

25  **A.**   Yes.  Five pieces.

1        And I tell him, I going to give you the money in three,

2   four days.

3   **Q.**   You told who?

4   **A.**   I tell Duanes.

5   **Q.**   Okay.

6   **A.**   Because he say give all the money so that we can follow

7   him and see where the money is.

8   **Q.**   Who said to give the money --

9   **A.**   Vargas.

10  **Q.**   So the plan was you buy -- you get some heroin from

11  Mr. Duanes and give him cash?

12  **A.**   Yes.

13  **Q.**   And then you follow Mr. Duanes to --

14  **A.**   Not me.  They going to follow.

15  **Q.**   Mr. Robles follows?

16  **A.**   Yeah.

17  **Q.**   Okay.  Did you do that?

18  **A.**   Uhm -- uhm -- sorry.  Sorry.

19  **Q.**   Did you do that?

20  **A.**   Yes.  The problem was one day before I sell four pieces,

21  two halves left.  One day before I had to give the money to

22  Duanes.  I come in the Monday before and tell them I don't have

23  no customers.  I have to give you the money tomorrow.

24  **Q.**   You went and told who that?

25  **A.**   Mr. Robles.

1  **Q.**    Okay.

2  **A.**    And he told me don't worry about it.  He had somebody they

3  going to buy the thing.  And I give it to him, two halves.

4  **Q.**    You gave what to him?

5  **A.**    Two halves of heroin.

6  **Q.**    Two half pieces.

7  **A.**    Half pieces.

8  **Q.**    Okay.

9  **A.**    12.5 each.

10  **Q.**    Okay.

11  **A.**    Next day when I come to the police station he only have

12  one half money.

13  **Q.**    How much was that?

14  **A.**    I think I tell him $200.

15  **Q.**    Okay.

16  **A.**    Yeah, I believe so.  But they don't have all of it.  They

17  only had the money for half.  So they call the guy -- he called

18  somebody but the guy don't answer.  And he tell Vargas, oh, he

19  don't answer the phone.  They told me the guy that gave me the

20  other half he don't answer the phone?

21      Then I start being worried.  What I do now?  I have to pay

22  Duanes, you know.  And it was like don't worry, dude, we got

23  you.

24  **Q.**    Who said, "Don't worry, Dude"?

25  **A.**    Robles.  Don't worry, I got you.

```
 1        And I ask Vargas.  He put hundred dollars, and he put
 2   hundred dollars.  And I had to sign paper.  And they give me
 3   hundred dollars each and sign the paper.
 4   Q.   So you sold four pieces yourself?
 5   A.   Yes.
 6   Q.   You got money from Mr. Robles for half a piece?
 7   A.   Yes.
 8   Q.   And you didn't have to sign for that?
 9   A.   No.
10   Q.   And then you got money from Mr. Robles and Mr. Vargas, and
11   you had to sign for that?
12   A.   Yes.
13   Q.   So how much money did you have to give Mr. Duanes then?
14   A.   The money that covered the five pieces.
15   Q.   And about how much money was that?
16   A.   I think -- I think Vargas's gave me the piece, 350.  But I
17   tell them I do 400.  It's the way that sell on the street.
18   It's the way they sell on the street.  So I said hundred, 200
19   the half.
20   Q.   So did you ultimately give money to Mr. Duanes?
21   A.   Yes, sir.
22   Q.   Where did you give it to him?
23   A.   I give it to him somewhere in the Tenderloin.
24   Q.   How much did you give him, do you think?
25   A.   I give everything, all the money, yes.
```

1   **Q.**   And did you tell Mr. Robles and Mr. Vargas that you had

2   given him the money?

3   **A.**   Yes.  I'm -- I understand they follow him.

4   **Q.**   They followed him?

5   **A.**   Yeah, what I understand.

6   **Q.**   Who told you that?

7   **A.**   Robles.  Because later we go to the park.

8   **Q.**   That day you went to the park?

9   **A.**   Yeah.  They pick me up and go to the park.

10  **Q.**   And when he picked you up, who picked you up?

11  **A.**   Robles and Vargas.

12  **Q.**   And when they picked you up what did they tell you?

13  **A.**   They say we know where this guy's walking into the park.

14  **Q.**   And did you go to the park with Mr. Robles and Mr. Vargas?

15  **A.**   Yes.

16  **Q.**   Why did you go to the park with them?

17  **A.**   Digging holes.  We, we -- they told -- he told me he

18  follow him.  At one point he look back and they walking around.

19  I don't know.  But they don't see.

20       But we go where was the area.  We dig holes, like holes,

21  holes, holes, digging holes.  Holes.  We looking around in the

22  ground, the earth and, like, we digging.

23  **Q.**   And you did this when the earth is, like, loose?

24  **A.**   Yes.  Yes, we digging everywhere.

25  **Q.**   And did you find anything out --

1   **A.**   No, we don't find nothing.  The park is so big.

2   **Q.**   Say again.

3   **A.**   The park is so big.  We can't.

4   **Q.**   So I want to talk, for a little while, Mr. Hernandez,

5   about how you came to be a witness in this trial, okay.

6   **A.**   Okay.

7   **Q.**   All right.  Now, you said earlier that you -- after

8   Mr. Robles left to go to motorcycles you did some deals with

9   Mr. Vargas too; correct?

10  **A.**   Correct, yes.

11  **Q.**   And did you eventually stop doing deals with Mr. Vargas?

12  **A.**   We don't stop deals.  Vargas is -- is more personal.  He's

13  more like, uhm, more humility more -- I don't know what word is

14  in English.  More -- you be more comfortable with him.  He's

15  like more person.  He have feelings.

16  **Q.**   Okay.

17  **A.**   And most of the time he told me I have to do my life, you

18  know, continue my life.  We don't have to do that if I don't

19  want to.

20  **Q.**   So when you started doing -- when you were doing deals

21  with Mr. Robles, who was calling who to set up the deals, to

22  try to get the deals?  Were you calling him, or was he calling

23  you?

24  **A.**   In the beginning they -- they call me.  I call them some.

25  The first one they call me.

1   Q.   With Mr. Vargas was it different?

2   A.   In the beginning Robles called me every time, every time

3   Hey dude, what's up?  What's up?  What's up?  You know, like he

4   push me to do.  Vargas, no.  Vargas -- if I don't call him, he

5   don't call me back.  Robles buy me a phone.  He buy the phone

6   and pay the bill, Mr. Robles.

7   Q.   So, eventually, with Mr. Vargas did you stop calling him

8   with deals?

9   A.   Yes.  We -- we still talking but no most of the time about

10  deals.  Yeah, we -- we do couple more.  Like two years, last

11  two years, we do like 10 deals, 12 deals.

12  Q.   When you stopped calling him where were you living?

13  A.   When I stop calling or Mr. --

14  Q.   After you were dealing with Mr. Vargas for a while, and

15  then you stopped calling him, where were you living when it,

16  sort of, ended?

17  A.   In the end?

18  Q.   Yeah.

19  A.   Lived in the shelter.

20  Q.   You lived in the shelter?

21  A.   Sometimes.  Sometimes in the hotels.

22  Q.   And where was the shelter that you lived?

23  A.   Fifth and Mission.

24  Q.   Fifth and Mission?

25  A.   Yeah.

1  Q.   Did you end up getting a job, like a regular job?

2  A.   Yeah.  I working for *Examiner* newspaper.

3  Q.   The *Examiner* newspaper?

4  A.   And I working in -- one guy have a newsstand.  They sell

5  magazines.  I work for him too.  Two jobs.

6  Q.   Where was the newsstand?

7  A.   Second and Market, I think.  Yes, I believe so.  Second

8  and Market.

9  Q.   So you started doing that after you stopped doing things

10  with Mr. Vargas?

11  A.   We don't stop.  We still in contact, but with no pressure.

12  Like if I know somebody.

13  Q.   Okay.

14  A.   He still call me.  And I help him to move one day.

15  Q.   You helped him move his house?

16  A.   His girlfriend's.  I helped to move to another house.  Was

17  very different.

18  Q.   Very different?

19  A.   Nice person.  Very different.  He told me go to work,

20  forget these things.  You better than that.  Do some work.

21       And he's -- I don't know, very -- good person.  Bad person

22  can do bad things.  But very different than the first officer.

23  Q.   At one point in time did you find out that the police were

24  looking for you about this?

25  A.   Yes.

1   **Q.**   How did you first find out?

2   **A.**   That same one, Carlos, I working -- I working over there.

3   And then I walk in the Mission, in the Tenderloin.  And he told

4   me the police going to my house.  And then my wife come to the

5   place I work and tell me somebody coming looking for me.

6   **Q.**   Where was the place that you worked at the time?

7   **A.**   Second and Market in the newsstand.

8   **Q.**   And what did you do when you found out that the police

9   were looking --

10  **A.**   I go to the police --

11  **Q.**   -- for you --  Let me finish.

12  **A.**   Okay.

13  **Q.**   What did you do when you found out the police were looking

14  for you?

15  **A.**   I don't know why, so I go to the police station and asking

16  for Vargas.  A police officer in the -- in the window when you

17  come and ask for peoples or file complaint or whatever.  He

18  know me.  So he say, oh, he's not here today.  And I say,

19  well -- so I tell him why I'm there.  I say, I'm here because

20  the police looking for me and I don't know what I do.  I don't

21  do nothing, but the police looking for me.

22       And he told me like, you know what, call the guys -- I

23  mean, narcotics, call the guys for us.  Because if I look in

24  the computer and I'm find you do something I have to go over

25  there and put the handcuffs, and probably going to be hard for

1   them to take you out.  So go looking for them.

2   **Q.**   So you left?

3   **A.**   And I left.  Yeah, I walk away from that.

4   **Q.**   Did you call Mr. Vargas?

5   **A.**   Yeah, I call Mr. Vargas.

6   **Q.**   What did Mr. Vargas tell you?

7   **A.**   He said, oh, you know what, it's not for you.  It's for we

8   do in the past, the money and all those things.  He said it's

9   not for me.  He said they looking for me.  The problem is for

10  me, for us, all that we do in the past.  Okay.  And easy

11  conversation.

12  **Q.**   At some point in time did the police track you down to

13  talk to you?

14  **A.**   Yes.

15  **Q.**   Who found you?

16  **A.**   They found me, yes.

17  **Q.**   Who?

18  **A.**   One police officer.  The name Al Duarte.  That moment I

19  know him he told me his name is Al.

20  **Q.**   Al?

21  **A.**   Yes.

22  **Q.**   And did Mr. Duarte ask you to talk to him?

23  **A.**   Yeah.  He told me to talk to if I'm a witnesses.  They

24  explain to me, little bit, what happened.  They told me if I

25  working for some guys in the police station.  And I say yes.

1           We want to talk to you about that.  In the beginning not

2      too comfortable.

3      **Q.**   Where were you living at this time?

4      **A.**   Shelter.

5      **Q.**   Shelter?

6      **A.**   Fifth and Market, yes.

7      **Q.**   Okay.  Eventually, did you go talk to Mr. Duarte and his

8      colleagues?

9      **A.**   That same day.  They come in the morning.  And then I tell

10     him, well, I can't go nowhere.  I working.  If you want me talk

11     to you I talk to you, but when I'm -- when I'm finished work.

12     And he say okay.

13          And then I'm close -- because I had to close the little

14     stand.  So I closing the stand.  They come in, walking to me.

15     He say, You ready?  I say, Yeah, I'm ready.

16     **Q.**   Did you go with them?

17     **A.**   Yeah.

18     **Q.**   Where did they take you?

19     **A.**   They take me to -- you know the Dugout place?

20     **Q.**   The Giants?

21     **A.**   Yeah, the Giants.

22     **Q.**   Baseball park?

23     **A.**   Yes.  Close to over there in the beach.  Something over

24     there.  I don't know the area.

25     **Q.**   Was there an office there?

1  **A.**    There's a little building.  Yes, an office there.

2  **Q.**    And did you talk to Mr. Duarte?

3  **A.**    Yes.

4  **Q.**    Were there people from the FBI there too?

5  **A.**    Yes.  Mr. Greg Nestor, Mr. Joe -- I see Mr. Joe somewhere.

6  Right there.

7       And then what else?  Mr. Joe.  Mr. Greg.  What's another

8  person?  I don't remembering.  Mr. Eton.  And then come

9  Mr. Caputo later.

10 **Q.**    Is Mr. Caputo a prosecutor?

11 **A.**    Yes.

12 **Q.**    Okay.  From my office?

13 **A.**    Yes.  And was a police -- field police officer, too, like

14 field officers San Francisco Police.

15 **Q.**    So there were some FBI and some San Francisco police?

16 **A.**    Yes, yes.

17 **Q.**    And starting then -- I don't think we need to go into all

18 the details, but starting then did you start talking to people

19 at the San Francisco Police and the FBI about the things you're

20 telling about today?

21 **A.**    Yes.  They start talk to me about if I be informant for

22 these guys, if I work for these guys, give you tips.  And I say

23 yes.

24 **Q.**    Eventually, did these people include Ms. Flores from the

25 FBI?

1   **A.**   Yes.  Ms. Flores came a few days later.

2   **Q.**   After you started meeting with them, did you get yourself

3   a lawyer?

4   **A.**   Yes.

5   **Q.**   How did you get a lawyer?

6   **A.**   We were in court and --

7   **Q.**   You went to court?

8   **A.**   Not at this court.  Some little private court.

9   **Q.**   A small court in this building?

10  **A.**   Yeah.  Yes, this building.

11  **Q.**   And did the Judge give you a lawyer?

12  **A.**   Yeah, Mr. Guzman over there.  Erick Guzman.

13  **Q.**   So beginning at that time you are talking with the FBI.

14  You have a lawyer.  Do you continue with your job?

15  **A.**   They don't let me stay my job.

16  **Q.**   Who won't let you stay in your job?

17  **A.**   FBI.

18  **Q.**   Why not?

19  **A.**   For my safety.  I want to stay in my job.  I want to keep

20  my job.  And we have a lot of arguments about that.  One point

21  I had to quit my job.

22  **Q.**   You had arguments?

23  **A.**   Yeah, because I don't want to leave my job.  I like my

24  job.  I meet a lot of people.  At that moment I think

25  everything going to come back like before, like I had to do

1  things for the police.  Because I don't know what they really

2  want to do.

3      Robles had already left.  Vargas let me go.  So I wanted

4  my life change.  I want to start working.  I don't want no more

5  deals.  Be somebody else.

6  **Q.**  But they persuaded you to work with them for a while?

7  **A.**  Yeah.  They told me this is different.  And then I see

8  it's different.  It's not nothing for exchange money.  It is

9  case.

10  **Q.**  At some point in time did you move out of the shelter?

11  **A.**  They move me.  They told me this is not good place for me.

12  I had to move.

13      But because they told me what did we do?  And I tell what

14  we did.  In the beginning I just tell what did we do.  We don't

15  make details, nothing.

16      And I think they have a little investigate about

17  everything I tell them.  They investigate and make sure.

18  **Q.**  Did you start getting some money for expenses?

19  **A.**  When -- when I quit from my job.

20  **Q.**  When you moved from the shelter?

21  **A.**  Yes.  Mr. Greg Nestor, one of the FBI agent, first time he

22  try give me money for my expenses and for my hotel.  They have,

23  like, 300, $400.  One is for my hotel because they tell me you

24  have to quit your job.  I say, all right, if I quit my job what

25  I going to eat?  Where I going to live?

1          And he say, We're going to help you.  FBI going to help

2     you with the hotels and with expenses.

3          He tried to give me money.  I refused to accept the money.

4     I don't want the money from the police no more.

5          But they told me this case going to take forever.  So I

6     refused.  I don't accept the money.  And in the beginning we

7     have a lot of arguments.  And I don't -- I don't take the

8     money.  I walk away.

9     Q.   Eventually, did you start taking money for expenses?

10    A.   Yes.  Then I see this case what kind of -- I see that it's

11    different.  They don't want like other guys.

12    Q.   So what kind of -- what kind of hotel did you end up

13    staying in?

14    A.   Cheaper hotel in Tenderloin.

15    Q.   Same like you lived in, in the Mission before?

16    A.   Yes.

17    Q.   Okay.

18    A.   That kind of hotel, yes.

19    Q.   How much did you have to pay for that?

20    A.   I believe it's 55 a day.  Or $60.

21    Q.   And did the FBI cover those expenses?

22    A.   Yes.

23    Q.   And where was that first hotel?

24    A.   In the Tenderloin.

25    Q.   Did you also get some money for living -- for food, and

1  laundry, and things like that?

2  **A.**   Yeah.  They gave me money for food, laundry, and other

3  things.  They give me some kind of money.  I think it was 40

4  Monday to Saturday.

5  **Q.**   Okay.

6  **A.**   And 50 for the hotel.  But only Monday -- Monday through

7  Saturday -- or Friday.  I don't know.  But they don't give me

8  for weekends.

9  **Q.**   Okay.

10  **A.**   They gave me for the weekend for hotel, but not for

11  expense.

12  **Q.**   Okay.

13  **A.**   Because up until then I working.  And they tell me you

14  can't work.  And one of the things they say I can't work, one,

15  for my safety.  And second one I'm illegal.  When that guy come

16  to me I'm illegal.  I can't call no police.  I'm scared.

17  **Q.**   When Mr. Robles came to you?

18  **A.**   Yes, when I agreed to cooperate first time.

19  **Q.**   So you lived in a hotel in the Tenderloin for a while?

20  **A.**   Few months.  And at then they moved me.

21  **Q.**   Do you understand why they moved you?

22  **A.**   For my safety.

23  **Q.**   And where did you move to?

24  **A.**   Close to Chinatown, in the downtown -- near to Chinatown.

25  **Q.**   Did you continue to receive some expense money for the

 1  hotel and for food, and stuff, from the FBI?

 2  **A.**    Yes.  I think every week they pay my hotel.  Yeah, they

 3  come every week.  Not every day, every week.

 4  **Q.**    Now, you said that you were in the country illegally and

 5  you couldn't work.  Do you remember that?

 6  **A.**    Yes.

 7  **Q.**    Did you get some help from the FBI to allow you to work in

 8  the United States?

 9  **A.**    Yeah.  They move me to another state.  And when they move

10  me to another state, yeah, they help me with that.

11  **Q.**    So after the hotel in Chinatown did you eventually move to

12  another state?

13  **A.**    Yes.  They moved me to another state.

14  **Q.**    The FBI moved you?

15  **A.**    The FBI yes, sir.

16  **Q.**    And at that point in time did you get some money for

17  living expenses when you went to the new state?

18  **A.**    Yes, sir.  I live in another hotel for two months because

19  I don't have my work authorization yet.

20  **Q.**    At some point in time did you obtain, with the help of the

21  FBI, a work authorization to work in the other state?

22  **A.**    Yes, sir.

23  **Q.**    Okay.  And did you look for a job and find the job?

24  **A.**    When they give me the work authorization they say the help

25  the expense and other things they stop.  They stop giving me

1   money because I already can work legally in the United States.

2        So, yes, for the last two years they give me -- they give

3   me the work authorization in August.  I start work in

4   September.  And for the last two years I'm -- I cover my --

5   they don't give me no more money.  I'm working and I'm -- I buy

6   my own things with my own work.

7   **Q.**   What kind of job did you get?

8   **A.**   I work in the candy factory.  Mix operator.

9   **Q.**   And how much money did you make an hour at the candy

10  factory?

11  **A.**   They pay me 13.48.

12  **Q.**   Once you moved to the new state did you come back here on

13  occasion to talk --

14  **A.**   One --

15  **Q.**   Hold on.  After you moved to the new state did you come

16  back to California on a couple of occasions to talk with the

17  FBI again?

18  **A.**   Not for vacation.  But, yes, I come to California to talk

19  with the FBI.

20            **MR. HEMANN:**  What was the question?

21            **THE INTERPREPTER:**  He thought you said "vacation."

22  You said "occasion."

23  **BY MR. HEMANN:**

24  **Q.**   Occasion.  Not vacation.

25  **A.**   I'm sorry.  I thought you said vacation.

PROCEEDINGS

1   **Q.**   Was it like a vacation?

2       (Laughter)

3   **A.**   No.

4   **Q.**   No, not like a vacation.

5   **A.**   I'm sorry.

6           **THE WITNESS:**  Thank you.

7   **BY MR. HEMANN:**

8   **Q.**   Did you come back a couple of times to California to talk

9   about the case?

10  **A.**   Yes, sir.

11  **Q.**   And when you came back were your expenses paid by the FBI?

12  **A.**   Yeah, they paid for the hotel and for the plane ticket.

13          **MR. HEMANN:**  Now would be a good time, or 15 minutes

14  would be a good time.

15          **THE COURT:**  How much more do you have?

16          **MR. HEMANN:**  I would say I have about 30 minutes.

17          **THE COURT:**  Okay.  So let's do it now.

18      Ladies and gentlemen, we will be in recess until 20 to

19  3:00.  Remember the admonition given to you.  Don't discuss the

20  case, allow anyone to discuss it with you, form or express any

21  opinion.

22      Thank you.  You can leave your binders here.  Take your

23  books with you.

24      (Jury out at 2:17 p.m.)

25          **THE COURT:**  Let the record reflect the jurors have

 1  left.

 2      Mr. Getz.

 3          **MR. GETZ:**  I would like to say something, if I could,

 4  but outside the presence of the witness.

 5          **THE COURT:**  Mr. Hernandez, could you step outside.

 6  Thank you.

 7          **MR. GETZ:**  Your Honor, we did file a written pleading

 8  requesting a limiting instruction.  And the matters that the

 9  witness has testified about are the same ones that were recited

10  in the pleading.

11      And thinking back on the pleading and listening to the

12  witness today, I think it's too thin to tie Furminger to

13  anything at all.  There's not even any proof, nor could there

14  be, that he even heard what the witness was talking about.

15          **THE COURT:**  That's correct.  But I --

16      **MR. HEMANN:**  May I?

17          **THE COURT:**  Go ahead.

18      **MR. HEMANN:**  Two observations.

19          **THE COURT:**  Well --

20      **MR. HEMANN:**  Number one is that Mr. Vargas is going

21  to sit there and testify that they split the money.  I mean,

22  Mr. Vargas, believe it or not, will connect what Mr. Hernandez

23  is saying to Mr. Furminger.

24          **THE COURT:**  What I would do is -- oh, I have no idea

25  what Mr. Vargas is going to say.  But these statements, of all

 1  these conversations, if, in fact, it is claimed that your

 2  client knew about them or had some role with respect to them

 3  would be statements in furtherance of a conspiracy.

 4      In other words, it would be admissible against your

 5  client.  You don't have to charge a conspiracy.  That's the

 6  theory of admission.

 7      So, you know, I think I will caution -- when this witness

 8  is finished, I may caution the jury that in order to view this

 9  evidence as admissible against your client there must be

10  evidence of a conspiracy or evidence of -- that your client

11  knew about it or participated in it in some manner.

12          **MR. HEMANN:**  Your Honor, I guess, I object to that --

13          **THE COURT:**  Am I not connecting?

14          **MR. HEMANN:**  It would be great if we could have

15  Mr. Hernandez and Mr. Vargas switch off.  And have Mr. Vargas

16  walk in immediately after Mr. Hernandez says something and say,

17  yeah, that's this deal that Mr. Furminger knew about.

18      But we can't do that.  And there will be a little -- I

19  know we're very eager to get to Mr. Furminger, but

20  Mr. Hernandez has something more specific about Mr. Furminger.

21      I've been as careful as I can be about saying, Was

22  Mr. Furminger there?

23      I feel like I'm giving, sort of, the limiting instruction

24  as I go, which is:  Was he present?  Was he not?  And we're

25  trying to be careful about that.

1      **THE COURT:**  Whether he's present or not is not the

2  guide of whether it's admissible.

3      **MR. HEMANN:**  Agreed.

4      **THE COURT:**  So I think I would just, you know, let it

5  in.  And whether or not it's binding against Mr. Furminger

6  depends on how the evidence comes in.

7      So I don't know how -- the problem with a limiting

8  instruction is:  Don't consider it against A; only consider it

9  against B.

10      And the issue, at this point, is we're not at the point to

11  see whether or not that's an appropriate instruction.  It might

12  be.

13      And I could easily, easily -- if it's not connected in a

14  legal way I could easily give a curative instruction.  I could

15  simply say to the jury:  Remember when Mr. Hernandez testified?

16  He testified for a day or so about all of these events.  I

17  instruct you that that evidence is not admissible as to

18  Sergeant Furminger."

19      I mean, it's easy enough to do if that's warranted by the

20  evidence finally.  But it's a problem of order of testimony.

21  And that's why all the courts have said, repeatedly, that

22  provided that the government is acting in good faith, with

23  respect to how they believe it will be admissible, they can

24  introduce these statements subject to their proffer that they

25  will connect it up in an admissible way.

 1      And then I can make that judgment.  And depending on that

 2   judgment, I'll rule.  And then I'll -- whatever will flow from

 3   that.

 4          **MR. GETZ:**  That's fine.  Then I would ask the Court

 5   to find that I'm not intending a waiver if I cross-examine this

 6   witness.

 7          **THE COURT:**  You're not.

 8          **MR. GETZ:**  Thank you.

 9          **THE COURT:**  Absolutely.

10      Okay.  Thank you.

11          **MR. HEMANN:**  Thank you, Your Honor.

12      (Recess taken from 2:22 to 2:47 p.m.)

13      (The following proceedings were held in open court,

14   outside the presence and hearing of the jury.)

15          **THE CLERK:**  You may remain seated.

16      Please rise for the jury.

17      (The following proceedings were held in the presence of

18    the Jury)

19          **THE COURT:**  Okay, please be seated.

20      Let the Record reflect all the jurors are present; the

21   parties are present.

22      You may proceed.

23   **BY MR. HEMANN:**

24   Q    Mr. Hernandez, can you move the microphone a little closer

25   to you again?

1        (Request complied with by the Witness)

2   Q    There you go.  We were talking before the break about the

3   FBI providing expenses for your living over the last several

4   years.  Correct?

5   A    Yes.

6   Q    Do you know how much the FBI provided for your living

7   expenses since 2011?

8   A    How much money they give me?  Another time?

9   Q    Yeah.

10  A    Until now?  I don't know, sir.  But, I don't have no idea.

11  It's like, like, total -- total money they have?

12  Q    Total.

13  A    Like 30, maybe more than that.

14  Q    30,000?

15  A    Yes.

16  Q    And what did you use that money for, that the FBI

17  provided?

18  A    Expenses and paid my rent, my utilities.  Because I can't

19  work because I don't have any authorization, I can't work, I'm

20  illegal.

21  Q    And you have been able to work since you received the work

22  authorization?

23  A    For the last three years, I working by myself.  They don't

24  -- stop help me.  Soon I have the work, searching for work,

25  legally, in the United States.

1   Q    At some point in time, did you enter into some kind of an

2   agreement with the government about charges against you?

3   A    The FBI?

4   Q    Yeah.

5   A    Yes.

6   Q    What kind of agreement did you have?

7   A    They tell me if I speak the true and everything about this

8   case, I -- I can have -- I have immunity.  When I working --

9   whatever I do with Mr. Robles, Mr. Vargas, I have to admit it.

10       And, they tell me I had to tell the true, and only that

11  true.

12  Q    And did you negotiate that agreement with the assistance

13  of your attorney?

14  A    With my lawyer?

15  Q    Yes.

16  A    Yes.  He was present.

17  Q    During the time that you were working with Mr. Robles, and

18  Mr. Vargas, was there a period of time that you took a break

19  and moved out of San Francisco?

20  A    Repeat.

21  Q    During the time that you were working for Mr. Robles and

22  Mr. Vargas as an informant --

23  A    Yes.

24  Q    -- was there a time that you took a break and moved out of

25  San Francisco?

1   **A**    Yes.  For -- yes, for a few months.

2   **Q**    Why did you do that?

3   **A**    At that time I'm working -- well, Robles and Vargas were

4   over there but I just respond to Mr. Robles, I work for him.

5   He push me too much, he ask me too much.  So, I want to walk

6   away a little bit.

7   **Q**    So where did you go?

8   **A**    First I go to Palo Alto, one of my friends.  And, a few

9   days.  And then I meet -- I know this guy, the name, some guy,

10  work in the Mission.  He -- he tell me he live in an apartment

11  with another guys, but they don't pay their rent, so they are

12  in court.  They don't pay no rent.

13        They tell me, "You want to live with us?  It's free rent

14  for two or three months."

15  **Q**    Where's that?

16  **A**    The Excelsior District.

17  **Q**    The Excelsior District, in San Francisco?

18  **A**    Yes.

19  **Q**    So did you live there for a few months?

20  **A**    Yeah, for two or three months, I live, stay over there.

21  **Q**    And when that deal ran out, did you --

22  **A**    Yeah, he told me -- okay.

23  **Q**    When the deal ran out, did you move back to the Mission?

24  **A**    Yes.

25  **Q**    And, when you moved back to the Mission, did you start

1   doing things with Mr. Robles and Mr. Vargas again?

2   **A**    I'm back to do little things, like sell fake IDs or -- the

3   things I do before.

4   **Q**    And did you start communicating with Mr. Robles and

5   Mr. Vargas again?

6   **A**    Yes.  One day I find them and I'm -- they always in my

7   same area, so, maybe next day, or very, very close, I'll find,

8   and he say, "Come to the office, I want to talk to you."

9        And I come to the office.

10  **Q**    Now, did you have a telephone?  You mentioned earlier, you

11  had a telephone?

12  **A**    Yeah.  Mr. Robles buy me one telephone.  At that point.

13  And he say we --

14  **Q**    And was the telephone in your name?

15  **A**    In my last name only.

16  **Q**    And do you remember what the first name was?

17  **A**    Now, I know it was "Eric Hernandez."  But I don't know at

18  that time.  I never pay bills; he only buy phone.  He -- he --

19  okay.

20          **MR. HEMANN:**  Your Honor, I'm going to -- discussed

21  this with Counsel.

22      I'm going to show Mr. Hernandez a document that we are not

23  going to offer into evidence, at this point in time.  He's just

24  going to identify one thing on the document, subject to

25  connecting it up later.

 1          **THE COURT:**  Okay.

 2          **MR. HEMANN:**  May I approach?

 3          **THE COURT:**  Yeah.  Is the document numbered?

 4          **MR. HEMANN:**  It is.  I'm about to read it.  It's

 5  Government Exhibit No. 293.  It is not on the Court's exhibit

 6  list.

 7      May I approach, Your Honor?

 8          **THE COURT:**  Yes.

 9  **BY MR. HEMANN:**

10  **Q**    There are some names and some telephone numbers on that

11  document, Mr. Hernandez.  Do you see those?

12      (Witness examines document)

13  **A**    I think this is the phone number that he have --

14  **Q**    Let me ask the question.

15  **A**    Okay.

16  **Q**    Do you see the numbers and the name?

17  **A**    Yeah.

18  **Q**    Do you see on that document the telephone number for the

19  phone that Mr. Robles gave you?

20  **A**    I think that one is another area.  Different.

21  **Q**    Can you read the number that you recognize?

22  **A**    From Mr. Robles, 925 --

23  **Q**    No, no, no.  The number for the phone that he gave you.

24  **A**    Oh, it is (415) 240-8767.  And that's, by "Name,"

25  "Hernandez, Eric."

1    **Q**    Say it again?

2    **A**    "Hernandez, Eric."

3    **Q**    And is that the name that Mr. Robles registered the phone

4    in for you?

5    **A**    Yes --

6              **MS. CAFFESE:**  Objection.  That calls for speculation.

7              **MR. HEMANN:**  Let me rephrase the question,

8    Your Honor.

9    **BY MR. HEMANN:**

10   **Q**    Do you know whether that is the name that Mr. Robles used

11   to register the phone for you?

12   **A**    Yes --

13             **MS. CAFFESE:**  Well, objection.  Lack of foundation.

14   Personal knowledge.

15             **THE COURT:**  You have to lay a foundation.

16   **BY MR. HEMANN:**

17   **Q**    Did Mr. Robles discuss with you the telephone?  Did he

18   talk to you about the telephone?

19   **A**    At that time frame --

20   **Q**    Just, answer the question, slowly:

21        Did Mr. Robles talk to you about the telephone, when you

22   were working with him?  Yes or no?

23   **A**    Yes.  When he buy me the phone, yes.

24   **Q**    And did he tell you that he registered it under a name

25   other than your name?

1    **A**    Yes.  He gave me that paper, where he buy it, the --

2    (Indicating) -- a paper with my phone number and everything.

3    They -- Metro, MetroPCS.

4    **Q**    He gave you a paper?

5    **A**    Yes.

6    **Q**    About the phone from MetroPCS?

7    **A**    Yes.

8    **Q**    And did that phone (sic) have your telephone number on it?

9    **A**    Yes.

10   **Q**    And did that paper have the name that it was registered

11   to?

12   **A**    Yes.

13   **Q**    And was it the name that is on that piece of paper -- Let

14   me say it again.

15   **A**    Yes.

16   **Q**    Is the name on Exhibit 293 the same name as the name on

17   the piece of paper from MetroPCS that Mr. Robles gave you?

18   **A**    I say yes.

19   **Q**    And what is that name?

20   **A**    It's "Hernandez, Eric."

21   **Q**    Thank you.

22   **A**    Where did the name come from, "Eric"?

23           **MR. HEMANN:**  Ms. Lane, could you please -- and this

24   will pertain, Your Honor to Tab 9 of the incident binder.

25       And Ms. Lane, could you put up Exhibit 273, please.  I'm

 1   sorry -- yeah, 273.

 2        (Document displayed)

 3   BY MR. HEMANN:

 4   Q    Could you look at the screen in front of you,

 5   Mr. Hernandez?

 6        Do you recognize that building?

 7   A    Yeah, this building, I'll give a tip to Mr. Robles about

 8   one person -- it was two dope dealers in that building.

 9   Q    There was two what?

10   A    Dope dealers.

11           THE INTERPRETER:  Dope dealers.

12   BY MR. HEMANN:

13   Q    So there were two dope dealers in that building?

14   A    Yes.

15   Q    And you gave a tip to Mr. Robles about the dope dealers in

16   this building?

17   A    Yes, sir.

18   Q    First of all, how did you know about the dope dealers in

19   that building?

20   A    How they know, somebody introduced me to one of them.

21   Somebody introduced me to one of them.  Then, when dealing with

22   him, one day I go looking for him.

23   Q    "Him," the dope dealer?

24   A    The first, the one I meet first, that his name was

25   Fernando.  He don't was there.  So another guy, he know me

1    because I go like two, three times.  And, he told me if I

2    looking for Fernando to buy, and I said yes.  "I got it too."

3    And he sell me to.  We go to his room.

4    **Q**    And so you bought some drugs from Fernando in his room in

5    this building?

6    **A**    Yes.  And the other guy that his friend, Fernando's

7    friend, told me he got to.  Because the day they knock on the

8    door, Fernando was not there.  But when they knock on the door,

9    somebody next to there opened the door.

10        And I know that guys because one day I go to go play --

11   the Broadway, you go that way (Indicating), it's football.

12   It's a park.  I go to play football with them a couple of

13   times.

14   **Q**    In the park near their house?

15   **A**    In the park, close to Broadway, you go all the way down,

16   there's a park.  I don't know the address.  I don't know.

17   **Q**    So after you bought drugs in this apartment in this

18   picture, did you go back and talk to Mr. Robles about it?

19   **A**    Yes, sir.

20   **Q**    What did you tell Mr. Robles?

21   **A**    I tell him, I'm -- I have a house, a building with two

22   different dope dealers.

23   **Q**    Okay.  And did you describe for him what the dope dealers

24   were doing in the building?

25   **A**    Yes.

1  **Q**    And what did you tell him about the -- about where the

2  dope dealers were living?

3  **A**    Yes, I tell -- and, that moment, I know where his

4  apartment and everything, so I tell him.  We do one buy, one

5  day before.

6  **Q**    And when you say "We did one buy," who are you talking

7  about?

8  **A**    Me, Robles and Mr. Vargas.

9  **Q**    And when you said "We did one buy," what does that mean?

10 **A**    I go to buy.

11 **Q**    Okay.

12 **A**    For them.

13 **Q**    Did they go with you?

14 **A**    Yes.  They -- they -- they wait.  They drove me, and wait

15 for me, I don't know where.

16 **Q**    And they drove you in what car that day?

17 **A**    The first day, the first time they do the buy, I don't

18 know.  I don't remember.  Was a police car.  They drive three

19 cars.  They got one from Buick; one, like, Ford car; and one

20 green one.  I don't remember what car we had that day, but what

21 -- most of the times in the blue.

22 **Q**    A Buick?

23 **A**    The -- in the blue, or in the green Buick.  This is the

24 only cars that we go to buys.

25 **Q**    So there were three cars?

1   **A**    Yes.

2   **Q**    And they were --

3   **A**    No, no, one car only.

4   **Q**    Say again?

5   **A**    They drive three different cars.

6   **Q**    Okay.  So the group drove three different cars?

7   **A**    Yes.

8   **Q**    Okay.

9   **A**    But --

10  **Q**    On that day you only drove one car?

11  **A**    Yes.  Probably the gray one, I don't remember at this

12  minute.

13  **Q**    So you go over there?

14  **A**    Yes.

15  **Q**    How did you get the money to do the buy on that occasion?

16  **A**    They gave it to me.

17  **Q**    Did you go in and make a buy?

18  **A**    Yes.

19  **Q**    What did you buy?

20  **A**    I think I buy two twenties.

21  **Q**    Of?

22  **A**    Cocaine.

23  **Q**    And did you come back and give the drugs to --

24  **A**    Yes.

25  **Q**    Did you come back and give the drugs to Mr. Vargas and

 1  Mr. Robles?

 2  **A**    I give to Mr. Robles, but Vargas was there.

 3  **Q**    After that day when you did the buy at this address, did

 4  you go back there with Mr. Robles and Mr. Vargas?

 5  **A**    They told me they going to hit the house next day.  They

 6  want -- he told me I had -- "I go to pick you up because we

 7  want to make sure, tell us the correct house and everything.

 8  Exactly everything."

 9       So, --

10  **Q**    What time did they -- did they pick you up the next day?

11  **A**    Yeah.  I live -- very early.  7:00, 7:30.  Very early in

12  the morning.  I live at Fifth and Market -- and Bryant, Fifth

13  and Bryant.  And they picked me up, Mr. Robles come in another

14  car.  He always ride a motorcycle, but that day he come in the

15  van, picked me up.  Fifth and Harrison.  Very early in the

16  morning.

17  **Q**    What kind of car were they driving when they picked you up

18  that day?

19  **A**    He picked me up in the van.  In the van.

20  **Q**    The van?

21  **A**    Yeah.  Van.

22  **Q**    And where did you go when he picked you up?

23  **A**    We go to the police station.

24  **Q**    And then, was it just you and Mr. Robles driving to the

25  police station?

 1  **A**    Yes.  Vargas was already there.

 2  **Q**    And when you got the police station, what did you do that

 3  day?

 4  **A**    They told me, we going to the house.  The house

 5  (Indicating).

 6  **Q**    And did you drive in the van over to the house?

 7  **A**    No.  We drive in one truck that I never see.  Gold color,

 8  Chevy.

 9  **Q**    Chevy?

10  **A**    Chevy truck.

11  **Q**    Would you recognize the car if you saw it now?

12  **A**    Yeah, if you show me, I can --

13          **MR. HEMANN:**  Your Honor, may I approach the witness

14  with Exhibit 181?

15          **THE COURT:**  181.

16      (Witness examines document)

17  **BY MR. HEMANN:**

18  **Q**    Do you recognize that vehicle, Mr. Hernandez?

19      (Witness examines document)

20  **A**    The truck was a Chevy gold color.  I don't see color here,

21  but yes, Chevy.

22  **Q**    Was that the vehicle that you drove over to 519 Broadway

23  with that day?

24      (Witness examines item)

25  **A**    I can't say it was this, but it was one truck exactly like

1   this.

2   **Q**    It looked exactly like that.

3   **A**    Yeah.

4           **THE COURT:**  Admitted.

5           **MR. HEMANN:**  Thank you, Your Honor.

6      (Trial Exhibit 181 received in evidence)

7   **BY MR. HEMANN:**

8   **Q**    And at the time -- at that time -- not now, at that time,

9   did you know whose truck that was?

10  **A**    No.  I ask, ask him.

11  **Q**    You asked who?

12  **A**    Asked Mr. Robles.

13  **Q**    And what did Mr. Robles tell you about whose truck it was?

14  **A**    Because I know Mr. Vargas have a BMW, and Mr. Robles have

15  a motorcycle, and that they have the van.  So I never see that

16  truck.  And I'm asking, "Who's this truck?"

17      And he's like, "Oh, this truck belong to the sergeant."

18  Mr. Robles told me, that truck belonged to the sergeant.

19  **Q**    And did you ask them why you were using that truck rather

20  than one of the usual police vehicles?

21  **A**    Yes.

22  **Q**    What did they say?

23  **A**    They never -- when they go to hit the house, they never

24  take me.  They -- they go, they do his job.  They have -- that

25  day, they take me to the house.  And, they tell me, we -- "I

1  want you guys, you go with us."

2       And I say, "Where you go?"

3       He say, "I go to that guy's house right now."

4       And I asking him why we don't go in -- why we went in this

5  truck.  And Mr. Robles told me, "Because we don't want to

6  arrest nobody, we going to robber these motherfuckers."  Say

7  exactly like that.

8       And -- okay.  That's cool.  I'm stay in the truck.  I

9  don't go to the house.  I'm staying -- they walk to the house.

10  I'm staying in there.

11  **Q**    You drove --

12       (Reporter interruption)

13           **MR. HEMANN:**  Let me ask a better question.

14  **BY MR. HEMANN:**

15  **Q**    Did you drive to this address on Broadway with them, then?

16  **A**    Yeah.  In the front of the house it's the public parking,

17  a parking lot, public parking lot.

18       We come to the house, they drive all the way to the end

19  (Indicating) in the corner, in the end.  I sit in the back and

20  I'm -- and they start walking (Indicating).

21  **Q**    Did the truck have a front seat and back seat?

22  **A**    Yes.

23  **Q**    Where were you sitting?

24  **A**    In the back seat.

25  **Q**    Okay.

1  **A**      They parking that way (Indicating).  Face -- so I had to

2  turn my head to see what happened (Indicating).

3        I'm looking everything (Indicating), and, but, one guy

4  that clean, that work in the parking lot, the guy with the big

5  moustache, he was around, cleaning.  Was in the morning, was in

6  the morning.

7        So I lay down.  Sometimes I'm looking.  One time when I'm

8  looking, I see Mr. Robles climb on the steps.

9            **MR. HEMANN:**  Could you put, Ms. Lane, Exhibit 273

10  back on, please.

11  **BY MR. HEMANN:**

12  **Q**      So you were across the street, in the back seat of the

13  truck?

14  **A**      Yeah.

15        (Document displayed)

16  **Q**      And were you looking at this building?

17  **A**      Yes.  He's climbing that.  And I know it was Mr. Robles

18  because he always use the Hawaiian tee shirts, Hawaiian.

19  **Q**      He would wear Hawaiian shirts?

20  **A**      Correct.  Most of the time, Hawaiian.

21  **Q**      Did you see Mr. Robles in one of the windows of this

22  building?

23  **A**      I seen Mr. Vargas climbing that step.

24  **Q**      You mean Mr. Vargas or Mister --

25  **A**      I'm sorry.  Mr. Robles.  Because he had the Hawaiian tee

1  shirt.  I'm just looking, come back.  That guy is one person

2  that cleaned that parking lot.  So I just look a little

3  (Indicating), come back.

4  **Q**    Did Mr. Vargas and Mr. Robles come back out of this

5  building after they went in?

6  **A**    Might -- maybe 20, maybe half hour, 20 minutes.  I don't

7  know, watch the clock.  I just --

8  **Q**    When they come back in -- did they get back in the truck?

9  **A**    Yes, they come back to the truck.

10  **Q**    And when they got back in the truck, what did they tell

11  you?

12  **A**    When they come back in the truck, they talking about

13  something.  And Mr. Robles give me -- you know the little

14  Mentos, the little --

15  **Q**    Mints?

16  **A**    Like *sardinas*, little cans.

17  **Q**    Little can, for mints?

18  **A**    Maybe for mints, look like, look like for mints.  They

19  give it to me, and close -- a little container.

20  **Q**    Okay.  Metal container?

21  **A**    Look like that one container, I call it, look like that.

22  I don't remember exactly, but it was a little container like

23  that.  Just -- (Indicating)

24  **Q**    Where were you sitting?

25  **A**    I sit in the back.  He come and give it to me.  A little

1    container.  The metal one.

2  **Q**    And, did you look in the metal container?

3  **A**    Yeah, I open it.

4  **Q**    What's in the metal container?

5  **A**    A lot of twenties.

6  **Q**    A lot of twenties?

7  **A**    Twenties -- little bags that cost $20, in drugs.  Twenty

8    dollars.

9  **Q**    Little bags of what?

10  **A**    Cocaine.  I know it is twenties, a lot of twenties.

11  **Q**    Did you talk to Mr. Robles about what he just gave you?

12  **A**    Yes, we come back to -- because that, that truck, nobody

13    knows I'm sitting, like, talk to them.  And we started talking

14    about -- they start talking about what happened, but --

15  **Q**    And what did Mr. Robles tell you about what happened?

16  **A**    They said they find that drugs, like, like -- like I tell

17    them.

18       And, at one point I tell him if -- I tell him, "So I have

19    this, and how about money?"

20       And he is like, "You motherfucker, you have all that

21    thing, you got to sell that and give me half."  I don't give

22    him that.

23  **Q**    Did you go sell it?

24  **A**    Yes, but I don't give the money.  I keep it.  Because he

25    don't need no cash.

1   Q    So you kept the money; and you said you did not share it

2   with Mr. Robles?

3   A    No, because next day, what I understand, they only hit one

4   house.  They don't go to the other guy.  Or the other guy was

5   not there; I don't know.

6   Q    So, is that what they told you?

7   A    Yes.

8   Q    Okay.

9   A    And next day, I meet the guy, the guy they are looking

10  for, Fernando, because he working in one restaurant.  And I

11  meet him in the street.

12  Q    Stop for a minute.

13  A    Okay.

14  Q    Go slow on this.

15  A    Okay.

16  Q    Did you talk to Mr. Fernando?

17  A    Yes.

18  Q    Okay.  Did you talk -- don't say what he said.  Did you

19  talk to him about what happened?

20  A    Yes.

21  Q    Okay.  After you spoke to Mr. Fernando, did you go back

22  and talk to Mr. Robles again?

23  A    Yes.

24  Q    Did you talk to him about what Mr. Fernando said?

25  A    Yes.

1  Q    Okay.  Now, tell us what Mr. Fernando said when you met

2  him.

3  A    He say they --

4             MS. CAFFESE:  Excuse me, Judge; objection.  Hearsay.

5             MR. HEMANN:  Not offered for truth.

6             THE COURT:  It is not offered for truth.  In other

7  words, it's just -- it's a statement that you are to consider,

8  if you find the witness credible that it was actually made to

9  him.  The statement was made to him.  It doesn't mean that the

10 content of the statement is true.  It just means that somebody

11 said X.

12      And, your determination would be:  Did the witness -- is

13 the witness credible when he says that.

14      Okay.  Go ahead.

15 BY MR. HEMANN:

16 Q    What did Mr. Fernando say to you?

17 A    Which, Fernando told me when these guys come to the house,

18 they find the drugs, and they find money.  And they say it's

19 another -- another person from another apartment to stay that

20 night with them, talking with them in the apartment.

21      All these guys are from Yucatan, so all the guys I think

22 was friends.

23 Q    From the Yucatan?

24 A    Yes.

25 Q    Okay.

1   **A**    So, so he say they tell him, "Where do you live?"

2        And he say, "I live over there" (Indicating).

3        So take to his house, and they take money from that house

4   too.  So, in that moment I be mad.  That's why I don't give

5   half of the drugs.

6   **Q**    Stop.

7   **A**    Yeah.

8   **Q**    So Mr. Fernando told you that money was taken?

9   **A**    Huh?

10  **Q**    Mr. Fernando told you that money was taken, too?

11  **A**    Yes.

12  **Q**    Did you go discuss that with Mr. Robles?

13  **A**    Yes.

14  **Q**    And what did Mister -- what did you say to Mr. Robles and

15  what did he say to you?

16  **A**    He say he give me all the drugs.

17  **Q**    Did he talk about the money?

18  **A**    Yeah.  He say, I don't want to have no cash.  I have the

19  drug already.  And, --

20  **Q**    So he's not going to give you cash.

21  **A**    No.  Because he give me the drug.  It was a lot of

22  twenties.

23  **Q**    Did you have an argument with Mr. Robles about this?

24  **A**    He very mad.  He mad.  I'm -- he's police officer, he mad,

25  I can -- I know -- I argue with him, but when I see he start,

1    like, be mad (Indicating), I stop.

2  **Q**    After that 519 Broadway, did you talk to Mr. Robles and

3    Mr. Vargas about doing a larger robbery?

4  **A**    Like I say in the beginning, when we start talking, he

5    always seemed to -- when I say my friends, I say, the dope

6    dealers that I know is people from my country.  The one I grow

7    up, in Michoacán.  These guys large, smoke a lot of cocaine.

8    We talk about kilos.  Half kilos with them.

9        He want that kind of person.  I don't give it to them.  I

10    give it to them, peoples from the street.  Peoples that deal in

11    grams.  Peoples that I know came from 2007 when I come back.

12  **Q**    So, did Mr. Robles identify a larger guy that he wanted

13    you to do?

14  **A**    Yes.  So he wanted that.  So, the one time -- we talk a

15    lot, and one time we are talking about one guy that has a body

16    shop in Bayshore.  He have a body shop, and he buy three, four

17    kilos at a time.

18        One of the guys that grow up with me in Mexico, in my

19    block, and my area when I was a kid, he delivered to him.

20        For any reason, we bring that conversation one day.  And

21    he tell me, "Let's go get that guy."

22        I said, "No.  I don't want my friend to go to jail."  He

23    would eventually.  But I don't want it for me, him.

24  **Q**    Now, did you go over there and look at this guy's place?

25  **A**    Yes, we go a couple of times.

1   Q      What --

2   A      Vargas and Robles.  And they watch me when I go to the

3   body shop, and the guy give me a hug and everything.

4   Q      And you knew him and they knew him to be a drug dealer?

5   A      Yes, but I don't want my friend to go to jail.

6   Q      Now, did you talk with them at some point about robbing

7   that guy?

8   A      One day I'm watching the police station, and --

9   Q      Stop for a minute.  Were you sitting in that same room

10  where you were usually?

11  A      In that same room, yes.

12  Q      Who was in the room on that day?

13  A      It was Mr. Robles and the sergeant.  It had to be Vargas

14  -- Vargas always walking around.  Always, always right there.

15  Q      So Mr. Robles and the sergeant were there that day.

16  A      Yeah, but that day I had the conversation with Mr. Robles,

17  Mr. Robles and the sergeant was standing up.

18  Q      What did you talk about?

19  A      We talking about a few things, and then he tell me, "Hey,

20  you know what?  The sergeant and I'm have the idea, you don't

21  want -- you, you friend to go to jail.  We don't put him in

22  ail.  We going to rob him.  You know when he deliver the

23  drugs?"

24         First of all, we discuss about how much drugs, I think.

25  Every time -- I mean every time that guy -- like I say, no,

1  right?  Every time that guy from the body shop buy, he buy

2  three kilos, four kilos.  Every time.

3      So, he say if I know what day he come to delivery.  And I

4  say I don't know right now, but I can ask.  So they told me,

5  they said, he and the sergeant have the idea they rob --

6  **Q**    When you say "they," Mr. Robles told you.

7  **A**    Mr. Robles told me that.  He say --

8      (Reporter interruption)

9          **THE WITNESS:**  "Okay, you don't want your friend to go

10 jail.  The sergeant and me have the idea there, rob him.  The

11 money.  Not the drugs, the money."

12 **BY MR. HEMANN:**

13 **Q**    Okay.

14 **A**    And, I say, "How you going to do that?"

15     And he's like, he come with a plan and say, "Okay, you

16 find out what day he come, we waiting for him, wait for the

17 deal is over then we follow him, stop it.  And take, pull him

18 from the car and take the car.  And then we take the car apart.

19 But your friend stay in the middle of the street."

20     I be like, "He's my friend."  I be like --

21 **Q**    So when you say you "be like," you responded to Mr.

22 Robles?

23 **A**    Yes.  I don't want to do that, but -- okay, but I want to

24 -- I don't want to do that.  I really don't want do that.  He's

25 my friend.  You know?

1   **Q**   And you said he's your friend?

2   **A**   Yeah.  In the past when he ask me, "Give me your friends,"

3   I say no.  "Give me people who do drugs," no.  Because these

4   are my peoples.  My friends.

5   **Q**   So when you said "These are my friends; I don't want to do

6   it," did the sergeant say anything?

7   **A**   "We don't want to arrest him."

8   **Q**   What did he say?

9   **A**   "We don't want to arrest him.  We don't want to arrest

10   your friend."  "Him."  I mean, he say "him" but it's me, like

11   my friend.

12   **Q**   Okay.

13   **A**   And, and we talking about, like, how much money are we

14   going to have, I say, "Well, he always have four kilos, that's

15   more than $65,000."  Three kilos is 48.  Because in the United

16   States it is 16,000 at that time, a kilo, something like that.

17         The guy in the body shop, he never ordered less than three

18   kilos, two kilos.  He always order more than two kilos.

19   **Q**   So after you had that conversation in the -- in the office

20   at the police station, did you ever talk to Mr. Robles again

21   about that man?

22   **A**   I think that night, that same day, I say, "Okay, I want to

23   find out when my friend come to see that guy in the body shop."

24   But I don't want to do that.  But they tell me that they don't

25   want to arrest him, but anyways, I don't want to do that.  I

1    don't want to hurt my people.

2        Okay, so, I was like -- I don't know the time, sir, but

3    was around -- all this thing happened around 10:00 and 2:00 in

4    the morning.  I don't know if it was 10:30 or 11:00, but was in

5    that time.  Because, I was at Fifth and Market, and they turned

6    the lights off, 10:00.

7    Q    And that's the shelter?

8    A    Yes.

9    Q    Okay.

10   A    They turned the light out at 9:45, and it's already no

11   lights when they call me.  So I had to go to the bathroom, and

12   that's when they invite me to some bar.  Mr. Robles invite me

13   to one bar in North Beach, close, one bar.  I don't remember

14   the street, but it's close to North Beach.  To Broadway.

15   Q    Did you go?

16   A    Yes.  They give me a taxi, they say, they call taxi for

17   me, wait for him at 5 and Harrison -- I mean 5 and Brannan.

18   Q    Okay.

19   A    The taxi pick me up.  When I come to the place, Vargas pay

20   for.

21   Q    Okay.

22   A    Vargas pay for the taxi so I come inside the bar.

23   Q    Who is in the bar?

24   A    Vargas, Robles and another cops.  I don't know these guys.

25   But I know it is a cop because someone has a pistol or stars, I

1    know, they have the little thing that they put here

2    (Indicating).

3    **Q**    Uh-huh.

4    **A**    It was a lot of cops.  Probably six, seven.  I never seen

5    that guys.

6    **Q**    So was it unusual for Mr. Robles to call you this late in

7    the evening?

8    **A**    Yeah, he never call me at that time.  Most of the time

9    they work in daytime.  They work in, I think, 8:00 to 4:00.

10   **Q**    Did you have a conversation with Mr. Robles in the bar?

11   **A**    We started talking about -- nothing, just talking, you

12   know.  They introduced me to the other guys.  At one point he

13   only tell -- oh, he buy me a beer, he give me a beer in a

14   drinking cup.  He was sit right there, I was sit next

15   (Indicating), Vargas, another police officer (Indicating).  No,

16   Vargas was in here and he sit over there (Indicating).

17       And one thing, say, "Hey, dude, what's up?  We going to

18   rob your friend?  What the fuck?"

19       I be like -- I'm looking at the officer, the officer

20   looking at me.  And I don't feel good at that moment, because

21   everybody looking at me.  And I said like this, man.  "That's

22   all."  So I say, "I don't know, bro, we talk later."  I say, "I

23   want to leave."

24   **Q**    You said, "I want to leave"?

25   **A**    "I want to leave," yeah.

1   **Q**    Why did you want to leave?

2   **A**    Well, I don't like talking in front of the police

3   officers.  And we do bad things.  And he talking in front of

4   all the police officers that I never see in my life.  And, I

5   don't know if he was drunk, or I don't know.

6        But, the next thing I say, "You know what?  I want to

7   leave."

8        And he say, "Okay," and he put his hands on me, and he

9   escorted me outside.  When we come outside, caught taxi -- I

10  don't know if he paid the taxi or gave me $20 to pay the taxi.

11       Soon I leave, I text him, or I call him.  I don't remember

12  what happened, but I remember he text me back.  I tell him,

13  "You know what, man, we don't want to do this deal because you

14  tell me in front of all that cops."

15       And he call me -- and he text me back, "They don't know

16  what's up, dude.  What's wrong with you?  They don't know

17  what's up."

18       And then he call me again.  You know what, marijuana and

19  all that shit.

20       And I'm like, "I don't want to do it, I don't want to do

21  it, I don't want to do it."

22  **Q**    And that was at the end of it?  Did you ever follow up and

23  do that deal?

24  **A**    Yes.  Then they ask me a couple of times, but I say, "Man,

25  you talk too much.  No."  That was the excuse.  The excuse, and

 1   we never --

 2   Q    That was the excuse you used?

 3   A    Yes, that was the excuse I used, I don't want to do that.

 4   Q    After that, did Mr. Robles leave and go to motorcycles?

 5   A    Yes.

 6   Q    And you mentioned earlier that you continued doing some --

 7   some jobs with Mr. Vargas.  Correct?

 8   A    Correct.

 9   Q    Okay.

10        MR. HEMANN:  Ms. Lane, could you put up Exhibit 276?

11   BY MR. HEMANN:

12   Q    And you said there were somewhere between ten and 15.

13        (Document displayed)

14   A    Huh?

15   Q    There was somewhere between ten and 15 that you did with

16   Officer Vargas?

17   A    Yes.

18        (Witness examines document)

19   Q    Okay.  And did you get cash out of all of those ten to 15

20   that you did with Mr. Vargas?

21   A    Right, in the house (Indicating)?

22   Q    Not this one.

23        MR. HEMANN:  Take it off for one second, please.

24        (Document taken off display)

25

1   **BY MR. HEMANN:**

2   **Q**    Forget you saw that picture for a moment.

3        You said earlier, ten to 15 that you did with Mr. Vargas,

4   right?

5   **A**    Yes.

6   **Q**    Did you get cash out of all those deals?

7   **A**    I have cash, and I have a couple of things.

8   **Q**    Some property?

9   **A**    Property.  Mr. Robles gave property too.

10  **Q**    Mr. Robles gave you property too?

11  **A**    Yes, and the computer from the police station in the

12  beginning.  A computer, a laptop (Indicating).

13            **MR. HEMANN:**  Would you put it up again?

14       (Document displayed)

15  **BY MR. HEMANN:**

16  **Q**    Did one of the deals you did with Mr. Vargas involve this

17  apartment building?

18  **A**    Yes, sir.

19  **Q**    On Leavenworth Street?

20  **A**    Yes, sir.

21  **Q**    And, just a very big overview, who lived there?

22  **A**    One guy, the name was Iveen (Phonetic), or Dean, something

23  like that.  And my little friend, José.  And another guy that I

24  don't know his name.

25  **Q**    And did you tell Mister -- were they dealing drugs out of

1   that apartment?

2   **A**    Yes.

3   **Q**    And did you tell Mr. Vargas about it?

4   **A**    Yeah, one day before, I go to his house to buy.  And that

5   dope dealer, he have a brand-new computer.  And I tell Vargas I

6   want that computer.

7   **Q**    And, did you tell him they were dealing drugs there?

8   **A**    Yes.

9   **Q**    And, after you told Mr. Vargas that, did Mr. Vargas hit

10  that building?

11  **A**    Yes.  And I tell Mr. Vargas, don't arrest the little one,

12  the José, because he don't have nothing to do with that.  Um,

13  he only is a roommate for the dope dealer.

14       And yeah, Mr. Vargas, hit that house.

15  **Q**    And, did Mr. Vargas get that computer for you?

16  **A**    Yes.  A computer and a BB gun.

17  **Q**    And he gave both of them to you afterwards?

18  **A**    Yes, he gave them to me.

19  **Q**    Now, you mentioned talking to Mr. Vargas about arresting

20  the people in the apartment.  Right?

21  **A**    Yeah.  I tell the little guy with the name José, doesn't

22  have nothing to do with the drugs.  He have two jobs.  He

23  working.  He only is a roommate in another room.  And he arrest

24  him anyways.

25       And Vargas told me, "If they living with a dope dealer and

1   he know, he go to jail too."  So, I'm a diablo.

2   Q    So, did Mr. Vargas have a different approach to arresting

3   people than Mr. Robles did?

4   A    Yes.  The first time that I talked to Vargas, one of the

5   first thing, because Mr. Robles in the beginning told me, "Make

6   sure they have money."

7        Because I tell they have drugs.  Have money, make sure

8   they have money.  When he walk from the room, Vargas told me --

9   I think it's first time that I talked to Vargas, he say, "You

10  know what, dude, these guy want to commit (Unintelligible) one

11  day because all he want is money, money.  He don't care about

12  case."  That what Mr. Vargas told me.  I think that was the

13  first conversation that we have.

14  Q    Did Mr. Vargas, though -- if that was Mr. Robles's

15  approach, what was Mr. Vargas's approach to arresting people?

16  A    Yes.

17  Q    What did Mr. Vargas do about arresting people?  Did he

18  arrest more people or less people?

19  A    More people.  But, I do more time -- more things with

20  Vargas, too, because Mr. Robles leave.  So, I don't work for

21  him no more.

22           MR. HEMANN:  No further questions, Your Honor.

23           THE COURT:  Okay.  Cross.

24       Ladies and gentlemen, do you want to stand up to stretch

25  for a minute?  And then we will start with cross-examination.

```
 1        Thank you.  You may proceed, Mr. Getz.

 2             MR. GETZ:  Thank you.

 3                    CROSS EXAMINATION

 4   BY MR. GETZ:

 5   Q    Good afternoon.

 6   A    Good afternoon, sir.

 7   Q    Do you remember on January 10th, 2012, you testified in

 8   this building?  You took an oath (Indicating), and you

 9   testified in grand jury.

10        Do you remember that?

11   A    I don't remember it was that day, but I remember I go to

12   grand jury.

13   Q    Okay.  So, I -- I say to you that the date that you came

14   here and testified was January 10th, 2012.  Does that sound

15   right?

16        Do you -- do you accept that?

17   A    Yeah, probably, yes.

18   Q    Okay.  Now, if you testified on January 10th, 2012, that

19   is almost three years ago.  Correct?

20   A    Correct, sir.  Yes.

21   Q    When you testified before grand jury three years ago, were

22   the things you testified about better in your mind than today?

23   A    Part of that, yes.

24   Q    More clear?

25   A    Yeah, more -- more -- yes.
```

1  **Q**    All right.

2  **A**    I don't know the dates but I know what we do.

3  **Q**    That's fine.  When -- when you testified in the grand jury

4  you took an oath to tell the truth very much like the one you

5  took here.  Correct?

6  **A**    Correct, señor.  Sir.

7  **Q**    And you knew, you knew when you came here that day, three

8  years ago, almost three years ago, you knew the subject matter

9  you were going to talk about.  Correct?

10       You knew what you were going to talk about.

11  **A**    I know I have to say that I -- I come to say the true, the

12  things that happened in the past.

13  **Q**    Because, back then, you already had been interviewed many

14  times.  Correct?

15  **A**    Correct.  With the FBI?  Yes.

16  **Q**    Yes.

17  **A**    Yes, sir.

18  **Q**    Okay.  Now, when you testified three years ago, you had

19  your lawyer with you that day, Mr. Guzman.  Correct?

20  **A**    Correct.

21  **Q**    Also, the whole time you have been testifying here, your

22  lawyer, Mr. Guzman, has been seated where you can see him.

23  Correct?

24  **A**    Yeah, I can -- yes, right there.

25  **Q**    All right.  Now, my question for you is do you feel -- and

1  it's fine if you do, but do you feel like you need to have a

2  lawyer here when you testify?

3  **A**    No, I don't feel that.

4  **Q**    Okay.

5  **A**    Because I'm speak the truth.  I never lie to the guys, I

6  never lied to these guys, I just speak the truth.

7  **Q**    When you testified in 2012, they asked you what the name

8  of the sergeant was.  Correct?

9  **A**    Hmm, I don't remember, sir.

10 **Q**    Okay.

11 **A**    Exactly, they asked me what the name is.

12        **THE COURT:**  If you are going to be asking a series of

13 questions from that transcript, which I assume you are, I would

14 like a copy of it or -- is it an exhibit?  Or is it --

15        **MR. GETZ:**  I do have the transcript.  But --

16        **THE COURT:**  Well, is it an exhibit in the case?  Or

17 does the government have a copy of it?

18        **MR. HEMANN:**  I have my copy, and I'm happy to give it

19 to Your Honor.

20        **THE COURT:**  No, you need a copy.

21        **MR. GETZ:**  Maybe I could do it a different way.

22        **THE COURT:**  Well, sure.  All right.  Okay.  I just

23 need to look at --

24        **MR. GETZ:**  No.

25        **THE COURT:**  The -- the questions and so forth.  But

 1   if you do it a different way, that's fine.  Maybe I don't need

 2   to look at it.

 3           **MR. GETZ:**  All right.

 4           **THE COURT:**  Okay.

 5   **BY MR. GETZ:**

 6   **Q**   When you were in grand jury, they showed you a picture of

 7   the sergeant, and they asked you what is his name.  Do you

 8   remember that?

 9   **A**   I don't remember, sir, but yeah, they showed me picture

10   about the sergeant.

11   **Q**   All right.

12   **A**   They did.

13   **Q**   You said you did not know his name, but you think of him

14   as the sergeant.  Do you remember saying that?

15   **A**   Yeah, I remember that, sir.  Probably, at that time, I

16   know that his name but it's hard for me to remember that name,

17   for me.  I already forget in the 25 minutes ago.

18   **Q**   All right.  You forgot earlier --

19   **A**   Probably in that day I know the name.

20   **Q**   You forgot earlier today.  Correct?

21   **A**   Yeah.

22   **Q**   Okay.  Now, you never had called him on the phone, had

23   you?  You never had his phone number, the sergeant?

24   **A**   Oh, no, sir.

25   **Q**   He never called you?

```
 1   A    He never called me.  I speak to him only one or two times.

 2   Q    You never saw him on the street in the Mission, did you?

 3   A    I seen him in the Mission street.

 4   Q    Really?  Did you talk to him?

 5   A    I seen him one day at the 12th and Market -- I mean,

 6   Market and Van Ness.  There at the end.  He walking with

 7   something in the arm, I see him, Market and Van Ness.

 8        And I say, "What's up, how you doing?"  That's it.  And

 9   then he walk away and I walk away.

10   Q    And you remembered him that day because you had seen him

11   at Mission Station?

12   A    Yes, I know him because I see him.  And I know he's the

13   sergeant of Mr. Vargas and Mister -- yes.

14   Q    How many times do you think you have been to Mission

15   Station?

16   A    How many times I go to Mission Station?

17   Q    (Nods head)

18   A    With Vargas and Robles, both?  A lot of times, 40 to 50

19   times.  A lot of times.

20   Q    So, 40 to 50 times you --

21   A    Yeah, around like that, yes.

22   Q    Forty to 50 times you have been to Mission Station.

23   A    Yes.

24   Q    All right.

25   A    Thirty, 40 times.
```

1  Q     And of the 40 to 50 times, how many times do you think you

2  saw the sergeant there?

3  A     Most of the time, I see he's walking around.  You talk

4  about that time that he was in there when I discuss things?

5  Like five times.  But most of the time he's walking around.

6  Walking around.

7       But the time that he was standing up, watching me and

8  focus on our conversation, five times, okay, like, four times.

9  I don't remember exactly, but not too many.

10  Q     Forty to 50 times you have seen him at the station.

11  A     I go to the police station, like, 40 times.  And that

12  times I see him probably around 20 times, 25 times, around.

13  But like five times in the room, with me around -- and Robles

14  and Vargas, inside.  Five.

15  Q     Five times in the room, close enough to hear you.

16  A     Yes.

17  Q     You'd say.

18  A     Around -- not too many times, sir.

19  Q     Okay.  And you've testified today about two times when you

20  were saying things you thought he could hear?

21  A     Yeah, that he talked to me.  Yeah.

22  Q     Okay.  So, am I correct, am I correct --

23  A     Yes.

24  Q     -- in asking you that the 40 times that you were at

25  Mission Station, 38 times, he was not close enough to hear you,

1   you say?

2           MR. HEMANN:  Objection, Your Honor.

3           THE WITNESS:  He was back and forth, sir.  Back and

4   forth.  I'm sorry.

5           MR. HEMANN:  It's the characterization of the number.

6           THE COURT:  (Inaudible)

7           THE WITNESS:  I say 40; probably it was 36, or 38.  I

8   don't remember.  But the times that I remember that he was

9   there, I remember because, no was many times.  That's four

10  times.

11      (Reporter interruption)

12          THE WITNESS:  Because the time that he was in the

13  room.  The time I go to the police station, I don't remember.

14  The time that he was around, I don't remember.  I don't pay

15  attention to the details.

16  **BY MR. GETZ:**

17  **Q**   You did not pay attention to him, did you?

18  **A**   No.  I don't pay attention to him because I dealing with

19  Mr. Robles.  And Mr. Vargas, later.

20  **Q**   I just want to make sure I heard something correctly you

21  said a moment ago.

22  **A**   Yeah.

23  **Q**   Did you raise the number to 46, 48, now?

24  **A**   That's the -- probably was more, sir.  I don't know -- I

25  don't say, "Oh, today I go see these guys, two, three," I don't

 1  put a note in my book.  Nothing.  Probably was 70 times.  I

 2  don't remember.  Was a lot of times.

 3       Sometimes I go to the police station two times in one day.

 4  Sometimes I don't go one day; sometimes I go three days.

 5  Really don't remember how many times.  I'm sorry if I put 40

 6  times; I'm sorry.  Probably was more than that.

 7       I don't remember -- I don't remember how many times,

 8  because I go a lot.

 9  Q    I just want to make sure --

10  A    Yeah.

11  Q    Did I hear you say a moment ago, "70 times" in Spanish

12  "setenta"?  Is that what you just said?

13  A    *Setenta*?

14  Q    How many -- what was the number you said?

15  A    No, I put example.  I don't say I go ten, 70.

16  Q    You don't say *"setenta."*

17  A    Maybe I say -- okay, let me explain to you.

18  Q    Well, before do you, let me --

19  A    You tell me --

20          **THE COURT:**  I think now you're arguing with the

21  witness.  I think that his testimony stands as it is.

22       I mean, you could cross-examine him on it, but I don't

23  know; how much more time are we going spend on whether it's 68

24  or 70 or 40?

25          **MR. GETZ:**  Well, it's getting better.

```
 1            THE COURT:  He says he doesn't know the number.

 2            MR. GETZ:  All right.

 3            THE COURT:  I think that's established.  He doesn't

 4   know the number.  He said he was there many times.

 5            THE WITNESS:  Many times.  I don't know exactly, sir.

 6   I don't know how many times.

 7            MR. GETZ:  Okay.

 8            THE COURT:  Okay.

 9   BY MR. GETZ:

10   Q    Okay.  I want to take a moment and ask you about Sergio.

11   You know the Sergio I'm talking about.  The one --

12   A    The one that we talking before, sir?

13   Q    Yeah.

14   A    Yes, sir.

15   Q    So, Sergio, have you talked to him?

16   A    Not too much.

17   Q    A little bit?

18   A    "How you doing, what's up?"

19   Q    Did you ever buy anything from him?

20   A    When I was with the FBI, they send me to buy one thing.

21   Q    What was that?

22   A    We buy iPhone I think -- I mean, iPod.  The thing that you

23   heard music (Indicating).  I believe so.  He sold me something

24   like --

25   Q    Did you know what else he sold besides that?
```

1  **A**    He buy anything, stolen.  I don't know.  Hmm, I don't know

2  how he do his business.  All I know is he buy stolen things.

3  Because I have friends, the street, they selling to him.

4      No friends -- guys that I know in the Mission, they

5  stole -- like, they stole that computer (Indicating),  they run

6  to Sergio.

7      You go pawnshop, they ask for ID.  Sergio don't ask you.

8  He don't give you a receipt.  You don't have receipt.  He just

9  (Indicating).  Clean buy.  Don't pay taxes, don't pay nothing.

10 Just buy.

11 **Q**    Okay.

12 **A**    So --

13          **MR. GETZ:**  I have nothing further.

14          **THE COURT:**  Okay.  Thank you.

15      Ms. Caffese?

16          **MS. CAFFESE:**  Thank you, Your Honor.

17                    **CROSS EXAMINATION**

18 **BY MS. CAFFESE:**

19 **Q**    Good afternoon.

20 **A**    Good afternoon.  Good afternoon, ma'am.

21 **Q**    Good afternoon, Mr. Hernandez.  Thank you.

22      Sir, I want to go over a little bit of the background that

23 you talked about early on in your direct examination.  And that

24 is that you came here to the United States in the nineties.

25      Is that right?

```
 1   A    Yeah, around -- around that year, yes.

 2   Q    And you indicated that you came here, and at the time, you

 3   were undocumented.  Is that correct?

 4   A    Excuse me?

 5   Q    You were undocumented.

 6   A    Uh --

 7   Q    You were in --

 8   A    Yes, yes.  Yes.

 9   Q    You were illegal.

10   A    Yes.

11   Q    And between your entry into the United States in the

12   nineties up until 2008, you, quote, sold and conspired to sell

13   kilos of heroin, and large quantities of cocaine.

14        Is that correct?

15   A    No.  Only heroin.  Before '98.

16   Q    I'm sorry?  I'm sorry.  Go ahead?

17   A    You said before '98?

18   Q    No, I said from the 1990s until 2008, you conspired and

19   sold -- sold and conspired to sell kilos of heroin, and large

20   quantities of cocaine.  Correct?

21   A    Yes, ma'am.

22   Q    All right.  And that's true, and in fact, that was part of

23   the agreement that you have made with the government in this

24   case.  Is that right?  To admit that to be a true fact.

25        Correct?
```

1  A    Like, I have immunity for -- like -- I don't remember we
2  talking about that.  We talking about whatever I do with the --
3  I have immunity what I do in the past, about -- drugs and other
4  kind of things, yes.
5  Q    And in 2008, as you have told the jury, you were actually
6  a guard to a methamphetamine facility.  Is that right?
7  A    I really don't guard that.  My friend let me stay in that
8  house.  He say, "I have a trailer, you can stay in that
9  trailer.  But, I have that thing.  Do you want to live over
10 there?"
11     I say, "Okay."  My babies on the way, I'm working, I don't
12 have no money.  And yeah, I move.  Big trailer.  The trailer,
13 he has his room, I have my own room.
14 Q    You were a guard for that facility, is that right?  True
15 statement?
16         THE COURT:  Wait, wait.  I think we'll move along
17 faster --
18         THE WITNESS:  I don't get paid for.
19         THE COURT:  I think you should try to keep words
20 fairly simple, direct, in your questioning, if you can.
21 Because I think that sometimes it gets a little lost in the
22 translation.
23     "Guarded a facility" instead of that you were -- whatever
24 you can say about it, but --
25         MS. CAFFESE:  All right.  Thank you.

1         THE COURT:  You can describe it.  I'm just saying you

2    should try to keep it simple.

3         MS. CAFFESE:  Okay.  Well -- all right.  I'll try.

4    BY MS. CAFFESE:

5    Q    Well, this place that you watched over -- watched over?

6    A    I don't pay for.  He told me, "You can" -- yes.

7    Q    I understand that.

8    A    Okay.

9    Q    You didn't have to pay, because part of your job was to

10   watch over this place that essentially made meth.  Right?

11   A    That's not part -- that's not part of this job.  He's my

12   friend and he tell me, "You don't have no money, I have this

13   trailer.  You can move over there, but there's stuff in the

14   back."

15        (Reporter interruption)

16        THE WITNESS:  "You can move over there but there's

17   drugs inside.  There's crystal meth inside."

18        I don't have no job, I don't have no choice.  I have my

19   wife, my wife's pregnant.  Well, it's my girlfriend.  And we

20   move over there into that trailer.

21        He say, "There's a drug inside the trailer."  I don't have

22   to watch that.  I working.  He don't tell me, "I pay you to do

23   that."  He only say, "You can move over there."

24   Q    Let me ask you, sir:  When you say you had a baby on the

25   way, is that the child you have here in San Francisco?

 1  **A**     No, it's my twins.  I have twins.

 2  **Q**     All right.  So, you had twins?

 3  **A**     Yes, ma'am.

 4  **Q**     Different from the child, the daughter you have here in

 5  San Francisco.

 6  **A**     Yes, ma'am.

 7  **Q**     Is that right?  Okay.  And, during the course of -- or

 8  since the time that you have become or have -- a cooperator or

 9  began cooperating with the government in this case, you've

10  received approximately $43,000 to date.  Is that right?

11  **A**     Do you want -- from then to right now, probably yes.

12  **Q**     All right.  And you will still get compensated until this

13  case is over.  Correct?

14  **A**     I don't know.

15  **Q**     You don't know?  All right.  So, $43,000 is a lot of money

16  to you, isn't that right?

17  **A**     It's a lot of money, ma'am.

18  **Q**     Now, you had a child -- or didn't you have a child here --

19  or did you have a child here in San Francisco when you moved to

20  --

21  **A**     I have my daughter here.

22  **Q**     All right.  Have you shared any of that money with your

23  wife and daughter here in San Francisco, sir?

24  **A**     They don't give me large amount of money.  Just give me

25  like four, basically five days.  When they pay me the money, I

1  have to go to pay the room, the hotel.  I pay the room, the

2  hotel, and then I buy my food and the money's gone.

3  **Q**    So the answer to my question then is no, you have not

4  shared any of that money with your wife and child here in

5  San Francisco.

6  **A**    No, no.

7  **Q**    Is that correct?

8  **A**    No, ma'am.

9  **Q**    And you received immunity on January 9, 2012.  Is that

10  right?

11  **A**    Yes, ma'am.

12  **Q**    Okay.  And the immunity was that the government was not

13  going to prosecute you for all the times that you have dealt

14  with kilos of cocaine and heroin and whatever other drugs you

15  have dealt with.  True statement?

16  **A**    I don't remember we talking about that.  We remember, they

17  going to give me immunity if I cooperate, and say the true, and

18  say only will the true, and just the true.  Nothing --

19  **Q**    And if I recall your direct examination correctly, you

20  said to tell the truth, and tell them everything.  Is that

21  right?

22  **A**    Only the true.

23  **Q**    Yeah.  But, tell them everything.  Is that right?

24  **A**    If it's -- if it's everything, this mean true, yes,

25  everything.  Tell the true.

1  Q    So whatever you tell them, whatever you tell them is

2  supposed to be the truth.  Is that right?

3  A    Yes.  Or they told me, "The immunity go away and you get

4  persecuted (sic) like them."

5  Q    And on January 12th, three days after you got immunity, is

6  the day that you testified before the grand jury.  True

7  statement?

8  A    I don't remember.  It was three days before.  But,

9  probably yes.  I don't think it was one week.  I'm not good

10  with the dates.  I don't remember.  It was three days later.  I

11  don't remember.

12  Q    We will get back to that.  In any event, it was before you

13  testified before the grand jury and took the oath to tell the

14  truth that you received immunity.  True statement?

15  A    Yes, I think, yes, I think.

16  Q    All right.  And in addition to the 43,000 and some-odd

17  change that you have received, you were also given, excuse me,

18  parole status from the Department of Homeland Security.  True

19  statement?

20  A    For work, yes.

21  Q    And you received employment authorization, which led to a

22  job in September of 2012 for your cooperation with the

23  government.  True statement?

24  A    Yes, ma'am.  Yes, ma'am.

25  Q    And when you came to this country, you came, and

1  essentially your job was to traffic in narcotics.  Is that

2  right?

3  **A**    Yes, ma'am.

4  **Q**    All right.  And let's go over all the drugs that you have

5  trafficked in.  It would be heroin?

6  **A**    Yes, ma'am.

7  **Q**    Right?  Cocaine, is that right?

8  **A**    Yes, ma'am.

9  **Q**    Crystal methamphetamine, is that right?

10 **A**    Yes, ma'am.

11 **Q**    Okay.  And, as you said on your direct examination, you

12 worked primarily in the Mission, 16th-Mission area, that's

13 right?

14 **A**    Yes, ma'am.

15 **Q**    Small community there?

16 **A**    I work all San Francisco.  A lot, a lot -- no, no, I can't

17 say only Mission.  People come from Oakland.  And yes, I did

18 selling, I have -- I do dealings my whole life.

19      And I think it's right.  Mr. Robles shows me -- I mean,

20 pick me up.  I think this is -- if I was a priest, a priest, I

21 don't think he come to me.  He come to me because I'm dealing

22 drugs.

23 **Q**    And you've seen the things that these drugs do to people

24 in that area.  Is that right?

25 **A**    Is what?

```
 1              MR. HEMANN:  Objection, Your Honor.  Relevance.

 2              THE COURT:  I'll allow it.  I'll allow it.

 3  BY MS. CAFFESE:

 4  Q    You have seen the things, you've seen what happens to

 5  people who use drugs like heroin and cocaine and crystal

 6  methamphetamine.  Is that true?

 7  A    I never --

 8  Q    Is that true sir?

 9  A    Yes, I never -- I never deal with crystal meth because

10  they -- very bad.

11  Q    All right.  You, yourself, as I believe you indicated, are

12  a recovering addict.  Is that right?

13  A    Huh?

14  Q    You are a recovering addict?  Is that right?

15              THE INTERPRETER:  (Inaudible)

16              THE WITNESS:  Yeah, I tried to -- yeah, when I'm,

17  when I meet Vargas I'm start -- when I'm start working with

18  them, I'm start -- slow down all the things, don't do no more.

19  But, as I'm living, when I come back I try to stop it, when --

20  2007.

21  BY MS. CAFFESE:

22  Q    At the time that you were working as an informant, you

23  were selling and using drugs.  Is that correct?

24  A    When I'm working for Mr. Robles or Mr. Vargas, probably I

25  did, probably.  And I say ,no like before, probably, yes, I do.
```

1    Maybe not every day, not every week, no night before, but

2    probably in the beginning, yes.

3    **Q**    So the answer to my question is yes, you were selling

4    drugs when you were working as an informant.  Is that right?

5    **A**    I -- selling drugs, yes.  Because I looking for informant

6    -- for peoples to turn in.

7    **Q**    All right.

8    **A**    I have two jobs.  I'm working.

9    **Q**    And you testified that one of your big bosses was

10   Mr. Valencia, is that right?

11   **A**    Yes, ma'am.

12   **Q**    And apparently, you've worked for a lot of big drug

13   bosses.  Is that right?

14   **A**    He, I work for him.

15   **Q**    You worked -- Mr. Valencia was not the only big drug boss

16   you worked for.  Is that true?

17   **A**    I worked with two more in the past.  But Valencia was the

18   big one.

19   **Q**    Mr. Valencia fired you, is that right?

20   **A**    Yes.  No, he -- yes.  I fire myself, because I use a lot

21   of drugs.

22   **Q**    Well, he -- he didn't let you work for him anymore.  Is

23   that right?

24   **A**    Because I'm -- I -- he don't come one day and say,

25   "Hernandez, get the fuck out of here," no.  I fucked -- he give

Belle Ball and Katherine Sullivan
Official Reporters - U.S. District Court
(415) 373-2529

1    me a lot of opportunities.  He tell me, "I can pay for your

2    recover, stop it."

3         Yes, one time he say, "I can't deal with you no more."

4    Q    And you stopped working for him, or he fired you, or

5    however the that relationship ended is because even the drug

6    bosses didn't trust you.  Is that right?

7    A    Um, that's correct, ma'am.

8    Q    And you were kind of like a free agent or a freelance

9    writer, so to speak?  You were allowed to go from one drug boss

10   to another drug boss to a third drug boss.  True statement?

11   A    I didn't go with nobody after that, because I had a

12   problem with the drug.

13   Q    You said that you worked for three drug bosses?

14   A    In the past.

15   Q    Is that right?

16   A    In the past.  One, nineties to '94.  Another one '95,

17   until I go to prison in '98.  And then '99 with Valencia, yes.

18   Q    Right.  Three of them, in a relatively short period of

19   time.  Is that right?

20   A    Short time, 12 years?  I don't think -- oh, yeah.  Twelve

21   years?  Okay.  Short time, yeah, 12 years.  Yeah.

22   Q    Four years --

23   A    Not 12 years, okay.

24   Q    Four years, each boss?

25   A    Everybody go to jail in that business, ma'am.  And my boss

1  go to jail, so I have to look for another boss.

2  Q    And they didn't mind, they didn't mind that you were just

3  like a freelance drug dealer, is that right?

4          THE COURT:  The term "freelance," why don't you find

5  out if he knows what that means.

6          THE WITNESS:  I don't know what that means.

7          MS. CAFFESE:  Okay.  I'll rephrase.  Excuse me.

8          THE COURT:  Great.  Thank you very much.

9  BY MS. CAFFESE:

10  Q    So, I think I've made my point, but the point is --

11          THE COURT:  No, wait a minute.  Wait, wait.  I mean,

12  if you use words and he doesn't understand the words, I don't

13  know what point you made.

14      So, if you're interested in making the point, I think you

15  have to use essentially language that he understands.

16  BY MS. CAFFESE:

17  Q    Who are the other two drug bosses that you worked for,

18  aside from Valencia?

19  A    Another guys.  I have to --

20  Q    What are their names?

21  A    I have to say that?

22  Q    Well, you testified that you worked for other drug bosses.

23          MR. HEMANN:  Objection.

24          THE COURT:  Well, let's see.  I'm trying to figure

25  that out.

```
 1              MS. CAFFESE:  That's fine, Judge.  That's okay.  It's
 2   not that -- I can ask another question.
 3              THE COURT:  Okay, thank you.
 4              THE WITNESS:  Thank you.
 5              MS. CAFFESE:  You're welcome.
 6   BY MS. CAFFESE:
 7   Q    And, these two other people didn't mind that you had
 8   switched bosses.  Is that right?
 9   A    Yes.
10   Q    Okay.  Is that typical in the drug industry, that you can
11   work for different bosses or different employers who presumably
12   are competing against each other?
13   A    My first boss go to jail.  He go to jail.  And, I was in
14   Mexico when he go to jail.  So, find me a new, new boss.  I
15   come work for him.
16        And then I go to prison.  My boss go to prison too.  So
17   when I get out, he's still in prison.  So, somebody recommend
18   me a new guy.
19        And, one of the thing is I do these things from when I was
20   a kid (Indicating).  That's the only thing I know.  When I go
21   to Atlanta, and I'm finding a new way to put food on my table,
22   working, I work --
23   Q    Is it customary for somebody like you to work for
24   different bosses who are competing against each other?
25              MR. HEMANN:  Objection.  Relevance.
```

1              THE COURT:  Well, first of all, competing against

2     each other, I don't know what that -- where the evidence is of

3     that.  At any rate, I'm going to sustain the objection.  I

4     think it is somewhat remote.

5     BY MS. CAFFESE:

6     Q    Were these bosses working for different organizations?

7     A    No, everybody come from my country.  It's the same, same

8     -- same, same my friend, everybody.  We don't compete.  The sun

9     is too big for everybody.

10    Q    So nobody, where you came from, none of the drug cartels

11    are competing against each other?  Is that what you are telling

12    us?

13    A    Yes.  Not at that time.  Now, yes.

14    Q    Okay.  So during this time period in the nineties, there

15    was no competition?

16    A    You have money, you buy.  It didn't --

17    Q    But when you became an informant, my recollection on

18    direct examination was that you wanted to get Guerrero out

19    because he was your competition.  True statement?

20    A    It's not really my -- he is not my friend, first of all.

21    He knows my boss.  He is a guy that -- I buy things for him in

22    the middle, and he find another connection.  But he's not

23    really my competition; he's not my boss.

24    Q    Sir, on direct examination --

25    A    And he is not from my country.

1   Q    On direct examination, did you testify that Guerrero was

2   your competition?  True statement?

3   A    Okay.

4   Q    Okay.  Thank you.  So, you lived in the Mission for about

5   20 years.  Is that right?

6   A    That's correct, ma'am.

7   Q    And you knew everybody in the Mission, is that right?

8   A    I -- walking around all the Mission, all the -- not

9   everybody.  Most of the peoples.

10  Q    Most of the people.  So, 16th and Mission, you would know

11  people who hung out there.  Is that right?

12  A    Really, really, 16th and Mission, no.  In the Mission

13  District, 16th and Mission, some junkie peoples, I don't have

14  nothing to do with the guys.  People that use a strong --

15  people that look like zombies, I don't have nothing to do with

16  them guys.

17  Q    I don't think I -- well -- let's just say this.

18       All right.  Did you know, for example, Daisy Bram in the

19  Mission?

20  A    I don't know who's Daisy Bram.

21  Q    Okay.  Did you know -- well, you know Sergio Sanchez?

22  A    Sergio, he was forever in 20 and Mission.  I know that

23  guy.

24  Q    Did you know Kelsey Stewart?

25  A    No.  I don't know who's Kelsey Stewart.

1  Q    All right.  So you didn't apparently know everybody in the

2  Mission then.

3  A    I know people that deal in drugs.

4  Q    So you knew a lot of big dope dealers.  Is that right?

5  A    Most, all my peoples come from Redwood City or Palo Alto.

6  Q    So, is the answer to my question yes, you did know a lot

7  of dope dealers?

8  A    I know a lot of dope dealers, yes, ma'am.  Yes, ma'am.

9  Q    And you started working actually as an informant as far

10 back as 1998.  Is that right?

11 A    I'm start working like what?

12 Q    You started working as an informant, actually, back in

13 1998.  Isn't that true, sir?

14 A    I'm not working like an informant.  They -- um, it's a

15 little complicated.  I tell them where the drugs are.  They

16 don't find it, when they arrest me.

17 Q    All right.

18 A    But they already got me, and I go to prison for.

19 Q    All right.

20 A    I don't make no deal.

21 Q    It is a direct question, sir.

22       Well, let me ask you this.  Before you testified today,

23 actually, you were interviewed.  And I'm not going to go

24 through all of the interviews and communications you had with

25 these folks (Indicating).

1  **A**    Yes.

2  **Q**    But it started back on August 4, 2011.  Is that right?

3  **A**    Yes.

4  **Q**    Okay.  And, August 12th, 2011, you had interviews with

5  S.F. Police Department and FBI agents, is that right?

6  **A**    Yes.

7  **Q**    And incidentally it was on August 12, 2011 when you stated

8  that you were an informant dating back to 1998.  True

9  statement?

10  **A**    Yes.

11  **Q**    All right.  So you had actually been an informant before

12  you signed up as an informant with Officer Robles.

13  **A**    I don't say -- I don't think I say "informant."  I don't

14  think I say "informant."  It is a different history.  A couple

15  of police arrest me.  And to this moment, I don't know what

16  happened.  What I feel, I feel they train me first in that

17  moment because the lady called and say "Where you are," and I

18  say "I'm at 18 and Mission," and said "Wait for me, I'll go

19  over there and that (Unintelligible) narcotics."

20       So, I'm mad.  I want to pay back, after they train me.

21  So, they know everything.  They know who's in the housing,

22  who's over there, but they don't find the drugs.  The drugs is

23  in someplace.

24       We don't want to, like, okay, going informant to you, let

25  me go; we don't make no arrangements.  I just confess, confess,

1    I give you confession.  Okay, the drug's somewhere.  That's it.

2    They don't pay me, they don't let me go.  I go to prison.  They

3    don't pay me for.  I don't -- I confess.  I say yes, we have a

4    drug in the house.  In that place.

5    **Q**    Okay.  Are you done, sir?

6    **A**    Yes, ma'am.

7    **Q**    So, why did you tell the authorities that you were an

8    informant back in 1998, if that wasn't true?

9              **MR. HEMANN:**  Objection, Your Honor.  He just

10   testified that he did not use the word "informant" with the FBI

11   in --

12             **THE WITNESS:**  Never.

13   **BY MS. CAFFESE:**

14   **Q**    Okay, so they misrepresented -- that would be --

15             **THE COURT:**  Now, wait a minute.  Wait a minute.

16   You're cross-examining him on a statement, I think, written by

17   somebody other than himself.  Yeah.

18        And you can't actually do that, in terms of -- unless he's

19   adopted it as his statement.

20        I don't know, is it -- is it in quotes?  I don't have it

21   in front of me.  It may be the witness's or whoever is writing

22   the report, it may be that's that person's impression of what

23   he's doing.

24        Anyway, I sort of think now may be good a good time to

25   take a break today, because we're going to resume at 9:00

1   tomorrow.

2          I said I would give you the schedule.  I think I -- maybe

3   I have already, but if I haven't -- I haven't.

4          Okay, we're all day tomorrow.  That's Friday.  Monday, all

5   day.  Tuesday, all day.  Wednesday, no.  Thursday, no.  Friday,

6   no.  Because I'll be in -- out of state.

7          So, that's the schedule next week.  In other words, two

8   days next week, Monday and Tuesday of next week.

9          So, thank you very much.  Remember the admonition given to

10  you:  Don't discuss the case, allow anyone to discuss it with

11  you, form or express any opinion.

12         I'll see you tomorrow at 9:00.  You may leave your books

13  on the -- your jury books, take back to the jury room.  Your

14  binders, just leave on your chairs, if you would.

15         (Jury excused)

16         (The following proceedings were held outside of the

17   presence of the Jury)

18              **THE COURT:**  Okay.  Let the Record reflect the jurors

19  have left.

20         So, Ms. Caffese, I don't want to confront you in front of

21  the jury.  And it may be that we just simply have a mis- -- you

22  can step down.

23         A misunderstanding on cross-examination from a 302.  It is

24  a 302, isn't it?

25              **MR. HEMANN:**  It's a source report, but --

PROCEEDINGS

```
1           THE COURT:  Source report.  And, the rule I have in
2   the court so you can -- you can follow it, is that it's
3   perfectly proper to say to a witness something like: "Isn't it
4   a fact that you told the police officers that you were an
5   informant?"
6        He can say yes or no, whatever his answer is.
7        But your followup question can't be -- if he says no, as
8   an example, can't be "Well, is the person who wrote this
9   report, is he mistaken when he used the word 'informant'"?
10          MS. CAFFESE:  Understood, Judge.  I apologize.
11          THE COURT:  You are a seasoned trial lawyer, and I'm
12  not concerned at all.
13          MS. CAFFESE:  I apologize.
14          THE COURT:  You don't have to apologize.  I just
15  don't -- I feel that -- that the lawyers are much better off if
16  I stay out of it.  They'll be unanimous in that feeling.
17       And so, I just have that rule, and that's just a better
18  way to proceed.
19          MS. CAFFESE:  Understood.
20          THE COURT:  Obviously if you think he used the word
21  "informant," you can call the officer to the stand, in your
22  case, or at some point, and -- and query him on that issue.
23       Okay.  So --
24          MS. CAFFESE:  Understood.
25          THE COURT:  Let me just ask you, I'm only trying to
```

```
1   do some scheduling.  And, you are certainly -- your -- your

2   cross-examination, you know, ought to be as long as you want it

3   to be.

4       But, do you have an idea how long you are going to be

5   tomorrow?

6           MS. CAFFESE:  I would say one hour.

7           THE COURT:  Oh, okay.

8           MS. CAFFESE:  But I will say -- out of an abundance

9   of --

10          THE COURT:  By the way, you're not limited.

11          MS. CAFFESE:  So, I was going to say one hour and 15

12  minutes.

13          THE COURT:  Anyway, what I want to do is make sure

14  the government then has additional witnesses that they are

15  going to bring in tomorrow.

16          MR. HEMANN:  (Nods head)

17          MR. VILLAZOR:  (Nods head)

18          THE COURT:  Because I don't want them to have to rest

19  their case.

20          MR. HEMANN:  We have a whole --

21          THE COURT:  I mean, they can rest their case whenever

22  they feel comfortable.

23          MR. VILLAZOR:  Sent them home today, Your Honor.

24          MR. HEMANN:  We have a passel -- I don't know if

25  that's a lot, I think that's a lot -- a passel of witnesses.
```

PROCEEDINGS

1   We have witnesses to take us all the way through.

2           **THE COURT:**   Okay.   That is great.   So, thank you very

3   much, everybody.   Have a pleasant evening.

4           **MR. HEMANN:**   Thank you, Your Honor.

5       (Conclusion of Proceedings)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX**

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **DEFILIPPO, JEROME** | | |
| (SWORN) | 464 | 4 |
| Direct Examination by Mr. Villazor | 464 | 4 |
| Cross Examination by Mr. Getz | 499 | 4 |
| Cross Examination by Ms. Caffese | 513 | 4 |
| Redirect Examination by Mr. Villazor | 527 | 4 |
| | | |
| **HERNANDEZ, CESAR** | | |
| (SWORN) | 535 | 4 |
| Direct Examination by Mr. Hemann | 535 | 4 |
| Cross Examination by Mr. Getz | 708 | 4 |
| Cross Examination by Ms. Caffese | 717 | 4 |

**E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **VOL.** | **EVID** | **VOL.** |
|---|---|---|---|---|
| 1 | | | 468 | 4 |
| 2 | | | 470 | 4 |
| 3 | | | 616 | 4 |
| 50 | | | 490 | 4 |
| 51 | | | 493 | 4 |
| 181 | | | 689 | 4 |

1

2

3                     **<u>CERTIFICATE OF REPORTERS</u>**

4         I, BELLE BALL, and I, KATHERINE SULLIVAN, Official

5  Reporters for the United States Court, Northern District of

6  California, hereby certify that the foregoing is a correct

7  transcript from the record of proceedings in the above-entitled

8  matter.

9

10      /s/  Belle Ball

11              Friday, November 14, 2014

12          Belle Ball, CSR 8785, CRR, RDR

13

14

15

16      /s/  Katherine Sullivan _____

17              Friday, November 14, 2014

18        Katherine Sullivan, CSR 5812, CRR, RMR

19

20

21

22

23

24

25