Volume 5

Pages 740 — 1011

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

UNITED STATES OF AMERICA, )
                                      )
            Plaintiff, )
                                      )
  vs. )  NO. CR 14-102-CRB
                                        )
IAN FURMINGER and EDMOND ROBLES, )
                                      )  San Francisco, California
        Defendants. )  Friday
                                      )  November 14, 2014
_____)  9:01 a.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:        MELINDA HAAG
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
            BY:  JOHN HENRY HEMANN
                    RODNEY C. VILLAZOR
                    Assistant United States Attorneys


For Defendant Ian Furminger:
                    LAW OFFICES OF BRIAN H. GETZ
                    201 California Street
                    Suite 450
                    San Francisco, California  94111
            BY:  BRIAN H. GETZ, ESQ.
                    JOHN PAUL PASSAGLIA, ESQ.


Reported by:        BELLE BALL, CSR 8785, CRR, RDR
                    KATHERINE SULLIVAN, CSR 5812, CRR, RMR
                    Official Reporters, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**

**For Defendant Edmond Robles:**
                          **LAW OFFICES OF TERESA CAFFESE**
                          **1000 Brannan Street**
                          **Suite 400**
                          **San Francisco, California  94103**
                    **BY:  TERESA CAFFESE, ESQ.**
                          **HEATHER KELLY, ESQ.**

**Spanish-Language Interpreters:**
                          **Santiago Mendoza**
                          **Ines S. Swaney**

**Also Present:        Defendant Ian Furminger**
                      **Defendant Edmond Robles**
                      **Special Agent Melissa Patrick**
                      **Special Agent Sandra Flores**
                      **Dalida Vartanian**
                      **Stephen Janick**
                      **Alycee Lane**
                      **Erick Guzman, Esq.**

PROCEEDINGS

```
 1   FRIDAY, NOVEMBER 14, 2014                        9:01 A.M.

 2                      P R O C E E D I N G S

 3           THE COURT:  Please be seated.

 4       Good morning, ladies and gentlemen of the jury.

 5       Let the record reflect all jurors are present, the parties

 6   are present.  Ready to proceed.

 7       Again, let me express my appreciation to the jury for

 8   being so attentive.  Thank you very much.

 9       CESAR HERNANDEZ, PLAINTIFF WITNESS, PREVIOUSLY SWORN

10           THE COURT:  Mr. Hemann, you may proceed.  Oh, no,

11   it's Ms. Caffese.

12           MS. CAFFESE:  Thank you.

13           THE COURT:  Good morning.

14           MS. CAFFESE:  Good morning.

15           THE COURT:  Is the interpreter here this morning, or

16   not?

17           MR. HEMANN:  No, Your Honor.

18           THE COURT:  All right.  So, please, Mr. Hernandez, we

19   do not have an interpreter here this mourning.  So if you don't

20   understand any question that's being asked of you, don't answer

21   it.

22           THE WITNESS:  Okay, sir.

23           THE COURT:  Just say, "I don't understand."

24           THE WITNESS:  Okay.

25           THE COURT:  There's no problem --
```

 1           THE WITNESS:  Okay.

 2           THE COURT:  -- at all in saying you don't understand.

 3      The problem is if, in fact, you don't understand and then

 4  you answer the question.

 5           THE WITNESS:  Okay, sir.

 6           THE COURT:  And, also, Mr. Hernandez, could you

 7  please speak slowly.

 8           THE WITNESS:  Okay.

 9           THE COURT:  I know that's not your normal way of

10  speaking.  But it is important because our court reporter must

11  get everything down that you say, okay.

12           THE WITNESS:  Okay, sir.

13           THE COURT:  All right.  Thank you.

14      Ms. Caffese.

15           MS. CAFFESE:  Thank you, Your Honor.

16           MR. HEMANN:  Your Honor, we do have an interpreter.

17           THE COURT:  Okay.  We do have an interpreter.

18           MR. HEMANN:  The interpreter from yesterday wasn't

19  able to come, so we had to do a little switch.

20           THE COURT:  Sir, would you come forward.

21      Okay.  So you see we do have someone to assist if

22  necessary.

23           THE WITNESS:  Thank you.

24           THE COURT:  Would you come forward, please.  And we

25  will swear you in.

PROCEEDINGS

 1           THE WITNESS:  Good morning, ma'am.

 2           MS. CAFFESE:  Good morning.

 3           THE CLERK:  Good morning.  Please raise your right

 4   hand.

 5       (Interpreter sworn.)

 6           THE INTERPRETER:  Yes, I do.

 7           THE CLERK:  Please state your name.  Spell your last

 8   name for the record.

 9           THE INTERPRETER:  My name is Santiago Mendoza.  Last

10   name Mendoza, M-e-n-d-o-z-a.  Certified federal interpreter.

11           THE COURT:  Mr. Mendoza, what we are doing with this

12   witness is not simultaneous translation.  Occasionally a word

13   is used or a question is asked that needs some assistance from

14   you, okay.

15           THE INTERPRETER:  Okay.

16           THE COURT:  So you can have a seat.  I think there's

17   a chair there.  At least there should be.  And just listen.

18   Occasionally you can be called upon to render your services.

19           THE INTERPRETER:  Okay.  All right.

20           THE COURT:  Thank you very much.  Appreciate it.

21       Thank you, Ms. Caffese.

22           MS. CAFFESE:  Thank you, Your Honor.

23           MR. HEMANN:  Thank you, Your Honor.

24

25

1                    **CROSS EXAMINATION (RESUMED)**

2   **BY MS. CAFFESE:**

3   **Q.**    Good morning.

4   **A.**    Good morning, ma'am.

5   **Q.**    Yesterday we were talking a little bit about your

6   background and coming to the United States.   Remember?

7   **A.**    Yes, ma'am.

8   **Q.**    All right.   And I asked you some questions about the

9   benefits which the government has given to you since you have

10  been cooperating as a witness, correct?

11  **A.**    Yes, ma'am.

12  **Q.**    All right.   And you were given -- I don't know if we went

13  over it yesterday, but you were given parole status by the

14  Department of Homeland Security; is that right?

15  **A.**    Yes, ma'am.

16  **Q.**    And you were also given authorization, back in September

17  of 2012, to work here legally?

18  **A.**    Yes, ma'am.   Expire in three more months -- in two more

19  months.

20  **Q.**    Were you done, sir?

21  **A.**    Yes, ma'am.

22  **Q.**    Okay.   You, I assume -- or I should not assume.   But do

23  you fully expect to receive further work authorization once

24  that -- the current authorization expires?

25  **A.**    I asked and they say they don't promise me nothing.

1    Probably not.

2    **Q.**    Probably not?

3    **A.**    Probably, like, I don't know.  They say we can't promise

4    you nothing.  So soon the case is over probably you have to go

5    back to Mexico.

6    **Q.**    Is that your intention, sir, to go back to Mexico after

7    this case is over?

8    **A.**    I want to stay here and work.  But if it's not possible,

9    what I can do?

10   **Q.**    So the FBI, the government, hasn't indicated to you that

11   they'll help you get authorization to stay here and work, since

12   they've done that for the last several years?  Or not several

13   years but --

14   **A.**    They don't promise me to do that.  But they say maybe they

15   can try.  Try.  But they don't promise me yes, you want to stay

16   here.

17   **Q.**    But they were able to give you authorization up and

18   continuing through this trial; is that right?

19   **A.**    Yes.

20   **Q.**    And my understanding now, from your testimony, is that

21   they've told you they'll try to get you authorization to stay

22   here and work in this country legally, right?

23   **A.**    Uhm, yes.

24   **Q.**    And that's what you want to do?

25   **A.**    Yes, I want -- I want to stay here and working legal.

 1  **Q.**   All right.  Now, when you first came to this country

 2  you -- as you said, you essentially sold drugs.  Is that right?

 3  **A.**   That's correct.

 4  **Q.**   Lots of drugs; is that right?

 5  **A.**   Not the beginning, but after.

 6  **Q.**   Right.  So -- and you essentially flooded the streets with

 7  heroin, meth, cocaine?

 8  **A.**   Cocaine.

 9  **Q.**   All right.  And you did some traveling while you were here

10  illegally.  And I say "illegally" because that's your word, not

11  mine.  Correct?

12  **A.**   Yes.

13  **Q.**   And you mentioned you had gone to Atlanta, Georgia; is

14  that right.

15  **A.**   Yes, ma'am.

16  **Q.**   And you had a job there; is that right?

17  **A.**   Yes, ma'am.

18  **Q.**   You had a job in -- you said --

19  **A.**   Stevi B's Pizza.  And I working in the movie theater.  I

20  clean all night.  I clean the movie theater.

21  **Q.**   So you had two jobs there?

22  **A.**   Yes, ma'am.

23  **Q.**   Were the two jobs you had at the same time, or were they

24  at different times?

25  **A.**   I start in the movie theater 11:00 to 6:00 or 7:00.  I

 1  finish.  Then I work pizzas 8:30 'til 2:30.

 2  **Q.**   Did you make pizza at Steven's (sic) Pizza?

 3  **A.**   In the morning I prepare everything.  And they have salad

 4  everything.  And then I'm -- my job is -- was a buffet.  A lot

 5  of pizzas, so I cutting the pizzas.

 6  **Q.**   How old were you?

 7  **A.**   How olds I am right now?

 8  **Q.**   No, then, when you were working.

 9  **A.**   Was seven years ago.  So 32.

10  **Q.**   Okay.  So you were able to secure honest, legal employment

11  in the United States of America.  True?

12  **A.**   No, ma'am.  I working with illegal papers.  And in the

13  movies they don't ask me for papers.  And the Stevi B's Pizza

14  they don't ask me papers.

15  **Q.**   My question was, that was an honest job, right, prepping?

16  **A.**   Yes.

17  **Q.**   Prepping for pizza was an honest job.  There's nothing

18  illegal about that work, was there?

19  **A.**   Yes.

20  **Q.**   And there was nothing illegal about cleaning the movie

21  theater; is that right?

22  **A.**   Yes.

23  **Q.**   That was honest, good work that millions of people in this

24  country do every day; is that right?

25  **A.**   Yes, ma'am.

1  **Q.**   But you left that job -- those jobs; is that right?

2  **A.**   Yes.  We move to Gatlinburg, Tennessee.

3  **Q.**   Right.  And you --

4        (Reporter interrupts.)

5             **THE WITNESS:**  Gatlinburg.

6             **THE COURT:**  Ms. Caffese, could I ask you to slow down

7  a bit.

8             **MS. CAFFESE:**  Yes.

9             **THE COURT:**  Thank you.

10             **MS. CAFFESE:**  I'm sorry.

11  **BY MS. CAFFESE:**

12  **Q.**   Why did you leave those jobs?

13  **A.**   My wife have twins.  And she have family in Gatlinburg.

14  And they say it's better jobs over there.  So we move to

15  Gatlinburg.

16  **Q.**   Now, was that -- is that a different wife than the wife

17  you had here in San Francisco?

18  **A.**   Yeah.

19  **Q.**   All right.  So were you -- were you married to Rosa Pineta

20  that here in San Francisco?

21  **A.**   No.

22  **Q.**   But that's the woman you have a daughter with, right?

23  **A.**   Yes.

24  **Q.**   And that's the woman that still lives here and has the

25  daughter that you haven't seen in how many years now?

 1  **A.**    After -- three years.

 2  **Q.**    Okay.  So you left that job.  Did you get another job that

 3  was --

 4  **A.**    When I get in Gatlinburg.

 5  **Q.**    Aside from selling dope, did you get another job?

 6  **A.**    Yes, when I go Gatlinburg.

 7  **Q.**    And that was the job doing construction?

 8  **A.**    No.  I work in (unintelligible) house, and I work in

 9  Calhoun's Restaurant.

10  **Q.**    I'm sorry, what was the first job?

11  **A.**    Restaurant, (unintelligible) house restaurant and

12  Calhoun's Restaurant.

13  **Q.**    So restaurant work?

14  **A.**    Yeah, restaurant work.

15  **Q.**    And that was a job which you were receiving a wage for; is

16  that right?

17  **A.**    Yes.

18  **Q.**    Was an honest job; is that right?

19  **A.**    Yes.

20  **Q.**    You didn't sell drugs; is that right?

21  **A.**    Nope.

22  **Q.**    All right.  And you -- after that why did you leave that

23  job?

24  **A.**    I have a problems with my mother of my twins, and we

25  split.

1    **Q.**   Okay.  So you had a marital issue, split-up?

2    **A.**   Yes.

3    **Q.**   All right.  And is that why you quit that job?

4    **A.**   I move to Nashville.

5    **Q.**   Okay.  Nashville, Tennessee?

6    **A.**   Tennessee.

7    **Q.**   All right.  And you moved there.  And did you get another

8    honest job?

9    **A.**   Uhm, when I come to Nashville they have another Calhoun's

10   Restaurant over there.

11   **Q.**   What kind?

12   **A.**   Another Calhoun's Restaurant.  The one I work before.

13        So my manager, before I move to Nashville, he tell me he

14   recommend -- he recommend me to that restaurant.  So when I

15   come Nashville I had that job.

16   **Q.**   So you had another honest job in Nashville; is that right?

17   **A.**   Right.

18   **Q.**   Then you moved again; is that right?

19   **A.**   Yes.

20   **Q.**   Where did you move after that?

21   **A.**   Kansas.

22   **Q.**   Okay.  And in Kansas is that where --

23   **A.**   I moved -- I move Memphis before that, for couple months,

24   and I work in Outback Restaurant in Memphis.

25   **Q.**   Okay.  And when you moved from Memphis, is that when you

1    moved to Kansas?

2    **A.**    Yes.

3    **Q.**    All right.  And that's where you worked in construction;

4    is that right?

5    **A.**    Yes, ma'am.

6    **Q.**    Was that a better-paying job than the money you were

7    getting doing restaurant work?

8    **A.**    Yeah, was better.

9    **Q.**    How much were you making an hour doing construction work,

10   sir?

11   **A.**    Depends how many hours.  About 400, 500 a week.  Around

12   that.

13   **Q.**    All right.

14   **A.**    I'm the driver.

15   **Q.**    All right.  And after that job did you have any other

16   honest work before selling drugs?

17   **A.**    Before I come back here?

18   **Q.**    Yes.

19   **A.**    No.

20   **Q.**    So, essentially, when you immigrated to this country, you

21   did have an opportunity to find honest work, right?

22   **A.**    In California wherever you going to ask for job they want

23   Green Card, everything.  That places over there is more --

24   **Q.**    So when you came to California you had to just sell drugs

25   because you couldn't get an honest job?

 1  **A.**   No, no, no.  I come here to sell drugs.

 2  **Q.**   Right.  Okay.  So it had nothing to do with not being able

 3  to get a Green Card?

 4  **A.**   No.

 5  **Q.**   Right?

 6  **A.**   No.  When I was in Mexico I come here to sell drugs.

 7  **Q.**   After you came here from Kansas you came back to

 8  California to sell drugs in our state; is that right?

 9  **A.**   Uhm, yes, ma'am.

10  **Q.**   Why didn't you just stay in Kansas and do construction

11  work?

12  **A.**   I want to see my daughter --

13        **MR. HEMANN:**  Objection, Your Honor.  Relevance to the

14  line --

15        **THE COURT:**  I'll allow it.  Go ahead.  I'm sorry.

16        **MS. CAFFESE:**  I believe he can answer.

17        **THE COURT:**  What was the answer?

18        **MS. CAFFESE:**  I think he's -- go ahead.

19        **THE COURT:**  Ask the question.

20  **BY MS. CAFFESE:**

21  **Q.**   Why didn't you just stay in Kansas and continue in the

22  construction industry?

23  **A.**   One of the most important things I come to see my daughter

24  and make money.

25  **Q.**   Make money selling drugs; is that right?

 1   **A.**   Yes, ma'am.

 2   **Q.**   Okay.  So is this the daughter that's 17 years old, here

 3   in San Francisco?

 4   **A.**   Yes, ma'am.

 5   **Q.**   All right.  Is that the last time you saw your daughter?

 6   **A.**   No, ma'am.

 7   **Q.**   Did it occur to you that you could have visited your

 8   daughter and then go back to doing honest work?

 9              **MR. HEMANN:**  Objection, Your Honor.  Relevance to the

10   daughter.

11              **THE COURT:**  Okay.  Sustained.

12              **MR. HEMANN:**  Thank you.

13   **BY MS. CAFFESE:**

14   **Q.**   Well, you didn't just -- you didn't come to San Francisco

15   to be with your daughter; is that right?  To stay with your

16   daughter, to be more accurate.

17   **A.**   I come to San Francisco -- I be honest, I talking that

18   too.  I come to San Francisco to deal in drugs and see my wife.

19   If this is what you want to heard, yes, I come to sell drugs.

20   **Q.**   Okay.  And to see your wife?

21   **A.**   And see my daughter.

22   **Q.**   Okay.  And this is the same daughter you haven't seen for

23   how long now?

24              **MR. HEMANN:**  Objection, Your Honor.

25              **THE WITNESS:**  Four years.

1          MR. HEMANN:  Questions about the daughter.

2          MS. CAFFESE:  I'm done with the daughter now, so I'll

3  move on.  Your Honor, I will move on.

4          THE COURT:  Thank you.

5  BY MS. CAFFESE:

6  Q.   Okay.  So I would imagine, sir, selling drugs was very

7  lucrative for you.  Let me rephrase.

8       You made a lot of money selling drugs; is that right, sir?

9  A.   In the past.

10 Q.   Well, when you were selling drugs you made a lot of money,

11 correct?

12         THE COURT:  Well, I think there has to be some

13 definition as to "a lot of money."

14         MS. CAFFESE:  Well, I will rephrase that.

15         THE WITNESS:  Now I don't -- I don't selling drugs.

16 I'm a middleman where I make a hundred dollars, hundred fifty.

17 When I come back, middleman.  Hundred dollars.  Not too much

18 money.  No money.

19 BY MS. CAFFESE:

20 Q.   No money?

21 A.   $200, $200 two times a week.  Middleman.

22 Q.   And you were only making $200 a week.  So --

23 A.   No, no, no, no.  In the deal.

24 Q.   I'm sorry?

25 A.   When I do a deal, when I going to be a middleman to

1    somebody.

2    **Q.**   So how much money were you making a week as a middleman?

3    **A.**   If I do one time, hundred dollars, 200.  If I do two

4    times, $300.

5    **Q.**   Would that be a day, sir?

6    **A.**   Pardon?

7    **Q.**   Would that be per day?

8    **A.**   Per day?

9    **Q.**   Well, how many deals -- when you were a middleman do you

10   have an estimate of approximately how many deals you do a day

11   where you would make a hundred, 200 bucks a deal?

12   **A.**   Probably one or two a week.

13   **Q.**   One or two a week?

14   **A.**   Yes, one or two a week.

15   **Q.**   So you were making, what, only a couple of hundred bucks a

16   week?

17   **A.**   Yes.  And I work in Portico's Restaurant in that time.

18   **Q.**   I'm sorry?

19   **A.**   I work in the Portico's Restaurant, Second and Beale, at

20   that time.  Night job.  Regular job.

21   **Q.**   Is that a restaurant?

22   **A.**   Yeah, Second and Beale.  I mean Market and Beale.

23   **Q.**   So your testimony is that when you came back to

24   San Francisco you were actually making less money than you were

25   making in construction; is that your testimony, sir?

1   **A.**   Yes.  I make less money.

2   **Q.**   Okay.

3   **A.**   That's why I go to shelter.

4        When I live in Kansas, working construction, I'm live in a

5   nice house.  Here I live in shelters.  Five and Market; 19 and

6   South Van Ness; and Tenderloin.  Every time the shelters.

7   **Q.**   So when you told us, just a bit ago, that you came to

8   San Francisco from Kansas to sell drugs, you came not to make

9   more money but simply just to sell drugs?

10  **A.**   I think my -- when I come here my ex-boss, Rafael

11  Valencia, he tell me if I want to come back.  And I come back

12  with him.  But we have a problems in first deal, second deal,

13  so -- and then I'm -- I don't -- I don't do -- I don't work no

14  more with him.  I don't make no more money.

15  **Q.**   You had another boss you were able to work for; didn't

16  you?

17  **A.**   No.

18  **Q.**   Oh, you didn't have any other bosses?

19  **A.**   No.

20  **Q.**   I thought you had a couple of other bosses after

21  Valencia --

22        **MR. HEMANN:**  Objection, Your Honor.  Vague as to

23  time.  The times are all pushed together.

24        **THE COURT:**  Sustained.

25

1    **BY MS. CAFFESE:**

2    **Q.**   All right.  So when you -- were you working for

3    Mr. Valencia when you came from Kansas to San Francisco?

4    **A.**   Less than a week.

5    **Q.**   I'm sorry?

6    **A.**   Less than a week.

7    **Q.**   So --

8    **A.**   Just one deal or two.

9    **Q.**   Just one deal or two?

10   **A.**   Yes.

11   **Q.**   So you only did one deal or two for Mr. Valencia?

12   **A.**   Yes, ma'am.

13   **Q.**   Okay.  So that was a very, kind of like, very short time

14   employment with Mr. Valencia?

15   **A.**   But I work for him before, two years, four years.

16   **Q.**   Oh.  In any event, I'll move on here.

17        Now, you testified -- and I don't want to get all the

18   times wrong here, but there was a time period in which you were

19   selling kilos, kilos of cocaine a week.

20   **A.**   From '99 to 2002, ma'am.

21   **Q.**   Okay.  And you -- was that cocaine?

22   **A.**   Yes, ma'am.

23   **Q.**   And those kilos of cocaine that you were moving and

24   flooding in the streets of California, that was something you

25   were very proud of; is that right?

1  **A.**    It's a life I know my whole life.  And I say yes.

2  **Q.**    When you say your "whole life" and that's the story of

3  coming here and having to be forced into selling drugs because

4  you couldn't stay in an honest job?

5             **MR. HEMANN:**  Objection.  Argumentative.

6             **THE COURT:**  Sustained.

7  **BY MS. CAFFESE:**

8  **Q.**    All right.  Sir, you --

9  **A.**    When I come here I come by myself.  I don't have no

10  family.  I don't have poppy, mommy to send me to school.  I

11  come here 13, 14 years old.  No family.  The only guy I know he

12  dealing drugs.

13  **Q.**    Did your mother teach you the value of selling drugs?  Is

14  that a value you learned from your mother when you came to this

15  country?

16             **MR. HEMANN:**  Objection.  Relevance and argumentative.

17             **THE COURT:**  Sustained.

18  **BY MS. CAFFESE:**

19  **Q.**    Well, you know other people, immigrants who come to this

20  country sometimes who don't have to work illegal?

21             **MR. HEMANN:**  Objection.  Argumentative and relevance.

22             **THE COURT:**  Sustained.

23             **THE WITNESS:**  I was wrong.

24             **THE COURT:**  Well, wait.  Mr. Hernandez, if I

25  sustain --

1          **THE WITNESS:**  Okay.

2          **THE COURT:**  If I say "sustained" you don't have to

3  answer the question, okay.

4          **THE WITNESS:**  All right.

5          **THE COURT:**  Thank you.

6  **BY MS. CAFFESE:**

7  **Q.**   You told us yesterday that when you were dealing with

8  kilos, kilos of cocaine, that you would party every night; is

9  that right?

10 **A.**   Yes.  But I was wrong, ma'am.  I was wrong in the past.

11 Now I try to change my life.  I working for the last two years.

12 I was wrong.

13 **Q.**   When did you decide you were wrong?  At what point in your

14 life did you decide this was wrong?

15 **A.**   I know -- I know everything -- every day -- my whole life

16 I know is bad thing.

17      When my -- I don't know.  I'm -- I'm -- I can't explain

18 that, ma'am.  But I'm wrong before.  Whatever I do to -- I'm

19 sorry.  I was wrong selling drugs.  Doing that things.

20      But now I trying to change my life.  Be an animal, no see

21 my daughter, I try to change all those things.  Yes, I'm wrong.

22 I'm wrong before.

23      I was proud selling drugs.  I be like -- I don't know, but

24 I was wrong.

25 **Q.**   When did you decide you were wrong?

 1  **A.**   When I try to change my life when I'm start working.  But

 2  it's like -- I don't know.  It's like I try, but I'm not too

 3  strong.  Now I try to be stay working only.

 4  **Q.**   So is it fair enough you can't answer my question --

 5  **A.**   Yes, ma'am.

 6  **Q.**   -- when you decided it was wrong?

 7  **A.**   Well, I decided a lot -- long time ago.  But I say two,

 8  three years ago decide.  Two years.  Decides like whatever

 9  happen I'm -- I will work.

10  **Q.**   Let me get back to the point, I think, I was trying to

11  make earlier.  When you were talking yesterday about impressing

12  your friends, you were very proud of that, right?

13       Parties, you would impress your friends with all of the

14  kilos of cocaine you had; is that right?

15  **A.**   All my friends move kilos.  I don't impress nobody.

16  **Q.**   I'm sorry.  You impress --

17  **A.**   All my friends, same and me, we working for big guys.

18  Everybody, money I make, money they make.  We don't impress

19  nobody.  We just hang out and have a good time.

20  **Q.**   You impressed nobody is your testimony today?

21  **A.**   My friends have same as me.

22  **Q.**   Okay.  But yesterday I heard you to say, when you

23  testified yesterday that you impressed your friends, was that

24  the truth or not the truth?

25  **A.**   Impress my friends?  I don't remember say that, but

1  probably I say.  But maybe I'm -- I use wrong word.  But I --

2  okay.  I impress my friend.  But they have the same money as

3  me, so I don't know.  I don't know, ma'am.

4  Q.   You don't know?

5  A.   They have more money than me sometimes.  Most of the guys

6  hang out with the bosses.

7  Q.   You were a big guy.  You hung out with the bosses.  That's

8  pretty impressive, uhm?

9          MR. HEMANN:  Objection, Your Honor.  Argumentative.

10          THE COURT:  Sustained.

11 BY MS. CAFFESE:

12 Q.   Well, were you impressed by the fact that you were able to

13 hang out with the big bosses of narcotics trafficking in the

14 United States of America?

15 A.   Like I say, I'm wrong.

16 Q.   I know.  I know that.  You're wrong.

17 A.   Yes.

18 Q.   You feel you're very wrong now, right?

19 A.   Yes.

20 Q.   I'm talking about back then, sir.

21 A.   Yes.

22 Q.   You felt very proud that you were able to hang out with

23 the big bosses?

24 A.   Yes, ma'am.

25          MR. HEMANN:  Your Honor, I'm going to object to this

```
 1   continuing line of questions.  It's irrelevant and cumulative
 2   at this point.
 3           THE COURT:  Well, at this point it's cumulative.
 4           MS. CAFFESE:  I'll move on, Your Honor.
 5           THE COURT:  Thank you.
 6           THE WITNESS:  What I'm --
 7           THE COURT:  You don't have to answer.  There is
 8   not -- wait for another question.
 9           THE WITNESS:  Okay.
10           THE COURT:  She's going to ask you another question.
11   Counsel is going to ask you a question.
12   BY MS. CAFFESE:
13   Q.   Now, you had known Sergio Sanchez for 15 years; is that
14   true?
15   A.   No.  I can say for 15 years, no.  I know him for long
16   time.
17   Q.   That's not true?
18   A.   I know that the other guy they stay with him for 15 years.
19           MS. CAFFESE:  I have a copy, Your Honor, of the
20   transcript, Grand Jury transcript.
21           THE COURT:  Do I have a copy of the transcript?
22           MS. CAFFESE:  I don't believe you --
23           THE COURT:  Well, are you relating to the transcript
24   yesterday?
25           MS. CAFFESE:  No.
```

```
 1              THE COURT:  What transcript?

 2              MS. CAFFESE:  Grand Jury.

 3              THE COURT:  Oh, Grand Jury.  Okay.  If you could pass

 4   that up.

 5              MS. CAFFESE:  This is just of Mr. --

 6              THE COURT:  Is that your only copy?

 7              MS. CAFFESE:  No, I have one.

 8              THE COURT:  All right.  So what page do you want me

 9   to look at?

10              MS. CAFFESE:  215.

11              THE COURT:  One moment, please.

12              MS. CAFFESE:  Lines 14 to 17.

13         (Pause)

14              THE COURT:  Okay.  You can read that.

15   BY MS. CAFFESE:

16   Q.   Sir, yesterday you spoke about testifying before the Grand

17   Jury; is that right?

18   A.   Yes, ma'am.

19   Q.   And you -- I believe it was Mr. Getz who asked you about

20   taking an oath to tell the truth, right?

21   A.   Yes, ma'am.

22   Q.   Just like the oath you took yesterday to tell the truth?

23   A.   Yes, ma'am.

24   Q.   Okay.  And do you remember, back on January 10th, 2012,

25   being asked this question and giving this response:
```

```
 1                "QUESTION:Okay.  Remind the Grand Jury who

 2        Sergio is.

 3                "ANSWER:Sergio is this guy.  They -- I know him

 4        for maybe 15 years."

 5        Do you remember being asked that --

 6                MR. HEMANN:  Your Honor, can I ask that the rest of

 7   the answer be read, please.

 8                THE COURT:  Yes.

 9                MS. CAFFESE:  Certainly.

10                "ANSWER:  Sergio" --

11        Referring, if I may, to Sergio Sanchez.  I believe that

12   was the context of this.

13                "ANSWER:Sergio is this guy.  They -- I know him

14        for maybe 15 years.  I never talk to him like a

15        friend but I always -- he buys stolen things from

16        peoples on 20 and Mission.  And I think he's the one

17        that offer me the weed.  I don't know.  I don't know,

18        but."

19   BY MS. CAFFESE:

20   Q.   Do you remember being asked that question and giving that

21   response?

22   A.   I remember I say that.

23        But the guy that I know for 15 years is the guy, the one

24   that we made the tape.  They working on the same.  And then I

25   meet Sergio.  But I really -- I don't remember how many years.
```

1   I make mistake the day I say 15 years.  Probably.  I -- I don't

2   know how many years I know Sergio.  I know him for little

3   while.  But his boss the one -- I mean, his friend I know him

4   for back in the '90s.  And then he introduce me Sergio.  What

5   point, I don't remember what year, ma'am.  I don't remember.

6   **Q.**  Was that a true statement --

7           **THE COURT:**  Well, I think we've done enough.  Thank

8   you.  Okay.

9   **BY MS. CAFFESE:**

10  **Q.**  Now, did you work undercover for the FBI while you were an

11  informant for San Francisco, the San Francisco Police

12  Department?

13  **A.**  No.

14          **MS. CAFFESE:**  Directing the Court and counsel's

15  attention to Grand Jury page 160, lines 6 to 9.

16          **THE WITNESS:**  I work for DEA.

17  **BY MS. CAFFESE:**

18  **Q.**  So you did work -- well, the DEA is the federal

19  government?

20          **THE COURT:**  I'm sorry, 160 --

21          **MS. CAFFESE:**  It might have been clarified.

22          **MR. HEMANN:**  I would like the reference, Your Honor,

23  please.

24          **THE COURT:**  What line?

25          **MS. CAFFESE:**  Yes.

```
 1              THE COURT:  Okay.  What line do you want me to look

 2   at?

 3              MS. CAFFESE:  6 to 9.  But, I believe, the witness

 4   just indicated he did work for the DEA.

 5              MR. HEMANN:  I'd like to strike the question, though,

 6   because the question is the FBI.  And there is a suggestion

 7   he's lying.

 8              THE COURT:  That's correct.  And he's -- his

 9   statement -- his statement in the Grand Jury testimony --

10              MS. CAFFESE:  Let me clarify.

11              THE COURT:  -- is consistent with his testimony here.

12              MS. CAFFESE:  Yes, Judge.

13              THE COURT:  So go on to a different subject.

14   BY MS. CAFFESE:

15   Q.   You worked with the federal government while you --

16   A.   Yes.

17   Q.   Excuse me.

18   A.   Yes, yes.

19   Q.   Did you work for the federal government, as an informant,

20   while you were working with San Francisco Police Department?

21   A.   I working for Mr. Robles, yes.

22   Q.   So the answer is yes, you were working with the federal

23   government as an FBI -- excuse me, I didn't mean to say FBI --

24   as a government informant also; is that right?

25   A.   I give a tip about one person.
```

1  Q.   Now, you worked for a large -- with a large number of

2  officers at the Mission Station; is that right?

3  A.   That's correct.

4  Q.   Okay.  And --

5  A.   I work for Mr. Robles and I work for Mr. Vargas.  But

6  sometime was another police officers.

7  Q.   Right.  So the answer to my question is, yes, you worked

8  for a large number of officers at Mission Station; true?

9  A.   No.  I work for Mr. Robles and Mr. Vargas.  And I do one

10 case with another officers one time because Mr. Robles or

11 Mr. Vargas had day off.  So they tell me go do that with them.

12        MS. CAFFESE:  All right.  Let's go to 28, 3 to 5.  I

13 think that was the line.

14     All right.  I'm going to direct the Court's attention to

15 page 26, 27, lines 23 to 25, and then on 27 going down to 5.

16        THE COURT:  I think this testimony is consistent with

17 what he just testified to.

18        MS. CAFFESE:  May I ask him, Your Honor?

19        THE COURT:  No.  The process -- he's testified.  Then

20 I look at the testimony, the previous testimony, to see if it's

21 inconsistent.  Looking at what you cited it doesn't seem to be

22 inconsistent.

23        MS. CAFFESE:  Very well.  All right.

24        THE COURT:  I think you can go on with your

25 examination in another -- without using that.

1   **BY MS. CAFFESE:**

2   **Q.**   You worked with a number of officers besides Robles and

3   Vargas; is that right?

4   **A.**   Yes.  I'm -- when I do things with another officers is

5   because Mr. Robles and Mr. Vargas take day off and tell me go

6   do that with them.

7   **Q.**   All right.  So the answer so my question is "yes" then; is

8   that right?

9   **A.**   Okay, yes.

10  **Q.**   Okay.  Thank you.

11  **A.**   You're welcome.

12  **Q.**   Now, I want to ask you a few questions about the first

13  time you were arrested by Officer Robles and Officer Zachos, I

14  believe.

15       Okay.  Let's go back to December 27th of 2008.  Do you

16  remember being arrested -- you testified to it yesterday -- by

17  Officer Robles?  Is that right?

18  **A.**   When I was in the hotel, yes, ma'am.

19  **Q.**   And Officer Robles was not the only officer that

20  obviously -- well, as you testified, there was another --

21  **A.**   No, there was another officer.

22  **Q.**   Do you know that officer's name?

23  **A.**   No.

24  **Q.**   Okay.  Was he -- you identified him --

25  **A.**   Yeah, I know him.

1   Q.   You know him.  Does Officer Zachos, Constantine Zachos,

2   ring a bell to you?

3   A.   Can you show me picture?  I can't tell I seen him or not.

4   Q.   Very well.  You described him as the officer with the

5   stutter; is that right?

6   A.   Yes.

7   Q.   And when you first met -- excuse me, when the officers

8   first came to your door, they identified themselves as police

9   officers; is that right?

10  A.   No.  They say manager.  Manager my house.

11  Q.   Did you -- are you aware that police officers in

12  particular areas -- and we're just talking about the Mission

13  now -- sometimes go to these hotels to -- in response, I should

14  say, to complaints of drugs?

15  A.   In that hotels?  Repeat that question.

16  Q.   I wasn't that clear.

17       Are you aware that the officers sometimes go to hotels,

18  such as the one you were living in, to do checks on whether or

19  not --

20  A.   Yes, I know. I know they do stuff.

21  Q.   How do you know what I'm asking if I don't ask the

22  question, sir?

23  A.   Okay.

24  Q.   I know it's --

25  A.   All right.

 1  **Q.**   What do you know?

 2            **THE COURT:**  Wait.  Wait.  Wait.  "What do you know?"

 3  is not actually a question.  It's a question, but you better

 4  attach it to something.

 5  **BY MS. CAFFESE:**

 6  **Q.**   Let me ask the question.  You're aware police officers

 7  sometimes go to these hotels to check on drug activity; is that

 8  right?

 9  **A.**   Peoples on probation.  Peoples on parole.  People that

10  deal in drugs.

11  **Q.**   And sometimes the managers, you're aware, call the police

12  because they get complaints there are drugs coming in and out

13  of the places, right?

14  **A.**   Probably, yes.

15  **Q.**   Not everybody in those hotels, those hotels are selling

16  drugs; is that right?

17  **A.**   Yes.

18  **Q.**   There are good, honest people that live there; is that

19  right?

20  **A.**   Not in that hotels, I don't think so.

21  **Q.**   No?  Okay.

22       (Laughter)

23  **A.**   The one I live, I don't think so good people live over

24  there.

25  **Q.**   The one you were living in, no good people, right?

```
 1   A.   I don't think, no.  Everybody -- prostitutes.  All that
 2   kind of people that -- dealing drugs over there, Sixth and
 3   Mission.
 4   Q.   All right.  So there would be a lot of police activity in
 5   that hotel then?
 6   A.   Yes.
 7   Q.   There were a lot of bad people living in that hotel; is
 8   that right?
 9   A.   Yes, ma'am.  A lot of people.  16 and Mission.
10   Q.   So when the police came to your door and they opened -- it
11   got opened.  You said it was pushed open; is that right?
12   A.   Yes, ma'am.
13   Q.   Okay.  And yesterday you told us that you showed them your
14   City College I.D.?
15   A.   Yes.
16   Q.   Okay.  All right.  Now, were you going to City College at
17   the time?
18   A.   I got it here.  You want to see?
19   Q.   Sure.
20        (Laughter)
21   Q.   Actually, I don't want to see it.  Okay.
22   A.   Oh, good, 'cause I don't got it.
23   Q.   You don't have it?
24   A.   No.
25   Q.   Oh, darn.
```

```
 1        Okay.  Well, anyway, you told us --
 2   A.   Uhm.  I got it here for you, I don't know what happen.  I
 3   want to show you the I.D. City College of San Francisco.
 4   Q.   And that would have been the same I.D. that you showed
 5   Officer Robles back in 2008?
 6   A.   Maybe, yes, because I go to school, ISL (sic), second
 7   language, at 20 and -- and -- forget -- Pardee, Pardee
 8   (phonetic).
 9   Q.   Well, and you had this I.D., apparently?
10   A.   Yes.
11   Q.   You've had, apparently, since your -- the date of your
12   arrest, because you thought you had it in your wallet here
13   right to show me this morning?
14   A.   I put it with my papers with my -- it's the only I.D. that
15   I have.  I keep it with me, yes.
16   Q.   You have it somewhere in your papers?
17   A.   Uhm, pictures and that kind of things.
18   Q.   You still have it somewhere?
19   A.   Yes.
20   Q.   So you could find it for us?
21   A.   Uhm?
22   Q.   Could you find it for us?
23   A.   I find what?
24   Q.   The City College I.D. that you were just talking about.
25   A.   Yeah.  It's in my room right now.
```

1   Q.   Okay.  Now, did the FBI agent, Ms. -- Agent Flores here --

2   A.   I show it to one of these.  I don't know.  I show

3   somebody.

4   Q.   Oh, you showed it to somebody.  Okay.  Did they ask to

5   take it as evidence?

6   A.   No.

7   Q.   No?

8   A.   No.

9   Q.   Oh, okay.

10       So, anyway, let's get back to your Grand Jury testimony.

11  A.   Yes, ma'am.

12  Q.   And I'm going to --

13          MS. CAFFESE:  If I can direct the Court's attention,

14  Counsel's attention to page 14.

15          THE COURT:  Okay.  Page 14.  Lines?

16          MS. CAFFESE:  4.

17          THE COURT:  Pardon?

18          MS. CAFFESE:  Excuse me.  Lines 4 to 7.

19          THE COURT:  Okay.

20  BY MS. CAFFESE:

21  Q.   Sir, again, do you remember being asked this question,

22  these two questions, and giving the following responses:

23          "QUESTION:Okay.  What did he do then?"

24       Referring to the officer, just to put in context.

25          "ANSWER: Asked me for I.D.

```
 1            "QUESTION:Okay.  And what did you say?

 2            "ANSWER:I said I don't have I.D. at the moment."

 3        THE WITNESS:  Yes, I don't have I.D.  I only had the

 4  City College.

 5  BY MS. CAFFESE:

 6  Q.   Well, do you think I.D is -- your City College card is an

 7  identification?

 8  A.   My understanding this is I.D.  See.  Right here.  The

 9  other one is school card.

10        THE COURT:  What are you holding up?

11        THE WITNESS:  I.D.

12        THE COURT:  You're holding up --

13        THE WITNESS:  This is I.D.  At that moment I don't

14  have I.D.

15        THE COURT:  I need to identify for the record.

16     Mr. Hemann, would you go up and see what it is.

17        MS. CAFFESE:  Do you want -- sure.

18        THE COURT:  Okay.

19        THE WITNESS:  This is a picture I.D.

20        MS. CAFFESE:  Thank you.

21        THE COURT:  Just read into the record what it is.

22        MS. CAFFESE:  It's an identification card of --

23        THE COURT:  Well, is it the state of California?

24        MS. CAFFESE:  No.  It's another state.

25        MR. HEMANN:  It's a state identification card from
```

1  the state that the witness now lives.

2           **THE COURT:**  Thank you very much.

3      Okay.  All right.  You may return it to him.  That's fine.

4  **BY MS. CAFFESE:**

5  **Q.**  This is not a driver's license; is that right?

6  **A.**  No.

7  **Q.**  It's just an I.D.?

8  **A.**  It's a driving permit.  Learning.

9  **Q.**  Learning permit?

10 **A.**  It's like I.D.

11 **Q.**  Yeah.  It's a learning permit?

12 **A.**  I.D.

13 **Q.**  I.D.  Like City College card is an I.D. for learning at

14 City College, right?

15          **MR. HEMANN:**  Objection, Your Honor.  Argumentative.

16          **THE COURT:**  Sustained.

17          **MS. CAFFESE:**  All right.  We'll move on, Judge.  I'm

18 sorry.

19 **BY MS. CAFFESE:**

20 **Q.**  All right.  Now, you testified yesterday under oath --

21 **A.**  Yes.

22 **Q.**  -- that -- okay -- that the police officers arrested you

23 for no reason, sir, correct?

24 **A.**  Uhm, was a empty bag in my hotel.

25 **Q.**  I'm sorry?

```
 1   A.    Was a empty -- they arrest me for a empty bag in my hotel.
 2   Empty.  Empty bag.
 3   Q.    I understand.  Empty bag.  Empty bag.  Okay.
 4         So, sir, is it your testimony today -- well, let me ask
 5   you, do you know -- do you know whether or not a police report
 6   was generated as a result of that arrest?
 7   A.    No.  I never see that police report.
 8              MS. CAFFESE:  I'm going to refer to people's Exhibit
 9   47.
10              THE COURT:  People's Exhibit 47.
11              MS. CAFFESE:  Excuse me.  I'm sorry.  Government.
12              THE COURT:  I did exactly what you did.
13         Okay.  Government Exhibit 47.  Let's wait a moment.  Let
14   me get it.  Is it part of the binders or not?
15              MR. HEMANN:  Should be in Your Honor's binders to the
16   left there, possibly.
17              THE COURT:  Hold on.
18              MS. CAFFESE:  Don't put it up yet.
19              THE COURT:  It's the incident report dated
20   December 27th --
21              MS. CAFFESE:  Correct.
22              THE COURT:  -- 2008?
23              MS. CAFFESE:  Yes.
24              THE COURT:  Okay.  One moment, please.
25         (Pause)
```

```
 1            THE COURT:  Okay.  You may proceed.

 2            MS. CAFFESE:  Thank you.

 3  BY MS. CAFFESE:

 4  Q.   Sir, it's your testimony yesterday that you did not have

 5  any methamphetamine inside that hotel room; is that correct?

 6  A.   Uhm?

 7  Q.   Did you have methamphetamine -- did you have

 8  methamphetamine inside that hotel room?

 9  A.   No.

10  Q.   Okay.  Did you have a registration card that appeared to

11  be a false identification?

12            THE COURT:  Wait.  You're now referring to a

13  registration card that was maintained by the hotel clerk?

14            MS. CAFFESE:  Yes.

15            THE COURT:  Okay.  So he wouldn't have it.

16  BY MS. CAFFESE:

17  Q.   Did you register under a false name?

18  A.   I don't remember.

19  Q.   Okay.  Are you aware that sometimes the plainclothes or

20  the police officers do walk-throughs of these hotel rooms

21  because dope dealers register hotel rooms under false names?

22  A.   I'm not aware -- I scare because I'm on probation, I'm on

23  parole, and I always have nothing in my room.  I don't have

24  nothing to hide in the room.  So I'm on probation, on parole, I

25  know the officer come they going to ask question whatever.
```

1   Q.   Are you aware that sometimes drug dealers -- not

2   sometimes, often sometimes.  Let me rephrase.

3        Oftentimes, drug dealers register rooms under false names?

4   True statement?

5   A.   I'm not manager that hotel so I don't know what name they

6   use it.

7   Q.   All right.  Now, when you were arrested you were brought

8   to the Mission Station; is that right?

9   A.   Yes.

10  Q.   Okay.  And there were -- aside from Officer Ro- -- Robles,

11  excuse me, there -- and aside from Officer Zachos there was an

12  officer by the name of Officer Rachel Murphy, correct?

13       Was there a female officer that was also present, sir?

14  A.   When they come over there to the hotel?  No.

15  Q.   Yes, when they come over there.

16  A.   No.  It's a female that pick me up in the van.

17  Q.   So a female officer did respond, an officer, female

18  officer did respond to the location; is that right?

19  A.   Yeah.  And she take me to 17 and Valencia.

20  Q.   Okay.  Now, you testified yesterday that you had nothing

21  illegal inside the apartment right?  We've already established

22  that.  Correct, yes?

23  A.   Correct.

24  Q.   And yesterday I was also asking you about the number of

25  times -- and I'm not going to go through every single time you

```
 1  spoke with the authorities, but I'll go through most of them.
 2       On August 11, 2011, you were interviewed by U.S. Attorney
 3  Caputo, Agent Quinn, Lieutenant DeFilippo, Sergeant Minner,
 4  Officer Doherty, and Sergeant Keller at the Internal Affairs
 5  office here in San Francisco.  Do you remember that?
 6  A.   Yes.
 7  Q.   And they asked you about your first encounter with Officer
 8  Robles and Officer Zachos and Officer Murphy.  And you told
 9  them that the three officers entered the room --
10  A.   I never said three officers.
11  Q.   Okay.  That was -- that would -- okay.  You never told
12  them three officers entered the room?
13  A.   I said Mr. Robles and the guy with the speech problem.
14  Q.   All right.  And did you tell law enforcement at that time,
15  during the interview, that the officers found $700 in U.S.
16  currency and a crack pipe under the mattress?  Did you tell
17  them that?
18  A.   When I come back to the room I check everything very good.
19  Very good.  It was a old piece of pipe between the couch, the
20  mattress.
21       That hotel was so cheap the mattresses have holes
22  everywhere.  Holes.  The beds is very bad hotels.  So I'm going
23  to see what is in there.  And I check my room very good.
24       And it was a little pipe.  What I understand this is use
25  the people they smoke crack use that thing.  But it's a cut in
```

1   half piece, in the bed in the -- in the inside couch, under the

2   couch.

3   **Q.**   Did you -- I'm sorry, under the what?

4   **A.**   In the bed.

5   **Q.**   Before I get back to your statement, I just want to follow

6   up on a few things.  So why did you go back and search your

7   apartment very -- not your apartment, but the room that you

8   described yesterday?

9   **A.**   Because the guys find a bag, I don't know where they come

10  from.  And --

11  **Q.**   I'm sorry?

12  **A.**   Because the officers, when they come to the room, they

13  find a little bag.  So I want to make sure it's nothing more in

14  there because it's not mine.  This is -- that kind of hotels

15  people use that hotels to go over there be high.

16  **Q.**   Let me see if I understand you correctly.

17  **A.**   Yes, ma'am.

18  **Q.**   You were -- because the officers found a bag --

19  **A.**   Yes.

20  **Q.**   -- a little bag --

21  **A.**   Yes.

22  **Q.**   -- when you got back to your hotel room --

23  **A.**   Yes.

24  **Q.**   -- you wanted to search to --

25  **A.**   See is nothing else somewhere.

1   Q.   -- to see if there wasn't anything else somewhere?

2   A.   And when I come back to the hotel it's a big mess, so it

3   was easy.  But I put my hand inside and touch everything.

4        Yes, is what I do.  I come back and I make sure it's

5   nothing there.

6   Q.   But you testified that there was nothing -- there was no

7   methamphetamine or anything that the police took from you --

8   A.   I don't know at that time.  I don't know what's a pipe --

9   I don't know I going to find a pipe.  It's nothing.  It's a --

10  okay.  It's a piece of glass.  Was no drugs.  Is a piece of

11  glass.  A pipe.  You can buy that --

12  Q.   Excuse me?

13  A.   Little piece.  Little piece of glass.  Was no drugs.  No

14  cocaine; no crack; no heroin.  A piece of glass.  The peoples

15  use it for do that.  But no drugs.

16  Q.   Okay.  So when you told -- excuse me.  When you told the

17  authorities that when the three officers -- excuse me, when the

18  officers -- you clarified that, okay -- found $700 in currency

19  and a crack pipe under the mattress --

20  A.   700 --

21          MR. HEMANN:  Objection.  Misstates his testimony,

22  Your Honor.

23          MS. CAFFESE:  Well, okay.  I understand.  I will

24  rephrase, Judge.  Excuse me.

25          THE COURT:  Thank you.

1  **BY MS. CAFFESE:**

2  **Q.**   Did you tell the officers that -- when I say "officers,"

3  actually, I meant Inspector Keller and the other law

4  enforcement folks you spoke to back on August 11th, 2012 --

5  that there was $700 under the mattress, was that -- was that a

6  true statement?

7              **THE COURT:**  Well, are you asking him did he tell the

8  officers that?

9  **BY MS. CAFFESE:**

10  **Q.**   Did you tell -- did you tell the inspectors, who

11  interviewed you back in August of 2011, that there was $700 in

12  the room?

13  **A.**   2011?

14  **Q.**   Okay.  It's the same -- I know we kind of go, kind of,

15  around and around here.  But we're still talking about the

16  interview you had on August -- in August of 2011.  And I said

17  it was August 11th, 2011.  Which you said you remembered.  And

18  we went through this crack pipe stuff now.

19       Now I want to ask you about another statement you told --

20  or if you told these folks.  Did you tell them that there was

21  $700 in currency that Robles and the other officers found?

22  True or false?

23  **A.**   I don't remember.

24  **Q.**   Okay.  Now, you said that they took you to the station,

25  right?

1  **A.**   The station, yes, ma'am.

2  **Q.**   And they wanted you to become an informant for them; is

3  that right?  Excuse me, Robles wanted you to become an

4  informant?

5  **A.**   He tell me if I give him somebody he let me go.  Call

6  somebody and you go.

7  **Q.**   So Robles told you, "If you give me somebody I'll let you

8  go" --

9  **A.**   Yes.

10 **Q.**   -- is that your testimony?

11      Was Officer Zachos there?

12 **A.**   When we come to the police station I don't see that -- you

13 talking about the guy that go with him to the hotel, right?

14 No, I don't see him over there.  I see Vargas.

15 **Q.**   Right.  Well, yesterday I believe you testified that

16 Officer Vargas was also at the hotel when you were arrested,

17 correct?

18 **A.**   No.  He don't was in the hotel.

19 **Q.**   He was not --

20 **A.**   Vargas, no.  I meet him in the police station with police.

21 **Q.**   Vargas was at the police station --

22 **A.**   Yes.

23 **Q.**   Was Vargas at the police station when you were transported

24 there?

25 **A.**   Yes.

1    Q.    All right.  Did Vargas sit inside the room with you while

2    you were being asked to become an informant?

3    A.    Repeat, please.

4    Q.    Was Vargas sitting with you all when Robles was talking to

5    you about becoming an informant?

6    A.    I think he's back and forth.

7    Q.    So he was coming back and forth inside the room?

8    A.    The details I don't remember.  I don't remember that

9    detail he was over there.

10   Q.    So he could have been in the room at some portion of the

11   time while you were being spoken to by Robles; is that right?

12   A.    Yes, ma'am.

13   Q.    And I'm sorry if you told us already, but was there

14   another officer, aside from Robles, talking to you in the room

15   about giving somebody up?

16   A.    I don't remember in this point.  I don't remember.  I talk

17   to the gentleman right there.  And it's police station.  A lot

18   of police there.

19   Q.    There's some things you remember very specifically, is

20   that right, in this case?

21   A.    Yes.

22   Q.    There are some things that you don't remember particularly

23   specifically; is that right?

24   A.    Uhm, I remember I talk to him.

25   Q.    Right.  I know.  But I'm asking you this, sir:  There's

 1   some things -- like, for example, what Vargas's role was during

 2   this arrest on December 27th, 2008 -- that you can't remember;

 3   is that true, sir?

 4            **MR. HEMANN:**  Objection, Your Honor.  He just

 5   testified exactly what he remembered.  Relevance to the

 6   question.

 7            **THE COURT:**  Well, I'll allow it.

 8   **BY MS. CAFFESE:**

 9   **Q.**   Is that a true statement?

10            **THE COURT:**  The question is:  Are there some things

11   you don't remember?  Is that your question?

12            **MS. CAFFESE:**  That's essentially the gist of the

13   question, yes, Your Honor.

14            **THE COURT:**  Okay.

15            **MS. CAFFESE:**  And I was specifically asking about --

16            **THE COURT:**  I think he's already testified there are

17   some things he doesn't remember.

18            **MS. CAFFESE:**  Very well.

19            **THE COURT:**  This is 2008, right?

20            **MS. CAFFESE:**  Yes.

21   **BY MS. CAFFESE:**

22   **Q.**   All right.  Sir, you have a specific recollection,

23   however, of Robles telling you that, "If you give me somebody,

24   if you give me a name, I'll let you go"; is that right?

25   **A.**   Yes, ma'am.

1  Q.   And it was contingent on you giving Robles a name before

2  Robles would let you go that day; is that right?

3           THE COURT:   The word "contingent."

4           MS. CAFFESE:   Okay.  Excuse me.

5  BY MS. CAFFESE:

6  Q.   It was your understanding that if Robles -- if you didn't

7  give Robles a name he wasn't going to let you go; is that

8  right?

9  A.   He don't have nothing on me so I let him (indicating).  He

10 don't have nothing on me.

11 Q.   You just let him (indicating)?

12 A.   Talking.  He don't have nothing on me.  Empty bag.  So I

13 let him run the mouth.

14 Q.   Okay.  And -- but you didn't give him a name; is that

15 right?

16 A.   No.

17 Q.   And he let you go, is your testimony; is that right?

18 A.   He don't have nothing on me.

19 Q.   I know that.  That's what your testimony is.

20 A.   He don't let me go.  He don't have nothing on me.

21 Q.   But you said and you testified under oath --

22 A.   Yeah.  If I said that -- okay.  I'm sorry.

23 Q.   Did you want to explain something?

24           THE COURT:   There is no question pending.

25

1   BY MS. CAFFESE:

2   Q.   My question was that you said under oath that Robles would

3   let you go if you gave somebody up to him?

4           MR. HEMANN:   That is not what his testimony was

5   yesterday, Your Honor.   I object.

6           THE COURT:   Well, the testimony is what the testimony

7   is.   Why don't we move on.

8   BY MS. CAFFESE:

9   Q.   Now, your testimony yesterday was that you didn't want to

10  become an informant.   True statement?

11  A.   Yes.   Yes, I don't want to be informant.

12  Q.   And you testified that he had Robles and others, others

13  had come back to your hotel room, right?

14  A.   Yes, ma'am.

15  Q.   Okay.   And they were, kind of, forcing you to become an

16  informant?   You felt pressured?

17  A.   I don't know we can call it force.   He put his feet in my

18  chest and put the head and tell me if I don't tell him or call

19  him he going to put something on me.   I don't think that's

20  force or not, but I think -- my understanding is he force me.

21          MS. CAFFESE:   So, again, I'm going to direct the

22  Court's attention and counsel's attention to page 25 of the

23  Grand Jury transcript.

24          THE COURT:   Page 25.

25          MS. CAFFESE:   Page 25, 15 through 23.

```
 1            THE COURT:  Okay.  15.

 2       (Pause)

 3            THE COURT:  To where?

 4            MS. CAFFESE:  I was just going to read to 23.

 5            THE COURT:  Okay.  That's not inconsistent with his

 6  testimony.  It's not inconsistent.

 7  BY MS. CAFFESE:

 8  Q.   Let me ask the question.  Were they ever nice to you when

 9  they came to your hotel room to ask you to work for them?

10  A.   No.

11       Okay.  First of all, yes, he say, Why you don't call me,

12  dude?  But they knock the door.  They knock the door very bad.

13  And when I open the door he's like, "Why you don't call me?

14  Why you don't call me?"

15  Q.   They were very aggressive, is your testimony?

16            THE COURT:  Well, we're talking about a lot of

17  different times.

18       I think his testimony was at the beginning they were not

19  nice.  He described what happened on that particular date.  And

20  I think his testimony was, subsequently in encounters with

21  these people they were nice to him.  I think that was his

22  testimony.  But that's my recollection.

23       Ladies and gentlemen, when I say things like that I want

24  you to understand, first of all, that you are to decide, based

25  on what you hear, what the evidence is.  I'm simply supervising
```

1    the examination.

2        So because I say something about my -- what I think I

3    heard, you could have heard things differently.  And you are

4    the ultimate judges of the facts here.  So don't be influenced

5    by what I say I heard, because it is your judgment that counts.

6    It's not my judgment that counts.

7        However, I do have certain concerns about how the

8    examination proceeds, and so I do want to seek clarification,

9    if that's appropriate.

10            MS. CAFFESE:  Thank you, Your Honor.

11            THE COURT:  And before we go back to what was said on

12   the earlier occasion, we have to make sure that it is

13   inconsistent, in the Court's view, with what he has testified

14   to.  And I don't find this to be inconsistent.

15            MS. CAFFESE:  Very well.

16   BY MS. CAFFESE:

17   Q.   Perhaps I'm confused.  Let me clarify.

18       Is it your testimony that they were -- that Robles and --

19   well, first of all, was it other officers that were initially

20   aggressive with you, mean to you?

21   A.   The second time they come to the door?

22   Q.   Well, I think -- the first time they came, I believe, you

23   said they were mean to you?

24   A.   Yeah.  They had handcuffs on me, and everything, when they

25   find the little bag.

 1  **Q.**   When they came back to want you to become an informant?

 2  **A.**   The first time.

 3  **Q.**   When you say "the first time," I'm sorry, which --

 4  **A.**   The first time I met him, the first time he come to the

 5  hotel and find the bag.

 6  **Q.**   I'm sorry.  Is that when you testified that he put his

 7  knee on your chest, that Robles put his knee on your chest?

 8  **A.**   No.  Second time.

 9  **Q.**   The second time.

10       So the second time when Robles came, was he with anyone?

11  **A.**   Yes.

12  **Q.**   Who was he with?

13  **A.**   Like, five police officers.  I don't know the names.  I

14  know them.

15  **Q.**   You know them?

16  **A.**   Yeah.  Later -- later I know --

17  **Q.**   And how did you come to know them?

18  **A.**   Later I find out in the hotel, and I remember -- I mean,

19  when I'm start work for Mr. Robles, and they work with them

20  too.

21  **Q.**   Did you identify all of those officers to any of the FBI

22  agents or law enforcement during the course of your several

23  interviews with them?

24  **A.**   Yeah.  They showed me some pictures.

25  **Q.**   So were you able to identify all the five -- not sure.  I

1   think there were several police officers that came the second

2   time.  Were you able to identify them?

3   **A.**   Yeah.

4   **Q.**   So you've identified them all; is that right?

5   **A.**   I remember few ones.

6   **Q.**   Was Vargas one of them?

7   **A.**   Uhm, I don't remember.  I remember only -- I remember the

8   one that come to my room was a lot.  It was Vargas at one

9   point.

10       (Reporter interruption.)

11  **A.**   Everybody come out --

12  **Q.**   Okay.

13  **A.**   -- and I stay alone with him.

14  **Q.**   Do you remember -- I believe the court reporter wanted a

15  clarification on --

16  **A.**   I don't remember seeing Vargas that day.  I don't

17  remember.  Probably was.  I don't remember.

18  **Q.**   All right.  So, as you testified today, Vargas could have

19  been there, could have not been there.  You don't remember?

20  **A.**   I don't remember.

21  **Q.**   All right.  Now, it was your choice to become an

22  informant, sir; was it not?

23  **A.**   He tell me if I don't call him he going to come back and

24  he take me.  I was illegal.  I don't have no family.  I can't

25  go to the police because he's police.  My daughter was here.  I

1   live here.  If I can say my choice because I'm scared, yes.

2   I'm scared to him.  He told me, "You don't call me, I come back

3   for you."  Yes, I call him.

4       Before that he see me in the street and all that kind of

5   stuffs.  I call him, yes.  I'm scare.  I'm illegal.  I can't go

6   to the police because he's police.  So I'm scare to -- I don't

7   know.

8   Q.  You keep mentioning your daughter, that you were here and

9   your daughter.  Were you living with your daughter at the time

10  here?

11  A.  No, but I see my daughter.

12  Q.  Uh-huh.  How often would you see your daughter?

13  A.  Uhm, not every day.

14  Q.  How often?

15  A.  I don't remember.  Sometimes couple months.  Sometimes

16  every week.  Sometimes when -- I don't know.

17  Q.  Years maybe?

18  A.  Uhm, yeah.  Four years before I live -- when I lived --

19  Q.  So you felt you were scared, and you gave us several

20  reasons why you became an informant.

21      Now, did it occur to you, if you were afraid, to go back

22  to these other states where you had jobs, apparently, working

23  legally -- honest jobs, I should say?

24  A.  I had that option, but I live here.

25  Q.  And yesterday you told us that you did take a leave of

```
 1   absence for about four months from, I think it was June to

 2   August -- October of --

 3   A.   Something like that.

 4   Q.   Right.  So you did leave your work as an informant; is

 5   that right?

 6   A.   Yes.

 7   Q.   Okay.  So you made the choice, when you wanted to make the

 8   choice, to stop working as an informant?

 9   A.   Yes.

10   Q.   True statement?

11   A.   Yes.

12   Q.   And, in fact, you had the will and the strength to move to

13   Redwood City; is that right?

14   A.   Palo Alto.

15   Q.   Oh, Palo Alto.  Was it Redwood City too?

16   A.   And I work in Palo Alto, in the restaurant.

17   Q.   So you were able to actually find honest work in Palo

18   Alto?

19   A.   For few weeks.  And they ask me for papers.  And I don't

20   have so they fire me.

21   Q.   All right.  So going back to my line of questioning here

22   is that you were able to take a -- June, July, August,

23   September, October, was it five months?

24   A.   Something like that.

25   Q.   Yeah, five months you decided to leave the work as an
```

1  informant and live outside the city?

2  **A.**    Yes, ma'am.

3  **Q.**    And during those five months when you were not working as

4  an informant you also lived in San Francisco; is that right?

5  **A.**    Yes, ma'am.

6  **Q.**    All right.  And, in fact, you told us yesterday that the

7  reason you became an informant is because Guerrero was your

8  competition?

9  **A.**    I say that, okay.  Not my competition.  Okay.

10  **Q.**    You also asked them, the police officers, for protection

11  when you became -- that you wanted -- excuse me, that you

12  started working as an informant because you really only wanted

13  protection?

14  **A.**    Protection from who?

15  **Q.**    I don't know.  Did you ask for protection when you started

16  working for them?

17  **A.**    They told me they going to protect me if I sell drugs.

18  **Q.**    Did you ask them for anything, sir?

19  **A.**    Asking them for money and asking them for drugs when we

20  had the peoples and later.

21  **Q.**    You asked them for money?

22  **A.**    Yes.  Not in the first.  In the second ones we make plans.

23  **Q.**    So at some point -- when you what?  Made friends?

24  **A.**    Plans.

25  **Q.**    Plans.  Okay.

1    So you asked them for protection from your competition; is

2  that right?

3  **A.**  I don't know what competition.

4  **Q.**  Well, competition meaning --

5  **A.**  I don't have no competition.

6  **Q.**  No competition?

7  **A.**  Carlos Guerrero was my customer.  He find a better guy,

8  with better price.  And he tell the other guy, I know somebody

9  better price.  And he don't buy from me no more.  So I don't

10  see the competition.  He only go away somebody else to buy,

11  better price.

12  **Q.**  Okay.  Is Pareja Guerrero?

13  **A.**  Carlos Guerrero, ma'am.

14  **Q.**  Is that Rojas Pedros, same guy?

15  **A.**  Uhm?

16  **Q.**  Is Pedro Rojas the same person --

17  **A.**  I don't know, ma'am.

18  **Q.**  -- as Carlos Guerrero?

19  **A.**  Carlos Guerrero same as Pareja.

20  **Q.**  Do you also know him as Pedro Rojas?

21  **A.**  No.

22  **Q.**  No?

23  **A.**  Pedro Rojas?

24  **Q.**  I'm just asking you.

25  **A.**  No.

1    **Q.**    All right.  So do you know what the date of that arrest

2    was, of Guerrero?

3    **A.**    No, ma'am.

4    **Q.**    No idea?

5    **A.**    No idea, ma'am.

6    **Q.**    Was Vargas with you then?  Excuse me.  I should say do you

7    know whether or not Vargas was part of that arrest of Guerrero?

8    **A.**    That day was a few officer too.  But I talk with

9    Mr. Robles only.

10   **Q.**    It was only Officer Robles who --

11   **A.**    It was the only one I talk to that day.

12   **Q.**    He was the only one.  Okay.

13         Now, was Guerrero one of your countrymen?  And when I say

14   that, was he Mexican also?

15   **A.**    Yeah.  But he's not from my country.  He's from Pueblos

16   (phonetic).  It's not Michoacan like me.

17   **Q.**    Was he -- he was Mexican also; is that right?

18   **A.**    Yes, Mexican.

19   **Q.**    And -- but you testified yesterday that you never tipped

20   or you never informed on any of your people?

21   **A.**    My people from my country, Apatzingan, Michoacan.  I very

22   proud of my Apatzingan, Michoacan.

23   **Q.**    Was this your little town that you didn't --

24   **A.**    Apatzingan.  My peoples right there.

25   **Q.**    I'm sorry, but I do -- if I can clarify.  When you say

```
 1  your people, just slower a little bit, so I get it.

 2  A.    The peoples from my town, the peoples that I grow up with

 3  them in Mexico, the peoples that's here, that I know from

 4  Mexico, that want to take a bullet for me, my friends.

 5  Q.    So your friends -- when you say your friends, and you

 6  meant your people, you were not talking about Mexican --

 7  A.    No.

 8  Q.    -- people?

 9  A.    No.

10  Q.    No?

11  A.    No.

12  Q.    So Guerrero was not your friend?

13  A.    No.  He was my customer.

14  Q.    Okay.  Well, so let me ask you, was Fernando Santana your

15  friend?

16  A.    Fernando Santana steal something from me.  Is not my

17  friend.

18  Q.    How about Carlos Duanes, he wasn't your friend because he

19  was Cuban?

20  A.    Businessman.  No friend.  No friend.  Business.  Business.

21  Q.    How about Jose Flores?

22  A.    Jose Flores was my friend.  And I tell Mr. Vargas -- well,

23  was not my friend but I like him so I tell Mr. Vargas please

24  don't arrest that guy.  He don't have nothing to do.

25  Q.    I'm going to save this for a little bit later.  Let me get
```

1    back to here.

2         You would go to the -- excuse me, to the Mission Station,

3    is it true, two, three times a week; is that right?

4    **A.**   Yes, ma'am.

5    **Q.**   All right.  And you would go into the station yourself; is

6    that right?  You walked in there?

7    **A.**   And after that, yes.  Later yes, ma'am.

8    **Q.**   Well, I guess the bottom line is that you actually walk in

9    there, right through the front doors.

10   **A.**   I call in there first.  I call in there first.

11   **Q.**   All right.

12   **A.**   And I go with them every time, with Mr. Robles, because --

13   **Q.**   Because?

14   **A.**   They are criminals like me.  Business.  Business.

15   **Q.**   All right.  That's good.

16        So I'm going to --

17             **MS. CAFFESE:**  49.

18   **BY MS. CAFFESE:**

19   **Q.**   So you testified yesterday that you had to, like, see

20   people in person, right, to talk to them because your English

21   is not so good.  Is that right?

22   **A.**   Long conversation, yes.  Yes, ma'am, I say that, yes.

23   **Q.**   All right.  It was hard for you to talk over the phone,

24   right?

25   **A.**   Little hard.  Not hard, but *pequito* hard.

1 **Q.**  *Pequito* hard.  All right.

2      So -- but you testified that you spoke with Robles over

3 the phone a lot; is that right?

4 **A.**  Uhm, only like first words I learn in the United States

5 is, "Where are you?"  So I know that word.  Where are you?  Can

6 I meet you?  Or when he call me, "Where you at?"

7 **Q.**  Did you speak with Vargas two, three times a day for about

8 a year?

9 **A.**  No three times a day.  Maybe two to three times a week.

10 **Q.**  Two to three times.  Okay.  Two to three times a week?

11 It's not -- go ahead.

12 **A.**  I don't know what this going to.

13          **THE COURT:**  Well, maybe we should take a recess now.

14      Ladies and gentlemen of the jury, we will be in recess

15 until 10:30.  I have some -- it's a little long but I have some

16 other matters that I have to call because I've devoted this

17 date to jury trial.

18      So remember the admonition given to you.  Don't discuss

19 the case, allow anyone to discuss it with you, form or express

20 an opinion.  We will be in recess until 10:30.

21      Mr. Hernandez, you may step down.

22          **THE WITNESS:**  Thank you.

23      (Recess taken from 10:09 to 10:31 a.m.)

24      (The following proceedings were held outside of the

25 presence of the Jury)

```
 1              THE CLERK:  Please come to order.  The Court is now

 2    in session.

 3              THE COURT:  Bring in the jury.

 4         (The following proceedings were held in the presence of

 5    the Jury)

 6              THE CLERK:  All rise for the jury.

 7              THE COURT:  Please be seated.  Okay, let the Record

 8    reflect all juror are present; parties are present.

 9         You may proceed.

10              MS. CAFFESE:  Thank you, Your Honor.

11                   CROSS-EXAMINATION RESUMED

12    BY MS. CAFFESE:

13    Q    Sir, when you would go to the Mission Station, would you

14    call every time?

15    A    Ma'am?

16    Q    Did you -- before you went to the Mission Station, would

17    you always call Ed Robles?

18    A    Sometimes he call me, sometimes I call him.

19    Q    Okay.  But, you, you went to the Mission Station, on

20    several occasions without calling Ed Robles.  Right?

21    A    Hm, probably.

22    Q    Right.  And --

23    A    In the -- after -- after -- yes.  Not in the beginning.

24    Q    Not every day.  What?  I'm sorry.

25    A    Yes, few times, right.
```

1  Q    All right.  So you would actually go into the Mission

2  Station without calling Ed Robles.  True statement?

3  A    I believe, yes.  Probably, yes.

4  Q    All right.  And that would be on your own accord, just

5  walking in.  Is that right?

6  A    Huh?

7  Q    You would just walk in by yourself.

8  A    Inside to the police station?

9  Q    Yes.

10 A    Inside to the police station, yes, but not to the little

11 office.

12 Q    In the police station.

13 A    Yes.

14 Q    And sometimes when you went to the station, officer

15 Ed Robles wasn't there.  Is that right?

16 A    Hm, probably.

17 Q    Right.  There were times when you would go into Mission

18 and Ed Robles was not there.  Correct?

19 A    I only remember one time right now, but probably yes.

20 Probably yes.

21 Q    Probably yes?

22 A    That happened, yes.

23 Q    All right.  And you are aware, as you testified yesterday,

24 that Mr. Robles went into the motorcycle unit at the end of

25 2009, beginning January of 2010, right?

```
 1   A     I don't remember this date, but I remember he went to
 2   motorcycle, yes, he told me.
 3   Q     And the first tip you described was in February of 2009.
 4   Is that right?
 5         (Reporter interruption)
 6              MS. CAFFESE:  First tip.
 7              THE WITNESS:  Yeah.
 8   BY MS. CAFFESE:
 9   Q     Yeah?
10   A     Yeah.
11   Q     All right.  And, as you said, for five months you took of
12   leave of absence from your work as an informant.  Is that
13   right?
14   A     Something like that.
15   Q     Something like that.  Okay.  Now, I'm going to refer to
16   People -- Government's Exhibit 49.  And, sir, you --
17         (Off-the-Record discussion between counsel)
18              MR. HEMANN:  I'm sorry, Your Honor.
19         (Off-the-Record discussion between counsel)
20              THE COURT:  I don't have it in my book.  Is it in
21   evidence?
22              MS. CAFFESE:  No.  It is Government Exhibit 49.
23              THE CLERK:  Do you have a copy for the Court?
24              MS. CAFFESE:  I believe the government --
25         (Off-the-Record discussion between counsel)
```

```
 1              THE COURT:  Something called the "Secure View 1"?  I
 2    don't even know what that is.
 3              MS. CAFFESE:  All right.  Well, maybe we can --
 4    instead of -- let me try to proceed without it.
 5              THE COURT:  Okay, all right.  Go ahead.
 6    BY MS. CAFFESE:
 7    Q    Sir, you had a telephone, is that right?  During this time
 8    period that we have been talking about, in '09?  You had two
 9    telephones but -- you had telephones.  Is that right?
10    A    Yes.
11    Q    Okay.  And you had Vargas's name in your contact list, is
12    that right?
13    A    Yes.
14    Q    You did not have Ed Robles's name in your contact list, is
15    that right?
16    A    I have him too.
17         (Reporter interruption)
18              THE WITNESS:  I got Mr. Robles too.  And, the -- the
19    only difference the phones, is the last number.  3 and 2.  I
20    don't know if --
21    BY MS. CAFFESE:
22    Q    Would Vargas -- excuse me, would Ed Robles's name be in
23    the same contact list as Vargas's?  Your --
24    A    When they have my phones -- I don't remember if I have his
25    phone, still have his phone number.  But I believe, yes, I'm --
```

1    I don't remember.

2         (Off-the-Record discussion between counsel)

3              MS. CAFFESE:  All right, if I can approach?

4    BY MS. CAFFESE:

5    Q    Let me ask you, sir, if you recognize -- I am referring to

6    Exhibit 49.

7              MS. CAFFESE:  Can I show that, Judge?  It is an

8    exhibit that the government has.

9              THE COURT:  Is it in evidence?  Not in evidence?

10             MS. CAFFESE:  It is not in evidence.  I would like to

11   move it into evidence.

12             MR. HEMANN:  I believe, Your Honor, that -- just like

13   we did with the phone record with Mr. Hernandez yesterday, if

14   we can identify data on this record that he's familiar with,

15   and then subject to moving the document in later on, if it's

16   authentic and relevant and things like that.

17        But, I don't believe that this witness --

18             THE COURT:  Can authenticate it.

19             MR. HEMANN:  -- has ever seen this (Indicating) in

20   his entire life.

21             THE COURT:  Okay.  You can go, show it to him.

22             MS. CAFFESE:  Can I show the exhibit, just --

23             THE COURT:  Yes, Exhibit 49, marked for

24   identification; you may show it to the witness.

25

1  **BY MS. CAFFESE:**

2  **Q**    Sir, let me ask you if you recognize this phone number

3  that I'm pointing to here, sir.  See this phone number?

4       (Witness examines document)

5            **THE COURT:**  I think you ought to read the phone

6  number into the record.

7            **MS. CAFFESE:**  Okay.  I didn't know -- phone number

8  (415)240-8767.

9  **BY MS. CAFFESE:**

10  **Q**    Is that your phone number?

11  **A**    One of my phones, yes.

12  **Q**    Okay this was one of your phones.  And, let me ask you --

13  I'm going to go to Page 6 of the exhibit.  And ask you to look

14  here at "Contact 0101."

15       See that?  Do you see that where I'm pointing sir?

16  **A**    Yes.

17  **Q**    And next to it, sir, there is a -- there -- spelled V as

18  in "Victor, A-R.

19  **A**    Yeah.

20  **Q**    Is that for Vargas?

21  **A**    Hm, I don't know.

22  **Q**    Okay.

23  **A**    Probably.

24  **Q**    Probably?

25  **A**    Probably so.  I don't remember.  Probably Vargas,

1    probably.

2    **Q**    Do you recognize this phone number (Indicating) next to

3    VAR, (415) 717-2936?

4    **A**    No, I don't remember.

5    **Q**    Okay.  Fair enough.  But --

6    **A**    If it's in my contacts I never see that number.  I only

7    see the name.  So --

8    **Q**    All right.  And VAR, would you -- as you sit here, would

9    you remember that to have been for --

10   **A**    I don't remember was Mr. Vargas, but probably, if he's

11   VAR, yes.

12   **Q**    Would you remember the name you would have for Ed Robles

13   if he were in your contact list?

14   **A**    I don't know.  You have to show me.

15   **Q**    Well, what name would you have -- would you have had --

16   I'll go back there.

17   **A**    Okay.

18   **Q**    Would you have had Robles's name as "Robles" or "Ed" in

19   your contact list if it were in your contacts list?

20   **A**    I don't remember.

21   **Q**    Okay.  Now, you spoke with Vargas two or three times a day

22   for one year.  I think that's where I left off.  Fair enough to

23   say?

24   **A**    I don't think I speak to him two or three times a day for

25   a year.  Probably a week.  If he's in my -- testimony, maybe

1    some mistake.  Maybe -- I don't think we speak two or three

2    times a day for year.  I don't think so.

3  **Q**    All right.  Well, do you remember -- or did you, I should

4    say, on August 25th, 2011, when you were interviewed by the

5    FBI, the U.S. Attorney and your attorney, Erick Guzman, who is

6    here today, I believe, when you were interviewed, telling the

7    authorities that you would talk to Vargas on his phone two to

8    three times a day for approximately one year?

9  **A**    Like I say, maybe I don't explain.  I talk to him in one

10   year, sometimes in one day, two or three times.  But no every

11   single day, like.  If we had something to do, I call him, he

12   call me back, one day.  But no every single day, three times,

13   miss.

14 **Q**    Okay.  Now, what was your cut in -- I think you understand

15   what I mean by "cut," but if you don't, tell me.

16        What was your cut when you got cash and drugs?  Excuse me.

17   When cash and/or drugs were found on somebody, what was your

18   cut?  If we can just clarify that.

19 **A**    I ask in the beginning, after I start working for

20   30 percent, but never -- it depends.  I don't know.  They --

21   they give me whatever they want.

22 **Q**    Well, did -- let me ask you.  Did you tell the authorities

23   that your cut was 30 percent of whatever was found?

24 **A**    I asked for the 30 percent.  But they never respect that.

25 **Q**    Did you tell the authorities that your cut was -- that you

 1  actually received 30 percent of what was found, sir?  True or

 2  false?  Did you tell the authorities that?

 3  **A**    Probably, I said that.  Probably I explained myself good.

 4  Probably -- I don't remember this point but if -- if it's over

 5  there, I say that.  Whatever is there, I say.

 6  **Q**    Did you tell --

 7  **A**    Yes.

 8  **Q**    Were you finished?

 9  **A**    Yes.

10  **Q**    Did you tell, did you also tell the authorities that your

11  cut was 10 percent?

12  **A**    What the kind of conversation that I have, in that kind, I

13  have that with -- I believe with the DA, asking for the

14  10 percent.  But they don't say they -- no.  That kind of

15  details was -- I don't remember.

16      One day we talk about something, next day we talking about

17  another things.  Talking and talking and talking.

18  **Q**    Well, what I'm specifically asking you is in prior

19  statements that you made.  Not what you were talking about with

20  the officers, but basically, statements that you have made

21  prior to coming to trial, to the authorities.  All right?

22      You understand that that was my question.

23  **A**    Yes, ma'am.

24  **Q**    And if I'm correct, tell me so.  And if I'm not, tell me.

25  And that is that:  Do you have a recollection of telling the

1    authorities that your cut was 30 percent at one point?  True

2    statement?

3    A     If it's in the papers, said that, yes, I said that.  But

4    maybe I don't explain myself.

5    Q     And at another time when you spoke with the authorities,

6    you told them that it was only 10 percent.  True statement?

7    A     If it's in there, yes.

8    Q     And, am I also correct that when you were working for

9    Vargas, you received ten MP3 players, correct?

10   A     I don't remember it was ten -- MP what?  It was a

11   computer, was a BB gun, was a GPS, was a little DVD for

12   watching movies, was little Play Station.  Lots of things.  No,

13   no, no, like ten, 15 -- I don't remember in that moment, ma'am.

14   This is -- um, when they give something to me, I don't put in

15   the book (Indicating).  They give it to me, I forget it's

16   going.  I don't --

17   Q     When you say "they" -- I'm talking about Vargas.  Vargas

18   gave you these computer things, is that right?

19   A     Mr. Robles, too.

20   Q     Okay.  Vargas gave you the MP3 players, is that right?

21   A     Couple ones, yes.

22   Q     All right.  And that is because these things that I'm

23   referring to -- the MP3 players, the backpacks, the other types

24   of small electronics, cell phones, laptops, small televisions,

25   DVD players and money -- all came since you started working for

1  Vargas as a CI.  True statement?

2  **A**    When I work for Mr. Robles, I have things too.  Same deal.

3  **Q**    So, is it your testimony today, today, that Ed Robles gave

4  you all of these things that I've just mentioned?

5  **A**    No, no.  No.

6  **Q**    No.

7  **A**    The only person don't give me nothing is that man right

8  there (Indicating).

9  **Q**    I'm sorry?

10  **A**    The sergeant, he don't give me nothing, ever.

11  **Q**    Okay.  I'm only concerned about Officer Robles, sir.

12  **A**    Okay.  Robles and Mr. Vargas give me things.

13  **Q**    What did Robles give you, according, under oath today

14  (Indicating), what --

15  **A**    A computer.

16  **Q**    A computer.  Okay.  And when was that?

17  **A**    In the beginning.

18  **Q**    When was that?  Do you have a day, sir?

19  **A**    We talking about electronics things?  Or are we talking

20  about everything?

21  **Q**    I asked you --

22  **A**    Gave me cocaine, he give me crystal, he gave me computer,

23  he give me one iPhone, he give me telephone, he give me, um,

24  what else?  A backpack.

25       I don't remember what else in this --

1  Q    And you are saying Ed Robles gave you those things.

2  A    Yes.

3  Q    All right.  So, when you spoke with -- and let me ask you.

4  When you spoke with --

5  A    And the computer -- oh.

6  Q    Go ahead, no, finish.

7  A    And the computer belonged to the police department.  I

8  don't know what's over there.

9  Q    I want to know, can you tell us when you got your

10  computer?

11  A    Yeah, the computer was in the police station --

12  Q    When was that?  What month?  Because you only worked with

13  Ed Robles for a short period of time.  Right?

14  A    Yes, yes.

15  Q    Okay.  And because, as you've testified to, you were not

16  working with Robles for five months of 2009.  Right?

17  A    Yes.

18  Q    Okay.  So, we have got a narrow scope to work with here.

19  So tell me when you received the computer from Robles that

20  you've testified to right now.

21  A    I don't remember it was before I leave or when I come

22  back.  But one point I go to the -- the office in the police

23  station, and there's the computer over there (Indicating).  And

24  I tell him, "Can I have that?"

25       And he's -- "Sure.  Why not?"

1  Q    Who else was there, sir?

2  A    Mr. Vargas.

3  Q    Anybody else there, aside from Mr. Vargas?

4  A    Not that I remember.

5  Q    Can't remember.  How about the iPhone?  You mentioned an

6  iPhone today for the first time, you mentioned that -- excuse

7  me -- that Ed Robles gave you.

8       When did he give you the iPhone?

9  A    IPhone, when -- my bad.  IPod, with the music.  Music.  No

10 phone.  IPod.  Sorry about my English.

11 Q    We have an interpreter.  Do you need an interpreter?

12 A    No.

13 Q    Would you like to use the interpreter, sir?

14 A    No, no.

15 Q    Okay.  So Ed didn't give you an iPhone?

16 A    He gave me an iPod.

17 Q    He gave you an iPod?

18 A    Gave me an iPod.

19 Q    Let's just start with the iPod.  When did he give you the

20 iPod?

21 A    Had to be in the police station, because most of the times

22 the things -- they have a -- a box with backpacks and things

23 over there.  He give me backpacks, a couple of ones

24 (Indicating).

25 Q    When did he give you the iPod?  When?

1  **A**    I don't remember, ma'am.  I don't remember what day.

2  **Q**    And these things that Ed Robles gave you were always in

3  the police station, is that right?

4  **A**    The crystal was in the street.  And the cocaine was in

5  North Beach.

6  **Q**    How about the computer, the iPod --

7  **A**    The police station, police station.

8  **Q**    And there were other officers in the police station.  Is

9  that right?

10  **A**    I don't know if I'm correct or I don't know, but I think

11  that office was only for narcotics unit.  I don't know.  I'm

12  not -- but every time I go over there, it's only Mr. Vargas and

13  Mr. Robles.  And like I say, the sergeant, one time, he don't

14  talk to me, he stand up over there.

15  **Q**    Is it your -- I'm sorry.

16  **A**    Yes.

17  **Q**    Is it your testimony that only Vargas and Robles and

18  Furminger sometimes were in this police station when you

19  received, for example, the computer and iPod?

20  **A**    I don't remember -- I want to say this:  When they give me

21  something, I don't have a note, to say, oh, it's there, it's

22  there.  I don't remember.  It's things that happen.  It's a

23  business.  It's -- I don't remember who was over there.  I

24  remember him because he was over there.  I remember Vargas

25  because he's (Inaudible) but I don't remember it was a police

1  officer woman or -- I don't think I know that, ma'am.  So, I'm

2  sorry.  I can't help you.

3  **Q**    Do you remember whether or not there were non-police

4  officers working at the station when you were given, for

5  example, the computer and the iPod, that you mentioned?

6  **A**    The only police officer I remember was there was Vargas

7  because he cleaned the computer.

8  **Q**    And you mentioned a telephone, also, that --

9  **A**    IPod, ma'am.  IPod.

10  **Q**    I know.

11  **A**    I made mistake.  I said iPhone, oh, yeah, yeah, yeah.  My

12  bad.  Yeah.

13  **Q**    Since we're on the phone here, why don't we just take a

14  little trip to this part of it.

15       You said that Ed Robles bought you a phone.  Right?

16  **A**    Yes, ma'am.

17  **Q**    And you have also stated when you spoke to the authorities

18  that it was the DEA who gave Robles the money to buy the phone

19  for you.  Is that right?

20  **A**    Um, I don't remember right now, but if it's there, yes.

21  **Q**    All right.  So, so, it is, as you say, if -- if that's a

22  true statement if you had said it, that Robles was given money

23  from the DEA -- Drug Enforcement Agency, I think it is -- to

24  purchase the phone for you.  Is that right?

25  **A**    If it's in there, yes.

1  Q    So it's not like Ed Robles just bought you a phone because

2  he wanted to buy you a phone for no reason.  True statement?

3  A    Well, only says, he buy me a phone.  I don't say for what

4  reason.  I say only he buy me a phone, because I'm going to

5  speak the true.  And the true is he buy me a phone.  And

6  everything here is true.

7  Q    So what you left out yesterday was it was the fact that

8  the DEA gave the money to Ed so you could buy a phone to work

9  as an informant.  That's what you stated yesterday; is that

10  correct?

11          MR. HEMANN:  Objection to the form of the question as

12  to what he said yesterday, Your Honor.

13          THE COURT:  Sustained.

14  BY MS. CAFFESE:

15  Q    Yesterday, did you mention that it was the DEA who gave

16  Ed Robles --

17          THE COURT:  Well, the question is whether it was

18  asked, and --

19          MS. CAFFESE:  All right.

20          THE COURT:  You know that is not a proper question.

21          MS. CAFFESE:  Very well.

22          THE COURT:  Let's move on.

23          MS. CAFFESE:  All right.

24  BY MS. CAFFESE:

25  Q    So, sir, going back to the things that I asked you that

 1  were given to you, we were going through the iPod, computer,

 2  backpacks, apparently, when you spoke with the authorities, the

 3  FBI, the U.S. Attorney, the SFPD back on August 25th -- excuse

 4  me, it wasn't that day.  Let me make sure I have the right date

 5  here.

 6       August 17, 2011, did you tell the authorities that since

 7  you worked for Vargas as a CI, you received approximately ten

 8  MP3 players, payoffs in cocaine, at least four backpacks,

 9  numerous other types of small electronics, cell phones,

10  laptops, small televisions, DVD players and money?

11       Do you have a recollection of telling -- making that

12  statement to the authorities back in August of 2011?  True or

13  false?

14  **A**    I don't --

15            **MR. HEMANN:**  (Inaudible)

16            **THE COURT:**  The question isn't true or false.  The

17  question is:  Does he remember having said that to the police

18  on that occasion.

19            **MS. CAFFESE:**  Fair enough.

20  **BY MS. CAFFESE:**

21  **Q**    Do you remember making that statement?

22  **A**    I don't know when I say specifically ten MP3 players.  I

23  don't know.  But yeah, they give me -- they give me a few

24  things, and I selling, and the FBI got in the case.

25  **Q**    Sir, what I'm focusing on now, what I'm focusing on -- if

1   you need the interpreter, that's fine.

2   **A**    Okay.

3   **Q**    But, let me ask you.  Do you remember making that

4   statement, first of all?

5   **A**    Yes.

6   **Q**    All right.  And that statement was since you worked for

7   Vargas -- right?

8   **A**    Since I worked for Robles and Vargas I have electronic

9   things, drugs, and money.

10           **MR. HEMANN:**  Your Honor, I'm going to object --

11           **THE WITNESS:**  Vargas and Robles, both.

12           **MR. HEMANN:**  -- about this report.  I think they are

13   cumulative.  And the agent is available, if necessary.

14           **THE COURT:**  Well, why don't we move on, because I

15   think that we sort of covered this subject.

16           **MS. CAFFESE:**  All right.  Very well.  Very well.

17   **BY MS. CAFFESE:**

18   **Q**    You actually became friends with Rey Vargas, is that

19   right, sir?

20   **A**    I don't have police officer friends.

21   **Q**    When you became -- when you became -- excuse me.  When you

22   worked with Vargas, did you consider him a friend?

23   **A**    It's a big word, "friend."  It's a big word.  Somebody

24   that I know.  But I say "friend," but it's not like my friend.

25   It's --

1 **Q**    Well --

2 **A**    Businessmen.  Business only.

3 **Q**    You went to his house on several occasions and played

4 video games together, isn't that true, sir?

5 **A**    I went to his house because his wife -- his girlfriend is

6 moving, and Mr. Vargas asked me if I want to help him.  And,

7 one day I go to his house to put everything in the bags.  He

8 have a big TV and games.  And next day, I go to move her up,

9 pick up all the things.  Was a job.  Was a job.  He pay me for

10 that.

11 **Q**    On August 11, 2011, did you tell the authorities that you

12 became friends with Officer Rey Vargas?  Did you tell them

13 that?

14 **A**    Probably I say "friends," yes, but it's -- yes.  Yes, I

15 tell them, yes.

16 **Q**    Was that the truth or was that a lie when you told them

17 that you were friends, sir?

18 **A**    When I tell we are friends, but is not my friend.  It's a

19 word, is like "friend."  Come friends.

20 **Q**    Did you tell the authorities on that same day that you had

21 been to Vargas's house on several occasions, and played video

22 games with him?  Did you tell the authorities that, sir?

23 **A**    Several occasion, probably two or three times, yes.

24 **Q**    And you also helped Vargas's girlfriend, Anne Cutberson,

25 move twice.  Is that right?

1    **A**    That's right, I come to his house.  The reason that I come

2    to his house is a job.  Move.

3    **Q**    Were playing video games with him a job?

4    **A**    I don't play video games with him.  I watch the games and

5    I look at the TV and we working.  We working.  We working hard

6    that day.

7    **Q**    But you were playing video games.  You just testified you

8    played video games with him.

9    **A**    A little Play Station, yes.

10   **Q**    Right.  Okay.  Now, when you moved the girlfriend, it

11   wasn't just once; it was two times.  Is that right?

12   **A**    Um, two times?  I don't remember.

13   **Q**    Could have been?

14   **A**    I think was one time, but the first time we put everything

15   in the garage, the store garage.  And then we take it to his

16   apartment.

17   **Q**    Okay.  Well, do you remember telling the authorities that

18   on one of the occasions, Vargas actually hit a parked car with

19   the U-Haul and kept going?

20   **A**    Yeah.  I try to park the U -- Yahoo -- that -- the truck

21   -- the rental.

22   **Q**    The U-Haul?

23   **A**    Yeah.

24   **Q**    Okay.  You remember Vargas hitting the parked car, and he

25   didn't stop.  He just kept going.  Is that right?

1    **A**      Yeah.  He let me drive that car.

2    **Q**    Now, since we're still on Vargas, we might as well keep

3    going here.

4              **MS. CAFFESE:**  Can you put up the CI receipts, please?

5    Excuse me.

6    **BY MS. CAFFESE:**

7    **Q**    Now, you work with -- and I'm going to be referring --

8              **MS. CAFFESE:**  And can we just move Government's 56

9    in?  Are they --

10             **MR. HEMANN:**  If this witness has knowledge of them,

11   certainly.

12             **MS. CAFFESE:**  Yeah --

13             **THE CLERK:**  Counsel, do you have copies for the

14   Court?

15             **MS. CAFFESE:**  No, we don't, actually.

16             **THE CLERK:**  He needs a copy.

17       (Off-the-Record discussion between counsel)

18             **THE COURT:**  What are you offering?

19             **MS. CAFFESE:**  What I'm going -- they're CI receipts

20   that this witness --

21             **THE COURT:**  What exhibit number?

22             **MS. CAFFESE:**  It is 56.

23             **THE COURT:**  Any objection?

24             **THE CLERK:**  (Inaudible) book?

25             **MS. CAFFESE:**  They should be in the government's.

 1              **MR. HEMANN:**  Subject to a foundation from this

 2    witness, no.

 3              **THE COURT:**  Okay.

 4              **MR. HEMANN:**  If there's a foundation.

 5              **THE COURT:**  Okay.  Well, they are admitted subject to

 6    a motion to strike.  Go ahead.

 7         (Trial Exhibit 56 received in evidence)

 8              **MS. CAFFESE:**  All right.  Now, now can you put

 9    August 20, 2010, up there?

10         (Document displayed)

11    **BY MS. CAFFESE:**

12    **Q**    Sir, I'm going to show you a —— one of Government's

13    Exhibit —— Page 8 of Government's Exhibit 56.

14         See that, sir?

15         (Witness examines document)

16    **Q**    Do you see that?  And do you recognize it?

17         (Witness examines document)

18    **A**    Yeah, it's my —— Officer Darcy show me that, and I say I

19    don't remember at the time, but I don't think it's not mine.

20    This is my —— the problem was the R.  Because my R is double.

21    So, it's right, I don't —— I don't know if this is my

22    signature.  I don't know.

23    **Q**    Okay.  Let me just ask you —— do you want to look at that

24    little screen there?

25    **A**    Yes.

1   Q     Okay.  So, you recognize this document.  Right?  You were

2   shown the document by Inspector Keller, I believe?  Right, sir?

3   A     Yes.

4   Q     All right.  And this is one of the receipts -- and I'm not

5   saying this one in particular, but does this look like a

6   receipt that you would be given by the police for a particular

7   tip?

8   A     Um.

9   Q     I'm not saying this particular one that you were actually

10  given, but does this look like a receipt like you --

11  A     Yeah, it looks like a receipt, that I sign it.

12  Q     And this one here, when you were shown, had a signature

13  there of the recipient.  But that signature wars not yours.  Is

14  that right?

15  A     The R don't look like mine.  But, I don't remember

16  whenever we buy $40 of heroin.  I don't remember.

17  Q     Right.  And that's why you put "'No, not my signature.'"

18  "Cesar Hernandez."  Is that right?

19  A     I don't write -- I don't put that in there.

20  Q     Well --

21          MR. HEMANN:  Your Honor, could -- I'm just wondering

22  if Ms. Caffese could clarify which writing she's referring to,

23  because there are several possibilities on this page.

24          MS. CAFFESE:  Thank you, Counsel.

25          MR. HEMANN:  Thank you.

 1          **MS. CAFFESE:**  Yes, absolutely.  All right, this

 2  doesn't come up.  Does this come up -- all right.

 3  **BY MS. CAFFESE:**

 4  **Q**    All right, so under "Signature of Recipient" there, see,

 5  next to the date, August 20th, 2010, that's not your signature,

 6  is that correct?

 7  **A**    I don't know, ma'am.

 8  **Q**    Well, go down here, in quotes, "'No, not my signature,'"

 9  you wrote that, is that right?

10  **A**    No, I don't write that.

11  **Q**    Did you write "Cesar Hernandez" under "'No, not my

12  signature'"?

13          (Witness examines document)

14  **A**    I don't remember.  But, the one that I remember is we

15  never buy $40 of heroin, is what I remember.

16  **Q**    Right.  And that is exactly right, and that was a receipt

17  from Vargas.

18          **THE COURT:**  Well, what is your question?

19  **BY MS. CAFFESE:**

20  **Q**    Well, was that a receipt from Vargas that you were --

21          **THE COURT:**  Well, he wouldn't -- he wouldn't know

22  that.

23  **BY MS. CAFFESE:**

24  **Q**    Well, you were shown this receipt, is that correct?

25  **A**    I see Vargas' name on the top.

1  Q    You were shown this receipt, is that right?  By the

2  inspectors, by the authorities.  Is that right?

3  A    Well.

4  Q    And they asked you whether or not you ever received,

5  receiving $40 in payment for this purchase of heroin.  Is that

6  right?

7  A    I don't remember.

8       (Reporter interruption)

9  A    I don't remember.  I signed a lot of papers.

10         MR. HEMANN:  Objection as to the form of the

11  question.  She's impeaching, without anything to impeach.

12         MS. CAFFESE:  No, I'm not impeaching.  I don't mean

13  to be impeaching.

14         THE COURT:  I don't think she is impeaching.

15     I don't know what you are doing, and I'm not criticizing

16  you.  I'm just saying I don't know where this is going.

17         MS. CAFFESE:  All right.  Let me try.

18         THE COURT:  This is a document.  He says that that's

19  not his signature, under "Signature of Recipient."  And there

20  we are.  And --

21         MR. HEMANN:  We don't have any objection to that,

22  Your Honor.

23         MS. CAFFESE:  All right.  Let me cut to the chase.

24  BY MS. CAFFESE:

25  Q    This was a forged document by Vargas.

```
 1              MR. HEMANN:  Objection, Your Honor.

 2              THE COURT:  Sustained.

 3   BY MS. CAFFESE:

 4   Q    All right.  Let's go to the next one.  Incidentally,

 5   before I move to the next one, on August 20 of 2010 --

 6              THE COURT:  And this one has the Bates stamp ending

 7   0379.  Is that correct?

 8              MS. CAFFESE:  Yes, correct.

 9              THE COURT:  Okay.  Now, you want to go to Bates stamp

10   0380.  Is that right?

11              MS. CAFFESE:  Correct.

12              THE COURT:  Okay.  Go ahead.

13   BY MS. CAFFESE:

14   Q    Now, sir, is it easier if I show you the hard copy?  Or if

15   you look at it on your screen?

16   A    I can see here (Indicating).

17   Q    Okay.  So why don't you look at what's -- what's up on

18   your screen.  It's Government Exhibit 56.  And it looks like

19   Page 9, Bates stamp 0380.

20        Sir, look at that, okay?

21   A    Okay.

22   Q    And you were shown this -- do you remember being shown

23   this receipt form by Inspector Keller?

24   A    Yes, I remember.

25   Q    And this down here, under the line "'Not my signature,'"
```

1   there's "Cesar" -- which looks like your signature, "Cesar

2   Hernandez."  Correct?

3   **A**    I sign a lot of papers.  Probably I say it it's not my

4   signature, probably yes.  I always tell them, I sign a lot of

5   papers.  Like, okay, it's me.  I don't write "'Not my

6   signature.'"  Probably I say I don't remember.  I sign a lot of

7   papers.

8   **Q**    Okay.  I'm asking you whether or not the signature "Cesar

9   Hernandez" is your signature or not.

10  **A**    On what?

11  **Q**    On this receipt, sir.  Let me --

12          **THE COURT:**  I think the question is, Mr. Hernandez --

13          **THE WITNESS:**  Yes.

14  **BY MS. CAFFESE:**

15  **Q**    I'm not saying that you wrote "'Not my signature'" --

16          **THE COURT:**  Why don't we just ask him, simply.

17          Do you see, do you see -- you see the statement "'Not my

18  signature.'"  Do you see that?

19          **THE WITNESS:**  Yes.

20          **THE COURT:**  On the left side.  And then underneath,

21  there's a name.

22          **THE WITNESS:**  Yes.

23          **THE COURT:**  That seems to be your name.

24          **THE WITNESS:**  Yes, sir.

25          **THE COURT:**  Okay.  Did you sign that?  Is that your

1   signature underneath that line?

2           **THE WITNESS:**  Probably it's my signature.

3           **THE COURT:**  Okay, thank you.

4   **BY MS. CAFFESE:**

5   **Q**    And on August 25th, 2010, you were working with Rey

6   Vargas.  Right?

7   **A**    Mr. Vargas.

8   **Q**    All right.  And, this was -- okay.  Very well.

9           **MR. HEMANN:**  Your Honor, we will stipulate as to each

10  of these where he says it's not his signature.  He's not the

11  signer of the document.  The original document.  We are willing

12  to stipulate to that.

13          **THE COURT:**  Well, you have to get an agreement with

14  Counsel.

15          **MS. CAFFESE:**  All right, very well.  That's fine.  I

16  think -- we will stipulate -- I won't go through the other ones

17  then.

18          **THE COURT:**  Okay.

19          **MS. CAFFESE:**  We will stipulate.  Thank you, Counsel.

20  I appreciate that.

21      (Document taken off display)

22          **THE COURT:**  All right.

23          **MS. CAFFESE:**  All right, so let me --

24  **BY MS. CAFFESE:**

25  **Q**    Now I want to talk about the marijuana incident that you

 1   talked about yesterday.  And I will try to move along as

 2   quickly as I can on this.

 3        Yesterday you spoke about some marijuana or a bag that you

 4   believed contained marijuana.  Remember that, sir?

 5   **A**    I never say that bag contained marijuana.  To them, to

 6   everybody.  I don't know what is in there.  I never say it's

 7   marijuana.  Never -- I say it's a strong smell like marijuana

 8   in the car, from the bag.

 9        I don't see what is in there.  I don't ask what is in

10   there.  I don't say is marijuana.

11   **Q**    Okay.  And I understand that.  And in fact, you have never

12   seen Ed Robles with any marijuana.  Right?

13   **A**    That's correct, ma'am.  True statement.

14   **Q**    So when you were in the car, you said this bag was tied

15   up.  Is that right?

16   **A**    Yes, ma'am.

17   **Q**    All right.  And you said that it was bag, and you showed

18   us it was a fairly large bag, I don't know, look liked that

19   (Indicating)?  Or you show us.

20   **A**    Well, the bag was big, it was a big garbage bag

21   (Indicating).  But when they tie it up (Indicating), but it was

22   a bag.  They make it tied and the bag had like this much

23   (Indicating).

24   **Q**    What's that, I don't know, about two feet?

25   **A**    Was two feet, like this (Indicating), yes.

1  Q    All right.  It was whatever it was.  And you said --

2  A    No, it was not whatever it was.  It was like this

3  (Indicating).  Like this (Indicating).

4  Q    Okay.  That's fine.  That's fine.

5  A    Thank you.

6  Q    You said that you could smell a strong odor of marijuana.

7  Is that right?

8  A    Yes.

9  Q    And you also testified that you could tell that it was of

10 a high quality.  Is that right?

11 A    It's strong marijuana, strong.

12 Q    You said yesterday, were these your words, sir, "It was

13 high quality"?

14 A    It's different than the Mexican marijuana.

15 Q    Did you say it was high quality, sir?

16 A    Yes, ma'am.

17 Q    All right.  You couldn't see it, but how could you tell it

18 was high quality without having seen it?

19 A    Um, you can bring Mexican marijuana and break down

20 marijuana and (Indicating), tell you which one is, right now.

21 At this moment.

22 Q    You were also able to say -- you don't deal with

23 marijuana, though, is that right?

24 A    I don't deal with marijuana.  I have friend that deal with

25 marijuana.  Carlos, *El Pareja*, he dealing with that marijuana.

1  I see the marijuana before, a kid.  When I was a kid, dealing

2  with the Mexican marijuana, and I see that kind of marijuana.

3  So I can see the difference.

4  **Q**    You can see the difference.

5  **A**    I -- I smell the difference.

6  **Q**    You said you could see, but you could see and you could

7  smell the difference is what you're saying.  Okay.

8  **A**    It's very different, ma'am.

9  **Q**    So, you also said that it was purple marijuana.  You used

10  the word "purple" yesterday.  Right?

11  **A**    In that time, it's only one -- maybe it's more in that

12  time.  Right now it's hundreds of different -- but at that

13  moment, everybody calling "purple."  I don't remember, but

14  purple.  They call it, by high quality.  Right now it's

15  hundreds of names.

16  **Q**    Well, it was your word that you said -- is this like -- I

17  don't really know all the different types of marijuana, but

18  presumably purple is a type of marijuana?

19  **A**    Purple was in that time, quality, yes.

20  **Q**    And you were able to determine that it was purple

21  marijuana without having seen it.  Is that right?

22  **A**    Like I tell you, you can show me different marijuana and I

23  tell you which one is purple right now.

24  **Q**    But you would have to see it first, right?

25  **A**    I don't see, no.

1  Q    You wouldn't have to see the marijuana before you could

2  tell us whether it was purple marijuana or -- I don't know, is

3  there like a "kumish" or "kumosh" marijuana, or --

4  A    See right now there are a lot of types.  At that time --

5  Q    I don't know.  I don't know, sir.  I'm asking you, there

6  was more than just purple marijuana at that time.

7  A    Right now, it's (Indicating).

8  Q    Sir, would you have to see the marijuana before you would

9  be able to tell whether it's purple marijuana or Afghan gooey

10 marijuana or whatever marijuana, marijuana comes in, at the

11 time.

12       That's a simple question.

13 A    I say the smell strong to purple marijuana.

14 Q    All right.  Now, this was marijuana that Ed Robles

15 apparently had in the patrol car.  Is that right?

16 A    I don't know.  I smell the marijuana in the bag.  I don't

17 know.  It was marijuana in there.

18 Q    Okay, let's move on a little bit.

19 A    Okay.

20 Q    Because what you said yesterday was that you spoke with

21 Ed, and I don't know whether it was the same day or the next

22 day.

23       To clarify, just orienting, it was the next day that you

24 met up with him?

25 A    I believe that, the same day.

1   **Q**   Okay.  It was the same day.  And that you stated that

2   Robles told you that he a friend who had some marijuana.  Do

3   you remember testifying to that --

4   **A**   Yes, I remember.

5   **Q**   Okay.  So, did you ask him or did you try to get any

6   clarification for why he would say that he had some -- a friend

7   that had marijuana to sell if he had his own marijuana in his

8   patrol car?

9   **A**   I don't care.  So I don't ask.

10  **Q**   But, your recollection was that he told you he had a

11  friend that had marijuana to sell.  Is that right?

12  **A**   Yes.

13  **Q**   And you went into some detail about Sergio during this

14  time period in which the marijuana was being discussed.  Is

15  that right?

16  **A**   No Sergio.  One person that sell fake IDs tell me they

17  have marijuana for 2,000.  I tell him, "I can get that thing

18  for 1,800 right now."

19       And he say "Give me one second," and he go to the corner,

20  he talk to Sergio -- what they talking about, I don't know.  I

21  don't know what happened, I don't know nothing.  He come back

22  and tell me, "Yes, we can give you a deal, 1,800."

23       Sergio never told me nothing about marijuana.

24  **Q**   Okay.  Let me ask you, sir:  Is it correct that that same

25  day, someone known to you to be an FBI informant approached

1   you -- and when I say "the same day," the same day that you

2   smelled the marijuana in the car that Ed's in -- that same day,

3   some FBI informant approached you, telling you that he knew

4   someone who was trying to sell around $2,000 of marijuana?

5   **A**    Mr. Robles told me he work for the FBI at one point

6   before.  And, yes.

7   **Q**    I'm sorry, is it -- Mr. Robles said he worked for the FBI

8   before?

9   **A**    Mr. Robles told me that guy working for the FBI.  That

10  Puerto Rican.

11  **Q**    My question, though, is:  Did you testify at the grand

12  jury that someone known to be an FBI informant approached you,

13  telling you that he knew somebody who is was trying to sell

14  around $2,000 worth of marijuana?

15  **A**    Yes.

16  **Q**    Okay.  So you did testify to that, that -- okay.

17  **A**    Yes.

18  **Q**    Now, and then the next day after you have this

19  conversation about some FBI informant wanting to sell

20  marijuana, the next day did you testify at the grand jury that

21  someone by the name of Sammy (Indicating quotation marks) also

22  told you that someone was trying to sell pounds of marijuana?

23  **A**    If Sammy was the guy, the fake IDs, that want -- Sergio

24  (Unintelligible).

25  **Q**    So you did testify to that at the grand jury, is that

1  right?

2  **A**    Yes.

3  **Q**    And you did you testify also that this Sammy guy quoted

4  you $2,000 per pound?

5  **A**    Yes.

6           **MR. HEMANN:**  Your Honor, object to using the grand

7  jury testimony.

8           **THE COURT:**  Sustained.

9  **BY MS. CAFFESE:**

10  **Q**    Now, let me ask you, this person Sammy that you have

11  referred to during this examination here also, did you see

12  Sammy walk over to someone named Sergio Sanchez, who agreed to

13  sell it to you for $1,800?

14  **A**    I don't see he go ask that to Sergio.  I say he walked to

15  Sergio.  I don't know what did they talk -- that is the street.

16  We move everywhere, we move.  We talking about that, I telling

17  him, he walking around, and then he come back and we have that

18  conversation again.  And he say "Okay, we can find it for

19  1,800."

20      I see him go talk to Sergio.  I see him, he talk to a

21  couple customers.  And then, we walking around, we sell fake

22  IDs, we walking around, walking around.

23  **Q**    Okay.  So just so I have this straight, you are testifying

24  today that it is true that you said it is true that Sammy

25  walked over to Sergio, who agreed to sell the marijuana to you

1    for $1,800?

2          Is that a true statement?

3    A    I don't know what they talking about.  I say he go to talk

4    to Sergio, and then come back tell me "It's okay, I can -- we

5    can do it for 1,800."

6    Q    Well, you're telling us that it was Sergio who was going

7    to sell you some marijuana.  Is that right?

8              MR. HEMANN:  Objection, Your Honor.

9              THE COURT:  Sustained.

10   BY MS. CAFFESE:

11   Q    All right.  Did you ever talk, did you ever -- did -- let

12   me just ask you the question.  Around this same time, was there

13   also a Puerto Rican guy named Piro- -- you'll probably know the

14   name, Piroquoaa?

15         (Reporter interruption)

16             MS. CAFFESE:  P-I-R-O-Q-U-O-A-A.

17   BY MS. CAFFESE:

18   Q    Do you know that name?

19   A    No, I calling him Boricua.  Boricua.

20             MS. CAFFESE:  Okay.  I think that's Piroquoaa.

21         (Reporter interruption)

22   BY MS. CAFFESE:

23   Q    Around this same time period that we're discussing here --

24   A    One day, next day, around, around.

25   Q    Right, you told Inspector Keller and all those folks that

1    this Puerto Rican guy told you he had a few pound for sale of

2    high-quality purple, too.  Right?

3    **A**    I don't remember if he told me that.  If he told me, "I

4    have two pounds," I don't remember.

5    **Q**    All right.  Do you remember telling Inspector Keller and

6    the authorities that the Puerto Rican guy quoted $2,100 for

7    this weed that we have been talking about in this trial?

8    **A**    If it's in there, yes.  At that moment, I don't remember

9    how much -- how much was the price.  Twenty, 2,100, I don't

10   remember how much he told me.

11   **Q**    All right, sir.

12   **A**    Around that.

13   **Q**    And this was all during the same -- and the same incident

14   we have been discussing about Ed having this bag in the car,

15   and then saying to you, he had a friend who had marijuana, and

16   the whole thing with Sergio, this is all part of the same

17   discussion.  Right?

18   **A**    Was in this, yes.

19   **Q**    Okay.  Just wanted to see if I could understand it a

20   little bit more.

21        So this North Beach incident that you talked about

22   yesterday -- let's kind of transition here.  You testified

23   yesterday that there was a -- that you went with Ed Robles, and

24   Vargas, to North Beach.  Right?

25   **A**    Yes, ma'am.  Yes.

1  Q    All right.  And you said that this --

2           MS. CAFFESE:  Do we have that photograph, actually?

3      (Off-the-Record discussion between counsel)

4           THE COURT:  Which photograph?  Is it this one

5  (Indicating)?

6           MS. CAFFESE:  I believe so.

7           THE COURT:  Will you give it to counsel.

8           MS. CAFFESE:  No, it's not that one.

9      (Off-the-Record discussion between counsel)

10           MR. HEMANN:  Exhibit 273.

11           THE COURT:  I'm sorry, Exhibit 273?

12           MR. HEMANN:  Yes, Your Honor.

13           MS. CAFFESE:  Now, this is the --

14           THE COURT:  519 Broadway.

15      (Off-the-Record discussion between counsel)

16           THE COURT:  Yeah, go ahead.

17      (Document displayed)

18  BY MS. CAFFESE:

19  Q    So, sir, do you see this on your screen?

20  A    Yes, ma'am.

21  Q    This is 519 Broadway?

22  A    Um, I don't know if it's 19 -- 519 Broadway, but this is

23  the house that we go to with Mr. Vargas and Mr. Robles.

24  Q    All right.  Now, you said that you had gone there a couple

25  of times --

1  **A**     I buy --

2  **Q**     -- before Vargas and Robles went into one of the rooms.

3       Is that right?

4  **A**     Yes, I go and buy a couple of times.

5  **Q**     All right.  Now, did you say -- not yesterday, but did you

6  say that you saw Ed Robles climb up the front of the fire

7  escape and go into the second story there?

8  **A**     I don't know if he go to the second floor or he stand up

9  over there.  I don't -- I don't remember, whether he go to the

10 second floor or come to the first floor or -- I see him stand

11 up over there.

12 **Q**     Did you say -- I'm not saying yesterday, but my

13 recollection was that you were in a -- in a pickup.  Is that

14 right?

15 **A**     Yes, ma'am.

16 **Q**     All right.  And, you were in the pickup, and were you in

17 the back, the back of the pickup?

18 **A**     Um, yes, yes, in the -- yes, in the -- (Indicating).

19 **Q**     Yes?

20 **A**     Yes, yes.

21 **Q**     And you said on other occasions, am I correct, that you

22 were hiding down on the floor of the pickup with your jacket

23 over your head (Indicating).  Is that right?

24 **A**     That's correct.

25 **Q**     Right, because you wanted to hide, because you were afraid

1  somebody would see you.  Is that right?

2  **A**    Yes, correct.

3  **Q**    Okay.  And so you were hiding in the back of the pickup

4  with a jacket over your head.  Is that right?

5  **A**    It's a parking lot in the front.  They have parking all

6  the way to the back.  Nobody see me over there.  The problem

7  was, is one guy cleaned the area, is why I'm --

8  **Q**    Okay.  So you said at other times in the trial that you

9  saw Ed Robles climb up the fire escape.  Isn't that right?

10  **A**    Yes, this is correct.

11  **Q**    You yeah, you said that.

12  **A**    Identified that yes.

13  **Q**    You said you saw him climb up the fire escape.  Kind of

14  like Spiderman.  You know Spiderman?

15  **A**    I don't know he go up or down, but I seen him there.

16  **Q**    Right.

17  **A**    Yes.

18  **Q**    And that street there is Broadway.  Is that right?

19  **A**    Yes.

20  **Q**    And this was in broad daylight, early in the morning.  Is

21  that right?

22  **A**    Around 10:00, 9:00.

23  **Q**    Okay and I'm just curious, not curious but you do you know

24  whether or not there's a -- there is a door that you go

25  through, obviously, to get into that building that you have

1  identified or someone has identified as 519 --

2  **A**    Yes.

3  **Q**    Is that right?

4  **A**    Yeah.

5  **Q**    So you -- you could get -- go into the building to get

6  through those rooms through the door.  Right?

7  **A**    Probably, yes, yes.

8  **Q**    You wouldn't really have to like climb down or up the fire

9  escape to get into the second-floor room.  Is that right?

10             **MR. HEMANN:**  Objection --

11             **THE WITNESS:**  That's correct.

12             **MR. HEMANN:**  -- to the question, Your Honor.  He just

13  testified he did not see him go up or down.

14             **MS. CAFFESE:**  Well, let me clarify.

15  **BY MS. CAFFESE:**

16  **Q**    My understanding is that -- did I ask you whether or not

17  at another time you said that Ed Robles --

18             **THE COURT:**  Well, are you asking -- that is what's

19  confusing, is you are asking him about some previous statement.

20  And, and, why don't you simply ask him, what did he see?

21      I mean, you can lead him.  And then if it's different from

22  what you believe he said on a previous occasion, you can ask

23  him about that.

24  **BY MS. CAFFESE:**

25  **Q**    Did you state on a previous occasion --

1              **THE COURT:**  No, really, it's a different note.  To

2  try to move this along, I think the way to ask him the question

3  is, what did he see.  See if it's inconsistent in your view.

4  And if it is, you can ask him about the inconsistency.

5              **MS. CAFFESE:**  All right.

6              **THE COURT:**  So you have to lay a foundation before

7  you ask him -- ask -- you can't ask a witness about everything

8  they said on a prior occasion.  Especially this witness, who

9  has had many such statements.

10      It only becomes relevant if their testimony today is

11  inconsistent with their testimony or their statements earlier.

12              **MS. CAFFESE:**  Okay.

13              **THE COURT:**  So you have to lay a foundation.

14              **MS. CAFFESE:**  Understood, Your Honor.

15              **THE COURT:**  Okay.  Great.

16              **MS. CAFFESE:**  Let me --

17  **BY MS. CAFFESE:**

18  **Q**    How did you see Ed Robles get into the building?

19  **A**    I was in the back of the seat (Indicating), and looking

20  back.  I seen him over there.  Was little far away

21  (Indicating), I know it's him because he use Hawaiian tee

22  shirts.

23      And this is one of the things that I know 100 percent is

24  him because I don't -- we -- no too close, little bit far.

25  Little bit.  I'm in the end of the parking lot, he all the way

1  this side (Indicating).

2      And, I just looking, and I don't know if he go up or he go

3  down because when I looking, it's a guy with a big moustache

4  that cleaning the parking lot (Indicating), he's coming to

5  clean.

6      So I see him, and then I come back (Indicating).  So I

7  don't know if he go up or down.  This is the reason.

8  **Q**   Okay, let me clarify.  So if I understand you correctly

9  are you saying that Ed went into the room, through the fire

10 escape?

11 **A**   Um, I don't see Vargas around so I -- I think they already

12 inside.  I don't know.  I don't know what he doing over there.

13 I was in the truck in the parking meter (Indicating).

14     I don't know what he do; maybe you asking him what he do

15 in that, but I see him (Indicating), over there.  Whatever he

16 doing over there?  I don't know.

17 **Q**   Are you saying you saw him over there, inside the room?

18 **A**    Inside the fire -- that -- you have a picture, fire escape

19 right there.  He was right there.  Okay?

20 **Q**   So your testimony is --

21 **A**    Is only I see him over there, I see.  I don't see him

22 again, what he do.

23 **Q**   Your testimony is that you saw Ed Vargas -- excuse me,

24 Ed Robles on the fire escape.  Is that what you're saying?

25 **A**    Yes, that's correct, that's correct.  Correct.

1    Q    And is it your testimony that that is how Ed Robles got

2    into the --

3             THE COURT:  No --

4             THE WITNESS:  I don't know how he -- sorry.

5             THE COURT:  No, it's not a fire escape --

6    BY MS. CAFFESE:

7    Q    So you don't know.  You just saw him on a fire escape.

8    A    Yes, I don't know how --

9    Q    The middle of the morning.

10   A    I don't --

11   Q    On the day, sir?

12   A    No.

13   Q    Did you see other people inside the room?  Could you see

14   other people inside the room?

15   A    I don't go inside the room.  I stay in that truck in the

16   parking lot.  I don't go to the apartment, ma'am.

17   Q    All right.  Now, apparently following that incident, you

18   were at a bar with Ed Robles and other police officers.  Is

19   that right?

20   A    Excuse me?

21   Q    You were in a bar with Ed and other police officers,

22   following that particular event at some point.  Is that right?

23   A    I don't remember it was after this, after this, or what

24   particular -- but yes, I was in a bar with them.  They call me

25   and I go to the bar at one time.

1  **Q**    Okay.  Now, sir, you have -- do you remember when this
2  North Beach incident actually occurred?

3  **A**    Ma'am, in that time I live in the shelter.  I don't know
4  what day.  The month I know was Christmas because trees and
5  everything, lights on the houses.

6      But I don't know what day, if it's right -- February, if
7  it's March.  I don't pay no rent, I don't pay no bills.  I know
8  it is Christmas because everybody dressing like Santa Claus.
9  So, I don't know.

10 **Q**    Well, we know Christmas is in December.

11 **A**    Yes.  That's why I know it was December.

12 **Q**    Are you saying this occurred in December?

13 **A**    No, I say I don't know what -- what day or what time or
14 what month.  I don't know.

15 **Q**    I'm sorry; I misunderstood you.

16     So, when you spoke -- let me ask you this.  When you spoke
17 with Inspector Keller, August 12th of 2011, did you tell her
18 that this North Beach event occurred six months before Robles
19 was transferred?

20     Did you tell the authorities that?

21 **A**    If I say that right there, in that time maybe I remember.
22 But right now, I don't remember.

23 **Q**    So, you would say that if you had said it, it was -- made
24 that statement --

25 **A**    If I said that, it must be, yes, close.

1  Q    Because it was closer in time to when it had happened so

2  it would be fresher in your memory, right?

3  A    Yes.

4  Q    All right.  And that would have been June or July of 2009,

5  is that right?

6  A    I don't remember.  I don't remember.

7  Q    Okay.  But six months --

8  A    But I believe it was before that thing, or after, but --

9  almost the same, almost -- during that time.

10 Q    All right.  So what you are saying, though, is that was

11 probably accurate, what you told the inspector, then?

12 A    I don't know if it was after or before.  I don't know.

13 Q    And you already told us that you took a leave of absence

14 from June to October of 2009.  Right?

15 A    I don't know if I leave from June to what.  I only take --

16 like I say, I don't know what months.  I don't take a note,

17 ma'am.

18     I'm sorry, I can't help you about that.  I don't take

19 notes, what month it was.

20 Q    And let me ask you, I believe -- correct me if I'm wrong,

21 but yesterday I believe you testified that there was -- that

22 there were -- let me just ask the question.

23     Do you know what they got from the -- from that hotel

24 room, as you sit here today?

25 A    What hotel room, ma'am?

1   **Q**    From the –– the 519 Broadway (Indicating).

2   **A**    That is not hotel room, ma'am.  It is apartments.

3   **Q**    Okay.  The apartment, 519.

4   **A**    It is an apartment there.

5   **Q**    Yeah, sorry.  Excuse me.

6   **A**    I don't know what they have in there.  They only give me a

7   metal cup with a lot of twenties, like ––

8   **Q**    So you –– so you never ––

9   **A**    No less than twenty, no more than thirty.  Twenties.

10  Twenties, the cocaine.

11  **Q**    Okay.  So your testimony is you never learned whether or

12  not they –– what they got from that.  Just what you got in your

13  little can (Indicating), or whatever.

14  **A**    Yes.

15  **Q**    Box.

16  **A**    Yes.

17  **Q**    All right.  Fair enough.  Let's go on to Carlos Duanes.

18  **A**    Carlos Duanes, okay.

19  **Q**    Now, yesterday, your testimony was that you went to Golden

20  Gate Park.  Is that right?

21  **A**    Yes.

22  **Q**    All right.  And you were digging in Golden Gate Park?

23  **A**    In the area, yeah.

24  **Q**    With Vargas and Robles?

25  **A**    Yes.

1   Q     And do you remember what day that was?  What month?  Let's

2   start with the month.

3   A     No.

4   Q     You can't remember the month?

5   A     (Shakes head)

6   Q     Could have been June?

7   A     First, it was like five years.  Second one, I don't think

8   I know about --

9   Q     It could have been any month of the year of 2009, as you

10  sit here today.  Is that right?

11  A     I don't remember what month.  I'm sorry.

12  Q     All right.  And you told, is it -- is it true that you

13  told Robles that Duanes was selling a lot of heroin?

14  A     Yes, not that business, but yeah, he -- (Nods head) yes,

15  yeah, I probably I told him he sell heroin.

16        A large --

17  A     A large amount.

18  Q     So, that would be true?

19  A     Yes, ten pieces, 20 pieces, yes.

20  Q     And you said that he kept his money in different holes in

21  different parks.  Is that right?

22  A     That's correct.

23  Q     All right.  And, did you say or did the officers tell you

24  that they had followed Duanes to see where he put the drugs?

25  Did you say that?

1  **A**    Yes.  And they followed Duanes to his house too, later.

2  **Q**    Okay.  Just the first part.  Did you make that statement

3  that they followed Duanes to see where he put the drugs?

4  **A**    He told me, I don't -- I don't see.  If -- if they follow.

5  But, they called me and said, "We don't know where is that

6  place, and we go over there to make a hole."  Holes.

7  **Q**    Is it true or not true that you purchased drugs from -- on

8  credit, from Duanes?

9  **A**    Yes, ma'am.

10  **Q**    All right.  And, why would you do that?

11  **A**    Because we want to -- give the money, follow him where he

12  put the money.  Some kind of plan (Indicating quotation marks).

13  **Q**    Wait.  So you purchased drugs from Duanes and money --

14  excuse me, purchased drugs from Duanes on credit so you could

15  follow Duanes to see where he put the money?

16  **A**    When I pay him.

17  **Q**    But you bought, bought drugs from him on credit, meaning

18  you didn't have to give him any money.  Right?

19  **A**    When I pay him back.  The credit is not going to be free.

20  Credit is you have to pay later.  I don't know if you know

21  about that.

22  **Q**    Why did you do that?  If this was a plan, why -- why

23  didn't you just give him the money when you got the drugs, so

24  then you knew Duanes would have the money, and you could follow

25  him?

1   A    I don't have the money.  Police officer don't have too

2   much money.  We don't have that kind of money, like 2,000,

3   $2,000.  We don't have that kind -- they only have money to buy

4   twenties and forties.

5   Q    At some point did you come up with the $2,000 --

6   A    Yes.

7   Q    -- to buy the money -- excuse me, to buy the heroin?

8   A    No.  He give me credit.  And we pay back.

9   Q    All right.

10  A    So with that --

11  Q    How much money did you have to pay him back?

12  A    It was 400, 380, 3- -- I don't remember exactly what price

13  he give it to me, so -- I don't go to school, made the

14  accounting.  Put like 380 by five, that was the money, or 400

15  by five.

16       I don't remember at that point how much -- how much he

17  sell to me, the piece, but it was five.  So --

18  Q    But it wasn't $2,000, right?

19  A    Close to $2,000.  I don't -- ma'am, I don't remember he

20  give it to me in 380 or 400.  I don't remember that price.  But

21  I believe is 380.

22  Q    Let me move on, then.

23  A    Or 400, yes.

24  Q    About 400.  But it wasn't 2,000 because --

25  A    Something like that, the final payment, yes.

1  Q    So, very well.  Sir, you hid your drug habit from

2  Ed Robles.  Isn't that true?

3  A    Pardon me?

4  Q    You had a drug habit, is that right?

5  A    Huh?

6  Q    A drug habit.  A drug problem.

7            **THE WITNESS:**  What is that?

8       (Off-the-Record discussion between Witness and

9  Interpreter)

10           **THE WITNESS:**  Oh, yes.

11 **BY MS. CAFFESE:**

12 Q    Okay.  And you hid that from Ed Robles; isn't that right?

13 A    If I told him, yes.

14 Q    No, I'm asking you:  Did you hide your drug problem from

15 Ed Robles when you were working as an informant?

16           **MR. HEMANN:**  Asked and answered.  He just answered

17 the question, Your Honor.

18           **THE COURT:**  Do it again.

19 **BY MS. CAFFESE:**

20 Q    I believe the Judge will allow you to answer the question,

21 sir.

22      Did you hide your drug habit from Ed Robles while you were

23 working?

24 A    First of all, he is not my father; I don't have to do

25 that.  But, in that moment, I try to recover myself.  I don't

1    think I did too much drugs in that time.

2         I think, like I say, whatever they call me, I be there.

3    So if I be -- if I was high, um --

4    **Q**    Did you hide your drug problem from Ed Robles?  Yes or no?

5    **A**    Yes, I don't -- yes.

6         I don't know whether it's hide, like --

7         (Off-the-Record discussion between Witness and

8    Interpreter)

9              **THE WITNESS:**  Oh, what -- yeah.  I told him I have

10   drug problems.  He's not my father.  I don't have to -- maybe

11   I'm there, be hiding from him, or yes -- probably yes, yes,

12   I'm -- I don't know how to answer this.

13        I don't want to say no one, I use drugs, I don't want

14   nobody -- yeah, probably yes.  Yes, yes, I'm -- hide I use

15   drugs.  Not from him; from everybody.  Because -- I don't tell

16   everybody, "Hey, I use cocaine, hey..." maybe that's not a good

17   idea.

18   **BY MS. CAFFESE:**

19   **Q**    Did you hide the fact that you were selling drugs from the

20   officers?

21   **A**    He told me, "Selling drugs, nothing happen to you."  In

22   fact, one day, one police stop me with an eight ball.  And he

23   let me go.

24   **Q**    Did you hide any of your drug selling, your independent --

25   your separate drug selling from Robles?  Yes or no?

1   **A**    I said --

2          (Off-the-Record discussion between Witness and

3   Interpreter)

4          **THE WITNESS:**  Yes.  Not only from Robles; from

5   everybody.  Yes.

6   **BY MS. CAFFESE:**

7   **Q**    Okay.  Very well.

8   **A**    Yes.

9   **Q**    All right.  Now, I do want to --

10          **MS. CAFFESE:**  I am almost done, Your Honor.  But, I

11  just want to make sure I hit some highlights here.

12  **BY MS. CAFFESE:**

13  **Q**    You testified yesterday about this guy Manny.  You said --

14  remember Manny?

15  **A**    Manny?

16  **Q**    Manny, I think his first name is Sergio also, goes by

17  "Manny Vasquez"?

18  **A**    I don't know.

19  **Q**    You don't know?

20  **A**    I don't know what his real name, I don't know.

21  **Q**    But you know Manny, right?

22  **A**    I know him, I -- how I say this?  I know who is Manny but

23  I don't know -- I have no relationship with him, I don't -- I

24  know nothing about it.  Something that --

25  **Q**    But Manny was a name that came to you, according to your

1  testimony, from Ed Robles.  Is that right?

2  **A**    Yes.

3  **Q**    And you testified yesterday that Ed told you that Manny

4  was somebody who moved lots of drugs.  Is that right?

5  **A**    No.  He say I want peoples like -- we talking about Manny

6  and then I say yeah, because -- he's more like my friends, is

7  what I want do, what I want.  He not talking about drugs, he

8  talking about a lot of money.

9      He say "This is the people I want to, because I make a lot

10 of money here, you know, see how much money we can make and how

11 much money..." all the conversation was that.  "You know how

12 much money we can make, dude, oh, a lot, dude," bup, bup, bup.

13 **Q**    And this is what -- this is all in context of Ed telling

14 you about Manny had a lot of money.  Is that right?

15 **A**    Yeah, Mr. Vargas was present.

16 **Q**    And Manny had a lot of money because he sold lots of

17 drugs.  Is that right?

18 **A**    Um --

19 **Q**    Is that what Robles told you?

20 **A**    I don't remember if he say "because he sell a lot of

21 drugs," but if the money come from the drugs, so -- he don't

22 have to tell me that.  I know the money comes from drugs, if

23 it's a lot.

24 **Q**    And according to your testimony, Ed told you, "That's what

25 I want, I want you to get me guys like Manny."

1       Is that right?

2   **A**    That's correct, ma'am.

3   **Q**    So, why would -- why would Ed Robles need you to get him

4   money if he had access to big guys like Manny, with a lot of

5   money?  Why would he need you, just this small-time little

6   broker?  Why would he need you?

7           **MR. HEMANN:**  Objection; calls for speculation.

8           **THE COURT:**  Sustained.

9   **BY MS. CAFFESE:**

10  **Q**    Did he tell you why he needed you, if Ed Robles had access

11  to guys like Manny who had a lot of money?  Did he ever tell

12  you, why you?

13  **A**    I'm -- we working.  Together.  And he tell me, he say

14  people that he want to.  Because like I say before, I give it

15  to him, only people from the street.  Guys that deal twenties.

16  Garbage.  I don't give, you know, my peoples.

17  **Q**    What made --

18  **A**    My friends.

19  **Q**    I'm sorry?

20  **A**    That's not special, they dealing in ounces, they dealing

21  with grams.  We deal in kilos, we deal in ounce.  My friends.

22  It is different.  It's not special; it's different.

23  **Q**    But you, I think, told us, though, you were just dealing

24  as a middleman, small amounts.  Right?

25  **A**    Later, yes.

1   Q     When you were working with Ed Robles, apparently.  Is that

2   right?

3   A     Yes.

4   Q     Now, you also said that when Ed left to go to the

5   motorcycle unit, you had a conversation with him.  Is that

6   right?

7   A     I don't know what kind of conversation.  Please tell me.

8   Q     You said that Ed -- you asked him, "Why you want to go to

9   motorcycle unit?  You could, you know, make so much more money

10  staying here," in Mission plainclothes.

11        Do you remember telling us that yesterday, sir?

12  A     Correction, correction, correction.  I don't tell him "Why

13  you want to go to motorcycle, you make more money here," no.

14        I say, "Why you want to go to motorcycle?  You know you

15  going to make no money."

16        And he goes, "Dude, I'll make more money, motorcycle.  You

17  know how many illegal motherfuckers I'm going stop?"  That was

18  his answer.

19  Q     Okay.  And, is that because illegals have so much money?

20  A     Maybe because he don't have no (Unintelligible) I don't

21  know --

22        (Reporter interruption)

23        **THE WITNESS:**  I don't know, ask him.  I don't know.

24  He only told me that.  I don't know.

25

1  **BY MS. CAFFESE:**

2  **Q**    Okay.  So, but I just want to get clear.  Ed Robles told

3  you he was going to go to the motorcycle unit because he could

4  make more money, stopping illegals.

5       That's your testimony, sir?  Is that right?

6  **A**    No, no, no.  He don't tell me "I go to motorcycle because

7  I go to make money."  I ask him, "What -- now you go to

8  motorcycles, now you don't want to make no more money, because

9  no more narcotics."

10      "Dude, motorcycles," like I said before.  Right?  He

11 doesn't tell me, "Hey, dude, I'm going to motorcycles because

12 I'm going to stop illegals because more money."

13      Ma'am, correct, please.

14 **Q**    Didn't you just tell us, sir --

15         **THE COURT:**  I think he testified the way he

16 testified.  Okay?  Let's move on.

17         **MS. CAFFESE:**  Okay.

18 **BY MS. CAFFESE:**

19 **Q**    Sir, have you lied?

20 **A**    I like people, yeah.

21 **Q**    Okay.

22 **A**    I like friend, I --

23 **Q**    No, "lied."

24 **A**    Oh, you say "lied," "lied"?  I'm sorry.

25 **Q**    Have you lied during your testimony --

```
 1              THE COURT:  Sorry -- finish the question, okay.
 2   BY MS. CAFFESE:
 3   Q    Have you lied during your testimony during these last two
 4   days?
 5   A    What?
 6   Q    Did you lie at all during your testimony the last two
 7   days?
 8   A    Liar?
 9        (Off-the-Record discussion between Witness and
10   Interpreter)
11              THE WITNESS:  No, ma'am.  Maybe, something I said in
12   my testimony now, maybe I say in that, like I tell that lawyer,
13   "forty, 60 times," and maybe before, say "thirty-five times."
14   Probably I make a little mistake.  But everything -- I don't
15   believe I want to lie to the FBI.
16   BY MS. CAFFESE:
17   Q    Okay.  Well, you had a number of times to speak with and
18   clarify any inconsistencies or things that may have been a lie
19   or may have been untrue.  Is that true?
20   A    I've lied in the past, yes.  I'm cheating on my wife, I
21   cheating on my girlfriend, I lie, like B.S.  But one thing that
22   I'm never going to do is lie to the FBI.  No, ma'am.
23   Q    So if there was a lie, if there was something that we went
24   over, some of the things we went over, you would have been able
25   to clarify it during these last several months and years with
```

1   the FBI, or Inspector Keller, right?

2   **A**   Was no lie -- was a lie -- if I'm inventing these things

3   when they asked me about that sergeant, why I don't tell them,

4   "Oh, he gave me drugs, he gave me money"?  Because the true is

5   that man, he don't give me nothing.  In fact, he only talked to

6   me two times.  That is the true.

7       If I'm in bed, "Oh, sergeant, oh, that sergeant give me

8   money, the sergeant give me drugs, the sergeant give me

9   everything," no.  The fact and true is -- and I'm speaking only

10  the true -- the man that is seat over there (Indicating) he

11  never give me nothing.  And he is right there, seated over

12  there.  He never gave me nothing.  In fact, he talked to me

13  two, maybe three times.

14      But the man that is seated over there (Indicating), he

15  give me drugs, he give me money, he forced me to be a snitch

16  and he (Inaudible).  That is the truth.

17  **Q**   Sir --

18      (Reporter interruption)

19  **BY MS. CAFFESE:**

20  **Q**   He forced you to be a snitch.  That's what you're saying

21  right now?

22  **A**   Yes.  He told me if I don't give you people, if I don't

23  call him, he will come back and he will take me to the jail.

24  He want to (Inaudible) me.  I was illegal, I don't have no

25  papers.  I can't go to the police because he's police.

1      So yes, I'm -- like I just told, I have a choice to want

2  to -- but San Francisco, I love San Francisco (Indicating).

3  This is my thing.

4  **Q**    You just testified that Ed Robles forced you to be a

5  snitch.  Is that true or false?

6  **A**    It's true.  He put a foot on my chest and he put the hand

7  on my face and say, "You have to call me, motherfucker, or I'll

8  come back for you."

9       And I say, "I don't have nothing, I always clean, I can

10  find what you" -- whatever they want.  Even a gun or pistol.

11  And I say, "I don't have nothing."

12       "It's your word against all these police officers."  And

13  was other police officers, walking around.  In my room.

14  **Q**    So when you snitched on Guerrero, Ed Robles forced you to

15  snitch on your competition?

16  **A**    He always call me, call me, so, I want to -- he go away.

17  It's right, I have this problem with Guerrero.  I had this

18  problem with Guerrero.  And then, I had that problem with him.

19  So, I say, "Okay.  I take this guy away and I give you him."

20       And Guerrero's nobody, he's not my friend, I don't owe

21  nothing to him.  I want to make only one deal, because he told

22  me, "Give somebody, and then it's all done.  I forget about

23  you."

24       "Okay."

25  **Q**    Well -- finish.  I'm sorry.

1   **A**    If he say, "You have to call me, you have to call me," and

2   every time I see him in the Mission, that was my area.  That

3   was -- yes.

4   **Q**    Well, when you made the choice to leave this work, from

5   June to October of 2009, that was your choice, sir.  Right?

6   **A**    Yes, yes.

7   **Q**    And when you decided come back in November of 2009, that

8   was your choice, sir.  True statement?

9   **A**    It's true.  But in that point, in that point, I know the

10  guys, and I know that are a criminal I meet.  The only

11  difference was the badge and the star.  I come back to make

12  business.

13  **Q**    And it was your choice to leave your job in construction

14  to sell drugs.  That was your choice, sir.  Isn't that true?

15  **A**    I'm coming -- I'm coming in November, and in Kansas is a

16  lot of snow.  That much (Indicating).  I can't -- so I don't

17  have no job.  So yeah, and then the guy called me, I say,

18  "Okay, why not?"  I had to move anyways.  Big snow (Indicating)

19  in Kansas.

20  **Q**    And it was your choice to leave your job prepping in

21  restaurants and doing janitorial work to make more money

22  selling drugs, right?

23  **A**    They fired me.

24          **MR. HEMANN:**  Objection.  Asked and answered.

25

1   **BY MS. CAFFESE:**

2   **Q**     Sir, no one forced you to sell kilos of cocaine, did they?

3             **MR. HEMANN:**  Objection.  Asked and answered.

4             **THE COURT:**  Sustained.

5             **MS. CAFFESE:**  I don't have any further questions.

6   Thank you, Your Honor.

7             **THE COURT:**  Okay.

8        (Off-the-Record discussion between counsel)

9             **MS. CAFFESE:**  Oh, Judge, I would actually ask for a

10  sidebar.

11            **THE COURT:**  A sidebar, well, not right now.  Let's --

12  let's continue with --

13            **MS. CAFFESE:**  Yeah.

14            **THE COURT:**  -- redirect.  Is there any redirect?

15            **MR. HEMANN:**  Very briefly.  About three points,

16  Your Honor.  It'll take less than five minutes.

17                      <u>**REDIRECT EXAMINATION**</u>

18  **BY MR. HEMANN:**

19  **Q**     Mr. Hernandez, when you first started talking about the --

20  well, first of all, tell the jury about your relationship with

21  Mr. Vargas.  How you felt about him.

22  **A**     I felt him, he's -- well, I consider not a good person,

23  because we do a couple bad thing like I do with that guy right

24  there (Indicating).  But, I know both.

25        Vargas is more kind of person to me.  More kind of okay.

 1  And in the end, he tell me if I want to go away it's okay,

 2  don't do that no more.  He recommend to me stop do that.  He

 3  take me to Folsom, he have a friend that have a restaurant,

 4  recommend, recommend, give me recommendation to the guy to get

 5  a job.

 6      I'm starting, go to school, English school.  He tell me,

 7  "I'm going to help you to change your life.  You need

 8  something, you call me."

 9      He was bad people.  We do a lot of bad things like that

10  guy (Indicating).  But Mr. Vargas is very, very different

11  person than who's over there (Indicating).

12  Q    Mr. Hernandez, when you started cooperating with the FBI,

13  Ms. Flores (Indicating), Mr. Joe (Indicating), and the guys --

14  A    Mr. Nestor, Mr. Etan (Phonetic), Mr. Joe, I remember every

15  agent.

16  Q    Did you provide information about Mr. Vargas?

17  A    Yes.

18  Q    Did you tell the FBI about all of the bad things that you

19  did with Mr. Vargas?

20  A    Yes.

21  Q    At some point in time, did you find out that Mr. Vargas

22  got indicted, charged in this case?

23  A    Yes.

24  Q    Were you going to testify against Mr. Vargas in this case?

25  A    I testify against him, yes.

1   Q    And some day, at one point in time, he pled guilty.

2   Right?

3   A    Yeah, pled guilty, yes.

4   Q    Okay.  But before he did that, did you intend to come in

5   and tell the jury all of the bad things that you knew about

6   Mr. Vargas?

7   A    Yes.

8   Q    Ms. Caffese asked you about the -- the marijuana incident

9   with Mr. Robles.  Remember that?

10  A    Mr. Robles and Mr. Vargas.

11  Q    Okay.  And, about the conversation that you had about

12  marijuana with Mr. Robles.  Do you remember that?

13  A    Yes, sir.

14  Q    Did Mr. Robles use the term "purple" when he was

15  describing the marijuana to you?

16  A    Um, he say something like, "Hey, dude, you don't have no

17  customers for marijuana?"

18       I say, "What marijuana?"

19       He say, "Oh, because I have a friend, they have a

20  high-quality purple marijuana."

21  Q    Okay.  In addition to that mention of "purple," you said

22  that there was a -- an FBI -- somebody you thought was an FBI

23  informant who asked you about marijuana, right around that same

24  time.  Remember?

25  A    Yes.  I -- yes, yes.

1  Q    Yes?

2  A    Yes.

3  Q    Okay.  And, was that -- how did you know that that person

4  was an FBI informant?

5  A    Um -- I want to remember good because I don't want to say

6  my statement, I don't want to say something and the lady become

7  very mad.  Sorry.

8       I know one day we talking with him about these guys, these

9  guys -- the --

10 Q    You say you were talking with him.  Who's him?

11 A    Mr. Robles.

12 Q    And what did Mr. Robles say?

13 A    And was Mr. Vargas, about this guy, this guy selling this.

14 This guy, he see me one day inside the police station -- I mean

15 the parking lot.  In the -- I remember.  And the Puerto Rican

16 told me, "They arrest you?  I see you in the police station."

17      So, I don't remember how started the conversation, but I

18 brought the conversation to them.  The Puerto Rican guy seen

19 me.  And, I don't remember what was that conversation, but what

20 I remember, "Don't -- don't dealing with him, don't make deals

21 with him.  He work for the FBI."  And, like that.  Mr. Robles

22 told me that.

23 Q    Mr. Robles identified an FBI informant to you.

24 A    Yes.

25 Q    Did Mr. Robles know that you were selling some of the

1    drugs that he gave you?

2    **A**    Um, he know I selling the drugs?

3    **Q**    Yes.

4    **A**    I don't know if he know.  He give it to me for selling but

5    I never tell him selling, I use it, I give it away.  I don't --

6    yeah, but he tell me selling, in the North Beach, or buy drugs.

7    **Q**    The one in North Beach?

8    **A**    He told me selling the drugs, he give me half.  But I

9    don't -- I don't --

10   **Q**    And Mr. Hernandez, you mentioned on cross-examination,

11   that one time the police stopped you with an eight ball.  Do

12   you remember you just said that?

13   **A**    Repeat, please?

14   **Q**    You just said that one day the police stopped you with an

15   eight ball?

16   **A**    Yes.

17   **Q**    What's an eight ball?

18   **A**    Three grams.

19   **Q**    Of what?

20   **A**    Cocaine.

21   **Q**    Where did they stop you?

22   **A**    I live in the hotel on 17 and Mission, I mean 16 and 17,

23   and they use -- this is for somebody in the taqueria, 19 and --

24   and -- 19 and -- in the Mission.  I think the La Parrilla -- I

25   remember the name.

1    So I walking, I walking, and there's a red light.  I don't

2    drive.  I'm walking.  The 17.  And Mission.  So, I was hurry,

3    so I cross with the red light.  And, when I'm walking, maybe

4    just the police, a police car stop me, booo.

5  **Q**    A marked police car?

6  **A**    Yeah a marked police car.  It was a police officer and

7    lady.  Police officer with a bald head.  The lady.  And they

8    told me if I have ID.  Like, I never have ID, and I had that

9    thing in my pocket.

10   So he start searching.  And I tell him -- when he start

11   searching me, he tell me if I have something on me like

12   weapons, something, I tell him I'm working for Mr. Robles.  I

13   think in that moment I mention, because I have scared, I have

14   something with me, so I mention all the narcotics, Sanchez,

15   Robles, blah, blah, blah, everybody to him.

16   And at one point he make a call, and he's, "Okay.  Don't

17   do that again." And then I leave.

18   And then he call me (Indicating), and say "Dude" --

19 **Q**    Who called you?

20 **A**    Mr. Robles.

21 **Q**    What did he say?

22 **A**    One time I -- I think I go to -- because, it looks --

23 **Q**    Stop, stop, stop.  He called you, and what did he say?

24 **A**    "Come to the police station."  So I go over there and

25   everybody is joking about me, laughing about me, like, "I can't

 1  believe" -- you know, like making fun of me.  Because police

 2  stopped me because I walking across the red light.  So.

 3           **MR. HEMANN:**  Thank you, Your Honor.  No further

 4  questions.

 5           **THE COURT:**  Anything else?

 6           **MS. CAFFESE:**  I do, Judge.

 7           **THE WITNESS:**  Told you.  I told you.

 8           **MS. CAFFESE:**  I'm sorry.

 9           **THE COURT:**  Well --

10                    **RECROSS EXAMINATION**

11  **BY MS. CAFFESE:**

12  **Q**    Sir, you said that Mr. Vargas was a different person from

13  Ed Robles.  Is that right?

14  **A**    We are human beings.  No different.  Attitude.

15  (Inaudible) bad things.  The attitude.

16       (Reporter interruption)

17  **BY MS. CAFFESE:**

18  **Q**    All right.  Well, let me ask you:  Did you feel the same

19  way about Vargas before Vargas pled guilty a couple of weeks

20  ago?

21  **A**    Yes.  Yes.  I don't know if I can say this, but when in

22  the beginning, I said this to the beginning, to the FBI, maybe

23  they have record, they always say Vargas good person now.

24  Maybe -- I don't know, they -- it's in the recording or in the

25  paper, but I say that, beginning.  With that bag on me, I say.

1  **Q**    Did Vargas tell you to stop snitching after a video

2  surveillance got released of him stealing something from a

3  hotel?

4  **A**    No.

5  **Q**    He never told you to stop snitching?

6  **A**    Yeah, he told me, but no after that or before that, I

7  don't remember.  Long time ago.  Long time.

8  **Q**    Yes.

9  **A**    Okay.  Okay.  The point is:  He don't force me, he don't

10  call me, he don't -- if I don't call him, and he call me and

11  say if I want to go to eat, something like that.  He knows,

12  like, if I talk to him I have to talk to him about somebody.

13  Vargas, I can call him for any reason, for -- different.

14        But, make sure, it's not my friend, it's only -- I want to

15  make sure.

16  **Q**    Vargas told you to stop snitching, at some point.  Is that

17  right?

18  **A**    Hmm, at one point he tell me -- I tell him my plans.  I

19  tell him I want to work.  I want to -- and he say, "Yeah, you

20  can do that, bro, it's good."

21  **Q**    That was after approximately March of 2011 when you gave

22  him a tip about a man named Fernando Santana.  Is that right?

23  **A**    No, it was before, because already -- when Carlos Santana

24  happened, I work in the (Unintelligible) and I see him in the

25  paper, and I already work long time in the newspaper so that

1  happened before that thing.

2  **Q**    Well, you told Vargas that Santana had stole $1,000 from

3  you, is that right?

4  **A**    $1,000.  1,000.  And actually it was not $1,000, it was --

5  I'll give you something, selling, and he gave me part of the

6  money.  What I would given to him cost 1,000, and he only give

7  like -- I don't remember.  He owe me like 600, $500 or

8  something like that.

9  **Q**    Right.  And you were mad that he stole from you, right?

10 **A**    I mad if anybody stole from me.  Not only Santana.

11 Anybody.

12 **Q**    Okay.  Very well.  And that -- all right.  And you told

13 Vargas, and Vargas said that he would help you take care of

14 that guy.  Is that right?

15 **A**    Um, I don't think he used that words.  The words I

16 remember is "We can do..." I tell him I'm going to kick that

17 motherfucker -- I'm sorry.  I'm sorry for that word.

18     He say, "We can do nothing because he's with the FBI."  He

19 never told me "I hope you do that," no.  He is like, "No, dude,

20 don't do that."  Probably I say that in the beginning, as he

21 sits over there, I said that.  Like I say, I don't know.  I

22 have confuse.  I don't know.  But yes, we have that

23 conversation, we had that conversation.

24 **Q**    Isn't it true that Vargas told you that he had someone

25 that he would take care, and he offered you the name and bank

 1  account number of a hit man?

 2      True statement?

 3  **A**   I think, I think I tell him.  I think I offer him.  Now, I

 4  don't offer him, the guy that give me the stuff, he told me,

 5  and I tell him.

 6      That guy, the own -- the owner of the drug was my

 7  brother-in-law.  He told me, "I can take care of..."

 8  **Q**   Was there discussion of a hit man with Vargas?

 9  **A**   No hit man.  The guy that kicks ass, bap, bap, bap

10  (Indicating).  I'm not a violent guy, ma'am.  Just a couple,

11  bap, bap, bap.

12  **Q**   And that's the nice personal Vargas that you're talking

13  about today.  Is that right?

14              **MR. HEMANN:**  Objection, Your Honor.

15              **THE COURT:**  Sustained.

16              **MS. CAFFESE:**  All right.

17  **BY MS. CAFFESE:**

18  **Q**   So --

19  **A**   We never do nothing.

20              **THE COURT:**  No, no; no question.

21              **THE WITNESS:**  Okay.

22              **THE COURT:**  Go ahead.

23  **BY MS. CAFFESE:**

24  **Q**   You became aware that Vargas was seen stealing from a

25  hotel room on a video.  Isn't that true?

 1  **A**    On one occasion I see the video on internet, and it was a

 2  lot -- a lot of cops.  Not only him.

 3  **Q**    Yeah.

 4  **A**    Okay, so --

 5  **Q**    It was after that, that you stopped working for him.  Is

 6  that right?

 7  **A**    I stop working for that, no, I'm -- we -- at that moment

 8  we have another case about the tickets, being ticket, Muni

 9  tickets.  We have that -- we still working but then, at one

10  point I think he got suspend, I don't know what so he told me

11  do this case, with sergeant -- I'm sorry, when this guy, the

12  name Molina.

13        He -- Vargas -- they send Vargas to another police station

14  in Potrero.  But next to Potrero, and he say, "Dude, we can do

15  nothing but we have already -- address everything and give it

16  to Molina."

17        But we continued working at that time.  No drugs, of

18  course, no drugs.  Was somebody make thousands of tickets for

19  the Muni and give it to the homeless to sell them for 20 cents,

20  something.  I don't know.  So I know who got the computer, and

21  I called Vargas and tell about that.

22  **Q**    You had remained in contact with Vargas at the time,

23  that --

24  **A**    I remained in contact until the last minute that the FBI

25  came for me.

1  **Q**    Right.  In August of 2011, when you were first contacted

2  about an investigation concerning Vargas, you called him.

3  Isn't that right?

4  **A**    Yes.  I called him a lot of time.

5  **Q**    Right.  You called him.  And Vargas actually called you

6  and said, "Remember, you can have a lawyer."  Is that right?

7  Do you remember that conversation?

8  **A**    I don't remember that conversation.  What I remember is

9  the -- because was a car, bee, bee, bee -- I heard.  So, the

10  last thing that I remember is he told me, "Dude, don't call me

11  on that phone no more."  All right.  I say that, true.  And

12  only that true.

13  **Q**    And Vargas asked you to call him after Inspector Duarte

14  interviewed you about him.  Is that right?

15  **A**    Is, is record, is -- whatever is over there, is correct.

16  I don't remember this point.  But whatever is over there, is

17  correct.

18  **Q**    And you felt comfortable calling Vargas to tell Vargas

19  what the authorities wanted to know about what he had done

20  wrong.  True statement?

21  **A**    Again, repeat.

22  **Q**    You felt comfortable talking, calling Vargas and telling

23  him, telling Vargas, what the investigators were interested in

24  finding out?

25            **MR. HEMANN:**  Objection.

1   **BY MS. CAFFESE:**

2   **Q**     True statement?

3              **MR. HEMANN:**  Foundation.

4              **THE COURT:**  I guess that's correct.  Ask the

5   question.

6       I would like to sort of try to conclude the examination.

7   I think we are just going over --

8              **MS. CAFFESE:**  All right, all right.  Your Honor, I

9   have no further questions.  Thank you.

10             **THE COURT:**  Okay.  Thank you very much.

11      Mr. Hemann, you have nothing, right?

12             **MR. HEMANN:**  I have nothing, other than I would like

13  for -- not to excuse the witness until we have had a sidebar.

14             **THE COURT:**  Right.  Okay, all right.  Anything

15  further on other than the sidebar?

16      Okay, ladies and gentlemen, we are going to take our

17  recess now.  We will be in recess until 1:00, when we will

18  resume.  Do not form or express any opinion.

19      And, please leave your notebooks in the jury room.  And,

20  your binders on your seats.  Thank you very much.

21      (Jury excused)

22             **THE COURT:**  Okay.  Everybody can be seated.  Let the

23  Record reflect the jurors have left.  Mr. Hernandez is out of

24  the courtroom.

25      Ms. Caffese, you wanted to raise an issue at sidebar?

PROCEEDINGS

```
 1              MR. HEMANN:  As do I, Your Honor.

 2              THE COURT:  Okay.  So, Ms. Caffese, do you want to go

 3    first?  What is it that you are requesting?

 4              MS. CAFFESE:  Yes, Judge.  I just wanted to renew,

 5    excuse me my motion that I had made earlier asking the Court to

 6    reconsider permitting me to cross-examine Mr. Hernandez about

 7    his past domestic-violence convictions and conduct, because --

 8              THE COURT:  Denied.  Denied.  I mean, we've done it.

 9    This is now the third or fourth time this motion has been made.

10        Thank you.

11              MS. CAFFESE:  Thank you.

12              THE COURT:  Okay.  Your record is preserved on that

13    issue.  403; I'm excluding it.

14        Okay.  Go ahead.

15              MR. HEMANN:  Your Honor, I believe that I have it

16    right that Ms. Caffese accused Mr. Vargas of suggesting that

17    Mr. Hernandez hire a hit man, during this last exchange.  And,

18    I do not believe that Ms. Caffese had a good-faith basis upon

19    which to ask that question.

20        And I think it is sufficiently inflammatory that --

21              THE COURT:  It certainly is very inflammatory.

22              MR. HEMANN:  -- that the Court should instruct --

23    should strike that testimony, and instruct the jury that it

24    should not consider it.

25        I can tell you where it comes from.  It comes from a page
```

PROCEEDINGS

```
 1   of notes that we produced in discovery, that says (As read):

 2                    "09-08 mad."

 3       09-08 is Mr. Hernandez.

 4                    "...told Vargas he, 09-08, had someone

 5               who would take care of Santana, offered

 6               Vargas name and bank account of hit man."

 7       Which was what he said.  He said he was mad and wanted to

 8   beat him up.

 9       Ms. Caffese suggested that it was Mr. Vargas, the nice guy

10   Mr. Vargas (Indicating quotation marks), who suggested that the

11   witness hire a hit man.  That is --

12               THE COURT:  Okay, okay, I got it.

13               MR. HEMANN:  -- false.

14               THE COURT:  Ms. Caffese --

15               MS. CAFFESE:  Well --

16               THE COURT:  -- that is a correct impression of what

17   the evidence is.  Do you have any basis to suggest that

18   Mr. Vargas suggested to Mr. Hernandez that Mr. Vargas -- that

19   Mr. Vargas suggested the hiring of a hit man?

20       Is there any basis for that question?

21               MS. CAFFESE:  Well, I -- can I read you the note?

22               THE COURT:  Well, no.  I think what you -- certainly,

23   you can read me the note.  I think it was just read to me.

24       (Document handed up to the Court)

25               MS. CAFFESE:  I think the idea -- I think the --
```

1              **THE COURT:**  The impression that has been left with

2    the jury was that Vargas suggested the hiring of a hit man.  A

3    San Francisco Police Officer suggested that a hit man be hired

4    to --

5              **MS. CAFFESE:**  Yes, because I think that is exactly

6    right.  What we have here is that these people -- actually,

7    Hernandez saying he's somehow a non- -- the inference to the

8    jury is somehow Hernandez is a non-violent peaceful man, as

9    well as Vargas is a non- --

10             **THE COURT:**  Wait.  That may or may not be the case.

11   I'm not suggesting that that's  -- but, that's not the issue.

12   The issue is:  Did Mr. Vargas, Officer Vargas, suggest the

13   hiring of a hit man?  That's the question.

14             **MS. CAFFESE:**  I think that is --

15             **THE COURT:**  That is the question, because that is the

16   impression that has been left with the jury.

17             **MS. CAFFESE:**  I think that they probably offered --

18   the impression is that the hit man was offered by Vargas.  And

19   Vargas can come and say it's not true.  But certainly there --

20             **THE COURT:**  Well, wait a minute.  Wait a minute.

21   Wait a minute.  Wait a minute.

22      Do you have any basis to suggest that Mr. Vargas suggested

23   the hiring of a hit man?

24             **MS. CAFFESE:**  Well, if -- let me put it this way.  I

25   will clarify with the jury, then, if there's -- (As read):

PROCEEDINGS

1              "...offered Vargas name and bank

2           account of a hit man to take care of

3           Santana."

4      I think that is, quite frankly, fair game for

5 cross-examination.

6           **MR. HEMANN:**  And --

7           **THE COURT:**  Did I hear that right?

8           **MS. CAFFESE:**  Quote (As read):

9              "...offered Vargas name and bank

10          account number of a hit man."

11     And Hernandez goes -- this is the context.  Hernandez goes

12 to Vargas, mad because Santana has cheated him out of a

13 thousand dollars, or whatever he cheated him out of.  Then,

14 they have a discussion about a hit man.

15           **THE COURT:**  Okay.  Go ahead.  And who had what?  Who

16 said what?

17           **MS. CAFFESE:**  Vargas offered the name and bank

18 account number of a hit man.

19           **MR. HEMANN:**  That's not what the note says, on which

20 this is based.

21           **MS. CAFFESE:**  Well, how do I know that?  I didn't

22 write the note.  But I think it's fair enough for me to be able

23 to ask him.

24           **MR. HEMANN:**  There's no basis -- and it goes on to

25 say, Your Honor, that Mr. Vargas said "No.  Let Guerrero,"

 1  another police officer, "take care of it."  Which is exactly

 2  what the witness testified.

 3       To.  And now the jury thinks, without any basis, that

 4  there's some evidence out there, because Ms. Caffese had a

 5  piece of paper in her hand (Indicating), some evidence that

 6  Vargas suggested a hit man.

 7       And this, by the way, is information provided by

 8  Mr. Hernandez.  He's admitting it.  "I told him."  She

 9  cross-examined him; I didn't object to that.  Because she can

10  cross-examine him, I guess, on that, even though it is not

11  really relevant.

12       But, Vargas certainly didn't suggest the hiring of a hit

13  man.  That is what the question suggested.  I would move it to

14  be stricken.

15            **THE COURT:**  That's my impression.

16            **MS. CAFFESE:**  Well, they could have clarified that on

17  redirect, Your Honor.

18            **THE COURT:**  Oh, no, no, no, no.  No, no.  That is not

19  going to happen.  I think what has to happen is, absent a

20  good-faith -- absent a good-faith basis for suggesting to the

21  jury by way of your question that it was Officer Vargas who

22  suggested a hit man, absent that basis, I'm going to instruct

23  the jury that there is no evidence or no basis to -- at this

24  point to suggest that that's what Mr. Vargas -- that Officer

25  Vargas had that conversation.  Suggested that.  That, I think,

PROCEEDINGS

1   is a fair way of dealing with it.

2          **MS. CAFFESE:**  If I can just -- the question is if

3   there's a good-faith belief.  And what I'm suggesting --

4          **THE COURT:**  Right.

5          **MS. CAFFESE:**  This is a good-faith belief for asking

6   the question, when --

7          **THE COURT:**  What?

8          **MS. CAFFESE:**  Hernandez said he was mad.  He tells

9   Vargas he has someone who could take care of Santana.  Offered

10  Vargas --

11         **THE COURT:**  He.  He.

12         **MS. CAFFESE:**  Offered Vargas the name and bank

13  account of a hit man.

14         **THE COURT:**  That's fine.

15         **MR. HEMANN:**  To which Vargas responded, "No, let's

16  let Guerrero take care of it."

17         **MS. CAFFESE:**  That's not what he said.  What he said,

18  to be absolutely literal, is Vargas told 09-08 that Guerrero

19  would take care of it.  Maybe Guerrero would follow up on the

20  hit man.

21         **MR. HEMANN:**  Oh, Officer Guerrero's a hit man.  I

22  mean, that's absurd.

23         **MS. CAFFESE:**  No, would follow up on the hit man.

24         **THE COURT:**  Okay, I'm going to think of a possible

25  instruction, and I'll deal with it.  And I'll discuss it with

1   you before I give it.  Okay?

2       If the government has a proposed instruction with respect

3   to it, would you please furnish me a copy, and furnish Counsel

4   a copy.

5               **MR. HEMANN:**  Yes, Your Honor.

6               **THE COURT:**  Okay, thank you.  We are in recess.

7               **MS. CAFFESE:**  Thank you, Your Honor.

8               **MR. HEMANN:**  1:00, Your Honor?

9               **THE COURT:**  1:00.

10              **MR. HEMANN:**  And now may the witness be excused.

11              **THE COURT:**  Yes.

12              **MR. HEMANN:**  Thank you.

13      (Witness excused)

14      (Recess taken from 12:07 to 1:00 p.m.)

15      (The following proceedings were held in open court,

16  outside the presence of the jury:)

17              **THE COURT:**  Let the record reflect the parties are

18  present.  The jury is not present.  The government has prepared

19  a curative --

20              **MR. HEMANN:**  And I shared it with counsel.  They're

21  thinking about their position.

22      Mr. Getz suggested -- instead of questions from

23  Ms. Caffese and several answers by Mr. Hernandez -- "testimony

24  in which the word 'hitman' was used."

25              **THE COURT:**  I think that's better.

PROCEEDINGS

 1              **MR. HEMANN:**  And Ms. Caffese, I think, also has a

 2  few.

 3              **THE COURT:**  So what is the --

 4              **MS. CAFFESE:**  All right.  Before I go on, I assume

 5  the Court is going to give an instruction.

 6              **THE COURT:**  Well, I'm going to give some instruction.

 7  I'm not wedded to this one.

 8              **MS. CAFFESE:**  Of course, I'm not conceding, and I

 9  believe there was a good faith belief for me to ask the

10  question in consideration of what has come in, and everything,

11  the accusations made and the note in discovery I was given, but

12  if the Court were to give an instruction, I suggest, and I can

13  read it into the record:

14              "I instruct you that there is no

15              evidence that Mr. Vargas provided

16              Mr. Santana the name of a hitman."

17              **THE COURT:**  Well, I think the question is -- that's a

18  pretty narrow reading of it.  The government's suggestion is

19  broader than that, and, I think, fairer.

20      The question I have, is there any evidence to suggest that

21  Mr. Vargas suggested that he or anyone else do any sort of

22  violence to Mr. Santana?  Is there any evidence of that?

23              **MS. CAFFESE:**  Yes, there is.  In the discovery there

24  is.  The objection is that I allegedly --

25              **THE COURT:**  I'm sorry, what is it?

 1          MS. CAFFESE:  Well, the note that I was reading from,

 2   Judge.

 3          THE COURT:  Well, I have the note you were reading

 4   from.  We should make that part of the record.

 5          MS. CAFFESE:  Okay.

 6          THE COURT:  But where is it that -- do you want me to

 7   hand it back to you?

 8      Barbara.

 9      Where is the suggestion that Mr. Vargas suggested that he

10   or someone else do any sort of violence to Mr. Santana?  Where

11   is that?

12          MS. CAFFESE:  "Vargas told Hernandez" --

13          THE COURT:  No.  Wait.  You're reading now from the

14   notes.

15          MS. CAFFESE:  Excuse me.  I am.

16          THE COURT:  So give me a direct quote from the note

17   because I now don't have it in front of me.

18          MS. CAFFESE:  Quote, Guerrero would take care of it.

19      And this is immediately after the discussion of the

20   hitman.

21      In this case we have all these outlandish allegations that

22   these officers -- that my client, specifically -- I'm only

23   concerned with my client -- robbed people; set up people;

24   wanted to beat them up; wanted to, you know, contact gang

25   members to have people beaten up.

1        I don't know if that came out through Mr. Hernandez.  That
2    was certainly part of the discovery.

3        There are all these allegations that my client did all of
4    these terribly bad criminal acts.  Violent acts.  And I think
5    it --

6              **THE COURT:**  It has nothing to do with this statement.

7              **MS. CAFFESE:**  Well, it comes to the statement to put
8    it in context, when they're talking about a hitman, that Vargas
9    says Guerrero would take care of it.

10        I think that a logical inference could be he could take
11   care of it by contacting a hitman because he didn't want this
12   schmuck, Hernandez, getting everything confused and people in
13   trouble because Hernandez doesn't know how to get things done,
14   and maybe Guerrero could get things done.

15        And I think that the record as it stands -- and we're
16   talking about a good faith question here, given the context of
17   this case and all the accusations and how Vargas, himself, says
18   let Guerrero take care of it -- reasonably suggests that
19   Hernandez couldn't take care of it.

20             **MR. HEMANN:**  Neither Mr. Hernandez nor Mr. Vargas
21   said anything on this piece of paper.  This piece of paper was
22   written by, I believe, a San Francisco Police Department
23   inspector.

24        There still is no evidence that either Mr. Vargas or
25   Mr. Guerrero suggested doing violence.

PROCEEDINGS

```
 1        Ricky Guerrero is a police officer.  There's no evidence
 2   that suggests that he was a violent person or did violent --
 3   there's nothing.
 4            MS. CAFFESE:  But -- but -- excuse me.
 5            MR. HEMANN:  Now -- now it's out there.
 6            MS. CAFFESE:  But, you know what, Judge?  Vargas is a
 7   police officer also.  And he's a convicted criminal.  And in
 8   this case -- and Hernandez, essentially, has presented himself
 9   as a peaceful kind of nice man, when we know he has a history
10   of violence.
11            THE COURT:  What if I said this?
12        I think Ms. Caffese is right.  Not for the reasons she
13   stated, to tell you the truth.  But as I understand it, the
14   testimony is that -- I don't know.  Did the witness say that he
15   suggested hiring a hitman?
16            MR. HEMANN:  No.  The question of him was never
17   asked.
18            MS. CAFFESE:  I would suggest --
19            MR. HEMANN:  What he testified was, Your Honor, was
20   that he was mad --
21            THE COURT:  The safest thing, whatever it is, is to
22   strike the testimony.
23        It is to say there is no evidence that a hitman was
24   discussed by either Mr. Vargas or Mr. Hernandez.  That a hitman
25   was discussed or mentioned.  That's true.
```

PROCEEDINGS

```
 1              MR. HEMANN:  Yes.

 2              THE COURT:  Maybe it doesn't go far enough, from the

 3   government's point of view, but it leaves whatever else is out

 4   there if you want to argue that -- whatever you want to argue,

 5   depending on, finally, what the state of the record is.

 6              MS. CAFFESE:  Don't know if the Court wants to hear

 7   anymore.

 8              THE COURT:  Actually, at this point, I don't.  I'm

 9   going to instruct the jury.

10              MR. HEMANN:  We've marked this for identification

11   only as Exhibit 294.

12         (Trial Exhibit 294 marked for identification.)

13              THE COURT:  Okay.

14              MS. CAFFESE:  Thank you.

15              THE COURT:  Fine.

16         Bring in the jury.  Let's get going.

17         (Jury enters at 1:07 p.m.)

18              THE COURT:  Okay.  Please be seated.

19         Let the record reflect that the jurors have returned to

20   the courtroom.  The parties are present.

21         Before we start, let me address two things.

22         First of all, I understand that the row behind the

23   alternates was occupied -- I saw it was occupied this

24   morning -- and provided, unfortunately, some distraction, at

25   least potential distraction for the alternates and other
```

1  members of the jury.

2      And what I've done is sealed off that row behind you.  No

3  one will be in that row.  And if during the course of the trial

4  something comes up that seems to be a distraction, please let

5  me know about it.  I appreciate your letting me know about it.

6  Let me know about it and we can take some steps to address it.

7      As I'm sure you understand, in terms of people coming in

8  and out of the courtroom, it's a public proceeding.  And I

9  can't control access to the courtroom.  But I can control where

10  people sit and what they say or do in the courtroom.  And I'm

11  prepared to do that if it interferes in any way with your

12  ability to hear and see the evidence.

13      Just prior to the recess today there was some testimony,

14  questions and responses of Mr. Hernandez in which the word

15  "hitman" was used.

16      And I want to advise you that there is no evidence in this

17  case of the use of the word "hitman," testimony about a hitman.

18  And, therefore, you are instructed to disregard any testimony

19  as it relates to a hitman, that term.

20      Okay.  I've also excused, because he has completed his

21  testimony, Mr. Hernandez.

22      You may call your next witness.

23          MR. VILLAZOR:  Thank you, Your Honor.  The government

24  calls Frank Agosta.

25          THE CLERK:  Will the witness please come forward.

```
 1        Good afternoon.  Please remain standing and raise your
 2   right hand.
 3              FRANK AGOSTA, PLAINTIFF WITNESS, SWORN
 4            THE WITNESS:  Yes.
 5            THE CLERK:  Please be seated.  Please state your full
 6   name.  Spell your last name for the record.
 7            THE WITNESS:  Frank Agosta, A-g-o-s-t-a.
 8                       DIRECT EXAMINATION
 9   BY MR. VILLAZOR:
10   Q.   Good morning, Mr. Agosta.
11   A.   Good morning.
12   Q.   Good afternoon.  Excuse me.
13        Mr. Agosta, what do you do for a living?
14   A.   Currently retired.
15   Q.   How long have you been retired?
16   A.   Five years.
17   Q.   Prior to your retirement where did you work?
18   A.   UPS.
19   Q.   How long did you work at UPS?
20   A.   Thirty-seven years.
21   Q.   And how did you start off at UPS?
22   A.   I was a part-time truck loader.
23   Q.   Did you move on?
24   A.   Yes.
25   Q.   Where did you go?
```

1    **A.**    I went into management, at that time, and went up from

2    there.

3    **Q.**    Where did you go after that?

4    **A.**    Went into operations, then into sales.  And then the last

5    ten years of my career was in security.

6    **Q.**    Security?

7    **A.**    Yes.

8    **Q.**    Can you tell the members of the jury what UPS security

9    generally does?

10   **A.**    Generally, it's to protect the assets of UPS.  So we

11   investigate anything that's internal theft, external problems.

12   Everything that has to do with the safety and security of our

13   building and packages within the buildings and our drivers and

14   employees.

15   **Q.**    While you were employed in the security, UPS security,

16   where were you located?

17   **A.**    In San Francisco the last couple of years.

18   **Q.**    Now, directing your attention to March 2009, were you in

19   security at that time?

20   **A.**    Yes, I was.

21   **Q.**    Do you recall, around the end of March 2009, two boxes,

22   two UPS boxes were intercepted by a UPS employee?

23   **A.**    Yes.

24   **Q.**    Can you generally describe the circumstances in which they

25   were intercepted?

1   **A.**   They were intercepted at our air service center at

2   44 Montgomery Street in San Francisco.  Our clerk there, that

3   accepts the packages, thought they were highly suspicious and

4   turned them over to security for inspection.

5   **Q.**   At that time were you working that night?

6   **A.**   No, I was not.

7   **Q.**   Did you eventually come to work that --

8   **A.**   I came to work at 3:00 a.m. the next morning, yes.

9   **Q.**   Do you recall the date that you came in to work?

10  **A.**   March 24th.

11  **Q.**   And that --

12  **A.**   March 25th.  I'm sorry.  The morning of March 25th.

13  **Q.**   At 3:00 a.m.?

14  **A.**   Yes.

15  **Q.**   Do you recall seeing the boxes?

16  **A.**   Yes.  They were in our office, locked.

17  **Q.**   Did you inspect them right away?

18  **A.**   Not right away.  I had other things I needed to get

19  accomplished that early in the morning.

20        So I waited, probably, until about 7:00 a.m.

21  **Q.**   At 7:00 a.m. did you inspect the boxes?

22  **A.**   Yes, I did.

23  **Q.**   Could you describe the boxes as you saw them?

24  **A.**   They were two what we call UPS Express boxes or overnight

25  delivery boxes.  They are made by UPS and given to customers

```
 1   for their use.  They were both sealed.  And they were -- both
 2   of them were kind of on the -- what I would call bulging.
 3       If you set a box flat on the table they sit flat.  These
 4   were kind of bulging, so they would rock back and forth on the
 5   desk when they were placed down.
 6   Q.   Did you open -- and, by the way, that was two boxes?
 7   A.   Two, yes.
 8   Q.   Did you open the boxes?
 9   A.   Yes, I did.
10   Q.   What did you find?
11   A.   Found it contained a substance that looked like marijuana.
12   Q.   What did you do after you opened them up and found the
13   substances that looked like marijuana?
14   A.   I called the San Francisco Police Department.
15   Q.   Mr. Agosta, I'm going to show you what's been marked as
16   Government Exhibit 111.
17       Do you recognize that?
18   A.   Yes, I do.
19   Q.   What is that?
20   A.   It's a UPS Express box.
21   Q.   Is that the UPS Express box -- one of the Express boxes
22   that you inspected that night?
23   A.   Yes.
24   Q.   Excuse me.  That early morning?
25   A.   Yes.
```

1          **THE COURT:**  Exhibit 111 is admitted.

2      (Trial Exhibit 111 received in evidence.)

3          **MR. VILLAZOR:**  Thank you.

4  **BY MR. VILLAZOR:**

5  **Q.**  I'm sorry, sir.  After you opened up the boxes what did

6  you do?

7  **A.**  I contact -- I called the general San Francisco Police

8  Department number.

9  **Q.**  And did police respond to your call?

10 **A.**  Yes.  They sent officers out.

11 **Q.**  Do you recall how many police officers?

12 **A.**  There were three.

13 **Q.**  Do you recall their names?

14 **A.**  Uhm, the only one I recall the name was the one that was

15 in my report, was Sergeant Furminger.

16 **Q.**  Do you see him in the courtroom today?

17 **A.**  I believe so, yes.

18 **Q.**  Can you identify him?

19 **A.**  The gentleman sitting at the table, taller gentleman with

20 the goatee.

21 **Q.**  Sitting next to the gentleman with the beard?

22 **A.**  Yes.

23          **THE COURT:**  Let the record reflect he has identified

24 the defendant Furminger.

25

1    **BY MR. VILLAZOR:**

2    **Q.**   Do you recall the other two officers that showed up?

3    **A.**   No, I don't.

4    **Q.**   Did you ask Sergeant Furminger the value of the marijuana?

5    **A.**   Yes, I did.

6    **Q.**   What was the purpose of asking him that?

7    **A.**   For our internal reports.  We like to keep track of what

8    things are, value-wise, that we recoup.

9    **Q.**   What did Sergeant Furminger say when you asked him that?

10   **A.**   He said approximately $20,000.

11          **MR. VILLAZOR:**  Just a moment.

12       No further questions, Your Honor.

13          **THE COURT:**  Cross.

14                    **CROSS EXAMINATION**

15   **BY MR. GETZ:**

16   **Q.**   Good afternoon.

17   **A.**   Good afternoon.

18   **Q.**   Are you the one who made the decision to open up the

19   boxes?

20   **A.**   Yes.

21   **Q.**   Now, what were the circumstances that led you to open up

22   the boxes?

23   **A.**   Well, our clerks thought they were suspicious.  And within

24   the UPS tariffs we have the right to open and inspect any

25   carton we want to inspect.  So at that time, as long as they

1    were there, I would follow up with our person's suspicions.

2    **Q.**    Somebody you worked with was suspicious about what was in

3    the boxes, but waited until you arrived to open them?

4    **A.**    Because I was off duty.  And no other security person was

5    there, so they were locked and secured in our office.

6    **Q.**    Now, do you recall that one of the reasons a suspicion

7    grew was because somebody had double parked in front and came

8    in to drop the boxes off for shipping?

9                **MR. VILLAZOR:**  Objection.  Foundation.

10               **THE COURT:**  I'll allow the question.

11   **BY MR. GETZ:**

12   **Q.**    What was the suspicion about the boxes?

13   **A.**    The only thing that I knew the suspicion is that our clerk

14   at this service center stated that they came in late, the

15   people rushed in to drop the packages off, dropped them off and

16   left.

17   **Q.**    And Montgomery Street at your location is a one-way street

18   going right to left?  That is to say, from Sutter to Post,

19   correct?

20   **A.**    I do not know that.

21   **Q.**    You don't know that about 44 Montgomery Street?

22   **A.**    No.

23   **Q.**    Did I hear you say this happened at 44 Montgomery Street?

24   **A.**    Yes.

25   **Q.**    Okay.  And that's where you worked, correct?

1  **A.**    No.

2  **Q.**    Oh.  So 44 Montgomery Street is not your usual place of

3  work?

4  **A.**    It's covered under the -- I work out of our San Francisco

5  building on -- in Potrero district on 17th Street.

6  44 Montgomery is a satellite UPS facility that accepts

7  packages.

8  **Q.**    Did you come down there, when you came down there,

9  expressly to deal with this package that's in front of you?

10 **A.**    No.  The package was brought to the 17th Street location.

11 **Q.**    All right.  When UPS opens a package like that and reports

12 it to the police, is there ever any kind of remuneration that

13 flows from the police department to UPS?

14 **A.**    No.

15 **Q.**    In a situation like this -- well, let me be more specific.

16     When the police came out on this particular package, you

17 had in mind a certain set of questions that you were going to

18 ask the police before they arrived, correct?

19 **A.**    No.

20 **Q.**    Isn't it always important, in situations like this, to ask

21 the police officers what the value of the item is?

22 **A.**    For our reports, yes.

23 **Q.**    All right.  So let me ask the question again.  Before the

24 police came out, you had in mind that you were going to ask

25 what the value of the package was, correct?

1   **A.**   Yes.

2   **Q.**   All right.  So when Mr. Furminger came out and you had

3   this interaction with him, did you show him the marijuana that

4   you had seized?

5   **A.**   Yes.

6   **Q.**   Excuse me.  Did you show him the marijuana that you

7   possessed?

8   **A.**   Yes.

9   **Q.**   And how did you show it to him?

10  **A.**   By handing him the boxes and him looking at the

11  merchandise that was in it.

12  **Q.**   All right.  And then you said to him, Tell me how much you

13  think this stuff is worth, correct?

14  **A.**   Uh-huh.

15  **Q.**   Yes?

16  **A.**   Yes.

17  **Q.**   How long did it take him to answer that question and give

18  you the figure 20?  How long did he spend looking at the

19  marijuana before he answered?

20  **A.**   It was in -- in the general course of the whole thing they

21  were there, probably, half an hour.

22  **Q.**   All right.  And when he said $20,000, that it was worth

23  $20,000, were you surprised?

24  **A.**   No.

25            **MR. GETZ:**   Thank you.  I have nothing further.

```
 1              THE COURT:  Ms. Caffese.

 2              MS. CAFFESE:  Thank you.

 3                      CROSS EXAMINATION

 4   BY MS. CAFFESE:

 5   Q.   Good afternoon, sir.

 6   A.   Good afternoon.

 7   Q.   Just a couple of questions.

 8        When property is taken from your facility by the police,

 9   do the police give you a receipt?

10   A.   Yes.

11   Q.   Okay.  And that's part of the proper protocol; is that

12   right?

13   A.   Correct.

14   Q.   And in this case --

15              MS. CAFFESE:  If I could put up Exhibit 116.

16              THE COURT:  116?

17              MS. CAFFESE:  Yes.  And I have a copy.

18   BY MS. CAFFESE:

19   Q.   It comes on your little screen there.  But do you want a

20   hard copy?

21   A.   I think I have a copy.

22   Q.   Oh, okay.

23              THE COURT:  Do you want to admit it?

24              MS. CAFFESE:  Is there an objection?

25              MR. VILLAZOR:  No objection.
```

```
 1              THE COURT:  Admitted.  116 admitted.

 2         (Trial Exhibit 116 received in evidence.)

 3              MS. CAFFESE:  Thank you.

 4  BY MS. CAFFESE:

 5  Q.   Sir, did you have an opportunity to look at what, I

 6  believe, is a property receipt form here?

 7  A.   Yes.

 8  Q.   And this property receipt form is from the San Francisco

 9  Police Department?

10  A.   Correct.

11  Q.   All right.  And it's dated March 25th, 2009; is that

12  correct?

13  A.   Correct.

14         (Document displayed.)

15  Q.   And I believe on direct examination you said you can only

16  recall Mr. Furminger here?

17  A.   Correct.

18  Q.   All right.  Do you have a recollection of also speaking

19  with Ed Robles, the man seated between the two women over

20  there?

21  A.   I don't recognize him.  But there were three officers

22  there.  But to say that was him, no, I can't.

23  Q.   Okay.  Is it -- but you do recall being given a receipt

24  that has been marked here Exhibit 116; is that right?

25  A.   Yes.
```

1  Q.   And this receipt -- I think it's up on our little screens

2  here -- is from an officer with star number 1467.  Is that

3  correct?

4  A.   Yes.

5  Q.   And it's written out to be the items "Two UPS Express

6  shipping boxes," right?

7  A.   Correct.

8  Q.   And the officer who completed this form states that there

9  were two plastic sealed bags with marijuana.  Is that right?

10 A.   Uh-huh.

11 Q.   And that's right under the two UPS Express shipping boxes

12 that you released to the officers; is that right?

13 A.   Correct.

14 Q.   And then the other two items are the -- I imagine those

15 are tracking numbers there?

16 A.   Yes.

17 Q.   Okay.  And so you -- do you remember being given this

18 receipt for the property, for the marijuana that you released,

19 by an officer that day?  Is that right?

20 A.   Yes.

21          MS. CAFFESE:  Thank you, sir.  I don't have any other

22 questions.

23          MR. VILLAZOR:  No redirect.

24          THE COURT:  Thank you.  Thank you very much for

25 coming.  You're excused.

BRANDT - DIRECT / VILLAZOR

```
 1        (Witness excused.)
 2              THE COURT:  Call your next witness.
 3              MR. VILLAZOR:  The government calls David Brandt.
 4              THE CLERK:  Will the witness please come forward and
 5   take the witness.
 6        Please remain standing and raise your right hand.
 7              DAVID BRANDT, PLAINTIFF WITNESS, SWORN
 8              THE WITNESS:  So help me God.
 9              THE CLERK:  Please be seated.
10        Please state your full name.  Spell your last name for the
11   record.
12              THE WITNESS:  My name is David Brandt.  B-r-a-n-d-t.
13                       DIRECT EXAMINATION
14   BY MR. VILLAZOR:
15   Q.   Good afternoon, Officer Brandt.
16   A.   Good afternoon.
17   Q.   You're a San Francisco police officer?
18   A.   That's correct.
19   Q.   How long have you been a police officer?
20   A.   Nineteen and a half years.
21   Q.   When did you graduate from the academy?
22   A.   I graduated from the academy December 1995.
23   Q.   Did you graduate from the academy with Ian Furminger?
24   A.   That's correct.
25   Q.   Do you see him in the courtroom today?
```

1   **A.**   Yes, I do.

2   **Q.**   Can you identify him?

3   **A.**   He's the very tall gentleman sitting in the far -- with

4   the gray sport coat on.

5   **Q.**   Were you actually roommates in the academy?

6   **A.**   Yes, we were.

7   **Q.**   Were you in each other's wedding party?

8   **A.**   Not each other.  He was in mine.  I wasn't invited to his.

9   **Q.**   Do you know Officer Robles, Ed Robles?

10  **A.**   Yes, I do.

11  **Q.**   Is he sited in the courtroom?

12  **A.**   Yes, he is.

13  **Q.**   Can you identify him?

14  **A.**   He's the gentleman in the back of the table, two to the

15  right of Officer Furminger, Sergeant Furminger, wearing a light

16  gray jacket, white shirt, and dark tie.

17  **Q.**   Do you know an officer by the name of Rey Vargas?

18  **A.**   I've met him a couple of times.

19  **Q.**   Did you ever work in the same station as Ian Furminger?

20  **A.**   I worked in the same unit with Sergeant Furminger.

21  **Q.**   Where was that?

22  **A.**   That was at the Housing Task Force.  I believe it was

23  about 1999.

24  **Q.**   Did you ever work in the same station as Ed Robles?

25  **A.**   Yes, I worked with Officer Robles at Mission Station.  It

 1  was about 1998.

 2  **Q.**   And Officer Vargas or Mr. Vargas?

 3  **A.**   I never worked with him.

 4  **Q.**   Directing your attention to April 2009.  Where were you

 5  stationed?

 6  **A.**   April 2009, I was at Park Police Station.

 7  **Q.**   Do you recall an arrest of a woman by the name of

 8  Daisy Bram?

 9  **A.**   Yes, I do.

10  **Q.**   Was that on April 6, 2009?

11  **A.**   I believe so.

12  **Q.**   Could you explain to the jury what you observed that day.

13  **A.**   That day I was walking on one of the footpaths near Alford

14  Lake, the entrance to Golden Gate Park.  And a young man

15  approached me to sell me marijuana.

16      The young man then left me, walked up to a young lady

17  sitting on, like, some rocks up further in the park, close to

18  the -- closer to the entrance, bottom of the stairs.  She was

19  seated.  And I believe she -- I'd have to read the report to

20  recollect it right on spot, or I could -- if you want me to --

21  **Q.**   That's fine.

22  **A.**   Okay.

23  **Q.**   And the woman that you're describing was that Daisy Bram?

24  **A.**   That's correct.

25  **Q.**   Could you describe for the jury what you recall how

1    Daisy Bram looked that day.

2    **A.**   Uhm, she looked -- she was well-dressed but a little

3    dirty.  Not bad.  But it wasn't -- didn't look like really

4    well-kept or anything.

5    **Q.**   Can you describe, how was she not well-kept?

6    **A.**   She just had a appearance of a little bit of dirt.  She

7    fit in with the homeless a little bit.

8    **Q.**   Did you, at that point, make a decision to effectuate an

9    arrest?

10   **A.**   When we had enough probable cause, yes, we did.

11   **Q.**   When did you decide you had enough probable cause?

12   **A.**   When we already obtained the marijuana and saw where it

13   came from, went back up there.  And I believe we saw it in her

14   purse at that time.

15   **Q.**   Were you alone?  I'm sorry, I forgot to ask.  Were you

16   alone?

17   **A.**   No.  I was with Officer Bodisco.

18   **Q.**   When you decided to effectuate the arrest, where did

19   Officer Bodisco go?

20   **A.**   I believe he stayed with the other individual who tried to

21   sell me.

22   **Q.**   Is that the young boy who tried to sell you the marijuana?

23   **A.**   Marijuana, correct.

24   **Q.**   Officer Bodisco went after the young boy?

25   **A.**   I believe so.

1    **Q.**   Did you arrest Daisy Bram?

2    **A.**   I believe so.

3    **Q.**   What happened after you arrested her?

4    **A.**   We escorted both the individuals back to Park Police

5    Station.

6    **Q.**   Did you place Ms. Bram in a jail cell?

7    **A.**   No, we did not.

8    **Q.**   Where did you place her?

9    **A.**   There's a bench -- when you come in the entranceway to the

10   police station there's a bench for females to go there because

11   they're not allowed into the cells at the police stations.  So

12   we sat her there at the bench.

13   **Q.**   Did you handcuff her to the bench?

14   **A.**   Yes, we did.

15   **Q.**   Do you know Officer Sean Doherty?

16   **A.**   Yes, I do.

17   **Q.**   Was he working at the Park -- was he assigned to the Park

18   Station at that time?

19   **A.**   Yes, he was.

20   **Q.**   Could you see him after you had arrested Daisy Bram at the

21   Park Station?

22   **A.**   I don't recall seeing him that day.

23   **Q.**   Do you have any recollection of discussing anything with

24   Officer Doherty about Daisy Bram?

25   **A.**   Not that day, no.

1  **Q.**  What happened to Daisy Bram?  What did you end up doing

2  with her?

3  **A.**  We ended up booking her.  And she was transported down to

4  the county jail.

5  **Q.**  And you said book her.  What does book her mean?

6  **A.**  Well, we processed her, sent her down.  She was actually

7  booked at the county jail, not at the station.  But we sent her

8  down to be booked and processed.

9  **Q.**  And by booked, did you --

10  **A.**  She was charged.

11  **Q.**  With a felony?

12  **A.**  Yes, correct.

13  **Q.**  Officer Brandt, you testified you don't recall having any

14  conversation with Officer Doherty?

15  **A.**  Not that day, no.

16  **Q.**  Do you have any recollection of talking with Ian Furminger

17  that day?

18  **A.**  I know I've testified that the phone call was made.  And I

19  vaguely remember a phone call.  I really don't remember any

20  specifics on it.  And that phone call, I remember very little

21  of it.

22  **Q.**  So you vaguely recall a phone call with Ian Furminger?

23  **A.**  That's correct.

24  **Q.**  On that day?

25  **A.**  Correct.  My partner said I made it.  Sergeant Furminger

1    said I made it.  I have no doubt I made the phone call.

2             **MR. VILLAZOR:**  No further questions.

3             **THE WITNESS:**  Thank you.

4                    <u>**CROSS EXAMINATION**</u>

5    **BY MR. GETZ:**

6    **Q.**    Good afternoon.

7    **A.**    Good afternoon.

8    **Q.**    The situation you described at Alford Lake, where you're

9    walking along and somebody offers to sell you marijuana, was

10   that unusual at all?

11   **A.**    It's illegal.  It's not unusual.

12   **Q.**    And in that particular part of Golden Gate Park it's quite

13   common; isn't it?

14   **A.**    That's correct.

15   **Q.**    So if, for example, this coming Sunday I walk from Stanyan

16   Street to Children's Playground, 9 out of 10 I'm going to get

17   asked if I want to buy some weed, correct?

18   **A.**    I don't know about those odds, but there's a possibility.

19   **Q.**    Okay.  In any event, it happens every day, right?

20   **A.**    I believe so.

21   **Q.**    All right.  So the day that you arrested Daisy Bram and

22   the other person, you anticipated, by going there, you would

23   probably be asked if you wanted to buy some marijuana, correct?

24   **A.**    No, sir, I actually wasn't.

25   **Q.**    What were you anticipating you would find there?

1   **A.**   My partner and I, a lot of times we walk through there --

2   a lot of the individuals in that area knew both of us because

3   we worked there for years.

4        So what we were trying to do is a lot of times we separate

5   a little bit.  And the reason we separate is so they don't make

6   us as officers walking through the area.  And we're trying to

7   on view things going on between other people more so than them

8   approaching us.

9   **Q.**   And that's an area where a lot of homeless people sleep?

10  **A.**   Some homeless sleep in that area, yes.

11  **Q.**   Was there anything about the arrest -- and I'm talking

12  about the physical arrest of the young man and Daisy Bram that

13  was unusual from your point of view?

14  **A.**   No, sir.

15  **Q.**   All right.  In terms of how Daisy Bram was handled, when

16  she was brought to the station, was there anything unusual

17  about the way that was done?

18  **A.**   No, sir.

19  **Q.**   In terms of your booking her and keeping her in custody,

20  rather than releasing her with some future court date, was

21  there anything unusual about the way that was handled?

22  **A.**   Not at all.

23  **Q.**   Is it fair to say that the way that you handled Daisy Bram

24  and the other individual was by the book?

25  **A.**   That's correct.

```
 1              MR. GETZ:  Thank you.  I have nothing further.

 2              THE COURT:  Ms. Caffese, anything?

 3              MS. CAFFESE:  Just a couple of questions.

 4                        CROSS EXAMINATION

 5   BY MS. CAFFESE:

 6   Q.   Good morning.

 7   A.   Good morning.

 8   Q.   Sir, you said you had worked with Ed back in 1998; is that

 9   right?

10   A.   Correct.

11   Q.   And you said on direct examination you worked with him at

12   Mission Station?

13   A.   I didn't work directly with him.  We worked on the same

14   watch.  I don't know if we worked together in the same car.

15   It's so long ago.

16   Q.   Were there any problems that you had with Ed when you

17   worked out at Mission Station, that you heard about or

18   experienced during that time period?

19   A.   No.  Absolutely none.

20              MS. CAFFESE:  Okay.  I don't have any other

21   questions.  Thank you, sir.

22              MR. VILLAZOR:  One question, Your Honor.

23                      REDIRECT EXAMINATION

24   BY MR. VILLAZOR:

25   Q.   Officer Brandt, was it unusual for you to talk to Ian
```

1   Furminger the day you arrested somebody, regarding that arrest?

2   **A.**   It's not unusual.  No, it's not really unusual if they had

3   some association with them.

4   **Q.**   Do you recall any association between them?

5   **A.**   I believe Ms. Bram stated that she was working with

6   Officer Valdez.  She gave a Latin name which, later on, I put

7   together as being Valdez, which I knew worked for Sergeant

8   Furminger.  So I would have called Sergeant Furminger just to

9   let him know, hey, we've arrested one of your informants.

10          **MR. VILLAZOR:**   Thank you.  No further questions.

11          **THE COURT:**   You're excused.  Thank you very much,

12   Officer.

13          **THE WITNESS:**   Thank you, sir.

14      (Witness excused.)

15          **THE COURT:**   Call your next witness.

16          **MR. VILLAZOR:**   Government calls Sean Doherty.

17          **THE CLERK:**   Will the witness please come forward and

18   take the witness.

19      Please remain standing and raise your right hand.

20          **<u>SEAN DOHERTY, PLAINTIFF WITNESS, SWORN</u>**

21          **THE WITNESS:**   I do.

22          **THE CLERK:**   Please be seated.

23      Please state your full name.  Spell your last name for the

24   record.

25          **THE WITNESS:**   Sean Doherty.  D-o-h-e-r-t-y.

**<u>DIRECT EXAMINATION</u>**

**BY MR. VILLAZOR:**

**Q.**  Good afternoon, Officer Doherty.

**A.**  Good afternoon.

**Q.**  Officer Doherty, you're a San Francisco police officer?

**A.**  Yes, sir.

**Q.**  How long have you been a police officer?

**A.**  Going on 11 years now.

**Q.**  When did you graduate from the academy?

**A.**  2004.  Would have been September 10th.

**Q.**  And once you graduated from the academy did you have a field training officer?

**A.**  I had four.

**Q.**  Who was your first field training officer?

**A.**  A man by the name of Noel Schwab.

**Q.**  Did you have a second field training officer?

**A.**  Yes, I did.

**Q.**  Who was that?

**A.**  That's Ian Furminger.

**Q.**  Your third?

**A.**  Mark Im.

**Q.**  Spell that.

**A.**  Im, I-m.

**Q.**  I-m.

And the fourth?

 1   **A.**   John Tack.

 2   **Q.**   And can you explain to the members of the jury what a

 3   field training officer is?

 4   **A.**   Sure.

 5        When you graduate from the academy you have to learn the

 6   nuts and bolts of police work actually on the street.   And

 7   those are the officers that guide you through that process over

 8   a five-month span.

 9   **Q.**   And, Officer Doherty, after you finished with your field

10   training officers did you move on to a station?

11   **A.**   Yes.

12   **Q.**   Where did you go?

13   **A.**   I went to the Bayview Station.

14   **Q.**   How long were you there?

15   **A.**   I'd say 16 months.   Maybe 15.   16 months, approximately.

16   **Q.**   Were you a patrolman?

17   **A.**   Yes, sir.

18   **Q.**   After that assignment where did you go?

19   **A.**   I went to Park Station.

20   **Q.**   Park Station.   And what -- were you assigned to a

21   particular unit within the Park Station?

22   **A.**   I had a variety of assignments.   I'm still there.

23   **Q.**   Were you part of the bike patrol?

24   **A.**   Yes.

25   **Q.**   And, currently, you're still at Park Station?

 1   **A.**   I am.

 2   **Q.**   What group are you with?

 3   **A.**   I'm in a plainclothes unit.

 4   **Q.**   What does the plainclothes unit do?

 5   **A.**   Mainly narcotics enforcement.  Surveillance kind of

 6   things.

 7   **Q.**   Officer Doherty, do you know Rey Vargas?

 8   **A.**   No.

 9   **Q.**   Do you know Ed Robles?

10   **A.**   No.

11   **Q.**   And you already, obviously, testified that Sergeant

12   Furminger was one of your field training officers?

13   **A.**   Correct.

14   **Q.**   Since he became your field training officer did he become

15   a friend of yours?

16   **A.**   Absolutely.

17   **Q.**   Does he still remain to be a friend?

18   **A.**   He's my friend, yes.

19   **Q.**   Did you become closer when he moved from the peninsula to

20   the East Bay?

21   **A.**   Yes.

22   **Q.**   Near you?

23   **A.**   Correct.

24   **Q.**   Now, I'm going to direct your attention to April of 2009.

25   You were at Park Station?

1  **A.**   Yes, sir.

2  **Q.**   What unit were you in?

3  **A.**   I was on a bike then, bicycle patrol.

4  **Q.**   Do you recall arresting a gentleman by the name of Jayme

5  Walsh?

6  **A.**   I do.

7  **Q.**   Could you tell the members of the jury what you first

8  observed when you saw Jayme Walsh?

9  **A.**   I was on bicycle patrol in an area of Golden Gate Park.

10  And I saw a man, who turned out to be Jayme Walsh, smoking a

11  joint, marijuana.

12       And he walked over to a woman and pulled something out of

13  her purse and then walked away from the woman.  And so, at that

14  point, I sort of had the feeling it's some sort of a narcotics

15  transaction was going to occur, had occurred, or something to

16  that effect.

17       And I detained Mr. Walsh.  And I pulled the Tupperware

18  container out of his breast pocket, and it had marijuana in it.

19  **Q.**   Before we get into Mr. Walsh, you mentioned a woman?

20  **A.**   Uh-huh.

21  **Q.**   Did you later identify that woman?

22  **A.**   That was Daisy Bram.

23  **Q.**   And was that the first time you had ever seen Daisy Bram?

24  **A.**   No.

25  **Q.**   You had previously encountered her?

1    **A.**    Correct.

2    **Q.**    When did you encounter her?

3    **A.**    That would have been, sort of, late 2008.  I did a foot

4    beat in the Tenderloin for most of 2008.  And I came back to

5    Park Station in October.

6    **Q.**    Uh-huh.

7    **A.**    So I would say September.  August maybe.

8    **Q.**    Were you arresting Ms. Bram?

9    **A.**    No.  No, no.  It was a chance encounter on the sidewalk.

10   **Q.**    What happened?

11   **A.**    A woman had -- I was on a uniform foot beat and a woman

12   had -- had fallen off of a curb and split her head open.  Not

13   an insignificant wound.

14        And so I called for an ambulance.  And it took an

15   unusually long time for an ambulance to come.  So during

16   that -- during that waiting this woman, who was Daisy Bram,

17   approached me and the fallen woman and rendered aid -- or, I

18   should say, comfort to the injured woman.

19   **Q.**    So, Officer Doherty, going back to Golden Gate Park, when

20   you encounter her a second time, did you at the time recall

21   her?

22   **A.**    I made the connection, yes.

23   **Q.**    And you said you pulled a marijuana joint from Mr. Walsh?

24   **A.**    Well, he had been smoking a joint.  But he had additional

25   as well.

1   **Q.**   Did you place him under arrest?

2   **A.**   I did.

3   **Q.**   And then did you search him?

4   **A.**   Yes.

5   **Q.**   Do you recall what you found on him?

6   **A.**   While we were still in the field I found a California I.D.

7   card and, like, a Mileage Plus card issued to -- in a woman's

8   name.  Not his name.

9   **Q.**   Not Mr. Walsh?

10   **A.**   Right.

11   **Q.**   What did you do then?

12   **A.**   We transported him back to the station.  He was -- at this

13   point, he would have been in the booking room.  And I did a

14   complete inventory search of his person and his belongings.

15   **Q.**   When you say "we transported him," who transported him?

16   **A.**   This was about a hundred yards away from the station, so I

17   don't know if we walked him or if a car took him.  I don't

18   remember.

19   **Q.**   Did you place Daisy Bram under arrest?

20   **A.**   No.

21   **Q.**   What happened to her?

22   **A.**   I said she was free to leave.

23   **Q.**   So you took Jayme Walsh back to the police station.  And

24   did you perform a booking search?

25   **A.**   Yes, sir.  That's what it would be called.

 1  **Q.**    What's a booking search?

 2  **A.**    A booking search is if you're going to bring somebody into

 3  the station you literally have to go through every pocket and

 4  every wallet, everything, make sure there's no contraband

 5  coming into the station.  More thorough than the search would

 6  be out in the field.

 7  **Q.**    You had already found the woman's identification?

 8  **A.**    Right.

 9  **Q.**    And the mileage card out in the field?

10  **A.**    Yes, sir.

11  **Q.**    And you were doing a second search, a booking search back

12  at Park Station?

13  **A.**    Correct.

14  **Q.**    Did you find anything unusual in Mr. Walsh's possession?

15  **A.**    I found Ian's business card, police business car.

16  **Q.**    Ian, you mean Ian Furminger?

17  **A.**    Ian Furminger.  Sorry.

18  **Q.**    Was there anything handwritten on the back?

19  **A.**    I think it was his cell phone number was on the back.

20  **Q.**    Did you already have his cell phone number, or was that

21  the first time you saw his cell phone number?

22  **A.**    Well, I certainly had his cell phone number.  But I don't

23  remember if it was on the card or not, offhand.

24  **Q.**    Were you surprised to find Ian Furminger's business card

25  on Mr. Walsh's person?

1  **A.**   It surprised me.  But it's not unusual to find an

2  officer's card in somebody's possession.

3  **Q.**   Did you place a call to Mr. Furminger?

4  **A.**   I did.

5  **Q.**   Prior -- prior to making that call to Mr. Furminger was it

6  your intention to book Mr. Walsh for misappropriation for

7  stolen property?

8  **A.**   It was.  And the marijuana charge.

9  **Q.**   And the marijuana charge.

10      After you had did that, you actually placed a call to

11  Mr. Furminger?

12  **A.**   Yes.

13  **Q.**   What did you relay to him?

14  **A.**   I told him the circumstances of the arrest, and said that

15  I had found his card in Mr. Walsh's wallet.

16  **Q.**   What did Mr. Furminger say to you?

17  **A.**   He wondered if it would be -- I think his exact words or

18  words to the effect of is there any way that he can be cited

19  instead of booked?

20  **Q.**   Well, prior to saying whether or not they could be cited

21  did he mention anything about releasing them outright?

22  **A.**   No.

23  **Q.**   Officer Doherty, do you remember testifying in the Grand

24  Jury?

25  **A.**   Yes.

1  **Q.**   And that was on November 8th, 2011?

2  **A.**   Sounds -- that sounds right.

3  **Q.**   Do you have a recollection about not feeling comfortable

4  of releasing her -- excuse me, releasing him clear out?  Do you

5  remember that?

6  **A.**   That is correct.

7  **Q.**   So I'm talking about that feeling at that point.  Was your

8  intention -- excuse me.

9       Was Sergeant Furminger asking you to release him outright,

10  and you were not comfortable doing that, given the prior

11  discovery of the woman's identification card?

12              **MR. GETZ:**  Objection.  Misstates the testimony.

13              **THE COURT:**   Overruled.

14              **THE WITNESS:**   It's not my recollection that Ian

15  Furminger told me to release them outright.  It's my

16  recollection that he said instead of a felony is there any way

17  that he could be cited.

18       But it is true that I would have felt uncomfortable

19  releasing them outright -- or releasing him outright.

20  **BY MR. VILLAZOR:**

21  **Q.**   And cite, what does cite out mean?

22  **A.**   Typically, in the commission of a felony, or if one is

23  charged with a felony, you're booked then and there at the

24  station.  And you go downtown, into county jail.

25       The other option is a cite and release, in which you issue

1  somebody a ticket or a summons to appear in court on the

2  charges listed on the ticket.

3  **Q.**   Ultimately, what did you do with Jayme Walsh?

4  **A.**   Ultimately, he was cited and released from Park Station.

5  **Q.**   Prior to doing that did you get an approval from your

6  supervisor at the Park Station?

7  **A.**   Yes.

8  **Q.**   Who was that?

9  **A.**   I believe it was Darby Reed.

10 **Q.**   And Ian Furminger, at the time, he was at Mission Station?

11 **A.**   Yes.

12 **Q.**   He was not your supervisor?

13 **A.**   No.

14 **Q.**   Excuse me, Officer Doherty.  Was that on April 5th, 2009,

15 the day you arrested Jayme Walsh?

16 **A.**   That sounds right, yes.

17 **Q.**   The very next day did you see Daisy Bram again?

18 **A.**   I did.

19 **Q.**   Can you describe for the members of the jury when you saw

20 Daisy Bram?

21 **A.**   I was on -- on bicycle patrol again, and I happened to

22 walk into the station.  And at the entrance to the station is a

23 steel bench where female inmates are kept, held separately from

24 males.  And so I walked into the station.  She was right there,

25 handcuffed to that bench.

1   **Q.**   Did you recognize her right away?

2   **A.**   Oh, yeah.

3   **Q.**   What was your impression?

4   **A.**   I was shocked and amazed.

5   **Q.**   Did you make any phone calls that afternoon?

6   **A.**   I called Ian.  And I said, "You're not going to believe

7   this, but one half of the folks from yesterday are here again."

8   **Q.**   Do you recall what Ian Furminger said back to you?

9   **A.**   Uhm, I don't -- I don't think so, no.

10  **Q.**   You don't have any recollection of what he said that day?

11  **A.**   He -- he must have inquired as to why she was there, whose

12  arrest it was.

13  **Q.**   Do you have any specific recollection?

14  **A.**   No, afraid not.

15  **Q.**   Did you learn who arrested Ms. Bram that day?

16  **A.**   Yes.  Dave Brandt had arrested her.

17  **Q.**   Did you have a conversation with him about what transpired

18  the day before?

19  **A.**   Absolutely.

20  **Q.**   After telling him what happened, did you hear him say a

21  specific statement?

22  **A.**   At some point I -- he made a comment about what her

23  future -- immediate future would be.

24  **Q.**   And what was his statement about her --

25          **THE COURT:**  His, who?  Who is the his --

```
 1                THE WITNESS:  Did I say "his"?

 2                THE COURT:  Pardon?

 3   BY MR. VILLAZOR:

 4   Q.   Her.

 5   A.   Her immediate future, Daisy Bram.

 6                THE COURT:  I'm sorry.  Maybe I'm not following it.

 7   But I thought -- why don't we go back.

 8        I'm trying to figure out who you're talking about in this

 9   conversation.

10                THE WITNESS:  I'm sorry.

11                THE COURT:  Not the subject, but who's the

12   conversation with?

13   BY MR. VILLAZOR:

14   Q.   Did you, Officer Doherty, have a conversation with

15   Officer Brandt?

16   A.   I spoke with Officer Brandt, yes.

17   Q.   Did Officer Brandt make a statement after you had that

18   conversation?

19   A.   Yes.

20   Q.   What did Officer Brandt say?

21   A.   He said, "Fuck it.  She's getting booked."

22   Q.   Did he book her after he made that statement?

23   A.   She was booked that day, yes.

24   Q.   Officer Doherty, is that the last time you encountered

25   Daisy Bram physically -- or in person?  Excuse me.
```

1  **A.**    Yeah, in total, I think.

2  **Q.**    Officer Doherty, what's CLETS?  C-L-E-T-S, CLETS.

3  **A.**    Oh, it's the -- I don't know if I could even give the --

4  California Law Enforcement -- it's the computer that we run

5  criminal histories through.

6  **Q.**    And you would have run -- when you arrested Jayme Walsh,

7  you would have run his criminal history?

8  **A.**    Absolutely.

9  **Q.**    Can you explain to the jury how you run a criminal

10  history?  Do you log into some sort of computer?

11  **A.**    Sure.

12       There's a variety of ways, depending on convenience and

13  accessibility.  But you could log into a computer.  And,

14  typically, you enter a last name, a first name, a date of

15  birth, if you know it, a race, a sex.

16       Another way to do it is to essentially give that exact

17  same information to a dispatcher or to a -- you could do it

18  over the phone.  Process is the same.

19  **Q.**    If you were to check somebody's criminal history at a

20  computer terminal would you log in with your specific AO

21  number?

22  **A.**    A number, yes.

23  **Q.**    Excuse me.  A number.

24  **A.**    Yes.

25  **Q.**    Sorry.  And your A number is 8827?

1  **A.**    A08827, yes.

2  **Q.**    After you saw Daisy Bram at the Park Station did you run

3  her through the CLETS system?

4  **A.**    Yes.

5  **Q.**    Was that more than one occasion?

6  **A.**    It was.

7  **Q.**    How many times?

8  **A.**    I guess, three or four.  Two.  Three.  Four.

9  **Q.**    Let's talk about the second time.

10  **A.**    Okay.

11  **Q.**    Excuse me.  The first time you ran Daisy Bram after her

12  arrest.

13  **A.**    Okay.

14  **Q.**    When was that?

15  **A.**    That was the end of 2009, the beginning of 2010, if I'm

16  not mistaken.

17  **Q.**    January 7, 2010, does that ring a bell?

18  **A.**    That sounds good.

19  **Q.**    And you ran Daisy Bram through the criminal history --

20  **A.**    I did.

21  **Q.**    And she had not -- you had not encountered her in person?

22  **A.**    No.

23  **Q.**    Why did you run Daisy Bram through the criminal history

24  system?

25  **A.**    Ian had called me and was making the inquiry.

1  **Q.**    When you say "Ian," Ian Furminger called you?

2  **A.**    Yes.

3  **Q.**    And are there ways that Ian Furminger could have done it

4  himself?

5  **A.**    Conceivable, yes.

6  **Q.**    What kind of ways --

7  **A.**    Any one of the ways that I mentioned.

8         Logging into a computer.  Dispatch.  Tele- -- well, he

9  used the telephone.

10 **Q.**    You could get on a computer in the car and run the system

11 there?

12 **A.**    Uh-huh.

13 **Q.**    You said you ran her a couple of more times?

14 **A.**    That's my recollection, yes.

15 **Q.**    Do you know why you ran her a couple more times?

16 **A.**    Not -- not other than that she was a known criminal who

17 was on my radar as a police officer.

18 **Q.**    Did Ian Furminger ask you to run her a couple more times?

19 **A.**    No.

20            **MR. VILLAZOR:**  No further questions.

21            **THE COURT:**  Mr. Getz.

22                        <u>**CROSS EXAMINATION**</u>

23 **BY MR. GETZ:**

24 **Q.**    Good afternoon.

25 **A.**    Good afternoon.

1  **Q.**   At the top of your testimony you talked about having four

2  field training officers.  Do you remember that?

3  **A.**   I do.

4  **Q.**   In your estimation who was the best training officer?

5  **A.**   Ian Furminger.

6  **Q.**   Why?

7  **A.**   He was the most proactive and -- we made more arrests in

8  that period than, probably, all my other field trainers

9  combined.

10 **Q.**   Let me take you back to the Jayme Walsh arrest and

11 citation.

12      Do you agree with me that in that time frame, and even

13 today, it's very common for people to sell marijuana in that

14 part of the park?

15 **A.**   Absolutely.

16 **Q.**   All right.  So if I told you I tried to walk, last Sunday,

17 from Stanyan Street to Children's Playground and I got

18 solicited ten times would you doubt that for a minute?

19 **A.**   I wouldn't for a moment.

20 **Q.**   All right.  When you saw Jayme Walsh smoking the joint, in

21 your mind are you seeing a felony or a misdemeanor?

22 **A.**   Well, prior to January 1st, 2011, I would have been seeing

23 a misdemeanor.  Since then I would be seeing an infraction.

24 **Q.**   Okay.  But, certainly, an offense that is citationable --

25 or citable rather than book and put somebody in jail, correct?

1  **A.**    Oh, absolutely.

2  **Q.**    All right.  So taking it a step further, when you saw

3  Jayme Walsh with the container of marijuana, is that still of a

4  quantity that's consistent with citing and releasing somebody

5  instead of arresting them?

6  **A.**    In most circumstances, yes.

7  **Q.**    But in this case we had yet another characteristic, which

8  was he had an I.D. card, and I think you said a Mileage Plus

9  card, that didn't belong to him, correct?

10  **A.**    That's correct.

11  **Q.**    Now, as a police officer you probably come across a lot of

12  people that when they're searched have an I.D. card, or

13  property like that, belonging to someone else, correct?

14  **A.**    Very common.

15  **Q.**    And is it very common that when you come across that on

16  somebody they frequently say, "Oh, I just found this.  I didn't

17  steal this.  I found it.  I was going to turn it in."  Did you

18  ever hear that?

19  **A.**    All the time.

20  **Q.**    And in this case, when you came across the I.D. belonging

21  to a woman, and her Mileage Plus card, with Jayme Walsh did he

22  say that?

23  **A.**    He did.

24  **Q.**    And did he also say that not only did he find -- not only

25  did he find those items, but he had run it on Craigslist and

1   was trying to find the owners to return it?  Correct?

2   **A.**   He said he had placed an ad on, like, a found ad on

3   Craigslist.

4   **Q.**   So let me just see if the picture is as I'm about to

5   describe.

6        You took him into Park Station, correct?

7   **A.**   That's correct.

8   **Q.**   He's handcuffed?

9   **A.**   Uhm, well, he's in the -- in a very confined booking cell.

10  **Q.**   But he was taken there in handcuffs?

11  **A.**   He was taken there in handcuffs, yes.

12  **Q.**   He was handcuffed behind his back and taken to Park

13  Station?

14  **A.**   Correct.

15  **Q.**   Park Station does not have an overnight holding facility,

16  does it?

17  **A.**   That is correct.

18  **Q.**   Meaning that if you have somebody at Park Station who is

19  going to be booked and fingerprinted you have to take them down

20  to 850 Bryant, correct?

21  **A.**   Yes, sir.

22  **Q.**   Which ties up one or more officers for a couple of hours,

23  right?

24  **A.**   Yes, sir.

25  **Q.**   And it's a drain of resources to take somebody down there

DOHERTY - CROSS / GETZ
928

 1   and take the officer away from the Park Station patrol,

 2   correct?

 3   **A.**   Uhm, not my decision to make.  But in my personal opinion

 4   that's sometimes the case.

 5   **Q.**   So let's say we have a close case.  We have a case where

 6   somebody has got some marijuana.  And it's not really a

 7   for-sale amount.  We're not talking about pounds here.  Maybe

 8   just enough for Tupperware.  And let's say we have a situation

 9   where that same person has got an I.D. card that belongs to a

10   woman, not his wife, with a Mileage Plus card, and he's saying

11   that he found it.

12         Is this a close call as to whether or not the person

13   should be cited or booked and taken down to 850 Bryant Street?

14   **A.**   I'd call it a weak -- a weak felony at best.

15   **Q.**   At best.  Meaning that depending on the circumstances you

16   might book and arrest a person or you might cite them and

17   release them, correct?

18   **A.**   I'd say that's fair.

19   **Q.**   Now, you mentioned you found a card with Ian Furminger's

20   cell phone number on the back.

21         When you find a card like that, on a person that you're

22   arresting or considering arresting, what does that card usually

23   mean to you?

24   **A.**   That they've stolen that card.

25   **Q.**   Talking about the police officer I.D.

1   **A.**   Oh.

2   **Q.**   The business card.

3   **A.**   Ian's card.

4   **Q.**   Now I'm asking you about the business card.

5   **A.**   Okay.

6   **Q.**   Let me start again.

7   **A.**   Yes.  I'm sorry.

8   **Q.**   So we're talking about a business card with Ian Furminger

9   or any other police officer's --

10  **A.**   Right.

11  **Q.**   -- name on it, and cell phone number on the back.

12  **A.**   Right.

13  **Q.**   What does that -- in your experience, what does that

14  usually mean?

15  **A.**   I would say, probably 100 percent, that that person is

16  either a confidential informant or working in some capacity for

17  another police officer.

18  **Q.**   Working as a confidential informant for the San Francisco

19  Police Department?

20  **A.**   Correct.

21  **Q.**   Did you discuss that topic with Ian Furminger when you

22  called him?

23  **A.**   Yes.

24  **Q.**   Ian.

25       And what he told you on that telephone call, did you

DOHERTY - CROSS / GETZ                                    930

```
 1   factor that into your decision to release Jayme Walsh rather
 2   than ferry him down to 850 Bryant Street?
 3   A.   Yes.
 4   Q.   What was the information you relied on?
 5   A.   Ian said words to the effect that he was in the process of
 6   signing Mr. Walsh up as an informant.
 7   Q.   Now, when you had this telephone call with Ian Furminger
 8   were you inside Park Station, or did you step out into the
 9   parking lot behind it?
10   A.   I was in the parking lot.
11   Q.   Why did you step out to make that call?
12   A.   For privacy and clarity.
13   Q.   Do you agree with me that the configuration of the
14   buildings at Park Station, and the material, interferes with
15   cell phone reception?
16   A.   Cell phone and radio reception, yes.
17   Q.   Is it common for police officers, who want to make a call,
18   to step outside if they're using a cell phone?
19   A.   Yes.
20   Q.   Is it normal procedure to step outside if you're asking a
21   question about someone possibly being an informant, so that
22   other people in the station don't hear?
23   A.   That would be my practice.
24   Q.   Is that why you stepped outside like that?
25   A.   Yes.
```

1  Q.   Is it true that information about confidential informants

2  is not even supposed to be shared with other police officers in

3  the San Francisco Police Department?

4  A.   That is correct.

5  Q.   Meaning that if one officer is handling an informant, that

6  officer is not supposed to tell other officers the identity of

7  his informant?

8  A.   That would be bad practice.

9  Q.   And that's for the informant's safety.  Do you agree?

10 A.   First and foremost.

11 Q.   You mentioned that the Jayme Walsh profile of events

12 surrounding his -- his arrest was, I think your words were "a

13 weak felony at best."  Is that what you said?

14 A.   Yes.

15 Q.   Whatever feelings you had about whether you should arrest

16 Jayme Walsh that day, instead of citing him and booking him,

17 were you influenced at all by the fact that he acted like a

18 jerk when you went to arrest him?

19 A.   Mr. Walsh was very aggressive during his whole encounter

20 with me.  That might have played a factor, subconscious factor.

21 I don't know.  But he was aggressive almost to the point of

22 being combative with me.

23 Q.   And usually when somebody fails the attitude test that way

24 it's more likely they're going to get booked and arrested

25 rather than cited out, correct?

1  **A.**   Well, you still have to take the facts of the case into

2  consideration.  That's your primary concern.  But not a good

3  way to make friends.

4  **Q.**   Do you have any -- when you think back on what you did

5  that day, do you have any qualms or regrets about citing

6  Jayme Walsh out?

7  **A.**   Absolutely not.

8  **Q.**   If the same thing happened again tomorrow would you do the

9  same thing with that next person under those circumstances?

10  **A.**   Well, it would be a case-by-case basis, but I would be

11  open to it, sure.

12          **MR. GETZ:**  Okay.  I have nothing further.

13          **THE COURT:**  Anything?

14          **MS. CAFFESE:**  No, Your Honor.  No --

15          **THE COURT:**  Okay.  Anything?

16          **MR. VILLAZOR:**  Some quick redirect, Your Honor.

17          **THE COURT:**  Sure.

18                   **REDIRECT EXAMINATION**

19  BY MR. VILLAZOR:

20  **Q.**   Officer Doherty, when Mr. Walsh told you about searching

21  on Craigslist for whatever he was doing --

22  **A.**   Yes, sir.

23  **Q.**   -- did you buy that?

24  **A.**   I didn't buy that.

25  **Q.**   And you said he was combative?

 1  **A.**    He was.

 2  **Q.**    Did you run his rap sheet?

 3  **A.**    I must have, but I don't recall.  That would be my

 4  practice a hundred percent of the time.

 5  **Q.**    Prior to talking to Mr. Furminger was it your intention to

 6  book him with a felony?

 7  **A.**    That was my intent, yes.

 8             **MR. VILLAZOR:**  No further questions.

 9             **THE COURT:**  Thank you very much.  You're excused.

10  Thank you, Officer.

11       (Witness excused.)

12             **THE COURT:**  Call your next witness.

13             **MR. VILLAZOR:**  Greg Nestor.

14             **THE CLERK:**  Will the witness please come forward and

15  take the witness.

16       Please remain standing and raise your right hand.

17             **GREGORY NESTOR, PLAINTIFF WITNESS, SWORN**

18             **THE WITNESS:**  I do.

19             **THE CLERK:**  Please be seated.

20       Please state your full name.  Spell your last name for the

21  record.

22             **THE WITNESS:**  All right.  Thank you.

23       It's Gregory Robert Nestor.  N-e-s-t-o-r.

24

25

<u>**DIRECT EXAMINATION**</u>

**BY MR. VILLAZOR:**

**Q.**   Good afternoon.  Agent Nestor, could you please tell the
jury who you work for?

**A.**   I work for the FBI, here in San Francisco.

**Q.**   What are you currently doing?

**A.**   Currently, I work at the firearms training unit.  I'm an
instructor out there.  I teach firearms, defensive tactics,
interior tactics, that type of thing, to the agents.

**Q.**   How long have you been doing that?

**A.**   I've been doing that about two and a half years.

**Q.**   Prior to that what were you doing?

**A.**   I was working public corruption, about seven years, in
both Oakland and San Francisco.

**Q.**   Agent Nestor, were you part of the FBI investigative team
for the case for this trial?

**A.**   Yes.

**Q.**   I'm going to direct your attention to July 6, 2011.  Do
you remember going to Boone, Iowa?

**A.**   Yes.

**Q.**   Why were you going Boone, Iowa?

**A.**   We were going to Boone, Iowa to gather some evidence that
Daisy Bram indicated was at a location there at her
grandfather's house.

**Q.**   When you say "we," who is "we"?

1    **A.**   There was four of us.  Daisy Bram; her 11-month-old son,

2    Thor; and SFPD inspector Darcy Kelly -- or Keller.

3    **Q.**   And, again, why were you going to Boone, Iowa?

4    **A.**   We were going there to pick up evidence that Daisy had

5    indicated was located at that location.

6         It was packaging that she said she -- she was given by the

7    police officers, that contained marijuana.  She -- they gave

8    back the marijuana, but the packaging is something that she

9    kept.

10   **Q.**   Did she say specifically where she kept it?

11   **A.**   She did.  She said it was in a cupboard in a laundry room

12   above, like, a washer/dryer.

13   **Q.**   Did you go to Boone, Iowa?

14   **A.**   Yes.

15   **Q.**   And did you go to a house in Boone, Iowa?

16   **A.**   Yes, we did.

17   **Q.**   And did you recover what Ms. Bram had described?

18   **A.**   We did.  And it was --

19   **Q.**   Where did you recover it?

20   **A.**   It was located in that same location.  It was on a shelf

21   in a cupboard above the washing machine in the laundry room.

22   **Q.**   Did you actually recover that?

23   **A.**   Yes.

24   **Q.**   I'm going to show you what's been marked as Government

25   Exhibit 114.

1   **A.**    Okay.

2   **Q.**    Agent Nestor, have you had a chance to look at

3   Government's Exhibit 114?

4   **A.**    Yes, I have.

5   **Q.**    What is it?

6   **A.**    This is the packaging that we recovered from that

7   cupboard.

8              **THE COURT:**  114 admitted.

9          (Trial Exhibit 114 received in evidence.)

10  **BY MR. VILLAZOR:**

11  **Q.**    What happened after you recovered that plastic wrapping?

12  Where did you go?

13  **A.**    After we recovered this packaging, Inspector Keller and I

14  drove from Boone, Iowa to Barrington, Illinois.

15  **Q.**    Barrington, Illinois.

16             **MR. VILLAZOR:**  Your Honor, at this time I would like

17  to read a stipulation agreed to by the parties.

18             **THE COURT:**  Go ahead.

19             **MR. VILLAZOR:**  Entitled "Barrington Police

20  Department."  Number 1:

21                "On March 26, 2009, Reynaldo Vargas

22             contacted Detective Jack Humer of the

23             Barrington, Illinois Police Department in

24             reference to a UPS package destined to be

25             delivered to an address in Barrington,

1              Illinois.

2                   "2.  On March 27, 2009, at 1:30 p.m.,

3              Detective Humer obtained a search warrant

4              from an Illinois state court.

5                   "3.  On March 28, 2009, Barrington

6              Police Department received Government

7              Exhibit 111, a UPS box with tracking number

8              1Z951X070193022745, containing Government

9              Exhibits 112 and 113, marijuana in

10              vacuum-sealed bags from SFPD."

11          And number 4:

12                   "On March 29th, 2009, Detective Humer

13              stored Government Exhibits 111, 112 and 113

14              in Barrington Police evidence storage."

15              **THE COURT:**  112 and 113 admitted.

16              **MR. VILLAZOR:**  Your Honor, it's 112A, B --

17              **THE COURT:**  112A, 112B, 113A, and 113B all admitted.

18          (Trial Exhibits 112A, 112B, 113A, and 113B received in

19      evidence.)

20              **MR. VILLAZOR:**  Thank you.

21      **BY MR. VILLAZOR:**

22      **Q.**  Agent Nestor, I'm going to show you those real quick.

23          Agent Nestor, you previously examined Government Exhibits

24      112 and 113?

25      **A.**  Yes.

1   **Q.**   And are those the marijuana and the packaging that you

2   recovered from Barrington, Illinois?

3   **A.**   Yes.

4   **Q.**   What happened after you recovered the packaging from

5   Boone, Iowa, and the packaging from Barrington, Illinois?

6   **A.**   Once we gathered the packaging, including the UPS box that

7   contained this, from the Barrington Police Department we went

8   straight to our Chicago field office evidence room and turned

9   it into evidence.

10  **Q.**   When you say "our Chicago field office" is that the FBI --

11  **A.**   Yes.  We went straight from the Barrington Police

12  Department to the Chicago -- the division of the FBI field

13  office to turn in this evidence to their evidence room.

14  **Q.**   Did the evidence room technicians, did they accept it as

15  you were going to give it to them?

16  **A.**   Initially it was all contained in the UPS box.  They made

17  us break it out and separate it from the UPS box.

18  **Q.**   I'm going to show you what's been marked as Government

19  Exhibit 126.  It will come up on your screen in a moment.

20      Do you see Government Exhibit 126?  Is it coming up on

21  your screen?

22  **A.**   Yes.

23  **Q.**   What is that?

24          **THE COURT:**  Well, okay I'm going to admit -- without

25  objection, I'm admitting 126A, B, C, D, E, F, G, and H.

1        (Trial Exhibits 126A, 126B, 126C, 126D, 126E, 126F, 126G,

2   and 126H received in evidence.)

3            **MR. VILLAZOR:**  If we can publish to the jury, Your

4   Honor.

5            **THE COURT:**  Yes.

6        (Document displayed.)

7   **BY MR. VILLAZOR:**

8   **Q.**   Agent Nestor, what are the pictures in Government Exhibit

9   126?

10  **A.**   It appears to be the photograph of the packages of

11  marijuana removed from the UPS box.

12  **Q.**   Were you there when those pictures were taken?

13  **A.**   Yes.

14  **Q.**   Why were they taken?

15  **A.**   They were taken just to show what was removed from the box

16  before we turned it into the evidence room there.

17           **MR. VILLAZOR:**  Your Honor, we have one more

18  stipulation to read into the record.

19                "Controlled Substances.  Under federal

20            law, drugs, substances, and certain

21            chemicals used to make drugs are classified

22            into five distinct categories or schedules.

23            Under federal law, it is unlawful to

24            possess or distribute drugs classified as a

25            Schedule I controlled substance or Schedule

1              II controlled substance.

2                   "Marijuana is a Schedule I controlled

3         substance.

4                   "Government Exhibit 112B is 216.7 grams

5         of marijuana.

6                   "Government Exhibit 113B is 246.9 grams

7         of marijuana."

8         Agent Nestor, I have no further questions.

9              **THE COURT:**  Any cross?  Mr. Getz?

10             **MR. PASSAGLIA:**  Nothing on behalf of Mr. Furminger.

11             **THE COURT:**  Oh, sorry.  Thank you.

12        Ms. Caffese, any cross?

13             **MS. CAFFESE:**  Yes.  Thank you.

14                        **CROSS EXAMINATION**

15   BY MS. CAFFESE:

16   **Q.**  Good afternoon, sir.

17   **A.**  Good afternoon, ma'am.

18   **Q.**  Sir, when you went to Boone and retrieved the packaging

19   that was with Ms. Bram, it's my understanding that you compared

20   that packaging to some packaging from San Francisco; is that

21   correct?

22   **A.**  Uhm, I didn't compare any -- any of that.  I think our FBI

23   lab did, if that's what you mean.

24   **Q.**  Well, did you compare any tape that was on the packaging

25   that Ms. Bram had, Daisy Bram had in Boone, to the packaging or

1  tape that was on marijuana that was seized from UPS in

2  San Francisco?

3  **A.**   I do not recall any tape at this time.

4  **Q.**   Do you recall testifying at the Grand Jury that the

5  packaging that Ms. Bram had did not match the packaging that

6  was from the UPS seizure in San Francisco?

7  **A.**   You mean did not match from a tool mark that it was cut

8  from or --

9  **Q.**   Just the tape where it was cut.  The packaging actually

10  did not match.  Let me back up.

11  **A.**   Yes.

12  **Q.**   During the Grand Jury there was some testimony that there

13  was some match; is that right?  Do you remember having to

14  clarify for the Grand Jury that, in fact, the packaging that

15  was in the marijuana, the marijuana that was seized from UPS --

16  **A.**   Yes.

17  **Q.**   -- and the marijuana that was seized from Daisy Bram did

18  not match?  Do you remember testifying to that, sir?

19          **MR. VILLAZOR:**   Your Honor, I'm going to object.  The

20  foundation -- we're talking about Grand Jury testimony.

21          **THE COURT:**   I'm a little concerned about what we're

22  talking about when you talk about the marijuana didn't match,

23  the packaging, some portion --

24          **MS. CAFFESE:**   Packaging.

25          **THE COURT:**   But I don't know what you mean by "the

1   packaging."  Do you mean what was wrapped around the package?

2   Do you mean the packages themselves?  It's just vague.

3           MS. CAFFESE:  Let me see if I can clarify with this

4   witness.  If I can't, that's okay.

5   BY MS. CAFFESE:

6   Q.   My understanding is that you testified to the Grand Jury

7   that the packaging material -- or at least -- I believe it was

8   the tape.  You tell me.  But there was a comparison that was

9   made between the packaging with the marijuana that Daisy Bram

10  had to some packaging of marijuana that was kept here in

11  San Francisco; is that right?

12          MR. VILLAZOR:  Objection, Your Honor.  Could we have

13  at least a page number in a transcript?

14  BY MS. CAFFESE:

15  Q.   If I'm wrong on this --

16  A.   I do not recall any tape.

17  Q.   All right.

18  A.   Because the packages are vacuum sealed.

19  Q.   What did you recall?  Do you recall anything or doing any

20  comparison, I should say, between the packaging that you

21  retrieved from Daisy Bram to any other evidence in this case?

22  A.   And, again, I think the FBI lab did some comparison.

23  Q.   Okay.  Fair enough.

24          MS. CAFFESE:  Thank you.

25          THE COURT:  Anything further?

```
 1          MR. VILLAZOR:  No further questions, Your Honor.

 2          THE COURT:  Thank you very much.

 3     (Witness excused.)

 4          THE COURT:  Ladies and gentlemen, we're going to take

 5 a recess now.  Remember the admonition given to you.  Don't

 6 discuss the case, allow anyone to discuss it with you, form or

 7 express any opinion.

 8     We'll be in recess until 2:30.

 9     (Recess taken from 2:15 to 2:34 p.m.)

10      (The following proceedings were held outside of the

11 presence of the Jury)

12          MR. HEMANN:  Your Honor, can I have the witness start

13 walking towards --

14          THE COURT:  Sorry?

15          MR. HEMANN:  May I have the witness begin walking

16 towards the --

17          THE COURT:  Yeah, all right.

18     (The following proceedings were held in the presence of

19 the Jury)

20          THE COURT:  Please be seated.  Let the Record

21 reflect, all jurors are present, parties are present.  You may

22 call the next witness.

23          THE CLERK:  You don't need the interpreter sworn

24 again?

25          THE COURT:  Well, I don't think so.  We have to see
```

1   what --

2          THE CLERK:  Okay.

3          MR. HEMANN:  We will need the interpreter sworn in.

4          THE COURT:  Please swear her in.

5          MR. HEMANN:  Your Honor, the United States calls

6   Cayetana Reynoso.

7          THE COURT:  Okay.  Do you want to swear in the

8   interpreter?

9          THE CLERK:  Will you be needing them, you say?

10         MR. HEMANN:  We will be needing the interpreter, yes.

11      (Ines Swaney, Spanish-language interpreter, sworn)

12         THE CLERK:  Please state you name for the record.

13         THE INTERPRETER:  My name is Ines, I-N-E-S, Swaney,

14   S-W-A-N-E-Y.  California state- and federally-certified Spanish

15   court interpreter.

16         THE CLERK:  Please raise your right hand.

17         **CAYETANA REYNOSO, PLAINTIFFS' WITNESS, SWORN**

18      (All responses of the Witness are given through the

19   Interpreter, unless otherwise noted)

20         THE CLERK:  You may place your hand down.  Please

21   state your full name; spell your last name for the Record.

22         THE WITNESS:  My name is Cayetana Reynoso, which is

23   my husband's surname.

24         THE INTERPRETER:  The interpreter will spell it for

25   the court reporter.

```
 1              MR. HEMANN:   Thank you.

 2                         DIRECT EXAMINATION

 3  BY MR. HEMANN:

 4  Q    Good afternoon, Ms. Reynoso.

 5  A    Good afternoon.

 6  Q    Where do you live?  Could you please tell the jury where

 7  you live?

 8  A    Home is 126 Potrero Avenue.  We have been living -- we

 9  have been living close to 40 years at that house.

10              MR. HEMANN:   And Ms. Lane, could you please put up on

11  the screen, Exhibit 271, Page 2.

12       (Document displayed)

13              THE WITNESS:   (In English) Yeah, is mine.

14  BY MR. HEMANN:

15  Q    And Ms. Reynoso, is this your house?

16  A    Yes.  That is my house.

17              MR. HEMANN:   Your Honor, this testimony will relate

18  to the events at Tab 6.

19  BY MR. HEMANN:

20  Q    Ms. Reynoso, do you remember a day that the police came to

21  your house, and searched it?

22  A    That's right.

23  Q    Do you remember how long ago that was?

24  A    A little bit more than five years ago.

25  Q    Did the police come to the door of your house?
```

1   **A**   Yes.  Many of them, in green uniform at first.

2   **Q**   And after the police in green uniforms came, did some

3   additional police officers come?

4   **A**   That's right.

5   **Q**   And what sort of clothing were the additional police

6   officers wearing?

7   **A**   They were not wearing uniforms.  Just normal clothing,

8   suits.

9   **Q**   When the police officers first came to your house, who let

10  them in the door to your house?

11  **A**   Well, because we heard -- we did.  Because we had heard a

12  lot of noise downstairs, from downstairs because it's a

13  separate door downstairs.  And they rung the door because with

14  so much violence, and then they -- they were knocking just too

15  much.

16       I got really scared because it was almost like 20 people,

17  wearing green and helmets and everything.

18  **Q**   Okay.  So, Ms. Reynoso, did they first come to the small

19  door at the bottom of the steps?

20  **A**   Oh, yes.

21  **Q**   And did you open the door at the top of the steps for

22  them?

23  **A**   That's right.  And they all went upstairs.  Up the stairs.

24  **Q**   When the police officers came into your house, what did

25  they do?

 1  **A**     Well, a man approached me with a weapon on one side, and

 2  for me not to move.  And there was just a lady who was a friend

 3  of one of my sons there.

 4  **Q**     Did you learn, Ms. Reynoso, from the police officers, what

 5  they were doing there in your house?

 6  **A**     We found out that, yes, because I saw, supposedly they

 7  were saying that there were weapons, and they searched and they

 8  went up and down and all over the place.  And the doors that

 9  were locked with a key, they broke them down in order to see.

10  **Q**     Okay.  So, did the police officers search your entire

11  house for weapons (Indicating)?

12  **A**     That's right.

13  **Q**     You said a moment ago that the police officers came into

14  your house through the door at the top of the steps.  Is that

15  correct?

16  **A**     Yes.  That's right.

17  **Q**     And once inside your house, is there a second floor, a

18  higher floor?

19  **A**     There is another floor, yes.

20  **Q**     And, was the bedroom, your bedroom, on that higher floor?

21  **A**     Yes.  That's right.

22  **Q**     Did the police officers --

23  **A**     Third floor.

24             **MR. HEMANN:**  Sorry, say it again?

25             **THE INTERPRETER:**  Yes.  Third floor.

BY MR. HEMANN:

Q    Did the police officers go up to the third floor as part
of their search?

A    Yes.

Q    In your bedroom, were there any closets?

A    There are two.  The private one is my husband's and then
there's mine.  Each one has its own -- their own key.

Q    And was your closet locked?

A    That's right.

Q    Did you have a key to the closet?

A    Yes.  I always keep them.  I've got my keys.  And my
husband also has his own.  One closet is for him and one closet
is for me.

Q    When the police officers came to your house that day, did
you give them a key to enter into your closet?

A    That's how it was, yes.

Q    And did you see the police officers go upstairs to search
your closet?

A    Yes.  I was -- I was in the living room with the police
next to they as close as the interpreter is to me and that
policeman was telling me "Don't move."

Q    So you did not go upstairs with the police officers to
your room with the closet.  Correct?

A    That's correct.  I did not.  The key was given to them.
They were given the key.

1  **Q**    For how long, Ms. Reynoso, were the police officers in

2  your house?

3  **A**    I don't remember exactly.  Maybe about four hours, I think

4  because it was -- because it was early, maybe four or five

5  hours.

6  **Q**    After the police officers left, did you go upstairs to

7  your bedroom?

8  **A**    Yes.

9  **Q**    Did you look in your closet to see if anything that

10  belonged to you was missing?

11  **A**    Yes.

12  **Q**    And did you find anything that was missing?

13  **A**    Yes.  Some cash money that was there, there were -- it was

14  $10 short of -- $10 short of $2,000 that were in there.

15  **Q**    Was the money, was it kept in any kind of container?

16  **A**    Yes, I had it in a little bag, kind of like a wallet.

17  **Q**    And where was that wallet?

18  **A**    In my closet where my rings are and all that.  They were

19  not mine; they belonged to a daughter of mine who gave me those

20  rings so I could give her $1,000 for rent.  So they didn't

21  belong to me, but when she would give me the money back I would

22  give her back those rings.

23  **Q**    So you had some money that was missing and some rings that

24  were missing.

25  **A**    That were missing, yes.

1  Q     How do you know that it was $10 short of $2,000 that was

2  missing?

3  A     Because I would always count it in order to deposit it at

4  the bank.

5  Q     Ms. Reynoso, did you see anybody take your money?

6  A     No, because I was downstairs.

7  Q     And Ms. Reynoso, do you know who took your money?

8  A     I wouldn't be able to say whether the first ones who came

9  in or the last ones who came in.  I wouldn't be able to say.

10       (Off-the-Record discussion between counsel)

11            MR. HEMANN:  Your Honor, thank you.  No further

12  questions.

13            THE COURT:  Any questions?

14            MR. PASSAGLIA:  Nothing on behalf of Mr. Furminger.

15            THE COURT:  Thank you.

16            MS. CAFFESE:  Yes, thank you, Your Honor.

17            THE COURT:  Thank you.

18                        **CROSS EXAMINATION**

19  BY MS. CAFFESE:

20  Q     Good afternoon, ma'am.  My name is --

21  A     Good afternoon.

22  Q     My name is Teresa Caffese, and I have just a few

23  questions.  Okay?

24  A     Very well.

25  Q     Okay.  Thank you.

1  **A**    Yes.

2  **Q**    Now, when -- the attorney here has asked you about the

3  police officers responding to your house back in June, 2009.

4  Right?

5  **A**    That's right.

6  **Q**    When he was referring to "police," do you know whether the

7  police that first responded were part of the San Francisco

8  Police Department, or were from the federal government, the

9  ATF?

10  **A**    As far as I'm concerned, I believe that they were from the

11  federal government because they were all wearing a green

12  uniform.

13  **Q**    All right.  And if I were to ask you if you know the name

14  of the officers, or the group, the agency, and that would be

15  the Alcohol, Tobacco and Firearms, would you know that to be

16  the name of the agency, ma'am?

17  **A**    Well, yes, because they were the ones in green uniform and

18  the other ones were not wearing a uniform.

19  **Q**    And those officers -- excuse me -- well, yeah, those

20  officers, or I'll call them officers, that responded, do you

21  remember how many of those federal agents came to your house?

22  **A**    I don't remember, but there were quite a few of them, were

23  slightly over some 20, perhaps.  These are the first ones.

24  **Q**    So the first group that came, you would say, your

25  approximate -- approximately maybe 20 or more.  Correct?

1  **A**    Yes, more or less.

2  **Q**    And do you remember how long those agents were in your

3  house before the other officers came?

4  **A**    Yes, I think close to three hours.  Between two and three.

5  **Q**    Okay.  So, before the second group of police officers,

6  when you say "police officers," you described them as police

7  officers without a uniform.  Is that right?

8  **A**    That's right.

9  **Q**    Okay.  And, those officers didn't come until three hours

10  after the federal agents came.  Is that right?

11  **A**    No, I -- more or less.

12          **THE COURT:**  Just -- really don't remember.  They were

13  just a lady who came along, her name was lawn, Ms. Loan

14  (Phonetic) or something, and he was in the dining room.

15  **Q**    Okay, it's okay if you don't remember specifically how

16  many hours.  It's okay.

17          Now, before -- I'm going to, if I say "plainclothes" or --

18  well, would you' -- let's see.  If I use the term "plainclothes

19  officers," would you know what I mean by that?

20          **THE INTERPRETER:**  Counsel, would you like the

21  interpreter to say it in English, "plainclothes"?

22          **MS. CAFFESE:**  Yes.

23          **THE WITNESS:**  Plainclothes officers?

24  **BY MS. CAFFESE:**

25  **Q**    Officer not in uniform.  Can I say that?

1  **A**    Oh, okay.  Okay.  Yeah, I know, I understood.  Yes.

2  **Q**    All right.  And, before the officers who were not in the

3  uniforms came to your house, were the -- the agents in the

4  green searching all of your house, to your recollection?

5  **A**    Yes, yes, they were searching.

6  **Q**    Did they search -- do you know whether they searched your

7  room?

8  **A**    Yes.  As far as I found -- learned, they were looking for

9  weapons.

10 **Q**    And to your knowledge, the agents searched all of the

11 rooms in your house before the officers who were not wearing

12 uniforms came?

13 **A**    I think so.

14 **Q**    And, is it true, or do you -- is it fair to say that you

15 cannot remember which of the -- the agents took the key to the

16 closet you were talking about on your direct examination?

17 **A**    Let me remember.  I don't know whether it was the first

18 one or the second ones that demanded to have the key.  I

19 believe that it was the first ones.

20 **Q**    Okay.  Thank you.  And, the reason -- so, if you know, the

21 reason that the agents came to your house was because they were

22 looking for firearms.  Is that right, ma'am?

23 **A**    That's right.

24 **Q**    Okay.  And, I'm sorry, but I do have to just ask you a few

25 questions about this.

1        Okay.  And --

2    **A**    That's fine.

3    **Q**    Thank you.  At the time, you had a son who was living with

4    you.  Is that right?

5    **A**    All right.

6    **Q**    And the son that was living with you, my understanding, he

7    was living -- the picture is down now, but he was living in the

8    first floor, can I call it the garage area of your house?

9        (Off-the-Record discussion between counsel)

10            **THE WITNESS:**  Yes.  That's right.

11            **MS. CAFFESE:**  I think counsel will put it up for us.

12    Thank you.

13        (Document displayed)

14            **MS. CAFFESE:**  271 -- not quite.

15        (Document displayed)

16    **BY MS. CAFFESE:**

17    **Q**    There we go.  We have your house again, right?

18    **A**    But the son was also living upstairs in the area, in the

19    room, with his girlfriend, at our level, the same level as the

20    bedroom.

21    **Q**    And your level was -- can I say the third level?

22    **A**    Yes.  That's right.

23    **Q**    So, he had a room -- so he had a room on the first level,

24    is that right?

25    **A**    No, the one who had the first room, the one who lived

1  downstairs is a son by the name of José.  And the other one

2  whose name is Felipe, he was living in a little room, they had

3  been living up there for about year, he and his girlfriend, at

4  our level.

5  Q    At your level.  Okay.  So, I'm sorry; I didn't had realize

6  you two sons.

7       So one of the sons was living on the first level, that is

8  Feli- -- José, right?  And Felipe and his girlfriend were

9  living on the same level as you; is that right?

10 A    Yes.  Our level.

11 Q    And the reason why the federal agents came up to your

12 house was because of some firearms that --

13 A    I'm sorry, I forgot a little bit.  Excuse me.  The

14 younger son has somewhat of a bad record.  And at that time he

15 wasn't there, he was away at 850.  Because he likes to drink.

16 Q    Okay.  Was that José?

17 A    José.

18 Q    Okay.  Now, José was the one who had some firearms at your

19 house?

20 A    I wouldn't be able to say because I never saw anything.

21 Q    Okay.  Fair enough.  That is the reason why or your

22 understanding is why the federal government went to your house,

23 to search the house.  Is that right?

24 A    Yes, but we didn't know anything.

25 Q    No.

1   **A**     The fear that we got -- it was unexpected.

2   **Q**     And I'm not suggesting that you knew anything, what your

3   son was doing at the time, ma'am.  I'm not suggesting that.

4         The government had a search warrant for the search of your

5   house, though.  Is that right?

6   **A**     Mrs. Long only showed it at the very end.

7   **Q**     Okay.

8   **A**     About to leave.

9   **Q**     All right.  And do you know whether or not one of the guns

10  or whether a gun, firearm, was found in one of the closets on

11  the second -- excuse me, on the level of the house that you

12  were living in?

13  **A**     No, I didn't learn that anything had been found.

14  **Q**     Okay.  Fair enough.

15        Now, one -- hopefully just a couple of other questions.

16        The officers who were not in uniform, when they came the

17  few hours after the ones in the green, people came?  Do you

18  remember?  The green uniforms.

19        Do you remember how many officers who were not wearing

20  uniforms were present at your house?

21  **A**     I felt that they were a little fewer than the previous

22  ones.

23  **Q**     Less than twenty.

24  **A**     Yeah.

25  **Q**     More than -- if you remember, more than ten?

1  **A**    Perhaps, there may have been like ten or thereabouts but I

2  do not remember exactly.

3  **Q**    Fair enough.  Now after this happened, you, and your

4  family, I believe your husband, you filed a lawsuit.  Is that

5  right?

6  **A**    I believe so.

7  **Q**    Yes.  And in that lawsuit, you alleged that $200,000 was

8  missing from your house.  Am I right, ma'am?

9  **A**    In connection with my husband.  So in other words when he

10  puts something away, he never tells me how much he has.  Same

11  thing I do.  But I like to tell the truth, and nothing but

12  truth.

13        **MS. CAFFESE:**  Thank you, ma'am.  I appreciate your

14  coming.  Thank you.

15        **MR. HEMANN:**  No questions, Your Honor.

16        **THE COURT:**  Thank you very much for coming; you are

17  excused.

18     (Witness excused)

19        **THE COURT:**  Okay.  Call your next witness.

20        **MR. VILLAZOR:**  The government calls Andrew Byrd.

21        **THE CLERK:**  Will the witness please come forward and

22  take the witness stand.

23        **ANDREW CLINTON BYRD, PLAINTIFF'S WITNESS, SWORN**

24        **THE CLERK:**  Please be seated.  Please state your full

25  name; spell your last name for the Record.

1          Make sure you always speak into the mic.

2                **THE WITNESS:**  Andrew, Andrew Clinton Byrd, B-Y-R-D.

3                            **DIRECT EXAMINATION**

4    **BY MR. VILLAZOR:**

5    **Q**    Good afternoon, Mr. Byrd.  Mr. Byrd, do you live in

6    San Francisco?

7    **A**    Yes.

8    **Q**    Are you presently on Social Security?

9    **A**    Yes.

10   **Q**    Are you working?

11   **A**    No.

12   **Q**    In 2009, did you have a business?

13   **A**    Yes.

14   **Q**    What was that business?

15   **A**    I was selling meth.  Crystal meth.

16   **Q**    Crystal methamphetamine?

17   **A**    Uh-huh.

18   **Q**    What kind of weight were you moving?  What volume?

19   **A**    Uh, two pound a month, maybe.

20   **Q**    Two pounds a month?

21   **A**    (Nods head)

22   **Q**    How much did that typically cost you to buy, two pounds a

23   month?

24   **A**    I wouldn't buy it all at once.  I mean, but like -- and it

25   would change a little bit here and there.  But, you know, eight

 1  to nine thousand dollars, for a half pound.

 2  **Q**   What kind of prices were you charging for the crystal

 3  meth?

 4  **A**   Um --

 5  **Q**   So, for an eight ball.  How much would you charge for an

 6  eight ball?

 7  **A**   At what time?  Or when --

 8  **Q**   In 2009.

 9  **A**   It would -- I mean it changed at different times,

10  depending on how much it cost me.  But, between -- you know,

11  200, 250.  Trying to remember.

12  **Q**   Well, let me ask you this, Mr. Byrd.

13  **A**   Okay.

14  **Q**   Did you have a kind of recordkeeping system of how much

15  you would charge and how much was owed to you?

16  **A**   Yeah, I mean I would keep -- I would jot things down, keep

17  track, try keep track of what was going on.

18  **Q**   What was going on.  I'm going to show you what's been

19  marked as Government Exhibit 253 (Indicating).

20  **A**   Okay.

21  **Q**   Why don't you take a look at it.

22  **A**   Okay.

23      (Witness examines items)

24  **Q**   Do you recognize that?

25  **A**   Yeah.

1      **MR. VILLAZOR:**  Your Honor, for the Record, those are

2  ten loose-leaf sheets.

3      **THE WITNESS:**  Yeah.

4  **BY MR. VILLAZOR:**

5  **Q**    Mr. Byrd, can you explain to the jury what those

6  loose-leaf sheets are?

7  **A**    Notes about, you know, what people paid me or what people

8  owe, still, outstanding.

9  **Q**    Is that your handwriting on the exhibit that's been

10  identified as 253?

11      (Witness examines document)

12  **A**    It looks -- looks like -- yeah, it looks like all my

13  handwriting.

14      **MR. VILLAZOR:**  The government moves Exhibit 253 into

15  evidence.

16      **THE COURT:**  Admitted.

17      (Trial Exhibit 253 received in evidence)

18  **BY MR. VILLAZOR:**

19  **Q**    Mr. Byrd, I'm going to show you some of these sheets on to

20  the computer screen.  Okay?

21  **A**    Okay.

22      (Reporter interruption)

23  **Q**    Excuse me, sorry.

24      Mr. Byrd, can you see -- let me see if I can zoom in.

25  **A**    I can see most of it there.

1  **Q**    You can see most of it?

2  **A**    Yes.

3  **Q**    All right.  I'm going to point to where it's --

4  **A**    Now I can't see it.

5  **Q**    What happened?  Okay.  One more time.  Sorry, Mr. Byrd.

6  You see where I'm pointing, it says "FRI NIGHT"?

7  **A**    Yes.

8  **Q**    Okay.  Then the first line it says "Angelo," and then

9  there's a crossed-out number.  Do you see that?

10 **A**    Um, mostly, yeah.

11 **Q**    Oh, wait, there we go.

12 **A**    Yeah, yeah, I can see it.

13 **Q**    Okay.

14 **A**    Looks like "200."

15 **Q**    200?  And could you explain to the jury what that is?

16 What does "Angelo," crossed-out "200" mean?

17 **A**    That he paid me $200 that he owed me.

18 **Q**    And then "Keith," next line?

19 **A**    250, yeah, that he paid.

20 **Q**    So, Angelo paid you $200; Keith paid you $250?

21 **A**    That looks, yeah.

22 **Q**    And "Jeff W"?

23 **A**    Yeah.  That he -- yeah, looks like, yeah he owed me 40,

24 then -- he probably, I mean, in a case like that, it was

25 probably like there was something left over, and then something

1   got added to it, you know.

2   Q    So Jeff owed you 40 plus $60?

3   A    Yeah.  I mean, it would be from -- that would be from two

4   separate things, for me to write it down like that.

5   Q    And, all these individuals, these are individuals that

6   bought crystal meth from you.

7   A    Yes.  Yes.

8   Q    There's a name at the bottom there, "Todd H."

9   A    Yes.

10  Q    What's that number over there?

11  A    5,000.

12  Q    Did Todd H. owe you $5,000?

13  A    After -- I mean, at this point, yeah.  I loaned him

14  $5,000.  In that case.

15  Q    And then, "James"?

16  A    Yeah.

17  Q    He owed you how much?

18  A    1,020.

19  Q    That's 1,000?

20  A    Yeah, that's a 1.  If it were a 7, I would put a line

21  through the middle (Indicating), usually.

22  Q    Mr. Byrd, there are additional names and there are

23  additional numbers here?

24  A    Yes.

25  Q    Fair to say these are customers of yours?

 1  **A**    At the time, yes.

 2  **Q**    And this is the kind of money that they owed you?

 3  **A**    Yeah.

 4       (Document taken off display)

 5  **Q**    I'm going to show you another one.

 6       (Document displayed)

 7  **Q**    That starts with, at the top left corner, "Luis"?

 8  **A**    Yeah.

 9  **Q**    And there's a number there.

10  **A**    47,000.  Plus 1,000.

11  **Q**    Mr. Byrd, did Luis owe you $47,000?

12  **A**    At that point, yes.

13  **Q**    And what was that for?

14  **A**    He -- he was -- I actually was loaning him the money to

15  help him deal with a situation where he was being kind of

16  forced out of his living situation by an ex.

17       And so he was using it to hire lawyers, and pay for -- and

18  to pay for the, you know, like legal, like, his legal help.

19  And actually, I guess, living expenses and stuff like that.  He

20  was a friend.

21  **Q**    Where did you get $47,000 to loan to Luis?

22  **A**    I mean, I got it through selling drugs, and -- I mean, I

23  didn't loan it to him all at once.  It built up over time.

24  **Q**    And all the money you loaned him over that time was from

25  the sale of crystal meth?

```
 1    A     Yeah.

 2    Q     All right.  And then the bottom right, is that Todd again?

 3    A     Yes, same Todd, yes.

 4    Q     And now it's 13,000?

 5    A     That's what it says, yeah.

 6    Q     And again I'm going to show just down here, there are all

 7   these names and numbers?

 8    A     Uh-huh.

 9    Q     Are these all customers of yours?

10    A     All except -- well, one of them is an ex, but --

11    Q     Who is your ex?

12    A     Larry?

13    Q     Larry?

14    A     Larry, yeah.

15    Q     And Larry owes you 5,000?

16    A     Yeah.

17    Q     At the time?

18    A     Well, still.

19    Q     Hasn't paid it back?

20    A     No.

21    Q     And "Merideth," how much did Merideth owe you?

22    A     Says "27,000."

23    Q     And ten dollars?

24    A     I think that is a zero.

25    Q     That is a zero?
```

1    A    Yeah, I have sloppy handwriting.

2    Q    Is that another -- is that another loan?  Or did she buy,

3    accumulate $27,000 as drug debt?

4    A    Well, no, that was something, she actually stole money

5    from me.  So, I mean, it's not -- that's just jotted down as a

6    notation, I guess, more than a --

7    Q    As a reminder?

8    A    Yeah, as a reminder, pretty much.

9         (Document taken off display)

10   Q    Mr. Byrd, I'm going to show you another one.

11        (Document displayed)

12   Q    And in top left it starts off with "Moses."  Do you see

13   that?

14   A    Uh-huh.

15   Q    And I'm going to go over to the right-hand column.

16   A    Yes.

17   Q    All right.  And, you see where it says "At 1,300?

18   A    Yes.

19   Q    Could you read that to the jury?

20   A    Read it?

21   Q    Yeah.

22   A    "At 1,300" -- oh, "At 1,300 my cost is..." and then I have

23   it broken down to gram, you know, gram, a 16th, eight ball, a

24   quarter-ounce.

25        And how much my actual cost is, like --

```
 1   Q    Okay.  So let's take that slow.  "G" is for gram of

 2   crystal meth?

 3   A    Yeah.  Yes.

 4   Q    And what is "T" for?

 5             MR. PASSAGLIA:  Excuse me, Your Honor.  Can Counsel

 6   please tell me what pages these are?  Thank you.

 7             MR. VILLAZOR:  This is Government Exhibit 253.  You

 8   have the Bates number.

 9             MR. PASSAGLIA:  I can't see it on the screen.

10        (Off-the-Record discussion between counsel)

11   BY MR. VILLAZOR:

12   Q    I'm sorry.  So, "G" is for gram?

13   A    Yes.

14   Q    "T" is for --

15   A    Teenager, or a 16th.

16   Q    A 16th?

17   A    16th of an ounce.

18   BY MR. HEMANN:

19   Q    "Teen" is a nickname for that?

20   A    Yeah.  It's like 1.75 grams.

21   Q    And "B" is what?

22   A    Ball or eight ball, which is double that, or 3.5 grams.

23   Q    And "QO"?

24   A    Quarter-ounce, seven grams.

25   Q    All right.
```

1        (Document taken off display)

2            MR. VILLAZOR:  Excuse me, Your Honor.

3        (Off-the-Record discussion between counsel)

4            MR. VILLAZOR:

5        (Document displayed)

6    BY MR. VILLAZOR:

7    Q    I'm going to show you one last one.

8    A    Okay.

9    Q    Do you see there's some math at the bottom?

10   A    Uh-huh.  Yes.

11   Q    And on the left, it's 9750, and then underneath that is

12   4800, then it's added together as 14,550?

13   A    Yes.

14   Q    What is that?

15   A    A total of --

16   Q    What does it mean, what does "14,550" mean to you?  What

17   were you jotting down?

18   A    Uh, I mean I can't -- now?  I mean, it's like, five years

19   later, I can't say for sure.  I'm just -- I'm assuming that

20   it's a total of how much -- I mean -- I mean it's probably -- I

21   don't know.

22       It was like -- I would just say it's a total of money on

23   hand, and money owed, probably.  In most, in most -- that is

24   most likely the case.

25       (Document taken off display)

1  Q    Mr. Byrd, when you were in the business of selling crystal

2  meth, where were you keeping your money?

3  A    Uh, on hand.  I mean, basically.  The people -- I mean, I

4  would sell something, money I would have, I would just save it

5  up to, you know, to repurchase.

6  Q    Where did you keep the drugs?

7  A    On hand.  In a lockbox.

8  Q    At one point in October, 2009, did you live at the Hotel

9  Sunrise?

10  A    Yes.  I mean, yes.

11  Q    Room 106?

12  A    Uh-huh.  Yes.

13  Q    I want to show you what's been marked into evidence

14  already, introduced into evidence as Exhibit 272.

15        MR. VILLAZOR:  Your Honor, for the jury's reference,

16  that's Tab 8.

17     (Document displayed)

18        THE WITNESS:  That's the hotel.

19  BY MR. VILLAZOR:

20  Q    Is that the hotel you were living in?

21  A    Yes.

22  Q    Did you register under your name?

23  A    Yeah.  I registered in my name when I first went there.

24  Q    How long did you live there?

25  A    At that point?

1  Q    Yeah.

2  A    I had been there for two and a quarter years, or 26, 27

3  months.

4  Q    Mr. Byrd, were you arrested at the Hotel Sunrise?

5  A    Yeah, October of 2009.

6  Q    October, 2009?

7  A    The second, I believe.

8  Q    Were you actually in the process of moving out?

9  A    I was moving, yes.

10  Q    You were still staying at the Hotel Sunrise?

11  A    Yeah.  The place I was moving to wasn't ready, wasn't

12  fully ready yet.

13  Q    I would like to talk about that arrest.  Were you sleeping

14  at the time?

15  A    I had been sleeping, yes.  I mean, I was asleep -- I mean

16  I --

17  Q    Immediately prior to your arrest, were you asleep?

18  A    Yes.  I mean yes, I was sleeping.

19  Q    And then what happened?

20  A    I woke up.  I woke up, and I -- I knew that my door was

21  unlocked because I had had a friend there earlier, two hours

22  earlier.  He had left, and I was too tired to, like, get up and

23  lock the door.  And it had to be locked either with a key from

24  the outside or, you know, from inside.  And so I knew it was

25  still unlocked.

 1  **Q**   So you were getting up to unlock your door?

 2  **A**   To lock it.

 3  **Q**   I'm sorry; to lock it?

 4  **A**   To lock it, yes.

 5  **Q**   Then what happened?

 6  **A**   It started to open before I -- before I could get to it.

 7  **Q**   Did you -- did anyone announce that they were at the door?

 8  **A**   No.

 9  **Q**   Did you open the door to see if anyone was outside, prior

10  to locking it?

11  **A**   No.  I tried to close it.

12  **Q**   So, what happened?

13  **A**   It didn't work.  I -- it got -- I got pushed in with the

14  door, and, you know, grabbed, and flipped around, handcuffed.

15  And then I was arrested.

16  **Q**   By whom?

17  **A**   By officers.

18  **Q**   Of the San Francisco Police Department?

19  **A**   Uh-huh.

20  **Q**   Do you remember how many police officers came in?

21  **A**   Three.

22  **Q**   Do you remember their names?

23  **A**   Yeah.  I mean, Furminger, Robles, and Vargas.

24  **Q**   Do you see Sergeant Furminger sitting in this courtroom?

25  **A**   Yes.

1  **Q**   Can you identify him?

2  **A**   He's the -- right there (Indicating).

3  **Q**   Sitting next to the gentleman with the beard?

4  **A**   Uh-huh. And the girl with the cute hair.

5  **Q**   Do you see Officer Vargas in the room? Excuse me; Officer

6  Robles in the room?

7  **A**   Back in the corner.

8         **MR. VILLAZOR:**  Your Honor, the witness has

9  identified...

10         **THE COURT:**  So noted.

11  **BY MR. VILLAZOR:**

12  **Q**   All right. You said that you were handcuffed. Do you

13  know who handcuffed you?

14  **A**   No.

15  **Q**   And, at the time, were you -- how were you dressed?

16  **A**   Not very. I just had a tank top on.

17  **Q**   Did you have any pants on?

18  **A**   No.

19  **Q**   Did you have any underwear on?

20  **A**   Just a tank top.

21  **Q**   What happened after you were handcuffed?

22  **A**   I was set -- I was sat down at the end of the bed. And,

23  and one officer went to one side of the room, and one went to

24  the other side of the room. And, and Vargas was talking to me.

25  **Q**   All right. Let me take that back. So, Officer Vargas was

1  talking to you?

2  **A**   He was asking me, like, yeah, asking me, like, why I --

3  why I was -- why I -- you know, like, whatever, like register

4  under a false name, and whatnot.

5  **Q**   What were Sergeant Furminger and Officer Robles doing at

6  the time you were talking with Officer Vargas?

7  **A**   Furminger was -- you know, looking at my laptop.  And,

8  Robles was going through my wallet.

9  **Q**   Did any of the officers show you a search warrant?

10 **A**   No.

11 **Q**   Sorry?

12 **A**   No.

13 **Q**   Did any of them ask for your consent to look around and

14 see your room?

15 **A**   No.

16 **Q**   Eventually did you get dressed?

17 **A**   Uh, I was able to -- or I got help maybe slipping on some

18 basketball shorts and shoes, slipping some shoes on.

19 **Q**   After you got dressed, what happened?

20 **A**   I was taken out to front, and handed off to a uniformed

21 officer who drove me to Mission Station.

22 **Q**   Do you recall who walked you to the front of the hotel?

23 **A**   No.  Not -- I don't remember, I don't clearly know at what

24 point I got handed off.  So, I mean, I know that Vargas was

25 dealing with me.  I can't say that he walked me through the

1    hotel all the way or not.

2    **Q**    And while Vargas was dealing with you, what was Sergeant

3    Furminger and Officer Robles doing?

4    **A**    Searching my room, I guess.

5    **Q**    Did you have drugs in the room?

6    **A**    Yes.

7    **Q**    And did you have money in the room?

8    **A**    Yes.

9    **Q**    How much money did you have?

10   **A**    At that point, $8,759.

11   **Q**    You say that with precision.

12   **A**    That's what I -- that is what I remember.

13   **Q**    Is there any particular reason you remember that specific

14   number?

15   **A**    Because I needed 8,800 to buy what I was -- what I needed

16   to buy.  And I -- I made a call to let me friend know that I

17   was ready to see him, that morning.

18        And plus, I had counted, I counted.  I knew I had 8,500.

19   And then when my friend came by to see me, one of the things he

20   did was give me $250.  And I had the nine already.

21   **Q**    Where did you last see that money?

22   **A**    250 plus the nine were -- were out in my room.  With my

23   keys and whatnot, a wallet, on a little tabletop thing.  And

24   the rest of it was in a blue, like, bank bag -- zipper bag, one

25   of those (Indicating), whatever, deposit bag.  In a box like on

 1  the side of my bed.  Closer to the head of my bed.

 2  **Q**    Was it under a lock and key?

 3  **A**    The cash, no.  It was directly behind the lockbox, that

 4  had the key for it (Indicating).

 5  **Q**    What was in the lockbox with the key?

 6  **A**    The drugs.  And some jewelry.

 7  **Q**    What kind of jewelry?

 8  **A**    Golden -- like, a gold ring set, a gold and diamond ring

 9  set.  White gold.  A diamond ring that belonged to the friend

10  who had stopped by that morning.  And then, a Movado watch, and

11  another friend's pocket watch, who had been staying with me.

12  **Q**    Did you have a half dollar too?

13  **A**    A what?

14  **Q**    A half dollar?

15  **A**    That actually -- the pocket watch had a Kennedy -- it was

16  like a part of the watch.  It was -- yeah.  It -- those weren't

17  separate things.

18  **Q**    So, you were arrested that day?

19  **A**    Yes.

20  **Q**    Where were you taken?

21  **A**    To Mission Station.  And then to 850 Bryant.

22  **Q**    Did you spend some time in jail?

23  **A**    Yeah.

24  **Q**    How many days?

25  **A**    Four or five.  I don't remember, exactly.

```
 1   Q      What happened when you went -- did you eventually get out

 2   of jail?

 3   A      Yes.

 4   Q      Where did you go?

 5   A      Home.

 6   Q      And when you returned home, what, how did you find your

 7   room?

 8   A      It was -- it was locked, and I had to -- I had to ask for

 9   a key from the desk to get into the room.  Because I didn't

10   have any keys.  And it was just all -- you know, a big

11   shambles.

12   Q      Could you please elaborate a little bit on "shambles"?

13   What did you see?

14   A      It was a just a mess.  I mean, most of the things that was

15   on shelves and this and that, in drawers, everything was just

16   piled up on bed, in the middle of the room.  It was a big

17   wreck.

18   Q      Did you notice things were missing from your room?

19   A      Well, yeah.  I mean, well, the drugs and money, and --

20   Q      The drugs?

21   A      Yeah.

22   Q      How about the almost $8,800?  Was that missing?

23   A      Yeah.

24   Q      How about the jewelry?

25   A      Yes.  I mean, everything -- everything that had been in
```

1   the -- in the bankers box, like, was gone.  The whole box was

2   gone.

3   **Q**   Did you find any drugs still in the room?

4   **A**   Yeah, there was still a quarter-ounce on the bed,

5   underneath all the -- all the stuff that had been thrown on

6   there.  It had gotten buried quickly, I guess.

7   **Q**   Was it stored in a particular area?

8   **A**   It was in a little Hello Kitty purse, like a zipper coin

9   purse thing.

10  **Q**   A little Hello Kitty?

11  **A**   A pink thing, yeah.

12  **Q**   Did you also have a bong?

13  **A**   Yeah.

14  **Q**   Still there?

15  **A**   It was -- yeah.  It wasn't put away on the side, it was

16  sitting out in the open (Indicating), but --

17  **Q**   Mr. Byrd, you didn't see anyone actually take these items

18  from your room, did you?

19  **A**   No.  I was gone.

20  **Q**   Who were the last people you saw in your hotel room?

21  **A**   Last -- the officers who are present, and Vargas.

22  **Q**   And Vargas?

23  **A**   Uh-huh.

24          **MR. VILLAZOR:**  Thank you.  No further questions.

25          **THE COURT:**  Okay.

1                        <u>**CROSS EXAMINATION**</u>

2   **BY MR. PASSAGLIA:**

3   **Q**    Good afternoon, Mr. Byrd.

4   **A**    Hello.

5   **Q**    My name is John Paul Passaglia.  I represent

6   Mr. Furminger.

7        You said you were staying at the Hotel Sunrise?

8   **A**    Uh...

9        (Reporter interruption)

10          **THE WITNESS:**  I'm sorry; yes.  Yes.

11  **BY MR. PASSAGLIA:**

12  **Q**    Would you consider that a five-star hotel?

13  **A**    No.  It's a SRO.  It's better than some, but no.

14  **Q**    So, SRO.  Would you say the police visit SROs more

15  frequently than, say, a five-star hotel?

16  **A**    Yeah.  Because it's easier to get what you want out of the

17  management.

18  **Q**    Fair enough.  Now, you said you were moving about two

19  pounds a month, about five minutes ago, at the time.  Is that

20  correct?

21  **A**    Yes.

22  **Q**    You also said you lent $47,000 to Luis?

23  **A**    Yes.

24  **Q**    You said you lent $27,000 to Mary Beth.

25  **A**    No, Merideth.  I stated that she stole money from me.

 1  **Q**    She stole 27,000.

 2  **A**    Well, she --

 3  **Q**    We're talking a lot of money.  How come you're checking in

 4  at a hotel where you know the police come frequently?

 5  **A**    I never had any problems with them.

 6  **Q**    No?  So you chose an SRO, but you're moving that kind of

 7  money?

 8        That's fine.  I'll go to the next question.

 9        You said you're not working now.  Is that correct?

10  **A**    Yeah.  I'm not working.

11  **Q**    Do you mean you're not working, or not working legally?

12  **A**    Not working.

13  **Q**    Okay.  You typically lend $47,000 to people?

14  **A**    Yeah.

15  **Q**    What -- you're a good friend.

16  **A**    I am.

17  **Q**    Now, you said your room, at the time, the door was

18  unlocked.  Is that correct?

19  **A**    When I woke up, yes.

20  **Q**    Correct.  And I think your answer five minutes ago was "I

21  was too tired to lock the door."

22  **A**    At 8:00, yes.

23  **Q**    Okay.  Do you recall doing an interview here at this

24  building (Indicating), the federal government, on January 10th,

25  2013?

1   **A**    Yes.

2   **Q**    Do you remember telling agents that day that you were up

3   all night partying the night before, and that you had went to

4   sleep at about 8:00 a.m.?

5   **A**    I didn't say exactly that, but I said that I had been -- I

6   was up, I was using, and then I did fall -- I go to sleep, fell

7   asleep around 8:00 a.m.

8   **Q**    Okay.  So "up all night partying" means up all night

9   smoking meth.

10  **A**    Pretty much, yeah.

11  **Q**    So it wasn't that you were too tired to close the door,

12  but you basically passed out.  You'd probably been up a few

13  days?

14  **A**    That's the same thing.

15  **Q**    Okay, well, to some of us it's the same thing, I guess.

16       So, would it be safe to say that when you passed out, you

17  were high, watching, questionably, child pornography?

18  **A**    No.  I was watching adult pornography.

19  **Q**    But you did admit to agents that you thought the woman in

20  the video was extremely young?

21  **A**    It was a male, and no.  I said that he looked young.

22  **Q**    Okay.  Based on the images, Sergeant Furminger did take

23  the laptop, didn't he?  You signed something in consent for him

24  to take it?

25  **A**    No, I -- after we were at Mission Station and they wanted

1  someone to come, like, search for child porn, I gave them

2  permission to look through my computer, because there was no

3  child porn.

4  **Q**    But your apartment at the time was a thousand feet from an

5  elementary school.   True?

6  **A**    I wouldn't know.   I don't go to elementary school.

7  **Q**    Okay.   Now, you claim the officers left a half ounce of

8  meth and a bong.   Is that correct?

9  **A**    Quarter-ounce.

10  **Q**    Quarter-ounce, excuse me.

11  **A**    And I would say that they missed it, more than left it.

12  **Q**    Understood.   So I want to go through what was booked in

13  evidence.   You can tell me if you remember that these things

14  were in your room.

15  **A**    Okay.

16  **Q**    They found suspected methamphetamine on a table on the

17  bed.   Is that correct?

18  **A**    No.

19  **Q**    No; I'm sorry.   It just says "suspected methamphetamine."

20  So they found methamphetamine.   Correct?

21  **A**    Yeah.

22  **Q**    Okay.   And then they found more, seven plastic bags of it

23  on the top of the dresser.   Is that correct?

24  **A**    That's correct that that's what that says, but that's not

25  where they found it.   It was all in a lockbox, locked.

1  **Q**    You're saying it wasn't in different areas.

2  **A**    No.  Everything was in one -- why would I have it in

3  different areas?  It was all in one place.

4  **Q**    The Valium was in there, too?

5  **A**    The what?

6  **Q**    The Valium?  You didn't have pills, Valium?

7  **A**    I believe I had a pill and a half, or something like that.

8  **Q**    Okay.  And excuse me if I mispronounce this because I'm

9  not familiar with the drug, but "DE-PA-KO-TE"?

10 **A**    I don't even know what that is.

11 **Q**    And plastic baggies were booked into evidence, as well,

12 right?

13 **A**    Yes.

14 **Q**    Digital scales?

15 **A**    Yes.

16 **Q**    Now, at some point, you were a plaintiff in a civil case

17 involving this very incident.  That is true, right?

18 **A**    Uh-huh.

19 **Q**    You hired a lawyer?

20 **A**    The same lawyer that was helping me with the arrest case,

21 yeah.

22 **Q**    Explain to us what happened with that case.

23 **A**    At the point, basically, after -- after a stretch of time,

24 it -- he talked me into dismissing it, basically.  Said that

25 there was no --

1  Q    He talked you into it?  It was dismissed with prejudice by

2  the Court.  Is that a fair statement?

3  A    That is what I heard, yeah.

4  Q    Is it also fair that you missed a bunch of court dates?

5  A    No.

6  Q    Okay.  So, it was just dismissed with prejudice?  That's

7  fair.

8  A    I don't know what you mean.

9  Q    Are you aware, in civil court, that the burden of proof is

10 lower than in criminal court?

11         MR. VILLAZOR:  Your Honor, objection.  Relevance.

12         MR. PASSAGLIA:  That's fine.  I'll move on.

13 BY MR. PASSAGLIA:

14 Q    There was an investigator hired in that civil case before

15 it was dismissed; do you know that?

16         MR. VILLAZOR:  Objection.  Relevance, Your Honor.

17         MR. PASSAGLIA:  It's relevant because --

18         THE COURT:  I'll -- I'll permit it.

19         MR. PASSAGLIA:  Thank you.

20 BY MR. PASSAGLIA:

21 Q    Are you aware of that?

22 A    I'm not sure what you mean.

23 Q    An investigator went out and interviewed people because

24 you had a civil case.  You were a plaintiff, right?

25         So somebody interviewed the people at the hotel, people

1   that worked there to try to see if there was some merit to the

2   claim you were bringing.

3        Are you aware of that?

4   **A**   I'm not sure the time, when you are talking about.

5   **Q**   I'm talking about when you decided to make a civil case --

6             **MR. VILLAZOR:**  Objection, Your Honor.

7             **THE WITNESS:**  I don't know.  I don't know about --

8   **BY MR. PASSAGLIA:**

9   **Q**   Okay, fair enough.  But it was your testimony that you

10  were selling methamphetamine.  Is that correct?

11  **A**   Yeah.

12  **Q**   And so you had visitors probably coming all the time,

13  right?  You are moving major weight?

14  **A**   I had people come see me, yes.

15  **Q**   And, it was your testimony that, "I passed out, I knocked

16  out, I went to sleep, it's all the same."  Right?

17  **A**   Yes.

18  **Q**   So, how could you possibly know -- you're passing out,

19  you're smoking meth -- who went in your room and took your

20  stuff?  Why would it be Sergeant Furminger?

21            **MR. VILLAZOR:**  Objection, argumentative.

22            **MR. PASSAGLIA:**  I have no further questions; thank

23  you.

24            **THE COURT:**  Well, wait a minute.  Slow down.  Do you

25  want him to answer the question?

```
 1              MR. PASSAGLIA:  No, I don't.  Thank you.

 2              THE COURT:  Okay.  Well, ladies and gentlemen, just

 3   to remind you, questions are not evidence.  They only become

 4   relevant depending on the answers that your given to questions,

 5   so you should ignore the question.  Okay.

 6      Anything further?

 7              MR. PASSAGLIA:  No further questions, Your Honor.

 8              THE COURT:  Ms. Caffese?

 9              MS. CAFFESE:  Yes, thank you, Your Honor.

10              THE COURT:  Yeah.

11                         CROSS EXAMINATION

12   BY MS. CAFFESE:

13   Q    Good afternoon, sir.  My name is Teresa Caffese.  And I

14   have some questions for you.  Okay?

15   A    Okay.

16   Q    Sir, you went over some testimony earlier about your --

17   the pay/owe sheets.  Remember that?

18   A    Yeah, the notes.

19   Q    Right.

20              MS. CAFFESE:  Would you mind putting the Exhibit 253

21   up again?  The pay/owe sheets?

22      (Off-the-Record discussion between counsel)

23      (Document displayed)

24              MS. CAFFESE:  Thank you.

25
```

1  **BY MS. CAFFESE:**

2  **Q**    All right.  I'm just going to put -- well, there were

3  several that -- excuse me.  There were several that you went

4  over during your direct examination?

5  **A**    Yeah.

6  **Q**    And I'm just picking -- actually, this wasn't --

7        (Document taken off display)

8  **Q**    Let's use this one.

9        (Document displayed)

10  **A**    Okay.

11  **Q**    Just as an example here.  All right.  That would be an

12  example of one of the pay/owe sheets that you talked about

13  during direct examination, sir?

14  **A**    Yes.

15  **Q**    All right.  And, I just noticed that there were several

16  here, but they didn't have any dates on them.  Do you have know

17  when -- what period of time this all related to?

18  **A**    Uh, that year.  I mean, different points, different times,

19  that year.

20  **Q**    That would be 2009?

21  **A**    2009, yes.

22  **Q**    So, if I were to go through these various pay/owe sheets

23  and --

24        (Document taken off display)

25        (Document displayed)

1  Q    And I've got another one up here, it's the one, there's

2  Janet and Leo and Demetria, Charles, and Dusty and Hunter and

3  Carlos and Moses, you wouldn't be able to give us a date for

4  any of these either?

5  A    A specific date, no.

6       (Document taken off display)

7  Q    Okay.  Now, my understanding was you were actually

8  arrested back on October 2, 2009.  Is that right?

9  A    Yes.

10 Q    Okay.  And, when you -- when the police officers came, I

11 believe you said you spoke primarily to Vargas?

12 A    He spoke to me, and -- yeah.

13 Q    All right.  And, he told you that it was because -- well,

14 let me ask you.

15      Are you aware that sometimes the police, particularly in

16 the Mission area, go through some of these hotels to determine

17 whether or not the occupants of the rooms are actually

18 registered under the correct name?

19 A    Yeah.  They come monthly.

20 Q    Okay.  And that is not something unusual that happens in

21 some of these hotels that are -- as Counsel was saying, they're

22 not the Hyatt.

23 A    No, it's not.

24 Q    So it's not unusual to do these walk-throughs to make sure

25 these people in these hotel rooms are not registering under

 1  false names, and dealing drugs.

 2      Is that fair enough to say, sir?

 3  **A**  Sure -- yes.

 4  **Q**  Okay.  And, when the officers, back on October 2nd, 2009,

 5  came to your hotel room --

 6  **A**  Hotel, yes.

 7  **Q**  The hotel, you were advised that they were checking

 8  concerning occupancy issues.  Is that right?

 9  **A**  What do you mean?

10  **Q**  Well, whether or not the name, the Social Security number

11  on your registration card, actually matched.

12  **A**  No.  I was just -- all I heard was, like, you know, "Why"

13  -- or, like, "Why, why have you..." you know, "Why -- are you

14  registered under a false name," like that is what I was asked

15  in my room.  And I answered that I wasn't.  That's all I could

16  tell them.

17  **Q**  All right.  Now, you testified on direct examination that

18  there were three officers.  Right, sir?

19  **A**  I saw three officers.

20  **Q**  All right.  There was -- do you remember a fourth officer

21  by the name of Officer Zachos, inside the apartment?  Excuse

22  me; the room?

23  **A**  No.  I only saw that name -- ever saw that name on the

24  police report.

25  **Q**  So it's your testimony there were only three officers, is

1    that right?

2  **A**    Yes.

3  **Q**    Now, Officer Robles went through your wallet.  Is that

4    right?

5  **A**    He -- yeah, he -- looking through my wallet.

6  **Q**    And he was looking through your wallet.  And presumably,

7    that is where your identification is kept, sir?

8  **A**    That's where I kept it, yes.

9  **Q**    Okay.  And, as a result of your arrest that day, there

10   were several items that were actually taken from that room.  Is

11   that right?

12 **A**    Yeah, my -- my -- yeah, there's property taken.  And --

13   and evidence, I guess.

14 **Q**    Right.  I'm just saying, I'm going through it here, I

15   mean, there was suspected methamphetamine.  I mean, is that

16   right?

17 **A**    Yes.

18 **Q**    There was a laptop, tape, I guess, somewhere in the room,

19   that you were watching videos.  Correct?

20 **A**    Yes.

21 **Q**    All right.  And there was seven plastic bags of suspected

22   methamphetamine, is that right?

23 **A**    Yes.

24 **Q**    All right.  And, actually, there was -- there was a lot of

25   methamphetamine located inside the room.  Is that correct?

 1   **A**    Yes.  I mean, well, that's subjective, but yeah, there was

 2   an amount.

 3   **Q**    Well, actually you are right.  It is subjective.  How much

 4   would you say, total, methamphetamine was seized from your

 5   room, sir?

 6   **A**    I only can say from seeing what's written in the police

 7   report.  Just under, I think, an ounce and a half or something.

 8   **Q**    When you say you just can remember from looking at the

 9   police report --

10   **A**    It was five years ago.

11   **Q**    All right.  But, according to the pay/owe sheets here, you

12   were dealing with quite a -- quite a large quantity of meth.

13   Is that right?

14   **A**    Yeah, that is why I was going to buy more.

15   **Q**    All right.  Do you buy it at the beginning of the month,

16   generally?

17   **A**    I buy when I run out.

18   **Q**    I'm sorry?

19   **A**    Buy when I run out.

20   **Q**    All right.  And, at an ounce, I think, if I understand you

21   correctly from what you just said, that would be a relatively

22   small amount?

23   **A**    Yeah.

24   **Q**    Because you would be buying more, then?  You would need

25   more to sell?

1    **A**    I would -- I wouldn't buy an ounce at a time.  I would --

2    **Q**    Okay.  Now, after you were arrested, you were taken to the

3    police station.  Is that right?

4    **A**    Uh-huh.

5    **Q**    Now, did you give a consent -- well, let me strike that.

6         It's your testimony that you had never consented to a

7    search of your room?

8    **A**    True.  I didn't consent to a search of my room.

9    **Q**    You did.

10   **A**    Did not.

11   **Q**    You did not.

12   **A**    I wasn't asked.

13   **Q**    All right.  Were you taken to the Mission Station first?

14   **A**    After my room?  Yes.

15   **Q**    All right.  And then, after Mission you were taken to The

16   Hall of Justice?

17   **A**    Yeah.

18   **Q**    All right.  So, you were actually in jail, I guess, for at

19   least, what, four to five days?

20   **A**    As I recall, yes.

21   **Q**    And it was after that four or five days that you had

22   returned to your hotel room.  Is that right?

23   **A**    Yes.

24   **Q**    Now, do you know when you left the room, when you were

25   taken, did you take note whether or not it was secured by the

1  police?

2  **A**    The door was open.  The officers were in my room when I

3  was taken away.

4  **Q**    And when you were taken away, did the door remain open,

5  sir?

6  **A**    When I was taken away?  It was open, yeah.

7  **Q**    No; no one secured it, is what I'm asking you.  Locked it.

8  **A**    I had -- I mean, no, they were still in my room.  Why

9  would they secure it?

10  **Q**    Do you know whether or not your -- your door or your --

11  the door to your hotel room was ever locked, after you were

12  arrested?

13  **A**    It was locked when I got back to my room.

14  **Q**    And, when you got back to your room after those four or

15  five days is when you noticed that it had been trashed.  Is

16  that right?

17  **A**    It was what I saw when I got back, yes.

18  **Q**    Right.  You saw that it had been -- I'm using your -- I

19  think those are your words, "trashed."  Is that right?

20  **A**    Yes.  It was all torn apart.

21  **Q**    And it was after those four to five days, when you

22  returned to your room, is when you noticed that some things

23  were taken, as you have testified to.  Is that right?

24  **A**    True.  Yes.

25  **Q**    Thank you, sir.  I have -- well, I think you testified to

1    this.  But, your case that you sued over this case -- over your

2    arrest was dismissed, ultimately.  Right?

3    **A**    It was, yes.

4              **MS. CAFFESE:**  Okay.  Thank you, sir.

5              **MR. VILLAZOR:**  Brief redirect, Your Honor?

6              **THE COURT:**  Go ahead.

7                     **REDIRECT EXAMINATION**

8    BY MR. VILLAZOR:

9    **Q**    Mr. Byrd, did you register under a false name at the Hotel

10   Sunrise?

11   **A**    No.

12   **Q**    Did you have any outstanding warrants?

13   **A**    No.

14   **Q**    Was this actually the first time you were arrested?

15   **A**    That was my first arrest, yes.

16   **Q**    So were you on probation or parole or anything like that?

17   **A**    No.

18   **Q**    Mr. Byrd, did you have child pornography on your laptop?

19   **A**    No, I had adult pornography.

20   **Q**    Were you charged with child pornography?

21   **A**    No.

22              **MR. VILLAZOR:**  No further questions.

23              **MR. PASSAGLIA:**  Nothing further, Your Honor.

24              **THE COURT:**  Thank you.

25              **MS. CAFFESE:**  May -- excuse me; may I ask --

1          THE COURT:  Yes, go right ahead.

2                    **RECROSS EXAMINATION**

3  BY MS. CAFFESE:

4  **Q**    Sir, the Social Security number that you wrote down on

5  your registration card did not match your name.  True

6  statement?

7  **A**    No; it should have matched my name.

8  **Q**    All right.

9          **MS. CAFFESE:**  No further questions.  Thank you, sir.

10     (Off-the-Record discussion between counsel)

11         **MR. HEMANN:**  Your Honor, may I consult with counsel

12  for one second about the scheduling?

13         **THE COURT:**  Yeah.

14     (Off-the-Record discussion between counsel)

15         **THE COURT:**  Ladies and gentlemen, you can speak

16  amongst yourselves, if you would like to.  If you want to

17  stretch, you can stretch.

18     Is the witness excused?

19         **MR. HEMANN:**  Oh, yes.  Sorry, Your Honor.

20         **THE COURT:**  All right.  Thank you very much,

21  Mr. Byrd.  You are excused.

22         **THE WITNESS:**  Thank you.

23     (Witness excused)

24         **MR. HEMANN:**  Your Honor, the United States calls

25  Anthony Heckman.

1        THE COURT:  Okay.

2        THE CLERK:  Will the witness please come forward and

3  take the witness stand.

4    **DETECTIVE ANTHONY HECKMAN, PLAINTIFF'S WITNESS, SWORN**

5        THE CLERK:  Please be seated.  Please state your full

6  name.  Spell your last name for the Record.

7        THE WITNESS:  Anthony Heckman.  H-E-C-K-M-A-N.

8                      **DIRECT EXAMINATION**

9  BY MR. HEMANN:

10 Q    Thank you.  Good afternoon, Officer Heckman.  Thank you

11 for waiting for so long today.  What do you do you for a

12 living?

13 A    I'm a detective with the City of Newark.

14      (Reporter interruption)

15        THE COURT:  That is Newark, California, right?

16        THE WITNESS:  Yes.

17 BY MR. HEMANN:

18 Q    And how long have you been a Newark, California, Police

19 Officer?

20 A    Almost 17 years.

21 Q    Were you on duty on May 25th, 2009?

22 A    Yes.

23 Q    And what were you doing that day?

24 A    I was working patrol.

25 Q    So you were in uniform.

1  **A**    Yes.

2  **Q**    Did you get a call at some point that day from the

3  San Francisco Police Department?

4  **A**    I did not receive a call.

5  **Q**    Did someone -- did somebody in your department receive a

6  call that day from the City of San Francisco Police Department?

7  **A**    I believe so.

8  **Q**    And, based on that call, did you do -- take some police

9  activity?

10  **A**    Yes.

11  **Q**    What did you do?

12  **A**    I believe I met with San Francisco Police Department, at a

13  house.

14  **Q**    Where was that house?

15  **A**    On Wells Avenue.

16  **Q**    Is that in the city of Newark?

17  **A**    Yes.

18  **Q**    And what was the purpose of your meeting the San Francisco

19  Police Officers at that location?

20  **A**    I don't recall exactly what the purpose was but based on

21  my report I reviewed, it was to assist them with a search of a

22  residence.

23  **Q**    Do you remember participating in a search of a residence

24  that day?

25  **A**    No, I do not.

1    Q    Have you had a chance to look at your police report from

2    that day?

3    A    Yes.

4    Q    Did looking at your police report refresh your

5    recollection of the events that day?

6    A    No, it did not.

7    Q    So you don't have any recollection, whatsoever, of the

8    events that day?

9    A    I have a vague recollection of meeting some San Francisco

10   Police Officers in that area.  But not the residence, or

11   anything else.

12   Q    Did you conduct a search that day?

13   A    Based on what my report says, it appears that I conducted

14   a search of the house for people.

15   Q    For people.

16   A    Yes.

17   Q    Did you seize any evidence that day?

18   A    Not that I'm aware of.

19   Q    If you had seized evidence that day, would you have

20   prepared a report reciting that you had seized evidence that

21   day, or --

22   A    Absolutely.  Absolutely.

23   Q    Absolutely?  Did you prepare a report that stated that you

24   seized evidence that day?

25   A    No, I did not.

1   **Q**    Do you remember going into the house in question that day?

2   **A**    No, I do not.

3   **Q**    If you had gone into the house in question that day, would

4   you have prepared a report that reflected that?

5   **A**    Yes.

6   **Q**    Did you?

7   **A**    I did so.

8   **Q**    And does the report reflect that you went into the house

9   and participated in a search?

10  **A**    Yes.

11          **THE COURT:**  Does that have a location?

12          **MR. HEMANN:**  It does, Your Honor.  And I could ask

13  the witness.

14  **BY MR. HEMANN:**

15  **Q**    Was this location 7961 Wells Avenue?

16  **A**    I don't have a copy of my report right now, but --

17          **MR. HEMANN:**  Your Honor, may I hand the witness a

18  copy of his report?

19          **THE COURT:**  Yes.

20          (Witness examines document)

21          **THE WITNESS:**  Yes, it would be.

22  **BY MR. HEMANN:**

23  **Q**    And when you say "it would be," what do you mean?

24  **A**    That would be the location of the house.

25          **MR. HEMANN:**  Ms. Lane could you put up Exhibits --

 1   I'm sorry -- wrong tab here.

 2        (Off-the-Record discussion between counsel)

 3   **BY MR. HEMANN:**

 4   **Q**    I'm sorry; Exhibit 247, please, Mr. Heckman.

 5             **MR. HEMANN:**  And that is in evidence, Your Honor.

 6             **THE COURT:**  Yeah.

 7             **MR. HEMANN:**  And please put up Page 7 of that

 8   exhibit.

 9        (Document displayed)

10             **MR. HEMANN:**  Could you blow up the very last

11   paragraph?  Not the small one, the very last long paragraph,

12   please.

13        (Document displayed)

14   **BY MR. HEMANN:**

15   **Q**    Do you see that up on the screen in front of you,

16   Detective Heckman?

17   **A**    Yes, I do.

18   **Q**    There's a sentence, second to the last, there.  It says

19   (As read):

20                 "Officer Heckman located a large amount

21             of cash inside a black bag (e7) in the

22             upstairs bedroom under the nightstand."

23        Do you see that?

24   **A**    Yes.

25   **Q**    Is that a true statement about the search that day,

1    Officer Heckman?

2    **A**    I do not have a recollection of that.

3    **Q**    You don't have a recollection of doing that?

4    **A**    Doing that.

5    **Q**    And, if you have had done that, would you have prepared a

6    report saying that you had done that?

7    **A**    I would have indicated that in my report.

8    **Q**    And did you do so?

9    **A**    No.

10           **MR. HEMANN:**  Thank you, Officer Heckman.  No further

11   questions.

12           **THE COURT:**  Any cross?

13        (Off-the-Record discussion between counsel)

14                    <u>**CROSS EXAMINATION**</u>

15   BY MR. GETZ:

16   **Q**    Good afternoon.

17   **A**    Good afternoon.

18   **Q**    Is there a term that is commonly used when police officers

19   from another county come to your county to further an

20   investigation that started outside?

21   **A**    I don't understand the question.

22   **Q**    You know the term "outside assist"?

23   **A**    Yes.

24   **Q**    So outside assist is where, for example, someone in the

25   Newark Police Department gets a call from another county, like

```
 1   San Francisco, and the San Francisco Police Officers are coming

 2   over to do their investigation, and what you do in assisting

 3   them, that's called "outside assist."

 4        Correct?

 5   A    That's correct.

 6   Q    Now we have been talking about there particular day.  And

 7   if I understand your testimony, you don't remember

 8   participating in an outside assist on Wells Avenue.  Is that

 9   true?

10   A    No, I vaguely remember assisting San Francisco Police

11   Department in that area.  But I don't recall any of the

12   details.

13   Q    All right.  So, so when you say "vaguely," you vaguely

14   recall, what do you recall about that, that you can tell us

15   about?

16   A    Just basically, the only thing I recall is -- just that I

17   had met someone, met San Francisco down there.  I don't recall

18   who was there, and what was done.

19   Q    Do you remember, for example, how many officers came from

20   San Francisco?

21   A    No.

22   Q    Do you recall that because the door was locked, entry was

23   made through a front window?  Do you remember that part?

24   A    No, I don't.

25   Q    All right.  So, it wouldn't help you to remember if I told
```

```
 1   you you were there for two or three hours, you don't remember

 2   that episode.

 3   A    No, I do not.

 4           MR. GETZ:  All right.  May I have a moment,

 5   Your Honor?

 6       (Off-the-Record discussion between counsel)

 7           MR. GETZ:  May I show the witness a document?

 8           THE COURT:  Sure.

 9           MR. GETZ:  Thank you.

10   BY MR. GETZ:

11   Q    Do you recognize that document --

12           THE COURT:  I think we should just identify the

13   document.  Is it -- does it have an exhibit number?

14           MR. GETZ:  It does not.

15           THE COURT:  Okay.  Well, we'll get to that.  Go

16   ahead, Mr. Getz.

17   BY MR. GETZ:

18   Q    Did I hand you a Newark police report?

19   A    Yes.

20   Q    And is that your handwriting?

21       (Witness examines document)

22   A    That's my signature at the bottom.

23   Q    Okay.  Write you please resources to the jury those two

24   paragraphs I pointed out to you?

25       (Document displayed)
```

1   **A**    (As read)

2               "On the listed date and time, responded

3               to 7961 #A Wells Avenue to assist..."

4        (Reporter interruption)

5             **THE COURT:**  Do it slowly, if you will.

6             **THE WITNESS:**  Apologize. (As read)

7               "...San Francisco PD Street Crimes

8               Unit, with the consensual search of the

9               residence.  Upon my arrival, I conducted a

10              stake out of the residence until

11              San Francisco PD arrived on scene.  Upon

12              their arrival, I contacted Officer

13              Ed Robles along with two additional

14              San Francisco PD officers.  San Francisco

15              PD made entry through the open front window

16              of the residence.  Along with

17              San Francisco...along with the

18              San Francisco PD officers..."

19       Excuse me.

20              "I along with the San Francisco PD

21              officers searched the residence locating no

22              residents.  Upon further detailed search of

23              the residence, San Francisco PD Officers

24              located a quantity of currency, suspected

25              heroin and cocaine.  San Francisco PD

```
 1              collected the evidence and secured the

 2              residence."

 3  BY MR. GETZ:

 4  Q    So, you wrote that the San Francisco Police found

 5  currency, heroin, and cocaine.  Correct?

 6  A    Correct.

 7  Q    Because that's what happened that day.  And you

 8  memorialized it in that report.  Correct?

 9  A    Correct.

10          MR. GETZ:  Your Honor, I have nothing further.

11          THE COURT:  Okay.  Anything else?

12          MS. CAFFESE:  Just a few questions.

13          THE COURT:  Would you mark that for identification.

14          MR. GETZ:  Yes, Your Honor.

15          THE COURT:  Okay.  Exhibit next in order, for

16  identification.

17      Okay.  Go ahead, Ms. Caffese.

18          MS. CAFFESE:  Could I have that?

19          MR. HEMANN:  Sure.  Okay.

20          MS. CAFFESE:  I'll give it -- thank you.

21                  CROSS EXAMINATION

22  BY MS. CAFFESE:

23  Q    Good afternoon, Mr. Heckman.  My name is Teresa Caffese.

24  I have a few questions for you.

25  A    Okay.
```

1  **Q**    You read this police report which is going to have a

2  exhibit number, but it's the report you wrote back on May 25 of

3  2009, are correct?

4  **A**    Correct.

5  **Q**    And in this report that you are reading from, you

6  indicated that you were contacted by San Francisco Police

7  Department to assist, to do this -- this search.  Is that

8  right?  An outside assist.  That's right?

9  **A**    That's correct.

10 **Q**    And that is part -- are you aware that is part of police

11 protocol?  That if an outside agency is going to another

12 jurisdiction, they are to call, like here, your jurisdiction,

13 to say, "Hey, come outside-assist, please."  Is that true?

14 **A**    Not always.

15 **Q**    It's not always?

16 **A**    Doesn't always happen that way.

17 **Q**    Okay.  Is it supposed to happen?

18 **A**    It's -- protocol.

19 **Q**    Okay.  So, it's protocol.  And in this case, it's -- it

20 appears here, where you put "Related officer, SFPD Ed Robles,

21 Star No. 1467..." contacted you for the outside assist

22 consistent with protocol.  Am I correct?

23 **A**    Yes.

24 **Q**    And do you have a recollection of speaking with Officer

25 Robles when you were at the scene?

1   **A**    No, I do not.

2   **Q**    And do you know or have you been shown any police reports

3   which documented the money and the other evidence that was

4   seized and booked into evidence by Officer Robles?

5   **A**    Yes.

6   **Q**    You did see that.

7   **A**    Yes.

8   **Q**    Okay.  And, you noticed when you reviewed that police

9   report, it was written by Officer Robles, is that right?

10  **A**    I don't recall who it was written by.

11  **Q**    But, there was some money, you do you remember how much

12  money was booked in by Officer Robles?

13  **A**    Roughly $3,000, to my best recollection.

14  **Q**    And in addition to the $3,000, that Officer Robles booked

15  into evidence, there was narcotics that was also booked into

16  evidence by Officer Robles.  Am I right?

17  **A**    Correct.

18          **MS. CAFFESE:**  Thank you, sir.

19          **THE COURT:**  Anything further?

20      (Off-the-Record discussion between counsel)

21          **MR. HEMANN:**  Oh, no, Your Honor.  Thank you.

22          **THE COURT:**  Okay.  Thank you very much, Officer.  You

23  are excused.

24          **THE WITNESS:**  Thank you, Your Honor.

25      (Witness excused)

1          **THE COURT:**  So, ladies and gentlemen, I think we will

2    take our recess for the weekend.

3         Remember the admonitions given to you:  Don't discuss the

4    case, allow anyone to discuss it with you, form or express any

5    opinion.

6         We'll start at 9:00 a.m. so please get here a few minutes

7    before, on Monday.

8         We will have trial, as I indicated, Monday, and Tuesday of

9    next week.  But not the remainder of the week.  Let's see.  Let

10   me look.

11        Is Thanksgiving the following week?

12            **MR. VILLAZOR:**  Yes, Your Honor.

13            **THE COURT:**  Okay.  So, just so -- obviously, people

14   make plans.  We will meet the following week on Monday, and on

15   Tuesday, but not on Wednesday.  The day before Thanksgiving.

16   Okay?

17        Thank you very much.  You are excused.

18            **THE COURT:**  Yeah, leave your binder on the chairs,

19   leave your note pads in the jury room.

20        (Jury excused)

21        (The following proceedings were held outside of the

22   presence of the Jury)

23        (Off-the-Record discussion)

24            **THE COURT:**  Well, let's -- let's talk about where we

25   are in this case.  In other words, how far along we are, and

1   what we're projecting.

2          MR. HEMANN:  I and Mr. Villazor feel that there is a

3   very high likelihood that we will be wrapping up on Monday or

4   Tuesday before Thanksgiving.

5          THE COURT:  Oh, okay.

6          MR. HEMANN:  Depending, I think, largely on the

7   length of the cross examination of Mr. Vargas.

8          THE COURT:  Okay.  When is he expected to testify?

9          MR. HEMANN:  Monday or Tuesday of next week.

10         THE COURT:  Oh.  Okay.  All right.  Okay.

11         MR. HEMANN:  Is that right?

12         MR. VILLAZOR:  Yeah.

13         THE COURT:  So, then, the defense should be ready to

14  proceed after Thanksgiving.  The day after -- I mean, the

15  Monday after Thanksgiving.

16         MR. GETZ:  The defense is always ready, Your Honor.

17         THE COURT:  Pardon?

18         MR. GETZ:  The defense is always ready.

19         THE COURT:  Ah, that's music to my ears.  Music to my

20  ears.  Thank you very much.

21         MR. VILLAZOR:  Thank Your Honor.

22         THE COURT:  Okay.

23         MR. HEMANN:  Thank you, Your Honor.

24         THE COURT:  Thanks, and I'll see you all Monday.

25         MR. HEMANN:  Yes, Your Honor.

PROCEEDINGS                                                        1008

1          (Trial Exhibit 295 marked for identification)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    **INDEX**

2

3  **PLAINTIFF'S WITNESSES**                            **PAGE**   **VOL.**

4  **HERNANDEZ, CESAR**
   (PREVIOUSLY SWORN)                                    742      5
5  Cross Examination resumed by Ms. Caffese              745      5
   Redirect Examination by Mr. Hemann                    862      5
6  Recross Examination by Ms. Caffese                    868      5

7

8  **AGOSTA, FRANK**
   (SWORN)                                               888      5
9  Direct Examination by Mr. Villazor                    888      5
   Cross Examination by Mr. Getz                         893      5
10 Cross Examination by Ms. Caffese                      897      5

11

12 **BRANDT, DAVID**
   (SWORN)                                               900      5
13 Direct Examination by Mr. Villazor                    900      5
   Cross Examination by Mr. Getz                         906      5
14 Cross Examination by Ms. Caffese                      908      5
   Redirect Examination by Mr. Villazor                  908      5

15

16 **DOHERTY, SEAN**
   (SWORN)                                               909      5
17 Direct Examination by Mr. Villazor                    910      5
   Cross Examination by Mr. Getz                         924      5
18 Redirect Examination by Mr. Villazor                  932      5

19

20 **NESTOR, GREGORY**
   (SWORN)                                               933      5
21 Direct Examination by Mr. Villazor                    934      5
   Cross Examination by Ms. Caffese                      940      5

22

23 **REYNOSO, CAYETANA**
   (SWORN)                                               944      5
24 Direct Examination by Mr. Hemann                      945      5
   Cross Examination by Ms. Caffese                      950      5

25

**BYRD, ANDREW CLINTON**
(SWORN)                                        957     5
Direct Examination by Mr. Villazor           958     5
Cross Examination by Mr. Passaglia           977     5
Cross Examination by Ms. Caffese             984     5
Redirect Examination by Mr. Villazor         992     5
Recross Examination by Ms. Caffese           993     5


**HECKMAN, DETECTIVE ANTHONY**
(SWORN)                                        994     5
Direct Examination by Mr. Hemann             994     5
Cross Examination by Mr. Getz                999     5
Cross Examination by Ms. Caffese            1003     5

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 56 | | | 822 | 5 |
| 111 | | | 892 | 5 |
| 112A | | | 937 | 5 |
| 112B | | | 937 | 5 |
| 113A | | | 937 | 5 |
| 113B | | | 937 | 5 |
| 114 | | | 936 | 5 |
| 116 | | | 898 | 5 |
| 126A | | | 939 | 5 |
| 126B | | | 939 | 5 |
| 126C | | | 939 | 5 |
| 126D | | | 939 | 5 |
| 126E | | | 939 | 5 |
| 126F | | | 939 | 5 |
| 126G | | | 939 | 5 |
| 126H | | | 939 | 5 |
| 253 | | | 960 | 5 |
| 294 | 886 | 5 | | |
| 295 | 1008 | 5 | | |

1

2

3

4                    **CERTIFICATE OF REPORTERS**

5          I, BELLE BALL, and I, KATHERINE SULLIVAN, Official

6   Reporters for the United States Court, Northern District of

7   California, hereby certify that the foregoing is a correct

8   transcript from the record of proceedings in the above-entitled

9   matter.

10

11      /s/  Belle Ball_____

12              Saturday, November 15, 2014

13           Belle Ball, CSR 8785, CRR, RDR

14

15

16

17      /s/  Katherine Sullivan _____

18              Saturday, November 15, 2014

19       KATHERINE SULLIVAN, CSR 5812, CRR, RMR

20

21

22

23

24

25