Volume 6

Pages 1012 — 1299

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
  vs.                              )  NO. CR 14-102-CRB
                                   )
IAN FURMINGER and EDMOND ROBLES,   )
                                   )  San Francisco, California
          Defendants.             )  Monday
                                   )  November 17, 2014
_____)  9:04 a.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          MELINDA HAAG
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                  BY:   JOHN HENRY HEMANN
                        RODNEY C. VILLAZOR
                        Assistant United States Attorneys


For Defendant Ian Furminger:
                        LAW OFFICES OF BRIAN H. GETZ
                        201 California Street
                        Suite 450
                        San Francisco, California  94111
                  BY:   BRIAN H. GETZ, ESQ.
                        JOHN PAUL PASSAGLIA, ESQ.


Reported by:            BELLE BALL, CSR 8785, CRR, RDR
                        KATHERINE SULLIVAN, CSR 5812, CRR, RMR
                        Official Reporters, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**

**For Defendant Edmond Robles:**
      **LAW OFFICES OF TERESA CAFFESE**
      **1000 Brannan Street**
      **Suite 400**
      **San Francisco, California  94103**
    **BY:  TERESA CAFFESE, ESQ.**
      **HEATHER KELLY, ESQ.**

**Spanish-Language Interpreter:**
      **Ines S. Swaney**

**Also Present:**   **Defendant Ian Furminger**
      **Defendant Edmond Robles**
      **Special Agent Melissa Patrick**
      **Special Agent Sandra Flores**
      **Dalida Vartanian**
      **Stephen Janick**
      **Alycee Lane**

```
 1   MONDAY, NOVEMBER 17, 2014                        9:04 A.M.

 2                      P R O C E E D I N G S

 3       (The following proceedings were held in open court, in the

 4   presence of the Jury:)

 5            THE COURT:  Please be seated.  Okay.  Let the record

 6   reflect all jurors are present.  All parties are present.

 7       You may call your next witness.

 8            MR. VILLAZOR:  Thank you, Your Honor.  The government

 9   calls William Sicord.

10            THE CLERK:  Will the witness come forward and take

11   the witness stand.

12       Please remain standing and raise your right hand.

13            ROBERT SICORD, PLAINTIFF WITNESS, SWORN

14            THE WITNESS:  I do.

15            THE CLERK:  Please be seated.

16       Please state your full name.  Spell your last name for the

17   record.

18            THE WITNESS:  William Sicord.  S-i-c-o-r-d.

19                      DIRECT EXAMINATION

20   BY MR. VILLAZOR:

21   Q.   Good morning.

22   A.   Good morning.

23   Q.   Do you work for the Drug Enforcement Administration?

24   A.   That's correct.

25   Q.   What's your job title?
```

SICORD - DIRECT / VILLAZOR

```
 1   A.   I'm a special agent.

 2   Q.   How long have you been with the DEA?

 3   A.   Twenty-three years.

 4   Q.   Where did you start?

 5   A.   I started with DEA in Boston, and was transferred to DEA

 6   in San Francisco.

 7   Q.   How long have you been a special agent with the DEA in

 8   San Francisco?

 9   A.   About almost -- all but two months of the 23 years here in

10   San Francisco.

11   Q.   Can you generally describe to the members of the jury what

12   the DEA does and what do you.

13   A.   We conduct drug investigations of federal offenses, drug

14   trafficking.  And we try to target large organizations that

15   traffic across state lines, county lines, and even

16   internationally.

17   Q.   Are you assigned to a particular unit within the DEA?

18   A.   I am.

19   Q.   What is that unit?

20   A.   Right now I'm assigned to Group One of the San Francisco

21   Field Division.

22   Q.   Is Group One assigned to a particular field?

23   A.   We're based here in the San Francisco office.  And we

24   conduct investigations here out of the -- pretty much out of

25   the Northern District of California.
```

SICORD - DIRECT / VILLAZOR

1  Q.   Prior to being assigned to Group One what was your

2  assignment within the DEA?

3  A.   I've had several assignments within the DEA.

4       At one point, I was assigned to the San Francisco

5  Metropolitan Task Force.

6  Q.   Is that in 2009?

7  A.   Yes.  Yes.

8  Q.   What's the Metropolitan Task Force?

9  A.   It's a task force -- a special investigative group made of

10  DEA agents and San Francisco police officers.

11  Q.   Is there a particular area that the Metro Task Force is

12  assigned to do?

13  A.   We try to investigate organizations that have some nexus

14  to San Francisco.  Not always, but we try to -- but we try to

15  utilize those resources of the San Francisco Police Department

16  and have some kind of nexus back here to the city.

17  Q.   And the -- the people that are assigned to the

18  Metropolitan Task Force they include DEA agents?

19  A.   Yes.

20  Q.   Do they include San Francisco police officers?

21  A.   Yes, they do.

22  Q.   Are those San Francisco police officers deputized

23  federally?

24  A.   Yes, they are.

25  Q.   And they are called Task Force officers?

1   **A.**   Task Force officers.

2   **Q.**   In 2009, when you were on the Metro Task Force, were there

3   particular San Francisco police officers that were assigned to

4   your group?

5   **A.**   Yes.

6   **Q.**   Who were they?

7   **A.**   I believe, Inspector Phil Fee.

8   **Q.**   How do you spell Phil Fee?

9   **A.**   F-e-e.

10          And Britt Elmore, who -- I think he's a patrolman.  I

11   believe he was assigned to our group.  And Daniel Perea

12   P-e-r-e-a.  He was assigned to our group from San Francisco

13   Police Department.

14   **Q.**   And, I'm sorry, roughly what time period are we talking

15   about with the Metro Task Force that you were working?

16   **A.**   Well, I've been working -- I worked Metro Task Force,

17   probably, 20 years.  But the time you're asking about, I

18   believe, is 2008-2009.

19   **Q.**   Agent Sicord, I'm going to ask you about a particular

20   investigation.  But before I do that, does the DEA and do you

21   use wiretaps as an investigative tool for law enforcement

22   purposes?

23   **A.**   We do.

24   **Q.**   All right.  And generally explain to the jury what a

25   wiretap is.

1  **A.**    Well, it's where we receive court authorization after

2  making an -- writing an affidavit, bringing it to a District

3  Court Judge.  We receive court approval to intercept telephone

4  conversations of different drug dealers.  We do intercepts both

5  state -- in the state level and federal level.

6  **Q.**    And once you have a wiretap approved, and you're

7  intercepting those communications, does the DEA do

8  surveillance?

9  **A.**    We do.

10 **Q.**    What's the purpose of doing surveillance with a wiretap

11 monitoring?

12 **A.**    Well, we need to go out and, sort of, make sense of

13 what -- of the conversations that we're hearing.  In many

14 instances we'll try to interdict drugs or money, or even just

15 observe criminal activity that we hear about over the phone,

16 and try to corroborate what we hear over the phone, and present

17 it as evidence, subsequently, in federal or state proceedings.

18 **Q.**    Are there members of the Task Force, law enforcement

19 members, who also have to stay in the room where the wiretap is

20 being monitored?

21 **A.**    Yes.

22 **Q.**    What is the purpose of that?

23 **A.**    Well, in many instances the intercepts are in foreign

24 language, so we have linguists who actually do the monitoring.

25 But the agents are there to, sort of, decipher codes that

1  they're using and then, also, sort of, to be the liaison to the

2  agents out on the street.

3  Q.   So there's an agent in that wiretap room to coordinate

4  efforts --

5  A.   Yes.

6  Q.   -- outside of the wiretap room?

7  A.   Yes.

8  Q.   Outside of the Task Force do you also utilize

9  San Francisco police officers?

10  A.   Yes, we do.

11  Q.   In what capacity?

12  A.   Well, frequently, they'll assist with surveillance.  And

13  also, then, in some instances, we will ask them to do a stop on

14  a vehicle, or go into a location, a house where we suspect

15  drugs are located that we hear about over the wire.

16  Q.   What's the purpose of using a San Francisco police

17  officer, outside of the Task Force, to do those actions?

18  A.   In most cases it prevents the targets of our wiretap

19  intercept to figure out that they're actually targets of a

20  federal wiretap.  So we found, over the years, that a local

21  police department doing an interdiction stop on another vehicle

22  arouses less suspicion than saying -- you know, than DEA agents

23  doing the stop or enforcement stop.

24  Q.   Otherwise, it would otherwise look like an unlucky traffic

25  stop?

SICORD - DIRECT / VILLAZOR

1   **A.**    Correct.

2   **Q.**    Agent Sicord, as part of the Metro Task Force did you

3   initiate a wiretap investigation in January of 2008?

4   **A.**    Yes, we did.

5   **Q.**    Can you explain to members of the jury how you started

6   that wiretap investigation?

7   **A.**    So in -- in early 2008, we received information from our

8   office in Ventura, California who had intercepted two different

9   telephones in East Palo Alto, California, for two different

10  drug suspects who were brothers.  They were later identified as

11  Adrian and Leonardo Magaña.  They provided us the contents of

12  those telephones -- those telephone conversations.

13      And there were many drug-related conversations which we

14  initiated a drug investigation on.  And when we figured out who

15  the users of those telephones were, the Magaña brothers, we --

16  we figured out that they were actually brothers of a target

17  that the San Francisco Police Department and the San Mateo

18  County Task Force were working on.

19  **Q.**    And who were those targets?

20  **A.**    A woman by the name of Gricelda Magaña Aguilar and her

21  husband, Sergio Vasquez Vega.

22  **Q.**    Did Sergio Vasquez Vega go by any particular alias?

23  **A.**    He had, to my recollection, two different aliases.  One of

24  which was Manny and one of which was Bote.

25  **Q.**    How do you spell Bote?

1  **A.**    B-o-t-e.

2      And we didn't learn about that alias until our subsequent

3  wiretap when people just, sort of, talked to him using that

4  nickname.

5  **Q.**    Eventually, did the Task Force initiate a wiretap

6  investigation into Sergio Vasquez and Gricelda Aguilar --

7  **A.**    Yes.

8  **Q.**    -- among others?

9  **A.**    So, if I could clarify, we used the information from our

10  Ventura office to work on two different telephones.  And then

11  we, kind of, merged that investigation with an existing

12  investigation that SFPD and the San Mateo County Task Force

13  were targeting on Sergio and Griselda.  We, kind of, made it

14  into one large investigation, one large federal investigation.

15  **Q.**    Okay.

16      Was Ian Furminger, of the Mission Station, was he part of

17  the Metropolitan Task Force?

18  **A.**    No.

19  **Q.**    Ed Robles?

20  **A.**    No.

21  **Q.**    Rey Vargas?

22  **A.**    No.

23  **Q.**    Were they part of monitoring any wiretaps in your

24  investigation?

25  **A.**    No.

```
 1   Q.    Were they part of doing any surveillance as part of the

 2   DEA coordination?

 3   A.    No, not that I'm aware of.

 4   Q.    Did you use any particular investigative techniques with

 5   Mr. Vasquez or Ms. Aguilar?

 6   A.    I'm sorry?

 7   Q.    Did you introduce any law enforcement officers undercover?

 8   A.    Yes.  Prior to even the DEA getting involved, as I said

 9   before, the SFPD and the San Mateo County Task Force had an

10   undercover officer, Britt Elmore, from the SFPD department, who

11   was buying drugs undercover from Sergio Vasquez Vega and

12   Sergio's wife, Gricelda Magaña.

13   Q.    Do you recall approximately how many undercover buys he

14   performed?

15   A.    I believe four or five.

16   Q.    What was he buying?

17   A.    I believe he was buying ounces of heroin and ounces of

18   methamphetamine.

19   Q.    After those undercover buys the DEA then placed Sergio

20   Vasquez and Gricelda Aguilar under arrest?

21   A.    No.

22   Q.    Why not?

23   A.    Our intent in the investigation was to target the large

24   organization of which they were part.

25         So we used the information from their drug buys, targeted
```

1  their telephones, along with the telephones of their brothers,

2  who I mentioned were intercepted in our -- from our Ventura

3  investigation.  We targeted a large organization, at least,

4  from which they were getting their heroin.

5        And we ultimately moved from the Magaña's telephones and

6  Sergio's telephone to their source of supply in the East Bay

7  and in the Central Valley.

8  Q.   So, in other words, were you going up the chain?

9  A.   Yes, sir.

10 Q.   How far did that chain take you?

11 A.   I would say at least two levels above the Magañas.

12 Q.   Did it take you internationally?

13 A.   We did.  One of the targets -- we ultimately went up on a

14 federal investigation on the telephones in the Central Valley.

15 We -- we did that intercept of the Eastern District of

16 California.  And we eventually intercepted their suppliers in

17 Mexico.

18 Q.   As you were going up the chain, what happened with

19 Gricelda Aguilar and Sergio Vasquez?

20 A.   We just, sort of, moved on to these higher targets.

21       And I would say there's a good -- maybe nine months to a

22 year we just kind of -- I don't want to say we forgot about

23 them.  We just, kind of, moved on up to the higher targets.

24 Q.   You already had those undercover buys through Britt Elmore

25 with these individuals?

1  **A.**   Yes.  And we had done other enforcement actions which

2  secured us, in our minds, enough evidence to prosecute them.

3  In order to keep the case going to the larger targets we, sort

4  of, left Sergio and Gricelda out there as we moved on to these

5  higher targets.

6  **Q.**   Did you feel you had enough evidence to place them under

7  arrest at any given time?

8  **A.**   Yes.

9  **Q.**   Did you learn that Sergio Vasquez had contact with law

10  enforcement as you were going up the chain?

11  **A.**   Yes.  In 2009, we did subsequently learn that they had

12  contact with law enforcement.

13  **Q.**   When did you learn that?

14  **A.**   I believe it was in late May of 2009.

15  **Q.**   Was it around any particular holiday?

16  **A.**   Is it Memorial Day weekend?

17  **Q.**   Whatever your recollection.

18  **A.**   It was May 25th, I believe, they were arrested.  If that

19  was a three-day weekend, I think we probably learned about it

20  on the Tuesday.  So I think we learned about it on May 26th.

21  **Q.**   So after the fact?

22  **A.**   After the fact.

23  **Q.**   What did you learn?

24  **A.**   I remember coming into the office and being told by one of

25  the Task Force members -- I believe it was Britt Elmore who

 1  told me that Sergio and Gricelda had been arrested the day

 2  before.

 3  Q.  Did you learn of any other actions that were taken?

 4  A.  I was told that the officers, I believe it was from

 5  Mission Station, their plainclothes unit had done the arrest

 6  here in San Francisco.  And I was told that they subsequently

 7  executed a search of their house in Newark, California.

 8  Q.  Now, during the part of when you were actively

 9  investigating Mr. Vasquez and Ms. Aguilar, did you know about

10  that Newark house?

11  A.  No.  To my recollection, their last address that we had

12  for them was in East Palo Alto.

13  Q.  Did you receive any call from any of the Mission Station

14  police officers upon the arrest?  Did they call you to let you

15  know?

16  A.  No.

17  Q.  Did any Mission police officer call you to let you know

18  that they were going to search a house in Newark?

19  A.  No.

20  Q.  Did any of them call you to let you know that they had

21  placed them under arrest or that they had searched the house?

22  A.  No.  Nobody from Mission Station.

23     One of the -- as I said earlier, I think Officer Elmore,

24  who was a deputized Task Force officer on the investigation,

25  was the one who informed me, I believe.

SICORD - CROSS / GETZ

1            **MR. VILLAZOR:**  Just a minute, Your Honor.

2        No further questions, Your Honor.

3            **THE COURT:**  Any cross?  Mr. Getz.

4                        <u>**CROSS EXAMINATION**</u>

5    **BY MR. GETZ:**

6    **Q.**   Good morning.

7    **A.**   Good morning.

8    **Q.**   I think you said during your testimony a few minutes ago

9    that Sergio and Gricelda -- or one of them -- were set up to

10   sell ounce-size quantities of narcotics, but they weren't

11   arrested at that moment.  Do you remember that testimony?

12   **A.**   I do.

13   **Q.**   How many times did that happen, that you're aware of?

14   **A.**   I believe four.  But the SFPD and San Mateo Task Force

15   were investigating them prior to -- prior to DEA being

16   involved.

17   **Q.**   So the four times we're talking about, at this moment,

18   we're talking about four times that the DEA successfully bought

19   drugs from Gricelda and/or Sergio; correct?

20   **A.**   I believe we funded three or four buys.

21   **Q.**   That's fine.

22        And it was pretty obvious, during those three or four

23   buys, that Gricelda and Sergio had no idea they were selling to

24   law enforcement while they were doing so; correct?

25   **A.**    I believe having a conversation with Officer Elmore

1    subsequent to one of his buys, where he thought that they may

2    have recognized him from a prior purchase.  But I don't know

3    whether it was early on in the investigation or subsequent, but

4    I believe I had a conversation with Officer Elmore that he

5    thought that they may have recognized him, but they continued

6    to sell to him.

7    Q.    And in your 22 years as a DEA special agent, have you been

8    involved in what I'll call controlled buys, where the law

9    enforcement agent buying from the legitimate drug seller --

10   legitimate in the sense that it's a true believer in

11   recreational narcotics -- and at some point the seller senses

12   that the seller is dealing with law enforcement and gives any

13   kind of excuse not to deliver the goods?  I got to go.  I

14   forgot about something.  I brought the wrong bag.  And the deal

15   is squashed because the person is afraid of the peril of being

16   arrested if they do the hand-to-hand.  Have you ever seen that

17   happen?

18   A.    I'm not sure I understand.  The "true believer"?

19   Q.    Bad choice of words.  Let me try to do it a different way.

20         Gricelda and Sergio completed the deal and walked away

21   with DEA-marked money; correct?

22   A.    Yes.

23   Q.    All right.  Now, so far as we know, they accepted the

24   money, and they were not arrested for any of those deals.  So,

25   as far as we know, they didn't realize that they had just been

1  involved with law enforcement; correct?

2  A.   Correct.

3  Q.   Which means that they were free to go ahead with their

4  other deals which they undoubtedly did; correct?

5  A.   Yes.

6  Q.   They kept on selling drugs for money up until the time

7  that they were arrested -- I think you mentioned it was late

8  May 2009 -- right?

9           MR. VILLAZOR:   Objection.  Calls for speculation.

10  BY MR. GETZ:

11  Q.   Well, I'm not trying to ask the witness to speculate.

12        So they were arrested in late 2009 -- I believe you

13  testified to that -- right?

14  A.   Yes.

15  Q.   They were arrested by San Francisco police officers;

16  weren't they?

17  A.   They were arrested in May of 2009, by San Francisco police

18  officers, yes.  That's your question?

19  Q.   Yes.

20  A.   Okay.

21  Q.   And one of the San Francisco police officers who was

22  involved with the arrest of those two was my client,

23  Ian Furminger.  Do you know that name?

24  A.   I do.  I do now.  At the time I didn't.

25  Q.   Of course.

1      And you didn't know it at the time because at the time he

2   wasn't connected to your Task Force; correct?

3   **A.**    Correct.

4   **Q.**   He was doing his own investigation; wasn't he?

5            **MR. VILLAZOR:**  Objection.  Calls for speculation.

6            **THE COURT:**  Sustained.

7   **BY MR. GETZ:**

8   **Q.**   In any event, they got arrested by San Francisco Police

9   officers who were unaware of the investigation you were doing?

10           **MR. VILLAZOR:**  Objection.  Calls for speculation.

11           **THE COURT:**  Sustained.

12           **MR. GETZ:**  May I show the witness a police report?

13           **THE COURT:**  Sure.

14           **MR. GETZ:**  Number 090547335.

15           **THE COURT:**  Is this the witness's police report?

16           **MR. GETZ:**  It's a San Francisco Police report.

17           **THE COURT:**  Some other person wrote?

18           **MR. GETZ:**  Correct.

19           **THE COURT:**  Okay.  You may show it to him.  But he

20   can't testify from the report.

21           **MR. GETZ:**  You're right.  As always the Court, is

22   correct.

23           **THE COURT:**  Well, not always.

24           **MR. GETZ:**  I would like him to -- I would like him to

25   read it to himself.  And then I'll ask a question --

 1              THE COURT:  Sure.  Take your time --

 2              MR. GETZ:  -- with the Court's permission.

 3              THE COURT:  -- and read it, Agent.

 4         (Witness reading.)

 5              THE WITNESS:  Okay.

 6    BY MR. GETZ:

 7    Q.   Did you have time, just now, to read up to page 7 of 7,

 8    the narrative?

 9    A.   No.  My report stops at page 5 of 5.

10    Q.   All right.  I gave you the wrong one.

11              MR. GETZ:  I'm sorry.  Substituting 090540436.

12              THE COURT:  Is that an exhibit?

13              MR. GETZ:  Not yet.

14              MR. VILLAZOR:  Your Honor, it is.  It's actually in

15     tab 5.

16              THE COURT:  So it's in evidence?

17              MR. VILLAZOR:  It's in evidence.

18              THE COURT:  Okay.  So tab 5.  Okay.

19              THE WITNESS:  Which part do you want me to look at?

20    BY MR. GETZ:

21    Q.   I wanted you to read the narrative part where Sergio and

22    Gricelda were picked up by the police.

23         Have you had a chance to read that?

24    A.   It's the narrative portion.  Okay.

25    Q.   And my brother of the Bar, Mr. Villazor, has advised me

 1  that you're looking at evidence item 247, tab 5.

 2          **THE COURT:**  Well, he wouldn't know that, right, for

 3   the record.

 4  **BY MR. GETZ:**

 5  **Q.**   Have you had a chance to read that narrative?

 6  **A.**   Just -- it details the stop of Sergio and Gricelda.

 7  **Q.**   Correct.

 8  **A.**   Yes.

 9  **Q.**   And this was done by San Francisco police officers;

10  correct?

11          **MR. VILLAZOR:**  Your Honor, I'm going to object to the

12   foundation.

13          **THE COURT:**  Well, this is in evidence.  So I don't --

14   I'm going to permit the questions.  The witness either has --

15   if he doesn't have knowledge of it, he doesn't have knowledge

16   of it.  If he has knowledge of it, he does.  But the document

17   itself is in evidence.

18       So go ahead, Mr. Getz.

19  **BY MR. GETZ:**

20  **Q.**   Looking at that now, does this refresh your recollection

21  of what happened to Gricelda and to Sergio?

22       Haven't you seen this before?

23          **THE COURT:**  Was your question:  "Have you seen this

24   before?"

25

1  BY MR. GETZ:

2  Q.   Well, have you seen this before?

3  A.   Have I seen this report before?  Yes, I have seen it

4  before.

5  Q.   All right.  So now that I've shown it to you, you remember

6  the circumstances surrounding -- does it refresh your

7  recollection of how Gricelda and Sergio were picked up by the

8  San Francisco Police?

9  A.   Yes.  On the afternoon of May 25th.

10 Q.   And does it refresh your recollection that it happened

11 because Furminger, for one, had no idea that there was this DEA

12 investigation going on?  Right?

13          MR. VILLAZOR:  Objection.  Speculation.

14          THE COURT:  Well, sustained.

15 BY MR. GETZ:

16 Q.   All right.  Is it -- are there times where -- where

17 different agencies, be it FBI, or DEA, or San Francisco Police,

18 or sheriffs, county sheriffs' organizations, or any number of

19 law enforcement agencies are investigating the same person

20 where the other agencies don't know?  Does that happen?

21 A.   It does happen.

22 Q.   And that's what happened here; wasn't it?

23          MR. VILLAZOR:  Objection.  Calls for speculation.

24          MR. GETZ:  I can overcome that objection by asking

25 the question better.

**BY MR. GETZ:**

**Q.**   You found out, after they got picked up by the police,
that some local law enforcement officers were investigating
these people; didn't you?

**A.**   I was –– I found out the day after they were arrested that
the SF –– the San Francisco Police Department had arrested them
the night before.

I'm not aware whether they were investigating the day
before they were arrested.  I just came in the day later and
was told that they had been arrested.  I don't know the content
of any prior investigation other than –– than seeing the arrest
report and then that they subsequently did a search warrant of
the house.

**Q.**   Were you concerned, at that moment, that the San Francisco
Police action was going to mess up your DEA work?

**A.**   The only thing I was concerned about, at that time, was
making sure that we could get Sergio and Gricelda and other
members of the Magaña family into federal custody when we were
going to take down our larger federal investigation.

At that point, I don't think I was overly concerned,
because we had moved on one or two levels above Sergio and
Gricelda.  I was not worried that the SF arrest was going to
jeopardize that higher-level investigation.

**Q.**   You weren't worried that Sergio and Gricelda were going to
tell their people above them that they had been picked up by

```
 1   the police?

 2   A.    At that point, we had been investigating their suppliers

 3   for nearly a year.  And we had secured a tremendous amount of

 4   evidence against their higher-ups.

 5   Q.    But they didn't know that at that time; did they?

 6   A.    Who's that?

 7   Q.    The higher-ups.  They didn't know that you had done an

 8   investigation of Mr. Big?

 9              MR. VILLAZOR:  Objection.  Calls for speculation.

10              THE COURT:  Well, first of all, I don't know who

11    "Mr. Big" is.

12        (Laughter)

13   BY MR. GETZ:

14   Q.    Do you know who I mean --

15              THE COURT:  Go ahead.

16   BY MR. GETZ:

17   Q.    Do you know who I mean by Mr. Big, the ones you're looking

18   for at the top?

19   A.    So, I'm sorry, is your question was I worried at the time

20   that SFPD arrested Sergio and Gricelda?  Was I worried?  No,

21   because at the time our higher-up was already -- was already in

22   custody.  The main player in our investigation was already in

23   custody in Stanislaus County, and we were awaiting a federal

24   indictment on him.

25        So if this arrest occurred in May of 2009, the higher --
```

1   our highest target in the United States was in custody on -- we

2   took him into custody on March 19th, 2009.  So it was a good

3   two months before.

4   **Q.**   Had your wiretap already been disclosed by the time

5   Gricelda and Sergio were picked up?

6   **A.**   No.

7   **Q.**   Now let's talk about wiretap for a moment.  And you

8   described how wiretap works and how it's a law enforcement

9   tool.  But you didn't say anything about how often a wiretap

10  gets run compared to the greater number of drug cases.

11       A wiretap is a rare event.  Do you agree with that?

12  **A.**   I'm -- you kind of lost me on the --

13  **Q.**   All right.  Let me try to do a better job with you.

14       I suggest to you that if you're investigating 20 drug

15  cases in the San Francisco region, maybe you'll try to get, at

16  most, one wiretap.  Do you agree with that?  1 out of 20, I

17  tell you.

18  **A.**   Me personally, or the other agents in my office or -- we

19  do a lot of wiretaps.

20  **Q.**   Yeah.  In 22 years how many wiretaps have you done?

21  **A.**   I've participated, probably, 20 --

22  **Q.**   Sure.

23  **A.**   -- 25 wiretaps.

24  **Q.**   20, 25.  About one a year; correct?

25  **A.**   (Nods head.) Probably.

1   Q.   In your 22 years, how many drug cases, how many different

2   drug cases have you investigated?

3   A.   Several hundred.

4   Q.   So my question is very simple.  It's rare to run a

5   wiretap; correct?

6   A.   I would say somewhat rare.  I do -- we do a lot of

7   wiretaps.

8   Q.   Yeah.  But I'm just pointing out, if you do hundreds of

9   cases in a 22-year career, and you've only done 20 to 25

10  wiretaps, your percentage is pretty low?

11  A.   Correct.  But some of our wiretaps last longer than a

12  year.

13  Q.   So is it fair to say then, since wiretaps are relatively

14  rare, you remember this particular arrest as being potentially

15  interfering with the wiretap that was happening

16  contemporaneously with it?

17  A.   I believe I said our wiretap had ended two months prior to

18  this arrest.  So at the time my recollection was I want to make

19  sure that Sergio and Gricelda and any other members of the

20  initial part of our conspiracy that we targeted would be taken

21  into federal custody.

22       Our wiretap had concluded on the sources of supply at the

23  time.  So I was not particularly worried -- I think we had

24  gone, at least domestically in the United States, as far as we

25  could go.

1   Q.   Is it fair to say it was not a good thing for the DEA when

2   the San Francisco Police picked these two up; was it?

3   A.   Actually, it wasn't a bad thing for us because that way

4   when we -- we had not gotten our federal indictment out of the

5   Eastern District of California.  And in cases such as this -- I

6   believe, we had indicted 15 to 20 different members of the

7   organization all the way up.  Frequently, one of the big

8   problems we have is locating our initial targets.

9        So, in actuality, when these guys were picked up it sort

10  of lessens our problem of trying to locate them, when we

11  arrested the other members of the conspiracy, because they were

12  already in custody.

13  Q.   Meaning that it worked out for you in hindsight?

14  A.   Yes.

15  Q.   But if it had been up to you, at that moment, you would

16  rather they were not arrested that night; correct?

17  A.   Frequently, in cases like this, I'm happy when our

18  defendants, who we are going to indict federally at a later

19  date, are in custody.  So that way I don't need to go look for

20  them at a later date.

21       So in actuality, yes, it was fortunate for us that Sergio

22  was taken into custody.  In fact, the day after they -- Sergio

23  was arrested, we asked SFPD to do a second investigation to

24  get -- my recollection was Sergio was in custody, Gricelda was

25  released.

```
 1         We actually asked SFPD to see if they could arrest them
 2    again for us so we had the second person in custody.  And then
 3    there was another member of the conspiracy picked up with them
 4    two days later.  So it was -- it was very good for us because
 5    we had asked them to initiate a second investigation on them.
 6    Q.   So if Sergeant Furminger was involved in what you just
 7    discussed he did something good; didn't he?
 8    A.   I don't know who -- I don't necessarily -- if he was
 9    involved, yes.  As well as the other officers.
10         You know, we just asked them to keep these guys in custody
11    for us.
12              MR. GETZ:  Thank you.
13              THE COURT:  Ms. Caffese.
14              MS. CAFFESE:  Thank you, Your Honor.
15                         CROSS EXAMINATION
16    BY MS. CAFFESE:
17    Q.   Good morning, sir.
18    A.   Good morning.
19    Q.   My name is Teresa Caffese.  And I have a few questions for
20    you, if I may.
21         So my understanding is that, oftentimes, members of our
22    local San Francisco Police Department become cross-designated
23    with the federal government; is that correct?
24    A.   Yes.
25    Q.   And they participate in narcotics investigations with the
```

 1  federal government, the DEA; is that right?

 2  **A.**    Correct.

 3  **Q.**    And as you've already testified, Britt Elmore was one of

 4  those officers, local police officers, that worked with you on

 5  larger narcotics investigations; is that right?

 6  **A.**    Yes.  And just to clarify, there's -- we have agents -- we

 7  have officers who would be assigned to the Task Force.  But

 8  then there's also a situation where officers are allowed to be

 9  cross-designated federally for case-specific or

10  investigation-specific instances.

11      So this was a larger case.  And I don't -- at the time, I

12  don't remember if Officer Elmore was assigned to the Task Force

13  or he was just cross-designated to work that one particular --

14  just one particular investigation.

15  **Q.**    And that would have been the Manny-Gricelda-Vasquez larger

16  family investigation; correct?

17  **A.**    Correct.

18  **Q.**    All right.  Go ahead.

19  **A.**    It was -- there's a -- an organization called OCDETF,

20  which is a federal -- it's a conglomeration of different

21  federal agencies who work together on larger narcotics

22  investigations.

23      So I don't remember if Officer Elmore, at the time, was

24  assigned to the Task Force, or he was just cross-designated for

25  this one large OCDETF investigation.

Q.    How often would you have spoken with Officer Elmore during

this time period that we've been speaking of, '08-'09?

A.    Pretty frequently.  If not daily -- if he -- if he was --

I would say very regularly.

Q.    When did you last work with him?

A.    After this investigation?

      I mean, we've worked other investigations on and off

together.  We may work on a surveillance.  Or I'll see him in

the office and ask him about different investigations.  He and

I talk regularly.

Q.    Okay.  Now, as the DEA conducts their investigations -- I

mean, you're aware that, obviously, our local police department

has units called plainclothes, for example; is that right?

A.    Yes.

Q.    And are you, I assume, familiar with the Mission area of

the Mission Station?

A.    Yes.

Q.    And you're aware that Mission Station has a plainclothes

unit; is that right?

A.    Plainclothes unit or units?

Q.    Units?

A.    Yes, yes.

Q.    Oftentimes those plainclothes officers work undercover; is

that right?

A.    Yes.

1  **Q.**   Not dissimilar to what you do in your capacity as a DEA

2  agent.  Fair enough?

3  **A.**   Yes.

4  **Q.**   They try to abate crime.  They participate in undercover

5  buy/bust operations.  They try to arrest drug dealers.  Is that

6  right?

7  **A.**   Yes.

8  **Q.**   Some of them are small drug dealers.  Some of them are big

9  drug dealers.  Is that right?

10  **A.**   My understanding, yes.

11  **Q.**   Okay.  And there was nothing about the arrests of Manny

12  and Gricelda Vasquez that interfered with your narcotics

13  investigation.  Is that fair enough?

14  **A.**   Could you restate that.

15  **Q.**   You testified that as a result of the Manny/Gricelda

16  investigations here locally --

17  **A.**   Right.

18  **Q.**   -- and also larger, in terms of what you folks were doing

19  at a bigger level, you were able to make a lot of big busts.

20  Is that right?

21  **A.**   We were subsequently able to make several other arrests,

22  yes.

23  **Q.**   And these were conspiracies to distribute heroin and

24  cocaine.  Or you tell me.  What types of drugs were you able

25  to --

 1  **A.**   The larger investigation targeted heroin distribution.

 2  **Q.**   All right.  And nothing about the arrest of Manny and

 3  Gricelda Aguilar, Vasquez Aguilar interfered -- interfered with

 4  those federal prosecutions.  True statement?

 5  **A.**   True statement.

 6  **Q.**   Well, I mean, you were able to secure convictions --

 7  **A.**   Yes.

 8  **Q.**   -- of these folks; is that right?

 9  **A.**   Their arrest did not interfere with their prosecution.

10  **Q.**   Right.

11       And if a local police officer working undercover -- such

12  as Officer Robles -- sees local drug dealers committing crimes,

13  they're not just -- would you agree they should not just ignore

14  that because you happen to be doing an investigation of some

15  other people that might be involved with the folks they're

16  arresting?

17  **A.**   Could you -- I don't understand the question.

18  **Q.**   All right.  Well, local police officers, would you agree,

19  should not ignore local drug dealing simply because you're

20  investigating people that might be involved in other narcotics

21  related --

22            **THE COURT:**  Are you assuming he's -- Counsel is

23   rising.

24       I think it's an incomplete hypothetical.

25       The question is -- are you asking the agent if a local law

STCORD- CROSS / CAFFESE

```
 1   enforcement officer who observes a drug transaction should

 2   ignore that drug transaction?  That's the question.  And I

 3   think the context is assuming he does or does not know that

 4   there's a federal investigation.

 5       Are you assuming he knows there's a federal investigation?

 6           MS. CAFFESE:  Let me rephrase, Your Honor.

 7           THE COURT:  Okay.

 8   BY MS. CAFFESE:

 9   Q.   If a San Francisco police officer is aware of illegal

10   activity regarding a suspect, is it fair to say they should

11   investigate that illegal activity?

12   A.   Yes.

13   Q.   They shouldn't simply just ignore it; correct?

14   A.   Correct.

15   Q.   Because that's their job, that's what we pay our local

16   police officers to do: fight crime; stop crime; arrest people

17   who are breaking laws.  True statement?

18   A.   Yes.

19   Q.   All right.  Now, I understood your testimony that Officer

20   Robles was not a member of the Metropolitan Task Force that

21   Britt Elmore was a member of; is that right?

22   A.   Correct.  And I corrected myself.

23       I wasn't sure if Officer Elmore was assigned to the Metro

24   Task Force, or if he was just cross-designated for this one

25   investigation.  Just wanted to clarify that.
```

1   Q.   Okay.  But that had nothing to do with what you were doing

2   in terms of your narcotics investigation.  True statement?  Let

3   me rephrase.

4        What significance -- So what?  Officer Robles wasn't a

5   member of the Metropolitan Task Force.  There are many police

6   officers --

7             THE COURT:  Wait.  Wait.  Wait.  Wait.  Slow down.

8        Do you want to ask whether there are many police officers

9    who are not members of the Task Force?  I don't know what your

10    "So what?" means.

11  BY MS. CAFFESE:

12  Q.   Are there many police officers locally who make

13  drug-related arrests, that are not part of the Metropolitan

14  Task Force?

15  A.   Correct.

16  Q.   Okay.  And are you aware that when Britt Elmore was

17  working with you on this operation that there came a point

18  where he lost sight, he lost -- that you guys lost Manny?  Do

19  you know --

20  A.   No.

21  Q.   Don't understand my question?

22             MR. VILLAZOR:  Objection.  Vague.

23  BY MS. CAFFESE:

24  Q.   Well, the DEA -- or, I should say, are you aware that when

25  Britt was conducting surveillance of Manny Vasquez that there

 1  came a point where he couldn't find him; he lost him?

 2          MR. VILLAZOR:  Objection, Your Honor.  Could we get a

 3   time frame?

 4          THE COURT:  Well, are you aware that that occurred at

 5   any point?

 6  BY MS. CAFFESE:

 7  Q.   We were talking 2008 to 2009, is that when this -- this

 8  investigation was being conducted?

 9  A.   So if I understand your question correctly, are you asking

10  about what Officer Elmore knew?

11          THE COURT:  I think she's asking you, what did you

12   know?  Did you know that at some point -- were you told at

13   some point or did you learn at some point that Manny -- I

14   guess that's his name -- Manny was -- the surveillance of

15   Manny was -- suggested that he evaded surveillance or wasn't

16   under surveillance?

17          MS. CAFFESE:  He lost him.

18          THE COURT:  He lost him.  Were you aware of that?

19          THE WITNESS:  That we -- it was our understanding, at

20   the time of this arrest, we thought he lived in East Palo

21   Alto.  If that -- and it was our understanding, as

22   investigators working together with Officer Elmore, as well as

23   the other people in San Mateo County Task Force we worked

24   with, it was our understanding they lived in East Palo Alto.

25   So I don't know if we lost them.

SICORD- CROSS / CAFFESE

```
 1   BY MS. CAFFESE:

 2   Q.    Okay.  Thank you.  That's what I want to get to.

 3         Manny and Gricelda were living at East Palo Alto for a

 4   while; is that right?

 5   A.    Yes.

 6   Q.    Okay.  And you folks had -- when I say "you folks," the

 7   federal government, the DEA, had pole cameras there; is that

 8   right?

 9   A.    No.

10   Q.    Okay.  You had -- you had the residence, Manny's

11   residence, under surveillance.  True statement?

12   A.    When?

13   Q.    Well, when Manny and his wife, Gricelda, and his family

14   were living in East Palo Alto, you were watching them?  You,

15   Britt Elmore, and the rest of the Task Force that were

16   investigating these people.

17   A.    Initially, in 2008, yes, their house was under

18   surveillance.

19   Q.    And at some point you lost -- you discovered that Manny

20   and Gricelda were no longer living in East Palo Alto.  True

21   statement?

22   A.    Yes.

23   Q.    And are you aware that when the DEA and the Task Force

24   from SFPD was working with you, namely Britt Elmore, he called

25   Officer Robles and said, "Do you know what happened to Manny?"
```

1  Do you know whether or not that's true or not?

2  **A.**   I don't know.

3        **THE COURT:**   I think the question is:  Were you told

4   that?

5  **BY MS. CAFFESE:**

6  **Q.**   Were you told that?

7        **THE COURT:**   There's no way he would know whether it

8   was true or not.  There's no way he knows that.  He can

9   certainly testify as to what he was told.

10 **BY MS. CAFFESE:**

11 **Q.**   Did Officer Elmore ever tell you that Officer Robles was

12 able to identify or locate, I should say, where Manny and

13 Gricelda had moved to?

14 **A.**   My recollection of the events was that they were arrested

15 on May 25th.  On May 26th, Officer Elmore informed me that

16 Sergio Vasquez and Gricelda Magaña were arrested the previous

17 day in San Francisco, and the SFPD subsequently did a search of

18 their residence in Newark.

19      So I don't know where Officer Elmore found that out.  I

20 don't know if he spoke to Officer Robles or spoke to officer

21 var- -- I don't know with whom he spoke.

22      I just know that on the 26th we found out that they had

23 been arrested and their house was searched the previous day.

24 **Q.**   And you would not have known that Manny and Gricelda had

25 moved to Newark, California, had it not been for the arrests

1    that Officer Robles made.  True statement?

2    **A.**   I wouldn't have known about it at the time.  I don't know

3    if we would have subsequently figured it out.

4        I'm not sure what your --

5    **Q.**   When you say you would have known about it at the time,

6    what do you mean by that?

7            **THE COURT:**  Well, the question is not an appropriate

8     question.  The question, as to whether or not he would have

9     known, is speculative.

10       He's saying that as of the 25th of May -- which is your

11    point -- as of the 25th of May, he did not know that Manny and

12    Gricelda lived in Newark.  That's what he said now.  And then

13    he said on the 26th of May he found that out.

14           **MS. CAFFESE:**  Thank you.

15           **THE COURT:**  Okay.

16   **BY MS. CAFFESE:**

17   **Q.**   Did Officer Elmore, when he told you about the Newark

18   arrests, or when you found out about the Newark arrests, did

19   Officer Elmore also tell you that it was because Officer Robles

20   had been working with a man named Ayari, otherwise known as The

21   Shah, who gave Officer Robles the information that led to

22   Manny's arrest and the ultimate seizure of narcotics at the

23   Newark house?

24   **A.**   It was my understanding -- Officer Elmore told us that the

25   plainclothes guys from Mission Station had an informant who

 1  made a phone call to Manny or Gricelda -- I'm not sure which --

 2  asked them to deliver a quantity of drugs to the city; and they

 3  were subsequently stopped.

 4      I don't know -- that's pretty much the extent of my

 5  information.  I don't know anything about the informant, how

 6  they did it.  All I know is they just called Manny and Gricelda

 7  on the 25th, ordered drugs.  And they were arrested when they

 8  came to the city.

 9  **Q.**   And that arrest, are you aware that was on May 25th of

10  2009?

11      You became aware of it --

12  **A.**   Yes.

13  **Q.**   -- in court today?

14  **A.**   Well, I knew about it on May 26th.

15  **Q.**   And that arrest was because an informant that had been

16  working with Officer Robles --

17          **THE COURT:**  Counsel, he can't testify as to that.  So

18   you shouldn't ask him that.  He can testify as to what he was

19   told.  And we have, sort of, gone over it a number of times.

20          **MS. CAFFESE:**  If I can, Judge.

21  **BY MS. CAFFESE:**

22  **Q.**   The Newark arrest -- if the Newark search had not been

23  done, those drugs that were found, the drugs that were found at

24  Newark, would have never been located; is that fair enough?

25          **THE COURT:**  That's clearly speculative.  Okay.

 1   Sustained.

 2   **BY MS. CAFFESE:**

 3   **Q.**   Now, after the -- the Newark house was searched, did

 4   Officer Elmore tell you that he had invited Officer Robles to

 5   participate in larger or other search -- searches and arrests

 6   with the Task Force?

 7                   **MR. VILLAZOR:**  Objection.  Relevance.

 8                   **THE COURT:**  I'll allow it in terms of whether this

 9   witness was told that.

10   **BY MS. CAFFESE:**

11   **Q.**   Were you told that by Officer Elmore, that after Officer

12   Robles participated in the search and seizure of the drugs from

13   Newark, that he was asked to participate in other arrests and

14   searches?

15   **A.**   I don't know with whom Officer Elmore spoke.

16        My recollection was or is that on the 26th we found out

17   about the initial arrest.  And my recollection was that Sergio

18   Magaña -- Sergio Vasquez was still in custody and Gricelda was

19   out of custody.

20        As a group of investigators we asked, I believe it was

21   Officer Elmore, to recontact the officers from Mission Station

22   to see if they could do a subsequent ordering of more drugs

23   from Gricelda, on the 27th of May, two days later, in order to

24   get Gricelda into custody so that she, too, would be in custody

25   when we did our federal indictment later on that year.

1   **Q.**   And you're aware and became aware that's exactly what

2   Officer Robles did; is that right?

3   **A.**   I don't know who Officer Elmore called at Mission Station.

4   **Q.**   Okay.

5   **A.**   If you're asking me do I know Officer Elmore called

6   Officer Robles, I don't know.   I don't know who he called.

7   **Q.**   Did Officer Elmore ever tell you that Officer Robles

8   actually called him before he went to Newark to search the

9   Newark house?

10  **A.**   Did Officer Elmore -- I'm sorry.   Did Officer Elmore tell

11  me that he got a phone call from Officer Robles prior to the

12  search?

13          **THE COURT:**   That's the question.

14          **THE WITNESS:**   I -- I don't know what phone call --

15          **THE COURT:**   No.   Did he tell you that?   Did Officer

16   Elmore say that's what happened?

17          **THE WITNESS:**   No.

18      My recollection was the day after the arrest officer

19   Elmore telling me in the group, in the office, that the

20   plainclothes guys from Mission Station arrested Sergio and

21   Gricelda the prior day.   I don't know the source of his

22   information.

23  **BY MS. CAFFESE:**

24  **Q.**   Did the DEA ever -- during any of the time period that

25  we're talking about, 2008-2009, did the DEA, you, or anybody

 1  else, if you're aware, ever call Mission Station and advise the

 2  sergeant, lieutenant, captain of that station, Please do not

 3  have any of your plainclothes officers conducting any local

 4  investigations of Manny Vasquez, Gricelda Aguilar?

 5          **MR. VILLAZOR:**  Objection.  Argumentative.

 6          **THE COURT:**  No.  I'll allow it.

 7      Go ahead.

 8          **THE WITNESS:**  We have officers assigned to our group

 9   from San Francisco Police Department.  I don't know if they

10   had conversations with officers from Mission Station about

11   these two particular drug dealers or not, to say, you know,

12   we're investigating them; please don't.  Or if you hear

13   information about them please pass it on.

14      I don't know if the -- if our SFPD Task Force officers

15   working with us or other investigators -- because we were also

16   working with SFPD Narcotics at the time -- I don't know if

17   they had conversations with the officers from Mission Station.

18  **BY MS. CAFFESE:**

19  **Q.**   Now, did you ever tell anybody at Mission Station,

20  captain, lieutenant, sergeant, not to have any of their

21  officers, plainclothes officers, doing any independent

22  investigation or arrests of Manny and/or Gricelda?

23  **A.**   I did not.

24          **MS. CAFFESE:**  Okay.  Thank you, sir.  I don't have

25   any other questions.

1          **MR. VILLAZOR:**  Brief follow-up, Your Honor.

2                    **REDIRECT EXAMINATION**

3   **BY MR. VILLAZOR:**

4   **Q.**   Agent Sicord, what's deconfliction?

5   **A.**   Deconfliction in this particular instance would be, sort

6   of, sharing of information between different law enforcement

7   agencies to make sure we don't investigate the same targets.

8   **Q.**   Is there a computerized system in which you can run a

9   deconfliction?

10  **A.**   Yes.

11  **Q.**   What's that called?

12  **A.**   Western States Information Network, WSIN.

13  **Q.**   WSIN for short?

14  **A.**   Correct.

15  **Q.**   Agent Sicord, you talked about Officer Elmore doing

16  undercover buys with Sergio Vasquez?

17  **A.**   Yes.

18  **Q.**   The undercover buys, that would be Officer Elmore buying

19  drugs from Sergio Vasquez?

20  **A.**   Yes.  And, I believe, Gricelda Magaña was at several of

21  those -- or some of those deals.  And there were other people

22  there too.

23  **Q.**   Did Officer Elmore sell drugs to Manny or Gricelda or

24  anybody in the investigation?

25  **A.**   No.

SICORD - REDIRECT / VILLAZOR

1  Q.    Is that a technique the DEA does, selling drugs as part of

2  an undercover operation?

3  A.    We have an enforcement technique called a "reverse," where

4  we attempt to sell drugs to drug dealers.  And when they show

5  up with money and try to complete the exchange they would be

6  arrested.

7  Q.    How does the reverse work?

8  A.    We don't release drugs when -- when the drug dealer shows

9  up with the money.

10      If we had someone in an undercover capacity, who wanted to

11  sell a kilo of cocaine or something like that, when they showed

12  up to complete the exchange, if the targets brought money, they

13  would be arrested at that time.

14  Q.    In a reverse does the DEA let the person walk away with

15  the drugs?

16  A.    Maybe take possession, and as soon as they took possession

17  of it they would be arrested.

18  Q.    Agent Sicord, I just wanted to go over the timeline for

19  Memorial Day weekend just one more time.

20      May 25th, 2009, it's your understanding that Sergio

21  Vasquez and Gricelda were placed under arrest?

22  A.    Correct.

23  Q.    The following day, May 27th, 2009, is when you learned

24  about it from Officer Elmore?

25  A.    The 26th.

1    Q.   I'm sorry, the 26th.  Excuse me, the 26th?

2    A.   I believe, yes.

3    Q.   Did you take any subsequent action, or ask any subsequent

4    action to be taken, after you learned that Sergio Vasquez and

5    Gricelda had been detained the day before?

6    A.   It was my understanding that Sergio was in custody and

7    that Gricelda was released.

8    Q.   Gricelda was released?

9    A.   Gricelda was released.

10        So the agents and Task Force officers in our group were

11   hoping to get Gricelda into state custody again.  So, I

12   believe, we asked Officer Elmore to contact the plainclothes

13   officers at Mission Station to see if they could do another

14   investigation and get Gricelda to deliver more drugs into the

15   city, allowing her to be arrested and kept in custody a second

16   time.  That was the 27th.

17   Q.   Did that happen?

18   A.   It did.

19   Q.   And, again, when was that?

20   A.   May 27th.

21             MR. VILLAZOR:  No further questions, Your Honor.

22             MR. GETZ:  I have nothing further.

23             MS. CAFFESE:  No further questions.  Thank you, Your

24   Honor.

25             THE COURT:  Thank you very much.  You're excused.

```
 1        (Witness excused.)

 2             THE COURT:  Call your next witness.

 3             MR. VILLAZOR:  Thank you, Your Honor.  The government

 4   call Shayan Rahimi from Bank of America.

 5             MS. CAFFESE:  Your Honor, I will indicate that we are

 6   prepared to stipulate to the bank records.

 7             MR. VILLAZOR:  It's going to take five minutes, Your

 8   Honor.

 9             THE COURT:  Okay.  Let's just go ahead.

10             THE CLERK:  Will the witness please come forward.

11   Remain standing and raise your right hand.

12             SHAYAN RAHIMI, PLAINTIFF WITNESS, SWORN

13             THE WITNESS:  I do.

14             THE CLERK:  Please be seated.  Please state your full

15   name spell your last name for the record.

16             THE WITNESS:  Shayan Rahimi.  Last name is

17   R-a-h-i-m-i.

18                       DIRECT EXAMINATION

19   BY MR. VILLAZOR:

20   Q.   Good morning, Mr. Rahimi.

21   A.   Good morning.

22   Q.   Mr. Rahimi, where do you work?

23   A.   Bank of America.

24   Q.   Do you work at a particular location?

25   A.   Danville Banking Center, yes.  Danville, California.
```

```
 1   Q.   Danville, California.
 2        Mr. Rahimi, were you asked by agents of the FBI to produce
 3   bank records of Bank of America?
 4   A.   I was.
 5   Q.   I'm going to show you what's been previously marked as
 6   Government Exhibit 290, 291, and 292.
 7        Do you recognize those documents?
 8   A.   Yes.
 9   Q.   Are those official bank records of the Bank of America?
10   A.   Yes.
11        MR. VILLAZOR:   The government would move Government
12    Exhibits 290, 291, and 292 into evidence.
13        THE COURT:   Admitted.
14    (Trial Exhibit 290, 291, 202 received in evidence.)
15        MR. VILLAZOR:   Your Honor, permission to publish it
16    to the jury.
17        THE COURT:   Yes, go ahead.
18    (Document displayed.)
19   BY MR. VILLAZOR:
20   Q.   Mr. Rahimi, I'm going to show you what's been marked on
21   the first page of Government Exhibit 290.  I have highlighted
22   several items.  You can actually look on the screen if that's
23   more helpful.
24   A.   Okay.
25   Q.   Looking at the top left, do you see the person --
```

1   **A.**   Yes.

2   **Q.**   -- who is the bank account holder?

3   **A.**   Yes.

4   **Q.**   Can you read that to the jury?

5   **A.**   Erin L. Robles, Edmond M. Robles.

6   **Q.**   Going down to the summary, "MyAccess Checking Account," do

7   you see that?

8   **A.**   Yes.

9   **Q.**   This is beginning balance on 5/7/2009?

10  **A.**   Yes.

11  **Q.**   What is the amount?

12  **A.**   $793.21.

13  **Q.**   Total deposits?

14  **A.**   17,153.16.

15  **Q.**   Total checks, withdrawals, transfer, account fees, and

16  ending balance -- excuse me, account fees?

17  **A.**   $17,744.97.

18  **Q.**   Is that the money that went out that month?

19  **A.**   Yes.

20  **Q.**   And then what's the ending balance?

21  **A.**   $201.40.

22  **Q.**   Going to the bottom of page 1, "Branch/ATM deposit," do

23  you see that?

24  **A.**   Yes.

25  **Q.**   What does it say?

1    **A.**    On May 26, $6,000 was deposited.

2    **Q.**    I'm going to show you what's marked Government Exhibit

3    291.

4               **MR. VILLAZOR:**  Ms. Lane.

5          (Document displayed.)

6               **MR. VILLAZOR:**  If we could highlight the right

7     section of that.

8    **BY MR. VILLAZOR:**

9    **Q.**    Do you see where it says "Cash In – Debit"?

10   **A.**    Yes.

11   **Q.**    And bottom line, "Cash In $6,000.00," what does that mean?

12   **A.**    This is a ticket that's used anytime a cash transaction is

13   processed over the teller line.

14   **Q.**    I'm going to switch over to Government Exhibit 292.

15         (Document displayed.)

16              **MR. VILLAZOR:**  All right.  And if we could highlight

17    the right column again.

18   **BY MR. VILLAZOR:**

19   **Q.**    And where it says "Currency $6,000," what does that mean?

20   **A.**    That means that was cash.

21              **MR. VILLAZOR:**  And if we could go to the left to the

22    name.

23   **BY MR. VILLAZOR:**

24   **Q.**    What is the name?

25   **A.**    Edmond Robles.

1  **Q.**   What is the date?

2  **A.**   May 26, 2009.

3  **Q.**   Mr. Rahimi, if we could go back to Government Exhibit 290.

4         **MR. VILLAZOR:**   And I'm going to ask that we go to the

5   fourth page of Government Exhibit 290, down to the bottom.

6      (Document displayed.)

7  **BY MR. VILLAZOR:**

8  **Q.**   Could you read the highlighted portion to the jury.

9  **A.**   (As read:)

10         "Balance inquiry on May 21st Non-Bank of America

11         ATM."

12  **Q.**   What's the balance, the amount?

13  **A.**   Let's see.  Two dollars.

14  **Q.**   What date was that?

15  **A.**   On May 21st.

16  **Q.**   All right.  Turning to page 5.

17      (Document displayed.)

18  **BY MR. VILLAZOR:**

19  **Q.**   And I've highlighted certain sections over here.  Do you

20  see the May 26, American Express?

21  **A.**   Yes.

22  **Q.**   If you go to the right, how much was debited to American

23  Express?

24  **A.**   $622.58.

25  **Q.**   Jumping down -- one, two, three, four -- five lines down,

1    do you see where it says (as read) "Bank of AM Crd ACH DES:

2    Paybyphone"?

3    **A.**    Yes.

4    **Q.**    Do you see that?

5    **A.**    Yes.

6    **Q.**    By the way, what's "Paybyphone"?

7    **A.**    That looks like a Bank of America credit card that was

8    paid over the telephone.

9    **Q.**    And how much is the money paid by phone on May 27th?

10   **A.**    $700.

11   **Q.**    Going down -- one, two, three -- three down, there's

12   "American Funds."  How much was sent to American Funds?

13   **A.**    $200.

14   **Q.**    Going down to "Discover Card Bill Payment," how much was

15   sent to Discover Card?

16   **A.**    $400.

17   **Q.**    Down one more, "Purchase," I guess, "Target," how much was

18   sent?

19   **A.**    $433 and, looks like, 86 cents.

20   **Q.**    Going down to May 28th, the one right down, "Chase Bank

21   One Bill Payment," how much?

22   **A.**    $1,000.

23   **Q.**    Going done one more, "Chase Card Services Bill Payment,"

24   how much?

25   **A.**    $2,000.

1    **MR. VILLAZOR:**  No further questions, Your Honor.

2    **THE COURT:**  Anything, Mr. Getz?

3    **MR. PASSAGLIA:**  No questions on behalf of

4    Mr. Furminger.

5    **THE COURT:**  Ms. Caffese.

6    **MS. CAFFESE:**  I do.  Thank you, Your Honor.

7    **THE COURT:**  Okay.

8                    <u>**CROSS EXAMINATION**</u>

9    **BY MS. CAFFESE:**

10   **Q.**   Good morning, sir.

11   **A.**   Good morning.

12   **Q.**   My name is Teresa Caffese.  I have just a few questions.

13   **A.**   Sure.

14   **Q.**   Sir, in your experience, do your customers often have

15   multiple accounts, more than one account?

16   **A.**   Oftentimes, yes.

17   **Q.**   All right.  And are there -- can you give us some of the

18   reasons, in your experience, that people might have more than

19   one account.

20   **A.**   A checking and a savings.  A checking account used to pay

21   bills.  Various different reasons.

22   **Q.**   So sometimes, for example, somebody might have an account

23   with Chase here -- and I'm referring to 290 because I see a --

24   money from this account going to a Chase account.  Is that

25   right?

PROCEEDINGS

1  **A.**    Yes.

2  **Q.**    And you're not the custodian of records for the Chase

3  Bank; is that right?

4  **A.**    Correct.

5  **Q.**    So it's not unusual, for example, for a customer to have

6  one account and pay bills to another bank account, or transfer

7  money between their accounts; is that right?

8  **A.**    Correct.

9          **MS. CAFFESE:**  Okay.  Thank you, sir.

10          **MR. VILLAZOR:**  No further questions, Your Honor.

11          **THE COURT:**  Thank you very much for coming in.

12       (Witness excused.)

13          **THE COURT:**  Call your next witness.

14          **THE WITNESS:**  Thank you.

15          **MR. VILLAZOR:**  Your Honor, we have a witness, but

16   this might be a good time for a break.

17          **THE COURT:**  Okay.  Ladies and gentlemen, we're going

18   to take a recess now.  We'll be in recess until 10:30.

19       Remember the admonition given to you.  Don't discuss the

20   case, allow anyone to discuss it with you, form or express any

21   opinion.

22       Leave your binders here.  Take your notebooks with you.

23   See you at 10:30.

24       And we're planning to go today, ladies and gentlemen, to

25   about 4:00, 4:15.  We may be a little bit late.  I want to see

```
 1   where we are in the testimony.  We won't go past 4:30, but we
 2   may go as late as 4:30.  So it just depends.
 3      Okay.  Thank you very much.
 4      (Jury out at 1:24 p.m.)
 5         THE COURT:  Okay.  Let the record reflect the jurors
 6   are retired.
 7      I received a motion from Mr. Getz concerning the --
 8   concerning redaction of communications, but I don't know when
 9   it's intended to be offered.  That's the question.
10         MR. VILLAZOR:  This next upcoming witness, Your
11   Honor.
12         THE COURT:  Okay.  Let's go through that motion and
13   deal with it before the recess.
14      This is a motion that was filed today, I guess --
15         MR. VILLAZOR:  I think last night.
16         THE COURT:  Yesterday.  Last night.  Okay.  Let's
17   just go through them as they appear in the motion.
18      Page 1 -- pardon me.  Page 2, line 7, this is the text
19   message from May 16th, '12.  The question is the highlighted
20   material, which is from line 8 to line 12 and a half.
21      What does that add to the evidence?  Because it's, sort
22   of, loose talk.  I don't know how to describe it.  Some of it
23   is expletive.  Some of it is slang.  Some of it is -- I don't
24   know.  I see what it is, but I don't know why it's relevant
25   is, I guess, my question.
```

PROCEEDINGS

```
 1          MR. VILLAZOR:  Your Honor, I don't think we were able

 2   to articulate when we were arguing over the N word about the

 3   context, but this is just the context.  It's a communication

 4   between Mr. Robles and Mr. Furminger.  And this is their

 5   conversation.  It puts in conduct -- in context the -- (as

 6   read:)

 7               "In the backyard, in the sun, listening to Luther on

 8               my system I got from Serg.  I'm sending Chuck on over

 9               to you."

10       And it just puts it in context of how these two were

11   communicating to each other.

12          THE COURT:  It demonstrates the relationship between

13   the two, whatever the level of intimacy is between the two.

14   And it's more than -- it tends to show a relationship,

15   whatever that relationship is.

16          MR. VILLAZOR:  That's correct, Your Honor.

17          THE COURT:  And it's more than just simply a --

18          MR. VILLAZOR:  It's not the gratuitous N word we were

19   talking about.

20          THE COURT:  No, no.  I don't think anything in there

21   is -- is racially derogative.  Unlike some of the other

22   things.

23          MR. VILLAZOR:  Correct, Your Honor.

24          THE COURT:  Here it just simply shows the

25   relationship.  I would leave it in on that basis that it does
```

 1    show the relationship between the two.

 2        As to --

 3            **MR. GETZ:**  May I interject one thing?

 4            **THE COURT:**  Of course.  Of course.

 5            **MR. GETZ:**  If the Court's ruling is founded on the

 6    relationship, then the goal is achieved with the last two

 7    lines, "Listening to Luther on my system I got from Serg.  I'm

 8    sending Chuck on over to you."

 9        I don't see -- I don't see how the predecessor lines

10    improve that.

11            **THE COURT:**  Well, it does in the Court's view.  And

12    it's an inference the jury can draw that it's this level of

13    intimacy.  Whatever that level is.  I'm not commenting on it

14    because it can be argued that that's just how people talk to

15    each other even if they are only professionally related.  But

16    that's an argument that the jury can make.

17        So I'm going to leave that in.

18        As to number 2, line 24, I have a concern about line 25

19    and a half, the relation of the border bandits.  And I have a

20    concern of 26 and a half from the savages.  So I would grant

21    the motion as to those two portions of the text.

22            **MR. VILLAZOR:**  Your Honor, if I may --

23            **THE COURT:**  Savages and border bandits?

24            **MR. VILLAZOR:**  Your Honor, it's the government's

25    position Mr. Getz opened that door when he stood here in his

PROCEEDINGS

```
 1    opening statement talking -- this is relative to Sergio

 2    Sanchez, the friendship that Mr. Sanchez and Mr. Furminger

 3    allegedly have; that they're close; and they're -- you know,

 4    same date of birth; and that they're best friends; and however

 5    Mr. Getz had argued it.

 6        It's our position that he opened the door on this.  And it

 7    shows -- it's to rebut the intimacy or the friendship, the

 8    brothers from another mother kind of relation- --

 9            THE COURT:  I think it's just too prejudicial.

10        That's not to say it can't be used for cross-examination

11    if that becomes an issue.  But simply to introduce the term

12    that these people are savages, border -- I didn't see what was

13    deleted --

14            MR. HEMANN:  Your Honor, I can -- I'm doing the

15    closing.  And I think this, in part, was my concern.  I think

16    that Mr. Getz clearly intends to argue that Mr. Furminger is a

17    man of the Mission.  We heard all sorts of -- in opening

18    statement about the vitality and wonders of the Mission and

19    Mr. Furminger's work in making it the great place that it is

20    in the context of his relationship with Mr. Sanchez.

21            THE COURT:  Let's take the term "from the savages."

22    Where are the savages?

23            MR. HEMANN:  Well, I think "the savages" relates to

24    the border bandits.  And the border bandits --

25            THE COURT:  It says, "To live here away from the
```

PROCEEDINGS

```
 1   savages."  Where are the savages?  Savages are south of the

 2   border.

 3          MR. HEMANN:  Savages are in the Mission, Your

 4   Honor --

 5          THE COURT:  Is that right?

 6          MR. HEMANN:  -- according to Mr. Furminger here.

 7   It's the border bandits and the savages.  And they're

 8   certainly not in Orinda.

 9      And so the concern is that there's this whole, you know,

10   effort to make Mr. Furminger and Mr. Sanchez look like, you

11   know, these good friends.  The door is open to it now.

12          THE COURT:  I am concerned.  I see what he said.  So

13   he said, "Richmond" -- that's Richmond, California -- "got a

14   new..."  Is that right?

15          MR. VILLAZOR:  Yes.

16          THE COURT:  "... got a new high school called

17   El Cerrito."

18      So "away from the savages" is the -- is away from the

19   people who wouldn't otherwise be entitled to go to El Cerrito

20   or the Richmond.

21      When I first read it I thought it was referring to people

22   in Mexico.  That's what I thought.  But it's not.  It's

23   referring to people --

24          MR. HEMANN:  Well, "border bandits" I take as a

25   reference to people who -- people who come over the border and
```

PROCEEDINGS

```
 1   live in the Mission, and the exact people that were -- were
 2   referred to in opening statement as the people who give the
 3   life and vigor to the Mission.  Which some of us agree with,
 4   and, apparently, some of us don't.
 5         MR. GETZ:  As this discussion illustrates, people
 6   kind of see what they want to see here.
 7         MR. HEMANN:  Your Honor --
 8         MR. GETZ:  In either version it's got to be sanitized
 9   by striking "fucking border bandits" and "away from the
10   savages" because those are purely offensive slurs that are far
11   more prejudicial than probative.
12         THE COURT:  I'm going to grant that.  I'm going to
13   grant that subject to -- I think it may be appropriate
14   cross-examination if the defendant testifies.  But I'm not
15   sure -- I think it's pretty prejudicial.
16         MR. HEMANN:  I think --
17         THE COURT:  The question is how -- if the defendant
18   doesn't testify then, I think, Mr. Getz has to be very careful
19   about what he says in his closing.
20      Remember the opening isn't really evidence.  And I don't
21   know that you particularly open up the whole case by your
22   opening statement.  I understand it can be --
23         MR. HEMANN:  And I think that we're comfortable with
24   that, Your Honor, with regard to -- but you know how it is.
25   You don't want to get up in closing and object.
```

PROCEEDINGS

```
 1          THE COURT:  If it depends on this then that would

 2    be -- I'm sorry, in a sense your argument proves too much

 3    because if you're closing really depends on this then this is

 4    highly -- then this is both probative and prejudicial.

 5        But I think it's more prejudicial than probative, at this

 6    point, so I will exclude those two phrases.

 7          MR. GETZ:  I just want to add that I will feel,

 8    Your Honor, I have failed my client miserably if I don't draw

 9    at least three objections from these people during my closing.

10          THE COURT:  Okay.  Line 3.  I mean, I looked at it.

11    I thought -- I didn't see -- well, I guess what is the

12    relevance as to the first -- lines 9 through 11, that his wife

13    lost her wedding ring?

14          MR. VILLAZOR:  Number one, we're not going to

15    introduce this highlighted portion between Mr. Sanchez because

16    it wasn't an exchange between them.  But we do plan on

17    introducing it down the road.

18          THE COURT:  Down the road.  I'm not deciding it right

19    now.

20        Okay.  Moving ahead.

21          MR. VILLAZOR:  Okay.

22          THE COURT:  September 4, September 17 text message.

23          MR. VILLAZOR:  Again, down the road, Your Honor.

24        But, I think, just back to Mr. Getz's prior objection to

25    this, there's also this "I need a ring for my stupid wife."
```

PROCEEDINGS

```
 1    That we plan on introducing with Mr. Sanchez and -- in the
 2    text exhibit.
 3              THE COURT:  What am I looking at?  I'm sorry.
 4              MR. VILLAZOR:  If you go back to line 15 and a half,
 5    I guess.
 6              THE COURT:  Well, that's all coming in.  He's not
 7    objecting to that.
 8              MR. VILLAZOR:  Okay.
 9              MR. GETZ:  I did object to --
10              THE COURT:  I'm leaving that in.
11              MR. GETZ:  -- the word "stupid."
12              THE COURT:  Oh, "stupid."
13              MR. GETZ:  No, because they get what they want
14    without that word.  The word "stupid" is very offensive.  And
15    it doesn't add anything --
16              THE COURT:  It was his word.
17              MR. GETZ:  It was his word.  But under 403 the
18    Court's got a choice here.  And I think it's inflammatory in
19    the context of this jury trial.
20              THE COURT:  Okay.  It goes out.
21              MR. GETZ:  Thank you.
22              THE COURT:  All right.  Number 4.
23              MR. VILLAZOR:  That's for another day, Your Honor.
24              THE COURT:  Fine.
25         Number 5, I think is all in.  Number 5, because it's not a
```

PROCEEDINGS

```
 1   question of poverty.  It's a question of what degree of

 2   economic motivation was there for the offense for which he's

 3   charged.  So it all comes in.

 4            MR. GETZ:  Well, I did give the Court a fairly

 5   persuasive case for my position.

 6            THE COURT:  By the way, subject to my reading the

 7   fairly persuasive case of the *U.S. vs. Mitchell*.  But I think

 8   if you correctly state -- and I believe you did -- what that

 9   ruling was, it was that you can't just introduce evidence that

10   a person is impoverished to show he stole X, Y, or Z.  It has

11   to be more nuanced than that.  And you can always introduce

12   evidence of motive.

13        And here he is, if he has some necessitous situation that

14   provides a greater incentive for somebody to steal, it goes to

15   motive.  You know, he's accused of -- it couldn't be a more

16   direct thing.  Isn't he accused of taking some of this cash

17   that was allegedly dug up?

18            MR. VILLAZOR:  Yes, Your Honor.

19            THE COURT:  Okay.  Well, you know, a need for cash,

20   if it's of the relevant period of time, is sufficient.

21        Okay.  It's 10:25.  I want to take ten minutes.

22            MS. CAFFESE:  Your Honor, there are some issues, as

23   it relates to Mr. Robles, that I believe we need to address

24   before Mr. Sanchez testifies.

25            THE COURT:  Okay.  Let's --
```

PROCEEDINGS

```
 1          MS. CAFFESE:  And I'll try to go through them very
 2   quickly.
 3          THE COURT:  We should stay on.  We'll continue.  Go
 4   ahead, Ms. Caffese.
 5          MS. CAFFESE:  Judge, I'm going to be referring to --
 6   first, there are two exhibits.  One is 186.  I believe that
 7   the government intends to introduce this.
 8      And on the second page of this exhibit there is a
 9   reference that, quote, Ed -- "I am worried for Ed.  He is very
10   reckless."  And this is a text between Furminger and Sergio
11   Sanchez.
12      And my objection is based on a confrontation issue
13   because, obviously, Mr. Robles, Officer Robles has a right to
14   confront and cross-examine Furminger under the Sixth
15   Amendment.
16          THE COURT:  Well, wait a minute.  Wait a minute.
17   Wait a minute.
18      Maybe I'm confused, so I have to tell you if you've said
19   something that I've completely lost you on.
20      The confrontation issue arises, as a general rule,
21   subsequent to an arrest.  That is to say, defendant X or
22   witness X says something subsequent to arrest.  If witness X
23   said something or defendant said something during the course
24   of the -- of the criminal act, that either comes in as an
25   admission against that particular defendant, or if it's a
```

PROCEEDINGS

```
 1  statement in furtherance of a conspiracy it comes in.  It's
 2  not hearsay.  And it's not a confrontation issue.  Has nothing
 3  to do with confrontation.
 4      You have a right to confront the witnesses who testify
 5  against you, not statements that a defendant made at -- during
 6  the course of a criminal act.  Otherwise, you would never go
 7  to trial.
 8              MS. CAFFESE:  Judge --
 9              THE COURT:  In a conspiracy you would never have a
10  trial.
11              MS. CAFFESE:  All right.  My second objection --
12              THE COURT:  Yes.
13              MS. CAFFESE:  -- Judge, is that it is taken out of
14  context.  And that is they are talking about recklessness,
15  recklessness as it relates to Ed cheating on his wife.
16      And that, I believe, under *Bibbero* is, first of all,
17  irrelevant.  It's idle conversation.  And I cite *United States
18  vs. Bibbero*, 749 F.2d 581.
19      And I think that that -- that statement should be excluded
20  as more prejudicial than probative.
21              THE COURT:  Okay.  Now I understand the context.
22              MR. VILLAZOR:  Your Honor, it's not my understanding,
23  having talked to Mr. Sanchez, that that was his understanding
24  of what "reckless" meant.
25              MS. CAFFESE:  Well, if you read --
```

PROCEEDINGS

1        **THE COURT:**  Well, the statements are as follows (as

2    read):

3            "A perfect couple yes.  I am worried for Ed.  He is

4            very reckless.  I know.  He is in a bad way at home.

5            I don't have to worry about my wife catching me cheat

6            because I don't cheat."

7      Response:

8            "You don't have to cheat.  You must not -- you must

9            have a nice wife."

10     Okay.  It seems to come up in the context of reckless with

11   respect to his wife.

12       **MS. CAFFESE:**  Yes.

13       **THE COURT:**  I think Ms. Caffese is right.

14       **MS. CAFFESE:**  So under --

15       **THE COURT:**  Doesn't it?

16       **MS. CAFFESE:**  I believe so, Your Honor.  And I think

17   that it's irrelevant.

18       **THE COURT:**  Okay.  That goes out.

19       **MS. CAFFESE:**  Okay.  The second thing --

20       **THE COURT:**  That goes out.

21       **MS. CAFFESE:**  Real quickly, Judge.

22       **THE COURT:**  Sure.

23       **MS. CAFFESE:**  Under 186 --

24       **THE COURT:**  Barbara, tell the jury it will be ten

25   more minutes.

```
 1        Exhibit 186.

 2             MS. CAFFESE:  My concern, Your Honor, I believe it

 3   was --

 4             THE COURT:  Who is speaking here?

 5             MR. VILLAZOR:  The highlighted number, Your Honor, is

 6   Mr. Furminger's.

 7             THE COURT:  Unfortunately, nothing is highlighted in

 8   my issue.

 9             MS. CAFFESE:  Excuse me.  Excuse me.

10             MR. VILLAZOR:  What's the date?

11             THE COURT:  My example is not highlighted.

12             MR. VILLAZOR:  Your Honor, I can help you if you tell

13   me what the date is.

14             MS. CAFFESE:  What exhibit number do you have, Your

15   Honor?

16             THE COURT:  I have 186.

17             MS. CAFFESE:  All right.  Actually, I think we've had

18   all different -- pardon me.

19             MR. VILLAZOR:  I know what she's talking about, Your

20   Honor.

21             MS. CAFFESE:  Actually, I'm talking about I think it

22   was --

23             THE COURT:  Well, show each other.

24             MS. CAFFESE:  It was previously marked 190.

25             THE COURT:  Can you give me the Bates stamp of the
```

PROCEEDINGS

```
 1   last couple of digits.
 2            MR. VILLAZOR:  1975, Your Honor.
 3            THE COURT:  1975.  I don't have 1975.  I have Exhibit
 4   186.
 5            MS. CAFFESE:  All right.
 6            THE COURT:  And then I have Bates stamps numbers on
 7   each page.
 8            MS. CAFFESE:  Do you have an exhibit number?
 9            MR. VILLAZOR:  Yeah.
10            MS. CAFFESE:  Essentially, Judge, there are text
11   messages where Mr. Furminger and Cesar -- excuse me, Sergio
12   Sanchez --
13            THE COURT:  Yes.
14            MS. CAFFESE:  -- are talking about the marriage
15   between Rey and Ed.  It's, essentially, they're gay, perfume,
16   these guys don't like that kind of perfume.
17       And I suggest that under Bibbero that this is simply idle
18   conversation.  It doesn't go to any conspiracy.  It's
19   irrelevant.
20            THE COURT:  Time out.
21            MR. VILLAZOR:  Your Honor, what it goes to --
22   Mr. Sanchez will say it's a joke.
23       What it goes to, it goes to Mr. Sanchez will say he knows
24   Ian, Ed, and Rey, the three of them together.  He'll joke
25   about them.
```

 1        Obviously, we're not making any sort of gratuitous remark.

 2   We're showing that Sergio Sanchez will joke with Ian Furminger

 3   about Ed Robles, the defendant, and Rey Vargas, the

 4   co-conspirator who has pled guilty.  And they joke about the

 5   three of them like they all know each other.

 6        And that's why that's relevant, Your Honor.  Not because

 7   it's some gratuitous remark.

 8           **THE COURT:**  I don't have it in front of me.  Is there

 9   some gratuitous insult to people who are gay?

10           **MR. VILLAZOR:**  What it says is Mr. -- talking about

11   the wedding rings.

12      Mr. Furminger says:

13           "Got any lady's wedding rings?" Question mark.

14      Mr. Sanchez replies:

15           "Are you getting married again?"

16      Mr. Furminger says:

17           "No.  My wife lost hers tonight."

18      Mr. Sanchez replies:

19           "The wedding it's the same date like Ed and Rey."

20      And then Mr. Furminger replies:

21           "They got divorced.  I need a ring for my stupid

22           wife.  Do you have any?"

23      Mr. Sanchez replies:

24           "I don't have any."

25      So we're talking about getting a wedding ring.

```
1            THE COURT:  Fine.  Take out the word "stupid," and
2    the rest can come in.
3            MS. CAFFESE:  Just so the -- the other portion, quite
4    frankly, is:
5                 "Okay.  But remember Ed and Rey can't use it.
6            It's for men only."
7       What I'm suggesting is this is just idle conversation
8    between these guys.
9            THE COURT:  I'm letting it in.  I'm letting it in.
10           MS. CAFFESE:  May my objections be preserved?
11           THE COURT:  Everything you say is always preserved.
12   You don't have to re-preserve it.  We have a record.
13   Everything is on the record.
14           MS. CAFFESE:  Thank you.
15           THE COURT:  Let's take ten minutes.
16           MR. VILLAZOR:  Thank you, Your Honor.
17      (Recess taken from 10:32 to 10:44 a.m.)
18      (The following proceedings were held outside of the
19   presence of the Jury)
20           THE COURT:  Bring in the jury.
21      (The following proceedings were held in the presence of
22   the Jury)
23           THE CLERK:  All rise.
24           THE COURT:  Okay, please be seated.  Okay, let the
25   Record reflect the jury is present; parties are present.
```

PROCEEDINGS

```
 1        You may proceed.

 2             MR. VILLAZOR:  Thank Your Honor.  Government calls

 3   Sergio Sanchez.

 4             THE CLERK:  Will the witness please come forward?

 5        He's not one of those?

 6             MR. VILLAZOR:  He's not one of those.

 7             THE CLERK:  Okay.

 8             MR. VILLAZOR:  He's there.

 9             THE CLERK:  In the red?

10             MR. VILLAZOR:  That's him.

11             THE CLERK:  Okay, thank you.

12        Will the witness please come forward?

13        Please come forward, take the witness stand.

14             SERGIO SANCHEZ, PLAINTIFF'S WITNESS, SWORN

15             THE CLERK:  Please state your full name, spelling

16   your last name for the Record.  Make sure you always speak in

17   the mic.

18             THE WITNESS:  Sergio, my first name; Sanchez, my last

19   name.

20             MR. VILLAZOR:  And Your Honor, before I begin,

21   similar to Mr. Hernandez, Mr. Sanchez has a good command of

22   English.  However, we do have a translator here (Indicating)

23   in the event that we have some sort of miscommunication.

24             THE COURT:  Okay.  The translator, would you identify

25   yourself?
```

 1          **THE INTERPRETER:**  Yes.  My name is Ines Swaney.

 2   I-N-E-S, S-W-A-N-E-Y.  California state- and

 3   federally-certified Spanish court interpreter.

 4          **THE COURT:**  And you have been sworn in in this

 5   action?

 6          **THE INTERPRETER:**  In this case, yes, Your Honor.

 7          **THE COURT:**  Okay.  So, sir, if a question is asked

 8   and you don't understand the question, would you please

 9   indicate?

10          **THE WITNESS:**  Okay.

11          **THE COURT:**  Thank you.

12      You may proceed.

13          **MR. VILLAZOR:**  Thank you, Your Honor.

14                        <u>**DIRECT EXAMINATION**</u>

15   BY MR. VILLAZOR:

16   **Q**    Good morning, Mr. Sanchez.

17   **A**    Good morning.

18   **Q**    I'm going to ask that you speak into the microphone.

19   Okay?

20   **A**    Okay.

21   **Q**    Mr. Sanchez, currently what do you do for a living?

22      What is your job?

23   **A**    I'm working at --

24   **Q**    Working at?

25   **A**    Pizza Hut.

1   Q    Pizza Hut.  What do you do at Pizza Hut?

2   A    Deliver pizza.

3   Q    Do you work another job at another pizza place?

4   A    Yes.

5   Q    Where do you work?

6   A    Village Pizzeria.

7   Q    Village Pizzeria?

8   A    Yes.

9   Q    Is the Pizza Hut job a full-time job?

10  A    One full-time, one part-time.

11  Q    Is the other pizza job a part-time job?

12  A    Yes.

13  Q    How long have you been working at the pizza places?

14  A    One -- almost one year.

15  Q    Mr. Sanchez, do you know someone by the name of Ian

16  Furminger?

17  A    Yes.

18  Q    Who is Ian Furminger?

19  A    (Indicating)

20  Q    Are you pointing him out in the courtroom?

21  A    Yeah.

22  Q    Do you see him seated over here at this table

23  (Indicating)?

24  A    Yes.

25  Q    Is he the guy with the -- sitting next to the gentleman

1   with the beard?

2   **A**    Yes.

3           **THE COURT:**   Let the Record reflect he's identified

4    the Defendant Furminger.

5   **BY MR. VILLAZOR:**

6   **Q**    Do you know a guy by the name of Edmond Robles?

7   **A**    Yes.

8   **Q**    Do you see him sitting in the courtroom today?

9   **A**    Yes.

10  **Q**    All right.  Can you point him out?

11          (Request complied with by the Witness)

12  **Q**    Seated at the back corner of the table?

13  **A**    Yes.

14          **THE COURT:**   Let the Record reflect he's identified

15   the Defendant Robles.

16  **BY MR. VILLAZOR:**

17  **Q**    Mr. Sanchez, before you were working at the pizzarias, did

18  you have another kind of job?

19  **A**    Um, part-time.

20  **Q**    Part-time?

21  **A**    Yes.

22  **Q**    You worked for a painter?

23  **A**    Painter.

24  **Q**    How much money did you make a day with the painter?

25  **A**    One hundred fifty a day.

```
 1  Q    $150 a day?

 2  A    Yeah.

 3  Q    Was that a full-time job?

 4  A    No.  It was regular hours.

 5  Q    All right.  You also used to have another kind of

 6  business, right?

 7  A    Yes.

 8  Q    And that business was on -- in Mission?

 9  A    Twentieth and Mission.

10  Q    Twentieth and Mission?

11  A    Yes.

12  Q    On 20th Street?

13  A    Yeah.

14  Q    And you used to sell and buy stolen things.  Right?

15  A    Yes.

16  Q    What kind of things?

17  A    Electronics.

18  Q    Computers?

19  A    Computers, yeah.

20  Q    Laptops?

21  A    Laptops.

22  Q    Cameras?

23  A    Yes.

24  Q    Jewelry?

25  A    Yes.
```

1    Q    And you also had stuff that wasn't stolen.  Right?

2    A    Yeah.

3    Q    Would you say how much of your inventory, how much of your

4    stuff was stolen?  What percentage?

5    A    Sixty percent.

6    Q    Six-zero, 60 percent?

7    A    Yes.

8    Q    Did you have a store on 20th Street in the Mission?

9    A    No.

10   Q    No?

11   A    No.

12   Q    Where were you operating?

13   A    I put my stuff in the trunk of my car.

14   Q    The trunk of your car.

15   A    Yes.

16   Q    And you parked that car on 20th Street?

17   A    Twentieth and Capp.

18   Q    Twentieth and Capp, C-A-P-P?

19   A    Yeah, South Van Ness.

20   Q    South Van Ness?

21   A    Twentieth and South Van Ness.

22   Q    Mr. Sanchez, I'm going to show you what's already been

23   introduced into evidence.  It is called Government Exhibit 277.

24   They are going to be a bunch of pictures.

25        I'm going to show it to you in a second.

1          (Document displayed)

2               **MR. VILLAZOR:**  And Your Honor, for the jury's

3    reference, this is Tab 12.

4    **BY MR. VILLAZOR:**

5    **Q**    I'm showing you the first picture of Government Exhibit

6    277.

7          Do you recognize that, Mr. Sanchez?  Look to your right.

8    See that computer screen?

9          (Witness examines document)

10   **A**    Yes.

11   **Q**    What is that?

12   **A**    Jarritos Restaurant, it was called before.  Right now it's

13   called San Jalisco.

14   **Q**    Let me stop you there.  Jarritos is J-A-R-E-T-T-O?

15   **A**    No.  J-A-R-R-R-I-T-O-S (sic).

16   **Q**    It used to be called that?

17   **A**    Yes.

18   **Q**    When you used to work on 20th between Mission and

19   Van Ness?

20   **A**    Yes.

21   **Q**    Now it's called what?

22   **A**    San Jalisco.

23   **Q**    San Jalisco?

24   **A**    Yeah.

25   **Q**    J-A-L-I-S-C-O?

 1   **A**     Yeah.

 2   **Q**     What kind of restaurant is that?

 3   **A**     Mexican restaurant.

 4   **Q**     Mr. Sanchez, you said you -- you kept your goods in the

 5   trunk of your car.  Right?

 6   **A**     Yes.

 7   **Q**     What kind of car did you have?

 8   **A**     The M3.

 9   **Q**     An M3?

10   **A**     Yeah.

11   **Q**     Who is the maker of the M3?

12   **A**     BMW.

13   **Q**     How much did that cost?

14   **A**     Almost 100,000.

15   **Q**     Before that, what kind of car did you have?

16   **A**     The X5.

17   **Q**     Is that another BMW?

18   **A**     Yes.

19   **Q**     That's an SUV?

20   **A**     SUV.

21   **Q**     So while you were operating on 20th, you had an X5 BMW?

22   Yes?

23   **A**     Yes.

24   **Q**     And then you had an M3 BMW.

25   **A**     Yes.

1    Q    All right, I'm going to turn to the next picture.

2         (Document displayed)

3    Q    What's that we're seeing?

4    A    The little park on 20th and Capp.

5    Q    Twentieth and Capp, that's the park near 20th and Capp?

6    A    Yes.

7              MR. VILLAZOR:  If we can go to the next picture?

8         (Document displayed)

9    BY MR. VILLAZOR:

10   Q    That's the street address across from the park?

11   A    Across the street, yeah.

12             MR. VILLAZOR:  Next picture?

13        (Document displayed)

14   BY MR. VILLAZOR:

15   Q    Where are we now?

16   A    The pharmacy, Milagros Pharmacy.

17   Q    And are you on the corner of 20th and Mission?

18             MR. VILLAZOR:  If we can get the next picture?

19        (Document displayed)

20   BY MR. VILLAZOR:

21   Q    And that's the same, same angle.  But just --

22   A    Same angle, yeah.

23   Q    Okay.  Now --

24             MR. VILLAZOR:  If I can get the next picture?

25        (Document displayed)

 1  **BY MR. VILLAZOR:**

 2  **Q**    What, what's this next picture?  With the Bates stamp

 3  38805.  What is this?

 4       Is that 20th Street?

 5  **A**    Yes.

 6  **Q**    And would you park your M3 along this street?

 7  **A**    Sometimes.  Sometimes there, sometimes on Capp.

 8  **Q**    On Capp?

 9  **A**    Capp and 20th, yeah.

10  **Q**    I'm going to show you another picture.

11       (Document displayed)

12  **BY MR. VILLAZOR:**

13  **Q**    All right.  And it's Bates stamp 38806.  That Pete's

14  Bar-B-Que?

15  **A**    Yes.

16  **Q**    On 20th and Mission?

17  **A**    Yes.

18  **Q**    Is this where you used to stand when you used to sell

19  stolen goods and buy stolen goods?

20  **A**    Yes.

21  **Q**    Yes?

22  **A**    Yes.

23  **Q**    How far would you be from your car?

24  **A**    Sometimes one block, two blocks.

25  **Q**    Why would you be so far away from your car?

1   **A**   I don't want the people and the police see me.

2   **Q**   How long were you -- how long were you selling and buying

3   stolen goods on 20th Street?  How long were you doing that?

4   **A**   The hours or the time?

5   **Q**   Well, do both.  From -- how long, how many years or

6   months, days, how long were you operating on 20th Street?

7   **A**   Like, 20 years.

8   **Q**   For 20 years?

9   **A**   (Nods head)

10  **Q**   And you said hours.

11  **A**   Hours.

12  **Q**   What are the hours you were working?

13  **A**   Eight to five.

14  **Q**   8:00 a.m. to 5:00 p.m.?

15  **A**   (Nods head)

16  **Q**   Is that seven days a week?

17  **A**   Six days.

18  **Q**   Six days.  What day did you take off?

19  **A**   Sundays.

20  **Q**   Why did you take off on Sunday?

21  **A**   I go out to the casino or -- to Santa Cruz.

22  **Q**   You said you know Ian Furminger.

23  **A**   Yes.

24  **Q**   What job did he have?

25  **A**   Police officer.

1  Q    How about Ed Robles?  What job did he have?

2  A    Police officer.

3  Q    Did Ian Furminger ever arrest you while you were operating

4  on 20th Street?

5  A    No.

6  Q    Ed Robles.  Did he ever arrest you while you were

7  operating on 20th Street?

8  A    I think one time.

9  Q    One time.

10 A    (Inaudible)

11 Q    Did he arrest you?  Or did he detain you?

12 A    Yeah, arrested me.

13 Q    He arrested you?

14 A    Yes.

15 Q    What did he arrest you for?

16 A    For buying stolen property.

17 Q    For buying stolen property?

18 A    Yeah.

19 Q    After he arrested you, did he sign you up as a

20 confidential informant for the San Francisco Police Department?

21 A    Yes.

22 Q    After you signed up as a confidential informant, did

23 Ed Robles ever arrest you again?

24 A    Not -- not him, but somebody else.

25 Q    Okay.  I'm asking if Ed Robles arrested you after signing

1    up as a confidential informant.

2  **A**    No.

3  **Q**    Somebody else arrested you, though, right?

4  **A**    Yes.

5  **Q**    All right.  Was that in August of 2012?

6  **A**    Yes.

7  **Q**    Mr. Sanchez, I want to talk a little bit about how you --

8    how you used to do your business on 20th Street.  Okay?

9  **A**    Yes.

10  **Q**    So you would park your car on 20th Street, yes?

11  **A**    Yes.

12  **Q**    And what would be inside your trunk?

13  **A**    Electronics.

14  **Q**    And other you stuff?

15  **A**    Tools.

16  **Q**    Tools?

17  **A**    Yes.

18  **Q**    How about televisions?

19  **A**    No.  No TVs.

20  **Q**    No TVs.

21  **A**    No, is a --

22  **Q**    Why not TVs?

23  **A**    They're too big; they don't fit in my trunk.

24  **Q**    They don't fit in your trunk.  Okay.

25    How did somebody come up to you and say, "I want to buy,

1    buy something from you"?

2         Would you be standing on the corner?  Right here on Pete's

3    Bar-B-Que?

4    **A**    Yeah.

5    **Q**    And then someone comes up to you.  And did they give you

6    some kind of sign or signal?  What did they do?

7    **A**    No, they just come and talk to me.

8    **Q**    They talk to you?

9    **A**    First, yeah.

10   **Q**    And then, they ask you if you have anything for sale?

11   **A**    Yes.

12   **Q**    What if they want to sell you something?  Do they just

13   come up to you?

14   **A**    Yeah.

15   **Q**    And you say "*cuanto*"?

16   **A**    Yeah.

17   **Q**    And what does "*cuanto*" mean?

18   **A**    How much?

19   **Q**    And what kind of things would you buy?

20   **A**    Laptops.  IPhones.

21   **Q**    Other phones?

22   **A**    Yeah.

23   **Q**    Cameras?

24   **A**    Cameras.

25   **Q**    GPS?

1    **A**    Yes.

2    **Q**    Power tools?

3    **A**    Yes.

4    **Q**    All right.  When you bought something or you sold

5    something, would you give them a receipt?

6    **A**    No.

7    **Q**    Would you ask them for identification?

8    **A**    No.

9    **Q**    Would you charge them for any taxes?

10   **A**    No.

11   **Q**    I want to talk about when you signed up as a confidential

12   informant.  Okay?

13   **A**    Yes.

14   **Q**    Who signed you up as a confidential informant?

15   **A**    Ed Robles.

16   **Q**    Ed Robles.  Where were you living at the time?

17   **A**    On 2445 Mariposa Street, San Francisco, California.

18   **Q**    Was that in the Mission?

19   **A**    By Potrero Avenue.

20   **Q**    By Potrero Avenue.  Were you coming out of your house one

21   time, when you saw Ed Robles?

22   **A**    Yes.

23   **Q**    And what happened?

24   **A**    He told me if I don't sign, I can be arrested.

25   **Q**    Did he say anything else?  Why would he arrest you?

```
 1              MS. CAFFESE:  Objection.  That calls for speculation.

 2              THE COURT:  Sustained.

 3   BY MR. VILLAZOR:

 4   Q    Did he say anything else besides that he would arrest you?

 5   A    No.  He don't say nothing.

 6   Q    Doesn't say anything else?

 7   A    No.

 8   Q    He just said "I'm going to arrest you if you don't sign

 9   up"?

10   A    Yes.

11   Q    Did he tell you that he knows what you do?

12   A    Yes.  He knew -- he knew it.

13   Q    Did he say that?

14   A    I don't remember that.

15   Q    Well, after that, did he take you to Mission Station?

16   A    Yeah.

17   Q    Did you sign some paperwork?

18   A    He didn't take me.  I went by -- by myself.

19   Q    You went by yourself?

20   A    Yeah.  And I signed the paper.

21   Q    That same day?

22   A    Not exactly if it was the same day, but --

23   Q    Did you go to Mission Station and meet with Officer

24   Robles?

25   A    Yes.
```

1   Q    Did you sign some paperwork?

2   A    Yes.

3   Q    And did you -- I want to show you what's been marked as

4   Government Exhibit 70.

5        (Witness examines document)

6   Q    Mr. Sanchez, do you recognize that document, Government

7   Exhibit 70?

8   A    Yeah.

9   Q    Is that the paperwork you signed with Ed Robles?

10  A    Yes.

11           THE COURT:  Admitted.

12       (Trial Exhibit 70 received in evidence)

13       (Document displayed)

14           MR. VILLAZOR:  No, second page.

15       (Document displayed)

16           MR. VILLAZOR:  Next page.

17       (Document displayed)

18  BY MR. VILLAZOR:

19  Q    All right.  Mr. Sanchez, I'm going to show you the top,

20  top corner in the left.  I'll show it to you on the computer.

21       (Document displayed)

22  Q    All right.  Do you recognize that handwriting?

23  A    Yes.

24  Q    Whose handwriting is that?

25       Is that not your handwriting?

```
 1   A     No, it's not mine.

 2   Q     Is that your name, "Sergio Cardenas Sanchez"?

 3   A     Yes.

 4   Q     I'm going to go down to the signature, to the bottom left.

 5   Do you see where it says "SIGNATURE"?

 6   A     Yeah.

 7   Q     Whose signature is that?

 8   A     Mine.

 9   Q     Do you see where it says "OFFICERS"?

10   A     Yes.

11   Q     Whose name is listed there?  Can you read that?

12   A     Ed Robles, and the -- and the date.

13   Q     Do you see a signature below that?

14   A     I don't know who that one.

15   Q     You don't know whose that is.

16   A     No.

17   Q     Do you remember Rey Vargas?  Do you know Rey Vargas?

18   A     Yeah.

19   Q     Do you remember him being there when you signed up as a

20   confidential informant?

21   A     I don't remember that part.

22   Q     You don't remember Rey Vargas being there?

23   A     Yeah, I don't remember.

24   Q     And the date, January --

25   A     Because I think I didn't know him.
```

1   Q    You didn't know Rey Vargas then?

2   A    No.

3          MR. VILLAZOR:  Okay, take it down.

4   (Document taken off display)

5          MR. VILLAZOR:  Actually, bring it back up.

6   BY MR. VILLAZOR:

7   Q    Mr. Sanchez, I want you to look back -- sorry, I have to

8   bring it back up.  To the third page.

9          (Document displayed)

10  Q    And you see that above the signature there is some little

11  -- there is some text there.  I want to blow that up.

12         (Document displayed)

13  Q    Okay, do you see that?

14  A    Yes.

15  Q    All right.  That's right above your signature.

16  A    Yes.

17  Q    Right?  Does it say (As read):

18         "San Francisco Police Department cooperating

19         individual agreement."

20  Does it say that?

21  A    Yes.

22  Q    It says (As read):

23         "INFORMANTS SHALL BE ADVISED OF THE FOLLOWING:

24         1, THEY SHALL NOT VIOLATE CRIMINAL LAW IN FURTHERANCE

25         OF GATHERING INFORMATION, OR PROVIDING SERVICES, AND

1              THAT ANY EVIDENCE OF SUCH A VIOLATION WILL BE

2              REPORTED TO THE APPROPRIATE LAW ENFORCEMENT AGENCY."

3      Does it say that?

4  **A**   Yes.

5  **Q**   (As read)

6              "2, THEY HAVE NO OFFICIAL STATUS, IMPLIED OR

7              OTHERWISE, AS AGENTS OR EMPLOYEES OF THE SFPD."

8      Did I read that correctly?

9  **A**   Yes.

10  **Q**   (As read)

11              "3, THE INFORMATION THEY PROVIDE MAY BE USED IN A

12              CRIMINAL PROCEEDING AND THAT ALTHOUGH ALL LAWFUL

13              MEANS WILL BE TAKEN TO PROTECT THEIR CONFIDENTIALITY,

14              THIS CANNOT BE GUARANTEED."

15      Did I read that correctly?

16  **A**   Yes.

17  **Q**   (As read)

18              "4, THERE ARE NO PROMISES OF LENIENCY OR IMMUNITY

19              FROM PROSECUTION, EXPRESSED OR IMPLIED, REGARDING THE

20              DISPOSITION OF THE INFORMANT'S CASE, IF APPLICABLE."

21      Did I read that correctly?

22  **A**   Yes.

23  **Q**   (As read)

24              "5, INFORMANTS ACTIVELY INVOLVED IN THE PURCHASE OF

25              NARCOTICS OR OTHER CONTRABAND SHALL BE SEARCHED

1          COMPLETELY (STRIP SEARCH) PRIOR TO MAKING THE

2          PURCHASE.  THE SEARCHING OFFICER SHALL BE OF THE SAME

3          SEX AS INFORMANT."

4     Did I read that correctly?

5  **A**   Yes.

6  **Q**   (As read):

7          "6, IT IS THE RESPONSIBILITY OF THE INFORMANT TO STAY

8          IN CONTACT WITH HIS/HER INFORMANT MANAGER."

9     Did I read that correctly?

10 **A**   Yes.

11 **Q**   And above your signature it says:

12          "I HAVE READ THE ABOVE STATEMENT AND AGREE TO COMPLY

13          WITH THE TERMS."

14    It says that.  Yes?

15 **A**   Yes.

16    (Document taken off display)

17    (Document displayed)

18 **Q**   Now, Mr. Sanchez, as a confidential informant, did you

19 assist the San Francisco Police Department in recovering stolen

20 items?

21 **A**   Yes.

22 **Q**   All right.  What's the first one?

23 **A**   Laptop.

24 **Q**   A laptop?

25 **A**   Laptop, yeah.

 1  **Q**    Was there anything special about that laptop?

 2  **A**    Like, for pornography, pictures only.

 3  **Q**    Pornography?  Was it child pornography?

 4  **A**    Yes.

 5  **Q**    What did you do with that child pornography laptop?

 6  **A**    I give it to -- to Ed.

 7  **Q**    When you say "Ed," do you mean Ed Robles?

 8  **A**    Yes.

 9  **Q**    Did you assist San Francisco Police Department with

10  recovering other stolen laptops?

11  **A**    No.

12  **Q**    No other laptops?

13  **A**    Yeah, but not to San Francisco Police.

14  **Q**    Not San Francisco Police?

15  **A**    Yeah, some detectives from L.A. or some --

16  **Q**    L.A.?

17  **A**    The L.A. area.

18  **Q**    What about a big MacBook, Apple MacBook?  Do you remember

19  helping San Francisco Police Department?

20  **A**    Yeah, I help him find it.

21  **Q**    Because you knew where stolen laptops go.

22  **A**    Yeah.

23  **Q**    Right?

24       Did you provide information to San Francisco Police

25  Department about drug dealers?

 1    **A**    I think one time.

 2    **Q**    One time.

 3    **A**    Yeah.

 4    **Q**    Right?  Was it a crack dealer who was selling near your --

 5    **A**    Yeah.

 6    **Q**    Near Mission?

 7    **A**    Yeah.

 8    **Q**    And 20th?

 9    **A**    Yes.

10    **Q**    And you told -- who did you tell about it?

11    **A**    I think, Ed Robles.

12    **Q**    You told Ed Robles about a crack dealer on Mission?

13    **A**    Yes.

14    **Q**    Is having a crack dealer near your -- your work, is that

15    bad for business?

16    **A**    Yes.

17    **Q**    Explain to the jury why that's bad for business.

18    **A**    Because it's -- it's not good for my business.

19    **Q**    Why?

20    **A**    Because we don't have anybody selling drugs in there.

21    **Q**    Why is it -- what's the big deal?  Why is it bad if

22    someone's selling drugs where you are selling stolen things?

23    **A**    I don't know, because it's not an area that -- that people

24    sell drugs in there.  Not like 16th Street.

25          Bad business for me, too.

 1  **Q**    Do you know what happened to that guy who was selling

 2  crack cocaine?

 3  **A**    He got arrested.

 4  **Q**    How did you learn that?

 5  **A**    It was Ed, Ed Robles arrested him.  Because I -- I didn't

 6  see him for like two, three weeks after that.

 7  **Q**    Did you ask Ed Robles about that crack dealer?

 8  **A**    Yeah.

 9  **Q**    Did he tell you about him?

10  **A**    Yeah.

11  **Q**    What did he say?

12  **A**    I don't remember that part, but he -- I think he arrested

13  him.

14  **Q**    All right.  Was there any police officer from the

15  San Francisco Police Department that was -- that was bothering

16  you, that was hassling you?

17  **A**    Yes.

18  **Q**    Do you remember his name?

19  **A**    Zachos, Zachos in that case.

20  **Q**    What was Officer Zachos, what was he doing?

21  **A**    After that, I don't see him no more.

22  **Q**    Well, we skipped a step.  What was Officer Zachos, why was

23  he bothering you or how was he bothering you?

24  **A**    He searched my car, and -- he never -- never arrested me.

25  He detained me lot of times.

1    **Q**    Searching your car?

2    **A**    Yeah.

3    **Q**    Did that stop?

4    **A**    Eh?

5    **Q**    Did he stop doing that, Officer Zachos?

6    **A**    Yes.

7    **Q**    When was that?

8    **A**    After I signed the agreement.

9    **Q**    The confidential informant agreement?

10   **A**    Yes.

11   **Q**    Did Ed Robles tell you anything about Officer Zachos?

12   **A**    No.  Never.

13   **Q**    But it was after you signed as a confidential informant.

14   **A**    Yes.

15   **Q**    Mr. Sanchez, would you -- back when you used to work on

16   20th Street, did you consider Ian Furminger a friend?

17   **A**    Yes.

18   **Q**    How did you first meet?  When did you first meet?

19   **A**    One time, four police officers were searching my car.

20   **Q**    Four police officers were searching your car?

21   **A**    Yes.

22   **Q**    Okay.  But, none of those four were Ian Furminger.

23   **A**    No.  He wasn't there.  He came after.

24   **Q**    He came after?

25   **A**    Yes.

1   Q    Okay.  And what -- when did he come?

2   A    He come after the other police officer were there.  I

3   think they -- they called him (Indicating).  I don't --

4   Q    Were the four police officers who searched your car, were

5   they still there when Ian Furminger arrived?

6   A    Yeah.  They were there.

7   Q    Did you speak with Ian Furminger?

8   A    Yes.

9   Q    What did he say?

10  A    Not the first time I met him.

11  Q    Did you -- did he ask you for identification?

12  A    Yes.

13  Q    And at that time did you notice you guys actually have the

14  same birthday?

15  A    Yeah, when he showed me the -- the driver's license.

16  Q    Yeah?

17  A    Had the same age and --

18  Q    Same month, day and year?

19  A    Yeah.

20  Q    Were you arrested that day?

21  A    No, I was not.  Detained only.

22  Q    You were detained?

23  A    Yeah.

24  Q    Did you exchange phone numbers with Ian Furminger at that

25  time?

1   **A**    No.

2   **Q**    When the officers, including Officer -- Sergeant

3   Furminger, when they left, did you go back to your car?

4   **A**    Yes.

5   **Q**    Did you notice anything was missing?

6   **A**    Yeah, miss one camera and I think --

7   **Q**    An iPod?

8   **A**    One iPod, one little iPod.

9   **Q**    You didn't see any of the officers take it.

10  **A**    No.

11  **Q**    But you had it before the officers came?

12  **A**    Yeah.

13  **Q**    And you noticed it was gone after the officers left.

14  **A**    Yeah.  But it wasn't Ian Furminger.  He never went through

15  my car.

16  **Q**    He never went through your car?

17  **A**    No, Ian, no.

18  **Q**    Did anybody from the San Francisco Police Department,

19  those four officers, Sergeant Furminger, did they leave you a

20  receipt saying they took the iPod or the camera?

21  **A**    No.

22  **Q**    Did you eventually see Sergeant Furminger later on in a

23  few weeks?

24  **A**    Yea.

25  **Q**    At that time, did you exchange phone numbers?

1   **A**     Yeah.

2   **Q**     Did you talk to him about your business?

3   **A**     No, I never talk to him about it.

4   **Q**     Did you -- did you say that you could get anything for

5   him?

6   **A**     Mm, I don't know how long it took but I told him that,

7   yeah.

8   **Q**     Okay.  Tell the jury, what did you tell him?

9   Specifically.

10  **A**     That I can get anything he want.

11  **Q**     You can get anything he wants.

12  **A**     (Nods head)

13  **Q**     What did he say?

14  **A**     The first time, I don't remember what he say.

15  **Q**     But you exchanged phone numbers?

16  **A**     I exchange the number.  He gave me his number to call him

17  about a stolen -- stolen bicycles.

18  **Q**     Stolen bicycles?

19  **A**     Yeah.  He told me, "If you see any stolen bicycles, then

20  you call me."

21  **Q**     Okay.

22  **A**     That is how I got his number.

23  **Q**     Did you eventually start talking to Ian Furminger over the

24  phone?

25  **A**     Yes.

1  Q    And did you exchange text messages with him?

2  A    Yes.

3  Q    Did you guys joke a lot?

4  A    A lot, yeah.

5  Q    And when you were standing on 20th and Mission or walking

6  up in 20th and Mission, did you see Ian Furminger driving by?

7  A    Yeah, he drives sometimes but he just say -- like, hi to

8  me (Indicating).

9  Q    And you were waving your hand?

10  A    Yeah.

11  Q    So you were standing on the corner, right?

12  A    Yeah.

13  Q    And you've got your M3 down the block with stolen items?

14  A    Yes.

15  Q    And Ian Furminger was waving at you, hi (Indicating)?

16  A    No, I don't think he knew my car, on that day.

17  Q    Okay.  But was he waving at you?

18  A    Yes.

19  Q    You guys gone out to lunch before?

20  A    Yes.

21        MR. VILLAZOR:  Could we pull up Exhibit 277, the

22   first page?

23      (Document displayed)

24  BY MR. VILLAZOR:

25  Q    All right.  You said this is the restaurant there now.

1   A   Yeah.

2   Q   But it was under a different name before?

3   A   Different name, by the same owners.

4   Q   Did you have lunch with Ian Furminger over here?

5   A   Yes.

6   Q   How many times?

7   A   Two times.

8   Q   Two times?  Have you ever had lunch with him again?

9   A   No.

10  Q   Did you go out to dinner with him?

11  A   No.  Never.

12  Q   Did you guys go out for drinks?

13  A   No.

14  Q   You said you went to the casino.  Did you ever go the

15  casino with Ian Furminger?

16  A   No.  I invited him but never went together.

17  Q   You invited him to the casino.

18  A   Yes.

19  Q   Did you ever go with him?

20  A   No.

21  Q   You had to renew your immigration papers once, right?

22  A   Yes.

23  Q   Did you ask Ian Furminger to come with you?

24  A   I think I ask him, just to help me, interpretation or

25  something like that.

1    Q    Something like that?

2    A    Yeah.  But he never went.

3    Q    He didn't go with you?

4    A    No.

5    Q    Have you ever been to his house?

6    A    No.

7    Q    Do you know whether he was married, had a girlfriend,

8    anything like that?

9    A    I think he was married, but I don't know his wife.

10   Q    You never met his wife?

11   A    No, I don't know his wife, his kids.

12   Q    Did you guys celebrate any holidays together?

13   A    No.

14   Q    Cinco de Mayo?

15   A    No.  Never.

16   Q    The Mission Station.  Do you know where it is?

17   A    Yeah.

18   Q    Did you ever go over there and hang out with Ian

19   Furminger?

20   A    No.

21   Q    How many times have you been to the Mission Station?

22   A    Only one time I went there.

23   Q    One time?

24   A    Yeah, when I -- I went there, one phone.  One iPhone.

25   Q    And that was the last time you ever remember going there?

1    **A**    Yeah.  The other times when they detained me I went there

2    for -- not arrested, but detained.

3    **Q**    When you were detained, where were you taken?

4    **A**    I got detained by officers, some officer.  I don't know

5    those guys.

6    **Q**    Did they take you to Mission Station?

7    **A**    Yes.

8    **Q**    So, two times you have been to Mission Station?

9    **A**    Uh, yeah, maybe two times.

10   **Q**    One time --

11   **A**    Three times (Indicating).

12   **Q**    Three times.

13   **A**    (Nods head)

14   **Q**    Okay.  So one time was to sign the confidential informant

15   paperwork.

16   **A**    Yeah.

17   **Q**    A second time, you were detained?

18   **A**    One detained and the other one, I returned one phone,

19   iPhone.

20   **Q**    You returned an iPhone?

21   **A**    An iPhone, yeah.  Was stolen.

22   **Q**    That was stolen.

23   **A**    Yeah.

24   **Q**    How did you know it was stolen?

25   **A**    Because I says, "Can you return this iPhone?"  And they

 1  gave it back to the owner.

 2  **Q**    Do you ever go to Mission Station for any barbecues or

 3  anything like that?

 4  **A**    No.

 5  **Q**    All right.  Mr. Sanchez, did you -- during your friendship

 6  with Ian Furminger, did you give him things?

 7  **A**    Yes.

 8  **Q**    Did you sell him things at a discount?

 9  **A**    Yes.

10  **Q**    Did you give things to Ed Robles?

11  **A**    Yes.

12  **Q**    And did you sell things to him at a discount?

13  **A**    Yes.

14          **MS. CAFFESE:**  Well, excuse me.  Just clarification as

15   to who with.

16          **THE COURT:**  Who are you talking about?

17          **MR. VILLAZOR:**  Ed Robles.

18          **THE COURT:**  Thank you.

19  **BY MR. VILLAZOR:**

20  **Q**    All right.  I'll start.

21          Did you give things to Ed Robles?

22  **A**    Yes.

23  **Q**    Did you sell things to Ed Robles at a discount?

24  **A**    Yes.

25  **Q**    Can you tell the jury why you did the those things with

```
 1   Ed Robles and Ian Furminger?  Why did you do it?

 2   A    In my own words, is to let me work.

 3   Q    To let you work.

 4   A    Yeah.

 5   Q    And what work is that?

 6   A    Operate my business.

 7   Q    What business is that?

 8   A    Buying, buying things.

 9   Q    And selling things?

10   A    Yes.

11   Q    Lots of them that were stolen?

12   A    Yes.

13   Q    Were you fearful that they would arrest you?

14   A    Yes.

15   Q    Were you doing it for protection?

16   A    Yes.

17   Q    Did Ian Furminger or Ed Robles ever physically threaten

18   you?

19   A    No.  Never.

20   Q    Did they actually say, "If you don't sell us these things,

21   you're going to get arrested"?

22        They never actually said those words, did they?

23   A    No.

24   Q    When you gave them things and you bought them things --

25   I'm talking about Ian Furminger, Ed Robles -- did they ever ask
```

1   you if it was stolen?

2   **A**    No.

3   **Q**    Did they ever give you a receipt when they took something

4   from you or when you -- when they accepted the gifts or they

5   bought the things?

6   **A**    No.

7   **Q**    No receipt?

8        When you met -- when you met Ian Furminger to give him

9   things or to sell him things, where did you meet him?

10  **A**    Twentieth and South Van Ness.

11  **Q**    On the street?

12  **A**    Yes.

13  **Q**    Would you meet him by the car?

14  **A**    Yes.

15  **Q**    Where would you -- then would you open up your trunk?

16  **A**    Yes.

17  **Q**    Before you opened up your trunk, would you do anything?

18  **A**    We look around for --

19  **Q**    "We looked around."

20  **A**    Yeah.

21  **Q**    So you looked around?

22  **A**    Yes.

23  **Q**    Why would you look around?

24  **A**    For other police officers.

25  **Q**    How about Ian Furminger?  Would he look around?

1   **A**   I think so, too.

2   **Q**   Say it again?

3   **A**   Yeah.

4   **Q**   When you gave him things, would you just do it out in the

5   open, like you hand it over in a store?

6   **A**   Sometimes.

7   **Q**   Sometimes.

8   **A**   Yeah.

9   **Q**   Did you hand him things at a restaurant or -- when you

10  guys had lunch?

11  **A**   No.  No, not that.

12  **Q**   How about when you gave thing to Ed Robles and when you

13  sold things to Ed Robles?  Where would you meet him?

14  **A**   My car.

15  **Q**   Your car?

16  **A**   Yeah.

17  **Q**   And again, it was in your trunk?

18  **A**   Yeah.

19  **Q**   Would you look around to see if the police were around?

20  **A**   Oh, no, no.  Not in my car.  No.  Outside.

21  **Q**   But before you opened up your trunk, would you look around

22  (Indicating)?

23  **A**   No.  With Ed, no.

24  **Q**   With Ed, no.

25  **A**   No.

 1   **Q**    At any time that you gave things to either Ed Robles or

 2   Ian Furminger, did they ever search your car?

 3   **A**    No.

 4   **Q**    Have you ever been prosecuted or arrested for giving Ian

 5   Furminger or Ed Robles things?

 6   **A**    No.

 7   **Q**    Okay, let's talk about the specifics.  Okay?  All right.

 8   Let start with Mr. Furminger.

 9        Did you give him a Nikon camera, N-I-K-O-N?

10   **A**    Yes.

11   **Q**    He didn't pay for that.

12   **A**    He paid the -- I think he pay me.  Yeah, I think he pay

13   me, and buy me lunch.

14   **Q**    He paid you with lunch.

15   **A**    Yeah.

16   **Q**    Did he pay you with money?

17   **A**    I don't remember that part.

18   **Q**    Do you remember testifying in the grand jury?

19   **A**    Yeah.

20   **Q**    Do you remember you looked over this?  The -- we've met

21   before?

22   **A**    Yeah.

23   **Q**    Do you remember reading this (Indicating)?  Do you

24   remember reading this grand jury transcript?

25   **A**    Yes.

 1  Q     If I showed you this grand jury transcript, do you think

 2  it will help you remember whether or not Ian Furminger paid you

 3  for the camera?

 4        Can I show you -- I'll show to you page, I'll walk up

 5  there --

 6  A     I'm sure he paid for lunch, the camera.

 7  Q     Did he pay for the camera; did he give you cash for the

 8  camera?

 9  A     I think he pay me.

10  Q     You think he paid you.

11  A     Yeah, I think.

12  Q     All right.  I'm going to show you Page 21, Lines 4 to 7.

13        MR. VILLAZOR:  Your Honor, I have a copy, if you

14   would like.

15        (Document handed up to the Court)

16        (Off-the-Record discussion)

17        THE COURT:  Sorry; are we talking about --

18        MR. VILLAZOR:  Your Honor, I mixed up my notes.  I'm

19   going to move on.

20        THE COURT:  All right.

21  BY MR. VILLAZOR:

22  Q     Did you give him a GPS?

23  A     Yes.

24  Q     Did he pay you for that?

25  A     Yes.

1   Q   He paid you for the GPS?

2   A   Yeah.

3   Q   Now I'm going to ask you to look at Page 21, Line 4 to 7.

4       (Witness examines document)

5   Q   Do you see that?

6           **THE COURT:**  You can read it.  "Question."  Go ahead.

7    Read it.  Do you need --

8           **THE WITNESS:**  Which line?

9   **BY MR. VILLAZOR:**

10  Q   So there's Page 21, Line 4 to 7.

11          "Did you -- when we talked earlier..."

12      (Reporter interruption)

13          **MR. VILLAZOR:**  Page 21, Line 4 (As read):

14          "**QUESTION:**  Did you -- when we talked earlier, I

15          asked you whether Sergeant Furminger paid you for the

16          GPS device.  Is that correct?

17          "**ANSWER:** Seems to me he did not pay me."

18      Did I read that correctly?

19      (Witness examines document)

20  Q   Did I read it correctly?

21  A   Yeah.

22  Q   How about perfume?  Did you give him bottles of perfume?

23  A   Yes.

24  Q   And, did you actually buy those bottles of perfume?

25  A   Yeah.

1   Q   Where did you buy it from?

2   A   From Macy's.

3   Q   Macy's?

4   A   Yeah.

5   Q   The department store?

6   A   Yeah.

7   Q   You sold him things too, right?

8   A   Yes.

9   Q   Did you sell him a DeWalt power drill?

10  A   Yes.

11  Q   Did he ask for it?

12  A   Yes.

13  Q   How much did you sell it for?

14  A   I think, $20.

15  Q   How much was it worth?

16  A   In the store, I think like 70 or 75.

17  Q   Did you sell him tequila?

18  A   Yes.

19  Q   What kind of tequila?

20  A   I think, Herradura.

21  Q   Herradura?

22  A   Herradura.

23  Q   H-E-R-R-A-D-U-R-A?

24  A   Yeah.

25  Q   What kind of tequila is that?  Mexican?

1   A   Mexican tequila.

2   Q   Did he ask you for more things?

3   A   Yes.

4   Q   Did he ask you for a television?

5   A   Yes.

6   Q   Did he ask you for Apple laptops?

7   A   Yes.

8   Q   Did he ask you for wedding rings?

9   A   Yes.

10  Q   Did he ask you for a wireless Bose system?

11  A   Yes.

12  Q   Did he ask you for Christmas presents for his wife?

13  A   Yes.

14  Q   Did you offer him things, that he didn't take?

15  A   Yeah, I offer him, but he refuse to.

16  Q   He refused?

17  A   Yeah.

18  Q   Did you offer him a Sony camera?

19  A   Yes.

20  Q   Toshiba laptop?

21  A   Yes.

22  Q   A Verizon phone?

23  A   Yes.

24  Q   An iMac 2009, 27-inch?

25  A   Yeah.

1   Q    Did you offer him women's sunglasses?

2   A    Yes.

3   Q    IPad 3?

4   A    Yes.

5   Q    16, Samsung tablet?

6   A    Yes.

7   Q    Kindle tablet?

8   A    Yes.

9   Q    Mr. Sanchez, did you want to buy things for him from the

10  store, and give it to him?

11  A    Not all -- not all of them.

12  Q    Not all of them.

13  A    Some.

14  Q    And again, why did you give him these things and sell him

15  these things at a discounted rate?  Why did you do that to Ian

16  Furminger?

17  A    My own words, for protection, maybe.

18  Q    Say that again?

19  A    For protection.

20  Q    All right.  Let's talk about Ed Robles.  Did you also give

21  him things?

22  A    Only that, the sunglasses and the laptop.  That's all.

23  Q    Okay.  Let's talk about the sunglasses.  Did you offer him

24  a pair of sunglasses that he refused?

25  A    Yes.

1  Q   Why did he refuse it?

2  A   I didn't --

3        MS. CAFFESE:  Objection; calls for speculation.

4  BY MR. VILLAZOR:

5  Q   What did he say when he refused it?

6  A   I think they were too small, too small for him.

7  Q   Did he ask you for a specific kind of sunglasses?

8  A   Ray-Ban.

9  Q   Ray-Ban?

10  A   Ray-Ban, yeah.

11  Q   He wanted Ray-Ban sunglasses?

12  A   Yes.

13  Q   Do you know whether or not those Ray-Ban sunglasses were

14  stolen?

15  A   No.  They were not stolen.

16  Q   They were not stolen?

17  A   No.

18  Q   Can you be sure?

19  A   Yeah.  I'm sure about that.

20  Q   You are sure about that?

21  A   Yeah.

22  Q   All right.  I'm going to show you Page 32, Line 11 to 15

23  in the grand jury transcript.  And I'm going come up there.

24        THE COURT:  You can just read it.

25        MR. VILLAZOR:  Yes, Your Honor.

1        **THE WITNESS:**  Like probably, right --

2        **MS. CAFFESE:**  I'll object, because it's not --

3        **THE COURT:**  Overruled.

4        **MS. CAFFESE:**  It is not inconsistent.

5        **THE COURT:**  Yes, it is.  The jury will be the judge

6   of that.

7       You can just read it.  You don't have to show it to him.

8        **MR. VILLAZOR:**  Thank you, Your Honor.

9        **THE COURT:**  Just go back -- ladies and gentlemen,

10  it's up to you when you hear the testimony, to determine if

11  it's inconsistent or if it's not inconsistent, to the extent

12  it may be consistent, to the extent it may be inconsistent.

13      Okay.

14        **MR. VILLAZOR:**  Your Honor, I'm going to start on Line

15  4, then (As read):

16        **"QUESTION:**  Did you tell me when we last spoke that

17           while you weren't sure, you thought the sunglasses

18           were stolen?

19        **"ANSWER:**  I wasn't sure.

20        **"QUESTION:**  You weren't sure.  Didn't you also tell

21           me that they didn't have a case?

22        **"ANSWER:**  No, they didn't have one.

23        **"QUESTION:**  Okay.  So do you think they were stolen?

24        **"ANSWER:**  Well, perhaps they were.  Perhaps they

25           weren't.

1           "**QUESTION:**  You can't tell for sure?

2           "**ANSWER:** I can't be sure."

3           **THE WITNESS:**  Yeah.

4    BY MR. VILLAZOR:

5    **Q**    All right.  Let's talk about, you mentioned a laptop.

6    **A**    Yes.

7    **Q**    Did you give him the laptop or did you sell the laptop?

8    **A**    I sold them.

9    **Q**    You sold them.  What kind of laptop was it?

10   **A**    The HP.

11   **Q**    HP?

12   **A**    Yes.

13   **Q**    How much did you sell it for him?  Sell it to him?  Sorry.

14   **A**    I think, 200.

15   **Q**    How much did you think it was worth?

16   **A**    Like, 600.

17   **Q**    Do you know if it was stolen or not?

18   **A**    No, it wasn't stolen.

19   **Q**    It wasn't stolen.  Did he ask if it was stolen?

20   **A**    No.

21   **Q**    Did you offer him other things?

22   **A**    No.  Nothing else.

23   **Q**    Motorcycle jackets?

24   **A**    Yeah, but he refused to.

25   **Q**    He refused them?

1    **A**    Yeah, he refused to buy it.

2    **Q**    Why did you offer him motorcycle jackets?

3    **A**    Because I -- I saw him driving the motorcycle.

4    **Q**    Oh, you saw him on his motorcycle?

5    **A**    Yeah.

6    **Q**    Was it a San Francisco Police Department motorcycle?

7    **A**    Yes.

8    **Q**    Where did you see him?

9    **A**    He passed by, by 20th Street.

10   **Q**    Did he wave hi to you (Indicating)?

11   **A**    Yeah.

12   **Q**    Stop and talk to you?

13   **A**    Yeah.

14   **Q**    Were you doing your business on 20th Street?

15   **A**    No, it wasn't during business.  I was standing.

16   **Q**    You were just standing there?

17   **A**    Standing there.

18   **Q**    Did Ed Robles ask you about a power generator?

19   **A**    I don't know who asked me.  One of those, but they didn't

20   buy it.

21   **Q**    Okay.  Let's take that slowly.

22        When you said one of them asked for a power generator, do

23   you remember who, who's one of them?  Who are you talking

24   about?

25   **A**    I don't know exactly.

1  Q    Either Ed Robles or Ian Furminger?

2  A    Yes.

3  Q    And somebody asked you about a power generator.

4  A    Yes.

5  Q    Do you remember showing somebody, either Ed Robles or Ian

6  Furminger, a power generator?

7  A    Yeah, I show it to them, but --

8  Q    And you showed it to them; where was it?

9  A    Twentieth and South Van Ness.

10 Q    Was it in the trunk of your car?

11 A    I pull it out.  It was on the sidewalk.  Because it was

12 big (Indicating), very big.

13 Q    Now, again, why did you offer and sell things to

14 Ed Robles?  Why did you do those things?

15 A    They never told me to protect me, but I say by myself,

16 protection.

17 Q    Did you know Rey Vargas?

18 A    Yes.

19 Q    Did you ever sell or give him things?

20 A    Yes.

21 Q    You gave Rey Vargas things?

22 A    No.  He gave me.

23 Q    Oh, he gave you.

24 A    He gave me.  He never -- I never gave him.

25 Q    You never gave Rey Vargas anything.

```
 1   A   No.

 2   Q   Did you ever sell Rey Vargas anything?

 3   A   No.

 4   Q   Did he give you things to sell?

 5   A   Yes.

 6   Q   Did you believe they were stolen?

 7   A   He told me --

 8   Q   I don't want to know what he told you.  I just want to

 9   know if you thought they were stolen.

10   A   Cannot be sure on that.

11   Q   You can't be sure.

12   A   Yeah.

13   Q   Well, what was he giving you, to sell?

14   A   He gave me jewelry.

15   Q   Jewelry?

16   A   Jewelry.

17   Q   Was it men's jewelry or women's jewelry?

18   A   Most of them, women.

19   Q   Most of them, women's jewelry?

20   A   Yeah.

21   Q   Did he sell you -- give you electronics to sell?

22   A   What?

23   Q   Electronics?

24   A   Yes.

25   Q   Cameras?
```

 1  **A**     Cameras, laptops.

 2  **Q**     Phones?

 3  **A**     Phones.

 4  **Q**     Mr. Sanchez, we talked about you and Ian Furminger

 5  exchanging phone numbers.  Right?

 6  **A**     Yes.

 7  **Q**     And you exchanged text messages?

 8  **A**     Yes.

 9  **Q**     You met with U.S. Attorney's office and FBI (Indicating),

10  before?

11         Yes?

12  **A**     Yes.

13  **Q**     And, did we show you some text messages (Indicating)?

14  **A**     Yes.

15  **Q**     And did you have a chance to look at these text messages?

16  **A**     Yeah, I look at them already.

17  **Q**     Okay.  I'm just going to show you this.

18              **MR. VILLAZOR:**  Your Honor, these are a series of text

19   messages, excerpts from various exhibits.  I'm going to just

20   show it, briefly, to Mr. Sanchez.

21         (Witness examines document)

22  **BY MR. VILLAZOR:**

23  **Q**     Do you see there is a signature at the bottom of the first

24  page?

25  **A**     Yes.

1    **Q**    All right.  Whose signature is that?

2    **A**    Mine.

3    **Q**    And are these text messages, some text messages that you

4    exchanged with Ian Furminger?

5    **A**    Yes.

6              **MR. VILLAZOR:**  Your Honor, I guess for identification

7    purposes we could mark all these excerpts as one exhibit.  We

8    have to, obviously, do some redactions.

9              **THE COURT:**  Go ahead.  Do these collection have a

10   number or not?

11             **MR. VILLAZOR:**  I'm going to designate it with a

12   number now.  Defense counsel has a copy.  We obviously did

13   some additional redactions.

14             **THE COURT:**  Okay.

15             **MR. VILLAZOR:**  I just have to figure out what the

16   exhibit number is.

17       (Off-the-Record discussion)

18             **MR. VILLAZOR:**  Your Honor, I'm going to mark this and

19   move it into evidence as Government Exhibit 296.

20             **THE COURT:**  296.  Admitted.

21       (Trial Exhibit 296 received in evidence)

22             **MR. VILLAZOR:**  Your Honor, if I could publish these

23   excerpts to the jury?

24             **THE COURT:**  Yeah, those agreed upon.

25       (Document displayed)

1          (Document taken off display)

2          (Document displayed)

3   **BY MR. VILLAZOR:**

4   **Q**    The first page I'm going to be showing you is dated

5   September 6, 2011 (Indicating).

6          And Mr. Sanchez, I'm going to look at a number, (415)

7   706-8941.  Is that your phone number?

8   **A**    Yes.

9              **MR. VILLAZOR:**  Your Honor, at this time, actually, we

10   have a stipulation as to the phone numbers.

11          May I read it to the jury?

12              **THE COURT:**  Yes.

13              **MR. VILLAZOR:**  (As read)

14              "Wireless carrier records:  At all times relevant,

15              Ian Furminger's personal cellular number is

16              (415)309-4914.  Edmond Robles's personal cellular

17              phone number is (925)336-6709.  And Reynaldo Vargas's

18              personal cellular phone number is (415)717-2936.  And

19              the parties further stipulate that the writings,

20              signals and sounds to and from their personal

21              cellular telephones are transmitted by means of wire

22              communication and interstate commerce.:

23          And Your Honor, for the jury's reference, we have

24   highlighted Sergeant Furminger's cellular telephone.  The

25   first column is the sender.  The second column is the

 1    recipient.

 2   **BY MR. VILLAZOR:**

 3   **Q**    Mr. Sanchez, are you able to read on the screen?

 4   **A**    Yes.

 5   **Q**    Okay.  So, on September 6, 2011, you wrote to Ian

 6   Furminger (As read):

 7             "I am counting all the cars passing by Mission Street

 8             and 20th."

 9         He wrote back:

10             "The guys that are not shaven and wearing plaid puffy

11             shirts are the police.  But you knew that!"

12         You wrote back:

13             "No, I didn't know."

14         You also wrote:

15             "They must come from out of town because I know all

16             the police from San Francisco."

17         He wrote back:

18             "Ha.  Very easy to pick out."

19         You answered:

20             "Yes."

21         Did I read all that correctly?

22   **A**    Yes.

23         (Document displayed)

24   **Q**    Showing you a series of text messages, September 7, 2011.

25   You are writing to Ian Furminger (As read):

1              "I have a nice GPS for you but it's not complete is

2              missing the cradle."

3      Ian Furminger replies:

4              "That's ok.  You mean the cradle to hold it up?  No

5              big deal I can make it work."

6      (Document taken off display)

7  Q   Continuing on that conversation.

8      (Document displayed)

9  Q   You wrote:

10             "Yeah and is big screen looks like new and its new

11             model."

12     Ian Furminger wrote back:

13             "Cool!  Can we meet tomorrow?"

14     Did I read that correctly?

15 A   Yes.

16 Q   And that date is September 7, 2011 (Indicating).  Correct?

17 A   Yes.

18 Q   Later that day, you wrote:

19             "Yes."

20     Ian Furminger wrote back to you:

21             "Cool see you tomorrow?"

22     You wrote back:

23             "Ok."

24     Did I read that correctly?

25 A   Yes.

1        (Document displayed)

2   Q    September 8, 2011.  Ian Furminger wrote to you (As read):

3            "Can we meet for lunch tomorrow?  I hate to go to

4            city tomorrow and today is wife birthday."

5        You wrote back:

6            "If you hate coming tomorrow you can come another day

7            I will saved it for you."

8        Ian Furminger wrote back:

9            "Ok."

10       You wrote:

11           "I know it's Friday a lot of traffic."

12       Did I read that correctly?

13  A    Yes.

14  Q    And when you said "I will saved it for you," what were you

15  talking about?  Were you talking about the GPS?

16  A    Yes.

17       (Document taken off display)

18       (Document displayed)

19  Q    Next series of text messages, September 9, 2011.  Ian

20  Furminger wrote to you (As read):

21           "Lunch?"

22       You wrote back:

23           "I just ate.  30 minutes ago."

24       Ian Furminger wrote to you:

25           "Ok meet by restaurant now?"

```
 1        You ask:
 2              "Ok do I take the GPS now or after."
 3        Ian Furminger:
 4              "Now."
 5        You:
 6              "Ok."
 7        Mr. Sanchez, the restaurant we're talking about, was that
 8   Jarritos?
 9   A    Yes.
10   Q    Did you give Ian Furminger the GPS at that time?
11   A    But not inside the restaurant.
12   Q    Not inside the restaurant.
13   A    No.
14   Q    Where?
15        (Document taken off display)
16   A    By South Van Ness and 20th.
17   Q    South -- outside?
18   A    Yeah, outside.
19   Q    Why did you give it outside?
20   A    I don't know.
21   Q    You don't know?
22        Did you take it out of your trunk?
23   A    Yeah.
24   Q    Did you look around to see there was no police around?
25   A    Yes.
```

1  **Q**   Showing you another text message dated 11-1-2011.

2      (Document displayed)

3  **Q**   There is a new number there, (650)417-8501.  Do you see

4  that number?

5  **A**   Yeah.

6  **Q**   And that is your number?

7  **A**   Yes.

8  **Q**   All right.  Is this your signature there (Indicating)?

9  **A**   Yes.

10 **Q**   And you signed that because you wanted to -- you wanted to

11 make sure that was your number.

12 **A**   Yes.

13 **Q**   And you wrote (As read):

14         "Hey Ian this is your friend Sergio this is my new

15         number (650) 417-8501."

16     Ian Furminger wrote back:

17         "Cool got it!"

18     Correct?

19 **A**   Yes.

20     (Document taken off display)

21     (Document displayed)

22 **Q**   November 17, 2011.  Ian Furminger wrote (As read):

23         "Yes!  Hey I need a 72-inch TV for my house!  You got

24         one?"

25     You wrote:

```
 1              "That's too big you better buy the screen from
 2              metreon theater."
 3       Ian Furminger wrote:
 4              "Costco when I make more overtime buddy!"
 5       Ian Furminger added:
 6              "Saving my money now!"
 7       You wrote:
 8              "Costco it's cheaper than best buy."
 9       Ian Furminger writes back:
10              "Hey, I took a sick day today so won't be in for
11              lunch."
12       You wrote:
13              "Np."
14       Now, what is "Np"?
15  A    "Np," no problem.
16  Q    No problem.
17       (Document displayed)
18  Q    Another text message, dated 12-1-2011.  You wrote
19  (As read):
20              "I sent you an email with a info for tomorrow."
21       He wrote:
22              "Thank you!"
23       You replied:
24              "You still coming tomorrow?"
25       You write:
```

1              "Are you interested in a brand-new small digital Sony

2              camera 14.1 megapixel complete with charger?"

3       And you add:

4              "Red color."

5       Ian Furminger replied:

6              "Yes."

7       You add:

8              "It's brand new but no box you will see it ok."

9       You add:

10             "For you very chea"

11      Ian Furminger writes back:

12             "See you tomorrow."

13      And then you write:

14             "For you very cheap $2,200.40 ok."

15      And you add:

16             "Euros."

17      Now, when you said 2200.40 in Euros, were you joking

18  around?

19 **A**    Yes.

20 **Q**    Ian Furminger wrote:

21             "Great man I will give you one million U.S. dollars."

22      You replied:

23             "Thanks bro."

24      Ian Furminger:

25             "Be there just after lunch?  I have to sell my

1                   elephant to the circus in this morning."

2          You write back:

3                   "I want that million dollars in single dollars bills

4                   ok."

5          Ian Furminger wrote:

6                   "Pennies."

7          You wrote back:

8                   "Yeah get rid of that big animal."

9    A    We were joking.

10   Q    You were joking.  You don't have elephants to sell.

11   A    No.

12        (Document displayed)

13   Q    Another text message, dated December 2, 2011.  Ian

14   Furminger writes (As read):

15                  ""I'm gonna be at the restaurant in about 30

16                  minutes."

17         You replied:

18                  "Ok."

19         Ian Furminger wrote:

20                  "I am here!"

21         You replied:

22                  "Ok."

23         Now, Mr. Sanchez, did you meet Ian Furminger again at the

24   restaurant?

25   A    Yes.

```
 1  Q    Jarritos?

 2  A    Yeah.

 3       (Document displayed)

 4  Q    Another text message.  December 14, 2011, Ian Furminger

 5  wrote (As read):

 6            "When are you available?"

 7       And he added:

 8            "Ok yes come tomorrow!"

 9       You replied:

10            "Ok."

11       Ian Furminger:

12            "Are you coming for sure because I am taking tomorrow

13            off work!"

14       You replied:

15            "For sure man."

16       Ian Furminger said:

17            "Ok" (sic).

18       December 14th, same day.  Ian Furminger wrote:

19            "No!  My wife use Claratin (sic) that's all I know!

20            She needs a good Christmas present!"

21       Ian Furminger adds:

22            "Got anything?"

23       You replied:

24            "Everybody is in jail."

25       You add:
```

```
 1                "I have some nice women sunglasses and wallets."

 2        You add:

 3                "And a Cartier perfume but I'm not sure if it's mans

 4                or woman.  And 5 cows for sale."

 5        Did you write all that?

 6   A    Yes.

 7   Q    Did you really have women's sunglasses at the time?

 8        Did you really have women's sunglasses?

 9   A    Yes.

10   Q    Did you really have wallets?

11   A    Yeah.

12   Q    And did you really have Cartier perfume?

13   A    Yes.

14   Q    Ian Furminger wrote:

15                "Let's have lunch Thursday."

16        You add:

17                "Tomorrow or the next Thursday."

18        Did I read all that correctly?

19   A    Yes.

20   Q    Staying on that same day.

21        (Document displayed)

22   Q    Ian Furminger writes:

23                "This Friday I mean!"

24        You write:

25                "Ok.  Bring a big truck for the cows."
```

1   **A**   Joking around.

2   **Q**   Joking around.

3   **A**   Yeah.

4        (Document displayed)

5   **Q**   Showing you another series of text messages, December 16,

6   2011.  You write (As read):

7            "On Shotwell in 10 minutes."

8        Ian Furminger replies:

9            "Ok."

10       (Document taken off display)

11           **MR. VILLAZOR:**  Excuse me, Your Honor.

12       (Document displayed)

13       (Off-the-Record discussion between counsel)

14   **BY MR. VILLAZOR:**

15   **Q**   Ian Furminger wrote on December 16th, 2011:

16           "I am here."

17       You reply:

18           "I'm on my way."

19           "I am near fire department training lot."

20       You reply:

21           "Ok."

22       He asks you:

23           "Where are you coming from?"

24           "I'm here."

25           "I don't see you."

1          Did I read that all correctly?

2    **A**    Yes.

3          (Document displayed)

4    **Q**    Showing you now a text message series dated February 13,

5    2012.

6          You wrote to Ian Furminger (As read):

7               "FBI arrested 3 more in trafficking drugs 29 already

8               arrested 3 more left."

9          He wrote back:

10              "Hey did anyone ever come talk to you about me?"

11         You replied:

12              "No.  Nobody."

13         He responds:

14              "I trust you tell me the truth!"

15         You replied:

16              "I promise you nobody.  Why anything wrong?"

17         He replies:

18              "Things are very weird!  I will explain in person

19              later!"

20              "I swear to God nobody came and talked to me.  Ok."

21         Ian Furminger wrote:

22              "I know and believe you!"

23         You replied:

24              "Thanks Ian."

25         Did I read that correctly?

1   **A**   Yes.

2        (Document taken off display)

3        (Document displayed)

4   **Q**   Showing you another series of text messages dated March 4,

5   2012.  You wrote (As read):

6            "I'm watching the Smurfs.  Very good movie."

7        Ian Furminger:

8            "Cool!  Hey do you have anything good?"

9        You replied:

10           "Toshiba lop top and 2 Verizon's phones."

11       Did I read that correctly?

12  **A**   Yes.

13  **Q**   Did you really have Verizon phones for sale?

14  **A**   Yes.

15  **Q**   Did you really have a Toshiba laptop for sale?

16  **A**   Yes.

17       (Document taken off display)

18       (Document displayed)

19  **Q**   Showing you another text message, dated March 21, 2012.

20  You wrote (As read):

21           "Do you want 1 bottle of patron tequila anego?"

22       A-N-E-J-O.  That's what you wrote.  Correct?

23  **A**   Yes.

24       (Document taken off display)

25       (Document displayed)

1  Q   Later that same day, Ian Furminger replied:

2          "Sure."

3      You said:

4          "Okay I will saved it for you."

5      Ian Furminger replies:

6          "Cool."

7      You said:

8          "Ok."

9      You add:

10         "1 tequila, 2 tequila, 3 tequila and then floor."

11     Ian Furminger replies:

12         "Yes."

13     Did you really have that bottle of tequila?

14 A   Yeah, I have that bottle.  I didn't give it to him.

15 Q   You didn't give it to him.

16 A   No.

17 Q   Did he want it?

18 A   He want it, but he didn't buy it from me.

19 Q   But that's different from the Herradura tequila we talked

20 about earlier.

21 A   Yeah.

22     (Document displayed)

23 Q   Showing what's been dated March 22, 2012, you write

24 (As read):

25         "I think I bought a laptop and an iPhone from an

1          undercover officer."

2      That's what you wrote.

3  A   Yes.

4  Q   Ian Furminger replied:

5          "That is not a good idea to do."

6      You replied:

7          "I know.  After 11 years this happened."

8      Ian Furminger:

9          "What happened?"

10     You say:

11         "Something happened eleven years ago I bought some

12         stuffs from police."

13     Ian Furminger:

14         "So are you in San Quentin with Scott Peterson?

15     You replied:

16         "No I'm in Santa Rita."

17     Ian Furminger:

18         "That's nice they let you use your phone!"

19     You say:

20         "Yes I'm the only one using it."

21     Now, Mr. Sanchez, were you really in prison at the time?

22  A  No, we were joking.

23  Q  You were joking.

24  A  Yeah.

25  Q  But did you really believe that you bought a laptop and an

1  iPhone from an undercover officer?

2       (Document taken off display)

3  **A**   I was sure about that.

4  **Q**   You were sure about that?

5  **A**   Yeah, I was sure, yeah.

6       (Document displayed)

7  **Q**   Showing you another series of text messages dated April 4,

8  2012.  You write (As read):

9           "When are we going to the Vacaville Outlets and buy

10          your 70 inches TV?"

11  Ian Furminger:

12          "When I get enough money!  How much do you think?

13          What's up?"

14  You replied:

15          "No more than $25,000."

16  **A**   Joking.

17  **Q**   You're joking; it's not 25,000.

18  **A**   Yeah.

19  **Q**       "Maybe 1,300."

20  Are you serious then?

21  **A**   No, we were joking.

22  **Q**   All right.  Ian Furminger wrote:

23          "Too much right now man!"

24  Right?

25  **A**   Yeah.

1   Q    Continuing on in that conversation, still March -- excuse

2   me, April 4, 2012.

3        (Document displayed)

4   Q    You write:

5            "I checked for you I saw 2 prices.  1 it's $1,000 and

6            the other 1,200 Panasonic.  70 inches plasma."

7        Ian Furminger writes:

8            "Maybe 1299 but 1300 is too much!"

9        You say:

10           "I put the dollar.  I told you I will help you with

11           half.  I paid 4,000 for my TV it's called Samsung

12           ultra slim."

13       Ian Furminger:

14           "Wow a dollar is a lot to give!  Are you sure?"

15       You write:

16           "100 percent sure."

17       That's what you wrote, right?

18  A    Yeah.

19  Q    Okay.  Now, showing you what's been marked on April 10th,

20  2012.

21       (Document displayed)

22  Q    (As read)

23           "Now we can buy your TV I won $1,100 today."

24       Ian Furminger wrote:

25           "Money is tight right now man but soon I hope."

1       Did I read that correctly?

2    A    Yes.

3    Q    Showing you what's been -- the text message that's been

4    dated March -- May 4, 2012.

5       (Document displayed)

6    Q    Ian Furminger wrote to you (As read):

7          "I need a nice Apple Computer!  Have any

8           connections?"

9       You wrote:

10          "No man my connection is on 850 Bryant you must know

11           where it is."

12       Ian Furminger:

13          "Yeah."

14       You wrote:

15          ""No man my connection is on 850 Bryant you must know

16           where it is for a few months."

17       Did I read that correctly?

18    A    Yes.

19    Q    Mr. Sanchez, when you said "850 Bryant," what are you

20    talking about?  Where's 850 Bryant?

21    A    (Indicating) In jail, in --

22    Q    The jail.

23    A    The jail.

24    Q    All right.  And when you say "connection," what's

25    "connection"?

1  **A**   I was joking with him.

2  **Q**   No, no.  What's "connection"?

3  **A**   The guy that sell me stuff.

4  **Q**   The guy who sells you stuff.  Apple laptops, right?

5  **A**   Yeah.

6       (Document taken off display)

7       (Document displayed)

8  **Q**   Showing you a text message that is dated May 5th, 2012.

9  Ian Furminger writes:

10          "Yeah, but I need a computer."

11       (Document taken off display)

12  **Q**   And continuing on in that conversation, May 5, 2012.

13       (Document displayed)

14  **Q**      "Thanks."

15       You write:

16          "Apple pie right"?

17       He replies:

18          "Yeah and a good one."

19       You reply:

20          "Ok I will do the best I can."

21       Did I read that correctly?

22  **A**   Yes.

23       (Document taken off display)

24  **Q**   Showing you another set of text messages, dated May 16,

25  2012.

 1        (Document displayed)

 2   Q    You write (As read):

 3             "My friend just got out from jail the one who brings

 4             me the Apple lop tops but he is scared because they

 5             gave him three years probation."

 6        Did I read that correctly?

 7   A    Yes.

 8   Q    And when you said your friend just got out from jail, was

 9   that the connection you were talking about a few days prior?

10   A    No.  It's a different.

11   Q    This is a different guy.

12   A    Different guy.

13   Q    This is a different connection?

14   A    Yes.

15   Q    Ian Furminger writes:

16             "I am scared too."

17        You wrote:

18             "I would be too and you why."

19        Ian Furminger:

20             "Ha no reason."

21        You write:

22             "I know why you are scared because you watched the

23             movie Nightmare on Elm Street."

24        Now you're joking.

25   A    Joking, yeah.

1  Q    And there's a series of jokes over here, right?

2  A    All of them.

3  Q    Okay.  But then, on May 16, 2012 at 20:36:47, Ian

4  Furminger writes:

5          "So when can I get my computer?"

6          "Soon on February the 30th.  Ha ha."

7      You write:

8          "Do you want 13 or 15 inch MacBook or MacBook Pro

9          like what year."

10     Ian Furminger:

11         "Can you do big desk top?"

12     You say:

13         "Ok."

14     He replies:

15         "Ok you can get it?"

16     You replied:

17         "22, 24, 27 inches no matter any of those sizes."

18     Ian Furminger:

19         "27."

20     You reply:

21         "901 ASAP!"

22     You go on:

23         "I will ask other buyers to saved it for me."

24     Ian Furminger:

25         "Cool thanks."

1      You say:

2           "Ok I will start asking 2morrow."

3      Did I read that correctly?

4    A  Yes.

5      (Document taken off display)

6    Q  May 23rd, 2012.

7      (Document displayed)

8    Q  Ian Furminger writes to you (As read):

9           "Got any ladies wedding rings?"

10     You reply:

11          "Are you getting married again?"

12     He adds:

13          "No, my wife lost hers tonight."

14     You replied:

15          "The wedding, it's the same date like Ed and Ray."

16     And you're joking about that last statement, right?

17   A  Yes.

18   Q  Who's "Ed"?

19   A  Ed Robles.

20   Q  Who's "Ray"?

21   A  Rey Vargas.

22   Q  But you're just joking about that.

23   A  Yeah.

24     (Document taken off display)

25     (Document displayed)

1          **MR. VILLAZOR:**  Your Honor, just a moment.

2      (Off-the-Record discussion between counsel)

3          **MR. VILLAZOR:**  Excuse me, Your Honor.

4  **BY MR. VILLAZOR:**

5  **Q**   Continuing on in that conversation.

6      (Document displayed)

7  **BY MR. VILLAZOR:**

8  **Q**   (As read):

9          "They got divorced!  I need a ring for my wife.  Do

10          you have any?"

11      You replied:

12          "I don't have any."

13      Did I read that correctly?

14  **A**   Yes.

15  **Q**   May 24, 2012.

16      (Document displayed)

17  **Q**   You write (As read):

18          "Hey man you don't want 21 inches iMac 2009 he want

19          350."

20      Ian Furminger writes:

21          "What year?"

22      You say:

23          "2009 runs 2G 250 hard drive."

24      Ian Furminger:

25          "No thanks but thanks."

 1          You say:

 2              "Ok I will keep trying for the 27 inches."

 3          Ian Furminger:

 4              "Nice."

 5          You say:

 6              "Ok."

 7          Did I read that correctly?

 8   **A**    Yes.

 9   **Q**    Now, in the top line, you said "He want 350."  Did I read

10   that?  "He want 350"?

11   **A**    Yes.

12   **Q**    Who's "he"?

13   **A**    The guy that was selling it.

14   **Q**    There was a guy who brought you that iMac.

15   **A**    Yeah.

16   **Q**    Right?  And can you describe to the jury how that guy

17   brought you that iMac?

18   **A**    He was coming, the bicycle.

19   **Q**    He had it on his bicycle?

20   **A**    Covered over everything in a blanket.

21   **Q**    He was covering it in a blanket?

22   **A**    Yeah.

23   **Q**    And he wanted to sell it to you?

24   **A**    Yeah.

25   **Q**    And you were on 20th Street?

 1  **A**    Yeah.

 2       (Document taken off display)

 3       (Document displayed)

 4  **Q**    June 25th, 2012.  You write (As read):

 5            "Are you on vacation?"

 6       He replies:

 7            "No, back tomorrow!  Got anything good?"

 8       You say:

 9            "I'm getting brand new 18-volt DeWalt drills and

10            impact drills and sawzalls."

11       He replies:

12            "A big impact would be cool."

13       You write "Slow business.  Ok."

14       Did I read that correctly?

15  **A**    Yes.

16  **Q**    June 30th, 2012.

17       (Document displayed)

18  **Q**    You write:

19            "Did you see the picture?"

20       And did you e-mail him a picture?

21  **A**    Yeah.

22  **Q**    He replied:

23            "Yes cool."

24       You ask:

25            "Do you want it?"

1    He replies:

2            "I have lots of those."

3    You say:

4            "For you cheap 5,000 Euros."

5    He replies:

6            "Good deal."

7    Now, did you really have something to sell to him?

8  **A**   No.  I was joking.

9  **Q**   This is -- the "5,000 Euros" was a joke?

10 **A**   Yeah.

11   (Document taken off display)

12 **Q**   June 7, 2012.

13   (Document displayed)

14 **Q**   Ian Furminger (As read):

15            "Got any womens sunglasses?  Or any other women

16            stuff?"

17   You reply:

18            "No."

19   You add:

20            "I will be here til 3.  I get something for woman I

21            will let you know today."

22   He replies:

23            "Cool."

24   You say:

25            "Ok."

1        Did I read that correctly?

2   **A**     Yes.

3        (Document taken off display)

4             **MR. VILLAZOR:**  Your Honor, I have a couple more to

5   go.  It's noon now.  Do you want to take the lunch break?

6             **THE COURT:**  Okay, ladies and gentlemen, we will take

7   a recess now.  We will be in recess until 1:00.

8        Remember the admonition given to you:  Don't discuss the

9   case, allow anyone to discuss it with you, form or express any

10  opinion.

11       We will resume at 1:00.

12       (Jury excused)

13       (The following proceedings were held outside of the

14  presence of the Jury)

15            **THE COURT:**  Okay, let the Record reflect the jurors

16  have left.

17       About how much longer?

18            **MR. VILLAZOR:**  I'm sorry?

19            **THE COURT:**  How much longer do you think we have?

20            **MR. VILLAZOR:**  I have about ten more text messages,

21  and then I'll be done.

22            **THE COURT:**  Okay.  Okay.  Thank you.

23       (Trial Exhibit 296 marked for identification)

24       (Recess taken from 12:01 to 1:01 p.m.)

25            **THE COURT:**  Okay.  Let the record reflect that the

```
 1    jurors are present.  All parties are present.

 2        You may proceed.

 3            MR. VILLAZOR:  Thank you, Your Honor.

 4    BY MR. VILLAZOR:

 5    Q.   Good afternoon, Mr. Sanchez.

 6    A.   Good afternoon.

 7    Q.   I'm going to remind you you're still under oath.  Okay?

 8    A.   Yes.

 9    Q.   All right.  I'm going to show you about ten more text

10    messages.  Starting resuming on July 13th, 2012.  You wrote (as

11    read):

12            "Hey a friend of mine it's selling the iPad 3 for

13            350.  It's 16g.  Do you want that one?  Or you want

14            to wait for a cheaper one?"

15        Ian Furminger wrote:

16            "No thanks."

17        You said:

18            "Ok Bro."

19        Did I read that correctly?

20    A.   Yes.

21        (Text messages displayed while being read by Mr. Villazor

22    as follows:)

23    Q.   July 18, 2012.  You wrote (as read):

24            "Hey, do you still want something for woman?"

25        Ian Furminger wrote:
```

1           "Yes."

2      You wrote:

3           "I have a brand-new Marc Jacobs perfume in the box an

4           a Gucci Guilty for men."

5      Ian Furminger wrote:

6           "Cool!  See you tomorrow."

7      Did I read that correctly?

8   A.  Yes.

9   Q.  Mr. Sanchez, did you have Marc Jacobs perfume?

10  A.  Yes.

11  Q.  Did you have Gucci Guilty for men?

12  A.  Yes.

13  Q.  Next day, July 19th, 2012.  Ian Furminger wrote (as read):

14           "What time will you be at work?

15      You reply:

16           "9 a.m."

17      Ian Furminger wrote:

18           "Meet me on your way!  Potrero?"

19      You wrote:

20           "Potrero and what street?"

21      Ian Furminger wrote:

22           "20."

23      You replied:

24           "Sounds good."

25      Ian Furminger wrote:

1          "I'm at 20th and Hampshire."

2          "You wrote:

3          "Ok.  I will be there in 5 minutes."

4      Ian Furminger wrote:

5          "Ok.  Park on 20th."

6          "You replied:

7          "Ok."

8      Did I read that correctly?

9  **A.**   Yes.

10 **Q.**   Showing you another text message, July 19th 2012.  You

11 wrote (as read):

12         "Do you want a Skilsaw Mag 77 looks like new?"

13     Ian Furminger replies:

14         "No thanks."

15     You replied:

16         "Np next time I will get you something better Alaskan

17         Polar Bear."

18     Did I read that correctly?

19 **A.**   Yes.

20 **Q.**   Were you joking about the Alaskan polar bear?

21 **A.**   Yes.

22 **Q.**   But you really had a Skilsaw Mag 77 that looked like new?

23 **A.**   I didn't have it.  Somebody was trying to sell it to me.

24 **Q.**   Somebody was trying to sell it to you?

25 **A.**   Yeah, but I didn't buy.

1   Q.   You didn't have it?

2   A.   No.

3   Q.   But somebody on the street was trying to sell it to you?

4   A.   Yeah.

5   Q.   August 1st, 2012.  You wrote (as read):

6            "Do you want a 16g Samsung Tablet or you want to wait

7            for the iPad?"

8        Ian Furminger wrote:

9            "Wait."

10       You reply:

11           "Ok."

12       You added:

13           "I'm going to keep this one for myself.  I'm working

14           very hard for your iPad."

15       Did I read that correctly?

16   A.   Yes.

17   Q.   At that time did you have a 16g Samsung Tablet?

18   A.   No.

19   Q.   Was someone trying to sell it to you?

20   A.   Yeah.

21   Q.   On the street?

22   A.   Yes, on the street.

23   Q.   On the street.

24       August 2nd, 2012.  You wrote (as read):

25           "Hey Ian my friend have the iPad 2 for $300.  It

1              looks like new WiFi.  32G."

2       Ian Furminger wrote:

3              "Nice."

4       Going same day, August 2nd, 2012.  You write:

5              "Yes or (sic) maybe."

6       Continuing that conversation on August 2nd you, 2012.  Ian

7  Furminger wrote (as read):

8              "Now no!  Thanks but a lot going on here."

9       You reply:

10             "Where?  Family problems?

11      Ian Furminger:

12             "Oh, yes."

13      You say:

14             "Sorry to hear that."

15      Same day, August 2nd, 2012.  You write (as read):

16             "Do you want a Dolce Gabana for men perfume?"

17      Ian Furminger wrote:

18             "Yes."

19      You replied:

20             "Ok but remember Ed and Ray can't use it it's for men

21             only."

22      You add:

23             "I will saved it for you."

24      Ian Furminger replied:

25             "Thanks."

1        Did I read that correctly?

2   **A.**    Yes.

3   **Q.**    When you were saying -- writing, "Ok but remember Ed and

4   Ray can't use it it's for men only," when you say that, was

5   that a joke?

6   **A.**    Joke.

7   **Q.**    You were joking?

8   **A.**    Yes.

9   **Q.**    Who's "Ed"?

10  **A.**    Ed Robles.

11  **Q.**    Who's "Ray"?

12  **A.**    Rey Vargas.

13  **Q.**    August 4th, 2012.  You write to Ian Furminger:

14            "Do you want Victorias Secret Perfume for woman?"

15       Ian Furminger:

16            "Yes."

17       You reply:

18            "Ok I have both perfumes de Dolce Gabana for men and

19            the Victoria Secret for men.  And you can pay me when

20            you finish paying your child support deal."

21       You wrote that to Ian Furminger, correct?

22  **A.**    Yes.

23  **Q.**    You add:

24            "I mean the Victorias Secret for woman."

25       Ian Furminger wrote:

```
 1              "Cool, you around tomorrow morning?"

 2      You reply:

 3              "Tomorrow part-time only from 9 a.m. to 2 p.m."

 4      And you say:

 5              "Ok 10-4."

 6      Did I read that correctly?

 7  A.  Yes.

 8  Q.  August 5th, 2012.  You write to Ian Furminger (as read):

 9              "We meet at 9 a.m. or no?"

10      Ian Furminger:

11              "Shit, I will be there a little late.  I will get

12              right back to you.

13      You reply:

14              "Ok I can meet you where you at.  Are you in the

15              city?

16      Ian Furminger:

17              "Tenderloin.  Yeah, I go over there what street?"

18      You write:

19              "Eddy and Jones."

20      Continuing on that same conversation, Ian Furminger (as

21  read):

22              "Yes, how long?"

23      You reply:

24              "10 minutes."

25      Ian Furminger:
```

```
 1                "Cool thanks.  I will be outside."

 2         You reply:

 3                "Ok almost there."

 4         Did I read that correctly?

 5  A.   Yes.

 6  Q.   August 7th, 2012.  Ian Furminger to you (as read):

 7                "The caption should say, Liar."

 8         You reply:

 9                "Ha.  He is my boss."

10         Ian Furminger:

11                "He is a disappointment.

12         You reply:

13                "Probably only you know."

14         Ian Furminger:

15                "I know more than most."

16         You:

17                "Do you want a color Kindle tablet?"

18         Ian Furminger:

19                "No.  Anything else?"

20         You:

21                "Nothing else."

22         Ian Furminger:

23                "I am disappointed."

24         Did I read that correctly?

25  A.   Yes.
```

SANCHEZ - DIRECT / VILLAZOR

```
 1  Q.  Continuing that same conversation on August 7th, 2012.

 2  You reply (as read):

 3          "Why are you disappointed?"

 4      Ian Furminger:

 5          "I want cool stuff like a big TV and you don't have."

 6      You reply:

 7          "Don't fit in my car.  I will buy a big car.

 8      Ian Furminger:

 9          "Great."

10      You:

11          "Okay."

12      Did I read that correctly?

13  A.  Yes.

14  Q.  August 10th, 2012.  Ian Furminger (as read):

15          "Any luck on the wireless Bose?"

16      B-o-s-e.

17      You reply:

18          "No luck."

19      Did I read that correctly?

20  A.  Yes.

21  Q.  Continuing on August 10th, 2012.  Ian Furminger (as read):

22          "You need to work harder!  Or I will tell your boss!

23          I will be there!  Coffee in the morning?

24      You reply:

25          "I do work hard."
```

SANCHEZ - CROSS / GETZ

```
 1        Ian Furminger:

 2              "I know man, I know!  Sorry."

 3        You reply:

 4              "Okay."

 5        Did I read that correctly?

 6   A.   Yes.

 7              MR. VILLAZOR:  Just a moment, Your Honor.

 8        No further questions, Your Honor.

 9              THE COURT:  Mr. Getz.

10                     CROSS EXAMINATION

11   BY MR. GETZ:

12   Q.   Good afternoon.

13   A.   Good afternoon.

14   Q.   While we're still reasonably close in time to the text,

15   let me show you one, Exhibit 192.

16        (Document displayed.)

17   Q.   This is November 1st, 2011, in the early afternoon.  (As

18   read:)

19              "Hey Ian this is your friend Sergio.  This is my new

20              number."

21        Do you remember sending that one?

22   A.   Yes.

23   Q.   When you said "this is your friend Sergio," was that true?

24   Were you his friend?

25   A.   Yes.
```

SANCHEZ- CROSS / GETZ

1   **Q.**   And you sent that as soon as you got your new number,

2   correct?

3   **A.**   Yes.

4   **Q.**   Because you wanted to be able to communicate with him,

5   correct?

6   **A.**   Yes.

7   **Q.**   And, for the most part, you two communicated with text?

8   **A.**   (Nods head.)

9   **Q.**   And seeing each other in the Mission District; correct?

10  **A.**   Yes.

11  **Q.**   Now, on that day, about seven hours later that day, you

12  sent him a similar message.  You said (as read):

13          "Hey Ian this is your friend Sergio.  This is my new

14          number."

15      And then you said the number.  And he said:

16          "Cool got it."

17      That was -- that was seven hours later, correct?

18  **A.**   Yes.

19  **Q.**   You wanted to make sure that he got it.  That's why you

20  sent that twice, right?

21  **A.**   Uhm, maybe if he didn't receive it that first time.

22  **Q.**   Yeah.

23  **A.**   Yeah, that's why.

24  **Q.**   Okay.  Ian Furminger never threatened you; did he?

25  **A.**   No.

1    Q.   Ian Furminger never told you that if you gave him a gift

2    he would protect you; did he?

3    A.   No.

4    Q.   Did you come here to the United States when you were 13?

5    A.   I was 16.

6    Q.   You were 16 when you came?

7    A.   Yes.

8    Q.   Okay.  And you had a sister, Veronica, when you came here;

9    correct?

10   A.   Yes.

11   Q.   Was she already here?

12   A.   No.  She was in Mexico.

13   Q.   Okay.  You had a sister, Elsa.  Was she here already?

14   A.   No.

15   Q.   You had a sister, Griselda.  Was she here already?

16   A.   No.

17   Q.   You had a brother, Adan.  Was he here already?

18   A.   He was here already.

19   Q.   Okay.

20   A.   Yeah.

21   Q.   You had a brother, Francisco.  Was he here already?

22   A.   He was here, yeah.

23   Q.   What about your brother, Javier?

24   A.   He was here too.

25   Q.   All right.  So when you came here to the United States

SANCHEZ - CROSS / GETZ

1   were you hoping to be together with Adan, Francisco, and

2   Javier?

3   **A.**   Yeah.  I used to live with them.

4   **Q.**   Now, when you came you did not have a passport; correct?

5   **A.**   No.

6   **Q.**   You did not have a driver's license?

7   **A.**   No.

8   **Q.**   You did not have a work permit?

9   **A.**   No.

10  **Q.**   And that's hard; isn't it?

11  **A.**   Very hard.

12  **Q.**   But it's also a situation where you have to be careful of

13  other people; correct?

14  **A.**   Yes.

15  **Q.**   Because you don't want to get picked up by the *Federales*;

16  right?

17  **A.**   Yes.

18  **Q.**   You didn't want to be deported; right?

19  **A.**   No.

20  **Q.**   When you came here to the United States were you able to

21  find work delivering newspapers?

22  **A.**   No, I was not.  I was studying.  I went to high school.

23  **Q.**   Okay.

24  **A.**   Yeah.

25  **Q.**   Did you work your way through high school at all?

SANCHEZ - CROSS / GETZ

```
 1   A.    Yes.  I finish high school.

 2   Q.    All right.  So now I want to ask you about the work you

 3   did when you came to the United States.  Did you work for Crown

 4   Delivery, delivering newspapers?

 5   A.    Yeah, that my first job.

 6   Q.    And you delivered newspapers because they agreed to pay

 7   you even though you did not have a passport?

 8   A.    Yes.

 9   Q.    Did you also --

10   A.    Before they don't ask for that.

11   Q.    Back then?

12   A.    No, that time not -- that came after.

13   Q.    Was it about 1984 you did that job?

14   A.    Yeah.

15   Q.    And then --

16   A.    '84, '85.  Something like that.

17   Q.    Did you also find work at Jennifer's Restaurant?

18   A.    Yes.

19   Q.    On Chestnut Street?

20   A.    Yeah.

21   Q.    What kind of work did you do?

22   A.    Dishwasher.

23   Q.    All right.  And even though you had the newspaper delivery

24   work and even though you worked at Jennifer's Restaurant did

25   you live with fear that you had to be careful?
```

 1  **A.**    Yes.

 2  **Q.**    Because you knew that maybe you could still have a problem

 3  with --

 4  **A.**    Yes.

 5  **Q.**    -- the government, right?

 6  **A.**    Yeah.

 7  **Q.**    Did you also work at La Trattoria Restaurant?

 8  **A.**    Yes.

 9  **Q.**    What kind of work did you do there?

10  **A.**    Dishwasher too.  I work in Brooks Brothers too.

11  **Q.**    Brooks Brothers?

12  **A.**    Yeah.  It was a clothing store on Post And Grant before.

13  **Q.**    What kind of work did you do there?

14  **A.**    Janitor.

15  **Q.**    Did you also work at Ken Hing Sewing Company as a janitor?

16  **A.**    Yes.

17  **Q.**    How long did you do that for?

18  **A.**    Over a year.  I think two years.

19  **Q.**    And all the time you had these jobs, La Trattoria, Ken

20  Hing Sewing Company, Brooks Brothers, even though you were

21  working, did you still have worries that you could be deported

22  if things did not go well?

23  **A.**    After that, no, I --

24  **Q.**    No?

25  **A.**    No.  The first time I was worried.

1   Q.   Okay.

2   A.   And I work McDonald's on Bayshore too.

3   Q.   What kind of work did you do at McDonald's?

4   A.   I made hamburgers, and cleaning too.  Cleaning the floors

5   and bathrooms.

6   Q.   Did you put in papers to try to become a permanent

7   resident?

8   A.   Yes, in 1987.

9   Q.   When you put those papers in did you get letters from your

10  family, your sisters and brothers, to support --

11  A.   Yes.

12  Q.   -- the proof that you were living here?

13  A.   Yeah.

14  Q.   And working here?

15  A.   They asked me not from work; from my school.  They ask my

16  papers from school, I went to school.

17  Q.   What school did you go to?

18  A.   Mission High School and John Adams.

19       (Reporter interrupts.)

20  A.   John Adams.  It's on Masonic and Haight.

21  Q.   Is it difficult to go to school and support yourself at

22  the same time?

23  A.   It is, yeah.

24  Q.   And it was difficult to find those jobs that you got;

25  wasn't it?

 1  **A.**    Yeah.  I worked at 15th --

 2              **THE COURT:**  I think you have to wait for a question.

 3              **THE WITNESS:**  Oh, sorry.

 4  **BY MR. GETZ:**

 5  **Q.**    You worked at 15th and where?

 6  **A.**    Hilton Hotel.

 7  **Q.**    Oh, at the Hilton?

 8  **A.**    Yeah, O'Farrell and Mason.

 9  **Q.**    What work did you do there?

10  **A.**    The laundry.

11  **Q.**    What other jobs have you had?

12              **MR. VILLAZOR:**  Your Honor, I'm going to object on

13   relevance grounds.

14              **THE WITNESS:**  Painting.

15              **THE COURT:**  Sustained.

16  **BY MR. GETZ:**

17  **Q.**    Is it true that when you don't have the proper papers you

18  have to do a lot of different jobs?

19  **A.**    Yes.

20              **MR. VILLAZOR:**  Your Honor, objection.  Relevance.

21              **THE COURT:**  Sustained.

22  **BY MR. GETZ:**

23  **Q.**    Let's talk about the first time you helped the police.  I

24  think you said you helped the police get a laptop.  Do you

25  remember that?

 1  **A.**    Yes.

 2  **Q.**    Is that -- you have in mind that was the first time that

 3  you helped the police?

 4  **A.**    Yes.

 5  **Q.**    Now, before the police received that laptop who had it?

 6  Where did the laptop come from?

 7  **A.**    From the flea market in Oakland.

 8  **Q.**    And you heard that there were some dirty pictures on that

 9  laptop; correct?

10  **A.**    Uhm, you mean the HP?  Yeah.  I didn't see them.  My

11  friend seen it.  Because I don't know how the play the --

12  **Q.**    Right.

13  **A.**    Yeah.  He seen it and told me about it.

14  **Q.**    What happened was your friend talked to you about the

15  laptop and said that there were pictures of what looked like

16  naked children; correct?

17  **A.**    Yes.

18  **Q.**    And you knew it was against the law to have those

19  pictures; correct?

20  **A.**    Yes.

21  **Q.**    So you made arrangements to get that laptop to give to the

22  police; correct?

23  **A.**    Yes.

24  **Q.**    Tell the jury what you did to get that laptop from the

25  Oakland flea market.  Say what you did to get the laptop.

1   **A.**   A friend of mine bought it over there.

2   **Q.**   Okay.

3   **A.**   And then he knew I sell stuff.  And he told me, "Can you

4   return this to the police?"

5        "I'm scared to return it," I told him.

6        Yeah, but they have catch the guy that have these

7   pictures, those girls, little girls.

8   **Q.**   You were scared to return it because you were afraid that

9   somebody might think that those pictures were yours; correct?

10  **A.**   No, no, I don't think that.

11  **Q.**   Well, why were you afraid to handle that laptop?

12  **A.**   To get arrested.

13  **Q.**   Okay.

14  **A.**   Yeah.

15  **Q.**   So what did you do with the laptop?  Who did you give that

16  to?

17  **A.**   Ed Robles.

18  **Q.**   And when you gave that to him, did you give that to him

19  because you wanted to do something good?

20  **A.**   Yes.

21  **Q.**   That would help everybody else; correct?

22  **A.**   Yes.

23  **Q.**   And when you gave him the laptop with the bad pictures on

24  it, you were hoping he would remember that you did this good

25  thing?

1    A.    Yes.

2    Q.    And you felt that if he remembered that you did this good

3    thing, that's something that would make you safer; correct?

4    A.    Yes.

5    Q.    And you were thinking that in your head; right?

6    A.    Yes.

7    Q.    Now, another thing you talked about this morning was

8    helping the detectives from Los Angeles get a laptop.  Do you

9    remember that --

10   A.    Yes.

11   Q.    -- testimony?

12         And in that situation not one, not two, but three

13   detectives came up from Los Angeles to talk to you; correct?

14   A.    Yes.

15   Q.    And you knew when those three detectives came up from

16   Los Angeles this is a very important laptop; correct?

17   A.    Yes.

18   Q.    And you knew that this was worth a lot more money than

19   just the cost of the laptop because the airplane tickets would

20   be worth a lot more than what that laptop cost; correct?

21   A.    I think they came to do something in San Francisco.  And

22   that laptop was stolen between 19 and 20th and Mission.

23   Q.    Was stolen at Cha Cha Cha Restaurant; right?

24   A.    Yeah.  That what they told me.  And I don't know who told

25   him that I buy stuff, because they never knew me.

 1  **Q.**   No, they didn't.

 2  **A.**   No.

 3  **Q.**   But they were introduced to you by somebody who knew you;

 4  correct?

 5  **A.**   Yes.

 6  **Q.**   Who was that?

 7  **A.**   I have no idea who told them.

 8  **Q.**   Okay.  Do you remember --

 9  **A.**   They came straight to me.

10  **Q.**   Do you remember that it was a police officer who

11  introduced you to those three detectives?

12  **A.**   Uhm --

13  **Q.**   Remember that part?  If you don't, that's fine.

14  **A.**   I don't --

15  **Q.**   Maybe you remember.

16  **A.**   Somebody came with -- with police officer.

17  **Q.**   Right.

18  **A.**   I don't remember who -- who he was.

19  **Q.**   A police officer came to you.  And you were told that

20  there was a very important laptop --

21  **A.**   Yeah, they told me.

22  **Q.**   -- that they needed to find; correct?

23  **A.**   Yes.

24  **Q.**   And that three people from Los Angeles were up here

25  looking for this laptop?

1  **A.**    Yeah.   They stay three days.   Three days waiting to see

2  what happened.

3  **Q.**    All right.   And just to illuminate the question of why

4  they were looking for that laptop, it was Lucas Films that had

5  lost the laptop; correct?

6  **A.**    Yes.

7  **Q.**    And you later learned that the movie *Transformer 3* was

8  encrypted in that laptop in the finished form; correct?

9  **A.**    I don't know about that part.

10  **Q.**    Did you know the name of the movie on the laptop?

11  **A.**    No.   I never -- I never turn it on.   They told me, "If you

12  find this serial number call us right away."

13  **Q.**    Okay.

14  **A.**    Don't turn on the computer, nothing.

15  **Q.**    Did they tell you about the movie on it?

16  **A.**    No.

17  **Q.**    In any event, you helped to find that laptop; didn't you?

18  **A.**    Yeah.   Took me, like, a week.

19  **Q.**    How did you do it?

20  **A.**    I went to the flea market.   And they have a lot of

21  computers.   And I look.   Because they gave me the serial

22  number, the description of the laptop.   I found it.

23  **Q.**    And what did you do when you found it?

24  **A.**    I bought it from the guy.   He didn't give it to me.   I

25  bought it for, I think, $600.

1   **Q.**   600?

2   **A.**   600, yeah.

3   **Q.**   And then you contacted --

4   **A.**   Then I contact the detective because he gave me his phone

5   number.

6   **Q.**   Okay.

7   **A.**   He say as soon as -- if you find it -- "Try hard," they

8   told me.  "I will try.  I cannot guarantee you, but I try."

9   **Q.**   And you found it and gave it to them?

10  **A.**   Yeah.

11  **Q.**   And they gave you, as a reward, thousands of dollars;

12  correct?

13  **A.**   They gave me $1200.

14  **Q.**   1200?

15  **A.**   I tell them not to pay me.  I do as a favor.  Favor.

16       They say, "No, you have to get this money."  They gave me

17  1200.

18  **Q.**   And after all the time you spent in -- after all the time

19  you spent looking for that computer you told them "You don't

20  have to pay me" because you were happy to do something good;

21  right?

22  **A.**   Yeah.  And I don't even know those officers.

23  **Q.**   All right.  Not too long after you found that laptop that

24  you just talked about --

25  **A.**   Yes.

 1   Q.   -- there was a time where you saw somebody near where you

 2   worked on the street at 20th and Mission.  It was a guy who was

 3   trying to sell -- he had laptop computers, and he was selling

 4   those near you.  Do you remember that?

 5   A.   Yes.

 6   Q.   And do you remember that you called the police and --

 7   A.   I bought a couple, couple laptops?

 8   Q.   From this guy.

 9   A.   From that guy?

10   Q.   Yeah.

11   A.   And to look in the description.

12        But a police officer came and look at them, no, that's not

13   it.  They want those -- those pictures that you say.

14   Q.   But there did come a time where you bought a laptop from

15   this guy.  And you called -- you called Officer Zachos.

16   Z-a-c-h-o-s.  And you told him you had recovered a stolen

17   laptop; correct?

18   A.   Yes.

19   Q.   And Officer Zachos, was he at Mission Station also?

20   A.   Yes.

21   Q.   Officer Zachos came and took the laptop from you; correct?

22   A.   Yes.

23   Q.   And he thanked you for finding a stolen laptop; right?

24   A.   Yes.

25   Q.   And when he thanked you for finding the stolen laptop, you

 1  did not ask him for money; correct?

 2  **A.**   No.

 3  **Q.**   But you were happy that you did it because you felt you

 4  had done something good; right?

 5  **A.**   Yes.

 6  **Q.**   And that Officer Zachos would respect you and be grateful

 7  for the good thing you did; right?

 8  **A.**   Yes.

 9  **Q.**   And later Officer Zachos told you that he found the lady

10  who got the computer stolen, that you had found, and you had

11  made her happy; correct?

12  **A.**   Yeah.

13  **Q.**   And that made you feel good; right?

14  **A.**   Yes.

15       You had written --

16            **THE COURT:**  Wait.  Wait.  Sorry.

17            **THE WITNESS:**  Sorry.

18            **THE COURT:**  Please wait for a question before you

19   volunteer information.

20            **THE WITNESS:**  Okay.

21  **BY MR. GETZ:**

22  **Q.**   You said when you first meet Ian Furminger you asked

23  him -- well, let me ask it a different way.

24       You said when you first met Ian Furminger you two talked

25  about stolen bicycles; correct?

 1  **A.**    Yes.

 2  **Q.**    Do you mean that he wanted to buy a stolen bicycle from

 3  you?  Or do you mean he wanted to find stolen bicycles to give

 4  back to the people?

 5  **A.**    Yeah, to give back to the people.

 6  **Q.**    So he told you, "There have been a lot of bicycle thefts

 7  here.  If you find one you think is stolen tell me, and I will

 8  make the arrangement to return it."  Correct?

 9  **A.**    Yes.

10  **Q.**    And that's what you tried to do; correct?

11  **A.**    Yes.

12  **Q.**    Have you ever heard the name Terry Smith?  Do you know

13  that name, Terry Smith?

14  **A.**    No.

15  **Q.**    Okay.  Do you remember one day a couple of years ago you

16  saw somebody on Mission Street that you thought was stealing

17  laptops, and you called the police to have them come down?

18  **A.**    Yes.

19  **Q.**    Do you remember this?

20  **A.**    Yes.

21  **Q.**    And do you remember when the police came down they

22  couldn't see where he was.  But they saw where you were, and

23  they came to you and said, Did you call us on this?

24       Do you remember this?

25  **A.**    Yes.

 1  Q.    And you said, Yes, I did.  I did call you on this.  Let me

 2  show you where he is.

 3        And you took the police over and pointed this man out to

 4  them; correct?

 5  A.    Yes.

 6  Q.    Because you knew he had stolen laptops; correct?

 7  A.    Yes.

 8  Q.    And the police arrested him; correct?

 9  A.    Yes.

10  Q.    And then afterwards they thanked you for helping; right?

11  A.    Yes.

12  Q.    And that made you feel good because you felt they

13  respected what you did; right?

14  A.    Yes.

15  Q.    Do you remember a couple of years ago there was a big

16  jewelry store robbery in the Mission District, and the three

17  robbers pulled out guns and ran out of the jewelry store with a

18  lot of money?

19  A.    Yes.

20  Q.    Do you remember that when that happened you happened to be

21  right on the -- on the corner, and the three guys --

22  A.    Yeah.

23  Q.    -- ran past you with briefcases?

24  A.    I saw them, yes.

25  Q.    Do you remember that?

 1  **A.**    Yes.

 2  **Q.**    Do you remember talking to the police and giving the

 3  police information about what they looked like?

 4  **A.**    Yes.

 5  **Q.**    And you gave a full description of those three guys who

 6  were running down the street with millions of dollars worth of

 7  jewelry in the briefcases.  Do you remember this?

 8  **A.**    Yes.

 9  **Q.**    Why did you give them the information?

10  **A.**    To arrest the guys.

11  **Q.**    Did you do this because you wanted to do something good?

12  **A.**    Yes.

13  **Q.**    Did you do this because you wanted the police to respect

14  you?

15  **A.**    I don't even -- I don't think that before.

16  **Q.**    Excuse me?

17  **A.**    Yeah, I have no idea in that.

18  **Q.**    All right.

19  **A.**    But I saw the guys robbing the store.  All three guys,

20  they have a gun.  And they hit the man, they hit him right here

21  (indicating).

22        (Government and defense counsel confer off the record out

23  of hearing of the jury and reporter.)

24            **MR. GETZ:**  I'm getting ahead of myself here.

25

1  **BY MR. GETZ:**

2  **Q.**   Can you see what I'm holding in my hand from where you are

3  sitting?

4  **A.**   Yes.

5  **Q.**   Is this a picture of something you recovered for the

6  police?

7  **A.**   Let me see closer.

8          **MR. GETZ:**  May I approach?

9          **THE COURT:**  Yes.

10         **THE WITNESS:**  Yes.

11 **BY MR. GETZ:**

12 **Q.**   All right.

13 **A.**   A statue.

14 **Q.**   So --

15 **A.**   That was expensive too.

16 **Q.**   Before I put this up, you talked to some police officers

17 about a valuable statue that you had; correct?

18 **A.**   Yes.

19 **Q.**   And you were worried that the statue may have been stolen;

20 correct?

21 **A.**   Yes.

22 **Q.**   And you wanted the statue to go back to the owner;

23 correct?

24 **A.**   Yeah.  It was stolen from the gallery.

25 **Q.**   From the San Francisco Art Gallery; right?

1   **A.**   Gallery, yeah.

2           **MR. GETZ:**  I haven't marked it yet but I would like

3   to move a picture of the statue into evidence.

4           **THE COURT:**  Admitted.

5       (Trial Exhibit 401 received in evidence.)

6   **BY MR. GETZ:**

7   **Q.**   I'm going to show you a picture of the statue.  Is that --

8   can you see that?

9   **A.**   Yes.

10  **Q.**   Is that the statue that you recovered?

11  **A.**   Yes.

12  **Q.**   What did you do with it?  What did you do with it when you

13  got it?  Who did you give it to?

14  **A.**   I think I give it to Ed Robles.

15  **Q.**   And when you gave it to him, you gave it to him because

16  you wanted the original owner to have it; right?

17  **A.**   Yeah.

18  **Q.**   You talked about some texts where you mentioned to Ian

19  Furminger that you thought that maybe you had sold some things

20  to police officers.  Do you remember that?

21  **A.**   Buy.  Buy.  Not sold.

22  **Q.**   Excuse me?

23  **A.**   Buying.

24  **Q.**   You had bought?

25  **A.**   Buying, yeah.

1   Q.   You had bought.  And you were worried about that.

2        You did, in fact -- you did get arrested at some point

3   after that; right?

4   A.   Yeah, I got arrested.

5   Q.   All right.  And when you got arrested you called Ian

6   Furminger and you told him about it; right?

7   A.   Yes.

8   Q.   But he didn't help you; did he?

9   A.   No.

10  Q.   In fact, when you talked to him on the phone about your

11  arrest, you got the feeling here (indicating) that he didn't

12  even care; right?

13  A.   Yes.

14  Q.   Now, I just want to ask you one last couple of questions.

15       You did -- you talked about going to work, you signed the

16  confidential informant type of thing.  Do you remember that?

17  A.   Yes.

18  Q.   And is it true that one of the reasons you signed that is

19  because you were afraid; right?

20  A.   Yeah.

21  Q.   You were afraid of the police, and you were afraid of the

22  *Federales*; right?

23  A.   Yes.

24  Q.   And there was also a time before that where you were doing

25  business out on 20th and Mission, and a gang called MS-13 was

1  taking taxes from you; right?

2  **A.**    Yes.

3  **Q.**    MS-13 is a street gang that operated in the Mission

4  between 2008 and 2012; right?

5  **A.**    Yes.

6  **Q.**    And every Thursday afternoon one of the gang members would

7  pay you a visit; correct?

8  **A.**    Yes.

9  **Q.**    And the gang member would take $40 from you; right?

10  **A.**    They start with 25.  Then they want more, more.

11  **Q.**    And it was every Thursday between 10:30 and 12:00; right?

12  **A.**    Yes.

13  **Q.**    Because you were always out there on Thursday between

14  10:30 and 12:00; am I right?

15  **A.**    Yes.

16  **Q.**    And you knew that if you didn't give them the money they

17  might kill you.  Am I right?

18  **A.**    Yes.

19  **Q.**    So you gave them the money every Thursday.  And you never,

20  ever once asked Ian Furminger for protection from that; right?

21  **A.**    No, I never.

22  **Q.**    No, you never did; did you?

23  **A.**    No.

24  **Q.**    And, in fact, you kept paying because you were afraid of

25  the gang?

1  **A.**   Of them, yeah.

2  **Q.**   So there's a lot to be afraid of in San Francisco; isn't

3  there?

4  **A.**   Yes.

5          **MR. GETZ:**  I have nothing further.

6          **THE CLERK:**  Counsel, your exhibit.

7          **THE COURT:**  Ms. Caffese.

8          **THE CLERK:**  Do you want to use 401?

9          **MR. GETZ:**  Okay.  Yeah.  I'll do it over here.

10      (Trial Exhibit 401 marked.)

11          **THE COURT:**  We'll mark it later.  The photograph?

12          **THE CLERK:**  The statue.

13          **THE COURT:**  Next in order.  401.  It's admitted.

14      Go ahead.

15          **MS. CAFFESE:**  Thank you, Your Honor.

16                       <u>CROSS EXAMINATION</u>

17  **BY MS. CAFFESE:**

18  **Q.**   Good afternoon, Mr. Sanchez.  My name is Teresa Caffese.

19  I have some questions for you.

20  **A.**   Okay.

21  **Q.**   Mr. Sanchez, Ed Robles never gave you anything to sell; is

22  that right?

23  **A.**   No.

24  **Q.**   There was never any stolen property that he would bring to

25  you and ask you to sell it and split the proceeds with; is that

1    right?

2    **A.**    Yes.

3    **Q.**    And you never communicated with Ed Robles over any text

4    messaging; is that true?

5    **A.**    Uhm, I don't think so.

6    **Q.**    All right.  And when you would communicate with Ed Robles

7    that would be when he would sometimes call you to ask whether

8    or not, for example, stolen property was with you, and he would

9    be following up on an investigation, for example; is that

10   right?

11   **A.**    Yes.

12   **Q.**    And I believe this is true, but there was one incident in

13   which Ed called you concerning a robbery at a construction

14   site.  Do you remember that, sir?

15   **A.**    Yes.

16   **Q.**    And he called you and he said:  Do you have the stolen

17   property?  Are the suspects there?  Do you see them?

18        Is that right?

19   **A.**    Yes.

20   **Q.**    And where were you at that time; do you remember?

21   **A.**    I was on 20th and Mission.

22   **Q.**    Okay.  You were on 20th and Mission.  And you told Ed,

23   Officer Robles, Yes, the guys are here; is that right?

24   **A.**    Yes.

25   **Q.**    And you helped keep them there so Ed Robles could come and

1   arrest these guys who had just committed a robbery of a

2   construction site; right?

3   **A.**     Yes.

4   **Q.**     That was a strong-arm robbery; is that right?

5   **A.**     Yes.

6   **Q.**     And there was a statue Mr. Getz asked you about that had

7   been stolen.  Remember that?

8   **A.**     Yes.

9   **Q.**     And that statue was a very valuable statue; right?

10  **A.**     It was, yeah.

11  **Q.**     And that valuable statue had been stolen from an art

12  gallery here in San Francisco; right?

13  **A.**     Yes.

14  **Q.**     And it was Ed Robles who got that statue from you; is that

15  right?

16  **A.**     Yes.

17  **Q.**     And it was Ed Robles who returned that statue to the

18  gallery; is that right?

19          **MR. VILLAZOR:**  Objection.  Calls for speculation.

20          **THE WITNESS:**  Yeah --

21          **THE COURT:**  How does he know?

22  **BY MS. CAFFESE:**

23  **Q.**     Did --

24          **THE COURT:**  The question is:  How did you know?

25

1   **BY MS. CAFFESE:**

2   **Q.**   How did you know that, sir?  How did you know that the

3   statue that Ed Robles was able to find, that had been stolen,

4   was returned to the owner?

5   **A.**   Because how did he knew it was stolen from the gallery?  I

6   didn't know it was stolen from the gallery.

7               **THE COURT:**  I'm sorry, what did you say?  You didn't?

8    You did?

9               **THE WITNESS:**  I didn't know it was stolen from the

10   gallery.

11  **BY MS. CAFFESE:**

12  **Q.**   Did he tell you?

13  **A.**   Yeah, he told me that.

14  **Q.**   All right.  Now, during your testimony this morning, sir,

15  you were asked a lot of questions about things that you had

16  offered Ed Robles.  Remember?

17  **A.**   Yes.

18  **Q.**   And you would offer him things.  But he would say, "No, I

19  don't want them."  Is that right?

20  **A.**   Yes.

21  **Q.**   Okay.  And Ed Robles treated you fairly; is that true?

22  **A.**   Yes.

23  **Q.**   He was nice to you; is that true?

24  **A.**   Yes.

25  **Q.**   He respected you?

1  **A.**    Yes.

2  **Q.**    And you respected Officer Robles.  Is that true, sir?

3  **A.**    Yes.

4  **Q.**    Okay.  Now --

5  **A.**    They never threaten me.

6          **THE COURT:**  I don't think there's any question.

7  **BY MS. CAFFESE:**

8  **Q.**    Thank you, sir.

9      And Ed never offered you any protection.  Is that right,

10  sir?

11  **A.**    No.

12  **Q.**    I wanted to clarify just a couple of things about the

13  signing up as a CI.  Remember this morning you talked a little

14  bit about that?

15  **A.**    Yes.

16  **Q.**    Okay.  Now, my understanding is that you were actually

17  signed up as a CI before you signed the paper that you saw this

18  morning with Ed; is that right?  Is that true?

19  **A.**    I don't know about that part.

20  **Q.**    Okay.  Let me ask you this.  A little bit different here.

21  You were working with other police officers before you signed

22  the CI agreement with -- with Ed; is that right?

23  **A.**    No, I wasn't working with nobody.

24  **Q.**    Well, you -- do you remember Officer Richardson?

25  **A.**    Yeah.

1    Q.   Okay.  And --

2    A.   But he was -- he was my friend.  But we never do business.

3    He never asked me for anything.

4    Q.   Was he the officer that connected you -- or, I should say,

5    that the -- that -- that you spoke with about the L.A.

6    detectives coming to San Francisco to interview you?

7    A.   No, it wasn't -- it wasn't.

8    Q.   It was other police?

9    A.   Somebody else did.

10   Q.   When the L.A. detectives came to talk to you about this

11   big laptop, that was before the laptop with the pornography; is

12   that right?

13   A.   Yes.

14   Q.   Okay.  And so you -- you had helped or you -- well, let me

15   ask you.  You helped in other investigations before you helped

16   with the laptop that Ed got from you that had the child

17   pornography on; is that right?

18   A.   Yes.

19   Q.   And you actually -- while we're on the subject, you

20   actually helped other agencies.

21        You helped Immigration; is that right?

22   A.   Yes.

23   Q.   And what you would do, if I'm correct, with Immigration is

24   sometimes they would show you photographs, and you would

25   identify, for example, gang members to Immigration; is that

1   right?

2   **A.**    Yes.

3   **Q.**    Is that how that worked?

4   **A.**    Yes.

5   **Q.**    So you worked not only with local police there but you

6   also worked with the federal government; is that right?

7   **A.**    Yes.

8   **Q.**    Now, one thing I want to clarify, just a little bit, here

9   is that earlier on --

10          **MS. CAFFESE:**  Mine's all marked up here.  I'm just

11   going to do what Mr. Getz did.

12   **BY MS. CAFFESE:**

13   **Q.**    Do you see this?  It's Exhibit 70.

14   **A.**    Yes.

15          **MS. CAFFESE:**  Can I?  No, that doesn't work here?

16          **THE COURT:**  I don't know.  That's quite a distance.

17   He said, "Yes."  I guess he sees the paper.

18       Can you read it?

19          **THE WITNESS:**  Yeah, I seen it.

20   **BY MS. CAFFESE:**

21   **Q.**    You see it?

22   **A.**    Yeah.  That the one I signed; right?

23   **Q.**    Let me show it to you because I -- just so --

24   **A.**    Yeah.  This the one I sign.

25   **Q.**    Okay.  All right.

1      **MS. CAFFESE:**  I marked mine all up.

2          If I can just use -- does that work better?  Is that okay?

3          (Document displayed.)

4      **MR. VILLAZOR:**  Sure.

5      **MS. CAFFESE:**  That's okay.

6   **BY MS. CAFFESE:**

7   **Q.**   Let me just ask you the questions.  You signed up as a

8   confidential informant with Officer Robles on -- it looks

9   here -- January 15th, 2010.

10          And I'm going to show it to you, if I may, just to make

11   sure you see it and so we're okay on the date.

12   **A.**   Okay.

13   **Q.**   Okay.

14   **A.**   Yes.

15   **Q.**   Is that right?

16   **A.**   Yes.

17   **Q.**   All right.  So it was January 15th, 2010, when you

18   actually signed up -- excuse me -- with Officer Robles as a CI;

19   is that right?

20   **A.**   Yes.

21   **Q.**   Because many times before then, when Officer Robles would

22   call you, you didn't expect to get money for being -- for

23   giving tips, for being a good person; is that right?

24   **A.**   Yes.

25   **Q.**   Okay.  And -- and when you signed up to be a confidential

1  informant here on January 5th, 2010, this was related to

2  that -- that -- the pornographic laptop; is that right?

3  **A.**   Yes.

4  **Q.**   And then I have here --

5         **MS. CAFFESE:**  I mark, Judge, if I may, Exhibit 348.

6      (Government and defense counsel confer off the record out

7  of hearing of the jury and reporter.)

8      (Trial Exhibit 348 marked for identification.)

9  **BY MS. CAFFESE:**

10  **Q.**   If I can, I'm going to show this to you first, okay.  See

11  if you recognize it.

12      Do you see this, this here, sir?

13  **A.**   Yes.

14  **Q.**   Now, is this the receipt showing $500 that you were given

15  in informant funds because of turning in the laptop?  Is that

16  right?

17  **A.**   Yes.

18  **Q.**   Okay.  And officer -- excuse me, Officer Robles made that

19  happen for you; is that right?

20  **A.**   Yes.

21  **Q.**   Okay.  That was a good thing; is that right?

22         **MR. VILLAZOR:**  Objection.

23         **THE WITNESS:**  Yes.

24         **MS. CAFFESE:**  I would like to move 348 into evidence.

25         **THE COURT:**  Admitted.

```
 1          (Trial Exhibit 348 received in evidence.)

 2              MR. VILLAZOR:  No objection.

 3              MS. CAFFESE:  Thank you, Counsel.

 4  BY MS. CAFFESE:

 5  Q.   Now, I want to talk about the sunglasses, okay.

 6  A.   Okay.

 7  Q.   All right.  Now, as you sit here today, sir, were the

 8  sunglasses that you were asked about earlier today stolen or

 9  not stolen?

10  A.   I can go 50 and 50.

11  Q.   All right.

12  A.   Yeah.

13  Q.   Go ahead.  Finish if you --

14  A.   I'm not sure.

15  Q.   All right.  Now, I'm going to read -- earlier today

16  Counsel had asked you some questions from a Grand Jury

17  transcript.

18              MS. CAFFESE:  And I would like to read some portions

19   that were not read, Your Honor.

20              THE COURT:  I don't know.  Let's see what you have in

21   mind.

22              MS. CAFFESE:  Okay.

23              THE COURT:  What page?

24              MS. CAFFESE:  I would like to read from page 31, on

25   31.
```

```
 1              THE COURT:  I'm sorry, page 31.

 2              MS. CAFFESE:  Page 31, starting at line 24, going to

 3   25.  And then going on to page 32 --

 4              THE COURT:  Wait.

 5              MS. CAFFESE:  -- to line 3.

 6              THE COURT:  Go right ahead.

 7              MS. CAFFESE:  Thank you, Your Honor.

 8   BY MS. CAFFESE:

 9   Q.  Sir, I'm just going to read a couple of questions here,

10   and answers from your Grand Jury testimony back on January 29,

11   2013.

12   A.  Okay.

13   Q.  Do you remember, sir, being asked the following questions

14   and giving the following answers:

15              "QUESTION:  Were those sunglasses stolen?

16              "ANSWER:  I don't think so.

17              "QUESTION:  You don't think so?

18              "ANSWER:  No, because I bought them from a friend of

19              mine who does not steal."

20   A.  Yeah.

21              THE COURT:  Just listen, please.

22              MS. CAFFESE:  Thank you.

23              THE COURT:  Go ahead.

24   BY MS. CAFFESE:

25   Q.  Do you remember being asked those --
```

SANCHEZ- CROSS / CAFFESE

```
 1              THE COURT:  No, no, no.  Just go right through.

 2              MS. CAFFESE:  All right.  All right.

 3         Thank you, sir.

 4              THE COURT:  Well, are you going to read the rest of

 5    it?

 6              MS. CAFFESE:  I think Counsel --

 7              THE COURT:  Well, no, I think we should read the rest

 8    of the page.

 9              MS. CAFFESE:  Sure.

10              THE COURT:  Down to line 22, okay.  Question and

11    answer.  You don't have to go back.  Line 4.

12              MS. CAFFESE:  Yes.  (As read:)

13              "QUESTION:  Did you tell me, when we last spoke, that

14              while you weren't sure, you thought the sunglasses

15              were stolen?

16              "ANSWER:  I wasn't sure.

17              "QUESTION:  You weren't sure?  Didn't you also tell

18              me that they didn't have a case?

19              "ANSWER:  No, they didn't have one.

20              "QUESTION:  Okay.  So do you think they were stolen?

21              "ANSWER:  Well, perhaps they were.  Perhaps they

22              weren't.

23              "QUESTION:  You can't tell for sure?

24              "ANSWER:  I can't be sure.

25              "QUESTION:  Okay.  But whether they were or they
```

1          weren't, a lot of items you bought and sold were

2          stolen; right?

3          **"ANSWER:**  Yes, many of them."

4     **THE COURT:**  Go ahead.

5     **MS. CAFFESE:**  (As read:)

6          **"QUESTION:**  And each of these officers that we're

7          talking about knew -- knew that was because -- knew

8          that that was the business you were in?

9          **"ANSWER:**  Yes."

10    **THE COURT:**  Okay.

11    **MS. CAFFESE:**  Okay.

12  **BY MS. CAFFESE:**

13  **Q.**  That is your complete --

14         **THE COURT:**  Okay.  There it is.  You don't have to

15   say anything.  It's right there.  Okay.

16  **BY MS. CAFFESE:**

17  **Q.**  And when you answered the question the first time you were

18  asked by the government counsel --

19         **THE COURT:**  No.  I think we've actually, sort of,

20   covered it.

21         **MS. CAFFESE:**  Very well.

22         **THE COURT:**  Otherwise, it's argumentative.

23      You can argue it.

24  **BY MS. CAFFESE:**

25  **Q.**  The friend you bought the sunglasses from didn't deal in

```
 1   stolen merchandise.  Is that -- that was your recollection; is

 2   that right?

 3   A.   Yeah.

 4   Q.   And that's why you believed, to the best of your

 5   recollection, that the sunglasses weren't stolen?

 6   A.   Yes.

 7              MR. VILLAZOR:  Objection, Your Honor.

 8    Mischaracterizes the evidence.

 9              THE COURT:  Sustained.

10   BY MS. CAFFESE:

11   Q.   Forty percent --

12              THE COURT:  No.  I think we move on, okay.

13              MS. CAFFESE:  Your Honor --

14              THE COURT:  He said maybe they were, maybe they

15    weren't.  He's not sure.  And he's given his reasons.  So I

16    think we can actually move on.

17   BY MS. CAFFESE:

18   Q.   During the direct examination, sir, you had mentioned that

19   60 percent of the things that you bought and sold were stolen;

20   is that right?

21   A.   Yes.

22   Q.   But 40 percent of what you sold was not stolen; is that

23   right?

24   A.   Yes.

25   Q.   Okay.  Now, when you -- when you met with Officer Robles
```

1  and gave him, I think you said, the sunglasses and the laptop,

2  you didn't look around to see if there were any police officers

3  around; is that right?

4  **A.**   No.

5  **Q.**   Okay.  And you weren't standing -- I think you had said

6  that you weren't standing, and correct me if I'm wrong, but you

7  weren't standing in your car selling the merchandise from one

8  of your -- from one of the areas in which you generally were

9  doing your business; is that right?

10 **A.**   Yes.

11 **Q.**   It was more of a random interaction -- how did that come

12 about that you had seen Ed?

13 **A.**   When Ed, I get out of my car.  I don't open the trunk.

14 **Q.**   Was he --

15 **A.**   Outside in the street.

16 **Q.**   Was it, kind of, just a random coincidence that you had

17 run into him, sir?

18 **A.**   Yes.

19 **Q.**   Okay.  And my understanding is that he was in the

20 motorcycle detail when you had -- when you had seen him this

21 time.  Is that right?

22 **A.**   Yes.

23 **Q.**   Okay.  And after -- after Ed went into the motorcycle unit

24 in January of 2010, did you see him very much?

25 **A.**   No, not very much.

1    **Q.**   Okay.

2    **A.**   Because he move to another area.  Area.  I don't know

3    where, where he move.

4    **Q.**   That was the motorcycle --

5    **A.**   Yeah.

6    **Q.**   -- right?  Fair enough.

7         Now, did you ever -- did you know a man by the name of

8    Cesar Hernandez?

9    **A.**   Cesar Hernandez?  Yeah.

10   **Q.**   You know Cesar?

11   **A.**   Yeah.

12   **Q.**   He used to hang out in the Mission area?

13   **A.**   Yeah.

14   **Q.**   What do you think of Cesar Hernandez?

15           **MR. VILLAZOR:**  Objection.

16           **THE COURT:**  Sustained.

17           **MS. CAFFESE:**  Very well.

18   **BY MS. CAFFESE:**

19   **Q.**   Did you ever give Ed an envelope with money in it?

20   **A.**   No.

21   **Q.**   Did you ever sell large quantities of marijuana, sir?

22   **A.**   No.

23   **Q.**   Did you ever sell marijuana known as purple marijuana?

24   **A.**   No.

25           **MS. CAFFESE:**  Thank you, sir.  I don't have any other

 1   questions.

 2              **THE WITNESS:**  Okay.

 3              **THE COURT:**  Anything further?

 4              **MR. VILLAZOR:**  Yes, Your Honor.  Just briefly.

 5                        **REDIRECT EXAMINATION**

 6   **BY MR. VILLAZOR:**

 7   **Q.**   Mr. Sanchez, remember the defense attorneys asked you

 8   about those L.A. policemen who came up about the laptop?

 9   **A.**   Yes.

10   **Q.**   Did you offer to give them anything?

11   **A.**   Who, them?

12   **Q.**   Did you give them any gifts?

13   **A.**   No.

14   **Q.**   Did you offer to sell them anything out of your trunk?

15   **A.**   No, nothing.

16   **Q.**   How about the -- you helped out Immigration officials.

17   You would look at pictures?

18   **A.**   Yes.

19   **Q.**   Did you give them any gifts --

20   **A.**   No.

21   **Q.**   -- out of your trunk?

22   **A.**   No, nothing.

23   **Q.**   Did you offer to sell them anything out of your trunk?

24   **A.**   No.

25   **Q.**   Mr. Sanchez, are you still in the business of selling

1  stolen property?

2  **A.**    No.

3  **Q.**    You're delivering pizzas?

4  **A.**    Yes.

5  **Q.**    Why aren't you selling stolen property any more?

6  **A.**    I have restoration friend right now.

7  **Q.**    And you said you got arrested in August of 2012?

8  **A.**    I'm on probation too.

9  **Q.**    On probation?

10 **A.**    Yeah.

11 **Q.**    You got arrested in August 2012?

12 **A.**    Yes.

13 **Q.**    Who's the first person you called from the San Francisco

14 Police Department?

15 **A.**    I call Ian.

16 **Q.**    Ian Furminger?

17 **A.**    Yes.

18        **MR. VILLAZOR:**  Nothing further, Your Honor.

19        **THE COURT:**  Okay.  Thank you.  Anything further?

20     You may be excused.  You can leave.

21        **THE WITNESS:**  I can go now?

22        **THE COURT:**  Yeah.

23        **THE WITNESS:**  Finally.

24        **THE COURT:**  Good-bye.

25     (Witness excused.)

```
 1              MR. HEMANN:  Your Honor, the United States calls

 2    Ignacio Ramirez.

 3              THE CLERK:  Will the witness please come forward.

 4         Good afternoon.  Please stand.  Raise your right hand.

 5         IGNACIO RAMIREZ, Plaintiff WITNESS, SWORN.

 6              THE WITNESS:  I do.

 7              THE CLERK:  Please be seated.

 8         Please state your full name.  Spell your last name for the

 9    record.

10              THE WITNESS:  Ignacio Ramirez Palafox.

11    P-a-l-a-f-o-x.

12                        DIRECT EXAMINATION

13    BY MR. HEMANN:

14    Q.   Mr. Ramirez, do you know Ian Furminger?

15    A.   I do.

16    Q.   How do you know Ian Furminger?

17    A.   Through work.

18    Q.   Through what sort of work?

19    A.   I was working at his house in Laguna.

20    Q.   In where?

21    A.   Laguna.

22    Q.   In Laguna?

23    A.   In Laguna, Burlingame.

24    Q.   What sort of work were you doing for him?

25    A.   Painting and fixing windows and all that.
```

 1  Q.    When did you start doing that kind of work for

 2  Mr. Furminger?

 3  A.    Around 2008.

 4  Q.    And do you remember Mr. Furminger buying a new house

 5  sometimes in 2008?

 6  A.    No.

 7  Q.    When do you remember Mr. Furminger buying a house at some

 8  point in time?

 9  A.    He bought a house in Orinda.  I don't remember the year.

10  Q.    Do you remember him buying a new house?

11  A.    Yes.

12  Q.    Where was the new house?

13  A.    Orinda.

14  Q.    And you knew Mr. Furminger before he bought that house in

15  Orinda; correct?

16  A.    Yes.

17  Q.    For how long?

18  A.    For, like, four years.

19  Q.    Four years.  How did you first meet Mr. Furminger?

20  A.    I was working in Burlingame.

21  Q.    In Burlingame?

22  A.    Yeah, very close to the Laguna house.

23  Q.    So you met him in what year?

24  A.    In around 2008.

25  Q.    So the first time you met him was in 2008?

1    **A.**    Yeah.

2    **Q.**    And he was living in Burlingame then?

3    **A.**    Yeah.

4    **Q.**    And then you knew him for four years?

5    **A.**    (Nods head.)

6    **Q.**    Yes?

7    **A.**    (Nods head.)

8              **THE COURT:**  You have to answer audibly.

9              **THE WITNESS:**  Yes.

10   **BY MR. HEMANN:**

11   **Q.**    You knew him for four years, and then he moved to where?

12   **A.**    Orinda.

13   **Q.**    What year did he move to Orinda?

14   **A.**    What year?

15   **Q.**    Yeah.

16   **A.**    I don't remember exactly the year, to would be honest.

17   **Q.**    How long has he lived in Orinda?

18   **A.**    Was there for, like, three years.

19   **Q.**    He's been there for year years?

20   **A.**    Yeah.

21   **Q.**    As of right now?

22   **A.**    Oh, no.  As right now, like, four years.

23   **Q.**    So you believed that he moved to Orinda four years ago?

24   **A.**    Yeah, around that time.

25   **Q.**    Mr. Ramirez, do you remember meeting with Special Agent

1  Sandra Flores from the FBI?

2      Do you see her sitting there with the glasses?

3  **A.**  Yes.

4  **Q.**  Do you remember meeting Tyler Nave from the FBI?

5      Do you see him with the beard in the seats?

6  **A.**  Yes.

7  **Q.**  Did you tell -- when you met with them, did you tell them

8  that you met Ian Furminger -- or Ian Furminger bought his house

9  in Orinda in 2008?  Didn't you tell them that?

10  **A.**  Yes.

11  **Q.**  Yes.  Did Ian Furminger buy his house in Orinda, as far as

12  you know, in 2008?

13  **A.**  I don't remember the exact year.  It's been too long.

14  **Q.**  Do you remember what time of year it was, what month

15  during the year he bought the house in Orinda?

16  **A.**  It was between Halloween and Thanksgiving.

17  **Q.**  So in the fall?

18  **A.**  Yes.

19  **Q.**  Okay.  At some point in time did you do some work for

20  Mr. Furminger in the house in Orinda?

21  **A.**  Yes.

22  **Q.**  What sort of work did you do for him?

23  **A.**  Painting and installing skylights.

24  **Q.**  About how long -- and when you say "skylights," one

25  skylight, or more than one skylight?

1  **A.**   Was two skylights in the living room.

2  **Q.**   Okay.  Were the two skylights together?

3  **A.**   Yes.

4  **Q.**   One hole, two skylights?

5  **A.**   Yes.

6  **Q.**   About how long after Mr. Furminger bought the house did

7  you install the skylights?

8  **A.**   That was between seven and eight months after he bought

9  the house.

10  **Q.**   So between seven and eight months after Thanksgiving?

11  Yes?

12  **A.**   Yes.

13  **Q.**   Did you get paid by Mr. Furminger for putting in the

14  skylights?

15  **A.**   Yes.

16  **Q.**   And how much did you get paid?

17  **A.**   I remember around $400.

18  **Q.**   And did you get paid by check or in cash?

19  **A.**   Cash.

20  **Q.**   Mr. Furminger gave you the cash?

21  **A.**   Yes.

22  **Q.**   Did you purchase the actual skylights, the physical

23  skylights, that you installed?

24  **A.**   No.

25  **Q.**   Do you know who purchased the skylights that had been

 1  installed?

 2  **A.**   I know he buy.

 3  **Q.**   When you say "he," who do you mean?

 4  **A.**   Ian.

 5  **Q.**   And how do you know that?

 6  **A.**   Because when I get there, the skylights were already

 7  there.

 8           **MR. HEMANN:**  No further questions, Your Honor.

 9           **THE COURT:**  Thank you.

10       Mr. Getz.

11                     **CROSS EXAMINATION**

12  **BY MR. GETZ:**

13  **Q.**   Good afternoon.

14       What kind of projects did you do for Ian Furminger before

15  the skylights that you just spoke about?

16  **A.**   Basically, like, painting and crown molding.  Some tile in

17  the bathrooms.  Something like that, yeah.

18  **Q.**   Anything else you can think of?

19  **A.**   I remember I did the fence in the backyard.  And I did a

20  deck in the backyard too.

21  **Q.**   All of these projects that you just talked about, were you

22  paid for the work you did?

23  **A.**   He paid.  He paid me.

24  **Q.**   When it came time for him to pay you, did you ask him to

25  give you cash?

1    **A.**    I did.

2    **Q.**    Okay.

3    **A.**    I asked him to give me cash.

4    **Q.**    All right.  So when you came out to do the skylights at

5    the Orinda house, did you know before you got there that you

6    would ask him to pay in cash?

7    **A.**    Yes.

8    **Q.**    And did you ask him to pay you cash on that job when you

9    finished?

10   **A.**    Yes.

11   **Q.**    Have you been doing this kind of work for the last eight

12   or ten years?

13   **A.**    Yes.

14   **Q.**    You do it for different people; don't you?

15   **A.**    Yes.

16   **Q.**    Whoever needs help, needs someone who can work with their

17   hands, that's you; right?

18   **A.**    That's me.

19            **MR. GETZ:**  Okay.  Thank you.

20            **THE WITNESS:**  You're welcome.

21            **THE COURT:**  Thank you very much.  You're excused.

22    You may leave.

23        (Witness excused.)

24            **THE COURT:**  Next witness.

25            **MR. VILLAZOR:**  Yes, Your Honor.  The government calls

 1   Kenneth Kwak, K-w-a-k.

 2       Your Honor, he's in the building.  I just don't know where

 3   he is.

 4           **MR. HEMANN:**  He was in the hall a moment ago, Your

 5   Honor.

 6           **THE COURT:**  Let's just wait a minute.

 7           **MR. HEMANN:**  Let me go find him.

 8           **THE COURT:**  I would rather take our recesses after

 9   Mr. Kwak rather than before Mr. Kwak.

10       So, ladies and gentlemen, if you want to stand up,

11   stretch, talk, whatever.  We will wait for Mr. Kwak.

12           **MR. VILLAZOR:**  He's here.

13           **MR. HEMANN:**  Sorry, Your Honor.  I didn't want to

14   shout.  He was sitting right there.

15           **THE COURT:**  Okay.  Okay.  Mr. Kwak is here.  Let's

16   resume.  Thank you.

17           **THE CLERK:**  Please remain standing and raise your

18   right hand.

19           <u>**KENNETH KWAK, Plaintiff WITNESS, SWORN**</u>

20           **THE WITNESS:**  Yes.

21           **THE CLERK:**  Please be seated.

22       Please state your full name.  Spell your last name for the

23   record.

24           **THE WITNESS:**  Kenneth Kwak.  K-w-a-k.

25

**<u>DIRECT EXAMINATION</u>**

**BY MR. VILLAZOR:**

**Q.**   Good afternoon.

**A.**   Sure.

**Q.**   Mr. Kwak, you work for the Alcohol, Tobacco, Firearms and Explosive Bureau?

**A.**   Yes, I do.

**Q.**   You're a special agent?

**A.**   Yes, I am.

**Q.**   How long have you been a special agent with the ATF?

**A.**   Since 2001.

**Q.**   Prior to that were you in law enforcement?

**A.**   Yes, I was.

**Q.**   Did you start off with the San Francisco Police Department?

**A.**   I did.

**Q.**   Were you in the graduating class with Ian Furminger?

**A.**   Yes, I was.

**Q.**   Do you actually see Ian Furminger in this courtroom?

**A.**   Yes, I do.

**Q.**   Can you identify him?

**A.**   He has red glasses on, reading glasses.

**Q.**   After you graduated from the academy, were you assigned to a particular station?

**A.**   Yes, I was.

1  **Q.**   Where were you stationed?

2  **A.**   Initially, in the Richmond District for training, and then

3  Mission District.

4  **Q.**   Did you ever work with Officer Ed Robles?

5  **A.**   Yes, I did.

6  **Q.**   Do you see Mr. Robles in the courtroom today?

7  **A.**   Yes, I do.

8  **Q.**   Can you identify him?

9  **A.**   He's wearing a gray suit.

10  **Q.**   How long were you with the San Francisco Police

11  Department?

12  **A.**   A little under three years.

13  **Q.**   Did you transfer out?

14  **A.**   Yes, I did.

15  **Q.**   Where did you go?

16  **A.**   San Jose Police Department.

17  **Q.**   How long were you a police officer at San Jose Police

18  Department?

19  **A.**   Approximately three and a half years.

20  **Q.**   And after that did you go to the ATF?

21  **A.**   Yes, I did.

22  **Q.**   Where were you first assigned with the ATF?

23  **A.**   Oakland field office.

24  **Q.**   And that's in the Northern District of California?

25  **A.**   Yes.

1   Q.    Did you eventually get promoted within the San Francisco

2   division?

3   A.    I was actually the acting supervisor for San Francisco

4   field office.

5   Q.    After that -- when was that, by the way?

6   A.    That was 2009.

7   Q.    Did you transfer out of there?

8   A.    Yes, I did.

9   Q.    Where did you go?

10  A.    Became the supervisor of a group in Los Angeles field

11  division.

12  Q.    How long were you there?

13  A.    Three -- approximately three years.

14  Q.    And after that where'd you go?

15  A.    Headquarters, which is located in Washington, D.C.

16  Q.    And is that where you're presently assigned?

17  A.    Yes, I am.

18  Q.    Agent Kwak, directing your attention to June 18th, 2009,

19  were you working that day?

20  A.    Yes, I was.

21  Q.    Was ATF performing a search warrant?

22  A.    Yes.

23  Q.    Do you recall the location?

24  A.    It was on Potrero Avenue in the 700 block.

25  Q.    I'm going to show you what's been already marked into

1  evidence as Government Exhibit 271.

2          **MR. VILLAZOR:**  Tab 6, for the members of the jury.

3      (Photograph displayed.)

4          **MR. VILLAZOR:**  And, Ms. Lane, if you'd turn to, I

5   guess, the second photo -- or third photo.

6      (Photograph displayed.)

7          **MR. VILLAZOR:**  Go back.

8      (Photograph displayed.)

9  **BY MR. VILLAZOR:**

10 **Q.**   Agent Kwak, is that the place where the ATF conducted a

11 search warrant?

12 **A.**   Yes, it is.

13 **Q.**   And at that time were you the acting group supervisor?

14 **A.**   Yes.

15 **Q.**   Was there a case agent assigned to that search warrant?

16 **A.**   Yes.

17 **Q.**   And is that case agent Megan Long?

18 **A.**   Yes.

19 **Q.**   Megan Long, L-o-n-g.

20      Did the ATF call the San Francisco Police Department tact

21 team for assistance?

22 **A.**   Yes, we did.

23 **Q.**   All right.  And can you explain to the members of the jury

24 what the tact team is?

25 **A.**   I'm sorry, can you repeat the question?

1   **Q.**    Is the tact team the SWAT team?

2   **A.**    Yes, sir.

3   **Q.**    Why was the SWAT team called in?

4   **A.**    It was basically the size of the house as well as the --

5   the -- one of the occupants had suspected mental health issues.

6   And this was also dealing with assault weapons.

7   **Q.**    Were other police officers from the San Francisco Police

8   Department called in to assist as well?

9   **A.**    Yes.

10  **Q.**    From where?

11  **A.**    Mission Station.

12  **Q.**    Were you the -- as group supervisor, were you the one who

13  made the call?

14  **A.**    Yes.

15  **Q.**    And who would you have called, if you have any specific

16  memory?

17  **A.**    Either the lieutenant or captain.

18  **Q.**    And did San Francisco police officers respond to your

19  call?

20  **A.**    Yes, they did.

21  **Q.**    Do you recall who they were?

22  **A.**    It was Officer Ed Robles and Rey Vargas.

23  **Q.**    Did you specifically ask for Ed Robles?

24  **A.**    No.

25  **Q.**    You knew him from your prior work at San Francisco Police

1    Department?

2    **A.**    Yes.

3    **Q.**    Where did you meet?

4    **A.**    Initially, with San Francisco?

5    **Q.**    No.  I'm sorry.  Where did you meet Mr. Robles that day?

6    **A.**    We were at a staging location, I believe, down by Potrero

7    Shopping Center, behind there in a utility yard.

8    **Q.**    And can you explain to the jury what's a staging area?

9    **A.**    Staging area is a location where law enforcement would

10   meet prior to going to either do the law enforcement action or

11   to put on, you know, special equipment.  But it's a place where

12   you meet before actually engaging in the action.

13   **Q.**    And did the ATF agents and Officer Robles wait at the

14   staging area until you got the clear sign from the tact team?

15   **A.**    Yes.

16   **Q.**    After the tact team gave that clear sign, did you and

17   Officer Robles and other agents go to the house on Potrero?

18   **A.**    Yes.

19   **Q.**    Did you then execute the search warrant?

20   **A.**    We executed the search.

21   **Q.**    The search.  Excuse me, the search?

22   **A.**    Yes.

23   **Q.**    And as group supervisor, can you generally explain what

24   you were doing during the search?

25   **A.**    I had oversight of the entire location, and so I was

1   bouncing between the different floors, the different rooms, in

2   order to see if there was anything that the agents or officers

3   needed in order to complete what they were doing.

4   **Q.**   Were agents and officers assigned to particular areas to

5   search?

6   **A.**   Yes.

7   **Q.**   Do you have a memory as to where Officer Robles was

8   assigned to search?

9   **A.**   He was assigned to search in the master bedroom.

10  **Q.**   Was he there to go alone?

11  **A.**   No.  I believe he went with Officer Vargas.

12  **Q.**   Was Ian Furminger there that day?

13  **A.**   No, he was not.

14  **Q.**   Did you eventually go to the master bedroom yourself?

15  **A.**   I did.

16  **Q.**   And what did you see as you were going into the master

17  bedroom?

18  **A.**   Officer Robles and Officer Vargas coming out.

19  **Q.**   Did you see Officer Robles with anything in his hand?

20  **A.**   No, I don't recall.

21  **Q.**   Did you ask him if he had found anything?

22  **A.**   I asked if there was anything in the room, and they said

23  that they didn't find anything.

24  **Q.**   And did you go into the room?

25  **A.**   Yes, I did.

1  **Q.**   Did you do what's called a secondary search?

2  **A.**   Yes, I did.

3  **Q.**   And did you find anything?

4  **A.**   I did.

5  **Q.**   What did you find?

6  **A.**   I found a .22 long rifle, a Marlin, and ammunition.

7  **Q.**   Did you find -- what kind of ammunition did you find?

8  **A.**   It was multiple rounds of .22 caliber, which is a smaller

9  caliber, and .38 caliber.

10         **MR. VILLAZOR:**  Thank you, Agent Kwak.  I have no

11  further questions.

12         **MR. PASSAGLIA:**  Nothing on behalf of Mr. Furminger.

13         **THE COURT:**  Anything further, Ms. Caffese?

14         **MS. CAFFESE:**  Yes, Your Honor.  Excuse me.

15                    <u>**CROSS EXAMINATION**</u>

16  BY MS. CAFFESE:

17  **Q.**   Good afternoon, Agent Kwak.  My name is Teresa Caffese.  I

18  have some questions for you, if I may.

19  **A.**   Good afternoon.

20  **Q.**   Now, sir, my understanding is that Megan Long -- Megan

21  Long was the lead investigator in the case; is that right?

22  **A.**   Yes.

23  **Q.**   She was the agent responsible for preparing the tactical

24  plan; is that right?

25  **A.**   She was responsible for what we call an op plan, which is

 1  actually a document that has all of the personnel listed.  But

 2  the tactical plan for this location was actually done by SFPD

 3  tact team.

 4  **Q.**   Okay.  So she -- when you say the operation, what -- what

 5  was Ms. -- or Agent Long responsible for, if you can elaborate

 6  on what that is.

 7  **A.**   So the operational plan lists the different personnel that

 8  is assigned to come to the operation as well as list any

 9  equipment that they are bringing.  It's also used to describe

10  the location as well as any history behind the case.

11  **Q.**   Okay.  And the SWAT team, is that the tactical group?

12  **A.**   Yes, sir -- or, yes, ma'am.  Sorry.

13  **Q.**   That's okay.

14       They would have advised -- they would have devised the

15  tactical plan.  And the tactical plan is what?

16  **A.**   The plan that they would use in entering the house in

17  order to make entry, in order to secure the location safely.

18  **Q.**   Okay.  And my understanding -- it was a long time ago, but

19  my understanding is that there were several police officers

20  from the -- we'll call them the SWAT team that responded; is

21  that right?

22  **A.**   Yes, ma'am.

23  **Q.**   And do you have a recollection of how many police officers

24  from the SWAT team responded to the Potrero house?

25  **A.**   I don't have an exact count, but from reviewing

1  documentation I believe there were -- actually, I couldn't give

2  you an exact amount right now.

3  Q.   Okay.  If I were to say 16 officers from the tactical

4  unit, would that be a fair estimate?

5  A.   I guess, yes.

6  Q.   Okay.  Now, earlier in your direct examination you said

7  that the -- you, along with the tactical unit, met at a staging

8  area; is that right?

9  A.   No, that's incorrect.  The tactical team was on their own.

10  We met as a search group, the ATF group as well as the SFPD

11  plainclothes officers.

12  Q.   Excuse me.  So I do want to ask you some questions about

13  that.

14       You said that Officer Robles met you at a staging area; is

15  that right?

16  A.   Yes.

17  Q.   Okay.  Now, do you -- where -- do you have a specific

18  recollection of Officer Robles actually meeting you at that

19  staging area?

20  A.   Yes, I do.

21  Q.   Now, when would that have been in relationship to when the

22  actual search was executed in terms of time?

23  A.   It could be anywhere from an hour to half an hour before

24  the execution of the search warrant by the tactical team.

25  Q.   Okay.  Did you arrive at the house at the same time that

1  you -- well, let me ask you.

2      How many of you, meaning the ATF agents, how many of the

3  agents were part of this search?

4  **A.**   I'd have to review the op plan again in order to give you

5  an exact number.

6  **Q.**   Approximately how many?

7  **A.**   Approximately -- I believe there were eight to nine ATF

8  agents and two SFPD officers from Mission Station.  Then we

9  also had one to two more San Francisco P.D. task force

10 officers.

11 **Q.**   Okay.  So let me break this up now.

12     Did you arrive to the house before Officers Robles and

13 Vargas arrived to the house?

14 **A.**   We arrived pretty much at the same time.

15 **Q.**   You didn't come in the same vehicles; is that right?

16 **A.**   No, we came in different vehicles.

17 **Q.**   All right.  When you arrived, were the -- were the SWAT

18 team or tactical unit from SFPD already present?

19 **A.**   Yes.

20 **Q.**   And they were already inside the house; is that right?

21 **A.**   Yes.

22 **Q.**   And do you know -- well, do you know how long they had

23 been inside the house before you arrived to the premises?

24 **A.**   I'd say a very short time, but I could not tell you an

25 exact amount of time.

 1  Q.   All right.  Now, I'm just going to show you a document and

 2  ask you whether or not you recognize this document.

 3  A.   I do recognize the document.

 4  Q.   And what is that, sir?

 5  A.   It's a report of investigation, which is where we document

 6  our narratives for ATF.

 7  Q.   And this report is dated July 31st, '09?

 8          **THE COURT:**  Does it have an exhibit number?

 9          **MS. CAFFESE:**  It does.  I don't think we have it.

10   Can I mark it later, Your Honor?

11      (Trial Exhibit 349 to be marked for identification.)

12          **THE COURT:**  Sure.

13          **MS. CAFFESE:**  All right.

14          **THE COURT:**  You better show it to counsel.

15  **BY MS. CAFFESE:**

16  Q.   Now, this report of investigation was prepared by Megan

17  Long; is that right?

18  A.   Yes.

19  Q.   And it was authorized by you; is that right?

20  A.   Yes.

21  Q.   And it lists the time that you were briefed; is that

22  right?

23  A.   I believe so.

24          **MR. VILLAZOR:**  Your Honor, I'm going to object to the

25   relevance of reading from the document.

```
 1              THE COURT:  Well, he didn't prepare the document.
 2   The question is -- and I haven't seen the document, so I don't
 3   know what we're talking about here.
 4              MS. CAFFESE:  All right.
 5   BY MS. CAFFESE:
 6   Q.   I want to get back to the staging where you believe or you
 7   testified that Officer Robles was present at, okay?
 8   A.   Yes.
 9   Q.   Now, where was that location, specifically?
10   A.   I believe it was in the general area down towards Potrero
11   and 17th.  There is a DPS, I think they call it here in
12   San Francisco.  You have to excuse me, I haven't been in
13   San Francisco for a while.  But it's the utilities yard.
14       I believe there's one down in that area behind the 17th
15   and Potrero shopping center area.
16   Q.   Now, would you -- and correct me if I'm wrong, but I
17   believe you said that there were, aside from Vargas and Officer
18   Robles, there were other SFPD officers there in that staging
19   area with you?
20   A.   Yes.
21   Q.   Okay.  And do you remember who those people were -- who
22   those other officers were?
23   A.   I know one was Michael Hamilton.  He was a ATF Task Force
24   officer.  I believe the other one -- I can see his face right
25   now.  I don't have his name off the top of my head.
```

1   **Q.**   So just two?

2   **A.**   Yes.

3   **Q.**   All right.  And my understanding is that the Mission

4   officers, Officer Robles, for example, was asked to participate

5   or assist in this -- the execution of this search warrant; is

6   that right?

7   **A.**   Yes, the execution of the search.

8   **Q.**   All right.  Now, Officer Robles arrived to the Potrero

9   house after you and your team arrived; is that right?

10  **A.**   Again, I believe we all arrived at the same time, because

11  the reason for the staging location is so we can all meet there

12  and then, from that location, all drive over to the search

13  warrant location.

14  **Q.**   Do you know, as you sit here today, who went in the house,

15  the house -- let me rephrase that.

16       When your unit responded and when Officer Robles

17  responded, do you have a recollection of whether or not you

18  were keeping track of where, for example, Officer Robles went?

19  **A.**   No.  Just the general knowledge of where they were

20  responsible for, for the search.

21  **Q.**   But you obviously weren't watching where all of the

22  officers were during the search, right?

23  **A.**   No, I was going between floors, in between rooms.

24  **Q.**   I would imagine there were obviously a lot of officers

25  inside this house; is that right?

1   **A.**    Yes.

2   **Q.**    Okay.  But probably 30?

3   **A.**    Thirty officers?

4   **Q.**    Law enforcement personnel.

5   **A.**    At one point when the tactical team was there as well as

6   our team, probably less than that but close.

7   **Q.**    More than 20?

8   **A.**    Most likely.

9   **Q.**    All right.  And you obviously do not -- or could not keep

10  track, fair enough to say, who is going in the master bedroom,

11  for example; is that right?

12  **A.**    Well, no, we had a general knowledge of who was

13  responsible for that room.

14  **Q.**    Who was responsible.  But, obviously, you don't know who

15  all actually went into the room; true statement?

16  **A.**    Yes.

17  **Q.**    All right.  And you obviously don't know who all went into

18  the room on the second floor; is that right?

19  **A.**    Not specifically.

20  **Q.**    All right.  And obviously it was a very serious situation,

21  because you had responded on a search warrant because there was

22  a mentally disturbed convicted felon associated with assault

23  weapons -- rifles, excuse me, within this household; is that

24  right?

25  **A.**    Yes.

KWAK - CROSS / CAFFESE

1   Q.   And that's why the local police actually got a search

2   warrant for this home; is that right?

3   A.   Actually, it was us who got the search warrant for the

4   home.

5   Q.   I'm sorry?

6   A.   It was Agent Long who got the search warrant for the home.

7   Q.   Well, she wrote the warrant, but the local police

8   officer -- department actually got the warrant signed by Judge

9   Benson; is that right?

10          MR. VILLAZOR:  Objection.

11  BY MS. CAFFESE:

12  Q.   If you know.

13  A.   I --

14          THE COURT:  I don't think it's relevant whether a

15   federal judge signed it, a magistrate judge, a state court

16   judge.  I don't think it's relevant.

17  BY MS. CAFFESE:

18  Q.   The secondary search that was referred to is customary; is

19  that right?

20          THE COURT:  I'm sorry, secondary search?

21  BY MS. CAFFESE:

22  Q.   I believe -- did you refer to a secondary search?

23  A.   I did.

24  Q.   All right.  Now, a secondary search is done to make sure

25  that things aren't missed; is that right?

 1  **A.**    Yes.

 2  **Q.**    All right.  And that's not unusual; is that right?

 3  **A.**    What's not unusual?

 4  **Q.**    It's not unusual to conduct a secondary search?

 5  **A.**    No.

 6  **Q.**    All right.  And that's what you did; is that right?

 7  **A.**    Yes.

 8  **Q.**    All right.  And apparently there was a rifle in the master

 9  bedroom --

10  **A.**    Yes.

11  **Q.**    -- in this house; is that right?

12  **A.**    Yes.

13  **Q.**    And there was ammunition that was found in this master

14  bedroom?

15  **A.**    Yes.

16  **Q.**    There was ammunition found in other parts of the house

17  too; is that right?

18  **A.**    I don't recall specifically, but if I were to review

19  documents, I believe the only ammunition that was recovered was

20  from the master bedroom closet.

21  **Q.**    How much ammunition total was found in the house?

22  **A.**    I would have to refer back to the documents.

23  **Q.**    All right.  Now, you're aware that the Reynosos filed a

24  lawsuit as a result of the government's search of this house;

25  is that right?

 1                    MR. VILLAZOR:  Objection.  Relevance.

 2                    THE COURT:  Sustained.

 3   BY MS. CAFFESE:

 4   Q.   Are you aware that the Reynosos allege that the federal

 5   government took $200,000 from their house?

 6                    MR. VILLAZOR:  Objection.  Relevance.

 7                    THE COURT:  Well, I don't know that it's relevant.

 8   I'll take an offer of proof outside the presence of the jury.

 9       And, ladies and gentlemen, you should understand that a

10   question is not in evidence unless an answer is given.  Okay.

11       I'll hear you outside the presence of the jury on the

12   relevance.

13                    MS. CAFFESE:  Okay.

14                    THE COURT:  Not now.

15                    MS. CAFFESE:  I'm almost done, actually.

16                    THE COURT:  Okay.  Well, you can be done.  He's not

17   going anywhere.

18   BY MS. CAFFESE:

19   Q.   But were you -- were you deposed --

20                    MS. CAFFESE:  Well, my other questions actually,

21   Judge --

22                    THE COURT:  Well, but, I mean, the question is --

23   well, other than this subject are you complete?

24                    MS. CAFFESE:  Yes.

25                    THE COURT:  All right.  Any redirect on anything

1    other than this last subject?

2              MR. VILLAZOR:  Just a few questions, Your Honor.

3              THE COURT:  And then I'll return to your issue

4    outside the presence of the jury.  I just don't want to keep

5    them here.

6              MS. CAFFESE:  I understand.  Okay.

7              THE COURT:  Thanks.

8                        **REDIRECT EXAMINATION**

9    BY MR. VILLAZOR:

10   **Q.**  Agent Kwak, you were asked a lot about the secondary

11   search?

12   **A.**  Yes.

13   **Q.**  All right.  So go back.  So you were about to enter the

14   master bedroom, and that's when you saw Officer Robles, Officer

15   Vargas exiting?

16   **A.**  Yes.

17   **Q.**  What did you do when you went in and performed that

18   secondary search?

19   **A.**  I went ahead and looked around the master bedroom itself,

20   and then I went into one of the master bedroom closets and

21   conducted the search there and found some evidence.

22   **Q.**  When you went into the master bedroom closet and searched,

23   how long did it take you to find that gun?

24   **A.**  Probably within the first minute, two minutes.

25   **Q.**  And, I'm sorry, I called it a gun.  Was it actually a

PROCEEDINGS

1  rifle?

2  **A.**    It was a rifle.

3  **Q.**    And how big is that rifle?

4  **A.**    It was probably 3 feet; 36 inches, maybe a little bit

5  less.

6          **MR. VILLAZOR:**  Thank you.  No further questions.

7          **THE COURT:**  Okay.  Ladies and gentlemen --

8          **MS. CAFFESE:**  Excuse me, I do have one --

9          **THE COURT:**  Oh, go ahead, Ms. Caffese.  Yes, please

10  come up.

11         **MS. CAFFESE:**  Thank you.

12                        **RECROSS EXAMINATION**

13  **BY MS. CAFFESE:**

14  **Q.**    I want to follow up on one area.  I think it's one

15  question here.

16      Was the master bedroom that the gun was found in

17  Mr. Reynoso's room?  Correct?

18  **A.**    There were actually multiple Reynos- -- there were

19  multiple males with the last name Reynoso.  Can you specify

20  which one you're talking about?

21  **Q.**    Okay.  Excuse me.  The older Reynoso.  Not the convicted

22  felon.  Not the other son, but senior Reynoso.

23  **A.**    Yes.  We believed that that was his room.  He indicated

24  that was his room.

25         **MS. CAFFESE:**  Thank you.

PROCEEDINGS

```
 1              MR. VILLAZOR:  Nothing further, Your Honor.

 2              THE COURT:  Okay.  Ladies and gentlemen, we're going

 3    to take our recess.  We'll be in recess until ten to 3:00.

 4    Remember the admonition given to you.  Don't discuss the case,

 5    allow anyone to discuss it with you, form or express any

 6    opinion.

 7          (Jury out at 2:32 p.m.)

 8              THE COURT:  Let the record reflect the jurors have

 9    retired.

10        Ms. Caffese, you wanted to inquire into a lawsuit; is that

11    right?

12              MS. CAFFESE:  Yes, Your Honor.

13              THE COURT:  Okay.  So go ahead.  Tell me what you

14    wanted to ask or why it's relevant.

15              MS. CAFFESE:  Your Honor, yesterday Ms. Reynoso --

16    not yesterday --

17              THE COURT:  Whenever.  Friday.

18              MS. CAFFESE:  When we -- the last calling of the case

19    Ms. Reynoso testified that they, in fact, filed a lawsuit

20    against the government.

21              THE COURT:  Right.

22              MS. CAFFESE:  And the government played a role in

23    that lawsuit because, as I mentioned in -- my briefing was

24    that the government defended the lawsuit --

25              THE COURT:  Yes.
```

1      **MS. CAFFESE:**  -- as claiming nothing had been stolen.

2      **THE COURT:**  Well, what is your point?  Is your

3   point --

4      **MS. CAFFESE:**  My point is now they're actually

5   putting on evidence to suggest that money was stolen.

6      **THE COURT:**  Not from this witness.

7      **MS. CAFFESE:**  Well, he was one of -- well, he's a

8   member of the government and was --

9      **THE COURT:**  Do you have any reason to believe -- wait

10  a minute.  This witness testified as he testified.  But not

11  that he saw money, that he -- to the contrary, he said he

12  didn't see the -- he was told by Vargas and Robles that they

13  didn't have anything.  They didn't find anything.

14    He's not saying they came out with a bag that could have

15  held money.  He's saying they said they didn't have anything.

16  That was his testimony.

17    So I'm trying to figure out why is it relevant that a

18  lawsuit was filed against the government as to this particular

19  witness.

20     **MS. CAFFESE:**  Well, the lawsuit a -- submitted,

21  Judge.  I'll submit it.

22     **THE COURT:**  Oh, okay.  All right.  So you're excused.

23  All right.

24    (Witness excused.)

25     **THE COURT:**  And we'll proceed at ten to.  Thank you.

PROCEEDINGS

```
 1        (Recess taken from 2:34 to 1:56 p.m.)

 2        (The following proceedings were held in the presence of

 3   the Jury)

 4             THE CLERK:  All rise.

 5             THE COURT:  Please be seated.

 6        Let the Record reflect all jurors are present; parties are

 7   present.

 8        You may call your next witness.

 9        Yes.

10             MR. VILLAZOR:  Your Honor, we have a quick change we

11   are calling now Crystal Ponzer to the stand.

12             THE COURT:  Okay.  Go ahead.

13             MR. HEMANN:  Slight change in plans, Your Honor.  I'm

14   sorry.

15             MR. VILLAZOR:  Perhaps she --

16             MR. HEMANN:  The United States calls Reynaldo Vargas.

17             THE CLERK:  Will the witness come forward around take

18   the witness stand.

19             REYNALDO VARGAS, PLAINTIFF'S WITNESS, SWORN

20             THE CLERK:  Please be seated.  Please state your full

21   name and spell your last name for the Record.  Always make

22   sure you speak into the mic.

23             THE WITNESS:  May name is Reynaldo, R-E-Y-N-A-L-D-O,

24   Vargas, V-A-R-G-A-S.

25
```

# DIRECT EXAMINATION

BY MR. HEMANN:

Q    Mr. Vargas, were you a San Francisco Police Officer?

A    Yes.

Q    When did you first become a San Francisco Police Officer?

A    In October of 1999.

Q    And did you go to the police academy in San Francisco?

A    Yes, I did.

Q    At some point in time did you work at the Mission Police Station?

A    Yes.

Q    When did you start working at the Mission Police Station?

A    I did my probation year at Mission Police Station.  And so I believe that started in probably 2001.

Q    And that was for one year?

A    Yes, it was.

Q    And then thereafter did you go back to the Mission Station?

A    Yes, I did.

Q    When was that?

A    I went back there, I believe, in 2006.

Q    At some point in time did you begin working in the plainclothes unit in the Mission Station?

A    Yes.

Q    When was that?

1    **A**    I believe that was in early 2009, very early in 2009.

2    **Q**    And what month or months in particular are you thinking

3    about?

4    **A**    Probably either in late January or early February.

5    **Q**    And at some point in time did you leave the San Francisco

6    Police Department?

7    **A**    Yes.

8    **Q**    When was that?

9    **A**    In May of 2012.

10   **Q**    When you became a San Francisco Police Officer,

11   Mr. Vargas, did you take an oath?

12   **A**    Yes.

13           **MR. HEMANN:**  Ms. Lane could, you put up Exhibit 1?

14   Which is in evidence, Your Honor.

15       (Document displayed)

16   **BY MR. HEMANN:**

17   **Q**    Do you see that up on the screen, Mr. Vargas?

18   **A**    Yes, I do.

19   **Q**    Does that look like the oath that you took when you became

20   a San Francisco Police Officer in 1999?

21   **A**    Yes, it does.

22   **Q**    Mr. Vargas, as a San Francisco Police Officer, did you

23   violate that oath?

24   **A**    Yes, I did.

25   **Q**    As an officer at the Mission Station, did you commit

1    crimes?

2    **A**    Yes, I did.

3    **Q**    What crimes did you commit?

4    **A**    Um, theft.  Um, I provided drugs, that -- to potential

5    informants with the intent that they would sell them.  I did

6    these acts with other police officers.

7    **Q**    You stole things?

8    **A**    Yes.

9    **Q**    What did you steal?

10   **A**    Um, gosh.  Money, property, such as like laptops, iPods,

11   that sort of stuff.

12   **Q**    You gave drugs to confidential informants?

13   **A**    Yes.

14   **Q**    What kind of drugs?

15   **A**    Marijuana, heroin and cocaine.

16   **Q**    Did your position, Mr. Vargas, as an undercover police

17   officer, a plainclothes police officer, give you the

18   opportunity to commit these crimes?

19   **A**    Yes.

20   **Q**    How so?

21   **A**    It gave me the opportunity in that I was the individual

22   that was investigating narcotics traffickers.  And I was the

23   person, person effecting those arrests, executing those

24   searches.

25   **Q**    Did you, Mr. Robles (sic), commit those crimes with any

1    other San Francisco Police Officers?

2    **A**    Did I commit it with other officers?  Yes.

3    **Q**    What other officers?

4    **A**    I committed those crimes with my then-partner, Officer

5    Robles.  And at times with my supervisor, Sergeant Furminger.

6    **Q**    And when you walked in the courtroom today, did you see

7    both Sergeant Furminger and Mr. Robles?

8    **A**    I see them now.

9    **Q**    When did your criminal conduct with these officers begin?

10   **A**    Almost immediately, into my start of working in that

11   plainclothes unit.

12   **Q**    So in what year, month or year?

13   **A**    2009.  If it wasn't late January, it was early February.

14   **Q**    You began at the San Francisco Police Department in 1999,

15   you said?

16   **A**    Yes.

17   **Q**    And that first year you were a probationary officer, after

18   you graduated from the academy?

19   **A**    After I graduated from the academy I was assigned to a

20   field training station.  And so, I was probably there about --

21   not quite a full year, maybe about three quarters of a year

22   there.  Then to the probation station.

23   **Q**    Where was the first assignment?

24   **A**    That was Northern Police Station.

25   **Q**    And that is in sort of the middle, the Fillmore area of

1    San Francisco?

2    **A**    Exactly.

3    **Q**    And then you went over to Mission Station in roughly 2000,

4    in some point during 2000?

5    **A**    Yes, I believe so.

6    **Q**    What did you do at Mission Station during that first year?

7    **A**    During that first year, it was chiefly in uniform patrol.

8    So just a black -- driving a black-and-white car, in full

9    police uniform.  Because I was so junior, I believe I did

10   almost that -- probably did that entire year working the

11   midnight shift, so 9:00 at night until 7:00 in the morning.

12   **Q**    Did you have a partner that year?

13   **A**    Yes.

14   **Q**    One particular person or a variety of people?

15   **A**    A variety of partners.  Primarily because I was so new, I

16   wasn't really allowed to work by myself, so I was always

17   assigned with a much more senior officer.

18   **Q**    And could you generally describe to the jury what the

19   duties of a uniformed police officer are, the sorts of duties

20   that you learned to do that year?

21   **A**    Um, because I was so new, it was, um, kind of the basics

22   of patrolman.  Answering up calls for service.

23        So, any time somebody calls the police, either for an

24   emergency all the way down to some sort of parking violation,

25   responding to those calls.  Dealing with any sort of incidents

1    that we would view, ourselves.  Parking enforcement, traffic

2    enforcement, all of those sort of things, as well as any kind

3    of special event that happened within that district.

4    Q    And how long did you do that?  Just about a year?

5    A    Yes.

6    Q    After you completed your probationary time, did you move

7    to another office or another station?

8    A    Yes.

9    Q    What station did you move to?

10   A    That was the Central Station in North Beach.

11   Q    And how long were you stationed at the Central Station?

12   A    I believe, two years.

13   Q    What sort of duties did you have at Central?

14   A    At Central Station I was again assigned to patrol.  And,

15   during a portion of the time, I actually began to work in a

16   plainclothes capacity.

17   Q    And when you say "during a portion of the time,"

18   describe -- I mean, was it for a -- one continuous period of

19   time?  Or was it hit and miss?  Or -- when you say that?

20   A    Initially it was very sporadically.  Maybe one day a week,

21   one day every two weeks, something like that.

22        A lot of these assignments there had to deal with

23   staffing.  If there was ample staffing then they would allow

24   some officers to work in a plainclothes capacity.  I believe

25   for a period of time I was assigned chiefly to plainclothes.

1    However, if the staffing did not allow, they would take us

2  right out of plainclothes and put us right back in uniform to

3  perform uniform patrol.

4  **Q**    How do the duties of a plainclothes officer differ from

5  the duties of a uniformed police officer?

6  **A**    They differ in the sense of the focus.  The focus may be,

7  depending on what area you work, the issues that arise in those

8  specific districts.  It may be street-level narcotics, it may

9  be a gang area.  And may be other sort of nuisance crimes like

10  auto break-ins or burglaries.

11    We also tended to focus on what we were asked to focus on.

12  So if the issue were auto burglaries in a certain area, we

13  would try and focus on that sort of thing.  But because you're

14  not in uniform and also not driving a marked police car, you

15  are obviously not as easily seen.  And so you're kind of -- the

16  approach is very different, and what you are trying accomplish

17  as a police officer is a bit different.

18  **Q**    Are you always, as a plainclothes police officer, trying

19  to blend in and not be noticed?  Or sometimes you are trying to

20  be noticed, and sometimes you're not trying to be noticed?

21  **A**    Yes, that would be the goal, to try not to be noticed

22  until time to be noticed, like effecting an arrest or something

23  along those lines.

24  **Q**    At Central, did you focus on any particular -- you

25  mentioned that the focus could be different from station to

1  station.  Did you focus on anything in particular at Central

2  Station in North Beach?

3  **A**    In North Beach some of the problems that we focused on was

4  there were narcotics trafficking, auto break-ins.  Union

5  Square, portions of the Union Square district are part of the

6  Central District.  So at times we focused on some of the thefts

7  in some of the higher-end retail stores.

8  **Q**    After you left Cen- -- you say you were at Central for two

9  years?

10  **A**    Yes.

11  **Q**    After you left Central, where did you go?

12  **A**    I was assigned to The Hall of Justice.

13  **Q**    Doing what -- The Hall of Justice is what?

14  **A**    850 Bryant Street.

15  **Q**    But, what does that mean?

16  **A**    Well, it's -- there were all sorts of different floors and

17  positions and units there.  I was assigned to a -- the

18  identification bureau.

19  **Q**    And that's -- so it's the police headquarters.

20  **A**    Yes.

21  **Q**    For all of San Francisco.

22  **A**    Yes.

23  **Q**    And you were assigned to the identification bureau, which

24  means what?

25  **A**    That is a unit that deals with maintaining all the

1   criminal records for anyone that's arrested in San Francisco.

2   Current and past.  As well as doing fingerprint checks.  And

3   they also handle all of the registrants, be it sex registrants

4   or arson registrants, all in that office.

5   Q    How long did you work at the identification bureau?

6   A    I believe, about a year and a half.

7   Q    After you left -- at some point you left to another

8   assignment.

9   A    Yes.

10  Q    What was your next assignment?

11  A    Ingleside Station.

12  Q    Ingleside Station is where?

13  A    That is out -- just off of Ocean Avenue, near the Glen

14  Park BART Station.

15  Q    What was your assignment at Ingleside?

16  A    There, it was patrol again.  Back to uniform patrol.

17  Q    How long were you at Ingleside?

18  A    I don't believe I was there a complete year.  Probably

19  less than a year.

20  Q    And, did you leave Ingleside for another -- another duty

21  station in San Francisco?

22  A    Yes.

23  Q    And, what duty station?

24  A    Back to Mission Station.

25  Q    When you went back to Mission Statement (sic) -- and this

1   is now in 2006?

2   **A**    Yes.

3   **Q**    What was your first assignment at Mission?

4   **A**    I was in patrol, but almost immediately I began doing

5   bicycle patrol.

6   **Q**    What does bicycle patrol entail?

7   **A**    We were assigned to very small areas, what we would call a

8   beat area.  And as bicycle patrol we were really focused on

9   kind of making contact with either -- if it was a commercial

10  district, the business owners, trying to deal with those

11  street-level issues that they may have.  And just being very,

12  very visible and very approachable because you're on a bicycle

13  right there with the pedestrians and the other bike riders, and

14  that sort of thing.

15  **Q**    What was your beat area?

16  **A**    Initially it was 24th Street, the 24th Street corridor.

17  So from 24th and Mission all the way down to 24th and Potrero.

18  Later on it became the 16th and Mission area.

19  **Q**    And when you say "Later on," how much later on?

20  **A**    Maybe about a year later.

21  **Q**    How long, in all, did you perform bicycle patrol duties at

22  Mission Station?

23  **A**    Probably close two years.  Until I then went into the

24  plainclothes assignment.

25  **Q**    And, how did it come to pass that you moved into the

1    plainclothes assignment?  Was it something you wanted?

2    Somebody suggested it?

3    **A**    All of those things.  It's something I wanted.  It's

4    something that was suggested as well.  I -- being -- at that

5    point I was the beat officer at 16th and Mission.  And if

6    anyone's familiar with that area, there's a lot of street-level

7    narcotics that's dealt out there.  And it's a high-crime area.

8    And so I was very effective as beat officer, and I made a lot

9    of arrests, specifically drug arrests.

10        So it kind of seemed like a natural transition for me to

11   work into a plainclothes capacity, focusing on the same thing,

12   just minus the uniform.

13   **Q**    Was there an immediate transition, or was it a transition

14   over a period of time, from the bike unit to the plainclothes

15   unit?

16   **A**    I believe it wasn't 100 percent.  There were times that I

17   would work plainclothes, and then not.  But then it became

18   100 percent transition where I only worked plainclothes.

19   **Q**    Had you met Mr. Robles and Mr. Furminger prior to the time

20   that you began in the plainclothes unit at Mission Station?

21   **A**    I believe I had met Mr. Robles before, but I didn't know

22   him very well until I actually started working at Mission

23   Station.

24        And, I believe that's the same case for Mr. Furminger.  I

25   didn't really know him well.  I knew of him, but did not know

1  him well until I was actually working at the station.

2  Q    Did you begin working at Mission before or after

3  Mr. Robles and Mr. Furminger?  This is in -- focusing on after

4  you started in '06.  Were they -- were they there when you got

5  there?  Or did they come afterwards?

6  A    No, then, they came after.

7  Q    And so did you meet them when they started working at

8  Mission Station?

9  A    Yes.

10  Q    Did you work with them directly before you moved into the

11  plainclothes unit?

12  A    I don't believe so.

13  Q    When you first were assigned to the plainclothes unit, did

14  you have a partner?

15  A    Yes.

16  Q    Who was your first partner?

17  A    That was Mr. Robles.

18  Q    Who was Mr. Robles' partner before you?

19  A    Then, I believe it was Mr. Zachos.  Z-A-C-H-O-S.

20  Q    Was there some event that led you to replace Mr. Zachos as

21  Mr. Robles's partner?

22  A    At one point he had a medical issue that arose at the

23  station, actually, and so he was off duty for a while.  And

24  while he was off I took his place.

25  Q    The criminal conduct that you said earlier that you had

1  engaged in, did that begin before or after you joined the

2  plainclothes unit?

3  A    After.

4  Q    Did any of that conduct occur, that you described earlier,

5  while you were in the bike unit?

6  A    No.

7  Q    How, Mr. Vargas, did you come to start committing the

8  kinds of crimes that you described earlier?  What was the first

9  event in what became a pattern of criminal activity?

10  A    I don't know if I recall a specific instance of the first

11  time we stole something together.  But I just recall, um, at

12  some point being given -- money being slipped into my pocket,

13  and being told, "Hey, here you go, here's your cut."  Something

14  along those lines.

15  Q    By whom?

16  A    By Mr. Robles.

17  Q    And do you remember -- not, maybe, specifically, but

18  generally where you were when that event occurred?

19  A    I know it was in the Mission District.  And I just can't

20  recall if it was in -- in one of the SROs or something along

21  those lines, but it easily could have been.

22  Q    I want to ask just a couple of definitional things.

23  "SRO."  What is an SRO?

24  A    It is a single-resident occupancy hotel, of which there

25  are numerous in the Mission District.  Basically, those hotels

1    that rent per day, all along the 2000 and 2100 block of

2    Mission.  And there are numerous types of SROs all over the

3    city.

4    **Q**    Could you describe how, sort of in your typical SRO, the

5    rooms, bathrooms, halls, et cetera, are -- reception area, how

6    it's all set up?

7    **A**    Typically, these hotels have a big metal secure gate.  By

8    and large, they are shared-bathroom hotels, meaning there is a

9    bathroom on the hall.  The rooms do not have it.  The rooms are

10   very sparse, very small.

11        And, the specific ones that we dealt with were often very,

12   very seedy.

13   **Q**    And by "seedy," you mean --

14   **A**    There was a lot of crime rampant in those areas -- in

15   those hotels.  Drug dealing, prostitution, drug dealers, that

16   sort of thing.  We had countless calls for domestic violence,

17   any kind of violence.  They were very much problem areas.

18   **Q**    Now, as a plainclothes officer, what would occasion you to

19   be in an SRO?

20   **A**    If we weren't specifically responding to some sort of call

21   there or investigating someone that led to us the SRO,

22   typically we would go into the SROs of our own volition, and

23   just investigate them.  We would do what we call "registry

24   checks."  We would look at the registration cards, and see if

25   anything within the card stood out.

1    The requirements of those SROs is that the person checking

2    someone in, they need to get valid forms of registration.

3    Oftentimes, they don't.  Seeing those cards that didn't have

4    valid forms of registration would be a bit of a red flag to us.

5    Maybe that would be something we would investigate further.

6    **Q**    And what sort of crimes, as a plainclothes officer in the

7    Mission, were you focused on investigating during the time you

8    were there?

9    **A**    During the time we were there, we investigated all sorts

10   of crimes.  There were crimes, um, from the lowest-level

11   nuisance sort of enforcement, public drinking and public use of

12   narcotics and trafficking in narcotics, all the way up to very,

13   very serious crimes -- kidnaping, homicides -- all occurring

14   within the SROs, and just out of it.  So, the full gamut.

15   **Q**    Is there a particular kind of criminal offense that took

16   up the majority of the time of the officers in the plainclothes

17   unit?

18   **A**    Absolutely.

19   **Q**    What was that?

20   **A**    That was narcotics.

21   **Q**    There's been some testimony in the trial about the

22   plainclothes officers or plainclothes units and the narcotics

23   unit or the narcs, something like that.  Were there different

24   groups?

25   **A**    Yes.

1  Q    Can you explain to the jury what the difference between a

2  plainclothes officer and a narcotics officer was, at least at

3  the time, 2009 to 2012?

4  A    Yes.  A plainclothes police officer is assigned to a

5  specific district, and they are entailed with handling any sort

6  of kind of lower-level investigations, dealing with all the

7  crimes within that district.

8      At that time, there was a group, a division called

9  "Narcotics," with officers and sergeants and inspectors, that

10 focused purely on narcotics.  The plainclothes unit of the

11 station may be dealing with low-level and sometimes mid-level,

12 whereas the narcotics division would be working mid-level to

13 higher level.  And purely focused on that, and nothing else.

14 Q    So you began working with Mr. Robles, is it fair to say,

15 full-time, after Officer Zachos went off on his medical issue?

16 A    Yes.

17 Q    And beginning to work with Mr. Robles, did you ever hear

18 of an individual by the name of Cesar Hernandez?

19 A    Yes.

20 Q    Who was Cesar Hernandez?

21 A    Cesar Hernandez was an individual that Mr. Robles had come

22 into contact with in one of the SROs.  And he was attempting to

23 enlist him as an informant.

24 Q    And how do you know that?

25 A    Because he told me.  And so did Cesar Hernandez.

1  **Q**    When you first started working with Mr. Robles, did you

2  encounter Mr. Hernandez out on the street?

3  **A**    I either -- the first time I encountered him was either in

4  an SRO, or actually at Mission Station.

5  **Q**    And what do you remember from that the first encounter?

6  **A**    I just remember Mr. Robles telling Cesar, "You better call

7  me.  You better contact me."  And kind of, if I can demonstrate

8  holding up his hand like this (Indicating), symbolizing a phone

9  to -- to his face, saying "You better call me."

10 **Q**    Thumb and pinky up next to your face?

11 **A**    Yes.

12 **Q**    And for what purpose?

13 **A**    To enlist him as an informant.

14 **Q**    Now, what does that mean, to enlist somebody as an

15 informant?

16 **A**    There were times we came into contact with people that we

17 knew ran in certain narcotics circles, that had potential value

18 to us as an informant.  Basically, giving us information on an

19 organization they were with, or even an enemy organization.

20      Oftentimes people informed on their competition as drug

21 dealers.  It was an easy way to eliminate their competition.

22 Others, we arrested on small-level offenses and that was a way

23 for them to kind of work off that arrest, to basically provide

24 information to us, so as not to get charged or prosecuted for

25 that drug offense.

1  **Q**    Were you with Mr. Robles during his first several

2  encounters with Mr. Hernandez?

3  **A**    No.

4  **Q**    Did you hear later about those encounters?

5  **A**    Yes.

6  **Q**    When did you hear about them?

7          **MS. CAFFESE:**  Well, excuse me; objection.  And that's

8  -- objection.  Hearsay.  And also, why is this coming in?  And

9  from whom?

10          **MR. HEMANN:**  I can clarify, Your Honor.

11          **THE COURT:**  Go ahead.

12 **BY MR. HEMANN:**

13 **Q**    What did you hear from Mr. Robles about those first few --

14 first few contacts between he and Mr. Hernandez?

15 **A**    Mr. Robles and I used to have a nickname for

16 Mr. Hernandez.  We used to call him "Mr. Yuca," like the

17 Yucatan Peninsula in Mexico.

18      So he told me, "I met this little Yuca, and he should be

19 good," like maybe he had information for us.

20 **Q**    And over the course of time, did you then end up knowing

21 Mr. Hernandez, and working with him for some period of time

22 after you first heard about him from Mr. Robles?

23 **A**    Yes.

24 **Q**    And over that period of time, did you learn from

25 Mr. Hernandez about his criminal past?

1   **A**     Yes.

2   **Q**     And did you learn about those things from Mr. Hernandez in

3   Mr. Robles' presence?

4   **A**     Yes.

5   **Q**     What did you learn?

6   **A**     That, um, that he had a pretty -- pretty wild past.  And

7   that in fact he, at times in his life, was a pretty prominent

8   drug dealer in a very sophisticated and high-level

9   organization, moving huge amounts of drugs.

10  **Q**     Why did you and Mr. Robles not cause Mr. Hernandez to be

11  prosecuted for that conduct?

12        **MS. CAFFESE:**  Well, objection.  That calls for

13   speculation.  Lack of foundation.

14        **THE COURT:**  Well, it goes to the witness's state of

15   mind.

16     Go ahead.

17        **THE WITNESS:**  First of all, it was him describing his

18   past to us.  Second, as an investigator, I thought this is a

19   wealth of knowledge that we could somehow use.

20     He ran in circles that typically, as a plainclothes police

21   officer in the Mission District, we wouldn't even fathom were

22   occurring there in that area.  As I said, we dealt with a lot

23   of street-level, very, very small-level narcotics traffickers.

24   Cesar Hernandez and the individuals that he ran with were way

25   off our scale.

1  BY MR. HEMANN:

2  Q    Did you and Mr. Robles ever talk about going back and

3  investigating Mr. Hernandez for all of the things that he had

4  told you about?

5  A    No, I don't believe so, no.

6  Q    In your experience as a police officer, was it typical to

7  prosecute people for -- informants for things that they told

8  you about their pasts?

9  A    Typically, no.  Because when we entered into that sort of

10  relationship, we were trying to then move forward and trying to

11  gain some sort of usefulness from them.

12       And I don't think -- at least in my opinion and in my

13  sense, I wanted that information to come freely and fully.  And

14  if there was ever a belief that, you know, they may, in fact,

15  be prosecuted or we attempt to go back at them for things that

16  they were coming forward with, then, you know, it may hamper

17  that relationship and that rapport that we had.

18  Q    When the San Francisco Police Department or when an

19  officer opens or begins to use an informant, does the officer

20  run the rap sheet of the informant?

21  A    Yes.

22  Q    What does that mean?  What does "run the rap sheet" mean?

23  A    That is a general term for checking the criminal history

24  of the individual.  And, in terms of applying to then register

25  someone as an informant, that would be a pretty complete check

 1  of their criminal history, from local to state.  And also

 2  federal.

 3  **Q**    Do rap sheets show state prison convictions?

 4  **A**    Yes.

 5  **Q**    And did Mr. Hernandez, in fact, have a state prison

 6  conviction?

 7  **A**    Yes.

 8  **Q**    At some point in time, Mr. Vargas, did you hear from

 9  Mr. Robles about an activity or an action that took place at a

10  house at approximately the corner of 22nd and Harrison in

11  San Francisco?

12  **A**    Yes.

13          **MR. HEMANN:**  Ms. Lane, would you be so kind as to put

14   up Exhibit 267.

15          And it's Tab 1, Your Honor.

16          (Document displayed)

17  **BY MR. HEMANN:**

18  **Q**    Do you recognize this -- the house that is pictured here,

19  Mr. Vargas?

20          (Witness examines document)

21  **A**    I don't recognize it, but I've heard it described.

22  **Q**    And, from whom have you heard -- who did you hear describe

23  it?

24          **MS. CAFFESE:**  Well, objection; calls for hearsay.

25          **THE COURT:**  Overruled.

1   **BY MR. HEMANN:**

2   **Q**   Who did you hear describe it?

3   **A**   From Cesar Hernandez and Mr. Robles.

4   **Q**   What did you hear about this house from Mr. Robles?

5   **A**   That, um, they had made an arrest in the house, and he

6   also characterized the arrest.

7   **Q**   How did Mr. Robles characterize the arrest?

8   **A**   He told me it was really good.

9   **Q**   And by "really good," do you know what he meant?

10  **A**   Yes.

11  **Q**   What?

12  **A**   I took that to mean that there was a good amount of money

13  recovered from there.

14  **Q**   At some point in time, did you go to that house with

15  Mr. Robles?

16      (Witness examines document)

17  **A**   Actually, I do think I was there once, yes.  After the

18  initial arrest.  I believe so.

19  **Q**   And we will go back to that in a moment.

20          **MR. HEMANN:**  Your Honor, Exhibit --

21      (Document taken off display)

22          **MR. HEMANN:**  -- 246 is in evidence.

23      And if you could, Ms. Lane, put up Exhibit 246.

24      (Document displayed)

25          **MR. HEMANN:**  And blow up the top -- the information

```
 1    at the very top that has the date and the incident number.
 2         (Document displayed)
 3    BY MR. HEMANN:
 4    Q    Do you see that, the date of that incident, Mr. Vargas?
 5    A    Yes.
 6    Q    And that was the 19th of February.  2009.  Do you see
 7    that?
 8    A    Yes.
 9            MR. HEMANN:  And if you could scroll down just a bit,
10     Ms. Lane, and look at the name of the officer that prepared
11     this report.
12         (Document displayed)
13    BY MR. HEMANN:
14    Q    Do you see that?
15    A    Yes.
16    Q    Is there a -- there is a name, and then there's something
17    that says "STAR."  Do you see that?
18    A    Yes.
19    Q    What does that mean?
20    A    In San Francisco we are issued a police star.  Not a
21    badge.  And, that star is given a number.  And that number
22    stays with the police officer through his career.  So he --
23    there's one star number per police officer.
24    Q    Do you see the star on that first line under "Reporting
25    Officer"?
```

1   **A**    Yes.

2   **Q**    What is the star number?

3   **A**    I can make out the 1 and the 4, and then it gets a little

4   difficult to make out.

5   **Q**    Do you remember what Officer Robles' star number was?

6   **A**    I actually don't.

7           **MS. CAFFESE:**  I'll stipulate to that.

8           **THE WITNESS:**  Okay.

9           **MS. CAFFESE:**  That officer Robles' star number is 12

10   -- excuse me --

11          **THE COURT:**  I'm sorry?

12          **MS. CAFFESE:**  1467, I believe?

13          **MR. HEMANN:**  1467.

14          **THE COURT:**  Okay.

15   BY MR. HEMANN:

16   **Q**    And so, this is not a report that was written by you,

17   correct?

18   **A**    No.

19   **Q**    And, were you working, do you remember, on the 17th --

20   sorry, the 19th of February, 2009?

21   **A**    I don't believe I was.

22   **Q**    And so, did you hear about this incident, then, after you

23   came back from being off?

24   **A**    Yes.

25   **Q**    And then, now, what occasioned you to go back to the house

1   with Mr. Robles?

2   **A**     The reason was actually Cesar Hernandez.

3   **Q**     And what about Cesar Hernandez caused you to go back to

4   the house with Mr. Robles?

5   **A**     He was complaining.

6   **Q**     What was he complaining about?

7   **A**     Well, he was complaining that when the arrest was made,

8   that there were drugs and money there, but more importantly to

9   Cesar Hernandez, he specifically wanted the drug dealer's

10  jewelry.  He had really nice jewelry.

11      So he had complained to Mr. Robles in kind of colorful

12  language, you know, "You screwed up.  The jewelry was there.

13  That was worth more than, you know, the money."

14  **Q**     Over time, did Mr. Robles -- and over time following that,

15  did Mr. Robles and Mr. Hernandez complain to each other in

16  colorful language?

17  **A**     Absolutely.

18  **Q**     And, kind of, if you could characterize the relationship

19  between Mr. Robles and Mr. Hernandez, based on your

20  observations, how would you describe it?

21  **A**     We all became -- and I'm including myself in this -- we

22  became pretty close to -- to Cesar Hernandez.  At times he was

23  very frustrated with us and we were a bit frustrated with him.

24      I personally viewed Cesar Hernandez as someone with a

25  wealth of knowledge.  And he knew he had a bunch of knowledge

1   as well, especially in terms of mid-to high-level narcotics

2   targets.  His frustration with us at times was that he would

3   bring us these really great targets, but we just didn't have

4   the ability to approach an investigation of that level.  We

5   would get frustrated with him because we wanted him to provide

6   us targets but we wanted them simple.  You know, things that we

7   could -- you know, actionable, things that we would actually

8   work with.

9        I mean, it's great that you can tell us the head of the

10  cartel lives down the street, but there's nothing we can really

11  do with that unless -- we were plainclothes police officers

12  from a different station.  We weren't the superstar

13  investigators.  We didn't have, you know, tools and manpower or

14  anything like that.

15       And so --

16  **Q**    And how did Mr. Robles and Mr. Hernandez interact with

17  each other?

18  **A**    Friendly at times; a little angry at times.  They used to

19  -- you know, jokingly cuss each other out.  Sometimes a little

20  more angry, you know, frustrated at times.  It went both ways.

21  **Q**    When you began working with Mr. Robles, and for the -- for

22  the, let's say, four or five months after you started working

23  with him, was Mr. Hernandez at some point a formal signed-up

24  SFPD source?

25  **A**    Yes.

1   Q    And whose source was he?

2   A    He was signed up by Mr. Robles.

3   Q    Eventually -- and this is going to get down the road --

4   eventually did he become your source?

5   A    Yes.

6   Q    And when was that?  When, what event caused him to become

7   your source?

8   A    Mr. Robles left Mission Station to another assignment.

9   And so, he was gone.  So Cesar, in a sense, became mine at that

10  point.

11  Q    So with regard to the house that was up here at 22nd and

12  Harrison, what did you go back to the house for with

13  Mr. Robles?

14  A    The jewelry.

15  Q    And what did you do?

16  A    We went inside and looked, looked in the room that had

17  previously been searched.  And I'm assuming where the arrest

18  was originally made.

19  Q    How do you know that?  Why did you assume that?

20  A    Well, because that was the room we went directly to.

21  Q    And was there any officer there other than you and

22  Mr. Robles?

23  A    I just don't remember.

24  Q    Did you find any jewelry?

25  A    No.

 1   Q    So if this is in February of 2009, was it after this that

 2   you began committing these kind of crimes with Mr. Robles?

 3   A    Yes.

 4   Q    At some point in time, did you get a tip with regard to

 5   somebody by the name of Joseph or Zeppi Furlong?

 6   A    Yes.

 7   Q    From whom did you get this tip?

 8   A    From two individuals that came in, basically to give

 9   information on a specific drug dealer.  I don't know if their

10   full intent was ever to become informants, but specifically to

11   give information on him.

12   Q    "Him" being --

13   A    Furlong.  Zeppi or Joseph.

14   Q    Who were these two individuals?

15        (Document taken off display)

16   A    I'm not 100 percent sure.  I believe it's Jayme Walsh; I'm

17   not sure of his last name, but -- Daisy Bram.

18   Q    You're not sure of Jayme's last name for sure?

19   A    Yes, yes.

20   Q    But it was a Jayme, and then also --

21   A    Daisy.  Right.  We had a nickname for them that we used

22   commonly with them.

23   Q    And when you say "we," who are you talking about?

24   A    I'm talking about myself, Mr. Robles and Mr. Furminger.

25   Q    What was that nickname that you used for them?

1   **A**     We called them "the kids."

2   **Q**     And how often was that nickname, you know -- what period

3   of time are we talking about that you used this nickname with

4   your two colleagues?

5   **A**     We -- the full time we -- pretty much the full time we

6   dealt with them.  And including afterwards.

7   **Q**     What did you learn from them when they came in to Mission

8   Station that day?

9   **A**     Basically, they had a drug dealer, it was their own drug

10  dealer that sold them heroin.  And, they basically felt

11  offended by him because he wasn't answering their phone calls

12  timely to get them drugs.  And so, they were mad.  And they

13  were bitter.  And they wanted to give him up to the police.

14  **Q**     Where did this -- this drug dealer that they told you

15  about operate?  In the Mission?

16  **A**     No.

17  **Q**     So, let me stop you there.  The Mission, you're

18  geographically --

19         **MR. HEMANN:**  If you can put up 287, please, Ms. Lane.

20      (Document displayed)

21         **MR. HEMANN:**  I'm sorry, 289.  Apologize.

22      (Document displayed)

23  **BY MR. HEMANN:**

24  **Q**     Is this --

25         **MR. HEMANN:**  It's in.

 1          (Off-the-Record discussion between counsel)

 2          **MR. HEMANN:**  Oh, sorry, Barbara.

 3  **BY MR. HEMANN:**

 4  **Q**    Is this roughly a map of the Mission Police District?

 5  **A**    That looks very close, yes.

 6  **Q**    And, you mentioned this drug dealer operated somewhat

 7  outside the Mission District on Market Street.

 8  **A**    Yes.

 9  **Q**    Okay.  Was it the practice of the Mission District

10  plainclothes unit to operate outside of the Mission District,

11  itself?

12          I guess what I'm asking is --

13  **A**    Right.

14  **Q**    -- if somebody walks into Mission Station, and says, "I've

15  got a drug dealer on Market Street," why don't you call the

16  Southern Station and say, "There's a drug dealer on Market

17  Street; go deal with it"?

18  **A**    We absolutely could have.  However, we were given a little

19  bit of leeway to investigate these sort of things.  Especially

20  if there was some sort of nexus within the Mission District.

21          In this instance, that would have been tougher to kind of

22  justify, but because we had the people there and we started

23  talking with them, and gained the rapport with them, I don't

24  think we felt they wanted to share that information with

25  additional officers and basically start the steps again and

 1    tell the story again.  And so --

 2        (Document taken off display)

 3    **A**    -- once it came to us, we were the people that were going

 4    to act on that information.

 5    **Q**    So these two folks, Daisy and Jayme, come in.  What is

 6    their appearance?  What is their -- what did they look like and

 7    sound like?

 8    **A**    Um, I mean -- bad to characterize, but they were typical

 9    heroin addicts.  They were very disheveled.  You know, heroin

10    is a really bad drug on their body.  They had some sores.  They

11    -- they were unwashed.  The clothes were dirty, that sort of

12    thing.  They were -- they looked in poor shape.

13    **Q**    What sort of information did they provide you about

14    Mr. Furlong?

15    **A**    They knew his name.  They had a phone number for him, for

16    which -- the same number they would use to order drugs.  They

17    said he was a pretty substantial drug dealer.

18        They knew the general area of where he delivered drugs to

19    people.  They didn't know where he lived.

20        And that was pretty much it.

21    **Q**    Did you all do some investigation of Mr. Furlong, based on

22    the information that they provided?

23    **A**    Yes.

24    **Q**    What did you do?

25    **A**    Tried to work with the name that they had, and wasn't much

1  we could do with the phone number, in and of itself, but

2  basically try -- you know, when we would get a name we would

3  start searching criminal databases, almost like a criminal

4  check of sorts, and see if we could come up with a picture, to

5  show them, to see if we were talking about the right person.

6  Q    Did you find out anything about Mr. Furlong when you

7  started looking into his name?

8  A    Yes.

9  Q    What did you find out?

10  A    That's not his name.

11  Q    When you say "That's not his name," what -- "Furlong" was

12  his name?

13  A    Yeah, I don't know if it's his legal name now, but it's

14  certainly not the name that he was born with.  And he -- in

15  searching him, we found out he had a pretty substantial

16  criminal history under a different identity, altogether.

17  Q    Did you find out anything about what potential assets

18  Mr. Furlong might have had?

19  A    At that point, I don't believe so, no.

20  Q    Okay.  At some point, did you find out that?

21  A    Later on, yes.

22  Q    What did you find out?

23  A    Well, at some point later on we arrested him, and then

24  subsequent to that we were able to locate his residence.  And

25  then we were able to find out that he owned a car and had

1    multiple bank accounts with pretty substantial money in it.

2    **Q**    So let's go back to the arrest, then.  Did you set up some

3    sort of plan to -- to encounter an arrest of Mr. Furlong?

4    **A**    Yes.

5    **Q**    What was that plan?

6    **A**    Our initial plan was to use Daisy to call him and order up

7    drugs.  And, Mr. Furlong, I believe, at that point, was on

8    probation for a prior offense, and so, we knew if we had him at

9    a location that we could arrest him, basically.

10   **Q**    And, did you go out and arrest Mr. Furlong?

11   **A**    Yes.

12   **Q**    Where was he when you arrested him?

13   **A**    He was in the Union Square area.  I believe, on Ellis

14   Street.

15   **Q**    Who went out to effectuate an arrest on Mr. Furlong?

16   **A**    Myself and Mr. Robles.

17   **Q**    Did anybody else go out with you on that occasion?

18   **A**    Yes.

19   **Q**    Who else?

20   **A**    Officers Bucy and O'Rourke were there as well.

21   **Q**    And did you arrest Mr. Furlong?

22   **A**    Yes.

23   **Q**    And when you arrested him, what did you find?

24   **A**    Um, he was, in a sense, a walking pharmacy.  He had all

25   kinds of drugs, of different varieties, of different amounts.

 1    Everything weighed out.  Broken down into little envelopes.

 2         Stuff I -- honestly, types of -- he had multiple types of

 3    heroin, as in black tar, but he also had powder heroin that I

 4    had never even seen before.  All kind of prescription pills.

 5    As well as cash and stuff.

 6    Q    And did you take -- did you seize all of this drug

 7    evidence?

 8    A    Yes.

 9    Q    And did you take Mr. Furlong into custody?

10    A    Yes.

11    Q    And after you had him in custody, do you come up with some

12    sort of plan as to what to do next, from an investigatory

13    standpoint?

14    A    Yes.

15    Q    What was that?

16    A    Our next step would be to try and locate his house.

17    Because we figured if this was -- this was the drugs he took

18    with him to do his deliveries, there must be many more times

19    more back at his residence.

20    Q    And what steps did you take to find his residence?

21    A    We did -- the most literal step was to check his criminal

22    history, and see if he -- look at DMV records or identification

23    records came to a location.  And they did.

24    Q    And what location was that?

25    A    I believe it was on Bush Street.

1   Q    Did you go look for him?

2   A    Yes.

3   Q    Or look for the apartment?

4   A    Yes.

5   Q    Did you find that that was his apartment?

6   A    We found that his -- that was his apartment, at one time.

7   But he had, in fact, moved out from there.

8   Q    Now, I'm saying -- you said "we" again.  I should clarify.

9   Who is the "we" at this point?

10  A    At that point the "we" was Mr. Robles and Mr. Furminger.

11  Q    Why was Mr. Furminger added to this group?

12  A    Mr. Furminger was our direct supervisor.  And so, he

13  supervised our unit.  And, at many times, the three of us would

14  ride together in a plainclothes capacity.

15  Q    You described earlier, you said earlier that his rank was

16  sergeant?  Is that correct?

17  A    Yes.

18  Q    So he was the supervisor of the officers in the

19  plainclothes unit at Mission Station, the line officers?

20  A    He was one of them, yes.

21  Q    Were there multiple sergeants in the plainclothes unit at

22  Mission at that time?

23  A    Mr. Furminger's shift didn't always line up exactly with

24  Mr. Robles and myself.  So sometimes there was an overlap.  So

25  he would overlap the day-shift plainclothes unit which was

1   Mr. Robles and myself, and then overlap the nighttime shift

2   which was a completely different unit of guys, so he could kind

3   of oversee both.

4       But at times he would adjust his starting time to ride

5   with us specifically.

6   Q    Did you work with -- could you give the jury some sort of

7   percentage of the time that you worked with Mr. Furminger?

8   A    There were -- there were weeks where it was 90 percent.

9   There were weeks where it was 70 or 60 percent.  It wasn't

10  100 percent all the time, but there were weeks where we rode

11  together ever single day, and there were weeks where we only

12  rode together every few days.

13  Q    And when you say "rode together," it would be the three of

14  you in a car --

15  A    The three of us in a car, in a plainclothes capacity.

16  Q    Now, there's a room in the Mission District Police Station

17  that the plainclothes unit used.  Is that correct?

18  A    We used to use one of the rooms there basically as our

19  office.

20  Q    Did that room have a name?  Was it called something?

21  A    It was called "the plainclothes office."

22  Q    And, did Mr. Furminger have duties other than plainclothes

23  duties, on occasion, at the Mission Station?

24  A    Yes.

25  Q    This is -- and the time I'm focusing on is after you and

 1  Mr. Robles partner up in 2009.

 2       So 2009, 2010 -- let's just focus on 2009 for now -- did

 3  Mr. Furminger have other duties there?

 4  **A**    Yes.

 5  **Q**    What were his other duties?

 6  **A**    Ultimately, he was still a sergeant at the station.  So,

 7  whatever functions were kind of necessary for somebody in that

 8  supervisory capacity, he had to fulfill them.  If that meant

 9  dealing with some sort of issue with another officer, signing

10  reports, being back at the station, being available -- a lot of

11  it had to do with the manpower issue.

12       If there weren't a lot of sergeants working, then he would

13  have to kind of oversee those duties.  But if there was a

14  staffing -- if there was staffing available, then he was free

15  to kind of run with us.

16  **Q**    When -- so, go back to after you arrested Mr. Furlong.

17       You, Mr. Robles, and Mr. Furminger go looking for his

18  apartment.

19  **A**    Yes.

20  **Q**    His residence.

21  **A**    Yes.

22  **Q**    You go to Bush Street.  He's not there.  Were you able to

23  figure out where he was actually living at the time of his

24  arrest?

25  **A**    Yes.

1   **Q**    How did you figure that out?

2   **A**    We honestly just started -- we figured, he used to live on

3   Bush Street.  He was dealing drugs in the Union Square area.

4   Our knowledge and, kind of, expertise led us to believe that he

5   was probably staying in some sort of residence hotel similar to

6   an SRO of a type in that Union Square area.

7        So we honestly just started walking around, hotel to

8   hotel, with his name.  And we had a photo of him.  And we just

9   started checking in at all the front desks and seeing if he was

10  staying there.

11  **Q**    When you -- did you eventually find the place?

12  **A**    Yes.

13  **Q**    And when you found the place, what did you do?

14  **A**    We went straight up to the room.

15  **Q**    And when you say "we," it's, again, you and Mr. Furminger

16  and Mr. Robles?

17  **A**    Yes.

18  **Q**    And when you went up to the room, what did you do?

19  **A**    I don't recall if we had a key or not.  But I know we

20  knocked on the door, and we did make entry into that room.

21  **Q**    And did you find people in that room?

22  **A**    Yes.

23  **Q**    What people?

24  **A**    There was a girl who was the girlfriend of Mr. Furlong.

25  And then, another acquaintance of theirs.

1  Q    What did you do with the people who were in the room?

2  A    The acquaintance, I believe we just got rid of him,

3  meaning we just told him to get lost.  And the girlfriend we

4  detained and took back to Mission Station.

5  Q    And when you say "detained," what is that?  Did you

6  handcuff her (Indicating)?

7  A    Yeah, I'm sure she was probably handcuffed at one point.

8  Q    Did you do anything with the room?

9  A    Oh, yes.

10  Q    What does "Oh, yes" mean?

11  A    We searched it in our method, and obviously tore the room

12  apart, which was pretty jam-packed and filthy already.  And so

13  we probably made it much worse.

14  Q    What was the method that you all would use to search rooms

15  in situations like this?

16  A    I don't know that we had a specific tried-and-true method.

17  We basically would kind of go to a section and start tearing

18  stuff apart.  You know, we would look inside shoes; we would

19  look inside the pockets of clothing.  We would lift up

20  mattresses, open up drawers, look under drawers, behind them.

21  You know, move furniture around.

22       You know, a lot of it for me, specifically, I searched

23  areas where I had found drugs in the past.  So if that meant

24  taking off the switch plates for the light switch because I had

25  found drugs in there in the past, sure, I would look.  And if

1  the screw looked disturbed, then maybe I'll look there.

2      If there's a rip in the mattress now I'm going to start

3  really digging around in the mattress and see if the rip meant

4  something was stuffed in there.

5  Q    Would you empty cereal boxes?

6  A    Oh, absolutely.

7  Q    And what sort of condition typically would you leave the

8  room in when you left?

9  A    Big mess.

10 Q    Do you recall if Mr. Furminger was on duty as a sergeant

11 at Mission Station that day?

12 A    Yes.

13 Q    Do you know whether that was his regular duty day or not?

14 A    That, I don't recall.

15 Q    Did he come with you on the search, though?

16 A    Yes.

17 Q    What were you looking for when you did the search?

18 A    Drugs; money; any sort of what we called indicia, kind of

19 a general term, but pay/owe sheets, anything that was -- that

20 dealt with the narcotics trafficking, kind of accounting the

21 person had.  Anything along those lines.

22     And also something that would say Mr. Furlong, in fact,

23 lived there.  Bills, anything with his name on it specific to

24 that place.

25 Q    Was it your intention -- your intention -- when you went

 1  into that room, to book everything that you took from that room

 2  into evidence?  No matter what you found.

 3  A    I believe so.  And I'm unsure 100 percent because at times

 4  if I saw something that I would want, I took it.  So I don't

 5  know if my intent, every time I entered -- you know, even

 6  specifically to Mr. Furlong's residence, if I went inside with

 7  the intent to steal something.

 8       But specifically to his place, there was something that

 9  made itself available to me, it was an opportunity thing.  And

10  so I took it.

11  Q    Before going into Mr. Furlong's place, did you and

12  Mr. Robles and Mr. Furminger discuss taking things from that

13  place for your own benefit?

14  A    I don't believe so, no.

15  Q    Did you, in fact, take things for your own benefit from

16  that place?

17  A    Yes, I did.

18  Q    Did you seize things also that were booked into evidence?

19  A    Absolutely.

20  Q    What sort of things did you seize from that place that

21  were ultimately booked into evidence?

22  A    Pretty large amount of narcotics, of multiple varieties.

23  Q    What did you take that you kept for your own benefit and

24  did not book into evidence?

25  A    I took a -- two, actually, two Apple gift cards.

1  Q    Was any cash taken by either you, Mr. Furminger, or

2  Mr. Robles that day in that residence?

3  A    I don't recall that there was.  I just don't remember.

4  Q    The gift cards that you mentioned, do you remember where

5  you found them in the room?

6  A    I believe I found them on the ground, which, you know,

7  they probably didn't start there, but during the midst of our

8  search ended up on the ground at some point.

9  Q    When you say you're talking about Apple gift cards, can

10  you describe generally what they physically look like?

11  A    It's a card, the same size as any credit card or ATM card

12  would be, except it's got the Apple symbol on it.

13  Q    Eventually, did you grab it and take it, and put it in

14  your pocket?

15  A    Yeah.

16  Q    Before you did that, did you call Apple and find out how

17  much money was on these gift cards?

18  A    Yes.

19  Q    How much did you find was on the gift cards?

20  A    One of them was, I believe, like $500.  And the second one

21  was a much smaller amount, maybe 40 or $50, something like

22  that.

23  Q    Did you communicate to either Mr. Robles or Mr. Furminger

24  that you had found these gift cards with a significant amount

25  of money on them?

1    **A**    Yes.

2    **Q**    Which one of them?

3    **A**    I told Mr. Robles later on.

4    **Q**    And you say "later on."  What do you mean, "later on"?

5    **A**    I don't think I told him immediately.  I think I told him

6    a little later on in the day.  Maybe after being back at

7    Mission Station.

8    **Q**    At some point in time, did you leave that room?

9    **A**    Yes.

10   **Q**    And did you leave with the young lady that was detained in

11   the room?

12   **A**    Yes.

13   **Q**    And where did you take her?

14   **A**    Mission Station.

15   **Q**    Who went back to Mission Station?

16   **A**    We all did.

17   **Q**    All three?

18   **A**    Yes.

19   **Q**    Did you talk to the young lady, both at the site of the

20   search, at the hotel, and then back at Mission Station?

21   **A**    Yes.

22   **Q**    Do you remember her name?

23   **A**    Kelsey I think is the first name.  I don't remember the

24   last name.

25   **Q**    When you talked to her, did you ask her about any of

1  Mr. Furlong's property?

2  **A**    Yes.

3  **Q**    What of Mr. Furlong's property did you ask her about?

4  **A**    Well, there were some very specific things.  In searching

5  Mr. Furlong's place, I don't recall us getting any kind of

6  money.  And, somebody that was selling the amount and the

7  variety of drugs that he was, there should have been a pretty

8  large amount of money to go along with that.  So it was pretty

9  remarkable that there wasn't any money there.

10       So basically we were trying to find the money.  And

11 figured that it just wouldn't be at that location; it'd be

12 somewhere else.  And so he had -- we knew he had a car

13 registered to him.  And so we thought maybe he was hiding it in

14 the car.

15       I know we found bank receipts of his that had substantial

16 amounts of money inside of it, and, I believe, safety deposit

17 keys.  So we were trying to find out where he was doing

18 business, which banks.

19 **Q**    And did you ask Kelsey questions to try to figure out

20 where the money was?

21 **A**    Absolutely.

22 **Q**    Did Ms. -- did Kelsey tell you where the money was?

23 **A**    No.

24 **Q**    At some point in time did you let her go?

25 **A**    Yes.

1  Q    Release her from Mission Station?

2  A    Yes.

3  Q    Did you keep in contact with Kelsey, you, personally,

4  after the day that she was arrested?

5  A    Yes.

6  Q    And why did you do that?

7  A    Because we were still looking for the money.

8  Q    How many times did you see her after that day?

9  A    Maybe a couple of times more.

10 Q    And in what kind of setting did you see her?

11 A    Probably in one of the little restaurants across the

12 street from the station.

13 Q    Did you, Mr. Vargas, have a -- a sexual or romantic

14 interest in Kelsey?

15 A    No.

16 Q    And why was it that you -- did you feed her?  Did you give

17 her food?

18 A    Absolutely.

19 Q    Why did you do that?

20 A    Um, she was the girlfriend of a drug dealer, who was also

21 addicted to drugs.  And we had removed her source of support.

22 Her sole source of support.

23      And so essentially she had -- didn't have any money,

24 couldn't feed herself.  And, was now out of drugs, or out of

25 the supply of drugs.  And so, she was kind of desperate.  And

1   so I felt sorry for her, and bought her lunch.

2   **Q**   That sounds very altruistic.  Was your motive entirely

3   altruistic?

4   **A**   No.

5   **Q**   What was the rest of your motive, if you will?

6   **A**   Still looking for her boyfriend's money.

7   **Q**   Let's go back to the Apple gift card.  With regard to the

8   Apple gift card, did you do something with it?

9   **A**   Yes.

10  **Q**   Did you -- did that something involve either Mr. Furminger

11  or Mr. Robles?

12  **A**   Yes.

13  **Q**   Who did it involve?

14  **A**   Mr. Robles.

15  **Q**   What did you do, what did you and Mr. Robles do with the

16  Apple gift cards?

17  **A**   We went down to the Apple Store on Stockton and Market and

18  made purchases.

19  **Q**   What did you purchase?

20  **A**   I, myself, purchased an iPhone.

21  **Q**   And did Mr. Robles purchase something?

22  **A**   Yes.

23  **Q**   What did Mr. Robles purchase?

24  **A**   An iPod Nano.

25  **Q**   What were the relative values of these two items, roughly?

1  **A**    The two items together were over the amount of the gift

2  cards because I, in fact, made up the difference for my phone

3  with my personal ATM card.

4  **Q**    So if the total was say, $550, what percentage of that was

5  your phone and what percentage was Mr. Robles's Nano?

6  **A**    Oh, I'm sure, the Nano was probably -- I don't recall what

7  -- maybe $150, but I know my phone was much more, so I know I

8  had to make up the difference with my own personal money, for

9  the purchase of the phone.

10  **Q**    And why did Mr. Robles get the less -- the lesser-valued

11  item in that little transaction?

12        **MS. CAFFESE:**  Objection; speculation.

13  **BY MR. HEMANN:**

14  **Q**    Do you know why Mr. Robles got the lesser-valued item in

15  that transaction?

16  **A**    Because I got the more expensive one.

17  **Q**    But why did you get the more expensive one, and he get the

18  cheaper one?

19  **A**    Um, because I found it.  I don't know that there was an

20  exact reason.  I wanted the phone, so I think I was a little

21  more demonstrative in picking up that purchase, and he was kind

22  of only dealing with the remaining amounts.

23  **Q**    When you left the Apple Store that day, did you take the

24  iPhone with you?

25  **A**    Yes.

PROCEEDINGS

1  Q    And did you register that iPhone in your own name?

2  A    I think it probably did it there, right at the store.

3  Q    Did Mr. Robles take the Nano with him?

4  A    Yes.

5  Q    Did he tell you what he intended to do with it?

6  A    No.

7  Q    Do you know somebody, Mr. Vargas, by the name of

8  Bernadette Melvin?

9  A    Yes.

10  Q    Who is Bernadette Melvin?

11  A    She owns a cafe within the Mission District.

12  Q    How do you know her?

13  A    I met her through Mr. Robles.

14  Q    And did Mr. Robles tell you what sort of relationship he

15  had with Ms. Melvin?

16  A    Yes.

17  Q    What sort of relationship did he have with Ms. Melvin?

18  A    It was a romantic relationship.

19  Q    And do you know where she lived at the time that you were

20  at the Mission Station?

21  A    Yes.

22  Q    Where did she live?

23  A    She lived on a street directly behind the station.

24         MR. HEMANN:  Your Honor, we can either stop now or I

25  could probably -- now might be a good time.

PROCEEDINGS

1          **THE COURT:**  Okay.  Ladies and gentlemen, we are going

2    to take our recess.  We will return at 9:00 tomorrow.

3          Remember the admonition given to you:  Don't discuss the

4    case, allow anyone to discuss it with you, form or express any

5    opinion.  I will see you at 9:00 a.m.

6          (Jury excused)

7          (The following proceedings were held outside of the

8    presence of the Jury)

9          **THE COURT:**  Okay, let the Record reflect all jurors

10   have retired.

11         And you can step down, Mr. Vargas.

12         (Witness excused from the witness stand)

13         **THE COURT:**  So, the government has raised an issue

14   with respect to what would be appropriate for

15   cross-examination of the witnesses, in a submission.  And I

16   would like to hear some argument on that tomorrow morning at

17   8:30.

18         That probably gives us enough time.  We could do 8:15.

19         **MR. HEMANN:**  8:30 would probably be a sufficient --

20         **THE COURT:**  I think.

21         **MR. HEMANN:**  -- amount of time.

22         **THE COURT:**  Have you been served with a copy of --

23         **MR. GETZ:**  Yes, I did.  And, my thought -- maybe the

24   Court will consider it between now and tomorrow.  I would like

25   that motion -- I would like the Court to rule at the end of

```
 1   direct.
 2           MS. CAFFESE:  I would join in that motion, Judge.  I
 3   did write a brief --
 4           THE COURT:  At the end of direct.
 5           MR. GETZ:  At the end of direct.  At the end of
 6   direct, the Court will know whether or not it's admissible or
 7   not.
 8           THE COURT:  Well, I don't -- I'm a little confused.
 9   I don't know that the -- I may know more at the end of direct,
10   but I don't know that I would know -- I mean, basically, the
11   two areas that were -- that have been identified by the
12   government are impeachment by, quote, bad acts.
13      So, I don't know that -- I don't know why I would learn
14   more about that -- I -- I would be surprised if the
15   government's going to -- maybe the government's going to
16   inquire into it.  I don't know.  They're entitled to.
17           MR. HEMANN:  I think that Your Honor's raised my
18   point --
19           THE COURT:  Yeah.
20           MR. HEMANN:  -- which is:  If it's coming out, I'm
21   going to ask him about it.
22      If -- I think that there's things that I would not -- I
23   was careful, obviously, not to mention that he was fired in
24   2012, because I think it is not admissible.  I think that if
25   the Court rules that it is admissible, I'm going to ask him if
```

PROCEEDINGS

1    he was fired in 2012.

2         **THE COURT:**  Well, if we can sort of set the

3    parameters.  The government takes the position that it is

4    appropriate to ask some question about both incidences.

5         As to the 2002 -- is that right -- incident, it is

6    appropriate to ask the witness whether or not he has lied or

7    given a false statement concerning his police activities, to

8    the -- is it the OCC, Office of Citizen Complaints?

9         **MR. HEMANN:**  That is his recollection, is that he

10   made a false statement to the OCC investigator.

11        **THE COURT:**  Okay, so the government takes the

12   position that that would be an appropriate cross-examination

13   because it -- it goes to the witness's truthfulness, the

14   truthfulness.  Okay.

15       (Off-the-Record discussion between counsel)

16        **THE COURT:**  But that no other inquiries should be

17   made, to wit, that it involved the drug dealer, it involved

18   excessive force, I guess that's what it was.

19        **MR. HEMANN:**  Really that's the heart of it,

20   Your Honor.

21        **THE COURT:**  Okay.  But that since he -- I guess, did

22   he concede that he lied about it?  Or was it --

23        **MR. HEMANN:**  He will concede.

24        **THE COURT:**  He will concede that he lied about it.

25        **MR. HEMANN:**  That he lied.

PROCEEDINGS

```
1            THE COURT:  Okay, so that's -- that is -- you know,

2    that's not the issue.  The issue is, I guess, whether anything

3    else could be asked about it.

4        The second issue relates to time sheets, is that right?

5    Or -- I don't know what they're called.  But anyway --

6            MR. HEMANN:  That's one of the issues.

7            THE COURT:  Anyway, information concerning his

8    activities with respect to -- concerning his activities which

9    he furnished to the police department.

10           MR. HEMANN:  To get paid.

11           THE COURT:  In relation to his pay.

12           MR. HEMANN:  (Inaudible)

13           THE COURT:  And he is again -- I am not quite sure

14   whether he takes the position or the government takes the

15   position that these statements were false.

16           MR. HEMANN:  Well --

17           THE COURT:  Or whether -- or not.

18           MR. HEMANN:  The government takes no position on it.

19   The testimony will be -- from him -- will be that he submitted

20   them.  He believed that they were properly submitted at the

21   time.  And that he later learned that they were not correctly

22   filled out.  That he did not intend to receive pay to which he

23   was not entitled.

24       The reason that I think this is such a complicated issue

25   is, as the Court will see if it spends this evening reading
```

1   the SFPD audit of this issue, there was an enormous widespread

2   problem at SFPD that is the subject of the audit.  Other

3   police officers were doing things the same or very similar to

4   what Mister -- Mr. Vargas was apparently doing.

5       And, I think that it will create -- I mean, I know from my

6   conversations with him that it will create a very long, very

7   complicated, very irrelevant discussion over something that

8   was apparently a significant problem during a period of time.

9           THE COURT:  Well, I guess what -- okay.  I'm not sure

10  where we are on that, you know, but I will be -- certainly I

11  can hear argument about it tomorrow at 8:30.

12      I see no reason to wait until the end of the examination.

13  I think that the government is entitled to bring it out.  If I

14  ruled it admissible, the government would be entitled to bring

15  it out, as they are entitled to bring out a conviction on

16  direct examination of a witness.

17      So, I'd like to rule on it.  With respect to your request

18  that I wait until the end, that is denied.  I'll do it 8:30 --

19  which you (Indicating) join in.

20      I'll do it at 8:30.  And you see what the government's

21  position is, and I would like to hear what your position is,

22  since you haven't had an opportunity to address it.

23      Yes.

24          MS. CAFFESE:  Thank you.  My position.

25          THE COURT:  Well, you don't have to tell me now.

1292

```
 1            MS. CAFFESE:  No, I was going -- may I suggest this,
 2    Your Honor?
 3       I had filed a motion which I believe -- I would appreciate
 4    if the Court would read in tandem --
 5            THE COURT:  Sure.
 6            MS. CAFFESE:  -- with the government's, because --
 7            THE COURT:  I'm sorry; when did you file it?
 8            MR. HEMANN:  A week before trial, maybe?
 9            MS. CAFFESE:  Yes.
10            THE COURT:  Do you have the docket number on it, and
11    I can dig it out?  It will be right at the top.  Or maybe the
12    government has the docket number.
13            MR. HEMANN:  Oh, I don't.  I'm sorry, Your Honor.
14            THE COURT:  Okay.  You know, I'm delighted to look at
15    any motion, but I think the party should tell me which motion
16    they want me to look at.
17            MS. CAFFESE:  Unfortunately, I don't have --
18            THE COURT:  Well, I'm not reading 5,000 papers.  If
19    you have one that you want me to read, I'll be glad to.
20            MR. HEMANN:  Looks like it's 120 --
21            THE COURT:  If you show it to Ms. Caffese --
22            MR. HEMANN:  123, Your Honor.
23            MS. CAFFESE:  Okay.
24            THE COURT:  Is that it, Ms. Caffese?  Is that your
25    motion?
```

1          **MS. CAFFESE:**  Yes, thank you.

2          **MR. VILLAZOR:**  Docket 123, Your Honor.

3          **THE COURT:**  Docket 123.  Okay.  I'll look at that

4    tonight.

5          **MR. HEMANN:**  And really, to put a slightly finer

6    point on it, Your Honor, in terms of what Mr. Vargas is going

7    to say, is that -- that Ms. Caffese describes this as -- as

8    fraudulent court compensation cards.  And the real question is

9    whether they were fraudulent, i.e., did he have a fraudulent

10   intent.

11      I don't think he's going to argue that they were right --

12   they're wrong.  They weren't wrong.  They were wrong.

13         **THE COURT:**  Well, you know, I mean, I'm just sitting

14   back here thinking the guy has admitted taking -- stealing

15   money, stealing narcotics, I guess writing false police

16   reports, though I haven't heard that part yet.  You know,

17   doing many, many things that are dishonest.

18      And so at some point, to say "Aha, but didn't you also

19   submit false statements..."

20         **MR. HEMANN:**  That is precisely my point, Your Honor.

21         **THE COURT:**  Cumulative.

22         **MR. HEMANN:**  What's going to happen is he's going --

23   "Did you submit false..." and he's going to say, "No, I

24   didn't."  And then we're going to have 45 minutes on --

25         **THE COURT:**  No, we're not going to have 45 minutes.

```
 1    That I guarantee you.

 2              MS. CAFFESE:  May --

 3              THE COURT:  The question is:  It either comes in or

 4    doesn't come in.

 5         Yes.

 6              MS. CAFFESE:  May I say something, really briefly?

 7              THE COURT:  Yes.

 8              MS. CAFFESE:  And this is an important distinction to

 9    make.

10         One of the witnesses in my case is Officer Candace Hilder.

11    And she would contradict any suggestion by this witness that

12    it was a mistake.

13         And the point that I wanted to make, Your Honor --

14              THE COURT:  Let me just address that for a minute,

15    because 608 is very clear.  It says no extrinsic evidence can

16    be introduced with respect to the fraud, or the crime, or the

17    false statement.

18         So your suggestion to me that you have some other witness

19    who would come in and corroborate your version and impeach the

20    witness's version is, to me, the red flag of its

21    inadmissibility.  Because that -- I can tell you all the

22    things that can happen.  That's not one of them.

23              MS. CAFFESE:  Can I -- may I just make my second

24    point, Judge?

25              THE COURT:  Yeah, go ahead.
```

1     **MS. CAFFESE:**  Is that:  This is exactly consistent

2  with what Vargas does, is the government is saying his crimes

3  all were committed when he was partnered with Officer Robles.

4     My point is, is that this man has engaged in criminal

5  conduct long before he ever became partnered with Officer

6  Robles.  And in fact, what he did in defending himself at his

7  trial, administrative trial, was exactly what he's doing in

8  this trial.  He pointed fingers, he pointed fingers, at other

9  people.

10     And that is what Candy Hilder will testify to, Judge.

11     **THE COURT:**  Okay.

12     **MS. CAFFESE:**  But my point is that it has lots of

13  relevance to --

14     **THE COURT:**  Well, let me tell you -- well, ah, let's

15  not confuse relevance to other requirements with respect to

16  the evidence.

17     In other words, you have to deal with 608.  It is coming

18  under 608, not 609; it is coming in under 608.  And 608 is

19  very clear as to what can come in and what can't come in.

20     So, you know, if -- maybe there's some other theory that

21  he always blames somebody else; I don't know.  I mean, I

22  didn't get a sense that he represented himself as --

23  necessarily as an honest cop; that somehow Mr. Robles turned

24  him into a dishonest cop.

25     I don't know.  But, that's -- you know, my impression and

```
 1   the jury's impression may be two very different things.  And
 2   maybe the intention of the U.S. Attorney is very different.
 3       Anyway, I have to analyze this.  I'll certainly look at
 4   your memo.  And I'll certainly have argument tomorrow morning
 5   at 8:30.  That's why I want to give you the opportunity.
 6           MR. HEMANN:  And the -- the -- we have attached to
 7   our memo, Your Honor --
 8           THE COURT:  I know; I saw that.
 9           MR. HEMANN:  The --
10           THE COURT:  I saw that.
11           MR. HEMANN:  Really, I think the point that
12   Mr. Vargas was making was that this didn't happen to other
13   police officers who engaged in the same --
14           THE COURT:  I'm not trying the whole department.  I
15   don't know how big this investigation was.  I don't know
16   whether other cops are accused of it.
17       And, you know, my task here is to make sure that the
18   Defendants who are here receive a fair trial under the rules
19   of evidence.  But, not to try the San Francisco Police
20   Department for false billings.  And I really don't want to get
21   into that issue.
22       And by the way, 608 is designed to keep that out.  That is
23   exactly what 608 has been written to do, which is to exclude
24   extrinsic evidence of false statements or other type of
25   conduct, to show the bad acts of a particular witness.  That's
```

1    the design of it.  That's why it's there.

2        Okay.  Anyway, let's not have the argument now.  Let's try

3    to have it tomorrow at 8:30.  Okay?

4            **MS. CAFFESE:**  Thank you, Your Honor.

5            **THE COURT:**  Thanks, everybody.

6            **MR. HEMANN:**  Thank you, Your Honor.

7            **THE COURT:**  Okay.

8        (Proceedings concluded)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **INDEX**

2

**PLAINTIFF'S WITNESSES**                  **PAGE**   **VOL.**

3

4  **SICORD, WILLIAM**
   (SWORN)                               1014    6
   Direct Examination by Mr. Villazor    1014    6

5  Cross Examination by Mr. Getz         1026    6
   Cross Examination by Ms. Caffese      1038    6

6  Redirect Examination by Mr. Villazor  1053    6

7  **RAHIMI, SHAYAN**
   (SWORN)                               1056    6

8  Direct Examination by Mr. Villazor    1056    6
   Cross Examination by Ms. Caffese      1062    6

9

10 **SANCHEZ, SERGIO**
   (SWORN)                               1080    6
   Direct Examination by Mr. Villazor    1081    6

11 Cross Examination by Mr. Getz         1167    6
   Cross Examination by Ms. Caffese      1190    6

12 Redirect Examination by Mr. Villazor  1206    6

13 **RAMIREZ PALAFOX, IGNACIO**
   (SWORN)                               1208    6

14 Direct Examination by Mr. Hemann      1208    6
   Cross Examination by Mr. Getz         1213    6

15

16 **KWAK, KENNETH**
   (SWORN)                               1215    6
   Direct Examination by Mr. Villazor    1216    6

17 Cross Examination by Ms. Caffese      1223    6
   Redirect Examination by Mr. Villazor  1234    6

18 Recross Examination by Ms. Caffese    1235    6

19 **VARGAS, REYNALDO**
   (SWORN)                               1238    6

20 Direct Examination by Mr. Hemann      1239    6

21

22

23

24

25

Belle Ball and Katherine Sullivan
Official Reporters – U.S. District Court
(415) 373-2529

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 70 | | | 1096 | 6 |
| 290 | | | 1057 | 6 |
| 291 | | | 1057 | 6 |
| 292 | | | 1057 | 6 |
| 296 | 1157 | 6 | 1129 | 6 |
| 348 | 1198 | 6 | 1199 | 6 |
| 349 | 1227 | 6 | | |
| 401 | 1190 | 6 | 1187 | 6 |

## CERTIFICATE OF REPORTERS

I, BELLE BALL, and I, KATHERINE SULLIVAN, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball_____

Monday, November 17, 2014

Belle Ball, CSR 8785, CRR, RDR

/s/  Katherine Sullivan _____

Monday, November 17, 2014

Katherine Sullivan, CSR 5812, CRR, RMR