```
                                          Volume 7

                                    Pages 1300 - 1568

                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

           BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
   vs.                             )  NO. CR 14-102-CRB
                                   )
IAN FURMINGER and EDMOND ROBLES,   )
                                   )  San Francisco, California
            Defendants.            )  Tuesday
                                   )  November 18, 2014
_____)  8:34 a.m.

                     TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          MELINDA HAAG
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                   BY:  JOHN HENRY HEMANN
                        RODNEY C. VILLAZOR
                        Assistant United States Attorneys


For Defendant Ian Furminger:
                        LAW OFFICES OF BRIAN H. GETZ
                        201 California Street
                        Suite 450
                        San Francisco, California  94111
                   BY:  BRIAN H. GETZ, ESQ.
                        JOHN PAUL PASSAGLIA, ESQ.


Reported by:            BELLE BALL, CSR 8785, CRR, RDR
                        KATHERINE SULLIVAN, CSR 5812, CRR, RMR
                        Official Reporters, U.S. District Court

(Appearances continued, next page)
```

**APPEARANCES, CONTINUED:**

**For Defendant Edmond Robles:**
                            **LAW OFFICES OF TERESA CAFFESE**
                            **1000 Brannan Street**
                            **Suite 400**
                            **San Francisco, California  94103**
                  **BY:**  **TERESA CAFFESE, ESQ.**
                            **HEATHER KELLY, ESQ.**


**Also Present:**
                            **Defendant Ian Furminger**
                            **Defendant Edmond Robles**
                            **Special Agent Melissa Patrick**
                            **Special Agent Sandra Flores**
                            **Dalida Vartanian**
                            **Stephen Janick**
                            **Alycee Lane**
                            **Tony Brass, Esq.**

1  **NOVEMBER 18, 2014**                                      **8:34 A.M.**

2                        **P R O C E E D I N G S**

3      (The following proceedings were held in open court,

4  outside the presence of the jury:)

5          **THE COURT:**  Good morning, everybody.

6      Let the record reflect the parties are present, the jury

7  is not.  Thank you very much for being here promptly.

8      So there are two issues, perhaps some unrelated issues as

9  well, but two principal avenues of inquiry that the parties

10  have agreed would be -- or it appears that the parties would

11  bring up, that the defense would certainly bring it up, and if

12  the defense is going to bring it up, the government wants the

13  opportunity to inquire into it.

14      So let me -- let me say it again, as I said it last night,

15  what I understand it would be.  I understand as to issue number

16  one that, if asked, the witness would admit that he lied to a

17  police investigative agency on the details of an arrest in

18  which the issue was whether he used excessive force in

19  connection with the arrest.  That's issue number one.

20          **MR. HEMANN:**  Correct.

21          **THE COURT:**  Okay.  The government wishes to -- if that

22  evidence comes in -- and I believe it does -- the government

23  wants the opportunity to inquire into it on direct as they

24  would with a felony conviction as an example of a witness that

25  they call.  And that's as to issue number one.

```
 1       As to issue number two, there is evidence that the witness
 2  on, I guess, multiple occasions submitted false time sheets.
 3  Are they time sheets or claims or --
 4            MR. HEMANN:  They are --
 5            MS. CAFFESE:  Cards.
 6            MR. HEMANN:  They're court time compensation cards --
 7            THE COURT:  Court --
 8            MR. HEMANN:  -- is how --
 9            THE COURT:  So it's -- well, they are time sheets.
10            MR. HEMANN:  They're time sheets, basically.  That's a
11  fair way to say it.
12            THE COURT:  They are a form of time sheets.
13            MR. HEMANN:  Yes, they are, Your Honor.
14            THE COURT:  Okay.  Time sheets -- we can find out what
15  the words are -- which he will -- the accusation is that on
16  numerous occasions over some period of time he submitted false
17  time sheets.  And he, if asked the question, would deny it, or
18  I don't know what he would do.
19       But the first question is:  Can that be inquired into?
20  And the answer, in my view, is, yes, it can be inquired into.
21       Now, when I say "inquired into," I want to be very careful
22  about the -- the degree to which it can be inquired into; that
23  is to say, there are certain things that I think can be
24  inquired into as it relates to that subject and certain things
25  that cannot.
```

1        An example of what cannot be inquired into is any

2   adjudication of either of those two incidences; that is, that

3   an OCC officer or a police commission or some adjudicative body

4   made a determination that, in fact, it's true he used excessive

5   force or, in fact, it's true he lied about the arrest, or, yes,

6   it's true he submitted false documentation.  None of that can

7   be -- is admissible.  That's number one.

8        Number two, in the Court's view, under 608, none of the --

9   and after reviewing document number 123, which is submitted on

10  Mr. Robles' behalf, none of that evidence, which is extrinsic

11  evidence, is admissible.

12       That is to say the time cards, a witness as to either of

13  the incidences or the incident, number one, or the false

14  claims, number two, can be inquired into -- can be elicited.

15       So I think -- I think that the testimony would be

16  something like this.  And I think I'd like to try to have, now,

17  a discussion about it.

18       I think that the defense and, in my view, the prosecution

19  may elicit from Vargas that he lied to an OCC investigator in

20  connection with an arrest that involved the use of excessive

21  force.  That's number one.

22       I think that the defense and, indeed, the prosecution may

23  ask the witness whether he submitted false time cards in

24  connection with his duties as a police officer.

25       I think the defense and, again, the prosecution may ask

1  how many false time cards Vargas submitted and over what period

2  of time, covering what period of time.

3       So that's what I think is admissible in evidence.  What I

4  think is not admissible are all the other things that I

5  mentioned.  Okay.

6       So I can hear from the parties if you need a clarification

7  or if you want to argue it further.  I have to tell you I have

8  read what you submitted in this regard, so -- and I took a look

9  at Ninth Circuit law.  Not a lot on all of this, but I think

10  this complies with 608.

11       **MR. HEMANN:**  The clarification I would request, Your

12  Honor, is that I believe that what officer -- Mr. Vargas will

13  say in response to the question about the time cards is, "I did

14  not believe they were false, I came to learn that they were

15  incorrect," or something like that.

16       **THE COURT:**  He can say whatever he chooses to say.  In

17  other words -- and that's what -- whatever his answer is, is

18  his answer.  And I don't believe that extrinsic evidence can be

19  introduced to contradict that answer.

20       **MR. HEMANN:**  And the clarification, just to play it

21  out, is what we would object to is a follow-up question that

22  said, "Isn't it true that you were fired by the San Francisco

23  Police Department for submitting the 20 false time cards?"

24       **THE COURT:**  And that can't be inquired into.  That's

25  an adjudication by an administrative body or by a -- yeah, an

1  administrative body, finding that the evidence of dishonesty

2  justified a particular administrative action.  It's an

3  adjudication.

4      So unless you have a case which says it can -- because the

5  way I look at it you can't.  And the law I've seen says you

6  can't.  Whether you think that's fair or not, I mean, I

7  understand.  But I don't write the rules of evidence.

8      I understand your feelings in the matter.  But feelings

9  aren't going to -- feelings don't run -- you know, the Evidence

10  Code may be a bit like the IRS code.  It's sort of a way -- you

11  know, it's a time-tested way of admitting evidence and

12  excluding other evidence.

13      So is there any -- do you have any questions about this?

14      Is it clear, Ms. --

15          **MS. CAFFESE:**  May I, Your Honor?

16          **THE COURT:**  Ms. Caffese, go right ahead.

17          **MS. CAFFESE:**  Judge, I think there are two issues

18  here.  I understand the Court's ruling concerning the

19  adjudication and I understand the Court's ruling of the

20  prohibition against extrinsic evidence.  I get that.

21      The problem that we have here, though, is Mr. Vargas

22  claims in his direct examination that the misconduct, to

23  paraphrase -- to paraphrase, so to speak, that his life of

24  crime committed when he went to plainclothes and started

25  working with Officer Robles.

```
 1        My concern is that that is misleading to the jury because
 2   our argument is that Vargas --
 3           THE COURT:  Well, maybe I can cut through this,
 4   because I was -- I was persuaded by your argument.  In other
 5   words, it was sort of the reverse of a "Come to Jesus" moment.
 6   It was sort of a "Come to Satan" moment that, you know, he was
 7   fine until he met your client and then, suddenly, he was drawn
 8   down the path of sin.
 9        And I think that's why I'm saying to you that the time
10   period -- I have no idea what these false time sheets are.  Do
11   they pre- --
12           MS. CAFFESE:  Yes.
13           THE COURT:  -- they predate --
14           MS. CAFFESE:  Yes.
15           THE COURT:  Oh, then you can certainly say, "Isn't it
16   true that you submitted these time requests, which were
17   erroneous" -- in your view false; but in his view erroneous --
18   "even before you met Mr. Robles?"  Didn't it occur in 2004,
19   whatever year it did, 2006?
20        Isn't that big report -- doesn't that document --
21           MS. CAFFESE:  Yes, it does.
22           MR. HEMANN:  The conclusion that I draw from the
23   report is that lots of officers were doing it starting in --
24   the audit period was '07 to '09.  I have to ask Officer Vargas
25   exactly when he did it.  I think he'll say he probably did it
```

1   during that period of time as well, even though he didn't go to

2   court very often.

3        **THE COURT:**  Well, anyway, you can certainly establish

4   the time period, okay, which I think in part addresses your

5   concern about his -- when he embarked upon this conduct which

6   you believe to be fraudulent conduct.

7        **MS. CAFFESE:**  If I could --

8        **THE COURT:**  Go ahead, Ms. Caffese.

9        **MR. HEMANN:**  Sorry.

10       **THE COURT:**  Yeah.

11       **MS. CAFFESE:**  If I can add something -- and I think

12  this needs to be part of the record -- is that Mr. Vargas

13  claims this was a department problem, widespread.  But the

14  facts are to the contrary.

15       And in my investigation and my speaking with the P.O.A.,

16  speaking with Mr. Chignell, was that, in fact, none of the

17  other officers had these issues.  And that's why I put Hilder

18  on the witness list, because what he is claiming is a lie.

19       He went through a due process hearing where he claimed

20  that -- that was his defense -- everybody else was doing that.

21  And that was proven to be false, that, in fact, other people

22  weren't doing it.

23       He actually was not --

24       **THE COURT:**  I don't know.  It may be a different

25  situation.  I have to try to figure this out.  If he starts to

1  say things like everybody was doing it -- wait a minute, I'm

2  just telling you.  This is like let me give you a heads-up.

3          MR. HEMANN:  Right.

4          THE COURT:  So I take it that if he starts going into

5  it, then it may be a totally different story as to what I allow

6  in in cross and so forth.

7      But if he starts defending it and saying I did it because

8  Jones did it and everybody in the department did it and so

9  forth and so on, that broadens the scope of inquiry.  Okay?

10         MS. CAFFESE:  Fair enough.

11         THE COURT:  But you can't say, Well, wasn't it your

12  defense that everybody did it?  And then he says, Yes.  And now

13  you say, Now the door is open.  You can't do it that way.  It

14  has to come from him.

15     In other words, if he's going to come up and defend the

16  conduct, then he opens the door.  If you ask him to defend the

17  conduct, you've opened the door.

18     So you know-- are you not understanding what I'm saying?

19  You look puzzled.

20         MS. CAFFESE:  I'm --

21         THE COURT:  It's a question of opening the door.  It's

22  who's opening the door.  Are you opening it by way of your

23  questions or is he opening it by way of his responses?

24     And that's clear.  We do this with witnesses all the time.

25  You should caution the witness.  The government should caution

1   the witness about what he's going to say, because if he's going

2   to offer a defense to these on unsolicited -- unsolicited, let

3   me emphasize that -- he opens the door.

4        If it's solicited, the question is:  Who solicits it?

5   Does the government or does the defense?  And one or the other

6   will be charged with opening the door.

7        And if you open the door -- the defense cannot open the

8   door.  The witness could open the door.  Or the government can

9   open the door if they want to.

10          MR. HEMANN:  The government is going to stay very far

11   away from the door, Your Honor.

12          MS. CAFFESE:  The second point I just want to make is

13   that, aside from the issue of impeachment is the defense theory

14   in this case, is that before Officer Robles became Vargas's

15   partner, Vargas, himself, was participating in his own

16   misconduct which dates back to 2002, which dates back to the

17   incidence with -- with others.  And it also postdates his

18   working with Robles.

19          THE COURT:  Postdates?

20          MS. CAFFESE:  Right.  Because some of this is

21   misconduct that -- and I believe it's going to come out on

22   direct examination -- is that Vargas was acting alone, when

23   Mr. Robles wasn't even present.

24        And I think that the evidence shows, and will show, that

25   just like what he did back in defending himself with the time

1   sheets, is that everybody else was doing that when, in fact, he

2   was doing it on his own.  And he blames other people,

3   essentially, to claim leniency for himself.

4         **MR. HEMANN:**  If I may, Your Honor, just two points in

5   response to that.

6         Number one, it's not the same conduct.  This case is not

7   about Officer Robles submitting false time cards.  If it were,

8   then perhaps we would be having this discussion in a more -- in

9   a way more consistent with the -- the position would be more

10  consistent with the rules of evidence.

11        It is not -- hey, we're not taking the position he's an

12  honest person.  We're taking the position he's a dishonest

13  person who did dishonest things.  And if his testimony here is

14  to be believed, fine.

15        But we're not taking the position that he never did

16  anything wrong before.  That goes for the time cards.  That

17  goes for the use of force.  He should not have punched a guy in

18  the face with a meth pipe.  I don't think so.  Nobody thinks

19  so.  I presume he doesn't even think so at this point.

20        But that doesn't have anything to do with the conduct that

21  started after he became a plainclothes police officer.

22  Obviously, he was predisposed to it because he popped into it

23  right away, which is our theory of the case.  So that's number

24  one.

25        Number two, in terms of the door being opened, an attorney

1  retained by the Police Officers Association defended Mr. Vargas

2  at this due process hearing that Mr. Vargas didn't even attend.

3     The P.O.A. took the position, through the attorney it

4  hired and authorized to take the position, that Mr. Vargas

5  should not be fired.

6     So this -- this whole -- if the door gets opened, it gets

7  opened to a holy mess of conflicting interpretation --

8          **THE COURT:**  It's not going to be opened.

9          **MR. HEMANN:**  So --

10         **THE COURT:**  I mean, I'm not going to let it.

11     Look, I have so much control, but other things I don't

12  control.  I can't predict.  That's why we're having this

13  discussion now, because you guys are very good and you'll

14  follow what the ruling of the Court is.

15     And I hope I've been as clear as I can be.  I hope I've

16  been clear.  I don't know that I've been as clear as I can be,

17  but I hope I've been clear.

18     And, you know, I was sympathetic to Ms. Caffese's argument

19  about the timing because I think that is of some significance

20  because it puts her client in a particularly unfavorable light

21  to suggest that he was the one who, quote, corrupted Officer

22  Vargas.  And that makes it -- that makes it -- that makes it

23  appear that Mr. Robles is more culpable.

24     On the other hand, I would be surprised, given everything

25  I'm learning about the case, that the government would argue it

1    that way.  It doesn't seem that they would.  Obviously, they'll

2    argue based upon the record.  And you have to have a record in

3    order to make an argument.

4        So I think it's fairly clear as it's evolving and I just

5    wanted to give guidance to the parties.

6        (Government and defense counsel confer off the record.)

7            **THE COURT:**  Do you want to take a break?

8            **MR. HEMANN:**  There's one other incident, that

9    Ms. Caffese told us this morning, that she's intending to

10    cross-examine Mr. Vargas about.  I read it very briefly.

11        It's a 2002 argument with another -- probably the easiest

12    thing to do is just hand it up to the Court.  It's a dispute

13    between two -- another -- between Mr. Vargas and another police

14    officer during the course of what looks like an arrest of

15    somebody else.

16        They get into an argument.  Mr. Vargas threatens --

17    according to the police officer, threatens the other police

18    officer.  I would hand it up to the Court.  There's a paragraph

19    in the middle that starts, Vargas asked, quote, where do you

20    live bitch, unquote.  And it goes on from there.

21        We don't think that that is appropriate cross-examination.

22        (Handing document to the Court.)

23        (Pause)

24            **THE COURT:**  Well, I don't know how it goes to honesty.

25            **MS. CAFFESE:**  Well --

1        **THE COURT:**  How does it go to honesty?

2        **MS. CAFFESE:**  This is what I would argue, Judge, is,

3   once again --

4        **THE COURT:**  Go ahead.  I'm going to mark it as an

5   exhibit so the record is there.

6        (Trial Exhibit 350 marked for identification.)

7        **MS. CAFFESE:**  Thank you.

8      Mr. Vargas, once again, claims his misconduct occurred

9   when he began working for Robles.

10       **THE COURT:**  I don't think he's saying that.  I mean,

11  that's not going to be the evidence, is it?  He's not going to

12  ask the question, look, until you met Mr. Robles, did you ever

13  do anything dishonest?  He's not going to ask that question.

14     He said how he took money.  I think that's what the

15  evidence is, that he took money from a scene when he became a

16  plainclothesman.  And I think he said that he -- I think his

17  testimony was he was given the money at the scene by

18  Mr. Robles.

19     But I don't think -- he's not taking the position that

20  until then he was honest.  And my guess is -- we can revisit

21  this before you start your cross, but looking at it now, it

22  doesn't appear to be an act of dishonesty.

23       **MS. CAFFESE:**  That's what I would ask, Your Honor.

24       **THE COURT:**  Okay.  All right.  Let's take five minutes

25  and then we'll start.

 1          **MR. HEMANN:**  Thank you, Your Honor.

 2          **MS. CAFFESE:**  Thank you.

 3      (Recess taken from 8:54 to 9:03 a.m.)

 4          **THE COURT:**  Please be seated.

 5      Let the record reflect all jurors are present.  The

 6  parties are present.

 7      You may continue.

 8          **MR. HEMANN:**  Thank you very much, Your Honor.

 9      <u>**REYNALDO VARGAS, PLAINTIFF WITNESS, PREVIOUSLY SWORN**</u>

10              <u>**DIRECT EXAMINATION (RESUMED)**</u>

11  **BY MR. HEMANN:**

12  **Q.**  Mr. Vargas, yesterday we were discussing the Apple gift

13  cards.  Do you remember that?

14  **A.**  Yes.

15  **Q.**  Okay.  I'd like to finish up that discussion before we

16  move on.

17      You testified that you made a call to check the balance

18  from the -- from the Marilyn Hotel; is that correct?

19  **A.**  Yes.

20  **Q.**  And who was present when you made the call to check the

21  balance on that card?

22  **A.**  At that particular moment I may have been alone or it

23  would have been Mr. Robles.  I don't recall Mr. Furminger being

24  there that exact moment when I was checking the balance on the

25  cards.

1   Q.   After you checked the balance and you cleared the scene,

2   you said you went back to the Mission Station with Kelsey?

3   A.   Yes.

4   Q.   At some point during the day at Mission Station, did you

5   discuss the gift card with Mr. Robles and/or Mr. Furminger?

6   A.   Yes.

7   Q.   And which or both of the two?

8   A.   Just with Mr. Robles, not with Mr. Furminger.

9   Q.   And when you discussed it with Mr. Robles, what did the

10  two of you discuss?

11  A.   I told him that I had found the card at Mr. Furlong's

12  residence and that it had a large balance on it and I,

13  basically, suggested we go shopping.

14  Q.   And did Mr. Robles -- did he appreciate at that moment,

15  when you first told him, the significance of the fact that you

16  had grabbed this gift card?

17          MS. CAFFESE:  Objection.  Calls for speculation.

18          THE COURT:  I'm sorry.

19      Well, sustained.

20          MR. HEMANN:  I can ask a different question.

21  BY MR. HEMANN:

22  Q.   Did Mr. Robles say any -- when you first told him that you

23  had grabbed the gift cards, did he express anything to you

24  regarding his understanding of what the usefulness of the gift

25  card was?

 1  **A.**   I don't think he appreciated --

 2  **Q.**   Well, the question I'm asking is:  What did he express to

 3  you?  And then we can talk about what you -- how you

 4  interpreted it.

 5  **A.**   Surprise.

 6  **Q.**   And what did he -- what was the substance of what he said

 7  that led you to say "surprise"?  He didn't say "surprise,"

 8  right?

 9  **A.**   No.

10  **Q.**   Okay.  What did he say?

11  **A.**   He was surprised at the value, that there was, in fact, so

12  much money on the cards.  And then -- you know, to then use it

13  to then buy something.

14       And so I don't think he appreciated their value the way I

15  did.  I was the person that picked up the card and took the

16  time to then see if there was a balance on it.  And so I think

17  that he kind of would have glossed over that where I did not.

18  **Q.**   At some point in time did Kelsey -- and I'm not using her

19  first name out of disrespect.  You just don't remember her

20  first name; correct?

21  **A.**   Her last name.

22  **Q.**   Her last name, sorry.

23       Did Kelsey make a phone call that day from Mission

24  Station?

25  **A.**   I believe so, yes.

1    Q.   Do you have a recollection as to where she called?

2    A.   I believe she had a part-time job, and so she was trying

3    to call her job.

4    Q.   After she made that phone call, you said you released her?

5    A.   Yes.

6    Q.   And you and Mr. Robles went to the Apple gift store?

7    A.   Yes.

8    Q.   Did you and Mr. Robles put in for overtime that day?

9         **MS. CAFFESE:**  Well, excuse me.  That calls for

10   speculation as to Mr. Robles.

11        **THE COURT:**  Sustained.

12   **BY MR. HEMANN:**

13   Q.   Did you put in for overtime that day?

14   A.   I don't recall if I did.  I could have, but I just don't

15   recall.

16   Q.   And did Mr. Robles, to your knowledge, put in for overtime

17   that day?

18   A.   Again, I don't recall.

19   Q.   At some point in time did you speak with Mr. Furminger

20   about the Apple gift card purchases?

21   A.   Yes.

22   Q.   When was that?

23   A.   That was, I believe, a couple of days later.

24   Q.   And what was the -- was it in person or on the telephone?

25   A.   It was in person.

VARGAS - DIRECT / HEMANN

1   Q.   And was Mr. Robles present during that conversation?

2   A.   Yes.

3   Q.   And what did you discuss?

4   A.   Mr. Furminger was a little upset with us and used some

5   colorful language.

6   Q.   And how did he express his upsetness, his being upset?

7   A.   Can I --

8   Q.   You don't need to quote it, but how did he express it,

9   without necessarily quoting it?

10  A.   He was upset that we had gone to the Apple store and

11  purchased things without him.

12  Q.   Do you know how he found out that you had gone to the

13  Apple store?

14  A.   I know that I didn't tell him, so I made the assumption

15  that Mr. Robles told him.

16  Q.   And what was the substance of what Mr. Furminger said?

17  A.   I'll subtract the colorful language, but basically, hey,

18  thanks for going there without me and cutting me out of that.

19  Not getting his portion.

20  Q.   Was he upset with you for the impropriety of making the

21  purchase?

22  A.   He was upset because he was not included in the purchase.

23  Q.   You mentioned yesterday that you had received a tip for

24  Mr. Furlong, Zeppi Furlong, from Daisy Bram and Jayme, her

25  partner?

1    **A.**    Yes.

2    **Q.**    After you made the arrest of Mr. Furlong and conducted the

3    search at the Marilyn Hotel and used the gift card, did you

4    come again into contact with Mr. -- with Jayme and Daisy?

5    **A.**    Yes.

6    **Q.**    And how did that come about?

7    **A.**    We had many contacts with them subsequent to that Furlong

8    arrest.

9    **Q.**    When you say "we," who are you talking about?

10   **A.**    Myself, Mr. Robles, and Mr. Furminger.

11   **Q.**    And what was the context of the contact that you had

12   with -- with Daisy and Jayme?

13   **A.**    Well, in terms of, you know, trying to cultivate someone

14   as an informant, they -- their first initial case was really

15   good, really successful.  And so our first thoughts were, wow,

16   this could be a great relationship.  If they had additional

17   information and additional targets of that level, it could be

18   great.

19        And so we continued to try and cultivate that relationship

20   and just talk to them, get to know them, because we had never

21   met them before at all and so we both had to kind of get a

22   comfort level with each other; us and them, them and us.

23   **Q.**    So how did you go about -- what kinds of things did you do

24   to cultivate the relationship?

25   **A.**    We would talk about -- about drug-related topics.  We

 1   would talk about personal topics.  We found out about, you

 2   know, some of their history, where they had come from.  We knew

 3   their criminal history, and so we kind of delved a little bit

 4   into that, kind of get the back story behind that stuff.

 5   Bought them food several times.  So, you know, kind of

 6   conversed over food, that sort of thing.

 7   Q.   Where did you meet with them?

 8   A.   At the -- at Mission Station.

 9   Q.   Why is it that you and Mr. Robles and Mr. Furminger were

10   doing this together, if you will?

11   A.   As I had mentioned yesterday, probably at this point in

12   mid to late February and beginning into early March my schedule

13   had lined up completely with Mr. Robles, so he and I were

14   partners.  So we would be working every day together.

15        And often during these times Mr. Furminger would schedule

16   himself with us as well.  And so the three of us would be

17   riding together.

18   Q.   When you talked about cultivating them as -- as

19   confidential informants, both of them or just one of them was

20   your intent?

21   A.   Ultimately, only one was really viable as an informant.

22   Q.   Which one?

23   A.   Daisy.

24   Q.   And why was Jayme not a rely -- a potentially reliable

25   informant?

1  **A.**    His criminal history and, in particular, violence kind of

2  precluded him from ever being accepted as an informant.  We

3  have to put together a packet and then turn that in.  And that

4  packet is then reviewed and has to be either approved or

5  denied.  And we just never thought that with his criminal

6  history he would ever be approved.

7  **Q.**    Now, at some point in time did -- did Daisy fall ill?

8  **A.**    Yes.

9  **Q.**    And what were the circumstances regarding her falling ill?

10  **A.**    It was really soon after the Furlong arrest.  And as they

11  told me --

12          **MS. CAFFESE:**  Excuse me.  That calls for -- he's

13  testifying to hearsay.  Objection.

14          **MR. HEMANN:**  Not offered for the truth, Your Honor.

15          **THE COURT:**  Well, my concern was "they."  Who is

16  "they"?

17  **BY MR. HEMANN:**

18  **Q.**    Could you be more specific?

19  **A.**    Yes.

20  **Q.**    Go --

21          **THE COURT:**  Who said what?

22  **BY MR. HEMANN:**

23  **Q.**    Who said what?  Yes.

24  **A.**    Jayme and Daisy told me that Daisy had stabbed herself

25  with a dirty needle, and her hand had started to become

1    infected.

2        We learned about it really quick as it was getting --

3    starting to get very bad.  It subsequently got so bad she had

4    to be hospitalized and nearly lost her hand because her hand

5    exploded in size.

6    Q.   And did you view this yourself?

7    A.   Yes.  At one point Mr. Robles, Mr. Furminger, and myself,

8    we actually went over to visit them in the hospital and brought

9    them coffee and bagels.

10   Q.   And just the way you answered that made me think -- try as

11   much as you can as you're answering questions, instead of

12   saying "we," even though it sounds awkward, identify who the

13   "we" is when you do it.  If you don't, I'll try to remind you,

14   okay.

15       So the three of you went to the hospital, visited.  You

16   spoke with her?

17   A.   Yes.

18   Q.   Okay.  So I want to leave Daisy and Jayme for a moment and

19   ask you whether at some point in time you recall some marijuana

20   being seized by or identified by UPS in San Francisco?

21   A.   Yes.

22   Q.   And what -- what do you remember about -- about that?

23   A.   There's a UPS distribution center that's located within

24   the Mission District.  And, oftentimes, the UPS employees,

25   themselves, would catch suspicious packages and then locate

```
 1  narcotics that were attempting to be shipped through UPS.

 2  Q.    And did that happen one day in March of 2009?

 3  A.    Yes.

 4  Q.    And did you and Mr. Furminger and Mr. Robles do something

 5  with regard to that report made by UPS?

 6  A.    Yes.

 7  Q.    What did you do?

 8  A.    UPS would call a police dispatch number and then request

 9  that officers come and retrieve that and book -- you know,

10  seize those narcotics.

11  Q.    And did the three of you go do that?

12  A.    Yes.

13  Q.    Together?

14  A.    Uhm, yes.

15  Q.    After you retrieved it, what did you -- and by that I mean

16  the three of you -- do with the marijuana?

17        Immediately thereafter, what did you do with the

18  marijuana?

19  A.    Took it back to Mission Station.

20  Q.    When you got back to Mission Station, did you do something

21  further with the marijuana?

22  A.    Yes.

23  Q.    And when that happened, who was present?

24  A.    Myself, Mr. Robles, and Mr. Furminger.

25  Q.    And what did you do with the marijuana?
```

1    **A.**    We --

2    **Q.**    First of all, what did it physically -- when you -- when

3    you brought something back to Mission Station, what did it look

4    like?

5    **A.**    There were two large boxes.  I shouldn't say "large."  Two

6    boxes.

7    **Q.**    Okay.  Just indicate to the jury sort of how big they --

8    **A.**    Uhm -- (indicating).

9    **Q.**    Foot and a half, two feet across?

10   **A.**    Yeah, maybe this in length and this in height

11   (indicating).  And the depth was maybe about this deep

12   (indicating).

13   **Q.**    Okay.  So 2-by-6 inches by a foot, something like that?

14   **A.**    Yes.

15   **Q.**    Okay.

16   **A.**    And as I recall, two boxes of equal size.

17   **Q.**    And what did you do with those two boxes?

18   **A.**    The boxes had been opened by UPS, and so the contents were

19   easily visible.

20   **Q.**    What did you do with the contents then?

21        You have two boxes, they're both opened, what do you do?

22   **A.**    We pull the contents out and they were vacuum-sealed

23   marijuana -- or suspected marijuana I guess you would say.

24   **Q.**    So you got how many pounds, roughly, do you think, if you

25   recall?

**A.**    At least three pounds, maybe four pounds.  Three or four pounds.

**Q.**    Okay.  Did you divide it up somehow?

**A.**    Yes.  Well, it was already divided into pounds.

**Q.**    Okay.  How many equal -- were they roughly equal?

**A.**    Yes, I believe so.

**Q.**    How many were they -- were there?

**A.**    Either three or four.

**Q.**    Okay.  What did you do with those three or four roughly equal bags?

**A.**    One of the bags we actually contacted a police jurisdiction at the destination that initially it was intended to be sent to.  I believe that was in either Indiana or Illinois, something like that.  And we contacted an officer out there and devised a plan to let a pound go through so that maybe they could investigate it on their side.

    We attempted to investigate if the person who had shipped the marijuana with all the information that we had available from UPS and also from the -- from the shipping form itself.

**Q.**    Okay.  And did, in fact, you go ahead and send a portion of the marijuana on through to its destination?

**A.**    Yes.

**Q.**    And were you in contact with the police at that destination to alert them that this marijuana was coming through?

VARGAS - DIRECT / HEMANN

1   **A.**   Yes.

2   **Q.**   Okay.  What did you do with the remaining marijuana?

3   **A.**   One of the bags I booked into evidence.  And this is kind

4   of subsequent to attempting to investigate the shipper and

5   basically coming up with a dead end there.  Not being able to

6   really develop any kind of credible information to go forward

7   in that investigation, it kind of came to a dead end.

8        And then I booked that evidence for SFPD, I believe, for

9   destruction.

10  **Q.**   And tell the jury sort of how you would do that.

11       When you say book the evidence for SFPD, how would you do

12  that?

13  **A.**   In this particular case the bag was really large.  It was

14  a pretty large bag.  And in our police department we have a

15  specific-sized manila envelope, basically 8-and-a-half-by-11,

16  that we use to book narcotics.

17       The bag of marijuana was much larger, too large to fit

18  inside that bag.  So what I did was I cut it out of its

19  original packaging, transferred into smaller bags, and then

20  used those smaller bags to put into our standard narcotics

21  envelope, and then book those envelopes into our narcotics drop

22  at 850 Bryant.

23            **MR. HEMANN:**   Your Honor, may I show the witness what's

24  been marked as Exhibit 244, 107, 108, 109, and 110?

25            **THE COURT:**   Are they in evidence?

 1          **MR. HEMANN:**  Not yet.

 2          **THE COURT:**  Okay.  Give me the numbers again.

 3          **MR. HEMANN:**  244.

 4          **THE COURT:**  244.

 5          **MR. HEMANN:**  107.

 6          **THE COURT:**  107.

 7          **MR. HEMANN:**  108.

 8          **THE COURT:**  108.

 9          **MR. HEMANN:**  109.

10          **THE COURT:**  109.

11          **MR. HEMANN:**  And 110.

12          **THE COURT:**  110.  Yes, go ahead.

13        (Trial Exhibits 107, 108, 109, 110, 244 marked for

14   identification.)

15   **BY MR. HEMANN:**

16   **Q.**   I'm handing you a large bag, Mr. Robles, that has some

17   smaller bags in it.  Could you just take a quick look at those

18   smaller bags, each of which is separately numbered with the

19   five numbers that I just indicated to you.

20   **A.**   (Witness complies.)

21   **Q.**   Have you had a chance to look at those, Mr. Vargas?

22   **A.**   Yes.

23   **Q.**   Are those the bags of marijuana that you -- that you

24   booked into evidence with the San Francisco Police Department?

25   **A.**   Yes.

1  **Q.**    And they have a smell to them; correct?

2  **A.**    Yeah, absolutely.

3  **Q.**    Did they smell the same or less strong or more strong at

4  the time that you seized it?

5  **A.**    I imagine, just due to time, they smelled much stronger

6  then.

7  **Q.**    Did you -- you took those.  Where did you do this dividing

8  up that you just described?

9  **A.**    At Mission Station, inside the plainclothes office.

10         **MR. HEMANN:**  Agent Flores, can you help me with this?

11     Can we have one moment, Your Honor?  We're going to put it

12  back where it belongs.

13         **THE COURT:**  Yeah.

14     So 244, 107, 108, 109, 110 admitted into evidence.

15     (Trial Exhibits 107, 108, 109, 110, and 244 received in

16  evidence.)

17         **MR. HEMANN:**  Thank you, Your Honor.

18  **BY MR. HEMANN:**

19  **Q.**    So, Officer -- or Mr. Vargas, was that all of the

20  remaining marijuana?

21     So you sent a portion to another state.  You booked a

22  portion that we just looked at into evidence.  Was there

23  another portion?

24  **A.**    Yes.

25  **Q.**    What did you do with that portion?

1   **A.**    Initially, that portion we kept intact -- I kept intact

2   with the -- in its original packaging.  And inside our office,

3   there was a file cabinet, and I believe I put that inside the

4   file cabinet.

5         **MR. GETZ:**  I would ask for clarification on the "we"

6   as part of that answer.

7         **MR. HEMANN:**  Oh, certainly.

8   **BY MR. HEMANN:**

9   **Q.**   When you did this, when you segregated a portion while you

10  were in your office and put it into the file cabinet, who was

11  present?

12  **A.**   Uhm, I believe I clarified myself.  I was present.  I did

13  it.

14  **Q.**   Okay.

15  **A.**   That's what I'm saying.

16  **Q.**   Was anybody else present when you put that portion into

17  the file cabinet at the office?

18  **A.**   When I put it in the file cabinet, I don't believe so, no.

19  **Q.**   And you said that initially you were dividing up the

20  portion to go to the other state, the portion to be booked into

21  evidence, and the portion that went in the file cabinet.

22        Were all three of you there at that point in time when you

23  initially started dividing it up?

24  **A.**   Portions of that time, yes, absolutely, all three were,

25  because we -- the three of us being myself, Mr. Robles, and

1    Mr. Furminger, because it was the three of us that came to the

2    decision to allow a portion of it to actually continue on to

3    its intended destination.

4    **Q.**   So by the time you got to that last bit, did -- had

5    Mr. Robles and Mr. Furminger left the office, that last

6    portion?

7    **A.**   I believe so, because my recollection is that ultimately

8    when it -- when booking those -- those last five bags there

9    that got booked into evidence, I believe I did that alone.

10               **MR. HEMANN:**   May I ask -- Barbara, do you have the

11   exhibits that are in evidence?  Are they up here with you?

12               **THE CLERK:**   Yes.

13               **MR. HEMANN:**   Can I have Exhibit 114, please.

14        Thank you.

15   **BY MR. HEMANN:**

16   **Q.**   Mr. Vargas, this is Exhibit 114, which is in evidence.

17        The portion of the marijuana that you put into the file

18   cabinet, as to that, does that bag that I just handed you look

19   familiar?

20   **A.**   Yes.  This could easily be the same bag.

21   **Q.**   And so you put a portion of the marijuana in the file

22   cabinet.  And after you did that, did you discuss the marijuana

23   that was in the file cabinet with either Mr. Robles or

24   Mr. Furminger?

25        And I say "did you discuss?"  Did you discuss, shortly

1  afterwards, with either of the two of them, that there was some

2  marijuana in the file cabinet at Mission Station?

3  **A.**    We did discuss it.  But we discussed it with other people

4  as well.  And those other people being Daisy and Jayme.

5  **Q.**    When you say "we," who discussed it with Daisy --

6  **A.**    Myself, Mr. Robles, Mr. Furminger, Daisy and Jayme, the

7  kids.

8  **Q.**    And what did you discuss?

9  **A.**    We asked them about the marijuana.

10       Daisy had a lot of familiarity with marijuana, probably

11  more than I did and maybe more -- I can't say what the other

12  guys -- what Mr. Furminger and Mr. Robles knew.  But she had a

13  lot of expertise, and so we were asking her about it.  Its

14  worth; its quality; values; what would street prices be.  That

15  sort of thing.  And she had a lot of knowledge in that.

16  **Q.**    When you took that portion of marijuana that we just

17  looked at -- I'm sorry, when you took the portion of marijuana

18  that was in that bag that you just looked at and put it in the

19  file cabinet, what was your plan for -- what were you going to

20  do with it?  Why didn't you book it into evidence?

21  **A.**    I don't know.

22  **Q.**    Then why did you do it?

23  **A.**    I don't know.

24  **Q.**    No idea at all, as you sit here today, why you took a

25  pound of marijuana and put it into a file cabinet at Mission

1    Station?

2    **A.**    I don't.

3    **Q.**    Were you planning, at that point in time, to sell it?

4    **A.**    I was not planning, at that time, to sell it, no.

5    **Q.**    What were you planning on doing with it?

6    **A.**    I don't know.  I -- I looked at it.

7         I've asked myself this question many times.  I had gone

8    through the investigation of attempting to locate the shipper.

9    That had come to a dead end.

10        We had let a portion of the package go through its

11   destination.  I don't believe there was any arrest or anything

12   on that end.

13        The portion that I booked, I booked in for destruction.

14   So, ultimately, all that was going to happen with it was going

15   to be destroyed.

16        And so here was this large portion of -- of marijuana, a

17   commodity of sorts.  So I was like, wow, what a waste to just

18   destroy it.  But I don't know that I had any sort of further

19   plan, at that moment, initially, when I put it in the file

20   cabinet.

21   **Q.**    At some point in time did you discuss that there's a

22   quarter -- or a pound of marijuana sitting in the file cabinet,

23   with either Mr. Robles or Mr. Furminger?

24   **A.**    Yes, because we would take it out and look at it.  So we

25   both -- all of us being myself, Mr. Robles, and Mr. Furminger

 1  knew that there was a pound of marijuana sitting in that file

 2  cabinet.

 3  **Q.**   Now, at this point in time had you met Cesar Hernandez?

 4  This is, sort of, the end of March of '09?

 5  **A.**   Yes.

 6  **Q.**   And did you discuss that marijuana with Cesar Hernandez?

 7  **A.**   I don't recall discussing it with him, no.

 8  **Q.**   Do you remember anybody discussing it with Mr. Hernandez

 9  in your presence?

10  **A.**   I don't recall it, no.

11  **Q.**   So at some point in time did you make a decision as to

12  what to do with that marijuana?

13  **A.**   Yes.

14  **Q.**   What was the decision that you made?

15  **A.**   I decided to give it to who I call "the kids," Daisy and

16  Jayme.

17       They had just come out of the hospital with her injury and

18  were even kind of in worse shape than when we had met them.

19  **Q.**   And why did you want to give it to them?  Why did you

20  decide to give it to them?

21  **A.**   As, uhm -- as wrong as this sounds, it was kind of an

22  altruistic gesture.  I wanted to give them something to --

23  something they could use to make some money for themselves.

24       They were very down on their luck.  My intent with it was

25  ultimately it was just going to be destroyed.  I thought that

 1   was kind of a waste.  At least if they had it they could do

 2   something with it.

 3        They could obviously sell it -- that was her expertise --

 4   and make some money for themselves to get themselves off the

 5   street into a hotel room, eat.  That sort of thing.

 6   Q.   So your intention -- not to put too fine a point on it --

 7   was to give heroin addicts marijuana to sell on the street?

 8   A.   Yes.

 9   Q.   So that they would have money?

10   A.   Yes.

11   Q.   Did you -- did it go through your head, at the time, that

12   this is an illegal thing to do?

13   A.   Absolutely.

14   Q.   Did you discuss this plan with either Mr. Robles or

15   Mr. Furminger?

16   A.   In advance, no.

17   Q.   At some point in time did you discuss giving the marijuana

18   to Daisy and Jayme, with either Mr. Robles or Mr. Furminger?

19   A.   Yes.

20   Q.   What were the -- first of all, which one or both?

21   A.   Uhm, I never discussed it with Mr. Furminger until after I

22   had already done it.

23        But Mr. Robles was there with me when I gave them the

24   marijuana.  And so I said -- I grabbed the bag of weed from the

25   file cabinet, and I put it in a paper bag, and I said, "Hey,

1    I'm going to give this to the kids."

2        And this is in our office.  So then he walked with me out

3    to the front of the office, just outside the station.  They

4    were, in fact, leaving.  So we kind of hustled out to catch

5    them as they were walking away.  And I motioned them back to me

6    and handed them the bag, the paper bag that contained the

7    marijuana.

8    Q.   So they had been in the station speaking with whom?

9    A.   Uhm, with -- at that point, myself and Mr. Robles.

10   Q.   And it was after they -- as they were leaving, did you

11   hatch this idea of giving it to them?

12   A.   Just a spur-of-the-moment thing.  And I just acted on it,

13   yes.

14   Q.   In the immediate aftermath of that -- so after you hand it

15   to them -- did you have a discussion about what you had just

16   done, with Mr. Robles?

17   A.   I don't really recall us discussing it too much further.

18   Q.   At some point in time did Daisy, Jayme, and that marijuana

19   reappear in your life?

20   A.   Yes.

21   Q.   How shortly after?

22   A.   Pretty quickly.  I don't recall exactly how many days, but

23   very soon afterwards.

24   Q.   What happened?

25   A.   I found out after the second incident, but I believe in

1  two successive days they were stopped and detained by police

2  either using marijuana or attempting to sell marijuana out in

3  Golden Gate Park.

4  **Q.**   And what happened to them?

5  **A.**   Uhm, I don't believe anything happened to them the first

6  incident.  But the very next day Daisy was arrested.

7  **Q.**   And so two incidents -- the first one Jayme, the second

8  one Daisy -- you were informed?

9  **A.**   Yes.

10 **Q.**   And then what happened after Daisy got arrested?

11 **A.**   She was booked.

12 **Q.**   And were there communications then between Daisy and you

13 about the fact that she had been booked?

14 **A.**   Yes.

15 **Q.**   And what were the nature of those communications?

16 **A.**   She called me from jail, very upset, yelling at me on the

17 phone and just upset in general.

18 **Q.**   Upset about what?

19 **A.**   Upset about being arrested.  Basically, that -- that we

20 couldn't help her out of the arrest.

21 **Q.**   At the point after you found out that the two of them had

22 been arrested selling this marijuana, did you discuss what you

23 had done with either Mr. Robles or Mr. Furminger?

24 **A.**   At that point, Mr. Furminger was already -- was aware of

25 it, where the marijuana had come from, that it had come from me

```
 1   giving it to them.

 2        And so I definitely recall myself and Mr. Robles deciding

 3   that we got -- we have to get this marijuana back from them.

 4   Q.   Back from whom?

 5   A.   From Jayme and Daisy.

 6   Q.   What -- did you then, once you decided to do it, did you

 7   do it?

 8   A.   Yes.

 9   Q.   How did you do it?

10   A.   They were staying at an SRO hotel on Market Street.  And

11   we knew where they were staying, and we went to their hotel and

12   told them to give us back the weed.  And they did.

13   Q.   How did you get there?

14   A.   We drove there.

15   Q.   In your police car?

16   A.   Yeah.  We were still in a plainclothes capacity, driving

17   an unmarked police car.  So the unmarked police car.

18   Q.   Who went?

19   A.   Myself and Mr. Robles.

20   Q.   Did you retrieve the remaining marijuana from Daisy and

21   Jayme?

22   A.   Yes.

23   Q.   And where was it?

24   A.   They had hidden it -- I guess the SRO had a drop ceiling.

25   So it was above one of the ceiling panels.  So they had to
```

 1  remove, like, a ceiling panel.  And it was kind of hidden --

 2  hidden up in that area.  I think, in their bathroom.

 3  **Q.**   Did you and Mr. Robles take, then, the marijuana with you

 4  and get back in the car?

 5  **A.**   Yes.

 6  **Q.**   What became of the remaining marijuana?

 7  **A.**   I actually don't recall.

 8  **Q.**   You don't have any recollection at all?

 9  **A.**   I'm -- I'm assuming we just dumped it or threw it away, or

10  something like that.  I just don't remember what happened with

11  it at that point.

12  **Q.**   Did you sell it or give it to anybody else?

13  **A.**   No.

14  **Q.**   At some point in time did you then -- after you had taken

15  back the marijuana, did you stay in contact with Daisy and

16  Jayme?

17  **A.**   After her arrest, it got really adversarial between Jayme

18  and Daisy and myself and Mr. Robles and Mr. Furminger.  And we

19  were really pissed off at them.  They were pissed off at us.

20  And so we really didn't have much -- any contact, I believe,

21  until a few months later.  Later on, I think in June or July, I

22  had contact with them.

23  **Q.**   And what was the nature of that contact?

24  **A.**   Jayme and Daisy called me to extort money.

25  **Q.**   And explain to the jury what you mean when you say they

 1  called you to "extort money."

 2  **A.**   What they did was they called me.  And Daisy threatened to

 3  allege that I had raped her, with the intent to get me in jail.

 4  And then Jayme said he would get himself arrested so he could

 5  be in jail at the same time.

 6       And he claimed membership in an Arian prison gang, and

 7  said that him and his White Supremacist prison gang members

 8  would be there waiting for me, where they would subsequently

 9  rape and kill me in jail.

10  **Q.**   Did this communication happen in person or --

11  **A.**   Via telephone.

12  **Q.**   During that telephone conversation, did you reach out to

13  either Mr. Robles or Mr. Furminger?

14  **A.**   Yes.

15  **Q.**   Which one?

16  **A.**   I called Mr. Furminger.

17  **Q.**   Why did you do that?

18  **A.**   He always had a very good rapport with Daisy and Jayme.

19  He was also my direct supervisor.  And I was, frankly, really,

20  really scared.

21       I've never gotten a call like that.  I had been, at that

22  point, a police officer for probably 10, 11 years.  And nothing

23  like that had ever happened to me before.  And so I was really

24  scared.  And so he was the first person I thought to call.

25  **Q.**   And did it occur to you that you had also committed a

1    crime?

2    **A.**     Absolutely.

3    **Q.**     You called him.  And what did you do when you called him?

4    How did you call him?  I thought you were talking to them on

5    the phone.

6    **A.**     Yes, they called my cell phone.  I had given them my

7    personal cell phone number.  So they called me directly.

8          At that point in time I also had a landline, I believe.

9    So what I did was basically held the two handsets together and,

10   you know, said, hey, well -- you know, and they started talking

11   to each other, telephone to telephone, basically holding the

12   two together.

13   **Q.**     And how -- did that conversation resolve -- resolve

14   anything as between the two sides?

15   **A.**     Not at all.  There was a lot of yelling and screaming back

16   and forth.  They were very apologetic to Ian -- excuse me, to

17   Mr. Furminger.

18         And, basically, they said they felt really bad because he

19   was a good white man.  But they -- I'll skip the colorful

20   language, but they didn't care anything about the two Mexicans,

21   meaning myself and Mr. Robles.  And if the white man had to go

22   down with those two Mexicans that was fine, but they wanted

23   $10,000 or else they were going to ruin my life and everyone

24   else's life.

25   **Q.**     At some point in time did they take further action to

 1  again take some action against you?

 2  **A.**   Yes.  Well, they -- they had given me a certain deadline

 3  to ship them $10,000.  And I got a few -- few more voice mail

 4  calls from them.

 5       But after that deadline passed I didn't have, really, any

 6  contact with them except later on receiving an OCC complaint,

 7  an office of -- I can't remember what OCC stands for now.  A

 8  citizen complaint from them.  They had lodged a complaint

 9  against us.

10  **Q.**   What is the OCC?

11  **A.**   I can't remember.  I'm missing one of the Cs.  Might be

12  Office of Citizen Complaints.

13       Basically, it's an organization that handles complaints

14  against police officers, that's not directly affiliated by --

15  with the police department and so to, kind of, give them some

16  separation and impartiality.

17  **Q.**   And do they have investigators, the OCC have

18  investigators?

19  **A.**   Yes.

20  **Q.**   Did the OCC start investigation of -- related to the Daisy

21  and Jayme marijuana deal?

22  **A.**   Yes.

23  **Q.**   At some point in time were you interviewed -- were you

24  notified that you would be interviewed by the OCC about the

25  Daisy-Jayme marijuana deal?

1   **A.**     Yes.

2   **Q.**     Did you discuss that interview with Mr. Robles, that

3   anticipated interview with Mr. Robles and Mr. Furminger?

4   **A.**     Yes.

5   **Q.**     Did you learn that -- during that discussion, whether they

6   would be interviewed by the OCC?

7   **A.**     Yes.

8   **Q.**     Did you discuss with the two of them, together or

9   separately -- and you'll tell us -- what you would say -- what

10  the three of you would say to the OCC investigators?

11  **A.**     Yes.

12  **Q.**     Could you describe the discussion that you had with the

13  two of them?  Or was it with both of them at the same time, or

14  separately?

15  **A.**     It was with both of them at the same time.

16  **Q.**     Could you describe that discussion with the jury?

17  **A.**     Yes.

18       The way we described it was we didn't describe what had

19  happened.  We basically came up with a theory that we believed

20  would be plausible to explain it.

21       So instead of saying we gave them the marijuana, we

22  discussed, Wow, I wonder how they could have gotten that

23  marijuana?  Maybe it was that time -- these times that we left

24  them alone in our office.  Maybe then they could have taken it.

25       And in discussing that, the hypothetical instance, we kind

 1   of all agreed like, yeah, that must have been when they -- they

 2   took the marijuana from us, you know, unbeknownst to us.

 3       And in that manner we kind of came to an agreement of how

 4   we would handle the interview and the specific questions.

 5   Q.   At some point in time after you had that discussion with

 6   Mr. Robles, Mr. Furminger, were you, in fact, interviewed by

 7   the OCC?

 8   A.   Yes.

 9   Q.   Did you tell the OCC the truth about how Daisy and Jayme

10   got the marijuana?

11   A.   No.

12   Q.   Why not?

13   A.   Uhm, because to tell the truth would have been admitting

14   that I committed the crime.

15   Q.   Was that the first time, Mr. Vargas, that you had lied to

16   an OCC investigator?

17   A.   No.

18   Q.   When was -- was there multiple prior occasions or one

19   prior occasion?

20   A.   One -- one occasion that stands out in my mind.

21   Q.   And when was that?

22   A.   I believe that was in 2002.

23   Q.   And did that occasion involve an investigation that was

24   being conducted by the OCC?

25   A.   Yes.

 1   **Q.**   And did that occasion involve an investigation into an

 2   arrest and an allegation against you of the excessive use of

 3   force?

 4   **A.**   Yes.

 5   **Q.**   That was in 2000 and --

 6   **A.**   -- '2, I believe.

 7   **Q.**   I want to ask you some questions about you admitted

 8   yesterday that you, over time, beginning in early 2002, engaged

 9   in some criminal activity with regard to thefts.  Do you

10   remember that?  Theft of property.

11   **A.**   Yes.

12   **Q.**   I want to just, sort of, talk about the general way those

13   thefts took place.  The *modus operandi*, if you will, of those

14   thefts.  And I'd like you to, sort of, describe in your own

15   words what -- how they worked.

16        What was it that you were doing, in terms of thefts, that

17   was illegal?

18   **A.**   Typically, how it would occur is that we would either have

19   information that would point us to a target, or develop

20   information ourselves regarding some sort of person that was

21   trafficking in narcotics.

22        We obviously couldn't deal with the users themselves

23   because those were only user quantities.  They didn't really

24   have anything beyond that.

25        And so once we would develop a target we would, kind of,

1 try to generate some probable cause to locate this person in

2 the room, in their residence, that sort of thing.

3     And how the thefts occurred would be subsequent to an

4 arrest and a search. And if narcotics were located then the

5 narcotics would be booked. If cash was located, uhm, portions

6 of the cash we would take; or sometimes all of the cash; and

7 occasionally, on instances, property as well.

8 **Q.**   You used the term "we" on several occasions. And I want

9 to, kind of, drill down on that before we move on.

10     Focusing on the time period 2009 and 2010, did the "we"

11 always include all three of you; Mr. Furminger, Mr. Robles, and

12 you?

13 **A.**   Almost always it was with Mr. Robles, and a good portion

14 of the time Mr. Furminger.

15     Mr. Robles and I were scheduled the exact same schedule,

16 the exact same hours and days of work after sometime in

17 February of 2009. And so Mr. Furminger would work with us

18 often. With our exact schedule sometimes he could not.

19 **Q.**   At some point in time did the conduct just involve you?

20 **A.**   Yes.

21 **Q.**   And when was that?

22 **A.**   Uhm, Mr. Robles left -- subsequently left Mission Station.

23 And so there were portions of the time where neither of them

24 were there. But I was, so I was taking things myself.

25 **Q.**   Were all of these thefts or did these thefts -- let me ask

1   it a different way.  Did these thefts have a typical magnitude

2   in terms of the amount of money or property that was taken?  Or

3   did they vary?

4   **A.**   They varied pretty dramatically.  There were a few -- few

5   instances where the amounts, in my opinion, were very large.

6   But, typically, the amounts were very, very small.  Sometimes

7   20, $40, something along those lines.

8       Because we were district plainclothes officers working in

9   the Mission District the people we were coming into contact

10  with and investigating were not big dope dealers.  They weren't

11  big drug dealers, so we weren't talking huge amounts of drugs

12  or huge amounts of money.  So the amounts were very small.

13  **Q.**   Focusing on 2009, when Mr. Furminger was there and before

14  Mr. Robles went to motorcycles, could you provide an estimate

15  of about how many times you were involved with one or both of

16  them -- we'll try to nail down the two of them separately in a

17  moment -- in the theft of property and/or money?

18  **A.**   It could easily have been two or three times a week.  So,

19  then, multiply that out four times for the month and then, you

20  know, multiply again with the month.  So it easily could have

21  been 30, 40, 50 times.  I mean, I would just be trying to

22  really estimate.

23  **Q.**   And after -- in 2010, when you were working on your own,

24  or not with Mr. Robles and Mr. Furminger, as it continued,

25  about how many more times did you engage in similar conduct on

1   your own?

2   **A.**   It diminished a bit.  But I still, on occasions, did --

3   did take money, and possibly even property as well.  Uhm, I

4   would just be guessing.  Once or twice a week.  I don't know.

5   Maybe -- sometimes less.  Sometimes even more.

6   **Q.**   In addition to the thefts of money or property during

7   searches, did you and Mr. Robles and Mr. Furminger also engage

8   in other illegal conduct when you were working together in

9   terms of taking something in particular?

10  **A.**   Yes.

11  **Q.**   What was that?

12  **A.**   Uhm, sounds silly.

13      Uhm, around San Francisco there's an antiquated

14  communication system called Call Boxes.  And they're basically

15  hard lines that are wired to different locations where police

16  officers, prior to radios, could walk to this location with a

17  special key, open it up, and have a direct line to the police

18  station, communicate.

19      That system is still there.  Basically, in case of an

20  earthquake or some national disaster, the cell towers would all

21  fail, the hard lines would still be available for emergency

22  personnel to communicate.

23      Some of these boxes are a hundred years old.  Very old and

24  very ornate.  And what we would do is we saw that the City was

25  taking some out.  And we thought they were removing them and

 1  eliminating them out of the system.  And we wanted some as

 2  souvenirs, essentially.

 3      So what we would do is go out with a Sawzall, an electric

 4  saw, and search around and find ornate and very old ones.  And

 5  a lot of them, the really old ones, had the date of

 6  manufacturing stamped right on it.  And we would just cut them

 7  right off the telephone poles and take them.

 8  Q.  Was there ever a time that the three of you located some

 9  small -- either large fireworks or small explosive devices,

10  depending on how you think of them?

11  A.  Uhm, yes.

12  Q.  And when was that?  Or where was that?

13  A.  I don't recall being involved in the incident where those

14  were recovered, but it came to my knowledge that subsequent to

15  some search and arrest some M1000s -- which are pretty large;

16  basically a giant firecracker -- were recovered in a search.

17      And we used to drive around and set -- set them off.  And

18  they're really, really strong.  And so strong, in fact, that if

19  you were to put one on the asphalt it would actually take up

20  some of the asphalt in the explosion.

21  Q.  And when you say you used to drive around and set them

22  off, what would you do?

23  A.  Well, myself, Mr. Robles, and Mr. Furminger, you know, we

24  started -- sometimes our shifts, we would start at 6:00 a.m.

25  So we would drive around.  And the streets would be very empty

 1  then.  And we would just light one.  You know, open the car

 2  door and light one on the street, and take off, away from the

 3  thing, and leave the thing burning on the street.  And this

 4  huge explosion would happen.  And we'd go back and see that it

 5  had blown a tiny, little hole in the asphalt.

 6  **Q.**   Did you, in your work at Mission Station, come across a

 7  person by the name of Sergio?

 8  **A.**   Yes.

 9  **Q.**   And when I say "Sergio," do you know who I'm talking

10  about?

11  **A.**   Yes.

12  **Q.**   Who am I talking about?

13  **A.**   You're talking about the fence, the person that deals with

14  stolen property over at 20th and Mission.

15  **Q.**   How did you come across Sergio?

16  **A.**   When I first started working in the Mission -- and

17  subsequently, later, when I returned to the Mission -- Sergio

18  was essentially an institution there.

19      I mean, he was there like a statue, every single day,

20  doing -- you know, plying his trade.

21  **Q.**   And what was his trade?

22  **A.**   His trade was buying property from people off the street

23  and then turning around and selling it.

24  **Q.**   And what was the nature of that property?

25  **A.**   Uhm, stolen.

1  Q.    How do you know that?

2  A.    Uhm, based on his sources of property.  And they were

3  coming from auto boosters, people breaking into cars, as well

4  as people breaking into houses or constructions sites.  And so

5  he was buying all of that sort of property.

6  Q.    Did you ever sell anything to Sergio?

7  A.    Yes.

8  Q.    What did you sell him?

9  A.    Uhm, I -- on several occasions, I sold items that I had

10  recovered during searches.  So always small things like iPods

11  or something along those lines.

12      I even sold property that I had purchased myself

13  legitimately, that I just didn't want to deal with listing on

14  eBay or Craigslist, and just had him sell it for me.

15  Q.    Did you ever discuss Sergio with either Mr. Robles or

16  Mr. Furminger?

17  A.    Yes.

18  Q.    And what was -- what were the nature of your discussions

19  about Sergio with each of them?  And if you could be specific,

20  if they were different, what were the nature of those

21  discussions?

22  A.    There was a big incident that occurred in me -- prior to

23  my -- as I said earlier, prior to my plainclothes assignment I

24  was a bicycle beat cop.  And so I was often riding up and down

25  on Mission Street.  So I knew a lot of these people, especially

1  people like Sergio, who were always there on the street all the

2  time.  They would see me riding a bicycle.

3       The incident was a -- an individual who was involved with

4  a very large movie production had some -- had, basically, a

5  copy of the movie on a laptop.  And his laptop had gotten

6  stolen.

7       And because of my relationship with Sergio and my

8  knowledge of how he did business, I remember someone from the

9  Hall of Justice, one of the specific bureaus, coming to contact

10 me regarding Sergio, if I could ask him to help locate this

11 laptop.

12 **Q.**   And did you do that?

13 **A.**   Yes.

14 **Q.**   And was the laptop located, ultimately, by Sergio?

15 **A.**   Ultimately, it was, yes.

16      But in that, that is how, as I recall, Mr. Furminger kind

17 of got to know Sergio, because Mr. Furminger got involved in

18 that investigation as well.

19 **Q.**   And do you know from speaking with Mr. Furminger what the

20 nature of his relationship with Sergio was?

21 **A.**   Uhm, Mr. Robles, Mr. Furminger, and myself, especially

22 Mr. Robles and myself, we had a very similar relationship with

23 Sergio in that items that we would remove/steal during searches

24 we would then give to Sergio to sell.

25      I, myself, bought some items from Sergio.  And I believe

 1  that was more of the nature of -- Mr. Furminger's relationship

 2  with Sergio was more as a buyer.

 3  **Q.**  How do you know that?

 4  **A.**  Because he told me things he bought from him.

 5  **Q.**  Did you ever get anything from Sergio for free?

 6  **A.**  No, I don't believe so.

 7  **Q.**  Do you know from speaking to Mr. Robles whether he ever

 8  got anything from Sergio for free?

 9  **A.**  Not that I'm aware of.  And in dealing with Sergio,

10  oftentimes we would do so separately.

11      I would -- you know, if I had something I was going to

12  sell, I would do that on my own.  And the same thing with the

13  others as well.  And so oftentimes we were meeting him

14  individually.  So not that I'm aware of.

15  **Q.**  Was Sergio a source, a CI?

16  **A.**  Yes, he was.

17  **Q.**  And what officer was his handler, if you will?

18  **A.**  I believe I registered him.

19  **Q.**  Initially?

20  **A.**  I can't -- I can't say that for sure, but I know -- in

21  terms of a source of information, he was a source of

22  information to many police officers.  Probably many before I

23  was ever at Mission, and probably -- and after I was gone.

24      But in terms of formal registration, I know I had him

25  formally registered.  But I don't know if anyone else did prior

 1   to me.

 2   Q.   The commercial relationship that you had with Sergio, that

 3   you described earlier, was that a legal relationship or illegal

 4   relationship?

 5   A.   It was illegal.

 6   Q.   Why?

 7   A.   Well, because I was using him to sell stolen items for me.

 8   Q.   In addition to that illegal relationship, were there

 9   occasions on which Sergio actually provided assistance to the

10   SFPD in -- in performing its official duties?

11   A.   Numerous times.

12   Q.   So it was both?

13   A.   Absolutely.

14   Q.   I want to direct your attention, Mr. Vargas, to an

15   incident that took place involving an individual by the name of

16   Manny.

17        Do you remember arresting somebody whose name, street name

18   perhaps, was Manny?

19   A.   Yes.

20        **MR. HEMANN:**   And, Your Honor, this pertains to tab 5

21   in the binder.

22   **BY MR. HEMANN:**

23   Q.   Who, Mr. Vargas, was Manny?

24   A.   Uhm, he was a pretty sizable drug dealer who controlled

25   territories in San Francisco -- I don't believe in the East

1  Bay, but I believe on this side of the Bay -- from, probably,

2  in San Mateo County and San Francisco County.

3  **Q.**   What kind of drugs was he dealing?

4  **A.**   He dealt with cocaine, meth, and heroin.

5  **Q.**   Was -- how did Manny first come to your attention?

6  **A.**   Uhm, we had developed a relationship -- and I should say

7  specifically Mr. Robles and I -- with an informant we called

8  The Shah.  And The Shah used to be an employee of Manny's.  And

9  that's how we came to know Manny.

10  **Q.**   And what did you learn from The Shah --

11          **MR. HEMANN:**   And this is not offered for the truth,

12  Your Honor.

13  **BY MR. HEMANN:**

14  **Q.**   What did you learn from The Shah about Manny?

15  **A.**   What Manny did was Manny, in a sense, ran a distribution

16  network --

17  **Q.**   Let me stop you, Mr. Vargas.  This is what The Shah told

18  you about what Manny did?

19  **A.**   Yes, absolutely.

20  **Q.**   And The Shah, just to elaborate on him a little bit, he's

21  an informant.  What kind of informant -- what was his deal?

22  **A.**   He was a -- well, a drug dealer, especially during his

23  employment with Manny; and later on a drug user; but a formal

24  informant, first of Mr. Robles and then myself.

25  **Q.**   Was he an informant of Mr. Robles when you began working

 1   with Mr. Robles in 2009?

 2   **A.**    Yes.

 3   **Q.**    And after Mr. Robles left did you continue using The Shah

 4   as your informant?

 5   **A.**    Yes.

 6   **Q.**    Okay.  So what did The Shah tell you about Manny's

 7   business?

 8   **A.**    Basically, drug users would call a phone number that was

 9   run by Manny, and put in an order for a specific type of

10   narcotics.  One of those three, either heroin, cocaine, or

11   meth.

12        Manny then had multiple drivers driving multiple cars,

13   driving around the city.  And they would basically order

14   pick-ups and order drop-offs at certain locations.

15        Manny's system were to put the drugs in balloons and color

16   code the balloons for the type of drugs.  And Manny would tell

17   his driver, okay, drop three red balloons at this intersection.

18   And the driver would arrive there, and there would be a

19   purchaser there.  They would pay the money.  And the person

20   would drop the drugs and move on.

21        And The Shah was one of those drivers.

22   **Q.**    Other than the information that you -- by the way, did

23   Manny have a -- a real name or another name that you became

24   aware of at some point?

25   **A.**    Yes.  But I just don't remember it right now.

1  Q.   Would it refresh your recollection to look at a

2  San Francisco Police report regarding him?

3  A.   Yes.

4          MR. HEMANN:   Your Honor, I'm going to show the witness

5  Exhibit 247.  It doesn't need to be displayed, but just to

6  refresh his recollection.

7      (Witness reviewing document.)

8  BY MR. HEMANN:

9  Q.   Does that refresh your recollection as to Manny's real

10 name?

11 A.   Yes.

12 Q.   What was Manny's real name?

13 A.   Sergio Vasquez.  V-a-s-q-u-e-z.

14 Q.   So other than the information that you obtained from

15 The Shah about -- about Mr. Vasquez, did you know whether he

16 was under investigation in a -- by other drug enforcement

17 agencies?

18 A.   We later came to learn that -- "we" meaning myself,

19 Mr. Robles, and Mr. Furminger -- came to learn that that was,

20 in fact, the case.

21 Q.   And at some point in time you actually arrested

22 Mr. Vasquez; correct?

23 A.   Yes.

24 Q.   Did you learn that before or after -- did you learn that

25 he was the subject of a large investigation before or after you

1   arrested him?

2   **A.**    Before.

3   **Q.**    So at some point in time did you develop an interest --

4   you, Mr. Robles and Mr. Furminger -- in targeting Mr. Vasquez?

5   **A.**    Yes.

6   **Q.**    And did you do that knowing that he was the subject or a

7   subject in a larger investigation?

8   **A.**    Yes.

9   **Q.**    So why were you -- why were you interested in this?

10  **A.**    We later came to find out that --

11  **Q.**    When you say "later," be a little more specific.

12  **A.**    Okay.  For several weeks, with The Shah's help, myself,

13  Mr. Robles, and Mr. Furminger were targeting these drivers that

14  were delivering narcotics within the Mission District.

15      And we were -- "we" meaning the three of us -- were able

16  to affect several arrests of these drivers and recover pretty

17  substantial amounts of narcotics, especially, again,

18  considering the assignment that we had.

19      Subsequently, we learned that Mr. Vasquez was the target

20  of a federal investigation and part of a much larger

21  distribution network that had ties south of the border, into

22  Mexico.

23      And we subsequently learned that --

24  **Q.**    Subsequently to talking to the Shah and prior to arresting

25  Mr. Vasquez?

1  **A.**   Prior to arresting Mr. Vasquez, the three of us -- myself,

2  Mr. Robles, Mr. Furminger -- learned that there were pending

3  indictments, federal indictments.  Basically, the case had come

4  to its fruition, and they were about to arrest everybody.  But

5  they had lost track of Manny and three of his co-conspirators.

6  **Q.**   So what did that lead you to do?

7  **A.**   At this point, it was known by -- by these individuals

8  that were investigating Manny that we had a connection to Manny

9  through The Shah.  And, you know, we were also, kind of,

10 somewhat tapped into the same organization but maybe through a

11 different avenue.  And so we were asked, "If you see Manny, try

12 and grab him," because they had lost -- they had lost him,

13 essentially.

14      And they were just about to arrest him, but they didn't

15 know where he was, including his co-conspirators.  So we were

16 asked if we saw him to grab him so they knew where he would be

17 at a location when they unsealed the indictments.

18 **Q.**   So at some point in time did you get sufficient

19 information from The Shah that you were able to develop a plan

20 to actually arrest Manny?

21 **A.**   Yes.

22 **Q.**   And describe what happened, to the jury.

23 **A.**   Manny had had so many drivers arrested that he, in fact --

24 it got to the point where he had to make the deliveries

25 himself.

```
 1        And we learned from The Shah that Manny himself was, in

 2   fact, making drug deliveries one morning.  And we used The Shah

 3   to try and order drugs from Manny, specifically to get him to a

 4   location so that we could arrest him ourselves.

 5   Q.   Did you do that?

 6   A.   Yes.

 7   Q.   Where was that location?

 8   A.   Uhm, it was in the South of Market area, on one of the

 9   little side alleys below Mission Street, near Natoma or Minna,

10   around Sixth and Eighth.  In that general area.

11   Q.   Outside the Mission District?

12   A.   Yes.

13   Q.   So you arrested him?

14   A.   Yes.

15   Q.   Was he in a vehicle?

16   A.   Yes.

17   Q.   You stopped the vehicle?

18   A.   Yes.

19   Q.   Who was there from the SFPD?

20   A.   Uhm, myself and Mr. Robles for sure.  I believe,

21   Mr. Furminger.  And, I believe, we used -- we may have used

22   another unit there for the traffic stop.

23   Q.   And when you say "the traffic stop," just pulling over the

24   vehicle initially?

25   A.   The physical act of pulling the vehicle over, getting it
```

1    to stop.

2    **Q.**    Once the vehicle stopped, what did you find?

3    **A.**    We found -- well, Mr. Vasquez was there with his wife as

4    well as children -- but a sizable amount of narcotics as well.

5    **Q.**    Based on locating the narcotics -- and, by the way, to

6    your knowledge, had an arrest warrant been issued related to

7    the larger indictments at that point in time?  Was he wanted?

8    **A.**    No, he was not.  That had not happened yet.

9    **Q.**    Okay.  So based on the dope that you found in the car, did

10   you arrest Mr. and Mrs. Vasquez?

11   **A.**    We arrested Mr. Vasquez and detained Mrs. Vasquez.

12   **Q.**    Explain the difference between -- maybe it all seems the

13   same to the person in handcuffs, but explain the difference

14   between an arrest and a detention.

15   **A.**    A detention isn't an arrest.  The person may, in fact, be

16   released, given a certificate of release, with no arrest on

17   their record.  Basically, at that moment in time, they're not

18   free to go.  They are being held by police.  But they may, in

19   fact, be later released.

20   **Q.**    So is it -- is it appropriate to say that everybody is

21   initially detained, and sometimes those detentions become

22   arrests when the person is booked?

23   **A.**    That's correct.  Anytime a police officer says "stop" or

24   "don't move," that's kind of the beginning of the detention.

25   When you're not free, of your own volition, to make any

1   movement that's -- that's a detention.

2   **Q.**   So were both Mr. and Mrs. Vasquez detained initially,

3   based on locating the drugs in the car?

4   **A.**   Yes.

5   **Q.**   And what did you do with them?

6   **A.**   With the people or the drugs?

7   **Q.**   With the people.

8   **A.**   With the people, everybody was taken back to Mission

9   Station.

10  **Q.**   Including the children?

11  **A.**   Yes.

12  **Q.**   And what did you do with Mr. and Mrs. Vasquez once you got

13  to Mission Station?

14  **A.**   We attempted to interview them and, basically, generate

15  more information, attempting to get a consent to search their

16  residence.

17  **Q.**   Was Mr. Vasquez forthcoming with information?

18  **A.**   No.

19  **Q.**   Was Mrs. Vasquez?

20  **A.**   Yes.

21  **Q.**   Did you find out something from her that you did not

22  previously know about their residence?

23  **A.**   Yes.

24  **Q.**   What did you find out?

25  **A.**   Through The Shah we -- we -- and I believe it was one of

1    his residences.  We thought we knew where Mr. Vasquez and his

2    wife and family lived.  I believe it was in either East Palo

3    Alto or Redwood City.  But when we --

4    **Q.**    And when you say "we" thought they lived in East Palo Alto

5    or Redwood City, are you talking about you, Mr. Robles, or

6    Mr. Furminger, or, sort of, law enforcement generally who was

7    focused on them?

8    **A.**    Not only us specifically, but I believe law enforcement

9    generally thought that that was his location.

10   **Q.**    What did you find out that was different than that?

11   **A.**    Mrs. Vasquez did, ultimately, give us a consent to search

12   her residence.  But when she wrote out the address she wrote

13   out an address that we were completely unaware of.

14   **Q.**    Where was that address?

15   **A.**    I believe it was in Newark.

16   **Q.**    Newark, California?

17   **A.**    California, yes.

18   **Q.**    When you found out that she -- they had a home in Newark,

19   what did you do?

20   **A.**    Well, with the consent to search we then contacted someone

21   from Newark P.D., got permission from someone there at the

22   station, and drove out there.  Myself, Mr. Robles, and

23   Mr. Furminger drove out there to affect that search.

24   **Q.**    You did not call the San Francisco Police Department

25   Narcotics Unit; correct?

1   **A.**   No.

2   **Q.**   You did not call the DEA; correct?

3   **A.**   No.

4   **Q.**   Why did you call a Newark -- the Newark Police Department?

5   **A.**   We were going to be responding into another jurisdiction.

6   And that would be, kind of, standard protocol if we were, you

7   know, conducting any sort of police business, to notify them

8   that, in fact, we would be there.

9       Also, we were plainclothes police officers in an unmarked

10   police car.  And so, you know, to the common eye we may look

11   like criminals attempting to break into a house when, in fact,

12   we were law enforcement.

13   **Q.**   How were you planning on getting into the house?

14   **A.**   They don't -- I don't believe we were provided keys, but

15   Mrs. Vasquez told us that a window, a front window of the house

16   was unlocked.

17   **Q.**   So did you call the police so that the police didn't show

18   up when they -- somebody saw you climbing into the window?

19   **A.**   Essentially, yes.

20   **Q.**   So you drove down to Newark?

21   **A.**   Yes.

22   **Q.**   When you got to Newark, what did you do?

23   **A.**   We met with an officer from that department, and then

24   entered the residence and affected the search.

25   **Q.**   When you say "affected the search," what do you mean?

1  **A.**    We just started going through the place.  We started

2  searching everything.

3  **Q.**    Did you search inside the house?

4  **A.**    Yes.

5  **Q.**    Did you find any evidence of drug dealing/narcotics

6  trafficking in the house?

7  **A.**    Yes.

8  **Q.**    What did you find, generally?

9  **A.**    Uhm, we found large trash bags, like garden trash bags,

10 inside the dishwasher, which obviously stood out as very odd as

11 why would someone take the time to put a trash bag inside a

12 dishwasher to wash it.

13     But in taking out the trash bag it had an extremely strong

14 scent of vinegar, which is a scent that's associated with

15 heroin.  So we thought maybe this is the right -- this is the

16 spot, because bulk heroin is possibly coming in these bags.

17 They're trying to wash them to get rid of the smell.

18 **Q.**    Did any of the officers that were there, you included,

19 find cash in the house?

20 **A.**    Yes.

21 **Q.**    Which officer found cash in the house?

22 **A.**    I believe it was Mr. Furminger.

23 **Q.**    Was the Newark police officer aware, or do you know

24 whether the Newark police officer was aware that cash was found

25 in the house?

1   **A.**    Yes.

2   **Q.**    How do you know that?

3   **A.**    Because I think we told him.

4   **Q.**    Was he assisting in the search of the house?

5   **A.**    Yes.

6   **Q.**    So at some point in time did you leave the inside of the

7   house and go elsewhere to continue the search?

8   **A.**    Yes.

9   **Q.**    And where did you go search?

10   **A.**    I went into their enclosed backyard area.

11   **Q.**    Why did you do that?

12   **A.**    It was another location to search.  And, also, just kind

13   of thinking about who we were dealing with, and all of that, I

14   knew there was a possibility that there may be something in the

15   backyard.

16   **Q.**    Did you -- what did you do when you got out there?  What

17   did you see?

18   **A.**    I looked around at the yard.  I noticed that the yard

19   wasn't really landscaped well.  It was pretty sparse.  But in

20   looking around in the yard, they had a shovel sitting out there

21   in the backyard.  And so that, kind of, stood out to me because

22   there was a shovel but there's no landscaping.

23        And so I just started, kind of, poking my foot around onto

24   the ground.  And, you know, the ground was pretty hard-packed.

25   And as I was just poking around, you know, I was touching

1    hard-packed ground, hard-packed, hard-packed, and all the

2    sudden hit a patch of ground that was soft.

3    **Q.**    And, in your experience, what did you think about that

4    soft patch of ground?

5    **A.**    Well, putting the totality of everything together, the

6    type of people we were investigating, kind of what I had heard

7    from other informants as well as my own information, you know,

8    I had a general sense that -- that Mexican Nationals tend to

9    bury drugs and money.

10        And so seeing the shovel, seeing no landscaping with it,

11   nothing else really dug up, but feeling the soft-packed ground,

12   I thought I might have found the location where either drugs or

13   money, or both, were hidden.

14   **Q.**    Did you dig up that location?

15   **A.**    I did.

16   **Q.**    What did you find?

17   **A.**    I found both drugs and money.

18   **Q.**    What did you find in terms of drugs?

19   **A.**    More than an ounce -- I found heroin.  And I don't

20   remember the exact amount.  It may have been multiple ounces of

21   heroin.

22   **Q.**    And did you find anything else?

23   **A.**    Yes.

24   **Q.**    What else did you find?

25   **A.**    Cash.

 1  Q.  And when you first saw it, describe what you saw.

 2  A.  Uhm, in digging into the ground I came up with a little

 3  bag that -- and I opened that up, and it had heroin in it.

 4      And then I continued to dig further, and found a much

 5  larger bag.  And that bag had a substantial amount of cash in

 6  it.

 7  Q.  As you stood in the backyard and looked at that cash, did

 8  you count it at that time?

 9  A.  No.

10  Q.  What did you do with the cash?

11  A.  I then took the cash.  And it was pretty much a large

12  volume.  And I actually walked from the backyard, through the

13  house, into the front yard, and put it in -- in our car.

14  Q.  When you did that, as you were walking back through the

15  house did you see any of the other officers?

16  A.  No.

17  Q.  Could you perceive where they were?

18  A.  I believe -- this is a two-story residence.  I'm pretty

19  sure everybody was upstairs, still searching, at that point.

20  Q.  As you walked through the house and got upstairs, did you

21  announce to anybody -- or got through the house, into the car,

22  did you announce to anybody that you had located drugs or cash?

23  A.  When I came back from dropping the money off, into the

24  car, then I announced to them that I had found drugs.

25  Q.  You didn't tell anybody that you had found the money?

1   **A.**   No.

2   **Q.**   Why not?

3   **A.**   My concern initially was the -- the Newark officer.  I

4   didn't want him to be aware that I had found money.

5   **Q.**   Did you intend to keep the money?

6   **A.**   Yes.

7   **Q.**   At some point in time did the search wrap up?

8   **A.**   Yes.

9   **Q.**   And when the search wrapped up, did the Newark police

10  officer go his own separate way?

11  **A.**   Yes.

12  **Q.**   And did you and Mr. Robles and Mr. Furminger return to

13  San Francisco?

14  **A.**   Yes.

15  **Q.**   Did you return in the same car?

16  **A.**   Yes.

17  **Q.**   And where were the three of you in the car?

18  **A.**   I recall Mr. Furminger was driving, and Mr. Robles was in

19  the front passenger seat.  And I was sitting in the backseat.

20  **Q.**   At some point in time did you talk with them about the

21  money?

22  **A.**   Yes.

23  **Q.**   And could you describe for the jury how that -- in the

24  car?

25  **A.**   Yes.

1  **Q.**   On the way home?

2  **A.**   Yes.

3  **Q.**   Can you describe for the jury how that conversation took

4  place?

5  **A**    Initially, we were talking about the search and everything

6  we had located.  And honestly, honestly, they -- "they" being

7  Mr. Robles and Mr. Furminger -- were disappointed.  We

8  recovered some money, but nothing of real, real substance.

9        And then I both informed them, like, "Hey you guys, I

10 found it."

11 **Q**    Did the three of you drive down together to Newark?

12 **A**    Yes.

13 **Q**    And on the way, did you discuss the possibility of finding

14 cash in the house?

15 **A**    Yes.

16 **Q**    Tell the jury about that discussion.

17 **A**    We were both -- we knew that especially at this point,

18 realizing that Manny was the focus of a very large

19 investigation, that this was the type of dealer that we've

20 rarely came into contact with, especially to be able -- for us

21 to effect arrests on someone of his stature.  And so, the

22 possibility of a large amount of money was definitely on our

23 minds.

24       And so we were -- you know, there was anticipation.  We

25 were excited, like wow, this could really be good.  We could

 1  really hit a big score here.

 2  **Q**    And when they expressed disappointment in the car on the

 3  way home, did you respond to that somehow?

 4  **A**    Yes.

 5  **Q**    How did you respond?

 6  **A**    I told them that I had found it.  You know, I don't

 7  believe they were aware of it at all at that point.  And I told

 8  them that I had, in fact, found a substantial amount of cash.

 9  **Q**    And, did you time your disclosure of this to be -- to

10  surprise them somehow, or to please them somehow?

11  **A**    Exactly that.  So, to surprise them.  You know, they were

12  expressing disappointment, and I kind of, you know, I was --

13  you know, I knew that I had found it, and so I kind of let them

14  in on it, that I had, in fact, found it.

15  **Q**    When you returned to Mission Station, were Mr. and

16  Mrs. Vasquez both still there?

17  **A**    I believe -- I don't know if Mr. Vasquez was there.  He

18  may have, in fact, been transported down to 850 Bryant at that

19  time.  But I believe Ms. Vasquez was there.

20  **Q**    And, was Ms. Vasquez -- Mrs. Vasquez released?

21  **A**    Yes.

22  **Q**    And, who authorized her release?

23  **A**    Well, a supervisor probably released her.  That could have

24  been Mr. Furminger, I don't recall exactly on the report,

25  but -- yeah.

 1  **Q**    Did you and Mr. Furminger and Mr. Robles all concur with

 2  Mrs. Vasquez's release?

 3  **A**    Yes.

 4         **MR. HEMANN:**  Your Honor, this would probably be a

 5  pretty good time for a break.

 6         **THE COURT:**  Okay.  Ladies and gentlemen, we're going

 7  to take our recess now.  We are going to be in recess until

 8  twenty to 11:00.

 9      Remember the admonition given to you:  Don't discuss the

10  case, allow anyone to discuss it with you, form or express any

11  opinion.

12      (Jury excused)

13         **MR. HEMANN:**  Thank you, Your Honor.

14      (Recess taken from 10:22 to 10:41 a.m.)

15      (The following proceedings were held outside of the

16  presence of the Jury)

17         **THE COURT:**  Okay, bring in the jury.

18      (The following proceedings were held in the presence of

19  the Jury)

20         **THE COURT:**  Please be seated.

21      Okay.  Let the Record reflect all jurors are present.

22  Parties are present; witness is on the stand.

23      You may proceed.

24         **MR. HEMANN:**  Thank you, Your Honor.

25

BY MR. HEMANN:

Q    Mr. Vargas, before the break, we were talking about the --

the search that you conducted in Newark, California.

A    Yes.

Q    Do you remember about how big the backyard was?

A    It wasn't a huge backyard.  Maybe, um, maybe about 30 feet

deep and about 20 feet wide, something like that.  It wasn't --

wasn't a huge area.

Q    Could you describe it or size it based on landmarks here

in the courtroom, somehow?

A    Sure.  It was smaller than this area (Indicating), being

behind Your Honor's seat, the wall, over to that first row

there.  Smaller than this area.

     If you were to cut out the jury box maybe, maybe the

smaller rectangle, maybe to the front of Your Honor's desk here

to that wall (Indicating), eliminating the jury box, just a

rectangular shape.

Q    When you got into the car, and told Mr. Furminger and

Mr. Robles that you -- you had money, at that point in time,

had you counted the money yet?

A    No.

Q    When did you count the money?

A    I counted the money on the ride back from Newark to

San Francisco.

Q    And, did you count it in the presence of Mr. Robles and

1    Mr. Furminger?

2    **A**    Yes.

3    **Q**    How much money was there?

4    **A**    A little bit over $31,000.

5    **Q**    Did you and Mr. Robles and Mr. Furminger discuss how to

6    divide the money?

7    **A**    I don't know if we discussed it, but I -- I split the

8    money into three exact portions of $10,000 each.

9    **Q**    And did you do that in the car?

10   **A**    Yes.

11   **Q**    And what did you do with the money?  With those three

12   exact portions?

13   **A**    I gave 10,000 to Mr. Furminger; I, myself, kept 10,000; I

14   gave 10,000 to Mr. Robles.

15          And the additional amount was also given to Mr. Robles,

16   with the intention that it would end up going to the Shah as

17   payment for his information.  So, I believe that was over

18   $1,000, could have been 12, $1,300 additional to the 30.

19   **Q**    Do you know whether that additional thousand or so dollars

20   ended up going to the Shah?

21   **A**    I do not.

22   **Q**    After you split the money up with Mr. Furminger and

23   Mr. Robles, did there come a time that you talked about it

24   again with them?

25   **A**    Yes.

1    Q    How long afterwards?

2    A    A couple of days after, after we recovered the cash.

3    Q    Do you remember where that conversation took place?

4    A    Yes.

5    Q    Where was it?

6    A    It was in Noe Valley; it was one of the smaller streets

7    off of 24th Street.  Parallel to it, so maybe Elizabeth or one

8    of those smaller streets.

9    Q    Was it in a particular place?  Or was that on the street?

10   A    It was on the a street.  And we were driving in the -- in

11   our Crown Victoria, unmarked police car.

12        And, and basically I -- I didn't know what to do with that

13   much cash.  I had never really dealt with a huge amount of cash

14   before, so I kind of had this anticipation, and I was dying to

15   ask them what they were doing with their portions of the money.

16        And so I asked them, "What are you guys doing?  What are

17   you guys doing with all this money?"

18        And I was hushed, told not to speak by -- by

19   Mr. Furminger.  We parked the car, and got out of the car.  We

20   then turned off our police radios.

21        And, there used to be a belief that there was a function

22   with our police radios that gave Dispatch the ability to

23   remotely activate our microphones, basically key it in so that

24   you could hear a conversation without the officer, themselves,

25   keying it.

```
 1        So we actually took the batteries out of our radios,
 2   enabling it useless, and then discussed what we were going do
 3   with the money.
 4   Q    What was your plan for dealing with your portion of the
 5   money, the $10,000?
 6   A    I honestly didn't know.  I think that was part of the
 7   reason why I was so curious what they were going to be doing
 8   with their portions of the money.
 9   Q    How ultimately did you spend your $10,000?
10   A    I bought a -- bought a large television.  And, later on, I
11   purchased a bicycle.
12   Q    Did you talk to Mr. Furminger about what his intention was
13   with the money that he obtained, the $10,000 he obtained?
14   A    Yes.
15   Q    What did Mr. Furminger tell you?
16   A    He said he was putting in solar skylights in his
17   residence.
18   Q    Anything else?
19   A    Not that I recall, no.
20   Q    Did you talk to Mr. Robles about what he was doing with
21   his portion of the cash?
22   A    Yes.
23   Q    What did he tell you?
24   A    He told me he was going to buy a bicycle.
25   Q    Did he describe to you at that point in time the bicycle
```

 1   that he was interested in?

 2   **A**    Then, no.  But just the -- that he was going to be

 3   actively searching to purchase the bicycle.

 4   **Q**    Did you know prior to that that he had been in the market

 5   for a bicycle?

 6   **A**    No.

 7   **Q**    After he told you that, did you have further discussions

 8   with Mr. Robles about the bicycle?

 9   **A**    Yes.

10   **Q**    What were those discussions?

11   **A**    He was actively looking on Craigslist.  And I'm not

12   talking about a normal bicycle.  I'm talking about a very, very

13   high-end road bicycle.  And so at one point we actually met

14   with an individual so that he could view the bicycle.

15        It was -- I remember the bike.  It was a Belgian bicycle

16   made by the company Ridley.  Very, very high-end bicycle.  Even

17   used, that bicycle would be several thousand dollars.  And so,

18   we went and viewed that bicycle, but Mr. Robles did not

19   purchase that bike.

20   **Q**    Ultimately did Mr. Robles purchase a bike -- did you

21   discuss with Mr. Robles him purchasing a bicycle with that

22   money?

23   **A**    Yes.

24   **Q**    Do you know what kind of bicycle it was that he purchased?

25   **A**    Yes.

1    **Q**    What kind of bicycle was it?

2    **A**    He purchased a Pinarello Dogma, an Italian road bike,

3    very, very high-end and very rare.

4    **Q**    Did you physically see the bicycle in the immediate

5    aftermath of Mr. Robles purchasing it?

6    **A**    I don't know if I saw it immediately after, but we

7    definitely -- "we" meaning myself and Mr. Robles, we definitely

8    talked about it.

9        I, myself, am a pretty avid road cyclist, and I know that

10   particular bike very well.  So, I mean, I was really jealous

11   and I was real interested in how it rode, what it was like

12   riding that bike.  And so we talked about it, several times,

13   about different bike rides he had gone on the bike, its

14   performance, that sort of thing.

15   **Q**    At some point in time did you come into possession of that

16   bike?

17   **A**    Yes.

18   **Q**    How did that come about?

19   **A**    Mr. Robles just stopped riding the bike that much.  And, I

20   really wanted it.  And I told him that.  And, "That's terrible

21   that you aren't riding that bike; it's collecting dust."  And I

22   would bother him about it, tell him to sell it to me.  "Just

23   sell me the bike."

24       I would bother him about it frequently.  "You know you

25   don't want that bike; you know I deserve it.  Just sell it to

1    me."  And so eventually I did purchase that bike from him.

2    Q     Would you recognize the bicycle if you saw it today?

3    A     Yes.

4    Q     In fact, did you provide the bicycle frame to the FBI

5    after you began cooperating?

6    A     Yes.

7          MR. HEMANN:  Your Honor, may I show the witness an

8    exhibit?

9          THE COURT:  (Inaudible)

10         MR. HEMANN:  Showing the witness what's marked as

11   Exhibit 298.

12        (Witness examines document)

13   Q     Is that a picture of the bicycle?

14   A     Yes.

15         MR. HEMANN:  Your Honor, we move 298 into evidence.

16         THE COURT:  298, admitted.

17        (Trial Exhibit 298 received in evidence)

18        (Document displayed)

19   BY MR. HEMANN:

20   Q    And just so -- I guess we've got the frame, itself, here.

21   Is this the frame that is the bicycle that is depicted in that

22   photograph?

23        (Witness examines item)

24   A     Yes, it is.

25   Q     And this is the -- this is the bicycle that you purchased

 1   from Mister -- Mr. Robles, with the money that you took from

 2   the house in Newark.

 3   **A**     Yes.

 4           **THE COURT:**  That will be admitted, as well.

 5           **MR. HEMANN:**  Yes, thank you, Your Honor.

 6       (Reporter interruption)

 7           **MR. HEMANN:**  Could we just use the same number for the

 8   picture and the frame, Your Honor?

 9           **THE COURT:**  Yeah, picture of bicycle and frame of

10   bicycle will be 298.

11           **MR. HEMANN:**  Thank you.

12   **BY MR. HEMANN:**

13   **Q**     In the aftermath of the Manny -- well, let me stop.  Did

14   you do anything else with regard to the -- the Sergio Vasquez

15   investigation?

16   **A**     Yes.

17   **Q**     What else did you do?

18   **A**     Um --

19   **Q**     Let me direct your attention to the couple of days after

20   the search of the Newark house.

21   **A**     Yes.

22   **Q**     What did you do?

23   **A**     Again, with information provided from the Shah, we learned

24   that Mrs. Vasquez, along with two other co-conspirators, were

25   then -- basically, taken up the job, and were actually making

 1  the narcotics deliveries, themselves.  Again, in the Mission

 2  District.

 3       And, once we became aware of the location, we responded

 4  out to that location and stopped that car, effected a traffic

 5  stop.  Stopped that car, and recovered quite a bit of narcotics

 6  from that car with them.

 7  Q    And at that point in time, was Mrs. Vasquez arrested?

 8  A    Yes.

 9  Q    After the Vasquez arrests, did you receive any

10  commendations for your work in connection with that case?

11  A    Yes.

12  Q    How did you come about receiving those -- that

13  commendation?

14  A    Mr. Furminger, who was our supervisor, put up myself,

15  Mr. Robles, and himself up for a commission commendation for

16  our work as part of the larger ultimate federal investigation

17  in that entire case, which Manny and those co-conspirators,

18  including his wife, were a target.

19  Q    And who amongst you, the three of you, received

20  commendations?

21  A    All three of us.  Myself, Mr. Robles and Mr. Furminger

22  received a Police Commission commendation.

23  Q    Was that an unusual commendation to receive?

24  A    It was much higher than the standard sort of inter-station

25  commendation.  So it came with a -- on a parchment, a big

1    proclamation.  We wear a formal uniform and the jacket, we call

2    it an Ike jacket.  And there was actually little ribbon that

3    comes along with that commendation, and it gets permanently

4    placed on your jacket.  So, it was a commendation of note.

5    **Q**    And was this -- the $30,000, you describe it as -- how

6    significant, relative to the other thefts that you engaged in?

7    **A**    The largest by far, many times over.

8    **Q**    Did you continue to look for similar sized or big hits?

9    **A**    Sure.

10   **Q**    And did you discuss doing that with Mr. Furminger and

11   Mr. Robles?

12   **A**    Yes.

13   **Q**    At some point in time, did you get a tip from Cesar

14   Hernandez or some information from Cesar Hernandez with regard

15   to somebody by the name of El Moreno?

16   **A**    Yes.

17   **Q**    What was the nature of that tip?

18   **A**    Moreno, as we called him, was someone that Cesar Hernandez

19   was very familiar with, and had known for many years.  And, he

20   described him to us as a pretty sizeable heroin trafficker,

21   dealing in heroin in, I believe, the Tenderloin area.  And

22   sizable amounts, every day, day after day.

23   **Q**    Did you formulate some sort of plan that was directed

24   towards El Moreno?

25   **A**    Yes.

1  Q   What was the plan that you developed, and who did you

2  develop it with?

3  A   In talking to Cesar, he described to us that Moreno had a

4  -- what he would do is he had -- basically he would dig holes

5  in Golden Gate Park, and that's where he would stash his drugs

6  and money.  And so we were trying to figure out a way to follow

7  him back to those locations.

8      We knew where he lived; we knew his residence.  But based

9  on information from Cesar Hernandez, we knew that there would

10 be nothing inside the residence.  That if we were to in fact

11 generate a search warrant for the place, that the residence

12 would be clean.  The locations where the drugs and the money

13 were in fact somewhere else, buried in the ground.

14 Q   Now, that sounds a little crazy to somebody who uses a

15 bank.  But was that information that somebody's burying cash in

16 Golden Gate Park something that struck you as being irrational?

17 A   No, especially based -- after the Manny incident, the idea

18 of people burying their money and drugs underground seemed

19 pretty credible to me.

20 Q   And had you discussed the practice, if you will, of

21 burying money in the backyard or in the ground with

22 Mr. Hernandez?

23 A   Yes.

24 Q   So, what plan did you decide, what was the -- the plan to

25 find this money?  How were you going to use Mr. Moreno to find

1    this money?

2    **A**    We needed to either have a purchase or we just needed to

3    figure out some sort of way to necessitate him to respond back

4    to those locations, either by -- not purchasing drugs, because

5    that was a common practice, but basically catch him at the end

6    of his shift of serving drugs, going back to his -- you know,

7    back to those hiding holes, or something along those lines.

8        Or in the case with Mr. Hernandez, have Mr. Hernandez pay

9    off some money to Moreno, so that Moreno could then take the

10   money back to his hiding locations.

11   **Q**    How did you make that happen?  Or, did you make that

12   happen?

13   **A**    Yes.

14   **Q**    How did you make it happen?

15   **A**    Cesar Hernandez, you know, using his long-time

16   relationship with Moreno, was fronted or given some narcotics

17   on credit that he would then in turn sell, and give the, kind

18   of, wholesale amount back to Moreno, keeping the profits for

19   himself.

20   **Q**    And did he do that?

21   **A**    Yes.

22   **Q**    What sort of drug was it?

23   **A**    Heroin.

24   **Q**    Were you involved in watching or observing or surveilling

25   or something the money going back to El Moreno from

1    Mr. Hernandez?

2    **A**    We attempted to.  Yes.

3    **Q**    How did that work out?

4    **A**    We tried to -- we knew where Moreno would be meeting Cesar

5    to pick up that money, and we knew in the general sense of what

6    his destination was ultimately, and we tried to follow him back

7    to that location.

8        But Moreno was good.  He -- you know, he used a lot of

9    what you would call counter-surveillance techniques.  He would

10   park, stop for a while, pull forward again, make a U-turn and

11   go back, leave his car for a while, walk back to the car.  All

12   these sort of types of techniques, to see if there was anybody

13   following him or anybody behind him.  And all the time he's

14   looking around, himself, to see if anyone is around.

15   **Q**    Now, did you actually follow him in the direction of

16   Golden Gate Park?

17   **A**    We tried, yes.

18   **Q**    Did you -- did you follow him ultimately to a place where

19   he was digging holes?

20   **A**    Yes.

21   **Q**    And did you see him digging holes?

22   **A**    We never got -- I never got close enough to actually see

23   him digging holes.  We followed him, I mean, generally, in the

24   -- in an area of Golden Gate Park, but we could never get

25   anywhere real close to him.

 1  Q    And I sort of let the "we's" get out of hand here a little

 2  bit.  When you say "we," in this case, who are you talking

 3  about?

 4  A    Mr. Robles and myself.

 5  Q    Not Mr. Furminger.

 6  A    No.

 7  Q    So, you get out there near him in Golden Gate Park.  And

 8  then, is there something that you all followed up on to try and

 9  find the dope and the money?

10  A    I wouldn't say we got very near.  I mean, we knew in the

11  most general sense an area where he was.  But once he left the

12  area, we kind of went to that general area -- "we" being

13  myself, Mr. Robles and Cesar -- in an attempt to locate where

14  he was.  But, we're in the park.  And all it is is sticks and

15  dirt and rocks and trees.

16       And so we just never really -- we couldn't find anything;

17  we couldn't find anywhere that looked freshly disturbed.  We

18  realized it was going to be close to impossible to locate

19  anything.

20  Q    Did you ever find any cash there?

21  A    No.

22  Q    So, you worked at the Mission District Station with

23  Mr. Robles throughout 2009?

24  A    Yes.

25  Q    Were there occasions before 2009 that you would be asked

 1   by another law enforcement agency to assist in will some

 2   particular way?  The FBI, the DEA, ATF?

 3   A    Yes.

 4   Q    Et cetera?  Was there an occasion on which you were asked

 5   by the ATF to assist in a search?

 6   A    Yes.

 7   Q    How did that come about, from what you know?

 8   A    I was working at -- working my assignment at Mission

 9   Station, with Officer Robles, and we were requested to respond

10   out to a location on Potrero Avenue to assist the ATF in

11   executing a search warrant.

12   Q    And did you and Mr. Robles ultimately then go out and do

13   that?

14   A    Yes.

15           MR. HEMANN:  Your Honor, if I could have the witness

16   look at a photograph that's in evidence?

17       Exhibit 271, please, Ms. Lane.

18       (Document displayed)

19           MR. HEMANN:  And, the second page.

20       (Document displayed)

21   BY MR. HEMANN:

22   Q    Is that the residence, Mr. Vargas?

23   A    Yes.

24   Q    What was to be your role in assisting the ATF with regard

25   to this residence (Indicating)?

1  **A**    Just, assist.  They wanted just local law enforcement

2  there.  And we assisted them for a period of time, dealing with

3  all of the folks that were detained in that residence.  As well

4  as assisting them with the actual searching of the residence.

5  **Q**    Do you recall where you searched within that residence?

6  **A**    Yes.

7  **Q**    Where was that?

8  **A**    All over the house.  That lower level, that garage area,

9  behind that, there was a small in- law apartment.  That second

10 level was the living level, but we searched there as well.  But

11 the third level were all bedrooms.  And we searched all of

12 those areas as well.

13 **Q**    Did you search in the company of anybody?

14 **A**    Many people.  There were times when I was alone, and --

15 and several times where there were multiple people searching an

16 area at the same time.

17 **Q**    Did you ever search in the company of Mr. Robles?

18 **A**    Yes.

19 **Q**    And do you remember any part of the house that you

20 searched with Mr. Robles?

21 **A**    Yes.

22 **Q**    What part of the house?

23 **A**    The bedroom -- well, what I guess would be deemed the

24 master bedroom of that house.

25 **Q**    Would you describe what that master bedroom -- sort of how

1    it was configured, what it looked like, to the jury?

2    **A**    Upon entry to the door, there was a large bed kind of

3    placed in the center of the room, and then closets on either

4    side of it.

5         (Off-the-Record discussion between counsel)

6              **THE WITNESS:**  Of that bed.

7    **BY MR. HEMANN:**

8    **Q**    So you searched there.  Were you in that room with

9    Mr. Robles?

10   **A**    I was there, alone, and also in there with Mr. Robles.

11   **Q**    What were you searching for?  What were your directions

12   from the ATF as to what to look for?

13   **A**    Well, this was a gun search warrant, so we were looking

14   for firearms as well as any -- any other -- at this point it's

15   contraband, so basically anything illegal.  It could be drugs,

16   it could be money, any of that sort of thing.  But I think

17   primarily we were looking for guns.

18   **Q**    At some point in time when you and Mr. Robles were

19   searching that room, do you remember Mr. Robles finding

20   anything?

21   **A**    Yes.

22   **Q**    What was it that he found?

23   **A**    He found some cash.

24   **Q**    How did you find that out?

25   **A**    He found some cash and laid it out on the bed briefly, I

1  believe, and -- and just kind of motioned me out of the room,

2  and shut the door behind me for a while.  And, basically

3  placing himself in the bedroom.

4  **Q**   What were you doing out -- you were -- is there a hallway

5  out there?

6  **A**   Yes.  I was then standing in the hallway, basically in

7  front of that bedroom door.

8  **Q**   Do you know why you were doing that?

9  **A**   At that point I was acting as a lookout.

10 **Q**   How long were you standing out there?

11 **A**   Seconds.  Just -- less than a moment, less than a minute.

12 **Q**   And then, did you then come into contact again with

13 Mr. Robles?

14 **A**   Well, yes.  Mr. Robles opened the door, and the cash was

15 gone off the bed, and he walked out.

16 **Q**   Did you walk out with him?

17 **A**   Um, yes, out of that area, yes, but probably either to

18 continue the search or that sort of thing, just to continue on

19 with what we were doing at that point, out.

20 **Q**   Did you locate a firearm and some ammunition in that room?

21 **A**   I did not, no.

22 **Q**   Do you know whether Mr. Robles located a firearm and some

23 ammunition in that room?

24 **A**   I don't believe he did, either.

25 **Q**   About how long after you -- the incident with the money

 1  did you all leave the search site?

 2  **A**    I don't recall the exact time.  I don't believe it was too

 3  much longer.  I don't believe it was hours longer.  But some

 4  time later, after that, we did leave.  They concluded the

 5  search.

 6  **Q**    Say again; I'm sorry?

 7  **A**    They, being the ATF, concluded the search.

 8  **Q**    Had you and Mr. Robles traveled to the search site

 9  together?

10  **A**    Yes.

11  **Q**    Did you leave together?

12  **A**    Yes.

13  **Q**    Did you go somewhere in particular after you left?

14  **A**    Yes.

15  **Q**    Where did you go?

16  **A**    We went to a very, very small side alley behind the

17  station, in the car, and sat in the car.  And Mr. Robles

18  reached in his pocket and pulled out a wad of cash, which he

19  gave me half.

20          **MR. HEMANN:**  And, Ms. Lane, could you put up Exhibit

21  289?

22      (Document displayed)

23          **MR. HEMANN:**  Are you able to blow up a portion of

24  this?  Can you blow up the portion around Mission Station, sort

25  of the block or two around Mission Station in the middle of

VARGAS - DIRECT / HEMANN

 1    this?

 2         (Document displayed)

 3             **MR. HEMANN:**  That's a little hard to see on this map.

 4    **BY MR. HEMANN:**

 5    **Q**    Are you able to see on this map where that little alley

 6    was that you were in?

 7    **A**    I'm very familiar with it, so I know where it should be,

 8    yes.

 9    **Q**    Where would it be, relevant to the dot that is Mission

10    Station?

11    **A**    Okay.  If you look at 18th Street and then start moving to

12    the left from Valencia up to Guerrero, there's a small alley

13    there that stems from the right.

14         Shortly in on that, that little alley there, there's an

15    additional alley that heads back towards Valencia Street,

16    behind the station.  It would be there.  Kind of below the blue

17    dot, essentially.

18    **Q**    Below and to the left?

19    **A**    Yes.

20    **Q**    Did you split up the money in the car, or did you get out?

21    **A**    In the car.

22    **Q**    Did you -- how much did you receive?  Approximately.

23    **A**    Approximately about $1,000, maybe a little bit more than

24    that.

25             **MR. HEMANN:**  Thank you.

```
 1        (Document taken off display)
 2   BY MR. HEMANN:
 3   Q    So, Mr. Vargas, when you left the SFPD in 2012, were you
 4   under investigation for some of the activities that ultimately
 5   became part of this case?
 6   A    Yes.
 7   Q    And, eventually were you charged were any crimes by the
 8   federal government?
 9   A    Yes.
10   Q    And when was that?
11   A    I believe that was February of -- of this year.  2014.
12   Q    And were you charged in the same charging document as
13   Mr. Furminger and Mr. Robles?
14   A    Yes.
15   Q    When you first were charged, did you enter a plea?
16   A    Yes.
17   Q    What was the plea that you entered, initially?
18   A    Not guilty.
19   Q    At some point in time did you change your plea from not
20   guilty to guilty?
21   A    Yes.
22   Q    When was that?
23   A    Gosh, that was -- that was not too long ago.  A few weeks
24   ago.  I don't remember -- sorry, I don't recall the exact date.
25   Q    And did you change your plea in this building, in this
```

1  very courtroom?

2  **A**    Yes, I did.  In front of Your Honor.

3  **Q**    Why did you change your plea?

4  **A**    Because I'm guilty.

5  **Q**    Before you changed your plea and pled guilty, had you

6  reviewed the evidence that had been provided to you by the U.S.

7  Attorney's office in connection with the case?

8  **A**    Yes.

9  **Q**    Did you enter into any agreement with the United States in

10  connection with your guilty plea?

11  **A**    Yes.

12  **Q**    What sort of agreement was that?

13  **A**    I --

14  **Q**    What was it called?

15  **A**    Oh, it's called "Plea Agreement."

16  **Q**    And in that agreement, did you agree to plead to

17  particular crimes?

18  **A**    Yes.

19  **Q**    What crimes did you agree to plead to?  The way you would

20  describe them.

21  **A**    All the crimes that I was charged with, which included

22  theft, which included providing narcotics to be sold,

23  conspiracy to provide those narcotics, as well as -- this is

24  the one that's tricky -- committing an offense while working

25  for an agency that receives federal funds, federal funding.

1  **Q**   And that agency in this case being --

2  **A**   The San Francisco Police Department.

3  **Q**   Was there one charge that the government dropped?

4  **A**   Yes.

5  **Q**   What charge is that?

6  **A**   I believe that was the civil-rights violation.

7  **Q**   In the plea agreement, were you made any promises

8  regarding your sentence?

9  **A**   Promises regarding my sentence?  No.

10 **Q**   And in connection with the plea agreement, did you agree

11 to testify and cooperate with this -- with this continuing

12 prosecution and investigation?

13 **A**   Yes.

14 **Q**   Why did you do that?  What motivated you to do that?

15 **A**   I'm guilty.  And it was my full belief that I would be

16 found guilty.

17 **Q**   Did you, under the plea agreement, get anything in return

18 for your cooperation?

19 **A**   That based on my level of cooperation, there may be

20 leniency towards me in terms of sentencing, either -- through a

21 recommendation from your office.

22 **Q**   And is that your hope, Mr. Vargas?

23 **A**   Yes.

24 **Q**   That there is some leniency?

25 **A**   Yes.

```
 1   Q    Do you have an understanding, under the plea agreement and

 2   under the law, who ultimately makes the decision as to your

 3   sentence?

 4   A    Yes.

 5   Q    Who is that?

 6   A    And that's Your Honor.

 7   Q    After the Potrero search that resulted in the -- you

 8   receiving $1,000, did you continue with Mr. Robles and

 9   Mr. Furminger to commit the same sorts of crimes?

10   A    Yes.

11   Q    Did you ever do one of these thefts out at a place in the

12   Outer Richmond?

13   A    Yes.

14   Q    And, do you remember where that was, roughly?

15   A    Yes.

16   Q    Where was it?

17   A    It was off of 19th Avenue.  I would call that the Lakeview

18   area, but yes.

19           MR. HEMANN:  Your Honor, Exhibit 280 is in evidence.

20   May I show it to Mr. Vargas?

21           THE COURT:  Yes.

22   BY MR. HEMANN:

23   Q    Is this a police report regarding that incident,

24   Mr. Vargas?

25           (Witness examines document)
```

VARGAS - DIRECT / HEMANN

1   A    Yes.

2   Q    And what was the address of that incident?

3   A    The address of this incident is on 44th Avenue.  This is

4   in the Richmond.

5   Q    Describe to the jury how that theft initially came about.

6   What led you out there?

7   A    I don't recall who provided the information, but

8   obviously, because this is a specific person, as well as the

9   location, we were provided information regarding this

10  individual who we subsequently arrested.

11  Q    Who was that individual?

12  A    Mr. Zaychenko, Z-A-Y-C-H-E-N-K-O.

13  Q    When you say "we," who's "we"?

14  A    Myself and Mr. Robles.

15  Q    Did you and Mr. Robles go out to Mr. Zaychenko's home in

16  the Richmond?

17  A    Yes, we did.  With other police officers, yes, we did.

18  Q    What was your purpose in going out there?

19  A    To investigate Mr. Zaychenko as a methamphetamine dealer.

20  Q    And did you conduct a search of the home in which

21  Mr. Zaychenko was living at the time?

22  A    Yes.

23  Q    Did you find Mr. Zaychenko there?

24  A    Yes.

25  Q    Describe for the jury how that search took place.

VARGAS - DIRECT / HEMANN

```
 1  A    We -- we entered his residence.  We -- his girlfriend was
 2  on felony probation with a search condition.  She was also a
 3  resident there.  And so we entered, basically using her search
 4  condition.
 5       We -- once we entered the residence, there was quite a bit
 6  of narcotics all over the place.  Coin baggies with small
 7  plastic baggies with what looked like methamphetamine to us,
 8  all kind of pills, paraphernalia, as well as Mr. Zaychenko, who
 9  was sleeping.
10  Q    Did you seize that drug evidence?
11  A    Yes.
12  Q    And did you arrest Mr. Zaychenko?
13  A    Yes.
14  Q    And during that search, did you take any property that
15  belonged to somebody in the house for your own use, rather than
16  to book into evidence?
17  A    Yes.
18  Q    What did you take?
19  A    I took an MP3 stereo, a speaker.  A Bose sound dock.
20  Q    Did you observe Mr. Robles take anything for his own
21  personal use?
22  A    Yes.
23  Q    What did you observe Mr. Robles take?
24  A    I can recall him taking a license plate cover off of one
25  of the cars of Mr. Zaychenko.  And it was a CHP charitable
```

 1  foundation -- the 11-99 Foundation -- license plate cover.

 2  **Q**    And did you have an understanding at the time as to what

 3  the -- what the import?  Why would he want one of those?

 4  **A**    It may, in fact, be urban legend, but there was a belief

 5  that to pay -- it's not a small amount of money.  It's

 6  probably, in fact, several thousand dollars that you donate to

 7  this foundation that, in fact, earns you that license plate

 8  cover.

 9       But the belief was that if you had that license plate

10  cover on your car, that the CHP would give you leniency in any

11  kind of violations for speeding or something like that, because

12  you had in fact donated to their charity.

13  **Q**    You mentioned that when you went out there to

14  Mr. Zaychenko's residence, you did so based on a tip that you

15  would find some significant drug evidence there.  Is that

16  correct?

17  **A**    Yes.

18  **Q**    And then you ultimately stole some property.

19  **A**    Yes.

20  **Q**    Is that scenario that you just described relatively

21  typical of the two-, three-a-week scenarios that you described

22  earlier this morning?

23  **A**    That would be typical.  The -- what would make up the

24  difference would be just information that we cultivated on our

25  own.  But either we generated the information on our own, or,

 1   or through some sort of tip or direction from some informant.

 2   Q    If I could direct your attention, let me ask you --

 3         MR. HEMANN:   Would you put up, Ms. Lane, Exhibit 272,

 4   which is at Tab 8 of the binder.

 5   (Document displayed)

 6   BY MR. HEMANN:

 7   Q    Do you recognize that building, Mr. Vargas?

 8   A    Yes.

 9   Q    How do you recognize it?

10   A    I recognize it as one of the many SRO hotels in the

11   Mission District.

12   Q    Did you ever steal anything from that, from a room in that

13   building?

14   A    Yes.

15   Q    And do you remember that theft?

16   A    Yes.

17   Q    Who participated in that theft with you?

18   A    It was myself, Mr. Robles and Mr. Furminger.

19   Q    And how did you come to be in the -- as you can see from

20   the -- the photograph, the Hotel Sunrise?

21   A    Um, again, this was a tip from someone.  I just can't

22   recall who it was.  Because when we went to the hotel, we had

23   our target in mind.  We weren't just doing a simple registry

24   check.  We were looking for somebody specifically.

25   Q    You went in.  When you say "typical registry check," what

1  do you mean?

2  **A**   There were times -- I may have mentioned this briefly

3  yesterday -- that we would check the registration cards of

4  these SROs to make sure that they were filled completely and

5  validly, and also that the person registered the room had left

6  some sort of verifiable identification.  This is, again, only

7  if there weren't other assignments to take our attention.

8      Basically if we had the free time available, this was

9  something we could do to look -- look for wanted subjects, any

10 of that sort of thing.

11 **Q**   Now, is your recollection you were actually looking for a

12 particular person on this occasion?

13 **A**   My recollection is that was not a registry check.  We

14 were, in fact, looking for a specific person.

15 **Q**   And did you find the person that you were looking for?

16 **A**   Yes.

17 **Q**   How did you find the person on that occasion at the Hotel

18 Sunrise?

19 **A**   On that occasion, what we found his registration card.  We

20 found him registered to a specific room.

21 **Q**   Did you do something with that registration card in order

22 to gain entry to the room?

23 **A**   Yes.

24 **Q**   What did you do?

25 **A**   We checked the criminal history of the individual, and we

 1   ran his name through some of the criminal databases, basically

 2   checking for wants and warrants.

 3       There was additional information on the card, providing a

 4   Social Security number.  Well, you can run the name to check

 5   for wants, but you can also run the Social Security number on

 6   its own and check for any warrants associated with that Social

 7   Security number.

 8   **Q**   And did you do that with regard to the Social Security

 9   number?

10   **A**   Yes.

11   **Q**   What do you recall that you found?

12   **A**   I recall that we -- that the Social Security number came

13   back to somebody that was wanted.  Somebody who had a warrant,

14   potential warrant for their arrest.

15   **Q**   Based on that, did you decide to go into the room that you

16   were -- that you had identified associated with that

17   registration card?

18   **A**   Yes.

19   **Q**   Now, typically, Mr. Vargas, do you need, when you have

20   somebody who you have identified as being subject to an arrest

21   warrant, and they are inside a room, do you need some sort of

22   paperwork in order to get into that room?

23   **A**   Yes.

24   **Q**   What sort of paperwork do you need?

25   **A**   A search warrant.

```
 1   Q     Did you go about getting a search warrant to go into the

 2   room of that person?

 3   A     No.

 4   Q     How did you get in?

 5   A     I recall us having a key to the room.  And so, and then

 6   using that key to open up the door.

 7   Q     And from whom did you get the key?

 8   A     From the manager there at the hotel.

 9   Q     When you went into that room, who was with you?

10   A     It was myself, Officer Robles, Mr. Robles, Mr. Furminger

11   and I believe a fourth officer.

12   Q     Do you remember who that fourth officer was?

13   A     I believe it was Zachos, Z-A-C-H-O-S.

14   Q     How big was the room?

15   A     It's pretty small.

16   Q     Was it a typical SRO?

17   A     I would say of a slightly higher quality than the typical

18   SROs.  It was cleaner.  It wasn't on Mission Street.  Those

19   tend to be some of the -- the less-nice ones.  This one even

20   had a half-bath inside of it.  This was on the nicer side of

21   things.

22   Q     When you went into that room, what did you encounter?

23   A     We found the person that we were looking for.  When we

24   opened the door, he was on his bed, naked.  He jumped up and

25   tried to shut the door on us.  Tried to close us, you know, out
```

1  of the door.

2  **Q**    Can you describe what the room was like?

3  **A**    Very small, disheveled, you know, kind of a mess.  And, as

4  I said, he was laying on his bed.  It was a mess.  He had his

5  laptop on.

6       And as I recall, there were quite a bit of drugs all over

7  the place.  You know, on -- beside him, on the dresser, in

8  other locations again these are coin baggies of

9  methamphetamine, scattered around the room.

10 **Q**    And had you gone in with the belief that this individual

11 was a methamphetamine dealer?

12 **A**    Yes.

13 **Q**    And was the room typical of some kind of mid-level

14 methamphetamine dealer?

15 **A**    Yes.

16 **Q**    Once you got into the room, what did you do with the

17 inhabitant?  And by the way, do you remember as you sit here

18 today, what his name was?

19 **A**    Yeah.  I believe his last name was Byrd.

20 **Q**    What did you do with Mr. Byrd, having encountered him?

21 **A**    He -- he had struggled with us a bit.  As I said, he had

22 tried to shut the door on us.  I believe he even tried to shut

23 the door on my foot, and I put my foot inside, you know,

24 between the door and the jamb so he couldn't close it.

25      So we had to kind of force our way in, so we were already

1   struggling with him a little bit.  So, he was really hostile,

2   obviously really mad, and now arrested with a lot of drugs.

3   So, you know, struggling a bit with us.  So he was handcuffed.

4   **Q**    What did you do?

5   **A**    We handcuffed him.  And of course, now we had him

6   handcuffed and naked.  And so, he had to use the bathroom, and

7   I remember taking him into his little bathroom and allowing him

8   to pee, and then trying to get him dressed, putting some

9   clothes on him, that sort of thing.

10  **Q**    And did you assist in that regard?

11  **A**    Yes.

12  **Q**    When you get into the room, what was your, in particular,

13  responsibility?  You, Officer Vargas.

14  **A**    Specifically, me, I dealt with -- with Mr. Byrd.

15  **Q**    So, was it you who got him dressed and got him out of the

16  room?

17  **A**    Yes.

18  **Q**    What were Mr. Furminger and Mr. Robles doing while you

19  were doing that?

20  **A**    While I dealt with Mr. Byrd, they were searching.  Looking

21  for evidence, just starting the search of the room.

22  **Q**    And do you remember anything in particular that

23  Mr. Furminger was doing?

24  **A**    He was dealing with the laptop that Mr. Byrd was looking

25  at.

1   Q    When you say "dealing with" it, what do you mean?

2   A    When Mr. Furminger and I walked in, and dealt with

3   Mr. Byrd, there was a video playing on the laptop.  And, it was

4   of a potentially illegal nature to possess a video of that

5   sort.

6   Q    It looked like a kid.

7   A    It looked like --

8   Q    Or, a person under the age of 18.

9   A    It looked like a person under the age of 18, involved in

10  an illegal sex act.

11  Q    And so Mr. Furminger was collecting evidence regarding

12  that computer.

13  A    Yeah.  Once -- as I recall it, once we -- I don't know if

14  it was something Mr. Byrd did or in fact something we did, but

15  we lost the video.  The video stopped playing, it had dropped

16  out.

17       And so I think we were -- we knew the computer was

18  unlocked and open so I think we were trying to pull that video

19  back up to see if we had seen what we had actually seen.

20  Q    When you say "we" were doing that, who do you mean, "we"?

21  A    I mean Mr. Furminger and myself.  This was after, you

22  know, I am trying to deal with it and then me help -- assisting

23  him later, once Mr. Byrd had left the residence.

24  Q    What was Mr. Robles doing?

25  A    He was searching the room.

1    Q    Searching other places in the room?

2    A    Yes.  I mean, it's a small room, so basically, you know,

3    there was, you know, drawers and cabinets and things and

4    clothes and boxes, and looking through all of that sort of

5    stuff.

6    Q    Did any of the officers present -- what was Officer Zachos

7    doing, if you remember?

8    A    I don't recall him being there through much of the search

9    afterwards, and so my belief is that he went back to the

10   station with Mr. Byrd.  Because I just don't recall him being

11   there towards the end of the search.

12   Q    Did -- during the search, did any of the three officers

13   who you do remember being there, locate any money?

14   A    Yes.

15   Q    What, who located money?

16   A    I believe that was Officer Robles.

17   Q    How do you know at a that?

18   A    Because shortly thereafter, we went to another location,

19   and Mr. Robles had all that money and then divided it up

20   between myself and Mr. Furminger.

21   Q    Did Mr. Robles show you money during the search, itself?

22   A    Yes, I believe so.  I believe he kind of said, you know,

23   showed that there was a pretty sizable amount of cash.

24   Q    You are gesturing with your hands; what are you doing?

25   A    I'm kind of showing basically a thickness (Indicating) and

```
 1  it would be the thickness of the bills that were together.  And
 2  I'm gesturing a couple of inches.
 3  Q    Was it like a roll or a stack?
 4  A    I believe, a stack.
 5  Q    You left the scene of the search.  You left the hotel room
 6  at some point, correct?
 7  A    Yes.
 8  Q    In addition to the money and the drugs, did you seize
 9  anything in particular that you remember?
10  A    I believe we did seize that laptop, and, and basically
11  kind of forwarded that through channels with an attempt, with a
12  hope that who -- our techs, could in, fact locate the video
13  that we had seen.
14  Q    Your techs?
15  A    Computer techs, basically they would start scouring
16  through the laptop and see if there was in fact anything
17  illegal in term of any videos or anything like that, or images.
18  Q    After you left Mr. Byrd's hotel room, where did you and
19  Mr. Robles and Mr. Furminger go?
20  A    We went to a cafe on Mission Street.
21  Q    Do you remember the name of the cafe?
22  A    I do.
23  Q    What was the name?
24  A    It was -- it's called Cafe La Taza, L-A, T-A-Z-A.
25  Q    Where is it?
```

```
 1   A     It is on Mission Street.  It's probably between 21st and
 2   22nd, right within that general vicinity.
 3   Q     Did you sit down in the cafe with Mr. Robles and
 4   Mr. Furminger?
 5   A     Yes.
 6   Q     At a table?
 7   A     Yes.
 8   Q     And did the money then come up again?
 9   A     Well, at a certain point, Mr. Robles got up from the table
10   and went to the bathroom on his own.  And, he came back out,
11   and as we were sitting there at the table, he kind of bumped my
12   leg under the table with his hand, and in his hand was -- was
13   an amount of cash that he gave to me.
14         And I saw that he was doing the same thing to
15   Mr. Furminger.
16   Q     How much cash did he give you?
17   A     I believe it was close to $2,000.
18   Q     Did you discuss it with Mr. Furminger and Mr. Robles,
19   while you were sitting in the cafe?
20   A     No.
21   Q     Why not?
22   A     I don't think it was -- we kind of did this, I mean, even
23   the act of doing it under the table, we weren't trying to be
24   public about it.  We were trying to be discreet about it.
25         So I think in -- in not talking about it, that was kind of
```

1  another level of that discretion.  Where, yes, we're doing

2  this, and here it is, but we're not -- we are not going to

3  discuss it.

4  Q    In 2009, when you worked as a partner with Mr. Robles,

5  could you describe, sort of, what the nature of your friendship

6  was or the nature of your relationship?

7  A    Um, we were very -- we were friendly.  You know, I

8  considered him a friend.  We didn't go out a lot socially,

9  outside of work.  But, yeah, I considered him a friend.  I

10  considered it a friend relationship.

11      And certainly because we were then involved in -- in not

12  only doing a lot of quality police work, a lot -- doing a lot

13  of police work that we, in fact, tainted by our theft, so we

14  kind of had that bond with that as well.

15  Q    How would you describe your relationship with

16  Mr. Furminger?

17  A    I -- I considered it friendly as well, but probably not as

18  close as I was with Mr. Robles because Mr. Robles and I rode

19  with each other every day, we spent hours and hours together.

20  I didn't spend nearly the amount of time with Mr. Furminger.

21  And I hadn't really known him until he was assigned to Mission

22  Station.

23  Q    Based on what you were able to observe, was Mr. Furminger

24  and Mr. Robles -- was the character of their relationship

25  different than the character of your relationship with each of

1   them?

2   **A**    Yes.

3   **Q**    How so?

4   **A**    They -- theirs was a closer relationship.  I believe they

5   went out much more socially than I did with them.

6   **Q**    Why do you believe that?

7   **A**    Several reasons.  They lived a lot closer together than I

8   did from them.  And, they were both, you know, married with

9   kids so they had that sort of similarity as well.  I was single

10  and then started to date somebody, and so I was kind of

11  involved in a separate thing.  And -- those sort of reasons.

12  **Q**    After the -- the incident with Mr. Byrd, after the arrest

13  and taking the money, your conversation at that cafe, did you

14  go back to Mission Station and write a police report?

15  **A**    Yes.

16  **Q**    Was that your normal practice after one of these kind of

17  -- I mean, I guess after a law enforcement event, would you go

18  write a report?

19  **A**    Yes.

20  **Q**    And, as between you and Mr. Robles, was one of you a more

21  prolific report writer?

22  **A**    Yes.

23  **Q**    Who was that?

24  **A**    That was me.

25  **Q**    Why is that?

1   **A**   It was a division of labor.  And, and I didn't mind

2   writing the police reports.  And I thought I wrote a pretty

3   good police report.  And so I didn't mind doing that.  And it

4   was --

5   **Q**   Who between you was senior?

6   **A**   Mr. Robles.

7   **Q**   By how many years?

8   **A**   By several years.  More than five, maybe even more than

9   that.  I don't know the exact amount, but many years senior to

10  me.

11  **Q**   Did that have to do -- did that influence the division of

12  labor in terms of the report writing?

13  **A**   Somewhat, but it just -- you know, I didn't mind it.  I

14  enjoyed writing the reports.  I enjoyed describing the

15  investigation and doing that sort of thing.  And so that was

16  kind of my -- um, as we kind of worked more and more together

17  and got into a flow of what each other did, that kind of, more

18  often than not, became my task as how we divided things up.

19          **MR. HEMANN:**   If you could put up 252, please.

20      (Document displayed)

21  **BY MR. HEMANN:**

22  **Q**   Is this, Mr. Vargas, the report that you wrote -- and I

23  put the whole report in front of you -- the report that you

24  wrote regarding the incident with Mr. Byrd?

25      (Witness examines document)

1   **A**     Yes.

2   **Q**     And did you write it the day of the events that took

3   place?

4   **A**     Yes.

5   **Q**     Are portions of that report false, Mr. Vargas?

6          (Witness examines document)

7   **A**     Yes.

8   **Q**     In what respect?

9          (Witness examines document)

10  **A**     Well, the first portion that I would say is false is the

11  description of the entry of the room.  And as I recall, we had

12  a key.  So that, that portion where we describe him opening up

13  the door, that, that's incorrect.  And --

14  **Q**    If you could look at -- tell us what page that's on, down

15  at the bottom.

16  **A**     On your numbering that would be Page 4.  It would be the

17  second paragraph.

18         (Document displayed)

19  **A**     Probably the fourth to fifth line.

20  **Q**     Are there other portions of that report that are false?

21         (Witness examines document)

22  **A**     Yes.

23         (Off-the-Record discussion between counsel)

24             **MR. HEMANN:**  I'm sorry; that is Tab 8 we are looking

25  at.

1   **BY MR. HEMANN:**

2   **Q**    Are there other portions of that report that are false?

3   **A**    Yes.

4   **Q**    What other portions?

5   **A**    Well, the evidence page is wrong, in that it's lacking the

6   money that was seized.

7   **Q**    So you omitted from the report the fact that you had taken

8   some amount of money from the residence?

9   **A**    Yes.

10  **Q**    And did you know the total amount of money, or did you

11  have a belief as to the total amount of money that was taken

12  when you wrote the report?

13  **A**    Yes.

14  **Q**    What was your belief?

15  **A**    Well, based on the portion of money I received, which was,

16  as I said, about $2,000, my belief was the total of it was

17  $6,000, meaning that we had each gotten one third.

18  **Q**    And this may seem like an absurdly obvious question, but

19  why didn't you put that in the record?

20  **A**    Well, because we had stolen the money.

21  **Q**    For the various incidents in which you took money and

22  prepared a report, took and kept for yourself and prepared a

23  report, would all of those police reports be false by omission?

24  **A**    Yes.

25  **Q**    Did Mr. Robles, on occasion, prepare police reports that

 1  you had an opportunity to see, that were false by omission?

 2  **A**    In the same manner, yes.

 3  **Q**    And did Mr. Furminger, on occasion, approve police reports

 4  of that nature?

 5  **A**    Yes.

 6  **Q**    Now, on this occasion, did he?

 7  **A**    No.  He did not.

 8  **Q**    Who approved this one?

 9  **A**    This is another sergeant who was assigned to Mission

10  Station.  Would you like his name?

11  **Q**    Sure, if you can make it out.

12  **A**    It looks like Sergeant Bueno, B-U-E-N-O.

13  **Q**    And did Sergeant Bueno have any knowledge of the fact that

14  you had taken money from that hotel room?

15  **A**    None, whatsoever.

16  **Q**    After the incident at the Sunrise Hotel with Mr. Byrd, did

17  you participate in a theft at a self-storage unit out in the

18  far western part of San Francisco?

19  **A**    Yes.

20        **MR. HEMANN:**  And Your Honor, we are going to look at

21  Exhibit 10.  Sorry.  And -- or Tab 10.

22        If you can put up, Ms. Lane, Exhibit 274?

23        (Document displayed)

24  **BY MR. HEMANN:**

25  **Q**    Is this the self-storage unit that you recall?

1   **A**      Yes.

2   **Q**      What led you to this self-storage unit?

3   **A**      Again, this is another tip from another informant.  And I

4   just don't recall who it was.  It was none of our typical or

5   more frequent informants.

6   **Q**      It was not Cesar Hernandez?

7   **A**      No.

8   **Q**      It was not the Shah?

9   **A**      No.

10  **Q**      What was the nature of the illegal activity that you were

11  looking into?

12  **A**      After getting this information, we were told basically

13  that there was a narcotics trafficker specifically a heroin

14  dealer of some note, a pretty sizable heroin dealer, that was,

15  in fact, living in the storage space.

16        And we came later to find out that there were several

17  people who lived in this storage space as their residence.

18  They plug in, you know, a microwave and a light and just move

19  into a little closet-sized storage space, and live there month

20  to month.

21  **Q**      When you said "we," who was working on this the

22  investigation, if you will?

23  **A**      Myself, Mr. Robles and Mr. Furminger.

24  **Q**      Based on the information that you received -- first of

25  all, do you recall whether the informant was able to identify

VARGAS - DIRECT / HEMANN

1  this particular self-storage facility?

2  **A**    Yes.  Specifically -- the specific facility, as well as

3  the person we were looking for, the actual target, himself.

4  **Q**    And, when you say "himself," what -- a man?

5  **A**    Yes.

6  **Q**    What do you remember about him?

7  **A**    I remember his -- his last name and his nickname.

8  **Q**    What were those?

9  **A**    I think his last name was -- was it Burgess Crosby?  I

10  know his nickname for sure.  His nickname was "Indio."

11  **Q**    Indio.

12  **A**    Yes.

13  **Q**    Once you got this information, did you and your fellow

14  officers conduct some further investigation with regard to

15  the -- the self-storage site?

16  **A**    Yes.

17  **Q**    What did you do?

18  **A**    We had gone there at least once prior to the arrest, maybe

19  even twice prior to the arrest.  Attempting to find out the

20  location and hoping to find Indio inside the storage space.

21       And I recall us talking to the manager of the storage

22  space and, you know, he just -- he was a bit transient.  He

23  would come in and out, and so --

24  **Q**    "He" being --

25  **A**    "He" being Indio.

1  **Q**    Not the manager.

2  **A**    No, he, being Indio, would come in and out of the place.

3  So we would arrive there and maybe sit there two or three

4  hours, hoping that Indio would show up and arrive.  And he just

5  wouldn't.

6  **Q**    One day, were you able to put Indio at the self-storage

7  place?

8  **A**    Yes.

9  **Q**    How did that come about?

10  **A**    We -- "we" meaning myself and Mr. Robles -- left our

11  contact information with the manager of the storage space, and

12  basically said, "Call me if Indio arrives and we'll go out

13  there, because we're going to arrest Indio."

14  **Q**    And did you get a call at some point in time?

15  **A**    Yes.

16  **Q**    Did you go out there?

17  **A**    Yes.

18  **Q**    Who went out there with you?

19  **A**    Two other police officers.

20  **Q**    Who and who, if you remember?

21  **A**    Officers, I believe, Greiner, G-R-E-I-N-E-R and Kenney,

22  K-E-N-N-E-Y.

23  **Q**    Do you recall whether Mr. Robles initially went out with

24  you?

25  **A**    Mr. Robles was assigned to work with me that day, and

 1  working with me that day, but did not respond out there.

 2  Q    So you went out there.  And what happened when you got

 3  there?

 4  A    As I recall, when we got there, the manager called and

 5  said Indio as well as his girlfriend had arrived there, but

 6  when we in fact -- you know, we're driving from the Mission

 7  District, and this is way out in outermost 19th Avenue, almost

 8  to the Daly City border.

 9       And so, in that time I recall Indio not being there.  He'd

10  left.  But as we were driving around the location, this is the

11  back side of the storage space.  This (Indicating) is not 19th

12  Avenue.  19th Avenue would be on the complete other side of

13  this building.

14       As we were driving around the location, we saw a car that

15  belonged to Indio, and we saw a woman, his -- who we later

16  found out is his girlfriend standing outside, and the door

17  opened.  The storage space door opened.

18  Q    Now, as you are going through these actions, these

19  surveillance actions, were you keeping in touch with either

20  Mr. Furminger or Mr. Robles?

21  A    Yes.

22  Q    How so?

23  A    With -- via text message.

24  Q    Did you talk to them on the phone, too?

25  A    I may have, yes.

1   **Q**   At some point in time, do you encounter Indio?

2   **A**   Yes.

3   **Q**   And how did that come about?

4   **A**   Well, we walked into -- these doors on the side here, some

5   of these doors open directly to storage spaces.  Some of them

6   open up into hallways.  And once you enter the hallway, the

7   individual storage spaces are connected to that hallway.

8       In walking into one of those hallways, we -- Indio was

9   there, we saw Indio there with his door to his particular

10  storage space open.

11  **Q**   What did you when you encountered Indio?

12  **A**   We arrested him.

13  **Q**   You and the other two officers?

14  **A**   Yes.

15  **Q**   Did you contact -- at about the time of the arrest or in

16  anticipation of the arrest, did you contact Mr. Robles or

17  Mr. Furminger?

18  **A**   Yes.

19  **Q**   Why did you do that?

20  **A**   Well, I let them know that I had grabbed Indio, as well as

21  his girlfriend.  And also that there was cash involved.  And

22  so, I had found money, and said, "Hey, get down here."

23  **Q**   Where did you find money?

24  **A**   I believe on -- there may have been some inside a storage

25  space, but I believe it was on Indio, himself, on his person.

 1   Q    What did you do with the money?

 2   A    I put it aside.  I kept it in my pocket initially, I

 3   believe.  Initially I had it in my pocket, but later put it

 4   aside.

 5   Q    Put it aside where?

 6   A    Inside his storage space.

 7   Q    Did Mr. Robles and/or Mr. Furminger come out to the

 8   self-storage unit?

 9   A    Yes.

10   Q    Did they come together or separate?

11   A    Separately.

12   Q    How do you know that?

13   A    Because they came in different cars.

14   Q    When they got there, what did each of them do?

15   A    Um, they came to me, obviously, because I was the person

16   that had recovered the money.  And, what I -- I do recall

17   taking the money out of my pocket, and then putting it on the

18   ground, away from the hallway, and more importantly at that

19   point, away from the other police officers that were unaware of

20   what I was doing.

21        And I kind of pulled Ian, Mr. Furminger, as well as

22   Mr. Robles, in with me and said "Here's the money."  And I put

23   it down on the ground inside the storage space.

24   Q    You mentioned earlier that Mr. Robles was on duty that day

25   and working with you?

 1   **A**    Yes.

 2   **Q**    But didn't go out with you to the storage spot.

 3   **A**    No.

 4   **Q**    Do you recall whether Mr. Furminger was on duty that day?

 5   **A**    I do not believe he was on duty.

 6   **Q**    Where do you believe he was when you were contacting him

 7   earlier in the day?

 8   **A**    Probably home.

 9   **Q**    It was not at Mission Police Station?

10   **A**    Not at Mission Station, no.

11   **Q**    At some point in time, after Mr. Furminger arrived, did he

12   do something with regard to that money?

13   **A**    Yes.

14   **Q**    What did he do?

15   **A**    Well, when I put the money down on the ground, he grabbed

16   it, and took it all, and took it with him.

17   **Q**    Afterwards, what happened?  After that happened, is Indio

18   still present?  Not in the storage locker, but --

19   **A**    No.  If he wasn't, like, out here on the sidewalk area, he

20   in fact had already been transferred back along with his gal

21   back to Mission Station, where we would subsequently book them.

22   **Q**    And were they subsequently booked?

23   **A**    Yes.

24   **Q**    What became of the money that Mr. Furminger gathered up in

25   the middle of the room?

1   **A**    At a later point, Mr. Furminger gave myself and Mr. Robles

2   portions of that money.

3   **Q**    Do you recall where that exchange took place?

4   **A**    I don't.  Sorry.

5   **Q**    Do you recall how much money you received?

6   **A**    I recall it being a few hundred dollars.  No more than

7   about 3- or 400.

8   **Q**    And how do you know that was money from the self-storage

9   facility?

10  **A**    I don't.  Only that that was -- you know, he had taken --

11  that money that I had recovered and put down on the ground, he

12  had then removed, and then was later giving me cash.

13  **Q**    We talked earlier about Cesar Hernandez.

14       Did you continue to talk about doing both legitimate and

15  illegitimate things with Cesar Hernandez in the latter part of

16  2009 and into 2010?

17  **A**    Yes.

18  **Q**    Do you recall conversations with Mr. Hernandez about an

19  auto body shop in the Bayview area of San Francisco?

20  **A**    Yes.

21  **Q**    What do you recall about those conversations?

22       (Document taken off display)

23  **A**    Cesar was a wealth of knowledge; he knew quite a lot of

24  drug traffickers.  And so in talking with him and talking about

25  who he knew, he described to us that there was an auto body

1    shop that trafficked in pretty sizable amounts of cocaine, that

2    they had a very, very sophisticated technique on how they

3    brought in the cocaine and then in turn shipped out the money.

4    And he described to us how that worked, as well as some of the

5    people involved in it.

6    Q    Based upon the description that he gave, did you and other

7    officers talk about a plan to conduct some sort of law

8    enforcement operation with regard to that auto body shop?

9    A    Yes.

10   Q    Who did you talk about that with?

11   A    I know myself and Mr. Robles, with Cesar, actually went

12   out to that location, at least once, maybe a couple of times.

13   And just kind of watched it, and took a look at it, and see

14   kind of what it was about.  We even walked around it a little

15   bit.

16        I recall we even sent Cesar in to make contact with the

17   person.  Just kind of as a friendly hello, not trying to

18   arrange a drug transaction or anything, but just to kind of see

19   that the information that he had was -- wasn't stale, it wasn't

20   too old, that in fact what he thought was occurring was still

21   going on.

22   Q    Was a plan ever developed to steal money from that auto

23   body shop?

24   A    Not that I'm aware of, no.

25   Q    Do you remember going out with Cesar, Mr. Hernandez, one

 1  evening at around that time where there was drinking involved?

 2  **A**    Yes.

 3  **Q**    What did you remember about that?

 4  **A**    What I remember is that a group of guys, we had gone out

 5  in that evening, and Cesar was not with us.  We had been out

 6  drinking for a while.  And then, at one point Cesar joined us

 7  in the midst of our evening for a little while.

 8  **Q**    Do you know how he came to join you?

 9  **A**    I believe he came by taxi.

10  **Q**    Did he stay long?

11  **A**    Uh, no.

12  **Q**    Do you remember whether he spoke to Mr. Robles that

13  evening when you were out drinking?

14  **A**    Oh, sure, absolutely.

15  **Q**    Do you remember them talking about the Frank's -- or the

16  auto body plan?

17  **A**    I don't recall it, no.

18  **Q**    Did you guys ever hit or -- either legitimately or

19  illegitimately, the auto body shop?

20  **A**    No.

21  **Q**    After Mr. Robles went to work with the motorcycle group,

22  did you continue working with him in any capacity?

23  **A**    With Cesar?  Or with --

24  **Q**    No, with Mr. Robles.

25  **A**    No.  Not that -- no.  I don't believe so.

1  **Q**    And at some point in time did you stop working with

2  Mr. Furminger as well?

3  **A**    Yes.  Yes, I believe so.  I mean, he was a supervisor, and

4  so in that sense, because of his rank he kind of works with all

5  the officers that are on duty at that time underneath of him.

6  But, but directly, I don't believe so -- yeah, we weren't

7  working together directly.

8  **Q**    Did you work with him less after Mr. Robles left Mission

9  Station?

10  **A**    Yes.

11  **Q**    Why is that?

12  **A**    Um, well, partially there was a transition of his

13  assignment.  He -- he worked with the plainclothes units less

14  and less.

15       And at one point, I believe -- and I'm unsure of the exact

16  time -- at one point he was in an accident, a vehicle accident,

17  so he was not there for a while then as well.

18  **Q**    But did you continue stealing money on your own when you

19  would do searches or arrests and things like that?

20  **A**    Yes.

21  **Q**    Did you continue working with Cesar Hernandez on occasion,

22  and stealing things and sharing those things with

23  Mr. Hernandez?

24  **A**    Yes.

25            **MR. HEMANN:**  Ms. Lane, if you could please put up

1    Exhibit 276.

2         (Document displayed)

3    **BY MR. HEMANN:**

4    **Q**    Do you recognize this building, Mr. Vargas?

5    **A**    Yes.

6         (Off-the-Record discussion between counsel)

7              **MR. HEMANN:**   Oh, Tab 11.   Thank you.   Thanks, Rodney.

8    **BY MR. HEMANN:**

9    **Q**    How do you recognize this building?

10   **A**    I recognize it just as one of the numerous hotels we did

11   some sort of operation or arrest in.

12   **Q**    When you say "we," who do you mean at this point?

13   **A**    At this point, me -- "we" being plainclothes police

14   officers.   Me, specifically, but at this point I was working

15   with other plainclothes police officers.

16   **Q**    And did you conduct a search in this building based on

17   information provided to you by Cesar Hernandez?

18   **A**    Yes.

19   **Q**    Did you steal anything from this building and share it

20   with -- keep it for yourself, I guess, number one?

21   **A**    In terms of keeping it for myself, I don't recall if I

22   did, on this particular -- in this particular place.

23   **Q**    Would it surprise you if you did?

24   **A**    No.

25   **Q**    Do you recall taking anything from this apartment

 1  building, and sharing it with Mr. Hernandez?

 2  **A**     Yes.

 3  **Q**     What do you remember sharing with Mr. Hernandez?

 4  **A**     A laptop computer.

 5  **Q**     Do you remember what kind of laptop it was?

 6  **A**     I believe it was a Toshiba.

 7  **Q**     At some point in time, did you stop doing work with Cesar

 8  Hernandez?

 9  **A**     Yes.

10  **Q**     And what led you to stop doing work with Cesar Hernandez?

11  **A**     I ceased being a plainclothes police officer, which pretty

12  much negated my need to have any sort of informant.

13  **Q**     Where was Cesar at this point in time?  Do you know where

14  he was living?

15  **A**     Yes.

16  **Q**     Where was he living?

17  **A**     He was living in a homeless shelter in the south-of-Market

18  area.

19  **Q**     In terms of his usefulness to you as an informant, either

20  for legitimate or illegitimate purposes, did his living in a

21  homeless shelter have an impact on that?

22  **A**     Yes, as well as him seeking legal employment, because he

23  wasn't running around in those illegal circles any more.  He

24  just didn't have the -- the most current information.  And so

25  he slowly but surely became less and less useful as an

 1   informant.

 2   **Q**    And as that transition occurred, were there occasions

 3   where you spent time with Cesar on I guess what I would

 4   describe as a social basis?

 5   **A**    Yes.

 6   **Q**    Can you describe that relationship -- how that

 7   relationship -- as he moved into, sort of, legitimate

 8   employment and lived in the homeless shelter, how did your

 9   relationship with him evolve?

10   **A**    Cesar, to me, was just a likable guy.  You know, we used

11   to hang out a lot.  He would come to the station a lot.

12        One of the reasons why he would come to the station a lot

13   is because I had a soft spot for him, he knew he could ask me

14   for some money, for food, and I would provide it for him.  He

15   would always, you know, go by, "Oh, Mr. Vargas, I need money

16   for a burrito."  And I would provide him some money to get

17   something to eat.

18        So, we would hang out a lot.  And at times I even brought

19   him to my residence to help me move, move some stuff, both in

20   my house and out of my house into a storage space.  And I used

21   Cesar, and, you know, paid him by the hour, and bought him

22   lunch.

23        And so, I felt comfortable enough with him to bring him to

24   my own house.

25   **Q**    At some point in time, did you, Mr. Vargas, stop engaging

1  in the kind of activity -- the kind of criminal activity that

2  you have described today?

3  **A**    Yes.

4  **Q**    What caused you to -- when, and what was it that caused

5  you to stop?

6  **A**    Well, I got removed from -- I got placed on a desk

7  assignment, so I was no longer a plainclothes police officer.

8  So, everything immediately halted at that point.

9  **Q**    And, did -- were you placed on a desk assignment in part

10  as a result of this -- the conduct that led to the charges

11  here?

12  **A**    Initially, what led to that was the Public Defender in

13  San Francisco releasing videos of plainclothes police officers

14  going in and out of the SRO hotels.  So that was what got many

15  of the plainclothes police officers, including myself,

16  transferred out of that assignment.

17  **Q**    And do you appear in a couple of those videos?

18  **A**    Yes, I do.

19  **Q**    And on those occasions in those videos, those, in

20  particular, that the Public Defender's Office released, were

21  you stealing anything on those occasions?

22  **A**    On those occasions, no.  I wasn't.

23  **Q**    But, you were stealing things on many occasions that were

24  not caught on videotape?

25  **A**    On numerous other occasions; but on those particular ones

 1  that are shown in the videos, no, I was not.

 2          **MR. HEMANN:**  Your Honor, this would be a good breaking

 3  point.

 4          **THE COURT:**  Okay.

 5          **MR. HEMANN:**  I would ask -- I have a couple of

 6  questions to follow up on.  I think I might be done, but I

 7  would just like to check my notes after lunch.

 8          **THE COURT:**  Sure.

 9          **MR. HEMANN:**  Thank you.

10          **THE COURT:**  Ladies and gentlemen, we are going take

11  recess now until 1:00.

12      Remember the admonition given to you:  Don't discuss the

13  case, allow anyone to discuss it with you, form or express any

14  opinion.

15      Back at 1:00.

16          **MR. HEMANN:**  Thank you, Your Honor.

17      (Jury excused)

18      (The following proceedings were held outside of the

19  presence of the Jury)

20          **THE COURT:**  Okay.

21          **MR. HEMANN:**  Thank you, Your Honor.

22          **THE COURT:**  Yeah.

23      (Recess taken from 11:55 a.m. to 1:02 p.m. )

24          **THE COURT:**  Please be seated.

25      Let the record reflect that all jurors are present, the

1    parties are present.

2          You may proceed.

3          **MR. HEMANN:**  Your Honor, we have no further questions

4    for Mr. Vargas at this time.

5          **THE COURT:**  Okay.  Thank you.

6          Mr. Getz.

7                          **CROSS EXAMINATION**

8    **BY MR. GETZ:**

9    **Q.**   Good afternoon.

10   **A.**   Good afternoon, Counselor.

11   **Q.**   I heard you say that you pled guilty.  When is your

12   sentencing date?

13   **A.**   Uhm, I don't believe that's been determined yet.

14   **Q.**   Why not?

15   **A.**   Uhm, I don't know.

16   **Q.**   You don't know?

17   **A.**   No.

18   **Q.**   Didn't you sign a plea agreement?

19   **A.**   Yes.

20   **Q.**   And did your plea agreement say something about when the

21   sentencing date would be?

22   **A.**   I don't know if it had a specific date on it.

23         (Government and defense counsel confer off the record.)

24         **MR. GETZ:**  Your Honor, may I approach --

25         **THE COURT:**  Sure.

1       **MR. GETZ:**  -- with what's going to be marked?

2       (Handing document to witness.)

3   **BY MR. GETZ:**

4   **Q.**   Mr. Vargas, I have handed you a copy of your plea

5   agreement.  I would ask you to read paragraph 10, to yourself,

6   please, and let me know when you've finished.

7   **A.**   (Witness reading.)

8       Okay.

9   **Q.**   Have you had a chance to read 10, subsection E?

10  **A.**   Yes.

11  **Q.**   It says, "I will request continuances of my sentencing

12  date as necessary until my cooperation is completed"; correct?

13  **A.**   Yes.

14  **Q.**   So your sentencing date is going to be when your

15  cooperation is completed; right?

16  **A.**   Yes.

17  **Q.**   Why is that?  Why don't we just sentence you now?  What

18  are we waiting for?

19  **A.**   I believe we're waiting for this trial to complete.

20  **Q.**   We're waiting for this trial to complete before your

21  sentence?  What's the connection there?

22  **A.**   Because I'm a witness during this trial.

23  **Q.**   And?

24  **A.**   And I'm cooperating.

25  **Q.**   And what does that mean in connection with your

1  sentencing, that you're cooperating?

2  **A.**   That I'm cooperating as a witness and, in fact, it may

3  provide leniency to me in terms of sentencing.

4  **Q.**   All right.  So the answer to the original question is, the

5  reason I haven't gotten a sentencing date is because I'm trying

6  to get leniency here with my testimony; correct?

7  **A.**   That's part of the answer, yes.

8  **Q.**   Well, you didn't say that though, did you?

9  **A.**   No.

10  **Q.**   All right.  So let's talk about this process by which you

11  get leniency.

12     What's your understanding of how you get leniency when

13  you're sentenced?

14  **A.**   The process, with my understanding, is that the

15  U.S. Attorney's Office has to judge my level of cooperation as

16  well as how forthcoming I am with them, how truthful I am with

17  them.  And then, ultimately, they will make a judgment of that

18  and a recommendation to the judge.

19     But then, ultimately, Your Honor will make the decision on

20  his own, taking into account that recommendation.  But it's his

21  decision.

22  **Q.**   You understand that only the U.S. Attorney, your sponsor

23  here as a trial witness, can ask for the leniency; correct?

24  **A.**   I believe my attorney or -- could also request leniency as

25  well, is my understanding.

1    Q.   You understand that your attorney cannot ask for leniency

2    under the section of the sentencing guidelines that provides

3    it; correct?

4    A.   Yes, because he's not specifically named here.

5    Q.   He's not the government lawyer?

6    A.   Correct.

7    Q.   Only the government lawyer can make that motion for

8    leniency; correct?

9    A.   Under these terms, yes.

10   Q.   Well, these terms -- this is your plea agreement; correct?

11   A.   With -- with the government, yes.

12   Q.   All right.  And you've been represented during these

13   proceedings by Harry Stern; correct?

14   A.   Yes.

15   Q.   Now, you understand that, when it comes to your sentencing

16   date, it's only the government that has a choice whether to ask

17   for a lower sentence based on your cooperation; correct?

18   A.   It's my understanding that they make that determination.

19   So, yes, they would be the only people involved in that.

20   Q.   When they make that determination, what do you think

21   they're going to consider?

22   A.   Uhm, they're going to, hopefully, consider my

23   conversations with them, my testimony in this trial, and

24   anything further we would talk about.

25   Q.   Particularly, they're going to consider whether or not you

 1  were truthful during your testimony; right?

 2  **A.**   Yes.

 3  **Q.**   And do you think there's a chance that being truthful, in

 4  their view, means your testimony tracks their theory of the

 5  case?  Do you happen to think that's a possibility here?

 6  **A.**   It could be a possibility, yes.

 7  **Q.**   It could be.  Do you think it's more likely than not that

 8  their idea of truthfulness is you tracking their narrative of

 9  this case?

10  **A.**   I think a large component of that is also corroborating

11  the other testimonies that have already come before this.

12  **Q.**   Let's talk about "corroboration" for a second, since you

13  use that word.  You mentioned earlier in -- as an example, the

14  Andrew Byrd police report, you talked about how a lot in the

15  police report was accurate.

16       Do you remember that testimony?

17  **A.**   I don't recall speaking that a lot was accurate.  I think

18  we were talking specifically about inaccuracy.

19  **Q.**   We were talking about the fact that, in the Andrew Byrd

20  example, you did book drugs and you did book pay/owe sheets and

21  you did book this and you did book that, and it looks perfectly

22  natural except for the fact that there was no money booked.

23       Do you remember that testimony?

24  **A.**   That which you just described is correct.

25  **Q.**   So the fact of the matter is what made the Andrew Byrd

1   police report so credible is that there was a lot of truth in

2   it, there was more than a kernel of truth, there was a lot of

3   truth.  The lie was that it says there was no money found.  Am

4   I right?

5   **A.**   That as well as, I think, our entry.

6   **Q.**   So in a lot of these episodes where you stole money from

7   people, a lot about the police report is true, and that's what

8   makes the lie real; isn't it?

9        That's what makes the lie possible, there's so much truth

10  in what you write?

11  **A.**   Are you asking me if that's correct?

12  **Q.**   Yes.

13  **A.**   Yes.

14  **Q.**   Okay.  So in terms of your cooperation agreement, you can

15  say a lot here that's true, but one little lie might get lost

16  in the shuffle.  Do you agree with that, that that's possible?

17  **A.**   Anything is possible, sure.

18  **Q.**   Let's talk about that -- that search you did out on

19  19th Avenue.  What was the name -- the nickname for Crosby

20  was --

21  **A.**   Indio.

22  **Q.**   What is it?

23  **A.**   Indio, I-n-d-i-o.

24  **Q.**   Okay.  And you were out there -- let me see if I paint the

25  narrative correctly.  You're out there with two real police

 1  officers, police officers who are out there to do something

 2  good for the community.  And I'm talking about -- I think it

 3  was Kenney and Greiner; am I right?

 4  **A.**   Yes.

 5  **Q.**   All right.  And they're not out there to steal, are they?

 6  **A.**   No.

 7  **Q.**   You're out there to steal, you said?

 8  **A.**   Among other things, yes.

 9  **Q.**   So -- well, wait a minute.  Among other things, you were

10  out there to steal money.  That's why you went out there,

11  wasn't it?  That was the main purpose.

12  **A.**   My main purpose was to arrest Indio.

13  **Q.**   It was?

14  **A.**   Yes.

15  **Q.**   And the money was like a sideshow to you?

16  **A.**   In all of these cases, the money was not a guarantee.

17  There were many instances where we arrested people, where

18  everything was booked, money included.  There were times where

19  there was narcotics involved, where there was no money;

20  therefore, money wasn't kept because money wasn't there.  There

21  were times when only portions were booked and portions were

22  kept.

23  **Q.**   I thought you said that you got out there to Indio's

24  trailer -- right?  He lived in a trailer?

25  **A.**   A storage space.

1    **Q.**    Storage space?

2         You got out there, and you're out there with two honest

3    officers, Kenney and Greiner; right?

4    **A.**    Yes.

5    **Q.**    And you found some money, didn't you?

6    **A.**    Yes.

7    **Q.**    You found $1,200, didn't you?

8    **A.**    I don't recall the total amount.

9    **Q.**    Does that sound about right?

10   **A.**    It could or could not be.  I remember there was a little

11   bit of a dispute about that later.

12   **Q.**    Anyway, you found the money and Greiner and Kenney didn't

13   know you found the money, did they?

14   **A.**    No.

15   **Q.**    Robles wasn't there, was he?

16   **A.**    Not when I found the money, no.

17   **Q.**    Furminger wasn't there, was he?

18   **A.**    Not when I found the money, no.

19   **Q.**    So in terms of being a successful thief, at that moment

20   all you had to do was pocket the money and you've accomplished

21   your goal; correct?

22   **A.**    If I was going to keep it for myself, yes.

23   **Q.**    If you were going to keep it for yourself.  You had it, by

24   yourself, at that moment with two honest police officers to

25   worry about; correct?

**A.**    Right.

**Q.**    So at that point doesn't it make sense that you would

pocket the money and divide it up later, if you wanted to do

that?

**A.**    That is one possibility.  But the other possibility is

that Mr. Robles was working that day and Mr. Furminger got

contacted and responded right out from wherever he was and came

right over to the location.

**Q.**    That was your testimony.  I'm asking you about something a

little bit different.

**A.**    I'm just telling you what happened.

**Q.**    I'm asking you, when you found the money and you are in

the vicinity of two honest police officers who might detect

your thievery, the smart and logical thing to do would have

been to pocket the money; correct?

**A.**    That -- the smart way to steal something?  That's one way

to steal something.  I chose a different way to steal

something.

**Q.**    Pardon?

**A.**    I chose a different way to steal it.

**Q.**    At that point when you had the money, there was no purpose

to your thievery to have Robles and Furminger come out.

      You had them come out to create that kind of frame for

them, didn't you?

**A.**    No.  I was following a pretty standard practice that we

 1   had, that when we were each investigating a case we would be

 2   each involved with the spoils of it.  And if there were cases

 3   where I wasn't party to, I wouldn't be involved with it.

 4   Q.   How ridiculous does it look for you to say that after

 5   you've got the money and you've got two other officers doing

 6   the search, you drag Robles and Furminger out just because

 7   that's part of the honor among thieves?

 8         Is that what you're saying?

 9             MR. HEMANN:   Objection.   Argumentative.

10             THE COURT:   Sustained.

11   BY MR. GETZ:

12   Q.   You could have given them the money later; correct?

13             MR. HEMANN:   Objection.   Argumentative.

14             THE COURT:   Overruled.

15             THE WITNESS:   That's one possibility, yes.

16   BY MR. GETZ:

17   Q.   Do you agree with me that if the U.S. Attorney here

18   refuses to ask Judge Breyer to give you a lighter sentence

19   because of your cooperation, there's nothing you can do about

20   it?

21   A.   Yes.

22   Q.   Do you agree with me that you have no appeal from that

23   decision of the U.S. Attorney to refuse to ask you for

24   leniency?  Do you agree with that?

25   A.   Yes.  I believe that's, in fact, part of the plea

1    agreement, that I have no appeal.

2    **Q.**    That's right.

3         Now, let's go back -- let's go back a couple of months to

4    when you first got indicted.

5         Do you remember hearing that you got indicted?

6    **A.**    I remember hearing that I was about to be indicted.

7    **Q.**    And then the day came when you got indicted; remember

8    that?  Remember hearing for the first time that you got

9    indicted?

10   **A.**    Well, I believe I was actually arraigned while being

11   indicted.

12   **Q.**    Well, I'm asking about the first time you had knowledge

13   that you were indicted.  So I'm making a distinction between

14   before you were charged in this case -- before you were charged

15   in this case and being charged in this case.

16        I want you to think back and see if you can remember that

17   moment when you, Rey Vargas, knew for the first time you'd been

18   charged in this case.  Do you remember that moment?

19        If you don't, that's fine.

20   **A.**    Okay.  What I'm explaining to you is that I found out from

21   my attorney that I was going to be indicted; that I found out,

22   I believe on a Tuesday night, that on the Wednesday there was

23   going to be an arrest warrant issued for me, and that I should

24   come up to San Francisco to deal with it immediately.  And I

25   did deal with it on that Wednesday.

1   **Q.**   But you came up here and you appeared in front of Judge

2   Breyer in the morning, and you were arraigned; correct?

3   **A.**   Yes.

4   **Q.**   And at that arraignment you entered a plea of not guilty;

5   right?

6   **A.**   Yes.

7   **Q.**   And you told anyone who would listen to you that these

8   charges were bogus; correct?

9           **MR. HEMANN:**   Objection.   Foundation.

10          **THE COURT:**   Sustained.

11  **BY MR. GETZ:**

12  **Q.**   Did you tell family members that you were innocent?

13  **A.**   Yes, I may have.

14  **Q.**   Did you tell friends that you were innocent?

15  **A.**   I may have.

16  **Q.**   When you saw police officers you knew around town, and

17  they said, Hey, Rey, man, good luck, I know you're going to

18  beat it, did you say, Thank you, I'm going to beat it?

19  **A.**   I didn't live here in San Francisco anymore, so I didn't

20  really run into anybody to even have that sort of conversation.

21  **Q.**   How about when you came up here for those court

22  appearances?

23          You came up here for court a couple of times before we

24  reached this point where you're now testifying; correct?

25  **A.**   I came up to meet with my attorney, yes.

VARGAS - CROSS / GETZ                                    1444

1   **Q.**   And when you came up, did you ever run into your old

2   brother officers and hear them say, Rey, you can beat this

3   case?

4   **A.**   That was never really part of the conversations.  They

5   just mostly -- I remember running into a couple of police

6   officers and they really asked me like if I was okay and how I

7   was doing.

8   **Q.**   What did you tell them?

9   **A.**   Told them I was doing okay, doing the best I could.

10  **Q.**   Did you tell them you were going to win your case?

11  **A.**   I don't remember ever saying that.

12  **Q.**   Did the Police Officer Association have a fundraiser to

13  give money for officers like you who are charged?

14  **A.**   They may have, but I'm not aware of it.

15  **Q.**   You didn't get any of that money?

16  **A.**   Not a penny.  Not a -- not a penny.

17  **Q.**   Did they take care of your legal fees?

18  **A.**   They did.

19  **Q.**   Did you tell Police Officer Association personnel that

20  this case was bogus and you were going to beat it?

21  **A.**   No.  I think mostly I talked about the witnesses and --

22  two in particular, Daisy and Jayme -- that they didn't have

23  much credibility.

24  **Q.**   Did you tell people between the indictment and your change

25  of plea that you were going to beat this case because you're

1    innocent?

2         Did you shout that from the rooftops to anyone who would

3    listen?

4    **A.**    No.

5    **Q.**    Why not?

6    **A.**    First of all, I don't really speak in those sort of

7    bravado sort of terms.  And, second, ultimately, I knew that

8    I'm guilty.  So that -- I wasn't really going to be saying

9    things like that.

10        I mostly spoke about the credibility of certain people in

11   this case, meaning Daisy and Jayme, knowing that, you know,

12   although they made allegations about me providing them drugs,

13   they also threatened to extort me and kill me.

14   **Q.**    Well, we talk about the subject of when you pled guilty,

15   because you just now said that you knew at some point you were

16   going to plead guilty.

17        You went all through the evidence before you made that

18   decision; correct?

19   **A.**    Yes.

20   **Q.**    And you were hoping against hope that you could beat this

21   case; right?

22   **A.**    Initially, sure, yes.

23   **Q.**    Because you didn't want to accept responsibility for what

24   you did; correct?

25   **A.**    Initially, no.

**Q.**   In fact, earlier today, this morning, I think you were

asked, "Why did you plead guilty?"

     And you said, "Because I'm guilty."  Do you remember

saying that?

**A.**   Yes.

**Q.**   But you knew that when the indictment first came down,

didn't you?

**A.**   Yes.

**Q.**   And you didn't plead guilty then, did you?

**A.**   No.

**Q.**   And you didn't plead guilty the month after you were

indicted, did you?

**A.**   No.

**Q.**   You didn't plead guilty five months after you were

indicted, did you?

**A.**   No.

**Q.**   You got indicted in the early part of 2014 and you pled

guilty in October of 2014; right?

**A.**   Yes.

**Q.**   Why then?

          **MR. HEMANN:**   Your Honor, to the extent this implicates

the attorney-client privilege, I'd just ask that the question

be rephrased.

**BY MR. GETZ:**

**Q.**   Don't tell me anything about what Harry Stern told you.

1    I want to know -- based on your testimony that you pled

2  guilty because you were guilty, tell me why it took you so long

3  to do that.  Why did you wait until October?

4  **A.**   In those specific instances -- as I said before, I don't

5  live here, so I wasn't -- I wasn't able to meet with my

6  attorney all the time.  And so when I would come up and meet

7  with my attorney, that's when we would dive deeply into the

8  case, going through evidence, going through specifics.

9    And there came a time where it was, frankly, very

10  difficult for me to say I'm just going to stop lying.  That's

11  it.  You know, I'm guilty.  Everything that they're saying by

12  and large is true.

13    And so at that point I said that's -- you know, and I

14  remember, like, literally shaking before the decision and

15  finally saying, that's it, all right, I'll say I'm guilty of

16  this, I'm guilty of this, going down the line and describing

17  point by point what I had done, what I knew.  And that was it.

18  **Q.**   Give me a time frame for when you, in your own words,

19  decided you were going to stop lying.  How about a time frame

20  for that?  How about a month?

21  **A.**   I've known what the truth was, but up until this point I

22  had maintained this lie to myself, even to my family, just not

23  wanting to talk about it, not wanting to admit to them.  It's

24  humiliating to tell them, yes, I made these mistakes, these

25  really terrible mistakes.

1        It's terrible for me to say that to them.  It's hard for

2   me to say it.  But there came a point in time and -- through

3   the summer and, basically, as the -- the date of the trial

4   became closer, there was a weight on me.  And I just didn't

5   want to carry that anymore.  It would make me sick.

6        And I just got sick of having to deal with that and hold

7   that in.  And so through the summer and subsequent meetings

8   with my attorney, as things got more and more concrete, and the

9   date -- you know, that time to the date became closer and

10  closer, the pressure mounted.

11       And for me, I just sat there looking at it, looking at

12  everything, the totality of everything, and I just didn't

13  want -- I didn't want to keep that in anymore.  And so I don't

14  know the exact month, but it was a process through all of that

15  time.

16  **Q.**   The next couple of questions that I have on this subject,

17  I don't want you to say anything about what your attorney told

18  you.  I want to know -- what I'm asking about is what was

19  happening under your dome.  That's what I want to know.  Not

20  what anybody told you.

21       Now, do you remember this morning you were talking about

22  lying in an OCC proceeding involving excessive force?

23  **A.**   Yes.

24  **Q.**   Now, just to put that in context, the Office of Civilian

25  Complaints is a very significant operation as it pertains to

 1  the San Francisco Police; correct?

 2  **A.**    Sure.

 3  **Q.**    That is an independent watchdog agency which has and does

 4  result in investigations which can get police officers fired;

 5  correct?

 6  **A.**    They can, yes.

 7  **Q.**    And you knew when you were going in to the OCC proceedings

 8  that if this investigation went the wrong way for Rey Vargas,

 9  you could lose your job; right?

10  **A.**    Yes.

11  **Q.**    And you didn't want to lose that job, did you?

12  **A.**    No.

13  **Q.**    That job you got in 1999, when you took the oath and, you

14  know, you swore to defend against all enemies, that's the best

15  job Rey Vargas ever had, wasn't it?

16  **A.**    It was one of the best, yes.

17  **Q.**    So I want you to go back to that time frame when you're

18  heading toward the OCC investigation.

19        You prepared for that hearing, didn't you?

20  **A.**    Yes.

21  **Q.**    You were represented by an attorney in that hearing,

22  weren't you?

23  **A.**    In that hearing, yes.

24  **Q.**    You were going to testify in that hearing; correct?

25  **A.**    In the interview.  I was interviewed, but that wasn't a

1  hearing.

2  **Q.**   So speaking of the interview, you knew the interview was

3  going to happen on a particular day before it happened.   It

4  wasn't a surprise when you showed up there, was it?

5  **A.**   No, it was scheduled.

6  **Q.**   And you had time to plan and plot what you were going to

7  say at that hearing; right?

8  **A.**   Sure.

9  **Q.**   So when you showed up and you lied, it wasn't something

10 that was just off the cuff, you had planned the lie; correct?

11 **A.**   Uhm, sure, okay.

12 **Q.**   You had made up a story and you had thought it over to

13 make sure that that story was bulletproof; right?

14 **A.**   The story was not bulletproof.

15 **Q.**   You gave a story you thought was bulletproof though,

16 didn't you?

17 **A.**   I gave a story that glossed over some very specific

18 details.

19 **Q.**   You lied intentionally to protect your position; right?

20 **A.**   Yes.   And to keep myself from discipline, yes.

21 **Q.**   And that is something of a pattern for you, isn't it?

22      You lie when it's to your advantage; am I right?

23 **A.**   Sure.   I think you could say that about most lies.

24 **Q.**   It certainly was true in the Andrew Byrd police report and

25 all these other police reports when you lied by omitting money

1    that you found; correct?

2    **A.**    Yes.

3    **Q.**    That was to your advantage?

4    **A.**    Absolutely.

5    **Q.**    And that also was to your advantage because it kept you

6    from being found out to be the thief that you are; correct?

7    **A.**    Yes.

8    **Q.**    And you did that repeatedly, didn't you?

9    **A.**    Yes, I sure did.

10   **Q.**    You said this morning that you went in to steal 30, 40, 50

11   times.  Do you remember that?

12   **A.**    Uhm, yes, with -- that was with Mr. Robles and

13   Mr. Furminger, sure.

14   **Q.**    Yeah, we're just talking about Mr. Vargas now for a

15   minute.  I want to talk about you.

16       I want to talk about how you, in every police report you

17   ever wrote up, wherever you stole, you lied because that was to

18   your advantage; am I right?

19           **MR. HEMANN:**  Objection, Your Honor, foundation.  The

20   30, 40, 50 times were in '09, I think, is what he was talking

21   about, which is why the answer --

22           **THE COURT:**  Sustained.

23   **BY MR. GETZ:**

24   **Q.**    Now, in this situation here, where you're testifying, in

25   order for you to get the benefit of your testimony in a shorter

1    sentence, do you agree with me that the Honorable Judge Breyer

2    has to believe you?

3    **A.**    Absolutely.

4    **Q.**    And do you agree with me that if he doesn't believe what

5    you say, you run the risk of getting more time in prison?

6    **A.**    That's a definite possibility, yes.

7    **Q.**    Do you agree with me that being in prison, for an

8    ex-police officer, is not the best position to be in?

9    **A.**    I can't think of many worse positions, no.

10   **Q.**    So you have a real incentive here to get the lowest

11   possible sentence you can get; correct?

12   **A.**    I believe my incentive is to be as truthful as possible.

13   **Q.**    And truthful, to you, means tracking your testimony to the

14   government's narrative; correct?

15   **A.**    No.  Being truthful is being as forthcoming as I can about

16   everything that I remember and everything that I know.

17   **Q.**    You painted a little picture this morning about the ride

18   out to Newark, talking about the ride out to Newark with

19   Furminger and Robles.  Remember that?

20   **A.**    Yes.

21   **Q.**    Do you remember describing that ride out to Newark?  You

22   described the picture where the three of you were in a car.

23   And based on what had happened earlier, taking down these drug

24   dealers and learning about the potential for a place in Newark

25   where there could be a lot of money found, you painted a

1  picture about how you three were talking about it on the way

2  out to Newark.  Do you remember that?

3  **A.**    Yes.

4  **Q.**    And you painted a picture that had Mr. Furminger talking

5  about how much money might be found, and how this could be a

6  big score, and so I forth and so on.  Remember that?

7  **A.**    Yes.

8  **Q.**    All right.  Now, I want you to remember that when I ask

9  you whether on October 28th, of this year, you had an interview

10 with special agent Tyler Nave, of the FBI, in which you talked

11 to him about the Newark caper; do you remember that?

12 **A.**    Yes, I remember talking to him.

13 **Q.**    And present during the interview were

14 Special Agent Flores, and Mr. Villazor and Mr. Hemann were

15 there.  Do you remember that?

16 **A.**    Yes.

17     (Government and defense counsel confer off the record, out

18 of hearing of the jury and reporter.)

19 **BY MR. GETZ:**

20 **Q.**    Now, with the Court's permission I'm going to show you a

21 memorandum of an interview from that.  Memorandum from that

22 interview.  And I would like you to -- like you to read that

23 paragraph right here to yourself, and tell me when it's

24 finished.  Just read that quietly to yourself, please.

25 **A.**    (Witness complies.)

1   Q.   Now, Mr. Vargas, on October 28th, less than a month ago,

2   you told a different story about Newark; didn't you?

3   A.   It's slightly different, yes.

4   Q.   You said that on the ride out to Newark nothing was spoken

5   about money or a big score; correct?

6   A.   That's what's there, yes.

7   Q.   You said nothing was discussed on the way to Newark about

8   splitting it up; correct?

9   A.   That was often the case.  We -- prior to that we never

10  talked about dividing up monies, or we're each going to get a

11  third each, or anything like that.  We never talked about money

12  in those terms at all.

13  Q.   Oh, Mr. Vargas, I didn't ask you that.  I didn't ask about

14  generally.

15       Let me start again by reminding you of the picture you

16  painted this morning with Mr. Furminger and you talking about

17  big score, money, split it up, dig in the backyard, and

18  whatever else you said.

19       Do you have that in mind?

20  A.   Yes.

21  Q.   When you talked to these honorable people (indicating) on

22  October 28th, you didn't say anything about that; did you?

23           MR. HEMANN:   Objection.  Vague as to what "that" in

24  that list is.

25           MR. GETZ:   Fine.

1  BY MR. GETZ:

2  Q.   You didn't say anything about "We're going to get cash out

3  there; we could have a big score," did you?

4          MR. HEMANN:   Objection.  Vague as to time.

5  BY MR. GETZ:

6  Q.   I'm talking about this meeting you had on October 28th.  I

7  just showed you the memorandum of interview.  Would you like to

8  see this again?

9  A.   No.

10 Q.   You didn't say it; did you?

11         MR. HEMANN:   Objection.  Vague as to "it," Your Honor.

12 BY MR. GETZ:

13 Q.   You didn't say anything about going out to Newark to get

14 money at this place; did you?

15 A.   I don't recall if I mentioned that specifically or not

16 then.

17 Q.   What you said was -- and this is on October 28th, with

18 reference to the Newark caper.

19         MR. HEMANN:   Objection to reading the 302, Your Honor.

20         MR. GETZ:   I'm not going to read it.  I'm going to ask

21 him the question, with the Court's permission.

22         THE COURT:   Go ahead.

23 BY MR. GETZ:

24 Q.   Did you say, on October 28th, that, "We don't talk about

25 money on the way out; it's understood"?  Did you say that?

1   **A.**   I would have said something very close to that, yes.

2   **Q.**   But today is a much more elaborate vision of what ride out

3   to Newark; am I right?

4   **A.**   Uhm, there's more about, yes.  I have spoken more about

5   it, yes.

6   **Q.**   Let's talk about something else you said at that

7   interview.

8        Were you asked at that interview -- on October 28th, you

9   were asked how often you stole money and valuables during a

10  13-month period.  Do you remember that question?

11  **A.**   Yes.

12  **Q.**   And you said that you stole money and valuables in 10 to

13  20 incidents in that 13-month period.  Do you remember that

14  answer?

15  **A.**   I don't remember it specifically.

16  **Q.**   Okay.  Would it help if I showed you the report of that

17  interview?

18  **A.**   Sure.

19       (Government and defense counsel confer off the record, out

20  of hearing of the jury and reporter.)

21  **BY MR. GETZ:**

22  **Q.**   Mr. Vargas, could you just read this first sentence to

23  yourself (indicating).  And let me know when you're done.

24  **A.**   (Witness complies.)

25       Okay.

1   Q.   Mr. Vargas, did you say on October 28th that there were 10

2   to 20 incidents during a 13-month period when you stole money

3   and valuables?

4   A.   I said it then, yes.

5   Q.   And today, this morning, we're raising the stakes a little

6   bit.  Now it's 30, 40, 50; correct?

7   A.   Yes.  I believe that's a much truer number.

8   Q.   So how did we go from 10 to 20 before you testify, how do

9   we go to 30, 40, 50?  Could you explain that to me?

10  A.   I just believe that's a very conservative estimate.  And

11  the number I said today is probably much more closer to the

12  truth.

13  Q.   Look.  You knew you were coming up here for this interview

14  on October 28th; right?

15  A.   Yes.

16  Q.   You knew this was part of your cooperation agreement;

17  right?

18  A.   Yes.

19  Q.   You knew this was a formal part of your plea agreement, in

20  which you had to perform; right?

21  A.   Yes.

22  Q.   You knew that all these people at this table were going to

23  be interviewing you, expecting you to give truthful answers.

24  Am I right?

25  A.   Of course.

1  Q.   And you had a lot of time to think about what you were

2  going to say about these major events; right?

3  A.   I had time to think about it.  But as to the specifics of

4  each event, I didn't know which events we'd be going into until

5  we discussed them specifically.

6  Q.   By the time you came up here on October 28th, you had read

7  a lot of the police reports we've discussed here during your

8  testimony; correct?

9  A.   The hundreds and hundreds of police reports, yes.

10  Q.   You had months to do that; right?

11  A.   I actually didn't have personal copies of that stuff.  So

12  I didn't read hundreds and hundreds of police reports.

13  Q.   So when they asked you the most basic of all questions,

14  "How many times did you steal?" and you said 10 to 20 times,

15  was that the truth?

16  A.   It's at least that much, and probably a lot more.

17  Q.   So it was 10 to 20 times on October 28th.  And now, while

18  you're performing -- and do you agree with me you're performing

19  right now?  This is a performance.  This is important.  Do you

20  agree with that?

21          MR. HEMANN:   Objection, Your Honor.  Argumentative.

22          THE COURT:   Sustained.

23  BY MR. GETZ:

24  Q.   Do you agree with me that right now you're being evaluated

25  not just by the jury but by the U.S. Attorney's Office?

1    **A.**    Absolutely.

2    **Q.**    Do you agree that -- not just being evaluated by the

3    U.S. Attorney's Office -- you're being evaluated by a

4    United States District Court Judge who is going to sentence you

5    at some point?  Do you agree with that?

6    **A.**    Yes.

7    **Q.**    And so before, before you're being evaluated in that

8    manner you say 10 to 20.  You come in here this morning and you

9    say 30, 40, 50.  Right?

10   **A.**    Yes.

11   **Q.**    Why do you think you raised the numbers?

12   **A.**    Because I just think it's a more accurate assessment of my

13   conduct as well as the conduct of Mr. Robles and Mr. Furminger

14   during that period of time.

15   **Q.**    What possibly happened between October 28 and today that

16   made you think of something you hadn't thought of before?  What

17   came into your mind to raise the number?

18   **A.**    Looking through all these incidents -- you know, this is

19   many years ago, so looking through them, things come back into

20   my mind.  I refresh my recollection and the things -- you know,

21   specific instances come back that I just, frankly, hadn't

22   thought of in several years.

23   **Q.**    I thought you said less than 30 minutes ago that for the

24   last seven or eight months you were reading all police reports

25   that you could get your hands on, conferring with your

```
 1   attorneys, and talking about the evidence which, in your words,

 2   has led you to the point where you're going to stand up and say

 3   you're guilty.

 4        Didn't you say that 30 minutes ago?

 5            MR. HEMANN:  Objection, Your Honor.  Misstates the

 6   testimony.

 7            THE COURT:  Sustained.

 8   BY MR. GETZ:

 9   Q.   In any event, is it your testimony, then, that you

10   suddenly learned something new about the case between

11   October 28th and today, that you didn't know before, that

12   caused you to revise your numbers upward from 10 to 20, to 30,

13   40, 50?

14        Do you say that?

15   A.   I'm not saying it's a specific instance or line or word

16   that I've read.  I just believe that's a truer number, much

17   closer to an accurate number.

18   Q.   You talked a little bit about the situation where you went

19   into the hotel room and there was -- there was somebody in

20   there named Kelsey.  Do you remember that?

21   A.   Yes.

22   Q.   And if I say that her name is Kelsey Stewart does that

23   ring a bell?

24   A.   That could be her last name, sure.

25   Q.   Well, I represent to you that that's her last name.  Do
```

1   you accept that?

2   **A.**   Sure.

3   **Q.**   So let's talk about Kelsey Stewart for a second.

4        Do you remember that you called her up and wanted to meet

5   her in a restaurant?

6   **A.**   I recall being in contact with her.  I don't recall who

7   called who, but I absolutely recall meeting her in a

8   restaurant, yes.

9   **Q.**   Do you recall meeting her in a restaurant more than once?

10  **A.**   I recall once.  It could be twice, but I just recall once.

11  **Q.**   What did you meet her in the restaurant for?

12  **A.**   Uhm, to talk to her, to buy her lunch, and also to get

13  information from her.

14  **Q.**   Did you get information from her?

15  **A.**   No, not really.

16  **Q.**   Did you talk about the case?

17  **A.**   We talked about her boyfriend.

18       I was trying to get information from her regarding her

19  boyfriend.

20  **Q.**   That would be Mr. Furlong?

21  **A.**   Yes.

22  **Q.**   You talked to her about Mr. Furlong.

23  **A.**   Yes.

24  **Q.**   If I told you that she testified under oath that you

25  didn't ask her one question about Mr. Furlong, would you say

```
 1   she was lying?

 2           MR. HEMANN:   Objection.   Relevance and foundation,

 3   Your Honor.

 4           THE COURT:   Sustained.

 5   BY MR. GETZ:

 6   Q.   Let's talk about Kelsey Stewart after the time that you

 7   met her at the restaurant.

 8        Do you remember calling her, to see her some more, and she

 9   didn't want to see you?  Do you remember that part?

10   A.   No.

11   Q.   Do you remember saying to her, "I can see you anytime I

12   want; I know where you live"?  Do you remember that?

13   A.   Not at all.

14   Q.   Do you remember when you had her in custody -- and this is

15   during the time when you testified she made a call to work.  Do

16   you remember that?

17   A.   Yes.

18   Q.   She made a call to work because since she was with you she

19   was going to miss her shift.  Do you remember that?

20   A.   Since she was being detained at the station, yes.

21   Q.   All right.  And she told you that in addition to being

22   concerned about missing her shift, there was a far, far more

23   grave matter that she wanted to attend to.  Do you remember

24   that?

25   A.   I don't recall that.
```

1   Q.   Do you remember saying that she had a methadone clinic

2   appointment, and she needed to go pick up her methadone and

3   drop it with a cup of water?

4   A.   Yeah, I don't recall that.

5   Q.   You don't recall her methadone request?

6   A.   No.

7   Q.   And you don't recall her telling you that she really

8   needed to have her methadone that day?

9   A.   I don't recall that.

10  Q.   All right.  Do you remember that on her way out the door,

11  after she missed the methadone appointment, you gave her some

12  heroin and some money?  Do you remember that?

13  A.   No, I don't.

14  Q.   You don't?

15       So do you deny that you gave her heroin, or you're just

16  not sure?  Maybe you did; maybe you didn't?

17  A.   I don't deny it.  I just don't recall it.

18  Q.   You don't deny it because that's the kind of thing you

19  used to do; right?

20  A.   At times I gave informants drugs.  Absolutely.  So that's

21  why I'm not denying it.  I'm saying it could have happened.  I

22  just don't recall it.

23  Q.   Because there's so many times that you gave heroin to

24  someone who was trying to get off it because they were on

25  methadone; right?

1  **A.**   I don't know if that's the specific reason or instance,

2  but yeah.

3  **Q.**   That sounds like something you would do though; do you

4  agree?

5  **A.**   Well, I agree that it's something I had done in the past.

6  I don't recall if I did with her.  I don't recall it at all.

7  **Q.**   Do you remember you were talking about Daisy and Jayme,

8  and you said -- you were describing the way they looked?

9  **A.**   Yes.

10  **Q.**   And you said, you know, heroin is a really bad drug on

11  their body.

12       Do you remember saying that?

13  **A.**   Yes.

14  **Q.**   What kind of a person would give that drug to somebody?

15           **MR. HEMANN:**   Objection, Your Honor.  Relevance.

16  Argumentative.

17           **THE COURT:**   Sustained.

18  **BY MR. GETZ:**

19  **Q.**   Do you understand that procedurally, in connection with

20  your plea agreement, none of the charges get dismissed with

21  finality until you're sentenced?  Is that your understanding?

22  **A.**   The charges against me?

23  **Q.**   Yeah.  You had a bunch of charges, and you pled guilty to

24  a couple of them.  But there was one charge out there that

25  wasn't dismissed.  And, in fact, your plea agreement calls for

1   the Judge to decide if it's going to be accepted.  Do you

2   remember that language?

3   **A.**   My understanding was that I pled guilty to four charges.

4   And I believe a fifth was dismissed.  But if -- I may be

5   mistaken, but that's my belief.

6   **Q.**   And your understanding is that the whole sentencing

7   structure, the whole scheme of federal sentencing, is based on

8   different components, but one of the most important for you is

9   your testimony here today; correct?

10          **MR. HEMANN:**  Objection with regard to "the whole

11  scheme" in federal sentencing.

12          **THE COURT:**  I'll sustain the objection.  But if you

13  want to ask the question a different way, you certainly can.

14  **BY MR. GETZ:**

15  **Q.**   Just on a scale of 1 to 10, in terms of what your

16  sentencing is going to be based on, how important do you think

17  it is that we believe your testimony?

18  **A.**   I think that's the most important.  Probably 10.

19          **MR. GETZ:**  Thank you.  I have nothing further.

20          **THE COURT:**  Okay.  Ms. Caffese.

21          **MS. CAFFESE:**  Thank you, Your Honor, yes.

22                      <u>**CROSS EXAMINATION**</u>

23  **BY MS. CAFFESE:**

24  **Q.**   Mr. Vargas, what is a crime of opportunity?

25  **A.**   I guess I would describe it as -- as the opportunity

1   presents itself, then that person chooses to engage in that

2   crime.

3   **Q.**   So if I understand your testimony from yesterday, is that

4   the crimes that you committed were crimes of opportunity for

5   you; is that right?

6   **A.**   I'd say that's -- that's very fair, yes.

7   **Q.**   Were there any other reasons that you committed these

8   crimes, sir, aside from the fact that they were just crimes of

9   opportunity?

10  **A.**   I'm not sure I understand your question.

11  **Q.**   Was there any other motive or any other reason -- aside

12  from the fact that it just presented itself as an

13  opportunity -- that you would commit these crimes; stealing

14  money from people, for example?

15          **MR. HEMANN:**   Objection, Your Honor.  Motive and

16  opportunity are not the same thing.

17          **THE COURT:**   Well, that's why the question is unclear.

18      Are you asking did he have any reason other than that

19  there was an opportunity to commit a crime?

20          **MS. CAFFESE:**   Yes.

21          **THE COURT:**   So no other reason.  He just simply had an

22  opportunity and, therefore, he did it?

23          **MS. CAFFESE:**   Yes.

24          **THE COURT:**   So the motive -- you say excluding motive.

25  I'm trying to figure out -- most people who steal money steal

```
 1   money because they want the money.  But I'm trying to figure

 2   out whether you're dividing --

 3            MS. CAFFESE:  Let me rephrase it.

 4            THE COURT:  -- motive from opportunity.

 5   BY MS. CAFFESE:

 6   Q.   Your testimony yesterday, sir, was you committed these

 7   crimes because, simply, they were crimes of opportunity; right?

 8   A.   Yes.

 9   Q.   All right.  Like the Apple gift cards.  They just were on

10   the floor.  You picked them up.  Is that right?

11   A.   Yes.

12   Q.   Okay.  Well, were there any other reasons -- aside from

13   the fact that it was just simply a crime of opportunity -- that

14   you engaged in this conduct that you've been describing?

15   A.   Well, for example, if it was money it's because I wanted

16   the money.

17   Q.   Right.  You wanted to steal money, for example; is that

18   right?

19   A.   Yes.

20   Q.   And sometimes, for example, when you would steal the

21   things that you testified to there were other officers present;

22   is that right?

23   A.   Yes.

24   Q.   All right.  So when there were other officers present you

25   had to try to hide, for example, stealing a laptop or whatever
```

1   it was that you were stealing when those other officers are

2   present.  True statement?

3   **A.**   Yeah.

4   **Q.**   Now, you testified today and yesterday that you were not

5   really friends with Officer Robles; is that right?

6   **A.**   No, I said we were friends.

7   **Q.**   Well, when you first started working with him you didn't

8   know him very well; is that right?

9   **A.**   No, I hadn't -- prior to working with him I hadn't really

10  met him before.

11  **Q.**   And you didn't socialize with him; is that right?

12  **A.**   We did -- we didn't socialize often.  We did on occasion,

13  but not often.

14  **Q.**   And you didn't go over his house to play video games with

15  him; is that right?

16  **A.**   No, I think I've only -- I had only been to his house

17  maybe once or twice.

18  **Q.**   You only played video games with Cesar Hernandez; is that

19  right?

20  **A.**   He's not the only person, but he is a person.

21  **Q.**   Because Cesar was your friend; is that right?

22  **A.**   Yes.  Later on, after my relationship with Cesar we

23  became -- yeah, we became friendly.

24  **Q.**   And Ed didn't help you, you and your girl- -- or didn't

25  help you move your girlfriend out of her apartment two times;

1   is that right?

2   **A.**   No.   Ed -- or Mr. Robles helped me move personally when I

3   left the Bay Area.   He himself came and helped me move.

4   **Q.**   Did Ed help your girlfriend and you move your girlfriend

5   out of her apartment on two occasions?

6   **A.**   No.

7   **Q.**   No.

8       Cesar helped you and the girlfriend move on two occasions;

9   is that right?

10  **A.**   Yeah.   For pay, but absolutely.

11  **Q.**   Right.

12      And on one of those occasions was when you hit a parked

13  car and just kept going even though you had caused damage to

14  is; is that right?   Remember that?

15  **A.**   No.

16  **Q.**   You don't remember that?

17  **A.**   No.

18  **Q.**   Okay.   So could that have happened that you would have hit

19  a parked car and not stopped?

20  **A.**   I don't believe I hit a parked car.

21  **Q.**   Now, you testified yesterday that the first time that you

22  stole from a crime scene was essentially when you were

23  partnered up with Ed Robles; is that right?

24  **A.**   That's what I recall, yeah.

25  **Q.**   But you can't recall the circumstances of that; is that

1   right?

2   **A.**   As I recall it, I was given money.  Money was, like,

3   slipped into my pocket.

4   **Q.**   Well, but aside from that, you can't recall the

5   circumstances of where you were, for example; is that right?

6   **A.**   I don't recall the specific incident, no.

7   **Q.**   You can't recall what month it was; is that right?

8   **A.**   Well, I can limit it -- I can guess that it could only be

9   either January or February of 2009, because prior to that I had

10  never worked with Mr. Robles.

11  **Q.**   You can't remember what arrest that was; is that right?

12  **A.**   That's correct.

13  **Q.**   And then when you interviewed with the FBI agents on the

14  20th and 21st of 2014, didn't you say that, quote, you believed

15  it was more likely that it was Robles that first put cash in

16  your pocket because he was not close, because you weren't close

17  with Furminger; is that right?

18  **A.**   If that's what it says then, yes, that's what I said.

19  **Q.**   And you don't know whether or not there were any other

20  officers present when Officer Robles allegedly put this money

21  in your pocket; is that right?

22  **A.**   I don't believe so, no.

23  **Q.**   And you never actually complained to anybody that Officer

24  Robles put money in your pocket that day; is that right?

25  **A.**   No.

1    Q.   And the circumstances and specifics of that incident are

2    not really particularly detailed for you; is that true?

3    A.   Yes.

4    Q.   Now, you testified that it was essentially around the

5    period of time, this period of time, that your life of crime

6    began; is that right?

7            MR. HEMANN:   Objection, Your Honor.  Misstates the

8    testimony.

9            MS. CAFFESE:   I'll rephrase.

10   BY MS. CAFFESE:

11   Q.   It was during this period of time that, essentially, you

12   said you started engaging in misconduct.  Is that right?  Was

13   that your testimony yesterday?

14   A.   I stated that -- I believe I stated that I began stealing,

15   you know, money and other property with Mr. Robles and

16   Mr. Furminger about that time, yes.

17   Q.   Right.  And it would have also been at that time,

18   according to your testimony, that you started writing false

19   police reports, for example; is that right?

20   A.   Yes.  Specifically to hide the thefts, yes.

21   Q.   And lying, for example; is that right?

22           MR. HEMANN:   Your Honor, objection.  Vague as to lying

23   about what.

24           THE COURT:   Sustained.

25

BY MS. CAFFESE:

Q.   Well, is it your testimony that -- is it your testimony
that when you began working with Ed Robles, for example, that
you also started to lie about some of your conduct?

          MR. HEMANN:  Objection, Your Honor.  Relevance.

          THE COURT:  Well, I'll allow it.

          MR. HEMANN:  Your Honor --

          THE COURT:  I'll see where it goes.

          MR. HEMANN:  And the objection relates to a matter
that we discussed outside the presence of the jury earlier.

          THE COURT:  Well, you're not referring to that, are
you?  I don't know what --

          MS. CAFFESE:  I thought I could refer to it.  Perhaps
I'm -- I'm trying to lay a foundation.

          THE COURT:  I mean, you can use that as a point.  I
mean, I think that if what you're -- I don't know to what
extent you're inquiring into it.  The testimony is what the
testimony is.  If you want to -- why don't you either -- recite
what the testimony is and then just move on from there, I
think.

BY MS. CAFFESE:

Q.   Sir, we talked a little bit earlier about the fact that
you used excessive force in an arrest back in 2002; is that
right?

          MR. HEMANN:  Objection, Your Honor.

1          **THE COURT:**  No.  I think what he testified to was he

2    lied to the Office of Citizen Complaints in connection with an

3    investigation regarding excessive force.  That's what the

4    testimony was.

5          **MS. CAFFESE:**  Yes.

6          **THE COURT:**  And that's what we're going to leave at

7    that point.  He stated that's what he did.  In 2002, he lied.

8          **MS. CAFFESE:**  Yes.

9          **THE COURT:**  As I recall the testimony.

10       But, of course, ladies and gentlemen of the jury, it's

11   your recollection that controls here so I don't want to tell

12   you what the testimony is.  That's up to you.

13       But we're going to proceed from that point and move on to

14   whatever subject you want, but not that subject.

15         **MS. CAFFESE:**  I just wanted to ask him the question

16   whether or not he lied again in 2002.

17         **MR. HEMANN:**  Objection.  Asked and answered.

18         **THE COURT:**  He said yes.

19         **MS. CAFFESE:**  Right.

20         **THE COURT:**  He said he did.

21   **BY MS. CAFFESE:**

22   **Q.**  You also lied -- well, you weren't working with Ed Robles

23   when you lied to the OCC in 2002; were you, sir?

24   **A.**  No.

25   **Q.**  And when you were working from, let's say, about 2007 up

```
 1   until 2009, when you cheated on your time sheets, you weren't

 2   working with Ed Robles; were you, sir?

 3             MR. HEMANN:  Objection.  Foundation and compound.

 4             THE COURT:  Well, I think you have to lay a

 5   foundation.

 6   BY MS. CAFFESE:

 7   Q.   Sir, you lied on your time sheets from 2007 until 2009;

 8   isn't that true?

 9   A.   No.

10   Q.   You didn't lie?

11   A.   No.

12   Q.   Did you ever put in overtime for days in which you were

13   actually working?

14             THE COURT:  I'm sorry, I don't get the question.

15             MS. CAFFESE:  Excuse me.

16   BY MS. CAFFESE:

17   Q.   When you were not --

18             THE COURT:  If you're working --

19             MS. CAFFESE:  Excuse me.  I meant --

20             THE COURT:  Overtime is working; isn't it?

21   BY MS. CAFFESE:

22   Q.   Did you ever put in false time cards?

23   A.   The cards that you're speaking of, the court cards, they

24   were not -- I don't believe they're false, no.

25   Q.   You don't believe they were false; is that correct?
```

1  **A.**    Yes.

2  **Q.**    Just as you didn't believe, for example, that you wrote

3  accurate -- that you -- your testimony, your testimony under

4  oath is that you never submitted false time sheets; is that

5  your testimony, sir?

6  **A.**    If you're specifically talking about requests for court

7  compensation, I don't believe they were false.  They were

8  incorrect and they were improper and not eligible for

9  compensation, but they were not false.

10 **Q.**    They were incorrect and they were improper; is that right?

11 **A.**    Correct.

12 **Q.**    Okay.  Which means you didn't -- you were not owed the

13 overtime that you claimed.  True statement?

14 **A.**    Some of those cards were invalid.  So on those specific

15 cards they were ineligible to be put in for compensation, and

16 weren't.

17 **Q.**    Right.  And during that time period that we're referring

18 to, from 2007 until 2009, Ed Robles wasn't working with you; is

19 that right?

20 **A.**    Well, no, he was.

21 **Q.**    From 2007 -- excuse me.  From 2007 until 2008, Ed Robles

22 wasn't working with you; is that right?

23 **A.**    That period, no, he was not.

24 **Q.**    Now, you also became friendly with Cesar Hernandez; is

25 that right?

1   **A.**   Yes.

2   **Q.**   And during the time period in which you worked with Cesar

3   Hernandez you were -- you were actually admonished by

4   Lieutenant Pedrini not to be making -- not to be meeting with

5   informants such as Cesar alone; is that right?

6   **A.**   I don't recall that.

7   **Q.**   That could be true though; is that right?

8   **A.**   It absolutely could be.  I just don't recall it.

9   **Q.**   Right.  And that could be true because there were things

10  that you wanted to talk with Cesar Hernandez about outside the

11  presence of other police officers or witnesses; isn't that

12  true?

13  **A.**   I don't know why I was admonished for that, but I don't

14  know if that was the reason or not.

15  **Q.**   But you weren't supposed to be talking with CIs alone; is

16  that right?

17  **A.**   I don't know if that's the case.  That may be a department

18  policy.  I just don't recall it.

19  **Q.**   All right.  Well, let's talk about some of the -- do you

20  recall giving Cesar Hernandez some receipts for payments on

21  cases --

22  **A.**   Yes.

23  **Q.**   -- that he purportedly was supposed to work on with you?

24  **A.**   Yes.

25       **MS. CAFFESE:**  Can I have that exhibit?  I think it's

 1  been introduced into evidence.

 2       And I wanted to use the ELMO, Madam Clerk, if I could.

 3       And I'm referring to Exhibit 56.

 4       (Government and defense counsel confer off the record, out

 5  of hearing of the jury and reporter.)

 6           **MR. HEMANN:**  Flip these things.

 7           **MS. CAFFESE:**  Oh.  Thank you, sir.  Perfect.

 8  **BY MS. CAFFESE:**

 9  **Q.**   All right.  Now, sir, one thing that I wanted to ask you

10  about, first, is that when you were interviewed back on

11  October 21st -- excuse me, 20th and 21st of 2014, you stated --

12  or did you state -- excuse me.  Did you state that your

13  reports, referring to your police reports, were accurate?

14  **A.**   I believe I characterized them as pretty accurate, but

15  yes.

16  **Q.**   Yeah.  Do you want me to -- if you -- do you remember

17  telling the FBI agents and the government here, when you were

18  interviewed for the first time, that your reports were

19  accurate?

20           **MR. HEMANN:**  Objection.  Foundation.  It's just what

21  he testified to, Your Honor.

22           **THE COURT:**  Sustained.

23  **BY MS. CAFFESE:**

24  **Q.**   And that was the first time that you spoke with the

25  agents, back on October 20th, 2014, about the details of this

1  case; is that right?

2  **A.**   I believe they tried to interview me a couple of times,

3  but that's when we were actually conversing about it, yes.

4  **Q.**   Right.  So the first time, essentially, that you spoke

5  with the government about this case, and you said that your

6  reports were accurate, that was actually a lie.  True

7  statement?

8  **A.**   I guess it depends on which facet.  But, I mean,

9  obviously, my reports would be extremely inaccurate when -- in

10 regards to my theft.  I wouldn't delineate my theft in the

11 report, or thefts I was party to.

12     But in terms of the details and locations and times and

13 people there and evidence booked, all that stuff would be very

14 accurate.

15 **Q.**   Well, when you said that your reports were accurate -- and

16 you just testified to that statement; that's what you told the

17 government when you were supposed to be telling the truth --

18 you lied at the outset?

19 **A.**   I believe -- as I said, I believe what I said is that my

20 reports are pretty accurate.  They are.

21 **Q.**   "Pretty accurate."  What do you mean by "pretty accurate"?

22          **THE COURT:**  Well, I think he's answered that, okay.

23 **BY MS. CAFFESE:**

24 **Q.**   The fact of the matter is that you lied in several of the

25 police reports that you said, quote, were accurate, when you

 1  first met with the government in this case.  True statement,

 2  sir?

 3          **MR. HEMANN:**  Objection.  He testified that they were

 4  pretty accurate.

 5          **THE COURT:**  Sustained.

 6  **BY MS. CAFFESE:**

 7  **Q.**  All right.  Well, let me ask you -- I'm going to put up

 8  here -- this is Government Exhibit 56.  Can you see it on your

 9  screen there, Mr. Vargas?

10      (Document displayed.)

11  **A.**  Yes.

12  **Q.**  All right.  And see at the top there -- well, what is

13  this?

14  **A.**  That is a receipt that -- a form that we would use to

15  account for payment to an informant.

16  **Q.**  Right.  And this one here is "Received from Vargas,"

17  right, "979"?  You see at the top here --

18  **A.**  Yes.

19  **Q.**  -- "Vargas"?

20      Okay.  And do you see here that it was purportedly for a

21  purchase of heroin; is that right?

22  **A.**  Yes.

23  **Q.**  And then you've got a signature of a recipient there?

24  **A.**  Yes.

25  **Q.**  Do you know whose signature that is?

1  **A.**    Yeah.  I'm reading it now, yes.

2  **Q.**    What is it?  Who is it?

3  **A.**    Looks like the person we call The Shah.

4  **Q.**    Right.  And The Shah is a different person, a different

5  informant than Cesar Hernandez; isn't that true?

6  **A.**    They are different people.

7  **Q.**    All right.  And, in fact, here you see, "No, not my

8  signature."  Is that right?

9  **A.**    I see that, yes.

10 **Q.**    And the reason why that's significant, "No, not my

11 signature," signed by Cesar Hernandez, is because 09-08 is the

12 CI number for Cesar Hernandez; is that right?

13 **A.**    Yes, I believe so.

14 **Q.**    Okay.  And that's -- that was a falsified receipt; isn't

15 that true?

16 **A.**    Uhm, it's inaccurate.

17 **Q.**    Inaccurate.

18      Well, let me ask you about this receipt and see if it's

19 inaccurate also, okay, sir.  And this is page 9 of that same

20 exhibit.

21      (Document displayed.)

22 **Q.**    Do you see it here, sir?

23 **A.**    Yes.

24 **Q.**    And we've got you, as Vargas, as the one who's the person

25 that the money was received from; is that right?

1  **A.**    Yes.

2  **Q.**    All right.  And we've got here a date of August 25th,

3  2010, which is another date from the one that I just showed

4  you; right?

5  **A.**    Yes.

6  **Q.**    And here we have the CI number as 09-08.  Is that right?

7  **A.**    Yes.

8  **Q.**    And you know that 09-08 belongs to Cesar Hernandez; is

9  that right?

10 **A.**    I believe that's correct, yes.

11 **Q.**    And, once again, this is a falsified receipt.  True

12 statement?

13 **A.**    It's inaccurate.

14 **Q.**    Okay.  Well, let's -- let's go through another one, okay,

15 and see if this one's inaccurate too.

16      (Document displayed.)

17 **Q.**    We've got one here dated -- and this is page 3 of the same

18 exhibit.  Once again, this is from Vargas; right?  You?

19 **A.**    Yes.

20 **Q.**    And this has a date of 9/9/2010; is that right?

21 **A.**    Yes.

22 **Q.**    In fact, that was a date in which Officer Robles, over

23 here, wasn't even working with you; is that right?

24 **A.**    That may be the case, yes.

25 **Q.**    And, in fact, this was a time when you took over Cesar

 1  Hernandez as your informant; is that right?

 2  **A.**    I did take him over, yes.

 3  **Q.**    And this was another arrest of Joseph Furlong; is that

 4  right?  Supposedly anyway.

 5  **A.**    No.  This is -- all this signifies is that some narcotics

 6  were purchased from him.  Whether or not he was arrested due to

 7  this purchase, I can't recall.

 8  **Q.**    Okay.  But it was dealing with Joseph Furlong; is that

 9  right?

10  **A.**    Yeah.  According to this form, yes.

11  **Q.**    Incidentally, the same -- basically, the same person which

12  led, ultimately, to the theft by you of the Apple gift cards.

13  True statement?

14  **A.**    Exactly the person.

15  **Q.**    And here we -- we have another signature by who?  Do we

16  know whose signature that is?

17  **A.**    That looks like who I would call The Shah.  That looks

18  like his signature.

19  **Q.**    Okay.  And the CI number, once again, is 09-08; is that

20  right?

21  **A.**    That's what was written there, yes.

22  **Q.**    And was that another mistake?

23  **A.**    Yeah, it's inaccurate.

24  **Q.**    Inaccurate, right.

25          (Document displayed.)

Q.    So let's see.  This one here, we've got another one here.

And this is dated February 5th, 2011; is that right?

A.    Yes.

Q.    And February 5th, 2011, Officer Robles, over here, wasn't

working with you then either; was he?

A.    No, not in 2011.

Q.    All right.  And we have here another indication here that

this was not the signature of Cesar Hernandez; is that right?

A.    That's what's written there, yes.

Q.    And that's true it wasn't his signature; is that right?

A.    Those two signatures look different.

Q.    Right.

A.    I can say that.

Q.    Yeah.  Not his signature, huh?

A.    I don't know that that's not his signature.  I'm saying

that the two that are written down there don't look alike.

Q.    And, once again, you used Cesar Hernandez's, your friend's

CI number on all of these mistakes that we've gone over; is

that right, sir?

A.    Well, looking at that last slip, I believe that's a case

that Cesar did.  So I think that's totally accurate.

Q.    The signature doesn't match though; is that what you said?

A.    The signatures don't look alike, but I believe that's a

buy that Cesar did.  So everything on there would be accurate.

Q.    You paid Cesar in cocaine; didn't you, sir?

1   **A.**   Yes, I did once.

2   **Q.**   And that was one time when you were working with Officer

3   Stanz (phonetic) on a buy/bust; is that right?

4   **A.**   I don't recall when that was.

5   **Q.**   Yeah.  Did you ever tell Cesar Hernandez to just keep the

6   drugs he purchased during his buy/busts?

7   **A.**   No, I wouldn't have told him to do that because in a

8   buy/bust I then had to justify the buy money being out.  So

9   some narcotics had to be booked in as evidence.  So I would

10  never tell him to keep everything.

11  **Q.**   So let's talk about the Apple gift cards.  And I think we

12  have an exhibit for that one too.

13          **MS. CAFFESE:**  Do we have a receipt here that I could

14  have?  Thank you.

15      This is Government's Exhibit 33.  And I believe it's been

16  introduced into evidence.

17          **MR. HEMANN:**  It is.

18          **THE COURT:**  33 is admitted.

19          **MS. CAFFESE:**  Thank you.

20  **BY MS. CAFFESE:**

21  **Q.**   So we talked yesterday, I think a little bit today, about

22  these Apple gift cards; is that right?  Remember that, sir?

23  **A.**   Yeah.

24  **Q.**   All right.  And it was you who went in to the

25  Marilyn Hotel room and took the Apple gift cards; is that true?

1   **A.**    I took them, yes.

2   **Q.**    And you stole them; is that right?

3   **A.**    That's what I said, yes.

4   **Q.**    And, in fact, you purchased an iPhone and a Nano iPod with

5   them; isn't that true?

6   **A.**    No.

7   **Q.**    And those two transactions were done by you; is that

8   right?

9   **A.**    No.

10  **Q.**    No?  Okay.  I'm going to put up here government Exhibit --

11  the first page of Government Exhibit 33.

12       (Document displayed.)

13  **Q.**    We're going to just start with the top of this exhibit.

14  And I'm going to ask you here whether or not this is your name

15  that appears at the top.  "Customer."

16  **A.**    Yes.

17  **Q.**    "Rey Vargas," right?

18  **A.**    That's me.

19  **Q.**    Okay.  And do you see this receipt here -- and I'm

20  pointing here -- it says two purchases.  One for $199; is that

21  right?

22  **A.**    Yes.

23  **Q.**    And that is for -- I believe that is for the -- do you

24  know what that's for?

25  **A.**    Can you --

VARGAS - CROSS / CAFFESE

1    **Q.**    Go ahead.

2    **A.**    -- zoom out a little bit?

3          Perfect.  That's fine.

4    **Q.**    Thank you.

5    **A.**    That's for the iPod Nano.

6    **Q.**    Okay.  And then there's another purchase here, for $299;

7    is that right?

8    **A.**    Yes.

9    **Q.**    And that is -- that's for what, sir?

10   **A.**    That's for an iPhone.

11   **Q.**    Right.  And those two purchases, those two devices, were

12   made by you; is that right?

13   **A.**    No.  I purchased the iPhone.

14   **Q.**    Well, this is a single transaction; is that true, sir?

15   **A.**    Yes, it is a single transaction.

16   **Q.**    And let's look down below here, okay.  Do you see here the

17   total, "$557.33"?  Is that right?

18   **A.**    Yes.

19   **Q.**    Okay.  And you see here that there was a portion, a

20   portion of the balance that was -- that was made or paid with

21   your credit card; is that right?

22   **A.**    Yes.

23   **Q.**    Yes?

24   **A.**    Yes.

25   **Q.**    Okay.  And here on the second page of this receipt here

1   we've got total tendered by you of $557.33; is that right?

2   **A.**   Yes.

3   **Q.**   Okay.  All right.  Now, as Counsel, Mr. Getz, has gone

4   over -- and I'm not going to go over that with you, all of this

5   testimony with you again.

6        But you had available to you all of the police reports,

7   all of what we call the discovery in this case for the last

8   several months; isn't that right?

9   **A.**   Yes.

10  **Q.**   All right.  And you had available to you, for example, the

11  discovery or the statements made by Daisy Bram, who was

12  mentioned by you yesterday and today; is that right?

13  **A.**   Yes.

14  **Q.**   And you saw, presumably, or became aware of Daisy Bram's

15  statement that stated that you, and you alone, gave the

16  marijuana from UPS to Daisy and Jayme?

17         **MR. HEMANN:**   Objection, Your Honor.

18  **BY MS. CAFFESE:**

19  **Q.**   True statement?

20         **MR. HEMANN:**   It's hearsay and it's improper.

21         **THE COURT:**   Sustained.  The jury is admonished to

22  disregard the question.

23  **BY MS. CAFFESE:**

24  **Q.**   You were aware of all of the statements that have been

25  made in this case; is that right?

VARGAS - CROSS / CAFFESE

1  **A.**    I had access to it.  As to being aware of all the

2  statements, no.

3  **Q.**    No?

4  **A.**    Because there were hundreds and hundreds of pages that

5  were filed in this case.  So I have not looked through every

6  single page.  Not at all.

7  **Q.**    Well, you certainly were given, presumably -- well, were

8  you given police reports by the government to review?

9  **A.**    I was not.

10 **Q.**    Were you given information through your attorney,

11 information that was made available to him through the course

12 of this litigation?

13 **A.**    During our meetings we discussed information.  But in

14 terms of me, like, holding on tangibly to the papers, no.

15 **Q.**    Well, when you were interviewed by the government back on

16 October 20th and 21st, for the first time, at no point in that

17 interview did you say that Officer Robles was present when you

18 handed the marijuana to Daisy Bram and Jayme Walsh.  True

19 statement?

20          **MR. HEMANN:**  Objection, Your Honor.  Foundation and

21 relevance.

22          **THE COURT:**  Well, I guess the question -- as I

23 understand the question, the question is:  Did you ever tell

24 the government that Mr. Robles was present at the time the

25 marijuana was given to Daisy Bram?

1       Is that your question?

2            **MS. CAFFESE:**  Yes.

3            **THE COURT:**  Did you ever tell the government that?

4    That's a fair question.

5            **MS. CAFFESE:**  On October 20th and 21st.

6            **THE COURT:**  Wait.  Is your question:  Did he ever tell

7    the government?  Did he tell the government on that date?  Did

8    he tell the government on another date?

9            **MS. CAFFESE:**  I'm going to get to that, Your Honor.

10           **THE COURT:**  Well, I don't know that getting to that --

11   I don't know that -- well, you can ask the witness if he

12   remembers everything that he said to the government on October

13   whatever that date is.

14       And if the answer is yes or no, or whatever it is, you can

15   give him a document, if it refreshes his recollection or what.

16       Can I ask, how long were you with the government on --

17   what date is this?

18           **MS. CAFFESE:**  There's one report.

19           **THE COURT:**  What date?

20           **MS. CAFFESE:**  October 20th to October 21st.

21           **THE COURT:**  How long did you meet with the government

22   on October 20th or whatever date that was?  How long did you

23   meet with them?

24           **THE WITNESS:**  I don't recall how many hours, but I'm

25   sure -- all of our meetings have been several hours.  Sometimes

1  as short as three or four; sometimes eight or nine.

2          **THE COURT:**  I think you have to be more specific --

3          **MS. CAFFESE:**  All right.

4          **THE COURT:**  -- in your questions.

5  **BY MS. CAFFESE:**

6  **Q.**  On October 20th, 2014, did you ever tell the government

7  that Officer Robles was with you when you gave the marijuana to

8  Daisy Bram and Jayme Stewart [sic]?

9  **A.**  I don't recall.

10 **Q.**  On October 21st, 2014, when you were with the government,

11 did you ever tell them that Officer Robles was with you when

12 you gave the marijuana to Daisy Bram and Jayme Stewart?

13 **A.**  I don't recall.

14 **Q.**  Would it refresh your recollection if I gave you a copy of

15 the report regarding those interviews with the government?

16 **A.**  Yes.

17 **Q.**  Page 4.

18 **A.**  (Witness reviewing document.)

19 **Q.**  Did reading this paragraph here refresh your recollection?

20 **A.**  Yes.  It does not appear that I mentioned it then.

21          **MS. CAFFESE:**  Excuse me.  Thank you.  It was "Jayme

22 Walsh" not "Jayme Stewart."

23 **BY MS. CAFFESE:**

24 **Q.**  Now, you pled guilty in this case on October 21st, 2014.

25 Am I correct?  Excuse me, not pled guilty.  You entered -- you

Belle Ball and Katherine Sullivan
Official Reporters - U.S. District Court
(415) 373-2529

1  signed a plea agreement?

2  **A.**   I think I did both, but yes.

3        **MS. CAFFESE:**  I'm sorry.  Is the plea agreement in

4  evidence?

5        **MR. HEMANN:**  I don't believe it is, Your Honor.  It

6  was shown to the witness by Mr. Getz, but not moved into

7  evidence.

8        **MS. CAFFESE:**  Did you want to move it into --

9        **THE COURT:**  It's up to the defense.

10       **MR. HEMANN:**  We have no objection if the defense

11  wishes to do so, Your Honor.

12       **THE COURT:**  Do you want it introduced into evidence?

13       **MS. CAFFESE:**  Yes.

14       **THE COURT:**  Yes.  Okay.

15       **MR. HEMANN:**  No objection, Your Honor.

16       **THE COURT:**  Exhibit next in order.

17     (Trial Exhibit 351 received in evidence.)

18  **BY MS. CAFFESE:**

19  **Q.**   There is a date of October 21st, 2014; is that right?  Do

20  you have it there, sir?

21  **A.**   Filed October 21st, yes.

22  **Q.**   Right.  And this is your plea agreement that we're looking

23  at, that you're looking at; is that right?

24  **A.**   If it's the same, yes.

25  **Q.**   Let's make sure it's the same.

```
 1        Same one; isn't it?
 2   A.   Yes.
 3   Q.   And that was the date you pled guilty; is that right?
 4   A.   Yes.
 5   Q.   And I want to direct your attention to page 4 of that plea
 6   agreement.
 7        (Document displayed.)
 8   Q.   I'm going to be referring here to line 5.  You see it on
 9   line 5; right?
10   A.   Yes.
11   Q.   Okay.  And in that paragraph there you're talking about --
12   the "I" is you; is that right?
13   A.   That's correct.
14   Q.   And you said you provided Daisy Bram and Jayme Walsh with
15   a quantity of marijuana; is that right?
16   A.   Yes.
17   Q.   All right.  And you refer that's the marijuana that you,
18   Furminger, Robles obtained from UPS; is that right?
19   A.   Yes.
20   Q.   And it goes on to say that you had given Daisy Bram and
21   Jayme Walsh the marijuana; is that right?
22   A.   Yes.
23   Q.   And it was at the time you were attempting to enlist
24   Daisy Bram and Jayme Walsh as confidential informants; is that
25   right?
```

 1  **A.**    Yes.

 2  **Q.**    And then the next sentence, or the sentence after that one

 3  following it, reads:

 4              "Robles, D.B. and J.W. were aware of and agreed to

 5              the plan..."

 6         And the word is -- the word "before" is crossed out;

 7  right?

 8  **A.**    Yes.

 9  **Q.**    And inserted or right above it reads -- you wrote in "at

10  the time" --

11  **A.**    Yes.

12  **Q.**    -- "I gave the marijuana to D.B. and J.W."; is that right?

13  **A.**    Yes.

14  **Q.**    So you didn't say that Robles was standing right next to

15  you, in your plea agreement, when you signed this on

16  October 21st --

17              **THE COURT:**   The plea agreement speaks for itself.   It

18  says what it says.

19  **BY MS. CAFFESE:**

20  **Q.**    You had the opportunity to write and correct anything you

21  needed to correct in your plea agreement at that time, sir;

22  isn't that true?

23  **A.**    Yes.

24  **Q.**    Okay.  And now we come to court and under oath you say

25  that Officer Robles was with you when you were giving this

VARGAS - CROSS / CAFFESE                                    1494

1   marijuana to Daisy Bram and Jayme Walsh as they were going out

2   the front door of Mission Station; isn't that right?

3   **A.**   I would call it the back door, but yes.

4   **Q.**   Well, today -- correct me if I'm wrong, but did you say

5   the front door?

6   **A.**   I don't believe I ever said the front door.  I considered

7   the front door the entrance on Valencia Street.  And that was

8   not the entrance that we -- that Mr. Robles and I handed the

9   marijuana to them.

10  **Q.**   Well, before you were coming to court you were interviewed

11  again on October 27th; is that right?

12  **A.**   Yes.

13  **Q.**   All right.  And when you were interviewed on October 27th,

14  as your trial testimony was approaching, you stated in that --

15  at that time, to the government, that Ed Robles was standing,

16  quote, "right next to me."  Isn't that true?

17  **A.**   Yes.

18  **Q.**   All right.  So, essentially, we have three different

19  versions --

20         **THE COURT:**  Well, that's argumentative.  That's

21  argumentative.  Stop it now.

22         **MS. CAFFESE:**  All right.  Excuse me.

23         **THE COURT:**  That's argumentative.

24         **MS. CAFFESE:**  All right.  Very well.

25

VARGAS - CROSS / CAFFESE

1    **BY MS. CAFFESE:**

2    **Q.**   Now, if I'm correct, sir, you said that you had asked -- I

3    believe, at the time that this marijuana was seized, you had

4    asked the UPS or was it -- somehow you found out or believed to

5    believe -- believe that this marijuana was worth $20,000 on the

6    streets; is that right?

7    **A.**   I don't know where -- where that number has come from.  I

8    have no idea.

9    **Q.**   Well, you tell me.  At some point did you become aware of

10   how much money this marijuana was worth?

11          **THE COURT:**  When you say "this marijuana," are you

12   referring to the entire package of marijuana which was seized

13   from UPS?  Are you referring to smaller quantities?  What are

14   you referring to?

15   **BY MS. CAFFESE:**

16   **Q.**   The marijuana that was -- that you gave -- that you gave

17   Daisy Bram and Jayme Walsh was part of the seizure from -- from

18   the UPS; is that right?

19   **A.**   Yes.

20   **Q.**   Okay.  And that was back in March of '09; is that right?

21   **A.**   Yes.

22   **Q.**   Okay.  And did you know how much money or how much the

23   marijuana that was -- let me back up, actually.

24          The marijuana that you gave Daisy Bram and Jayme Walsh,

25   did you know what the street value of that marijuana was worth?

1   **A.**   No.

2   **Q.**   No idea?

3   **A.**   Uhm, a general idea, but not a specific idea, no.

4   **Q.**   What's the general idea?

5   **A.**   Anywhere from under a thousand dollars to maybe even up to

6   $2,000, depending on the quality and quantity, and also

7   depending on how, ultimately, it would be sold.  Sold as bulk

8   it would be much cheaper than breaking it down into smaller

9   amounts.  So those amounts could even climb higher.

10  **Q.**   So it was worth some amount of pretty good money; is that

11  right?

12  **A.**   Yes.

13  **Q.**   At least pretty near the sum of money you had stolen from

14  people such as Andrew Byrd; is that right?

15  **A.**   Just depends.

16  **Q.**   So Officer Robles just -- according to your testimony

17  today in court -- just agreed to give it away, give it away to

18  Daisy Bram and Jayme Walsh?

19  **A.**   Well, as I said, that was really my decision.  I said that

20  Officer Robles was there at the time.  And that's specifically

21  why it says in the plea agreement "at the time."  I was the

22  person that brought this up to their attention, and said

23  before -- the word "before" was incorrect.  He wasn't aware of

24  it before.  He was aware of it at the time as I handed it to

25  them.

1   Q.   Well, why didn't you bring this up to the government's

2   attention when you talked to them on October 20th, that Officer

3   Robles was there at the time?  Why didn't you bring it up then,

4   on October 20th?

5   A.   I don't know.

6   Q.   Why didn't you bring it up on October 21st?

7   A.   I still don't know.

8   Q.   All right.  And why didn't you bring it up in your plea

9   agreement to say that he was, quote, standing right next to me?

10  A.   That is why this change is there.  That was literally

11  describing that.

12  Q.   Well, that plea agreement does not have Officer Robles

13  standing right next to you, sir; does it?

14  A.   It doesn't say that verbatim, no.

15  Q.   No, it doesn't.

16       So my question to you is:  Do you have any idea why

17  Officer Robles -- because you didn't really know him very well;

18  right? -- would just have this faith in you and just say, yeah,

19  let's just give the kids some marijuana that might be worth a

20  thousand or $2,000?  Any idea of why he would do that?

21  A.   I don't.  You'd have to ask him.

22  Q.   Now, you said that Officer Robles, and I believe you said

23  Sergeant Furminger, took a leap of faith in you.  Is that

24  right?

25  A.   I don't believe I ever said that.

1   Q.   Did you say it in your 302s, in your reports?

2   A.   What's a 302?

3   Q.   Did you make those statements to the government when you

4   were interviewed?

5   A.   In terms of basically including the -- in the thefts, yes.

6   Q.   Right.  And why, since you've been testifying to, you

7   know, all these -- Officer Robles' motives, and what have you,

8   why would Officer Robles, and not even knowing you, just start

9   giving you money and bringing you in to start committing crimes

10  with him?

11          MR. HEMANN:  Objection.  Argumentative and

12  speculation.

13          THE COURT:  Sustained.

14  BY MS. CAFFESE:

15  Q.   Well, you had never worked with Officer Robles; had you?

16  A.   No.

17  Q.   And, in fact, as you said, you didn't really know him that

18  well; is that right?

19  A.   Not in the beginning, no.

20  Q.   And the only reason he had to work with you is because his

21  partner, Officer Zachos, had left on disability for a while; is

22  that right?

23  A.   That's my recollection of what happened, yes.

24  Q.   All right.  You had no idea, no plan, when you stole --

25  when you stole the marijuana, is that right, no plans what to

```
 1  do with the marijuana?

 2  A.   When I didn't book it in, no, I don't recall having any

 3  kind of plan.

 4  Q.   No.  Were you going to smoke it?

 5  A.   I don't smoke marijuana.

 6  Q.   Were you going to sell it, yourself?

 7  A.   No.

 8  Q.   Were you going to have -- I don't know -- somebody sell it

 9  for you?

10  A.   No.

11  Q.   These are questions you've asked yourself many times; is

12  that right?

13  A.   I think I asked myself slightly different questions than

14  that.

15  Q.   When Daisy got out of the hospital, you said that she was

16  better off, better off than when you first met her.  Was that

17  your testimony?

18  A.   Than we initially met her, yes, minus the -- of course,

19  she still had a very wounded hand.  But in terms of being,

20  like, kind of clean and that sort of thing, and well/regularly

21  fed and that sort of stuff, yes.

22  Q.   And just like Kelsey Stewart, you felt sorry for her;

23  right?

24  A.   We felt sorry for both of them.  I felt sorry for both of

25  them.
```

1   **Q.**   So the answer to my question is, yes, you felt sorry.

2   Just like Kelsey Stewart, the woman you took out on a couple of

3   dates, and texts, and pursued romantically, you felt sorry for

4   Daisy; is that right, sir?

5           **MR. HEMANN:**   Objection.   Argumentative.

6           **THE COURT:**   Sustained.

7   **BY MS. CAFFESE:**

8   **Q.**   Let's talk about Sergio, Sergio for a moment, sir.   Sergio

9   the fence you were talking about.

10  **A.**   Yes.

11  **Q.**   Sergio Sanchez.

12          Now, you've isolated your business, or I believe your

13  testimony was that --

14          **THE COURT:**   Wait.   I'm sorry.   I don't want to

15  interrupt you at an inopportune time, but I do want to take a

16  recess, unless you're --

17          **MS. CAFFESE:**   No, this is another subject matter.

18          **THE COURT:**   Okay.   Ladies and gentlemen of the jury,

19  we will take our recess now.   We will be in a brief recess.   We

20  will take a 10-minute recess, 10 or 12 minute recess.

21          Remember the admonition given.   Don't discuss the case;

22  allow anyone discuss it with you; form or express an opinion.

23          (Jury out at 2:33 p.m.)

24          **THE COURT:**   You can step down.

25          (The following proceedings were held outside of the

1  presence of the Jury)

2        **THE COURT:**  Okay.  Let the Record reflect that the

3  jurors have retired.

4      Mr. Hemann.

5        **MR. HEMANN:**  So there's a -- a slight matter that we

6  want to raise with the Court.  One of the FBI agents observed

7  earlier in the day today, I think, after the first morning

8  break, that as one of the jurors came in -- and I believe it

9  was -- I believe it was this -- this -- (Indicating)

10        **THE COURT:**  Well, we had better get an identification.

11  Juror Number --

12        **MR. HEMANN:**  I can't remember how to count the -- one,

13  two, three, four --9.

14        **THE COURT:**  Juror No. 9, the third seat from the end,

15  from where I'm sitting.

16        **MR. HEMANN:**  Yes.  The FBI agent observed that he

17  smiled broadly and slightly nodded his head to somebody in the

18  gallery.  And, again, the agent's observation wasn't definitive

19  in terms of the person or even whether it was something more

20  than a hello, maybe to a lawyer or party or something.  But,

21  that was the observation.

22      I don't -- I raise it to the Court's attention.  The

23  gallery was very crowded at the time.  I'm slightly concerned

24  that the juror saw somebody in the courtroom that he or she

25  knows, and whether -- that he knows and was acknowledging that.

1   I think our request would be, to the jurors as a whole, that

2   the Court say, "I'm just checking in, see whether there --

3   there have been a lot of people in the courtroom.  Have any of

4   the jurors recognized anybody in -- in the courtroom in the

5   gallery?" without being specific to this juror, and sort of

6   play it off as a check-in.

7        We debated whether we should raise it at all but we

8   thought, given that the observation showed some perceived level

9   of familiarity --

10        **THE COURT:**  I'm not so sure that is a good idea.  I

11  mean, I see people -- other than lawyers whom I know, like your

12  office and some defense lawyers, there are members of the press

13  who I also know who are here, both from the print media and

14  television media.  So, and of course, TV media, people are

15  fairly well known, or can be.

16        So, I don't know whether I want to start --

17        **MR. BRASS:**  Your Honor?

18        **THE COURT:**  Go ahead, come on up.

19        **MR. BRASS:**  It's me.  I know one of the jurors.  So if

20  that solves the issue --

21        **THE COURT:**  Why don't you come up.  Great.

22        **MR. HEMANN:**  Ladies and gentlemen, Tony Brass.

23        **THE COURT:**  Hello, Mr. Brass.

24        **MR. BRASS:**  Good afternoon, Your Honor.

25        **THE COURT:**  So, tell me, what's the story?

PROCEEDINGS

1          **MR. BRASS:**  That juror, his son attends school with my

2    youngest son.  So we know each other from different school

3    events and things like that.

4          **THE COURT:**  Okay.  And have you -- do you have any

5    connection with this case?

6          **MR. BRASS:**  I do.

7          **THE COURT:**  Have you -- when I say "this case" --

8    everybody can sit down.

9        When I say "this case," I'm now talking about these three

10   Defendants?  Or witnesses?

11         **MR. BRASS:**  Yes.

12         **THE COURT:**  You have some connection.

13         **MR. BRASS:**  I do.  I represented Bernadette Melvin in

14   this case.  She testified earlier.

15         **THE COURT:**  Well, but she was also a person who was

16   known to a juror.  Isn't that correct?

17         **MS. CAFFESE:**  That's right.  Juror No. 1.

18         **THE COURT:**  But that was Juror No. 1.

19         **MR. HEMANN:**  Correct.

20         **THE COURT:**  Okay.  Have you discussed the case with

21   anyone?  I don't mean -- of course you discussed the case.

22   Have you discussed it with that juror or any member of the

23   juror's family?

24         **MR. BRASS:**  Not at all.  That juror and I hardly know

25   each other.  But, we do know each other.

1          **THE COURT:**  And do you know whether he knows that you

2   represent one of the witnesses in this case?

3          **MR. BRASS:**  I have no idea if he knows.  As I recall,

4   Ms. Melvin testified, and although the fact that she was

5   represented was brought up, who represented her was not brought

6   up.

7          **THE COURT:**  That's right.

8          **MR. BRASS:**  I was here, but I didn't see him.

9          **THE COURT:**  All right.  So I'm going to leave it

10  alone, entirely.  And, tell you to leave the courtroom.

11         **MR. BRASS:**  Understood.

12         **THE COURT:**  And not --

13         **MR. BRASS:**  I'll take that as an invitation to leave

14  the courtroom, which I will do so.

15         **THE COURT:**  Okay, thank you.

16         **MR. HEMANN:**  Thank you, Your Honor.

17         **MR. BRASS:**  Thank you, Your Honor.

18         **MR. HEMANN:**  Thanks, Tony.

19     (Recess taken from 2:38 to 2:46 p.m.)

20     (The following proceedings were held in open court,

21  outside the presence and hearing of the jury.)

22         **THE COURT:**  I don't want to prevent you from doing

23  your job.  If you're here to listen to the testimony in

24  connection with your client, then obviously you can stay.

25     But if you're here just because you are interested in the

 1  case, from -- from a pedagogical point of view, I think it is

 2  better that you don't.

 3      **MR. BRASS:**  I believe -- I'm here because I think it

 4  assists me in doing my job.

 5      **THE COURT:**  Well, then stay.  And, I think I'll just

 6  caution the jurors not to have any contact, you know, okay?

 7      **MR. BRASS:**  That's fine, Your Honor.

 8      **THE COURT:**  Okay.  That's fine.  The last thing -- I

 9  mean, I can't keep you out; I'm not keeping you out.  Okay.

10      **MR. HEMANN:**  And Your Honor, just from --

11      **THE COURT:**  Yeah, go ahead.

12      **MR. HEMANN:**  -- a timekeeping perspective, I think

13  that Ms. Caffese indicated she's got about another hour, I

14  think.

15      **THE COURT:**  Another hour?  You need another hour?

16      **MS. CAFFESE:**  Yeah; you're surprised?

17      **THE COURT:**  Yeah, I'm a little surprised.

18      **MS. CAFFESE:**  Oh.

19      **THE COURT:**  Well, maybe not.  I thought -- well, you

20  have what you have.  I mean, you have what you have.

21      **MS. CAFFESE:**  Well, I think it's --

22      **THE COURT:**  You have what you have.

23      **MS. CAFFESE:**  Okay.

24      **THE COURT:**  I'm not cutting you off cross-examination.

25      **MR. HEMANN:**  So, if we --

1          **THE COURT:**  Well, you have redirect, if you have any.

2          **MR. HEMANN:**  And then I would say about ten minutes of

3   redirect.

4          **THE COURT:**  (Inaudible)

5          **MR. HEMANN:**  So we may be within -- looks like we will

6   be within ten minutes of 4:00, plus or minus.

7          **THE COURT:**  Yeah, that's fine.

8          **MR. HEMANN:**  Okay.

9          **THE COURT:**  Bring in the jury.

10         **THE CLERK:**  All rise.

11      (The following proceedings were held in the presence of

12   the Jury)

13         **THE COURT:**  Please be seated.

14      Let the Record reflect that all jurors are present.  All

15   parties are present.

16      Ladies and gentlemen, as I'm sure you can tell, people

17   have been coming in and out of the courtroom, sitting in the --

18   the spectators' section, with some frequency.

19      It may occur that you can recognize some people; maybe you

20   know them, maybe you know of them.  And again, I just simply

21   want to caution you, that's okay.  That's not a problem.

22      But, of course, don't discuss the case with anyone that

23   you may know or feel you recognize.  Just, you know, obviously,

24   don't discuss it with your family, friends or anyone else.

25      We have proceeded a long way down in this trial.  We have

Case3:14-cr-00102-CRB  Document148  Filed11/19/14  Page208 of 270

 1   heard a lot of testimony.  We have a ways to go, but we are

 2   moving very, very quickly, given the schedules.  And I will

 3   have more to say about that today, and also next week.

 4        You know we are meeting Monday and Tuesday of next week.

 5   But not Wednesday.  So, anyway, just remember the admonition

 6   given to you.

 7        And Ms. Caffese, you may continue.

 8            **MS. CAFFESE:**  Thank you, Your Honor.

 9                    **CROSS-EXAMINATION RESUMED**

10   **BY MS. CAFFESE:**

11   **Q**    Sir, you had a separate relationship with Sergio Sanchez.

12   Is that right?

13   **A**    I had a relationship with Sergio Sanchez, yes.

14   **Q**    And you isolated your, quote, business relationship

15   (Indicating quotation marks) from the other officers, is that

16   right?

17   **A**    Yes.

18   **Q**    You went to him individually, separate -- individually, is

19   that right?

20   **A**    Yes.

21   **Q**    All right.  And, what you did is you would give him stolen

22   things to sell.  Is that right?

23   **A**    On occasion I did, yes.

24   **Q**    You were using him to sell stolen items.  Isn't that

25   right?

1  **A**    Yes.

2  **Q**    And that conduct was obviously illegal because you knew

3  that the things that you were giving him were stolen.  Right?

4  **A**    Yes.

5  **Q**    Now, you testified about a laptop that was -- was taken,

6  or was seized at some point in an investigation that led to the

7  arrest of somebody who was possessing child pornography.  Is

8  that right?

9  **A**    I --

10  **Q**    Do you remember the laptop that you talked about, and the

11  laptop had child pornography on it?

12  **A**    With respect to -- actually, I don't know if that was ever

13  confirmed.

14  **Q**    What was ever confirmed?

15  **A**    I'm sorry; I don't know what you are speaking of.

16       **THE COURT:**  Well, I think the confusion is that a

17  laptop was seized, in which there was a suggestion that the --

18  one of the participants in the movie was underage.  If so, that

19  would be child pornography.

20       What the witness has said is what he said.

21       **MS. CAFFESE:**  Actually, I'm not --

22       **THE COURT:**  Are you referring to that incident?

23       **MS. CAFFESE:**  No, I'm not, actually.

24       **THE COURT:**  Because we have a number of laptops.

25       **MS. CAFFESE:**  Right.

1              **THE COURT:**  Okay.

2    **BY MS. CAFFESE:**

3    **Q**    There was an incident where you obtained, or, actually,

4    Officer Robles obtained a laptop which had child pornography on

5    it.

6         Is that right?

7    **A**    You're talking about a totally separate incident?  Yes, I

8    know which one you are talking about.  Yes, you're correct.

9    Yes.

10   **Q**    That was the incident which led to the arrest and the

11   conviction of Robert Stein.  Is that right?

12   **A**    Yes, I do recall so, yes.

13   **Q**    And that was, I believe, December of 2009, if you --

14   **A**    I don't remember the exact date, but that sounds very

15   close, yes.

16   **Q**    All right.  And, you stated under oath, in a search

17   warrant, that you had -- you had obtained that laptop in a

18   hotel room.  Is that right?

19   **A**    As I recall, I don't believe we said a hotel room.  I

20   believe we said in like a common area of the hotel.

21              **MS. CAFFESE:**  If I can show the witness what's been

22   Bates stamped B0-15-0037.

23   **BY MS. CAFFESE:**

24   **Q**    Now, before I get actually to the affidavit, which you

25   signed, this was incident in which there was an Officer Valdez

 1   who actually wrote the report.

 2        Do you remember that?

 3   **A**    Yes.

 4   **Q**    Okay.  And that was the report in which you, quote, took

 5   over.  Is that right?  You said that you took over the control

 6   of writing that report for Officer Valdez.  Didn't you say

 7   that?

 8              **MR. HEMANN:**  Objection to the -- foundation,

 9   Your Honor, as to when or where he said what.

10              **THE COURT:**  Sustained.

11   **BY MS. CAFFESE:**

12   **Q**    Did you write -- did you assist an Officer Valdez in

13   writing a police report relating to the seizure of a laptop

14   that had child pornography on it in December of 2009?

15   **A**    Did I assist him?  Yes.

16   **Q**    All right.  And in fact, what you said was that you had

17   taken control over the writing of that report.  Is that right?

18   **A**    I don't recall saying that.

19   **Q**    You don't recall telling the government that you took

20   control of the report from Officer Valdez when the report was

21   being written by him?

22              **MR. HEMANN:**  Objection, foundation.

23              **THE COURT:**  Sustained.

24   **BY MS. CAFFESE:**

25   **Q**    Well, let me show you the police report and see if you

1  have a recollection.

2          **MS. CAFFESE:**  I'm referring to Bates stamp --

3          **MR. HEMANN:**  Objection, Your Honor.  The witness has

4  not testified that he does not have a recollection of any of

5  this.

6          **THE COURT:**  Sustained.

7  **BY MS. CAFFESE:**

8  **Q**    Did you write an affidavit or did you sign an affidavit

9  which you prepared, where you said that the laptop was found --

10 that you noticed the laptop near a garage can adjacent to the

11 roof of stairs, in a hotel room?  All right, a hotel?

12 **A**    Yeah, that's not in a room.  As I was saying, I believe I

13 stated it was in a common area.  That's a common area of the

14 hotel, yes.

15 **Q**    That was a lie, wasn't it?

16 **A**    That is inaccurate, yes.

17 **Q**    It's inaccurate.  In fact, this search warrant, this

18 search warrant and affidavit -- and I'm going to show it to you

19 because I haven't done that yet, I'm going to ask you whether

20 or not that was a search warrant that you received after

21 writing the affidavit, was done by you.

22        (Witness examines document)

23 **A**    Yes.  I -- I did prepare this.

24 **Q**    All right.  And the date on that was December 8, 2009.  Is

25 that right?

1  **A**    That's what it says on there.  I never saw the date.

2  **Q**    And the evidence -- an affidavit, when you get a search

3  warrant, is signed under penalty of perjury.  Is that right?

4  **A**    Yes.

5  **Q**    Okay.  And, when you say it was inaccurate, that's because

6  there was a lie in this report.  Is that right?

7  **A**    Yes.

8  **Q**    And the lie was that the laptop was actually given to

9  Officer Robles from Sergio Sanchez.  True statement?

10 **A**    That's true.

11 **Q**    I'm going to show you a police report, Bates stamp

12 15-0004, and ask you whether or not you recognize this report,

13 sir.

14     (Witness examines document)

15 **A**    Yeah, I recognize it.

16 **Q**    I'm -- you kind of recognize it?

17 **A**    I -- yes.

18 **Q**    Yes.  And in fact, that was the report in which you

19 actually wrote the narrative for an Officer Vasquez.  Is that

20 right?

21 **A**    No, I didn't write this narrative.

22 **Q**    Why do you say that?

23 **A**    I say that because I didn't.

24 **Q**    Well, did you tell the government when you were

25 interviewing with them on October 20th, and/or the 21st, that

1  in fact, you did take control and wrote the narrative of that

2  report?  For Officer Vasquez?  Excuse me.  Valdez.

3  **A**    Yes.  Officer Robles and myself had to greatly assist

4  Officer Valdez in writing this report because he, in writing --

5  or in attempting to write the report, he wrote Sergio into the

6  report.  We were trying to isolate him away from the report.

7       We didn't believe -- you know, in terms of the source of

8  the laptop, we didn't think it was as important to talk about

9  where we got the laptop, as it was important to talk about what

10  was on the laptop and who, in fact, the laptop belonged to.

11       To us the importance was that there was what we believed

12  to be child pornography, and was, in fact, found to be child

13  pornography, and the person that we believed owned the laptop

14  did, in fact, own the laptop and was subsequently convicted of

15  possession of child pornography.

16       So, the detail of where we retrieved the laptop wasn't as

17  important to us on the scheme of things as to what was on it

18  and who it was owned by.

19  **Q**    So, you did tell the government on October 20th, that you

20  took control and wrote the narrative.  True statement?

21  **A**    No, I don't believe I used those words.

22  **Q**    Would it refresh your recollection if I showed you

23  anything, sir?

24  **A**    Sure.

25          **MS. CAFFESE:**  Well the Judge is shaking his head,

1    so --

2            **THE COURT:**  Well, that's --

3            **MS. CAFFESE:**  That's fine.

4            **THE COURT:**  He testified that he didn't say that.  So,

5    you can't give him a document and say -- he's not saying he

6    didn't have a recollection.  He's saying he didn't say it.

7    **BY MS. CAFFESE:**

8    **Q**    The report was false.  Correct?

9    **A**    The -- where the laptop -- the source of the laptop, yes.

10   That is absolutely false.

11   **Q**    Right.  And, certainly you write reports -- for example,

12   we've talked about some of the reports that you've written,

13   where in fact you say that you have come across certain

14   evidence, or you're doing a particular investigation based on

15   information that a confidential informant has given you.

16       Is that right?

17   **A**    Yes.

18   **Q**    So you certainly could have said, "Based on information a

19   confidential informant gave us, we seized a laptop which

20   contained pornography."  True statement?

21   **A**    That would have been one way to handle it, yes.

22   **Q**    And you could have said the truth in your affidavit, when

23   you got the search warrant.  True statement?

24   **A**    Yes.

25   **Q**    In February of 2010 you weren't working with Ed Robles,

1    were you?

2    **A**    No, I don't believe so.

3    **Q**    And when you went in to arrest a gentleman by the name of

4    Scotty Krasunik, you stole his laptop.  Is that right?

5    **A**    I don't remember a Scott Krasunik.

6    **Q**    You didn't remember the 319 10th Street arrest back on

7    February 10, 2010?

8    **A**    Right.  No, I remember that location.  I don't remember

9    that person.

10   **Q**    All right.  But do you remember that location; you

11   remember stealing an Apple laptop.  Is that right?

12   **A**    Yes.

13   **Q**    And that was another crime of opportunity, is that your

14   testimony?

15   **A**    Yes.

16   **Q**    All right.  And that was another, just a crime of

17   opportunity, even though there were many other officers

18   present, including Bucy, Emanuel, and O'Rourke.

19        Is that right?

20        (Reporter interruption)

21           **MS. CAFFESE:**  O'Rourke.  O-apostrophe-R-O-U-R-K-E.

22           **THE WITNESS:**  Yes.

23   **BY MS. CAFFESE:**

24   **Q**    Doesn't it make it more difficult to steal when you have

25   the presence of other officers on scene, sir?

1  **A**    Yes.  If I'm attempting to hide it from them, yes.

2  **Q**    Right.  So it is not really just a crime of opportunity.

3  Is that right?

4  **A**    Well, I believe it is.

5  **Q**    Well, you certainly didn't want -- or you wanted to be

6  sure that other officers didn't catch you during this crime of

7  opportunity, isn't that true?

8  **A**    Yes.

9  **Q**    And in fact, during this particular incident dating back

10 to February of 2010 at 319 10th Street, another officer there,

11 by the name of Officer Emanuel, actually discovered the suspect

12 you were supposed to be arresting hiding in an area that you

13 had just searched.

14 **A**    Is that a question?

15 **Q**    Yeah.  It is.

16 **A**    No, I don't believe that was a suspect.  And I think

17 probably everybody in that search, including other police

18 agencies, that all searched that area, so we all missed him.

19 And he was in a -- I think, behind a wall for more than an

20 hour.

21 **Q**    Do you remember the 245 Leavenworth arrest dealing with

22 Ever Cen and José Flores back on August 12th, again, 2010,

23 after you stopped working with Ed Robles?

24 **A**    Yes.

25 **Q**    Okay.  And that was an incident in which Cesar had asked

1   you for a laptop from those premises.  Is that right?

2   **A**     Yes.

3   **Q**     And in fact --

4           **MS. CAFFESE:**  Do I have some (Inaudible) there?

5           (Off-the-Record discussion)

6           **MS. CAFFESE:**  So, I'm going to be referring to Bates

7   stamp B009-0063.

8           **MR. HEMANN:**  Okay.

9           **MS. CAFFESE:**  Okay.

10  **BY MS. CAFFESE:**

11  **Q**     Let me ask you:  You actually had called Cesar Hernandez

12  -- well, let me put it this way.

13          You and Cesar Hernandez were actually talking that day

14  about the laptop, and what he wanted from the premises of 245

15  Leavenworth.

16          Is that right?  Do you remember that?

17  **A**     That was one of many things we were talking about, sure.

18  **Q**     All right.  And that's because you and Cesar were pretty,

19  pretty close.  Close enough that if he wanted something from a

20  crime scene that you were going to steal, okay, okay with you.

21          Is that right?

22  **A**     When Cesar often gave us -- including myself, Mr. Robles

23  and Mr. Furminger -- targets, he often gave us the target, and

24  included a shopping list with it.  "I want this out of this.

25  If he has this much money, give me this much."

1        He often was very specific in terms of his demands of

2   compensation for any of the individuals that he -- he provided

3   information against.

4   **Q**    And, with -- let's talk about Moreno.  I think, was that

5   Carlos Duanes, otherwise known as Carlos Duanes?

6   **A**    I know him as "Moreno," yes.

7   **Q**    So you set this up, my understanding is that this was a

8   heroin buy, you sent Cesar to buy some heroin from Moreno on

9   credit.  Is that right?

10  **A**    He was provided heroin on credit, yes.

11  **Q**    Right.  And then, you went to some length to talk about

12  how you were going to give -- Cesar was going pay the money

13  back, and then you were going to follow Moreno to see where he

14  was going to go bury the money in Golden Gate Park.

15       Is that right?

16  **A**    Yes.

17  **Q**    Why did you have to go through all that?  Why not just

18  follow Duanes?

19           **MR. HEMANN:**  Objection.

20           **MS. CAFFESE:**  Moreno.

21           **MR. HEMANN:**  Withdrawn, Your Honor.

22           **MS. CAFFESE:**  Excuse me.

23  **BY MS. CAFFESE:**

24  **Q**    Why didn't you just follow him?

25  **A**    We did follow him.

1  Q    Yeah, but why did you have to set up this whole thing

2  about, you know, giving the credit to Moreno, giving heroin to

3  Hernandez on credit, and then going back and giving Moreno the

4  money?

5      Why not just follow him from the onset?

6  A    Because, as I kind of explained earlier, he was -- he was

7  pretty sophisticated and very knowledgeable.  This is a guy

8  who's been dealing narcotics for many, many years, and just not

9  been arrested very much.  That's for a reason.  That kind of

10 speaks to his skill level.

11 Q    Uh-huh.

12 A    Also, our intention by providing him with a sizable amount

13 of money is more money than he would be able to walk around

14 with.  Hopefully, that would necessitate him going to his

15 locations where he would bury his money.

16 Q    Right.  And this would be in Golden Gate Park, right?

17 A    Right.

18 Q    So this really sophisticated big drug dealer would bury

19 money through Golden Gate Park.  Right?

20 A    Right.

21 Q    And you followed him one night, with Cesar, right?  Cesar

22 came along, right?

23 A    I believe it was -- it was pretty early morning.  Daytime.

24 Q    This was a field trip that you took Cesar along with you

25 to do.  Is that right?

```
 1   A     Well, we facilitated that exchange, and then, and then
 2   tried to follow him to that area, yes.  I wouldn't characterize
 3   it as a field trip.
 4   Q     Why did you need -- did you need Cesar?
 5   A     Because Cesar was a component of the transaction.
 6   Q     That's why you needed Cesar, to follow him?
 7   A     Yes.  For that specific instance, yes.
 8   Q     And -- okay.  You could have followed Moreno without
 9   Cesar, too, is that right?
10   A     Sure, at any point, but he would probably see that
11   undercover police officers were following him and not handle
12   any transactions.
13   Q     All right.  Well, I guess if he bought the money -- if he
14   bought the heroin on credit, actually, and if it was part of
15   the transaction, there would have been no money that Moreno
16   had.  If it happened as you said it did.
17   A     I'm sorry; I don't understand what you mean by that.
18   Q     Well, you said that you had to bring Cesar with you
19   because he was part of the transaction.  Right?
20   A     Let me try and explain it a little different way.
21   Q     Let me ask you, okay?  You just testified that you brought
22   Cesar with you after the deal went.  Right?
23   A     Yes.  The conclusion of the deal.  So, at an earlier time
24   -- I'll try and explain it to make it more clear.
25         At an earlier point, Cesar had been given narcotics to
```

Belle Ball and Katherine Sullivan
Official Reporters - U.S. District Court
(415) 373-2529

1   sell on credit.  So, after finishing selling that narcotics, or

2   actually coming short, and I believe Mr. Robles actually gave

3   him some money to complete the total transaction.  He was going

4   to give that the lump sum of money back to Moreno.

5       It was at that point, with that lump sum of money, Moreno

6   wouldn't want to carry that money around.  At least, that was

7   our thinking.  He would then have to go to one of his places

8   where he buries his money.

9       That was the intention.  To follow him back to those

10  locations where he buried his money and drugs.

11      Is that more clear?

12  **Q**   He bought the heroin on credit.  Is that right?

13  **A**   Yes.

14  **Q**   And do you have now some idea of how long it was after

15  Cesar bought the heroin on credit that you came back with the

16  money to give Moreno?

17  **A**   I don't recall on that.

18  **Q**   All right.  Let's move on to -- I think it's Zaychenko?

19  Do you remember that arrest?

20  **A**   Yes.

21  **Q**   And you talked about it on your direct examination.  But

22  one part that was left out was you testified that you stole

23  some things from a residence belonging to Zaychenko and his

24  girlfriend.

25      Is that right?

1   **A**    Yes.

2   **Q**    And the girlfriend had a probation search.  Is that right?

3   **A**    Yes.

4   **Q**    Well, after you had arrested Zaychenko, he, Zaychenko,

5   called you.  Is that right?

6   **A**    No.

7   **Q**    You had communications with Zaychenko after that arrest,

8   is that true?

9   **A**    I did, yes.

10  **Q**    And Zaychenko reported that his house that he shared with

11  his girlfriend had been burglarized.  Is that right?

12  **A**    Yes.

13  **Q**    And as a result of -- and as a result of that complaint

14  that Zaychenko had made to you, you actually wrote a false

15  police report of the of the, quote, burglary that you actually

16  committed.  True statement?

17  **A**    Some of the items that were listed that were taken were,

18  in fact, taken by myself and Mr. Robles.  But, not all of them,

19  no.

20  **Q**    I'm going to show you a police report --

21       (Off-the-Record discussion between counsel)

22        **MS. CAFFESE:**  Yeah, and I think it's Tab 6.

23        **MR. HEMANN:**  Tab 6.

24        **MR. VILLAZOR:**  7.  7.

25        **MS. CAFFESE:**  Oh, 7.  Excuse me.  Tab 7.

 1  **BY MS. CAFFESE:**

 2  **Q**    After you actually stole things from Zaychenko's house,

 3  you were brazen enough to actually write a police report saying

 4  that the house had been burglarized.

 5       True statement?

 6  **A**    I didn't say that.  So, no.  That's what Mr. Zaychenko

 7  said.  And I reported what he told me.

 8  **Q**    Right.  And the person who actually stole from the house

 9  was you.  Right?

10  **A**    I stole one of the items, yes, along with Mr. Robles, yes.

11  **Q**    So is this report, and I'm going to show you, dated

12  September 16th, 2009, which was written by you, is a false

13  report.

14          **MR. HEMANN:**  That is Exhibit 281 in evidence,

15  Your Honor.

16          **THE COURT:**  Thank you.

17       (Witness examines document)

18  **BY MS. CAFFESE:**

19  **Q**    True statement?

20  **A**    Which -- I'm sorry; can you repeat the question?

21  **Q**    False report.  We are talking about a false report.

22  **A**    Yes -- well, that the items are missing, no, that's not

23  false.  And that some of the items listed on there were taken

24  by myself and Mr. Robles, that's true.  But not all of those

25  items.

1          So, I don't know what happened to the other items.  I
2     don't know if his place was, in fact, burglarized.
3     Q    You enjoyed writing police reports.  That was your
4     testimony on direct examination, right?
5     A    Sure.
6     Q    You said you were actually pretty good at writing police
7     reports.  Isn't that what you said, sir?
8     A    That's my belief.
9     Q    And is the part that you liked the most about writing your
10    pretty good police reports, was that you could lie in them?
11             MR. HEMANN:  Objection, argumentative.
12             THE COURT:  Sustained.
13    BY MS. CAFFESE:
14    Q    What parts about writing these police reports did you
15    enjoy so much, sir?
16    A    The act, themselves, becomes a bit formulaic especially as
17    you are doing the same report over and over.  I just thought I
18    wrote a good police report.  That was my opinion.
19    Q    And you liked the fact that it was formulaic?
20    A    No, that's not a part I liked.
21    Q    But that was kind of what you did in your police reports?
22    A    In -- in what sense?
23    Q    I don't know.  You tell me.  Was it?  I don't know.
24             MR. HEMANN:  Objection, Your Honor, argumentative.
25             THE COURT:  Sustained.

1   **BY MS. CAFFESE:**

2   **Q**    Did you enjoy writing the burglary report after you stole

3   from Mr. Zaychenko, sir?

4              **MR. HEMANN:**  Objection, relevance.

5              **THE COURT:**  Argumentative.

6              **MS. CAFFESE:**  Okay.

7   **BY MS. CAFFESE:**

8   **Q**    Well, there was some hotel videos you mentioned were

9   released by the Public Defender's Office.  Is that right?

10  **A**    Yes.

11  **Q**    And actually one of them was a -- an incident on

12  December 30th, 2010, Jefferson Hotel, involving a Fernando

13  Santana.  Is that right?

14  **A**    Yes.

15  **Q**    And that's where you were accused of planting drugs on

16  Mr. Santana, is that right?

17  **A**    I don't know exactly what, if anything, we were accused

18  of.

19  **Q**    Okay.  Well, you gave Cesar a bottle of tequila stolen in

20  that search.  Is that right?  Remember that?

21  **A**    No, I do not.

22  **Q**    Well, back on December 30th of 2010, Officer Robles wasn't

23  working with you, was he?

24  **A**    No.

25  **Q**    And when you were caught on video at the Julian Hotel in

1  2011, carrying a bag out of that hotel, Officer Robles wasn't

2  working with you, was he?

3  **A**    No.

4  **Q**    And that's when you actually -- that's when you actually

5  left the department.  Is that right?

6  **A**    No.

7  **Q**    No.  Were you still working in plainclothes?

8  **A**    For a short time after that, yes.

9  **Q**    You were taken out of plainclothes, though, is that right?

10 **A**    Um, yes.  I believe they pretty much deactivated several

11 units due to those videos.

12 **Q**    Right.  You.  You.  We're just talking to you.  You went

13 out of plainclothes, is that right?

14        **MR. HEMANN:**  Objection, Your Honor; argumentative.  He

15 answered the question fairly.

16        **THE COURT:**  Asked and answered.

17 **BY MS. CAFFESE:**

18 **Q**    And when Cesar Hernandez called you in August of 2011 to

19 tell you that Officer -- I think it was Duarte was

20 investigating you, you spoke with Cesar.  Right?

21 **A**    Yes.

22 **Q**    And you asked Cesar, "Tell me what they want to know," is

23 that right?

24 **A**    No, I don't believe I asked him that.

25 **Q**    You told him, "Better watch out," warned him, "You can get

```
 1  a lawyer too; you can get a lot people in trouble."

 2       Remember having that conversation with Cesar?

 3  A    I don't remember saying that to him, either.

 4  Q    You certainly felt comfortable enough to be talking with

 5  Cesar, your friend, about what the authorities were after, as

 6  it related to you, sir.  True statement?

 7  A    No.

 8  Q    All right.  Now, you testified --

 9       MS. CAFFESE:  And I'm almost done, Your Honor.

10  BY MS. CAFFESE:

11  Q    You testified that after you took this money from Newark,

12  and it was a long conversation that you testified that you had

13  with Officer Robles and Sergeant Furminger on the way over to

14  Newark, that when you took the money, you put it in the trunk

15  of the vehicle.

16       That's what you told the government when you interviewed

17  with them on October 20th, 2014.  Is that right?

18  A    I don't believe that's correct.

19  Q    Well, can I show it and see if you remember saying that to

20  the government?

21       MR. HEMANN:  Objection.  Foundation, Your Honor.

22       THE COURT:  Sustained.

23  BY MS. CAFFESE:

24  Q    You also testified here, about what y'all were going to do

25  with the money.  Right?  Remember that?
```

1   **A**    Yes.

2   **Q**    You told the government on October 20th, 2014, isn't it

3   true that you said Robles was going to purchase a motorcycle?

4   **A**    No, I don't believe I said that at all.

5   **Q**    All right.  Well, do you think you might have forgotten

6   what you told the government back on October 20th, about what

7   Robles allegedly told you?

8   **A**    Not at all.  Because I know explicitly what he was looking

9   for.  So maybe the word "bike" got misinterpreted as

10  "motorcycle," but I know he was looking for a road bike.

11  **Q**    And you really wanted that bicycle, right?

12  **A**    Yes.  It's a great bike.

13  **Q**    In fact, that was part of the highlight of your

14  examination.  You were really excited when you were talking

15  about this expensive bicycle that Robles sold you.

16      Is that right?

17          **MR. HEMANN:**  Objection, Your Honor.

18          **THE COURT:**  Sustained.

19  **BY MS. CAFFESE:**

20  **Q**    And you eventually got what you wanted.  Right?  You got

21  that bicycle that you were so excited about.

22      Is that right?

23  **A**    Yeah, probably six or eight months down the line, yes.

24  When he chose to sell it to me, yes.

25  **Q**    Now, when you pled guilty, when you pled guilty back on

```
 1  October 21st, 2014, right before we were about to go to trial

 2  in this case, your lawyer -- let me give you your plea

 3  agreement.

 4  A    I've still got a copy here.

 5  Q    All right.  So, a lot of pages to this, but your lawyer

 6  was doing a lot of talking here.

 7       Is that right?

 8            THE COURT:  I'm sorry; what?

 9  BY MS. CAFFESE:

10  Q    Your lawyer was talking, the Court --

11            THE COURT:  "A lot of talking," I don't know what that

12  means.  Okay.

13            MR. HEMANN:  (Inaudible) the transcript.

14            MS. CAFFESE:  The transcript --

15            THE COURT:  A fair amount of talking, but I don't know

16  what that means.

17            MS. CAFFESE:  All right.

18  BY MS. CAFFESE:

19  Q    Your lawyer was talking on your behalf, is that right?

20  A    Yes.

21            MR. HEMANN:  I think Ms. Caffese is referring to

22  transcript of the plea colloquy.

23            MS. CAFFESE:  Yes, I am.  The plea.  The plea --

24            MR. HEMANN:  I don't believe that Mister --

25            MS. CAFFESE:  Oh, you don't have that.  I'm sorry.
```

```
 1            MR. HEMANN:  There's a disconnect, Your Honor.

 2            THE WITNESS:  I only have the plea agreement.

 3            THE COURT:  Yeah, the plea agreement, but not the

 4    colloquy.

 5            MS. CAFFESE:  I'm sorry.  I thought you had it.

 6    Sorry, sorry.

 7    BY MS. CAFFESE:

 8    Q    Here's a transcript of your plea here (Indicating).

 9            MS. CAFFESE:  Has that been marked and introduced?

10            MR. HEMANN:  No.

11            MS. CAFFESE:  All right.  Well, let me just mark it.

12    Perhaps we can mark it later as an exhibit if we need to.

13            THE COURT:  Exhibit next in order.

14            MS. CAFFESE:  Thank you.

15            THE COURT:  For identification.

16    BY MS. CAFFESE:

17    Q    So, this transcript of your plea back on October, 21st,

18    you indicated you wanted to apologize, right?

19            MR. HEMANN:  Objection, Your Honor.  This is hearsay.

20    And --

21            THE COURT:  Well --

22            MR. HEMANN:  Foundation.

23            THE COURT:  I think.  I don't know -- I think you have

24    to lay a foundation for what it is that you want to elicit.

25            MS. CAFFESE:  All right.
```

1           MR. HEMANN:  Your Honor, if -- if Ms. Caffese wants to

2   read the statement that --

3           THE COURT:  Do you want to read the statement?

4           MR. HEMANN:  At the time of his plea, as long as --

5           MS. CAFFESE:  Well, yes.

6           MR. HEMANN:  As long as there is an understanding --

7           THE COURT:  Well, ladies and gentlemen, maybe I can

8   explain this, here.

9           MS. CAFFESE:  I'll --

10          THE COURT:  Wait, let me explain something to the

11  jury.

12      Because I don't know that you are aware of this process.

13  So I'm going to explain to you the process in general, though

14  I'm not discussing this case in particular.

15      When a defendant pleads guilty, the customary procedure in

16  a Federal Court is that there is a plea agreement.  And you

17  have received in evidence the plea agreement in this particular

18  case.  That's not unusual.  It happens, not always, but it

19  happens with some frequency.

20      Along with a plea agreement is a proceeding in front of

21  the court in which a defendant is advised of his rights, and a

22  discussion of the circumstances surrounding the plea follows.

23  So it's open, public, and part of the record.

24      And so, that's called the "plea colloquy."  And that is

25  what Ms. Caffese is referring to in her questions.

 1          Now, yes.

 2              MR. HEMANN:  We would not object to having Mr. Vargas

 3   read what he said to the Court on that occasion.  I think

 4   that's --

 5              THE COURT:  There is no objection.  Is that what you

 6   want to do?

 7              MS. CAFFESE:  Well, actually, I would like to ask him

 8   some specific questions --

 9              THE COURT:  Sure.

10              MS. CAFFESE:  -- about what he --

11              THE COURT:  Go right ahead.

12   BY MS. CAFFESE:

13   Q    So you stated that you wanted to make an apology, correct?

14   A    Yes, or a statement, yes.

15   Q    Right.  And you apologized to three entities.  And I'm

16   referring to Page 16 of the transcript here.

17        (Witness examines document)

18   Q    You apologized to the San Francisco Police Department,

19   right?

20   A    Yes.

21   Q    You apologized to the City and County of San Francisco, is

22   that right?

23   A    Yes.

24   Q    And you apologized to your former co-workers, your police

25   officer co-workers.  Is that right?

1   **A**     Yes.

2   **Q**     But you didn't apologize to Kelsey Stewart for giving her

3   heroin; is that right?

4   **A**     No.

5   **Q**     And you didn't apologize to Indio for taking his money; is

6   that right?

7   **A**     No, I didn't.

8   **Q**     You didn't apologize to Michael Vice; is that right?

9   **A**     I'm not sure who that is.

10  **Q**     You didn't apologize for stealing from the people who

11  owned the Apple gift cards, for example?  You didn't apologize

12  to those people?

13  **A**     No.

14  **Q**     You didn't apologize to Scotty Krasunik or the people that

15  owned the laptops that you stole back in February of 2010, did

16  you?

17  **A**     No.

18  **Q**     And you didn't apologize to Andrew Byrd, whom you

19  testified in a preliminary hearing under oath (Indicating) --

20          **MR. HEMANN:**   Objection, Your Honor, foundation.

21  **BY MS. CAFFESE:**

22  **Q**     Is that true?

23          **THE COURT:**   Well, if the question is you didn't

24  apologize to Andrew Byrd, that is an appropriate question.

25  Anything else is not.

**BY MS. CAFFESE:**

**Q**    You didn't apologize to Andrew Byrd, did you?

**A**    I did not.

**Q**    And you actually testified at a preliminary hearing on January 6, 2010 --

         **MR. HEMANN:**  Objection, Your Honor.

**BY MS. CAFFESE:**

**Q**    -- under oath --

         **MR. HEMANN:**  Hearsay and foundation.

         **THE COURT:**  Well, I don't know what the question is.

**BY MS. CAFFESE:**

**Q**    You testified under oath at a preliminary hearing, dealing with the arrest and seizure of evidence involving Andrew Byrd. Correct?

**A**    Yes.

**Q**    And you lied under oath in a felony case, dealing with -- with that case that you were involved with.  Is that right?

**A**    If it pertains to the entry of the -- of the unit, then yes.  I probably -- because I don't think I ever mentioned that we probably used a key.

**Q**    Well, how about if it pertains to stealing money from Andrew Byrd?

**A**    Then by omission, yes, I did.

**Q**    And that was a case where somebody was charged with a felony.  Could have gone to state prison based on what you

1  said, under oath, in a court of law (Indicating).

2      True statement?

3  **A**    I think pretty much every drug case we did was a felony

4  case.

5          **MS. CAFFESE:**  No further questions.  Thank you, sir.

6          **MR. HEMANN:**  Just a few questions, Your Honor.

7                    **REDIRECT EXAMINATION**

8  BY MR. HEMANN:

9  **Q**    On cross-examination with Mr. Getz a little bit earlier

10 today, Mr. Vargas, you were asked about the government's

11 narrative of the case.  Do you remember that?

12 **A**    Yes.

13 **Q**    And, you were asked whether you were charged with --

14 whether you felt to tell the truth, you had to track the

15 government's narrative of the case.

16     Do you remember those questions?

17 **A**    Yes.

18 **Q**    When you began -- before you began cooperating with the

19 government, so between the indictment in February of this year

20 and your plea and cooperation in October of this year, did you

21 become familiar with the government's narrative of the case

22 with regard to the Daisy and Jayme marijuana transaction?

23 **A**    Yes.

24 **Q**    What was the -- as you perceived it, what was the

25 government's narrative of the case with regard to the Daisy and

1   Jayme marijuana transaction?

2   **A**    As I perceived it, the government's belief was that

3   myself, Mr. Robles, and Mr. Furminger were all involved in the

4   -- I guess, conspiracy to provide them with narcotics that they

5   would then intend to sell.

6   **Q**    And, did -- what was your understanding with regard to the

7   government's narrative of the case with regard to whether you

8   would get money back from Daisy and Jayme?

9   **A**    The government's narrative at that point was that it was

10  an intent to sell the narcotics and then split the proceeds.

11  **Q**    With whom?

12  **A**    With -- that was a part that didn't make sense, because

13  the government's belief was it was to split it in thirds, but

14  there was myself, Mr. Robles, Mr. Furminger, as well as Daisy

15  and Jayme, so there were kind of four parties involved.  That's

16  kind of the part that didn't make sense.

17  **Q**    When you came in to begin your cooperation and you spent

18  time talking to Ms. Flores and Mr. Nave (Indicating), and

19  Mr. Villazor and myself, did your description of the Daisy and

20  Jayme marijuana transaction track the narrative of the case

21  that you understood was the government's before your

22  cooperation?

23  **A**    No, it didn't.

24  **Q**    How was it different?

25  **A**    First, with the intent to sell it and receive monies back,

 1 but more importantly, that Mr. Furminger wasn't really aware of

 2 it prior to it already occurring.  Mr. Furminger found out

 3 about it after I had already done it.

 4      And in fact, I tried to really accept responsibility that

 5 it was my idea and I did it.  I mean yes, Mr. Robles stood

 6 there next to me right outside one of the doors of Mission

 7 Station when I handed her the drugs, but it was really my idea.

 8 And so I tried to really delineate to them that I did it, and

 9 Mr. Furminger found out only after it had already occurred.

10 **Q**    So was your cooperation information with regard to

11 Mr. Furminger consistent with the then-narrative of the

12 government's case?

13 **A**    No.

14 **Q**    So why was it that you told a story that was different

15 from the narrative of the case?

16 **A**    Because it was the truth.

17 **Q**    When you -- I'm going to direct your attention, kind of go

18 in order from the beginning to the end of Ms. Caffese's

19 testimony -- examination.

20      But going back to questions that Mr. Getz asked you, I

21 want to direct your attention to the self-storage search that

22 involved Indio in November of 2009.

23      Okay?

24 **A**    Yes.

25 **Q**    And there were questions about Mr. Robles's and

1  Mr. Furminger's involvement in the search that day.  Do you

2  remember that?

3  **A**     Yes.

4  **Q**     When you were out at the search site initially that day,

5  who were you with?

6  **A**     I was only with Officers Greiner and Kenney.

7  **Q**     Over the course of the time you were out there, were you

8  in contact with Mr. Robles and Mr. Furminger?

9  **A**     Yes.

10  **Q**     And how were you in contact with them?

11  **A**     With cell phone, via cell phone.  Text messaging or

12  calling.

13  **Q**     And have you, Mr. Vargas, had an opportunity to look at

14  some of the cell phone and text records that show

15  communications between you, Mr. Furminger and Mr. Robles that

16  day?

17  **A**     Yes.

18  **Q**     And did those communications take place while you were

19  present at the search site but while the two of them were

20  elsewhere?

21  **A**     That's correct.

22  **Q**     Eventually, did the two of them come to the search site?

23  **A**     Yes.

24  **Q**     Why did they come to the search site?

25  **A**     Because I had located a pretty decent amount of cash off

1  of Indio.

2  **Q**    Whose idea was it for Mr. Furminger to go to the scene of

3  the search?  And by that, I mean, did you say, "Please come out

4  to the scene of the search"?

5     Or did Mr. Furminger say, "I'm coming to the scene of the

6  search"?

7  **A**    I don't recall if I told him, or Mr. Robles told him.  But

8  I know I told at least Mr. Robles, "Hey, you know, this is..."

9  and this is a target we'd been working on for a couple of days.

10  "Hey, I've grabbed -- I've gotten Indio, I've arrested him

11  now.  And I've got money."

12  **Q**    Did you invite Mr. Furminger out?  Or did he come without

13  an invitation?

14  **A**    Key -- that was the -- the intent of him coming out was

15  that we were going split the proceeds of the money that we

16  found.  I just don't know if it was me who invited him, or  Mr.

17  Robles.  But I know we were all in contact.

18  **Q**    When did Mr. Robles help you move?

19  **A**    Oh, this was probably in August, I imagine, of 2012.

20  **Q**    And where did you move?  From where to where?

21  **A**    I moved from my home in the East Bay down to southern

22  California, where I've been living ever since.

23  **Q**    Was that before or after Mr. Hernandez helped your

24  then-girlfriend move?

25  **A**    Oh, that was probably -- gosh, it might have been almost a

1   year after.  Maybe -- yeah, maybe -- could have been even

2   longer than that.  A year difference.

3   **Q**   So if Mr. Robles helped you move some time in 2012,

4   Mr. Hernandez assisting your girlfriend in moving was some time

5   in 2010 or 2011?

6   **A**   Yes.

7   **Q**   You said on cross-examination with Ms. Caffese, that the

8   reports were pretty accurate.  Your police reports were pretty

9   accurate.  You used that term.

10  **A**   Yes.

11  **Q**   Can you describe for the jury what you mean when you say

12  "pretty accurate"?

13  **A**   I don't know, it's hard to justify when I'm omitting large

14  thefts and that sort of thing in the reports, but the details

15  in the reports in terms of where I was, when I was there, who I

16  was with, what I was doing, what was being said, what was

17  retrieved, where it was retrieved, at what amounts, those sort

18  of items, the details of it, those were very accurate.

19  **Q**   So the inaccurate parts of the reports were -- had to do

20  with the criminal conduct that you have admitted today and

21  yesterday.

22  **A**   Yes.

23  **Q**   I would like to show you some excerpts, or some of the

24  documents in Exhibit 56.  Remember that Ms. Caffese asked you

25  about the receipts that you gave to Cesar Hernandez?  Do you

1  remember that?

2  **A**    Yes.

3  **Q**    Can you describe to the jury what these receipts are?

4  What they're for?

5  **A**    When -- typically in using informants, one of our

6  approaches to arrest a narcotics dealer would be to send an

7  informant to a drug dealer, to do what's called a controlled

8  buy.

9       We are buying the narcotics.  We provide the informant

10  with the money to buy the drugs.  The informant then gives us

11  the drugs.  We let the drug dealer keep the money.  We then

12  book the drugs, test the drugs.  Our hope also is that at times

13  we can follow the drug dealer after the transaction back to his

14  low consideration.

15       All of that to develop a probable cause to write up a

16  search warrant.  Try to get -- you know, where he's keeping his

17  drugs, if it's at a house or in a car, anything else like that.

18  But basically we become the purchaser of the drugs.

19       These receipts are basically we pay them for their

20  services, providing the services of buying the drugs for us so

21  we give them money, kind of, that's their wage in a sense, for

22  doing that transaction for us.

23       (Off-the-Record discussion between Counsel and Clerk)

24           **MR. HEMANN:**  Barbara, can you please put the screen on

25  for the ELMO.

1           **THE CLERK:**  Okay.

2           **MR. HEMANN:**  Thank you.

3       (Document displayed)

4  BY MR. HEMANN:

5  Q    Remember we looked at this one, Mr. Vargas?

6  A    Yes.

7  Q    And, it describes the purposes of a controlled buy from

8  El Pollo?

9  A    Yes.

10 Q    At 18th Street and Capp Street.

11 A    Yes.

12 Q    Do you remember that buy?

13 A    Um, yeah.  It's pretty familiar to me.

14 Q    And was Mr. Hernandez actually the buyer in that

15 transaction?

16 A    Yes.

17 Q    There's a signature down there, "Signature, Witness

18 Officer," and the name printed underneath.  Do you see that?

19 A    Yes.

20 Q    Do you know who that is?

21 A    Yes.

22 Q    Who is it?

23 A    That is Officer Kujath, K-U-J-A-T-H.

24 Q    And in this situation, did you -- why is Officer Kujath's

25 name written on this?

1   A    As part of the procedure for filling out the receipt, it's

2   usually done in the presence of another officer so there is a

3   witness to the transaction of us then paying the informant for

4   purchasing drugs for us.

5   Q    Was Officer Kujath involved in any sort of criminal

6   activity with you?

7   A    No, none.

8   Q    Did you actually give $50 to Cesar Hernandez to buy drugs

9   in this particular instance?

10  A    In this instance, Cesar was paid $50 for the drugs he had

11  already bought.  I don't know how much money we spent on the

12  drugs, but that was Cesar's payment for the transaction.  I

13  don't know how much the transaction was.

14  Q    So this document (Indicating) shows the money that Cesar

15  would receive, sort of an informant fee?

16  A    Yes.

17  Q    The 50 bucks isn't the buy money.

18  A    No.

19       (Document taken off display)

20       (Document displayed)

21  Q    This document shows a payment of $40, on 8-20-2010.

22       Do you -- can you recognize the signature on -- of the

23  recipient on this transaction?

24  A    Yes.

25  Q    Who's that?

1   **A**    That's who I called "the Shah."

2   **Q**    Now, there is a witness to this transaction as well.  Who

3   is that?

4   **A**    Yes.  Officer Olson, O-L-S-O-N.

5   **Q**    Were you involved in some kind of criminal conduct with

6   Officer Olson?

7   **A**    None whatsoever.

8   **Q**    This purchase of heroin, do you know whether this had to

9   do with Mr. Hernandez or the Shah?

10  **A**    Oh, it's with the Shah.

11  **Q**    Why -- you said that in a way that suggests that you --

12  you have a pretty good memory of that.

13  **A**    There's a couple of reasons.  First of all, the Shah,

14  besides being at times a heroin dealer, is a heroin user.  So

15  if there was any drug that he would be dealing with, it'd be

16  heroin.

17       And vice-versa.  Cesar really didn't deal with heroin too

18  much.  He was a coke guy.  So pretty much coke was his -- was

19  the drug that he would deal with and --

20  **Q**    Now, under the signature there, under the Shah's

21  signature, there's a CI number, 09-08.  Do you see that?

22  **A**    Yes.

23  **Q**    Was that the Shah's CI number?

24  **A**    No.

25  **Q**    Who's CI number was that?

1   **A**    That's Cesar's CI number.

2   **Q**    Why did you put Cesar's CI number under the Shah's

3   signature?

4   **A**    Either it's an error, you know, I'm writing down the wrong

5   number, or the other reason could be that the Shah at that

6   point wasn't completely enlisted as an informant.  What --

7   hadn't gone through all the paperwork yet.  So I'm using a

8   valid number and filling out a valid form to justify payment to

9   him, but he doesn't have a number yet, so I'm using somebody

10  else's number.  In a sense.

11  **Q**    Did you actually give 40 bucks to the Shah in this

12  instance for participating in this transaction on behalf of the

13  SFPD?

14  **A**    Yes, for the purchase of heroin.

15  **Q**    And was Officer Olson involved in that transaction?

16  **A**    Yeah, well, he was witnessing the -- the transaction of

17  the Shah getting $40, yes.

18  **Q**    Anything illegal about this?

19  **A**    Um, no.

20       (Document taken off display)

21  **Q**    And then finally, the one that Ms. Caffese showed you.

22       (Document displayed)

23  **Q**    This one also I think you testified is the Shah's

24  signature on this.  Correct?

25  **A**    Yes.

1  Q    And was there an officer witness to this transaction?

2  A    Yes.

3  Q    Do you know what this -- do you recall this transaction?

4  A    I recall that, that case.  And, and I recall that the Shah

5  was the informant on that case.

6  Q    What does it say under the narrative there, the purpose?

7  A    "Buy walk from 'José,' Third Street and..." I believe

8  that's "Yosemite."

9  Q    What does "buy walk" mean?

10  A    When we can locate a drug dealer that actually sells out

11  of his residence, what we try and do is send an informant into

12  that residence, buy drugs there, and walk right out.

13       And, you know, we see the informant walk in basically with

14  our money and no drugs on him.  And when he exits out, he has

15  drugs on him and no money.  We then logically take the step

16  that the drugs must have come in from the residence that allows

17  us to then generate -- that's probable cause for us to then

18  seek a search warrant for that residence.

19  Q    Mr. Vargas, did you give sixty bucks to the Shah in

20  connection with this transaction?

21  A    Yes.

22  Q    Were you and Officer Sands involved in anything illegal

23  with this transaction?

24  A    None, whatsoever.

25       (Document taken off display)

1   Q    With regard to the Apple purchase, the Apple gift card

2   purchase at the Apple Store on Stockton Street, do you remember

3   testifying about that?

4   A    Yes.

5   Q    On the day of that you made the purchases, the iPhone and

6   the Nano, did you register one of the -- were one of the two

7   devices registered?

8   A    Yep.

9   Q    Which one?

10  A    The phone.

11  Q    And, to whom was the phone registered?

12  A    To me.

13  Q    Did you know how to register Apple devices at that time?

14  A    Um --

15  Q    Were you familiar with Apple devices.

16  A    Absolutely.

17  Q    And had you registered Apple devices before?

18  A    Yes.

19  Q    Did you register the Nano?

20  A    No.

21  Q    Why not?

22  A    Because I didn't take the Nano.  I didn't have it.

23  Q    I would like to go briefly through your discussion about

24  whether Officer Robles was next to you at the time of handing

25  the marijuana to Daisy and Jayme.  Do you remember that

1  discussion?

2  **A**    Yes.

3  **Q**    The first time -- do you remember the first time that you

4  spoke to the FBI, the first couple of days that you spoke to

5  the FBI, and, you know, pursuant to your cooperation?

6  **A**    Yes.

7  **Q**    And, do you remember during those conversations, whether

8  you were asked if Mr. Robles knew about the giving of the

9  marijuana to Daisy and Jayme?

10  **A**    Yes.  I believe I was asked in regards to both Mr. Robles

11  and Mr. Furminger, regarding what they knew with the

12  transaction with the marijuana.

13  **Q**    And during those first -- and again, you were interviewed,

14  20th and 21st, I believe you testified, of October, and then

15  the 27th and 28th of October.  Correct?

16  **A**    Yes.

17  **Q**    During the first couple of days, is that when you were

18  asked about their knowledge of the marijuana hand-over?

19  **A**    Yes.

20  **Q**    When you were interviewed the following weekend, were you

21  asked whether either of them was actually present during the

22  hand-over of the marijuana?

23  **A**    Yes.

24  **Q**    And what did you say at that time?

25  **A**    At that time I described that Mr. Robles was standing next

 1  to me, and Mr. Furminger wasn't there at all.

 2  **Q**    Now, did those two events -- when did the those two events

 3  happen in relation to your actual -- the entry of your plea in

 4  this courtroom?

 5       (Document displayed)

 6  **Q**    And you're looking at what document up there?

 7  **A**    I'm looking at the date of the plea agreement, which was

 8  the 21st of October.

 9  **Q**    May I take this for a moment?

10       On the 21st of October, you entered a plea to this plea

11  agreement -- pursuant to the plea agreement, in this courtroom.

12  Correct?

13  **A**    Yes.

14  **Q**    And let me ask you just a moment about the negotiation of

15  this plea agreement.

16       As to the -- the terms of this plea agreement, was there

17  an active back-and-forth negotiation?  Or was the plea

18  agreement the plea agreement?

19  **A**    There wasn't really any negotiation at all.  I was told

20  this was the plea agreement, and that's it.

21  **Q**    Were you given a choice about the -- the terms that were

22  -- that were offered to you in this plea agreement?

23  **A**    My choices were to plea or -- or not.  And that was it.

24  **Q**    Ms. Caffese showed you a --

25           **MR. HEMANN:**  Barbara, may I have the ELMO again?

1          (Document displayed)

2              **MR. HEMANN:**   Thanks.

3    **BY MR. HEMANN:**

4    **Q**    A couple of lines of this plea agreement.  And if it's

5    okay, I will just read the last line of the paragraph that

6    begins "In 2009," says -- and this is the original I'll read

7    (As read):

8                   "Robles, D.B. and J.W. were aware of and agreed to

9                   the plan at the time..."

10        I'm sorry.

11                  "...before I gave the marijuana to D.B. and J.W.;

12                  Furminger found out what I had done shortly

13                  thereafter."

14        Do you see that?

15   **A**    Yes.

16   **Q**    Was that language that was negotiated between your

17   attorney and the United States prior to the plea agreement?

18   **A**    Yes.

19   **Q**    There's a change there, that says "at the time."  How did

20   that change -- first of all, where were you standing when that

21   change came about?  Do you remember?

22   **A**    Yes.  I was standing at the defense table there

23   (Indicating).

24   **Q**    Right over here where Mr. Getz is sitting now?

25   **A**    Yes.  Sitting basically probably where Mr. Furminger is

 1   now.

 2   Q    And so, how did that change from "before" to "at the time"

 3   happen?

 4   A    I got the attention -- when -- going through the agreement

 5   and reading it line by line, I came to this point.  And I got

 6   my attorney's attention, and basically told him that that

 7   wording was wrong.  That Mr. Robles wasn't aware of what I was

 8   doing beforehand.  He basically found out at the moment.

 9        And so I just kind of -- I got his attention.  And my

10   attorney then walked up to you and raised this issue.  And then

11   we kind of discussed a change of the wording to better reflect

12   what actually occurred.

13        (Document taken off display)

14   Q    You were asked some questions about your characterization

15   of some of your criminal conduct as a "crime of opportunity."

16   Do you remember that?

17   A    Yes.

18   Q    Do you believe in any way, Mr. Vargas, that you are less

19   guilty because these were crimes of opportunity than they were

20   other crimes?

21   A    No.

22   Q    Why not?

23   A    Because ultimately, the crime is the crime.  Whether I

24   went into the location with the intent to steal or in the midst

25   of searching discovered that there was money that I thought I

1  could potentially get away with, the end result was that I took

2  the money or took property or anything else that I did

3  illegally and during this period.

4       And so, I'm wrong; what's wrong is wrong.  You know,

5  whatever my intent was going into it, the net result is that

6  it's illegal, and I did that.

7  **Q**    And was your intent different at different times,

8  depending on different circumstances?

9  **A**    Absolutely.

10 **Q**    How so?

11 **A**    As I was kind of just explaining now, when we went into

12 these locations and went to effect these arrests, we didn't

13 realize what we were getting into.  Oftentimes we went into

14 locations, and got nothing.  Oftentimes we went into locations

15 and retrieved money and drugs, and all of it was booked.

16 Sometimes only a portion of the money was booked, or -- or none

17 of it was booked.  It all kind of -- each instance depended on

18 its own individual circumstances.  There was not a

19 tried-and-true pattern or rule to any of this stuff.

20      And so at a certain point, if I thought there was

21 something there that I -- that I, whatever, needed or wanted,

22 or wanted to take and thought I could get away with it, I would

23 try, or I would.  Or if I didn't, then I wouldn't touch

24 anything at all.

25      And so that, in a sense, is what I -- I'm trying to

1   describe when I use that word, "opportunity."

2   **Q**    Do police officers frequently find themselves in

3   situations in which these kind of opportunities arise?

4   **A**    Absolutely.

5   **Q**    And do you believe it's a real violation of your oath to

6   do what you did while acting as a San Francisco Police Officer?

7   **A**    It's an absolute perversion of the oath.

8            **MR. HEMANN:**    Thank you.

9                          **RECROSS EXAMINATION**

10  **BY MR. GETZ:**

11  **Q**    When you talked to Daisy Bram and handed over the

12  marijuana, and you described how you were feeling an altruistic

13  mood -- do you remember that testimony?

14  **A**    Yes.

15  **Q**    And you said to her, "You can sell this marijuana, but

16  25 percent for you, 25 percent for me, 25 percent for Robles,

17  25 percent for Furminger."

18       Right?

19  **A**    No.

20  **Q**    What did you say?

21  **A**    I told them, "Here.  Do..." you know, "Get a hotel, feed

22  yourself."  You know, "do something."

23  **Q**    Did you see, when you went through the police reports on

24  this case, that Daisy Bram reported to the prosecutors here

25  that you told her, 25 percent for her, 25 percent for you,

1    25 percent for Robles, and 25 percent for Furminger?

2        Did you see that?

3    A    No.

4    Q    You never saw that report?

5    A    No.  I thought, actually, that she had said that I had

6    threatened her to sell it.  But no, I don't recall that, seeing

7    that at all.

8    Q    When it came time for you to make a deal, you really had

9    two choices, didn't you?  You could plead to what you were

10   charged with, and be sentenced, or you could do a cooperation

11   agreement.  Am I right?

12   A    I believe I had three choices.

13   Q    What was the third choice?

14   A    Stick with not guilty, and -- and take my chances in

15   trial.

16   Q    Well, you already said that you were tired of lying.  Do

17   you remember that?

18   A    Right.

19   Q    You had, you know, kind of a reverse.  Instead of a -- you

20   know, a period of your time when you were able to do it, you

21   said earlier today, you didn't want do that anymore.  Am I

22   right?

23   A    Correct.

24   Q    And, do you remember the part in your testimony when you

25   said you couldn't remember when you started to commit these

 1    crimes?  You just remember somebody put some money in your

 2    pocket?

 3         Right?

 4    A    I remember a general period of time, but not an exact

 5    time.  That's correct.

 6    Q    Yeah.  You can't remember when you first started to

 7    violate the oath, can you?

 8    A    No.

 9    Q    You can't tell us the one time where you crossed over,

10    where you went from being a good officer to a corrupt officer.

11         You won't tell us when that was, will you?

12    A    I can't tell you, no.

13    Q    Okay.  But don't you think, if you were what you said,

14    that you were a good officer, and all of a sudden you crossed a

15    line, how could you not possibly remember that moment?  That

16    moment when you went corrupt?  How can you not remember that?

17              MR. HEMANN:  Objection.  Argumentative, Your Honor.

18              THE COURT:  Well, I'll allow it.  Go ahead.

19              THE WITNESS:  I don't know.

20    BY MR. GETZ:

21    Q    Let's talk about the time when you were tired of the

22    lying, and you decided you wanted to settle this case, resolve

23    it with the government.  Hopefully to get less time than you

24    otherwise would if you went to trial.  Right?

25              MR. HEMANN:  Your Honor, I believe this is asked and

1  answered, and beyond the scope of redirect.

2          **THE COURT:**  Beyond the scope.

3  **BY MR. GETZ:**

4  **Q**    You could have pled guilty without a cooperation

5  agreement.  Right?

6  **A**    That was an option available to me, yes.

7  **Q**    But you wanted to get something for your testimony, didn't

8  you?

9  **A**    Actually I wanted to just get this all off my chest.

10 **Q**    You wanted to get less time for your testimony, did you

11 not?

12 **A**    Initially when I started talking, um, with the U.S.

13 Attorneys, no.

14 **Q**    I'm not asking about initially, Mr. Vargas.  I'm asking

15 about the time you decided instead of just pleading guilty, you

16 would plead guilty with a cooperation component.

17     Do you remember that?

18 **A**    That's what I'm telling you.  That's when I -- when I

19 initially started those discussions with them, no.

20 **Q**    And now you've got what you negotiated for.  You're

21 performing right now, aren't you?

22 **A**    I'm testifying to the best I can right now, yes.

23          **MR. GETZ:**  Thank you.

24          **THE COURT:**  Anything further?

25          **MS. CAFFESE:**  No further questions, Your Honor.  Thank

PROCEEDINGS

1  you.

2          THE COURT:  Anything further?

3          MR. HEMANN:  Thank Your Honor.  Thank you.  Nothing

4  further.

5          THE COURT:  No.  Okay, thank you.  You are excused.

6      (Witness excused)

7          THE COURT:  Well, ladies and gentlemen, ten to 4:00.

8  And, I think we will rest for the day.  Actually, we are

9  resting for the week, because we are not meeting Wednesday,

10  Thursday, or Friday.  And we are resuming on Monday.  Monday

11  and Tuesday, we will have trial.

12      I think we are moving along rapidly.  I will discuss with

13  you on Monday next what I think the schedule is going to be, so

14  that you can prepare accordingly.

15      Since it's a long period of time, I just want to reiterate

16  the fact that you are not to -- the admonition I've given you:

17  You are not to discuss the case, allow anyone to discuss it,

18  form or express any opinion.

19      I fully expect that there will be newspaper reports.

20  There could even be television mention of the case.  And again,

21  let me caution you not to read the articles, not to listen to

22  the news, the TV reports, if there are any.  Sometimes that's

23  impossible.  Sometimes it's -- you're simply -- it's simply

24  thrust upon you.  But if it is, I think that you should choose

25  to ignore it.

PROCEEDINGS

1        Obviously, if you heard things about the case that you

2   should not have heard, you should tell Barbara about it, and

3   we'll explore.

4        We're at a particularly critical juncture.  A lot of

5   testimony has gone on.  You have invested a great deal of time.

6   And, I do not want anything to occur to prevent you from

7   ultimately rendering a verdict, if you are able to do so.

8        So, that depends on your being vigilant, your following

9   the Court's instructions, your exercising whatever discipline

10  you have to exercise -- it may be nothing, and it may be

11  something -- to make sure that you are fair, impartial judges

12  of the evidence.

13       You will see, as the case progresses, that when you hear

14  more evidence or not, or when you hear argument, and especially

15  after I instruct you on the law, when you hear the views of

16  your fellow jurors, that will play a role in determining what

17  verdict you should render.  None of that has happened now.

18  You've heard some things, but you haven't heard everything.

19       So, I just want to tell you that the best thing you can

20  do -- which sounds almost impossible to do -- is not to think

21  about the case.  Think of it in terms that you've heard some of

22  it, but not all of it.  And that you're going to reserve

23  judgment until you hear all of it, and the views of your fellow

24  jurors.

25       If you do that, while it sounds like it maybe require some

1    mental gymnastics, it actually is an answer to the question of

2    whether you should keep on thinking about the case.  If you can

3    say -- and I sort of do that in all sorts of things.  I say,

4    "Well, I don't have to decide today; I can postpone that until

5    tomorrow," and then I think about something else.

6         So maybe you can grab on to something else that you can

7    fill that void which would be created by your not thinking

8    about the case.

9         Anyway, I thank you; you are extraordinarily vigilant.  We

10   will start sharp at 9:00 on Monday.  And, please leave your

11   binders on the seats; leave your notebooks in the jury room.

12   And, have a pleasant three days.

13        (Jury excused)

14        (The following proceedings were held outside of the

15   presence of the Jury)

16        **THE COURT:**  Okay, let the Record reflect the jurors

17   have retired.

18        So, of course, my question is:  Where are we?  And, let's

19   talk about a schedule.

20        **MR. HEMANN:**  Mr. Villazor and I believe that we will

21   be done by noon on Monday.

22        **THE COURT:**  Good.  Okay.  So, that means we will

23   commence the defense case Monday.

24        And, how do you want to proceed?  I don't know whether

25   Mr. Getz goings first, Ms. -- I don't care.  Just --

1          MR. GETZ:  I'll confer with Ms. Caffese about that.

2     And we will design a format, hopefully, that will please the

3     Court.

4          THE COURT:  Well, I'm hopeful in that regard, too.

5     But -- and you have not disappointed me yet in this case.

6     However, I think I'd like something a little bit more definite

7     to tell the jury, as "Don't worry, be happy.  It's going to all

8     work out."

9          Like, you know what?  What -- when's the case coming to an

10    end?  That sort of thing.  I think actually, they're sort of

11    interested in that.

12         MR. GETZ:  Well, I think there are a couple of things.

13    First of all --

14         THE COURT:  Yeah.  And I know you have to make

15    decisions, and I know also you don't want to make decisions

16    until after the government has rested.  So, I'm appreciative of

17    that fact.

18         MR. GETZ:  Well, I think -- I think that's right.  And

19    I would add to that, the fact that both Ms. Caffese and I have

20    filed witness lists.  And as is often the case around this time

21    of the year, I have received a lot of phone calls from my

22    witnesses, complaining that they had vacation plans or they

23    wanted to go somewhere for vacation that week.

24         So, one of the reasons why I can't answer the Court more

25    precisely is because I'm trying to figure out who will be

 1  available Monday afternoon, and Tuesday, since the Court

 2  indicated those are the only two days the defense will need to

 3  go forward next week.

 4      So, I think if I had a couple more days to sort it out

 5  with the witnesses, I could be more --

 6          **THE COURT:**  Okay.  Well, let me just set -- that's

 7  fine.  Let me just set a couple of ground rules.

 8      First of all, I want to go all of Monday and all of

 9  Tuesday.

10          **MR. GETZ:**  Right.

11          **THE COURT:**  That is to say, I -- I want you to have

12  whatever witnesses you can take.  There is no order to the

13  witnesses.  There's no order between yourselves.  That is, I'm

14  sensitive to the fact that, you know, you may want it in a

15  particular order.

16      You can do whatever you want.  I'm not formally saying,

17  "Okay, Mr. Getz, you present your case first," or "You present

18  your case second."  You can interchange, depending on witness

19  availability, depending on any -- any concerns that you may

20  have.

21      But the thing is that I don't want, as they say, to wake

22  up Tuesday at 10:00, or 1:00, and find out there's just nobody

23  there.  I think a couple of things have to be determined in

24  advance.  And, and I think you'll have to -- because at that

25  point, I will ask you whether or not your clients are going to

1  testify.  If they are, and you don't have other witnesses, I'm

2  going to have them testify, either one or both, at that point.

3       So, that's -- I say that not as a -- to threaten you.  I

4  simply say that, that I want to just have receiving out in the

5  open so that nobody is surprised about anything.  And you guys

6  are seasoned, seasoned lawyers.  So you would -- you might

7  anticipate that.

8       I would also say to you that you should tell the

9  government by close of business Thursday who is going to

10  testify on Monday, and Tuesday.  All right?

11       **MR. GETZ:**  I think that's fair.  And we will do that,

12  to the extent that we know.  And I think the government has

13  been very generous in identifying witnesses well in advance of

14  the deadline.  So we will try to do that.

15       I also wanted to mention that with the Court's permission,

16  I want to file a premature Rule 29 motion, so that the written

17  motion is before the Court when the government rests, and I

18  don't have to interrupt to make that motion.

19       **THE COURT:**  And the way I deal with it is that you can

20  simply make an oral motion.  I mean, at the conclusion of the

21  government's case you can make the motion; you don't have to

22  argue it.

23       That's true of both Defendants.  Just as long as you do --

24  you do have to make the motion.  But you don't have to argue

25  the motion at that point.

```
 1        Now, just so we know the rest of the schedule, though, I
 2   think I've said it already.  Crazy schedule.  Again, my fault.
 3   The first week in December we have court December 1st, December
 4   2nd.  And December 5th.  Friday.  The 5th of December.  Because
 5   I'll be back from Charlotte -- wherever I'm going.  So totally
 6   confused, I don't even know where I'm going.
 7        I'll be going for -- back from the East Coast the night of
 8   the 4th.  So, I'll be available for trial on the 5th.  So, we
 9   need three days in the first week of December.  Depending on
10   witnesses and so forth.
11        And by the way, I'm not going to -- if we happen to get
12   into argument at that point, if that's where we are, I want all
13   the argument to be done at one time, with the parties.  I need
14   to go over instructions and so forth.
15        So I'm not going to truncate, you know, have the
16   government give its argument, and then a week pass, and then
17   you give an argument, and then somebody else give an argument
18   two days later and three days later.  No.
19        I mean, I think the very least you can expect out of this
20   case from me is a coherent -- an opportunity to present a
21   coherent argument, all together, with both sides.  And so, I
22   will arrange that.  I'll just figure out how to do that.  Okay?
23           MR. GETZ:  (Nods head)
24           THE COURT:  But that depends on where we are in the
25   case.  I have no idea, I mean, where you are going to be.
```

```
 1        So anyway, three days in that week.  The 1st, 2nd and 5th.

 2   And then, I think I'm coming back the night of the 10th, so

 3   then there's the 11th and 12th of December.  Thursday and

 4   Friday.  And then the following week, which I've promised the

 5   jurors that the case would be over by then.

 6             MR. HEMANN:  Seems like we will be done well before

 7   then.

 8             THE COURT:  I think we'll be done well before then.

 9             MR. HEMANN:  Your Honor, if I can ask, the only

10   potential hiccup there is that if Ms. Caffese and Mr. Getz

11   decide to call few or no witnesses, and we're done Monday, or

12   early Tuesday.  And I don't know whether -- I mean, things like

13   this have happened before.

14             THE COURT:  Sure.

15             MR. HEMANN:  So I'm just wondering whether -- you

16   know, we obviously have closings to prepare as well as jury

17   instructions to deal with.  And I'm just wondering, if that

18   came to pass, whether the Court would anticipate that we would

19   be arguing on that Tuesday --

20             THE COURT:  No, no; I wouldn't do that to you.

21             MR. HEMANN:  Okay.

22             THE COURT:  In other words, even -- if you were to

23   rest on Monday, I would do jury instructions on Tuesday and so

24   forth.  And I would then kick over the argument to December 1st

25   and 2nd.
```

1          MR. HEMANN:   Okay.

2          THE COURT:   You know, I want you to -- the argument --

3    I believe argument can be all done in one day, but I -- you

4    know.  It depends.  Right?  It depends.

5       So, we'll try to figure it out.  The guiding light is that

6    you -- is that I want -- as a general rule, unless some

7    extraordinary circumstance, I would very much want the jury to

8    commence its deliberations at the conclusion of the argument.

9       I don't think a lot of gained by, you know, four days of

10   pause.  But, I don't know how it's going to end.  And there are

11   too many permutations here.

12         MR. HEMANN:   Your Honor, will you have the jury

13   deliberate in your absence?

14         THE COURT:   It might.

15         MR. HEMANN:   Okay.

16         THE COURT:   It might.  I mean, you know --

17         MR. HEMANN:   As much as we would like you here, that

18   would be our request, Your Honor.  To have them go -- as soon

19   as argument's done, until they're done, and have another judge

20   sit in.  Just because it's --

21         THE COURT:   Well, the way -- well, I don't like to do

22   that.  But, but, if it comes to that, I'll probably do it,

23   provided that I can remain in contact with all of you, which

24   really means through telephone appearance.

25      In other words, I think it's rough to give some other

 1    judge the task of readbacks or answering questions or that sort
 2    of thing.  However, I'll just do what I can do.  I just don't
 3    know.
 4         No promises one way or the other.  Except the promises
 5    that you all get to argue at the same time.  Not
 6    simultaneously, but, but within...
 7         So, any questions?  Mr. Getz?  Do you have any questions?
 8              **MR. GETZ:**  Yeah, I had a question --
 9              **THE COURT:**  Yeah.
10              **MR. GETZ:**  -- about argument.  Since Mr. Passaglia and
11    I have split the witnesses, I would like him to have part of
12    the opening -- part of the closing argument.
13              **THE COURT:**  Fine.
14              **MR. GETZ:**  Thank you.
15              **THE COURT:**  Ms. Caffese.
16              **MS. CAFFESE:**  Thank you, Your Honor.  Thank you.
17         I would renew my request to be permitted to call Officer
18    Hilder as a witness.  And Officer Hilder would be testifying to
19    the falsification of the time cards, time sheets that were
20    referred to by Mr. Vargas during his examination.
21              **THE COURT:**  And, that request is denied.
22              **MS. CAFFESE:**  Thank you.
23              **THE COURT:**  Anything else?
24              **MR. HEMANN:**  Not from the government, Your Honor.
25              **MR. GETZ:**  Not for Mr. Furminger.

PROCEEDINGS

1          **MS. CAFFESE:**  No.

2          **THE COURT:**  Okay.  Great.  Okay.  So, I'm sure you

3   will have a relaxing three days, and I'll see you all on Monday

4   morning.

5          **MR. HEMANN:**  Thank you, Your Honor.

6      (Proceedings concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                             **INDEX**

3
**PLAINTIFF'S WITNESSES**                            **PAGE**     **VOL.**

4

5   **VARGAS, REYNALDO**
    (PREVIOUSLY SWORN)                               1315        7
6   Direct Examination resumed by Mr. Hemann         1315        7
    Cross Examination by Mr. Getz                    1432        7
7   Cross Examination by Ms. Caffese                 1465        7
    Redirect Examination by Mr. Hemann               1535        7
8   Recross Examination by Mr. Getz                  1553        7

9                      **E X H I B I T S**

10
    **TRIAL EXHIBITS**              **IDEN**   **VOL.**   **EVID**   **VOL.**
11
    107                             1328     7      1329     7
12  108                             1328     7      1329     7
    109                             1328     7      1329     7
13  110                             1328     7      1329     7
    244                             1328     7      1329     7
14  298                                             1379     7
    350                             1314     7
15  351                                             1491     7

16

17

18

19

20

21

22

23

24

25

               Belle Ball and Katherine Sullivan
         Official Reporters – U.S. District Court
                      (415) 373-2529

## CERTIFICATE OF REPORTERS

I, BELLE BALL, and I, KATHERINE SULLIVAN, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball _____

Wednesday , November 19, 2014

Belle Ball, CSR 8785, CRR, RDR


/s/  Katherine Sullivan _____

Wednesday , November 19, 2014

Katherine Sullivan, CSR 5812, CRR, RMR