```
                                        Volume 8

                                  Pages 1569 - 1788

                   UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA

            BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

UNITED STATES OF AMERICA,          )
                                   )
               Plaintiff,          )
                                   )
    vs.                            )  NO. CR 14-102-CRB
                                   )
IAN FURMINGER and EDMOND ROBLES,   )
                                   )  San Francisco, California
               Defendants.         )  Monday
                                   )  November 24, 2014
_____   )  8:51 a.m.

                    TRANSCRIPT OF PROCEEDINGS

 APPEARANCES:

 For Plaintiff:          MELINDA HAAG
                         United States Attorney
                         450 Golden Gate Avenue
                         San Francisco, California  94102
                    BY:  JOHN HENRY HEMANN
                         RODNEY C. VILLAZOR
                         Assistant United States Attorneys


 For Defendant Ian Furminger:
                         LAW OFFICES OF BRIAN H. GETZ
                         201 California Street
                         Suite 450
                         San Francisco, California  94111
                    BY:  BRIAN H. GETZ, ESQ.
                         JOHN PAUL PASSAGLIA, ESQ.


 Reported by:            BELLE BALL, CSR 8785, CRR, RDR
                         KATHERINE SULLIVAN, CSR 5812, CRR, RMR
                         Official Reporters, U.S. District
 Court
 (Appearances continued, next page)
```

**APPEARANCES, CONTINUED:**

**For Defendant Edmond Robles:**
> **LAW OFFICES OF TERESA CAFFESE**
> **1000 Brannan Street**
> **Suite 400**
> **San Francisco, California   94103**
> **BY:  TERESA CAFFESE, ESQ.**
> **HEATHER KELLY, ESQ.**


**Also Present:**
> **Defendant Ian Furminger**
> **Defendant Edmond Robles**
> **Special Agent Melissa Patrick**
> **Special Agent Sandra Flores**
> **Dalida Vartanian**
> **Stephen Janick**
> **Alycee Lane**
> **Jerry Chang, Esq.**

```
 1   MONDAY, NOVEMBER 24, 2014                          8:51 A.M.

 2                       P R O C E E D I N G S

 3        (The following proceedings were held in open court,

 4   outside the presence of the jury:)

 5        THE COURT:  Okay.  Let the record show --

 6   Mr. Furminger is not present.  Is he available, Mr. Getz?

 7        MR. GETZ:  I thought he would be here by now.  I

 8   don't know exactly why he is not.

 9        THE COURT:  Well, could we have a conversation?

10   We're not going to take any testimony right now, obviously.

11        MR. GETZ:  Yes.  Pursuant to Rule 483(C)(3), I'd ask

12   the Court can waive his appearance for this.  And I have

13   discussed it with him.

14        THE COURT:  So I just want to, sort of, get

15   scheduling.  I also want to address your motion that I got,

16   that I recently received.

17      So where are we on scheduling and so forth?

18        MR. HEMANN:  So, Your Honor, we have witnesses that I

19   would anticipate would take us to approximately 10:30.

20        THE COURT:  Okay.

21        MR. HEMANN:  Maybe 11:00, depending on the length of

22   cross.

23        THE COURT:  Okay.

24        MR. HEMANN:  Is that right?

25        MR. VILLAZOR:  Yes.
```

 1          THE COURT:  And by that you mean that at that point

 2  the government rests?

 3          MR. HEMANN:  Correct, Your Honor.  We want to read

 4  the stipulation and things like that.

 5          THE COURT:  Yeah.  Fine, fine, fine.

 6          MR. HEMANN:  But I'm thinking 10:30, 11:00'ish.

 7          THE COURT:  Okay.  That would then turn us to the

 8  defense.  And --

 9          MR. GETZ:  My witness, Stephanie Furminger, will be

10  here at 10:00.  And I'm prepared to put her on as soon as the

11  government rests.

12          THE COURT:  Okay.  And it'll be noted for the record

13  you'll make a Rule 29 motion, and I'll take it under

14  submission.

15          MR. GETZ:  That's fine.  I filed one --

16          THE COURT:  Sergeant Furminger is here now.  That's

17  fine.

18          MR. GETZ:  Thank you.

19          THE COURT:  And do you contemplate more than one

20  witness?

21          MR. GETZ:  The second witness would depend on whether

22  the Court allows the evidence that we moved to exclude last

23  night of a text message, which is the sole remaining text

24  message issue between the parties.  The government wants to

25  offer it.  I think it shouldn't be admitted.

1    If the Court permits the text message to be admitted, then

2    I'm going to call as a witness the recipient of the message to

3    explain its meaning.  And she told me she would be here at

4    12:30.  So I would be able to put her on at 1:00 o'clock.

5         **THE COURT:**  All right.  Okay.

6    You do not intend to call Sergeant Furminger?

7         **MR. GETZ:**  That is correct.

8         **THE COURT:**  Okay.  Ms. Caffese.

9         **MS. CAFFESE:**  Thank you, Your Honor.

10        **THE COURT:**  Good morning.

11        **MS. CAFFESE:**  Good morning, Your Honor.

12   Subject to the -- any stipulations that we may have, we do

13   not intend to call any witnesses.  We will make -- for the

14   record, we would be making a Rule 29 motion also.

15        **THE COURT:**  Okay.  So, in any event, we will conclude

16   today in terms of both sides' evidence preparation?

17        **MR. VILLAZOR:**  Yes, Your Honor.

18        **MR. HEMANN:**  Yes, Your Honor.

19        **MR. GETZ:**  Correct.

20        **THE COURT:**  So then what I intend to do is the

21   following, subject to your approval:  To adjourn the jury

22   until Monday of next week; to go over jury instructions

23   tomorrow or this afternoon, whenever you want to do it; to

24   have argument commence Monday of next week.

25   I will cancel my trip and be here for the duration of next

1  week in the event that the jury has any questions concerning

2  any matters, because I cannot in good conscience -- and

3  occasionally good conscience has a way of working its way in

4  here -- simply leave the jury and try to do it all by

5  telephone.

6      So I will -- we'll have argument then on Monday of next

7  week, and it will be sent to the jury at that time.  Because

8  of Thanksgiving, obviously, we can't do it this week.  And I

9  do not like the idea, but, again -- this is subject to your

10  discussions -- I mean, theoretically we could have argument

11  tomorrow and then a week's hiatus.

12      But we can't -- I can't bring them in the Wednesday before

13  Thanksgiving because I promised them they wouldn't come in

14  here.  And I can't bring them in on Thanksgiving.  And I

15  wouldn't bring them in on Black Friday, whatever that is,

16  cyber-cynetic something or another.

17      You know, they've done away with all of these -- I don't

18  even get these new holidays.  I think I'm just -- I'm just

19  getting more remote from contemporary culture and practices,

20  which you may have observed in some of my rulings.

21      But the fact of the matter is I don't like that big pause.

22      Now, I said I would listen to you, so do you have some

23  views on that?  Anybody?

24          **MR. HEMANN:**  We're comfortable with the Court's

25  initial inclination.  And I think that the idea of having the

 1   jury get instructed and have argument will cause the sort of

 2   internal deliberations over the long weekend that the Court

 3   has said -- correctly said is not --

 4          **THE COURT:**  You know, and there's a terrible

 5   tendency, even though they promise not to do it, if you give

 6   them five days to start to analyze the arguments themselves --

 7   which is what the government is saying -- and also perhaps

 8   even further making up their mind before they hear the views

 9   of their fellow jurors and, God forbid, talking to other

10   members of the family around the Thanksgiving table, I think

11   it's just not a great idea.  So I'm going to exercise --

12   absent a strong objection, that's what I'm going to do.

13          **MS. CAFFESE:**  No objection.

14          **MR. GETZ:**  And that's fine for Mr. Furminger.

15          **THE COURT:**  All right.  So now let's turn to the

16   subject at hand, which is the -- the motion to exclude the

17   text.  And will you give me a moment to read it.

18      So I understand, is this a text that went to some person

19   other than one of the witnesses?

20          **MR. VILLAZOR:**  Your Honor, it's a text exchange

21   between Mr. Furminger -- and at the time we didn't know who it

22   was.  Mr. Getz, had indicated it was another officer, Gillory.

23   So it's a text message between --

24          **THE COURT:**  Okay.  Fine.  I'm excluding it.  I mean,

25   it has nothing to do with this case other than, arguably, it

1    says that the sergeant got away with -- you know, when they

2    were in the academy, or post academy they got away with

3    things.  And I don't even know what.

4        I think it meant something in the context of this case, if

5    it involved these witnesses or these incidences, you know.

6    If, in fact, there's a reference to look what we did in

7    incident number one, two, three, and four, then, of course,

8    it's an admission.

9        But it's not any of that, is it?

10           **MR. VILLAZOR:**  Well, Your Honor --

11           **THE COURT:**  It's just sort of a generalized, you

12   know, guys will be guys, boys will be boys, cops will be cops

13   sort of thing, you know.  Isn't it?

14           **MR. VILLAZOR:**  Your Honor, I would say -- so

15   Mr. Furminger first notes that he's at golf with Ed Robles.

16           **THE COURT:**  Uhm?

17           **MR. VILLAZOR:**  He's at golf -- he's at golf with Ed

18   Robles, felt the urge to text for some reason.  So he's with a

19   codefendant on a golf course, presumably, and --

20           **THE COURT:**  He's not talking to the codefendant, is

21   he?

22           **MR. VILLAZOR:**  No, but he's with the codefendant.  At

23   least that's the inference.  And then he says, "When the

24   Mission was cool and the people we like there."

25       And then she -- the other person replies, "You sure miss

1   those days?"

2       And that's when Mr. Furminger says, "I miss what we used

3   to get away with.  Holy shit."

4               **THE COURT:**  It's not coming in.  Thank you very much.

5               **MR. VILLAZOR:**  Thank you, Your Honor.

6               **THE COURT:**  Are they all here?

7               **MS. CAFFESE:**  Your Honor, we -- if I may, Your Honor.

8               **THE COURT:**  Yes, of course.

9               **MS. CAFFESE:**  One of the matters may be moot, as I

10  understand from the government this morning.

11              **THE COURT:**  Well, why don't you talk to the

12  government and ask them right now whether that's moot.

13              **MR. VILLAZOR:**  As to Mr. Santos, Officer Santos, it's

14  moot.  We won't be calling him.

15              **THE COURT:**  Okay.

16              **MS. CAFFESE:**  The other issue in my motion, Judge, is

17  to exclude any testimony concerning the LinkedIn endorsement

18  by Officer Robles to Mr. Hoang, who is the individual who's

19  going to be testifying about the sale of the bicycle.

20      My point is the fact that Mr. Robles -- Officer Robles

21  endorsed Mr. Hoang sometime later is irrelevant to any issue

22  in this case.  So --

23              **THE COURT:**  I better hear what the evidence -- what's

24  the proposed evidence?

25              **MR. HEMANN:**  So Mr. -- I think it's Hoang is going to

1    testify that in 2009, shortly after the -- he won't testify to

2    this part, but the relevance is that shortly after the Newark

3    $30,000 was taken, according to Mr. Vargas, within a couple of

4    days after that Mr. Robles purchased a bicycle for him -- from

5    him for $3,700 in cash.  That will be his testimony.

6         Five years elapse after that, and there is no contact

7    between the two of them.  Mr. Robles got indicted in February

8    of 2014, and shortly thereafter, Mr. Hoang received a LinkedIn

9    endorsement.  And I'm not sure I know what that is, but

10   Mr. Hoang certainly knows what that is.  This falls in the

11   category of me being remote as well.

12        **THE COURT:**  Well, that's the difference between us.

13   You're the proponent of the testimony.  I just have to sit

14   here and say -- I can tell you I don't understand it.  But I

15   don't want the prosecutor to get up and say, "I don't

16   understand it."

17        **MR. HEMANN:**  Well, I don't know what the actual

18   mechanism of an actual endorsement is, but he reaches out

19   through LinkedIn to vouch for Mr. Hoang some five years later,

20   in the immediate aftermath of his indictments, having had no

21   contact between the two of them for five years.  We believe

22   that that's consciousness of guilt.

23        **MS. CAFFESE:**  Well, that makes an assumption, Judge.

24   What happens is, if anyone is familiar with LinkedIn, I'm

25   constantly getting emails to endorse.  I could either press

1   delete, accept, a lot of other functions that could have been

2   utilized at the time that this request to be joined or

3   occurred.

4       So it assumes that somehow facts, quite frankly --

5           **THE COURT:**  Well, what facts does it assume?

6           **MS. CAFFESE:**  Well, it assumes that it was

7   intentional.  It assumes that Mr. --

8           **THE COURT:**  Well, are you saying that -- no, no, no,

9   no.  I have to understand this.

10      Okay.  Let's just take a scenario where five years ago he

11  has a contact with the witness, purchases something from the

12  witness, which I don't know is particularly in dispute, though

13  it's a fact.

14          **MS. CAFFESE:**  It is not.  It's not in dispute.

15          **THE COURT:**  Okay.  Then he gets -- and no contact

16  over five years.  And then he gets an endorsement from the

17  defendant.

18          **MR. HEMANN:**  He -- Mr. Hoang believes that Mr. Robles

19  invited him to be a LinkedIn friend just -- in January of

20  2014.  And then several months later, in April of 2014,

21  Mr. Robles endorsed, without being solicited by Mr. Hoang,

22  this -- this endorsement.

23      And, again, it's -- it is --

24          **THE COURT:**  It's out.  Next.

25          **MR. HEMANN:**  Okay.

```
 1            MS. CAFFESE:  Thank you.

 2            THE COURT:  Okay.  Oh, they're all here.  Bring them

 3    all in.

 4       (Jury enters at 9:04 a.m.)

 5            THE COURT:  Please be seated.

 6       Okay.  Let the record reflect that all jurors are present.

 7    The parties are present.

 8       You may call your next witness.

 9            MR. HEMANN:  Thank you, Your Honor.

10       The United States calls Tuan Hoang.

11            THE CLERK:  Will the witness please come forward.

12       Good morning.  Please remain standing.  Raise your right

13    hand.

14            TUAN HOANG, PLAINTIFF WITNESS, SWORN

15            THE WITNESS:  I do.

16            THE CLERK:  Please be seated.  Please state your full

17    name.  Spell your last name for the record.

18            THE WITNESS:  My full name is Tuan Trong Hoang.  My

19    last name is spelled H-o-a-n-g.  My first name is spelled

20    T-u-a-n.  My middle name is T-r-o-n-g.

21                     DIRECT EXAMINATION

22    BY MR. HEMANN:

23    Q.  Good morning, Mr. Hoang.  Thanks for coming in this

24    morning.

25       Was there a point in time that you owned a Dogma Pinerallo
```

1  bicycle?

2  **A.**  Yes, I did.

3  **Q.**  A red one?

4  **A.**  Yes.

5  **Q.**  I'm showing you what's been previously admitted in

6  evidence as Exhibit 298.  Does this appear to be the frame of

7  the bicycle that you once owned?

8  **A.**  Yes, it does.

9  **Q.**  Did there come a time, Mr. Hoang, that you decided to sell

10 this bicycle?

11 **A.**  Yes, I did.

12 **Q.**  When was that?

13 **A.**  In the year of 2009.

14 **Q.**  How did you go about making an effort to sell it?

15 **A.**  I listed it on Craigslist.

16 **Q.**  And why did you choose Craigslist?

17 **A.**  Craigslist is an easy way to sell items to the public.

18 **Q.**  Did you -- and how mechanically do you go about selling

19 something on Craigslist?

20 **A.**  Well, you -- I believe I created an account on Craigslist.

21 And then I took pictures of the bicycle.  I wrote a

22 description of the bicycle.  And I logged into Craigslist and

23 listed the item for sale.

24 **Q.**  Could you please -- there are a number of folders in front

25 of you on the witness stand there and they all have little

 1   numbers on them.  And if you can, first, look at Exhibit 303.

 2       Do you recognize that document, Mr. Hoang?

 3   **A.**  Yes, I do.

 4   **Q.**  Is that the -- your first Craigslist posting with regard

 5   to this bicycle?

 6   **A.**  It does appear to be, yes.

 7   **Q.**  There is a date up at the --

 8           **MR. HEMANN:**  Your Honor, the United States moves

 9   Exhibit 303 into evidence.

10           **THE COURT:**  303 admitted.

11       (Trial Exhibit 303 received in evidence.)

12   **BY MR. HEMANN:**

13   **Q.**  There's a date --

14           **MR. HEMANN:**  And if you could just blow up the top

15   section, Ms. Lane.

16       (Document displayed.)

17   **BY MR. HEMANN:**

18   **Q.**  There's a date up there at the top that says, "Record

19   Created" and "Posted."  What's the date for those two items?

20   **A.**  Oh, May 3rd.

21   **Q.**  There's a lengthy description of the bicycle down below

22   that.  There's, sort of, a long paragraph under the words "For

23   Sale."  Do you see that?

24   **A.**  Yes, that's correct.

25   **Q.**  And is that the text that you drafted to describe this

1    bike?

2    **A.**   Yes.

3    **Q.**   After you posted this entry on the 3rd of May, did you

4    receive an inquiry from a person by the name of Ed Robles?

5    **A.**   Yes, I did.

6    **Q.**   Okay.  Logistically, if you could take that, shut it, and

7    move it to the side, we'll collect them later on.

8        And turn to Exhibit 310.  And the way these printed out,

9    Mr. Hoang, they are not necessarily in chronological order.

10       But my question for you is whether this document contains

11   a series of emails between you and Mr. Robles regarding the

12   bike?

13   **A.**   It does.

14          **MR. HEMANN:**  Your Honor, the United States moves

15   Exhibit 310 into evidence.

16          **THE COURT:**  Admitted.

17       (Trial Exhibit 310 received in evidence.)

18       (Document displayed.)

19   **BY MR. HEMANN:**

20   **Q.**   If you could look, Mr. Hoang, at the top -- the email on

21   the first page at the top.

22          **MR. HEMANN:**  If you could blow that up, Ms. Lane,

23   please.

24   **BY MR. HEMANN:**

25   **Q.**   There's an email here from E. Robles, dated Thursday,

 1   May 7, 2009.  Do you see that?

 2   **A.**  Yes, I do.

 3   **Q.**  And the email -- and this isn't in your words.  I'll go

 4   ahead and read it.

 5          "Hello, I have a Macintosh MC300 in showroom

 6          condition if you were up for a trade.  I bought it

 7          new from the House of Music in San Francisco.  I

 8          could email you pics if you're interested.  I also

 9          have a McIntosh 7008 and a C712 and a pair of Tannoy

10          Saturn S10s.  The system sounds incredible.  Regards,

11          Ed Robles."

12          Do you see that?

13   **A.**  Yes, I do.

14   **Q.**  And is that the first inquiry that you received from

15   Mr. Robles regarding the bicycle?

16   **A.**  I believe it is.

17   **Q.**  Mr. Hoang, this proposes some -- looks like stereo

18   equipment rather than cash.  Is that something that you had

19   invited when you first posted the initial listing for this

20   bicycle?

21   **A.**  Yes, I did.  I considered a trade as well as a sale.

22          **MR. HEMANN:**  Ms. Lane, if you could go back to the

23   previous exhibit, Exhibit 303.

24      (Document displayed.)

25

 1   **BY MR. HEMANN:**

 2   **Q.**  If you could look up on the screen right there to your

 3   right, there's some text blown up.

 4       Is there a suggestion in here in the text that you

 5   drafted --

 6   **A.**  I hate to interrupt, but I have nothing on my screen.

 7   **Q.**  Oh, that's no good.  Go back to the document then, the

 8   hard copy document just to your right, Exhibit 303.

 9       And in that text there, do you propose a trade rather

10   than --

11              **THE COURT:**  Well, wait, wait, wait.

12              **MR. HEMANN:**  Oh, sorry.

13              **THE COURT:**  Time out for technological adjustments.

14       (Pause)

15              **THE COURT:**  Thank you.  Would you start your question

16   again, please.

17              **MR. HEMANN:**  Thank you, Your Honor.

18   **BY MR. HEMANN:**

19   **Q.**  Do you see the text up on the screen there now?

20   **A.**  I do.

21   **Q.**  Starting "For Sale"?

22   **A.**  Yes.

23   **Q.**  Do you see there your suggestion of what the terms of the

24   exchange might be?

25   **A.**  Yes, I do.

1   Q.   Could you read, Mr. Hoang, the two sentences starting with

2   the words "I am asking."

3        Do you see it on the -- starts --

4   A.   Oh, yes, I'm sorry.

5   Q.   Right there.  Thank you.

6   A.   (As read:)

7            "I'm asking $4,500 or best offer.  I would also be

8            open to trades for newer McIntosh audio equipment.

9            If you've got a Rolex Deep Sea, I will give you bike

10           plus 3,000 cash for your watch."

11  Q.   Great.  Thank you.

12       MR. HEMANN:  So if you can take this down and put up

13  310 again, Ms. Lane.

14       (Document displayed.)

15  BY MR. HEMANN:

16  Q.   So in 310, is Mr. Robles offering you, this email, some

17  McIntosh stereo equipment that you had suggested might be

18  acceptable?

19  A.   Yes.

20  Q.   Now, did you initially accept this offer as -- as proposed

21  by Mr. Robles?

22  A.   Uhm, I had considered it.  I had not formally accepted it.

23  Q.   After the initial Craigslist posting on May the 3rd, 2009,

24  did you post the bicycle on subsequent occasions?

25  A.   I believe I did.

1   **Q.**   Could you please look at Exhibit 304 in front of you in

2   one of the -- 304 and 305 in the envelopes or in the folders

3   in front of you.

4        And first 304, is this a subsequent posting on Craigslist

5   for the same bicycle?

6   **A.**   It looks like it, because it's dated a little bit later.

7             **THE COURT:**   304 admitted.

8        (Trial Exhibit 304 received in evidence.)

9        (Document displayed.)

10  **BY MR. HEMANN:**

11  **Q.**   What's the date on this, please?

12  **A.**   May 11, 2009.

13  **Q.**   And on May 11, 2009, what were you asking for the bike?

14  **A.**   I believe it's the same price.

15  **Q.**   4500?

16  **A.**   4500, yes.

17  **Q.**   If you could look at 305.

18  **A.**   Yes, I see it.

19  **Q.**   Is this a third posting for the same bike?

20  **A.**   Yes, dated May 20th.

21            **MR. HEMANN:**   Your Honor, the United States moves 305

22  into evidence.

23            **THE COURT:**   Admitted.

24       (Trial Exhibit 305 received in evidence.)

25       (Document displayed.)

1    **BY MR. HEMANN:**

2    **Q.**   Was the price that you were asking for the bike on May 20,

3    2009, different?

4    **A.**   Yes.   Looks like I had dropped the price on the bike.

5    **Q.**   From what to what?

6    **A.**   From $4,500 to $4,300.

7    **Q.**   And were you still at this point open to the McIntosh

8    stereo equipment?

9    **A.**   Yes, I am.

10   **Q.**   Okay.

11   **A.**   I was.

12   **Q.**   If you could put 304 and 305 aside, please, on your

13   folders there, Mr. Hoang.   Put them aside there.

14        And if you could look at Exhibit 301.

15   **A.**   Okay.

16   **Q.**   Do you recognize this as an email exchange between you and

17   Mr. Robles regarding the bike?

18   **A.**   Yes.

19           **MR. HEMANN:**   Your Honor, the United States moves

20   Exhibit 301 into evidence.

21           **THE COURT:**   Admitted.

22        (Trial Exhibit 301 received in evidence.)

23        (Document displayed.)

24   **BY MR. HEMANN:**

25   **Q.**   As these typically do, Mr. Hoang, the earliest one is at

 1  the end of the emails, the pages there.  And if you could look

 2  at the email dated May the 21st, 2009, at 6:01 p.m.

 3  A.  Okay.

 4  Q.  See at the very bottom.

 5        MR. HEMANN:  If you can expand that text at the

 6  bottom, starting with on "May" -- next page, please.  Starting

 7  with on "May 21st, 2009."

 8        THE WITNESS:  Would you like me to read that?

 9        MR. HEMANN:  I'm sorry, Ms. Lane, lower down.  The

10  first one.

11    (Document displayed.)

12  BY MR. HEMANN:

13  Q.  Yes, if you could read the text from the email from

14  Mr. Robles on May 21st, 2009, not the Craigslist advisory.

15  A.  Okay.  "Ed, what are you thinking" --

16  Q.  I'm sorry, the one below that, at 6:01 p.m.

17  A.  Oh.

18        "Come on, bro, let's do a trade for some Mac stuff.

19        Ed Robles."

20  Q.  Did you respond to this email at 6:01 p.m. -- or the

21  6:01 p.m. email?

22  A.  It appears I did.

23  Q.  And what was your response to Mr. Robles?

24  A.  (As read:)

25        "Ed, what are you thinking in terms of trade-in value

1            for your gear?  Thanks again for your persistence.

2            If it's persuasive, I may consider it."

3  **Q.**  Mr. Robles responded to you at 6:30 p.m. the same day, and

4  you have to, kind of, page back and forth in the emails here.

5  **A.**  Okay.

6  **Q.**  Do you see at the very bottom of the first page an email

7  from Mr. Robles to you the same day at 6:30 p.m.?

8  **A.**  Yes, I do.

9  **Q.**  And the text for that is on the top of the next page.

10           **MR. HEMANN:**  And, Ms. Lane, if you could blow that

11  up, and I could read that.

12  **BY MR. HEMANN:**

13  **Q.**  (As read:)

14            "Okay, how about the entire Mac system.  The MC300,

15            C712, and the MCD-7008 with the cables.  Good stuff,

16            straight across."

17      Then he goes on to describe the details regarding these

18  items; is that correct?

19  **A.**  Yes.

20  **Q.**  And then at the end -- close to the end he says:

21            "That's a great deal.  I'll probably ride that bike

22            for a week and give it up.  You'll be enjoying this

23            system for life.  There, it's on the table.  Let's do

24            it.  Ed."

25      Did I read that correctly, Mr. Hoang?

1    A.   Yes, you did.

2    Q.   And how did you respond to that offer for stereo equipment

3    from Mr. Robles?

4    A.   Would you like me to read that?

5    Q.   Just -- why don't you describe what your response is

6    rather than reading the whole thing.

7    A.   I considered every component listed in his offer for

8    trade.  And I looked at a website that has for sale/trade

9    high-end audio equipment, Audio Guide.  And I looked at recent

10   sales or recent listings to get a feel for the market value

11   for the items offered for trade.  And I responded to

12   Mr. Robles in that email.

13   Q.   And what was the substance of your response?

14   A.   It looked like, by adding the current market price at that

15   time for the equipment, it totaled less than what I was asking

16   for the bike.

17   Q.   And so did you accept or reject Mr. Robles' offer?

18   A.   It looks like I declined that offer.

19   Q.   And up until that point in time, had Mr. Robles offered

20   you any cash for the bicycle?

21   A.   It doesn't appear so.

22   Q.   After this email exchange with Mr. Robles on the 21st of

23   May, 2009, did you post another listing for the bicycle?

24   A.   Uhm, if I haven't sold it, then I probably did.

25   Q.   If you could please look at Exhibit 306, in front of you.

1    **A.**   Pardon me.

2    **Q.**   Sorry.

3    **A.**   306.

4    **Q.**   Is that, Mr. Hoang, a final posting or another posting for

5    the bike dated May the 31st, 2009?

6    **A.**   If this is my last posting --

7    **Q.**   Well, is it another posting that you did --

8    **A.**   Yes.

9    **Q.**   -- for the bike?

10   **A.**   Yes.

11          **THE COURT:**   Admitted.

12          (Trial Exhibit 306 received in evidence.)

13          (Document displayed.)

14   **BY MR. HEMANN:**

15   **Q.**   And what was the date and time of that posting?

16   **A.**   May 31st, 2009.  9:57 Pacific Central -- or Pacific

17   Daylight.

18   **Q.**   And had you dropped the price of the bike again?

19   **A.**   Yes, I did.

20   **Q.**   What did you drop it to?

21   **A.**   I dropped it from 4300 to $4,200.

22   **Q.**   Did Mr. Robles respond to this posting?

23   **A.**   I believe he did.

24   **Q.**   Could you please look at -- 310 is in evidence.

25          **MR. HEMANN:**   And, Ms. Lane, if you could put up -- go

1   to the second page of 310, and blow up the email at the

2   bottom.

3        (Document displayed.)

4   **BY MR. HEMANN:**

5   **Q.**  Do you see an e-mail there from Mr. Robles at 4:53 p.m. on

6   Sunday, May 31st, 2009?

7   **A.**  I don't have a date of -- 4:53?  I have 4:43.

8   **Q.**  Sorry, 4:43.  Thank you.  May 31st at 4:43 p.m.?

9   **A.**  Yes.

10  **Q.**  And Mr. Robles says:

11           "Will 3,000 cash do it?  Ed."

12       Did I read that correctly?

13  **A.**  That's correct.

14  **Q.**  Did you respond to Mr. Robles?

15  **A.**  Yes, I did.

16  **Q.**  And if you could look up at the top, there's an email

17  dated May 31st, 2009, at 6:36 p.m.  Do you see that?

18  **A.**  Yes, I do.

19  **Q.**  Can you please read the text of that email for the jury.

20  **A.**  (As read:)

21           "Hi, Ed.  I want to thank you for your cash offer and

22           persistence, but at this time I must decline.  The

23           lowest I can go is 4,000 cash as I have over $7,000

24           into this bike.  It's obvious you have excellent

25           taste in audio gear and bicycles.  Tuan Hoang."

1   Q.  There's an email response from Mr. Robles Monday,

2   June 1st, at 9:51 p.m.  And I'll read it.

3           "Hi Tuan.  Thought I'd give it one last shot.  I can

4           offer 3500 cash for the Dogma.  If you agree, I could

5           pick up tomorrow.  Thanks, Ed."

6       Did I read that correctly?

7   A.  Yes, you did.

8   Q.  So after you received that email from Mr. Robles, are you

9   now negotiating with him in cash rather than in stereo

10  equipment?

11  A.  That's correct.

12  Q.  And did you at some point in time speak with Mr. Robles by

13  telephone?

14  A.  I'm sure I did.

15  Q.  Could you please look at Exhibit 311.

16          MR. HEMANN:  And, Your Honor, we'll be putting this

17  in through the FBI agent, but we can have him -- it's a phone

18  record.

19          THE COURT:  Well, it can come in subject to a motion

20  to strike.

21      (Trial Exhibit 311 received in evidence.)

22  BY MR. HEMANN:

23  Q.  Before you is a series of telephone records, Exhibit 311.

24  Do you see that?

25  A.  Yes, I do.

1    **Q.**  Do you recognize one of the phone numbers on that list?

2    **A.**  Yes.

3    **Q.**  And what phone number do you recognize?

4    **A.**  Area code (925)336-6709.

5    **Q.**  And what phone number is that?

6    **A.**  I believe that is Mr. Robles.

7    **Q.**  And do you recognize another telephone number on that

8    list?

9    **A.**  Yes.  I believe that the other phone number is my cell

10   phone number.

11   **Q.**  And that's the 786-4191 number?

12   **A.**  That's correct.

13           **MR. HEMANN:**  Your Honor, subject to -- I think it's a

14   stipulation, Exhibit 311 is offered.

15           **THE COURT:**  Admitted.

16       (Trial Exhibit 311 received in evidence.)

17           **MR. HEMANN:**  If you could just put that up, Ms. Lane,

18   and blow up the times just -- the dates and times just to the

19   left, and duration.

20       (Document displayed.)

21   **BY MR. HEMANN:**

22   **Q.**  Did you, Mr. Hoang, have a series of telephone

23   conversations with Mr. Robles on June the 2nd, 2009, regarding

24   the bike?

25   **A.**  Yes, I did.

1   **Q.**  At some point in time did you -- did Mr. Robles make an

2   offer for the bike that you accepted?

3   **A.**  It very likely could have happened, yes.

4   **Q.**  Well, do you remember you and Mr. Robles coming to an

5   agreement on the price of a bike?

6   **A.**  Yes.

7   **Q.**  And how much was that agreement for?

8   **A.**  I believe it was for $3,700.

9   **Q.**  And how was that to be paid?

10   **A.**  In cash.

11   **Q.**  Going back to Exhibit 310 --

12          (Document displayed.)

13              **MR. HEMANN:**  If you could blow up that email in

14   the -- sort of in the center, dated June 2nd, 2009.

15   **BY MR. HEMANN:**

16   **Q.**  By this email, Mr. Hoang, did you send Mr. Robles details

17   as to how to get to your house to effect the transaction?

18   **A.**  Yes.

19   **Q.**  And there's some redacted material there.  Does the

20   redacted material have to do with the address and directions

21   to your house?

22   **A.**  Okay.  Yes.

23   **Q.**  Did you meet with Mr. Robles around June the 2nd, 2009, in

24   person?

25   **A.**  Yes.

 1   **Q.**   Where did you meet?

 2   **A.**   I met at my house.

 3   **Q.**   And what was -- where'd you meet at your house?

 4   **A.**   In front of my house, in the driveway.

 5   **Q.**   And did you exchange the bike for money?

 6   **A.**   Yes.

 7   **Q.**   And did Mr. Robles give you cash?

 8   **A.**   Yes.

 9   **Q.**   How much did he give you?

10   **A.**   $3,700.

11   **Q.**   Did you prepare any document to give to Mr. Robles along

12   with the bicycle?

13   **A.**   Yes, I did.

14   **Q.**   If you look at Exhibit 307, which is in front of you.

15   **A.**   Okay.

16   **Q.**   What is that document?

17   **A.**   It is a bill of sale.

18   **Q.**   Did you prepare that?

19   **A.**   Yes, I did.

20         **THE COURT:**   Admitted.

21      (Trial Exhibit 307 received in evidence.)

22         **MR. HEMANN:**   Thank you, Your Honor.

23      (Document displayed.)

24   **BY MR. HEMANN:**

25   **Q.**   Did you sign it?

1   **A.**  Yes, I did.

2   **Q.**  Did you give it to Mr. Robles to sign?

3   **A.**  Yes, I did.

4   **Q.**  Did he sign it?

5   **A.**  Yes, he did.

6   **Q.**  And did you provide a copy of this document to Mr. Robles?

7   **A.**  Yes, I did.

8   **Q.**  Did you save a copy for yourself?

9   **A.**  Yes, I did.

10  **Q.**  And did you give a copy of that document to the FBI?

11  **A.**  Yes, I did.

12  **Q.**  And is that the document that you're looking at right now?

13  **A.**  Yes, I did -- or yes, it is.

14       **MR. HEMANN:**  I thought the original was in the folder

15  there.  Let me just --

16  **BY MR. HEMANN:**

17  **Q.**  Is this the original of Exhibit 307, Mr. Hoang?

18  **A.**  Yes, it is.

19       **MR. HEMANN:**  Thank you, Your Honor.

20       **THE COURT:**  Cross?

21       **MR. PASSAGLIA:**  Nothing on behalf of Mr. Furminger.

22       **THE COURT:**  Ms. Caffese.

23       **MS. CAFFESE:**  Yes.  Thank you, Your Honor.

24

25

**CROSS EXAMINATION**

**BY MS. CAFFESE:**

**Q.**  Good morning, sir.  My name is Teresa Caffese.  And I have
some questions for you, if I may.

**A.**  Yes.

       **MS. CAFFESE:**  I have -- and I've marked this as
Exhibit 364.

    (Trial Exhibit 364 marked for identification.)

       **MS. CAFFESE:**  It's a series of email exchanges
between the parties.

       **MR. HEMANN:**  No objection to these, Your Honor.

       **MS. CAFFESE:**  Thank you.

       **THE COURT:**  364 admitted.

    (Trial Exhibit 364 received in evidence.)

**BY MS. CAFFESE:**

**Q.**  Sir, I would like to just ask you some questions
concerning the chronology of the emails, if I may.

       Now, my understanding is that you initially posted a
Craigs- -- posted the bicycle on Craigslist on May 1st, I
believe?

**A.**  Okay.

**Q.**  Beginning of May; is that right?

**A.**  I believe so.

**Q.**  All right.  And Officer Robles sent you an email on
May 7th of 2009; is that right?

1   **A.**   Should I look at the evidence?

2   **Q.**   Yeah.  Let me give you, if I may, what I'm referring to.

3   This is Exhibit 364.

4        And I'm going to be referring to the email exchanges

5   between you and Officer Robles, okay?

6   **A.**   Okay.

7   **Q.**   You've testified to these.  I'm just going to take it in a

8   chronological fashion that might make, hopefully, some sense.

9        So on May 7th, Officer Robles -- and that should be on

10   page 3 of your exhibit there?

11   **A.**   Okay.

12   **Q.**   He sends you an email to your ad saying that he has some

13   stereo equipment; is that right?

14   **A.**   Yes.

15   **Q.**   And he describes it in showroom condition; is that right?

16   **A.**   Yes.

17   **Q.**   And he says it's new.  And he describes it from the House

18   of Music in San Francisco; right?

19   **A.**   Yes.

20   **Q.**   He says, quote, "The system sounds incredible!  Regards,

21   Ed Robles."  Is that right?

22   **A.**   Yes.

23   **Q.**   All right.  Now, some time goes by and then you respond to

24   him on May 21st of 2009; is that right?

25   **A.**   Yes.

1    **Q.**  And you're asking him what he's thinking in terms of the

2    trade?

3    **A.**  Yes.

4    **Q.**  Is that right?

5        And you're thanking him for his persistence because,

6    clearly, the two of you are -- or he is trying to barter,

7    trade what he believes to be very expensive high-end stereo

8    equipment for your bicycle; is that right?

9    **A.**  That is correct, yes.

10   **Q.**  Now, you basically at that time don't respond; is that

11   right?

12       You don't immediately respond -- you don't immediately

13   accept his offer to exchange his stereo equipment --

14   **A.**  That's right --

15   **Q.**  -- for a bicycle?

16   **A.**  -- I do not immediately accept his offer.

17   **Q.**  Now, you ask him on the 21st what he's thinking of in

18   terms of a trade; is that right?

19   **A.**  Yes, that's correct.

20   **Q.**  And you're saying, "If it's persuasive, I may consider

21   it"?

22   **A.**  Yes.

23   **Q.**  And, actually, before this you're even thinking about --

24   or you reach out and ask whether or not somebody has a Rolex

25   watch to trade with?

1    **A.**  Yes.

2    **Q.**  Is that right?

3    **A.**  Yes.

4    **Q.**  So you're kind of interested in bartering, potentially,

5    some items for your bicycle; is that right?

6    **A.**  That is correct, yes.

7    **Q.**  Cash is not the only thing that you would necessarily have

8    been interested in if the price were right; is that right?

9    **A.**  That is correct.

10   **Q.**  Or if it were an item that you thought was the equivalent,

11   perhaps, of your bicycle?

12   **A.**  Yes.  If it's more, such as the watch, I would add cash to

13   the trade on my end.

14   **Q.**  Now, on May 21st, Officer Robles asked you, "Come on, bro,

15   let's do a trade for some Mac stuff, Ed Robles"; is that

16   right?

17       Do you see, that's page 2?

18   **A.**  Yes, I do, yes, at the bottom.

19   **Q.**  And on May 21st, again, he -- he describes how you're

20   going to be -- my next question, same page, on page 2 --

21   **A.**  Okay.

22   **Q.**  Okay.  And, actually, on page 1 is where the email to you

23   begins May -- on page 1, you see?

24   **A.**  Yes, I see that.  Thank you.

25   **Q.**  May 21st, 6:30 p.m.?

1    **A.**   Yes.

2    **Q.**   He describes to you how you're going to have this for

3    life, the stereo.  And you're going to be able to -- to enjoy

4    this incredible stereo equipment for life.  And he says he's

5    even going to throw in some additional components with the

6    deal.  Is that right?

7    **A.**   Yes, that's correct.

8    **Q.**   And he says, quote, "I'll probably ride that bike for a

9    week and give it up."  Is that right?

10   **A.**   Yes.

11   **Q.**   So there he's essentially telling you, hey, you're going

12   to have this great expensive stereo equipment for life and I'm

13   going to get the bike and I'm going to get rid of it,

14   essentially.

15       Is that what your interpretation of this exchange was,

16   sir?

17           **MR. HEMANN:**  Objection, Your Honor.  Calls for

18   speculation.

19           **THE COURT:**  Well, I think Counsel is asking was that

20   what his understanding was.  I mean, it is speculative, but

21   maybe he said something.  You have to lay a foundation for it,

22   but I'll allow the question.

23       Do you know what -- is that your understanding of what the

24   defendant was going to do?

25           **THE WITNESS:**  I --

**BY MS. CAFFESE:**

**Q.**  If you -- when I read you that and when you read that
email from Ed Robles, was --

**A.**  What I read, "and give up," I mean, it sounds like and
give up riding a bike, not necessarily giving up the bicycle.

**Q.**  Right.

**A.**  Yeah.

**Q.**  But, essentially, he's trying to persuade you to exchange
this bike.  He's saying, I'm not going to keep this bike for
very long and you're going to have this great stereo equipment
for life.  True enough?

**A.**  Yes, yeah.

**Q.**  All right.  Now, time goes by, obviously, is that right?
And at some point you agree -- did you want to look at
that some more, sir?

**A.**  Yes.

**Q.**  So, essentially, you're communicating with Officer Robles
long before you actually sell him the bike on June 2nd; is
that right?

**A.**  That's correct.

**Q.**  Okay.  And you thought, actually, the bike was worth much
more than you had paid for it; is that right?

**A.**  Not much more.

**Q.**  Excuse me.  Let me rephrase it.
You believed that the bicycle was worth much more than you

1    eventually sold it for; is that right?

2    **A.**   Uhm, I'm not following.

3    **Q.**   You reduced the price?

4    **A.**   Yes.  I had to.  It didn't sell.

5    **Q.**   And you reduced it to $3,700; is that right?

6    **A.**   That's right.

7    **Q.**   And, initially, how much were you asking for it?

8    **A.**   4500.

9            **MS. CAFFESE:**  Okay.  I don't have any further

10   questions.  Thank you, sir.

11           **THE COURT:**  Thank you.

12           **MR. HEMANN:**  Very briefly, Your Honor.

13       Put up Exhibit 310.  Blow up the very, very first email.

14       (Document displayed.)

15           **MR. HEMANN:**  I'm sorry, actual first, not first

16   first.  There we go.

17       (Document displayed.)

18                   **REDIRECT EXAMINATION**

19   BY MR. HEMANN:

20   **Q.**   The first email that Ms. Caffese asked you about was this,

21   and it refers to the McIntosh being in showroom condition and

22   says, "I bought it new from the House of Music in

23   San Francisco."

24       Do you see that?

25   **A.**   Yes, I do.

1   **Q.**  Do you know when Mr. Robles bought this new from the House

2   of Music in San Francisco?

3   **A.**  No, I don't.  Not exactly.

4   **Q.**  Do you know generally?

5           **MS. CAFFESE:**  Well, objection.  That calls for

6   speculation.

7           **THE WITNESS:**  I don't know.

8           **MR. HEMANN:**  Withdrawn.

9       No further questions, Your Honor.

10          **MS. CAFFESE:**  No further questions.

11          **THE COURT:**  Okay.  Thank you very much.  You're

12  excused.

13      (Witness excused.)

14          **THE COURT:**  Call your next witness.

15          **MR. VILLAZOR:**  The government calls Crystal Ponzer.

16          **THE CLERK:**  Will the witness please come forward.

17  Take the witness stand.  Please remain standing.  Raise your

18  right hand.

19              **CHRYSTAL PONZER, PLAINTIFF WITNESS, SWORN**

20          **THE WITNESS:**  Yes.

21          **THE CLERK:**  Please be seated.

22      Please state your full name.  Spell your last name for the

23  record.

24          **THE WITNESS:**  Crystal Ponzer, P-o-n-z-e-r.

25

1                          **DIRECT EXAMINATION**

2   **BY MR. VILLAZOR:**

3   **Q.**  Good morning, Ms. Ponzer.

4   **A.**  Good morning.

5   **Q.**  I'm going to hand you an incident report binder.  It's

6   already been admitted in evidence.  If you could turn to tab

7   10.

8               **MR. VILLAZOR:**  Ms. Lane, if you could put on Exhibit

9   274, which has already been admitted into evidence.

10      (Photograph displayed.)

11  **BY MR. VILLAZOR:**

12  **Q.**  Are you with me, Ms. Ponzer?

13  **A.**  Yes.

14  **Q.**  Do you recognize that place?

15  **A.**  Yes.  That's the storage locker that me and my ex were

16  residing in.

17  **Q.**  I'm sorry, could you -- do you want a glass of water?

18  **A.**  No, I'm okay.

19  **Q.**  Okay.  I'll ask it again.  If you would speak slowly into

20  the microphone.

21      Do you recognize this picture, Government Exhibit 274?

22  **A.**  Yes, I do.

23  **Q.**  What is it?

24  **A.**  It's a storage locker where me and my ex were residing in.

25  And also where I was arrested.

1    **Q.**   Okay.  Let me take that slowly.

2          Who is your ex?

3    **A.**   Burgess Crosby.

4    **Q.**   Burgess Crosby?

5    **A.**   Crosby, yes.

6    **Q.**   You said you were arrested?

7    **A.**   Yes.

8    **Q.**   Were you arrested with Mr. Crosby?

9    **A.**   Yes, I was.

10   **Q.**   Do you remember when you were arrested?

11   **A.**   Uhm, it was end of November maybe about four years ago,

12   probably.

13   **Q.**   If I showed you your -- do you remember, when you were

14   arrested was there a report written?

15   **A.**   Yes, there was.

16   **Q.**   If I showed you that report, would that help remember the

17   exact date you were arrested?

18   **A.**   Probably.

19   **Q.**   Okay.  If you could turn a few pages after 274, you'll see

20   a tab, a blank tab.

21          Do you see that there's an arrest report there?

22   **A.**   Yes.

23   **Q.**   Okay.  And if you turn to page 3 of that arrest report, it

24   says "3 of 7" on the bottom right?

25   **A.**   Uh-huh.

1   **Q.** Do you see your name?

2   **A.** Yes, I do.

3   **Q.** Okay. Now, if you turn to the first page, do you see --

4   at the top left do you see there's a date there?

5   **A.** Yes, it's the 19th.

6   **Q.** Okay. Does that -- does that refresh your recollection?

7   Does that refresh your memory as to when you were arrested?

8   **A.** Yeah, it does. I mean, I remember it was around

9   Thanksgiving, so -- but it's like, what, a week before

10  Thanksgiving or something, so.

11  **Q.** What were you arrested for outside of this storage locker

12  unit?

13  **A.** Uhm, because they found methamphetamine and heroin inside

14  of the locker, the storage locker.

15  **Q.** When you say "they," who are you referring to?

16  **A.** The police officers.

17  **Q.** From San Francisco Police Department?

18  **A.** Yes, Mission Station.

19  **Q.** All right. Would you remember any of the police officers

20  that placed you under arrest?

21  **A.** I'm sure I would.

22  **Q.** Do you see them in the courtroom today?

23  **A.** Yes, I do.

24  **Q.** All right. Can you point out any of them, if you

25  recognize them?

1   **A.**  The gentleman sitting right there in the middle

2   (indicating).

3   **Q.**  Is that the gentleman seated to the right of the man with

4   the beard?

5   **A.**  The left -- yeah, you're right, I guess.  Excuse me.

6       And I think either -- the bald man right there, I think.

7   I don't know.  I wasn't really -- because I was sitting in the

8   car the whole time.

9   **Q.**  You were sitting in the car the whole time?

10          **MS. CAFFESE:**  The record should reflect that the

11  witness has identified Mr. Passaglia.

12  **BY MR. VILLAZOR:**

13  **Q.**  Now, Ms. Ponzer --

14          **THE COURT:**  So noted.

15          **MS. CAFFESE:**  Thank you, Your Honor.

16          **MR. VILLAZOR:**  Your Honor, could the record reflect

17  that the witness has identified Mr. Furminger as well?

18          **THE COURT:**  So noted.

19  **BY MR. VILLAZOR:**

20  **Q.**  Ms. Ponzer, can you describe what you were doing prior to

21  arriving at this storage locker that morning?

22  **A.**  We had left Burgess's son's house.

23  **Q.**  What were you and Burgess doing at Burgess's son's house?

24  **A.**  I just was in the car the whole time.  He had went to pick

25  up some mail and insurance money that he had -- that Burgess

1  had for him, so.

2  **Q.**  Did you say insurance money?

3  **A.**  It wasn't insurance.  It was money.  You know, I think it

4  was for his car insurance or something for -- because the car

5  we'd got from Burgess -- well, Burgess had bought it from

6  Burgess Jr., so.

7  **Q.**  Burgess had bought it from Burgess Jr.?

8  **A.**  His son, yes.

9  **Q.**  Burgess Jr. is Burgess Crosby's son?

10  **A.**  Yes, he is.

11  **Q.**  Where was Burgess Crosby Jr.'s son living [sic]?

12  **A.**  On Peoria Street.  63 Peoria, in Daly City.

13  **Q.**  What were you doing prior to going to the house in Daly

14  City?

15  **A.**  Uhm, I think we went -- we were at breakfast.  Like, we

16  went to breakfast like we normally do and -- I don't know.

17  Just the beginning of our day, pretty sure.

18  **Q.**  After the Daly City house, where did you and Burgess

19  Crosby go?

20  **A.**  We went to the storage locker, because I needed to get

21  some clothes and because it was sort of on the way, I think.

22  Yeah.  I don't know.  I mean, it was a long time ago, so.

23  **Q.**  I understand.

24      Were you also there to store things in the storage locker?

25  **A.**  Uhm, yeah, we were.

1  **Q.**  What were you there to store?

2  **A.**  Well, Burgess was there to store the drugs, because it was

3  a lot to carry around.

4  **Q.**  Did Burgess Crosby have money on him?

5  **A.**  Yes, he did.

6  **Q.**  Did he store it in any particular way?

7  **A.**  He had two wallets.

8  **Q.**  Two wallets?

9  **A.**  Yes.  He had one wallet that was a business wallet and

10  then another wallet that was his personal wallet.  And I

11  think -- I'm not positive, but I think that possibly even --

12  because he had a lot of money.  I mean, he was selling a lot

13  of drugs.

14      So the money that he had gotten from his son, he could

15  have even put it, I think, somewhere in the car, possibly.  I

16  don't remember.

17  **Q.**  All right.  You said he had two wallets?

18  **A.**  Yes.

19  **Q.**  And one was a personal wallet?

20  **A.**  Yes.

21  **Q.**  And one was a business wallet?

22  **A.**  Yes.

23  **Q.**  Okay.  When you say "business wallet," what business are

24  you talking about?

25  **A.**  His drug dealing.

1   Q.   Okay.  When you arrived at the storage unit, what

2   happened?

3   A.   Uhm, we pulled up.  Burgess got out of the car and he went

4   to the trunk.  He got the dope.  He went and he entered the

5   storage locker, the outer door.  And then when he came out,

6   the officers, you know, arrest him and stopped him.

7        One of them got me out of the car and just proceeded to

8   search us and just do what they do.

9   Q.   Do what they do.

10        Now, if you look at the picture here, you'll see several

11   green doors.

12   A.   Yeah.

13   Q.   Do you see the picture on the screen to your right?

14   A.   Yeah, that's the outside of the storage locker.

15   Q.   Are one of those doors the door that you saw Burgess

16   Crosby go in?

17   A.   Yes.

18   Q.   Did you guys have a storage unit inside of this -- inside

19   of this storage unit?

20   A.   Yes, we did.

21   Q.   And you were -- you remained in the car?

22   A.   Yes.

23   Q.   Were you then placed under arrest?

24   A.   Yes.

25   Q.   What happened after that?

 1   **A.**   Uhm, I was taken down to the station.  Burgess told me

 2   that --

 3   **Q.**   Well, let's not go into what Burgess told you.

 4        But you were taken down to the police station?

 5   **A.**   Yes.

 6   **Q.**   Were you taken down in a marked police car with the

 7   lights?

 8   **A.**   I think so.  I don't remember.

 9            **MR. VILLAZOR:**   Just a moment.

10        No further questions, Your Honor.

11            **THE COURT:**   Mr. Getz.

12                      **CROSS EXAMINATION**

13   **BY MR. GETZ:**

14   **Q.**   Good morning.

15   **A.**   Good morning.

16   **Q.**   Going back to the time frame of what you were testifying

17   about a few moments ago, Thanksgiving week, 2009, in that time

18   frame were you struggling with drug dependency?

19   **A.**   Of course.  Why else would I be with a man that was

20   considerably older than I was, you know.

21   **Q.**   He was the one who was providing you with heroin; was he

22   not?

23   **A.**   Yes.

24   **Q.**   Were you also involved at all in selling it to support

25   your dependency?

 1    **A.**  Uhm, not really.  I mean, I would help Burgess a little

 2    bit, but it wasn't -- I mean, not really.

 3    **Q.**  You were helping him with his sales activities though?

 4    **A.**  I guess, yeah, I mean.

 5    **Q.**  You had been convicted before this arrest at 850 Bryant

 6    Street; correct?

 7    **A.**  Yeah, for a misdemeanor possession.

 8    **Q.**  So I want to talk about that case just for a moment,

 9    because I'm going to ask you how it pertains to the

10    Thanksgiving week episode.

11        And in that earlier case you were represented by the

12    public defender.  Do you remember that?

13    **A.**  Yes.

14    **Q.**  And the public defender who represented you helped you

15    make a deal to resolve that case before it went to trial;

16    correct?

17    **A.**  Yeah, I was placed on misdemeanor probation.

18    **Q.**  On the day that you were placed on misdemeanor probation,

19    you pled guilty in front of a judge --

20    **A.**  Misdemeanor for drug possession, yes.

21    **Q.**  Okay.  You were on the first floor of 850 Bryant Street in

22    one of those felony courts; correct?

23    **A.**  Yes, of course.  And it got drooped to a misdemeanor.

24    **Q.**  Right.  And on that day when you made that deal, you pled

25    guilty, you were standing there in an open court, much as I'm

1    standing here at this lectern, and you pled guilty.  You

2    looked at the judge and you pled guilty.  Do you remember

3    that?

4              **MR. VILLAZOR:**  Your Honor, objection.  Relevance.

5              **THE COURT:**  Overruled.

6    **BY MR. GETZ:**

7    **Q.**  Do you remember doing that?

8    **A.**  Yes.

9    **Q.**  Do you remember that when you pled guilty that morning the

10   Judge told you that, as part of the deal, you would be subject

11   to warrantless search; meaning that your person, your place of

12   residence, your automobile, wherever you are could be searched

13   at any time of the day or night, with or without a warrant, by

14   any peace or probation officer?  Do you remember the judge

15   told you that?

16   **A.**  Yes, I do.

17   **Q.**  And do you also remember that when the judge told you

18   that, the Judge asked you this question:  "Ms. Ponzer, do you

19   accept those conditions of probation?"  And you said, "Yes."

20   Do you remember that?

21   **A.**  Of course.

22   **Q.**  All right.  So you knew, when the police came out to see

23   you at the storage locker, you didn't have any protection

24   against warrantless search because you had agreed to be

25   subject to that.  Do you remember that?

1   **A.**   Okay.  Well, but -- I mean, can you get to the point?

2   **Q.**   My point is, do you remember realizing --

3   **A.**   Yes.

4   **Q.**   -- when you saw the police come that you were going to be

5   searched?

6   **A.**   Yes, I do.

7   **Q.**   All right.

8   **A.**   That's why I was honest with him and I told him because I

9   had a little piece of heroin on me, you know.  That's why I

10   told him before, I mean.

11   **Q.**   Where was that heroin?

12   **A.**   It was in my bra.

13   **Q.**   And you knew they were going to find it; right?

14   **A.**   Yeah, of course.

15        But can I just say that, one, I wasn't in the storage

16   locker; and, two, it was not in my name nor Mr. Crosby's.

17   **Q.**   You mentioned you had breakfast that day before you went

18   out to the storage locker; correct?

19        Is it true that the reason you went out to the storage

20   locker was to use heroin?  That was the purpose that morning?

21   **A.**   Not to use it.  I mean -- I mean, how -- I could -- when I

22   was using I could use it anywhere I wanted to, you know.  I

23   mean, I had two loaded syringes ready to go.  So I didn't have

24   to go out to the storage locker just to use it.  It makes no

25   sense.  I already stated that we went out there for Burgess to

1   store it because it was too much to carry around.

2   **Q.**   That's fine.

3       How much heroin did you use before the police officers

4   showed up and arrested you?

5   **A.**   I don't think I used any.  I didn't get out of the car.

6   **Q.**   No, I'm talking about that day.

7       That day you used heroin before the police arrived;

8   correct?

9   **A.**   No.  In the morning, when I first woke up, but not right

10   before the police arrived.

11   **Q.**   Yeah.  That's what I'm -- that's what I'm getting at.  I'm

12   getting at in the morning when you first woke up, the first

13   thing you did was use heroin; correct?

14   **A.**   Yes.  I was sick.

15   **Q.**   And by taking the heroin, that's part of the struggle to

16   not be sick at that moment; correct?

17   **A.**   Exactly.

18   **Q.**   Okay.  And in addition to the heroin you took that morning

19   when you first woke up, you had two syringes that were loaded

20   with heroin on your person when the police showed up; correct?

21   **A.**   Yes.  I stated that a minute ago.

22   **Q.**   Those syringes you had planned to use that day, but it was

23   interrupted by the arrival of the police officers; correct?

24   **A.**   No.  They -- I was -- they were in my purse.  I mean, if I

25   had planned to use them, they would have been used.  I mean, I

```
 1   have -- I was -- I was there in front of the -- sitting in
 2   front of the storage locker in the car for about five minutes,
 3   long enough to use it if I wanted.
 4        But, I mean, it's obvious they were in my purse because I
 5   told the police officers where they were.  They were inside
 6   the pouch inside my purse.  So if they were ready, if I was
 7   going to use them, they would have been in my hand.
 8   Q.  At the storage locker where you were, were there digital
 9   scales?
10   A.  Yes.
11   Q.  How many were there?
12   A.  I don't know.  I think two maybe.
13   Q.  What is the reason that the digital scales were there?
14   A.  To make sure everything comes out right, you know, that we
15   don't -- that nobody gets too much or too little.
16   Q.  For using it or for selling it?
17   A.  For both.
18   Q.  Okay.  There was a time after you were arrested when you
19   saw my client, Mr. Furminger, in the Mission District.  Do you
20   remember that?
21   A.  Yes, I do.
22   Q.  Okay.  So let me ask you about that for a moment, if I
23   could.
24        It was just a couple weeks after the episode that you
25   testified about involving the storage locker; correct?
```

 1    **A.**   Yes.   Maybe -- honestly, I don't really remember.   I mean,

 2    I know it was sometime after because I was nervous because I

 3    was out on bail.   And I was sitting in the car by myself again

 4    and waiting for Burgess to come outside of his residence.

 5         And I didn't just see Mr. -- what is his --

 6    **Q.**   Furminger?

 7    **A.**   Furminger?

 8    **Q.**   Right.

 9    **A.**   Yeah, it wasn't just him.   It was two other gentlemen that

10    were with him.

11    **Q.**   So you mentioned just now you were nervous because you

12    were out on bail.   And what made you nervous was two things,

13    and correct me if I'm wrong.   One thing was if you get

14    arrested while you're out on bail --

15    **A.**   We just bailed out again.

16    **Q.**   Right.   But it's an extra charge, isn't it, getting

17    arrested while you're on bail?   You know that; correct?

18    **A.**   Yeah, it's another case.   But, I mean, I'm already -- I

19    took probation and I'm off probation already.   Finished

20    without any violations or anything.

21    **Q.**   Understood.

22         But going back to 2009, and now it's after Thanksgiving

23    but before Christmas, and you ran into Mr. Furminger again.

24    I'm asking you about that.

25         And you were on probation there in the predecessor case,

1    the little misdemeanor deal you made; right?

2       You made a misdemeanor deal that we talked about before

3    you got arrested Thanksgiving week?

4    **A.**  Yes.

5    **Q.**  And you were at risk to have your probation violated in

6    that case; correct?

7    **A.**  Uhm, yeah, I guess.  I mean, I had -- I had drugs on me.

8    I mean --

9    **Q.**  Well, I'm going to get to that in a second.  But just

10   chronologically, you were on probation in the old case, and

11   that could have been violated, which means you go back to

12   jail; correct?

13   **A.**  But it didn't get violated.  It was misdemeanor probation.

14   You know, there's no such thing as violating you know, my

15   probation.  You either -- you get out on felony probation,

16   which is what happened to me.

17   **Q.**  You had in mind that you could not be violated on a

18   misdemeanor violation?

19   **A.**  There's no such thing.  You get arrested.  And then in

20   court you get released on felony probation.

21   **Q.**  All right.  So you were out on felony probation?

22   **A.**  No, misdemeanor.

23   **Q.**  On the Thanksgiving week episode?

24   **A.**  I hadn't gotten -- hadn't gotten sentenced to anything

25   yet.  I was still on misdemeanor probation.

1   **Q.**   You had a pending case?

2   **A.**   Yes.

3   **Q.**   Pending felony case?

4   **A.**   Uh-huh.

5   **Q.**   And when you saw Mr. Furminger the last time -- now we're

6   talking about between Thanksgiving and Christmas -- you knew

7   you were still subject to warrantless search; correct?

8   **A.**   Yes.

9   **Q.**   And you had heroin in your bra; right?

10  **A.**   I did, but --

11  **Q.**   And you had money on you; correct?

12  **A.**   Yeah, I had money on me.

13  **Q.**   Because you were selling that day; correct?

14  **A.**   Uhm, yeah, I was.  I mean --

15  **Q.**   So here's my question for you:  That day when you were out

16  selling and you had --

17  **A.**   I wasn't out selling that day at that moment.  I mean, I

18  always had money on me, you know.  I mean, Mr. Crosby made

19  sure of that.  Burgess did.

20  **Q.**   I'm not criticizing you.

21  **A.**   Sorry.

22  **Q.**   I'm just trying to put it in perspective here.

23  **A.**   Uh-huh.

24  **Q.**   The episode where you saw Mr. Furminger between

25  Thanksgiving and Christmas, you were supporting yourself by

```
 1   selling heroin; correct?

 2   A.   Yes.

 3   Q.   And you were struggling with your own drug dependency;

 4   correct?

 5   A.   Yes.  I mean, but --

 6   Q.   And you had heroin in your bra; correct?

 7   A.   Yes, I did.

 8   Q.   But he didn't find it, and you were not arrested.  Am I

 9   right?

10   A.   No.  But -- I mean, yes, you're right.  And the reason to

11   that is because --

12           MR. GETZ:  Thank you.

13           THE WITNESS:  Can I keep talking, Your Honor, or no?

14           THE COURT:  Well, I'll see if -- it's up to the

15   government whether they're going to ask you a further question

16   in that regard.  So if you wait a minute.

17       Well, Ms. Caffese.

18           MS. CAFFESE:  No questions, Your Honor.  Thank you.

19                     REDIRECT EXAMINATION

20   BY MR. VILLAZOR:

21   Q.   Ms. Ponzer, would you like to continue answering that

22   question?

23   A.   Yes.

24       The reason why I wasn't arrested was because Burgess had

25   come out, and he happened to have -- and they saw him, and
```

1    they said, oh, okay, you know, because he was going --

2    Mr. Furminger was going to take me down to the station.

3         That's why I was nervous that day, you know, because when

4    he had -- he had threatened me, you know, to take me down

5    there and have a female officer search me.

6         And, you know, I -- immediately I said, well, I don't have

7    anything on me, and I -- you know, I pulled my bra out, and I,

8    you know, was showing I didn't have anything on me, because

9    they'd already searched my person.

10        And that's when money fell out of my bra.  And he --

11   Mr. Furminger stated that, oh, well, I can smell the heroin,

12   you know.  And so they -- they were ready to take me down to

13   the station.  And then, like I said, Burgess came walking down

14   the street.  And they saw him, and they left me alone.

15   Q.  Ms. Ponzer, when you said money fell out of your bra,

16   about how much money did you have?

17   A.  Couple hundred maybe, $2- to $500 possibly.

18   Q.  And you were out on the street at the time prior to seeing

19   Mr. Furminger that second time?

20   A.  I was standing outside of the car smoking a cigarette.

21   And I saw Mr. Furminger and his -- his fellow officers, they

22   drove by in their gold car.  I think it was a gold Intrepid, I

23   think, four-door.

24        And they drove by, and I recognize the car.  And I saw

25   them turn back and look and recognize me.  So I got back in

1    the car and locked the doors.

2        And then, of course, they came back around and I had no

3    choice but to open the door and, you know, I mean --

4    **Q.**  Where were --

5    **A.**  I was in the car, and it was parked on Julian Street,

6    between 14th and 15th.  I was waiting for Mr. Crosby to come

7    out of his residence around the corner.

8             **MR. VILLAZOR:**  No further questions.

9             **THE COURT:**  Mr. Getz?

10                    **RECROSS EXAMINATION**

11   **BY MR. GETZ:**

12   **Q.**  Ms. Ponzer, the episode you were just talking about, that

13   happened before Christmas but after Thanksgiving, you and

14   Mr. Crosby were selling heroin that day; correct?

15   **A.**  Yes.  We've already established that.  Sorry.  Sorry.

16   **Q.**  You had heroin in your bra, which Mr. Furminger did not

17   find; correct?

18   **A.**  No.  How could he?  He's a male officer.  He can't search

19   me.  But he stated because he said he had smelled it.  If it

20   wasn't him, it was one of his other -- it was one of the other

21   officers.

22       One of them said, "Oh, you know, I can smell it."  You

23   know, that's why I was so nervous about --

24   **Q.**  And you told them -- you told them that you did not have

25   any heroin on you?

1    **A.**  Of course I did.

2    **Q.**  And that was a lie; correct?

3    **A.**  Of course, I told them that.  I didn't want to go to jail.

4    **Q.**  Exactly.  And you won that day, didn't you?  You won.  You

5    got to stay out?

6    **A.**  Well, only because Mr. Crosby came walking down the street

7    and came up just in time and he -- he had heroin on him.  They

8    found it.  They searched him and they found it in his

9    backpack.  And he ended up going to jail, so.

10   **Q.**  He did.  And you helped bail him out, didn't you?

11   **A.**  Of course.

12       Yes.

13           **MR. GETZ:**  I have nothing further.

14           **MR. VILLAZOR:**  No further questions, Your Honor.

15           **THE COURT:**  Ms. Caffese.

16           **MS. CAFFESE:**  No, Your Honor.  Thank you.

17           **THE COURT:**  Okay.  Thank you very much for coming.

18   You're excused.

19       (Witness excused.)

20           **THE WITNESS:**  Thank you.

21           **THE COURT:**  Okay.  The government's next witness.

22           **MR. HEMANN:**  Thank you, Your Honor.

23       The United States calls Mary Morentz.

24           **THE CLERK:**  Will the witness please step forward and

25   take the witness stand.

1      Remain standing and raise your right hand.

2           **MARY LOUISE MORENTZ, PLAINTIFF WITNESS, SWORN**

3           **THE WITNESS:**  I do.

4           **THE CLERK:**  Please be seated.

5      Please state your full name, spell your last name for the

6  record.

7           **THE WITNESS:**  Mary Louise Morentz.  M-o-r-e-n-t-z.

8                     **DIRECT EXAMINATION**

9  **BY MR. HEMANN:**

10 **Q.**  Good morning.  What do you do for a living?

11 **A.**  I'm a police officer with the City and County of San

12 Francisco.

13 **Q.**  How long have you been an officer with the City and County

14 of San Francisco?

15 **A.**  Over 20 years.

16 **Q.**  What do you do currently?

17      What kind of job do you have with the SFPD?

18 **A.**  I am the application administrator for the HRMS PeopleSoft

19 system.

20 **Q.**  And can you explain to the jury what that is?

21 **A.**  PeopleSoft system is your payroll personnel and training

22 application that the P.D. has been using since 2000.

23 **Q.**  And what kind of information does it contain or track?

24 **A.**  It tracks personnel job transfers and it tracks

25 timekeeping payroll functions, the days worked, days off.

1   **Q.**  Have you, Officer Morentz, been asked to provide official

2   San Francisco Police Department time records for four SFPD

3   officers?

4   **A.**  Yes, I have.

5       (Trial Exhibits 314 through 317 marked for

6   identification.)

7   **BY MR. HEMANN:**

8   **Q.**  I'm going to hand you four documents marked Exhibits 314,

9   315, 316, and 317, and ask you if those are among the

10  documents that you provided pursuant to a subpoena from the

11  U.S. Attorney's Office?

12  **A.**  Yes.

13  **Q.**  And who were the officers that those documents pertained

14  to?  If you could say them, sort of, by exhibit number that

15  you'll see down at the bottom right-hand corner.

16  **A.**  Exhibit 315, Robles A number A01427.

17      Exhibit 314, Furminger, A number A04938.

18      Exhibit 316, Vargas, A number A06947.

19      And Exhibit 317, Zachos, A number is A01806.

20  **Q.**  And could you describe for the jury what those four

21  documents are?

22  **A.**  These four documents are the electronic time files, as we

23  call it, from the HRMS application.  These are the work

24  records of these four individuals.

25  **Q.**  For what year?

1   **A.**  For the year 2009, January 1st to December 31st.

2           **THE COURT:**  Admitted, all four.

3       (Trial Exhibits 314 through 317 received in evidence.)

4           **MR. HEMANN:**  Thank you, Your Honor.

5   **BY MR. HEMANN:**

6   **Q.**  Now, I have these, Officer Morentz, on -- what kind of

7   documents are these?  Are they Excel spreadsheets?

8   **A.**  They are Excel spreadsheets.

9   **Q.**  As you know, they are a little bit cumbersome to print

10  out.  And I want to make this go fast, so I have it in two

11  ways.

12      Did you provide these electronically to the United States?

13  **A.**  Yes, I did.

14  **Q.**  Would you prefer to look at them in paper form -- and I

15  can get you a folder to use as a straight edge -- or

16  electronically?

17  **A.**  Electronically, please.

18          **MR. HEMANN:**  Your Honor, may I show them -- any

19  objection to me showing these electronically?

20          **MS. CAFFESE:**  No objection.

21          **MR. HEMANN:**  Okay.  And if I could orient the

22  witness, Your Honor.

23      I'm handing the witness a laptop.

24  **BY MR. HEMANN:**

25  **Q.**  And you can see them down -- if you look at XL down at the

 1   bottom, Robles, Zachos, Furminger, and Vargas.  And you can

 2   navigate between them if you wish.

 3   **A.**  Yes, sir.

 4   **Q.**  So let me put them on the other side of the microphone so

 5   you can see that.

 6       Okay.  So you have in front of you the paper copies of

 7   these four exhibits as well as the electronic Excel

 8   spreadsheets on the laptop computer.

 9       Is that correct?

10   **A.**  Yes, sir.

11   **Q.**  So I -- first, a very brief question with regard to

12   Officer Zachos.

13       Have you reviewed Officer Zachos's time records that are

14   in the document which is Exhibit 317?

15   **A.**  Yes, I did.

16   **Q.**  The time records show that he was off work for an extended

17   period of time in 2009; is that correct?

18   **A.**  Correct.

19   **Q.**  Could you tell the jury what Officer Zachos's last regular

20   day of work was in February 2009?

21   **A.**  Officer Zachos was marked SP, which is sick time with pay,

22   on February 15th.  And there is several of these starting in

23   February.

24   **Q.**  And if you could scroll through Officer Zachos's records

25   after February 15th, can you tell the jury when he ultimately

1    returned to his normal or regular duty shift for the first

2    time?

3    **A.**  First date, there are mixed -- there's a regular in August

4    8, that he returned to P.D. for couple more days.  And it

5    looks like August 14th is another regular workday.

6    **Q.**  Okay.  So August 8th is the first regular workday it

7    shows?

8    **A.**  Correct.

9    **Q.**  Thank you.

10       Okay.  Now I'm going to ask you to look at six incident

11    reports from 2009, just for the purpose of establishing a

12    date.  And you have in front of you, just to your left, an

13    incident binder.

14       If you could look at tab 1.  There are a number of

15    documents behind tab 1.  In particular, not the photograph but

16    Exhibit 246?

17    **A.**  Yes, sir.

18    **Q.**  Do you see that?

19    **A.**  Yes, I do.

20    **Q.**  And do you recognize that as the San Francisco Police

21    incident report?

22    **A.**  Yes, I do.

23    **Q.**  And do you see a date --

24          **MR. HEMANN:**  And all these documents will be in

25    evidence, Your Honor.

1  **BY MR. HEMANN:**

2  **Q.**  Do you see a date of that incident report?

3  **A.**  The occurrence date was February 19th of 2009.

4  **Q.**  Okay.  So focusing on February 19th, 2009, I'm going to

5  ask you for each of these to tell the jury what the time

6  status was for each of the three remaining officers; Robles,

7  Vargas, and Furminger.

8       So starting with Mr. Robles on the 19th of February 2009,

9  what was his time status?

10  **A.**  He has three time statuses for that day.  The first one is

11  called Sequence 1.  He is normally H, or watch off that day,

12  and not supposed to be working, or not scheduled to work.

13  **Q.**  Okay.

14  **A.**  The second sequence is an OE, overtime that he requested a

15  compensation rate from 0600 to 1400 at Mission Station for an

16  arrest.  And it was last modified on the 20th, at 8:05 in the

17  morning by Mominis Merna (phonetic).

18  **Q.**  Okay.

19  **A.**  The third sequence number, meaning that record was split,

20  for the same day is an OT3, which is an arrest at overtime

21  rate, at Mission Station for an arrest.  And it was last

22  modified by Furminger, A04938, on February 20, at 6:21 in the

23  morning.

24  **Q.**  So do the records show that Officer Robles worked on the

25  19th, from 0600 to 1900 that day?

1    **A.**   Correct.

2    **Q.**   Comprising of both overtime hours and overtime for an

3    arrest?

4    **A.**   Overtime and comp time for an arrest, yes, sir.

5    **Q.**   Did Officer Vargas work that day, according to SFPD

6    records?

7    **A.**   On 2/19, Officer Vargas was off that day, watch off.

8    **Q.**   And that is designated on those records by an H; correct?

9    **A.**   Correct.  H is designated for being watch off.

10   **Q.**   Did Officer Vargas -- do the records show that Officer

11   Vargas worked either -- any sort of overtime that day?

12   **A.**   No.

13   **Q.**   Mr. Furminger, what do the records show with regard to his

14   work on the 19th of February 2009?

15   **A.**   He has two work records.  The first record is a regular

16   normal shift day, working 0600 to 1100 hours at Mission

17   Station.  That record was last modified by Furminger, No.

18   A04938, on 2/19, at 8:26 in the morning.

19        The second record is an OU, or comp time, meaning that he

20   took time off on the same day, at Mission Station, from 1100

21   hours to 1600 hours.  And the person that entered that card is

22   also Furminger, A04938.  And the record was last modified on

23   2/19, at 8:25 in the morning.

24   **Q.**   So Mr. Furminger worked that day from 0600 to 1100, and

25   then was off for comp time from 1100 to 1600?

Case3:14-cr-00102-CRB   Document160   Filed11/24/14   Page66 of 221

 1    **A.**   Yes, sir.

 2    **Q.**   Could you look at tab 3 in the binder to your left.  And

 3    the report -- the incident report that is marked as Exhibit

 4    74, please.  It's a couple of tabs in.

 5    **A.**   Exhibit 74.  72?

 6    **Q.**   74.

 7    **A.**   74.

 8    **Q.**   On that incident report, what is the date?

 9    **A.**   Date is March 4th, 2009.

10    **Q.**   Turning back to the time records for Mr. Robles, could you

11    tell the jury what they show with regard to Mr. Robles's time

12    on March 4, 2009?

13    **A.**   There are two lines of record for Mr. Robles.  There is a

14    regular or normal shift worked at 0600 to 1600 hours at

15    Mission Station.  And that was his normal workday.

16        The second record is an OT3, which is an arrest, at

17    Mission Station at 1600 hours to 2100 hours.

18    **Q.**   And when you say OT3, is that overtime for an arrest?

19    **A.**   Overtime for an arrest, yes.

20    **Q.**   And are officers compensated differently for overtime for

21    an arrest than for regular time?

22    **A.**   Yes, they are, at 1.5 overtime rate.

23    **Q.**   1.5 overtime rate?

24    **A.**   1.5 overtime rate.

25    **Q.**   So it's one and a half times their normal hourly pay?

1    **A.**   Correct.

2    **Q.**   What about Mr. Vargas for March 4, 2009?

3    **A.**   Vargas has two records.  One is a regular or normal shift

4    day worked at Mission Station, 0600 to 1600 hours.

5         And a second overtime line, OT3 arrest at overtime, at

6    Mission Station, from 1600 to 2100 hours, as an arrest.  And

7    last entered or modified by Furminger A04938 on 3/7/09, at

8    1305 hours.

9    **Q.**   And what do the time worksheets show to Mr. Furminger's

10   work on March 4, 2009?

11   **A.**   On March 4th, he has two work records.  The first one is

12   that he is off duty, or watch off.  The second one is an OT3

13   line, an arrest at 1.5, from 0900 to 1300 hours.

14           **THE COURT:**  I'm sorry, what?

15           **THE WITNESS:**  From 0900 to 1300 -- excuse me.  From

16   0900 to 1300 hours at Mission Station for an arrest entered --

17   or last modified by Furminger, A04938, on 3/5/09 at 1018

18   hours.

19   **BY MR. HEMANN:**

20   **Q.**   So Mr. Furminger was on his regular holiday day on March

21   the 4th, 2009, and came in for overtime for four hours,

22   according to SFPD time records?

23   **A.**   Yes.

24   **Q.**   And that week, Officer Morentz, did Mr. Furminger have

25   other regular holiday time scheduled or in the days adjacent

1    to the 4th of March?

2    **A.**   4th of March, 5th of March, and 6th of March, he was

3    regularly scheduled to be off.  And then he took a vacation

4    day on the 7th of March.

5    **Q.**   So he was off from the 4th to the 7th with the exception

6    of this four-hour arrest on the 4th of March; correct?

7    **A.**   Correct.  He also had two overtime records on the 7th,

8    coinciding with his VA date.

9    **Q.**   So he came in for overtime on the 7th?

10   **A.**   Correct.

11   **Q.**   If you could turn to tab 5, please, and there's an Exhibit

12   247, one tab in?

13   **A.**   Correct.

14   **Q.**   What is the date of the incidents on this incident report?

15   **A.**   May 25th, 2009.

16   **Q.**   If you could look at the time records for, first,

17   Mr. Robles, on May 25th, 2009.

18   **A.**   May 25th, 2009, Mr. Robles had two work records.  The

19   first one is HP, or holiday pay.  He worked the holiday at

20   Mission Station from 0600 to 1600 hours.

21      The second record is an overtime 3, which is an arrest at

22   Mission Station from 1600 hours to 2000 hours.  And it was

23   last modified by Furminger, A number 04938, on 5/27/09, at

24   0913 hours.

25   **Q.**   With regard to working the holiday, how is that

1    designated?  By what letters?

2    **A.**  The holiday is designated by HP for holiday pay in this

3    instance.

4    **Q.**  And for May 25th, 2009, or Memorial Day, would officers

5    get paid holiday pay for working that day?

6    **A.**  If they were working that day, yes.

7    **Q.**  Mr. Vargas, please, Officer Morentz.  Could you tell us

8    what his pay status was on May 25th, 2009, and then

9    Mr. Furminger.

10   **A.**  May 25th, 2009, first record is a holiday pay.  Mission

11   Station, from 0600 to 1600 hours.

12      The second record is an OT3 arrest.  Mission Station, from

13   1600 hours to 2000 hours for an arrest.  And last modified by

14   Furminger A number 04938, on 5/27/09, at 0913 hours.

15   **Q.**  And that was the record for both Mr. Vargas and

16   Mr. Furminger, or was that just Mr. Vargas?

17   **A.**  That's Mr. Vargas.

18   **Q.**  Mr. Furminger, please.

19   **A.**  5/25, two records, holiday pay.  0600 to 1600 hours at

20   Mission Station.  The second record is an OT3 arrest at

21   Mission Station, from 1600 hours to 1900 hours for an arrest.

22   And last modified by Furminger, A number 04938, at -- on

23   5/27/09, at 0912 hours.

24          **MR. HEMANN:**  Your Honor, we have about three more to

25   go through.  We'll take probably ten minutes.  And I don't

```
 1    know if there will be cross.  And so I just wanted to let the
 2    Court know we could break now, would be easiest enough, or we
 3    could break later.
 4             THE COURT:  Do you want to break now?
 5        (Jurors shake their heads.)
 6             THE COURT:  No?
 7        They're just fascinated by this.
 8             MR. HEMANN:  It's gripping.
 9        (Laughter)
10             MR. HEMANN:  It is.
11             THE COURT:  We are all at the edge of our seats.
12        (Laughter).
13             MR. HEMANN:  It is gripping, Your Honor.
14             THE COURT:  Go right ahead.
15             MR. HEMANN:  Mr. Villazor is falling asleep on me
16    over here.  We'll foray on here, Your Honor.
17    BY MR. HEMANN:
18    Q.  Tab 6, please.
19        Oh, and, actually, there's no incident report in -- for
20    this, so let me just direct your attention, Officer Morentz,
21    to June the 18th, 2009.  June 18, 2009.  And if you could give
22    us the time records for Mr. Robles that day.
23    A.  6/18/2009, one work record, normal shift, 0500 to 1500
24    hours, at Mission Station.
25    Q.  And Mr. Vargas on June 18th?
```

 1   **A.**   One work record, regular work, Mission Station, 0500 to

 2   1500 hours.

 3   **Q.**   And Mr. Furminger that same day, June the 18th.

 4   **A.**   One record, watch off, meaning he was off duty.

 5   **Q.**   Thank you.

 6       If you could turn to tab 8, please.  There was an incident

 7   report behind the photograph.  What is the date of that

 8   report?

 9   **A.**   October 7th -- pardon me, October 2nd, 1999.

10   **Q.**   Sorry, October 2nd?

11           **THE COURT:**   '09.

12           **THE WITNESS:**   '09, I'm sorry.

13   **BY MR. HEMANN:**

14   **Q.**   2009?

15   **A.**   2009.

16   **Q.**   Could you tell us what the time records show for

17   Mr. Robles on that day.

18   **A.**   On October 2nd, he records two lines.  The first line is a

19   regular workday at Mission Station, from 0600 to 1600 hours.

20       The second line is an OT line, arrest on overtime, from

21   1600 hours to 1900 hours at Mission Station.  And last

22   modified by Furminger, A number A04938, on 10/5/09, as 544

23   hours.

24   **Q.**   And Mr. Vargas, what was his duty status on the 2nd of

25   October of '09?

**A.**  He's recording two lines.  The first one is a regular or

normal shift worked from 0600 to 1600 hours at Mission

Station.

And a second OT3 line, arrest at 1600 to 1900 hours at

Mission Station.  Last modified by Furminger, A04938 A09438,

on 10/5/09, at 544 hours.

**Q.**  And what was Mr. Furminger's duty status on October the

2nd, 2009?

**A.**  He records two lines.  The first one, line that he is

watch off, or H, for the day.  The second line is an OT5,

which is extended workweek overtime, at Mission Station, with

the event code 090000D, Safe Schools.  It was entered or

modified, last modified by Furminger, A04938, on 10/2/09, at

0912 hours.

**Q.**  So you mentioned a couple of things in that regard that

were -- came up the first time.

OT5, how does that differ from OT3?

**A.**  OT3 is your arrest.  OT5 is a voluntary workweek, that

you're volunteering to work overtime.  Not mandatory.

**Q.**  And there was some code associated with that, you said?

**A.**  The OT5 code.

**Q.**  Some other code you mentioned?

**A.**  Event code.

**Q.**  Event code, sorry.

**A.**  The event code is what we used to designate what this

```
 1   overtime is charged against.  In this instance, it's for Safe

 2   Schools.

 3   Q.   Do you know what that means?

 4   A.   Just that it's for Safe Schools.  It's something that a

 5   station most likely wanted to enforce and had overtime to have

 6   the officers do overtime.

 7   Q.   And, finally, Officer --

 8           THE COURT:  Before we leave that, does it indicate

 9   the number of hours?

10           THE WITNESS:  Yes, it does.

11           THE COURT:  How many hours?  And does it indicate the

12   time?

13           THE WITNESS:  Yes, it does.  It's 0600 to 1400 hours.

14           THE COURT:  0600?

15           THE WITNESS:  To 1400 hours.

16           THE COURT:  1400.  Okay.  Thank you.

17   BY MR. HEMANN:

18   Q    And obviously, we have been talking about -- this is all

19   military time?

20   A    Yes, it is.

21   Q    So that would be 1:00 in the morning to 2:00 in the

22   afternoon?

23   A    Correct.

24   Q    And finally with regard to -- please turn to Tab 10.

25   There is a report behind the photograph.  What is the date of
```

1   this report?

2   **A**   November 19, 2009.

3   **Q**   And this is for an event that took place, an incident at

4   4050 19th Avenue.  Correct?

5   **A**   Yes, sir.

6   **Q**   What is Mr. Robles's duty status that day?  November 19,

7   '09.

8       (Witness examines document)

9   **A**   He has two records.  The first one is regular or normal

10  shift at Mission Station from 0600 to 1600 hours.  A second

11  OT3 line, arrest, at Mission Station, from 1600 hours to 2100

12  hours.  For an arrest.  And that's modified by Furminger,

13  A04938 on 11-26-09 at 1428 hours.

14  **Q**   And, Mr. Vargas, that same day, the 19th of November, '09?

15  **A**   It records two lines.  The first one is a regular line.

16  0600 to 1600 hours at Mission Station.  And an overtime line,

17  OT3 arrest, at Mission Station, from 1600 hours to 2100 hours

18  for an arrest.  And that's modified by Furminger, A49 -- 04938

19  on 11-26-09, at 1429 hours.

20  **Q**   And finally, Mr. Furminger's time for the 19th of

21  November, 2009?

22  **A**   He records two lines.  The first line is an "H," means

23  that he is watch off.  The second is an OT3 line, OT3 at

24  arrest, at Mission Station from 1600 hours to 2100 hours for

25  an arrest.  And that's modified by Furminger, A04938 on

1    11-26-09 at 1435 hours.

2    **Q**   So each of the three officers that day showed an arrest,

3    an overtime arrest from 1600 to 2100 hours.

4    **A**   Yes, sir.

5    **Q**   What was Mr. Furminger's work status on the 18th of

6    November, the day before?

7    **A**   He has two lines of record.  The first one is a regular or

8    normal shift from 0600 to 1,300 hours and the second line, VA,

9    which is vacation day, from 1300 hours to 1600 hours.

10   **Q**   And then, you mentioned one line on the 19th is for

11   regular watch off, meaning off duty, correct?

12   **A**   Correct.

13   **Q**   And then on the 21st -- the 20th, 21st and 22nd of

14   November what is Mr. Furminger's duty status?

15   **A**   All three days of duty status are H, watch off.

16   **Q**   So, did not work the 20th, the 21st, and 22nd.

17   **A**   Correct.

18            **MR. HEMANN:**  I have no further questions, Your Honor.

19            **THE COURT:**  Well, you are familiar with the custom

20   and practice or the procedure in the police department where

21   one person authorizes a modification to the time records?

22            **THE WITNESS:**  Yes, I am.

23            **THE COURT:**  And, is that what was occurring with

24   respect to the modifications in which you identify a time, and

25   an officer as being the authorizing officer?

 1          **THE WITNESS:**  The supervisor in any instance would be

 2   a sergeant or on-duty -- that is, our supervisor can modify an

 3   employee's record within his command.

 4          **THE COURT:**  And so when you've identified Sergeant

 5   Furminger as the person who authorized the modification in the

 6   records, as you recited them, is that what was occurring?

 7          **THE WITNESS:**  No.  What was occurring was the

 8   sergeant was modifying the records, himself, within the HRMIS

 9   application.

10          **THE COURT:**  What does that mean?

11          **THE WITNESS:**  That means he logged into the system

12   with his employee ID as password, he went to the specific day

13   or the employee's scheduling records, and made those entries

14   and changed it himself.

15          **THE COURT:**  Thank you.

16          **MR. HEMANN:**  May I follow up on that, Your Honor?

17          **THE COURT:**  Yes.

18          **MR. HEMANN:**  Thank you.

19   **BY MR. HEMANN:**

20   **Q**   So with regard to Mr. Robles's time on the 19th of

21   November, '09, you said there were two lines, regular and OT3.

22       Correct?

23   **A**   Correct.

24   **Q**   Did the regular time need to be approved later by anybody?

25   **A**   The regular time is your normal work status.  Your pattern

1    days off.  Your regular hours.

2        This instance, this tells me that it is his normal system

3    set work record.  And there were no changes to it.

4    Q    And so, that's with regard to the regular time that day.

5    With regard to the OT3 or overtime time that day, is that an

6    example of what the Court was -- was asking about where that

7    had to later be approved by a supervisor, in this case,

8    Mr. Furminger?

9    A    Approved by, and in this case, entered by Mr. Furminger.

10   Q    And then, with regard to Mr. Furminger's own overtime

11   status that day, that was also approved, entered and approved

12   by Mr. Furminger?

13       (Witness examines document)

14   A    Yes.  The last person who modified that record was

15   Mr. Furminger.

16   Q    And there's nothing wrong with a sergeant -- just in terms

17   of timekeeping, there's nothing wrong with a sergeant

18   approving -- entering and approving a subordinate's time, or

19   entering and approving his own time.  Correct?

20   A    Correct.

21           MR. HEMANN:  Thank you, Your Honor.

22           THE COURT:  Any cross?

23           MR. PASSAGLIA:  Nothing on behalf of Sergeant

24   Furminger.

25           THE COURT:  Yeah.

 1          **MS. CAFFESE:**  Yes, Your Honor.

 2          **THE COURT:**  Go ahead, Ms. Caffese.

 3                    **CROSS EXAMINATION**

 4   BY MS. CAFFESE:

 5   **Q**   Good afternoon -- good morning, Officer.

 6   **A**   Good morning.

 7   **Q**   I have an exhibit that's been marked Exhibit 363.

 8          **MR. HEMANN:**  No objection to that, Your Honor.

 9          **THE COURT:**  363, admitted.

10   (Trial Exhibit 363 received in evidence)

11   BY MS. CAFFESE:

12   **Q**   Good morning, Officer.  My name is Teresa Caffese, and I

13   have some questions for you.

14       I'm going to give you what's been marked 363 here.

15   **A**   Yes, ma'am.

16   **Q**   So, Officer, just some preliminary questions before we get

17   to that.

18       I understand that you took the work history records from

19   Officer Robles, for example, and put it into an Excel

20   spreadsheet.  Is that right?

21   **A**   Correct.

22   **Q**   And you have been testifying about those matters on direct

23   examination?

24   **A**   Yes, ma'am.

25   **Q**   Now, if you could look at 363, and, my understanding -- do

1    you recognize these -- this document here?

2    **A**    Yes.  It is an employee work history report.

3    **Q**    Right.  And essentially, am I correct that this is the

4    same type of information in part that you testified about

5    during your direct examination?

6    **A**    In part, yes.

7    **Q**    Yes.  And, the part that you testified about was the year

8    2009.  Correct?

9    **A**    Correct.

10    **Q**    All right.  And those items, entries that you testified

11    are part of this document (Indicating) also, just -- why don't

12    you just briefly look at it to make sure they are included in

13    this.

14        (Witness examines document)

15    **Q**    Generally speaking.

16    **A**    Generally speaking.  Yes, generally speaking.

17    **Q**    Okay.  So, what's included in this document (Indicating),

18    363, however, are the work history reports for the year

19    January 2008, as it applies to Officer Robles.

20        Correct?

21    **A**    Yes.

22    **Q**    And, I'm going to go to Page -- the second page of this

23    work history report here.  And, it reflects the month of

24    February of 2008; correct?

25    **A**    Yes.

1   **Q**   And it reflects the month of March, 2008.  Correct?

2   **A**   Yes.

3   **Q**   And, am I correct that beginning on, for example, March 8

4   of 2008, going down to March 31st of 2008, Officer Robles was

5   working out of Mission Station with the exception of a couple

6   of days here, that I see, that he went to the academy,

7   presumably for training?

8        Is that correct?

9   **A**   Yes.  He was detailed to the academy.

10  **Q**   All right.  And in that month, there was also overtime

11  that was put in.

12       Correct?

13  **A**   Yes.

14  **Q**   All right.  And incidentally, just so we're clear, when an

15  officer receives overtime such as the overtime that was

16  received by Officer Robles that we've been talking about, that

17  is approved by a superior officer.  Correct?

18  **A**   Yes.

19  **Q**   And that could be a sergeant, but ultimately it's approved

20  by the lieutenant; correct?

21  **A**   Lieutenant or captain, correct.

22  **Q**   So there are two levels of approval; correct?

23  **A**   Yes.

24  **Q**   Thank you.  I just want to move on.  And I'm not going to

25  go through the entire year of 2008, but I do want to ask you

 1   about 2008 that we've left off here.

 2       And, I'm going to the third page.  And I see the months of

 3   April and May.

 4       Is that right?

 5       (Witness examines document)

 6   **A**   Yes.

 7   **Q**   And I see here, that in the months of April and May, there

 8   is was overtime that was actually put in, and approved by

 9   superior officers on behalf of Officer Robles.  Am I correct?

10       (Witness examines document)

11   **A**   Overtime was put in.  But I cannot tell you from this

12   document who did it.

13   **Q**   But there was overtime put in.  Correct?

14   **A**   Correct.

15   **Q**   And I see here from this document that once again, Officer

16   Robles was assigned to Mission Station, in April and May of

17   2008.  Correct?

18   **A**   With some detailing out to the academy and FOB, correct.

19   **Q**   What is FOB, by the way?

20   **A**   Field Operations Bureau.

21   **Q**   And what's that?

22   **A**   That's the headquarters of the patrol.

23   **Q**   Now let's go on to the next page.  And I'm looking at the

24   months of May and June.  And I also see here some overtime

25   that was put in; is that right?

1    **A**    Yes.

2    **Q**    And I also see here that in the month of May, with the

3    exception of being assigned or going to the academy for --

4    looks like eight days or so, eight, nine days or so, Officer

5    Robles was once again assigned to Mission Station, in May and

6    June of 2008.  Correct?

7    **A**    Yes.

8    **Q**    All right.  And then the next page, we go on to July and

9    August.  Is that right?

10   **A**    Correct.

11   **Q**    And we see overtime that's put in down at the bottom of

12   that page here, some overtime that's put in and approved; is

13   that right?

14   **A**    Correct.

15   **Q**    And once again, with the exception of about five, six,

16   seven days that he went to the academy, he was once again

17   assigned to Mission Station.  Is that right?

18   **A**    Yes.

19   **Q**    All right.  And then we're going on -- I guess I am going

20   through most of the months here, if I may.

21         But, the same is for September and -- August and September

22   he was assigned to Mission; is that right?

23         (Witness examines document)

24   **A**    Yes.

25   **Q**    October; is that right?  The next page?

1       (Witness examines document)

2    **A**    Yes.

3    **Q**    November; is that right?

4       (Witness examines document)

5    **A**    Again, with the academy, yes.

6    **Q**    Right.  And the same thing for December of 2008.  Is that

7    right?

8    **A**    Correct.

9    **Q**    All right.  And in those months, there was overtime that

10   was put in and approved for Officer Robles.  Is that right?

11   **A**    Correct.

12          **MS. CAFFESE:**  Officer, I have no further questions.

13   Thank you, ma'am.

14          **THE COURT:**  Okay, thank you.  You are excused.

15          **THE WITNESS:**  Thank you, sir.

16       (Witness excused)

17          **THE COURT:**  Anything further?

18          **MR. HEMANN:**

19       (Off-the-Record discussion between counsel)

20          **MR. HEMANN:**  We have another witness, Your Honor.

21          **THE COURT:**  You have another witness.  How long will

22   this witness be?

23          **MR. VILLAZOR:**  Your Honor, maybe 20 minutes.

24          **THE COURT:**  Oh, okay.  Then we will take a recess.

25       Ladies and gentlemen, we will recess until 11:00.

PROCEEDINGS

```
 1    Remember the admonition given to you:  Don't discuss the case,

 2    allow anyone to discuss it with you, form or express any

 3    opinion.

 4        When you come back, I will give you a timeline where we

 5    are.  So, don't make any plans during the recess.

 6        Thank you very much.

 7        (Jury excused)

 8        (The following proceedings were held outside of the

 9    presence of the Jury)

10            THE COURT:  We're in recess now, on this case.

11    However, let me call -- I have an order to show cause with

12    respect to Mr. Waukeen McCoy, who's here.

13        You can all be seated.

14        (A pause in the proceedings from 10:42 to 11:08 a.m.)

15        (The following proceedings were held outside of the

16    presence of the Jury)

17            THE COURT:  Pardon me.

18            MR. HEMANN:  So, Your Honor, it looks like we will

19    have our last witness.  That, after we rest --

20            THE COURT:  Well, wait one minute, Barbara, will you

21    please?

22            THE CLERK:  Okay.

23            THE COURT:  Sorry; go ahead.

24            MR. HEMANN:  Mr. Furminger will call one witness --

25            THE COURT:  Right.
```

PROCEEDINGS

```
 1              MR. HEMANN:  -- who we anticipate will be relatively

 2    brief.

 3              THE COURT:  Right.

 4              MR. HEMANN:  And then, we don't know --

 5              MS. CAFFESE:  Excuse me.  Thank you, Counsel.

 6         Your Honor, Mr. Robles has now advised me that he does

 7    wish to testify on his behalf.

 8              THE COURT:  Oh, he is going to testify.  Okay.  Well,

 9    then we will just see where we are.  In terms of time.

10              MR. HEMANN:  So, Your Honor, we had spoken with Ms.

11    -- Mr. Caff- -- Mr. Getz and Ms. Caffese over the weekend.

12    They advised us that their clients were not going to be

13    testifying.

14              THE COURT:  Yeah.

15              MR. HEMANN:  And, based on that, we did not continue

16    to prepare.

17              THE COURT:  Well, you better -- you have lunch.

18    That's the way it is in the real world.  Defendant has a right

19    to testify.  Okay.  I would have -- I have to ask -- I have to

20    ask Sergeant Furminger whether -- and I should do that now.

21         Sergeant Furminger, as you know, you have a right to

22    testify.  If you wish.  You also have a right not to testify.

23    But it is individual to you.  That is, notwithstanding

24    whatever your attorney advises you -- and I have to believe

25    your attorney is extremely competent in this area -- you have
```

PROCEEDINGS

 1    an independent right.

 2         So, is it correct that you do not wish to testify?

 3         Put that -- I just put that in the negative.  Do you want

 4    to testify?  You have a right to testify if you choose.

 5              **DEFENDANT FURMINGER:**  Can I reserve the right?

 6              **THE COURT:**  Pardon me?

 7              **DEFENDANT FURMINGER:**  Can I reserve the right until

 8    after Mr. Robles testifies?

 9              **MR. GETZ:**  (Inaudible)

10              **DEFENDANT FURMINGER:**  Okay, no.

11              **THE COURT:**  Well, that's -- I think what --

12         (Off-the-Record discussion between Defendant and Counsel)

13              **THE COURT:**  I think what I would do in that regard is

14    call Ms. Caffese first to present her case.

15         I'll do that -- in other words, Mister -- Mister --

16    Sergeant Furminger, I will give you the right to make your

17    decision after Mr. Robles testifies.  If that's what you want.

18         But what I'm going do in that regard, then, is call

19    Ms. Caffese for her case, and then go to Officer -- then go to

20    Sergeant Furminger, because it doesn't strike me that it is

21    appropriate to have one person put on half the case, and then

22    go and then put on another issue.

23              **MR. GETZ:**  Well --

24              **THE COURT:**  I don't know.  I could listen to the

25    government.  Do you have a different view?  I mean I'll -- I

 1   could entertain your view.

 2          **MR. GETZ:**  Before the government gives -- can I

 3   interject something?

 4          **THE COURT:**  Of course.

 5          **MR. GETZ:**  Well, two things.  First of all, we are

 6   going to put on Stephanie Furminger.

 7          **THE COURT:**  Right.

 8          **MR. GETZ:**  And I fully expect to rest.  And I have

 9   talked about this with Mr. Furminger, for weeks.

10       Second of all, you know, obviously the Court has seen that

11   both side are very prepared for this trial.

12          **THE COURT:**  Right.

13          **MR. GETZ:**  We have spent a lot of time; everybody has

14   tried to do their best.  And I can just tell the Court that

15   the government -- the government is facing surprise when they

16   hear that one of the -- either one or the other Defendant may

17   testify.

18       And, I would not object to them having the afternoon off

19   to prepare, because were I in their position, I could not

20   cross-examine some of these witnesses without the kind of

21   preparation that they have provided.

22       And it's actually even better for the Defendants, because

23   the precision that comes to the cross is important in allowing

24   the record to be made in the way that it should be made.

25       So --

PROCEEDINGS

```
 1          THE COURT:  Mr. Getz has made your best argument.

 2          MR. HEMANN:  He is a smarter man than I am,

 3  Your Honor.

 4          THE COURT:  All right.  Well, then, I think -- okay.

 5  I could do that.  I could do that.

 6      In other words, I don't want to get into some formalism

 7  here; it's just not -- it's not worth it.

 8          MR. GETZ:  No, I understand.

 9          THE COURT:  And we have a constitutional right at

10  stake, so I want to be very careful in that regard.

11      So what I will do is the following:  Given the decision of

12  at least Officer Robles to testify, I will allow the

13  government to rest.  I will call on Sergeant Furminger for his

14  case; he can put on a witness.  I will then recess for the

15  day.  And, we will resume.  But, I'm going to tell the jury to

16  come back, and we'll resume tomorrow.

17      If your client wishes to testify, he can.  If he doesn't,

18  he doesn't have to.  I'll call, then, Officer Robles if he

19  wants to testify -- I mean, if he doesn't want to testify.

20  That's why I'm bringing the jury back.

21          MS. CAFFESE:  As of this moment, Officer Robles wants

22  to testify.

23          THE COURT:  Yeah.  Okay.  Well, we're at the moment

24  where the moment is.  You know, the moment's arrived.  So, he

25  can testify.
```

```
 1      And, meantime, I'll fill the day up with things involving

 2   you people as well.  Because I want to go through jury

 3   instructions this afternoon.  So I would rather do it this

 4   afternoon; leave tomorrow open for cross and direct.

 5      I don't know how long it's going to take.  Do you have an

 6   idea how long your direct is going to be?

 7           MR. GETZ:  (Inaudible)

 8           MS. CAFFESE:  I don't believe it will be four hours.

 9   I think it will be between one to one and a half hours.

10           THE COURT:  Okay, we'll finish all that.  Okay, so, I

11   think that will be the schedule.

12      Now, is everybody pleased with that schedule?

13      In other words, Mrs. Furminger can testify today.  Nothing

14   will be said about who's resting and so forth.  And we'll just

15   move on to tomorrow and make our decisions.  Or this

16   afternoon.

17           MR. GETZ:  That's fine.

18           THE COURT:  Okay?  All right.

19           MR. HEMANN:  That's great.  And thank you to Mr. Getz

20   and Ms. Caffese, both of them, for being very professional.

21           THE COURT:  Thank Mr. Getz for being professional in

22   this situation.

23      Bring in the jury.

24      (The following proceedings were held in the presence of

25   the Jury)
```

1      **THE COURT:**  Okay, let the Record reflect that all

2    jurors are present; parties are present.

3      Government may call its next witness.

4      **MR. VILLAZOR:**  Your Honor, prior to calling our next

5    witness, the government would move Government Exhibit 318,

6    which is a joint stipulation exhibit.

7      Some of these stipulations have been already read into the

8    Record.  The rest we plan on reading into the Record

9    throughout the next witness's testimony.

10     **THE COURT:**  Yeah.  318, admitted.

11     (Trial Exhibit 318 received in evidence)

12     **MR. VILLAZOR:**  Thank you, Your Honor.  Government

13   calls Special Agent Sandra Flores.

14   **SPECIAL AGENT SANDRA J. FLORES, PLAINTIFF'S WITNESS, SWORN**

15     **THE CLERK:**  Please be seated.

16     Please state your full name; spell your last name for the

17   Record.

18     **THE WITNESS:**  Sandra J. Flores.  F-L-O-R-E-S.

19                      **DIRECT EXAMINATION**

20   **BY MR. VILLAZOR:**

21   **Q**   Good morning, Agent Flores.

22   **A**   Good morning.

23   **Q**   Agent Flores, will you tell the members of the jury how

24   long you've worked with the FBI.

25   **A**   Since April, 2003.

```
 1   Q    When you started out with the FBI, what unit were you
 2   assigned to?
 3   A    I was assigned -- first, out of Quantico, I was assigned
 4   to the San Jose RA here in San Francisco, working gangs and
 5   violent crime.
 6   Q    When you say "RA," what is "RA"?
 7   A    Resident Agency.
 8   Q    And after that, were you moved?
 9   A    I was moved to the Oakland Resident Agency.
10   Q    What did you do in the Oakland Resident Agency?
11   A    I was assigned to the Field Intelligence Group, working
12   gang intelligence.
13   Q    After that, were you then reassigned?
14   A    After that, I went to Baghdad for a short period of time,
15   for about six months.  And then shortly thereafter I went to
16   headquarters, working in the International Corruption Unit.
17   Q    "Baghdad" as in Baghdad, Iraq?
18   A    Yes.
19   Q    Were you there as a Special Agent with the FBI?
20   A    Yes, I was.
21   Q    What were you doing in Iraq?
22   A    Investigating fraud against the government, corruption
23   cases.
24   Q    Then you said you were moved to headquarters.  Where is
25   headquarters?
```

FLORES - DIRECT EXAMINATION / VILLAZOR

```
1   A    In Washington, D.C.

2   Q    What were you doing in Washington, D.C. with the FBI?

3   A    I was assigned for an 18-month temporary duty assignment

4   to the International Corruption Unit.  We supervised

5   antitrust, fraud -- sorry.  Fraud against the government, and

6   FCPA cases, across the bureau.

7   Q    After that 18-month stint, where did you go?

8   A    After my time in headquarters, I was -- I came back to

9   San Francisco in approximately the fall of 2011.

10  Q    Agent Flores, are you also a member of the Naval Reserves?

11  A    Yes, I am.

12  Q    How long have you been enlisted?

13  A    I took a commission with the Civil Engineer Corps in 2001.

14  Q    During your time as an FBI agent, did you also go abroad

15  as a Naval Reservist?

16  A    I did.

17  Q    When was that?

18  A    In 2010, spring of 2010, through spring of 2011.  I was

19  deployed to -- with the military.  And part of that time I was

20  in Kandahar, Afghanistan.

21  Q    That was as a member of the Naval Reserve?

22  A    Yes.

23  Q    Agent Flores, you said when you came back to the FBI you

24  were assigned to the public corruption unit?

25  A    I was.
```

1   **Q**   Are you a member of the investigative team that led to the

2   case that is before this jury?

3   **A**   I am, yes.

4   **Q**   Have you been sitting in this courtroom during the entire

5   trial?

6   **A**   Yes.

7   **Q**   Okay.  Do you know Cesar Hernandez who testified earlier

8   today?

9   **A**   I do.

10  **Q**   Excuse me.  Earlier in this trial?

11  **A**   Yes.

12  **Q**   Were you one of his designated handling case agents?

13  **A**   I was.

14  **Q**   What does a handling case agent do?

15  **A**   We take reporting from the individual, from the person

16  providing information.  We manage the case file.  If there's

17  payments to be made, we acquire the appropriate funding

18  approval, and manage the paperwork entailed -- associated with

19  those payments.

20  **Q**   When you first became involved in this investigation, did

21  you meet Cesar Hernandez?

22  **A**   Pardon me?

23  **Q**   When you first became involved in this investigation, did

24  you meet Cesar Hernandez?

25  **A**   Yes.

1    **Q**    And at the time, did he have a telephone?

2    **A**    He did.

3    **Q**    And was that telephone provided to the investigative team?

4    **A**    Yes.

5    **Q**    What did they do with that telephone?

6    **A**    The investigative team took the telephone and downloaded

7    the information contained on the device.

8    **Q**    I want to show you what's been marked for identification

9    only as Government Exhibit 49.

10    (Witness examines document)

11    **Q**    Do you see that?

12    **A**    Yes.

13    **Q**    What is that?

14    **A**    This is a download of Mr. Hernandez's phone from -- it

15    looks like it was downloaded on August 25, 2011.

16    **Q**    What is the phone number of Mr. Hernandez?

17    **A**    (415)240-8767.

18        **MR. VILLAZOR:**  Your Honor, if I may use the writing

19    pad, I would ask Agent Flores to put that up onto a writing

20    pad.

21    **BY MR. VILLAZOR:**

22    **Q**    Agent Flores, did you bring your own Sharpie?

23    **A**    I have a Sharpie you gave me.

24    **Q**    Thank you.  Could you please write Mr. Hernandez's name

25    and his number, 4 -- I'll wait.  (415)240-8767.

1           (Request complied with by the Witness)

2   **Q**    And Agent Flores, while you are up there --

3           **MR. VILLAZOR:**  Your Honor, the parties have

4   stipulated -- and if I could read into the Record (As read):

5           "SFPD Informant Policy

6           "No. 3.  Sergio Sanchez was signed as an SFPD

7           informant on January 21, 2013.  SFPD assigned him

8           Informant Identification Number 10-04.  His cellular

9           telephone was (415)706-8941 from at least

10          September 1, 2011 to October 31, 2011.  His cellular

11          telephone was (650)417-8501 from at least November 1,

12          2011 to November 30, 2012."

13          And Your Honor, with the Court's permission, if Agent

14  Flores could put Mr. Sanchez's two telephone numbers on?

15          **THE WITNESS:**  Can you repeat those, please?

16  **BY MR. VILLAZOR:**

17  **Q**    Sergio Sanchez: (415)706-8941, and (650)417-8501.

18          (Request complied with by the Witness)

19          **MR. VILLAZOR:**  Your Honor, if I could read another

20  stipulation into the Record?

21          "Wireless Carrier Records."

22          (Reporter interruption)

23          **MR. VILLAZOR:**  (As read)

24          "At all times relevant to Indictment CR-14-102-CRB,

25          Ian Furminger's personal cellular telephone number is

1           (415)309-4914."

2   **BY MR. VILLAZOR:**

3   **Q**   Agent Flores, if you could write that on the board again?

4   That's "Ian Furminger, (415)309-4914."

5           (Request complied with by the Witness)

6           **MR. VILLAZOR:**   Going back to the stipulation:

7           "Edmond Robles' personal cellular telephone is

8           (925)336-6709."

9   **BY MR. VILLAZOR:**

10  **Q**   Agent Flores, could you please put that up on the board.

11  "(925)336-6709."

12          (Request complied with by the Witness)

13          **MR. VILLAZOR:**   (As read)

14          "Reynaldo Vargas' personal cellular telephone is

15          (415)717-2936."

16  **BY MR. VILLAZOR:**

17  **Q**   Agent Flores, did the FBI obtain additional -- excuse

18  me -- additional cellular telephone for Mr. Vargas?

19  **A**   Did we what?  I'm sorry?

20  **Q**   Obtain an additional telephone line of Reynaldo Vargas?

21  **A**   An additional, in addition to this (Indicating)?

22  **Q**   In addition to the one that's on the board.

23  **A**   Oh, yes.  Yes.

24  **Q**   I'm showing you, just for identification, Exhibit 309.

25          (Witness examines document)

 1   **Q**   And is that the additional cellular telephone that

 2   Mr. Vargas had?

 3   **A**   Yes.  He had -- he told us he had acquired NexTel

 4   telephones for himself and for Ed Robles' use.  They called

 5   them their "police phones," and they were phones that Cesar

 6   Hernandez was also familiar with.

 7   **Q**   And what is the cellular telephone identified on Exhibit

 8   309?

 9   **A**   There's a phone number of (415)233-5744.  And there's a

10   phone number of (415)233-5743.  There's two pages here.

11   **Q**   Okay.  Agent Flores, could you please write that on the

12   board, as well, under Mr. Vargas's cellular telephone?

13          **THE COURT:**   309 admitted.

14   (Trial Exhibit 309 received in evidence)

15   (Request complied with by the Witness)

16   **BY MR. VILLAZOR:**

17   **Q**   Agent Flores, during the course of this investigation, did

18   the FBI identify a Mr. Tuan Hoang as a potential witness?

19   **A**   Yes.

20   **Q**   Did the FBI also obtain his cellular telephone number?

21   **A**   Yes.

22   **Q**   Showing what's been marked as Government's Exhibit 308.

23   (Witness examines document)

24   **Q**   Before you do that, Agent Flores, can you identify what

25   Government's Exhibit 308 is?

1    **A**    Yes.  This is a printout from our telephone applications,

2    which is a database where we maintain toll data and telephone

3    information, which identifies his phone number and his name,

4    address.  And other information if we have it, like the

5    telephone carrier.

6         **MR. VILLAZOR:**  The government would move Government

7    Exhibit 308 into evidence.

8         **THE COURT:**  308, admitted.

9         (Trial Exhibit 308 received in evidence)

10   **BY MR. VILLAZOR:**

11   **Q**    Agent Flores, could you put Mr. Hoang's cellular telephone

12   onto the board?  Which would be (415)786-4191.

13        (Request complied with by the Witness)

14   **Q**    Thank you, Agent Flores.  You may resume your seat.

15        Agent Flores, what does the FBI do in a case like this,

16   when they have cellular telephones of subjects and witnesses?

17   **A**    When we obtain telephone numbers provided by witnesses or

18   confidential human sources, et cetera, people we interview, we

19   -- if it is necessary, we will obtain phone data via grand

20   jury subpoena.

21        We've also obtained phone data from court orders, using

22   pen register devices.  And if necessary, and we have reason to

23   believe they're contacting via criminal activity, search

24   warrant for content of text messages.

25   **Q**    You mentioned "phone data."  Specifically, what kind of

1    phone data are you talking about?

2    **A**    Tolls.  That includes the time of the call, the date of

3    the call, the phone numbers that are being contacted, and the

4    time of the call.

5    **Q**    So, kind of like somebody's phone bill, who they called

6    and who they received calls from?

7    **A**    Correct.

8    **Q**    Was that done in this case?

9    **A**    Yes.

10   **Q**    Done through the various means that you explained to the

11   jury?

12   **A**    Yes.

13   **Q**    Would it be fair to say that the toll record the FBI

14   collected in this investigation was voluminous?

15   **A**    A lot.  Yes.

16   **Q**    Okay.  Does the FBI have a mechanism to sift and sort

17   through such data?

18   **A**    Yes.

19   **Q**    What is that called?

20   **A**    We have an application called "telephone aps," "telaps."

21   It is an application that allows us to sort through and query

22   data, that telephone data.  And we can put in date ranges,

23   telephone numbers, time ranges, and query information that we

24   need specific to incidents or specific to just a range of

25   time.

1    **Q**    So the FBI collected, in this case, all the phone data and

2    dumped it into this telaps program?

3    **A**    Yes.

4    **Q**    And you are able to -- the FBI is able to sort through

5    targeted queries?

6    **A**    Yes.

7    **Q**    So, for example, did the FBI do any targeted inquiries as

8    to Ian Furminger's telephone number?

9    **A**    Yes.

10   **Q**    Okay.  So, for example, did they look for all the text

11   messages between Ian Furminger and Sergio Sanchez between

12   February 19, 2009, and November 13, 2009?

13   **A**    Yes.

14   **Q**    Those were text messages?

15   **A**    Text messages.

16   **Q**    Were there about 2,400 text messages back and forth

17   between Mr. Furminger and Mr. Sanchez?

18   **A**    Approximately, yes.

19   **Q**    And did they look for any contact between Mr. Furminger

20   and the phone number associated with Cesar Hernandez?

21   **A**    Yes.

22   **Q**    Did they find any contact, direct contact between

23   Mr. Furminger and Mr. Hernandez?

24   **A**    I do not recall contact.

25   **Q**    Did they look for any communication between Mr. Furminger

1    and Ms. Kelsey Stewart, who testified earlier this trial?

2    **A**    Yes, we looked.

3    **Q**    Was there any contact that the FBI could find?

4    **A**    No.

5    **Q**    How about Mr. Robles?  Did the FBI search the phone number

6    associated with Mr. Robles on this paper exhibit, with contact

7    with Mr. Hernandez?

8    **A**    Yes.

9    **Q**    Was it about 60?

10   **A**    With Mr. Hernandez?

11   **Q**    Yes.  Between Mr. Robles and Mr. Hernandez, was it about

12   60 between February 19, 2009 --

13   **A**    With Cesar Hernandez, approximately 60, yes.

14        (Reporter interruption)

15   **BY MR. VILLAZOR:**

16   **Q**    And, let me be clear:  The date range was about February,

17   2009, to about November, 2012.

18   **A**    Okay.

19   **Q**    And that was between the number associated with

20   Mr. Robles, that 925 number --

21   **A**    Yes.

22   **Q**    -- and the number that's associated with Mr. Hernandez

23   that's identified on that piece of paper (Indicating)?

24   **A**    Correct.

25   **Q**    Did the FBI also look for communication between Mr. Robles

 1  and Mr. Sanchez, Sergio Sanchez?

 2  A    Yes.

 3  Q    And did they find about 1,300, give or take, different

 4  communications between Mr. Robles and Mr. Sanchez?

 5  A    Yes.

 6  Q    Did they also look for contact between Mr. Robles and

 7  Ms. Stewart, Kelsey Stewart?

 8  A    Yes.

 9  Q    And they found none?

10  A    We found none, yes.

11  Q    And the FBI did other targeted inquiries that we are about

12  to talk about, later.

13  A    Correct.

14       **MR. VILLAZOR:**  Your Honor, I neglected to read one

15  part of the wireless carrier records stipulation (As read):

16       "No. 2.  The writings, signals and sounds to and from

17       their personal cellular telephones are transmitted by

18       means of wire communication in interstate commerce."

19  And that's referencing the three telephone numbers I

20  associated with the -- the two Defendants and Mr. Vargas.

21       **THE COURT:**  Okay.

22  **BY MR. VILLAZOR:**

23  Q    Agent Flores, before we talk about those other targeted

24  searches through telaps, I want to talk about your part in

25  this investigation.  Okay?

1    **A**    Okay.

2    **Q**    As part of the investigation, did you testify before the

3    grand jury leading up to this case?

4    **A**    I did.

5    **Q**    And did you testify several times?

6    **A**    Yes.

7    **Q**    Did you have -- did you make a mistake in testifying

8    before that -- one of the grand juries?

9    **A**    I did.

10   **Q**    Can you explain to the jury, what was that mistake?

11   **A**    In one of my testimonies before the grand jury, we had

12   sent a lead to our Quantico division to analyze the plastic

13   wrapping that you heard talked about before, that had

14   contained the marijuana from UPS.

15   **Q**    And Agent Flores, if I could stop you there, we're talking

16   about two different sets of plastic wrapping; correct?

17        One from Boone, Iowa?

18   **A**    Correct.

19   **Q**    And one was from Barrington, Illinois?

20   **A**    Yes.

21   **Q**    And then, the FBI sent that to Quantico?

22   **A**    We did.  We sent the plastic wrapping that had been in

23   Boone, Iowa, had made its way to Boone, Iowa.  We had also

24   sent the plastic wrapping that had made its way to Barrington,

25   Illinois for analysis -- for fingerprint analysis, for

1    whatever evidentiary value we could obtain from that analysis

2    at the laboratory division.

3        We received a report back.

4        In resetting a second lead for additional analysis, we had

5    telephone communication with the lab, and miscommunicated and

6    misunderstood what the lab was telling us.

7        So, I had testified before the grand jury that the

8    packaging from Boone, Iowa, and the packaging from Barrington,

9    Iowa (sic), had actually been of the same sheet of paper -- or

10   sheet of plastic, I should say.

11       When we, months down the road, figured out that it was

12   incorrect -- actually, very recently -- we went before the

13   grand jury again and corrected that.  And, what we had found

14   was it was two pieces of the Barrington wrapping that had been

15   of the same sheet.

16   **Q**   So, Agent Flores, if I could go over that one short time,

17   when you testified before the grand jury the first time, you

18   thought the Boone, Iowa, plastic wrapping was at one time

19   attached to the Barrington, Illinois, wrapping (Indicating)?

20   **A**   Correct.

21   **Q**   And when you testified to that in the grand jury, did you

22   know that that was incorrect?

23   **A**   I did not know that was incorrect.

24   **Q**   When you learned that was incorrect, what did you do?

25   **A**   When we learned it was incorrect, then we went before the

1    grand jury and corrected it on the record.

2    **Q**   And when you say "we," specifically who are you talking

3    about?

4    **A**   Myself.

5    **Q**   You went before the grand jury.

6    **A**   I did.

7    **Q**   And you explained what you just explained to this jury.

8    **A**   I did.

9    **Q**   Agent Flores, I'm going to hand you the incident report

10   binder (Indicating), that's been used in this trial.

11       And essentially, is that a compilation of the incident

12   reports that the FBI has developed evidence for?

13   **A**   Yes.

14           **MR. VILLAZOR:**  Your Honor, again, I'm going to go

15   back to the stipulation (As read):

16           "SFPD Records

17           "1.  The SFPD Reports Management Section maintains an

18           archive of SFPD records, including arrest reports,

19           incident reports and search warrants.  Each case is

20           assigned a nine-digit report number.

21           "2.  Pursuant to SFPD policy, all felony arrest

22           reports are faxed from the police station to the

23           appropriate SFPD department.  The facsimile is

24           transmitted by means of wire communications in

25           interstate commerce."

 1  **BY MR. VILLAZOR:**

 2  **Q**   Agent Flores, if you could turn to Tab 5.

 3       (Request complied with by the Witness)

 4  **Q**   Past the picture, to Exhibit 247.

 5       (Request complied with by the Witness)

 6  **A**   Got it.

 7  **Q**   Are you there?

 8  **A**   I am.

 9  **Q**   What is the date of that incident?

10  **A**   May 25th, 2009.

11           **MR. VILLAZOR:**  Ms. Lane, if you could pull up

12  Government Exhibit 310.

13       (Document displayed)

14           **MR. VILLAZOR:**  And if you could show the middle, the

15  middle e-mail.

16       (Document displayed)

17  **BY MR. VILLAZOR:**

18  **Q**   Agent Flores, do you see that?

19  **A**   I do.

20  **Q**   What's the date of that email?

21  **A**   Tuesday, June 21, 2009.

22  **Q**   Agent Flores, let me show you what's been marked as

23  Government Exhibit 311.

24       (Document taken off display)

25       (Witness examines document)

1   **Q**   Do you recognize that?

2   **A**   I do.

3   **Q**   Is that one of these targeted search queries of telaps?

4   **A**   It is.

5          **MR. VILLAZOR:**  Your Honor, the government would move

6   Government Exhibit 311 into evidence.

7          **THE COURT:**  Admitted.

8      (Trial Exhibit 311 received in evidence)

9      (Document displayed)

10         **MR. VILLAZOR:**  Your Honor, it is a spreadsheet.  I

11  have hard copies for the jury.  If I could pass this

12  (Indicating) out to the jury?

13         **THE COURT:**  Okay.

14         **MR. VILLAZOR:**  Thank you.

15     (Copies of document handed out to members of the jury)

16         **THE COURT:**  I actually think this has been admitted

17  already.

18         **MR. VILLAZOR:**  I think it was subject to a motion to

19  strike.  This is the foundation we lay.

20         **THE COURT:**  Oh, all right.

21     (Document displayed)

22  **BY MR. VILLAZOR:**

23  **Q**   And, as the Judge correctly pointed out, Agent Flores,

24  this was shown earlier to the jury?

25  **A**   Correct.

1   **Q**   Could you just explain what the telaps had produced here?

2   **A**   We did a query, date range search from January 1, 2008, to

3   December 24, 2011, of the telephone number known to be used by

4   Edmond Robles, (925)336-6709, and the telephone number known

5   to be used by Mr. Hoang, (415)786-4191.

6        And these were the telephone calls we found in our

7   database.

8   **Q**   How many phone calls?

9   **A**   Four telephone calls on June 2nd.

10       (Document taken off display)

11  **Q**   Agent Flores, if I could ask you to turn to Tab 9 of the

12  binder.

13       (Request complied with by the Witness)

14  **Q**   It is a picture.  Do you recognize that?

15  **A**   I do.

16  **Q**   What is that?

17  **A**   This is a picture of an SRO located on Broadway in the

18  North Beach area in San Francisco.

19  **Q**   I'm showing you what's been marked as Government's Exhibit

20  299.  Do you recognize that?

21       (Witness examines document)

22  **A**   I do.

23  **Q**   Is this another telaps targeted query?

24  **A**   Yes.

25           **MR. VILLAZOR:**  Your Honor, the government moves

 1    Government's Exhibit 299 into evidence.

 2            **THE COURT:**  299, admitted.

 3        (Trial Exhibit 299 received in evidence)

 4            **MR. VILLAZOR:**  Your Honor, if I could again pass out

 5    hard copies to the jury?

 6        (Copies of document handed out to members of the jury)

 7            **MR. VILLAZOR:**  Ms. Espinoza, if I can have -- thank

 8    you.

 9        (Document displayed)

10    **BY MR. VILLAZOR:**

11    **Q**    Agent Flores, what is Government's Exhibit 299?

12    **A**    This is a -- another telaps query for telephone calls

13    between Mr. Hernandez' known telephone number at the time and

14    Mr. Robles' telephone number.

15    **Q**    Okay.  And focusing on --

16    **A**    Excuse me.  And Mr. Vargas' telephone number as well.

17    **Q**    Focusing on the first four entries, do you see the first

18    entry?

19    **A**    I do.

20    **Q**    Can you explain what the first entry signifies?

21    **A**    On November 12, 2009, there's a text message from

22    Mr. Hernandez to Mr. Robles at 6:57 a.m.

23    **Q**    The second entry?

24    **A**    There is a telephone call from Mr. Robles to Mr. Hernandez

25    at 7:23 a.m.

1    Q    For approximately how long?

2    A    Twenty-six seconds.

3    Q    The third entry?

4    A    A telephone call from Mr. Robles to Mr. Hernandez at

5    7:55 a.m. for 25 seconds.

6    Q    And the fourth entry?

7    A    A telephone call from Mr. Robles to Mr. Hernandez, at 8:05

8    a.m. for 32 seconds.

9    Q    Agent Flores, referencing that first text message, does

10   the FBI have the actual text message?

11   A    We do not.

12   Q    Why is that?

13   A    Because in order to obtain content from text messages, we

14   have to have a search warrant.  And we have -- in most cases

15   with the telephone companies, we have to preserve the data

16   with that telephone company.  Essentially we have to tell the

17   them to: Save the data for us, and we'll come back and provide

18   you a warrant to obtain the data at a future date.

19   Q    As part of this investigation, did the FBI perform search

20   warrants for text messages?

21   A    We did.

22   Q    And, you were here in trial when Mr. Sanchez, Sergio

23   Sanchez, testified?

24   A    Yes.

25   Q    Were those some of the text messages that the FBI

1    obtained?

2    **A**    Yes.

3    **Q**    Were there hundreds and hundreds of text messages the FBI

4    obtained?

5    **A**    Yes.

6    **Q**    Was there a limiting time frame of those text messages?

7    **A**    For Mr. Sanchez it was approximately June until the --

8    June, 2011, until about the end of the year.  I believe it was

9    November, 2011.

10   **Q**    By the way, were all these text messages that the FBI

11   obtained, were they all produced to the defense in discovery?

12   **A**    Yes.

13   **Q**    And all the toll data that was obtained by the FBI, was

14   that also produced to the defense in discovery?

15   **A**    Yes.

16        (Document taken off display)

17   **Q**    Agent Flores, I'm going to show you what's been marked as

18   Government Exhibit 300.

19        (Witness examines document)

20   **Q**    Can you explain to members of the jury what Government's

21   Exhibit 300 is?

22   **A**    This is also a query from telaps for contacts between

23   Mr. Hernandez, Mr. Robles, and Mr. Vargas.  The time-frame

24   search was February 1, 2009 to February 28, 2010.

25        (Document handed up to the Court)

1    **A**    And this time we did a time-range search of 2100 to

2    midnight.

3              **THE COURT:**  Admitted.

4              **THE WITNESS:**  Essentially, 9:00 p.m. to midnight.

5              **THE COURT:**  Admitted.  300 is admitted.

6         (Trial Exhibit 300 received in evidence)

7              **MR. VILLAZOR:**  Just a moment, Agent Flores.

8         (Copies of document handed out to members of the jury)

9         (Document displayed)

10   **BY MR. VILLAZOR:**

11   **Q**    Agent Flores, could you explain again to the jury what

12   Government's Exhibit 300 is?

13   **A**    This is a query from telephone aps.  And what we're

14   querying is contacts between Mr. Hernandez, Mr. Robles,

15   Mr. Vargas.  And we're looking at the time -- the date range

16   of February 1, 2009, to February 28, 2010.  And we're

17   specifically looking for a time-range search of late at night.

18   And the query was 9:00 p.m. to midnight.

19   **Q**    Can you explain the significance of querying 9:00 p.m. to

20   midnight?

21   **A**    Mr. Hernandez told us that he did not have contacts with

22   the SFPD officers late at night except for on a very few

23   occasions, and one in particular.  He believed it occurred

24   very late at night.  And so we looked for those contacts.

25   **Q**    Agent Flores, if I could turn your attention to the first

 1  entry on Government's Exhibit 300.  Can you explain to the

 2  jury what that represents?

 3  **A**    That is on November 13, 2009, at 23:07.  There's a call

 4  for 14 seconds from Mr. Robles' telephone number to

 5  Mr. Hernandez' telephone number.

 6  **Q**    For the rest of that evening, are there additional

 7  communications on November 13, 2009?

 8  **A**    Yes.

 9  **Q**    And who are they between?

10  **A**    They are between Mr. Robles and Mr. Hernandez.

11  **Q**    And, are there any -- is there any other indication that

12  Mr. Hernandez and Mr. Robles had any communication this late

13  at night from the date range specified in this exhibit?

14  **A**    There was another time in June -- excuse me, January 29,

15  2010, where there was contacts at 9:00 p.m., approximately

16  9:00 p.m. at night.

17  **Q**    And that is identified with the target name of Reynaldo

18  Camargo Vargas?

19  **A**    Yes.

20       (Document taken off display)

21  **Q**    Agent Flores, if you could turn to Tab 10.  Government's

22  Exhibit 254, the incident report after the pictures.

23       Let me know when you are there.

24  **A**    I'm here.

25  **Q**    Tab 10.

1    **A**    I have it.

2              **MR. VILLAZOR:**  Ms. Lane, if you could pull up Exhibit

3    254.

4        (Document displayed)

5    **BY MR. VILLAZOR:**

6    **Q**    And at the top left box, Agent Flores, what is the date of

7    this incident report?

8    **A**    November 19, 2009.

9    **Q**    Agent Flores, I'm showing you what's been marked as

10   Government's Exhibit 282.

11       (Document taken off display)

12       (Witness examines document)

13   **Q**    Can you identify that for the jury?

14       (Document handed up to the Court)

15   **A**    This is another query from telaps for contacts between

16   Mr. Robles, Mr. Vargas and Mr. Furminger, on November 19,

17   2009.

18              **THE COURT:**  282 admitted.

19       (Trial Exhibit 282 received in evidence)

20       (Copies of document handed out to members of the jury)

21              **MR. VILLAZOR:**  Ms. Espinoza, if I could have the --

22       (Document displayed)

23   **BY MR. VILLAZOR:**

24   **Q**    Agent Flores, could you again explain to the jury what

25   Government's Exhibit 282 is?

```
 1   A    This is a query from our telephone application database,

 2   which, we're looking for contacts between Mr. Robles,

 3   Mr. Vargas, Mr. Furminger, on November 19, 2009.

 4   Q    And is it only for November 19, 2009?

 5   A    Yes.

 6   Q    And is it only for the numbers that are identified between

 7   Mr. Robles, Mr. Furminger and Mr. Vargas on the writing pad?

 8   A    Yes.

 9   Q    And Agent Flores, if you could at least start with the

10   first one I've highlighted, could you explain the significance

11   of that first entry?

12   A    That, that is a text message at 6:27 a.m.  And that is

13   from Ian Furminger to Rey Vargas.

14   Q    And again, does the FBI have the actual content of that

15   text message?

16   A    No, we do not.

17   Q    Now, jumping down about 25 or so, do you see where I've

18   highlighted 11/19, 15:48?

19   A    Yes.

20   Q    So there's about twenty or more contacts between

21   Mr. Furminger, Mr. Robles, and Mr. Vargas?

22   A    Yes.

23   Q    And that's military time, 15:48?

24   A    Correct.

25   Q    What is that in normal time?
```

1    **A**    3:48 p.m.

2    **Q**    And if I could switch back to Government's Exhibit --

3    actually, I just have it right here.

4         (Document displayed)

5    **Q**    Government's Exhibit 254, what is the occurrence from

6    Date/Time, up at the top left box?

7    **A**    The time is 15:55.

8    **Q**    Which is?

9    **A**    3:55 p.m.

10        (Document taken off display)

11        (Document displayed)

12   **Q**    Agent Flores, going down about five entries from that last

13   15:48 entry, do you see that one, 16:24?

14   **A**    Yes.

15   **Q**    What does the 16:24 entry -- let me see if I could -- What

16   does the 16:24 entry show?

17   **A**    Scroll over --

18        (Document displayed)

19   **A**    This is a telephone call from Ed Robles to Ian Furminger.

20   **Q**    And then the next one, that I've shown here at 17:01?

21   **A**    That is a telephone call at 17:01, from Ian Furminger to

22   Rey Vargas.

23   **Q**    And what time is that?

24   **A**    17:01, which is 5:01 p.m.

25   **Q**    All right.

 1      (Document taken off display)

 2  **Q**   Going back to Government Exhibit 254.

 3      (Document displayed)

 4  **Q**   The incident report.  Do you see where there is the

 5  "OFFICIAL DECLARATION" that I'm pointing to?

 6  **A**   Yes.

 7  **Q**   And the reporting officer is who?

 8  **A**   Officer Vargas.

 9  **Q**   And going across four boxes, what's the date that he

10  signed it (Indicating)?

11  **A**   November 19, 2009.  At 17:35:04.

12  **Q**   Which is what time?

13  **A**   5:35 p.m.

14      (Item handed down)

15          **MR. VILLAZOR:**  Just a moment.

16      (Off-the-Record discussion between counsel)

17  **BY MR. VILLAZOR:**

18      (Document displayed)

19  **BY MR. VILLAZOR:**

20  **Q**   Agent Flores, I neglected to point out.  Again, the

21  reporting officer is who?

22  **A**   Reynaldo Vargas.

23  **Q**   And there's a reviewing officer?

24  **A**   Yes.

25  **Q**   Is there a star number that you can make out?

 1   **A**   That star number looks like 1297.

 2        (Document taken off display)

 3   **Q**   And are you familiar with whose number Star 1297 is?

 4   **A**   Yes.

 5   **Q**   Who is that?

 6   **A**   Ian Furminger.

 7        (Off-the-Record discussion between counsel)

 8             **THE COURT:**  Can we mark the sheet on the board there

 9   as Exhibit next in order?

10             **MR. HEMANN:**  Yes, Your Honor.

11             **THE COURT:**  What exhibit number would that be,

12   Barbara?

13             **MR. HEMANN:**  321, Your Honor.

14             **THE COURT:**  Is that 321?  Okay.  The sheet of paper

15   that's been shown the jury is 321.

16             **MR. HEMANN:**  Yes, Your Honor.

17             **THE COURT:**  And it is admitted in evidence.

18        (Trial Exhibit 321 received in evidence)

19   **BY MR. VILLAZOR:**

20   **Q**   Agent Flores, I have just one more thing to cover with

21   you.  Government Exhibit 298, this is the Pinarello Dogma?

22   **A**   Yes.

23   **Q**   When did the FBI learn of the existence of the Pinarello

24   Dogma that's in evidence?

25   **A**   When Reynaldo Vargas interviewed with us, and provided us

1   details on that bicycle.

2   **Q**   When was that interview?

3   **A**   In October -- late October of this year.  And he provided

4   it to us, I believe it was November of 12th of this year.

5   **Q**   Physically provided it?

6   **A**   Physically brought it to us, this --

7   **Q**   Prior to interviewing Mr. Vargas, did the FBI know

8   anything about this Pinarello Dogma?

9   **A**   We did not.

10  **Q**   Did the FBI know anything about a Craigslist posting of

11  this Pinarello Dogma?

12  **A**   We did not.

13  **Q**   Did you know of Mr. Tuan Hoang who had sold the Pinarello

14  Dogma?

15  **A**   We did not.

16      (Off-the-Record discussion between counsel)

17  **BY MR. VILLAZOR:**

18  **Q**   Agent Flores, you talked about search warrants.

19  **A**   Yes.

20  **Q**   Search warrants were conducted in this investigation?

21  **A**   Yes.

22  **Q**   And some of those search warrants were -- excuse me, some

23  of those text messages that were obtained through search

24  warrants were shown through Mr. Sergio Sanchez.

25      Correct?

1   **A**   Yes.

2   **Q**   Are there other text messages that the FBI has?

3   **A**   Yes.

4   **Q**   I will show you what's been marked as a compilation.  313.

5          **THE COURT:**  313.

6   (Witness examines document)

7   **BY MR. VILLAZOR:**

8   **Q**   Is that a compilation of text messages that the FBI --

9   pertinent text messages the FBI has obtained?

10  (Witness examines document)

11  **A**   Yes.

12         **MR. VILLAZOR:**  Your Honor, the government would move

13  to admit Government Exhibit 313.  And, it was obviously

14  subject to the Court's prior ruling.

15         **THE COURT:**  Okay.  Admitted.

16  (Trial Exhibit 313 received in evidence)

17         **MR. VILLAZOR:**  Ms. Espinoza, if we could have the --

18  thank you.

19  (Document displayed)

20  **BY MR. VILLAZOR:**

21  **Q**   Okay.  Just, to orient ourselves, Agent Flores, if you

22  would turn to Tab 12.  And you will see here, this is the

23  seventh picture, of Government's Exhibit 277.

24      Do you see that?

25  **A**   I do.

1   **Q**   Is that where Sergio Sanchez used to work?

2   **A**   Yes.

3   **Q**   And, showing you another page.

4        (Document displayed)

5   **Q**   Page 6 of Government Exhibit 277.

6        (Witness examines document)

7        (Document displayed)

8   **Q**   Is that also 20th Street, where Mr. Sanchez used to work?

9   **A**   This looks like the vicinity of 20th Street, yes.

10       (Document displayed)

11  **Q**   I'm showing you a series of text messages, dated

12  February 7, 2012.  Do you have that in your --

13  **A**   I do.

14       (Document displayed)

15  **Q**   And just for a frame of reference, yellow is

16  Mr. Furminger's phone number?

17  **A**   Yes.

18  **Q**   And the phone number that's in this exhibit, "9253366709,"

19  whose number is that?

20  **A**   That is Ed Robles' telephone number.

21  **Q**   And for purposes of displaying this to the jury, did you

22  -- did we put Mr. Furminger's text message in a yellow border,

23  and Mr. Furminger -- Mr. Robles's in a pink border?

24  **A**   Yes.

25  **Q**   All right.

```
 1        (Document displayed)

 2    Q    And if you could -- I will read Mr. Robles, if you could

 3    read Mr. Furminger's text messages.

 4    A    Okay.

 5    Q    (As read)

 6            "Do you have a portable generator I could borrow?"

 7    A    (As read)

 8            "No!  Keep meaning to buy one but the good ones

 9            expensive!  The ones on Craigslist are burned out!

10            What do you need it for?  Rent a bad ass one at

11            Cresco!"

12    Q        "Pitching machine...looking for a smaller Honda ER?"

13    A        "Oh, yeah you need one for that but a basic one!

14             Get the entry level Honda."

15    Q    Moving on.

16            "They're hella money... Sergio..."

17        Blank.

18    A        "Not that bad for a small one!  Like 600."

19    Q        "Fuck that..."

20    A        "Mother ducker I asked if you want to get coffee!"

21    Q        "At home... waiting for painter for other house.

22    Can't do it right now."

23        Agent Flores, I'm showing you a series of text messages

24    dated February 10, 2012.

25        (Document displayed)
```

1   **Q**   Again, is Mr. Furminger's phone number highlighted in

2   yellow?

3   **A**   Yes.

4   **Q**   And the other number is an unidentified person.

5   **A**   Yes.

6       (Document displayed)

7   **Q**   If you could read the yellow-bordered text message which

8   is Mr. Furminger's.

9   **A**   (As read)

10          "It's official!  I'm cashing in some of my 457,

11          Fucking sucks!"

12  **Q**      "I'll check it maybe six...at demo."

13  **A**      "I will put the check in the mail and it will be

14          good next week!  I was denied taking money out of

15          retirement as it didn't qualify as a hardship!"

16  **Q**   Showing you another text message, dated February 11, 2012.

17      (Document displayed)

18  **Q**   If you could read Mr. Furminger's text messages.

19  **A**   (As read)

20          "What are your days off?  You staying swings?

21          Having Emma on all my days off from here on out!  No

22          more allowing Lucie to get extra days.  That will

23          bring support back to reasonable amount!"

24  **Q**      "Staying swings, hopefully WO6 still."

25  **A**      "I have court against the ex March 13!  Her game is

```
 1                 about to get rained out!"
 2         (Document displayed)
 3   Q         "Yuck."
 4   A         "Five and a half more years and she is going to have
 5                 a rude awakening!  Then I give money straight to
 6                 Emma when she is in college!  I get paid an extra
 7                 thousand a month to work the overnight starting at
 8                 9:00 p.m.  May have to do it!  Shift choices are
 9                 every 6 months so if I gotta take it (sic) I gotta
10                 do it!  Plus I got denied a take (sic) from 457 plan
11                 because they don't consider it a hardship!
12                 Unfucking believable!  One way or another I will
13                 survive!  Been through worse!"
14   Q    Showing you another text message from Mr. Furminger, dated
15   March 3 -- excuse me, dated March 22, 2012.
16         (Document displayed)
17   A    "Stilt fighting Lucie in court.  Big drain emotionally and
18   financially.  Her attorney making her out to be S struggling
19   teacher."
20   Q    Finally, showing you a series of text messages dated
21   May 16, 2012.
22         (Document displayed)
23   Q    And again, 4153094914 is Mr. Furminger's?
24   A    Yes.
25   Q    And this 9253366709, is that Mr. Robles's?
```

 1   **A**    Yes.

 2   **Q**    And for purposes of presenting to this jury, did you put

 3   -- did we put the -- Mr. Furminger's text in a yellow border,

 4   and Mr. Robles' in a pink border?

 5   **A**    Yes.

 6   **Q**    And if you would read Mr. Furminger's, and I'll read

 7   Mr. Robles's.

 8   **A**    (As read)

 9            "Creapin."

10   **Q**            "Where U at?"

11   **A**            "Crib, getting my tan on like a straight playa!"

12   **Q**            "LOL..."

13       Blank.

14   **A**            "Fuck that shit bro, I am looking like a movie

15               mother fucking star and shit!  Steph is trippin off

16               my new pimp style when we roll out."

17   **Q**            "Dude.  You got issues."

18   **A**            "Hell yeah I do, in the backyard, in the sun, half

19               naked drinking cold ass white wine listening to

20               Luther on my system I got from Serg!"

21               **MR. VILLAZOR:**  No further questions, Your Honor.

22               **THE COURT:**  Cross?

23       (Off-the-Record discussion between counsel)

24

25

1                        <u>**CROSS EXAMINATION**</u>

2   **BY MR. PASSAGLIA:**

3   **Q**   Good morning, Agent Flores.

4   **A**   Hi, good morning.

5   **Q**   I'm going to ask you a few questions about the phone data.

6   All the questions I ask are in the time frame referenced in

7   the indictment, unless I say so.  Okay?

8   **A**   Okay.

9             **THE CLERK:**  Counsel, would you speak into the mic?

10            **MR. PASSAGLIA:**  Sure.

11  **BY MR. PASSAGLIA:**

12  **Q**   Approximately how many text messages were there between

13  Sergeant Furminger and the number associated with Sergio

14  Sanchez?

15  **A**   Uh, I would need my notes to --

16  **Q**   Sure.

17  **A**   -- provide that detail to you.

18      (Off-the-Record discussion between counsel)

19            **THE WITNESS:**  Off the top of my head, I believe it

20  was approximately 2,400; if you're asking between Sergeant

21  Furminger and Sergio Sanchez?

22  **BY MR. PASSAGLIA:**

23  **Q**   That's correct.  Thank you; that's fine.

24  **A**   Approximately.

25  **Q**   I'm going to have a few other questions along the same

 1   lines, if you would prefer your notes.

 2   **A**    Probably.

 3   **Q**    Okay.

 4            **THE COURT:**  Do you have your notes down there?

 5            **THE WITNESS:**  I handed them to one of the

 6   prosecutors.  It's --

 7            **MR. VILLAZOR:**  I have them, Your Honor.

 8            **THE COURT:**  Why don't you just give them to her.  And

 9   let the witness go through them, if she needs them.

10       (Request complied with by Mr. Villazor)

11            **THE COURT:**  There we go.  Okay.  Thank you.

12       (Witness examines document)

13            **THE COURT:**  And your question is?  Would you restate

14   your question, please.

15            **MR. PASSAGLIA:**  I will.

16   **BY MR. PASSAGLIA:**

17   **Q**    The question was:  Approximately how many text messages

18   were there between Sergeant Furminger and a number associated

19   with Sergio Sanchez?

20   **A**    There were approximately 2,400 text messages.

21   **Q**    2,400.  Same question:  Approximately how many text

22   messages -- this time and/or phone calls -- between a number

23   associated with Kelsey Stewart and Rey Vargas?

24   **A**    Approximately 70, or more.  Seventy-four.

25   **Q**    Okay.  And I believe you previously stated that the same

```
 1    question between Kelsey Stewart and Sergeant Furminger was

 2    zero.

 3        Is that correct?

 4    A    Zero.

 5    Q    Okay.  Now, I don't see it on the board, but is there a

 6    number associated with Daisy Bram/Jayme Walsh?

 7    A    There are, yes.

 8    Q    And approximately how many calls/text messages between

 9    that phone number and Rey Vargas?

10    A    Twenty-three.

11    Q    And that same question:  Approximately how many, between

12    the number associated with Ms. Bram and Mr. Walsh and Sergeant

13    Furminger?

14    A    Zero.

15    Q    And, I believe you said text messages and phone calls

16    between Cesar Hernandez and Sergeant Furminger in that time

17    frame was zero as well.

18        Is that correct?

19    A    Correct.

20    Q    In your investigation, did you learn how many officers

21    Sergeant Furminger supervised?

22    A    I heard that he supervised many.  I don't have an exact

23    number for you.

24    Q    Do you have an approximate?

25    A    I don't.
```

1    **Q**   Okay.  So, was there any investigation designed to

2    determine how many text messages Sergeant Furminger exchanged

3    with other officers besides Officer Robles and Officer Vargas?

4    **A**   No.

5    **Q**   So, there's no way to know if he texted or called more or

6    less with other officers that he supervised, compared with

7    Vargas and Robles; is that correct?

8    **A**   No; we didn't look at that.

9    **Q**   You just testified on direct about a few text messages.  I

10   just had a couple of questions about the names.

11        Who was Stephanie?

12   **A**   Stephanie --

13   **Q**   It was referred in a text message from Sergeant Furminger

14   and I believe Mister -- Officer Robles.  Do you --

15   **A**   I believe that to be Stephanie Furminger, his wife.

16   **Q**   And Lucie, I believe that was also referenced.  Do you

17   know who Lucie is?

18   **A**   I believe that to be a woman who he has a child with.  I

19   believe that's Lucie Bradshaw.  I can't be 100 percent

20   certain.

21   **Q**   Understood.  And the name "Emma," do you --

22   **A**   I believe Emma is his daughter.

23   **Q**   Okay.  Thank you.

24             **MR. PASSAGLIA:**  No further questions.

25             **THE COURT:**  Ms. Caffese?

1          **MS. CAFFESE:**  Thank you, Your Honor.

2                          **CROSS EXAMINATION**

3    **BY MS. CAFFESE:**

4    **Q**    Good morning, Agent.  Just a few questions.

5    **A**    Good morning.

6    **Q**    I think, anyway.

7          I just wanted to clarify a few things here.  I believe you

8    said during direct examination that the last communication

9    between Cesar Hernandez and Officer Robles was in 2012.

10   **A**    Um, I'm sorry; say that again?

11   **Q**    Well, let me ask you:  When was the last communication

12   that occurred between Cesar Hernandez and Officer Robles?

13   **A**    I don't know, off the top of my head.

14   **Q**    All right.  I have --

15         (Off-the-Record discussion between counsel)

16         **MS. CAFFESE:**  I would like to mark what I'm about to

17   show Agent Flores.

18         **THE COURT:**  Exhibit next in order for the defense.

19         **THE CLERK:**  364 (sic).

20         (Trial Exhibit later identified as 365 marked for

21   identification)

22   **BY MS. CAFFESE:**

23   **Q**    This is 364 (sic), agent.  Just, if you could look at

24   it -- I believe you testified to most of that, but just look

25   at that to make sure you are familiar with it.

1        (Witness examines document)

2    **A**   Okay.

3    **Q**   All right.  What is it, ma'am?

4    **A**   This looks like a query from our telephone applications.

5    It appears to have been a query between a telephone number

6    associated with Mr. Hernandez and a telephone number

7    associated with Mr. Robles.

8    **Q**   Can I take that back?

9    **A**   Sure.

10   **Q**   And the last communication on this exhibit, on this

11   inquiry between Officer Robles and Cesar Hernandez is

12   November 16, 2009.  Am I correct?

13   **A**   For that query, yes, ma'am.

14   **Q**   Yes.

15          **THE COURT:**  Okay.  Admitted.

16          **MS. CAFFESE:**  Thank you.  Yes.

17       (Trial Exhibit later identified as 365 received in

18   evidence)

19          **THE CLERK:**  Do you have one for the Court?

20          **MS. CAFFESE:**  Yes.

21          **THE COURT:**  Yeah.  364 (sic), admitted.

22          **MS. CAFFESE:**   Thank you.

23   **BY MS. CAFFESE:**

24   **Q**   Now, were there any text messages that you obtained

25   between Officer Robles and Cesar Hernandez?

1    **A**    No, ma'am.

2    **Q**    Did you check the number that belonged to Cesar Hernandez,

3    and determine whether or not there were any communications

4    with other officers aside from Sergeant Furminger and Rey

5    Vargas and Officer Robles?

6    **A**    I don't know -- I don't recall if we did or not.  I'm sure

7    we did during the early stages of the investigation, but I

8    don't recall those results.

9    **Q**    And, that's because Mr. Hernandez actually worked as a CI

10   with other officers at Mission Station.  Am I correct?

11   **A**    He provided information to other officers.  Specifically,

12   the officers he was handled by.

13   **Q**    All right.  Other than Officer Robles, for example?

14   **A**    What I meant, "handled," that was his handler.  It was

15   Officer Robles, and then Officer Vargas.

16   **Q**    Well, there were other officers aside from Officer Robles

17   and Officer Vargas that worked with Cesar Hernandez, correct?

18            **MR. VILLAZOR:**  Objection; foundation.

19            **THE COURT:**  Sustained.

20            **MS. CAFFESE:**  All right.  Very well.

21            **THE COURT:**  By the way, the exhibit that I

22   erroneously referred to as 364 is actually 365.

23            **MS. CAFFESE:**  Thank you, Your Honor.

24   **BY MS. CAFFESE:**

25   **Q**    All right.  Did you ever determine whether or not 519

1    Broadway actually exists?

2    **A**    We went there recently.  And, it is 517 Broadway.  We have

3    a 302 to that effect as well.  Just, in referring to it, we

4    started referring to it as "519."

5    **Q**    All right.  But 519 actually doesn't exist.  Correct?

6    **A**    No, ma'am.  517 exists.  And we have that documented in

7    302s.

8    **Q**    All right.  Very well.

9         Now, the FBI, my understanding, obtained certain -- the

10   Craiglists (sic) -- the Craiglistings (sic) in the last few

11   days.  Am I correct?  The Craiglistings for Mr. Hoang?

12   **A**    We obtained the postings from Craigslist in the last week

13   or so, give or take.

14   **Q**    All right.  And within the last week or so, you obtained

15   certain communications between Mr. Hoang and Officer Robles.

16   Is that right?

17   **A**    Yes.

18   **Q**    And the -- the email exchange that you received -- or I

19   should say that you turned over in discovery -- was the

20   communications from May 17th to June 2nd, 2009.  Initially.

21        Correct?

22   **A**    Initially, I believe the first communication was a little

23   earlier in May.  If I recall, it was May 7th.  I don't recall,

24   unless I have it in front of me.

25   **Q**    My question is, is that you didn't receive -- you actually

 1  did not receive the May 7th communication that Officer Robles

 2  made to Mr. Hoang until I forwarded you those emails.  Or, not

 3  you, specifically, but to counsel for the government here.

 4      Is that correct?

 5  **A**   We received the communication you provided, and then we

 6  had also -- Mr. Hoang had provided communication that he had

 7  with Mr. Robles to Special Agent Folger as well.

 8  **Q**   But, I'm specifically asking you this, Agent.  And that is

 9  that the communication, the emails that you received within

10  the last week initially did not include the May 7th, 2009,

11  communication that Officer Robles sent Mr. Hoang.

12      True statement?

13          **MR. VILLAZOR:**  Objection; relevance.

14          **THE COURT:**  Well, I'll allow it.  Go ahead.

15          **THE WITNESS:**  Special Agent Folger this weekend

16  received communication forwarded to him by Mr. Hoang.

17  **BY MS. CAFFESE:**

18  **Q**   Right.  That was this weekend.  Is that correct?

19  **A**   Yes, ma'am.

20  **Q**   And that was not included in the original communications

21  that you disclosed to me, for example.

22      True statement?

23  **A**   We disclosed to you what we had to disclose.

24  **Q**   Correct.  And what you initially disclosed did not include

25  the earlier communication that predated May 20th, between

1   Officer Robles and Mr. Hoang.

2       True statement?

3   **A**   Well, we disclosed to you what we had.  And from

4   November 12th until now, we collected information about that

5   Pinarello Dogma, including email communication that was

6   received this weekend.

7   **Q**   Well, I understand that.  But the May 7th communication,

8   you became aware of it because I made you aware of it, and

9   said:  Wait, there's some earlier communication that needs to

10  put all of this in context.

11      Correct?

12          **MR. VILLAZOR:**  Objection.  Asked and answered.

13          **THE COURT:**  I'll allow it.

14          **THE WITNESS:**  My belief, ma'am, is that Special Agent

15  Folger received email communication from Mr. Hoang which was

16  independent of you providing the email communication provided

17  to you by your client.

18  **BY MS. CAFFESE:**

19  **Q**   Do you know how Agent Folger received that information --

20          **THE COURT:**  Well, here's the problem.  Here's the

21  problem.

22      When you introduce -- when you ask questions about when

23  you delivered something, that also invites a further inquiry

24  that I think invades the attorney/client privilege.

25      I don't know, but it seemed to me that -- maybe there was

```
 1   an independent source, or maybe there wasn't.  So --
 2   independent of you, or independent of your client.
 3        So, I think it's sort of -- that's why we don't go into
 4   all of this discovery.  And, I'm going to now sustain the
 5   objection as it being asked and answered.
 6             MS. CAFFESE:  All right.
 7             THE COURT:  And we're going to leave it at that.
 8             MS. CAFFESE:  Very well.  I just have one other
 9   exhibit, Your Honor.
10             THE COURT:  Sure.
11             MS. CAFFESE:  And that would be the next in order.
12             THE CLERK:  366.
13             MS. CAFFESE:  All right.
14        (Off-the-Record discussion between counsel)
15             MS. CAFFESE:  Okay, this is Exhibit 366.
16        (Trial Exhibit 366 marked for identification)
17   BY MS. CAFFESE:
18   Q   And, just take a look it.
19        (Witness examines document)
20   Q   Do you recognize this exhibit, Agent?
21   A   I do.
22   Q   Okay.  And, this exhibit reflects the contacts between
23   Reynaldo Vargas and Kelsey Stewart.  Is that correct?
24   A   Yes, ma'am.
25   Q   And Counsel, Mr. Passaglia, has already asked about you
```

1   the contacts between Kelsey Stewart and Rey Vargas.

2       But specifically, there were more than 74 -- or let me say

3   more than 70 contacts between Vargas and Ms. Stewart from

4   March 9, 2009, to May 16, 2009.

5       Is that correct?

6   **A**   Yes.

7           **THE COURT:**  Admitted.

8           **MS. CAFFESE:**  Okay.

9       (Trial Exhibit 366 received in evidence)

10  **BY MS. CAFFESE:**

11  **Q**   And am I correct; there are no communications between

12  Officer Robles and Kelsey Stewart.  Is that correct?

13  **A**   That's correct.

14  **Q**   And there are no communications between Officer Robles and

15  Daisy Bram.  Correct?

16  **A**   Yes, ma'am.

17  **Q**   And there are no communications between Officer Robles and

18  Jayme Walsh.  Correct?

19  **A**   Correct.

20          **MS. CAFFESE:**  Thank you, Agent.  I have no further

21  questions.

22          **THE COURT:**  Anything further?

23          **MR. VILLAZOR:**  Very quickly, Your Honor.

24      Ms. Lane, if you could put on Government Exhibit 273.

25      (Document displayed)

PROCEEDINGS

1                        <u>**REDIRECT EXAMINATION**</u>

2    **BY MR. VILLAZOR:**

3    **Q**   Agent Flores, you see Tab 9 of the incident report binder?

4    **A**   Yes.

5    **Q**   What does this picture show?

6    **A**   This is a photograph of the SRO on Broadway.

7    **Q**   And what is the address that the FBI believes is a place

8    of offense?

9    **A**   It is 517 Broadway.

10   **Q**   517 Broadway?

11   **A**   Yes.

12           **MR. VILLAZOR:**  No further questions.

13           **THE COURT:**  Thank you.  Anything further?

14           **MR. PASSAGLIA:**  No.

15           **MR. HEMANN:**  We have a number of stipulations.

16           **THE COURT:**  Okay.  Well, you are excused.  You can

17   step down.

18           **THE WITNESS:**  Thank you.

19       (Witness excused)

20           **THE COURT:**  Okay.  Go ahead.

21           **MR. HEMANN:**  Thank you, Your Honor.  These are

22   stipulations that have not yet been read into the Record,

23   Your Honor.

24       I would like to read them into the Record, and they will

25   be reflected in the exhibit the jury will receive.

PROCEEDINGS

1          **THE COURT:**  Okay.

2          **MR. HEMANN:**  Number one (As read):

3          "San Francisco Police Department (SFPD) is a

4          government agency within the executive branch of the

5          City and County of San Francisco, California.

6          "1.a. In 2009, SFPD was a grantee and beneficiary of

7          the Public Protection Special Revenue Fund, a federal

8          grant program, in excess of $10,000.

9          "In 2010, SFPD was a grantee and beneficiary of the

10         Public Protection Special Revenue Fund, a federal

11         grant program, in excess of $10,000."

12    (Off-the-Record discussion between counsel)

13         **MR. HEMANN:**  I'll keep reading while it warms up.

14         "SFPD has ten police stations in the County of

15         San Francisco.  Mission Station..."

16    (Document displayed)

17         **MR. HEMANN:**  (As read)

18         "...630 Valencia Street, San Francisco, covers the

19         area east of Twin Peaks to James Lick Freeway and

20         south of Market Street to Cesar Chavez Street.

21         "Every SFPD officer takes a sworn oath to support and

22         defend the Constitution -- the U.S. Constitution, the

23         Constitution, statutes, and laws of California and

24         the code, policies and charter of the City and County

25         of San Francisco.  A sworn SFPD officer is empowered,

Belle Ball, CSR and Katherine Sullivan, CSR
Official Reporters – U.S. District Court
(415) 373-2529

PROCEEDINGS

1          among other things, to arrest persons and seize

2          property on behalf of City and County of

3          San Francisco.

4          "At all times relevant to Indictment CR-14-00102-CRB,

5          "a.  Ian Furminger is a sworn SFPD police officer and

6          an agent authorized to act on behalf of the SFPD.

7          His SFPD star number is 1297, and he was assigned to

8          the plainclothes unit at Mission Station from

9          February 19, 2009, to November 28, 2009;

10          "Edmond Robles is a sworn SFPD police officer and an

11          agent authorized to act on behalf of SFPD.  His SFPD

12          star number is 1467, and he was assigned to the

13          plainclothes unit at Mission Statement (sic) from

14          March 8, 2008, to January 23, 2010; and

15          "c.  Reynaldo Vargas is a sworn SFPD officer and an

16          agent authorized to act on behalf of SFPD.  His SFPD

17          star number is 979, and he was assigned to the

18          plainclothes unit at Mission Station from February 3,

19          2009, to May 13, 2011.

20          "The Mission Station plainclothes unit phone number

21          is (415)255-1180."

22     (Document taken off display)

23     (Document displayed)

24          **MR. HEMANN:**  (As read)

25          "As a business practice, the San Francisco Police

Belle Ball, CSR and Katherine Sullivan, CSR
Official Reporters - U.S. District Court
(415) 373-2529

1              Department maintains Employment History Records for

2              police officers.  Defense Exhibit 5, a 16-page

3              employment history for Edmond Robles, is a true and

4              accurate copy of his scheduling and assignment

5              history from January 1, 2008, to January 31, 2010.

6              "No. 2.  Confidential Informant Payment Receipt Forms

7              from July 29, 2010; August 20, 2010; August 25, 2010;

8              September 9, 2010; and February 5, 2011 are true and

9              accurate copies from SFPD informant files created and

10             maintained pursuant to the SFPD Informant Management

11             Manual.  (Included, in part in Government's Exhibits

12             2 and 56.

13             "No. 3.  A property receipt for SFPD incident report

14             number (090-312-655) dated March 25, 2009, is a true

15             and accurate copy from the file for two U.P.S.

16             shipping boxes with two plastic sealed bags

17             containing marijuana.  (See Government Exhibit 116)."

18       (Off-the-Record discussion between counsel)

19       (Document displayed)

20             **MR. HEMANN:**  Under "Controlled Substances"

21    (As read):

22             "Under federal law, drugs, substances and certain

23             chemicals used to make drugs are classified into five

24             distinct categories or schedules.  Under federal law,

25             it is unlawful to possess or distribute drugs

PROCEEDINGS                                            1710

1              classified as Schedule I controlled substances.

2              "a. Marijuana is a Schedule I controlled substance.

3              "B. Heroin is a Schedule II controlled substance.

4              "c. Oxycodone (OxyContin) is a Schedule II controlled

5              substance.

6              "2.  Government's Exhibit 244-C and 244-D amount to

7              83.89 (sic) grams of marijuana.

8              "3.  Government Exhibit 107-C and 107-D amount to

9              89.14 grams of marijuana.

10             "4.  Government Exhibit 108-C and 108-D amount to

11             99.6 grams of marijuana.

12             "5.  Government Exhibit 109-C and 109-D amount to

13             98.87 grams of marijuana.

14             "6.  Government's Exhibit 110-C and 110-D amount to

15             94.6 grams of marijuana.

16             "7.  Government Exhibit 112-B is 216.7 grams of

17             marijuana.

18             "8.  Government Exhibit 113-B is 246.9 grams of

19             marijuana."

20        (Off-the-Record discussion between counsel)

21        (Document displayed)

22             **MR. HEMANN:**  With regard to the Apple records, Your

23   Honor (As read):

24             "1.  Every Apple iPhone has unique identifiers, such

25             as a serial number, an International Mobile Equipment

Belle Ball, CSR and Katherine Sullivan, CSR
Official Reporters – U.S. District Court
(415) 373-2529

PROCEEDINGS

1           Identity (IMEI) number and a Global Unique

2           Identifier, (GUID).  These unique identifiers can be

3           found on the device or through Apple records.

4           "Apple ID is an Apple customer's user name for an

5           Apple customer to utilize Apple services and

6           products.  An Apple ID user name must be a valid

7           email address.

8           "Apple assigns a unique alphanumeric value called a

9           Directory Services Identification (DSID) to each

10          Apple ID.

11          "Reynaldo Vargas created Apple ID hm221@pacbell.net

12          on March 4, 2009.  Apple assigned DSID 1017348707 to

13          hm221@pacbell.net.

14          "Bernadette Melvin, with Apple ID

15          bernadettemelvin@gmail.com and Apple DSID 5288737961,

16          registered iPod Nano 16G Black (4th Generation)

17          (Serial Number YM9032PS5BF) with Apple on

18          September 4, 2009.  Her phone number is 415-377-5270

19          according to Apple records.

20          "Apple maintains basic registration or customer

21          information, including, name, address, email address,

22          and telephone number if an Apple customers

23          voluntarily and proactively registers the Apple

24          device with Apple.  Apple does not verify this

25          information.

1712

PROCEEDINGS

1      "Apple maintains a Global Customer Records Management

2      (GCRM) customer service database, to keep internal

3      records of contacts with Apple customers regarding an

4      Apple device or service.  The summary page is titled

5      '360-Degree View.'  Any Apple product the Apple

6      customer is associated with is recorded as an

7      'Installed Product ID.'

8      "Apple 'Point of Sale' transactions are cash,

9      credit/debit card, or gift card transactions that

10     occur at an Apple Retail Store.  Apple maintains

11     records of these point of sales transactions in the

12     ordinary course of business.

13     "iTunes gift cards have a sixteen-digit alphanumeric

14     redemption code which is located under the

15     'scratch-off' gray area on the back of the card, and

16     a nineteen-digit code at the bottom of the card.

17     Based on these codes, Apple keeps business records of

18     when a card has been activated or redeemed as well as

19     whether any purchases have been made with the card as

20     well as the name of the store, location, date, and

21     time."

22     (Document taken off display)

23     (Document displayed)

24     **MR. HEMANN:**  Finally (As read):

25     "Gelateria Naia is a gelato store with locations in

PROCEEDINGS

```
 1              San Francisco and in Walnut Creek.  The phone number

 2              at the Walnut Creek store is (925)943-1905.

 3              "Macy's is a chain of department stores with

 4              approximately 850 locations in the United States.

 5              There are two Macy's Stores in San Francisco.  One is

 6              located at 170 O'Farrell Street, and the second is

 7              located at 1 Stonestown Mall.

 8              "3.  DeWalt Industrial Tool Company manufactures

 9              power tools and is headquartered in Baltimore,

10              Maryland.

11              "4.  Nikon Corporation manufactures digital cameras

12              and is headquartered in Tokyo, Japan.

13              "5.  Tequila Herradura is a tequila distiller located

14              in Amatitan, Jalisco, Mexico.  Its parent company is

15              the Brown-Forman Corporation based in Louisville,

16              Kentucky."

17         (Document taken off display)

18              MR. HEMANN:  Thank you, Your Honor.

19              THE COURT:  Anything further?

20              MR. HEMANN:  The United States rests, Your Honor.

21    Thank you.

22              THE COURT:  Okay.  Ladies and gentlemen, I know that

23    it's 12:30.  But, let me tell you what I expect to do, with

24    your indulgence.

25         We now turn to the defense portion of the case.  As --
```

 1    today, the Defendants would like to call -- Defendant Sergeant

 2    Furminger would like to call as a witness an individual who

 3    has been waiting here for some two hours.  And, her testimony

 4    will be relatively brief.  So, I would like to do that now.

 5        At the conclusion of her testimony, I'm going to excuse

 6    you for the day, and ask you to come back tomorrow morning for

 7    further proceedings.

 8        However, I also told you I was going to give you an

 9    indication of what's going to happen.  My view is that the

10    case will go to you next week.  As soon as Monday, possibly as

11    soon as Monday.

12        And while I initially said that we would only meet Monday,

13    Tuesday and Friday of next week, I want to change that,

14    because my guess, educated or not, will be that you will be in

15    deliberations as long as it takes, but you will probably

16    commence your deliberations either Monday or Tuesday of next

17    week.  So, I didn't want to interrupt that process.

18        My -- I'm cancelling my other commitment.  So I will be

19    here in San Francisco, here, that week, as well -- that's

20    called "next week" -- as well.

21        So, in the interest of trying to move the case ahead, and

22    the fact that the evidence in the case will permit it, I would

23    like to ask you to readjust your calendars, if you made any

24    commitments, for -- I don't know whether I said Tuesday,

25    Wednesday?  Or Tuesday, Wednesday, Thursday?  Or Wednesday and

```
 1   Thursday?

 2        Well, whatever I said, I would like you to be available to

 3   participate in the trial next week, fully, next week, with the

 4   understanding and expectation that the case will be given to

 5   you early next week for determination.

 6        So, we did -- if you'll bear with us, rather than sending

 7   you out for lunch and having you come back and then listening

 8   to one witness, I would rather do it now and free you for the

 9   day -- actually, for the week -- no, not for the week.  Coming

10   in tomorrow.  So, I would just like to just free you for the

11   day, because I think that's far more convenient.

12        So, hearing no loud protests over this, let's proceed.

13   And if you would like to stand up -- yes?

14             ALTERNATE JUROR:  I'm sorry; would you spell out

15   again exactly when we're here and when we're not here?

16             THE COURT:  Yes.  You would be here tomorrow.  You

17   would not be here Wednesday or Thursday or Friday of this

18   week.  Wednesday, Thursday and Friday being the Thanksgiving

19   celebration.

20        Then, you will return Monday of next week.  And it is

21   anticipated that you will get the case for decision next week,

22   early next week.  Can't tell you exactly when right now, but

23   early next week.

24        And, you will be expected to be here all of next week, or

25   at least as long next week as it takes to determine the
```

 1    outcome of the case.  Okay?

 2              **ALTERNATE JUROR:**  Thank you.

 3         **THE COURT:**  Any other questions?  Did you all get

 4    that?

 5         (Members of the Jury indicate in the affirmative)

 6         **THE COURT:**  Great.  Okay.  If you want to stand up

 7    for a minute to stretch, and we'll call on Mr. Getz to call

 8    his witness.

 9         (A pause in the proceedings)

10         **THE COURT:**  You may be seated.  We are resuming

11    proceedings.

12       Mr. Getz.

13         **MR. GETZ:**  Yeah, I had told the witness that we

14    usually break from 12:00 to 1:00.  I assumed she was going to

15    stay in the lawyers' lounge, but I don't see her there now.

16    So, I can check the cafeteria and come right back.

17         **THE COURT:**  Well, I think I would rather -- well, I

18    don't know.  I don't know whether -- to take five minutes or

19    so now probably would be worth it.

20         **MR. GETZ:**  I'll just run down and see --

21         **THE COURT:**  Yeah.

22       Ladies and gentlemen, you may want to retire to the jury

23    room, but don't go anywhere, okay.

24       Remember the admonition given to you:  Don't discuss the

25    case, allow anyone to discuss it with you, form or express any

 1    opinion.  We'll see where we are.

 2         (Jury excused)

 3         (Recess taken from 12:40 to 12:46 p.m.)

 4              **THE COURT:**  Okay.  Let the record reflect all jurors

 5    are present, the parties are present.

 6         You may call your witness.

 7              **MR. GETZ:**  May I call Stephanie Furminger, please.

 8              **THE CLERK:**  Will the witness please come forward and

 9    take the witness stand.

10         Good afternoon.  Please remain standing.  Raise your right

11    hand.

12         **STEPHANIE FURMINGER, DEFENDANT FURMINGER WITNESS, SWORN**

13              **THE WITNESS:**  Yes.

14              **THE CLERK:**  Please be seated.

15         Please state your full name, spell your last name for the

16    record.

17              **THE WITNESS:**  Stephanie Furminger.

18                        **DIRECT EXAMINATION**

19    **BY MR. GETZ:**

20    **Q.**  Ms. Furminger, good -- good afternoon.

21    **A.**  Hi.

22    **Q.**  Where did you attend high school?

23    **A.**  Albany High School.

24    **Q.**  When you were in high school did you know somebody who you

25    see in this courtroom today?

1    **A.**    I did.  I do.

2    **Q.**    Who is that?

3    **A.**    Ian Furminger.

4    **Q.**    Are you two married?

5    **A.**    Not for long.

6    **Q.**    What do you mean, "not for long"?

7    **A.**    We filed for divorce in February.

8    **Q.**    Is this a friendly parting of the ways?

9    **A.**    No.

10   **Q.**    In all matters involving Ian Furminger, are you

11   represented by an attorney?

12   **A.**    I am.

13   **Q.**    What's his name?

14   **A.**    Jerry Chang.

15   **Q.**    Is he here in court today?

16   **A.**    He is.

17   **Q.**    Where is he seated?

18   **A.**    Right there (indicating).

19   **Q.**    Okay.  When were you and Ian Furminger married?

20   **A.**    July 25th, 2004.

21   **Q.**    Did the two of you have a child?

22   **A.**    Yes.

23   **Q.**    What's his name and age?

24   **A.**    Ronan Martin Furminger.  He's nine and a half.

25   **Q.**    At some time after Ronan was born did you go back to work?

1    **A.**   I did.

2    **Q.**   What year was that?

3    **A.**   I believe it was in 2007.

4    **Q.**   In 2007, what kind of work did you do?

5    **A.**   I worked for a natural and organic food distributor.  I'm

6    a sales manager.

7    **Q.**   What did that entail?

8    **A.**   Uhm, sales calls; travel; trade shows.

9    **Q.**   Did you work full-time?

10   **A.**   Yes.

11   **Q.**   Would that be true, also, for 2008?

12   **A.**   Yes.

13   **Q.**   Would that be true, also, for 2009?

14   **A.**   Yes.

15   **Q.**   Have you worked full-time for that concern over the last

16   five years?

17   **A.**   I've worked for nine --

18   **Q.**   Okay.

19   **A.**   -- with the company.

20   **Q.**   In 2009, were you employed full-time?

21   **A.**   Yes.

22   **Q.**   Where did the Furmingers live that year?  Where did you

23   and Ian and Ronan live?

24   **A.**   Orinda.

25   **Q.**   Did Ian Furminger's daughter from a previous relationship

```
 1   live with you, also, from time to time?

 2   A.   Yes.

 3   Q.   What's her name?

 4   A.   Emma.

 5   Q.   I want you to tell the jury --

 6   A.   Sorry.

 7   Q.   And I'm referring now to the time frame about 2009.  Was

 8   your family living comfortably?

 9   A.   Yes.

10   Q.   Were there financial problems?

11   A.   No.

12   Q.   Is the same true for 2010?

13   A.   Yes.

14   Q.   And 2011?

15   A.   Yes.

16   Q.   Is the same true for 2012?

17   A.   Yes.

18   Q.   Is it fair to say the combined incomes between you and Ian

19   Furminger resulted in a comfortable standard of living?

20   A.   Yes.

21   Q.   You said your marriage is breaking up.  Was it breaking up

22   and is it breaking up for financial reasons or for other

23   reasons?

24   A.   For other reasons.

25   Q.   All right.  Now I want to shift topics.  I want to go to
```

```
 1    the Orinda property.
 2        Do you have that property in mind?
 3    A.   Yes.
 4    Q.   Did Ian Furminger perform repair and upgrade work on that
 5    house?
 6    A.   Yes.
 7    Q.   What kind of work did he do?
 8    A.   We did a lot of work.
 9    Q.   Describe some of it, just so I can get a feel --
10    A.   We changed the garage and added a laundry room.  We took
11    paneling off the walls in the living room.  We covered up a
12    sliding glass door.  We put in skylights.  We tiled the
13    bathroom.  I mean, we did a lot.
14    Q.   Now, you just described all these tasks that were done to
15    upgrade the house.  And you used the word "we," but it was
16    really Ian Furminger who was doing it; correct?
17    A.   Yes.
18    Q.   And did he have some help when he did this work?  Did he
19    have someone he paid to help him?
20    A.   Yes.
21    Q.   Do you know a handyman named Nacho?
22    A.   I do.
23    Q.   Was that someone who helped him?
24    A.   Yes.
25    Q.   Do you happen to know Nacho's true name?
```

1   **A.**   I believe it's Ignacio.

2   **Q.**   Okay.  And when did you first meet Ignacio?

3   **A.**   About 2007.

4   **Q.**   And when you met him in 2007, was he helping Ian work on

5   the house you then lived in?

6   **A.**   Yes.

7   **Q.**   Where was that house?

8   **A.**   Burlingame.

9   **Q.**   What kind of work did Nacho and Ian do there --

10  **A.**   Laundry list.

11  **Q.**   -- that you remember?

12  **A.**   They remodeled a bathroom.  Put in a master closet.  Did

13  an addition to the back kitchen.  A deck.  We worked -- or

14  they worked on a garage.  Windows throughout the whole house.

15  Remodeled a kitchen.  Pretty much everything.

16  **Q.**   Is Nacho someone you've seen on a regular basis over the

17  last seven years?

18  **A.**   Not anymore.

19  **Q.**   Okay.  The Orinda house was sold; right?

20  **A.**   Yes.

21  **Q.**   And you two are now living separately; correct?

22  **A.**   Yes.

23        **MR. GETZ:**   All right.  Thank you.  I have no further

24  questions.

25        **THE COURT:**   Any questions?

```
 1              MR. HEMANN:  Just a few, Your Honor.

 2                       CROSS EXAMINATION

 3   BY MR. HEMANN:

 4   Q.  Good afternoon, Ms. Furminger.  My name is John Hemann,

 5   and I'm an assistant United States Attorney.

 6        What was Mr. Furminger's monthly income from the SFPD in

 7   2009?

 8   A.  His monthly income?

 9   Q.  (Nods head.)

10   A.  He made a little over 120,000 that year, so I don't know.

11   Q.  How do you know that?

12   A.  Because I have my tax returns.

13   Q.  And how recently did you look at those tax returns?

14   A.  Uhm, two days ago.

15   Q.  In preparation for testifying today?

16   A.  I did.

17   Q.  What was Mr. Furminger's child support obligation in 2009?

18   A.  To -- for Emma?

19   Q.  For his daughter from the previous marriage.

20   A.  I believe it was 650 a month.

21   Q.  And do you remember that?  Did you have to refresh your

22   recollection on that recently?

23   A.  No.

24   Q.  Has it been 650 a month for a long period of time?

25   A.  In 2007.  I don't -- I don't know what he pays now.
```

1  **Q.**  So from 2007 until when?

2  **A.**  It went up, I think, around 2009, to 1600 a month.

3  **Q.**  So in 2009 it went from $650 a month to $1,600 a month?

4  **A.**  Correct.

5  **Q.**  And the income that Mr. Furminger received from SFPD, that

6  $120,000 number you mentioned a couple of moments ago, that

7  was pre-tax income; correct?

8  **A.**  Yes.

9  **Q.**  And when you bought -- what year did you buy your house in

10 Orinda?

11 **A.**  2008.

12 **Q.**  What was your monthly mortgage payment on that house in

13 2009?

14 **A.**  It was a little over 3,000.

15 **Q.**  A month?

16 **A.**  Uh-huh.

17 **Q.**  You and Mr. Furminger, when you were still together, kept

18 separate finances; is that fair to say?

19 **A.**  Yes.

20 **Q.**  So he had his separate bank account and credit cards and

21 things like that?

22 **A.**  Yes.  We had a few credit cards together.  American

23 Express.  We had one bank account together, but I didn't use

24 it.

25 **Q.**  And you did not, during the time you were together, manage

1    or track his separate finances; correct?

2    **A.**   I managed the household finances.

3    **Q.**   But he was able to spend money, sort of, without you

4    doling it out or overseeing it in any way; correct?

5    **A.**   Yes.

6    **Q.**   He worked with you or he worked at the San Francisco

7    Police Department in -- from 2009 until 2012, when you were

8    still together?

9    **A.**   Yes.

10   **Q.**   And would it be accurate to say, Mrs. Furminger, that he

11   did not share with you much about his activities at the SFPD?

12   **A.**   That is correct.

13   **Q.**   Mr. Furminger was a heavy drinker during your marriage?

14          **MR. GETZ:**   Object.   It's irrelevant to any issue in

15   the case.

16          **THE COURT:**   Sustained.

17   **BY MR. HEMANN:**

18   **Q.**   Did Mr. Furminger spend money on social events outside of

19   your presence?

20   **A.**   Yes.

21   **Q.**   Did he have friends and things -- would he go out without

22   you?

23   **A.**   Not often.

24   **Q.**   Would he go out with people from SFPD without you?

25   **A.**   Yes.

1   **Q.**  Would he spend money during those events without you?

2   **A.**  I don't know.

3   **Q.**  You don't know a person by the -- personally, you don't

4   know a person by the name of Sergio Sanchez, do you?

5   **A.**  I do not.

6   **Q.**  Did you ever, while you were married to -- while you were

7   together with Mr. Furminger, socialize with anybody by the

8   name of Sergio Sanchez?

9   **A.**  I did not.

10  **Q.**  And did Mr. Furminger ever tell you that he was

11  socializing with a person by the name of Sergio Sanchez?

12  **A.**  I've heard his name but not social.

13  **Q.**  You heard his name because you discovered it while

14  looking -- you discovered his phone number while looking

15  through Mr. Furminger's telephone for another reason; correct?

16  **A.**  Correct.

17  **Q.**  You did not know that Mr. Furminger was obtaining property

18  from Mr. Sanchez, did you?

19  **A.**  No.

20  **Q.**  When you purchased your house with Mr. Furminger in

21  November 2008, there were not skylights in the house; correct?

22  **A.**  There were not.

23  **Q.**  About seven months after you purchased the house,

24  skylights were installed by Mr. Furminger and by Ignacio

25  Ramirez; correct?

1  **A.**   I'm not sure.  I don't remember when they were installed.

2  But, yes, Nacho and Ian put them in the living room.

3  **Q.**   At some point in time after you purchased the house;

4  correct?

5  **A.**   Yes.

6  **Q.**   Mr. Furminger paid Mr. Ramirez, didn't he?

7  **A.**   Nacho?

8  **Q.**   Yes.

9  **A.**   Yes.

10 **Q.**   You know him as Nacho, not Mr. Ramirez, I take it?  Yes?

11 **A.**   Correct.

12 **Q.**   Mr. Furminger paid Nacho; correct?

13 **A.**   Correct.

14 **Q.**   And Mr. Furminger was the person who obtained the

15 supplies, the hardware, the lights for the actual -- for the

16 skylights; correct?

17 **A.**   Correct.

18         **MR. HEMANN:**  No further questions, Your Honor.

19         **MR. GETZ:**  I have nothing further.

20         **THE COURT:**  Ms. Caffese?

21         **MS. CAFFESE:**  No, Your Honor.  Thank you.

22         **THE COURT:**  Thank you very much.

23     (Witness excused.)

24         **THE COURT:**  So, ladies and gentlemen, we are now

25 going to take our recess for the day.

1    Remember the admonition given to you.  Don't discuss the

2    case, allow anyone to discuss it with you, form or express any

3    opinion.

4    Please leave your notebooks in the jury room.  And we will

5    start tomorrow at 9 o'clock.

6    So thank you very much.  Have a pleasant evening.

7    (Jury out at 1:00 p.m.)

8        **THE COURT:**  Okay.  Let the record reflect the jurors

9    have left.

10    So what I'd like to do is see you back here at 2:30, and

11    we will go over jury instructions at that time, to the extent

12    we're able to, which I think we are.  The parties have to be

13    here, obviously.

14    So see you at 2:30.

15        **MR. HEMANN:**  Thank you, Your Honor.

16        **MR. VILLAZOR:**  Thank you, Your Honor.

17    (Recess from 1:02 to 2:30 p.m.)

18     (The following proceedings were held in open court,

19    outside the presence of the jury:)

20        **THE COURT:**  Please be seated.

21    Let the record reflect that the parties are present.  The

22    jury is not present.  We're here to discuss instructions.

23    In reviewing the instructions, I have several concerns.  I

24    suppose the principal concern addresses the honest services

25    charge.

 1        First, unless I have -- and I don't have it in front of

 2   me.  My law clerk has it.  She will be out here in a minute.

 3   Well, I'll come back to that when I get it in front of me.

 4        But, obviously, just to go through some boilerplate, I

 5   don't think there's anything unusual except that if one

 6   defendant testifies, the other one doesn't testify --

 7   Ms. Caffese.

 8            **MS. CAFFESE:**  It's just --

 9            **THE COURT:**  Go right ahead.

10            **MS. CAFFESE:**  Excuse me for interrupting, Your Honor,

11   but Mr. Robles has advised me that he does not wish to

12   testify.

13            **THE COURT:**  Okay.  So let me ask you, Mr. Robles --

14   if you would stand up a minute -- you understand you have the

15   right to testify and the right not to testify?

16            **MR. ROBLES:**  Yes, Your Honor.

17            **THE COURT:**  And you are free to use your own

18   judgment, obviously informed by your attorney.  But it is your

19   right.  It's not your attorney's right.

20        So having that in mind and hearing all the evidence in the

21   case, is it your desire to testify or not to testify?

22            **MR. ROBLES:**  Not to testify, Your Honor.

23            **THE COURT:**  Okay.  Thank you very much.

24        Now, Sergeant Furminger --

25            **MR. FURMINGER:**  Yes.

PROCEEDINGS

```
 1              THE COURT:  -- same thing for you.
 2         Having in mind the fact that Officer Robles is not going
 3    to testify, is it your desire individually, because you would
 4    be the sole defendant testifying, do you wish to testify or do
 5    you not wish to testify?
 6              MR. FURMINGER:  After conferring with counsel, I'll
 7    say no, I'm not going to testify.
 8              THE COURT:  You do not wish to testify?
 9              MR. FURMINGER:  That's correct.
10              THE COURT:  Okay.  All right.
11         Now, I'm wondering if I should get in the jury -- they're
12    coming in tomorrow with nothing to do except for me to send
13    them home.
14         Barbara, how difficult is it to reach the jurors?
15         I probably should bring them in any way, apologize to
16    them.  I'll take it, you know.  I'll say we're discussing the
17    legal issues.  As a result, we're going to spend the day in
18    conference ironing out different legal issues.  There's no
19    reason to keep the jury there.
20         Both parties will rest in front of the jury.  And I'll
21    thank them.  And then I want to give them a strong admonition
22    because it's over the holiday.
23         So don't worry about that.  I'm not going to phone them
24    and tell them not to come in.  They'll come in.
25              MS. CAFFESE:  Thank you, Your Honor.  I apologize.
```

PROCEEDINGS

```
 1              THE COURT:  No, no.  That's all right.  Look, these
 2   are not simple decisions.  And they're client decisions.
 3   They're not lawyer decisions.  And a client may be of two
 4   minds and uncertain, or certain of one and want to change
 5   their mind.  That's their right.  And I do not hold it against
 6   them.  And I don't hold it against the lawyers.
 7              MS. CAFFESE:  Thank you.
 8              THE COURT:  It's, perhaps, the most important
 9   decision they have to make in the case.  And so it's important
10   that they be given as much latitude as possible.  They don't
11   have all that much latitude anyway.  So given all the latitude
12   they prefer not to be here.  Right?  Right.
13       Okay.  Thank you.
14       You can sit down, Sergeant.  If you want to stand up, you
15   can stand up.
16       So, anyway, there we are.
17       Oh, I also am assuming, Ms. Caffese, that you're not going
18   to call any witnesses?
19              MS. CAFFESE:  Correct.
20              THE COURT:  All right.  Okay.  And I'm assuming,
21   Mr. Getz, that you have completed your witness presentation?
22              MR. GETZ:  Yes.  We're prepared to rest subject to
23   the renewal of various motions.
24              THE COURT:  Okay.  All right.  So let's go back, now,
25   to the boilerplate.
```

1        I will give that they should not draw any inference by a

2   defendant not testifying.  So that will be the instruction as

3   to that.

4        Next, I give a modified circumstantial evidence

5   instruction.  And it's modified in the following way until I

6   get reversed by the Court of Appeal on this:

7        "Evidence may be direct or circumstantial."  Then I cut

8   out the next two sentences, which explains the difference

9   between direct and circumstantial evidence.  Which, I have yet

10  to find anybody able to really explain, in some detail, as to

11  exactly what is meant and why the examples are good examples

12  of direct and circumstantial.

13       By the way, I just want you to note that the comment to

14  the instruction is three times the length of the instruction,

15  which is some indication as to the confusion that this

16  instruction causes.

17       However, I give the second paragraph:  "You are to

18  consider both types of evidence."

19       Okay.  Far be it from me to criticize the Ninth Circuit in

20  their exercise of their jury instructions.  But if they think

21  it's so important they can chastise me.  Now -- which they

22  could do.

23       Next we go to --

24            **MS. CAFFESE:**  Excuse me, Your Honor.  May I?

25            **THE COURT:**  Yes, of course.

PROCEEDINGS

```
 1              MS. CAFFESE:  Are both sentences after the first and

 2    third paragraph deleted?

 3              THE COURT:  Yes.

 4              MS. CAFFESE:  Both of them.  Thank you.

 5              THE COURT:  The two sentences are purportedly

 6    definitional sentences.

 7              MS. CAFFESE:  All right.  Thank you.

 8              THE COURT:  Let's see.  I'm trying to waste some time

 9    here.

10        Barbara, can you just ask Denise for what she's got.

11              THE CLERK:  She's coming in now.

12              THE COURT:  Is she?

13              THE CLERK:  Yeah.

14              THE COURT:  Because I want to chastise Mr. Hemann.

15        Mr. Hemann, is it true, is it true that you have more than

16    a passing familiarity with the Skilling case?

17              MR. HEMANN:  I have a passing familiarity with the

18    Skilling case before it was mucked up on appeal by others.

19              THE COURT:  Others --

20              MR. HEMANN:  Possibly --

21              THE COURT:  Are you familiar with the Supreme Court's

22    decision?

23              MR. HEMANN:  When I say "appeal," I would include

24    them in it.  But, yes, Your Honor, I have a passing

25    familiarity with the Skilling case.  I do.
```

PROCEEDINGS

1          THE COURT:  So you would know that the United States

2    Supreme Court has redefined "honest services"; something

3    that's not reflected in your proposed instruction, is it?

4          MR. HEMANN:  I would say that it is, Your Honor.

5    Very much so.

6          THE COURT:  All right.

7          MR. HEMANN:  And our resident expert on the *Skilling*

8    case --

9          THE COURT:  Is whom?

10          MR. HEMANN:  Mr. Wilson.

11          THE COURT:  He's on his way out, isn't he?

12     (Laughter)

13          MR. HEMANN:  Yes.  Not for this.

14     And we just talked to him about this.

15          THE COURT:  Really?

16          MR. HEMANN:  And he found this to be peachy keen

17    under --

18          THE COURT:  Okay.  Let's --

19          MR. HEMANN:  I can regale you with why, if you wish,

20    Your Honor.

21          THE COURT:  Well, he may have to come up here.  I'll

22    give him all day tomorrow.  But I don't think he's going to be

23    too happy.

24     Okay.  Let me just go through some boilerplate for a

25    minute, okay.  And then we'll get to honest services.

PROCEEDINGS

```
 1        If you want to call him to come up now that's fine.
 2             MR. HEMANN:  You know what?  Let's give it a crack.
 3             THE COURT:  You want to see if you can handle it?
 4             MR. HEMANN:  I'll try.  And if I end up in custody
 5   then he can come up and explain to you why --
 6             THE COURT:  It's been a while since I put a U.S.
 7   Attorney in custody.
 8             MR. HEMANN:  It would be a welcome respite, Your
 9   Honor.  Thank you.
10             THE COURT:  Yeah.  Okay.
11        Oh, Activities Not Charged, 3.10, I give that.  There's
12   been a little bit of other evidence.  Great.  So I'm going to
13   give that.
14        Do I give 4.3, Other Crimes, Wrongs or Acts of a
15   Defendant?  I don't think so.
16             MR. HEMANN:  I don't think so, Your Honor.
17             MR. VILLAZOR:  No, Your Honor.
18             THE COURT:  All right.  Let's talk about Impeachment
19   Evidence - Witness, 4.8.  I was going to say:
20                  "You have heard evidence that Reynaldo
21             Vargas, a witness, was impeached with a prior
22             inconsistent statement with falsehoods by
23             omission in police reports and false
24             statements to the Office of Citizen
25             Complaints.  You may consider this evidence
```

```
 1              in deciding whether or not to believe this

 2              witness and how much weight to give to the

 3              testimony of this witness."

 4      I say more about Vargas, but I'm now talking about

 5  impeachment.  I also talk about him being a defendant, you

 6  know, and he's awaiting sentencing and so forth.  So I don't

 7  want to talk about that right now.  I just want to talk about

 8  false statements.

 9              MS. CAFFESE:  I actually drafted another one that I

10  believe --

11              THE COURT:  Well, maybe you better hand it up.

12              MS. CAFFESE:  I believe I gave --

13              THE COURT:  It's already been handed up?

14              THE CLERK:  Yes, Your Honor.  It's what I gave you on

15  top.

16      (The Court and law clerk confer.)

17              THE COURT:  Well, you're concerned here about Cesar

18  Hernandez being included in that?

19              MS. CAFFESE:  Also, and additionally, that he has

20  been -- additionally, Reynaldo Vargas admitted to making

21  falsehoods in police reports and making false statements to

22  the Office of Citizen Complaints.

23      But, I believe, what's missing is that he actually

24  admitted to making false --

25              THE COURT:  I believe you're right, he didn't.  But I
```

```
 1   think he was impeached with it.  I don't know that -- I don't

 2   think you add the statement that he admitted it, for a variety

 3   of reasons.

 4       Number one, to say that somebody is a liar and, therefore,

 5   you can impeach him, and that he admitted that he lied, maybe

 6   his admission that he lied was a lie -- I mean, I don't know

 7   where you stop and where you start.  I think logic dictates.

 8       But, still, it is -- it's the fact that he lied that is

 9   the important fact for impeachment, not that he admitted his

10   lie, which is evidence of the fact that he was successfully

11   impeached by the lie.

12       So, in other words, it becomes, in my view, argumentative.

13   That's an argument.  You say and you're free to say -- by the

14   way, I'm not telling you how to argue the case.  But you're

15   free to say not only did he lie to the OCC, and did he lie in

16   his police -- I don't know whether you're going to say that --

17   did he lie to the OCC?  But he admitted he lied to the OCC.

18   It's not -- it's not in question.  Everybody here says he

19   lied, including him.

20       So I don't think adding the admission is anything more

21   than argument.  And I will allow you to argue it.

22       Now let's go to Cesar --

23               MS. CAFFESE:  Yes.

24               THE COURT:  -- Hernandez, because I don't know what

25   we're talking about here.
```

PROCEEDINGS

1       What are we talking about?

2              **MS. CAFFESE:**  If I may, Your Honor.

3              **THE COURT:**  Oh, yeah.

4              **MS. CAFFESE:**  I will point out that he admitted,

5   during cross-examination, that he made false statements to the

6   FBI agents, to Inspector Keller.  And that would obviously go

7   to his impeachment.

8       I had asked him, for example, "Didn't you tell Inspector

9   Keller the car was green on such and such date?"  And he would

10  reply on at least two or three occasions, "Well, if that's

11  what it says there, if that's what's recorded then, yes,

12  that's true."  Which, of course, is different than what he

13  would be testifying in court.

14             **THE COURT:**  I don't view those as admissions.  I

15  don't view those as admissions.

16      You can argue it.  You certainly can argue it, but it's

17  not that I would say to the jury he has been impeached by

18  those statements.

19      To single out some -- and there's a lot of impeachment.

20  Your whole case is a case of impeachment.  That's exactly

21  what -- I think, unless I've missed it, you're saying these

22  people are lying.

23             **MS. CAFFESE:**  True.

24             **THE COURT:**  That's the case.  You believe them or you

25  don't believe them.  One or more.  And that's the case.

1    So I'm not running out and saying this person lied here;

2   this person lied there.  Except in the case of Vargas, he did

3   admit unequivocally that he lied under previous occasions.

4   And that is something that the jury can consider.

5    I'm not going to add Cesar Hernandez to it.

6    Okay.  Now we go to Testimony of Witness Involving Special

7   Circumstances.  There I do talk about Cesar Hernandez.  And

8   I -- maybe I should read this to you.

9    Is it there somewhere?  Do they have this?

10            **LAW CLERK:**  They haven't seen it.

11            **THE COURT:**  You haven't seen it?

12            **LAW CLERK:**  No.

13            **THE COURT:**  Okay.

14            "You have heard testimony from Cesar Hernandez, a

15            witness who received immunity.  That testimony was

16            given in exchange for a promise by the government

17            that the witness will not be prosecuted for certain

18            crimes and the testimony will not be used in any case

19            against him.

20            "Cesar Hernandez also received benefits and

21            compensation from the government in connection with

22            this case, and admitted to being an accomplice to the

23            crimes charged."

24    I would have to say "several," I guess.

25            "An accomplice is one who voluntarily and

1              intentionally joins with another person in committing

2              a crime."

3      Okay.  Does anybody have a problem with that?

4              **MR. HEMANN:**  No, Your Honor.

5              **MS. CAFFESE:**  No, Your Honor.

6              **THE COURT:**  Okay.  Goes on:

7              "You have also heard testimony from Reynaldo Vargas,

8              a witness who pleaded guilty to crimes arising out of

9              the same events for which defendants are on trial,

10             and was given promises by the government as set forth

11             in a plea agreement that was admitted into evidence.

12             This guilty plea is not evidence against the

13             defendants, and you may consider it only in

14             determining this witness's believability.

15             "For these reasons, in evaluating the testimony of

16             Cesar Hernandez and Reynaldo Vargas you should

17             consider the extent to which and whether either of

18             their testimony" –– I don't know whether that's ––

19             "may have been influenced by any of these factors.

20             In addition, you should examine the testimony of

21             Cesar Hernandez and Reynaldo Vargas with greater

22             caution than that of other witnesses."

23     Any problem with that?

24             **MR. HEMANN:**  No.

25             **MR. VILLAZOR:**  No, Your Honor.

PROCEEDINGS

```
 1            MR. GETZ:  No.

 2            MS. CAFFESE:  No, Your Honor.

 3            THE COURT:  Moving right along.  We didn't have an

 4   expert, did we?

 5            MR. HEMANN:  No.

 6            MR. VILLAZOR:  No.

 7            THE COURT:  No opinion evidence; right?

 8            MR. VILLAZOR:  No.

 9            MR. HEMANN:  Correct.

10            THE COURT:  We don't have summaries not received in

11   evidence; right?

12            MR. HEMANN:  I don't think.

13            THE COURT:  I don't know of any.

14            MR. VILLAZOR:  No, Your Honor.

15            THE COURT:  Charts and Summaries in Evidence.

16            MR. HEMANN:  Yes.

17            MR. VILLAZOR:  Yes.

18            THE COURT:  Well, we did have that.  That "whose-its

19   magooz-its" I introduced.

20            MR. HEMANN:  Yes.

21            THE COURT:  Okay.  We have that.  Okay.  I'm going to

22   give that.  4.16 I'm giving.

23        I'm not giving "Knowingly" as a standalone instruction

24   because I think it's covered in the other.  Okay.

25        Now we'll start with the troublesome instructions provided
```

1    by the government in this case.

2        Counts One and Two, Wire Fraud.  We start with the

3    sentence after some introduction:

4            "First, the defendant knowingly devised and intended

5            to devise a scheme or plan to defraud or a scheme or

6            plan for obtaining money or property by means of

7            false or fraudulent pretenses, representations, or

8            promises."

9        Now, the difference between the government's version and

10   the Court's version are -- is elimination, that the Court has

11   eliminated the words "participation in," which are important.

12   I mean, they're words.  I'm just saying they're not

13   insignificant words.

14       And the reason is -- do we have the indictment?

15           **LAW CLERK:**  I can get that for you, Judge.

16           **MR. GETZ:**  I have it here.

17           **THE COURT:**  All right.  So we take a look at the

18   indictment.  I have it.  I have it.  I have it here.  And I

19   look at as this case was indicted.  And I don't see the words

20   in the indictment.  In Count One and Two I don't see the words

21   "participated in."  Maybe I missed it.

22           **MR. HEMANN:**  You are correct, Your Honor.

23           **THE COURT:**  Well, if I'm correct then you were not

24   correct.  So that goes out.

25           **MR. VILLAZOR:**  Correct again, Your Honor.

```
 1            THE COURT:  That's why I get the big bucks.  Okay.
 2   Because I've got a very good law clerk.  That's why.
 3        All right.  So there the words "participation in" or
 4   "participation" is out.  It's not in the indictment.
 5        Now, let's go back, however, because I'm -- I'm a little
 6   concerned, based upon the evidence, though I think it could be
 7   there, but based upon the evidence of the term "intended to
 8   devise a scheme or plan to defraud."
 9        That's not this case, is it?  This case is that they did
10   knowingly devise bah, bah, bah.
11        I don't understand what the intention was.  We intended to
12   do it but didn't succeed?
13        What are they saying here?
14            MR. HEMANN:  Well, for example, there was testimony
15   for -- this is just by way of example -- from Mr. Hernandez,
16   if believed, that towards the end of 2009, with regard to the
17   auto body shop, the defendants got together and devised a plan
18   to rob the auto body shop, that was discussed by Mr. Robles
19   with Mr. Hernandez in Mr. Furminger's presence.
20        And so that would be intending to devise a plan to obtain
21   money.
22            THE COURT:  But are you --
23            MR. HEMANN:  But not actually doing that.
24            THE COURT:  Are you arguing that?  Is that one of
25   the --
```

PROCEEDINGS

```
 1            MR. HEMANN:  Part of the scheme, Your Honor, yes.

 2            THE COURT:  Part of the scheme.  Well, maybe.  Okay.

 3   I mean, it's alleged in the indictment.

 4            MR. HEMANN:  And I would -- I would say also --

 5            THE COURT:  You say there's some evidence.  You say

 6   there's evidence in the record that they intended to devise a

 7   plan.

 8            MR. HEMANN:  I mean, certainly, there's -- there's

 9   other -- there's other examples.

10      There was some communications with regard to the

11   self-storage locker when money was found, but before money was

12   actually taken, and calls were made to Mr. Robles and

13   Mr. Furminger who went out, so --

14            THE COURT:  I think there's enough there.

15      I don't think I have any other comment on that.  Which

16   takes me to my favorite charge:  Honest Services Wire Fraud.

17      So starting with --

18            MS. CAFFESE:  Your Honor, before we move on --

19            THE COURT:  Sure, Ms. Caffese.

20            MS. CAFFESE:  -- may I comment on this particular

21   instruction?

22            THE COURT:  Yes.

23            MS. CAFFESE:  And I believe the Court has a copy of

24   one change that I would request.

25            THE COURT:  Let's take a look.  Wait.  Wait.  Wait.
```

1    Wait.  Yes.  You say:

2              "Third, the defendant acted with the specific intent

3              to defraud."

4         MS. CAFFESE:  Correct.  And I say that because that's

5    my understanding of the case law, is that the defendant has to

6    have the specific intent to defraud; and, therefore, it should

7    be included in the -- in the instruction that's read to the

8    jury.

9         THE COURT:  Well, I say they have to have the intent.

10        MR. HEMANN:  So the Ninth Circuit, Your Honor, says

11   that, "The Committee recommends avoiding instructions that

12   distinguish between specific intent and general intent."  And

13   that's 5.4 in the manual.

14      Ms. Caffese suggests just adding the word "specific

15   intent," but then using the definition provided in the

16   government's proposed instruction, which is the intent to

17   deceive or cheat.  And that's already in the instruction.

18      I take the Committee's recommendation to say don't say

19   "specific or general intent" because it's confusing, but

20   define the intent which is in the instruction the Court

21   intends to give, which is the intent to deceive or cheat.

22        THE COURT:  I'm going to leave it without the word

23   "specific."

24      Okay.  So that's one criticism.  I mean, that's one

25   objection.

PROCEEDINGS

1          Now, what I was interested in is the government's view --
2     wait.  First, the government suggests that there's another
3     part of honest services.
4          What do you say it is?  I don't have yours in front of me
5     right now.  Why don't you read your first element as you
6     wrote.
7                    MR. HEMANN:  The first element:
8                    "The defendant was required, while on duty, to act
9                    for the benefit of the City and County of San
10                   Francisco or the citizens San Francisco" --
11                   THE COURT:  No, no.  I'm not there yet.  Where am I?
12    I'm at Counts Three and Four.
13                   MR. HEMANN:  Yes.
14                   THE COURT:  First.
15         Oh, oh, by the way, I'm taking out "Citizens of
16    San Francisco."  They're out.  It was objected to, and I think
17    that's proper.
18         Okay.  Go ahead read it again, slowly.
19                   MR. HEMANN:  (As read:)
20                   "First, the defendant was required, while on duty, to
21                   act for the benefit of the City and County of San
22                   Francisco or the San Francisco Police Department on
23                   all matters within the scope of their relationship."
24         We added that, Your Honor, because of the *Milovanovic*
25    case, which suggests that that duty should be something that

Belle Ball, CSR and Katherine Sullivan, CSR
Official Reporters – U.S. District Court
(415) 373-2529

PROCEEDINGS

1    is found by the jury.

2        And, in an abundance of caution, rather than assume the

3    duty to act for the benefit, we thought the best course was to

4    instruct the jury that they needed to find that there was that

5    duty.

6        I don't think it's going to be a hotly disputed --

7            **THE COURT:**  No, no, I think that's fine.  I don't see

8    a problem with that.  But go ahead.  Read more because there's

9    more.  Go ahead.

10           **MR. HEMANN:**  You want me just to say "participated"

11   again, don't you?

12           **THE COURT:**  No, no.

13           **MR. HEMANN:**  Because I'm just going to take that one

14   out when I read it.

15           **THE COURT:**  That's out.  But I think there's

16   something else that's out.

17           **MR. HEMANN:**  So, second --

18           **THE COURT:**  Yeah.

19           **MR. HEMANN:**  That's first.

20           "Second, the defendant knowingly devised or intended

21           to devise a scheme or plan to defraud or a scheme or

22           plan to deprive the City and County of San Francisco

23           or the San Francisco Police Department of their right

24           to honest services.

25           **THE COURT:**  Okay.  Go ahead.  I'm going to put an

 1    "or" there, by the way.  "Knowingly devised or intended."

 2              **MR. HEMANN:**  (As read:)

 3              "Third, the defendant acted with the intent to

 4              defraud and to deprive the City and County of San

 5              Francisco or the San Francisco Police Department of

 6              their right to honest services."

 7              **THE COURT:**  Yeah.

 8              **MR. HEMANN:**  That's the intent element defined in the

 9    next instruction.

10              "And, fourth, the defendant used or caused to be used

11              a wire communication to carry out or attempt to carry

12              out an essential part of the scheme."

13         Those are our four elements that the case --

14              **THE COURT:**  What about the scheme?

15              **MR. HEMANN:**  So the scheme is on the next -- the

16    honest -- the intent to defraud is the scheme.

17              **THE COURT:**  Okay.  Wait a minute.  Where do I find

18    the description --

19              **MR. HEMANN:**  The intent to defraud is our Number 24,

20    the next one, beginning with, "Public officials inherently owe

21    a duty to act in the public's best interest."

22              **THE COURT:**  So read that to me.

23              **MR. HEMANN:**  Okay.  And this is an instruction that

24    we took from the *Kincaid-Chauncey* case, as modified by both

25    *Skilling* and by *Garrido*:

1           "Public officials inherently owe a duty to the public

2           to act in the public's best interest.  If, instead,

3           the official accepts something of value with an

4           intent to be influenced or rewarded, a bribe or

5           kickback" -- and, I think, it would probably read

6           better if it said:  "If, instead, the official

7           accepts a bribe or kickback" -- in other words

8           something of value with intent to be influenced or

9           rewarded -- "the official has defrauded the public of

10          the official honest services" --

11   **THE COURT:**  Good.  Let's start with that.  What

12   evidence is there that there was a bribe or a kickback in this

13   case?

14          **MR. HEMANN:**  So, if we have a transcript, Mr. Sanchez

15   testified that he gave things to the defendants for the

16   purpose of obtaining protection.  That was his testimony.  In

17   exchange for doing something, i.e. letting him -- what he said

18   was, "Letting me continue to do my business," which he

19   thereafter defined as selling stolen property.  He gave --

20          **THE COURT:**  Well, wait.  Maybe we don't have to have

21   a long discussion of this.

22     This honest services count relates only to Sergio -- it

23   doesn't relate to all the dope or all the money that was

24   taken.

25          **MR. HEMANN:**  Absolutely.

1          **THE COURT:**  I'm saying that's alleged.  I'm not

2    saying --

3          **MR. HEMANN:**  Correct.

4       The way the indictment is alleged, Counts One and Two go

5    to the dope and money.  Counts Three and Four in the -- the

6    wires are the Sergio Sanchez wires or text messages.

7       So Counts Three and Four only go to Sergio Sanchez.  They

8    do not go to the straight up thefts we that are arguing.  And

9    we would not argue it that way.  And we think it would be

10   inappropriate to argue it that way.

11         **THE COURT:**  I appreciate that that's why this

12   conference is useful, because it gets me on the right page.

13      So those are the bribes and kickbacks?

14         **MR. HEMANN:**  Correct.

15         **THE COURT:**  And it's limited to bribes or kickbacks.

16   There's not anything else in terms of honest services?

17         **MR. HEMANN:**  Correct.

18         **THE COURT:**  For example, a police officer -- I have

19   to ask you, a police officer writes a false police report.

20   One.  A police officer takes money from a crime scene, two.

21   Those are not honest services violations?

22         **MR. HEMANN:**  Without the additional fact of getting

23   something in exchange for doing those things.

24         **THE COURT:**  There's no *quid* for the *quo*.

25         **MR. HEMANN:**  There needs to be at least an implicit

PROCEEDINGS

1    *quid pro quo.*

2            **THE COURT:**  And there isn't in those cases.

3            **MR. HEMANN:**  In those cases --

4            **THE COURT:**  Well --

5            **MR. HEMANN:**  In Sergio Sanchez's case, yes.

6            **THE COURT:**  Okay.  Leaving Sergio to the side here

7    with all these other people who were --

8            **MR. HEMANN:**  Unaware.

9            **THE COURT:**  -- right.  Andrew Card, or whatever his

10   name.

11           **MR. HEMANN:**  Byrd.

12           **MR. VILLAZOR:**  Byrd.

13           **THE COURT:**  Thank you.  I guess he was a White

14   House --

15           **MR. HEMANN:**  Right.

16           **THE COURT:**  Sorry.

17       And others, that was just -- that's not an honest services

18   issue?

19           **MR. HEMANN:**  Correct.

20           **THE COURT:**  Okay.  Okay.  I think then -- okay.  I

21   think I understand that.

22       What was the other thing you and I talked about on that?

23           **THE LAW CLERK:**  Well, we added the "bribe or

24   kickback" as an element, which I don't think the government

25   had in their original instructions.  They indicted the

```
 1   concealment theory, which is not good law or Skilling.

 2           THE COURT:  Got that?

 3           LAW CLERK:  In the indictment we added --

 4           THE COURT:  Yes.  When you look at your indictment

 5   you talk about -- you say:

 6           "The defendant's honest and faithful services through

 7            bribery, kickbacks, and the concealment of material

 8            information."

 9      Do you see that --

10           MR. HEMANN:  Yes.

11           THE COURT:  -- in the indictment?

12      But that's out as a result of Skilling, the last, "and the

13   concealment" --

14           MR. HEMANN:  "Concealment" standing alone would not

15   be in under --

16           THE COURT:  Okay.  So that's out.

17           MR. HEMANN:  Correct.

18           THE COURT:  That's out.  And we're only talking about

19   bribery and kickbacks.

20           MR. HEMANN:  We did not, for that reason, put in the

21   instruction "concealment."

22           THE COURT:  Okay.

23           MR. HEMANN:  And if the Court -- if you look at

24   Kincaid-Chauncey, Kincaid-Chauncey is these instructions as we

25   put in, except for we took out the concealment basis because
```

 1    under *Skilling* that's no longer good law.

 2         And *Garrido* talks about the parts of *Kincaid-Chauncey* that

 3    survived *Skilling*, which is the bribe/kickback language.

 4         **THE COURT:**  Okay.  So what I'm going to do is redraft

 5    these this afternoon and probably post them, these special --

 6    and post them for your comments tomorrow.  Okay.

 7         **MR. HEMANN:**  Okay.

 8         **THE COURT:**  I mean, it's really important that I get

 9    this right.  And I know the government feels that way.  And

10    the defense can feel any way they want to on this.  But it's

11    important that I get this right, and so I welcome comments

12    from the parties afterwards.

13         Mr. Getz.

14         **MR. GETZ:**  If I might interject, I would -- when the

15    Court works through that, I'd like the Court to consider my

16    Rule 29 because I put in a paragraph on Count Three, on page 2

17    of my Rule 29, in which I --

18         **THE COURT:**  Well, then, I think I have to deal with

19    the Rule 29 right now.

20         **MR. GETZ:**  Pardon?

21         **THE COURT:**  I think I have to deal with your Rule 29

22    right now.  In other words, if I grant the Rule 29 then the

23    instructions will be different.

24         So if I either deny it or take it under submission, then

25    that's another issue.  So what is your Rule 29?

PROCEEDINGS

1    **MR. GETZ:**  Well, my Rule 29 on that count, Count

2    Three, is that Count Three charged a September 7th, 2011, text

3    message from Sergio to Furminger.  It was just one message.

4    And that was introduced at trial involving Sergio's statement

5    that he had a GPS for Furminger.

6        And the Court can look at that, at the transcript, at page

7    1132.  We have a copy of that if the Court wants to see it.

8        **THE COURT:**  I should.

9        **MR. GETZ:**  At that point in the testimony Sergio

10   Sanchez testified that he gave a GPS to Furminger, and that

11   Furminger paid for it.  That's at page 1117.

12       And then the government wanted to establish that Sanchez

13   was not paid for it, which he would not say.  However, he did

14   read into evidence, or the government did, the Grand Jury

15   testimony in which Sergio Sanchez stated, quote, Seems to me

16   he did not pay me, unquote.  That's at page 118.

17       So our feeling is there's inadequate evidence to show that

18   there was any *quid pro quo* for that particular transaction,

19   and that the evidence, we think, is inadequate to let Count

20   Three go to the jury.

21       So that was the point we wanted the Court to consider in

22   the Count Three jury instruction based upon the trial record

23   that was made when Sanchez testified.

24       It's the same type of thing with Count Four, in which it

25   was based on a single text.  That was February 7th, 2012, from

 1    Mr. Robles to Furminger, which references Sergio in connection

 2    with a portable generator sought by Mr. Robles.

 3         And, once again, there's absolutely no evidence that there

 4    was any kind of *quid pro quo* for that.  There was no intent

 5    nor any agreement explicit or implied by Mr. Furminger to be

 6    influenced in his official acts or duties.

 7         And to the extent that that topic was even touched upon,

 8    my recollection of the testimony -- and I can try to get you

 9    some transcripts, but I believe Sergio Sanchez said it was

10    happening in his head.

11         So I think that we have a serious Rule 29 issue on Three

12    and Four.

13              **MR. HEMANN:**  So without going back -- and I have not

14    gone back and read all Mr. Sanchez's testimony yet; and I can

15    by tomorrow.

16         But, first of all, it's "devised or intended to devise."

17    And it's a scheme.  It's an ongoing course of conduct that

18    Mr. Sanchez -- who was a sophisticated enough businessman that

19    he had a $100,000 BMW -- was giving discounted and free stuff

20    to two police officers who, in his view, were protecting him

21    by allowing him to continue to sell stolen equipment on the

22    street corner several blocks from Mission Station over a long

23    period of time.

24         That, we believe, is sufficient.  And whether he was paid,

25    not paid, or got a discount for an obviously stolen GPS seems

1   to be not -- not germane.

2       So I think that, again, I --

3           **THE COURT:**  Well, what I'm going to do on the Rule 29

4   is take it under submission on that.  I'm going to let it go

5   to the jury.

6       And, obviously, Mr. Getz, you are free to make all the

7   arguments you're making now in front of the jury, plus more.

8           **MR. GETZ:**  No, but I don't want to have to.

9           **THE COURT:**  No, no, I understand that.  But you have

10  to.

11          **MR. GETZ:**  Well --

12          **THE COURT:**  I mean, you have to unless I ultimately

13  agree with your position.  But, after all, if the jury acquits

14  on those counts or one of those counts you don't have to make

15  the argument.

16          **MR. GETZ:**  Well, I --

17          **THE COURT:**  There are two ways you can win.

18          **MR. GETZ:**  I want to win earlier.

19          **THE COURT:**  Well, that's just not going to happen.

20          **MR. GETZ:**  Well, can I just buttress my presentation

21  with one other observation?

22      I thought ten minutes ago the government argued, with

23  connection to Count One and Two, the wire fraud, that one had

24  to look at the individual conduct to find whether or not there

25  was a scheme.  And now the government appears to be arguing on

1    Three and Four, which is also wire fraud, that there was a

2    scheme and let's not look at the individual conduct.

3         So I don't think that argument -- maybe I'm not hearing it

4    correctly, but that doesn't sound consistent to me.

5         So that's why we thought the Rule 29 on Counts Three and

6    Four had some true vitality.  We didn't make that argument on

7    rule -- on Counts One and Two.  We made it on Counts Three and

8    Four because -- we made that argument about the jury

9    instruction on Counts Three and Four.  But --

10            **MR. HEMANN:**  The --

11            **MR. GETZ:**  I'm sorry, go ahead.

12            **MR. HEMANN:**  No, I'm sorry.

13            **MR. GETZ:**  No, that's fine.

14            **MR. HEMANN:**  The purpose of alleging particular wire

15   transmissions is because what the statute focuses on, in terms

16   of the offense conduct, is the interstate wire in furtherance

17   of the scheme.

18        All of the conduct, all of the relevant conduct goes to

19   whether or not a scheme existed.  And the *mens rea*, if you

20   will, is the devising of a scheme to defraud.  And so,

21   obviously, both the individual wire transactions are --

22            **THE COURT:**  I think so.

23            **MR. HEMANN:**  Okay.

24            **THE COURT:**  Are appropriate.  The only question is --

25   that's right.  I mean, I agree with your analysis.  However,

1  you know, I've not had an opportunity to review Sergio's

2  testimony.

3      I don't know whether -- I accept what Mr. Getz has said

4  about it.  But what I think he has said about it is that the

5  testimony is contradictory on that issue; that, at one point,

6  which was on an earlier occasion, he said that he thought the

7  GPS was stolen, and on a second occasion he said that it

8  wasn't.

9      But it's not whether it's stolen or not.  It's whether it

10 was actually given for fair market value or whether it

11 consisted of either a bribe -- a bribe, I guess, for more

12 lenient treatment.

13     There's a lot of evidence in the record that he expected

14 leniency or was at least hopeful of leniency for a variety of

15 reasons.  And so the record is replete with that.

16     And Mr. Getz isn't arguing that.  He's arguing that the

17 specific Count Three and Count Four there's insufficient

18 evidence from which one could conclude that those particular

19 items were not given to Mr. Furminger at fair market value.

20 Or, in the alternative, that they weren't -- well, wait.

21     Fair market value.  I'm just trying to figure out whether

22 it makes any difference whether they were stolen or not.  I

23 don't think so.

24

25     **MR. HEMANN:**  I don't --

1      **THE COURT:**  They could be honestly obtained, and sold

2    at a discount.

3      **MR. HEMANN:**  Sure.

4      **THE COURT:**  But it would be -- that may have some

5    variance to what the fair market value is, but --

6      **MR. HEMANN:**  Well, the importance of the "stolen"

7    element is that -- that he was allowed to continue to do this

8    business.  That goes to the need for protection.

9      **THE COURT:**  Yes.  But, I mean, it's not just these

10   two items.

11     **MR. HEMANN:**  Oh, not at all.

12     **THE COURT:**  In other words, in other words, if you're

13   selling items -- you're dealing in some stolen merchandise, A,

14   B, C and D.  Then I comes across a GPS.

15       The GPS, not stolen, I give to you at less than fair

16   market value.  And that's the consideration, that's the *quid*

17   *pro quo* of not arresting you on 1, 2, 3, 4, 5.

18       It's a larger -- that's why the scheme is of significance,

19   in addition to what the individual items are.

20       Nevertheless, defense is entitled to argue that Count 3

21   and Count 4 were not sold, or given, or whatever it is, at

22   less than fair market value.  I think that's a defense in the

23   case, I would think.

24       And to that, Mr. Getz says the testimony is inconclusive.

25     **MR. GETZ:**  Well, I was trying to go further, and I

1   was trying to say that the evidence does not show a course of

2   conduct of favors and gifts flowing to Mr. Furminger in

3   exchange for a pattern of official acts favorable to the

4   donor.

5       I'm saying there's no evidence showing that Mr. Furminger

6   got these gifts, and that Sergio Sanchez got official acts.

7   So that's why I say the Rule 29 is worth more than a look.

8           THE COURT:   Okay, I'm going to turn to this tomorrow,

9   after everybody has had an opportunity to look at it.

10          MR. GETZ:   That's fine.

11          MS. CAFFESE:   Your Honor, may I say, I made that

12  Rule 29 motion on behalf of Mr. Robles, also.  But

13  specifically as to these two counts, 3 and 4, the evidence as

14  to Officer Robles is not inconclusive.  There are three vital

15  pieces of evidence that came in.

16      One, that Sergio Sanchez gave a pair of sunglasses to

17  Mr. Robles when he had left Mission Station to go into the

18  motorcycle detail.  And those sunglasses were not stolen.

19      Secondly, there was a laptop that apparently Mister --

20  Officer Robles purchased from Mr. Sanchez when he apparently

21  left Mission Station.

22      And thirdly, in 2012, beyond the scope of this indictment,

23  there is a text message between Sergeant Furminger and Officer

24  Robles which references a pitching machine -- excuse me, a

25  generator that Officer Robles is looking for, for the pitching

1  machine.

2      So, I would suggest to the Court that the evidence is not

3  inconclusive as to Officer Robles.  There were absolutely no

4  kickbacks.

5      Mr. Sanchez said that Officer Robles always treated him

6  fairly, with respect; that there was never any --

7          **THE COURT:**  But Mr. Robles is not arresting him for

8  selling stolen merchandise.  Is there any -- you are saying

9  there is no evidence that Mr. Robles knew that any of the

10 merchandise was stolen?

11         **MS. CAFFESE:**  There is no evidence of that.  In fact,

12 the other evidence -- that as the Court pointed out, it really

13 doesn't even matter if it's stolen or not.

14     But the fourth thing that I would like to emphasize, if

15 we're talking about selling property, is that Sergio Sanchez

16 testified that 40 percent of his business dealt with property

17 that was not stolen.

18     And we're dealing with three potential issues -- three

19 potential products.  Some sunglasses that Sergio gives a man

20 that he respects, Officer Robles.  And --

21         **THE COURT:**  The evidence is ambiguous as to that.

22 Isn't it?

23         **MS. CAFFESE:**  Well, I don't believe it is,

24 Your Honor.

25         **THE COURT:**  He says it could have been stolen, could

1   have not been stolen.  He said 50/50.  Okay, so that's -- I

2   don't know whether that's ambiguous evidence, but it's -- it's

3   -- it's -- it is what it is.  I don't know whether it could

4   sustain a conviction.

5           **MS. CAFFESE:**  Clearly, there were no kickbacks.

6   There was no bribery and kickbacks.  And that was not the

7   evidence, at all.

8           **THE COURT:**  Well, you said the glasses.  Was there

9   anything else, in addition to the glasses?

10          **MS. CAFFESE:**  There was a laptop which I believe

11  Mr. Sanchez says that he sold Officer Robles, some time before

12  or after --

13          **THE COURT:**  Do we know -- do we have any idea what

14  the price was or what the value was?

15          **MS. CAFFESE:**  Well -- purchased --

16          **THE COURT:**  It doesn't have to come from you.  I'm

17  just saying:  Is there evidence in the Record as to what -- he

18  says "I sold the laptop to Officer Robles"?

19          **MR. HEMANN:**  I believe the evidence was that it was

20  discounted.  I believe that's the word.  But --

21          **THE COURT:**  Discounted.

22          **MR. HEMANN:**  I would have to check.

23          **THE COURT:**  Okay.  But -- okay.  That -- that carries

24  it a little bit.  I am not sure it carries it across the

25  finish line.

1    Nobody suggests -- do we know whether -- I mean, merchants

2    sell discounted merchandise all the time.  That doesn't mean

3    it's stolen.

4         **MR. HEMANN:**  So, Your Honor, I would go back to this

5    -- first of all, it's within the scope, the time scope of

6    Counts 3 and 4.  It would address Ms. Caffese's first

7    argument, which is December '08 through August '12, as alleged

8    in the indictment.  So, that is within the time scope.

9         **THE COURT:**  All right.

10        **MR. HEMANN:**  All of these three incidents.

11        **THE COURT:**  Okay.

12        **MR. HEMANN:**  Second of all, Mr. Robles was still a

13   San Francisco Police Officer, although he drove around on a

14   motorcycle, rather than -- so that is not relevant.

15        **THE COURT:**  Okay.

16        **MR. HEMANN:**  Finally, the three -- the three items

17   that Mr. Sanchez testified about were the sunglasses, the

18   computer, and the generator for the pitching machine, which

19   was obviously going to be discounted, you can infer from --

20   infer much from the texts, because Mr. Furminger and

21   Mr. Robles were complaining or observing about the cost of one

22   of these items at Best Buy or Costco, or wherever you buy

23   them.  And you could get a good one from Sergio.  Why go

24   there?  Not as expensive.

25        So, you're talking about getting things for less money

1   from Mr. Robles –– from Mr. Sanchez.

2           **THE COURT:**  Yeah, but Sergio dealt with both –– I

3   mean, the evidence is not contradicted, is it, that he dealt

4   with stolen and not-stolen merchandise.  He dealt with both

5   legitimate merchandise, and illegitimate merchandise.

6       Is the evidence that?

7           **MS. CAFFESE:**  Yes.

8           **MR. HEMANN:**  The evidence ––

9           **MS. CAFFESE:**  Well, excuse me.  I believe so.

10          **MR. HEMANN:**  Yes.  There's evidence that he stole ––

11  that he sold both stolen and non-stolen.

12          **THE COURT:**  Okay.

13          **MR. HEMANN:**  But our case is not that –– again, as

14  the Court observed a moment ago, this is –– what matters is

15  that he was in the business of selling stolen property on the

16  corner.

17      And in response to Ms. Caffese's question to Cesar

18  Hernandez, Cesar Hernandez said everybody knew that he was

19  selling stolen goods on the corner.

20          **THE COURT:**  Okay, but let's say that I'm a cop, and I

21  know that Smith is selling stolen merchandise, and not selling

22  stolen merchandise.  And, Smith has all sorts of merchandise.

23      So I go up to Smith, and I say, "Do you have a computer?"

24  Or, "Do you have X, or Y?"

25      And he says, "Yes, I do.  And here is the price."

PROCEEDINGS

```
 1          MR. HEMANN:  (Nods head)

 2          THE COURT:  Okay.  Now, at some point, depending on

 3   what the price is, I think you can -- a reasonable inference

 4   would be that it's stolen.

 5      But, we don't have any of that.  That's not what the

 6   evidence is.  The evidence is: I'm going to give you a

 7   discount on the merchandise.

 8      I have to believe that he gives a discount on every piece

 9   of merchandise he has.  His overhead -- his overhead is

10   slightly low, you know.  He's in the business where he doesn't

11   actually have much of an overhead, other than oil and gas.

12   And, that would bespeak a discount, in and of itself.

13      I doubt if he pays a business tax.  I doubt if he pays,

14   even, for his parking.  Hopefully he doesn't park in a

15   handicapped zone.  But be that as it may, you would expect him

16   to sell discounted merchandise.

17      Now, you can say, since he deals with stolen merchandise,

18   that's -- in and of itself, that's enough.  But I don't know

19   if it's enough if the record really is that he deals with

20   honest merchandise as well as -- or, you know, dishonest --

21   that's what I call it -- stolen; not stolen.

22      So my concern is that -- that with this count, I do have

23   some real concerns.  I have concerns that -- that the evidence

24   is inadequate to make a finding that -- that the specific

25   items of merchandise were stolen.
```

PROCEEDINGS

1          MR. HEMANN:  Your Honor, I -- I don't think there's

2     any requirement at all that the specific items that were

3     transferred were stolen.

4          THE COURT:  Really?

5          MR. HEMANN:  Really.  I don't believe that.

6          THE COURT:  So if I go into a store -- I mean, I go

7     to Sergio, and he sells me everything, but he -- he honestly

8     came by it, although I know he does deal in stolen

9     merchandise, but honestly came by these three items of

10    merchandise, and sold me these three items at the fair market

11    value of merchandise that could be sold by an individual who

12    is selling out of the trunk of his car.

13        So, I got no benefit that I wouldn't get from anybody else

14    selling out of the trunk of their car, and --

15        (Off-the-Record discussion between counsel)

16         THE COURT:  And is it either bribery or kickback --

17    no, no, I mean is it -- yeah.  Is it bribery or a kickback?

18         MR. HEMANN:  Bribery or kickback.

19         THE COURT:  -- that I paid fair market value for

20    these items, in exchange for not booking him for selling

21    stolen merchandise, which these items don't represent?

22         MR. HEMANN:  So, first of all, the evidence with

23    regard to the sunglasses are ambiguous.  I believe that the

24    evidence with regard to the computer is discounted.  And the

25    evidence with regard to the generator is below fair market

1   value.

2      Okay?  That's what I believe the evidence with regard to

3   these three things is.

4           **THE COURT:**  Well, we'll look at it.

5           **MR. HEMANN:**  So, there is an effort to obtain things

6   more cheaply.  And the issue is:  When a hypothetical person

7   is doing that, the hypothetical person here has to be a

8   San Francisco Police Officer.

9           **THE COURT:**  No; I'm a cop and I do it.

10          **MR. HEMANN:**  Okay.  And you are buying from -- by the

11  way, Officer Vargas testified very clearly that Mr. Robles and

12  Mister --

13          **MR. VILLAZOR:**  (Inaudible)

14          **MR. HEMANN:**  -- Mr. Robles -- we're focusing on

15  Mr. Robles now -- and Mr. Sanchez were doing business

16  together.

17     Mr. Vargas testified very clearly that they knew, because

18  they had discussed that Mr. Sanchez was in the business of

19  selling stolen goods.

20     And Mr. Sanchez says, "I was doing it, I was engaging in

21  these commercial transactions with these police officers in

22  order to allow my..." you know, to, stay in business.

23     And, in a --

24          **THE COURT:**  So you're saying even if he sold these

25  people honest goods --

```
1            MR. HEMANN:  At a discount.

2            THE COURT:  Well, honest goods at his fair market

3    value and so forth, he then -- he then -- that can proceed as

4    an honest-services violation, because they didn't bring him

5    in.

6        In other words, he could refuse to do business with them.

7    Which he didn't do.  So since he's doing business, the only

8    reason he's doing business with cops is not -- is in order to

9    avoid apprehension.  Or prosecution.

10           MR. HEMANN:  Correct.  It's one thing for police

11   officers to know that a fence is operating on the street.

12   It's one thing for them to know, and to turn the other cheek.

13       It's another thing altogether for police officers to then

14   engage in commerce --

15           THE COURT:  Okay.

16           MR. HEMANN:  -- in that fence's business.

17           THE COURT:  (Inaudible) that argument.  In other

18   words, it makes no difference if they got some discount

19   greater than what the general-public police officer would get,

20   no other member of the department gets, not knowing the things

21   that these people knew.

22       Not knowing what the Defendant knew, allegedly, not

23   knowing that, if they were simply a cop on the beat, or a cop

24   comes into town or cops in town -- no, they all live outside

25   town.  A cop comes into town, and says, "Look, I want to buy X
```

1   or Y," and goes to see this guy on Mission and 17th or

2   whatever it was, 20th?

3        **MR. HEMANN:**  Twentieth and Capp.

4        **THE COURT:**  Twentieth and Capp.  Twentieth and Capp.

5   And, and, buys something.  That person would not be prosecuted

6   absent his knowledge that this person is operating as a fence.

7        Or, putting it another way, to allow an individual to --

8   to continue in business, and actually to support the business,

9   even though you may be supporting an honest portion of the

10  business, but allowing him to go unapprehended for things that

11  you already know about is a violation of honest services.

12       Is that the argument?

13       **MR. HEMANN:**  Knowledge plus power plus commerce is

14  what we have.  They knew what he was doing.  They were sworn

15  to uphold the law.  And yet, they engaged in commerce --

16       **THE COURT:**  Okay.  So tomorrow, can you identify the

17  sections of the transcript and so forth, so we're rather

18  specific on this?

19       **MR. HEMANN:**  We would, Your Honor.

20       **THE COURT:**  And, I will not rule on this right now.

21       The difference between the conspiracy against civil rights

22  and the conspiracy on the honest services --

23       **MS. CAFFESE:**  Your Honor, I'm sorry, but before we

24  move on to the next --

25       **THE COURT:**  Sure.

PROCEEDINGS

1          MS. CAFFESE:  I did submit some changes to

2   Instruction 23, which, 8.124.  If I could just --

3      (Off-the-Record discussion between counsel)

4          THE COURT:  What are we looking at?

5          MS. CAFFESE:  Instruction 23 put --

6          THE COURT:  Okay, but you are asking again, the

7   specific intent.

8          MS. CAFFESE:  And, I understand the Court's ruling on

9   that.

10         THE COURT:  I'm not going to give it as specific

11  intent.

12         MS. CAFFESE:  I understand that.  But I also,

13  actually, added on Line 14 --

14         THE COURT:  Pardon me?

15         MS. CAFFESE:  On Line 14, the third element

16  (As read):

17         "After specific intent to defraud, that is, the

18         intent to deceive or cheat..."

19         THE COURT:  Okay.

20         MR. HEMANN:  That's fine, Your Honor, with the

21  government.

22         THE COURT:  Pardon me?

23         MR. HEMANN:  I think that's --

24         MS. CAFFESE:  The government's agreeing.

25         MR. HEMANN:  Oh, I'm sorry.  I'm on the wrong one.

 1        (Off-the-Record discussion between counsel)

 2            **MR. HEMANN:**  It's actually the intent -- I mean, it's

 3    the intent to defraud or deprive the City and County of

 4    San Francisco and the San Francisco Police Department the

 5    right to honest services.

 6        And that's -- unlike Counts 1 and 2 where that intent to

 7    defraud was not elsewhere defined, here, the intent to defraud

 8    is outlined on the next page, in another instruction.

 9            **THE COURT:**  I'm not going to give, as Counsel

10    suggests.

11            **MS. CAFFESE:**  And the only other item on that page,

12    Judge, is Line 21.  The addition of "also" after -- "Counts 1

13    and 2..."

14            "...instructions I gave you regarding wire

15            transmissions for Counts 1 and 2 also apply to Counts

16            3 and 4."

17        (Off-the-Record discussion between the Court and Law

18    Clerk)

19            **THE COURT:**  Well, okay, I'm going to -- I am going to

20    give you a proposed instruction that I think does a couple of

21    things.

22        Number one, it takes the general-conspiracy instruction

23    and puts it in the front, and part of the first conspiracy

24    that's alleged.

25        Secondly, it -- it also distinguishes, as you will see

PROCEEDINGS

 1    throughout this, that there is a different conspiracy

 2    instruction with respect to the civil-rights violation.  You

 3    don't have to prove an overt act, whereas you do for the

 4    others.

 5        So why don't you just take a look at it tonight, and then

 6    we'll address it tomorrow.  Okay?

 7            **MS. CAFFESE:**  Thank Your Honor.

 8            **THE COURT:**  So, you're reserving your objections.

 9            **MS. CAFFESE:**  (Nods head)

10            **THE COURT:**  To tomorrow.

11        I'm going to give the vicarious liability instruction.

12        The civil rights, I'm giving it without the overt

13    instruction -- overt act, but I'll give it to you.

14            **MS. CAFFESE:**  And Your Honor, before you move on?

15            **THE COURT:**  Yes.

16            **MS. CAFFESE:**  Thank you.  I have added on, added to

17    that particular instruction, at Line 7.  If the Court has a

18    copy.

19            **THE COURT:**  Line 7.  Thanks.

20        Go ahead.

21            **MS. CAFFESE:**  Okay.

22            **THE COURT:**  "Beginning on or about February 19," I

23    think that's right.  I think I'm giving that.

24            **MR. VILLAZOR:**  That matches the indictment,

25    Your Honor.

 1          THE COURT:  Yes.  Feburary 19th, ending on or about

 2   August '12.  Okay, yes.  That's accepted.

 3      So, here's a question.  Do we have to show -- does the

 4   government have the burden of showing that it -- that the

 5   police department received $10,000 in a particular year?

 6          MR. VILLAZOR:  Yes.  Yes, Your Honor.  That was set

 7   forth in our stipulation.  In excess of $10,000.

 8          THE COURT:  Okay, so it's there, somewhere.  Right?

 9          MR. HEMANN:  It's in the Record.  It was in the --

10          THE COURT:  It's in the Record.  I forgot -- I mean,

11   you read all these stipulations.

12      Did it say: In Year X, they received $10,000?

13          MR. HEMANN:  It was in -- in 2009, they got money

14   from some Department of Justice program, and in 2010 they got

15   money from some --

16          THE COURT:  And in each year, they received more than

17   10,000?

18          MR. HEMANN:  Oh, it was hundreds --

19          MR. VILLAZOR:  Millions --

20          THE COURT:  Well, I'm just asking.  Not a billion,

21   but is it in the Record?

22          MR. HEMANN:  Yes.

23          MR. VILLAZOR:  In the stipulation, Your Honor.

24          THE COURT:  That's all I need to know.  That's all I

25   need --

1            **MS. CAFFESE:**  I did actually have one.  Are we on

2    Form 27?

3            **THE COURT:**  Pardon?

4            **MS. CAFFESE:**  If we're on 27, Your Honor, 8.23?

5            **THE COURT:**  Well, we're not quite there.  There's the

6    conspiracy -- the Pinkerton charge which you are asking that

7    it be given in connection with Count 7.  The government is.

8            **MR. HEMANN:**  Yes.

9            **MR. VILLAZOR:**  Yes, Your Honor.

10           **THE COURT:**  That's fine.  Count 7 is fine.

11           **MS. CAFFESE:**  We're actually asking that it be given

12   for 5, 6 and 9.

13           **THE COURT:**  The Pinkerton charge?  You're requesting?

14   First time I've heard the Defendant request it.

15           **MS. CAFFESE:**  Let me -- yeah.  I'll withdraw that.

16   Excuse me.

17           **THE COURT:**  Okay.  I mean, you know, the government

18   can request it.

19           **MS. CAFFESE:**  I understand.

20           **THE COURT:**  You can request anything, okay.

21      Count 7, aiding and abetting.  I just want to make sure

22   that the aiding-and-abetting instruction goes only --

23           **MR. HEMANN:**  Correct.

24           **THE COURT:**  -- to Count 7.

25           **MR. HEMANN:**  That's correct, Your Honor.

PROCEEDINGS

1              **MR. VILLAZOR:**  Yes, Your Honor.

2              **THE COURT:**  Now we come to the interesting thing in

3    Count 8.

4              **MR. GETZ:**  May I interrupt?  I had a request for Jury

5    Instruction No. 30.

6              **THE COURT:**  Sorry?

7              **MR. GETZ:**  We had a request that unanimity be a part

8    of Jury Instruction No. 30, which I think was Count 7.  The

9    Court said "Count 8," but Count 7 was --

10             **THE COURT:**  Well, wait a minute.  For Count 7, you

11   want unanimity.  Let me just take a look.  Let me just take a

12   look.  Count 7.  Unanimity.

13        Yes, you are asking for that.  I think you're right.  In

14   other words, it would read:

15             "Third, during that one-year period, the Defendant

16             embezzled, stole, obtained by fraud, converted or

17             intentionally misapplied property, with each of you

18             agreeing which items of property was/were embezzled,

19             stolen, obtained by fraud, converted or intentionally

20             misapplied."

21        Well, maybe I'd only use the singular.  In other words,

22   let's say they all agreed that A was done.  They don't have to

23   agree to B, C, D, and E.

24             **MR. HEMANN:**  We would not object to a unanimity

25   charge the way the Court first articulated it.  I think that

1   having that laid out is not necessary; potentially confusing,

2   because it suggests that they need to agree unanimously with

3   regard to each of them.

4           **THE COURT:**  Well, that's what -- that is true.  So,

5   that's why the words ought to be "with each of you agreeing at

6   least as to..."  Something like that.

7           **MR. HEMANN:**  Correct.

8           **THE COURT:**  I mean, not quite --

9           **MR. HEMANN:**  We would agree with that.

10          **THE COURT:**  -- well written, but it's got -- you're

11  entitled to unanimity.  That's the concept.  So, let's put it

12  in the words.  I'll put in the words.

13     But the unanimity you're entitled to is that 12 people

14  have to agree as to one of the enumerated items.  Only one.

15  Okay?

16          **MR. GETZ:**  That's fine.

17          **THE COURT:**  Okay.  So that will be true with Count 7;

18  it's true with Count 8.

19     Count 9, it's not true.  They don't have to agree whether

20  it's heroin or crystal or, God forbid, marijuana.  They don't

21  have to agree to any of them.   They just have to agree to one

22  of them.

23     Okay.  Let's see if there's a few other things --

24          **MR. HEMANN:**  Count 8, the Court was going to look at.

25          **THE COURT:**  Sorry.  Count 8 is the extortion.  Well,

```
 1    I think that's -- I mean, there's unanimity in Count 8.  There
 2    has to be unanimity as to which item.
 3              MR. GETZ:  That's our request.
 4              THE COURT:  Well, isn't that Mr. Getz's point?  That:
 5              "For Count 8, in order to find the Defendant guilty,
 6              each of you must agree that at least one of the
 7              following items of property was one that the
 8              Defendant knew he was not entitled to receive, and
 9              further knew was given in return for taking some
10              official action..."
11       Then I'm adding the words:
12              "...or refraining from taking some official action,
13              with each of you agreeing as to which item so
14              qualifies."
15       Obviously, the refraining from action -- I don't know why
16    the government didn't say anything.  The refraining from
17    action is not arresting the guy.  The action is not arresting.
18       Taking official action is not -- is taking -- I, mean you
19    could -- you know, you could say not doing something is doing
20    something.
21       But, but the problem is that it adds an ambiguity, unless
22    you explain that there are two ways to take official action.
23    Doing something, and not doing something.
24              MR. HEMANN:  I agree that there should be unanimity
25    as to that.  That -- the doing something or not doing
```

1    something.  I'm not sure --

2         THE COURT:  Oh, no, I don't know --

3         MR. HEMANN:  -- whether there needs to be unanimity

4    as to -- if one juror thinks it was the sunglasses, and

5    another juror thinks it was the bottle of tequila that caused

6    the person -- that's not -- that's where unanimity is not

7    required.

8         THE COURT:  That's where the rubber meets the road

9    here, whatever it is.  Because that's a good question.  One

10   that occurred to me.

11       If six jurors think that X was stolen, or the subject of

12   an improper act, and six jurors think it was something else,

13   but they all 12 think that indeed, indeed, it was -- they all

14   agree that he got something which caused him to act, then, is

15   that enough?

16       To which I recommend that the parties read the case of

17   *United States versus Payseno,* P-A-Y-S-E-N-O, 782 F.2d, 832.

18   Judge Reinhardt -- no, actually, it was a judge on the panel,

19   Judge Strand wrote it.  And it seems to suggest -- it seems to

20   suggest that you have to give -- there has to be unanimity as

21   to the -- as to the item.

22       I don't know; my mind isn't made up on this.  So I would

23   appreciate some additional authority or argument.

24        MR. VILLAZOR:  Your Honor, I would add, we did see

25   this case cited by Mr. Getz.  And it footnotes -- excuse me --

1   on Page 835, the problem with the -- with the jury

2   instruction.

3       There were three specific extortion schemes with three

4   different victims.  That's different than what's charged in

5   the extortion count here.  The only person here is S.S.,

6   Sergio Sanchez.  There's a specific time charged in Count 8,

7   which is August, 2011, to August, 2012.

8       So, this case -- that was the problem with that case, is

9   that there were three victims, three separate schemes.  We

10  don't think that's a problem in this case, as charged in the

11  indictment, with that one-year time period.  And the only

12  person is Sergio Sanchez, S.S., as mentioned in the

13  indictment.

14      **THE COURT:**  So you see, that distinguishes the

15  *Payseno* case.

16      Do you have any authority on this?

17      **MR. HEMANN:**  We can provide it to Your Honor by

18  tomorrow.

19      **THE COURT:**  Okay; would you do so?  Would you do so?

20      **MR. VILLAZOR:**  Yes, Your Honor.

21      **THE COURT:**  Thank you.

22      **MR. GETZ:**  Just before the Court leaves the topic,

23  can I make one observation?  I also had another comment on

24  Count 8.  And, the model -- the government's No. 32.

25      The Court posed the hypothetical, what if -- I'm using the

1   wrong item, but what if six people thought the GPS fit the

2   definition of the crime for Count 8, and six people thought it

3   was the power drill; do we have a unanimous verdict?

4       We don't.  Because the six who agreed on the one rejected

5   the theory of conviction on the other, and vice-versa.  So you

6   would have to have 12 jurors agreeing that it was the drill,

7   or it was the power tool.  Otherwise, you don't have

8   unanimity.

9       That's the whole basis of our request on that jury

10   instruction, which is government's 32.

11            **THE COURT:**  Well, let me ask this, because I'm always

12   sort of lost in this area.

13       Twelve people believe that he committed a crime, with six

14   believing he did it one way, and six believing he did it

15   another way.  And I'm just trying to figure out -- the person

16   is accused of murder.  And they're -- and the defendant is

17   assaulted with -- or the decedent is assaulted with a gun and

18   a knife.

19       And, six people believed that the knife was the cause of

20   death and six people believe it was the gun that was the cause

21   of death.  They -- no one believes that he didn't cause the

22   death, by violent means.  We'll say gun.

23       So you would say -- what's wrong with that analogy?

24   Because to me, that, of course, makes no sense.  That is to

25   say, the guy committed 187.

1      It makes no sense whether he did it -- unless it's an

2   enhancement or something like that, but it makes no sense to

3   say that he didn't commit homicide.  Only, six people believe

4   he did it with the knife, and the other six people believe he

5   did it with a gun.

6           **MR. GETZ:**  Well, I think --

7           **THE COURT:**  So, like, for example -- to wit, a deadly

8   weapon.

9           **MR. GETZ:**  Right.

10          **THE COURT:**  Okay?

11     And there's both a knife involved, and a gun involved, and

12  the parties -- and the jury can't figure out whether it was

13  the knife that caused -- that ultimately led to his death, or

14  the gun.

15          **MR. GETZ:**  I think it's a causation example that the

16  Court gave.  Because in the Court's example, because there was

17  only one decedent and only one perpetrator, the causation is

18  irrelevant.  Because whether it was a knife or a gun makes no

19  difference.

20     A better analogy for the Court would be if the Court said:

21  We have one decedent, and two defendants; who pulled the

22  trigger?  Is it Defendant A that killed him, or Defendant B?

23  We know it's only one bullet, but we don't know which one

24  pulled the trigger.

25     Here, you have one power drill, one bottle of perfume, one

1    GPS.  And the question is:  Was there an extortion on any

2    particular item?

3        And, if the answer has to be yes, then we have to have the

4    jury agree on what item was extorted, in order to make that

5    crime stick.

6        You don't have that in the Court's hypothetical, because

7    in the Court's hypothetical, we know who the perpetrator is;

8    we know who the decedent is.  And it doesn't matter if it was

9    the knife or the gun.

10       But, it does matter here.  Did he extort it when he took

11   the perfume?

12           **THE COURT:**  You succeeded in --

13           **MR. VILLAZOR:**  Your Honor.

14           **THE COURT:**  -- torpedoing my --

15           **MR. VILLAZOR:**  Well, if I could offer perhaps a

16   better hypothetical --

17           **THE COURT:**  Better, better than mine?

18           **MR. VILLAZOR:**  -- set forth in *Payseno*, and actually,

19   the Ninth Circuit faulted the District Court because there

20   were three separate distinct crimes.  And, the -- the extorted

21   acts were repeated telephone calls.  Repeated telephone calls

22   to Victim 1, repeated telephone calls to Victim 2 and Victim

23   3.

24       And essentially what Mr. Getz is asking is they would have

25   to decide -- that jury would have to decide on which telephone

1    call it was.

2         That's not the case.  It's the extortion scheme from

3    August 2011 to August 2012.  Doesn't matter whether it's the

4    GPS or the perfume or the tequila, or anything like that.

5    It's the extortive acts, taken together.

6              MR. GETZ:  I would --

7              THE COURT:  So, in other words, in other words, if I

8    -- let's make sure I got it.

9         So you're saying that in the *Payseno* case, you had

10   different people running different schemes.  And it was

11   important for the jury to identify which person --

12             MR. VILLAZOR:  Correct.

13             THE COURT:  -- was the guilty person.  Not unlike

14   Mr. Getz's example of where you have two defendants in a

15   homicide; he dies of one bullet; who fired the weapon?

16             MR. VILLAZOR:  Correct.

17             THE COURT:  You are saying that here, in this case,

18   you have one defendant, I guess, on this one.

19             MR. VILLAZOR:  Yeah.  Mr. Furminger.

20             THE COURT:  Mr. Furminger.  And six items.

21        And, if 12 people agree that Mr. Furminger extorted this,

22   but they have a disagreement as to which items were

23   specifically extorted.

24        And that's not -- that's a -- that's more of an argument

25   over means than it is over criminal liability.  Whereas, in

1    the *Payseno* case, it's not an argument about means; it's an

2    argument about criminal liability.

3         Have I got that right?

4              **MR. VILLAZOR:**  I think so.

5              **THE COURT:**  You can tell me I haven't.

6              **MR. HEMANN:**  No; that's our view, Your Honor.

7              **MR. VILLAZOR:**  Yeah.

8              **THE COURT:**  What?

9              **MR. HEMANN:**  That's our view.

10             **THE COURT:**  Well, I'm just trying to state what I

11   think your view is.

12             **MR. HEMANN:**  Yes.

13             **MR. VILLAZOR:**  Yes, Your Honor.

14             **THE COURT:**  Okay.  Well, I'll think about it.

15             **MR. GETZ:**  And may I also just augment my request

16   under Count 8, with a comment on the section in government's

17   No. 32?

18        Starting at Line 13 going to Line 18, it starts off "In

19   the case of a public official..." and ends up "...satisfying

20   the statute."

21        Does the Court have that?

22             **THE COURT:**  We're talking about which instruction?

23             **MR. GETZ:**  On -- we're still on 32.  And I'm -- I

24   would point out to the Court --

25             **MR. VILLAZOR:**  It's for Count 8, Your Honor.

PROCEEDINGS

1          **MR. GETZ:**  For Count 8, the Jury Instruction No. 32

2     that the government's offering.  They give the four elements.

3          **THE COURT:**  Yeah.

4          **MR. GETZ:**  And then, they go on to say, "In the case

5     of a public official who obtains property, the government does

6     not..." and it goes on.

7          That, that whole paragraph's an argument.  That's not a

8     jury instruction.  That shouldn't be there.

9          **THE COURT:**  I think it should be.  I -- okay.  As to

10    that, I overrule the objection.  I think it's important.

11         A jury doesn't know, and wouldn't know, and might very

12    well think that a promise has to be explicit; it has to be

13    done contemporaneously with it.

14         You know, they may start to treat this like -- like

15    first-year law students, rather than jurors.  I think it's

16    important to give something like that.

17         Okay.  Your objection is noted.

18         **MR. GETZ:**  (Nods head)

19         **THE COURT:**  So, I'll try to get out -- which is a

20    nice way of saying that I think my law clerk will try to get

21    out -- a -- a set of proposed instructions tonight.  It will

22    be e-filed as "Proposed Instructions."

23         And then tomorrow, after the jury is dismissed, let's

24    address it.  Because I think it's important that you have

25    them -- that we settle them before you start to construct your

PROCEEDINGS

1    argument.

2            **MS. CAFFESE:**  Yes.  Thank you, Your Honor.

3            **MR. HEMANN:**  Thank you very much, Your Honor.

4            **THE COURT:**  See you at 9:00 tomorrow.

5            **MR. VILLAZOR:**  Thank you, Your Honor.

6            **THE COURT:**  Thank you very much.

7        (Proceedings concluded)

1                              **INDEX**

2                                                **PAGE**    **VOL.**

3   Plaintiff rests                              1713        8

4

    **PLAINTIFF'S WITNESSES**
5
    HOANG, TUAN TRONG
6   (SWORN)                                      1580        8
    Direct Examination by Mr. Hemann             1580        8
7   Cross Examination by Ms. Caffese             1599        8
    Redirect Examination by Mr. Hemann           1605        8
8
    PONZER, CRYSTAL
9   (SWORN)                                      1606        8
    Direct Examination by Mr. Villazor           1607        8
10  Cross Examination by Mr. Getz                1614        8
    Redirect Examination by Mr. Villazor         1623        8
11  Recross Examination by Mr. Getz              1625        8

12  MORENTZ, MARY LOUISE
    (SWORN)                                      1627        8
13  Direct Examination by Mr. Hemann             1627        8
    Cross Examination by Ms. Caffese             1646        8
14
    FLORES, SPECIAL AGENT SANDRA J.
15  (SWORN)                                      1658        8
    Direct Examination by Mr. Villazor           1658        8
16  Cross Examination by Mr. Passaglia           1694        8
    Cross Examination by Ms. Caffese             1698        8
17  Redirect Examination by Mr. Villazor         1706        8

18
    **DEFENDANT FURMINGER'S WITNESSES**          **PAGE**    **VOL.**
19
    FURMINGER, STEPHANIE
20  (SWORN)                                      1717        8
    Direct Examination by Mr. Getz               1717        8
21  Cross Examination by Mr. Hemann              1723        8

22

23

24

25

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 282 | | | 1682 | 8 |
| 299 | | | 1677 | 8 |
| 300 | | | 1680 | 8 |
| 301 | | | 1588 | 8 |
| 303 | | | 1582 | 8 |
| 304 | | | 1587 | 8 |
| 305 | | | 1587 | 8 |
| 306 | | | 1592 | 8 |
| 307 | | | 1597 | 8 |
| 308 | | | 1666 | 8 |
| 309 | | | 1665 | 8 |
| 310 | | | 1583 | 8 |
| 311 | | | 1594 | 8 |
| 311 | | | 1595 | 8 |
| 311 | | | 1675 | 8 |
| 313 | | | 1688 | 8 |
| 314 | 1628 | 8 | 1629 | 8 |
| 315 | 1628 | 8 | 1629 | 8 |
| 316 | 1628 | 8 | 1629 | 8 |
| 317 | 1628 | 8 | 1629 | 8 |
| 318 | | | 1658 | 8 |
| 321 | | | 1686 | 8 |
| 363 | | | 1646 | 8 |
| 364 | 1599 | 8 | 1599 | 8 |
| 365 | 1698 | 8 | 1699 | 8 |
| 366 | 1704 | 8 | 1705 | 8 |

## <u>CERTIFICATE OF REPORTERS</u>

I, BELLE BALL, and I, KATHERINE SULLIVAN, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball_____

Monday, November 24, 2014

Belle Ball, CSR 8785, CRR, RDR


/s/  Katherine Sullivan _____

Monday, November 24, 2014

Katherine Sullivan, CSR 5812, CRR, RMR