```
                                              Volume 10

                                      Pages 1825 - 2093

                    UNITED STATES DISTRICT COURT

                  NORTHERN DISTRICT OF CALIFORNIA

            BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

UNITED STATES OF AMERICA,          )
                                   )
             Plaintiff,            )
                                   )
  vs.                              )  NO. CR 14-102-CRB
                                   )
IAN FURMINGER and EDMOND ROBLES,   )
                                   )  San Francisco, California
             Defendants.          )  Monday
                                   )  December 1, 2014
_____)  8:34 a.m.


                    TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          MELINDA HAAG
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                   BY:  JOHN HENRY HEMANN
                        RODNEY C. VILLAZOR
                        Assistant United States Attorneys


For Defendant Ian Furminger:
                        LAW OFFICES OF BRIAN H. GETZ
                        201 California Street
                        Suite 450
                        San Francisco, California  94111
                   BY:  BRIAN H. GETZ, ESQ.
                        JOHN PAUL PASSAGLIA, ESQ.


Reported by:            BELLE BALL, CSR 8785, CRR, RDR
                        KATHERINE SULLIVAN, CSR 5812, CRR, RMR
                        Official Reporters, U.S. District Court

(Appearances continued, next page)
```

**APPEARANCES, CONTINUED:**

**For Defendant Edmond Robles:**
                        **LAW OFFICES OF TERESA CAFFESE**
                        **1000 Brannan Street**
                        **Suite 400**
                        **San Francisco, California  94103**
                **BY:   TERESA CAFFESE, ESQ.**
                        **HEATHER KELLY, ESQ.**


**Also Present:**
                        **Defendant Ian Furminger**
                        **Defendant Edmond Robles**
                        **Special Agent Melissa Patrick**
                        **Special Agent Sandra Flores**
                        **Dalida Vartanian**
                        **Stephen Janick**
                        **Alycee Lane**

PROCEEDINGS

```
 1   MONDAY, DECEMBER 1, 2014                              8:34 A.M.

 2                    P R O C E E D I N G S

 3        (The following proceedings were held in open court,

 4   outside the presence of the jury:)

 5             THE COURT:  Good morning.

 6             MR. GETZ:  Good morning.

 7             MR. HEMANN:  Good morning, Your Honor.

 8             THE COURT:  Are we all set?

 9             MR. HEMANN:  We are all set.

10        I sent the Court some notes.

11             THE COURT:  On page 18 -- this is the one, right?

12             MR. HEMANN:  Actually, there were two.

13             THE COURT:  What's the other one?  On page 18, line

14   9, I changed the "and" to "or."

15        I'm sorry, what was the other one?

16             MR. HEMANN:  Two more than that, Your Honor.

17        The correspondence I sent to Ms. Espinoza last night and

18   this morning with regard to --

19             THE COURT:  Just give me the page.

20             MR. HEMANN:  Oh, I need to go grab my note here.

21        The first one was as to the -- page 9, on the

22   definitional --

23             THE COURT:  Page 9.

24             MR. HEMANN:  Page 9.  There are definitions -- I

25   think the Court's intention was to have this pertain to all
```

```
 1   four of the counts, both the traditional wire fraud --

 2              THE COURT:  Right.

 3              MR. HEMANN:  -- and the honest services fraud.

 4        However, both scheme and intent to defraud as defined,

 5   have instructions that are focused on the honest services

 6   theory.

 7        And, for example, "scheme," as set forth here, refers to a

 8   plan or course of action involving bribes or kickbacks given or

 9   offered to a public official.  That would apply to Counts Three

10   and Four but not Counts One and Two.

11        Similarly, an intent to defraud, depriving the government

12   of their right to public official's honest services, that would

13   apply to Counts Three and Four but not One and Two.

14              THE COURT:  So how should I just change it?

15              MR. HEMANN:  The fix that I proposed, Your Honor,

16   and, I printed out my email to you --

17              THE COURT:  I'm sorry, I just left it inside.

18              THE CLERK:  Do you want me to print it?

19              MR. HEMANN:  The fix that I proposed is simply to

20   take these two references, "the honest services" references,

21   put them at the end of the respective paragraphs, with an

22   introduction that says, "As to Counts Three and Four, you must

23   find," et cetera, et cetera.

24              THE COURT:  Okay.  So I'm now looking at page 9.

25              MR. HEMANN:  Correct.
```

PROCEEDINGS

```
 1              THE COURT:  What should I do with page 9?

 2              MR. HEMANN:  So page 9 is the -- the version that I

 3    have, Your Honor, from last Wednesday afternoon, is counts One,

 4    Two, Three and Four terms.

 5              THE COURT:  Yeah.

 6              MR. HEMANN:  Under "scheme" --

 7              THE COURT:  Yeah.

 8              MR. HEMANN:  -- there is a portion of the second

 9    sentence that says "involving bribes or kickbacks given or

10    offered to a public official."

11              THE COURT:  Yes.

12              MR. HEMANN:  That would not apply to Counts One and

13    Two.

14              THE COURT:  Okay.  But it does apply to Counts Three

15    and Four?

16              MR. HEMANN:  Correct.

17         So our suggestion is that you cut that section out; add a

18    new sentence at the end saying, "As to Counts Three and

19    Four" --

20              THE COURT:  Okay.  So I just simply -- I'm sorry.  Do

21    I take out the entire sentence?  What -- I'm here to edit.

22         Everyone sit down.

23              MR. HEMANN:  It would say, "Thus, to find the

24    defendant guilty of this offense you must find the defendant

25    devised and intended to devise a plan or course of action,"
```

1    period.

2              **THE COURT:**  Period.  Okay.

3              **MR. HEMANN:**  And then take the rest of the sentence

4    out, our suggestion would be.

5              **THE COURT:**  Yeah.

6              **MR. HEMANN:**  And add to the end, "As to Counts Three

7    and Four, the plan or course of action must involve bribes or

8    kickbacks given or offered to a public official."

9              **THE COURT:**  Well, don't I have to limit "scheme" to

10   Counts One and Two?

11             **MR. HEMANN:**  Well, it's a -- it's --

12             **THE COURT:**  Or is that --

13             **MR. HEMANN:**  There has to be a scheme as to all four.

14             **THE COURT:**  Oh, I see.  Okay.

15             **MR. HEMANN:**  As to the honest services, the scheme

16   has to focus on the bribes or kickbacks.

17             **THE COURT:**  So I'd say as to -- I'm sorry, where do I

18   put that?

19             **MR. HEMANN:**  At the very end, Your Honor.

20             **THE COURT:**  Pardon?

21             **MR. HEMANN:**  At the very end of that paragraph.

22             **THE COURT:**  After the word "whole"?

23             **MR. HEMANN:**  After the word "whole."

24             **THE COURT:**  I write what?

25             **MR. HEMANN:**  "As to Counts Three and Four, the plan

PROCEEDINGS

```
 1   or course of action must involve bribes or kickbacks given or
 2   offered to a public official."
 3            THE COURT:  "As to Counts Three and Four," go ahead.
 4            MR. HEMANN:  "The plan or course of action must
 5   involve bribes" --
 6            THE COURT:  "Plan" -- wait a minute.
 7            MR. HEMANN:  Sorry.
 8            THE COURT:  "Course of action."
 9       Yeah.  Go ahead.
10            MR. HEMANN:  "Must involve."
11            THE COURT:  "Must involve."
12            MR. HEMANN:  And then that sentence that we took out,
13   that portion of the sentence, "bribes or kickbacks given or
14   offered to a public official."
15            THE COURT:  "Bribes involved" -- okay.  All right.
16            MR. HEMANN:  And then further down --
17            THE COURT:  Yeah.
18            MR. HEMANN:  -- under "intent to defraud --"
19            THE COURT:  Yeah.
20            MR. HEMANN:  -- the Court has "means to act
21   knowingly" --
22            THE COURT:  Just tell me what you want me to write.
23            MR. HEMANN:  Oh, sorry.
24       So the sentence should end with the comma.  "Intent to
25   defraud means to act knowingly and with the intent to deceive,"
```

PROCEEDINGS

1   period.

2                   **THE COURT:**  Period.  Okay.

3                   **MR. HEMANN:**  And then the rest of that sentence

4   should come out and go at the end and, again, say, "As to

5   Counts Three and Four the defendant" -- "to find the defendant

6   guilty you must find that he acted with the purpose of

7   depriving the public" --

8                   **THE COURT:**  "Find a defendant guilty."

9                   **MR. HEMANN:**  "You must find."

10                  **THE COURT:**  "Must find," yeah.

11                  **MR. HEMANN:**  "That he had the purpose" --

12                  **THE COURT:**  "That he had the purpose of depriving,"

13  da, da, da, da.

14                  **MR. HEMANN:**  Yes, Your Honor.

15                  **THE COURT:**  Okay.

16                  **MR. HEMANN:**  And then the last one --

17                  **THE COURT:**  Yeah.

18                  **MR. HEMANN:**  -- is as to the conspiracy, the general

19  conspiracy instruction, which is on page 10 --

20                  **THE COURT:**  Yeah.

21                  **MR. HEMANN:**  -- "Conspiracy General Elements."  It's

22  our understanding that the Court meant to lay out the general

23  elements for all of the counts.

24                  **THE COURT:**  Yes.

25                  **MR. HEMANN:**  There is a reference to Count Seven in

1   particular, starting at the bottom, that says, "You must find

2   that there was a plan to commit theft concerning a federally

3   funded program."

4             **THE COURT:**  Yes.

5             **MR. HEMANN:**  I think that that can just come out

6   altogether because that instruction is then repeated later when

7   you talk about the Count Seven conspiracy.

8             **THE COURT:**  Okay.  That's fine.

9             **MR. HEMANN:**  That was it.

10            **THE COURT:**  Okay.

11            **MR. HEMANN:**  Thank you, Your Honor.

12            **THE COURT:**  Everyone agree to that?

13            **MS. CAFFESE:**  Yes, Your Honor, on behalf of

14   Mr. Robles.

15            **MR. GETZ:**  Yes, on behalf of Mr. Furminger.

16            **THE COURT:**  Okay.  Fine.  Bring in the jury.

17            (Jury enters at 8:42 a.m.)

18            **THE COURT:**  Please be seated.

19       All right.  Let the record reflect the jurors are present;

20   all parties are present.

21                          **INSTRUCTIONS**

22   **BY THE COURT:**

23       Good morning, ladies and gentlemen of the jury.  I hope

24   you had a pleasant Thanksgiving.  And I very much appreciate,

25   as always, your jury service and the fact that you're here on

INSTRUCTIONS

1  time.

2      This will be the day that we have some of the missing

3  parts of a trial, which are, of course, fundamental to your

4  task, which is, first, I'm going to instruct you on the law

5  that you are to apply to this case.  And I'm going to give each

6  of you a copy of the instructions that I'm about to read so you

7  will have those instructions in your jury room.  They're not in

8  any binder yet, or anything, but they will be just given to you

9  once the case goes to you for deliberations.  And you are free,

10  of course, to refer to them during the course of your

11  deliberations.

12      Second, we are going to hear the argument of counsel as to

13  what counsel believes the evidence in this case has shown.  And

14  I find, usually, these arguments are very, very helpful in

15  tying all the pieces together in giving you their view of the

16  evidence.

17      But, again, I want to caution you, as I have throughout

18  these proceedings, that arguments are not evidence in and of

19  itself.  It is for you to decide what the evidence is.

20      From time to time, when attorneys recall what the evidence

21  is, they may have a recollection different from your

22  recollection or different from each other's recollection

23  between counsel.  And it is your recollection that controls.

24      The attorneys will do their level best to try to tell you

25  what they think was stated in court and what the evidence

 1   means, but it really is your decision to make.  And please

 2   understand that no lawyers intentionally try to misquote the

 3   record.  They are simply giving you their understanding of what

 4   the record is.

 5        After an argument has concluded you will then go back to

 6   the jury room and commence your deliberations, where you will

 7   be -- you are free and you are encouraged to discuss the case

 8   and your understanding of the case, and explore each other's

 9   views as to the case.  And, hopefully, you will be able to

10   arrive at a verdict.

11        So with that, I will now instruct you as to the law.

12        It is your duty to weigh and evaluate all the evidence

13   received in this case and in that process to decide the facts.

14   It is also your duty to apply the law as I give it to you to

15   the facts as you find them to be whether you agree with the law

16   or not.  You must decide the case solely on the evidence and

17   the law and must not be influenced by any personal likes or

18   dislikes, opinions, prejudices, or sympathy.  You will recall

19   that you took an oath promising to do so at the beginning of

20   the case.

21        You must follow all these instructions and not single out

22   some and ignore others; they are all important.  Please do not

23   read into these instructions or into anything I may have said

24   or done any suggestion as to what the verdict should be.

25   That's a matter entirely up to you.

1    This is a criminal case brought by the United States

2  government.  The government charges the defendants with wire

3  fraud, honest services wire fraud, conspiracy against civil

4  rights, conspiracy to commit theft concerning a federally

5  funded program, theft concerning a federally funded program,

6  and conspiracy to distribute controlled substances.  Defendant

7  Furminger is also individually charged with extortion under

8  color of law.

9    The charges against the defendants are contained in the

10  indictment.  The indictment simply describes the charges the

11  government brings against the defendants.  The indictment is

12  not evidence and does not prove anything.

13    The defendants have pleaded not guilty to the charges and

14  are presumed innocent unless and until the government proves

15  each defendant is guilty beyond a reasonable doubt.

16    In addition, each defendant does not have to testify or

17  present any evidence to prove innocence.  The government has

18  the burden of proving every element of the charges beyond a

19  reasonable doubt.  The defendant in a criminal case has a

20  constitutional right not to testify.  You may not draw any

21  inference of any kind from the fact that the defendants did not

22  testify.

23    Proof beyond a reasonable doubt is proof that leaves you

24  firmly convinced that the defendant is guilty.  It is not

25  required that the government prove guilt beyond all possible

1   doubt.

2        A reasonable doubt is a doubt based upon reason and common

3   sense and is not based purely on speculation.  It may arise

4   from a careful and impartial consideration of all the evidence,

5   or from lack of evidence.

6        If after a careful and impartial consideration of all the

7   evidence, you are not convinced beyond a reasonable doubt that

8   the defendant is guilty, it is your duty to find the defendant

9   not guilty.  On the other hand, if after a careful and

10  impartial consideration of all the evidence, you are convinced

11  beyond a reasonable doubt that the defendant guilty, it is your

12  duty to find the defendant guilty.

13       The evidence -- the testimony from which you are to decide

14  what the facts are consists of:  The sworn testimony of any

15  witness; the exhibits which have been received into evidence;

16  and any facts to which all the lawyers have stipulated.

17       In reaching your verdict you may consider only the

18  testimony and exhibits received in evidence.  The following

19  things are not evidence and you may not consider them in

20  deciding what the facts are:

21       Questions, statements, objections and arguments by lawyers

22  are not evidence.  The lawyers are not witnesses.  Although you

23  must consider a lawyer's questions to understand the answer of

24  a witness, the lawyer's questions are not evidence.  Similarly,

25  what the lawyers have said in their opening statements, what

1   they will say in their closing arguments and at other times is

2   intended to help you interpret the evidence, but it is not

3   evidence.  If the facts as you remember them differ from the

4   way the lawyers stated them, your memory of them controls.

5        Any testimony that I have excluded, stricken, or

6   instructed you to disregard is not evidence.  In addition, some

7   evidence may have been received only for a limited purpose;

8   when I have instructed you to consider certain evidence in a

9   limited way, you must do so.

10       Anything you may have seen or heard when the court was not

11  in session is not evidence.  You are to decide the case solely

12  on the evidence received at the trial.

13       Evidence may be direct or circumstantial.  You are to

14  consider both direct and circumstantial evidence.  Either can

15  be used to prove any fact.  The law makes no distinction

16  between the weight to be given to either direct or

17  circumstantial evidence.  It is for you to decide how much

18  weight to give to any evidence.

19       In deciding the facts in this case, you may have to decide

20  which testimony to believe and which testimony not to believe.

21  You may believe everything a witness says, or part of it, or

22  none of it.

23       In considering the testimony of any witness, you may take

24  into account:

25       the witness's opportunity and ability to see or hear or

1    know the things testified to;

2         The witness's memory;

3         the witness's manner while testifying;

4         the witness's interest in the outcome of the case, if any;

5         the witness's bias or prejudice, if any;

6         whether other evidence contradicted the witness's

7    testimony;

8         the reasonableness of the witness's testimony in light of

9    all the evidence, and

10         any other factors that bear on believability.

11         The weight of the evidence as to a fact does not

12    necessarily depend on the number of witnesses who testify.

13    What is important is how believable the witnesses were, and how

14    much weight you think their testimony deserves.

15         You are here only to determine whether each defendant is

16    guilty or not guilty of the charges in the indictment.  The

17    defendant is not on trial for any conduct or offense not

18    charged in the indictment.

19         A separate crime is charged against one or more of the

20    defendants in each count.  The charges have been joined for

21    trial.  You must decide the case of each defendant on each

22    crime charged against each defendant separately.  Your verdict

23    on any count as to one defendant should not control your

24    verdict on a count as to any other count or as to any other

25    defendant.  All the instructions apply to each defendant except

1  the extortion count instruction which applies only to Defendant

2  Furminger.

3       You have heard testimony that each defendant made

4  statements.  It is for you to decide whether the particular

5  defendant made the statement, and if so, how much weight to

6  give to it.  In making those decisions, you should consider all

7  the evidence about the statement, including the circumstances

8  under which the particular defendant may have made it.

9       You have heard evidence that Reynaldo Vargas, a witness,

10  was impeached with a prior inconsistent statement, with

11  falsehoods by omission in police reports and false statements

12  to the Office of Citizen Complaints.  You may consider this

13  testimony in deciding whether or not to believe this witness

14  and how much weight to give to the testimony of this witness.

15       You have heard testimony from Cesar Hernandez, a witness

16  who received immunity.  That testimony was given in exchange

17  for a promise by the government that the witness will not be

18  prosecuted for certain crimes, and the testimony will not be

19  used in any case against him.  Cesar Hernandez also received

20  benefits and compensation from the government in connection

21  with this case and admitted being an accomplice to the crimes

22  charged.  An accomplice is one who voluntarily and

23  intentionally joins with another person in committing a crime.

24       You have also heard testimony from Reynaldo Vargas, a

25  witness who pleaded guilty to crimes arising out of the same

1   events for which the defendants are on trial and was given

2   promises by the government as set forth in the plea agreement

3   that was admitted into evidence.  This guilty plea is not

4   evidence against the defendants, and you may consider it only

5   in determining this witness's believability.

6       For these reasons, in evaluating the testimony of Cesar

7   Hernandez and Reynaldo Vargas, you should consider the extent

8   to which or whether either of their testimony may have been

9   influenced by any of these factors.  In addition, you should

10  examine the testimony of Cesar Hernandez and Reynaldo Vargas

11  with greater caution than that of other witnesses.

12      Certain charts and summaries have been admitted into

13  evidence.  These charts and summaries are only as good as the

14  underlying supporting material.  You should, therefore, give

15  them only such weight as you think the underlying material

16  deserves.

17      Now, Counts One and Two.  Defendants Furminger and Robles

18  are charged in Counts One and Two of the indictment with wire

19  fraud in violation of Section 1343 of Title 18 of the

20  United States Code.  In order for a defendant to be found

21  guilty of that charge, the government must prove each of the

22  following elements beyond a reasonable doubt:

23      First, the defendant knowingly devised and intended to

24  devise a scheme or plan to defraud, or a scheme or plan for

25  obtaining money or property by means of false or fraudulent

1 pretenses, representations, or promises;

2     Second, the statements made or facts omitted as part of

3 the scheme were material; that is, they had a natural tendency

4 to influence, or were capable of influencing, a person to part

5 with money or property;

6     Third, the defendant acted with the intent to defraud;

7 that is, the intent to deceive or cheat; and

8     Fourth, the defendant used, or caused to be used, an

9 interstate wire communication to carry out or attempt to carry

10 out an essential part of the scheme.

11     A wiring is caused when one knows that a wire will be used

12 in the ordinary course of business or where one can reasonably

13 foresee such use.  It need not have been reasonably foreseeable

14 to the defendant that the wire communication would be

15 interstate in nature.  Rather, it must have been reasonably

16 foreseeable to the defendant that some wire communication would

17 occur in furtherance of the scheme, and an interstate wire

18 communication must have actually occurred in furtherance of the

19 scheme.

20     Counts Three and Four – Honest Services Wire Fraud.

21     Defendants Furminger and Robles are charged in Counts

22 Three and Four of the indictment with honest services wire

23 fraud in violation of Section 1343 and 1346 of Title 18 of the

24 United States Code, as it relates to conduct involving Sergio

25 Sanchez.  In order for a defendant to be found guilty of that

1  charge, the government must prove each of the following

2  elements beyond a reasonable doubt:

3      First, the defendant knowingly devised and intended to

4  devise a scheme or plan to defraud the City and County of San

5  Francisco or the San Francisco Police Department of their right

6  to honest services;

7      Second, the scheme or plan consisted of a bribe or

8  kickback in exchange for the defendant's services.  The

9  "exchange" may be express or may be implied from all the

10 following circumstances -- third -- I'm sorry, may be implied

11 from all the surrounding circumstances;

12      Third, the defendant breached a fiduciary duty he owed to

13 the City and County of San Francisco or the San Francisco

14 Police Department;

15      Fourth, the defendant acted with the intent to defraud by

16 depriving the City and County of San Francisco or the San

17 Francisco Police Department of their right to honest services;

18      Fifth, the defendant's act was material; that is, it had a

19 natural tendency to influence, or was capable of influencing, a

20 person's acts;

21      Sixth, the defendant used, or caused someone to use, a

22 wire communication to carry out or attempt to carry out an

23 essential part of the scheme; and

24      Seventh, the wire communication traveled in interstate

25 commerce.

1     Bribery and kickbacks involve the exchange of a thing or

2     things of value for official action by a public official.

3     Undisclosed conflicts of interest, or undisclosed self-dealing

4     is not sufficient.  The defendant must have intended to trade

5     an official action for items of value.  The exchange can be

6     express or it can be implied from the surrounding

7     circumstances, and need not concern a specific official act.

8     The government need not prove that each gift was provided with

9     the intent to prompt a specific official act; rather, the

10    government can show a course of conduct of favors or gifts

11    flowing to a public official in exchange for a pattern of

12    official acts favorable to the donor.

13        A "kickback" means anything of value provided to the

14    defendant for the purpose of improperly obtaining or rewarding

15    favorable treatment in connection with the defendant's official

16    duties.

17        The relationship between the defendant and the City and

18    County of San Francisco or the San Francisco Police Department

19    involves a "fiduciary" duty if the City and County of San

20    Francisco or the San Francisco Police Department placed special

21    trust and confidence in the defendant, in reliance that the

22    defendant would exercise his discretion and expertise with the

23    utmost honesty and forthrightness in the interests of the

24    public, and the defendant knowingly accepted that special trust

25    and confidence and thereafter undertook to act on behalf of the

1  public based on such reliance.

2      A "scheme" is a plan or course of action formed with the

3  intent to accomplish some purpose, which purpose is unlawful.

4  Thus, to find the defendant guilty of this offense, you must

5  find that the defendant devised and intended to devise a plan

6  or course of action.  As to Count Three and four, the plan or

7  course of action must include bribes or kickbacks given or

8  offered to a public official.  In determining whether a scheme

9  to defraud exists, you may consider not only the defendant's

10  words, statements, and conduct, but also the circumstances in

11  which those are used as a whole.

12      An act is done "knowingly" if the defendant is aware of

13  the act and does not act through ignorance, mistake, or

14  accident.  You may consider evidence of the defendant's words,

15  acts, or omissions, along with all the other evidence, in

16  deciding whether the defendant acted knowingly.

17      "Intent to defraud" means to act knowingly and with the

18  intent to deceive.  As to Counts Three and Four, to find a

19  defendant guilty you must find that he had the purpose of

20  depriving the public and government of their right to a public

21  official's honest services.  Whether a person acted knowingly

22  and with intent to defraud is a question of fact for you to

23  determine like any other fact question.  This question involves

24  one's state of mind.  The ultimate facts of knowledge and

25  criminal intent, though subjective, may be established by

1  circumstantial evidence, based upon a person's outward

2  manifestations, words, conducts, acts, and all the surrounding

3  circumstances disclosed by the evidence and the rational or

4  logical inferences that may be drawn from them.

5      The defendant's acts are "material" if they had a natural

6  tendency to influence, or were capable of influencing, any

7  person's acts.  The defendant [sic] need not prove that the

8  fraud involved any foreseeable economic harm.

9      The government must also establish that the defendant used

10  a wire or radio communication in interstate commerce to carry

11  out or attempt to carry out the scheme or plan.  To "use a wire

12  communication in interstate commerce" means to send information

13  across state lines by means of wire, including telephone or

14  other electronic lines.  It does not matter whether the

15  material wired was itself false or deceptive so long as the

16  wire was used as part of the scheme, nor does it matter whether

17  the scheme or plan was successful or that any money or property

18  was obtained.

19      If you decide that one or both of the defendants was a

20  member of a scheme to defraud and that the defendant had the

21  intent to defraud, that defendant may be responsible for other

22  co-schemer's actions during the course of and in furtherance of

23  the scheme, even if the defendant did not know what they said

24  or did.  For the defendant to be guilty of an offense committed

25  by a co-schemer in furtherance of the scheme, the offense must

INSTRUCTIONS

1   be one that the defendant could reasonably foresee as necessary

2   and the natural consequences of the scheme to defraud.

3       The defendants are charged with conspiracy counts that

4   these instructions will further explain to you.  In order for a

5   defendant to be found guilty of a conspiracy, the government

6   must prove each of the following elements beyond a reasonable

7   doubt:

8       First, that there was an agreement between two or more

9   persons to commit at least one crime as charged in the

10  indictment;

11      Second, the defendant became a member of the conspiracy

12  knowing of at least one of its objects and intending to help

13  accomplish it.

14      A conspiracy is a kind of criminal partnership, an

15  agreement of two or more persons to commit one or more crimes.

16  The crime of conspiracy is the agreement to do something

17  unlawful; it does not matter whether the crime agreed upon was

18  committed.  For a conspiracy to have existed, it is not

19  necessary that the conspirators made a formal agreement or that

20  they agreed on every detail of the conspiracy.  It is not

21  enough, however, that they simply met and discussed matters of

22  common interest, acted in similar ways, or perhaps helped one

23  another.  One becomes a member of a conspiracy by willfully

24  participating in the unlawful plan with the intent to advance

25  or further some object or purpose of the conspiracy, even

Case3:14-cr-00102-CRB   Document175   Filed12/02/14   Page24 of 270   1848

INSTRUCTIONS

1  though the defendant does not have full knowledge of all the

2  details of the conspiracy.  Furthermore, one who willfully

3  joins an existing conspiracy is as responsible for it as the

4  originators.  On the other hand, one who has no knowledge of a

5  conspiracy, but happens to act in a way which furthers some

6  object or purpose of the conspiracy, does not thereby become a

7  conspirator.  Similarly, a person does not become a conspirator

8  merely by associating with one or more persons who are

9  conspirators, or merely by knowing that a conspiracy exists.

10      Defendants Furminger and Robles are charged in Count Five

11  of the indictment with conspiracy against civil rights in

12  violation of Section 241 of Title 18 of the United States Code.

13  In order for the defendant to be found guilty of that charge,

14  the government must prove each of the following elements beyond

15  a reasonable doubt:

16      First, beginning on or about February 19, 2009, and ending

17  on August 12, 2010, the defendant agreed with one or more

18  persons to injure, oppress, threaten or intimidate any person;

19      Second, that the defendant became a member of the

20  conspiracy knowing at least of one of its objects and intending

21  by that agreement to hinder, prevent or interfere with that

22  person's enjoyment of a right secured by the Constitution or

23  laws of the United States;

24      Third, that one or more of the intended victims was an

25  inhabitant of California, which means that the person was

Belle Ball and Katherine Sullivan
Official Reporters - U.S. District Court
(415) 373-2529

1    physically present in the state of California at the time of

2    the deprivation; and

3        Fourth, that the defendant acted under color of State law,

4    which means that the defendant was acting in an official

5    capacity as a police officer at the time of the deprivation.

6        The second element of the conspiracy offense is that the

7    defendants intended by the conspiracy to interfere with the

8    individual's rights that were secured or protected by the

9    Constitution and laws of the United States.

10       Count Five charges that the defendants Furminger and

11   Robles and Reynaldo Vargas conspired to interfere with another

12   individual's free exercise and enjoyment of a specific right

13   protected by the United States Constitution.  The right named

14   in Count Five is the right to be free from the deprivation of

15   property without due process of law by one acting under color

16   of law.

17       Thus, in this case, if you find that the conspiracy was

18   directed against an inhabitant's right to be free from the

19   deprivation of property without due process of law by someone

20   acting under color of law, then you may find that the

21   conspirators agreed to interfere with the rights secured by the

22   Constitution of the United States.

23       Defendants Furminger and Robles are charged in Count Six

24   of the indictment with conspiring to commit theft concerning a

25   federally funded program in violation of Section 371 of

1  Title 18 of the United States Code.  In order for the defendant

2  to be found guilty of that charge, the government must prove

3  each of the following elements beyond a reasonable doubt:

4      First, beginning on or about February 19, 2009, and ending

5  on or about August 12, 2010, there was an agreement between two

6  or more persons to commit at least one crime of theft

7  concerning a federally funded program as charged in Count Seven

8  of the indictment;

9      Second, the defendant became a member of the conspiracy

10 knowing of at least one of its objects and intending to help

11 accomplish it; and

12     Third, one of the members of the conspiracy performed at

13 least one overt act on or after February 19, 2009 for the

14 purpose of carrying out the conspiracy, with all of you

15 agreeing on a particular overt act that you find was committed.

16     The overt acts alleged in the indictment are:

17     a.  On or about March 4, 2009, Defendants Furminger and

18 Robles and Reynaldo Vargas conducted a search of J.F.'s

19 apartment and seized items as part of their official duties.

20 They then took for their own benefit some of the items they

21 seized, including a $500 Apple gift card.

22     b.  On or about March 4, 2009, Defendant Robles and

23 Reynaldo Vargas used the Apple gift card specified above to

24 purchase an iPhone and an iPod Nano at an Apple store in

25 San Francisco;

1    c.  On or about May 25, 2009, Defendants Furminger and

2 Robles and Reynaldo Vargas stole money during a search in

3 Newark, California and split it among themselves;

4    d.  On or about June 18, 2009, Defendant Robles and

5 Reynaldo Vargas stole money during a search in San Francisco,

6 California and split it among themselves;

7    e.  On or about October 2nd, 2009, Defendants Furminger

8 and Robles and Reynaldo Vargas stole money during a search in

9 San Francisco, California and split it among themselves; and

10    f.  On or about November -- pardon me, on or about

11 November 19, 2009, Defendants Furminger and Robles and Reynaldo

12 Vargas stole money during a search of a storage facility in

13 San Francisco, California and split it among themselves.

14    An overt act does not itself have to be unlawful.  A

15 lawful act may be an element of a conspiracy if it was done for

16 the purpose of carrying out the conspiracy.  The government is

17 not required to prove that the defendant personally did one of

18 the overt acts.

19    A conspiracy may continue for a long period of time and

20 may include the performance of many transactions.  It is not

21 necessary that all members of the conspiracy joined it at the

22 same time, and one may become a member of a conspiracy without

23 full knowledge of all the details of the unlawful scheme or the

24 names, identities, or locations of all other members.

25    Even though a defendant did not directly conspire with the

1  other defendant or other conspirators in the overall scheme,

2  the defendant has, in effect, agreed to participate in the

3  conspiracy if the government proves each of the following

4  elements beyond a reasonable doubt that:

5       First, the defendant directly conspired with one or more

6  conspirators to carry out at least one of the objects of the

7  conspiracy;

8       Second, the defendant knew or had reason to know that the

9  conspirators were involved with those with whom the defendant

10  directly conspired; and

11       Third, the defendant had reason to believe that whatever

12  benefits the defendant might get from the conspiracy were

13  probably dependent upon the success of the entire venture.

14       It is not a defense that a person's participation in a

15  conspiracy was minor or for a short period of time.

16       Each member of the conspiracy is responsible for the

17  actions of other co-conspirators performed during the course

18  and in the furtherance of conspiracy.  If one member of the

19  conspiracy commits a crime in furtherance of the conspiracy,

20  the other members have also, under the law, committed the

21  crime.

22       Therefore, you may find the defendant guilty of conspiracy

23  to commit theft concerning a federally funded program as

24  charged in Count Six of the indictment if the government has

25  proved each of the following elements beyond a reasonable

1    doubt:

2        First, a person named in Count Seven of the indictment

3    committed the crime of theft concerning a federally funded

4    program as alleged in that count;

5        Second, the person was a member of the conspiracy charged

6    in Count Six of the indictment;

7        Third, the person committed the crime of federal program

8    theft in furtherance of the conspiracy circumstances.

9        Fourth, the defendant was a member of the same conspiracy

10   at the time the offense charged in Count Seven was committed;

11   and

12       Fifth, the offense fell within the scope of the unlawful

13   agreement and could have reasonably been foreseen as a

14   natural -- a necessary or a natural consequence of the unlawful

15   agreement.

16       Defendants Furminger and Robles are charged in Count Seven

17   of the indictment with theft concerning a federally funded

18   program, in violation of 666(a)(1)(A) of Title 18 of the

19   United States Code.  Section 666(a)(1)(A) makes it illegal to

20   steal from an organization receiving federal funds.  In order

21   for a defendant to be found guilty of that charge, the

22   government must prove each of the following elements beyond a

23   reasonable doubt:

24       First, at the time alleged in the indictment, the

25   defendant was an agent of the San Francisco Police Department;

1          Second, in a one-year period the San Francisco Police

2    Department received federal benefits in excess of $10,000;

3          Third, during that one-year period, the defendant

4    embezzled, stole, obtained by fraud, converted or intentionally

5    misapplied property with each of you agreeing that at least one

6    item of property was embezzled, stolen, obtained by fraud,

7    converted, or intentionally misapplied, and each of you

8    agreeing as to which items so qualifies:

9          a.  Items seized on or about March 4, 2009, during a

10   search of J.F.'s apartment, including a $500 Apple card.

11         b.  Money stolen on or about May 25, 2009, during a search

12   at Newark, California;

13         c.  Money stolen on or about June 18, 2009, during a

14   search in San Francisco;

15         D.  Money stolen on or about October 2nd, 2009, during a

16   search in San Francisco; and.

17         e.  Money stolen on or about November 19, 2009, during a

18   search of the storage facility in San Francisco, California;

19         Fourth, the property was under the care, custody, and

20   control of the San Francisco Police Department; and

21         Fifth, the value of the property was at least $5,000.

22         An "agent" is a person authorized to act on behalf of

23   another person, organization, or government.  Employees,

24   partners, directors, officers, managers, and representatives

25   are all agents of the organization or the government with which

1    they are associated.  An agent does not necessarily have any

2    control over the federal funds received by the organization,

3    government, or agency.

4         To prove the second element, the government must establish

5    that the San Francisco Police Department received, during a

6    one-year period beginning March 1, 2009, benefits in excess of

7    $10,000 under a federal program involving a grant, contract,

8    subsidy, loan, guarantee, insurance, or some other form of

9    federal assistance.  The one-year period must begin no more

10   than 12 months before the defendant began committing the

11   offense and must end no more than 12 months after the defendant

12   stopped committing the offense.  The one-year period may

13   include time both before and after the commission of the

14   offense.

15        The third element the government must prove beyond a

16   reasonable doubt is that the defendant embezzled, stole,

17   obtained by fraud, converted, or intentionally misapplied

18   property.

19        To "embezzle" money or property means to intentionally

20   take or convert to one's own use money or property of another

21   after that money or property lawfully came into possession of

22   the person taking it by virtue of some office, employment, or

23   position of trust.

24        To "steal" money or property means to take someone else's

25   money or property without the owner's consent and with the

1   intent to deprive the owner of the value of that money or

2   property.

3        To "obtain by fraud" means to intentionally take something

4   by false representations, suppression of the truth, or

5   deliberate disregard for the truth.  To knowingly convert money

6   or property means to knowingly appropriate or use such property

7   or money without proper authority for the benefit of oneself or

8   any other person who is not the rightful owner with the intent

9   to deprive the rightful owner of money or property.

10       To "intentionally misapply" money or property means to

11  intentionally use money or property of the San Francisco Police

12  Department knowing that such use is unauthorized or

13  unjustifiable or wrongful.

14       A defendant may be found guilty of theft concerning a

15  federally funded program, even if the defendant personally did

16  not commit the acts or act constituting the crime but aided and

17  abetted in its commission as alleged in Count Seven.

18       To prove a defendant guilty of aiding and abetting, the

19  government must prove beyond a reasonable doubt:

20       First, theft concerning a federally funded program was

21  committed by somebody;

22       Second, the defendant aided, counseled, commanded, induced

23  or procured that person with respect to at least one element of

24  the theft concerning a federally funded program;

25       Third, the defendant acted with the intent to facilitate

1   the theft concerning a federally funded program; and

2        Fourth, the defendant acted before the crime was

3   completed.

4        It is not enough that the defendant merely associated with

5   the person committing the crime, or unknowingly or

6   unintentionally did things that were helpful to that person, or

7   was present at the scene of the crime.  The evidence must show

8   beyond a reasonable doubt that the defendant acted with the

9   knowledge and intention of helping that person commit theft

10  concerning a federally funded program.  A defendant acts with

11  the intent to facilitate the crime when the defendant actively

12  participates in the criminal venture with advance knowledge of

13  the crime and having acquired that knowledge when the defendant

14  still had a realistic opportunity to withdraw from the crime.

15       The government is not required to prove precisely which

16  defendant acted -- actually committed the crime and which

17  defendant aided and abetted.

18       Count Eight.  Defendant Furminger is charged in Count

19  Eight of the indictment with extortion in violation of Section

20  1951 of Title 18 of the United States Code.  In order for

21  defendant Furminger to be found guilty of that charge, the

22  government must prove each of the following elements beyond a

23  reasonable doubt:

24       First, the defendant was a public official;

25       Second, the defendant obtained property, which the

1   defendant knew he was not entitled to;

2        Third, the defendant knew that the property was given in

3   return for taking some official action or refraining from

4   taking official action; and

5        Fourth, commerce or the movement of an article, commodity,

6   or people in commerce from one state to another was affected in

7   some way.

8        In the case of a public official who obtains property, the

9   government does not have to prove an explicit promise to

10  perform a particular act made at the time the property is

11  provided.  Rather, it is sufficient if the public official

12  understands that he is expected as a result of the property

13  exchange to exercise particular kinds of influence as specific

14  opportunities arise.  An explicit *quid pro quo* is not required;

15  an agreement implied from the official's words and actions is

16  sufficient to satisfy this element.

17       In order to find the Defendant guilty, each of you must

18  agree that at least one of the following items of property was

19  one that the Defendant knew he was not entitled to receive, and

20  further, knew was given in return for taking some official

21  action or refraining from taking some official action, with

22  each of you agreeing as to which item so qualifies:

23       A. a Nikon camera;

24       B. a GPS;

25       C. bottles of perfume;

1          D. a DeWalt power drill;

2          And e. Herradura tequila.

3          Defendants Furminger and Robles are charged in Count 9 of

4     the indictment with conspiracy to distribute controlled

5     substances in violation of Sections 841(a) and 846 of Title 21

6     of the United States Code.

7          In order for a defendant to be found guilty of that

8     charge, the government must prove each of the following

9     elements beyond a reasonable doubt:

10         First, beginning on or about February 19, 2009 and ending

11    on or about April 9, 2011, there was an agreement between two

12    or more persons to distribute marijuana, cocaine,

13    methamphetamine, or heroin, each of which is a controlled

14    substance;

15         And second, the Defendant joined in the agreement knowing

16    of its purpose and intending to help accomplish that purpose.

17         "To distribute" means to deliver or transfer possession of

18    marijuana, cocaine, methamphetamine or heroin to another

19    person, with or without any financial interest in that

20    transaction.

21         Well, I think you can see why I'm going to give you a

22    written copy of these instructions.  You know, it's sometimes

23    difficult to follow.  And I encourage you, in the course of

24    your deliberations, to go back and look when you are dealing

25    with various counts, to take a look.

```
 1        We tried to -- to use one definition basically on
 2   conspiracy, but there are differences in those definitions for
 3   various counts.  Nevertheless, you shouldn't rely on your
 4   memory as to what I just said for your -- you should really
 5   rely on -- on your written instructions.  Each of you will have
 6   a copy.
 7        And now we are going to commence the argument, which I
 8   hope will be clearer than my instructions.  And, we will start
 9   with the Government.
10        You might all want to stand up and stretch for a moment.
11   And, the government will set up.
12        Mr. Hemann.
13            MR. HEMANN:  Thank you, Your Honor.
14                         CLOSING ARGUMENT
15   BY MR. HEMANN:
16        Ian Furminger, Edmond Robles and Reynaldo Vargas are
17   thieves.  But what they did was far worse than just stealing.
18   What they did, using the authority that they had, was take a
19   gun, and a badge, and go out and abuse and violate the oath
20   that they took.  The solemn oath that they took, to uphold the
21   law.
22        This case, ladies and gentlemen, is about stealing.  It's
23   about drugs.  It's about using criminals to con -- to commit
24   the very crimes that the police are supposed to be preventing.
25   It's about the misuse of confidential informants.  It is about
```

1   writing false police reports.  And it is about the abuse of

2   power.

3        But at its core what this case is about is the violation

4   of the rule of law.  The rule of law is a principle that says

5   that our public officials, our government officials, are

6   required to follow the rules and not act in their own interest.

7   It sounds heavy; it sounds abstract.  But it's real.  And it is

8   the requirement that has allowed our democracy to function as

9   the longest continuingly-functioning democracy in the history

10  of the world.

11       For all of its flaws, what we have is a little bit of a

12  miracle.  And the miracle that we have survives only because we

13  insist -- insist -- that our public officials adhere to the

14  rule of law.  And ensuring that they do so, we must be

15  continually and constantly vigilant.

16       And ladies and gentlemen, that is why we are all standing

17  in this courtroom, today.  To make sure that the rule of law is

18  respected and adhered to by every single public official,

19  perhaps especially police officers.

20       Criminal law is about those, those bedrock requirements

21  that govern the way we conduct our everyday activities.  Trials

22  are about evidence.  Trials are where we decide, based only on

23  the evidence, whether somebody has stepped outside the bounds

24  that they are expected to live within.

25       The Court just instructed you that it is your duty to

1  decide this case solely on the evidence.  The evidence is what

2  you saw and heard in this the courtroom.  The witness testimony

3  (Indicating), the exhibits, and stipulations.  It's the

4  lawyer's job in closing to talk about the evidence.  To talk

5  about the record, and only the record.  And that's what I will

6  try to do today.

7      I'm going to focus on not all the evidence or we would be

8  here for another four weeks.  And not all of the instructions,

9  because you just have been read them and you will have a copy.

10  I'm going to try to focus on the core instructions and the core

11  evidence.

12      You will have with you back in the jury room all of the

13  evidence (Indicating), except for the drug evidence.  Looks

14  like a lot.  A couple of them are sort of bent-over

15  spreadsheets.  I would encourage you to look at every single

16  piece of evidence in your deliberations.

17      In my closing today I'm going to focus on five things.

18  I'm going to focus on the thefts, I'm going to focus on the

19  drugs, and I'm going to focus on the extortion with regard to

20  Mr. Sanchez.

21      Along the way, I'm going to talk about the credibility of

22  witnesses and the jury instructions that relate to each of the

23  nine counts that the Defendants have been charged with.

24      You may have seen, you may have discerned, yourselves,

25  over the course of the deliberat- -- of the evidence in this

```
 1   case, that there are common themes between the thefts, the

 2   drugs, and the extortion.  That there's a thread that runs

 3   through all of them.  This common thread is no coincidence.

 4   It's part of the way that the Defendants did business.  And if

 5   you haven't seen it already, I'm going to talk about that

 6   commonality, that common thread, as well.

 7        I'm going to start with the theft evidence.  And before I

 8   do that, I do just want to thank you.  This has been -- trials

 9   are hard.  They're a heavy responsibility.  You have been sort

10   of extraordinary in your getting here on time and your paying

11   attention.  All of the lawyers noticed that, and all of the

12   lawyers appreciate it very much.

13        So, starting with the thefts.  And, I want to try to guide

14   you a little bit in how the evidence relates to the

15   instructions and the counts here.  The thefts relate to a

16   number of the specific counts.  Counts 1 and 2, which are the

17   wire fraud counts.  Count 5, which is the civil rights count,

18   and Count 6 and 7 which are the theft counts.  And we will talk

19   more -- it's a bit of a cumbersome sounding statute.  It's the

20   666(a)(1)(A) statute that His Honor mentioned to you a few

21   moments ago.

22        The thefts relate to 1 and 2, 5, 6 and 7.

23        The principle -- the common thread between -- behind all

24   of these thefts was that Mr. Furminger, Mr. Robles, and

25   Mr. Vargas found themselves and intentionally put themselves in
```

1   places where they would have the opportunity to steal money

2   during searches and arrests.

3       This isn't a complicated scheme.  This isn't something

4   that it would take a genius to figure out.  This isn't some

5   great Ponzi scheme.  This is a scheme, however, that is at the

6   heart, the core, of what police officers do every single day.

7       All across America, every single day, police officers are

8   given the opportunity to walk into a room by themselves.  And

9   find a pile of money.  And the question is:  What do they do

10  when they pick up the money?  Do they keep it for themselves?

11  Do they split with it their colleagues?  Or do they book it

12  into evidence?  What do they decide to do?

13      The evidence in this case, ladies and gentlemen, proves

14  beyond a reasonable doubt that the plan that they devised was

15  to get into these rooms, get into these places, find the money,

16  pick it up, and split it amongst themselves.

17      And of course, at the core of every scheme like this,

18  whether it is the most complicated securities fraud scheme in

19  the history of the republic, or a public official finding a

20  pile of money and sticking it in his pocket, there's greed.

21  And there's battles between the co-conspirators, as to how to

22  split up the profits.

23      And you heard a little bit about this today -- or, over

24  the course of the trial.  And you heard about it from

25  Mr. Vargas, and you heard about it from Mr. Hernandez.

1    And I'm going to talk to you as the closing goes on about

2  some of the instances, some of the specific things that people

3  said.

4    This is Mr. Hernandez (As read):

5         "Did you ever have an argument with

6         Mr. Robles about how much money you were

7         getting at Mission Station?

8    "ANSWER:One day I think we had a little argument

9    because he always show up with 40, $60.  One day we have

10   an argument and he's like he got a little attitude.

11        "QUESTION:Say that again.  He had what?

12        "ANSWER:Attitude.

13        "QUESTION:Attitude?"

14   And I'm quoting, with apologies:

15        "ANSWER:Look motherfucker, the money is not only for

16   you.  You're not the only one.  I have to split the money

17   with bosses, my boss.  But very bad, was look,

18   motherfucker.  And then I be like okay.

19        "QUESTION:Were you a little scared?

20        "ANSWER:Yes."

21   In a moment of that argument, Mr. Robles revealed part of

22  the scheme to Mr. Hernandez.  He revealed that he was sharing

23  the money with his boss, Mr. Furminger (Indicating).

24   As I go through the evidence with regard to each one of

25  the thefts, I would ask that you keep two things in mind with

1  regard to what that evidence says:  As to the testimony, was

2  the testimony contradicted?  That was one of the elements in

3  terms of believability or credibility of witnesses that the

4  Court instructed you on:  Was the testimony contradicted?

5      And number two:  Was the evidence corroborated?  They're

6  sort of two sides of the same coin.  Contradiction and

7  corroboration.  I'm going to talk about them.  I'm probably not

8  going to talk about all of the evidence, but I'm going to talk

9  about some of it.

10      I'm going to start at the beginning.  The theft by

11  Mr. Robles at the house at 22nd and Harrison.

12      And Ms. Lane, if you could put up Exhibit 267, please.

13      You will recall that Mr. Robles was working Mr. Hernandez

14  for some time.  He went into his room twice.  He put him on the

15  ground.  He threatened him.  He tried to get Mr. Hernandez to

16  become a confidential informant.

17      (Document displayed)

18      **MR. HEMANN:**  You heard that Mr. Robles trashed

19  Mr. Hernandez's room and found an empty little baggie that he

20  said, "We can put this on you."  Mr. Hernandez didn't buy into

21  it the first time.  But Mr. Robles came back and trashed the

22  room again.  And that time, threatened, "We're going put a

23  pistol on you and it's going to be your word against the word

24  of the police."

25      And then he saw Mr. Hernandez on the street, and he said

1    "Call me" (Indicating).  And this is one of those little

2    details that you find that you get in trials.  He sat there and

3    he said, "Call me" (Indicating).

4         Days later, when Mr. Vargas was asked about the same

5    thing, he said, "Mr. Robles did this (Indicating), 'Call me.'"

6         Little tiny things like that provide the sort of

7    corroboration that you are going to need to figure out whether

8    witnesses are telling the truth.  On a tiny detail, same thing.

9    "Call me" (Indicating).

10        So finally, Mr. Hernandez calls him.  And why does

11   Mr. Hernandez call him?  Human nature is more complex often

12   than a single solution, single answer.  Mr. Hernandez called

13   him for two reasons.  Number one, he wanted to -- Mr. Robles to

14   get off his back.  Number two, Mr. Hernandez wanted to get rid

15   of the other dope dealer.

16        Mr. Hernandez was funny, he was charming, he's obviously a

17   smart guy.  He's a drug dealer.  He was a drug dealer then.

18   Maybe he's fixed himself.  But, he was a drug dealer.  And he

19   wanted to get rid of the other drug dealer.  Both competing

20   priorities, both clear, both admitted by Mr. Hernandez.

21        So he goes to Mr. Robles, he tells him about this dude,

22   *El Pareja*, who lives in this house that is now yellow but used

23   to be pink, you remember Mr. Hernandez telling you.  And he

24   says, "The guy lives in the house.  Here's where the drugs

25   are."  He drew Mr. Robles a map.  And then he left Mr. Robles

1    to go, and in Mr. Hernandez's words, "Hit the house."

2       He got a call the same day, evening, from Mr. Robles,

3    saying "Meet me."

4       And, remember the picture that Mr. Hernandez painted of

5    that meeting.  Sitting on steps, Mr. Robles coming up the steps

6    and seeing him.  Giving him some money (Indicating).  And

7    Mr. Hernandez, no saint, saying "Wait a minute, I see you got a

8    big roll of money.  Give me some more."  And Mr. Robles tossing

9    a couple more hundred dollars at him (Indicating), ending up

10   with $250.

11      And then, he gets up.  And as he gets up, Mr. Robles puts

12   something down in his pocket (Indicating).  And it's a little

13   piece -- and he showed you a little piece about this big

14   (Indicating), of something that looked like glass.  And he said

15   "What is it?"

16      "It's crystal meth."

17      In terms of corroboration, you can again look at little

18   details, like Mr. Robles then signed -- you have the police

19   report that's dated February 19th, and then -- if you could put

20   up Exhibit 50, please.

21          (Document displayed)

22          **MR. HEMANN:**  And just blow up the "To" and "From" and

23   date at the top, please.

24          (Document displayed)

25          **MR. HEMANN:**  The very next day, as Mr. Hernandez

1    said, Mr. Robles signs him up as a confidential informant.

2    Consistent with Mr. Hernandez's testimony, with Mr. Vargas's

3    testimony, and with the documentary evidence in the case.

4    Corroborating.

5        The next day, Mr. Vargas hears about this from Mr. Robles.

6    And this is what Mr. Vargas said when he testified (As read):

7            "**QUESTION:**Who did you hear describe it?

8            "**ANSWER:**From Cesar Hernandez and Mr. Robles.

9            "**QUESTION:**What did you hear about this house from

10       Mr. Robles?

11           "**ANSWER:**That they had made an arrest in the house,

12       and he also characterized the arrest.

13           "**QUESTION:**How did Mr. Robles characterize the arrest?

14           "**ANSWER:**He told me that it was really good."

15           "**QUESTION:**By 'really good,' do you know what he

16       meant?

17           "**ANSWER:**Yes.

18           "**QUESTION:**What?

19           "**ANSWER:**I took that to mean that there was a good

20       amount of money recovered from there."

21       And then Mr. Robles said they went back.  And they went

22    back to that house, that then-pink house, to look for jewelry

23    that Mr. Hernandez told them was left.  And they didn't find

24    anything.

25       And again, small detail that corroborates Mr. Robles -- or

1    Mr. Vargas.  Look at the time records.  And we went through the

2    thrilling, you'll recall, testimony of Sergeant Morentz from

3    the SFPD -- Officer Morentz from the SFPD, who went through in

4    a very tedious way the time records from each day.

5         What do they show?  They showed that on February 19,

6    Officer Robles was on duty.  Officer Vargas was not.  On the

7    20th, they were both on duty.  Corroboration.  Not a

8    (Unintelligible) corroboration, but detailed corroboration.

9         And sometimes, ladies and gentlemen, it's those little

10   things that if somebody was lying, they could never keep

11   straight all the little things.  The little things that provide

12   corroboration.

13        The next theft that you heard evidence of had to do with

14   the Apple gift card.

15        And if you could put up 268, please, Ms. Lane.

16            (Document displayed)

17        **MR. HEMANN:**  And you will remember the gift card was

18   originally purchased by Mr. Vice -- Mr. Vice's father, who

19   testified, given to Mr. Vice.  Mr. Vice then gave it to Zeppi

20   Furlong in exchange for drugs.

21        Mr. Furlong was the boyfriend of Kelsey Stewart, who lived

22   at the Marilyn Hotel (Indicating).

23        And, what you heard is that on the day of the search of

24   the Marilyn Hotel, Mr. Furminger came in.  And if you go back

25   and look at the time records, you've got Mr. Robles and Vargas

1  on duty that day, and Mr. Furminger on holiday that day, off

2  duty, coming in to participate in the search.

3      During the search, Mr. Vargas said that he found an Apple

4  gift card.  And when you look at the time records for the Apple

5  gift card, or the Apple records -- and it's Exhibit 31 and

6  32 -- you will see that a call was made at 9:00 to check the

7  balance.  And, Mr. Vargas owned it.  He said "I found it.  I

8  checked the balance."

9      Now, here's what Mister -- here is a choice that

10 Mr. Vargas could make.  If Mr. Vargas wants to promote a

11 narrative, a guilty narrative to get some benefit with regard

12 to Mr. Robles and Mr. Furminger, what does Mr. Vargas say?

13 Well, maybe he says, "We put it on speaker and we all stood

14 there and listened, and had a round of applause."  No.  What

15 Mr. Vargas said is (As read):

16         "**QUESTION:**You testified that you made a call to check

17     the balance from the Marilyn Hotel.  Is that correct?

18         "**ANSWER:**Yes.

19         "**QUESTION:**And who was present when you made the call

20     to check the balance on that card?

21         "**ANSWER:**At that particular moment I may have been

22     alone or would have been Mr. Robles.  I don't recall

23     Mr. Furminger being there that exact moment when I was

24     checking the balance on the cards."

25     Here's a -- a slow-pitch opportunity for Mr. Vargas to

1    say, "Oh, yeah, it was all of us, you know, together at the

2    moment, doing this."

3         And what he said is, a, "I don't know if Mr. Vargas was

4    there -- Mr. Robles was there or not.  And Mr. Furminger was

5    not there."

6         It's not somebody who was running around trying to drag

7    everybody into the hole with him.

8         So, they found the card, but they're looking for more.

9    And what they're looking for is where the cash is.  And not

10   Mr. Vargas, but two other witnesses talk about Mr. Furminger

11   and Mr. Robles asking about the cash -- asking about the car.

12        This is Ms. Stewart (As read):

13             "**QUESTION:**When they brought you into the room, was

14        one of them in charge of asking you questions?

15             "**ANSWER:**They all kind of had a go at asking me

16        questions.  I think Vargas must have felt that he had the

17        best bet for getting any information out of me.  He was

18        kind of playing the good cop, so he talked to me a lot.

19             "**QUESTION:**And if he was playing the good cop, how

20        would you describe the role the others were playing?

21             "**ANSWER:**Well, Robles would be the bad cop.  And

22        Furminger was just sort of the overseer, it seemed, like

23        he --

24             "**QUESTION:**What were they asking you about?

25             "**ANSWER:**Zeppi's possessions.  His car, where it was

```
1         parked.  If I had -- if I knew where it was parked, and if
2         I had the key.  And they wanted his account numbers.  They
3         said that, you know, whatever money they got, they could
4         split with me."
5         Wasn't just Ms. Stewart who remembered that.  It was
6   Mr. Elliot, who was there at the Marilyn Hotel with her.
7         This is Mr. Villazor asking him questions (As read):
8              "QUESTION:Setting aside what Mr. Vargas said to you,
9         do you recall either of the other officers speaking to
10        Kelsey Stewart?
11             "ANSWER:Yes.
12             "QUESTION:Do you remember specifically who said what?
13             "ANSWER:The -- the Officer Robles was very aggressive
14        with her.  They wanted to know the location of
15        Mr. Furlong's vehicle.
16             "QUESTION:You said 'they.'  Are you referring to
17        Mr. Robles?
18             "ANSWER:And -- him and Sergeant Furminger.
19             "QUESTION:They were both saying these statements?
20             "ANSWER:Yes.
21             "QUESTION:And what were they saying?
22             "ANSWER:They were both inquiring as to the location
23        of Mr. Furlong's -- I believe he had a BMW and a Vespa
24        scooter.  They wanted to know where these things were.
25             "QUESTION:Did they say anything further about -- did
```

1      they say anything else about the BMW or the scooter?

2              "**ANSWER:**After a while, they intimated that they would

3      split any proceeds that they would obtain from the sale of

4      such a thing with her, if she would come across with the

5      location of the vehicles.

6              "**QUESTION:**Do you have any specific memory of who said

7      'split,' who talked about splitting the proceeds?

8              "**ANSWER:**That was Officer Robles."

9          So, they're looking for the big money.  Now, you heard

10    that they missed, in the mess of the room, an envelope with a

11    thousand dollars.  But they were looking for the big money.

12    And they were suggesting to the girlfriend, Ms. Stewart, that

13    they would split with it her if she gave it to them.

14         After a while you heard that they let Ms. Stewart go from

15    the station where they had taken her.  And what did they do?

16    Mr. Robles and Mr. Vargas took the Apple gift card and they

17    went shopping at the Apple Store.

18              (Document displayed)

19          **MR. HEMANN:**  And what you see here, ladies and

20    gentlemen, is the chart that Mr. Villazor showed you during the

21    course of the trial.

22         Michael Vice (Indicating) got the gift card.  He gave it

23    to Mr. Furlong.  Mr. Furlong had it in his room.  And, you got

24    records to show that on the 4th of March, Mister -- somebody,

25    and Mr. Vargas said it was him, checked the balance.

1   And then at the Apple Store, the same day, at around 4:00,

2   you got the use of a $500 Apple gift card and the $53 Apple

3   gift card.  And it purchased two things.  Number one, the

4   iPhone that Mr. Vargas said he got because he's the one that

5   found it, the more valuable item.  And a Nano that Mr. Vargas

6   testified was purchased and taken by Mr. Robles.

7        Now, all you have on this point is Mr. Vargas's testimony

8   as to who took it that day.  That is the only evidence in the

9   record on what happened on that day, at that time.  It is not

10  contradicted.

11       Now, Mr. Vargas did say that Mr. Furminger knew, and he

12  did say that Mr. Furminger was unhappy about what had happened.

13  But he wasn't unhappy that these guys had used a stolen Apple

14  gift card.  He was unhappy that he didn't get cut in with some

15  little electronic trinket.

16       Mr. Vargas was asked (As read):

17          "QUESTION:At some point did you speak with

18       Mr. Furminger about the Apple gift card purchases?

19          "ANSWER:Yes.

20          "QUESTION:When was that?

21          "ANSWER:That was, I believe, a couple days later."

22       And if you look at the time records, you'll see that

23  Mr. Furminger was off duty.  So he didn't come in for a couple

24  days later.

25          "QUESTION:And what was -- was it in person or on the

```
1        telephone?

2             "ANSWER: It was in person.

3             "QUESTION: And was Mr. Robles present during that

4        conversation?

5             "ANSWER: Yes.

6             "QUESTION: And what did you discuss?

7             "ANSWER: Mr. Furminger was a little upset with us and

8        used some colorful language.

9             "QUESTION: You don't need to quote it, but how did he

10       express it, without necessarily quoting it?

11            "ANSWER: He was upset that we had gone to the Apple

12       store and purchased things without him.

13            "QUESTION: Do you know how he found out that you had

14       gone to the Apple Store?

15            "ANSWER: I know that I didn't tell him, so I made the

16       assumption that Mr. Robles told him.

17            "QUESTION: And what was the substance of what

18       Mr. Furminger said?

19            "ANSWER: I'll subtract the colorful language.  But

20       basically, hey, thanks for going there without me and

21       cutting me out of that.  Not getting his portion.

22            "QUESTION: Was he upset with you for the impropriety

23       of making the purchase?

24            "ANSWER: He was upset because he was not included in

25       the purchase."
```

1        Now, again, corroboration is important.  And what we know

2    is that Mr. Vargas registered the iPhone to himself.  You have

3    Apple records that show that he registered the iPhone to

4    himself.

5        You have no records that show that Mr. Vargas ever used

6    the iPod Nano.  What you have is evidence is that Mr. Robles

7    gave it to his girlfriend, Bernadette Melvin.  And that

8    Ms. Melvin received it in the original packaging.

9        The question to her was (As read):

10            **"QUESTION:**When you received it, was it new, in the

11        box, and in the packaging?

12            **"ANSWER:**Yes.

13            **"QUESTION:**And you unwrapped it, yourself, after

14        receiving it from Mr. Robles?

15            **"ANSWER:**Yes."

16        And to be clear, this Nano that was purchased this day

17    (Indicating) is the same as this Nano (Indicating).  This iPod

18    Nano that Ms. Melvin dug up and gave to her attorney, who gave

19    it to the FBI when the FBI went and found her.

20        And when did the FBI go and find her?  Not before

21    Mr. Vargas came in and began cooperating, but after.  After

22    Mr. Vargas said, "Wait a minute, Mr. Robles took the iPod

23    Nano."

24        This piece of evidence (Indicating), this real thing, came

25    to the FBI, came into this courtroom, because Mr. Vargas told

1   the FBI where to find it.  And it was there.

2       One last point on this.  4:11 I think is what the receipt

3   said, it was around 4:00 when this was purchased at the Apple

4   Store on Stockton Street in San Francisco.

5       Mr. Vargas and Mr. Robles were working overtime for the

6   San Francisco Police Department when they made this purchase.

7   They put in for overtime.  When they were -- they were there,

8   they were on duty, buying an Apple product with a stolen gift

9   card, that day.  Again, time records corroborate it.

10          (Document taken off display)

11          **MR. HEMANN:**  A couple months later, the DEA --

12  probably throughout this time, I think -- Special Agent Sicord

13  testified the DEA was looking for Manny and Gricelda Sanchez,

14  as you will remember.

15      And, and Special Agent Sicord and Officer Vargas both

16  testified that the SFPD sort of generally knew.  The narcotics

17  people were involved in the investigation.  But, it was

18  generally known, and Mr. Vargas said, "We knew that the DEA had

19  an investigation into Manny and Gricelda."

20      And Mr. Robles, Mr. Vargas and Mr. Furminger knew because

21  they had a source, the Shah, who we talked about.  Mr. Robles's

22  CI.  And the Shah gave these guys a tip.  "Manny, I know Manny.

23  I can get him come into San Francisco, and you can pop him."

24  And that's what happened.

25      And he rolls in, he's in a van with his wife and their

 1   kids, and he's arrested.  He's pulled over.  And what do they

 2   find?  They find drugs in the van.  They arrest both of them;

 3   they bring them down to Mission Station.  They -- Mr. Sanchez,

 4   Manny, says, "I'm not talking to you."

 5        Ms. Sanchez, of course, worried about her children, says,

 6   "Okay, I'll talk to you."  And what did she give them?  She

 7   gives them a house in Newark.  Nobody knew that this was their

 8   house.  Everybody thought it was in East Palo Alto.  So all of

 9   a sudden these guys are sitting on a new house, a new spot

10   where they don't know what's there.

11        So, what do they do with this target of the DEA/SFPD

12   narcotics investigation?  Well, they get in the car, and they

13   drive to Newark.  They don't tell the DEA.  They don't tell the

14   narcotics officers in San Francisco.  They get in the car, and

15   head down to Newark.

16        And they tell the Newark Police Officer, who doesn't know

17   anything about this, doesn't -- as you saw -- remember anything

18   about it.  Why do they do that?  Because three guys in flannel

19   shirts are about to climb through the window of a house on a

20   street in Newark, so somebody's got to know, or they're going

21   to get shot.  So they call Newark PD, and this officer meets

22   them there.

23        You will have to ask yourself why they wouldn't have

24   called the DEA, or why they wouldn't have called the narcotics

25   group to tell them they found Manny and Gricelda's secret stash

 1    house.

 2         But the answer's, of course, obvious:  Because they didn't

 3    want them coming down and participating in this bust, and being

 4    there while they were looking.

 5         And what did they do?  They found money in holes in the

 6    backyard.  And you will remember, both in opening and during

 7    the questioning of Mr. Vargas (Indicating), there was a little

 8    mocking by the defense.  With a digging motion.  Remember

 9    digging (Indicating)?  Preposterous.  Who would sit there like

10    an idiot, and say digging holes in the backyard?  Nobody would

11    do that.

12         Well, look at the report.

13         Could you put up Exhibit 247, Ms. Lane?

14              (Document displayed)

15         **MR. HEMANN:**  Officer Robles wrote the report.

16         And if you could go to Page 7, please, the last page, and

17    blow up the last paragraph, please.

18              (Document displayed)

19         **MR. HEMANN:**  Second to last paragraph, please.

20              (Document displayed)

21         **MR. HEMANN:**  There you go.

22         This is a report written by Officer Robles, and approved,

23    signed, by Mr. Furminger.

24         Here are your holes.  It's not crazy.  I mean, it sounds

25    crazy that you would bury money in a hole in the backyard.  But

1   you've heard about it.  You've heard that Mr. Hernandez did it

2   as a kid, in Mexico.  You've heard that this character, *El*

3   *Moreno*, did it at Golden Gate Park.  And, you see Mr. Robles

4   writing about it here.

5        They looked out in the backyard, and they got a shovel,

6   and they dug up, and they found heroin.  He doesn't talk about

7   the money that Mr. Vargas found in the holes.  He talks about

8   the heroin.

9        Now, you will see in the report that there is money

10  mentioned.  There's $3,000.  And that's disclosed in the

11  report.  But, why is it disclosed?  Because Heckman's there.

12  And Heckman sees the money.  And Heckman put the money in his

13  report.

14       So you can't disappear $3,000 that an honest law

15  enforcement officer saw you take.  But you can disappear the

16  $30,000 that's sitting in the hole in the backyard, a hole that

17  Mr. Robles obviously knew about.  It isn't really so

18  ridiculous, after all.

19       Now, Mr. Vargas testified that they found the money.  He

20  testified that they divided it up in the back of the car.  He

21  testified that they spoke about the money several days later in

22  a specific cafe in the Mission.

23       You remember, he said they turned the radios off because

24  they were concerned that the dispatchers could listen in.

25  There's a level of detail with regard to Mr. Vargas's and

1   Mr. Hernandez's testimony that is very difficult to just

2   fabricate.  Because when you're fabricating details, you are

3   going to get caught.

4       He's not getting caught.  There's not a bunch of crazily

5   contradictory evidence here.  But he remembers these details,

6   and he sat there (Indicating), and he told you these details.

7       Now, one of the things he told you is that during that

8   conversation at the cafe several days later, Mr. Robles and

9   Mr. Furminger told him what they were doing with the money.

10  Mr. Furminger told him that they were -- that he was using it

11  for skylights.

12      And you will remember that, lo and behold, seven or eight

13  months after Mr. Furminger bought his house, Ignacio Ramirez

14  installed skylights in Mr. Furminger's house.  And you will

15  remember that Mrs. Furminger, when she testified, said it was

16  November of 2008.  December, January, March, April, May, June,

17  July (Indicating).  Seven months afterward.  There's your

18  skylights.  That corroborated something that Mr. Vargas

19  remembered from that conversation.

20      The corroboration with regard to Mr. Robles was obviously

21  much more solid, and much more compelling.  But let me just

22  say, it would be a strange thing for Mr. Vargas to be

23  testifying that they split the money, when it was really just

24  going to Mr. Robles.  There's no reason.  And you've seen in

25  this case -- and we're talking about it a while -- that when

```
 1   Mr. Vargas wants to say it was only Robles and not Furminger,
 2   he says, "It was only Robles and not Furminger."
 3        This time, he says, "It was both of them."  And so the
 4   fact that he's corroborated in the respect that I'm just about
 5   to talk about with Mr. Robles should suggest to you that his
 6   testimony is truthful in a much larger regard.
 7        What did Mr. Vargas say Mr. Robles told him about spending
 8   the money that they took in the backyard at the address in
 9   Newark?
10        (Document displayed)
11        MR. HEMANN:  He said that Mr. Robles told him he was
12   going to use it to buy a bike.  An expensive bike.
13        And what you saw from the evidence from Mr. Hoang was that
14   throughout May of 2009, Mr. Hoang is posting listings for this
15   very expensive bicycle on Craigslist.  And Mr. Robles is
16   proposing a bargain.  He's proposing a trade of stereo
17   equipment that he owned.  He's not proposing any money at all.
18        Then comes May 25th, 2009 (Indicating).  And Mr. Vargas
19   says "We took $30,000 and split it, ten, ten, ten."
20        On May 26th, 2009, the day after, Mr. Vargas takes $6,000
21   -- would you please put up Exhibit 292.
22        (Document displayed)
23        MR. HEMANN:  And just blow up that top portion,
24   please.
25        (Document displayed)
```

1              MR. HEMANN:  Deposits $6,000 in cash in the bank.

2    And what you'll see from the other exhibits -- and I actually

3    think it's 290, sorry about that, and 291.

4              (Document displayed)

5              MR. HEMANN:  But in 290, which are the B of A bank

6    records, you will see that within 48 hours, almost all of that

7    $6,000 was sent to pay -- pay off credit cards.  All of a

8    sudden, this day, dropped right into his lap from Heaven.  You

9    see $6,000 going in the bank, and boom, out (Snaps fingers).

10         You also see, though, stunningly, that Mr. Robles all of a

11   sudden has cash to buy this bike.  Mr. Hoang posts it again on

12   the 31st.  And on June 2nd, Mr. Robles e-mails, and for the

13   first time says, "Will 3,000 cash do it?"

14         And as it turns out, there are some phone calls between

15   the two of them that Mr. Hoang testified about.  And then -- if

16   you could put up Exhibit 307 --

17             (Document displayed)

18             MR. HEMANN:  On the 2nd of June, a week later, a week

19   after he got the $10,000, he buys this bike from Mr. Hoang for

20   $3,700 in cash.

21         And, here's the bike (Indicating).  Because just like he

22   predicted in an earlier email when he was trying to convince

23   Mr. Hoang to give it to him for less, he didn't ride it much.

24   And he sold it to Mr. Vargas, his friend -- and we'll talk

25   about that -- sometime thereafter.

1       Now, I suspect that you will get some -- something from

2  Ms. Caffese about this series of events.  I would ask that you

3  not engage in any sort of speculation about evidence that is

4  not in the record.  I just talked you through all of the

5  evidence that is in the record on this point.  There is no

6  other evidence in the record on this point.

7       Anything else is speculation.  Mr. Vargas got $10,000 this

8  way (Indicating).  And he spent 9,700 of those dollars within a

9  week after he got it.  And you don't only have this.  You have

10 Mr. Hernandez testifying that in the immediate aftermath of the

11 Manny arrest and find, Mr. Robles talked to him about Manny.

12      He was asked (As read):

13              "So what did Mr. Robles ask you about

14          Manny?

15          "**ANSWER:**In that moment, I told him a little bit about

16          my life in the past, so he know I have friends like him.

17          And he says, See?  You have to give me friends like Manny

18          because we can make a lot of money.  And then you know how

19          much money I make on this guy?  And all that he happy,

20          excited, talked to me about these guys.  Like you walk in

21          the street and find money, you happy.  That's this guy."

22      And he gestured at Mr. Robles.

23              "I want you have to give me people like

24          Manny so that way we can make a lot of

25          money.

1              "He say, you know how much money I make

2          on that?  I say, how much?  He say, a lot.

3          A lot.  He always say that."

4      There's absolutely no doubt that these guys got this money

5  on that day.  Because even five years later, their spending of

6  that money can be corroborated.

7      Would you put up Exhibit 271, Page 2.

8          (Document displayed)

9          **MR. HEMANN:**  There was testimony about a search that

10  Mr. Vargas and Mr. Robles conducted at this address, at 726

11  Potrero.  And you will remember that this was a request that

12  the SFPD got from -- the Mission Station got from the ATF, from

13  Special Agent Kwak, who came and testified.  And Special Agent

14  Kwak said they wanted some help.  And fortuitously, or not

15  fortuitously, Mr. Robles and Mr. Vargas were sent over.

16      They were looking for guns.  Okay?  They searched a

17  bedroom of this house.  And, in the bedroom of the house was a

18  wallet containing, according to Ms. Reynoso who you saw

19  testify, $2,000.  Or actually, as Ms. Reynoso said, $10 short

20  of $2,000.  Because she knew, because she counted it.  And her

21  money -- not drug money, just a little old lady's money -- was

22  sitting in a wallet in her bedroom.

23      And you will recall what Mr. Vargas said about this.  He

24  said he walked into the room and saw Mr. Robles with the money

25  on the bed.  Mr. Robles gestured him (Indicating) to watch the

 1    door, which he did, just for a couple of seconds.  And when he

 2    opened the door, Mr. Robles came out, the money was gone.

 3        And then you will remember that he said they split the

 4    money.  And somehow, he remembers that they split it.  About

 5    $1,000.  Remarkable.  Half of what Ms. Reynoso said was taken.

 6        They split it.  And you will remember, it was in that

 7    little alley behind Mission Station.  Okay?

 8        So, how do we know that that is likely to have happened?

 9    How do we corroborate that?  Well, Special Agent Kwak testified

10    (As read):

11                "Were agents and officer assigned to

12                 particular areas to search?

13            "ANSWER:Yes.

14            "QUESTION:Do you have a memory as to where Officer

15        Robles was assigned to search?

16            "ANSWER:He was assigned to search in the master

17        bedroom.

18            "QUESTION:Was he -- was he there alone?

19            "ANSWER:No.  I believe he went with Officer Vargas."

20        Remember, Special Agent Kwak knew Officer Robles from his

21    time at Mission Station.

22            "QUESTION:Was Ian Furminger that there that day?

23            "ANSWER:No, he was not.

24            "QUESTION:Did you eventually go to the master bedroom

25        yourself?

1          **"ANSWER:**I did.

2          **"QUESTION:**And what did you see as you were going into

3     the master bedroom?

4          **"ANSWER:**Officer Robles and Officer Vargas coming out.

5          **"QUESTION:**Did you see Officer Robles with anything in

6     his hand?

7          **"ANSWER:**No, I don't recall.

8          **"QUESTION:**Did you ask him if he had found anything?

9          **"ANSWER:**I asked him if there was anything in the

10    room, and they said they didn't find anything.

11         **"QUESTION:**And did you go into the room?

12         **"ANSWER:**Yes, I did.

13         **"QUESTION:**Did you do what's called a secondary

14    search?

15         **"ANSWER:**Yes, I did.

16         **"QUESTION:**And did you find anything?

17         **"ANSWER:**I did.

18         **"QUESTION:**What did you find?

19         **"ANSWER:**I found a .22 long rifle, a Marlin, and

20    ammunition.

21         **"QUESTION:**Did you find -- what kind of ammunition did

22    you find?

23         **"ANSWER:**It was multiple rounds of .22 caliber which

24    is smaller caliber, and .38 caliber."

25    he found a rifle (Indicating) in the bedroom.  And moments

1  after this, he testified that it only took him one or two

2  minutes to find it.

3       So, Mr. Vargas and Mr. Robles go into the room ostensibly

4  to search for guns, which was the purpose of the search.  And

5  they miss the rifle (Indicating) that it took Special Agent

6  Kwak a minute to find.

7       Because, what were they doing?  They had satisfied their

8  purpose.  They found some cash, and they were hitting the road,

9  which they did, and divvied up the money later on.

10      You heard Officer Vargas, Mr. Vargas, testify about some

11 of the big hits.

12           (Document taken off display)

13           **MR. HEMANN:**  And, said that there were also a whole

14 bunch of little hits.  And Officer Vargas -- and we'll talk

15 more about him as we go -- obviously no saint, bad cop, kept

16 doing this.

17      And I don't know whether that presents anything other than

18 that he is a bad cop.  But he kept doing it.  He kept doing

19 these little hits long after Mr. Robles hit.

20      Mr. Vargas and Mr. Hernandez talked about some hits that

21 worked, and they talked about some hits that did not work.  And

22 the point is that all of these hits are part of the scheme that

23 is alleged in the indictment.  This is a scheme to take money

24 in searches.  The big hits, the little hits.

25      And, you will -- you were instructed that it doesn't even

1  matter if they worked or didn't work.  And I'm going to talk a

2  little bit as we go, and as you will -- you heard from His

3  Honor, it is a good thing you have these (Indicating) and I'm

4  going to read along -- I'm going to read you a few of them.

5      But, when Officer Vargas -- when Mr. Vargas talked about

6  some that worked, some that didn't work, when Hernandez talked

7  about some that worked and some that didn't work, it doesn't

8  matter because it's the scheme, it's the scheme that's illegal.

9      And the Court instructed you at the end -- it is on

10  Page 10, you'll see it (As read):

11              "...nor does it matter whether the

12              scheme or plan was successful or that any

13              money or property was obtained."

14      You heard that doing these was sort of a way of life for

15  these guys over the course of the time in question.  You had

16  heard about the address at 517 Broadway, the little hit there.

17      You heard about Mr. Vargas, Mr. Robles going out to a

18  house in the Richmond and just grabbing a Bose sound system and

19  what Mr. Robles perceived to be a valuable state Highway Patrol

20  license plate cover (Indicating).  Little, but still part of

21  the scheme.

22      You also heard about big hits, plans for big hits that

23  didn't go anywhere.  Mr. Hernandez talked about the Defendants'

24  desire to hit this auto body shop out in the Bayview, because

25  they have lots of coke and lots of money in the -- packed into

1    the -- the panels of the car, the compartments in the car.

2        And, Mr. Hernandez testified about these late-night phone

3    records or phone calls where they talked -- went to the bar in

4    North Beach, and they talked about the scheme.  And Mr. Robles

5    was drunk, and he was saying, "When are we going to do this?

6    When are we going to do this?"

7        And lo and behold, when we went back and looked at the

8    phone record, when Special Agent Flores went back and looked at

9    the phone records, she found right in November, 2009, a few

10   little late-night phone records that correspond to

11   Mr. Hernandez's recollection.  A text, "Come meet me in the

12   bar," and then a bunch of phone calls between he and

13   Mr. Robles.  And you will see those in Exhibit 300.

14       Mr. Hernandez also remembers talking about this at Mission

15   Station with Mr. Furminger present.

16       And remember, Mr. Hernandez's concern is that these were

17   his friends.  And remember, there's a long discussion about how

18   Mr. Hernandez views friends.  And, "friends" are people from

19   his country.  And his country is a state in Mexico.  Michoacán.

20   And he was worried about these Michoacán guys getting arrested.

21       So, Question to Mr. Hernandez (As read):

22              "When you said 'These are my friends, I

23          don't want to do it,' did the sergeant..."

24       Mr. Furminger.

25              "...say anything?

```
 1           "ANSWER:'We don't want to arrest him.'

 2           "QUESTION:What did he say?

 3           "ANSWER:'we don't want to arrest him.  We don't want

 4      to arrest your friend.'"

 5      So, in the scheme, you again see Mr. Furminger acting in

 6 the same role that Kelsey Stewart described.  Sort of the

 7 overseer role.  The sitting-back role.  And he says "No, no,

 8 no, we're not going to arrest your friends.  We're not going to

 9 arrest them."

10      Would you put up 272, please.

11           (Document displayed)

12           MR. HEMANN:  You will remember that Mr. Byrd

13 testified that he lived in the Sunrise Hotel in October of

14 2009.  And you will recall that Mr. Vargas, Mr. Robles, and

15 Mr. Furminger searched the Sunrise Hotel on October 2nd, 2009.

16      And, you will recall that the testimony was that

17 Mr. Vargas handled Mr. Byrd, who needed to get dressed while

18 Mr. Furminger looked at the computer and Mr. Robles searched

19 the room.

20      What Mr. Byrd said was (As read):

21           "QUESTION:What were Sergeant Furminger and Officer

22      Robles doing at the time that you were talking with

23      Officer Vargas?

24           "ANSWER:Furminger was -- you know, looking at my

25      laptop.  And Robles was going through my wallet."
```

1    When you look at the police report, you will see under the

2 evidence, and you will remember that the way police reports

3 work is the first page sort of provides some detail about the

4 date, and the officers who were involved, and things like that.

5 And the people who were booked.  And then, subsequent pages

6 show the evidence that was obtained.

7    And you will see that the person who grabbed all of the

8 evidence, consistent with what both Mr. Vargas and Mr. Byrd

9 said, was Mr. Robles.  And you will see his star number, 1467,

10 as the seizer of the evidence.

11    Mr. Byrd was very specific that cash was taken.  He was

12 very specific that just short of $8,800 was taken, because he

13 was going to use that $8,800 to buy more drugs.  He remembers

14 $8,759 was taken.

15    You know Mr. Byrd is a guy who's going to have cash

16 because he's a drug dealer.  And you saw records of all of the

17 cash that this guy's got running in and out of his pocket in

18 furtherance of his drug business.

19    But, what you don't see is any cash taken from Mr. Byrd's

20 residence.  You see methamphetamine taken, you see pills taken,

21 you see scales taken, you see these pay/owe sheets taken.  No

22 cash.  It's the miracle drug dealer, with no cash at all.

23    Mr. Vargas testified that they did take cash.  And he

24 remembers that they went to, again, a very specific place,

25 different than before.  I think this case was Cafe La Taza in

1    the Mission.  And Mr. Robles went into the bathroom and divided

2    up the money, and came out, and, under the table, handed $2,000

3    to him, and some amount of money to Mr. Furminger.

4         Now, if, as Mr. Getz suggested about Mr. Robles -- or

5    Mr. Vargas during his testimony, he had gone back and pored

6    over all these reports -- which, by the way, Mr. Vargas said he

7    did not do, because they were at his lawyer's office in

8    San Francisco and not with him in southern California.

9         But if he had done that, as Mr. Getz suggested he was

10   doing, to try to adhere to some narrative, he probably would

11   have taken the amount that Mr. Byrd says was taken, $8,729 and

12   divided by three.

13        But, no.  He says, "I got $2,000."

14        Now, why he got two and not a third of 8,729, we don't

15   know, and he doesn't know.  Maybe he got shorted by Mr. Robles.

16   But, he's not adhering to a narrative.  He is giving you his

17   recollection that differs -- in a slight way, a slight way --

18   but differs from what Mr. Byrd said, which is normal.  That's

19   credible.  That's real.

20        Would you put up Exhibit 274, please.

21        The last of the thefts that you heard evidence about had

22   to do -- you heard some evidence on the last day of testimony

23   from Ms. Ponzer, had to do with this site on 19th Avenue, the

24   19th Avenue storage site.

25             (Document displayed)

1              **MR. HEMANN:**  And you will remember that Mr. Vargas

2     testified that they were looking for Ms. Ponzer and her

3     boyfriend, Mr. Crosby; that they found them out here, at this

4     storage site which was way out in the Avenues in San Francisco.

5     Out by Stonestown.

6          And, that when -- and he is in contact, Mr. Vargas

7     testified, with Mr. Furminger and Mr. Robles throughout the

8     day.  When they get him, Mr. Vargas testified, he calls

9     Mr. Robles and Mr. Furminger and has them come in, for the

10    purpose of splitting up the money.

11         Again, the questioning by Counsel suggested this was

12    entirely unlikely.  "Who would do that?  You're a thief.

13    You're a criminal.  Why wouldn't you just take the money?"

14         Mr. Vargas -- it's all in self-interest.  He wanted to

15    share, because he wanted them to share.  So, he calls them.

16         Now, it's not just Mr. Vargas saying that out of the blue,

17    because again, there are phone records, boring phone records

18    and boring time records, that show, first of all, a series of

19    phone calls leading up to -- phone calls and texts, between all

20    three of them.  They're obviously not standing next to each

21    other, calling each other.  A series of phone calls and texts.

22    And then again, a gap from 4:24 p.m. to 17 -- to 5:01 p.m.

23    4:24 to 5:01, which is exactly consistent with the time on the

24    police report when they arrested Mr. Crosby, at 15:55, 3:55,

25    and the time on the police report when they finished the

 1  report, when Mr. Vargas finished the report at 5:35 p.m.  That

 2  was the period of time that they were together and they were

 3  out at the storage site, doing the search.

 4      You also have seen -- and you can look at the time records

 5  for that day.  Mr. Furminger is on vacation.  He is on vacation

 6  the day before, and then he is on regular holiday off that day

 7  and for the days subsequent to that.

 8      He came in from Orinda -- we have these maps in evidence.

 9          (Document displayed)

10      **MR. HEMANN:**  He came in from Orinda, all the way out

11  to 19th Avenue (Indicating), on the late afternoon, on the late

12  afternoon, 3:00, 4:00, 5:00, the middle of Bay area traffic.

13  He drove all the way in, when he's off.

14      Why would anyone do that, other than for the reason that

15  Mr. Vargas testified to?

16      I'm going to talk very briefly about the charges, the

17  legal elements that apply to these thefts.

18      And again, it's Count 1 and 2, which is wire fraud.  And I

19  want to mention briefly, you received in evidence and you heard

20  us reading these stipulations.  Stipulations are agreements by

21  the parties as to what facts are true.

22      As to almost every single one of these counts, there are

23  what lawyers call jurisdictional facts.  There needs to be, you

24  know, funding in an amount over $10,000.  There needs to be an

25  interstate wire transfer.  Faxes are interstate wire transfers.

1      You will find all of those in the stipulations.  And I'm

2 not going to go through them all -- any of them, really -- with

3 you now.  You will have -- you have a document in evidence,

4 it's sort of one of the later exhibits, I can't remember what

5 the number is.  But if you get to a jurisdictional element, the

6 stipulations address those jurisdictional elements.  And

7 they're not really in dispute in this case.

8      The scheme -- and wire fraud is a scheme -- the scheme is

9 to take money while on duty.  To take money that is not yours,

10 while on police business.

11      You will see that the scheme has to involve an omission or

12 a misrepresentation.  The omission here is that the Defendants,

13 as part of the scheme, omitted to tell the San Francisco Police

14 Department that they were taking money.  And, there's an

15 element that you need to find that this is a material omission.

16 And, the materiality of it is probably completely obvious to

17 everybody.

18      But, if they told the San Francisco Police Department that

19 they had taken the money, the San Francisco Police Department

20 would have wanted it back, because it's not the Defendants'

21 money.  It's sort of a key fact when you're booking money into

22 evidence, when you're taking money.

23      Importantly, here, with regard to wire fraud, there's a

24 concept that His Honor instructed you on called "vicarious

25 liability."  And what that means is once you find the existence

 1    of the scheme, all of the Defendants are responsible for the

 2    conduct of the scheme, even if they did not participate in one

 3    aspect or another of it.

 4         And obviously, you found here that sometimes one officer

 5    wrote the report, sometimes Mr. Furminger approved them,

 6    sometimes Mr. Furminger was present, sometimes Mr. Vargas was

 7    not present.  There's slight shifts.

 8         But, it's the scheme that's illegal.  And all of the

 9    Defendants are vicariously liable if they participated in a

10    portion of the scheme.  And you'll see the instruction on

11    vicarious liability that explains that.

12         The last point I want to make is a slightly technical

13    point about wires.  For jurisdictional and commerce-clause

14    reasons that we don't really need to go into here, there has to

15    be a wire.  And the wire has to be in furtherance of the

16    scheme.

17         And a "wire" simply means movement -- like it says,

18    "movement from one place to another through a wire."  The

19    parties have stipulated that the faxing of the police reports

20    are interstate wires, and the uses of the telephones and texts

21    are interstate wires.  So it doesn't have to be anything per se

22    illegal about the wire; it just has to be part of the conduct

23    that underlies the scheme.

24         And in this case, ladies and gentlemen, there are plenty

25    of wires.  Every police report was faxed, every -- many of the

1  instances involve telephone calls that you heard about and text

2  messages that you heard about.

3       (Document taken off display)

4       **MR. HEMANN:**  That's Count 1.  And 2.

5       Count 5 is the civil rights conspiracy.  And the theory

6  behind that is pretty simple.  The government is not allowed to

7  take -- a government official is not allowed to simply take

8  something that belongs to another person (Indicating), and put

9  it in their pocket and keep it.  Because that person

10 (Indicating) has a right to say, "Wait a minute, that's my

11 money.  And you have to give it back to me.  It's not your

12 money, it's my money."  They have the right to say that to the

13 government.  They can file a claim if their money was taken.

14      What these Defendants did is they foreclosed each of these

15 individuals' ability to do that.  They took away their due

16 process of law.

17      Now, in some cases, it probably wouldn't matter.  Would

18 Manny Sanchez have gotten his $30,000 back, out of the hole in

19 the backyard?  Probably not.  He would have had the right to

20 say, "Hey, that's my money."

21      Would Mrs. Reynoso have gotten her $2,000 back?  Heck,

22 yeah, because that wasn't drug money.  It wasn't illegal money.

23 It was her -- her money.  And she was not given that right,

24 because the Defendants took it away from her.

25      Half of Mr. Crosby's money that Ms. Ponzer talked about --

 1   remember, he had two wallets.  He had a business wallet and a

 2   personal wallet.  The personal wallet was his insurance money

 3   that he got from his son.  He had the right to say "Hey, wait a

 4   minute.  Yeah, I'm a drug dealer.  You get that money, but

 5   that's (Indicating) my insurance money."

 6       Taken away from him.  Everybody -- Mr. Byrd could have

 7   said, "Hey, wait a minute, that's not proceeds of illegal

 8   drugs; that's from my friend," and gotten that back.

 9       This is a key part of the rule-of-law discussion.  You are

10   not allowed to just waltz into somebody's premises, and take

11   their stuff, and leave them without a remedy.  That's what a

12   due-process conspiracy is.

13       And there's an instruction on due process, and I suggest

14   to you that you read -- at the end, there's two paragraphs that

15   describe essentially what I just said to you.  Taking property

16   without giving the claimants due process.

17       The last two counts that have to do with the thefts are

18   Counts 6 and 7.  And it's a conspiracy to commit -- to take

19   money from the San Francisco Police Department, in the City and

20   County of San Francisco.

21       The theory behind this is that as soon as the Defendants

22   picked up the money, it was no longer -- it wasn't their money.

23   As soon as they picked it up, it was in the care, custody and

24   control of the San Francisco Police Department and the City and

25   County of San Francisco.

```
 1        They were not in these buildings, in these houses, in

 2   these apartments, in these SROs because they individually had a

 3   right to be in there.  They were in there only because of their

 4   authority as San Francisco Police Officers.  So when they lay

 5   their hands on something, it's not Ian Furminger or Ed Robles

 6   or Rey Vargas taking it.  It's the City and County of

 7   San Francisco.  When they put it in their pocket and take it

 8   home, they're taking it from their employer.  From the

 9   San Francisco Police Department, and the City and County of

10   San Francisco.  It's their money.  It's the City's money.  It's

11   not their money.

12        So, just as in a civil-rights conspiracy you can't take

13   some guy's money and say that it's your own, you also can't

14   take your employer's money and say that it's your own.

15        The hook here -- and this is a -- just kind of an absurdly

16   written and a little bit complicated statute, as the length of

17   the instruction will indicate (Indicating).  The reason that we

18   are in Federal Court about this is because the Federal

19   Government gives over $10,000 a year to the San Francisco

20   Police Department, to do San Francisco Police Department work.

21        And the theory behind the statute is that the Federal

22   Government is entitled to police the expenditure of money once

23   that jurisdictional threshold is met, and make sure that it's

24   not stolen by the employees of the organization that it is

25   funding.
```

1          Those facts regarding the funding of the San Francisco

2     Police Department are stipulated to.  And so, we get in a

3     situation where if you -- these guys (Indicating) -- steal

4     money from the San Francisco Police Department, a

5     federally-funded program, they have violated this statute.

6          To find the Defendants guilty of the conspiracy there are

7     a number of overt acts at that Judge Breyer referred to.  The

8     evidence from each one of them, beyond a reasonable doubt.  You

9     only have to find one, unanimously, beyond a reasonable doubt.

10         The second point I want to make is that it is no defense

11     for these guys to point fingers at each other.  To say that

12     somebody was more responsible or they did the bad stuff.

13     That's not a defense under the law in this case.

14         And if you look at the jury instructions on these charges,

15     you will see that they are very, very clear (As read):

16              "It is not necessary that all members

17                  of the conspiracy join in it at the same

18                  time, and one may become a member of the

19                  conspiracy without full knowledge of all

20                  the details of the unlawful scheme or the

21                  names, identities or locations of all the

22                  other members.  It is not a defense that a

23                  person's participation in a conspiracy was

24                  minor or for a short period of time.  Each

25                  member of the conspiracy is responsible for

1              the actions of the other conspirators

2              performed during the course and in

3              furtherance of the conspiracy.  If one

4              member of a conspiracy commits a crime in

5              furtherance of a conspiracy, the other

6              members have also, under the law, committed

7              the crime."

8        So, it is no defense if Mr. Furminger gets up and says:

9    "It was Mr. Robles.  I didn't talk to Cesar Hernandez on the

10   phone; it wasn't me who was talking to Kelsey Stewart on the

11   phone."  None of that is a defense, to say that Mr. Robles is

12   at the center of this, not Mr. Furminger.

13       This idea that you can decide that you are no longer on

14   the team once you are in court is not supported by the law.

15       Nor is it a defense for Mr. Robles to do this.  You

16   remember during opening statements, Ms. Caffese showed you a

17   diagram.  And it had Rey Vargas's mug shot right in the middle

18   of it, and this idea that everything was all about Rey Vargas.

19       Well, I would submit to you that the facts and the

20   evidence that you heard in this court shows it was not all

21   about Rey Vargas.  That he was not in the center.  If anybody

22   was in the center, perhaps it was Mr. Robles.  But it doesn't

23   matter, because they were all in the orbits around each other.

24   That is what the law says makes you guilty of the conspiracy.

25       I can happily take a break at this point, Your Honor.

 1          **THE COURT:**  All right.  Ladies and gentlemen, we are

 2   going to take a recess.  It's going to be a short recess.

 3      Remember the admonition given to you:  Don't discuss the

 4   case, allow anyone to discuss it with you, form or express any

 5   opinion.

 6      And we will resume at ten minutes to 11:00.  Ten to 11:00.

 7          (Jury excused)

 8          (Recess taken from 10:35 to 10:52 a.m.)

 9          **THE COURT:**  Please be seated.

10      Let the record reflect all jurors are present; the parties

11   are present.

12      You may proceed.

13          **MR. HEMANN:**  Thank you, Your Honor.

14      I'd like to turn, now, to the issue of credibility, and

15   spend a little bit of time talking about how you are to

16   determine the issue of credibility as to the witnesses you

17   heard testifying.

18      You heard in opening statements and in some of counsel's

19   questions what I suspect you will hear in their closing

20   arguments, which is that these are bad people; people who you

21   wouldn't want to take home to dinner.

22      And I submit to you, ladies and gentlemen and I'm going to

23   talk a little bit about how that's really not the issue at all,

24   and, in fact, it's a false trail to follow.

25      I want to make two primary points.

1    Rey Vargas is a bad cop.  Cesar Hernandez is a drug

2    dealer.  Sergio Sanchez is a fence.  If I were allowed to ask

3    everybody in this courtroom to raise their hand if they agree

4    with me that these things are true, every single person here

5    would raise their hand.  That's the government's theory of this

6    case and, by all accounts, including all of their own

7    admissions, these things are true.

8         But, ladies and gentlemen of the jury, these aren't the

9    FBI's guys.  They're not the Court's guys.  They're not your

10   guys.  They're their (indicating) guys.

11        Five years ago, when we were all doing something else and

12   didn't have any idea that we would be sitting here together

13   today, they were their (indicating) guys.  They were their bad

14   cop; they were their drug dealer; and they were their fence.

15        Whether these things about them makes them bad people or

16   good people in counsel's judgment or my judgments or your

17   judgments is entirely irrelevant.

18        There is a rule, a rule of law, that you are to use to

19   decide whether these people were credible or not credible.  And

20   His Honor instructed you as to this rule.  And it is the

21   instruction on credibility of witnesses.  And it is how you are

22   to decide whether a witness is credible or not.  And you are

23   not to substitute somebody else's judgment as to whether

24   they're bad or good for the rules that you are to use to

25   determine their credibility.

1      I'd like to, first, talk about Mr. Vargas.  I think the

2  first two prongs of this, their opportunity to perceive things,

3  the witness's opportunity to perceive things and the witness's

4  memory, are not hotly disputed.

5      Obviously, Mr. Vargas was in a position to observe and

6  perceive the things that he talked to you about.  And he had a

7  memory that, I would say, by normal common sense standards you

8  should find was more than adequate.  His manner while

9  testifying was notable.  He was open.  He responded to

10  questions on both direct and cross equally.  He was not

11  evasive.  He did not minimize his own culpability.  He looked

12  you, he looked counsel in the eye and answered the questions

13  that he was asked.  And that is what "manner" gets to.

14      Whether Mr. Vargas had an interest in the outcome is a bit

15  of a mixed bag.  Obviously, he has no interest, doesn't affect

16  him one way or the other whether you return a guilty verdict or

17  a not guilty verdict on any count or as to any defendant.

18      And this is no surprise, this is no news flash, his

19  interest is in obtaining leniency.  And his interest is in

20  persuading the Court to give him a lower sentence because he

21  was truthful.  That is his understanding.  And that is the

22  understanding of the parties as set forth in the plea

23  agreement.

24      You have the plea agreement in evidence.  It is a six- or

25  seven- or eight-page legal document.  But I would suggest that

1   you read it and that you read every word of it so that you

2   understand, rather than the way we characterize it -- the way I

3   characterize it or the way counsel characterizes it -- what it

4   means and what Mr. Vargas can reasonably anticipate to get out

5   of this.

6        Now, Mr. Getz accused him of mimicking the government's

7   narrative to get a lighter sentence.  And we'll talk more about

8   the substance of this in a moment, but the premise is all

9   wrong.  The government doesn't give him a lighter sentence.

10       The way you can look at it is that the government is in a

11  position -- the way you can interpret, if you decide to

12  interpret, the plea agreement is the government is in the

13  position to unlock the door to a lighter sentence.  But how far

14  that door swings open depends on whether Mr. Vargas persuaded

15  Judge Breyer that he earned a lighter sentence.  That's the

16  law.  And you should read it in the plea agreement.

17       There's a factor that includes the bias and prejudice of

18  Mr. Vargas.  I don't think that that really applies in this

19  case.  He was obviously Mr. Furminger's and Mr. Robles' friend

20  for a period of time.  Mr. Robles helped him move after he left

21  the SFPD in 2012.

22       You see things like Mr. Furminger and Sergio Sanchez

23  teasing Mr. Vargas and Mr. Robles about their friendship in

24  some of the text messages.  So it's not a hostile relationship.

25  It's not a relationship of hatred.

1        Obviously, common sense would tell you that him testifying
2   in this trial would drive a wedge between them.  But there is
3   no evidence here of bias or prejudice in the sense the words
4   are usually meant.

5        One of the key points is whether there is contradictory
6   evidence in the record.  And it's a key point in whether or not
7   you believe Mr. Vargas or not, whether his testimony is
8   credible.

9        The government always, always bears the burden of proof
10  beyond a reasonable doubt.  Always.  But whether you believe
11  Mr. Vargas or not depends, in part, on whether there is
12  evidence that contradicted his testimony.  And I would submit
13  to you, ladies and gentlemen, that in this trial there is zero
14  evidence that contradicts Mr. Vargas's testimony both as to the
15  big-picture items and also as to the details.  We're going to
16  talk a little bit in a moment about the flip side of
17  credibility, corroboration, which we've touched on already.

18       The seventh factor is the reasonableness of Mr. Vargas's
19  testimony in light of all the evidence.  And, again, I would
20  submit to you, ladies and gentlemen, that the story Mr. Vargas
21  told you from the witness stand is entirely consistent with
22  reasonable human experiences.

23       On your jury questionnaires many of you observed that
24  there are good cops and bad cops.

25       And Mr. Vargas told a story of bad cops.  It's not a crazy

 1   story.  It's not a story of Martian cops.  It's a story of bad

 2   cops doing things that they had the opportunity to do.

 3       And given the fact that you heard from people who had

 4   money stolen, you heard from the snitches that were used to

 5   commit the crimes by Mr. Vargas, by Mr. Furminger, and

 6   Mr. Robles, you heard from other officers who observed them in

 7   circumstances surrounding the crimes, that what Mr. Vargas told

 8   you was reasonable given all of the circumstances.

 9       And, finally, with regard to believability, sort of any

10   other factor that bears on believability, I would submit that

11   there are two factors, two considerations that you should think

12   about.

13       Number one is corroboration.  Mr. Vargas was corroborated

14   again and again.  He was corroborated by the skylights.  He was

15   corroborated by the bicycle.  He was corroborated by Bernadette

16   Melvin receiving the iPod Nano.  He was corroborated by Cesar

17   Hernandez.  He was corroborated by the time records, the phone

18   records, and other evidence.

19       The second factor that bears on his believability has to

20   do with Mr. Getz's suggestion to him, that he rejected, that he

21   was adhering to the government's narrative.  That's a fair

22   thing for you to wonder.  Is he just singing to the choir to

23   try to get a lighter sentence?

24       Here is what Mr. Vargas said about that.  On

25   cross-examination with Mr. Getz, this is my question to him:

1              "Mr. Vargas, you were asked about the government's
2       narrative of the case.  Do you remember that?
3              **"ANSWER:**Yes.
4              **"QUESTION:**And you were asked whether you were charged
5       with -- whether you felt to tell the truth you had to
6       track the government's narrative of the case.  Do you
7       remember those questions?
8              **"ANSWER:**Yes.
9              **"QUESTION:**When you began -- before you began
10      cooperating with the government, so between the indictment
11      and February of this year, and your plea and cooperation
12      in October of this year, did you become familiar with the
13      government's narrative of the case with regard to the
14      Daisy and Jayme marijuana transaction?
15             **"ANSWER:**Yes.
16             **"QUESTION:**What was the -- as you perceived it, what
17      was the government's narrative of the case with regards to
18      the Daisy and Jayme marijuana transaction?
19             "As I perceived it" -- this is the answer -- "the
20             government's belief was that myself, Mr. Robles, and
21             Mr. Furminger were all involved, I guess conspiracy,
22             to provide them with narcotics that they would then
23             intend to sell.  The government's narrative at that
24             point was that it was an intent to sell narcotics and
25             then split the proceeds.

1              "QUESTION:With whom?

2              "ANSWER:With -- well, that was the part that didn't

3       make sense because the government's belief was to split it

4       in thirds.  And there was myself, Mr. Robles, and

5       Mr. Furminger, as well as Daisy and Jayme, so there were

6       kind of four plotters involved.  That kind of didn't make

7       sense.

8              "QUESTION:When you came in to begin your cooperation

9       and you spent time talking to Mr. Flores and Mr. Nave and

10      Mr. Villazor and myself did your description of the Daisy

11      and Jayme marijuana transaction track the narrative of the

12      case that you understood was the government's before

13      cooperation?

14             "ANSWER:No, it didn't.

15             "QUESTION:How was it different?

16             "ANSWER:First, with the intent to sell it and receive

17      monies back.  But, more importantly, that Mr. Furminger

18      wasn't really aware of it prior to it already occurring.

19      Mr. Furminger found out about it after I had already done

20      it.

21             "And, in fact, I tried to really accept responsibility

22             that it was my idea and I did it.  I mean, yes,

23             Mr. Robles stood there next to me right outside one of

24             the doors at Mission Station when I handed her the

25             drugs, but it really was my idea.  And so I tried to

1          really delineate to them that I did it, and

2          Mr. Furminger found out only after it had already

3          occurred.

4           "QUESTION:So was your cooperation and information

5      with regard to Mr. Furminger consistent with the then

6      narrative of the government's case?

7           "ANSWER:No."

8      And then, as if that wasn't enough, Mr. Robles corrected

9  the government's narrative of the case -- I'm sorry, Mr. Vargas

10 corrected the government's narrative of the case when he pled

11 guilty.

12     The plea agreement we just talked about is in evidence.

13 And you'll see, when you look at it, that there is a

14 handwritten correction that Mr. Vargas made in court.  He told

15 you, he sat right in the chair that Mr. Getz is sitting in now

16 and said we need to make a correction, a correction that worked

17 in Mr. Robles benefit.  Worked to his benefit.  A correction

18 that suggested that Mr. Robles didn't know before.  He knew

19 about handing the drugs to Daisy and Jayme.  He walked out and

20 he saw it happen, but that he wasn't in a conspiracy before.

21     Those are the kind of things that bear on believability.

22 He didn't come in as a robot to just mimic what he believed the

23 narrative to be.

24     Mind you, ladies and gentlemen, all of this came up in

25 response to questions that Mr. Vargas was asked on

1    cross-examination.

2        On the topic of the plea agreement the Court gave you an

3    instruction that you must consider the testimony of Mr. Vargas

4    with greater caution because of the plea agreement and because

5    of the number of -- a number of other factors.  That, ladies

6    and gentlemen, is probably just a matter of common sense.

7    Mr. Vargas has somewhat more of a horse in the race than

8    everybody else because he wants to be believed and he wants

9    leniency at sentencing.

10       But be careful with the greater caution, because the

11   greater caution doesn't mean make up a whole new set of rules

12   by which to judge his credibility.  It means apply these

13   factors with greater caution than you would another witness.

14   It does not mean apply different factors that the Court did not

15   instruct you on when you're thinking about Mr. Vargas.

16       Now, there is an aspect of Mr. Vargas's character that is

17   relevant in this case.  Mr. Vargas is obviously a weak

18   character.  Mr. Vargas twice lied in order to try to keep his

19   job.  He lied to the OCC, the Office of Citizen Complaints.

20   Once when he got investigated in 2002, and again with

21   Mr. Robles and Mr. Furminger when Daisy Bram made her complaint

22   about the marijuana in order to try to extort them.

23       He's a weak character.  What is interesting about that in

24   the context of this case is in answering the question as to why

25   Mr. Robles would feel comfortable slipping money into

 1   Mr. Vargas's pocket early in the time that they started working

 2   with each other.  There is something about Mr. Vargas'

 3   character that is weak.  Something that Mr. Robles either knew

 4   or suspected that made him comfortable slipping money into

 5   Mr. Vargas's pocket.

 6        This is not a paragon of virtue we're talking about,

 7   ladies and gentlemen.  This is a dirty cop that we are talking

 8   about.  And people can see, just in normal human experiences,

 9   people can spot and see and perceive people of weak character.

10   And it's that weak character that led him to be a bad cop.  The

11   same weak character that Mr. Robles and Mr. Furminger have.

12        There's another weak character in this case, a weak

13   character who, applying these factors, you will find gave

14   honest testimony.  And that person is Cesar Hernandez.

15   Cesar Hernandez is a drug dealer.  A lifelong drug dealer.  But

16   Cesar Hernandez shared a weak character that was identified by

17   Mr. Robles.

18        Remember the very vivid picture that Mr. Hernandez related

19   to you, of sitting on those steps after the 22nd and Harrison

20   hit, and what Mr. Robles did?

21            "What were you wearing?" was the question.

22            **"ANSWER:** I was wearing a jacket with a big bag in the

23        front.

24            **"QUESTION:** Like a pocket?

25            **"ANSWER:** Yes.

```
 1            "QUESTION:A big one?

 2            "ANSWER:Not a big jacket.  Like that jacket" -- and I

 3       think he indicated one of the juror's jackets -- "but with

 4       a thing in the front."  And he indicated the pocket.

 5            "QUESTION:Okay.  And when you stand up what did he

 6       do?

 7            "ANSWER:He put something in there.

 8            "QUESTION:What did he put in?

 9            "ANSWER:He don't tell me nothing.  He just put in

10       the -- I don't ask him.

11            "QUESTION:What did it look like?

12            "Like this."

13       And he took a napkin and kind of wrapped it up and made,

14   sort of, a pouch with the napkin crinkled on top.

15       Question -- and I said:

16            "So the witness is holding up a crumpled napkin.

17            "THE WITNESS:  Paper.  So then he walking to the car.

18            "QUESTION:And how did you leave it with him?

19            "ANSWER:I think that the other officer go back and he

20       jump in the car, so I wait for they to leave.  So then I

21       start walking the same direction, we are that way.

22            "QUESTION:Towards what street?

23            "Like 20, 21 to 20.  I start walking that way.  So I

24            put the thing, open it, and it was like glass.  You

25            know, when you broke a glass looked like that.  And
```

1          then I find out it's crystal meth.

2              "**QUESTION:** How did you know it was crystal meth?

3              "**ANSWER:** I know it's crystal meth."

4      So Mr. Robles, just like with Mr. Vargas, spots the

5  weaknesses of Mr. Hernandez's character and slips something in

6  his pocket and, thus, starts the kind of relationship that

7  ended up in the series of crimes that were committed.

8      I'm not going to go through all eight of these with

9  Mr. Hernandez, but I want to talk about a couple.

10     If his testimony was bought and paid for, as one of the

11 attorneys suggested on cross-examination that it was, then why

12 didn't he make up more detail?  Why didn't he put the finger

13 squarely on Mr. Furminger?

14     You'll recall in detail more vivid than I could possibly

15 give it, in response to Ms. Caffese's accusation/question that

16 he lied, Mr. Hernandez pointed his finger at Mr. Furminger and

17 said?

18             "If I'm lying, I would have told you that guy gave me

19             money.  I would have told you that guy gave me drugs.

20             But I didn't."

21     And he pointed at Mr. Robles and he said:

22             "That guy did.  If I'm lying, I would say both of

23             them."

24     If he's bought and paid for, he wasn't doing a very good

25 job.

```
 1        The focus on Mr. Hernandez has been character
 2   assassination.  And, yes, again, he's a drug dealer.  And some
 3   of you may believe that drugs are a scourge on society.  Some
 4   of you may believe that it's not a scourge on society.  Some of
 5   you may believe that Mr. Hernandez is witty and funny and
 6   charming.  Some of you may believe that he's a jerk.  But it
 7   doesn't really matter at all because these are what matter.
 8   And none of that is in there.  So don't get diverted on that
 9   he's a jerk path.
10        And, finally, on the last factor with regard to
11   Mr. Hernandez, believability.  One voice, one voice of all of
12   ours might be worth listening to more than anybody else's.
13        Would you please put up Exhibit 50.
14            (Document displayed.)
15            MR. HEMANN:  And that voice is Mr. Robles's at the
16   time.
17        Could you blow up the first paragraph.
18        Mr. Robles wrote in 2009:
19            "After the CI" -- Mr. Hernandez -- "was debriefed it
20            was found that the information given to us by the CI
21            was accurate.  The information will be helpful to
22            members of the department to solve future criminal
23            cases."
24        So Mr. Robles saying Mr. Hernandez provides accurate
25   information.
```

```
 1        And it's not just Mr. Robles.  Mr. -- Mr. Furminger
 2   supported that position.  And if you look in the manual, the
 3   informant's manual, Exhibit 2 -- if you could put up Exhibit 2,
 4   on the 15th page, Ms. Lane -- at the very top of the page
 5   you'll see that Mr. Robles was required to bring Mr. Hernandez
 6   in to meet his immediate supervisor, who at the time was
 7   Mr. Furminger, so that Mr. Furminger could make an assessment
 8   as to Mr. Hernandez's acceptability as a confidential
 9   informant.
10        What this shows, ladies and gentlemen, is that Mr. Robles
11   and Mr. Furminger picked all of these guys long before we got
12   here today.
13        They picked Mr. Hernandez out of the Mission SRO and used
14   him over and over and over again.
15        They drove around San Francisco with their partner,
16   Mr. Vargas, throwing fireworks out of their police car, at
17   6:00 a.m. in the Mission; sawing antique call boxes off of
18   telephone poles; trashing rooms in searches.
19        They were their guys.  They weren't the FBI's guys.  And
20   they weren't the government's guys.
21        I'd like to talk, for a moment, about drug counts.  It's
22   Count Nine, and it is charged against both Mr. Robles and
23   Mr. Furminger.
24        There is clear evidence in this case that requires very
25   little explanation at all that Mr. Robles and Mr. Vargas were
```

 1  giving drugs, distributing drugs through their confidential

 2  informant Mr. Hernandez.

 3      Mr. Robles conspired with Mr. Hernandez, under the

 4  instruction that you've been given, to sell drugs.  He gave

 5  crystal meth to Mr. Hernandez after the 22nd and Harrison hit.

 6  He helped Mr. Hernandez to sell heroin when they were looking

 7  for the holes in Golden Gate park with Mr. -- with El Moreno.

 8      He gave cocaine to Mr. Hernandez after they hit 517

 9  Broadway.  Remember the little bindles of cocaine that

10  Mr. Hernandez described?

11      And this is another example:  You remember Mr. Hernandez

12  is thinking back and he's seeing vivid detail; the Hawaiian

13  shirt; standing on the balcony; the guy sweeping outside; and

14  the little mints canister of balloons full of cocaine that

15  Mr. Robles gave him.

16      And Mr. Robles told Mr. Hernandez that he would be

17  protected selling drugs.  The question to Mr. Hernandez was:

18          "In fact, did you talk to Mr. Robles about going out

19          on the street and selling drugs?

20       "**ANSWER:**He tell me if I want to sell drugs -- later,

21      not that day but later he told me, 'You want to sell

22      drugs?  You can do that.'

23       "**QUESTION:**How did that come up?

24       "**ANSWER:**That was like no one time.  A lot of time he

25      say, quote, Dude, why don't you dealing drugs?  Everybody

1          know you here.  You know you have no trouble to do that.

2          Unquote.  He say all I can't do is killing somebody.

3               **"QUESTION:**Say that again.

4               **"ANSWER:**Kill somebody.

5               **"QUESTION:**He said all you couldn't do is kill

6          somebody?

7               **"ANSWER:**No, no.  I can do whatever I want, but no

8          kill somebody.  If I kill somebody he can't help.  He

9          don't want to help me.

10              **"QUESTION:**What if you got arrested dealing drugs,

11         what did he say?

12              **"ANSWER:**He say nobody going to arrest me for dealing

13         drugs."

14     There is no evidence, ladies and gentlemen, contradicting

15 Mr. Hernandez's testimony on this point.

16     Mr. Furminger also participated in a drug distribution

17 conspiracy with Mr. Robles and Mr. Vargas with regard to the

18 marijuana evidence, the marijuana that was given to Daisy Bram

19 and Jayme Walsh.

20     You'll remember that the three of them seized four pounds,

21 approximately four pounds of marijuana from a UPS store when

22 they got a call saying that the UPS security folks had

23 identified marijuana.  They went and picked it up and drove it

24 back.

25     You remember that Cesar Hernandez remembers being in the

1  backseat of the car and smelling this very strong-smelling

2  marijuana.  We have the marijuana evidence.  You're welcome to

3  smell it if you feel so inclined.  And you'll find that it

4  smells strong.

5      You'll remember that Mr. Robles drove back and parked in,

6  sort of, an unusual place, according to Mr. Hernandez, kind of

7  down the street, across from the funeral home.  And Mr. Robles

8  tried to get Mr. Hernandez to sell it.  He asked him if he knew

9  anybody.  He tried to get Mr. Hernandez to sell -- sell the

10  marijuana.  Mr. Hernandez remembers Mr. Robles saying something

11  about purple.  It's a purple marijuana.

12      And what you'll see in Exhibit No. 114 is the bag that the

13  marijuana came in that says "purple cush."  This is the bag

14  that, as you heard and I'll talk about in a moment, Mr. Vargas

15  put in a file cabinet in Mission Station and ultimately gave to

16  Daisy Bram and Jayme Walsh, which was received by Special Agent

17  Nestor from Daisy Bram in Iowa.

18      Mr. Robles also -- as I said, he gave -- he tried to get

19  Cesar Hernandez to sell the marijuana for him.  And Cesar

20  Hernandez also hears, all the sudden, on the street, outside of

21  Mission Station, people talking about a pound of this

22  high-quality marijuana on the market for about $2,000.

23      So Mr. Robles was actively trying to sell this.  Now, he

24  may have been doing so without the knowledge of Mr. Vargas and

25  Mr. Furminger, but Mr. Furminger -- Mr. Vargas comes up with

1  this idea one day "Let's just take this pound of marijuana"

2  that had been placed there after he divided it up with

3  Mr. Furminger's knowledge, placed in the file cabinet.

4      Remember, he said they took two pounds and sent it along

5  to the destination, to try to do a bust there.  They then took

6  another pound and booked it into evidence.  And they kept a

7  pound, and they put it in a file cabinet.  And Mr. Vargas

8  testified that all three of them were there when this happened.

9      Mr. Vargas spontaneously gives it away.  Gives it to Jayme

10  and Daisy.  That's not okay.  It's probably no better or worse

11  than selling it themselves under the law.  The law says you

12  can't distribute illegal drugs.

13      And, again, whether you feel -- regardless how you feel

14  about marijuana personally, these are the police distributing

15  illegal drugs by giving it to somebody, knowing that they're

16  going to sell it in order to make money.  So that's

17  distribution even though there is no money.  And Mr. Vargas is

18  guilty of it, and so is Mr. Robles for standing there with him

19  when he did it.

20      Recall that Mr. Vargas said, "Mr. Furminger didn't know I

21  did it on that day."  But in the days afterwards, Daisy and

22  Jayme were arrested in Golden Gate Park.  And Officer Doherty

23  came and testified about that.

24      When Jayme Walsh got busted, Mr. Furminger interceded.

25  And what Mr. Furminger said was, Listen, cite and release him.

```
 1          Now, mind you, this is a guy, Jayme Walsh, who was too
 2    much of a criminal, too bad of a criminal to be signed up as a
 3    CI.  He had a long record, and he had somebody else's
 4    identification in his pocket when he was arrested.
 5          And Mr. Furminger is a guy, according to Officer Doherty,
 6    who likes to make arrests.  Remember Officer Doherty testified
 7    that the reason he liked Mr. Furminger as a training officer
 8    is, quote, We made more arrests in that period than probably
 9    all my other field trainers combined.
10          So Mr. Furminger is not a guy to shy away from making
11    arrests, yet he wanted Jayme Walsh booked -- cited and
12    released.  Not booked.
13          And what did Mr. Doherty say about that?  Prior to talking
14    to Mr. Furminger:
15              "Was it your intention to book him with a felony?"
16          Was the question to him.
17          Answer from Mr. Doherty, Officer Doherty:
18              "Yes, that was my intention."
19          But because Mr. Furminger interceded, Mr. Walsh was
20    released.
21          Then later, when Jayme and Daisy threatened Vargas,
22    threatened to extort him for his involvement in this marijuana
23    conspiracy, Mr. Furminger is involved.
24          And what's Mr. Furminger's involvement?  It's not ringing
25    the bell and calling the chief of police and saying, My guy
```

1  just gave a pound of marijuana to a couple of heroin dealers.

2       No.  It was to scream at him on the phone and then to

3  agree with Mr. Robles and Mr. Vargas on a story to tell the

4  OCC.  That's what the evidence was.  That's not what somebody

5  who's not involved in a drug conspiracy would do.

6       I mentioned at the beginning that there is a commonality

7  that runs through the drugs and the thefts and the extortion.

8  And although, at first blush, it seems like these all may be

9  disparate offenses, the commonality is the use of criminals, of

10 informants to commit crimes rather than to fight crime.

11      What Mr. Vargas and Mr. Robles and Mr. Furminger did was

12 use CIs to participate in criminal activity.  They're not

13 supposed to continue to make crimes at all.  At all.  But they

14 got in bed with them.  And it happened with the thefts, and it

15 happened with the drugs, and it happened with the extortion.

16 What happened is -- and this is a case where the cops became

17 the criminals.

18      And Mr. Hernandez, perceptive as he appears to be, spotted

19 that in Mr. Robles.  And when he talked about taking the meth

20 and looking at Mr. Robles that day, he said:

21          "When he gave me the money he gave me the crystal

22          meth.  And when I talked to him I think I was -- he

23          was one of my kind.  Like me.

24           "QUESTION:He was one of your kind?

25           "ANSWER:Yeah.  The only thing he had is a badge and a

1              pistol.  He was like my people, criminal like me.  Like

2              the guys always hang out, you know, he was the same.  The

3              only difference he had a pistol and a badge, and I have no

4              problems to do things later.

5                   "So did you change your mind about doing more deals

6                   with Mr. Robles?

7                   **"ANSWER:**Yes."

8         Mr. Hernandez spotted that.  They were criminals just like

9    him.  With Daisy and Jayme, they let marijuana walk into

10   Golden Gate Park.

11        You heard Special Agent Siccord say that's not how it's

12   done.  When they let drugs go out they do it in a context where

13   they can grab them before they get too far.

14        What these guys did, ultimately with Mr. Furminger's

15   knowledge, is let heroin dealers walk into Golden Gate Park to

16   sell drugs to buy more drugs.  And these are guys who were

17   shaking down drug dealers in the Mission for crumbs.  But, yet,

18   when it serves their purpose they let a pound of marijuana walk

19   into the park.

20        Mr. Robles identified an FBI informant to Cesar Hernandez.

21   He said -- and this is my question on -- or this is

22   Ms. Caffese's question on cross-examination:

23             "I'm sorry."

24        This is in regard to the Puerto Rican drug dealer in

25   Mission Station.

1          "I'm sorry.  Is it Mr. Robles said he worked for the

2          FBI before?"

3     Answer from Mr. Hernandez:

4          "Mr. Robles told me that the guy working for the FBI

5          that Puerto Rican."

6     And then when I followed up on it in redirect

7  Mr. Hernandez says:

8          "So I don't remember how started a conversation, but I

9          brought the conversation to them.  The Puerto Rican

10         guy seen me.  And I don't remember what was that

11         conversation but I do remember from Mr. Robles, quote,

12         Don't, don't dealing with him.  Don't make deals with

13         him.  He work for the FBI, unquote."

14    And like that Mr. Robles told him.  Letting drugs walk,

15  handing crystal meth, dealing with criminals as criminals,

16  identifying an FBI informant.

17    And then Mr. Furminger with Mr. Sanchez.  Mr. Furminger

18  developed a relationship with Mr. Sanchez, a commercial

19  relationship with Mr. Sanchez, and in the context of that went

20  into business as a buyer with Mr. Sanchez, an informant, and

21  developed a relationship with him in which he was participating

22  in the criminality in violation of his duty to act as a police

23  officer.

24    You saw this in the testimony of Mr. Sanchez and also in

25  the text messages.  Mr. Sanchez tells Mr. Furminger, "I just

1  bought a laptop from an undercover agent."  Mr. Furminger said,

2  "That's not a good idea."

3      When Mr. Furminger found out -- knew that the FBI was

4  investigating him, Mr. Sanchez sent him an email saying, FBI

5  arrested three more in trafficking drugs.  Twenty-nine already

6  arrested.  Three more left.

7      Mr. Furminger responds, Hey, did anyone come talk to you

8  about me?

9      Mr. Sanchez said, No.

10     Mr. Furminger said, Listen.  I trust you to tell me the

11  truth.

12     Mr. Sanchez is a fence.  He's a guy from whom

13  Mr. Furminger is buying and receiving discounted/stolen

14  property from him.

15     Mr. Furminger is talking about buying goods from a source

16  of Sergio Sanchez who is at 850 Bryant.  What did you hear

17  850 Bryant was?  The San Francisco jail.

18     And Mr. Furminger is joking with Mr. Sanchez about being

19  able to identify undercover cops because they're wearing plaid

20  shirts.

21     I'm sure that this was funny at the time and clever at the

22  time, but a police officer has a higher duty than that.  And

23  it's a duty to provide appropriate law enforcement to the

24  citizens of the City and County of San Francisco and to the San

25  Francisco Police Department.

1    And you heard Captain DeFillippo talk about what that oath

2  means.  And it doesn't mean any of this nonsense.  What it

3  means is:

4         "It is a commitment to a way of life, you know, to

5          myself, to the community.  You know, uphold the laws

6          of the State of California, the Constitution, just

7          really set your moral and ethical compass in a

8          direction and follow that path."

9    And instead of doing that, these defendants got into bed

10  with informants and committed crimes with criminals.  And they

11  did it over and over and over again.

12    The last group of charges has to do with this conduct with

13  Mr. Sanchez.  And it is the honest services wire fraud and the

14  extortion counts.

15    And what Mr. Sanchez said about this was that he was doing

16  it in order to operate his business.  And when he was asked:

17         "**QUESTION:**What business is that?

18         "**ANSWER:**Buying, buying things.

19         "**QUESTION:**And selling things?

20         "**ANSWER:**Yes.

21         "**QUESTION:**Lots of them that were stolen?

22         "**ANSWER:**Yes.

23         "**QUESTION:**Were you fearful that they would arrest

24     you?

25         "**ANSWER:**Yes.

1          "**QUESTION:**Were you doing it for protection?

2          "**ANSWER:**Yes."

3     And they did not physically threaten Mr. Sanchez.  They

4 didn't say, like a mobster from the *Godfather*, you know, If you

5 don't give me some money I'm going to throw you in the

6 hoosegow.  What they said was let's have this relationship.

7     And the police went to the corner and they asked

8 Mr. Sanchez to give them things and to sell them things at a

9 steep discount.

10     Now, why, you might ask yourself, would Mr. Sanchez do

11 that?  Well, he testified that he did it so he would be allowed

12 to continue doing business.  And he testified, as he said

13 later, "In my own words, for protection."

14     And what is the -- and why wouldn't you believe that?

15 This is a man who has a $100,000 BMW.  This is a man who does

16 business on the street, but a sophisticated businessman who's

17 not going to give away something for nothing, something for

18 free.

19     What you will need to find in support of Counts Three and

20 Four and Count Eight, the honest services wire fraud and the

21 extortion, is that there was an exchange, an agreed upon

22 exchange, something in exchange for this protection that

23 Mr. Sanchez was asking for.

24     And the something does not have to be -- His Honor

25 instructed you -- something that is explicit.  What the

1    instruction is, is in case of a public official who obtains

2    property, the government does not have to prove an explicit

3    promise to perform a particular act made at the time the

4    property is provided.  Rather, it is sufficient if the public

5    official understands that he is expected, as a result of the

6    property exchange, to exercise particular kinds of influence as

7    specific opportunities arise.  An explicit *quid pro quo* is not

8    required.  An agreement implied from the official's words and

9    actions is sufficient to satisfy this element.

10       And what you have in this case, ladies and gentlemen, is a

11   course of conduct, a course of conduct in which items were

12   exchanged.

13       Mr. Robles received a pair of sunglasses that he

14   requested.  He received a computer for $200, that Mr. Sanchez

15   testified was worth $600.  He received -- and Mr. Vargas

16   testified, again without contradiction, that Mr. Robles would

17   sell things to Mr. Sanchez.  And Mr. Hernandez testified about

18   the instance in which Mr. Sanchez -- which Mr. Robles pulled up

19   in his car, and Mr. Sanchez handed him a stack of money, and

20   Mr. Robles said, He's a good guy.  He's a good guy,

21   Mr. Sanchez.

22       You heard that Mr. Furminger received a number of items.

23   He received perfume.  He received a saw.  He received a Nikon

24   camera.  He received all of the items that are listed in the

25   jury instructions for -- from Mr. Sanchez as part of this

1    ongoing course of conduct.

2        I would submit to you that you need to find each of

3    these -- you need to find one of them, I'm sorry, beyond a

4    reasonable doubt.  You need to agree on one of them, all of

5    you.  The evidence proves both in texts and in the testimony

6    from Mr. Sanchez that Mr. Furminger received all of them, and

7    he received them for protection.

8        In opening, Mr. Getz said that Mr. Sanchez was scared.

9    And you saw Mr. Sanchez.  He appeared, his manner was of a

10   person who was scared.  Of course he was scared.  He was scared

11   of going to jail.  He was scared of being deported.  He was

12   scared of being arrested.  And, as he testified, all of this

13   commercial activity that he engaged in with Mr. Furminger and

14   Mr. Robles was for protection from the things that he was

15   scared of.

16       Mr. Getz suggested that there is an alternative, a

17   friendship, sort of something arising out of their common

18   birthdays.  But when Mr. Villazor asked Mr. Sanchez about this

19   friendship he learned that the entire context of their

20   friendship, the entire support for their friendship was two

21   lunches.  Their families didn't spend time together.  They

22   didn't celebrate holidays together.  They didn't go to dinner

23   together.  Mrs. Furminger testified that she didn't know Sergio

24   Sanchez.

25       There's no friendship.  Two lunches in which stolen

1  property is exchanged does not a friendship make.  The only

2  common sense explanation is the explanation offered by

3  Mr. Sanchez, who said that he was giving these things to

4  Mr. Furminger in exchange for protection.

5      The idea, ladies and gentlemen, that government officials

6  hold in a democracy a sort of public trust is not a new one.

7  Over 2,000 years ago Plato talked about how there are people

8  who are given in a functioning democracy public trust.  And

9  Plato called these folks "the guardians."  And he said:

10          "It does not matter" -- this is in *The Republic*.

11          "It does not matter if the cobblers and the masons

12          fail to do their jobs well.  But if the guardians

13          fail, the democracy will crumble."

14      When a police officer stands in a room by himself with a

15  pile of money, or stands at the back of an open trunk staring

16  in at stolen goods while standing next to a fence, when a

17  police officer has a tin, Altoids tin full of cocaine and

18  there's nobody else around, all that officer has is his oath.

19  And all it is that stands between us, a functioning democracy,

20  and a democracy that is rotting at its core, is government

21  officials adhering to the promises that they made when they

22  took their oath.  It's about the rule of law and it is about

23  requiring government officials to adhere to the rule of law in

24  every instance.

25      Ladies and gentlemen, the evidence in this case proved

1    beyond a reasonable doubt that each of these defendants is

2    guilty of each of the crimes alleged in the indictment.

3         In the jury instructions His Honor instructed you that in

4    such a case, when the evidence proves guilt beyond a reasonable

5    doubt, it is your duty -- for which you took an oath -- as

6    jurors to return guilty verdicts.

7         And, ladies and gentlemen, I would submit to you that in

8    this case you must submit a guilty verdict as to each defendant

9    with regard to each of the counts in the indictment.

10        Thank you very much.

11        I've gone longer than I intended to go.  I really

12   appreciate your attention, and your attention to detail, and

13   your courtesy.  And I would ask that you give Mr. Getz and

14   Ms. Caffese and then Mr. Villazor, at the end, the same kind of

15   attention that you've given me.

16        Thank you very much.

17             **THE COURT:**  Okay.  Ladies and gentlemen, we're going

18   to take our noon recess now, a bit early, but we're only going

19   to take 45 minutes.

20        So remember the admonition given to you.  Don't discuss

21   the case, allow anyone to discuss it with you, form or express

22   any opinion.

23        We will resume at 12:30, with further argument.

24             (Recess taken from 11:43 a.m. to 12:30 p.m.)

25             (The following proceedings were held outside of the

1    presence of the Jury)

2            **THE CLERK:**  Counsel?

3            **THE COURT:**  Okay, bring in the jury.

4       I'm going to use the verdict form suggested by the

5    government.

6            (The following proceedings were held in the presence

7    of the Jury)

8            **THE COURT:**  Please be seated.

9       Okay.  Let the Record reflect, all jurors are present.

10   Parties are present.

11      You may proceed.

12                    **<u>CLOSING ARGUMENT</u>**

13   **BY MR. PASSAGLIA:**

14      "The only man that gave me nothing is right there

15   (Indicating).  The sergeant, he gave me nothing."

16      Remember that?  I remember it.  Cesar Hernandez spoke with

17   immunity in front of you.  Immunity.  He could say anything he

18   wanted.  But he wanted to make sure he wasn't going to be

19   misinterpreted.

20      On that stand, English as a second language, interpreter

21   behind him.  Directed questions by the government.  He knows,

22   it's not his first rodeo, he's thinking, man, you're in a

23   big-time Federal Court, Honorable Charles Breyer.  "I gotta let

24   you know something.  I'm here to testify, I got immunity.  That

25   man, he didn't give me anything."

```
 1      He said that.  It doesn't matter what they say he said;
 2 that's what he said.  Unprompted, twice.
 3      Both attorneys speak, and he wanted you to know.
 4 Something he had to let you know.  "Not on my name.  Not on my
 5 name."  We're going to talk about that.
 6      So, he wanted to make sure he wouldn't be misunderstood.
 7 In this case, a lot can be misunderstood.  Innocence and guilt.
 8 They shared similar facts in this case.
 9      It's not a bank robbery, where everybody puts ski masks
10 on, and sawed-off shotguns, and they say, "There they were,
11 he's in the house.  He had to do it."
12      This one's different.  Innocence and guilt.  We all agree
13 there was criminal activity going on.  The innocent police
14 officer, he would be there, right?  He would be at that scene.
15 So would the guilty one.
16      So, how do we decide?  At the surface level, it's
17 impossible.  You're going to look through police reports, and
18 numbers.  You're going to say he was there, he wasn't there,
19 who was at the station?  It's hard to figure out.  We're
20 talking incidents spanning over years.
21      And sometimes we can get confused.  We almost think like
22 it's a bank robbery, right?  We think: this is all illegal
23 activity, this is that, this is --
24          THE COURT:  Excuse me.  I think -- the court reporter
25 is indicating that she can't --
```

```
 1            MR. PASSAGLIA:  I apologize.

 2            THE COURT:  Just --

 3            MR. PASSAGLIA:  I apologize.

 4            THE COURT:  No, you don't have to apologize.  Just --

 5            MR. PASSAGLIA:  And I'll probably get over-zealous

 6   again.

 7        But, in a case like this, it's possible for an innocent

 8   man to be sitting here.  And you can see how.  You can see how

 9   it can get confusing.

10        We know bad things were done.  No one's saying that they

11   weren't.  The question is finding out who is responsible.

12   That's what we have to decide today.

13            (Reporter interruption)

14            MR. PASSAGLIA:  Sure.

15        The government is making their case three ways.

16            (Document displayed)

17        Witness testimony -- excuse my poor writing.  We will call

18   this "Witness testimony, not Vargas."  Okay?

19        The second way:  Phone logs, work records.

20        Third way:  Vargas.  And I'm going to leave most of Vargas

21   to Mr. Getz, but we will talk about it a little bit.  So, three

22   ways.

23        The government wants to say Mr. Furminger is the overseer.

24   He's the controller.  He's there.

25        And I want to go in, incident by incident, straight
```

1  through the record -- not my words, just on the record, and we

2  will just look at what was said.  And we're going to go through

3  all of these, and say, "Okay, this incident, what do the

4  witnesses say?  What do the records show?  What do the

5  witnesses say?  What do the records show?"  That's what we're

6  going to do.

7        But, just, before we get started on that, I just want to

8  make one initial comment.  And I want you all to remember this.

9  There are many reasons in each particular instance why the

10 phone logs and the work records don't mean much.  But there's

11 one reason why I would say just reject it as evidence,

12 altogether.  Just reject this as evidence.

13       And, you say:  Why?  What are those showing?

14       The government is claiming they show unusual activity.

15 That's what they're claiming.  They're not saying it's gotcha

16 evidence.  They're saying this is unusual activity.

17       Work, past eight hours.  Came in on a day he wasn't

18 supposed to come in.  Well, that's interesting.  So it's a

19 two-prong test.  That's what they're saying:  This is a

20 two-prong test.  The first prong is we're going to show you

21 this is unusual activity.  The second prong then is for you to

22 take that unusual activity, and you can use it for what you

23 want.  Some way, a lot of way.  You know, you put it in your

24 analysis of guilt or innocence.  Okay?  That's what they're

25 saying.

1    But, that first prong that is on them.  Is it unusual?  Is

2  it unusual?  Anything that's not here is not because of lack of

3  resources, I promise you that.  It's not because of a lack of

4  resources.

5    So, Sergeant Furminger -- we know he's a sergeant, right?

6  We call him "Sergeant Furminger."  That's for a reason:  He

7  watched over lots of people.  Lots of people.

8    So you want to say, this is irregular activity.  Just show

9  it to you.  This doesn't have to be a war with words between

10  lawyers.  I don't have to say this isn't unusual; they have to

11  say this is unusual activity?  Doesn't have to be.  Just show

12  us.  Pull the records from one of the other officers that he

13  supervised, and say, "Look, he never came in on his day off

14  with that person.  Look, he never texted that person."

15    Boom.  I just showed it's unusual activity.  Now, you

16  weigh that for what you want.  Right?

17    But, where's the unusual activity?  Where is -- it's not

18  here for a reason.  It doesn't exist.  They want you to say,

19  "Take my word for it, this is unusual.  Then from there, I want

20  you to weigh this for what it's worth."

21    That's true with all the laws.  Just show it's unusual.

22  They're not saying that, in itself, proves anything, but then

23  we can have a discussion.  You show me it's unusual, then we'll

24  talk about it.  They didn't do that.  I say:  Reject that

25  evidence altogether.  Fancy charge, craft, colors, reject it.

1    But, we're going to talk about it more in full.

2        So, like I said, I'm just going to stick right to the

3    record.  Nothing fancy, no rabbits out of the hat.

4        So, let's talk about the very first incident.  This is

5    Apple-gift-card hotel search.  Do you remember, this was on

6    March 4, 2009.  We heard about it from Kelsey Stewart.  She

7    testified.  We heard about it from Rey Vargas and Ian Elliot.

8    Remember, that was her friend.  She said she was at the hotel

9    with him.  So, this was the people we heard from.

10       Now, what were the incidents that were talked about?

11   There was a gift card theft.  $500 Apple gift card.  Allegedly

12   maybe talking about splitting bank proceeds when they were

13   searching the room.

14       Then, all the other incidences involving Kelsey Stewart

15   happened at Mission Station, post-arrest.  Right?  They said

16   there was guns in a drawer.  They showed her the guns in the

17   drawer, and asked, "Do you want any?"

18       They said she was given heroin, and she missed her

19   methadone clinic, so they said "Here's heroin."  And then we

20   talked briefly about sexual pursuit of her by a particular

21   officer.

22       So I would say those were all of the incidents that were

23   discussed.  I don't believe there's any other incidents that

24   were discussed.  So, let's talk about all those.

25       So, just to put a little context, this is from the direct

```
 1   examination of Rey Vargas.  Okay?

 2                  "QUESTION."

 3       This is context.  So before they go into the hotel where

 4   Kelsey Stewart lives, why they're going there.  Because, again,

 5   remember?  Two flips of a coin.  One is consistent with

 6   innocence; one is consistent with guilt.

 7       So let's find out:  Why did they go there, to begin with?

 8           "QUESTION" to Officer Vargas -- no longer Officer,

 9   excuse me.  To Mr. Vargas (As read):

10           "QUESTION:And when you arrested him, what did you

11       find?"

12       Now we're talking about JF.  This is the boyfriend of

13   Kelsey Stewart.  This was the reason they were going to Kelsey

14   Stewart's apartment to begin with, due to this arrest.

15       So (As read):

16           "QUESTION:Now when you arrested him, what did you

17       find?

18           "ANSWER:Um, he was in a sense a walking pharmacy.  He

19       had all kinds of drugs of different varieties, of

20       different amounts.  Everything weighed out.  Broken down

21       into little envelopes.  Stuff I -- honestly, types of --

22       he had multiple types of heroin, as in black tar, but he

23       also had powder heroin that I had never seen before, all

24       kind of prescription pills, as well as cash and stuff.

25           "QUESTION:And did you take -- did you seize all of
```

1    this drug evidence?

2         **"ANSWER:**Yes.

3         **"QUESTION:**And did you take Mr. Furlong into custody?

4         **"ANSWER:**Yes.

5         **"QUESTION:**And after you had him in custody, did you

6    come up with some sort of plan as what to do next, from an

7    investigatory standpoint?

8         **"ANSWER:**Yes.

9         **"QUESTION:**What was that?

10        **"ANSWER:**Our next step would be to try and locate his

11   house.  Because we figured if this was -- this was the

12   drugs he took with him to his deliveries, there must be

13   more times, more back at his residence."

14   So that's what Vargas says about how they even started

15   down this path.

16   Now, you know, we hear testimony from all these different

17   people.  It's hard to put it all into one event.  We can do

18   that now, because we have the record.

19   So now we go to Ian Elliot.  And he tells us a little

20   about that scene right before the officers come to the hotel.

21   So, we just talked about the arrest of Joseph Furlong.

22   That's what led us to go into Kelsey Stewart's house.  Now they

23   asked Ian Elliot, right before the officers come to the hotel

24   where he is with Kelsey (As read):

25        **"QUESTION:**Think back to the day before the police

1    officers arrived when you first went into the hotel room.

2            "ANSWER:Uh-huh.

3            "QUESTION:You saw a package of cocaine the size of a

4    softball, correct?

5            "ANSWER:Among other things, yes.

6            "QUESTION:And you took that?

7            "ANSWER:Um, I was given it.

8            "QUESTION:Who gave it to you?

9            "ANSWER:Um, Kelsey gave it to me on the --

10   Mr. Furlong told her to give it to me.

11           "QUESTION:All right.  You understood that was

12   Mr. Furlong's drugs?

13           "ANSWER:Yes.

14           "QUESTION:You also saw some Oxycontin?

15           "ANSWER:Yes.

16           "QUESTION:You also saw a block of heroin the size of

17   a paperback book?

18           "ANSWER:Yes.  That would be about right."

19       So this is the scene.  So they have arrested the drug

20   dealer.  Now, this is someone telling you the scene of the

21   hotel room they are going to.  This is what I call police work,

22   two flips of a coin, right?  That is police work.

23       So they're on their way to this hotel.

24       Now, again, Mr. Vargas (As read):

25               "Before going into Mr. Furlong's place,

1               did you and Mr. Robles and Mr. Furminger

2               discuss taking things from that place for

3               your own benefit?

4          **"ANSWER:** I don't believe so, no."

5      "Don't believe so, no."  And remember, this is one we're

6   going to get back to, this is one we're going to see the work

7   records, Sergeant Furminger came in on his day off.

8      But no discussion -- I don't know what he's coming in for,

9   unless it's to do police work.  So, now Ian Elliot sets the

10  scene a little:

11          **"QUESTION:** Did you return back to the Marilyn Hotel

12      that same day?

13          **"ANSWER:** I did.

14          **"QUESTION:** Why?

15          **"ANSWER:** I -- Kelsey called again and she was

16      distraught.  The manager of the hotel had been aggressive

17      with her, I believe sexually aggressive.  And so I

18      returned and hung out.  And I made a place for me on the

19      floor, and I spent the night on the floor.

20          **"QUESTION:** You slept over that night?

21          **"ANSWER:** Yes.

22          **"QUESTION:** Mr. Elliot, did you also take any of the

23      drugs that you had seen in that room?  Did you take any of

24      those drugs from the room?

25          **"ANSWER:** I did.

1          "**QUESTION:**Which drugs did you take?

2          "**ANSWER:**Cocaine.

3          "**QUESTION:**Ballpark, do you recall the size of the

4      cocaine?

5          "**ANSWER:**It was a fist-size, the size of a fist.

6          "**QUESTION:**Size of what?

7          "**ANSWER:**A fist.  A fist full of cocaine.

8          "**QUESTION:**Where did you put it?

9          "**ANSWER:**In my jacket.

10         "**QUESTION:**Was it actually that jacket?

11         "**ANSWER:**No."

12     You know, there's some back and forth.

13             "Okay.  Now, what did you wake up to

14          that morning?

15         "**ANSWER:**The police were at the door.

16         "How do you know it was the police?

17         "They banged on it and said 'Open up,

18          it's the police.'

19         "**QUESTION:**And who opened up the door?

20         "**ANSWER:**Either I did or Kelsey did, one of us, you

21     know, whoever.  I don't recall."

22     So now we set the scene.  An arrest, searching of the

23 hotel room.  Now we know what the hotel room looked like.  We

24 know the officers knocked.  Two flips of a coin.  Police work.

25     Now Mr. Vargas testified (As read):

1            "What did you take that you kept for

2              your own benefit and did not book into

3              evidence?

4         **"ANSWER:** I took two Apple gift cards."

5      And we talked -- we heard about how he called the phone

6  numbers to see how much money was in it.  We heard about all

7  that.  Again, we're just sticking to the record here.

8      Vargas asked at some point if he had talked to Sergeant

9  Furminger:

10            "At some point in time did you speak

11              with Mr. Furminger about the Apple gift

12              card purchase?

13         **"ANSWER:** Yes.

14         **"QUESTION:** When was that?

15         **"ANSWER:** That was, I believe, a couple of days later.

16         **"QUESTION:** And what was the -- was it in person or on

17      telephone?

18         **"ANSWER:** It was in person."

19      Another questioned asked to Mr. Vargas:

20            "Now, do you know how he found out that

21              you had gone to the Apple Store?"

22      And this is -- reading into his answer, he says:

23         **"ANSWER:** I know that I didn't tell him.  So, I made

24      the assumption Mr. Robles told him."

25      That's Vargas's answer: "I know I didn't tell him.  I

1  would never tell the Sergeant anything."  His answer is "I know

2  I didn't tell him."  That's the conspiracy?

3      And Vargas is the guy that's supposed to put Sergeant

4  Furminger in the conspiracy, and his answer is "I know I didn't

5  tell him."

6      And, again, going to the work records, they want to say he

7  comes in on his day off?  For a guy who's not telling them

8  before that we're going to steal anything, a guy that's for

9  sure not going to tell him what he took, and a guy that didn't

10 share anything with him.  And again, this is how we start

11 challenging these records (Indicating).  Aha, he came in on his

12 day off.

13     And?  How do you know he doesn't do that all the time?

14 Show us this is unusual.  This one makes no sense.  No sense.

15 Even if it was unusual to come on your day off, it's not a part

16 of a conspiracy.  He comes in on his day off.  Nobody tells him

17 they're going to steal stuff.

18     They do steal stuff.  Vargas steals a card.  Doesn't tell

19 Sergeant Furminger.  Doesn't give him any of the proceeds.

20 This is the conspiracy he came in on his day off with.  Two

21 flips of a coin.

22     So now let's look at Kelsey's testimony.  And this is

23 about at Mission Station.  So we went over the hotel scene.

24 Okay?  Now, Kelsey.  About the guns in the drawer.

25     You remember, she's brought -- she's arrested now from

1   that hotel; she's brought to Mission Station.  (As read)

2                   "During the gun incident, you do not

3              remember whether Mr. Furminger was in the

4              room?"

5        Kelsey answered:

6                   "I don't."

7        Okay.

8          "QUESTION:You mentioned that you saw Ian Furminger at

9        the hotel room.  Is it true that you have no recollection

10       of seeing him at Mission Station?

11         "ANSWER:No.

12         "QUESTION:No, it's not true?  Or no, you have no

13       recollection?

14         "ANSWER:No, that's not true.  I don't remember.

15         "QUESTION:Okay.

16         "ANSWER:I don't recall.

17         "QUESTION:That's what I'm trying to establish.  You

18       recall seeing him at the hotel room.  You have a picture

19       of his face at this point.  I believe you testified that

20       he was like an overseer.  Do you remember that testimony?

21         "ANSWER:Yes.

22         "QUESTION:But you have no such recollection of seeing

23       that face when you were taken to Mission Station.  Is that

24       correct?

25         "ANSWER:I really can't say for sure."

```
 1        Doesn't even know if he was at Mission Station, let alone
 2   involved in any of this.
 3        Now, regarding giving her the heroin when she left, which
 4   -- I mean, this is a girl that's young, she was down and out,
 5   so -- and, this was tough testimony.  But she says (As read):
 6                  "Yes.  I believe by time I got out of
 7             there, the cutoff period was already past."
 8        She's talking about her methadone clinic.  If you
 9   remember, she's trying to kick heroin.
10             "QUESTION:But Officer Vargas not only held you until
11        the period had passed, but he gave you heroin to take with
12        you that day.  Correct?
13             "ANSWER:Yes.
14             "QUESTION:Knowing that you were on methadone therapy.
15        Correct?
16             "ANSWER:Yes.
17             "QUESTION:Did Officer Vargas drop you off at the
18        hotel room?
19             "ANSWER:Yes.
20             "QUESTION:What did you receive from Mr. Vargas?
21             "ANSWER:Heroin and a $20 bill."
22        Just to highlight for one second of Vargas's predatory
23   conduct:
24             "QUESTION:And you don't recall her telling you that
25        she really needed to have her methadone that day?
```

1          "**ANSWER:**I don't recall that.

2          "**QUESTION:**All right.  Do you remember that on her way

3      out the door, after she missed the methadone appointment,

4      you gave her some heroin and some money?  Do you remember

5      that?

6          "**ANSWER:**No, I don't.

7          "**QUESTION:**You don't?  So you deny that you gave her

8      heroin, or you're just not sure?  Maybe you did; maybe you

9      didn't?

10         "**ANSWER:**I don't deny it.  I just don't recall it."

11     That's Vargas for you.  Doesn't even know.  It's not a

12  memory to him, giving heroin to somebody that missed methadone.

13     And lastly, to further highlight that point, a question,

14  regarding Vargas to Kelsey (As read):

15         "**QUESTION:**He kept asking you out, didn't he?

16         "**ANSWER:**Yes.  I went out with him for a total of two

17     times.

18         "**QUESTION:**And there came a point where he continued

19     to ask you out, and pay attention to you, and you said you

20     didn't have time to see him anymore.  Do you remember when

21     you told him that?

22         "**ANSWER:**Vaguely.

23         "**QUESTION:**And when you told him that you didn't have

24     time to see him anymore, Officer Vargas said, 'I know

25     where you live.'

1          "**ANSWER**:Uh-huh.

2          "**QUESTION**:And, quote, 'I can get to you any time I

3     want'; didn't he say that to you?

4          "**ANSWER**:Yes."

5          And I just want to highlight one point that we got from

6     Agent Flores here, which was that Kelsey Stewart and Rey Vargas

7     texted 74 times.  Kelsey Stewart and Sergeant Furminger, zero.

8          So, I don't have a fancy chart, no colors, no lines, and I

9     know that does a lot.  But just remember that.  Zero.  Okay?

10    Zero (Indicating).

11         So, if -- if Mr. Furminger's the great overseer, where is

12    he?  Where is he?  You got to oversee this stuff.  Is he

13    overseeing it or is he not there?  Two flips of a coin.

14         So, let's go on to another incident.  I want to talk about

15    the only charge that goes to Sergeant Furminger's, total.  And

16    before we do that, we've got to talk for one minute, we've got

17    to talk about what it means to be a confidential informant.

18         If you remember, Officer DeFilippo testified.  Now, his

19    testimony was strictly to talk about informants.  That's it.

20    Just to talk about informants.  He got up there.  He read the

21    manual, the policy manual, right?  That's what he was there to

22    do.

23         Well, just to use a metaphor for five seconds before I go

24    into it, because that testimony kind of bothered me, but -- so,

25    if this (Indicating) were the law of the land, this cookbook --

1  just follow me for five seconds.  If this (Indicating) were the

2  law of the land, and my Nohni, my grandmother, she was put on

3  trial for not cooking lasagne to the law of the land, they say,

4  "Okay, you need to do two scoops of this and two shakes of

5  that," and she didn't follow that, she's a good cook, she does

6  it with her hands.  She knows how to feel.

7       So they're going to put someone on the stand to read the

8  cookbook into evidence.  And then they're going to say, "Did

9  she use two scoops?  Did she use one scoop of butter?"  And

10 they want to say she violated that.

11      So, in preparing for that testimony, Mr. Getz and myself

12 were thinking, okay, well, what this person is going to testify

13 about is:  I cooked a million meals.  And so if we come in to

14 prepare for the testimony, and say, "Okay, you cooked a million

15 meals?  Come on, in a million meals, not once you never dabbled

16 a little from what the directions say?"

17      That's what we're thinking; this is what we're thinking.

18 We're not expecting to go to stand and say, "Sir, how many

19 meals have you cooked," and the answer is "None."  Like, whoa.

20 That -- that threw me back.

21      Let's just look at the testimony for one second (As read):

22          "**QUESTION:**And what percentage of the informants, in

23      your experience, who sign the cooperating individual

24      agreement are hoping to work off their beef?  What

25      percentage?  5?  20?  50?  A hundred?  What would you

1      say?"

2              **"ANSWER:**I have no idea.

3              **"QUESTION:**You have no idea.  How many informants have

4      you worked with?

5              **"ANSWER:**I've never signed up an informant."

6      "I've never cooked."

7              **"QUESTION:**Pardon?

8              **"ANSWER:**I've never signed up an informant.

9              **"QUESTION:**You never signed one up?

10             **"ANSWER:**Never."

11     So, he's never signed one up.  Maybe he wrote the manual,

12  or the future manual, or the past manual.  Maybe he works at

13  Mission Station.  And, he has to have some knowledge beyond

14  reading this thing.

15     Let's go on.  Question to Officer DeFilippo:

16             "All right.  Now, you, sir, were you a

17             contributor to this manual back in February

18             of 2008?  Is that correct?

19             **"ANSWER:**I was not.

20             **"QUESTION:**Is it fair to say it's my understanding

21     that you're also not a contributor to the more current

22     manual that was updated after 2009?

23             **"ANSWER:**Correct."

24     So he's never worked with an informant, and he didn't

25  write either manual.

1      Okay.

2          "**QUESTION:**You never actually used an informant,

3      yourself, personally?

4          "**ANSWER:**I have not.

5          "**QUESTION:**If a police officer arrests somebody that

6      you believe may have valuable information, they can

7      release that person.  Is that right?

8          "**ANSWER:**Under certain circumstances, yes.

9          "**QUESTION:**Okay.  So, what would the circumstances be,

10     if you know, sir?

11             "ANSWER"

12      This is my favorite.

13             "I can refer back to the manual."

14     "I can refer back..." That's what you're there to do.

15 You're an expert -- you didn't write it.  You didn't work with

16 informants.  And even you need to refer back to the manual, the

17 cookbook?

18     So, this is the last one I'll read, Your Honor.  Maybe

19 that's the last.  But (As read):

20         "**QUESTION:**Now, I don't know how familiar you are with

21     Mission Station back in '08-'09, but I do have a few

22     questions for you.  Okay?

23         "**ANSWER:**I know the general way it operated.  I didn't

24     work there.

25         "**QUESTION:**Have you ever been to Mission Station in

```
 1        '08-'09, sir, you if you remember?
 2             "ANSWER: I don't recall.
 3             "QUESTION: If I were to ask you if you knew how the
 4        file cabinets were maintained at Mission Station at the
 5        time, would you be able to answer that question?
 6             "ANSWER: No.
 7             "QUESTION: Do you know -- do you know whether or not
 8        different officers work with the same CIs?
 9             "ANSWER: I have no idea.  I don't know."
10        So, didn't write the manual, neither version.  He's never
11   worked with a CI.
12        But there was something that I did take -- when he read
13   the manual into evidence, part of the manual is (As read):
14             "The purpose of this manual is to
15             provide guidelines for the establishment,
16             use, and management of confidential
17             informants and/or sources.  The
18             San Francisco Police Department recognizes
19             that informants are an effective tool for
20             law enforcement."
21        This is straight from the manual.
22             "Members are encouraged..."
23        Encouraged.
24             "...to develop criminal intelligence
25             information through the recruitment and
```

```
 1              proper management of informants.  All
 2              members should look upon each contact with
 3              witnesses, suspects, victims, and citizens
 4              as potential sources of information."
 5         Police work.  Two flips of a coin.
 6                   "However, members are reminded that not
 7              every person is suitable as a potential
 8              informant.  The Department's ultimate
 9              responsibility to the community and that
10              need must be balanced against the need to
11              gather intelligence."
12         And that's what this discussion is going to be about, when
13    we talk about Sergio, is that balance.  That balance.
14         So, you're encouraged to develop criminal intelligence,
15    but you've got to be seasoned, you've got to balance it against
16    the community, must be balanced against the need to gather
17    intelligence.  And that's what we're going to be talking about.
18         So, let's talk about Sergio.
19         Again, this is the only count against Sergeant Furminger.
20    This is Count 8.  Extortion.
21         Now, I would say Sergio is a great CI.  That's what I
22    would claim.  That balance we're talking about, we found it.
23    We found the guy.  Sergio.  This guy is posted on the corner
24    like a light post.  There is nothing in the community he
25    doesn't know.  There is no one that has more intelligence than
```

1    him.  No one.  This is the guy you want to know.

2        In terms of weighing against the community?  Well, first

3    of all, you know, is stolen goods, not stolen goods?  It's hard

4    to know.  He says it's like 60/40.  Who knows?  But that's not

5    this case.  Right?  That's not this case.

6        It's:  Is he being extorted?  Is he being -- saying --

7    "Oh, you give me something, and I'll protect you."  Is that

8    what's going on here?  No.  He's just a CI.  That's what he is.

9    He -- he works for the police.  Could you think of someone

10   better?  Could you?  And we're going to talk about why you

11   can't think of someone better.

12       One, that balance we talked about?  Remember?  He works in

13   the community where -- we already talked about.  You can't go

14   to a pawnshop if you're undocumented; right?  You need a

15   California driver's license.

16       And he lives in the heart of the Mission, where the

17   undocumented can live the American dream, like we talked about

18   in opening.  That's where he lives.  So, he does serve some

19   need for the community.  One day I need a paintbrush, next day

20   I need a screwdriver.  This is a guy who buys and sells, trades

21   goods.  He has a purpose in the community.

22           Now, they want to say this was a criminal

23   relationship.  Two flips of a coin.

24       Let's go through all the work Mr. Sanchez testified about.

25       First, they want to show all these phone communications

1   with Sergeant Furminger, which was over 2,400, if you remember.

2   2,400.  They showed you a few texts.  So, this relationship was

3   much larger than the events he talked about.  Okay?

4        Let's just talk about:  How did he get that number?  So,

5   he's asked (As read):

6                 "But you exchanged phone numbers?"

7        About Sergeant Furminger.

8             **"ANSWER:** I exchanged the number.  He gave me his

9        number to call him about a stolen -- stolen bicycles.

10            **"QUESTION:** Stolen bicycles?

11            **"ANSWER:** Yeah.  He told me 'If you see any stolen

12       bicycles, then you call me.'

13            **"QUESTION:** Okay.

14            **"ANSWER:** That is how I got his number.

15            **"QUESTION:** Did you eventually start talking to Ian

16       Furminger over the phone?

17            **"ANSWER:** Yes.

18            **"QUESTION:** Do you mean that he wanted to buy a stolen

19       bicycle from you?  Or do you mean he wanted to find stolen

20       bicycles to give back to people?

21            **"ANSWER:** Yeah, to give back to people.

22            **"QUESTION:** So he told you 'There have been a lot of

23       bicycle thefts here; if you find one you think is stolen

24       tell me, and I'll make the arrangement to return it.'

25       Correct?

1          "**ANSWER:**Yes.

2          "**QUESTION:**And that's what you tried to do; correct?

3          "**ANSWER:**Yes."

4     So that's how he had the phone number.  Police work.

5  "hey, I need to find some stolen bicycles."  So that's how they

6  even trade phone numbers.  Two flips of a coin.

7     Let's talk about some of these incidences.

8          "**QUESTION:**You have in mind the first time that you

9     helped the police?

10         "**ANSWER:**Yes.

11         "**QUESTION:**Now, before the police received the laptop

12    who had it?  Where did the laptop come from?

13         "**ANSWER:**From the flea market in Oakland.

14         "**QUESTION:**And you heard that there were some dirty

15    pictures on that laptop; correct?

16         "**ANSWER:**Uhm, you mean the HP?  Yeah.  I didn't see

17    them.  My friend seen it.  Because I don't know how to

18    play the --

19         "**QUESTION:**Right.

20         "**ANSWER:**Yeah.  He seen it and told me about it.

21         "**QUESTION:**What happened was your friend talked to you

22    about the laptop and said there were pictures of what

23    looked like naked children; correct?

24         "**ANSWER:**Yes.

25         "**QUESTION:**And you knew it was against the law to have

1      those pictures; correct?

2              "**ANSWER:**Yes.

3              "**QUESTION:**So you made arrangements to get the laptop

4       to give to the police; correct?

5              "**ANSWER:**Yes.

6              "**QUESTION:**And when you gave him the laptop with the

7       bad pictures on it, you were hoping he would remember that

8       you did this good thing?

9              "**ANSWER:**Yes.

10             "**QUESTION:**And you felt that if he remembered that you

11      did this good thing, that was something that would make

12      you safer; correct?

13             "**ANSWER:**Yes.

14             "**QUESTION:**And you were thinking that in your own

15      head; right?

16             "**ANSWER:**Yes."

17      Let's talk about the second thing, where he helped the

18   Lucas Film laptop that got lost at Cha Cha Cha, in the Mission

19   (As read):

20             "**QUESTION:**A police officer came to you.  And you were

21      told that there was a very important laptop --

22             "**ANSWER:**Yeah, they told me.

23             "**QUESTION:**-- that they needed to find; correct?

24             "**ANSWER:**Yes.

25             "**QUESTION:**And that three people from Los Angeles were

1      up here looking for this laptop?

2              "ANSWER:Yeah.  They stay three days.  Three days

3      waiting to see what happened.

4              "QUESTION:All right.  And just to illuminate the

5      question of why they were looking for the laptop, it was

6      Lucas Films that had lost the laptop; correct?

7              "ANSWER:Yes.

8              "QUESTION:In any event, you helped to find that

9      laptop; didn't you?

10             "ANSWER:Yeah.  Took me, like, a week."

11     "Took me, like, a week."  The guy spent a week to find a

12 laptop to give back to the police.  Do you know how expensive

13 that laptop is, what they were looking for?  Do you know how

14 expensive it was?

15     You want to talk about crimes of opportunity, that's what

16 you want.  You want that laptop.  You can't imagine what Lucas

17 would give you for that laptop.  Opportunity?  Money?  That's

18 it.  You hit the gold at the end of the rainbow with that

19 laptop.  Turned over to the police.

20     Let's talk about another event he helped the police with

21 (As read):

22             "QUESTION:Did there come a time when you bought a

23     laptop from this guy, and you called Officer Zachos and

24     you told him you had recovered a stolen laptop; correct?

25             "ANSWER:Yes.

1          "**QUESTION:**And Officer Zachos, was he at Mission

2      Station also?

3          "**ANSWER:**Yes.

4          "**QUESTION:**Officer Zachos came and took the laptop

5      from you, correct?

6          "**ANSWER:**Yes.

7          "**QUESTION:**And he thanked you for finding a stolen

8      laptop, right?

9          "**ANSWER:**Yes.

10         "**QUESTION:**And when he thanked you for finding a

11     stolen laptop, you did not ask him for money, correct?

12         "**ANSWER:**No.

13         "**QUESTION:**But you were happy that you did it because

14     you felt you had done something good; right?

15         "**ANSWER:**Yes.

16         "**QUESTION:**And that Officer Zachos would respect you

17     and be grateful for the good thing you did; right?

18         "**ANSWER:**Yes.

19         "**QUESTION:**And later Officer Zachos told you that he

20     found the lady who got the computer stolen, that you had

21     found, and you made her happy; correct?

22         "**ANSWER:**Yeah.

23         "**QUESTION:**And that made you feel good; right?

24         "**ANSWER:**Yes."

25     I won't go through every event but we'll do two more,

1 because I'm honing the points. This is a man's life on the

2 line. And this is a charge only against him. You've got to

3 understand what the relationship really was.

4        This was somebody who was feeding -- the very job he was

5 supposed to do, cleaning up the streets. Mr. Sanchez was the

6 best guy he could have. This was -- like that informant manual

7 said, they encourage you, the informants, you've got to weigh

8 it. How helpful was this guy?

9        Let's look at another event (As read):

10           "**QUESTION:**Do you remember a couple of years ago,

11       there was a big jewelry store robbery..."

12       I ain't talking laptops here.

13              "Do you remember a couple of years ago,

14           there was a big jewelry store robbery in

15           the Mission District, and three robbers

16           pulled out guns and ran out of the jewelry

17           store with lots of money?

18           "**ANSWER:**Yes.

19           "**QUESTION:**Do you remember when that happened, you

20       happened to be right on the corner?

21           "**ANSWER:**Yeah.

22           "**QUESTION:**And you ran -- they ran past with you

23       briefcases?

24           "**ANSWER:**I saw them, yes.

25           "**QUESTION:**Do you remember that?

1          "**ANSWER:**Yes.

2          "**QUESTION:**Do you remember talking to the police and

3      giving the police information about what they looked like?

4          "**ANSWER:**Yes.

5          "**QUESTION:**And you gave a full description of those

6      three guys who were running down the street with millions

7      of dollars' worth of jewelry in their briefcases.  Do you

8      remember this?

9          "**ANSWER:**Yes.

10         "**QUESTION:**Why did you give them that information?

11         "**ANSWER:**To arrest those guys."

12     We're not talking selling out another guy selling stolen

13  laptops to help business.  We're not talking about increasing a

14  relationship with any particular officer.  We're talking some

15  random guys robbing a store in his neighborhood.  Two flips of

16  a coin.

17     Another one, just the last one I'll mention, is the

18  statue, if you remember.  A very, very expensive statue.

19  Again, they want to say the crimes of opportunity, for money

20  (As read):

21             "...you talked to some police officers

22          about a valuable statue that you had;

23          correct?

24         "**ANSWER:**Yes.

25         "**QUESTION:**And you were worried that the statue may

1       have been stolen; correct?

2               "**ANSWER:**Yes.

3               "**QUESTION:**And you wanted the statue to go back to the

4       owner; correct?

5               "**ANSWER:**Yes.  It was stolen from the gallery.

6               "**QUESTION:**From the San Francisco Art Gallery; right?

7               "**ANSWER:**...yeah. "

8       Could you think of a better informant?

9       Now, about protection.  Let's talk about that.  I'm going

10  to read a few things he talks about.  One is getting arrested

11  (As read):

12              "**QUESTION:**You did, in fact -- you did get arrested at

13      some point after that; right?

14              "**ANSWER:**Yeah, I got arrested.

15              "**QUESTION:**All right.  And when you got arrested you

16      called Ian Furminger and you told him about it; right?

17              "**ANSWER:**Yes.

18              "**QUESTION:**But he didn't help you; did he?

19              "**ANSWER:**No.

20              "**QUESTION:**In fact, when you talked to him on the

21      phone about your arrest, you got the feeling...that he

22      didn't even care; right?

23              "**ANSWER:**Yes."

24      So, the very protection that he's supposed to be

25  getting, there's no protection.  In his mind he says he

 1  basically had hurt feelings, but he's just an informant used in

 2  the game.

 3      They're doing the balancing.  He's giving a lot more.

 4  But, not going to come bail him out.

 5      Let's go on (As read):

 6          "**QUESTION**:Now, I just want to ask you one last couple

 7      of questions.  You talked about going to work.  You signed

 8      the confidential informant type thing.  You remember that?

 9          "**ANSWER**:Yes.

10          "**QUESTION**:And it is true that one of the reasons you

11      signed that is because you were afraid; right?

12          "**ANSWER**:Yeah.

13          "**QUESTION**:You were afraid of the police, and you were

14      afraid of the *Federales*; right?

15          "**ANSWER**:Yes.

16          "**QUESTION**:And there was also a time before that,

17      where you were doing business out on 20th and Mission, and

18      a gang called MS-13 started taking taxes from you; right?

19          "**ANSWER**:Yes."

20  He was getting shaken down.

21          "**QUESTION**:MS-13 is a street gang that operated in the

22      Mission between 2008 and 2012; right?

23          "**ANSWER**:Yes.

24          "**QUESTION**:And every Thursday afternoon, one of the

25      gang members would pay you a visit; correct?

```
 1              "ANSWER:Yes.

 2              "QUESTION:And the gang member would take $40 from

 3      you; right?

 4              "ANSWER:They start with 25.  Then they want more.

 5      More.

 6              "QUESTION:And it was every Thursday between 10:30 and

 7      12:00; right?

 8              "ANSWER:Yes.

 9              "QUESTION:Because you were always out there on

10      Thursday between 12:30 (sic) and 12:00, right?

11              "ANSWER:Yes.

12              "QUESTION:And you knew if you didn't give them the

13      money they might kill you.  Am I right?

14              "ANSWER:Yes.

15              "QUESTION:So you gave them the money every Thursday.

16      And you never, ever once asked Ian Furminger for

17      protection from that.

18              "ANSWER:No, I never did."

19      My last comment about Sergio is in reference to the 2,400

20 texts which I'm saying have been texted, but they only show you

21 this small sample.

22      Obviously, some relationship formed between these two.

23 And, this was not an extortion relationship where Sergeant

24 Furminger is forcing Mr. Sanchez.  Quite the opposite.

25      Think of this (As read):
```

```
 1              "QUESTION:This is November 1, 2013 in the early
 2      afternoon."
 3      And they read the text:
 4              ""Hey Ian this is your friend Sergio.
 5          This is my new number."
 6      They asked him:
 7              "Do you remember sending that one?
 8              "ANSWER:Yes.
 9              "QUESTION:When you said 'this is your friend Sergio,'
10      was that true?  Were you friends?
11              "ANSWER:Yes.
12              "QUESTION:And you sent that as soon as you got your
13      new number, correct?
14              "ANSWER:Yes.
15              "QUESTION:Because you wanted to be able to
16      communicate with him; correct?
17              "ANSWER:Yes.
18              "QUESTION:And for the most part, you two communicated
19      with text."
20      Nods head yes.
21              "QUESTION:And seeing each other in the Mission
22      District; correct?
23              "ANSWER:Yes.
24              "QUESTION:Now, on that day, about seven hours later
25      that day, you sent him a similar message.  You said:  'Hey
```

1       Ian this is your friend Sergio.  This is my new number.'"

2       And that's when he finally responds.  Ian's like:  Yeah, I

3  got it, I got it.  This is someone speaking, sends a new

4  number; seven hours later:  Hey, man, did you get my new

5  number?

6       Not extortion.

7       And, he was actually asked directly -- just the last two

8  things I'll say about him is (As read):

9          "QUESTION:Okay.  Ian Furminger never threatened you;

10      did he?

11         "ANSWER:No."

12      And:

13         "QUESTION:Ian Furminger never told you that if you

14      gave him a gift he would protect you; did he?

15         "ANSWER:No."

16      So, I don't know who's saying it.  It's not Sanchez.  It's

17  not Mr. Sanchez claiming to be extorted.

18      Let's talk about another event.  October 2, 2009.  This

19  was about Andrew Byrd, if you remember him.  I was fortunate

20  enough to get to cross-examine Mr. Byrd.  I was a little

21  over-zealous, possibly.

22      But, he was a meth addict.  A meth dealer.  He had been up

23  days straight, if you remember, watching pornography.  Young --

24  I guess not minors -- that was in question, but I guess not.

25  And he was basically just getting high.  And, claims that the

1  officers stole from him.  Do you remember?

2      And his theory is basically:  Oh, they came to get my

3  money.

4      And it's:  Well, how does that theory play out?

5      Well, he's like:  Well, there was a quarter -- a

6  quarter-ounce of meth on the dresser, and a bong.  And they

7  missed it.  They had a one-sight focus.  They came for the

8  money.

9      Well, one is: Is there money missing?  And then two:  Who

10  took it.  Right?  Flips of the coin.

11      Let's get into this.

12      So, first, just right from the police report, what was

13  booked?  Because he wants to say:  Oh, they left that

14  quarter-ounce of meth.  What was booked?  Going through the

15  evidence list: suspected methamphetamine.  Seven plastic bags

16  of more suspected methamphetamine.  Three, large quantity of

17  suspected methamphetamine.  Four, pay/owe sheets.  Five,

18  Valium.  Six, some pill called "depa-kotay."  And I know I'm

19  saying that wrong.

20      Eight, plastic baggies.  Digital scales with white

21  residue.  Laptop.  Digital storage.  Portable hard drive.  This

22  is all stuff booked into evidence.  And he's saying:  Oh, they

23  left a quarter-ounce of methamphetamine.  They had a sole

24  focus.  They came for my money.

25      Now, Mr. Byrd (As read):

1          "QUESTION:Immediately prior to your arrest, were you

2     asleep?

3          "ANSWER:Yes.  I mean yes, I was sleeping.

4          "QUESTION:And then what happened?

5          "ANSWER:I have woke up.  I woke up, and I -- I knew

6     that my door was unlocked because I had a friend there

7     earlier, two hours earlier.  He had left, and I was too

8     tired to, like, get up and lock the door.  And it had to

9     be locked either with a key from the outside or, you know,

10    from inside.  And so I knew it was still unlocked."

11         So, he's got an unlocked door.  He's knocked out.

12 Someone's still in the room.  When asked how much money he had

13 before it was allegedly stolen, he says $8,759, exactly.  He

14 has a good memory.

15         Now, question to Mr. Byrd (As read):

16         "QUESTION:Do you remember telling agents that day

17    that you were up all night partying the night before, and

18    that you had went to sleep at about 8:00 a.m.?

19         "ANSWER:I didn't say exactly that, but I said that I

20    had been -- I was up, I was using, and I did -- I go -- I

21    go to sleep, fell asleep around 8:00 a.m.

22         "QUESTION:Okay.  So 'up all night partying' means up

23    all night smoking meth.

24         "ANSWER:Pretty much, yeah.

25         "QUESTION:So it wasn't that you were too tired to

```
 1        close the door, but you basically passed out.  You'd

 2        probably been up for a few days.

 3             "ANSWER:That's the same thing."

 4    Mr. Byrd:

 5             "QUESTION:Now, at some point, you were a plaintiff in

 6        a civil case involving this very incident.  That's true,

 7        right?

 8             "ANSWER:Uh-huh.

 9             "QUESTION:You hired a lawyer?

10             "ANSWER:The same lawyer that was helping me with the

11        arrest case, yeah.

12             "QUESTION:Explain to us what happened with that case.

13             "ANSWER:At the point, basically, after a stretch of

14        time -- they talked me into dismissing it basically.  Said

15        there was no..."

16    He ends up saying there's no merit.  It was dismissed with

17 prejudice.

18    Now, something that's very interesting about Mr. Byrd's

19 arrest.  This is from Vargas' direct.  I want you to take note

20 of this.  Question to Mr. Vargas (As read):

21             "QUESTION:And did Mr. Furminger on occasion approve

22        police reports of that nature?"

23    They're talking about the Byrd incident.  He says:

24             "Yes.

25             "QUESTION:Now, on this occasion, did he?
```

```
1              "ANSWER:No, he did not.

2              "QUESTION:Well, who approved this one?

3              "ANSWER:This is another sergeant who was assigned to

4       Mission Station.  Would you like his name?

5              "QUESTION:Sure.  If you can make it out.

6              "ANSWER:It looks like Sergeant Bueno.

7              "QUESTION:And did Sergeant Bueno have any knowledge

8       of the fact that you had taken money from the hotel room?

9              "ANSWER:None, whatsoever."
```

10      You've got to take this one in context.  So they're

11 claiming this guy's coming in, days off, overtime, doing

12 anything he can to be a part of these alleged conspiracies

13 (Indicating quotation marks).

14      Well, he's not even the one.  That's not the one signing

15 off on that report.  It's Sergeant Bueno.

16      And to take it a next step, Vargas says "That guy had no

17 idea what we did."  So it opens the thought up:  Sergeant

18 Furminger could have no idea what he did at some time when he

19 was on the report.

20      So they want to say these reports are evidence.  Of what?

21 Sergeant Bueno would say of nothing, on that day.

22      So, I mean, the Andrew Byrd story was shaky before it

23 began.  Was something stolen?  Who stole it?  He says people

24 are coming in and out of his room, he's selling drugs, he's

25 falling asleep, people are in the room.  There's nothing there.

```
 1        As Mark Twain once said about Oakland:  There's no there,

 2   there.

 3        Let's go on one to more incident.  That storage locker,

 4   November 19, 2009?  You remember this was about a young woman

 5   named Crystal Ponzer.  She took the stand.

 6        For one -- that was tough.  She's dependent, woman, she

 7   was young.  She's talking about times when she was with an

 8   older man, really, for money.  It's tough.

 9        But, her credibility has to be at issue.  I sure hope so.

10   I hope we all agree with that.  Because if not, I'm not in

11   trouble.  Because she picked me out.

12        Remember when they said "Would you point out the officer?"

13   I was pointed out.  So I'm hoping you don't give her too much

14   credibility, or I'm a little scared.

15        But, she's a young drug-dependent girl, and she's on

16   probation with a search clause.  Okay?  So that's kind of the

17   background, right?

18        Every single thing she testifies I would say is good

19   judgment by the good police officer.  Two flips of a coin.  So

20   I'm going to go through the testimony, and then we're going to

21   talk about this more.

22             "QUESTION:All right.  Would you remember any of the

23        police officers that placed you under arrest?

24             "ANSWER:I'm sure I would.

25             "QUESTION:Do you see them in the courtroom today?
```

1              "**ANSWER:**Yes, I do."

2        So she's sure I do -- she's sure she would, and she points

3   me out.  Okay?  So, she's sure she could point people out.

4              "**QUESTION:**Going back to the time frame that you were

5          testifying about a few moments ago, Thanksgiving week,

6          2009, in that time frame, were you struggling with drug

7          dependency?

8              "**ANSWER:**Of course.  Why else would I be with a man

9          that was considerably older than I was, you know.

10             "**QUESTION:**He was the one who was providing you with

11         heroin, was he not?

12             "**ANSWER:**Yes.

13             "**QUESTION:**Were you also involved in selling it to

14         support your dependency?

15             "**ANSWER:**Uhm, not really.  I mean, I would help

16         Burgess a little bit..."

17         That's the boyfriend.

18                  "...but it...I mean, not really.

19             "**QUESTION:**You were helping him with his sales

20         activities though?

21             "**ANSWER:**I guess, yeah, I mean.

22             "**QUESTION:**You had been convicted before this arrest

23         at 850 Bryant Street; correct?

24             "**ANSWER:**Yeah, for misdemeanor possession."

25         So I'm setting the scene.  So she's on probation, okay?

1    And the question about that was:

2          "QUESTION:Do you remember that when you pled guilty

3          that morning..."

4    And again, this is about an incident before the incident

5    we're talking about.  She was on probation.  And we were trying

6    to establish that.  She didn't -- you know, they could search

7    her.

8          So:

9          "QUESTION:Do you remember that when you pled guilty

10         that morning the judge told you that as part of the deal

11         you would be subject to warrantless search; meaning that

12         your person, your place of residence, your automobile,

13         wherever you are could be searched at any time of the day

14         or night, with or without a warrant by any peace or

15         probation officer?  Do you remember the judge told you

16         that?

17         "ANSWER:Yes, I do.

18         "QUESTION:And do you also remember that when the

19         judge told you that, the judge asked you this question:

20         'Ms. Ponzer, do you accept these conditions of probation?'

21         And you said 'Yes.'  Do you remember that?

22         "ANSWER:Of course.

23         "QUESTION:All right.  So you knew, when the police

24         came out to see you at the storage locker, you didn't have

25         any protection against warrantless search because you had

1          agreed to be subject to that.  Do you remember that?

2                  "**ANSWER**:Okay.  Well...I mean, can you get to the

3          point?

4                  "**QUESTION**:My point is, do you remember realizing --

5                  "**ANSWER**:Yes.

6                  "**QUESTION**:Do you remember realizing when you saw the

7          police come that you were going to be searched?

8                  "**ANSWER**:Yes, I do.

9                  "**QUESTION**:All right.

10                 "**ANSWER**:That's why I want to be honest with them and

11         I told him because I had a little piece of heroin on me,

12         you know.  That is why I told him before, I mean.

13                 "**QUESTION**:Where was the heroin?

14                 "**ANSWER**:It was in my bra.

15                 "**QUESTION**:And you knew that they were going to find

16         it; right?

17                 "**ANSWER**:Yeah, of course."

18         She ends up saying she has two loaded syringes ready to

19    go, if you remember.

20         Now:

21                 "**QUESTION**:...in the morning when you first woke up,

22         the first thing you did was use heroin; correct?

23                 "**ANSWER**:Yes.  I was sick.

24                 "**QUESTION**:And by taking the heroin, that's part of

25         the struggle not to be sick at the moment; correct?

```
1              "ANSWER:Exactly.

2              "QUESTION:Okay.  And in addition to the heroin you

3         took that morning, when you first woke up, you had two

4         syringes that were loaded with heroin on your person when

5         the police showed up; correct?

6              "ANSWER:Yes."

7        Now, this is the one where they're claiming things were

8    stolen again.  I'm going to quickly going read to you the

9    evidence list from this arrest:

10        Folding knife with suspected heroin on the blade.  More

11   suspected heroin.  More suspected heroin.  Suspected heroin.

12   Suspected methamphetamine.  Digital scales with residue.

13   Pay/owe sheets.  Black nylon pouch.

14        So, things were taken.  But this -- this (Indicating) is

15   the most important, what I really want us to focus on.  Again,

16   they're saying these are crimes of opportunity.  Crimes for

17   money.  So we have to think.  We have to look at all the times

18   the opportunity's there, the money's there.  Is Sergeant

19   Furminger taking advantage?

20        Crystal Ponzer, if you remember, gets rolled on by

21   Sergeant Furminger just weeks after this incident, this alleged

22   incident at this -- at this facility where she's claiming --

23   you know, someone's claiming something is stolen.  Right?  This

24   arrest.

25        All right.  So, let's look at that arrest.
```

```
 1            "QUESTION:You had a pending case?

 2            "ANSWER:Yes.

 3            "QUESTION:Pending felony case?

 4            "ANSWER:Uh-huh.

 5            "QUESTION:And when you saw Mr. Furminger the last

 6        time -- now we're talking about between Thanksgiving and

 7        Christmas -- you knew you were still subject to

 8        warrantless search; correct?

 9            "ANSWER:Yes.

10            "QUESTION:And you had heroin in your bra, right?

11            "ANSWER:I did, but --

12            "QUESTION:And you had money on you, correct?

13            "ANSWER:Yeah, I had money on me.

14            "QUESTION:Because you were selling that day; correct?

15            "ANSWER:Um, yeah, I was."

16        Now, we're not talking about the incident at the locker.

17   We're talking about a few weeks later.  Still heroin in the

18   bra, still money.  Right?

19        So, Sergeant Furminger is talking with her.

20            "QUESTION:You had heroin in your bra which

21        Mr. Furminger did not find.  Correct?

22            "ANSWER:No.  How could he?  He's a male officer.  He

23        can't search me.  But he stated because he said he had

24        smelled it.  If it wasn't him, it was some other

25        officer -- it was one of the other officers.  One of them
```

1      said, 'Oh, you know, I can smell it.'  You know, that's

2      why I was so nervous...

3          **"QUESTION:**And you told them -- you told them that you

4      did not have any heroin on you?

5          **"ANSWER:**Of course I did.

6          **"QUESTION:**And that was a lie; correct?

7          **"ANSWER:**Of course.  I told them that.  I didn't want

8      to go to jail.

9          **"QUESTION:**Exactly.  And you won that day, didn't you?

10     You won.  You got to stay out.

11         **"ANSWER:**Well, only because Mr. Crosby came walking

12     down the street and came up just in time.  He had heroin

13     on him.  They found it.  They searched him.  They found it

14     in his backpack.  And he ended up going to jail."

15     So, you gotta think about that incident for a second.

16 They roll up on her.  She has a search clause.  She is on

17 misdemeanor probation, and she's out on felony bail.  We know

18 she's on misdemeanor probation, because the incident in

19 question is why she's saying they could search her when they're

20 at the storage unit.

21     But now she's been arrested at the storage unit, got

22 arrested, went to 850 Bryant, is out on bail.  That's felony

23 bail.  So she has a misdemeanor search clause; she is out on

24 felony bail.  She's a drug addict.  She's young.  She's out of

25 it.

1    He approaches her on the street.  She says she has cash on

2  her.  Hundreds of dollars of cash on her.  And drugs.  What

3  does Sergeant Furminger do?  Does he arrest her?  No.  Does she

4  say he took her money?  No.  Does she say he took his drugs?

5  No.

6    Could you think of a better opportunity?  She's sitting

7  there alone at the car.  I mean, what an innocent, easy victim.

8  She is the easiest victim that day.  But, again, he used sound

9  judgment.  What can you really do to her?  She's a junkie.

10  She's drugged out.  She's already on misdemeanor probation.

11  She already has a pending felony case.

12    What is this going to do?  Let's go after the boyfriend.

13  The older guy.  The guy that's basically, you know, forcing her

14  through drug dependency to be his girlfriend.  That's who they

15  decide to go after.  Hey, let's get the big fish.

16    Again, this is a tough job.  It's not black and white.

17  You can't ask Officer DeFilippo how to do his job.  They say

18  it's a gray-area job.  And I would say that he made the right

19  judgment that day.  He made the right judgment.  He didn't take

20  advantage of opportunity.  He didn't take money.  He arrested

21  who we all want arrested.

22    Just a few more.  Newark.  So, the government had talked

23  about this a little bit.  Ms. Vasquez, she was arrested in

24  San Francisco, if you remember.  This is what led to the Newark

25  incident.  They arrested someone who was selling drugs.  And,

1  she gave up the place where she lived.  That was in Newark.

2  Police work.

3     So, I just want to go through some of this.  If you

4  remember Officer Heckman, he was the Newark police officer that

5  testified.  So, he was called.  He was asked to read the report

6  he wrote into the record.  And I'm going to just read part of

7  it (As read):

8              "'I, along with the San Francisco PD

9              officers, searched the residence, locating

10             no residents.  Upon further detailed search

11             of the residence, San Francisco PD officers

12             located a quantity of currency, suspected

13             heroin and cocaine.  SFPD collected the

14             evidence and secured the residence.'

15         "**QUESTION:**So you wrote that the San Francisco police

16     found currency, heroin and cocaine, correct?

17         "**ANSWER:**Correct."

18     But, someone's alleging there was more than that.  And

19 this one, they are trying to say Sergeant Furminger was in on

20 it.  This one is a little confusing to me.  But, let's go

21 through how the government tries to make their case.

22     The first one is Ignacio Ramirez.  They call him "Nacho,"

23 remember?  He took the stand.  He helps Sergeant Furminger.  He

24 does handy work.  He allegedly helped them put in the lights.

25     Now, this is where it gets so illogical sometimes.  He

1    says, "I got paid $400."  He doesn't say he knows when the

2    lights were purchased, before or after.  "I got paid $400."

3    $400.  Okay.

4         But, what's even crazier is we learned through both his

5    testimony and Mrs. Furminger's testimony that he had done

6    things with them to help with the house, ten, 20, 25 times.

7    And that they could find ten, 15 incidences before the Newark

8    incident, and he had continued doing incidences after.

9         And yet, the government wants to say, "Aha, he came and

10   did some work at your house close to the Newark incident; we

11   got you."

12        Well, what if some incident was in discussion a year

13   before?  Would they have said, "Ah, he helped you put in the

14   fence"?

15        What if there was some incident two years before?  They'd

16   say, "Aha, he helped do tiles."  But, there was no incident

17   surrounding those events, so they're not even brought up.  It's

18   so self-selective.

19        What is it evidence of?  No one testified about when the

20   lights went up.  The guy that Ian always uses came, and he used

21   him this time.  He got paid $400.

22        So, let's read some of the testimony (As read):

23             "**QUESTION:**Did you get paid by Mr. Furminger for

24        putting in the skylights?

25             "**ANSWER:**Yes.

1          "QUESTION:And how much did you get paid?

2          "ANSWER:I remember around $400.

3          "QUESTION:What kind of projects did you do for Ian

4     Furminger before the skylights that you just spoke about?

5          "ANSWER:Basically, like, painting and crown molding.

6     Some tile in the bathrooms.  Something like that, yeah.

7          "QUESTION:Anything else you can think of?

8          "ANSWER:I remember I did the fence in the backyard.

9     And I did a deck in the backyard too.

10          "QUESTION:All of these projects that you just talked

11     about, were you paid for the work you did?

12          "ANSWER:He paid me.  He paid me.

13          "QUESTION:When it came time for him to pay you, did

14     you ask him to give you cash?

15          "ANSWER:I did.

16          "QUESTION:Okay.

17          "ANSWER:I asked him to give me cash.

18          "QUESTION:All right.  So when you came out do the

19     skylights at the Orinda the house, did you know before you

20     got there that you would ask him to pay in cash?

21          "ANSWER:Yes.

22          "QUESTION:And did you ask him to pay you cash on that

23     job when you finished?

24          "ANSWER:Yes.

25          "QUESTION:Have you been doing this kind of work for

1      the last eight or ten years?

2              **"ANSWER:**Yes.

3              **"QUESTION:**You do it for different people; don't you?

4              **"ANSWER:**Yes.

5              **"QUESTION:**Whoever needs help, needs someone who works

6      with their hands, that's you; right?

7              **"ANSWER:**That's me."

8      Now, Mrs. Furminger, Question -- asked about Nacho, same

9  guy we just talked about.  They asked her (As read):

10             **"QUESTION:**What kind of work did he do?

11             **"ANSWER:**We did a lot of work.

12             **"QUESTION:**Describe some of it, just so I can get a

13     feel.

14             **"ANSWER:**We changed the garage and added a laundry

15     room.  We took paneling off the walls in the living room.

16     We covered up a sliding glass door.  We put in skylights.

17     We tiled the bathroom.  I mean, we did a lot.

18             **"QUESTION:**Now, you just described all these tasks

19     that were done to upgrade the house.  And you used the

20     word 'we,' but it was really Ian Furminger who was doing

21     this; correct?

22             **"ANSWER:**Yes.

23             **"QUESTION:**And did he have some help when he did this

24     work?  Did he have someone he paid to help?

25             **"ANSWER:**Yes.

```
 1              "QUESTION:Do you know a handyman named Nacho?

 2              "ANSWER:I do.

 3              "QUESTION:Was that someone who helped?

 4              "ANSWER:Yes.

 5              "QUESTION:Do you happen to know Nacho's true name?

 6              "ANSWER:I believe it's Ignacio.

 7              "QUESTION:Okay.  And when did you first meet Ignacio?

 8              "ANSWER:About 2007.

 9              "QUESTION:And when you met him in 2007, was he

10        helping Ian work on the house you then lived in?

11              "ANSWER:Yes.

12              "QUESTION:Where was that house?

13              "ANSWER:Burlingame."

14        Different house, before.

15              "QUESTION:What kind of work did Nacho and Ian do

16        there --

17              "ANSWER:A laundry list.

18              "QUESTION:-- that you remember?

19              "ANSWER:They remodeled a bathroom.  Put in a master

20        closet.  Did an addition to the back kitchen.  A deck.

21        They worked on the garage.  Windows throughout the whole

22        house.  Remodeled the kitchen.  Pretty much everything."

23        And they want to say, "Skylights, gotcha."

24        Now, Agent Sicord testified.  Now, he was the federal

25  agent who testified about these events.  Because if you
```

1  remember the people they went to for Newark, the original

2  arrest was in San Francisco.  These people were actually being

3  watched by the federal government, before the San Francisco

4  police ever got involved.

5      And I'm confused what this agent came to testify about.

6  It appeared that he came to testify on behalf of Sergeant

7  Furminger, and he did just that.

8      So just bear with me here, but listen to this testimony

9  (As read):

10         "**QUESTION:**Is it fair to say it was not a good thing

11      for the DEA when the San Francisco Police picked these two

12      up?

13         "**ANSWER:**Actually, it wasn't a bad thing for us

14      because that way when we -- we had not gotten our federal

15      indictment out of the Eastern District of California.  And

16      in some cases such as this -- I believe, we had indicted

17      15 to 20 different members of the organization all the way

18      up.  Frequently, one of the big problems we have is

19      locating our initial targets.  So, in actuality, when

20      these guys were picked up it sort of lessens our problem

21      of trying to locate them, when we arrested the other

22      members of the conspiracy, because they were already in

23      custody.

24         "**QUESTION:**Meaning that it worked out for you in

25      hindsight?

1      "**ANSWER:**Yes.

2      "**QUESTION:**But if it had been up to you, at that

3      moment, you would rather they not arrested that night,

4      correct?

5      "**ANSWER:**Frequently, in cases like this, I'm happy

6      when our defendants, who we're going to indict federally

7      at a later date, are in custody.  So that way, I don't

8      need to go look for them at a later date.  So in

9      actuality, yes, it was fortunate for us that Sergio was

10     taken into custody.  In fact, the day after Sergio was

11     arrested, we asked SFPD to do a second investigation to

12     get -- my recollection was to get Sergio in custody,

13     Gricelda was released.  We actually asked SFPD to see if

14     they could arrest them again for us so we had the second

15     person in custody.  And then there was another member of

16     the conspiracy picked up with them two days later.  So it

17     was very good for us because we had them to initiate a

18     second investigation on them.

19     "**QUESTION:**So if Sergeant Furminger was involved in

20     what you just discussed, he did something good; didn't he?

21     "**ANSWER:**I don't know who -- I don't necessarily -- if

22     he was involved, yes.  As well as all the other officers.

23     You know, we just asked them to keep those guys in custody

24     for us."

25     So, that's the agent.  He said thanks.  "Thank you,

 1   Sergeant."  That's what he's saying.  He came to testify, to

 2   say:  These guys helped me out.

 3        I'm still trying to see, where's -- where's Sergeant

 4   Furminger?  And, that's what we're doing here.  I withheld the

 5   board I was going to use, because this is such a serious

 6   matter.

 7        But the Where's Waldo board (Indicating), that's what I'm

 8   saying:  Where's Sergeant Furminger?  That's what we're doing

 9   here today.  We're trying to find him.  Where is he?

10        Vargas cross (As read):

11            "**QUESTION:**You painted a little picture this morning

12        about the ride out to Newark, talking about the ride out

13        to Newark with Furminger and Robles.  Remember that?

14            "**ANSWER:**Yes.

15            "**QUESTION:**Do you remember describing that ride out to

16        Newark?  You described the picture where the three of you

17        were in a car.  And based on what happened earlier, taking

18        down these drug dealers and learning about the potential

19        for place in Newark where the there could be a lot of

20        money found, you painted a picture about how you were

21        there, talking about it on the way out to Newark.  Do you

22        remember that?

23            "**ANSWER:**Yes.

24            "**QUESTION:**When you painted a picture that had

25        Mr. Furminger talking about how much money might be found,

1    and how this could be a big score, and so forth and so on.

2    Remember that?

3              **"ANSWER:** Yes.

4              **"QUESTION:** All right.  Now, I want to you remember

5    that when I ask you whether on October 28th of this year,

6    you had an interview with Special Agent Tyler Nave, of the

7    FBI, in which you talked to him about the Newark caper; do

8    you remember that?"

9         Now, this is immediately after he takes the plea deal,

10   right?  This is immediately after.  So Vargas has now decided

11   to take the deal.  And he does an interview before he testifies

12   in front you.  He says:

13             **"ANSWER:** Yeah, I remember talking to him.

14             **"QUESTION:** And present during the interview were

15   Special Agent Flores, and Mr. Villazor and Mr. Hemann were

16   there.  Do you remember that?

17             **"ANSWER:** Yes."

18        So they end up showing him a memorandum of that interview.

19   So:

20             **"QUESTION:** Now, Mr. Vargas, on October 28, less than a

21   month ago, you told a different story about Newark; didn't

22   you?

23             **"ANSWER:** It's slightly different, yes.

24             **"QUESTION:** You said that on the ride out to Newark

25   nothing was spoken about money or a big score; correct?"

1     Right after he took the deal.  He said no discussion.

2         "**ANSWER:**That's what's there, yes.

3         "**QUESTION:**You said nothing was discussed on the way

4     to Newark about splitting it up; correct?

5         "**ANSWER:**Well, that was often the case.  Prior to

6     that, we never had talked about dividing up money, or each

7     going to get a third each, or anything like that.  We

8     never talked about money in terms like that at all.

9         "**QUESTION:**Oh, Mr. Vargas, I didn't ask you that.  I

10    didn't ask about generally.  Let me start again by

11    reminding you of the picture you painted this morning with

12    Mr. Furminger and you talking about a big score, money,

13    split it up, digging in the backyard, and whatever else

14    you said.  Do you have that in mind?

15        "**ANSWER:**Yes.

16        "**QUESTION:**You didn't say anything about 'We're going

17    to get cash out there, we could have a big score,' did

18    you?

19        "**QUESTION:**I'm talking about this meeting you had on

20    October 28th.  I just showed you the memorandum of the

21    interview.  Would you like to see it again?

22        "**ANSWER:**No.

23        "**QUESTION:**You didn't say it; did you?"

24    Objection.

25        "**QUESTION:**You didn't say anything about going out to

1    Newark to get money at this place, did you?

2         "**ANSWER:**I don't recall if I mentioned it specifically

3    or not.

4         "**QUESTION:**Did you say on October 28, 'We don't talk

5    about money on the way out; it's understood'?  Did you say

6    that?

7         "**ANSWER:**I would have said something very close to

8    that, yes.

9         "**QUESTION:**But today, you have a much more elaborate

10   version of what the ride out to Newark was like.

11        "**ANSWER:**Yeah, there's more about it, yes.  I've

12   spoken more about it."

13   So, Newark:  Two flips of a coin.  Police work.  The only

14   person saying Sergeant Furminger did something is Mr. Vargas.

15   But Mr. Vargas also said Sergeant Furminger was the one that

16   found the $3,000 that was booked into evidence.  Money was

17   found; drugs were found.

18   The prosecution makes it sound like we were making a joke

19   about the digging, but it wasn't a joke.  It was talking about

20   Vargas.  He goes in -- he's the one, hits the shovel in the

21   backyard, right?  Right away, "Hey, let's start digging.  Let's

22   get a score."

23   Where's Sergeant Furminger?  He's upstairs with the Newark

24   police officer, booking money that they find.

25   Now, Cesar Hernandez -- that's how I started this thing,

```
 1  shouting about, you know, what he said.  Just to read exactly
 2  what I was saying.
 3       So, Cesar Hernandez -- (As read):
 4           "QUESTION:Okay.  Now, you never have called Sergeant
 5       Furminger on the phone; you never had his number, right?
 6           "ANSWER:Oh, no, sir.
 7           "QUESTION:He never called you?
 8           "ANSWER:He never called me.  I speak to him only one
 9       or two times."
10  Cesar Hernandez:
11       "The only person don't give me nothing is that man
12       right there.
13           "QUESTION:I'm sorry?
14       "The sergeant, he don't give me nothing ever."
15  Cesar Hernandez, unprompted, a second time:
16       "Was no lie.  If I'm inventing these things, when they
17       ask me about the sergeant, why I don't tell them, 'Oh,
18       he gave me drugs.  He gave me money.' Because the
19       truth is that man, he give me nothing.  In fact, he
20       only talked to me two times.  That is true.  If I'm in
21       bed, 'Oh, sergeant, oh, that sergeant give me money,
22       the sergeant give me drugs, the sergeant give me
23       everything,' no, no.  The fact and true is I'm
24       speaking only the truth.  The man that I see over
25       there, he never give me nothing, and he is right
```

```
 1              there.  He over there.  He never gave me nothing.  In
 2              fact, he talked to me maybe two, maybe three times."
 3      This is the overseer, they want you to say, the overseer,
 4 the guy who is in Mission Station somewhere between 40 and 70
 5 times, depending on which piece of the testimony you want to
 6 pick out, this is the overseer, Sergeant Furminger, talk two or
 7 three maybe, maybe times, two or three times, the overseer.
 8      They might want to put Sergeant Furminger in it.  Cesar
 9 wants you to know, don't put him in.  Don't make a mistake.
10 Two flips of a coin.  Don't do it.  I got immunity, but I got
11 to tell you something, not Sergeant Furminger.
12      The last event I'm going to go through.  I know it's a
13 long day but, like I said, important things are at stake.  The
14 selling of marijuana is Daisy and Jayme.
15      Vargas direct:
16          "I'm sorry, when you took the portion of marijuana
17           that was in that bag that you just looked at and put
18           it in the file cabinet what was your plan for it?
19           What were you going to do with it?  Why didn't you
20           book it into evidence?
21           "ANSWER: I don't know.
22           "QUESTION: Then why did you do it?
23           "ANSWER: I don't know.
24           "QUESTION: No idea at all, as you sit here today, why
25      you took a pound of marijuana and put it into a file
```

1          cabinet at Mission Station?

2                  "**ANSWER:**I don't.

3                  "**QUESTION:**Were you planning at that point in time to

4          sell it?

5                  "**ANSWER:**I was not planning at that time to sell it,

6          no.

7                  "**QUESTION:**What were you planning on doing with it?

8                  "**ANSWER:**I don't know.  I looked at it.  I've asked

9          myself this question many times."

10     He goes on and on.  So he's not claiming anyone else took

11   it but himself.  Altruistic reasons, he said.

12                 "**QUESTION:**So at some point in time did you make a

13         decision as to what to do with the marijuana?

14                 "**ANSWER:**Yes.

15                 "**QUESTION:**Was that decision -- what was that decision

16         you made?

17                 "**ANSWER:**I decided to give it to who I call the kids,

18         Daisy and Jayme.  They had just come out of the hospital

19         with her injuries and were even kind of in worse shape

20         than when we had met them.

21                 "**QUESTION:**And why did you want to give it to them?

22         Why did you decide to give it to them?

23             "Uh, as -- as wrong as this sounds, it was kind of an

24             altruistic gesture.  I wanted to give them something

25             to -- something they could use to make some money for

1          themselves.  They were very down on their luck.  My

2          intent was it was -- ultimately, it was just going to

3          be destroyed.  I thought it was kind of a waste.  At

4          least if they had it they could do something with it.

5          They could obviously sell it.  That was her expertise.

6          Make some money for themselves to get themselves off

7          the street into a hotel room.  That sort of thing.

8          "So your intention -- not to put a fine point on it --

9          was to give heroin addicts marijuana to sell on the

10         streets?

11          "**ANSWER:**Yes.

12          "**QUESTION:**So that they would have money?

13          "**ANSWER:**Yes.

14          "**QUESTION:**Did it go through your head at the time

15    that this is a legal thing to do?

16          "**ANSWER:**Absolutely.

17          "**QUESTION:**Did you discuss this plan with either

18    Mr. Robles or Mr. Furminger?

19          "**ANSWER:**In advance, no.

20          "At some point did you discuss giving the marijuana to

21         Daisy and Jayme with either Mr. Robles or

22         Mr. Furminger?

23          "**ANSWER:**Yes.

24          "Which one or both?

25          "**ANSWER:**I have never discussed it with Mr. Furminger

```
1         until after I already did it."

2         This is the overseer, the controller of the conspiracy.

3         He's not called to come in for the Apple gift card.  He's

4    not called on this stuff to say, hey, should we take the

5    marijuana?  He's not put in prison.  He's the guy who said,

6    hey, did you tell Sergeant Furminger about the gift card?  I

7    know I never would.  It must have been X, Y, Z.  Remember

8    that's the guy who said it.  "I know I never would."  Well,

9    same here.  Never discussed it with him.

10        Officer Doherty testified about this, Sergeant Furminger.

11   Let's just talk about it in common sense terms, right.  No one

12   is saying he had knowledge of the marijuana beforehand, so they

13   want to say he had knowledge after the fact.  And they're

14   trying to prove that when Daisy and Jayme got arrested, the two

15   people that were selling the marijuana for Vargas, they want to

16   say he asked for leniency with them.  Right?

17        But, again, two flips of the coin.  Leniency.  These are

18   people working, he knows are working -- are attempting to be

19   signed up as CIs through people on his force.

20        So Officer Doherty:

21            "It's not my recollection that Ian Furminger told me

22            to release them outright.  It's my recollection that

23            he said, 'Instead of a felony is there any way that

24            they could be cited?'"

25        Officer Doherty:
```

1          "**QUESTION:**At the top of your testimony you talked

2    about having four field training officers.  Do you

3    remember that?

4          "**ANSWER:**I do.

5          "**QUESTION:**In your estimation who was the best

6    training officer?

7          "**ANSWER:**Ian Furminger.

8          "**QUESTION:**Why?

9          "**ANSWER:**He was the most proactive.  And we made more

10   arrests in that period than probably all of my field

11   trainers combined."

12   Officer Doherty:

13         "**QUESTION:**So let's say we have a close case."  We

14   give him a hypothetical.  We say, "We have a case where

15   somebody has got some marijuana and it's not really a for

16   sale amount.  We're talking about -- we're not talking

17   about pounds here.  Maybe just enough for Tupperware.  And

18   let's say we have a situation where that same person has

19   got an I.D. card who belongs to a woman, not his wife,

20   with a Mileage Plus card, and he's saying that he found

21   it.  Is this a close call as to whether or not the person

22   should be cited or booked and then taken down to 850

23   Bryant?

24         "**ANSWER:**I call it a weak felony at best.

25         "**QUESTION:**At best?  Meaning that depending on the

```
1        circumstances you might book and arrest a person or you

2        might cite them and release them?"

3    And remember that doesn't mean let them go cite and

4  release.  Just means they don't have to be brought into jail.

5  Just given a court date to show up.

6            "ANSWER:I'd say that's fair.

7            "QUESTION:Now, you mentioned you found a card with

8        Ian Furminger's cell phone number on the back.  When you

9        find a card like that on a person that you're arresting or

10        considering arresting what does the card usually mean to

11        you?

12            "ANSWER:That they've stolen that card.

13            "QUESTION:Talking about the police officer I.D.

14        "Oh."  Because he got confused there.  You remember

15        when Jayme Walsh, "One of the two people that I

16        arrested, he had a police card in his pocket.  It had

17        Sergeant Furminger's phone number written on it.

18            "QUESTION:The business card?

19            "ANSWER:Ian's card.

20            "QUESTION:Now I'm asking you about the business card.

21            "ANSWER:Okay.

22            "QUESTION:Let me start again.

23            "ANSWER:Yes.  I'm sorry, okay.

24            "QUESTION:So we're talking about a business card with

25        Ian Furminger or any other police officer's -- "Right.
```

1           "-- name on it, and cell phone number on the back.

2           "Right."

3           "So in your experience what does that mean?

4           "I would say probably a hundred percent that the

5           person is either a confidential informant or working

6           in some capacity for another police officer.

7           **"QUESTION:**Working as a confidential informant for the

8      San Francisco Police Department?

9           **"ANSWER:**Correct.

10          **"QUESTION:**Did you discuss that topic with Ian

11     Furminger when you called him?

12          **"ANSWER:**Yes.

13          **"QUESTION:**Ian.  And when he told you on the telephone

14     call did you factor that into your decision to release

15     Jayme Walsh rather than ferry him down to 850 Bryant?

16          **"ANSWER:**Yes.

17          "What was that information you relied on?

18          "Ian said words to the effect that he was in the

19          process of signing Mr. Walsh up as an informant.

20          **"QUESTION:**Now, when you had this telephone call with

21     Ian Furminger were you inside Park Station or did you step

22     outside to the parking lot behind it?

23          **"ANSWER:**I was in the parking lot.

24          **"QUESTION:**Why did you step outside to make that call?

25          **"ANSWER:**For privacy and clarity.

1         "QUESTION:Do you agree with me that the configuration

2    of the building at Park Station and the material

3    interferes with cell phone reception?

4         "ANSWER:Cell phone and radio reception, yes.

5         "QUESTION:Is it common for police officers who want

6    to make a call to step outside if they're using a cell

7    phone?

8         "ANSWER:Yes.

9         "QUESTION:It is normal procedure to step outside if

10   you're asking a question about someone possibly being an

11   informant so that other people in the station don't hear?

12        "ANSWER:That would be my practice.

13        "QUESTION:Is that why you stepped outside like that?

14        "ANSWER:Yes.

15        "QUESTION:Is it true that information about

16   confidential informants is not even supposed to be shared

17   with other police officers in the San Francisco Police

18   Department?

19        "ANSWER:That is correct.

20        "QUESTION:Meaning that if one officer is handling an

21   informant that officer is not supposed to tell other

22   officers the identity of his informant?

23        "ANSWER:That would be bad practice.

24        "QUESTION:And that's for the informant's safety, do

25   you agree?

1          "**ANSWER:**First and foremost.

2          "**QUESTION:**You mentioned that Jayme Walsh's profile of

3      events surrounding his arrest were -- I think were a -- a

4      weak felony at best.  Is that what you said?

5          "**ANSWER:**Yes.

6          "Whatever feelings you had about whether you should

7              arrest Jayme Walsh that day, instead of citing him or

8              booking him, were you influenced at all by the fact

9              that he acted like a jerk when you went to arrest

10             him?

11         "**ANSWER:**Mr. Walsh was very aggressive during his

12     whole encounter with me.  That might have played a factor,

13     subconscious factor.  I don't know.  But he was aggressive

14     almost to the point of being combative with me.

15         "**QUESTION:**And usually when somebody fails the

16     attitude test that way it's more likely they are going to

17     get booked and arrested rather than cited?

18         "**ANSWER:**Well, you still have to take the facts of the

19     case into consideration.  That's your primary concern.

20     But not a good way to make friends.

21         "**QUESTION:**Do you have any -- when you think back on

22     what you did that day do you have any qualms or regrets

23     about citing Jayme Walsh out?

24         "**ANSWER:**Absolutely not.

25         "**QUESTION:**If the same thing happened again tomorrow

1      would you do the same thing with that next person under

2      those circumstances?

3          "ANSWER: Well, it would be a case-by-case basis, but I

4      would be open to it for sure."

5      And the only other officer to testify about that event,

6  Officer Brandt.

7          "Officer Brandt, was there anything about the arrest,

8          and I'm talking about the physical arrest of the

9          young man and Daisy Bram, that was unusual from your

10         point of view?

11         "ANSWER: No, sir.

12         "QUESTION: All right.  In terms of how Daisy Bram was

13     handled when she was brought to the station was there

14     anything unusual about the way that was done?

15         "ANSWER: No, sir.

16         "QUESTION: In terms of your booking her and keeping

17     her in custody rather than releasing her with some future

18     court date was there anything unusual about the way that

19     was handled?

20         "ANSWER: Not at all.

21         "QUESTION: Is it fair to say that the way that you

22     handled Daisy Bram and the other individual was by the

23     book?

24         "ANSWER: That's correct."

25     "That's correct."  So nobody put Sergeant Furminger in on

1  stealing the marijuana.  They want to say, well, he had to be

2  in on it because look at the way he tried to deal with the

3  people that got arrested with it.

4      Well, there's no officer that's willing to state -- just

5  like when we had Officer DeFilippo, they couldn't get an

6  officer who actually deals with informants to testify; right?

7      You think Officer DeFilippo is the first-round pick?

8  Second-round pick?  Third-round pick?  He was a free agent;

9  right?  They couldn't find someone who was working in the real

10 world to come testify.

11     Well, for this one they didn't have a choice.  They

12 couldn't find somebody to just read some manual in about how to

13 arrest people.  They had to get the actual arresting officers.

14 And what did they officers tell you?  They wouldn't change

15 anything.  They did nothing wrong.  The same answer you would

16 have got if you got somebody besides Officer DeFilippo to talk

17 about the manual.

18     It's tough work.  They did nothing wrong.  Two flips of

19 the coin.  Bad things were done.  Not by Sergeant Furminger.

20 Where is he?  Where is Sergeant Furminger?

21     So I told you we would talk about the three pieces of

22 evidence.  One was the phone calls and the time.  The other was

23 the witness testimony.  And the last was Mr. Vargas's

24 testimony, which I'm going to leave to Mr. Getz.

25     I just conclude by saying two things.  One, I want to

1    thank you for your service.  You give up a lot.  This is the

2    highest act of citizenship.

3        But let me just remind you of one thing:  The final test

4    lies in the quality of the verdict that you render and whether

5    or not that verdict speaks justice.  Whether or not that

6    verdict speaks justice.

7        We appreciate everything you've given up.  And when you're

8    back there deliberating, I want you to remember the two things

9    we discussed.

10       One, where is Sergeant Furminger?  Where?  We just went

11   through every single witness.  Who says he put him there?  Who?

12       And, two, I want you to remember, because they're going to

13   have a bunch of that on -- I don't know where all their boards

14   are, but a bunch of fancy boards, bunch of colors, a bunch of

15   lines.  But I want you to remember it says in those

16   instructions to keep your common sense.  And I want you to say,

17   these boards, what are they telling you?  They are telling you

18   this is unusual activity, which in and of itself doesn't

19   necessarily mean anything, but they're saying this is unusual

20   activity.  Now, weigh that in.  Weigh that in.

21       He came in on his day off.  He asked for overtime.  It's

22   their duty to show you what's unusual activity.  Then it's your

23   duty to decide if you want to give them any purpose.

24       They didn't show you what's unusual because they couldn't.

25   Because they couldn't.  You have to start pulling other

1  officers that worked for Sergeant Furminger.  You say, oh, he

2  also came in on his day off.  He also got overtime.  He's a

3  police officer.  Two flips of the coin.

4      So thank you.  And I'm going to hand it to Mr. Getz now.

5  Thank you for your time.

6          **THE COURT:**  Ladies and gentlemen of the jury, do you

7  want to stand up and just take a little stretch, and we'll

8  conclude.

9          (Pause)

10         **THE COURT:**  Okay.  Mr. Getz, you may proceed.

11                   **CLOSING ARGUMENT**

12         **MR. GETZ:**  I join Mr. Passaglia in saying to you

13 thank you very much for your attention and your jury service.

14 We can't have the jury trial without you.

15     Think back for a minute to when you got the summons to

16 come here and you knew when you got that summons that there was

17 a chance that you could be a juror in a criminal case.

18     Now, I want you to imagine something, because when you got

19 the summons you had some idea of how court works.  We all have

20 some exposure to it one way or the other.  But I want you to

21 think back and imagine how you would feel if you were told,

22 when you got that summons, that you were going to view a trial,

23 and in this trial each side could pay for their witnesses, each

24 side would pay money for the witnesses to come testify.

25     So it's something of an adversarial system that you're

1   anticipating, but I want you to imagine you were told that one

2   side is going to pay a thousand dollars to this witness to

3   testify, $5,000 to that witness, $10,000, a little couple $500

4   short witnesses, and the other side, the other side is going to

5   pay what money they have for witnesses, and hire all the

6   witnesses they want, and then when we have the trial -- which

7   is what you are participating in -- the witnesses get on the

8   stand and testify for the pay that they got.

9       Now, would any of you have thought that that was a worthy

10  system of justice?  Would any of you have thought that this is

11  the truth-seeking mission in its finest hour?  Would any of you

12  be in any way interested or proud to serve as jurors in a case

13  like that?

14      No.  You would ridicule it.  You would mock that.  It's

15  ridiculous.  But what has happened here in this courtroom?  You

16  have one side, the government, that has paid for a witness.

17  And that's Rey Vargas.  Not with money.  Far more precious than

18  money.  They have offered him leniency.  They have offered him

19  concessions.  They have offered him reductions in his sentence

20  for his testimony.

21      That's what you have, because you will recall that Rey

22  Vargas is the one who was charged so many months ago and said

23  the first lie in this courtroom when he said, "I'm not guilty."

24  That was back in March.  And he maintained that lie over and

25  over and over again.

1        And why?  Why did it come to this point where he is now

2   being sponsored by the very government that prosecuted him?

3   They were pointing the finger at him all those months, and he

4   lied to you on the stand when he said, "I pled guilty because I

5   am guilty."  That was a lie because if that were not so he

6   would have pled guilty a lot earlier.  He would have pled

7   guilty when the case came in.

8        He maintained his innocence, he maintained the lie as the

9   case wended its way through the court until the point where he

10  negotiated a deal.

11       And you will remember that he said he could have pled

12  guilty to all the charges and been sentenced just as he would

13  have been sentenced without his testimony, but, instead, he

14  negotiated a deal.  And the deal he negotiated was concession

15  less time for his testimony.  That was the deal that he made.

16  That was the deal that underscored the underpinnings of his

17  testimony.  He's in a position to get something for his

18  testimony.  He's been bought with freedom, more precious than

19  gold.

20       The lie of the Rey Vargas testimony permeates completely

21  through all of it.  And it started with the question on cross

22  where I said, "Why haven't you been sentenced yet?"  And he

23  lied, and he said, "I don't know."

24       But as soon became apparent, he did know.  He knew why he

25  hasn't been sentenced yet.  He hasn't been sentenced yet

 1  because he hasn't performed.  He hasn't been sentenced yet

 2  because he hasn't done the government's bidding.  He hasn't

 3  been sentenced yet because his negotiation requires his

 4  testimony before he can be sentenced so he gets the benefit of

 5  his deal.

 6       The Rey Vargas that you saw worships lies.  That is his

 7  alter.  That is his ambition.

 8       He said to you he couldn't remember the first time that he

 9  ever committed a crime as a police officer.  That was a total

10  lie.

11       There's certain things in the world, in our common

12  experience, that we always remember:  The first time you ever

13  smoked a cigarette.  The first time you ever sipped a beer.

14  The first time you ever did something that was forbidden.  You

15  always remember that first time.

16       And he said he could not remember the first time he

17  committed a crime when he was wearing a badge.  That was a

18  total lie.  And he took the lie further.  He took the lie

19  further when he said, "I don't even remember how it happened.

20  Somebody put money in my pocket."

21       So it's almost as if someone else drew him in to what was

22  the life of crime.  Someone else caused him to commit the

23  series of crimes that he described he committed.

24       But none of that, none of that can be believed because if

25  you think back to what happened shortly after he became a

 1   police officer, the first Office of Citizen Complaints

 2   investigation, he lied with an elaborate story.  The second

 3   one, he lied with an elaborate story.  Lies are always with

 4   him.  And he cannot tell the difference between the truth and a

 5   lie.

 6        When he is in a situation such as the Apple gift cards,

 7   which Mr. Furminger has nothing to do with, he can draw

 8   Furminger into it by saying something afterwards like, yeah,

 9   you know, he castigated me for not, you know, letting him

10   participate in the shopping spree.

11        That's not the kind of thing that anybody can refute

12   because there's no proof that's being offered.  He's saying

13   that something was said that can never be proven or disproven.

14        You know, one thing I was thinking about is -- and from

15   the very start you've been told the burden of proof is with the

16   government.  You've heard that over and over.  But nobody has

17   told you why the burden of proof is with the government.  No

18   one has given you the reason for that.

19        There are two reasons for that.  One reason is the

20   government is better able to prove a case.  They have more

21   authority.  They have more money.  And I'm not -- I don't mean

22   to oversell that idea to you.

23        I'm not the Federal Public Defender.  John Paul Passaglia,

24   our law clerk, Steve and Janet, we're all well-paid people.

25   But there isn't anybody that has the authority and the strength

1  of the federal government.

2       So you can be sure, in a case like this, where the

3  investigation has been going on since 2009, 2010, if there was

4  any item of evidence that can possibly be picked up and brought

5  to court they would do it because they have the means to do

6  that, more so than any individual can ever defend no matter how

7  wealthy he is.

8       So that's the first thing.  We say the government has the

9  burden of proof because the government is better able to prove

10 it up.

11      And then the second reason, the second reason why the

12 government has the burden is the greatest irony in the law.

13 This is the most pure logic you are ever going to hear.  Ian

14 Furminger can't prove to you that he didn't do something.

15      It doesn't make any difference of what the crime is.  If

16 someone accuses another person of hitting them with a baseball

17 bat, you've got to show a fingerprint on the bat, you've got to

18 show, you know, some bruise, you have to show something.  I

19 can't prove that I didn't hit someone with a baseball bat.  I

20 can't prove that I didn't rob a bank.  The government has to

21 prove this.  Because logic says you can't prove a non-event.

22      And how that translates here is Ian Furminger can't prove

23 to you that he didn't do any of these crimes.  And he doesn't

24 even try.

25      What we want you to do is focus on the evidence you heard

 1  from the witness stand and think about why, why when the case

 2  came to trial is the government in a position where the

 3  evidence is so weak against Furminger it trots out a witness

 4  like Rey Vargas to be a part of the prosecution presentation.

 5      They got a good case against Vargas, let him plead open.

 6  Let him plead open and get sentenced.  Why negotiate for his

 7  testimony?

 8      I join with them, you should look at that plea agreement

 9  when you're in the jury room and see what it says about a

10  negotiated testimonial situation.

11      So the burden of proof is always with the government.  And

12  it never, ever shifts to this table (indicating).

13      And that means that you don't focus on anything but the

14  strength and the integrity of the government's evidence, if you

15  can find it.  You don't have that as to Mr. Furminger because

16  everything he did and all the testimony was as consistent with

17  innocence as it is consistent with guilt.  Where he's in the

18  room and he's searching and someone else takes the money is not

19  a situation where he can prove he did not take the money.

20      You know, every once in a while you see in a newspaper

21  headline, some big story about how somebody was in prison for

22  30 years and then they got out.  You know, we've all seen that.

23  It's common in newspapers and on TV, the stories of people who

24  were wrongfully convicted.

25      If ever there were a case where someone could be

1   wrongfully convicted, this is it because, as Mr. Passaglia

2   explained to you, all of Furminger's actions are consistent

3   with him being innocent.  And if there were a conviction on

4   Furminger in this case, it wouldn't be because the evidence was

5   strong.  It would be because the attorneys didn't do something

6   right.  Furminger knows that he didn't do anything wrong.

7        And in a situation where you have someone released from

8   prison after a long time because the conviction was wrong, in

9   every one of those cases there was a well-meaning prosecutor

10  who is bringing the evidence to court.  And there was a

11  well-meaning defense lawyer who was defending.

12       Let me say that again.  In every case where someone has

13  been wrongfully convicted there were well-meaning attorneys on

14  each side that were litigating that case.  And the irony, the

15  irony is almost always it was a doctor that saved the defendant

16  because 99 percent of those cases are DNA cases.  They're DNA

17  cases where the proof later shows that somebody didn't commit

18  the crime.

19       What about a case like this?  You got a case here where

20  there's never going to be DNA.  There's never going to be a

21  fingerprint.  There's never going to be somebody recanting

22  later and saying that this is so.  There's never going to be a

23  situation like that.

24       Proof beyond a reasonable doubt.  We are so far from that

25  in the Ian Furminger story and the evidence that you heard it's

PROCEEDINGS                                    2013

```
 1  not even close, ladies and gentlemen of the jury.  It's not

 2  even close.

 3       Maybe today, but definitely by tomorrow, you're going to

 4  have a chance to get up and go in that jury room, and you've

 5  got one chance, one chance to get it right.  "Ian Furminger,

 6  not guilty" should be your verdict.  And your verdict and

 7  impact will be everlasting.

 8       Thank you.

 9            THE COURT:  Okay.  Ladies and gentlemen, we're going

10  to take a recess until 2:25.  2:25.  15-minute recess.

11       Remember the admonition given to you.  Don't discuss the

12  case, allow anyone to discuss it with you, form or express any

13  opinion.

14            (Jury out at 2:10 p.m.)

15            THE COURT:  Okay.  Let the record reflect the jury

16  has left.

17       I'd like to show you, I've added some words to the form of

18  verdict.  We haven't discussed it yet, but I think I have to do

19  that for clarity's sake.  Why don't you take a look at it and

20  see if you have any problem.

21       I don't send the indictment in.

22            MR. HEMANN:  So the -- my only thought, Your Honor,

23  is that --

24            THE COURT:  I don't know what to do other than -- I

25  mean, the only -- as to Count One and Count Two, they don't
```

```
 1  even know what Count One is, don't know what Count Two is
 2  absent the indictment.  I don't send the indictment in because
 3  it contains all sorts of things which are not evidence.  So I
 4  at least have to identify what the counts are.
 5          MR. HEMANN:  Can we just chat about it for a moment?
 6          THE COURT:  Yeah, of course.
 7          MR. HEMANN:  Thanks.
 8          THE COURT:  Well, yeah.  Go right ahead.  I don't
 9  know -- if you have some other suggestion I'll be glad to
10  consider it.  But I can't just leave it Count One, Count Two.
11  There's no way to look at Count One and Count Two and know what
12  they are other than the generic wire fraud charge.  And the
13  problem is that they both have the same wire fraud charge.
14  It's not distinguished.
15          MR. HEMANN:  I see what Your Honor is saying.
16          THE COURT:  Do you want to look at the indictment?
17  Give them the indictment, Barbara.  Here, here, here.
18          MR. HEMANN:  I remember.
19          THE COURT:  Yeah, I mean, it's not distinguished.
20  It's not differentiated.
21          MR. HEMANN:  I guess our -- my inclination would be
22  for the Court to then provide some additional instruction to
23  the jury as to -- as to what the distinction is.  I think that
24  there needs to be some explanation of -- that the indictment
25  alleges these wires --
```

PROCEEDINGS 2015

```
 1              THE COURT:  Well, I --

 2              MR. HEMANN:  -- in furtherance of the schemes.

 3              THE COURT:  Okay.  I don't want to start getting into

 4    it all.  But I would just say -- I could say that the charge

 5    was two counts of wire fraud, and it related to a text message

 6    of a particular date.  If you have some helpful language you

 7    can draft it, and I'll read it.

 8         Anyway, that's probably how I'm going to do the form of

 9    verdict.  If you want me to say anything else just give me a

10    written instruction on it.

11              MR. HEMANN:  Okay.

12              THE COURT:  Thank you.

13              MR. HEMANN:  Thank you, Your Honor.

14         (Recess taken from 2:13 to 2:25 p.m.)

15         (The following proceedings were held in open court,

16    outside the presence of the jury:)

17              THE COURT:  Let the record reflect -- well, we don't

18    have all the defendants.  Let's wait for Mr. Furminger.

19         Ms. Caffese, do you know how long you are going to be?

20              MS. CAFFESE:  No more than an hour and 15 minutes.

21    If I am, cut me off.

22              THE COURT:  Okay.

23         (Pause)

24              THE COURT:  Okay.  Bring in the jury --

25              MR. HEMANN:  I just wanted to tell -- we -- we just
```

 1  ask the Court to provide some -- they've not heard the -- I

 2  don't believe that they've heard, up until now, the wire

 3  transmission connected to a particular count.

 4          THE COURT:  Well, that was in the indictment.  If

 5  they haven't -- if they haven't heard then I don't know what to

 6  say.  I mean, are you surprised, since you drafted the

 7  indictment, are you surprised -- there's no way for them to

 8  distinguish between Counts One and Two as an example.

 9          MR. HEMANN:  So I think that it --

10          THE COURT:  Let me ask, let's say they come back

11  guilty on Count One, not guilty on Count Two.  How are we

12  supposed --

13          MR. HEMANN:  I completely agree with the Court's

14  point, 100 percent.  And I think that where --

15          THE COURT:  You can address it in your rebuttal.  You

16  can address the argument.  You can address it, the argument.

17          MR. HEMANN:  Okay.

18          THE COURT:  Okay.  Bring them in.

19          (Jury enters at 2:26 p.m.)

20          THE COURT:  Please be seated.

21      Okay.  Let the record reflect all jurors are present; the

22  parties are present.

23      Ms. Caffese, you may proceed.

24                      **CLOSING ARGUMENT**

25          MS. CAFFESE:  Thank you, Your Honor.

1        Good afternoon, ladies and gentlemen.  Thank you for the

2   attention and respect that you have given Officer Robles and

3   me, the other counsel, the Court, and, obviously, the witnesses

4   who've testified in this trial.

5        There is an immense amount of material you have been given

6   throughout this trial, and there's a lot of material to go

7   through.  And I, obviously, am not going to review all of it,

8   but, please, I'm the last one standing so just hang with me for

9   a little bit longer.

10       So what I intend to do is I intend to, first, review some

11  of the jury instructions that I believe are most relevant to

12  the testimony of two special circumstances witnesses.  And

13  that's Cesar Hernandez and Rey Vargas.

14       Before I do that, I think it's important to review the

15  Presumption of Innocence and the Reasonable Doubt instruction.

16       And we talked a little bit earlier about the rule of law.

17  I think we all agree, we all agree that the rule of law is

18  essential and it permeates this trial.  And those principles

19  that govern our American democracy can't leave this courtroom.

20       And that's why I want to start out my presentation talking

21  about the presumption of innocence, one of the first things the

22  Court mentioned to you when you came in to be jurors and you

23  took the oath.  And the Judge said that Officer Robles is

24  presumed innocent unless and until the government proves he is

25  guilty beyond a reasonable doubt.

1          That's the law.  That's the rule of law.

2          Officer Robles does not have to testify.  The government

3  has the burden of proving each and every element of the charges

4  they have elected to indict Officer Robles on.

5          Nothing I haven't done or that I've done takes the place

6  or removes that burden that is on this table throughout this

7  trial (indicating).

8          Reasonable Doubt, that's the next instruction I want to

9  emphasize here.  And I want to repeat it.  Proof beyond a

10 reasonable doubt is proof that leaves you firmly convinced the

11 defendant is guilty.  It is not required the government proves

12 its case beyond all possible doubt, but a reasonable doubt is a

13 doubt based upon reason and common sense.  And it is not based

14 on purely speculation.  It may arise from a careful and

15 impartial consideration of all of the evidence or from lack of

16 the evidence.

17         You know, counsel for the government talked a lot about

18 corroboration and how Hernandez's testimony was corroborated.

19 It was corroborated in part -- not really at all -- essentially

20 by Vargas's testimony.  And so now what I want to do is talk

21 about Hernandez's testimony.

22         Hernandez is a special circumstances witness.  And what

23 His Honor instructed you earlier on this morning, he said that

24 you should examine the testimony of Cesar Hernandez with

25 greater caution than that of other witnesses.  And that's the

CLOSING ARGUMENT / CAFFESE                                    2019

1    same -- that's the same rule, the same rule of law that applies

2    to Rey Vargas.  You must examine his testimony, and for obvious

3    reasons, with greater caution.

4         Let's look, Dalida, at the next slide.

5              (Document displayed.)

6         **MS. CAFFESE:**  You've heard that Cesar Hernandez is a

7    witness who received immunity.  He received, in exchange for

8    his testimony, a promise by the government that he's not going

9    to be prosecuted for certain crimes.  He also received benefits

10   and compensation.  And you may consider how all of this has

11   influenced his testimony when you deliberate this case.

12        Can we go to the next slide, Dalida.

13             (Document displayed.)

14        **MS. CAFFESE:**  Now, Rey Vargas is another special

15   circumstance witness.  And I'm going to talk to you in more

16   detail about Rey Vargas's testimony.

17        But what makes Cesar Hernandez so special is that the

18   compensation he received, ladies and gentlemen, was not just

19   travel expenses, not just some expenses to cover lunches or

20   breakfasts or the times that -- the several times, the 10, 20,

21   15 times that he briefed with the government.  He received,

22   Cesar Hernandez received over $40,000.  $40,000.

23        And other counsel have talked about how his testimony was

24   essentially purchased.  And it was purchased by the government

25   because there were other witnesses, Cesar -- excuse me, Sergio

 1  Sanchez, for example, who was paid nothing for his testimony.

 2  Nothing.  The government did not have to buy Sergio Sanchez's

 3  testimony.

 4      Cesar Hernandez wasn't only given over $40,000, he was

 5  also given immigration status.  He was actually given

 6  immigration status by the government for his testimony.

 7      He had a choice.  He had a choice to do honest work in

 8  this country.  He lived in several different states.  And he

 9  talked about the different jobs he had making money on honest

10  work, honest work that a lot of people in this country do.

11      But he chose to do another type of work.  He chose to sell

12  drugs.  He chose to sell heroin, cocaine.  He even bragged

13  about this on the witness stand.  And, you know, earlier on,

14  when counsel talked about how he was charming, you know, how he

15  was charming and funny -- you know, I know we chuckled

16  sometimes during Hernandez's testimony.  But there was nothing

17  funny about this, ladies and gentlemen.

18      There was nothing funny about a man who brags about

19  selling and moving kilos of cocaine.  There's nothing funny

20  about that.  There's nothing funny about bragging about how he

21  meets all his cartel bosses in state prison and learns how to

22  move the other drugs; and about how he had so much money; and

23  he was this big guy who was so important when he would party

24  with his friends.  It's not funny.  Nothing funny about that.

25      All you have to do is take a look at some of the people

1  who testified, who obviously had chemical addiction problems,

2  who were addicted to the heroin, who were addicted to the

3  cocaine.  The Michael Vices.  You know, even the Ian Elliots.

4  There's nothing funny about that.

5      And that's the kind of witness that our government, your

6  government, my government, Officer Robles's government, says

7  you can live in the United States of America, when there are

8  thousands of people trying to get to this country -- and those

9  of us who have come from immigrants and people who have come to

10 this country, who've worked hard so they could go to school, go

11 to law school, become police officers -- you say no, you don't

12 have to do it the honest way; you can cheat, you can sell

13 drugs, and our government will give you status.  That's Cesar

14 Hernandez.

15     Let's talk about Rey Vargas.  You know -- actually, go

16 back one more, Dalida, because there was something else that I

17 wanted to mention before I went on.

18          (Document displayed.)

19          **MS. CAFFESE:**  And that is, is Rey Vargas and, you

20 know, Cesar Hernandez have a special relationship.  And they

21 not only have a professional relationship, they have a

22 relationship where they're friends.

23     You know, the two government witnesses here, the key

24 witnesses for the government are two people who played video

25 games together.  They played video games together.  They go to

1  barbecues together.

2      They helped each other -- well, I should say, Hernandez

3  testified that he helped Vargas move on two occasions.  And on

4  one of those occasions Hernandez talks about how Vargas hit a

5  car with the U-Haul and didn't stop and kept going.  Vargas

6  apparently denied it.  But these are the two guys who are

7  friends.

8      Hernandez is not just a CI, a confidential informant.

9  Ladies and gentlemen, we know that that's what, you know, law

10  enforcement uses sometimes to fight bigger crime.  There's

11  nothing wrong about that.  And, obviously, we need to do that

12  and we saw how if they're properly used.

13      But Vargas and Hernandez are very similar people.  And

14  it's interesting they are the two witnesses that try to

15  corroborate each other's testimony, but they don't do it very

16  well.  And I'll expand on that when I get to the relevant

17  incidents.

18      But Cesar Hernandez also claimed that Officer Robles

19  forced him to become a CI.  And that was after the

20  December 2008 arrest where Hernandez says he was arrested for

21  no reason, arrested, and not because he had a false name at the

22  SRO.  You know we heard testimony how law enforcement sometimes

23  goes to the SROs to make sure that the people renting the rooms

24  aren't, you know, there registered under false names.  And, you

25  know, actually there are good people who live in those places.

 1  Not everybody is a drug dealer.  So the reason why law

 2  enforcement sometimes go to these places is because the

 3  managers complain about the drug dealers selling the dope, like

 4  the Hernandezes of the world, and want them out.

 5      Hernandez denies that he had any controlled substance, the

 6  methamphetamine that they found there.  He denies and talks

 7  about a crack pipe, the crack pipe that he later, when I asked

 8  him about, Well, you told Inspector Keller that there was a

 9  crack pipe.  He said, No, the crack pipe was in the mattress; I

10  think it belonged to a prior tenant.

11      Well, you know, ladies and gentlemen, there would have

12  been an easy way to corroborate Cesar Hernandez's testimony.

13      And you could say, oh, Teresa you should have done that.

14  You can tell me after this trial all the things I should have

15  done.  But the government could have called the manager to tell

16  you that Cesar Hernandez wasn't there because he had falsely

17  put another name.  The manager could have come and corroborated

18  Cesar Hernandez's testimony.

19      And other officers, at least two other officers -- I think

20  Hernandez said there were two female officers.  One who

21  transported him.  But there was at least Officer Murphy and

22  there was Officer Zachos.  Where are those two officers to

23  testify that that was somehow an illegal arrest?

24      Counsel for Mr. Furminger talked about the burden of proof

25  and the -- the resources that our government has available to

1   them.  They investigated this case for three years.  They've

2   got all the resources available to them to do what they needed

3   to do if they really wanted to corroborate special

4   circumstances witness Cesar Hernandez.  They chose not to.  And

5   that is their choice.

6       Just as Cesar Hernandez chose to be a CI.  Officer Robles

7   didn't force him to do anything.  He chose to do dishonest

8   work.  He chose leave being a CI.  Remember when he talked

9   about the sabbatical that he went on for a few months, from

10  June to October, and he moved outside the city?  Then he came

11  back.

12      Did Officer Robles force him to come back and continue to

13  work with his buddy Vargas?  Did he force him to come back?

14  Officers forced Cesar Hernandez to do nothing.

15      Quite frankly, if there was any testimony that the

16  government could have provided to prove any of that you would

17  have heard it from Zachos, Murphy, Brooks, Bucy, from Grenair,

18  from Kenney, all the other police officers that were referred

19  to during the course of this trial.

20      The other thing that's important, ladies and gentlemen, is

21  that Cesar Hernandez is the only CI that is making these

22  claims.  And I suggest that they were false claims that Officer

23  Robles forced him to be a CI and that Officer Robles gave him

24  money and drugs and did all that.

25      We had many CIs that were referred to during the course of

1    this trial.  Shahin Ayari, the individual known as The Shah, he

2    was referred to.  Why didn't the government call The Shah as a

3    witness?  How about Daisy Bram, the other CI?  How about

4    Jayme Walsh?  How about any other CI that Officer Robles worked

5    with in the mid 2000s and 2008 and 2009?  How about anybody who

6    could have confirmed or corroborated what Cesar Hernandez said?

7    Why didn't the government call those other CIs?  Why?  Because

8    it didn't happen, I would suggest to you, as Cesar Hernandez

9    claimed it happened.

10        I do, now, want to go on to Vargas.

11        Now, Officer Vargas -- get back to that a little bit later

12   here.  Officer Vargas is, once again, one of the special

13   circumstance witnesses.  And, once again, you can consider the

14   promises that he was given by the government.

15        And it is true that his plea agreement is not evidence,

16   but you obviously can consider that he was given certain

17   promises in determining whether or not to believe his testimony

18   or not.  And you may consider all of these factors in

19   determining whether or not his testimony was influenced.  That

20   is the rule of law.  And there's a reason for that because,

21   obviously, we know that his testimony was suspect.  His

22   questionable testimony.

23        Can you go to the next slide, Dalida.

24             (Document displayed.)

25             **MS. CAFFESE:**  I pulled out a couple of portions of

1  the transcript which I thought was important to emphasize how

2  Vargas wants to cooperate because of his desire to get

3  leniency.  And you don't have to go to be a rocket scientist to

4  figure that out.

5      He could have a pled guilty, accepted responsibility for

6  his conduct, and accepted the due sentence that His Honor will

7  dispense.  He could have done that.  Right?  It's done all the

8  time in these courtrooms.

9      But, instead, what he did is he conditioned his plea, he

10  conditioned his plea on getting leniency.  And I would suggest

11  to you that is corruption with a capital C.  That is corruption

12  with a capital C.

13          **"QUESTION:**And do you think there's a chance that

14          being truthful, in their view" -- meaning the government's

15          view -- "means your testimony tracks their theory of the

16          case?  Do you happen to think that's a possibility here?"

17  Vargas:

18          "It could be a possibility, yes.

19          **"QUESTION:**It could be.  Do you think it's more likely

20          than not that their idea of truthfulness is you tracking

21          their narrative of this case?"

22  Vargas:

23          "I think a large component of that is also

24          corroborating the other testimonies that have already

25          come before this.

1            "**QUESTION:** Okay.  So in terms of your cooperation

2       agreement, you can say a lot here that's true, but one

3       little lie might get lost in the shuffle.  Do you agree

4       with that, that that's possible?"

5       Vargas:

6            "Anything is possible, sure."

7       You know I pulled that out of the transcript to make this

8  point:  What he does is he tailors his testimony, he tailors

9  his testimony to the government's narrative.  And what he is

10 doing in this -- in this statement, in this testimony is he is

11 admitting to that, essentially.  He's admitting to that.

12      He had access to all of the same information, all of the

13 police reports, all of the toll records, all of that, when he

14 became a defendant.  And, obviously, he reviewed that with his

15 attorney and he reviewed it again in his debriefings.  He had

16 access to all of that.

17      I said it in my opening, but the case with Officer Robles

18 really began when Officer Vargas decided to plead guilty on the

19 condition that he receive leniency, on October 20th, 21st, of

20 this year, a couple of weeks right before we were to start jury

21 trial in this case.

22      I think I have some more slides I want to focus on.

23 Again, the rule of law, Impeachment Evidence.  And this relates

24 to Reynaldo Vargas, the government's key witness.

25      The Court has instructed you that he was impeached with

1   three things.  And I'm going to suggest a fourth in a second.

2   A prior inconsistent statement; falsehoods by omission in

3   police reports.

4        Incidentally, remember when he said the thing he loved

5   most about being a police officer was writing reports, he was

6   so good at it?  I mean, I'm sitting there and I'm thinking, oh,

7   my God, what does he like about it?  He likes falsifying police

8   reports?  Even when somebody could go to state prison he loves

9   doing that?  What kind of person does that?

10       There are some things that have come out in this trial I

11  don't even know how to respond to.  It's just crazy to some

12  extent.

13       And, in fact, one of the things he said when he was first

14  debriefed by the government was that, "If it's in my report it

15  must be true because I always write accurate reports."

16       I mean, you know, the lies just constantly, constantly,

17  constantly.  Quite frankly, it's somewhat rare that you have so

18  many inconsistencies and lies in a criminal trial like this.

19  It really, really is.

20       The other thing that he was impeached about, false

21  statements to the Office of Citizen Complaints.  Well, that's

22  one thing he actually admitted to.  And, of course, he admitted

23  to that to save his job for and all the interdisciplinary

24  purposes.

25       Can you give me the next slide.

1              (Document displayed.)

2          **MS. CAFFESE:**  So I know counsel reviewed this about

3    the credibility of witnesses.  And you can use this instruction

4    to determine whether or not you believe Vargas or Hernandez.

5    And what I have here in red:  You may believe everything a

6    witness says, or part of it, or none of it.

7          That's what you can do as jurors.

8          The other ...

9              (Document displayed.)

10         **MS. CAFFESE:**  What is important is how believable the

11   witnesses were and how much weight you think their testimony

12   deserves.

13         Go to the next one, please.

14             (Document displayed.)

15         **MS. CAFFESE:**  Now, in weighing Vargas's

16   credibility -- and what I did is, obviously, there are other

17   factors here, but I kind of highlighted the ones I think are

18   relevant to your evaluation of the testimony.  Vargas had the

19   opportunity and ability to see or hear or know, or not know,

20   not only what he testified to, but what all of the other

21   government's witnesses testified to.  He had access to all of

22   that.

23         He did, in fact, have a selective memory.  Remember the

24   Zaychenko incident?  That was the one, I believe, happened in

25   October 2009.  He didn't even remember arresting the guy.  That

1    was the one where he arrested him, the man then made a report

2    saying that his house was burglarized, and Vargas actually

3    wrote a police report about the burglary he perpetrated

4    himself.

5         His manner while testifying was, in my opinion -- and this

6    is our evaluation -- suggest was cold, lacked all traces of

7    emotion.  And there was certainly no remorse.

8         When I asked him, When you apologized in your plea

9    agreement to the citizens of San Francisco and the police

10   department, did you apologize to Andrew Byrd?  Did you

11   apologize to Michael Vice?  Did you apologize to Kelsey Stewart

12   for giving her heroin?  Did you apologize to any of those

13   people?  The answer was no.  That's how remorseful he was.

14        I think that's 14.  Let's see here.

15        So let's talk a little bit about how believable Vargas's

16   testimony is.  Now, he says that he learned how this was done

17   when Officer Robles gave him some money one day after an

18   arrest, Officer Robles put some money in his jacket pocket.

19        Now, keep in mind that Vargas testified and the record was

20   pretty clear that Vargas and Officer Robles had never worked

21   together.  They weren't friends.  2008, 2007, 2006, 2005, there

22   was no testimony that Officer Robles ever worked or even knew

23   Vargas.  And then just like a month after they're assigned

24   together Officer Robles would just give Vargas, this junior

25   officer some money, a wad of money and say, hey, guy, this is

1  how it's done, at an unknown location, unknown time, and that's

2  where his life, his -- his life of crime pretty much started,

3  according to Vargas, which, of course, is not true because we

4  know that that started way before, way before Vargas ever knew

5  Officer Robles.  He lied again right there.

6      And he said -- well, I've already gone over the OCC and

7  the time cards which, incidentally, were inaccurate.  They were

8  just inaccurate.  They weren't falsified, he was just wrong.

9  Even though, apparently, for some period of time he was

10 actually working in the records department it was just

11 inaccurate.  All right.  Fine.

12     So let's talk about the things that he, Vargas, lied

13 about.  He lied about giving false testimony in the Andrew Byrd

14 case at the preliminary hearing.

15     He stole -- I'll go through this in more detail, but the

16 highlights is that he stole actual gift cards from Joseph

17 Furlong and Kelsey Stewart.

18     He claims to have stolen 30,000 from the Newark house, but

19 there was actually no evidence that any money was actually

20 stolen from that house.  He stole the stereo speakers from Gene

21 Zaychenko.  He stole cash from Burgess Crosby and Crystal

22 Ponzer.  He stole marijuana from the UPS box.  He falsified

23 police reports and search warrant affidavits.

24     And, you know, what's interesting is after Officer Robles

25 leaves plainclothes January 2010, he continues to steal.  And

1  the highlights of that are essentially the February 20th, 2010,

2  the Scotty Krausnik, stole the laptops from this gentleman.

3  And then there was another incident in August of 2010, where he

4  steals more from Ever Cen and Jose Flores.  And then, of

5  course, there are the false CI payments that I showed you.  And

6  when he's shown on redirect examination by counsel, well, you

7  know, Cesar -- that's where he had given the false CI payment

8  to Hernandez.  And -- well, actually, I should say he gave the

9  payment to another CI and claimed it was Hernandez, and

10 Hernandez had written "Not my signature."

11      Well, what's very interesting -- and I hate to use the

12 word -- I'm not going to use the word, actually.  But it's

13 interesting that before Vargas became a witness the government

14 apparently felt very comfortable, very comfortable using that

15 evidence to say that Vargas was falsifying the CI payments.

16      And now, after Vargas becomes, you know, one of their

17 witnesses, the fact that Cesar Hernandez says "That's not my

18 signature," that's false, false, false, they come and they say

19 to you, they say to you, oh, well, I just made a mistake.  And

20 the reason why I put -- Vargas saying -- I put Hernandez CI's

21 number is because Shahin didn't have a number.  Well, then why

22 not just put "not assigned"?

23      But the part that really is improper here is to change

24 your theory of the case depending upon where you are in the

25 proceeding.  That's just not right.  That's not -- that's not

 1   the rule of law.  It's not the rule of law.

 2       I want to -- all right.  The other thing that I think is

 3   important to highlight here, when you're talking about common

 4   sense and evaluating the testimony here, is that Officer

 5   Robles, prior to 2008, no evidence, no evidence of any improper

 6   conduct with CIs.  No crimes committed.  No suggestion he ever

 7   did anything wrong in any of those times in which he was

 8   working.

 9       I went through a lot of the work history, a lot of the

10   times when he was working in 2008, when Officer Zachos was his

11   partner.  And where is Officer Zachos?  Where is he?  Because

12   you know there was never any misconduct.  And in 2009,

13   miraculously, the misconduct as it relates to Officer Robles

14   ceases, and yet it continues to Vargas.

15       If there was some conspiracy, some plan that Officer

16   Robles was involved in, I would suggest to you, ladies and

17   gentlemen, that you would have heard that Vargas was sharing

18   the proceeds after Officer Robles left plainclothes.  But

19   there's no evidence of that.  And there's no evidence of that

20   because Officer Robles is not only not guilty, he's actually

21   innocent of these charges.

22       Now, for 23 years Officer Robles worked in the police

23   department.  And there's no evidence the government presented

24   to you that he ever committed any of the type of misconduct and

25   the inappropriate relationships in using confidential

1  informants.  And we know that because we know that through

2  Sergio Sanchez.  We know that because the government didn't

3  produce Daisy Bram.  Or Daisy Bram apparently had another kind

4  of relationship with Vargas.  But we know that because the

5  government didn't produce any evidence which would have, in

6  fact, corroborated.

7       They talked a lot about corroboration.  But information is

8  not evidence.  Information -- you've got a lot of information

9  in this case.  But really, ladies and gentlemen, you don't have

10 a whole lot of evidence against Officer Robles.  You don't have

11 evidence.  You have information, but not evidence.

12      You know, I -- kind of on the side here, but I really did

13 want to mention it because the government talks about how their

14 stories were so contrived.

15      Let's take, for example, this jewelry after the Guerrero

16 incident, aka Pedro Rojas.  You know, Hernandez doesn't mention

17 any jewelry at all being taken.  And they made a big ole thing

18 about how Vargas says that Hernandez made a big idea about they

19 missed the jewelry, you got to go back and you got to get the

20 jewelry.

21      Well, Hernandez, that was such a big part of their case

22 here, but you never heard any, any testimony from Hernandez

23 that there was some jewelry that apparently was missed.

24      The other thing that was kind of somewhat contradictory,

25 this whole thing about Duanes Moreno, the whole heroin thing.

 1   Heroin.  Can't even say the word.  Heroin.  Right.  Cesar talks

 2   about how Robles gave -- basically, Cesar says that he went to

 3   buy heroin, right, on credit from this guy because, supposedly,

 4   they wanted to go and follow Duanes Moreno to see where he

 5   stashes his money.

 6        And I was trying to make sense of this because if they

 7   really just wanted to follow this guy to see where he stashes

 8   his money, buries his money, why don't you just do that?  And

 9   why would you go buy heroin from Duanes on credit?

10        And then Hernandez says, well, then Officer Robles gives

11   me money to give back to Duanes.  And then, you know, Vargas

12   testifies about something completely different.  And then they

13   go on this field trip to try to find where the heroin is -- is,

14   you know, is buried inside of Golden Gate Park, right.  And we

15   go through this crazy story between the two of them.

16        I mean, and those are just a couple -- oh, the other one,

17   the other one which I have to mention is this Frank's Auto Body

18   where some night in November of 2009, apparently, Officer

19   Robles announces in the presence of a lot of other police

20   officers that he's going to go and carjack or rob -- rob

21   Frank's Auto Body because he's got a lot of open cash.  And

22   Cesar is very upset because Officer Robles has announced this

23   plan in front of all these other officers.  And Vargas doesn't

24   even talk about this crazy plan at all.

25        And, I guess, the question is, if it's corroboration that

1    that really happened then where are all the other police

2    officers?  Because that would be corroboration.  It would be

3    corroboration if other police officers were present and heard

4    they would have come in here and testified.  We don't have any

5    of that.

6         And the other thing about the North Beach incident, this

7    was the incident where -- incidentally, which -- I said I

8    wouldn't go through all of them, but this is the incident where

9    Hernandez says that -- and it was Robles and Vargas, and Vargas

10   doesn't even mention this, doesn't even remember this incident.

11   They go to this 519 Broadway.  And Robles is essentially, on

12   one part of the testimony, Spiderman climbing through the

13   window at the front of the building, and there's this guy

14   cleaning and -- I don't know, and that's why he remembers it.

15   And then he said, well, maybe he went to the front door, or

16   whatever door.  And apparently, you know, Officer Robles took

17   this -- these bindles and gave them to Hernandez.  Now, Vargas

18   doesn't testify, doesn't even remember that incident.  That's

19   how corroborating the two are with their testimonies.

20        Even more importantly, on the witness stand during

21   Agent Flores's testimony I asked her -- I didn't ask her.

22   Actually, counsel, Mr. Villazor, brought it out.  519 Broadway.

23   519 Broadway didn't exist.  They actually went out there during

24   the course of this trial to figure out and find out 519 didn't

25   actually exist.  It was 517.  That 519, the address that Cesar

1  Hernandez was so sure that Officer Robles went to, climbed

2  through the window spiderman, existed, they went to check, and

3  they said 517 doesn't exist.  It doesn't exist because that

4  whole incident didn't exist.

5      And the whole theory about planning this Frank's Auto Body

6  robbery never existed.  It never happened.

7      Now, there was one -- the next slide here about the

8  Andrew Byrd.

9          (Document displayed.)

10         **MS. CAFFESE:**  This is really one of the, perhaps,

11  disturbing parts of Vargas's whole, whole testimony.  And

12  his -- the disturbing parts of him being a witness for our/your

13  government is that he lied at the preliminary hearing of a man

14  who was charged with a felony.  And he was asked:

15          "**QUESTION:**And you lied under oath in a felony case,

16      dealing with that case that you were involved with.  Is

17      that right?"

18      Vargas:

19          "If it pertains to the entry of the -- of the unit,

20          then yes, I probably -- because I don't think I ever

21          mentioned that we probably used a key.

22          "**QUESTION:**Well, how about if it pertains to stealing

23      money from Andrew Byrd?"

24      Vargas:

25          "Then by omission, yes, I lied.  Yes, I

1          did."

2      If you lie by omission then that's okay, according to

3 Vargas.

4      And, incidentally, that was the same incident in which the

5 person who steals is Vargas.  No one else steals because

6 remember Andrew Byrd didn't say that Officer Robles took any

7 money out of his wallet.  He was looking for identification.

8      But what's very interesting about that is that when

9 Andrew Byrd goes back to his house afterwards that's when he

10 notices money is missing.  It's, essentially, pretty much the

11 same pattern Vargas always does.  He goes back and then he

12 probably steals.  But one thing that we know for sure is

13 Officer Vargas [sic] (indicating towards Mr. Robles) didn't

14 steal any money.

15      One thing I want to talk about is the tailoring of

16 Vargas's testimony.  You know, Vargas is an insider.  And, you

17 know, I spoke to you a little earlier about why is it that

18 this -- this misconduct and crime didn't happen in '08, with

19 Officer Vargas, nor was there any evidence.  It was only

20 through Vargas's testimony in '08.

21      Well, because Vargas is an insider.  For that year he's

22 working for -- with, excuse me, Officer Robles.  He knows a lot

23 about Officer Robles.  He knows, when he becomes a witness, a

24 lot about the government's case and their evidence.

25      But just think about it.  You know, you have colleagues

1  probably your colleagues know a lot more about what you do in

2  your lives than sometimes your husband, your wife, your

3  partner, your significant other.  You know, that's probably the

4  case for a lot of us.  And I'll include myself in that

5  situation.

6      But you talk, especially when you're working 10-hour

7  shifts with somebody.  They know the intimate details.  And

8  Vargas knew, he knew about Officer Robles's relationship/affair

9  with Bernadette Melvin.  He knew about Officer Robles's

10 interests in bike riding.  He knew a lot about Officer Robles.

11 And that's why we have, in 2009, these allegations that Vargas

12 makes about Officer Robles.  But we don't have them in other

13 time periods when Vargas is not working, is not working with

14 Officer Robles.  He's an insider and he tries to tailor his

15 testimony to the narrative.

16     Now -- can you go ...

17         (Document displayed.)

18     **MS. CAFFESE:**  Yeah.

19     This is now where I really do want to go through the --

20 some of the specific incidents.  And some of them have been

21 talked about, but some of them, ladies and gentlemen, I just

22 really have to talk about a little bit more as it relates to

23 Officer Robles for obvious reasons.

24     You know, Kelsey, the Kelsey Stewart arrest.  Who in that

25 case admits to stealing the Apple cards?  It's Vargas.  Who

1    checked the balances?

2       Vargas:

3            "I was the person that picked the card and took the

4            time to then see if there was a balance on it.  And

5            so I think that he" -- Robles -- "kind of would have

6            glossed over that, where I did not."

7       Who followed up with Kelsey for leads about Furlong's

8    property?  Vargas.

9       Who pursued a predatory romantic relationship with Kelsey

10   Stewart that involved dining out on a couple of occasions and,

11   counsel mentioned, over 750 phone calls?  Vargas.

12      And whose name is on the receipt?  Vargas.

13      You know, Vargas has inappropriate relationships with his

14   CIs.  He has inappropriate relationships with Kelsey Stewart.

15      Let's look at the next slide.

16      And what's really disturbing about this is that on

17   cross-examination I asked Vargas about the purchase receipt.

18   He claims that Officer Robles was with him and that Officer

19   Robles purchased the Nano iPod.

20      I showed him the receipt.  And the receipt was a single

21   purchase of two devices.  It was proof.  It's physical

22   evidence.  That's corroboration, physical evidence that can't

23   be cross-examined like the lie was.

24      When you've got physical evidence it speaks for itself.

25   And this piece of evidence shows you there was one transaction,

1    both purchased by Vargas.

2         There's a second page to that receipt.  And it shows, once

3    again, it was at 4:12 p.m. that Vargas bought it.  There were

4    no two separate purchases.  No separate purchases.  And he

5    denied it.  Even when I showed it to him, he denied it.

6         The timeline of this particular event is important because

7    what it shows is that Vargas, and Vargas alone, went downtown.

8    We know that he bought the two devices at 4:12 p.m.  We know

9    the arrest of Kelsey Stewart happened between 10:00 and 12:30

10   p.m.  We also know that Kelsey Stewart, by her testimony, made

11   two calls to Walnut Creek, right, to her employer at 1:24 and

12   about 2:39 p.m.  And she says Vargas, not Robles, took her back

13   to the hotel and gave her heroin.  Vargas.  It wasn't Robles

14   who took her back to the hotel.  So now we're back to the

15   middle of the afternoon.  Remember, 4:12.

16        I suggest to you, ladies and gentlemen, that Vargas didn't

17   have time to go back to Mission Station, pick up Officer

18   Robles, drive back to downtown, Union Square, and buy the two

19   devices.  It took some time, obviously, to drive to the

20   Marilyn -- the Marilyn Hotel at 2:30, whatever it was.  It was

21   about 2:30 p.m., 3 o'clock.  And then he obviously has to drive

22   to Union Square.  He parked.  Well, he probably parked

23   illegally, but even still.  And then it takes some time to pick

24   out the products.

25        Now, can we go to the next one before we -- the actual

 1   evidence about the gift card here implicates Vargas, and Vargas

 2   only.  We know that he stole.  He admitted to that.

 3       And what the government has failed to prove is that

 4   Officer Robles took the gift cards, knew they were stolen, or

 5   even was present at the store.

 6       Now, there is a piece of evidence that the government

 7   presented to you through Bernadette Melvin that somehow because

 8   the Nano iPod got -- was given to Ms. Melvin that somehow that

 9   proves knowledge and intent and conspiracy on Officer Robles's

10   part.

11       But the part that was left out of that, ladies and

12   gentlemen, is that that Nano iPod was given to Ms. Melvin in

13   September of 2009, six months after it was purchased by Vargas.

14   And it was in the same condition, same packaging, same box.

15   And it was given to her.  You remember Ms. Melvin said, yeah,

16   Officer Robles would always kid her because at her cafe the CDs

17   skip, and he gave her a gift.  She said, I knew I received it

18   when it was registered in September because I would have

19   registered it within 24 hours.

20       Is it just as reasonable, ladies and gentlemen, to

21   conclude that Officer Robles purchased that from Vargas?  Why

22   would he have waited six months, six months, if he actually

23   bought it -- which we know he didn't buy it -- and keep it in

24   its original box, new condition, in its plastic, if it's true

25   that Officer Robles bought that Nano iPod?

```
1         And we know he didn't because the proof is in the receipt.
2    And that is proof to you beyond a reasonable doubt that Officer
3    Robles did not steal because we know that -- that was Vargas's
4    testimony -- nor purchased that because that is the proof, the
5    receipt and the registration.
6         Now, I want to go on to the next one, which was the Newark
7    incident.  And this incident really does show you how much of
8    an insider Vargas is.
9         What do we know about Newark?  This is Vargas's story:
10   Quote, I went into the backyard alone.  I located soft earth
11   and a shovel.  I dug up $30,000.
12        Vargas told the FBI he put the 30,000 in the trunk.  But
13   he testified at trial he put it in the backseat and counted it
14   on the drive back.
15        He testified later he was -- later that Furminger and
16   Robles were surprised by the money.
17        The facts:  Officer Robles called Mike Heckman from the
18   Newark P.D. to come to the scene.  And, of course, when Officer
19   Robles is going to scenes to steal money, commit crimes, and
20   participate in conspiracies, he always calls the jurisdiction
21   he's going to, right, because we want to make sure we have
22   witnesses.
23        So I suggest to you, ladies and gentlemen, that there was
24   nothing inappropriate in any of this that Officer Robles did.
25   If there was any money taken, it wasn't taken by Officer
```

 1  Robles.

 2       And that, in fact, is proven because you heard the

 3  testimony of Officer Heckman.  Obviously, why would Officer

 4  Robles, if he were going to steal money or do anything and go

 5  to this house where he thought there was going to be lots of

 6  money to take, call another police officer, other police

 7  officers to the jurisdiction that he responded to?

 8       It's reasonable doubt.  You can use your common sense.

 9  That's part of what the process is about.  And that's what the

10  law instructs you to do.

11       The other thing about it, which is very interesting, is

12  that there was money booked.  Actually, the person who booked

13  the money was Officer Robles.  The person who wrote that report

14  was Officer Robles.  He wrote the report.  And he booked in

15  $3,120.

16       Well, interesting, let's add a zero to that and we've got

17  $30,000.  How convenient that is.  It's just an even 30,000

18  that can be divided between three people.  How convenient is

19  that?

20       Where is the evidence, aside from this frame that we've

21  paraded into the courtroom?  What else did Vargas spend his

22  money on?  Convenient that it was the Pinarello Dogma.  Where

23  is the evidence of what Vargas bought with his $10,000?

24       The other fact -- and this is a fact.  Other than Vargas's

25  testimony about digging up the $30,000, there is no testimony,

1    no corroboration that $30,000 was ever at that house.  None.

2        And it seems a little suspect that there would be a

3    shovel.  Remember they made a big deal about the DEA and about

4    these big drug dealers, right, and they're going to bury their

5    dope with the money in a hole, and there happens to be a shovel

6    where you're just going to dig up and find $30,000 in the

7    ground.

8        There was no evidence, no corroborating evidence that

9    there was ever even $30,000 there.  And I would suggest to you

10   that that was probably, if nothing else, a fiction of Vargas's

11   imagination.

12       Now, the other thing that's interesting about Newark --

13   and I tell you that this is interesting because it does show

14   you how Vargas does tailor his testimony to the government's

15   narrative.  I mentioned a little earlier that Vargas knew --

16   that was a portion of the testimony where he was really excited

17   about the bicycle, and he bought it, he was exuberant about how

18   much Officer Robles and officer -- Officer Robles liked bicycle

19   riding, and that was something they had in common.  And he

20   ended up buying his bicycle.

21       Well, what, interestingly enough, that Vargas didn't

22   really tell you about is that -- let's look at the timeline

23   here -- is that Officer Robles was looking to purchase a

24   bicycle long before he ever -- that -- long before Vargas

25   claims that Robles got this $10,000.

1        Because on May 3rd, after the posting on May 1st, on

2   May 3rd Officer Robles -- excuse me, on May 7th, Officer Robles

3   emails Tuan, and he wants to trade his sound system for a

4   bicycle.

5        On May 11th there's another reposting.  And Robles

6   responds to the second posting on May 22nd, wanting to barter

7   his stereo equipment.

8        Now, according to Officer Robles the stereo equipment is

9   at least worth about $3,000.  And through this exchange, long

10  before this alleged $10,000 gets placed in Officer Robles's

11  hands, Officer Robles is bartering to purchase the bicycle.

12  Long before any of this happens.

13       Now, who knew, who knew that Officer Robles was into

14  bicycle riding?  Who knew that he was probably in the process

15  of trying to buy a bike?  And who, just coincidentally, tailors

16  his testimony to this newer incident where Officer Robles now

17  gets $10,000?

18       There is no testimony presented, no corroborating evidence

19  that Officer Robles didn't use money that could have come from

20  the stereo equipment to purchase that bicycle.  They could have

21  done that.

22       Oh, they say, but there's $6,000 deposited.  Yeah, there's

23  a statement that says there was $6,000 deposited.  And who was

24  in a better position to know and put all those facts together

25  than Vargas?

```
 1        Well, what's interesting about that statement, ladies and
 2   gentlemen, the bank statement, is that I asked the custodian of
 3   records whether he knew anything about the Chase Bank account
 4   that Officer Robles had.  How much money was in the Chase
 5   account?  Is it unusual for people to have more than one
 6   account and transfer money and manage their monthly bills from
 7   two accounts?  No.  Nothing unusual about that.
 8        So I would suggest to you that if there was any misgiving,
 9   anything wrong with this cash deposit you would have seen,
10   maybe, bank account statements from earlier months, subsequent
11   months, Chase, maybe you would have seen some type of
12   inappropriate or strange activity.  But you didn't.  And the
13   B of A custodian said there was nothing unusual about any of
14   that.
15        Is it reasonable to believe that Officer Robles had cash
16   that he used for something else when he finally decided to buy
17   the bicycle for cash?  Just as reasonable.  Just as reasonable.
18        Just because Vargas says it happened doesn't make it
19   happen.  If he says the Easter bunny came and brought Robles
20   lunch would we have to believe it true?  Just because he said
21   it happened doesn't mean it happened.  Just because there's
22   information that's given to you doesn't make it true.
23        The other thing about this email exchange that is
24   important in this is that I asked Agent Flores on the witness
25   stand -- well, because the government was essentially just
```

 1  relying on presenting the May 17th communication.  And I said,

 2  well, isn't it true, Agent Flores, that there were

 3  communications before -- excuse me, before May 21st, that were

 4  left out in this discovery?

 5       "We gave you what we have."

 6       Well, I said, didn't I forward you folks the earlier email

 7  exchange?  Because I want the jury to see the whole exchange.

 8       "We forwarded what we have."

 9       And then it was Agent Folger received the rest of the

10  exchange from Mr. Wang.

11       Well, great.  That's exactly what I wanted you to present.

12       But I point that out because just as, you know, the 517,

13  519, and the email exchange, half of the evidence, not seeing

14  the full picture here, that's their job.  It's their burden.

15  It's their burden of proof to prove to you beyond a reasonable

16  doubt that Officer Robles did the things that they've alleged

17  him to do.

18       Now, major problem with the government's case is

19  speculation.  And, as counsel said, you know, Ms. Caffese is

20  going to speculate; I predict this and that.

21       Well, what they are asking you to do and what they've

22  asked you to do throughout this trial is speculate, is

23  speculate on information they have given you, but not actually

24  on hard evidence.

25       Now, I want to talk about Potrero because that's another

1    incident where the ATF -- remember, another example of where

2    it's speculation but nothing proven.  Bottom line is there are

3    over, what, 20 officers there, most of whom were from the feds

4    that came, were searching the house even before Officer Robles

5    and Vargas ever appeared, okay.  So they're all in the house.

6        Interestingly enough, Officer Robles is placed in senior

7    Reynoso's bedroom where the rifle is located and where this

8    money is allegedly taken.  And, of course, Vargas says that

9    Officer Robles put it on the bed, told him to go out, close the

10   door while he counted it.  Which I suggest to you is not

11   credible.

12       But more importantly than that, ladies and gentlemen, is

13   Mrs. Reynoso said the money, $2,000 minus ten, was taken from

14   her bedroom.  And her bedroom was the one not the master

15   bedroom.  And it was the bedroom that didn't have the rifle in

16   it.  Money was never taken by Officer Robles.  They never

17   proved that to you.  That was the evidence.

18       But Vargas missed that one because eventually you get

19   caught in your lies.  Eventually you can't keep lying because

20   you're going to get caught.

21       The other thing about that one, and it's another point

22   where it's a problem with the government's case, is that

23   Mrs. Reynoso's family -- incidentally, that was a search

24   warrant because of a mentally disturbed felon.  That's why the

25   had the search warrant and all.  But after that the Reynosos

1   sued the government and they claimed $200,000 was taken,

2   stolen.  Sued the federal government.  Sued the government.

3        Well, I want to know and I would have liked to have heard

4   evidence about how the government, how the government defended

5   that civil suit.  Did you hear any evidence --

6            **MR. HEMANN:**  Objection, Your Honor.  This was

7   stricken, this line of questioning, during --

8            **THE COURT:**  Sustained.

9            **MR. HEMANN:**  Thank you.

10           **MS. CAFFESE:**  Mrs. Reynoso testified -- I believe

11  that wasn't stricken -- that $200,000 was taken.  That was what

12  she claimed in the lawsuit was taken.

13           **MR. HEMANN:**  Objection, Your Honor.  This line of

14  questioning regarding the lawsuit was not allowed by the Court.

15           **THE COURT:**  Sustained.

16           **MS. CAFFESE:**  There was another incident, this is the

17  Zaychenko incident that I referred to a little bit earlier at

18  44th Avenue.  This was the incident in which Officer Robles

19  allegedly responds to 44th Avenue, participates in the arrest

20  and seizure of drugs, money, and laptops, and stereo equipment.

21  Things were stolen.  The only person who steals anything, who

22  admits to stealing anything, once again, is Vargas.  And

23  remember he was the one who said he couldn't remember

24  Zaychenko.  This is the case in which he falsified a police

25  report, where he said/testified that he got the report, that

1  Zaychenko called him afterwards and then he was brazen enough

2  to write a false report on a burglary that he himself had

3  committed.

4      So what's really interesting about the Zaychenko and the

5  Byrd case is that it is very likely that Vargas did go back and

6  steal from those premises.  I have no doubt that he did.  And I

7  think that was proven to you beyond a reasonable doubt that

8  Vargas did do these things.

9      But what's interesting is that they have not proven that

10  Officer Robles stole anything.  Because you know why?  There

11  were other officers involved in that case, too, that responded.

12  Officer Laganos and Officer -- I think it was Kenney, they did

13  not come as witnesses.

14      And I ask, what reason does the government have for not

15  calling those officers who could have testified to whether or

16  not Robles did anything wrong when he responded and whether or

17  not he was even there?

18      The only testimony you have is the testimony from Vargas.

19  And who wrote that police report?  Officer Vargas.

20      He says that what -- what Vargas does say is that Officer

21  Robles did this as proof -- what proof does the government

22  offer you that the two were together?  That Officer Robles

23  stole a license plate cover off a car in the middle of the

24  afternoon?  This is with the 1099 whatever license plate that

25  you put on your car so you don't get tickets.

1          Well, where is it?  We've got the Pinarello frame.  Where

2     is the license plate number?  They were investigating this case

3     for three years.  And, quite frankly, after Vargas pled guilty

4     and accepted responsibility the honorable thing to do would

5     have been to dismiss this case against Officer Robles.  That

6     would have been the right thing.  That would have been the just

7     thing to do.

8          All right.  Let's go to the storage unit.  And that's the

9     November 19th incident.

10          Once again, there's not even any proof or corroboration

11     that, actually, Officer Robles was there, is there, except

12     Vargas's testimony.  And this, again, is an incident in which

13     there were other police officers present.  I think this is the

14     one where Kenney and Grenair were present.  It would have been

15     very easy to call those officers.  What reason does the

16     government have for not calling those officers?

17          Well, you know, it's interesting because the reason why we

18     don't have any other corroborating evidence is because Officer

19     Robles apparently wasn't there because their witness,

20     Ms. Ponzer, didn't say Officer Robles was there.  No testimony.

21     Remember?  I got up and said Ms. Ponzer has not identified

22     Officer Robles.  She didn't.

23          Well, what's interesting about this is that and what

24     Vargas didn't do enough of his homework and wasn't prepared

25     well on this because let's look at the toll records.

```
 1              (Document displayed.)

 2              MS. CAFFESE:  Yeah.  Let's look at the toll records.

 3      I don't know if you can see them on your screen there.  But

 4      officer -- excuse me, Mr. Vargas, Vargas testified that on this

 5      day of November 19th he says that he called, that he called

 6      Officer Robles to come out.

 7           Now, he says that he called Officer Robles and -- to help

 8      in the search.

 9           Well, you know, I went back and we -- Heather and Dalida

10      and I went through these toll records here, and apparently --

11      incidentally, this proves the wire fraud.  This is their

12      evidence that there is this wire fraud that Officer Robles

13      committed.

14           Well, if you look -- and this is evidence, by the way --

15      the phone record reveals, essentially, that Vargas lies again

16      because in these phone records you see no, no calls that Vargas

17      makes to Robles.  No calls that Vargas makes to Robles.

18           What you see is that Robles is calling Vargas at 3:46 and

19      3:48.  His shift, Officer Robles's shift starts about 4 p.m.,

20      the overtime.  Incidentally which was approved, and we went

21      through the records, it was approved, all good, no problems.

22           Well, it's interesting that Officer Robles was calling

23      Vargas.  He's probably calling him because their shift is about

24      to begin, and Vargas isn't where he's supposed to be, Mission

25      Station, to start their shift, to start the second shift.
```

1          But there were no calls, no calls that Vargas made to

2   Robles that night, that afternoon.  And that's proven.  That's

3   what we call physical evidence that belies the government's

4   case.  That's evidence that can't be cross-examined.

5          But it doesn't stop there because we have a police report.

6   We have a police report that officer -- excuse me, that Vargas

7   writes.  And in his police report he says, he says that Officer

8   Robles and he go out together to the storage unit, that they

9   were actually together when they arrived.

10         So, see, both can't be true.  Both can't be true, right?

11  Either they are together or they're not together.  In his

12  report he says that Officer Robles went out there with him.

13         Well, let's take that -- well, let's take that fact for a

14  minute and think, okay, maybe that's true.  Well, if that were

15  true then why would Vargas have to be calling Robles, which we

16  know didn't happen?  And why would Robles be calling Vargas if

17  they were there together?

18         You know, we could go on and on and on with the

19  contradictions and the inconsistencies.  And just because they

20  say it's evidence doesn't make it evidence.  Just because it's

21  information doesn't make it evidence to convict.  And that's

22  the quality of the information you've been given.

23         Now, who wrote that police report?  Vargas.  Who lied in

24  that police report?  Vargas.  Who stole anything in that case?

25  Vargas.

1       Let's go to the next slide here because this is really the

2   pattern.

3           (Document displayed.)

4        **MS. CAFFESE:**  And what it is, it's like, "I did it,

5   but Ed was there."  That's pretty much how it goes.  "I did it,

6   but Ed was there."  From the beginning to the end that is

7   essentially what Vargas says.

8       Kelsey Stewart.  Who writes the report?  Vargas.  No

9   mention of Kelsey's arrest.  Who attempted the stealing?

10  Vargas does it.  Robles, he was there right.

11      Newark, who writes the report?  Actually Officer Robles

12  writes that report and actually books in the $3,120 that was

13  found.

14      Who stole $30,000?  Which, of course, we don't have any

15  evidence there was 30,000 because, I would imagine -- this is

16  another question I have and I'm sure you'll hear about in

17  rebuttal, where are Manny and Gricelda Vasquez, the people who

18  owned Newark, the people who owned the $30,000?  Where are

19  they?  Where is the proof that they had $30,000 in that

20  backyard, the victims?

21      It's interesting because, on one hand, they're saying, you

22  know, if it was drug money there is no violation of civil

23  rights.  There's no violation of this.  If it's honest money,

24  then there is.  I couldn't follow that argument either.  But

25  where are those witnesses?  We know they exist.  We know

1   they're around.

2        It's not my burden and it's not my job to do their job.

3   They had three years investigating this case, three years to

4   investigate this case to come up with corroborating evidence

5   that would be appropriate for you 12 people to evaluate.

6        All right.  I want to talk about the conspiracy to

7   distribute controlled substances.  And, you know, once again,

8   on this one you would have to believe Hernandez.  We've got

9   this whole marijuana thing.

10       I know we're getting tired.  I'm almost done.  I'm almost

11  done.

12       Hernandez comes up with this -- part of his testimony is

13  that he smoked some marijuana.  Officer Robles wanted to give

14  it him to distribute, to sell, but he doesn't sell marijuana.

15       And then part of the same testimony is that he talks about

16  how Robles, Officer Robles had a friend who had some marijuana.

17  And that was still part of this whole part of the testimony.

18  And then we had further testimony about the marijuana from

19  Hernandez, that Sergio Sanchez had the marijuana and somehow he

20  got it, he was going to sell it.  And I asked Sergio, Did you

21  ever sell marijuana?  He said, No.  So I don't even know what

22  we do with all of that, okay.

23       But then we have the whole Daisy Bram and Jayme Walsh

24  story, which at the beginning, when Vargas was a defendant, the

25  theory apparently was that it was a conspiracy amongst Bram,

 1   Walsh, Vargas, Robles, Furminger to distribute it, until Vargas

 2   cleared the record.  And then the government changes its

 3   theory.

 4        And then remember on cross-examination I asked Agent

 5   Flores about the testimony of the packaging, and she testified

 6   before the grand jury that the marijuana packaging in Boone,

 7   Iowa matched the Barrington packaging of marijuana that was

 8   sent from San Francisco, and how that was going to corroborate

 9   this other conspiracy and theory.  But that was all wrong.  It

10   was a mistake.  Thank you for clarifying it.

11        Three years into the investigation we change our theories.

12   Now Vargas says, I didn't know what I was going to do with the

13   marijuana.  I just decided to give it to the kids because I

14   felt sorry for them.

15        Well, interesting, because on October 20 -- go through

16   this kind of quickly here.  October 20th, when he first decides

17   to plea, his first thing was he never mentions that Robles was

18   ever present when the marijuana was given.  Then he pleads

19   guilty.  Then he says in his plea agreement, he writes "Robles

20   was aware at the time."  Then he says in his further debriefing

21   that month, after, "Robles was standing next to me."  Then he

22   comes to trial and says that, "Robles was with me when I gave

23   it to them, as they walked through the front door."  Change,

24   change, change, change.

25        Where is Daisy Bram?  Where is Jayme Walsh?  Where are

 1   those witnesses who could have corroborated or testified to any

 2   of this, any of this?  And that's the question you have to -- I

 3   suggest, I suggest you ask yourselves.

 4        Now, the only piece of evidence, physical evidence we have

 5   is the property statement, the property receipt which Officer

 6   Robles gave UPS, which documented the two packages that he

 7   seized.  When Officer Robles got all of that marijuana, he

 8   documented it and he gave a receipt, which was introduced into

 9   evidence, showing that he did the right thing.

10        After he documents it and gives the receipt for the two

11   boxes of the marijuana, or the two pounds of marijuana that was

12   actually taken out from the UPS, his hands are off of it.  It's

13   Vargas who takes over and Vargas who commits the crimes that

14   we've been discussing.  It's Vargas who gives the marijuana to

15   Daisy Bram.  Officer Robles had nothing to do with that.

16        Now, you know, I talked about this, but it's not a

17   coincidence that in January of 2010 there's no more misconduct

18   that's testified to when Officer Robles goes to motorcycle.

19        There are two honest services wire fraud charges.  That's

20   with Sergio.  Ladies and gentlemen, that's -- what's the

21   evidence there?  The evidence is that sometime before, right

22   before Officer Robles goes to motorcycle he randomly comes

23   across Sergio, right.  And Sergio gives him a pair of

24   sunglasses, so we know he's already a motorcycle unit.  And he

25   also sells Officer Robles a laptop below retail.  Well, of

1    course, it's below retail because, you know, you're not going

2    to pay the same amount for your laptop that you would be paying

3    at Best Buy.  That's why Sergio sells some of his products at

4    discount.  So there's nothing illegal about that.  And

5    40 percent of his business is legitimate.  It's -- it's not

6    stolen property.  Those are the two facts that somehow suggest

7    honest services wire fraud.

8         There are no wires that are used in that communication.

9    Oh, wait.  There is the text message in 2012, a couple of years

10   later, where Furminger and Officer Robles are texting, and

11   Officer Robles is talking about a generator he wants to get for

12   the pitching machine for his daughter's softball team.  And he

13   makes a reference to Serg.  That is the honest services wire

14   fraud count against Officer Robles.  That's the evidence.

15   That's the evidence.  Nothing more.

16        Sergio said -- he testified that -- all of the good things

17   that happened.  He testified how Officer Robles treated him

18   with respect, treated him fairly.  He gave -- remember when he

19   got the CI receipt for $500, and that was Officer Robles who

20   took the laptop with the child pornography material and turned

21   it over, and they caught the child pornographer?  That was all

22   legitimate.  And even Sergio said he didn't want the $500.  But

23   Officer Robles thought it was appropriate, filled out the

24   paperwork.  Sergio got the $500 for, you know, the arrest of

25   the child pornographer.

```
 1        What else did Officer Robles do?  There was the statue

 2   that Officer Robles came in possession through Sergio.  What

 3   did Officer Robles do with that statue?  He returned it to its

 4   rightful owner.  What would Vargas have done with that?  He

 5   would have a sold it and taken the money; right?  That's what

 6   Vargas would have done.

 7        You know interesting, ladies and gentlemen, is that Sergio

 8   Sanchez didn't receive any money for his testimony.  He wasn't

 9   paid anything.  His testimony wasn't purchased by the

10   government with over $40,000 and immigration status.  That says

11   something about Sergio Sanchez.

12        Now, I am going to pretty much conclude my thoughts here,

13   but, you know, at the beginning of the case remember in the

14   voir dire and my opening I said this case was like the ocean.

15   It's deep.  It's big.  It's confusion.  And it is.

16        But, you know, you can't take a flounder out of the ocean

17   and call it a whale.  You can't point at a raft and say it's a

18   battleship.  And you can't just take the garbage and call it

19   evidence to convict.  You just can't.  And that's what this

20   case really is about.

21        And so I leave you with the reasonable doubt instruction

22   again.  Because after I finish -- and I am finished, and it's

23   the kind of nervous moment for me to just go and sit down, for

24   obvious reasons.

25        But, you know, you know, I told you at the beginning that
```

 1    my job was to give you the tools to do your job.  And that's

 2    what I've tried to do.  I tried to point out the places where,

 3    obviously, the government failed.

 4         And you, you know, you might say, Teresa, you should have

 5    called Officer Robles to the witness stand.  I'll talk about it

 6    because obviously we're human.  You know, we want to hear from

 7    the other side.  But that's not the rule of law.

 8         And at the end of the case when I as Officer Robles'

 9    attorney decides, you know what, the government failed

10    miserably to prove anything in this case, he does what I tell

11    him to do, quite frankly.  And the government didn't prove

12    their case beyond a reasonable doubt.

13         And when you get to that place in your mental process and

14    maybe if someone mentions that -- you know, the jury

15    instructions are kind of like your instruction manual.  You

16    say, oh, wait.  There's an instruction for that.  Goes right

17    here.  We can't -- we can't consider that evidence or lack of

18    evidence.  That's what the instruction manual tells you.

19         And you can't because it is the government.  And there's a

20    reason why the government has the burden in the case.  They've

21    got the resources.  They've had three years to investigate this

22    case.

23         And so, yes, reasonable doubt, reasonable doubt means that

24    you have to be firmly convinced of the truth of the charges.

25    Yes, it's not a mere possible or imaginary doubt because, of

```
 1  course, everything relating to human affairs is susceptible to

 2  some possible or imaginary doubt.  But it is that condition

 3  that leaves you, the minds of the jurors, that you cannot say

 4  that you have been firmly convinced that Officer Robles is

 5  guilty of the charges.

 6       So on behalf of Officer Robles, ladies and gentlemen, on

 7  behalf of his family, thank you.  And I ask you to return

 8  verdicts of not guilty.

 9           THE COURT:  Okay.  We'll now hear rebuttal argument.

10       Ladies and gentlemen, do you want to stand up and stretch?

11           (Off-the-Record discussion)

12           MR. VILLAZOR:  260?  2-6-0?

13       Thank you.

14       Thank you, Your Honor.

15                        REBUTTAL ARGUMENT

16  BY MR. VILLAZOR:

17       I know it's been a long day.  And you have heard hours and

18  hours of lawyer arguments.  I'll be brief.

19       Remember when I first talked to you at the beginning of

20  this trial, many weeks ago:  You decide the facts based on the

21  evidence.  Facts based on the evidence.  That's the instruction

22  from the Court, and that's what you should do.  You should also

23  use your common sense.

24       Now, you heard from defense counsel a lot of things.

25  Where's so-and-so?  Where's Daisy Bram, where's Jayme Walsh?
```

1    Where are all the other officers?

2        Do you want -- would you want this trial to be any longer

3    with more officers coming in to testify?

4        Second, what more evidence do you need, when you have the

5    testimony of Officer Rey Vargas, you have the testimony of

6    Cesar Hernandez.  And as Mr. Hemann pointed out to you, in your

7    jury instruction, which you will have --

8            (Document displayed)

9            **MR. VILLAZOR:**  It's all about corroboration or

10   competition.  Sure, we all talked about it (Indicating).  Rey

11   Vargas, he was a bad cop.  And Cesar Hernandez was a drug

12   dealer, and Sergio Sanchez, he was a fence.

13           (Reporter interruption)

14           **MR. VILLAZOR:**  A fence.

15       They were criminals.  We're all in agreement there.  And

16   you heard primarily from Ms. Caffese, and Mr. Getz, about how

17   bad they were.  We agreed.  They're bad.  Rey Vargas broke his

18   oath.  Cesar Hernandez was a drug dealer.

19       The credibility of witnesses.  This (Indicating) is what

20   you need to look at.  This is the instruction from the Court.

21   And they all ran away from this (Indicating).  They all ran

22   away from it.  They don't want to talk about the evidence.

23   They don't want to talk about the testimony.  They wanted to

24   talk about who wasn't here.  Well, when you get these jury

25   instructions you will hear:

```
 1              "The weight of the evidence as to a
 2          fact does not necessarily depend on the
 3          number of witnesses who testified.  What is
 4          important is how believable the witnesses
 5          were, and how much weight you think their
 6          testimony deserves."
 7      You think.
 8      Now, they talked about how confused they are; they don't
 9  understand things.  Doesn't matter what they think.  Doesn't
10  matter how they're confused.  It's for you.  It's for you to
11  look at the testimony.
12      When Rey Vargas got on the stand and Cesar Hernandez got
13  on the stand, did you believe him?  Did you believe either one
14  of them?  And you look at these factors (Indicating).
15      Of course, you need to have Rey Vargas.  Of course, we
16  have to have Cesar Hernandez.  They had the opportunity and the
17  ability to see or hear and know the things that they testified
18  to.  Those are the two key witnesses.
19      And did you hear anything from the defense, where the
20  other evidence contradicted the witness's testimony?  Sure, you
21  heard how bad these guys are, what liars they are, what a drug
22  dealer Cesar Hernandez is.  You heard about that.  And we
23  agree.  But, what evidence contradicts their testimony?
24      And by the way, don't forget, you are the ones who got to
25  eyeball.  Whether you found Cesar Hernandez charming, whether
```

1  you were offended by Rey Vargas, you had the ability to look

2  them in the eye.  And it is totally up to you to decide whether

3  or not they were telling the truth.

4      Now, when you think about all the other evidence, it makes

5  no sense what Ms. Caffese's arguing.  And what Mr. Getz and

6  Mr. Passaglia argued.  That Mr. Vargas is a one-man crime

7  spree?  That he's doing -- he's the bad cop and he's stealing

8  all of this money, all under the noses of Ian Furminger and

9  Ed Robles.  That makes sense.  It makes sense.

10     Mr. Passaglia talked about the time records.  Aha.  We're

11 selectively picking things out.  No, no.  The time records.

12 The phone records.  Think about that.  That's -- that's not --

13 that's not primary evidence.

14     The primary evidence came from Rey Vargas and Cesar

15 Hernandez (Indicating).  And I challenge them (Indicating).

16 None of the time records, none of the phone records contradict

17 Rey Vargas or Cesar Hernandez.  What they do is corroborate.

18     And Rey Vargas said, "Hey, I went -- over at 22nd and

19 Harrison.  I heard about it after the fact."  Well, the time

20 records show that he was not on duty that day.

21     Or when Rey Vargas talked about how Ian Furminger came off

22 on his day off.  Well, the time records show that he was on his

23 day off.  He was actually in the middle of a four- or five-day

24 holiday.  He interrupted his vacation to come in.  That is what

25 the time records do.  That is what the phone records do.

```
 1        They talked about Government Exhibit 282.  282.
 2   Ms. Caffese made a lot about Mr. Vargas having a second phone.
 3        Okay.  Ed Robles, he was working that day.  And you will
 4   see in the time records, Ed Robles, he was on his normal shift
 5   starting at 6:00 a.m., going to 4:00 p.m.  In the time records.
 6   He was working that day.
 7        Ms. Caffese talked about how he just came on shift at
 8   4:00.  Not true.  Time records (Indicating).  Phone records.
 9        And what's interesting, I mean, talk about Sergio Sanchez.
10   Sergio Sanchez did all this great work.  He solved all these
11   crimes.
12        Did you kind of catch the irony when we were talking about
13   that on cross-examination?  Sergio Sanchez, as a CI, informs on
14   a guy selling stolen laptops in the Mission.  How's that for
15   the pot calling the kettle black?  He was getting rid of the
16   competition.  And they were helping him.  They were helping
17   him.
18        And what's really, really interesting is the text
19   messages.  All three of them.  They all ran away from the text
20   messages.  Right?  They all ran away from the text messages.
21        Let's bring them back for you.  Mr. Hemann showed you a
22   couple.  I'm going to show you couple more.
23            (Document displayed)
24        MR. VILLAZOR:  Now, let's remember, Sergio Sanchez, a
25   fence, selling out of the trunk of his $100,000 BMW M3, out of
```

1    the trunk of his car.  When Ian Furminger would get stuff,

2    Sergio Sanchez would look around; Ian Furminger would look

3    around.  A cop, looking around before somebody opens a trunk?

4    Because he knows it's illegal.

5         They talked about all these schemes.  There's a wire fraud

6    scheme, and that's an honest-services wire-fraud scheme.  I

7    want to make sure you understand.  I want to make sure you

8    understand this.

9         First I want to talk about the honest-services wire fraud.

10   Okay?  Honest-services wire fraud.  Defendants Furminger and

11   Robles are charged with a scheme or plan to defraud the City

12   and County of San Francisco, the San Francisco Police

13   Department, of the right of to honest services.  That goes to

14   Sergio Sanchez.  Okay?  The right to honest services.

15        The right of the City of San Francisco to have cops arrest

16   guys selling stolen goods on 20th and Mission.  That's what

17   that case is about.  That's what that charge is about.  It's

18   not isolated to one single wire or one single text or anything

19   like that.  It's the scheme.  And what we have to prove in

20   furtherance of that scheme, that the there's one or two wires

21   in furtherance of that scheme.

22        So you can't let Ms. Caffese narrow it down as one text

23   message showing that this is this entire scheme.  No, no, no,

24   no.  It's the other way around.  It's an overall scheme, from

25   August, 2011 to August, 2012.

1          The scheme was for Ian Furminger and Ed Robles to deprive

2     the City and County of San Francisco of the right to honest

3     services for police officers to honestly act in their duties to

4     arrest fences on -- on 20th and Capp, okay?

5          Then there's specific wires, specific actions.  And you

6     will see this in the verdict form, there are specific ones.

7     This one goes to Count 3.  Okay?

8               (Document displayed)

9          **MR. VILLAZOR:**  And in Count 3 it talks about --

10    you've seen this before -- on 9/7, 2011 this is for Counts 3,

11    this is one wire in furtherance of the overall scheme.

12         And you will remember, the "4153094914" that is

13    highlighted, that is Ian Furminger.  And in the second column,

14    that's the recipient.

15         So here, you have Sergio Sanchez (As read):

16              "I have a nice Gps for you but it's not

17              complete is missing the cradle.

18         Ian Furminger:

19              "That is ok!  You mean the cradle to

20              hold it up?  No big deal I make it work."

21         Going on, that same day, 9-7-2011

22              "Yeah..."

23         This is Sergio Sanchez (As read):

24              "Yeah and is big screen looks like new

25              and its new model."

1      Ian Furminger:

2              "Cool!  Can we meet tomorrow?"

3      This is one wire, for Count 3, furtherance of that scheme

4 to defraud the City and County of San Francisco of those honest

5 services.  This is that fraud.

6      And you will remember Sergio Sanchez testified about this.

7 And this is also related to that extortion charge.  Remember

8 when (Inaudible) was talking about the  certain things that you

9 have to find, one -- at least one, and I submit to you we have

10 proved all of it, but here's one.  GPS.

11     And do we know that Ian Furminger, in fact, got this?

12 Well, let's go to the text messages that they ignored.

13             (Document displayed)

14             "Yes, cool, see you tomorrow ok!"

15     September 7, 2001.  Two days later, on September 9, 2011.

16             (Document displayed)

17          **MR. VILLAZOR:**  Ian Furminger:

18             "Lunch?"

19     Sergio Sanchez:

20             "I just ate.  30 minutes ago."

21     Ian Furminger:

22             "Ok.  Meet by restaurant now?"

23     Sanchez:

24             "Ok.  Take the GPS now or after?"

25     Ian Furminger:

```
1                    "Now."

2       Sergio Sanchez:

3                    "Ok."

4       Use your common sense.  You know he got the GPS.  You know

5  Sergio Sanchez gave it to him over at that -- one of two times

6  that they had lunch at a restaurant over on 20th and Mission.

7       Use your common sense.

8            (Document displayed)

9            MR. VILLAZOR:  Another one that's not part of the

10  specific count, but it's just another one in furtherance of

11  this scheme -- and we could pick any of these, but just another

12  flavor of the text messages that the defense ran away from.

13       And, mind you, this is December 1, 2011.

14            (Document displayed)

15            MR. VILLAZOR:  Sergio Sanchez (As read):

16                    "Are you interested in a brand-new

17                 small digital Sony camera 14.1 megapixels

18                 complete with charger (Red color)"

19       Ian Furminger:

20                    "Yes."

21       Sergio Sanchez:

22                    "It's brand new but no box you will see

23                 it ok for you very chea."

24       Ian Furminger:

25                    "See you tomorrow."
```

```
 1        Okay.  This is just another part of this scheme.  Sergio
 2   Sanchez, who is not a friend of Ian Furminger's -- and they
 3   talked about that in opening, and the friend in the Mission.
 4        Why do you think -- use your common sense.  Why is Sergio
 5   Sanchez offering Ian Furminger -- a sergeant in the Mission
 6   District, plainclothes unit -- why is he offering these things?
 7   Because he wants to hang out with him, because he wants to have
 8   lunch with him, because he wants to watch the World Series with
 9   him?  No.  It's because he wants to have protection.  And
10   that's what Sergio Sanchez says.
11        Look at the jury instruction.  This isn't -- they made a
12   lot about the MS-13.  Yeah, it's not the MS-13 mafia, gun to
13   the head, you pay protection.  No, this is the seller.  This is
14   the color-of-right extortion.  And that's what the Court count
15   charges.
16        And that's why Sergio Sanchez -- it's just common sense --
17   why Sergio Sanchez was offering him all these things.  Because
18   he wanted protection.  And that is why Ian Furminger kept
19   coming at him.  He wanted wedding rings when he lost his
20   wedding ring.  He wanted a Bose stereo.
21        Why do you think he kept coming on him?  Because he was
22   putting on the pressure on Sergio Sanchez, to continue to
23   provide the protection.
24        Now, this is for Count 4, again, furtherance of the honest
25   wire fraud services.  And this relates to Ian Furminger and
```

```
 1   Ed Robles.  And, you'll remember the text.

 2            (Document displayed)

 3            MR. VILLAZOR:  On February 7, 2012 -- this is

 4   Count 4, the specific one charged for the overall scheme.

 5            (Document displayed)

 6            MR. VILLAZOR:  And we went over this.  In pink,

 7   Ed Robles (As read):

 8                "Do you have a portable generator I

 9             could borrow?"

10      Ian Furminger:

11                "No.  Keep meaning to buy one but the

12             good ones expensive.  The ones on

13             Craigslist are burned out."

14      Ian Furminger continues:

15                "What do you need it for?  Rent a bad

16             ass one at Cresco!"

17      Ed Robles:

18                "Pitching machine...looking for a

19             smaller Honda eu."

20                "Oh, yeah, you need one for that but a

21             big one, get the entry level Honda."

22      Continuing on, on February 7, 2012.

23                "They are hella money...Sergio..."

24      Blank.

25            (Document displayed)
```

1          **MR. VILLAZOR:** "Not that bad for a small one, like

2    600."

3          "Fuck that..."

4      Ed Robles.

5          "Mother ducker I asked if you want to

6          get coffee!

7          "At home waiting for painter for other

8          house.  Can't do it right now."

9      And you remember the testimony from Sergio Sanchez.  He

10   couldn't remember who he showed it to, but he showed somebody,

11   either Ian Furminger or Ed Robles, he was very specific about

12   that.  Couldn't remember who.  He showed them a power

13   generator.  Actually had to take it out of the trunk because it

14   was kind of big.

15      Remember, Sergio Sanchez talked about how he was limited,

16   his inventory was limited by the space of his trunk.  Couldn't

17   get a TV in there.  They put a power portable generator in.

18   And it's no coincidence that these guys are talking about a

19   portable generator, and who do they go to?  Sergio Sanchez.

20      What should they have been doing in the honest services?

21   They should have been arresting, they should have been

22   searching.  This is a signed CI.  You read that.  The manual.

23   The CI manual of the SFPD.  That's not just some -- that's not

24   a -- that's (Indicating) a cookbook.  That's not how to bake

25   lasagne.

```
 1          Those are the codes of conduct of law enforcement.  The
 2   codes of conduct for people who have the privilege and
 3   responsibility of wearing the San Francisco star and carry that
 4   gun.  They have the authority of the City of San Francisco.
 5   And we're not making light of that.
 6          Mr. Passaglia wants to call it a cookbook, or analogize it
 7   to a cookbook, but it's not.  These are the rules.
 8          Mr. Hemann talked about the rule of law.  These are the
 9   rules that officers have to abide by, because they are
10   entrusted with the public's trust.  And they broke that when
11   they sat there, and they looked to Sergio for a portable
12   generator.
13          And in this particular text, this is in furtherance of the
14   scheme.  This goes to Count 4.
15              (Document displayed)
16            MR. VILLAZOR:  Another one.  July 18, 2012.  Sergio
17   Sanchez (As read):
18                "Hey, do you still want something for
19            woman?"
20       Ian Furminger:
21                "Yes."
22                "I have a brand-new Marc Jacobs perfume
23            in the box and a Gucci Guilty for men."
24       Ian Furminger:
25                "Cool!  See you tomorrow!"
```

```
 1        Again, in furtherance of the scheme, not specifically

 2   charged in the honest wire services fraud scheme.  But, in the

 3   extortion charge against Ian Furminger, there's another one.

 4   There's the GPS; there's Herradura tequila.  There is a Nikon

 5   camera.  There's also perfume.

 6        Here's that text message to prove that Sergio Sanchez gave

 7   Ian Furminger bottles of perfume.  Again, going back to the

 8   stipulations and Mr. Sanchez's testimony.  He talked about how

 9   he bought this from Macy's.  And, that's your interstate

10   commerce.

11        I want to switch gears, and I want to talk about a wire

12   fraud.  Again the wire fraud, that's different than an honest

13   services fraud.  The wire fraud is charged by the government.

14        That's where the Defendants devise and intended to devise

15   a scheme or plan to defraud, or a scheme or plan for obtaining

16   money or property by means of false or fraudulent pretexts,

17   representations, or promises.

18        Okay.  Put in layman's terms:  It's to steal money.  It's

19   to steal money.  And to steal things.  And that's the scheme,

20   the overall scheme from the charge.  It's not just isolated to

21   one thing; it's the overall scheme, where Mr. Hemann laid out

22   with great detail all the various thefts.  Right?

23        And along with the theft from federally-funded programs,

24   which we talked about, it's a little cumbersome, it's also a

25   violation of wire fraud scheme.  Okay?  And we charged two --
```

1   we picked two specific instances of wires that were in

2   furtherance of that.  And we picked, for just the reasons, we

3   picked the one for 19th Ave. Self-storage.

4            (Document displayed)

5            **MR. VILLAZOR:**  That is November 19, 2009.  November

6   19, 2009.  And there are two specific things that were charged

7   as Counts 1 and 2.  Okay.  Count 1 talks about --

8            (Off-the-Record discussion between counsel)

9            **MR. VILLAZOR:**  Count 1 talks about the wire

10  communication.  So, so -- excuse me.  Count 1 talks about the

11  police report.  And it's in your tab -- I think it's Tab 10 or

12  11.  It's --

13           **THE COURT:**  No, I think -- I'm sorry; Count 1 talks

14  about the text message, doesn't it?

15           **MR. VILLAZOR:**  I'm sorry, Your Honor.

16           **THE COURT:**  I'm looking at -- I have to look at the

17  indictment, but I think -- I think Count 1 is -- do you have

18  the superseding indictment?

19           **MR. VILLAZOR:**  Okay.  You're right, Your Honor.

20  Thank you for that.

21           **THE COURT:**  Well, we don't want any -- Count 1,

22  Count 1, charges the Defendant -- Defendants with a wire fraud,

23  and lists as a date, a wire -- text communication from RV to

24  Furminger on November 19, 2009.

25      Count 2 deals with the police report on the same date.

1          **MR. VILLAZOR:**  Thank Your Honor.

2      And, I apologize for mixing that up.  Just go to

3  Government Exhibit 282.  282.  Okay?

4      This is that chart.  This is -- you remember from Agent

5  Flores, who talked about the phone record system that they can

6  just collect everything up and put it out and have the scheme.

7      Again, you'll have -- if you look at it, you might even

8  have it in your binders, there are several text messages from

9  Reynaldo Vargas to Ian Furminger, all to their numbers.

10     And this is the text messages -- these are the text

11 messages that went on, on the date of this arrest of Ms. Ponzer

12 and Mr. Burgess.  And, these go to Count 1.  These go to

13 Count 1.

14     As to Count 2, and this -- actually have wrong -- Count 2

15 is actually the police report.  The police report that's in

16 your binder.

17     And the parties have stipulated that what you do when you

18 make an arrest, you actually fax that police report to another

19 -- another department within the San Francisco Police

20 Department.  The parties are in agreement, when you fax that

21 police report, that is affecting interstate commerce.  That is

22 a wire transmission.  Okay?

23     So, again, just, let me emphasize.  The scheme, the wire

24 fraud scheme, spanned all those texts.  But we have picked two

25 instances of an actual wire transmission.  One that goes to the

1    text messages that Rey Vargas sent to Ian Furminger on 11-19,

2    2009.  The second goes to the police report that's in your

3    binder and was faxed pursuant to SFPD policy.

4         Now, Ms. Caffese talked about the purported lack of

5    evidence, lack of evidence corroborating Rey Vargas, the lack

6    of evidence corroborating (Inaudible).  And Mr. Passaglia, he

7    poked fun at the charts, and even brought up his own little

8    Where's Waldo picture.

9              (Reporter interruption)

10             **MR. VILLAZOR:**  Where's Waldo picture.

11        This isn't law-school mock trial.  It's a court of law.

12   And what we have given you is evidence.  Okay.  Summary

13   evidence of the exhibits.

14        And I want to first show you --

15             (Document displayed)

16             **MR. VILLAZOR:**  -- the chart Mr. Hemann showed you,

17   and you saw with Agent Nave.  Okay?  This isn't a Where's Waldo

18   picture.  This is a chart, just for your guidance.  But you

19   will see, there are exhibit numbers.

20        And as Mr. Hemann said, we strongly encourage you, look

21   through all the exhibits.  Does it make sense?  And we will

22   walk through this again.

23        Exhibits 22 and 29, that is Michael Vice.  And he actually

24   testified about that, his father gave him the $500 gift card.

25   And he actually got $53 when he returned, through the card.

1    And then he testified he gave it to Joseph Furlong.

2         Joseph Furlong who, again, they said:  Where is Joseph

3    Furlong?  But, do you really need to hear from Joseph Furlong?

4    He's a drug dealer.  He's a drug dealer.  And, use your common

5    sense.  I mean, you had your fair share of heroin addicts and

6    drug dealers.  Do you need Joseph Furlong?  What's that really

7    going to help?  Okay?

8         He was arrested on March 2nd, 2009.  And his room was

9    searched on March 4, 2009.  And if you look at Government

10   Exhibit 31 and 32, you'll see that call.  That call that

11   corroborates -- excuse me -- the exhibits that corroborate Rey

12   Vargas' testimony (Inaudible).

13        Then we go to the Apple Store.  And you have the receipt

14   that shows Rey Vargas buying, on paper, an iPhone and a Nano.

15   And that is Exhibit 33.  Undisputed.

16        But then, then you have this leap or this speculative

17   argument from Ms. Caffese:  "Oh, you know what?  Rey Vargas,

18   Rey Vargas held onto this Nano.  And Rey Vargas sold this to

19   Ed Robles."

20        Think about that.  Is there any evidence -- is there any

21   evidence to suggest that Rey Vargas sold to Ed Robles?  There's

22   none.  There's none.  And you can't decide facts based on

23   speculation.  You can only decide based on evidence.

24        And, what did Rey Vargas tell?  Well, you heard from

25   Special Agent Nave.  He said Ed Robles, Ed Robles got the Nano.

1    There's no evidence to contradict that.

2         Now, you also heard from Agent Nave who testified earlier

3    in this trial, FBI followed that trail.  They followed the

4    trail.  Rey Vargas didn't give Bernadette Melvin.  He didn't

5    give that.  That was a lead he gave to the FBI.

6         And what did they do?  They traced it; they went to the

7    Apple records.  They went and saw that it was registered to a

8    woman by the name of Bernadette Melvin.  They went and

9    interviewed Bernadette Melvin.  And Bernadette Melvin told the

10   FBI and she told you, she got that Nano from Ed Robles

11   (Indicating).  She got the Nano from Ed Robles.

12        Put two and two together.  Ed Robles got it, over at the

13   Apple Store.  And then he took it and he gave it, unwrapped, in

14   its original packaging, in its box, he gave it to his mistress.

15   And that's it.  There's no evidence at all to suggest that

16   somehow Rey Vargas sold this to Ed Robles.  Pure speculation.

17   Don't buy it.

18             (Document taken off display)

19             **MR. VILLAZOR:**  More evidence.

20             (Document displayed)

21             **MR. VILLAZOR:**  Evidence to decide these facts.

22   Again, just a chart.  Because, this trial's been long enough;

23   you don't need to see 15 more exhibits.  Okay?  But here, for

24   your notes, a summary board.  A summary for you.

25        Now, Ms. Caffese, I'm not really sure if I followed what

 1  she was talking about, but let's just go through the timeline.

 2  Okay?

 3       The undisputed -- forget selected quotes from testimony,

 4  or anything like that.  Let's just go to the exhibits.  And

 5  let's go to Tuan Hoang's words, his testimony.  And let's go

 6  with Ed Robles's emails.

 7       May 3rd, 2009.  Craigslist posting, Tuan Hoang.  May 7,

 8  2009.  Ed Robles wants a barter.  He wants to trade stereo

 9  equipment.  And it just doesn't work.

10       May 20, 2009, Tuan Hoang again posts on Craigslist, wants

11  to sell the Pinarello Dogma.

12       May 21, 2009, Ed Robles.  He wants to continue bartering:

13  Come on, let's do this, let's trade for the stereo.

14       I'll skip May 25th for a second.

15       May 31st, 2009.  Exhibit 306.  Again, Tuan Hoang posts the

16  Pinarello Dogma.  Still wants to sell it.

17       June 2nd, 2009. Magically, Ed Robles is now offering

18  3,000, cash.  3,000, cash.

19       All right, let's go back.  May 25th, 2009.  You heard

20  about this, ad nauseam.  You heard about Officer Heckman.

21       By the way, you heard it from Mr. Hemann.  They had to

22  call Officer Heckman from Newark, because you have three

23  plainclothes guys going into a house, climbing in through the

24  window.  They're going be to be suspected of burglary.

25       Ironically, they were.  They were there to rob.  But,

1    that's why they called Officer Heckman.  And what's important,

2    that they keep talking about what -- why -- what's this thing

3    with the DEA?  This is what's the thing with the DEA.

4        Remember, Rey Vargas talked about he's a plainclothes cop.

5    They deal in crooks.  Street-level guys.  What do you think the

6    DEA targets?  An international investigation is going to

7    happen.  A lot of money, a lot of drugs.

8        And, that's why Agent Sicord's testimony was relevant.  He

9    was telling you that Manny and Sergio and Gricelda, they were

10   high-value targets.  They were high-value targets.

11       And that's their motive.  They want to go down to Newark.

12   They didn't want the DEA to know about this.  They don't want

13   them to know about it.  But they had to let the Newark officer

14   know about it.

15       And he talked about: Hey, look, they seized 3,000.  And

16   they put it in a report.  But, guess who was there?  The Newark

17   cop.  He was there.  He saw it.  He wasn't part of this

18   conspiracy.  There's no evidence that Officer Heckman was part

19   of this conspiracy or that he did a wink, wink, nod, nod.

20            (Reporter interruption)

21           MR. VILLAZOR:  or that he did wink, wink, nod, nod,

22   at them seizing money.  No.  He was there and they seized

23   $3,000 in the house.  And that's why they booked it into

24   evidence.

25       Now, back to May 25, 2009.  $30,000.  Right?  Split,

 1   $10,000 each way.  And you heard -- I'm not going to talk about

 2   it again, you heard from Mr. Hemann.  Mr. Vargas gave that

 3   detailed account of:  Afterwards, what did they do with that

 4   money?  What did they do with that money?

 5        Well, you heard from Officer Vargas.  Ed Robles, who's

 6   going to buy a (Inaudible).  And that's all you heard from Rey

 7   Vargas, that he was going to buy a bike.  And sure enough, you

 8   have heard from Agent Flores.  And he told that to the FBI, and

 9   they started chasing a lead.

10        You want to talk about the FBI doing an effort?  How about

11   going back and finding 2009 Craigslist posts?  How's that for

12   effort?  How's that for effort?  And they found out what Ed was

13   posting, and they followed the trail, and it led to Tuan Hoang.

14   Led to Tuan Hoang.

15        And that, as you saw in Government Exhibit 307, ultimately

16   he sold the Pinarello Dogma to -- Tuan Hoang sold it to

17   Ed Robles, for $3,700.  That's $3,700.

18        Rey Vargas, he had no idea.  He had no idea about what to

19   do with the other money.  That's when you look back, and you

20   look back at the Bank of America records.  The Bank of America

21   records, which show a $6,000 cash deposit.

22        Coincidentally, the day after, May 25th, 2009, the day

23   after -- and I encourage you to take a look at the Bank of

24   America statement.  Look what happened on May 26, $6,000 cash.

25   Follow the money trail.  See where it went.

```
 1        Oh, Ms. Caffese talked about Chase bank account:  Oh,
 2   maybe the police officer had a lot of money over there.  Well,
 3   you'll see that of that $6,000, almost 5,800 went out to pay
 4   bills.  Including Chase.  Including Chase.  Okay?
 5        The other thing that Rey Vargas talked about (Indicating),
 6   he talked about when he was sitting there with Officer Robles
 7   and Sergeant Furminger.  "What will you guys do with the
 8   money?"
 9        They turned off the radios, and they took out the
10   batteries.
11        Well, Sergeant Furminger said, "I installed skylights.  I
12   installed skylights."
13        And no, were we cherry-picking all these things that
14   Nacho -- Nacho Ramirez, all the good work he did at the house
15   in Burlingame, or the good work he did in Marin?  No.  We were
16   specifically picking this one, because the timing works.  The
17   timing works.
18        They bought the house in November of 2008.  And seven
19   months later, Ignacio Ramirez installed skylights.
20        What does that testimony do?  That corroborates Rey
21   Vargas.  And, it also shows you where the money went.  The
22   money went here (Indicating), on May 25th.  It went to pay for
23   a bike; and it went to pay for bills Ed Robles; and for Ian
24   Furminger, it went to go pay for skylights.  That's the money
25   trail.
```

1       That (Indicating) is concrete, hard evidence that proves

2   beyond a reasonable doubt that these Defendants engaged in

3   criminal conduct.

4       Ladies and gentlemen, it is 4:15.  I'm going to wrap up,

5   because it's been a long day.  And I promised you that I would

6   be short.

7       The one question that nobody's asked and might be on your

8   minds is:  Why did they do it?  Why, why would Ian Furminger

9   and Ed Robles, why would they steal?  Why were they conspiring

10  to deal drugs?  Why would they let Sergio Sanchez run free and

11  fence his stolen goods?  Why would they do it?

12      And, motive is not an element of any crime; it's not

13  something we have to prove.  But it's something you probably

14  are wondering.

15      And, the answer is right there in front of you.  And we

16  talked about it.  It's -- it's because they could.  It's

17  because they were trusted by the public.  It's because they

18  never thought that Rey Vargas or Cesar Hernandez, guys who were

19  in it with them -- they were guilty, they committed these

20  crimes.  They never thought they would get on the stand.

21      They never thought that Kelsey Stewart or Ian -- Ian

22  Elliot, heroin addicts, or Crystal Ponzer would get up on that

23  stand and testify against them.  They never thought they would

24  do it.

25      And it's the same reason why they stole antique call

1  boxes, or why they lit firecrackers at 6:00 in the morning,

2  disturbing San Francisco residents.  Because they could.

3      The only thing that was stopping them, the only thing that

4  was stopping Sergeant Furminger and Ed Robles was that oath.

5  That oath to uphold the rule of law.  And as Mr. Hemann said,

6  they were the guardians, and they failed.  They broke that

7  oath, the broke the rule of law, and they broke the honest

8  services charge.

9      We ask that you find the Defendants guilty on all counts.

10      Thank you.

11                        **INSTRUCTIONS**

12  **BY THE COURT:**

13      So, ladies and gentlemen, we are going to conclude today.

14  I want to give you a few more instructions in a couple of

15  minutes, and then give you some further direction.

16      When you begin your deliberations, you should elect one

17  member of the jury as your foreperson who will preside over the

18  deliberations and speak for you here in court.  You will then

19  discuss the case with your fellow jurors to reach agreement, if

20  you can do so.

21      Your verdict, whether guilty or not guilty, must be

22  unanimous.  Each of you must decide the case for yourself, but

23  you should do so only after you have considered all the

24  evidence, discussed it fully with the other jurors, listened to

25  the views of your fellow jurors.

1    Do not be afraid to change your opinion if the discussion

2  persuades you that you should.  But do not come to a decision

3  simply because other jurors think it is right.  It is important

4  that you attempt to reach a unanimous verdict.  But of course,

5  only if each of you can do so, after having made your own

6  conscientious decision.

7    Do not change an honest belief about the weight and effect

8  of the evidence simply to reach a verdict.

9    Because you must base your verdict only on the evidence

10  received in this case, on these instructions, I remind you that

11  you must not be exposed to any other information about the

12  case, or to the issues it involves.

13    Except for discussing the case with your fellow jurors

14  during the your deliberation, do not communicate with anyone in

15  any way, and do not let anyone else communicate with you in any

16  way about the merits of the case, or anything to do with it.

17  This includes discussing the case in person, in writing, by

18  phone or electronic means, via email text messaging or any

19  internet chatroom, blog, website or any other features.

20    This applies to your communications with family members,

21  your employer, the media or press, and the people involved in

22  the trial.  If you are asked or approached in any way about

23  your jury service, or about anything about this case, you must

24  respond that you have been ordered not to discuss the matter,

25  and to report the contact to the Court.

INSTRUCTIONS

1      Do not read, watch, or listen to any news or media

2  accounts or commentary about the case, or anything to do with

3  it.  Do not do any research such as consulting dictionaries,

4  searching the internet or using other reference materials.

5  And, do not make any other investigation or in any other way

6  try to learn about the case on your own.

7      The law requires these restrictions to ensure the parties

8  have a fair trial, based on the same evidence that each party

9  has had an opportunity to address.  A juror who violates these

10  restrictions jeopardizes the fairness of the proceedings.

11      If any juror is exposed to any outside information, please

12  notify the Court immediately.

13      Some of you have taken notes during the trial.  Whether

14  you took -- whether or not you took notes, you should rely on

15  your own memory of what was said.  Notes are only to assist

16  your memory.  You should not be overly influenced by your notes

17  or those of your fellow jurors.

18      The punishment provided by law for this crime is for the

19  Court to decide.  You may not decide punishment in deciding

20  whether the government has proved its case against the

21  Defendant, beyond a reasonable doubt.

22      A verdict form has been prepared for you.  After you have

23  reached unanimous agreement on a verdict, your foreperson

24  should complete the form according to your deliberations, sign

25  and date it, and advise the court clerk that you are ready to

1  return to the courtroom.

2      The verdict form is very simple.  It lists each count.  It

3  tries to identify the nature of the count.  And it has a box

4  for "guilty" and "not guilty" for you to sign or check, once

5  you have reached a unanimous verdict as to any count.

6      If it becomes necessary during your deliberations to

7  communicate with me, you may send a note through the clerk,

8  signed by any one or more of you.

9      No member of the jury should ever attempt to communicate

10 with me, except by a signed writing.  And I will respond to the

11 jury concerning the case only in writing, or here in open

12 court.

13     If you send out a question, I will consult with the

14 lawyers before answering it, which may take some time.  You may

15 continue your deliberations while waiting for the answer to any

16 question.

17     Remember that you are not to tell anyone, including me,

18 how the jury stands, numerically or otherwise, on any question

19 submitted to you, including the question of the guilt of the

20 Defendant, until after you have reached a unanimous verdict or

21 have been discharged.

22     So, Barbara will now take the jury back into the room

23 where you can commence your proceedings.  I leave it up to you

24 when you decide that you want to go home, and what time you

25 want to resume tomorrow.

1    As to the alternates, please stay a moment in court.

2    So the twelve may -- take your binder and your notebooks

3  with you.  Other evidence will come in that's not in the

4  binder, but is in evidence, along with the instructions and the

5  form of verdict.

6         (Jury excused)

7         (The following proceedings were held outside of the

8          presence of the Jury)

9         **THE COURT:**  Okay, now -- please be seated.

10        Let me turn now to the alternates, the four

11         alternates.  Your task is not complete.  You cannot,

12         as alternates, participate in the jury deliberations.

13         However, from time to time -- and it's been my

14  experience that it's with greater frequency than might

15  expect -- an alternate is called in to participate in the jury

16  deliberations.  If that occurs, you will then -- the jury will

17  be instructed to start the deliberations anew, afresh.  And you

18  will participate fully in them.

19     Two things:  Number one, I'm sure that Barbara has your

20  telephone numbers, where you can be reached on a moment's

21  notice.  And, that's important.  And secondly, you're still

22  under court order not to discuss the case.  And, so, please do

23  not discuss the case.

24     You can contact Barbara, and she will tell you what is

25  happening at any time with respect to the case.  And

1    ultimately, she will tell you what has occurred with respect to

2    the disposition of the case, unless you are in the jury room.

3         So, with that, I would like to express the Court's thanks.

4    You may retire as well.  And, we will -- then the jury will

5    proceed with its deliberations.  I appreciate it.

6         Please give your notebooks and your binders to Barbara, if

7    you would.  Thank you very much.

8              (Whereupon, the Alternate Jurors were excused from the

9              courtroom)

10        **THE COURT:**  Okay.  Okay.  Well, I assume -- I think

11   it's a good idea for all -- not the -- everybody can be seated.

12        I think the -- the lawyers and Defendants should remain.

13   Barbara will come back out.  I want you to go over the jury --

14   I mean the exhibit list, though maybe you've done so already.

15        Have you done so already?

16        **MR. HEMANN:**  I believe we have done so already.

17        **THE COURT:**  Okay.  There are no issues.

18        **MR. HEMANN:**  (Inaudible) on that, Your Honor.  No

19   issues.

20        **THE COURT:**  Okay.  So, those exhibits will be given

21   to the jury.  I don't think -- I think the marijuana isn't sent

22   in.  But --

23        **MR. HEMANN:**  The only thing that I believe that

24   Barbara does not have is the drug evidence.

25        **THE COURT:**  Okay.  But your agent has it, or the FBI

 1  has it?

 2          **MR. HEMANN:**  Correct.

 3          **MR. VILLAZOR:**  Yes, Your Honor.

 4          **THE COURT:**  All right.  So if that's called for, then

 5  obviously it will go in.

 6      We will send in -- we just have to make some changes with

 7  form of verdict, and it'll go in, along with copies of the

 8  instructions, either today if they're still here, or this

 9  evening for tomorrow.  The jury will be asked to resume.

10      So, you are excused.  All lawyers and parties have to stay

11  in the courthouse during deliberations.  And, please give your

12  telephone number to Barbara, so if I get a note from the jury,

13  I can get ahold of you right away, and address the note.  And I

14  do get that from time to time.

15      Thank you.  We are finished for the day.

16          **MR. HEMANN:**  Thank you, Your Honor.

17          **MR. VILLAZOR:**  Thank you, Your Honor.

18          (Proceedings concluded)

19

20

21

22

23

24

25

1                                    __INDEX__

2                                                        __PAGE__    __VOL__.

3    Instructions by the Court                            1833        10
     Closing Argument by Mr. Hemann                        1860        10
4    Closing Argument by Mr. Passaglia                     1934        10
     Closing Argument by Mr. Getz                          2005        10
5    Closing Argument by Ms. Caffese                       2016        10
     Rebuttal Argument by Mr. Villazor                     2062        10
6    Instructions by the Court                             2086        10

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATE OF REPORTERS**</u>

I, BELLE BALL, and I, KATHERINE SULLIVAN, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball_____

Tuesday, December 2, 2014

Belle Ball, CSR 8785, CRR, RDR


/s/ Katherine Sullivan_____

Tuesday, December 2, 2014

Katherine Sullivan, CSR 5812, CRR, RMR