TERESA CAFFESE (CSBN: 124342)
LAW OFFICES OF TERESA CAFFESE
1000 Brannan Street, Suite 400
San Francisco, California 94103
Telephone: (415)536-1455
Email: teresa@caffeselaw.com

Attorney for Defendant
EDMOND ROBLES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>EDMOND ROBLES,<br><br>    Defendant. | Case No: CR-14-102 CRB<br><br>DEFENDANT'S SENTENCING MEMORANDUM<br><br>Date: February 23, 2015<br>Time: 10:00 a.m.<br>CTRM: 6, 17th Floor |

## I. INTRODUCTION

Following a jury trial, Edmond Robles was convicted of Counts 1 & 2, Title 18 USC 1343, Wire Fraud, Count 5, a violation of Title 18 USC 241, Conspiracy Against Civil Rights, Count 6, a violation of Title 18 USC 371, Conspiracy, and Count 7, a violation of Title 18 USC 666(a)(1)(A), Theft Concerning Federally Funded Program. He was acquitted of two counts of Honest Services Wire Fraud and one count of Conspiracy to Distribute Controlled Substances. The United States Probation Office has prepared a Presentence Report (PSR) and concluded that the advisory United States Sentencing Guideline (USSG) in this case is Total Offense Level 28, Criminal History Category I. Mr. Robles objects to the Guideline calculation and requests that the Court find that the accurate advisory Guideline is Total Offense Level 22, Criminal History Category I.[1]

---

[1] This memorandum incorporates fully Defendant's Guideline Calculation, previously submitted to the Court.

DEFENDANT'S SENTENCING
MEMORANDUM [CR 14-102 CRB]        1

Mr. Robles comes now before the Court requesting that the Court impose a sentence of 24 months imprisonment, to be followed by a term of Supervised Release. Such a sentence is sufficient, but not greater than necessary to fulfill the goals of sentencing as outlined in Title 18 USC 3553.

## II. BACKGROUND

Ed Robles was born in San Francisco and is now 47 years old. He is the youngest of four children born to his parents' marriage. Ed's father, 83 year old Ernest Robles, was born in San Francisco, but raised for the most part in Michoacan, Mexico. He was the manager of the St. Francis Hotel in San Francisco for over 30 years. Ed's mother, 82 year old Dolores, worked as a secretary at Wells Fargo Bank's Market Street Headquarters. Mr. and Mrs. Robles are now retired and reside in Las Vegas, Nevada. Ed's older brother Ernest is a graduate of the University of California Berkeley and the University of Michigan Law School. After a career in private practice and U.S. Bankruptcy Trustee, he was appointed in 1993 as U.S. Bankruptcy Judge in the Central District of California, Los Angeles. Ed's older sister Patricia is a graduate of San Francisco State University, is a manager for VISA Credit Company, and resides in San Mateo. His older sister Isabel is a homemaker residing in Lake Oswego, Oregon.

Ed attended Catholic schools in San Francisco and graduated from Sacred Heart High School in 1985. He was an all-league baseball player and ran track. Basically an average student, Ed then attended City College of San Francisco for a year, after which he went to work full time. In 1986, Ed joined the United States Marine Corps Reserve and was trained as a combat engineer. His unit was deployed in Europe during the first Gulf War, but did not see combat. Ed completed his reserve duty in 1992 and was Honorably Discharged at the rank of E-5, Sergeant.

In 1992, Ed joined the San Francisco Police Department. He completed the Peace Officer's Standards and Training (POST) approved academy and later earned an Advanced POST Certificate. He also completed specialized training in emergency vehicle operation and drug identification. He has been a guest instructor at the Police Academy. A review of Ed's police personnel file reveals consistent high ratings by his superiors. Over his 22 years on the street as a San Francisco Police

Officer, only one complaint against him was sustained by the Office of Citizen Complaints. He was named in only one law suit, which was dropped by the complainant. He earned a number of Captain's compliments for his excellent work as a police officer. A year before charges were filed in the present case, Ed achieved his dream position in the Police Department, being assigned to the motorcycle unit.

In 1998, Ed married Erin. They have three daughters, 15 year old Emily, and 8 year old twins Estella and Eva. Ed's three daughters have been the focus of his life throughout their childhoods. He has been the coach of their sports teams and has consistently been a major part of their lives. Ed and Erin are separated, but share custody of the girls, whom Ed sees everyday.

The allegations of the present charges encompass the time period in Ed's career from early to late 2009, when Ed was transferred to the motorcycle squad. It began with the arrival of Officer Reynaldo Vargas in approximately February 2009 and ended with Ed's transfer in December 2009. Throughout the balance of Ed's 22 plus year career with the Police Department there is no indication of wrong doing, only effective police work appreciated by his colleagues. Officer Becki Newman wrote:

> "I have known Ed for 19 years. We met while working together at Mission Police Station. I worked with Ed and saw him daily for years. I was new to the department and once I met him and got to know him better I knew that he was someone I could trust and depend on. Ed was a person I could go to with questions and he would always steer me in the right direction."

Similarly, Sgt. Russell Gordon wrote:

> " I have always found Ed's character to be of the highest caliber. My experience with Ed has always left me with the impression that he is hardworking, trustworthy and has a steadfast dedicated to the job at hand."

Ed's brother-in-law Robert Velarde, a 31 year veteran of the San Francisco Police Department, offers a unique view of Ed:

> "Not only were we 'brothers' by law, but we were also 'brothers' by profession. The bond that develops in the law enforcement field is like no other as we go through the trials and tribulations of everyday difficulties related to police life. Edmond and I frequently talked at length regarding our experiences, and regaled in our stories and 'cop talk.' I know from personal observations and through discussions with many of Edmond's co-workers, that he was highly regarded and an extremely hard working,

tenacious officer."

The present conviction does not fully define Ed Robles. Many people have stepped forward to express their love for him, confidence in him, and opinions of his character. Particularly moving is the account of Ed's reaction to his sisters severely disabled children. Ed's brother-in-law Lee Sturman wrote:

> "My wife (Edmond's sister) and I are parents of two severely disabled children (ages 17 and 12). Both were born with a rare genetic syndrome with characteristics that include;
>
>> Missing part of the brain called the corpus callosum
>> Severe intellectual disabilities (mental retardation)
>> No verbal speech capability
>> Significant sensory issues
>> Skeletal issues - Scoliosis (Daughter)
>> Feeding issues requiring a liquid diet and feeding tube (Son)
>> Inability to perform daily living activities (dressing, grooming, tidying, etc.)
>
> As parents, we have come to realize that many people are uncomfortable around children with disabilities (and their parents). They will often stay silent or become distant and pull away from our lives. But not Uncle Edmond. Instead of pulling away, his caring and generous nature drove him to try to help our situation. Knowing that raising our kids places a huge financial burden on our family, Edmond took it upon himself to organize and promote a "walk-along-the-bay" in San Francisco with the sole purpose of raising funds for our children. The event was well-attended by family, friends, and strangers. We were very humbled and grateful for the turnout. Donations have been placed into trust for the benefit of our children.
>
> But Edmond was not finished. Feeling he should be able to do even more, Edmond set up and promoted an online web site to help raise additional donations for our children. At this point, my wife and I felt truly overwhelmed with Edmond's generosity.
>
> To me, Edmond is an inspiration. When others felt sorry, Edmond felt energized. When others felt helpless, Edmond felt a call to action. If my children could talk, they would surely call Uncle Ed their hero."

Ed and Christopher Millikin have been friends since they served together in the United States Marine Corps. Chris is now a Senior Engineering Manager for Google. He wrote:

> "During our friendship, Ed has been there for me on countless occasions, but two immediately come to mind as highlighting his value to me as a friend. First, was a rough spot in my own marriage. Aileen and I separated for a time, and Ed was instrumental in helping us find our way. He never judged, he never chose sides. He simply loved us through the whole process, and reminded us of what we meant to one another. To that point, that was the toughest experience in my life. Little did I know at the time, that it was merely a dress rehearsal for true tribulation.

DEFENDANT'S SENTENCING
MEMORANDUM [CR 14-102 CRB]                4

> In 2004, my wife went in for out patient surgery for what we thought was a benign cyst. Instead, we were horrified to learn of a stage three tumor the size of a cantaloupe in her abdomen. Researching ovarian cancer does not fill one with hope and warmth, knowing that it afflicts the single most important person in your world fills you with a fear so vicious and suffocating that you find yourself in a dark and menacing place from which you think you will never emerge. It was at this time that my friend, no my brother, stood by me like no other.
>
> Even my own family retreated to polite safety, the reality of the situation being too much for them to process. Over the course of the months of treatment, Ed was there to provide a meal, share a ball game or just offer a shoulder for me to weep on. I am happy to say that we found light at the other end of that tunnel, and my wife is well over ten years cancer free. For all the things I am thankful for, I am thankful for this kind of friendship that helped me stay the course through this most difficult time."

Ed's wife Erin provides this important perspective of Ed:

> "The most important role in Ed's life is a loving and devoted father to our three beautiful daughters, Emily (15), Eva (8) and Estella (8). I knew when I first married Ed in 1998 that I had picked a husband who would always be there in every way for our children, if and when we were blessed enough to have a family, because of the amazing person he was, and his faith and commitment to his own family. Ed's commitment to family was of utmost importance to me when making the decision to marry, because my own father died of cancer when I was just three years old, and I missed and longed for the role of a father in my life as I grew up. It has been so wonderful to see my children have the love of their father in their lives as they grow into amazing young girls. Through the years I have been so proud and happy to see the impact of Ed's involvement with all three of them, whether it was with school, sports, music, family activities - Ed has enjoyed it all with them.
>
> Although Ed and I separated last year I knew that even with the breakup of our marriage our girls would be ok because their father would still continue to be the incredible father he has always been to them, and he would continue to make raising our children his priority in life.
>
> " . . . I am frightful to see what the absence of Ed in my children's lives for any amount of time will do to them. I am realistic, I know that Ed is facing very serious consequences, and I do not take that lightly. I ask, however, that you consider the impact of Ed's sentence on so many of us, including Ed."

Finally, Ed's older brother, the Honorable Ernest Robles summed up Ed's present circumstances and offers the Court a view of Ed no one else could have:

> "Joining the SFPD was according to Ed, his greatest accomplishment. It gave him a chance to help others, it gave him discipline and it gave him the opportunity to find stability in his life. He got married, had three wonderful girls whom he coached in their many sport activities and was looking forward to seeing them grow into wonderful young ladies when he was charged.
>
> Ed does not merit long incarceration. His life will never be the same. His relationship with his children will never be the same. He has always tried to help others and I

DEFENDANT'S SENTENCING
MEMORANDUM [CR 14-102 CRB]            5

truly believe that putting him away would deprive others who would benefit from his life's experience.

Everyday that Ed put on his badge he was ready and willing to sacrifice his life for someone else. I heard him talk about his undercover work and on many occasions I asked him to transfer out. But, he said that it was work that needed to be done and he was proud of his part in it.

He performed society's dirty work. I cannot believe that after one transgression society's response to Ed is to toss him aside like garbage. . . . I have been a bankruptcy judge for 23 years. I spent 10 years in the Department of Justice. Both before and after this ordeal I am prouder of Ed than any person I have ever met."

### III. APPLICABLE SENTENCING LAW

***United States v. Booker***, 160 L. Ed. 2d 621, 125 S.Ct. 738 (2005), renders the Guidelines as advisory only, and instructs the sentencing courts to consider the Guidelines in context of all of those factors enumerated in Title 18 USC 3553(a).

> ". . . Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." ***Booker***, at 660-661.

The Supreme Court addressed the issue of the "presumption of reasonableness" of a within Guidelines sentence in ***Rita v. United States***, 551 S.Ct. 338, 127 U.S. 2456, 168 L.Ed. 2d 203 (2007) and instructed that a within Guideline sentence is presumed reasonable only upon **appellate review**. The Court stated:

> "We repeat that the presumption before us is an *appellate* court presumption. Given our explanation in *Booker* that appellate "reasonableness" review merely asks whether the trial court abused its discretion, the presumption applies only on appellate review. The sentencing judge, as a matter of process, will normally begin by considering the presentence report and its interpretation of the Guidelines. *18 U.S.C. § 3552(a); Fed. Rule Crim. Proc. 32*. He may hear arguments by prosecution or defense that the Guidelines sentence should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines, to apply, *USSG § 5K2.0*, perhaps because the Guidelines sentence itself fails properly to reflect *§ 3553(a)* considerations, or perhaps because the case warrants a different sentence regardless. See *Rule 32(f)*. Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure. See *Rules 32(f), (h), (i)(1)© and (i)(1)(D)*, see also *Burns v. United States, 501 U.S. 129, 136, 111 S. Ct. 2182, 115 L.Ed. 2d 123 (1991)* (recognizing importance of notice and meaningful opportunity to be heard at sentencing). In determining the merits of these arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply. *Booker, 543 U.S. at 259-260, 125 S.Ct. 738, 160 L. Ed. 2d 621.*" at 351.

Further, the Court instructed:

> "The fact that we permit courts of appeals to adopt a presumption of reasonableness does not mean that courts may adopt a presumption of unreasonableness. Even the Government concedes that the appellate courts may not presume that every variance from the advisory Guidelines is unreasonable." at 354.

In **Nelson v. United States**, 129 S. Ct. 890, 892, 172 L.Ed. 2d 719 (2009), perhaps as a reminder and definitely for emphasis, the court stated:

> "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable."

The Ninth Circuit reiterated this premise in **United States v. Edwards**, 595 F.3d 1004, 1015 (9th Cir. 2010) ([Court] cannot presume a sentence is substantively unreasonable only because it falls outside the range recommended by the Sentencing Commission).

Indeed, in **Irizarry v. United States**, 128 S.Ct. 2198, 2202, 171 L.Ed. 2d 28 (2008), the Court ruled that a variance from the sentencing Guideline range did not even require notice to the parties.

The Ninth Circuit was heard on the presumption of reasonableness and directed that even on appeal the presumption of a Guideline sentence may not be reasonable. It stated:

> ". . . A court of appeals may *not* presume that a non-Guidelines sentence is *un*reasonable. Although a court may presume on appeal that a sentence within the Guidelines range is reasonable, *id*, we decline to adopt such a presumption in this circuit." **United States v. Carty**, 520 F.3d 984, 993 (9th Cir. 2008) (en banc).

The Guideline range is simply the beginning of the analysis for sentencing, not the end. The Ninth Circuit stated:

> "'The Guideline's factor may not be given more or less weight than any other.' So while the Guidelines are the 'starting point and initial benchmark' and must 'be kept in mind throughout the sentencing process,' the Guideline's range constitutes only a touch-stone in the district court's sentencing consideration." **United States v. Autery**, 555 F.3d 864, 8172 (9th Cir. 2009)

**United States v. Ressam**, 629 F.3d 793, 828 (9th Cir. 2012) (en banc), defined "substantive reasonableness:"

> "A substantively reasonable sentence is one that is sufficient, but not greater than necessary to accomplish §3553(a)(2)'s sentencing goals. The touchstones of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 USC §3553(a). In determining substantive reasonableness, we are to consider the totality of the circumstances,

including the degree of variance for a sentence imposed outside the Guidelines range."

The Court must now consider 18 USC 3553(a) in its entirety and impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The court, in determining the particular sentence to be imposed, shall consider –

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed --

  (a) to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense;

  (b) to afford adequate deterrence to criminal conduct;

  (c) to protect the public from further crimes of the defendant; and

  (d) to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner;

The sentencing court is now required to consider factors that the Guidelines effectively prohibited from consideration (ie: Age, USSG 5H1.1; Education and Vocational Skills, USSG 5H1.2; Mental and Emotional Condition, USSG 5H1.3; Physical Condition Including Drug or Alcohol Dependence, USSG 5H1.4; Employment, USSG 5H1.5; Family Ties and Responsibilities, USSG 5H1.6; Socio-economic Status, USSG 5H1.10; Civic and Military Contributions, USSG 5H1.11; and Lack of Youthful Guidance, USSG 5H1.12.). ***United States v. Ameline***, 409 F.3d 1073, 1093 (9th Cir. 2005) (*en banc*). To consider the "history and characteristics of the defendant," the Court must now consider factors the Guidelines eschewed.

Finally, the Supreme Court has cautioned that respect for the law is promoted in many ways, not always measured by the strictness of sentences or the nature of harsh sanctions. The Court stated:

> ". . . Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." ***Gall v. United States***, 128 S.Ct. 585, 599, 169 L.Ed. 2d 445 (2007).

In order to meet the mandate of the *Booker* remedy, this court must calculate the appropriate guidelines range and may consider appropriate departures. It must also apply the 3553(a) factors and address any other specific characteristics of the defendant or his offense that might impact the determination of a "reasonable" sentence under the particular circumstances of this case. The court must then consider the statutory parsimony provision and impose a sentence "sufficient, but not greater than necessary to comply with the purposes set forth in §3553(a)(2). The district court's sentencing decision will then be subject to an abuse-of-discretion review by the circuit. See *United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2010) (reversal is appropriate only if district court's sentence is "illogical, implausible, or without support in inferences that may be drawn from facts in the record").

## IV. A SENTENCE SUFFICIENT BUT NOT GREATER THAN NECESSARY

The jury's verdict has resulted in Edmond Robles' conviction for serious offenses that represent a violation of his oath of office and a breech of the public's faith. These offenses, however, do not fully represent Edmond Robles' character or his significant contributions to the City of San Francisco, his community, and his family. Given the enormous collateral consequences as a result of this conviction, including loss of his career, impoverishment, loss of his pension, loss of future earning potential, and notoriety in the community, any period of imprisonment will satisfy the sentencing statute's requirement that the sentence reflect the seriousness of this conduct, sufficiently punish Edmond Robles, promote respect for the law, provide adequate deterrence to Mr. Robles and others, and protect the public.

At the outset, conditions of confinement for Ed Robles will be harsher than that of regular inmates because of his status as a former police officer. The Ninth Circuit has recognized that "conditions of confinement" can form the basis for a downward departure (or variance in the post *Booker* era) from the established Guideline range. Mr. Robles will not necessarily be designated to

an institution close enough to his family to facilitate visits.[2] His day to day existence in prison will be characterized by threats or potential threats from other inmates. See **United States v. Davoudi**, 172 F.3d 1130, 1133 (9th Cir. 1999) (conditions of confinement are harsher for aliens), and **United States v. Charry Cubillos**, 91 F.3d 1342, 1344 (9th Cir. 1996) (conditions of confinement can form the basis for a downward departure).

Edmond Robles also has significant family responsibilities that impact on the sentencing decision. Letters submitted, including those quoted above, describe the vital role Mr. Robles plays in the lives of his three young daughters and the difficulty his wife will have supporting them without Mr. Robles' financial and personal contribution. The children will be devastated by his absence. Mrs. Robles will struggle mightily. Mr. Robles' current situation, fundamentally unable to work, has already created a huge financial burden on Mrs. Robles and Mr. Robles' family. Even during the era of mandatory Guidelines, family responsibilities were recognized as a potential basis for a below Guidelines sentence. See **United States v. Aguirre**, 214 F.3d 1122, 1127 (9th Cir. 2000). Mr. Robles does not suggest that this factor alone warrants a downward departure, but that it is a factor under 3553(a) that warrants a variance.

Under "history and characteristics of the defendant," Mr. Robles asks that the Court consider the aberrant nature of this illegal conduct in the context of his entire life and his over 22 year career in the San Francisco Police Department. Ten times, beginning in May 1996 through February 2007, Mr. Robles was recognized by his superiors for outstanding police work (Captain's recognition in Mr. Robles' personnel binder), including jumping in San Francisco Bay to rescue a suspect who had fallen in. On two occasions he was hospitalized for injuries sustained in a motorcycle accident and during a violent arrest. In 1998, at McLaren Park, Mr. Robles was shot at by a suspect wielding an Uzi automatic riffle. Thankfully, he was not hit. After he left the plain clothes unit at Mission Station, he was complimented by a citizen in December 2012. The present illegal conduct took

---

[2] For example in a recent case in the Central District of California, a former correctional officer was designated to FCI Lexington Kentucky for his "safety."

place between February 2009 and ceased that December. It began when Reynaldo Vargas joined the unit and ended when Mr. Robles was transferred to the motorcycle unit, his career long ambition. It does not reflect over 21 years of fundamentally blemish free extremely dangerous work as a police officer.

      Letters submitted on Mr. Robles' behalf describe an individual who cares about others and goes out of his way to make other's lives easier. Nothing is more compelling than the charity work he has done on behalf of his seriously disabled niece and nephew. The support and love he has given friends and family during difficult times, also exemplify characteristics of Mr. Robles not previously known to the Court. Mr. Robles has been a good man who has been a significant contributor to his family and community. Any analysis of his wrong doing should be considered in the context of all of the good he has done over the years.

      Mr. Robles asks that the Court consider, not only the seriousness of his illegal conduct as found by the jury, but also 21 years of positive accomplishment in the dangerous work of a city police officer, his role in raising and supporting his three daughters to whom he is extraordinarily close, the contributions he has made to other family members, and the support and love he has given friends and colleagues over the years. In this context, a sentence of 24 months imprisonment will send the correct message to the community, particularly the community of police, will recognize the seriousness of Mr. Robles' illegal conduct, will promote respect for the law as it demonstrates that the Court has considered the entire context of Mr. Robles' conduct, and will be sufficient, but not greater than necessary.

DATED: February 12, 2015           Respectfully submitted,

/s/
_____
Teresa Caffese
Attorney for Defendant
EDMOND ROBLES

DEFENDANT'S SENTENCING
MEMORANDUM [CR 14-102 CRB]      11