ANTHONY J. BRASS (SBN 173302)
Email: Tony@brasslawoffice.com
3223 Webster Street
San Francisco, California 94123
Telephone: 415-922-5462

WILLIAM J. GENEGO (SBN 103224)
Email: bill@genegolaw.com
Law Office of William Genego
2115 Main Street
Santa Monica, California 90405
Telephone: 310-399-3259

Counsel for Defendant
Edward Robles

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>IAN FURMINGER and EDMOND ROBLES,<br><br>Defendants. | **Case No. CR 14-0102-02 CRB**<br><br>EDMOND ROBLES' SUPPLEMENTAL GROUNDS IN SUPPORT OF HIS NEW TRIAL MOTION AND MEMORANDUM IN SUPPORT OF SUPPLEMENTAL GROUNDS<br><br>Date:     March 18, 2015<br>Time:     10:00 a.m.<br>Courtroom: No. 6, 17th Floor |

Edmond Robles, by counsel, hereby supplements his previously filed motion for a new trial (Dkt. 193) with the following additional grounds:

1.     The evidence was insufficient as to Counts One and Two, requiring an acquittal as to both counts.

2.     Mr. Robles was denied his right to be present at all stages of the trial, requiring a new trial as to all counts of conviction.

1    3.    The jury instruction as to Counts Six and Seven were erroneous, requiring

2  a new trial as to both counts.

3    4.    Mr. Robles was denied his right to the effective assistance of counsel at

4  trial, requiring a new trial as to all counts of conviction.

5    This supplement to the new trial motion is based on the memorandum of points

6  and authorities which follows, the accompanying declarations and exhibits, the files

7  and records of the case and such further and additional evidence and argument as may

8  be presented at a hearing on the motion.

9                                  Respectfully Submitted,

10  Dated: March 15, 2015

11                                  /s/ Tony Brass

12                                  /s/ William J. Genego

13                                  Counsel for Defendant Edmond Robles

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Table of Contents

I.  Introduction and Summary of Argument ............................................................. 1

II.  The Evidence Failed To Prove the "Materiality" Element of the Crime of Wire Fraud Charged In Counts One and Two ........................................................... 5

III.  The Failure to Apprise Mr. Robles of the Juror's Communication With the Court Violated His Right to Be Present at All Stages of the Trial ............................ 8

   A.  The Juror Communication .................................................................... 8

   B.  Mr. Robles' Absence Violated His Statutory and Constitutional Right to Be Present at All Stages of the Trial.................................................. 10

IV.  The Instructions as to the Violation of 18 U.S.C. § 666 Were Erroneous, Requiring a New Trial as to Counts Six and Seven ........................................ 13

V.  Mr. Robles Was Denied His Right to the Effective Assistance of Counsel .... 15

   A.  The Four Categories of Objectively Unreasonable Errors ............................. 16

   B.  The Errors Denied Mr. Robles a Fair Trial ...................................... 25

VI.  Conclusion.................................................................................... 26

## Exhibits

A    Declaration of William Genego

B    Summary of ATM Cash Withdrawals and Excerpts of Bank Statements

C    Declaration of Quijuan Maloof

D    Declaration of Erin Robles

E    Declaration of Robert Velarde

F    Declaration of Anthony Brass

G    Declaration of Edmond Robles

1

## Table of Authorities

2

3

Federal Cases

4

5          422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed.2d 562 (1975) ................................................... 12

6     543 U.S. 890 (2004) ................................................................................................................ 6

7     *Bustamante v. Eyman*,
          456 F.2d 269 (9th Cir. 1972) .................................................................................................. 12

8     *Chapman v. California*,
9          386 U.S. 18, 87 S. Ct. 824, 17 L. Ed.2d 705 (1967) ....................................................... 13

10    *McMann v. Richardson*,
          397 U.S. 759, 90 S. Ct. 1441, 25 L. Ed.2d 763 (1970) ................................................... 15

11    *Neder v. United States*,
12         527 U.S. 1, 119 S. Ct. 1827 144 L. Ed. 2d 35 (1999) ......................................................... 6

13    *Snyder v. Massachusetts*,
          291 U.S. 97, 54 S. Ct. 330, 78 L. Ed. 674 (1934) ....................................................... 11, 12

14    *Strickland v. Washington*,
15         466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984) ................................................. 15

16    *United States v. Brown*,
          623 F.3d 104 (2d Cir. 2010) ............................................................................................. 15, 16

17    *United States v. Evans*,
18         844 F.2d 36 (2d Cir. 1988) .......................................................................................................... 7

19    *United States v. Gagnon*,
          470 U.S. 522, 105 S. Ct. 1482, 84 L. Ed.2d 486 (1985) ........................................... 11, 12

20    *United States v. Lew*,
21         875 F.2d 219 (9th Cir. 1989) ....................................................................................................... 7

22    *United States v. Long*,
          301 F.3d 1095 (9th Cir. 2002) ................................................................................................. 13

23    *United States v. Maxwell*,
24         579 F.3d 1282 (11th Cir. 2009) ................................................................................................ 7

25    *United States v. Mitchell*,
          867 F.2d 1232 (9th Cir. 1989) ................................................................................................... 7

26    *United States v. Reyes*,
27         764 F.3d 1184 (9th Cir. 2014) ................................................................................ 10, 11, 12

28    *United States v. Rolle*,
          204 F.3d 133 (4th Cir. 2000) .................................................................................................. 12

*United States v. Rosales-Rodriguez,*
    289 F.3d 1106 (9th Cir. 2002) ........................................................................... 11

*United States v. Rybicki,*
    354 F.3d 124 (2d Cir. 2003) .................................................................................. 6

*United States v. Sherman,*
    821 F.2d 1337 (9th Cir. 1987) ........................................................................... 11

*United States v. Steele,*
    733 F.3d 894 (9th Cir. 2013) ....................................................................... 15, 16

*United States v. Webb,*
    691 F. Supp. 1164 (N.D. Ill. 1988) .................................................................... 14

Federal Statutes

18 U.S.C. § 666 ........................................................................................................ 13

18 U.S.C. § 666(a)(1)(A) .................................................................................. 2, 13, 14

18 U.S.C. §§ 666(a)(1)(A), (2) .................................................................................. 2

18 U.S.C. §1343 ......................................................................................................... 6

Federal Rules

Fed. R. Crim. P. 29 ..................................................................................................... 1

Fed. R. Crim. P. 33 ..................................................................................................... 1

Fed. R. Crim. P. 43 .......................................................................................... passim

Fed. R. Evid. 608 .................................................................................................. 4, 21

Other Authorities

Restatement (Second) of Torts § 538 (1977) ........................................................... 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.     Introduction and Summary of Argument

Following Edmond Robles's conviction, the Court orally granted an extension of time within which to file a motion for a new trial pursuant to Fed. R. Crim. P. 33 and judgment of acquittal pursuant to Fed. R. Crim. P. 29. Reporter's Transcript ("RT") 2169. Mr. Robles' trial counsel filed a new trial motion on January 16, 2015. Dkt. 193.

Thereafter, Mr. Robles obtained new counsel and the Court approved the request that he replace trial counsel. Dkt. 220, 223. The Court also granted new counsel an opportunity to supplement the new trial motion, and continued the hearing on the new trial motion, and sentencing, to March 18, 2015. Dkt. 225. The Court denied Mr. Robles' subsequent request for a further continuance. Dkt. 245. Accordingly, Mr. Robles submits this memorandum in advance of March 18 proceedings, to supplement his previously filed motion for a new trial.

A.     A new trial and judgment of acquittal is required as to Counts One and Two because there was no evidence that the alleged fraudulent omissions were material, that is that "they had a natural tendency to influence, or were capable of influencing a person *to part with money or property* or were capable of influencing a person *to part with money or property*." RT 1842 (emphasis added). In fact, they could not have been, as the alleged fraudulent omissions – to wit, omissions from police reports of the seizure of money and property – occurred *after* the money or property had been obtained from arrestees. Settled Ninth Circuit case law establishes that based on the evidence presented, the crime of wire fraud charged in Counts One and Two was not proved.

B.     A new trial is required as to all counts because Mr. Robles was denied his right under Fed. R. Crim. P. 43 and the Fifth Amendment to the Constitution to be present at, and participate in, all stages of the trial proceeding. The violation occurred at the conclusion of the first day of testimony, when the Court and counsel read a note from a juror outside Mr. Robles' presence. The substance of the note was not apparent from the discussion between the Court and counsel, and Mr. Robles was not advised of

1    its content by his attorney. Under Ninth Circuit and Supreme Court precedent, the

2    communication with the juror outside the presence of Mr. Robles violated his right

3    under Fed. R. Crim. P. 43 and the Constitution to be present at all stages of the trial.

4    This error requires a new trial as to all counts of conviction.

5        C.    A new trial is required as to Counts Six and Seven as the jury instructions

6    as to both were incorrect. The instructions as to Count Seven, which charged a

7    violation of 18 U.S.C. §§ 666(a)(1)(A), (2) (theft concerning a federally funded program,

8    aiding and abetting) were erroneous, because they advised the jury that a conviction

9    could be based on any one of five separately identified thefts, as long as the jurors

10   agreed on any one of the thefts. But three of the thefts involved property of a value of

11   less than $5,000, and thus could not support a conviction on Count Seven because an

12   essential element of the offense is that the value of the property be at least $5,000.

13       This error as to Count Seven also caused the instructions as to Count Six to be

14   incorrect. Count Six charged a conspiracy to violate 18 U.S.C. § 666(a)(1)(A), the crime

15   charged in Count Seven. The instructions on Count Six told the jury that the first

16   element could be established by proof of an agreement to commit any one of the five

17   thefts listed in the instruction for Count Seven. That caused the instruction to be

18   incorrect, because if the jury found the agreement was to commit any one of the three

19   thefts of property with a value of less than $5,000, it would not be sufficient to support

20   a conviction on Count Six.

21       D.    A new trial is also required on all counts of conviction because Mr. Robles

22   was denied his Sixth Amendment right to the effective assistance of counsel at trial.

23   Trial counsel's objectively unreasonable errors can be grouped into four categories:

24       1.    Failure to investigate the innocent explanation for Mr. Robles's seemingly

25            sudden and unexplained possession of a large amount of cash, and the

26            failure to present evidence that would have established the innocent

27            explanation.

28

1    The government presented evidence of a $6,000 cash deposit made by Mr. Robles

2    which appeared to be powerfully incriminating as the only explanation for the source of

3    the cash was the one offered by the government, based on the testimony of cooperating

4    co-defendant Reynaldo Vargas – that the cash was Mr. Robles' share of a theft

5    committed just days earlier, according to Vargas. The government capitalized on the

6    absence of an alternative explanation, mockingly suggesting that "[a]ll of a sudden,"

7    the cash must have "dropped right into [Mr. Robles'] lap from Heaven." RT 1884.

8    Trial counsel failed to investigate and present evidence that would have

9    established the actual – and innocent explanation for the cash. Specifically, that Mr.

10   Mr. Robles had been hoarding cash in anticipation of a separation from his wife, and

11   during a period of attempted reconciliation in May 2009, he deposited some of the cash

12   into their bank account which was used to pay outstanding bills, and purchase a

13   bicycle. The evidence available to prove this innocent explanation included bank

14   statements showing ATM cash withdrawals over a period of more than a year. See Exh.

15   A (Declaration of William Genego); Exh. B (Summary of ATM cash withdrawals and

16   excerpts of bank statements). Given the amount and frequency of the withdrawals, and

17   the period of time over which they occurred, the withdrawals are only reasonably

18   explained by the reason they in fact occurred. Other available evidence establishing the

19   innocent explanation for the cash includes testimony from Quijan Maloof and Erin

20   Robles, as evidenced by their declarations submitted with this memorandum. Exh. C

21   (Declaration of Quijuan Maloof); Exh. D (Declaration of Erin Robles).

22       2.    Failure to present evidence to support the defense position that Mr.

23               Robles was an honest officer who had worked in plainclothes without

24               incident before being partnered with co-defendant Vargas, and any thefts

25               that occurred were committed by Vargas and not Mr. Robles.

26   Counsel told the jury in her opening statement that Mr. Robles had worked as a

27   plainclothes officer prior to being partnered with Vargas in February 2009, and that

28   the jury would hear evidence that he never previously had any problems or allegations

Edmond Robles' Supplemental
Grounds to New Trial Motion     3     Case No. CR 14-0102-02 CRB

of wrongdoing, and that Vargas was the bad actor. After telling the jury it would receive such evidence, counsel inexplicably failed to present any testimony or other evidence to support her statements. Mr. Robles' plainclothes partner prior to February 2009, Officer John Zachos, was available to provide such testimony, as evidenced by the declaration of Robert Velarde submitted with this memorandum, which details a post-conviction interview of Officer Zachos. Exh. E (Declaration of Robert Velarde). The failure to support the position detailed for the jury was especially significant and prejudicial, because Vargas testified that it was Mr. Robles who had started him on the road to stealing by placing money in his pocket after a search.

> 3.   Failure to present evidence to impeach the government's key witnesses and discredit its evidence.

Trial counsel's errors in this area included attempting to impeach Vargas by presenting extrinsic evidence that he was fired from the Police Department, which is prohibited by Fed. R. Evid. 608. Despite this clear prohibition, counsel told the jury in her opening statement that if Vargas denied he was fired, they would hear from witnesses proving that he was. Although the Court prohibited counsel from presenting extrinsic evidence, it ruled that if Vargas opened the door he could be asked about whether he was fired.  Despite Vargas opening the door by providing misleading testimony that he "left" the department in 2012, counsel never confronted Vargas on cross-examination with the fact that he had been fired.

Trial counsel also failed to impeach and discredit Cesar Hernandez's adverse testimony that Mr. Robles supposedly trashed his room, with the available testimony of Officer Zachos.

Counsel also failed to impeach Hernandez's testimony that Mr. Robles told him about an alleged theft from "Manny" (the resident of the Newark property), with the fact that Hernandez never said anything about such a conversation during his grand jury testimony, or when interviewed by the FBI. Exh. F (Declaration of Anthony Brass). It was only *after* Vargas began cooperating with law enforcement and told them

he had stolen money during the Newark search that Hernandez first made any claim that Mr. Robles told him about a theft from Manny. While Hernandez's testimony appeared to independently corroborate Vargas' testimony, evidence of Hernandez's failure to even mention Manny earlier would have discredited his testimony. It also would have strongly supported the defense's position that Hernandez had tailored his testimony to see that Mr. Robles was convicted.

Similarly, counsel failed to discredit the government's evidence incriminating Mr. Robles regarding the June 18 Potrero Avenue search and the October 2 Andrew Byrd search and arrest, the two thefts that Vargas claimed Mr. Robles had committed.

4.   Failure to object to inadmissible evidence that was not relevant and highly prejudicial.

Counsel's errors in this area included the failure to object to the government's use of the San Francisco Police Department's Informant Manual, even though the evidence established the absence of any foundation for its admission. Counsel also failed to object to irrelevant and prejudicial character evidence about Mr. Robles supposedly setting off explosives in city streets for enjoyment.

There were no plausible strategic justifications for these errors. The errors resulted in the jury receiving a one-sided, distorted and inaccurate view of the case. Many of the errors individually, and all of them collectively, prejudiced Mr. Robles because they denied him his right to a fair trial.

## II.   The Evidence Failed To Prove the "Materiality" Element of the Crime of Wire Fraud Charged In Counts One and Two

As the Court stated during trial, the indictment does not make clear exactly what is charged as the scheme to defraud alleged in Counts One and Two. RT 2014 ("There's no way to look at Count One and Count Two and know what they are other than the generic wire fraud charge. And the problem is that they both have the same wire fraud charge. It's not distinguished.").

1      Counts One and Two generally track the wire fraud statute, 18 U.S.C. §1343,

2  and allege that Mr. Robles "and others, devised and intended to devise a scheme and

3  artifice to defraud and to obtain money and property by means of materially false and

4  fraudulent pretenses, representations, and promises."  Dkt. 113 at 8.  The

5  government's contention and proof was alleged omissions by Mr. Robles. Specifically,

6  that Mr. Robles failed to enumerate seized property in SFPD police reports. RT 1898

7  ("The omission here is that the Defendants, as part of the scheme, omitted to tell the

8  San Francisco Police Department that they were taking money."). Because the reports

9  were addressed to Mr. Robles' employer, the SFPD, rather than the parties from whom

10  the property was seized, and occurred only *after* the property had been taken, they do

11  not satisfy the "materiality" element of the wire fraud charged in the indictment.

12      In *Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827 144 L. Ed. 2d 35 (1999),

13  the Court held that the materiality of a falsehood is an element of mail and wire fraud.

14  The Court cited the definition found in the Second Restatement of Torts, which states

15  that a matter is material if: "(a) a reasonable man would attach importance to its

16  existence or nonexistence in determining his choice of action in the transaction in

17  question; or (b) the maker of the representation knows or has reason to know that its

18  recipient regards or is likely to regard the matter as important in determining his

19  choice of action, although a reasonable man would not so regard it. *Neder*, 527 U.S. at

20  22 (quoting Restatement (Second) of Torts § 538 (1977)); see also *United States v.*

21  *Daniel*, 329 F.3d 480, 486 (6th Cir. 2003) (material misrepresentations or omissions

22  are those that might affect a reasonable person's actions in a situation); *United States*

23  *v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (*en banc*) (misrepresentation or omission is

24  "material" when that "misinformation or omission would naturally tend to lead or is

25  capable of leading a reasonable employer to change its conduct"), *cert. denied*, 543 U.S.

26  890 (2004).

27      In *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989), the Ninth Circuit

28  reversed mail fraud convictions, holding than an immigration attorney could not be

Edmond Robles' Supplemental
Grounds to New Trial Motion                6                Case No. CR 14-0102-02 CRB

1   convicted of mail fraud based on false statements in applications for alien employment

2   certification forms that he submitted to a government agency, where the property that

3   he obtained (money) was obtained from his clients, rather than the party he deceived

4   (the U.S. Department of Labor).  This case is akin *Lew* in that the record is devoid of

5   evidence that the intent was to deceive the arrestees whose money Mr. Robles allegedly

6   obtained. See *id.* at 221 ("[W]e have been unable to find *any* evidence in the record that

7   Lew deceived his clients. . . .  [T]he intent must be to obtain money or property from

8   the one who is deceived . . . ."); see also, *e.g., United States v. Mitchell,* 867 F.2d 1232,

9   1233 (9th Cir. 1989) (reversing mail fraud conviction because "[a]lthough both

10  indictments alleged a scheme to obtain money and property, neither alleged a scheme

11  to obtain them from the governmental body" that was deceived; conviction cannot be

12  sustained "on a theory different from that charged by the grand jury"); *United States v.*

13  *Evans*, 844 F.2d 36, 39 (2d Cir. 1988) (affirming trial court's dismissal of mail and wire

14  fraud counts because government had to show that alleged fraudulent scheme was

15  intended to deprive the party deceived, rather than some other party).

16      "A misrepresentation is material if it has a natural tendency to influence, or is

17  capable of influencing, the decision maker *to whom it is addressed.*" *United States v.*

18  *Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (emphasis added, internal quotations

19  and alteration omitted).  Omissions in the SFPD police reports in this case neither

20  caused, nor had a tendency to cause, the arrestees to part with their property because

21  the reports were completed only *after* the seizures, and were addressed to Mr. Robles'

22  employer, the SFPD, not the arrestees. Thus the omissions could not have been

23  material as required for the crime of wire fraud.

24      As the court stated in *dictum* in *Evans*, 844 F.2d at 39, "If a scheme to defraud

25  must involve the deceptive obtaining of property, the conclusion seems logical that the

26  deceived party must lose some money or property." This is exactly how the Court

27  instructed the jury, telling jurors that "the statements made or facts omitted as part of

28  the scheme were material; that is, they had a natural tendency to influence, or were

1   capable of influencing, a person to part with money or property." RT 1842. However,

2   there was no evidence that any deceptive omissions in the SFPD police reports caused

3   the arrestees to depart with property; indeed there could *not* have been any such

4   evidence since the reports were prepared after the property seizures. Consequently, the

5   evidence is insufficient as a matter of law to establish the crime of wire fraud, and a

6   judgment of acquittal should be entered.

7

8   **III.    The Failure to Apprise Mr. Robles of the Juror's Communication With the Court**

9   **        Violated His Right to Be Present at All Stages of the Trial**

10          **A.    The Juror Communication**

11          The presentation of evidence began November 10, 2014. The fifth witness to

12  testify was Bernadette Melvin.  The Court excused the jury early when the government

13  did not have witnesses available.

14          After excusing the jury, the Court heard argument on the defense's request to

15  exclude a bank statement. During the course of the argument, the transcript reflects

16  that the following occurred:

17                          (The Clerk hands the Court a note)

18      The Court:      Show that to the lawyers. Sorry; go ahead.

19      The Court:      The overdraft fees are out.

20      Ms. Caffese:    Okay, thank you. The same argument --

21      The Court:      Yeah, but wait a minute. Pardon me. You saw the note?

22      Ms. Caffese:    I haven't read it yet, Judge.

23      The Court:      Okay, well, will you read it? Because the juror is still

24                      here. (Counsel examine the note)

25      Mr. Hemann:     I guess my only suggestion would be perhaps, Your

26                      Honor, in an abundance of caution, we ask Mr. [juror

27                      name redacted] whether he feels like his knowledge of

28                      her would influence him, one way or the other.

| | | |
|---|---|---|
| 1 | The Court: | Did you already ask him that? I'll ask him that. Do you |
| 2 | | want me to bring him back in the courtroom and ask |
| 3 | | him that. |
| 4 | Ms. Caffese: | I have no objection to that, Judge. I have no objection |
| 5 | | either way. I'm fine. He's disclosed. It doesn't seem as |
| 6 | | though – |
| 7 | Mr. Hemann: | I would defer to the Court on this, Your Honor. |
| 8 | The Court: | Yeah, I don't think we have to ask him. |
| 9 | Mr. Hemann: | Okay. |
| 10 | The Court: | All right. You can excuse him. Okay. Go ahead, Ms. |
| 11 | | Caffese? |

RT 455-56.

Mr. Robles was physically not in a position to see the note even if he had been alerted to it by the cryptic reference, nor did his counsel consult with him or advise him what the note said. See Exh. G (Declaration of Edmond Robles). More than three weeks later, during the jury's deliberations, Mr. Robles first learned from a conversation with his attorney that one of the jurors knew Bernadette Melvin. It would thus seem that the note referenced above from the juror advised the Court that he knew Ms. Melvin.

The inference that the juror's note advised that he knew Ms. Melvin is further supported by an exchange between the Court and Ms. Melvin's attorney (and Mr. Robles' current counsel) later in the trial (on November 18, 2014), when one of the jurors acknowledged someone in the courtroom and it was learned that the juror knew Mr. Brass:

| | | |
|---|---|---|
| | Mr. Brass: | It's me. I know one of the jurors. So if that solves the |
| | | issue – |
| | | ...      ...      ...      ... |
| | The Court: | ... And have you – do you have any connection with |
| | | this case? |

| | | |
|---|---|---|
| 1 | Mr. Brass: | I do. |
| 2 | The Court | Have you – when I say "this case" – everybody can sit |
| 3 | | down. |
| 4 | | When I say "this case," I'm now talking about these |
| 5 | | three Defendants? Or witnesses? |
| 6 | Mr. Brass: | Yes. |
| 7 | The Court: | You have some connection. |
| 8 | Mr. Brass: | I do. I represented Bernadette Melvin in this case. She |
| 9 | | testified earlier. |
| 10 | The Court: | Well, but she was also a person who was known to a |
| 11 | | juror. Isn't that correct? |
| 12 | Ms. Caffese: | That's right. Juror No. 1. |
| 13 | The Court: | But that was Juror No. 1. |
| 14 | Mr. Hemann: | Correct. |
| 15 | The Court: | Okay. Have you discussed the case with anyone? I |
| 16 | | don't mean -- of course you discussed the case. Have |
| 17 | | you discussed it with that juror or any member of the |
| 18 | | juror's family? |
| 19 | | ...      ...      ...      ... |

RT 1503.

### B. Mr. Robles' Absence Violated His Statutory and Constitutional Right to Be Present at All Stages of the Trial

A defendant has both a statutory and constitutional right to be present at all trial proceedings. *United States v. Reyes*, 764 F.3d 1184, 1188 (9th Cir. 2014). As the Court in *Reyes* explained, the source of the statutory right is Fed. R. Crim. P. 43, and the source of the constitutional right is "the Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment and Fourteenth Amendments." *Id.*, 764 F.3d at 1188-89, citing *United States v. Gagnon*, 470 U.S. 522,

105 S. Ct. 1482, 84 L. Ed.2d 486 (1985) (*per curiam*). As the Court in *Reyes* also noted, "the scope of Rule 43 is broader than the scope of the constitutional right to be present." *Id.* 764 F.3d at 1189, citing *United States v. Rosales–Rodriguez*, 289 F.3d 1106, 1109 (9th Cir. 2002) (in addition to the constitutional right to be present, "[t]he defendant also has a broader statutory right to be present 'at every stage of the trial including the impaneling of the jury and the return of the verdict.'" (quoting Fed. R. Crim. P. 43)); *United States v. Sherman*, 821 F.2d 1337, 1339 (9th Cir. 1987) ("The right to be present at every stage of the trial set forth in Rule 43 is more far-reaching than the right of a defendant to attend his trial as guaranteed by the Constitution.").

The *Reyes* Court ruled that a side bar exchange during which the trial court questioned a juror "outside of Reyes's earshot" violated Rule 43. *Reyes*, 764 F.3d at 1189. The Court rejected Reyes's argument that the trial court violated Rule 43 during seventeen other sidebar exchanges when lawyers for both parties joined the court "to request that jurors be excused for cause, exercise peremptory challenges, or discuss whether to continue with the proceedings even though two prospective jurors had not yet returned from lunch." *Id.* at 1189. The Court explained its ruling by stating that "[d]uring those seventeen exchanges, neither the court nor the attorneys spoke with a prospective juror or anyone else." *Id.* at 1189.

The constitutional right to be present applies "'whenever [the defendant's] presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" *Reyes*, 764 F.3d at 1193, quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934). This right was further defined by the Court in *Faretta v. California*, where it stated "[i]t is now accepted … that an accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed.2d 562 (1975). Conversely, a defendant's right to be present is not violated "when presence would be useless, or the benefit but a shadow." *Snyder*, 291 U.S. at 106-07.

1   These same criteria govern application of the constitutional right to be present

2   during communications between the court and a juror. A defendant does not have a

3   constitutional right to be present at every exchange between a judge and a juror.

4   *Gagnon*, 470 U.S. at 526 (holding that "[t]he mere occurrence of an *ex parte*

5   conversation between a trial judge and a juror does not constitute a deprivation of any

6   constitutional right. The defense has no constitutional right to be present at every

7   interaction between a judge and a juror.") (internal quotation marks and citation

8   omitted). However, the right to be present is implicated at *voir dire* and other

9   communications with jurors which affect a defendant's ability to "participate in the

10  presentation of his rights." *Bustamante v. Eyman*, 456 F.2d 269, 274 (9th Cir. 1972).

11  As the Ninth Circuit noted in *Reyes*, quoting the Fourth Circuit's decision in *United*

12  *States v. Rolle*, 204 F.3d 133 (4th Cir. 2000), a defendant's presence during *voir dire* is

13  important because a "defendant might have knowledge of facts about himself or the

14  alleged crime … which may become important as the individual prejudices or

15  inclinations of the jurors are revealed." *Reyes*, 764 F.3d at 1194.

16  Under the holding of *Reyes*, Mr. Robles' right under Rule 43 to be present at all

17  stages of the trial was violated when the communication occurred outside his presence,

18  and in a manner that did not apprise him of its content. It also violated Mr. Robles'

19  constitutional right to be present. Ms. Melvin was not just an ordinary witness; she

20  was Mr. Robles' ex-mistress who was being dragged into federal court because of Mr.

21  Robles' actions. Mr. Robles had "knowledge of facts about himself" that bore directly on

22  the impact and significance of the juror knowing Ms. Melvin, and his absence affected

23  his ability to participate in the protection of his rights. At a minimum, inquiry should

24  have made as to the nature of the relationship between the juror and Ms. Melvin, and

25  whether it might affect the juror's ability to be fair and impartial.

26  Because the error violated Mr. Robles' constitutional right to be present, reversal

27  is required unless it was harmless beyond a reasonable doubt. See *Chapman v.*

28  *California*, 386 U.S. 18, 23-24, 87 S. Ct. 824, 17 L. Ed.2d 705 (1967) (harmless error

1   standard maybe applied to constitutional violations); *c.f. United States v. Long*, 301

2   F.3d 1095, 1101 (9th Cir. 2002) ("The presence of a biased juror, however, cannot be

3   harmless. The error requires a new trial without the showing of prejudice."). There is

4   no basis on which it can be concluded that the error was harmless beyond a reasonable

5   doubt. Any argument that the evidence of guilt was overwhelming fails as the jury

6   acquitted Mr. Robles on three counts. In any event, a determination that the error was

7   harmless beyond a reasonable doubt could not be made because there is no record as to

8   how the juror knew Ms. Melvin, or the nature and extent of their relationship.

9

10  **IV.   The Instructions as to the Violation Of 18 U.S.C. § 666 Were Erroneous,**

11  **Requiring a New Trial as to Counts Six And Seven**

12      Count Seven charged a violation of 18 U.S.C. § 666(a)(1)(A), which prohibits

13  forms of theft concerning a federally funded program. An essential element of the

14  offense is that the property "is valued at $5,000 or more." *Id.*, (a)(1)(A)(i).

15      The instructions advised the jury that any one of five separate alleged thefts

16  could provide the basis for a conviction on Count Seven. Specifically, the jury was

17  instructed that the third element of the offense required the government to prove:

18      that … the defendant embezzled, stole, obtained by fraud, converted or

19  intentionally misapplied property with each of you agreeing that at least one item of

20  property was embezzled, stolen, obtained by fraud, converted, or intentionally

21  misapplied, and each of you agreeing as to which item so qualifies:

22      a.   Items seized on or about March 4, 2009, during a search of J.F.'s

23      apartment, including a $500 Apple card.

24      b.   Money stolen on or about May 25, 2009, during a search at

25      Newark, California;

26      c.   Money stolen on or about June 18, 2009, during a search in San

27      Francisco;

28

---

d.      Money stolen on or about October 2nd, 2009, during a search in

San Francisco; and.

e.      Money stolen on or about November 19, 2009, during a search of

the storage facility in San Francisco, California;

RT 1854.

Three of the alleged thefts, however, involved property *of less than $5,000* and

thus could not have provided a basis for conviction. The value of the property in the

March 4 theft was less than $600; the value of the property in the alleged June 18 theft

was less than $2,000 (RT 1886), and the only evidence as to the value of the November

19 theft was Vargas testimony that he received "[n]o more that about 3 – or 400"

dollars. RT 1423. Thus, three of the five thefts that the instruction told the jury were

sufficient to convict were not. Yet the jury was instructed it need only agree on one any

item.

Nor were the jurors allowed to aggregate the individual thefts to satisfy the

element that the property have a value of at least $5,000. While there is authority for

the proposition that the government may aggregate the amounts of individual thefts, it

may only do so where the jury is instructed that it must find the individual thefts were

part of a single scheme or plan the intent of which was to steal more than $5,000.

*United States v. Webb*, 691 F. Supp. 1164 (N.D. Ill. 1988).

This error as to Count Seven also rendered erroneous the instruction as to Count

Six, which charged a conspiracy to violate 18 U.S.C. § 666(a)(1)(A). The jury was

instructed that the first element the government was required to prove was that "there

was an agreement between two or more persons to commit *at least one crime of theft*

concerning a federally funded program *as charged in Count Seven* of the indictment…"

RT 1850 (emphasis added). In fact, the jury could not properly convict on Count Six if

the agreement was to commit three of the five thefts listed in reference to Count Seven

which involved property of a value of less than $5,000.

---

1    **V.    Mr. Robles Was Denied His Right to the Effective Assistance of Counsel**

2         The Sixth Amendment requires a defendant be provided with the effective

3    assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80

4    L. Ed.2d 674 (1984); *McMann v. Richardson*, 397 U.S. 759, 771, n. 14, 90 S. Ct. 1441,

5    1449, n. 14, 25 L. Ed.2d 763 (1970) (recognizing that "the right to counsel is the right to

6    the effective assistance of counsel.").

7         To establish a violation of the right to the effective assistance of counsel, a

8    defendant must satisfy the two prong test of *Strickland*, by showing that (1) his counsel

9    committed errors that were objectively unreasonable; and (2) he was prejudiced by the

10   errors. *Strickland*, 466 U.S. at 687-88. The errors are prejudicial if there is a

11   reasonable probability the outcome would have been more favorable, but for the errors.

12   *Id.* at 694. This does not require a defendant to establish that his attorney's errors

13   more likely than not altered the outcome of the trial. *Id.* at 694. Rather, a reasonable

14   probability is a probability sufficient to undermine confidence. *Id.* at 694. In sum, a

15   defendant must show that counsel's errors were sufficiently serious as to deprive him of

16   a fair trial. *Id.* at 687.[1]

17   _____

18        [1] This Court has authority to adjudicate Mr. Robles' prejudgment ineffective
     assistance of counsel (IAC) claim. *United States v. Steele*, 733 F.3d 894, 897 (9th Cir.
19   2013) (holding that "'when a claim of ineffective assistance of counsel is first raised in
     the district court prior to judgment of conviction, the district court may, and at times
20   should, consider the claim at that point in the proceeding.'"), quoting *United States v.
     Brown*, 623 F.3d 104,113 (2d Cir. 2010). This is a case where the Court should
21   adjudicate an IAC prejudgment for all the reasons identified by *Steele*.

22        Deferring adjudication of the claim until after an appeal will result in weakened
     memories and likely impact the availability of evidence. *Steele*, 733 F.3d at 897
23   (recognizing the "weakening of memories and aging of evidence" that results from
     lengthy delays). Adjudication of the claim now will not significantly disrupt the
24   proceedings, as Mr. Robles already has new counsel and is prepared to litigate the
     claim. See *Id.* 733 F.3d at 897 (noting that the decision whether to consider the claim
25   prejudgment "'may depend on, among other things, whether the court would need to
     relieve the defendant's attorney … in order to properly adjudicate the merits of the
26   claim,' …"), quoting *Brown*, 623 F.3d at 113. Finally, the scope of any hearing on the
     claim will be limited, given the specific nature of Mr. Robles' allegations and the
27   evidence he has proffered to support them, and because evidence in the existing records

28

1

### A.   The Four Categories of Objectively Unreasonable Errors

2   Trial counsel's objectively unreasonable errors can be grouped into four

3   categories or areas, they include the failure to investigate and present defense evidence

4   regarding the cash deposit, the failure to present evidence of the defense theory of the

5   case, the failure to impeach and discredit the government's key witnesses and evidence,

6   and the failure to object to inadmissible evidence.

7   1.   <u>Failure to Investigate and Present Evidence Of Innocent the Explanation</u>

8   <u>for the Cash</u>

9   One of the most incriminating pieces of evidence appeared to be Mr. Robles'

10   $6,000 cash deposit into his bank account on May 26, 2009, and a cash purchase of a

11   bicycle days later. These expenditures appeared to be especially significant because the

12   jury was told by a government witness that five days earlier, on May 21, a balance

13   inquiry was made on Mr. Robles' account and the balance then was just $2.00. RT

14   1060.

15   The prosecution's powerfully incriminating explanation for the cash was that it

16   represented Mr. Robles' share of a $31,000 theft committed on May 25, 2009 during a

17   search in Newark by him and his codefendants. The government highlighted this

18   evidence from its opening statement to its closing argument. RT 285 ("But the biggest

19   score, the biggest score was in Newark, California."); RT 290 ("The big score."); RT 290

20   ("And you are going to hear evidence about what Ed Robles did with his money. But,

21   you are also going to have Ed Robles's bank statements."); RT 291 ("And you will see

22   the very next day, after the Newark house, May 26th Ed Robles deposited $6,000.")

23   The deposit and expenditure of case not only incriminated Mr. Robles, but it

24   appeared to corroborate the testimony of cooperating government witness Vargas that

25   he and Mr. Robles and co-defendant Furminger had in fact committed a theft of

26

27

28   supports the claim. *Steele*, 733 F.3d at 897 (propriety of adjudicating IAC prejudgment
may be affected by "'the existence of evidence already in the record indicating

1   $31,000 at the Newark property. Further, by corroborating Vargas' testimony as to the

2   alleged Newark theft, the evidence inferentially enhanced Vargas' credibility as to all

3   other matters as to which he testified.

4            The defense offered no explanation for the cash deposit, even though an innocent

5   explanation existed and evidence of it was available. The prosecutor emphasized the

6   absence of any alternative explanation in its summation, telling the jury "I just talked

7   you through all of the evidence that is in the record on this point. There is no other

8   evidence in the record on this point." RT 1885. The government suggested the only

9   other explanation could be that "[a]ll of a sudden," the cash "dropped right into [Mr.

10   Robles'] lap from Heaven." RT 1884.

11           Had Mr. Robles' trial counsel conducted a reasonable investigation, she would

12   have obtained evidence showing the innocent explanation for the cash. Bank records

13   and available witness testimony establish that Mr. Robles had been hoarding cash

14   from ATM withdrawals for over a year in anticipation of a separation from his wife,

15   and the money was used to pay bills and make other purchases during a period of

16   attempted reconciliation.

17           Quijuan Maloof, who works with the San Francisco Department of Health and

18   has known Mr. Robles since they served together in the Marine Corps beginning in

19   1989, told Mr. Robles in late 2007 or early 2008 that he needed to start putting money

20   aside for himself. Exh. C, ¶ 5 (Maloof Decl.). Mr. Maloof knew Mr. Robles was having

21   problems in his marriage, and explained that if it got to the point where Mr. Robles

22   had to move out, he would need money to get a place of his own and "set up a

23   household suitable for his young daughters in order to be considered a fit parent and

24   insure he had visitation and custody rights." *Id.*, ¶ 5. Mr. Maloof reminded Mr. Robles

25   of the need to have money set aside for this purpose in subsequent conversations. *Id.* ¶

26   8.

27

28   ineffective assistance of counsel, or upon the scope of the evidentiary hearing that
     would be required to fully decide the claim."), quoting *Brown*, 623 F.3d at 113.

A review of Mr. Robles Bank of America account records shows that his ATM cash withdrawals began to noticeably increase in late 2007, and continued on at high levels through 2008 and early 2009. Exh. B at 1 (summary of ATM cash withdrawals); Exh. A, ¶ 4 (Genego Decl.). Erin Robles, Mr. Robles' estranged wife, noticed the ATM withdrawals, and confronted him. She initially suspected Mr. Robles was using the cash to attempt to hide his affair. Exh. D, ¶ 6 (Erin Robles Decl). As she explains in her declaration, she "later came to realize that [Mr. Robles] had to be pulling money out to hold aside in the event we were separated, and [she] began to do the same." *Id.*, ¶ 7. They attempted a reconciliation in May 2009, which is when the deposit was made. *Id.*, ¶ 8. She remembers that Mr. Robles purchased an expensive bicycle at about the same time. The purchase did not surprise her, however, as Mr. Robles was always buying and selling items on eBay and Craigslist. Id., ¶ 11.

This explanation for the source of the cash is also consistent with their amount, frequency and other purchases with the debit card. A sampling of the records shows, for example, that Mr. Robles would make multiple withdrawals on the same day, and would use his debit card to make a small purchase after making a large cash withdrawal. Exh. B at 2-11. In fact, there is no other plausible explanation for the amount and frequency of the ATM cash withdrawals, especially when compared to time periods before and after.[2]

Counsel's failure to present this evidence cannot be explained on strategic grounds, as she did not have the information to make a strategic decision, because of her failure to investigate. Counsel compounded the prejudice from the absence of an alternative explanation by telling the jury that Mr. Robles had financial problems: "Did he have financial troubles? Yeah. Okay? You know, did he have problems financially at times? Yeah. Like a lot of people, a lot of people." RT 333.

---

[2] Counsel's failure to investigate Mr. Robles' bank records is further illustrated by her failure to correct the testimony elicited by the prosecution that the account

It may be that counsel did not have time to conduct the necessary investigation, as the cash deposit only became an issue after Vargas plead guilty and began to cooperate, which was two weeks before the trial started. RT 331. In fact, the bank statement "came to light" the week before the trial. RT 267 ("There is a bank statement that came to light, I think it was on Thursday or Friday. And I think on Friday I received notice that the People – excuse me, the government intended to use it in opening statement …"). Counsel should have sought a continuance if there was not time to conduct the necessary investigation, especially given the degree to which the case changed as a result of Vargas' cooperation and the superseding indictment.

2.  Failure to Present Evidence of the Defense Theory

Trial counsel told the jury the defense theory of the case in her opening statement – Mr. Robles was an honest officer who had worked plainclothes before being partnered with Vargas and never had any problems or engaged in any wrongdoing. It was only during the time he was partnered with Vargas that he was alleged to have committed thefts. And that was because Vargas was the bad actor, and had cut a deal to save himself and implicate Mr. Robles. Trial counsel told the jury they would hear evidence supporting this defense: "And what you will hear during the course of this trial, interestingly enough, that when Ed Robles worked in plainclothes with other police officers at other times during his career, and he worked with other CIs, there were never any complaints …." RT 327.

After telling this to the jury, however, trial counsel never presented evidence to support it. There was evidence available to support it. Officer John Zachos was Mr. Robles' partner in the plainclothes unit from 2008 to early 2009. Office Zachos was placed on medical leave in February 2009, which resulted in Mr. Robles being partnered with Vargas. Exh. D, ¶ 6 (Velarde Decl.). Officer Zachos would have testified that at "no time did he ever witness [Mr. Robles] take money or other items from a

balance was $2.00 on May 21.  The $2.00 was the charge for making the inquiry, not the balance. Exh. A, ¶¶ 5-7.

1    search or arrest and not report it, and [Mr. Robles] never suggested, indicated or

2    implied in any way that he would ever do so." *Id.*, ¶ 6(e). This included after he

3    returned from medical leave in July 2009, as he and Mr. Robles continued to have

4    regular contact as members in the plainclothes unit. *Id.*, ¶ 6(c). Trial counsel, however,

5    did not call Officer Zachos.  As a result, the only evidence the jury heard on the point

6    was testimony counsel elicited on cross-examination from an officer called by the

7    prosecution who had worked at the same station as Mr. Robles in 1998, but who

8    couldn't remember if they worked in the same car, because it was "so long ago."[3]

9         The failure to support the defense theory with Officer Zachos' testimony was

10   especially prejudicial, because Vargas testified that it was Mr. Robles who had started

11   him on the road to stealing by placing money in his pocket after a search. As the Court

12   noted, according to Vargas' testimony, this was "sort of the reverse of a "Come to Jesus"

13   moment. It was sort of a "Come to Satan" moment that, you know, he was fine until he

14   met [Mr. Robles] and then, suddenly, he was drawn down the path of sin." RT 1307.

15        This preposterous claim by Vargas went unanswered because the jury never

16   heard from Officer Zachos. Once again the prosecutor capitalized on the point in

17   summation, portraying Mr. Robles as the instigator, even while recognizing the

18   inherent implausibility of Vargas' story about Mr. Robles slipping money into his

19   pocket unsolicited. RT 1913 ("What is interesting about that in the context of this case

20   is in answering the question as to why Mr. Robles would feel comfortable slipping

21   money into Mr. Vargas's pocket early in the time that they started working with each

22   other.")

23

24

----

25        [3]  See RT 908 (Sir, you said you had worked with Ed back in 1998; is that right?

26   A. Correct. Q. And you said on direct examination you worked with him at Mission
     Station? A. I didn't work directly with him. We worked on the same watch. I don't know

27   if we worked together in the same car. It's so long ago. Q. Were there any problems
     that you had with Ed when you worked out at Mission Station, that you heard about or

28   experienced during that time period? A. No. Absolutely none.").

----

3. <u>Failure to Impeach the Government's Key Witnesses and Discredit Its Evidence</u>

Trial counsel also failed to impeach the government's two key witnesses, Vargas and Cesar Hernandez, on critical points, and failed to use available evidence to discredit the government's evidence as to the various incidents.

Trial counsel told the jury in opening statement that Vargas was fired for falsifying his time sheets. RT 331 ("Vargas was eventually fired. And he was fired because he was cheating on his time cards. And I believe he will be admitting to that.") If he didn't admit to it, counsel told the jury, "you can be assured that you will hear testimony that shows how much he cheated from '07 until he finally gets caught." RT 331.

Counsel never would have been allowed to present extrinsic evidence to prove Vargas was fired, as it is flatly prohibited by Fed. R. Evid. 608. And that of course is exactly what the Court ruled. RT 1294 ("Let me just address that for a minute, because 608 is very clear.") The Court also ruled that Vargas could not be impeached with the fact that he was fired, unless the government or Vargas opened the door by suggesting he was not fired. RT 1309. Vargas later opened the door, when he adopted the prosecution's statement that he "left the SFPD in 2012," thereby falsely implying that he left voluntarily. RT 1393 ("Q: So, Mr. Vargas, *when you left the SFPD in 2012*, were you under investigation for some of the activities that ultimately became part of this case?" (emphasis added)).

Despite the door being opened, however, and despite having promised the jury it would learn Vargas was fired, defense counsel never confronted Vargas with the fact that he was fired.

Counsel also failed to impeach Vargas with his failure to take any action after Hernandez gave him the name of a hitman, apparently to take care of a rival. Defense counsel apparently believed (mistakenly), that Vargas had given Hernandez the name of a hitman, and attempted to impeach Vargas by having Hernandez testify that

1    Vargas had done so. There was no support for the question, however, as the discovery

2    said the exact opposite – Hernandez had given Vargas the name of a hitman. RT 870-

3    71, 882, 887.

4              Counsel's attempt to elicit this testimony from Hernandez on this point not only

5    failed, but resulted in the government requesting an instruction be given to correct the

6    misimpression suggested by defense counsel's question. The Court granted the

7    government's request, and instructed the jury that there was no evidence in the case

8    about the use of the word "hitman." RT 887 ("Just prior to the recess today there was

9    some testimony, questions and responses of Mr. Hernandez in which the word "hitman"

10   was used. And I want to advise you that there is no evidence in this case of the use of

11   the word "hitman," testimony about a hitman. And, therefore, you are instructed to

12   disregard any testimony as it relates to a hitman, that term.")

13             Counsel's error thus resulted in Vargas not being impeached for his failure to

14   take any action after Hernandez gave him the name of a hitman, and resulted in

15   Hernandez not being impeached for having given Vargas the name of a hitman.

16             Counsel also failed to impeach and discredit Hernandez's testimony that Mr.

17   Robles trashed his room and falsely arrested him for possession of drugs.  RT 544-46.

18   In cross-examining Hernandez about this allegation, defense counsel brought out that

19   Officer Zachos was present. RT 769 ("Now, I want to ask you a few questions about the

20   first time you were arrested by Officer Robles and Officer Zachos, I believe. Okay. Let's

21   go back to December 27th of 2008.") Had Officer Zachos been called, he would have

22   directly contradicted Hernandez's testimony. Exh. D, ¶ 6(d). Defense counsel, however,

23   did not call him.

24             Counsel also failed to impeach the government's attempt to use Hernandez to

25   bolster Vargas' testimony that Mr. Robles participated in the Newark theft. The

26   government elicited testimony from Hernandez that Mr. Robles bragged to him about a

27   theft from a person named "Manny," and how much money he had stolen from Manny.

28   "Manny" was the resident of the Newark property, and thus Hernandez's testimony

made it appear that Mr. Robles had bragged to him about the Newark theft.[4] This testimony appeared to corroborate Vargas' testimony with an admission by Mr. Robles, and seemed especially probative because the two stories appeared to be independent, with Hernandez telling the government about Manny before Vargas, and Vargas telling them about the same theft when he began to cooperate. That was not the case, however.

Defense counsel failed to bring out that Hernandez never said anything about a Manny until after Vargas began cooperating. In fact, a review of Hernandez's grand jury testimony and his interviews by the FBI reveal that they do not contain any statement by or attributed to Hernandez relating statements made to him by Mr. Robles about anyone named "Manny." Exh. F (Brass Decl.). Had defense counsel impeached Hernandez with the fact that he never claimed Mr. Robles said anything to him about a Manny until after Vargas began cooperating, it would not only have discredited Hernandez's testimony on the point, but it would have strongly supported a defense claim that Hernandez had tailored his testimony to do whatever he could to see that Mr. Robles was convicted.

Trial counsel also failed to use available evidence to challenge and discredit the evidence that appeared to incriminate Mr. Robles as to the other thefts. The evidence regarding the June 18 Portrero Avenue alleged theft could have been challenged by showing that, contrary to ATF Agent Kwak's testimony, he was not at the staging scene in advance of the search, which Mr. Robles maintains would be established by the computer assisted dispatch (CAD) records, and only arrived after the search was in

---

[4] RT 647-48 (Q. "Did Mr. Robles ever mention to you, when you were working with him, a person by the name of Manny? A. Yes. ... Q. So he told you that they had arrested Manny? A. They don't give me details. Most of the conversation was he wanted people like him. I know him at that time. I'm talking with him more. I know when he's mad, when he's happy. He was happy. He was like, I want people like him. And he told me. 'I make a lot of money, a lot of money. Know how much money I make? I make a lot.'")

progress. Moreover, other officers had in fact searched the master bedroom. Exh. A, ¶ 8. This evidence would have undermined the impression that Mr. Robles was assigned responsibility to search the master bedroom from the outset, and would have established that other officers had searched the room and had not recovered the rifle later found in the closet by Agent Kwak, Nor did counsel point out the implausibility that Mr. Robles would have taken money from the closet, which is where the victim said it was, and left a rifle behind. Rather than use this evidence or make any of these points, trial counsel argued in summation that the money was taken from a bedroom other than the master bedroom, even though there was no evidence to support the argument. RT 2049.

Trial counsel could have, but failed to, discredit and impeach the October 2 Andrew Byrd alleged theft, with testimony from Officer Zachos. Counsel brought out in her examination of Byrd that Officer Zachos was present, thus making it clear to the jury that Zachos was an available witness. RT 987 ("Q: All right. There was -- do you remember a fourth officer by the name of Officer Zachos, inside the apartment? Excuse me; the room? A: No. I only saw that name -- ever saw that name on the police report. Q: So it's your testimony there were only three officers …") If Officer Zachos had been called, his testimony would have discredited Byrd's claim. Exh. D, ¶ 6(e).

Counsel's questions making clear that Officer Zachos was an available witness to this and other incidents only served to compound the prejudice from her failure to call him. The jury would logically infer that if Zachos had favorable testimony, the defense would have called him as a witness.

### 4. Failure to Object to Inadmissible Evidence

At the beginning of its case, the government introduced the San Francisco Police Department's Informant Manual as its second exhibit. RT 470, Trial Exhibit 2. The government had the witness used to introduce the Manual recite various provisions, consisting of rules and procedures to be followed in handling confidential informants. RT 471-78. This suggested that the propriety of Mr. Robles' conduct to be measured or

1   evaluated according to the Manual. There was no basis for such an inference, and no

2   foundation for admission of the Manual, as there was no evidence that it was used in

3   training officers or that a copy had ever been given to Mr. Robles. RT 515.

4   Notwithstanding the absence of such a foundation, no objection was made.

5       Counsel also failed to object to the irrelevant and prejudicial character evidence,

6   elicited through Vargas. For example, government counsel asked Vargas, "In addition

7   to the thefts of money or property during searches, did you and Mr. Robles and Mr.

8   Furminger also engage in other illegal conduct when you were working together in

9   terms of taking something in particular?" RT 1348. Despite the signal that this

10  question sent, no objection was made. Vargas went on to describe how he and Mr.

11  Robles would look for old fashion call boxes on telephone poles that the Department

12  previously had used as a communications system, and were apparently considered to

13  be souvenirs, and would cut them off using an electric saw and keep them. RT 1348-49

14  ("And we would just cut them right off the telephone poles and take them.")

15      The government then had Vargas testify about how he and Mr. Robles would

16  allegedly drive around the City setting off "small explosive devices," again without

17  objection. RT 1349-50 ("And we would just light one. You know, open the car door and

18  light one on the street, and take off, away from the thing, and leave the thing burning

19  on the street. And this huge explosion would happen.")

20  ### B.  The Errors Denied Mr. Robles a Fair Trial

21      Trial counsel's objectively unreasonable errors resulted in the jury not receiving

22  evidence it needed to decide the case fairly. Counsel's failure to investigate and present

23  evidence of the innocent explanation of the cash deposit is sufficient by itself to

24  establish prejudice. Not only was the unexplained cash deposit damning evidence of

25  guilt, but it had a ripple effect on all the other evidence because it appeared to enhance

26  Vargas' credibility. Conversely, had the available evidence of the innocent explanation

27  for the cash deposit been presented to the jury, it would have undermined Vargas's

28  credibility not only as to the Newark theft, but as to all the other matters as well.

1   The other errors also prejudiced Mr. Robles, as they impacted the case in an

2   overall sense, and impacted each of the individual instances, *i.e.*, the three instances in

3   which Vargas attempted to implicate Mr. Robles in thefts Vargas admitted committing,

4   and the two instances where he claimed Mr. Robles had taken money.

5   But for counsel's errors, the jury would have received evidence supporting the

6   defense position that Vargas was the bad actor, and that the government's key

7   witnesses, Vargas and Hernandez, both admitted liars, were falsely incriminating Mr.

8   Robles. In sum, the errors denied Mr. Robles a fair trial and undermine reliability of

9   the verdict, given the available evidence the jury never heard.

10

11  **VI.   Conclusion**

12  The Court should enter a judgment of acquittal on Counts One and Two, and

13  order a new trial as to the remaining counts of conviction based on the violation of Mr.

14  Robles' right to be present at all stages of the  trial.

15  Alternatively, the Court should adjudicate Mr. Robles' IAC claim prior to

16  judgment and grant a new trial on that ground.

17

18                              Respectfully Submitted,

19  Dated: March 15, 2015

20                              */s/ Tony Brass*

21                              */s/ William J. Genego*

22                              Counsel for Defendant Edmond Robles

23

24

25

26

27

28

---